# PX 1

# PX 1

## BEFORE THE

## NATIONAL LABOR RELATIONS BOARD

## REGION 28

In the Matter of:

GUNDERSON RAIL SERVICE, LLC d/b/a
GREENBRIAR RAIL SERVICES,                Case: 28-CA-093183
                                               28-CA-103909
and                                            28-CA-104184
                                               28-CA-106613
SHEET METAL WORKERS' INTERNATIONAL             28-CA-111186
ASSOCIATION, LOCAL 359, AFL-CIO,

GUNDERSON RAIL SERVICES, LLC D/B/A
GREENBRIER RAIL SERVICES,

                    Employer
                                           28-RC-092179
and

SHEET METAL WORKERS' INTERNATIONAL
ASSOCIATION, LOCAL 359, AFL-CIO.

The above-entitled matter came on for further hearing

pursuant to adjournment, before **Administrative Law Judge,**

**Eleanor Laws,** at the Walsh Federal Courthouse, located at in38

South Scott Avenue, Tucson, Arizona, on Tuesday, September 17,

2013 at 12:13 p.m.

### A P P E A R A N C E S

```
 1
 2   On Behalf of the Counsel for General Counsel:
 3
 4        EVA SHIH, ESQ.
 5        SOPHIA ALONZO, ESQ.
 6        National Labor Relations Board
 7        2600 North Central Avenue, Suite 1400
 8        Phoenix, Arizona 85004
 9        Phone: (602) 640-2161
10        Fax:   (602) 640-2178
11
12
13   On Behalf of the Employer:
14
15        FREDERICK C. MINER, ESQ.
16        STEVEN G. BIDDLE, ESQ.
17        Littler Mendelson
18        2425 Camelback Road, Suite 900
19        Phoenix, Arizona 85106
20        Phone:   (602) 474-3600
21        Fax:     (602) 957-1801
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
```

1                              **I N D E X**
2
3                                                                        **VOIR**   **CRT**
4    **WITNESS**          **DIRECT**    **CROSS**   **REDIRECT**   **RECROSS**   **DIRE**   **EXAM**
5
6       None
7
8
9
10
11
12
13
14
15
16

1                               **E X H I B I T S**

2

3    **EXHIBIT**                          **IDENTIFIED**        **IN EVIDENCE**

4

5    General Counsel

6        1                                    7                    7

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

1                           **P R O C E E D I N G S**

2                                                **(12:13 p.m.)**

3          **ADMINISTRATIVE LAW JUDGE ELEANOR LAWS:  On the record.**

4          This is a formal trial before the National Labor Relations

5    Board in Greenbrier Rail Services, LLC d/b/a as Greenbrier –

6    uh, excuse me, Gunderson Rail Service, LLC d/b/a as Greenbrier

7    Rail Services and Sheet Metal Workers' International

8    Association, Local 359, AFL-CIO, Case No. 28-CA-093183, 28-CA-

9    103909, 28-CA-104184, 28-CA-106613, 28-CA-111186.  And it's

10   consolidated with Case 28-RC-093179.  The Administrative Law

11   Judge presiding is Eleanor Laws.  I am assigned to the San

12   Francisco office of the Division of Judges.

13         Any communication should be addressed to that office, and

14   any requests for extensions of time should be addressed to the

15   Associate Chief Judge in San Francisco.

16         Will Counsel and representatives of the parties please

17   state their appearances for the record?  For the General

18   Counsel?

19         MS. SHIH:  Thank you, your Honor.  Eva Shih, for the

20   General Counsel.

21         MS. ALONZO:  Sophia Alonzo.

22         JUDGE LAWS:  Okay.  And for the Charging Party, is there

23   anybody independently representing?

24         MS. SHIH: The Charging Party is not represented by

25   Counsel.  The Charging Party's Representative, for purposes of

1   the hearing, is present.

2        MR. SUYDAM:  I'm Charles Suydam.

3        JUDGE LAWS:  Thank you.  And you for the Respondent?

4        MR. MINER:  Good afternoon, your Honor.  Frederick Miner

5   for Littler Mendelson on behalf of Greenbrier.

6        MR. BIDDLE:  Also Steve Biddle from Littler Mendelson on

7   behalf of Greenbrier, and our corporate representative is Al

8   Lave, Alan Lave, who is the Vice President of Human Resources

9   for Greenbrier Rail Services.

10        JUDGE LAWS:  Okay.  Thank you.  During the pre-hearing

11   stages of this case, we did discuss the potential for settling

12   this case.

13        At this -- at this time, the parties do not believe

14   settlement is possible.  Trial developments sometimes change

15   opinions.  So if at any point during the trial it appears to me

16   or it appears to any of the parties like settlement discussions

17   might be worth pursing, we will break to do that.  Please let

18   me know, from either party side, whether you think settlement

19   positions may have changed at any point and we will try to

20   settle the matter.

21        I like you to bear in mind, sometimes, you know, positions

22   will change given evidence that's presented, so I just ask

23   everybody to keep an open mind.

24        And the General Counsel has submitted the formal documents

25   into the record.  Is there any objection from the Respondent?

1      MR. MINER:  No objection, your Honor.

2      JUDGE LAWS:  Okay, those are admitted into evidence.

3  **(General Counsel's Exhibit 1, marked and received into**

4  **evidence)**

5      The reason we did not start off right away this morning

6  dealt with a dispute over production of documents pursuant to a

7  couple of subpoenas that General Counsel issued.

8      There were two subpoenas issued, a petition to revoke and

9  a response.  I have reviewed those.  I do want to invite the

10  parties to speak briefly on that topic.  It's now 12:15, so

11  after I hear the – the arguments from the parties, we will

12  break for lunch, I will come back and issue a ruling on record.

13  So, if the General Counsel just wants to briefly state their

14  position.

15      MS. SHIH:  Thank you, your Honor.  I would like to state

16  on the record the specific paragraphs that we have concerns

17  over the production that's been provided to us today.

18      Specifically, with regard to Request No. 6, and this

19  referring to General Counsel's Exhibit 2, which is the first

20  subpoena which was issued to Respondent and that's Subpoena No.

21  B-634121.

22      Request Nos. 6, 7 and 11, as pertains to the issue of the

23  supervisory status of Leadmen.  No documents have been produced

24  in response to those requests.  Although I understand that

25  Respondent is working on that production of documents.

1    Obviously, we're not able to conclude whether their production

2    is responsive and complete, without seeing what documents are

3    produced.

4        The second issue pertains primarily to the financial

5    records that are contained in Requests 13, 14, 15 and 16.

6    We've received some documents in response to those Requests.

7    They are limited to a narrow timeframe that is not encompassed

8    by the requests which date back to January 1, 2009 and January

9    1, 2010.

10        They're also limited to records of the Tucson facility.

11   The Request in our subpoena goes beyond that and to the extent

12   that the Company operates multiple facilities, all part of the

13   same Division, none of which were also undergoing Union

14   organizing campaigns at the time of this layoff in November,

15   2012.  Those documents, and the status of those facilities, is

16   certainly relevant to the defenses that the Respondent has

17   raised in this case and whether those defenses are actually a

18   pre-text for discrimination.

19        Request 27 relates to those financial records as well, and

20   seeks documents pertaining to layoffs and reductions in force

21   at any facility since 2003, and no documents have been produced

22   in response to -- to that Request.

23        And then the last issue is Request No. 4 in the second

24   subpoena, which has been marked as General Counsel Exhibit 3,

25   it's Subpoena B-634124.  And to the extent that Respondent's

1  Counsel can either produce the actual employee surveys that

2  were submitted by Employees, or confirm to us that those

3  documents no longer exist or were not retained by the Company,

4  that would be sufficient.  But at this time, we haven't

5  received those responses.

6      JUDGE LAWS:  Does the Respondent wish to be heard over

7  there?

8      MR. MINER:  I'm sorry, your Honor?

9      JUDGE LAWS:  Do you wish to be heard on the – on the

10  matter?

11      MR. MINER:  Briefly.  Thank you very much.  We have filed

12  a petition with respect to the first Subpoena Duces Tecum,

13  which was served on us less than two weeks ago, as your Honor

14  is aware.

15      The second subpoena was served last Thursday.  All of the

16  Requests in the second subpoena have been responded to,

17  including the Request regarding survey responses.  We have

18  informed the acting General Counsel that those survey responses

19  do not exist, that they are not in our possession.

20      General – Acting General Counsel has asked us to go back

21  and re-verify our representation in that respect.  That's my

22  understanding of the dispute.

23      With respect to the Subpoena Duces Tecum, and I will add

24  that the production of very considerable documents in response

25  to both subpoena requests – both subpoenas, has required a

1  number of us, at our table, to burn the midnight oil, you

2  Honor.

3      And with respect to some of the Requests that Acting

4  General Counsel has referenced, we are continuing to research

5  and collect material that we believe would be responsive.

6      In particular, with respect to this issue regarding the

7  purported, or alleged supervisory status of Leadman, at the

8  facility, as you are aware from our conference call on Friday,

9  and as a result of our petition regarding the subpoena, there

10  have been two sets of stipulations, going back to October of

11  2011, regarding the supervisory status of those employees at

12  the Tucson shop.

13      We were unaware, until Acting General Counsel informed us

14  of the fact late last week, of the Acting General Counsel's

15  intention to litigate the issue of their supervisory status.

16      We're hopeful that we can produce some specific directed

17  documents that will help put this issue to rest.  And we are

18  hopeful that a stipulation in this respect can be achieved.

19      By far, the most significant issue with respect to all of

20  the subpoena requests, are the requests for financial documents

21  and financial statements, very extensive.  Financial

22  information has been provided to Acting General Counsel, going

23  back to January of 2010.  I don't understand, from anything

24  that Acting General Counsel has said, that there is any

25  objection to any of the responses that have been provided with

1    respect to the Tucson facility.

2        Having said that, we do not see the need.  We don't

3    understand the request for additional financial records going

4    back to 2009.  Again, very considerable information.  Very

5    considerable historical patterns and comparable data has been

6    provided, going back to January of 2010.  I don't understand

7    from Acting General Counsel's statement that she disputes that.

8        In connection with other Greenbrier facilities, your

9    Honor, this is a publicly held corporation with 38 separate

10   facilities, as of 2011.  Some of which are broad, in Canada and

11   in Mexico.  The facilities are located in far-flung locations,

12   as you can imagine.

13       The financial records being requested are not housed in a

14   common location.  They are at various facilities.  Some of them

15   are at headquarters, some of them are at various different

16   accounting departments and locations, that makes researching

17   and collecting them quite time-consuming and burdensome for the

18   Company.

19       We don't believe in any of that.  That the evidence, with

20   respect to these other facilities, will have any relevance to

21   this particular case.  This case is about a reduction in force

22   that was necessitated at Tucson and Greenbrier's defense to the

23   claim of retaliation, which defense includes the economic

24   necessity for the reduction.  That necessity will be well

25   established by the documents, arising out of Tucson itself,

1  that we will present in connection with this hearing and that

2  we have already produced to the Acting General Counsel.

3      Your Honor, I believe that covers all of the disputes that

4  have been outlined before us.

5      JUDGE LAWS:  Oh.  No.  The – Request 27, showing layouts

6  or RIF's, in the last ten years.

7      MR. MINER:  I'm sorry – there – that, that request does

8  duplicate the issue of the, the request with respect to

9  financial records at other facilities.

10     And so this particular request seeks financial information

11  or documents about other facilities.  Facilities other than the

12  Tucson facility, going back ten years.  We don't think that

13  that time period is relevant or helpful to this particular

14  case.  We don't think the information about other reductions,

15  that have been necessitated at other facilities, will – will

16  shed much light on this particular case.

17     MS. SHIH:  Your Honor, may I respond briefly?

18     JUDGE LAWS:  Sure.

19     MS. SHIH:  With regard to Request 27 pertaining to

20  layoffs, it not only seeks information with regard to other

21  facilities, but also with the Tucson facility, dating back to

22  2003.

23     So to the extent that that time period goes beyond simply

24  the financial records that we have requested in this case,

25  there's been no documents produced in response.  So we're not

1    aware whether the Company has conducted any other layoffs or

2    reductions in force, even at the facility at issue here.

3        We've asked for documents for a ten-year timeframe, not

4    only for the Tucson facility, but for other facilities as well,

5    which we believe certainly is relevant to the – to the issues

6    in this case.

7        And with regard to the financial records that – that the

8    Company has asserted had been produced to us dating back to

9    2010, just as an example, we have monthly repair shop

10   scorecards from the Tucson facility.  They have only been

11   provided to us on a monthly basis, dating back to February,

12   2013.

13       So there's six months' worth – or five months' worth of

14   monthly repair shop scorecards that do provide summaries of

15   financial information from – from discussions with counsel that

16   have been represented to us that these repair shop scorecards

17   are sent to each facility, on a monthly basis, from the

18   accounting department of – of Greenbrier.

19       So, to that extent, certainly it would not be burdensome

20   or cumbersome for the Company to simply produce those from a

21   central location.  To the extent that they're already

22   maintained, we would expect electronically, in that location.

23       The same is true for these Tucson income statements that

24   have been produced to us for six-month periods.  And those two

25   date back to January of 2010, I believe.  But they appear from,

1   you know, for all intends and purposes, to be electronic

2   reports that are generated, and in this case, generated January

3   5, 2012.  So, it – it seems implausible that – that this report

4   would be difficult or burdensome to generate, for facilities

5   other than Tucson, or for the Tucson facility for the

6   timeframes that we've requested.

7       JUDGE LAWS:  Okay.  I'll give Respondent one last chance

8   to reply to that and then we'll – we'll take a break.

9       MR. MINER:  Thank – thank you, your Honor.  With respect

10  to the scorecards, we – we represented to the Acting General

11  Counsel that we were offering six months of those cards purely

12  for demonstrative purposes.  We didn't believe that the

13  documents were particularly relevant or – or contained valuable

14  information.

15      And we pointed out that the information regarding earnings

16  and so, that is reported on those cards, is contained in the

17  financial statements that we provided, going back to January,

18  2010.

19      With respect to layoffs at the Tucson facility, Greenbrier

20  would agree to provide the evidence requested regarding

21  reductions – prior reductions at the Tucson facility, going

22  back to 2003.

23      JUDGE LAWS:  Okay.  Is that something you can get your

24  hands on relatively quickly, or is it going to take some time?

25      MR. MINER:  We – we are certainly hopeful by the end of

1   the week, we will have those documents in hand.

2       JUDGE LAWS:  All right – let's take – it's 12:30.  Let's

3   take an hour for lunch.  Be prepared to be back here and go on

4   the record at 1:30.  I will go ahead and make a ruling and –

5   and I'm inclined to proceed forward with witness testimony that

6   doesn't require the disputed information, because I think

7   that's the best use of everybody's time, since we're all here.

8       MR. MINER:  Thank you, your Honor.

9       MS. SHIH:  Thank you.

10      JUDGE LAWS:  Off the record.

11  (Off the record)

12      JUDGE LAWS:  We are back on the record after a lunch break

13  and then I met briefly with counsel to discuss some of the

14  outstanding subpoena issues.

15      And any of you correct me if I do not – say what I said I

16  the room next door – if I strayed from it in any meaningful

17  way.  I'll do my best.

18      With regard to the Leadmen, I'm gonna take a look at some

19  of the cases – uh, on the matter.  I have dealt with

20  supervisors before when there's been a person to have alleged

21  to have done something in connection with an unfair labor

22  practice and their supervisory status is therefore relevant to

23  what I'm going to be deciding.

24      This is just more to turning to scope the Unit and the

25  General Counsel's has argued and has relevance with regard to

1    that and with regard to the potential party in order, and so

2    I'm just going to take a further look at that.

3        With regard to the financial documents – um, I will order

4    that they be produced, as set forth in the subpoena, for period

5    of time three years prior to the alleged unlawful layoffs.

6        There were some concerns from the Respondent about

7    sensitive information and basically what the parties agreed to

8    was the documents will be turned over.  With regard to certain

9    sensitive information, I will let Counsel for the Respondent

10   describe that information.

11       The attorneys will not disclose specifics to the Union,

12   but will just disclose information sufficient to communicate

13   what they need to with regard to the financial status of the

14   companies.  And the things that the Respondents were concerned

15   with specifically are?

16   MR. MINER:  Thank you, your Honor.  Two categories.  The

17   first category being, references in the financial statements to

18   specific customers.  There are references to customers in the

19   accounts payable aging reports as well as accounts receivable

20   reports, recaps of sales reports, rail repair work and progress

21   reports, and so on.  We ask for the references to specific

22   customers be redacted.

23       And then in addition, we're also asking for references to

24   labor rates, or information that can be used to directly trace

25   back to labor rates such as billing efficiencies and so on,

1   also to be redacted from those reports.

2       JUDGE LAWS:  Thank you.  Is that consistent with your –

3   your understanding of what we discussed?

4       MS. SHIH:  It is.  And it's um – and, just for the record,

5   it's our understanding that those would be issues that we would

6   address with regard to each specific document, if and when

7   either party is moving them for addition into evidence.

8       JUDGE LAWS:  Yes.  And then finally, with regard to

9   Request No. 27, um – the parties have agreed that September,

10  2006 was the first time – I may be representing this wrong, so

11  correct me if I am – that counters any connection to Greenbrier

12  Rail Services, so that would be the farthest date to possibly

13  go, or documentation as to prior layoffs.

14      MR. BIDDLE:  Yeah, your Honor, if I could interject.

15      JUDGE LAWS:  Sure.  Please do.

16      MR. MINER:  So um – Greenbrier Rail Services is the

17  Company that operates the Tucson facility now.  Greenbrier Rail

18  Services, prior to September, 2006, did not have – nor did

19  Gunderson or any other Greenbrier-related entity, have any

20  ownership in the Tucson facility, prior to September, 2006.

21      JUDGE LAWS:  Okay, thank you.  I knew I had said that

22  incorrectly.  Um – with regard to the various facilities, oh –

23  and – and before I move on to the other facilities, I – I did

24  state to the Respondent's Counsel that the information with

25  regard to layoffs from September, 2006 for the Tucson's

```
 1   facility – I don't really expect any delay in – in producing

 2   that.  The subpoena was served on the 17th, so – so that should

 3   come sooner rather than later.

 4        With regard to the other facilities though, there really

 5   are some preliminary determinations that need to be made, in my

 6   opinion, before I determine what might be relevant and – and

 7   what might need to be turned over.

 8        And the Respondent's Counsel was going to inquire as to

 9   when – there are a couple of issues here – when the individuals

10   who may have been decision-makers in the layoffs at issue here,

11   had any connection to any of the other facilities, or when any

12   of the other facilities came under the uh – ownership or

13   control, I suppose, of the parent company.

14        So, I think the next steps are for – for Counsel for the

15   Respondent to look into that a little bit and we can take it

16   from there.

17        Is there anything else either party wants to say that I

18   may have inadvertently forgotten to say?

19        MS. SHIH:  If I may, your Honor, just a couple of things.

20   On the issue of the Leadmen, in addition to the actual Unit

21   description for purposes of the bargaining order, based on our

22   contention that there was a majority that the Company was

23   obliged to recognize as of November 7th, we've got a number of

24   allegations that the Company's failure to provide the Union

25   with notice – um, of unilateral changes and their failure to
```

1  bargain with the Union over those unilateral changes before

2  implementing them, is a violation of 85 of the Act.

3      And to the extent that those would affect employees who

4  are classified as Leadmen, it's absolutely necessary to a

5  number of the allegations of the Complaint, for you to make the

6  determination as to whether Leadmen are included in the Unit or

7  excluded from the union.

8      And in order to do that, obviously we believe all of those

9  documents we requested in the subpoena are necessary.  So it

10  goes a little bit beyond simply the bargaining order, but

11  obviously it's the – it's – the basis – the basis upon which

12  that is based, is the Unit description.  And whether or not

13  Leadmen are appropriately included in the Unit.

14      As far as the documents, I just want to clarify that the

15  financial records that – that your Honor has ordered that the

16  Company to produce for a period of three years prior to the

17  November, 2012 layoff – just to confirm, my understanding is

18  that that's not limited to the Tucson facility.

19      JUDGE LAWS:  That is correct.

20      MS. SHIH:  Okay.  Um, and then, can we – can we get some

21  sort of a more definitive timeframe as to when some of these

22  documents – in particular, the layoff documents as pertain to

23  the Tucson facility, and beyond that, the financial – like the

24  income statements for the other facilities, is likely to be

25  produced.  And that they can be produced in an electronic

1  format.

2      JUDGE LAWS:  Do you wanna – do you wanna confer for a

3  minute?

4      MR. MINER:  Yeah.  Could we please?

5      JUDGE LAWS:  Yeah, go ahead.  Off the record.

6      MR. MINER:  Okay.

7  (Off the record)

8      JUDGE LAWS:  We are back on the record and Counsel for

9  Respondent has conferred projecting some timelines, so I'll let

10  you speak to that.

11      MR. MINER:  Your Honor, it's difficult for us to project.

12  We are not going to wait, however, until we have complete

13  responses collected before providing them.  I anticipate that

14  starting tomorrow, we will begin to funnel responsive documents

15  to Acting General Counsel.  And how long it takes for that

16  process to be completed is difficult for us to estimate for a

17  couple of reasons.

18      With respect to financial statements going back to 2010,

19  or three years before the riff in this case – so, we're talking

20  about November, 2009, many of those documents can be

21  electronically transmitted to us and the on to Acting General

22  Counsel as well.

23      And it's a matter of manpower, finding the records,

24  collecting them, transmitting them onto us.  Uh – we anticipate

25  that is the relatively simple part of the equation, quite

1    frankly.

2        Going back prior to 2000 – late 2009, 2010, it will be

3    more difficult to locate the actual hard-copy documents that

4    will be needed to respond.  That's because at that time in late

5    2009, 2010, the Company implemented an electronic financial

6    record-keeping system, an hourly tracking and labor tracking

7    system, and so on, that makes it much easier for us to produce

8    documents going back prior to the implementation of that

9    system.

10        It does require us researching, facility by facility, at

11    the facilities or at the storage connected with those

12    facilities, or at the Company's headquarters, or at the

13    headquarters' storage facility, the actual hard-copy documents

14    that would be responsive to this.

15        And so sending out staff to do that leg work and can get

16    documents back to us will take much longer.  And again, we – we

17    have a hard time estimating how long.

18        JUDGE LAWS:  Okay.  Right.  I think the way we should go

19    forward is as follows.  Now, proceed in getting the electronic

20    information that you can get more readily – it looks like we're

21    only talking about a couple of months here, so since we will be

22    reconvening, I think we can move forward even with some of the

23    financial information this week, provided we can get it

24    relatively quickly, and then later, if those month or two worth

25    of hard documents make a difference, which I doubt it will –

1  uh, we could revisit it at that point.  But we can cross that

2  bridge when we get to it.

3      MR. MINER:  Okay.

4      JUDGE LAWS:  How about with regard to the – the layoffs in

5  Tucson in September, 2006?  And –

6      MR. MINER:  We are working on collecting those right now.

7      JUDGE LAWS:  Okay.  And then you – you will talk with who

8  you need to to determine – for the various other entities –

9  getting – getting a good estimate of when there might be

10 relevancy for those?

11     MR. MINER:  Yes we will, your Honor.

12     JUDGE LAWS:  Okay.  Well, I – I guess we could proceed one

13 of two ways.  There are plenty of complaint allegations that

14 don't need any of this documentation, in looking at all of the

15 alleged actions in Complaint allegation 5.  Those are

16 interrogations, and things of that matter.  And coming up to

17 the layoffs, which start at allegation 6.

18     But we go through (a) through (m) with various sub-points

19 for 5, so that's gonna take us some time.  We can start with

20 those without the outstanding information.

21     And we can either start with them this afternoon, or if

22 the parties think it makes more sense to spend your time trying

23 to gather and collect documents this afternoon, and start with

24 the testimony of those witnesses on those allegations first

25 thing tomorrow morning.

1      MR. MINER:  Okay.

2      JUDGE LAWS:  You want to discuss that to yourselves, I'm

3  happy to allow you to do that.

4      MS. SHIH:  We can do that.  The only thing I wanted to

5  state was that, to the extent that we can put on witnesses, and

6  this is primarily I'm concerned about the 611(c) witnesses that

7  we've all – that we've subpoenaed, to the extent that we can

8  put on those witnesses and examine them about the unfair labor

9  allegations, separate from the layoff or that involve economic

10  information – that's certainly fine.

11      But we'll obviously need to recall this when those

12  documents are produced.  And I know that was obviously an issue

13  that um – that led to the – the need for the postponement

14  request in the first place, but um –

15      MR. MINER:  Well, the request was denied.

16      JUDGE LAWS:  Yeah, the request was opposed by the – the

17  General Counsel, so –

18      MS. SHIH:  No, I understand that.  But what I'm saying is,

19  I – I understand that that's gonna be a concern but clearly

20  there's nothing that we can do to avoid that when we don't have

21  the documents that we requested, so –.

22      You know that you're going to need to recall witnesses

23  that may need to get back from wherever they're coming from in

24  the first place.

25      MR. MINER:  I think the process has been planned to

1  require the duplication of much witness testimony.

2      JUDGE LAWS:  I mean -- but unfortunately, it is too.

3      MR. MINER:  With respect to one witness subpoena issue,

4  one - or excuse me, a couple - of subpoenas for witnesses were

5  discussed during our conference call last -

6      JUDGE LAWS:  Yes.

7      MR. MINER:  - Friday.  One involving the CFO of the

8  Company, and we understand that Acting General Counsel is not -

9  not asking the CFO to come testify this week.

10     Another individual who came up on Friday, was Lex

11 Morrison, the former plant manager for the Tucson facility.

12 Mr. Morrison had a subpoena served - or we received a courtesy

13 copy of the subpoena - last Tuesday.  The subpoena called for

14 his attendance today.  Mr. Morrison is not available today.  He

15 is en route to Tucson.  We anticipate that he will be available

16 tomorrow.  And so those are the arrangements that we have made

17 for Mr. Morrison.

18     JUDGE LAWS:  Okay.

19     MS. SHIH:  Um - and that's correct that I wasn't holding

20 the Respondent to that subpoena that we issued to - to the CFO.

21 However, we did indicate that they would need to furnish a

22 custodian of records for all of these financial records.

23     With discussions earlier, it sounds like there may be at

24 least one or two witnesses that are already planning to be here

25 that can testify about most, if not all, of those documents to

1  the extent that there may be others that are going to be

2  necessary.  Obviously, you're in the best position to identify

3  who those people are.

4      MR. MINER:  We'll be glad to do that.

5      JUDGE LAWS:  That's – that's consistent with my

6  recollection of the telephone conversation we had.  Um – so, I

7  guess I want an honest assessment of, of how the parties think

8  the best way to proceed is.

9      I am open to either trying to get a witness on today who's

10  been waiting, or I'm open to having the parties use the time to

11  gather and hopefully look at and analyze documents and start

12  tomorrow.

13     MS. SHIH:  One thing I think might be helpful for us to

14  have a discussion about in order to make that determination is

15  the scheduling in general.  Because I know early on, we had a

16  discussion about various counsel being unavailable next week,

17  and perhaps your Honor being unavailable next week as well.

18     Since that time, it has – one development that I should –

19  should make you aware of um – we've made a request for 10j

20  authorization to the Board and we've actually requested

21  expedited consideration of that request.

22     And based on that, the General Counsel's position now is

23  that the hearing needs to continue straight through into next

24  week, and we're prepared to do that.

25     JUDGE LAWS:  What's the availability of Respondent, I

1   mean, at this point?

2        MR. MINER:  We're not available, your Honor.

3        JUDGE LAWS:  Okay.  And that's a late request, you know,

4   if you there – if you have other litigation that is taking

5   place next week, you know.  You can't really expect everybody

6   who has planned to come this week and not continue next week,

7   to suddenly be able to continue next week?

8        MS. SHIH:  Are both counsel unavailable next week?

9        MR. MINER:  You available next week?

10       MR. LAVE: I think we all – no –

11       MR. BIDDLER:  No.  I'm not – I'm in hearings next week.

12       MS. SHIH:  Can we discuss then when the hearing for

13   reconvene for purposes, not only of our scheduling, but also –

14   we've got something like 30 plus witnesses in this case.

15        And to have some idea of when witnesses will be called,

16   and when they'll need to be available – would be helpful to

17   know on what date we can plan to reconvene, if not next week.

18       JUDGE LAWS:  And that's certainly also going to depend on

19   what cases I'm scheduled to hear, so I don't think I can right

20   here, right now, tell you.

21       MS. SHIH:  Okay.  Is that something we would know by the

22   end of the week?

23       JUDGE LAWS:  Oh yeah, for sure.  We can – we can – and uh,

24   we – we can set dates by the end of the week for sure.  I just

25   need to get in touch with my office and figure logistically is

1   feasible for me to come back as well.  Aside and apart from the

2   parties' schedules.

3       I – the latest flight I could get out of here on Friday

4   was at 4:10, so I just want to let everybody know that who

5   really have to rent things, like a rental car to get back and

6   get to the airport, probably by about 2:00 – 2:00 o'clock, to

7   be safe.

8       I will try – I will try to get a later flight.  I wasn't

9   able to though.  It's just – it's just not an easy route to go

10  in the first place.

11      MS. SHIH:  Have we heard whether there's a time that we

12  are – that we need to be out of the courtroom, or out of the

13  building each day?

14      COURT REPORTER:  I think it's 5:00.

15      JUDGE LAWS:  5:30.

16      MS. SHIH:  Okay.  Thanks, your Honor.

17      JUDGE LAWS:  And then another thing with regard to

18  scheduling – so that we can more headway, do the parties have

19  any objection to – if I were to have us show up at 8:00 in the

20  mornings, recognizing we probably – the preliminary matters

21  wouldn't get on the record until sometime after that.

22      But I think, particularly tomorrow, if there might be some

23  documents to review, I think that would be helpful.  And I – I

24  know the building is open that early.

25      MS. SHIH:  We don't have any objection to that.

1      MR. MINER:  Your Honor, we can make that work and we think

2   it's a good idea actually.  We've got one witness who's here,

3   pursuant to a subpoena, today, Eric Valenzuela, he's had prior

4   plans to fly to San Antonio tomorrow afternoon.  If we could

5   start first thing in the morning with Mr. Valenzuela, that

6   would be very helpful in enabling him to catch his flight.

7      JUDGE LAWS:  We can certainly do that.  I think you

8   mentioned that he would need to be out of here by 11:00?

9      THE WITNESS:  Yeah.

10     MR. MINER:  His flight leaves about 2:00, as I understand

11  it, so 11:00 –

12     JUDGE LAWS:  I'm not, I mean, I'm not going to be able to

13  promise that we're gonna be able to wrap up with him during

14  that time, but we can certainly put him on first, and see how

15  far we get.

16     JUDGE LAWS:  Is – is he here now?  Does it make sense to

17  start with him today?

18     MR. MINER:  That's fine with us.

19     MS. SHIH:  Um – I'm just looking to see if there are

20  documents that I need to take a look at that were just produced

21  this morning.

22     JUDGE LAWS:  Take your time.

23     MR. BIDDLER:  Your Honor, could I ask a question – were

24  you talking about starting at 8:00 the rest of the week then,

25  or just tomorrow?  I misunderstood.

1    JUDGE LAWS:  Ideally, the rest of the week, unless –

2    unless there are conflicts.

3    MR. BIDDLER:  Thank you.

4    JUDGE LAWS:  Do you want to take some time off the record

5    to look through?

6    MS. SHIH:  Yes, please.

7    JUDGE LAWS:  Okay.

8    MS. SHIH:  Thank you.

9    (Off the record)

10    MS. SHIH:  We've had some discussions – I do have a number

11    of areas of questioning for Eric Valenzuela that I think will

12    require us to take a little bit of time to go through.  The

13    documents that were just produced to us this morning.

14    And I understand now from discussions with Respondent's

15    Counsel that his flight is actually a little bit earlier than

16    we had anticipated.  What I think may make sense, if everyone

17    else is agreeable, there are a couple of other housekeeping

18    matters I think we have to discuss, including some stipulations

19    that we had tried to reach on some various issues that we could

20    do this afternoon, and then have some time to go through all of

21    the documents that were produced this morning in response to

22    the subpoena.

23    And then begin with witness testimony in the morning, with

24    a witness other than Mr. Valenzuela.  So rather than

25    potentially break up Mr. Valenzuela's testimony so that he has

 1  to leave and come back, we'll simply just hold him for another

 2  time and start with other witnesses that are expected to be

 3  here and ready to go, tomorrow morning.

 4      JUDGE LAWS:  And is he a local witness?

 5      MS. SHIH:  He's not –

 6      MR. MINER:  Yes.

 7      JUDGE LAWS:  Yes.

 8      MS. SHIH:  Oh, sorry.  Eric?  He's a local witness?

 9      MR. SUYDAM:  He's from Tucson?

10      MR. MINER:  He's from Tucson.

11      JUDGE LAWS:  If he's from Tucson, I – I –

12      MR. MINER:  He's local for a few more weeks.  And then

13  he's moving.

14      MR. SUYDAM:  Okay, thank you.

15      MR. MINER:  As soon as he can move.

16      JUDGE LAWS:  Where he's moving to?

17      MR. MINER:  San Antonio.

18      JUDGE LAWS:  San Antonio?  Okay.  So can we get him in

19  though, while he's still up in Tucson, I guess that's the

20  question.  How long is he going away for?

21      MR. MINER:  Till Sunday.

22      MS. SHIH:  Okay.

23      JUDGE LAWS:  And when is he moving?

24      THE WITNESS:  It's about four to six weeks.

25      MR. MINER:  Four to six weeks, your Honor.

1      JUDGE LAWS:  Uh – you know, given that, I'm wondering if

2  there's any that we could break for an hour now and go over the

3  documents you need to question him, and question him while he's

4  here, and not potentially either gone or in the process of

5  packing up and relocating?

6      MS. SHIH:  We can certainly – I mean, we're prepared to

7  start with his testimony today.  Even if we start today, I

8  still – I mean, I still can't guarantee that we're gonna be

9  able to finish before he needs to leave in the morning.  It

10 sounds like he needs to leave around 10:00?

11     MS. SHIH:  So we have about two hours?

12     MR. MINER:  I – I think that's right.  And my guess is if

13 the Complaint is going to be amended yet again, this is a

14 witness who would need to come back and testify once again.  In

15 any event.

16     JUDGE LAWS:  In – okay.  All right.  Well, if that's the

17 case, we will – I will try to get this rescheduled for when

18 he's still does live here to try to minimize the inconvenience

19 to him.  But if the parties don't think that they can get

20 through with him by the time he has to go on an airplane, then

21 I don't see any reason to break up his testimony.

22     So it sounds like the parties agree.  Do you want to spend

23 the afternoon trying to work out some stipulations, work on

24 document requests, go over some of the documents that have been

25 provided and be ready to go tomorrow?

1      MS. SHIH:  Yes, that - is the case.  There is one

2  stipulation I think we can go ahead and go on the record.  And

3  that's the one about the Unit description, with the exception

4  of the issue as to the Leadmen.

5      MR. MINER:  Correct, your Honor.

6      JUDGE LAWS:  So the parties agree on the Unit description.

7  The point of disagreement is whether Leadmen are or are not

8  included in some of the other job descriptions set forth in the

9  Unit.  Is that a fair statement?

10     MS. SHIH:  Yes.

11     MR. MINER:  Yes you Honor, thank you.

12     JUDGE LAWS:  Okay.

13     MR. MINER:  One other, or one additional item, your Honor.

14  So our – our document research and investigation efforts today

15  have already started to bear some fruit.

16     JUDGE LAWS:  Good news.

17     MR. MINER:  And so I'm glad to inform you and Acting

18  General Counsel that we are able to supplement our response to

19  Request No. 4 to the second subpoena, served last Thursday,

20  with copies of completed employee satisfaction surveys.  And

21  I'm handing those to Ms. Shih right now.

22     MS. SHIH:  Thank you.

23     JUDGE LAWS:  And with that, that you've handed her, is

24  that the complete response to that requested subpoenaed item?

25     MR. MINER:  Yes it is.

1    JUDGE LAWS:  Very good.  Thank you.  And I can't remember

2  if we discussed this on the record or in the room next door,

3  but I just wanted to verify that – with regard to the bank

4  records – the General Counsel doesn't mind of them being sent

5  to you in electronic form and you will produce the hard copies.

6    MS. SHIH:  That's correct.  And actually, our preference

7  is to receive them electronically, if they're already in

8  electronic form.

9    MR. MINER:  One second.

10    JUDGE LAWS:  Sure.

11    MR. MINER:  Can we email those to you or do – what's the

12  best way for us to transmit those electronic records?

13    MS. SHIH:  Email them to me, or you can put them on a CD.

14    MR. MINER:  CD or a thumb tracker, something like that?

15  Okay, all right.

16    MS. SHIH:  Um-hum, either way.

17    JUDGE LAWS:  So by email, or on a CD or a thumb drive,

18  some type of similar instrument.  I think that makes sense

19  because the General Counsel may not think all of them are

20  relevant and therefore all of them might need to be – might not

21  need to be printed up.

22    MS. SHIH:  Right.  Thank you.

23    JUDGE LAWS:  Okay.  Then if everybody agrees, then we'll

24  diligently go to work with the various things we need to do to

25  get ready for tomorrow.  We'll break for now, assuming there's

1  nothing else anybody needs to add, and we will be back here in

2  this courtroom tomorrow at 8:00.

3          MR. MINER:  Thank you, your Honor.

4          MS. SHIH:  Thank you, your Honor.

5  (Off the record)

6                                              **(2:34 p.m.)**

7          **(Whereupon, the hearing was adjourned until 8:00 a.m.**

8  **Wednesday, September 18, 2013)**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**BEFORE THE**

**NATIONAL LABOR RELATIONS BOARD**

**REGION 28**

In the Matter of:

GUNDERSON RAIL SERVICES, LLC d/b/a
GREENBRIER RAIL SERVICES,                Case: 28-CA-093183
                                               28-CA-103909
and                                            28-CA-104184
                                               28-CA-106613
SHEET METAL WORKERS' INTERNATIONAL             28-CA-111186
ASSOCIATION, LOCAL 359, AFL-CIO,

GUNDERSON RAIL SERVICES, LLC D/B/A
GREENBRIER RAIL SERVICES,

                    Employer
                                               28-RC-092179
and

SHEET METAL WORKERS' INTERNATIONAL
ASSOCIATION, LOCAL 359, AFL-CIO.

　

        The above-entitled matter came on for further hearing,

pursuant to adjournment, before **Administrative Law Judge**

**Eleanor Laws,** at the Walsh Federal Courthouse, located at 38

South Scott Avenue, Tucson, Arizona, on Wednesday, September

18, 2013 at 8:19 a.m.

<u>**A P P E A R A N C E S**</u>

```
 1
 2    On Behalf of the Counsel for General Counsel:
 3
 4         EVA SHIH, ESQ.
 5         SOPHIA ALONZO, ESQ.
 6         National Labor Relations Board
 7         2600 North Central Avenue, Suite 1400
 8         Phoenix, Arizona 85004
 9         Phone: (602) 640-2161
10         Fax:   (602) 640-2178
11
12
13    On Behalf of the Employer:
14
15         FREDERICK C. MINER, ESQ.
16         STEVEN G. BIDDLE, ESQ.
17         Littler Mendelson
18         2425 Camelback Road, Suite 900
19         Phoenix, Arizona 85106
20         Phone:    (602) 474-3600
21         Fax:      (602) 957-1801
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
```

1                       **I N D E X**
2
3                                                      **VOIR**   **CRT**
4    **WITNESS**              **DIRECT**    **CROSS**   **REDIRECT**   **RECROSS**   **DIRE**   **EXAM**
5
6    Lex Morrison           51
7
8    Alan Lave            142
9
10
11                   **OPENING STATEMENT**                          **PAGE**
12
13   Ms. Shih                                                       45
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50

1                          **E X H I B I T S**

2

3    **EXHIBIT**                    **IDENTIFIED**         **IN EVIDENCE**

4    **General Counsel**

| | EXHIBIT | IDENTIFIED | IN EVIDENCE |
|---|---|---|---|
| 5 | 2 | 41 | 42 |
| 6 | 3 | 41 | 42 |
| 7 | 4 | 41 | 41 |
| 8 | 5 | 41 | 41 |
| 9 | 6 | 41 | 41 |
| 10 | 7 | 41 | 41 |
| 11 | 8 | 117 | 138 |
| 12 | 9 | 134 | 148 |
| 13 | 10 | 135 | 137 |
| 14 | 11 | 149 | (not offered) |

15

16

17

18

19

20

21

22

23

24

25

26

1                    P R O C E E D I N G S

2                                                    (8:19 a.m.)

3          JUDGE ELEANOR LAWS: On the record.

4          We are back on the record in the second day of this

5     hearing.  Before we went on the record, we discussed the issue

6     of whether I was going to require the Respondent to turn over

7     various subpoena requests that we discussed yesterday related

8     to the supervisory status of lead men.  At this juncture, I am

9     not going to require that.  I do not think the issue of whether

10    lead men are part of the unit is a live issue before me.

11         I did read the Acting General Counsel's response to the

12    Petition to Revoke.  I think it dealt with cases where there

13    were decisions in analogous proceedings, not a combined case

14    where there's no unfair labor practice charge that requires me

15    to determine the scope of the unit.  I think it may come up

16    later.  I don't think it's squarely before me.

17         Because we will be taking a break in this case and because

18    I don't think if I were to reverse my position, the burden on

19    the Respondent to produce the requested documents would be

20    before us.  I informed General Counsel I would, during the

21    break, permit them to file something in writing requesting

22    that I reconsider my ruling.  The Respondent can file a

23    response if they so desire.

24         MS. SHIH:  Your Honor, with regard to 611(c) questioning,

25    I did intend to question some of the witnesses that I plan to

1    call at least this week briefly on the issue of the lead men

2    and their job duties.  In order to avoid the potential to

3    recall them, will Your Honor permit that questioning, or

4    would you find that that's not going to be permitted at this

5    time?  And it would be -- I mean, I'm not planning to

6    question them extensively.

7         JUDGE LAWS:  If it is going to be a witness who would

8    otherwise be recalled should the later charge be consolidated

9    with this complaint, or should the witness be recalled because

10   we haven't gotten the full financial records in time then, yes,

11   I think that's a more expeditious use of time.

12        MS. SHIH:  That would be the case with the first witness

13   that I'm going to call this morning, Lex Morrison, since he was

14   not at the facility when the events that are the subject of the

15   current charge took place.  It would not be my decision to

16   recall him otherwise.

17        JUDGE LAWS:  Does the Respondent have any objection to

18   that?

19        MR. MINER:  No objection, Your Honor.

20        JUDGE LAWS:  Thank you.

21        MS. SHIH:  There are also a couple of preliminary matters

22   that Respondent's counsel and I discussed yesterday with regard

23   to stipulated exhibits.

24        JUDGE LAWS:  Okay.

25        MS. SHIH:  At this time, I have General Counsel Exhibits

1    4, 5, 6, and 7, which I understand there is no objection to

2    the admission of those exhibits.

3        General Counsel Exhibit 4 is the stipulated election

4    agreement in Case 28-RC-065383, and that was the

5    representation case from 2011.

6    **(General Counsel Exhibit 4 marked for identification)**

7        MS. SHIH:  General Counsel Exhibit 5 is the tally of

8    ballots from the election that was held in that case.

9    **(General Counsel Exhibit 5 marked for identification)**

10       MS. SHIH:  General Counsel Exhibit 6 is the stipulated

11   election agreement from Case 28-RC-093179, and that's the

12   representation case that had -- the objections on which have

13   been consolidated with this case.

14   **(General Counsel Exhibit 6 marked for identification)**

15       MS. SHIH:  General Counsel Exhibit 7 is the tally of

16   ballots from that election that took place in July 2013.

17   **(General Counsel Exhibit 7 marked for identification)**

18       JUDGE LAWS:  Thank you.  GC Exhibits 4 through 7 are

19   admitted.

20   **(General Counsel Exhibits 4 through 7 received into evidence)**

21       JUDGE LAWS:  I believe the court reporter was also handed

22   2 and 3 yesterday, and those are not admitted.  Is there any

23   objection to those exhibits?

24   **(General Counsel Exhibits 2 and 3 marked for identification)**

25       MR. MINER:  No objection, Your Honor.

1      JUDGE LAWS:  I don't have copies of 2 and 3, so -- those

2  are also admitted.

3  **(General Counsel Exhibits 2 and 3 received into evidence)**

4  **(Long pause)**

5      JUDGE LAWS:  Any other preliminary matters?

6      MS. SHIH:  I think the only other preliminary matter is,

7  just for confirmation purposes, that both parties are

8  stipulating that the unit description that's alleged in

9  Paragraph 7(a) of the complaint is an appropriate unit.

10      MR. MINER:  The unit -- say that again please.

11      MS. SHIH:  The unit description as alleged in the

12  complaint in Paragraph 7(a) is an appropriate unit.

13      MR. MINER:  We do not stipulate that the unit described in

14  7(a) is appropriate.

15      MS. SHIH:  What's your objection to the unit description?

16      MR. MINER:  I think, as you know, the issue is this is not

17  the same unit that was stipulated to for purposes of the prior

18  election.

19      MS. SHIH:  Your Honor, I think this is the issue now.  If

20  the parties can't stipulate that that is an appropriate unit

21  description, then the issue of whether lead men must be

22  expressly included or excluded is an issue that has to be

23  decided in this proceeding.

24      Based on your ruling, I was asking Respondent's counsel

25  just to confirm that they're stipulating that that is an

1    appropriate unit.  My understanding is they're taking the

2    position that lead men are supervisors, as defined in the Act,

3    which are expressly excluded from the unit.  If that's not the

4    case, then I think it is appropriate to address the issue of

5    the supervisory status of lead men in this proceeding.

6        JUDGE LAWS:  Your response?

7        MR. MINER:  I think this is the same issue we've been

8    talking about now for a few days.  I think the judge is correct

9    that this simply is not right at this time.  The issue may

10   become relevant at some future time if a bargaining order is

11   deemed to be appropriate or necessary in this case.  But as of

12   now, we're going to spend a lot of time on an issue that's not

13   directly relevant to any alleged unfair labor practice.

14       JUDGE LAWS:  I agree with the Acting General Counsel that

15   if the answer to Complaint Allegation 7(a) is no, then I do

16   have to determine, and I think that does open the door.  If

17   this isn't determined to be an appropriate unit, then I need to

18   determine which side is correct, the General Counsel's

19   allegation or the Respondent's denial.

20       I do think that that does put the issue of the unit before

21   me not so much as a scope issue, but more of a unit placement

22   issue.  Given that, Complaint Paragraph 7(a) is a disputed

23   complaint allegation, I'm going to need to go into it to decide

24   the case.  I do think to the extent 7(a) is disputed, I will

25   reverse my previous ruling and order that the -- whatever

1  documentation there is with regards to the actions or the

2  events that is relevant.

3      MS. SHIH:  Thank you, Your Honor.

4      JUDGE LAWS:  Again, the Respondent I know disagrees with

5  ruling by virtue of the fact you agreed with my very brief and

6  previous ruling.  If you would like me to reconsider that, feel

7  free to file something in writing.

8      MR. MINER:  I don't think that'll be necessary, Your

9  Honor.  Thank you.

10      MS. SHIH:  We would ask for witnesses to be sequestered

11  following opening statements, if Your Honor is going to permit

12  parties to give opening statements.

13      JUDGE LAWS:  Yes, I will, but I'll go ahead and give the

14  sequestration order.

15      A sequestration order is being issued in this proceeding.

16  This means that all persons who expect to be called as

17  witnesses in this proceeding, other than a person designated as

18  essential to the presentation of a party's case, will be

19  required to remain outside the courtroom whenever testimony or

20  other proceedings are taking place.

21      A limited exception applies to witnesses who are alleged

22  discriminatees in this matter.  They may be present in the

23  courtroom at all times, other than when witnesses for the

24  General Counsel or a Charging Party are giving testimony about

25  the same events about which the alleged discriminatees expect

1    to testify.

2        The sequestration order also prohibits all witnesses from

3    discussing with any other witness or any possible witnesses the

4    testimony he or she has already given or will give.

5        Likewise, counsel for a party may not disclose to any

6    witness the testimony of any other witness.  Counsel may,

7    however, inform his or her own witness of the content of

8    testimony given by any opposing party's witness to prepare to

9    rebut that witness' testimony.

10       It is the responsibility of counsel to see that they and

11   their witnesses comply with this sequestration rule.

12       Does the Acting General Counsel wish to make an opening

13   statement?

14       MS. SHIH:  I would, Your Honor.  Thank you.

15                      **OPENING STATEMENT**

16       BY MS. SHIH:  Despite the anticipated length of this case,

17   the number of witnesses and the number of allegations involved

18   in this complaint, this is actually a fairly simple and

19   straightforward case.  This case involves employees of

20   Respondent, Greenbrier Rail Services' Tucson facility, who have

21   been attempting to organize a union since 2011.

22       You'll hear evidence that a union campaign among these

23   employees began in 2011 with the United Transportation Union.

24   At that time, the company's animus towards the union began.

25   You'll hear testimony that lead union supporters, even as early

1  as 2011, were written up for engaging union activities.

2      The vote in that case, as reflected in documents that have

3  already been admitted into evidence, was in fact extremely

4  close with the union losing by only a margin of three votes.

5      Following the one-year bar on union organizing after the

6  unsuccessful election in 2011, you'll hear testimony that the

7  company was monitoring the one-year expiration date, sent their

8  vice president of human resources out to meet with supervisors

9  and foremen in late October to talk about how to handle union

10  activity that they were aware at that time was going on

11  again.

12      You'll hear evidence that by October 31st, there was no

13  question that the company was aware that the employees were

14  trying to organize again.  The 2012 union campaign, which

15  began about October 2012, started with employees meeting with

16  the United Food and Commercial Workers Union prior to the

17  one-year bar expiring and began organizing with them,

18  including signing authorization cards.

19      On November 5th, 2012, three employees met with the

20  Sheet Metal Workers Local 359, who's the Charging Party in

21  this.  Two days later, 47 employees had signed authorization

22  cards out of a unit of approximately 84 employees.  By

23  November 8th, three days after they met with the Sheet Metal

24  Workers, four more employees had signed cards, for a total of

25  51 authorization cards.

1      Three days later the company, claiming that the facility

2   had been losing money and had declining work, laid off 27

3   employees.  Another employee who had the day off on November

4   12th was laid off the following day, for a total of 28

5   employees who were laid off as part of an alleged mass

6   reduction in force.

7      You'll hear evidence, though, that the company's

8   characterization of that layoff as a reduction in force was

9   not designed to get rid of the least senior or the least

10  productive or the least reliable employees.  In fact, it was

11  designed to get rid of the union supporters and those that

12  the company believed were union supporters.

13     At least 64% of the employees who were laid off on

14  November 12th were individuals who had signed authorization

15  cards indicating that they wanted the union to represent them

16  for collective bargaining purposes.  In fact, weeks prior to

17  this layoff that was a result of inefficiency, lack of

18  production, a decline in work, a loss of money, the company

19  was asking to hire more temporary employees from their

20  temporary staffing agency.

21     Two days after the layoff, the union filed a petition

22  for representation and the first of numerous unfair labor

23  practice charges that are the subject of this case.  The

24  following week, the union made a demand for recognition,

25  which the company never responded to.

1      After the unfair labor practices were filed, the company

2   recalled about half of those employees that had been laid

3   off, the same employees that the company claimed had been

4   laid off for poor production, poor attendance, and other poor

5   performance issues.

6      The numerous unfair labor practice charges in this case

7   block the representation petition that had been filed in

8   November until the union ultimately filed a request for

9   election in May of 2013.  However, in the meantime, the

10   company had engaged in a counter-campaign that included

11   numerous unfair labor practices that you'll hear evidence

12   about in this case, including that the company raised

13   attendance voids for all of the employees that had not been

14   laid off; gave employees a CEO bonus; raised the cap on

15   hourly wage rates for the employees; implemented SAT poker

16   games with prizes such as iPods; solicited employee complaint

17   and grievances through an anonymous survey; and when one

18   employee discussed the need for a union and signed his name

19   to that survey, he was fired weeks later for an alleged

20   safety violation.

21      The company held captive audience meetings leading up to

22   the election in July with statement denigrating the union and

23   threatening employees with plant close.

24      Ultimately, the election held on July 11th, the union

25   received only 13 votes.  This is the union that received well

1    over a majority of authorization cards signed back in

2    November before unfair labor practices started among a group

3    of over 80 employees.

4        The unfair labor practice in this case so decimated

5    union support through intimidation and fear that the union

6    was not able to even find an employee willing to act as an

7    observer at the election in July.

8        Based on all of the evidence you'll hear in this case,

9    it's evident that the company's counter-campaign of unfair

10   labor practices had the intended effect of completely

11   undermining the employees' attempt to organize for a second

12   time.  It's also evident that the union will never be able to

13   receive a fair election in this case, and that's supported by

14   the fact that it received only 13 votes in July, after six

15   months prior having a majority of cards signed.  That

16   supports the General Counsel's request for a bargaining order

17   in this case.

18       In addition, there's allegations that based on the

19   majority status, as of November 7th, 2012, the company had an

20   obligation to recognize the union, to provide notice to the

21   union, and bargain with the union before making any changes

22   to terms and conditions of employment after that day,

23   including the decision to recall employees, which employees

24   to recall, the discharge of employees, including Juan Silva,

25   who was the individual who completed the survey, and

1    implementing and then ceasing the implementation of their

2    safety program.  All of those were unilateral changes that

3    are alleged to be violations of the Act, based on the

4    company's failure to bargain with the union upon having

5    reached a majority status in November.  Thank you.

6        JUDGE LAWS:  Does Respondent care to make an opening

7    statement now?

8        MR. MINER:  Your Honor, we'd like to reserve our opening

9    statements until the beginning of our case in chief.  Thank

10   you.

11       JUDGE LAWS:  That's fine.  Is the Acting General Counsel

12   ready with their first witness?

13       MS. SHIH:  Yes, Your Honor.  Our first witness is Lex

14   Morrison.

15   **(Long pause)**

16       JUDGE LAWS:  If you could raise your right hand?

17   Whereupon,

18                          **<u>LEX MORRISON</u>**

19   was called as a witness, by and on behalf of the General

20   Counsel, and having been duly sworn, was examined and testified

21   as follows:

22       JUDGE LAWS:  If you could please first state and spell

23   your name for the court reporter?

24       WITNESS:  Lex Morrison, L-e-x, M-o-r-r-i-s-o-n.

25       JUDGE LAWS:  Thank you.

1                    **DIRECT EXAMINATION**

2    Q    BY MS. SHIH:  Mr. Morrison, what's your current position

3    with Greenbrier?

4    A    I am currently the production manager at Finley,

5    Washington.

6    Q    How long have you been in that position?

7    A    Since January of this year.

8    Q    You were formerly the plant manager for the Tucson

9    facility of Greenbrier.  Is that correct?

10   A    That's correct.

11   Q    How long did you hold that position?

12   A    Four years.

13   Q    Do you recall the dates?

14   A    September 2008 to November of 2012.

15   Q    Did you remain employed by Greenbrier between November

16   2012 and January 2013?

17   A    Yes.

18   Q    So you were not laid off as part of the reduction in

19   force in November of 2012 at the Tucson facility?

20   A    That's correct.

21   Q    When was your last date in Tucson?

22   A    November 12th, 2012.

23   Q    Can you describe your job duties as the plant manager

24   for the Tucson facility?

25   A    I was responsible for all aspects of the production,

1    material in and out of the shop, their quality assurance

2    program at the facility, the office personnel, basically to

3    keep the shop productive and on track with the company's

4    goal.

5    Q    To whom did you report?

6    A    In the beginning, I was reporting to Gordon Hutchison.

7    Q    He was the regional manager?

8    A    That's correct.

9    Q    You said in the beginning.  Did that change at some time

10   while you were plant manager?

11   A    It did.  The shop was struggling to produce, and one of

12   the steps they changed was to put in a general manager.  That

13   was in 2012, I'm not sure exactly when.  They put a general

14   manager in so he could spend more time at the facility so the

15   regional manager could be at his other jobs as well.

16   Q    At that time, you began reporting to the general

17   manager?

18   A    That's correct.

19   Q    And that was Juan Maciel?

20   A    No, that was Kevin Stewart.

21       MR. BIDDLE:  Excuse me, Mr. Morrison, could you speak into

22   the microphone?  I can't even hear.

23   Q    And Kevin Stewart was your supervisor when you left the

24   Tucson facility in November of 2012?

25   A    Yes.

```
 1   Q     As the plant manager, you're responsible for the

 2   supervision of all the shops within the plant, correct?

 3   A     All of the shops?

 4   Q     Yes.

 5   A     I'm sorry, I don't know what you mean by all the shops.

 6   Q     Well, why don't we back up and have you describe what the

 7   makeup of the Tucson facility was.

 8   A     There were -- as the railcars came in, there as a mainline

 9   that they came on, and we removed them off of that line and put

10   them in their areas at the shop where that particular work

11   needed to be in which area of the shop.  There were single unit

12   cars in one area because we couldn't fit them in the area.  So

13   car repair was done in a wide range of areas of the facility.

14         Then there's a material department that has their own

15   areas within the facility.  The QA department is over all of

16   the shops, in all areas.  Yes, as a plant manager, I would

17   oversee all aspects of the facility.

18   Q     When you describe areas of the shops, can you explain

19   what those areas and what the differences among those areas

20   are?

21   A     There's a front facility, a covered facility.  That's

22   why it's near the front.  It's covered and there's specific

23   cars with their insignia.  There's another portion of the

24   shop that's also got a cover on it and that has multiple unit

25   cars worked in that area.  Then there's another area back
```

1   behind it that's more open.  It's not covered.  There's a

2   variety of cars that we work on.  Then there's a truck shop

3   repair that repair truck components on those cars.

4   Q    There's different areas, it sounds like, broken up by

5   the types of cars that are worked on in that area.  Is that

6   correct?

7   A    Yes.

8   **(Long pause)**

9   Q    Just so we have some background on understanding how

10  that facility operated, can you describe, in 2012 -- I'm

11  actually going to have you describe briefly the different

12  employee conditions that existed at that plant in 2012.  Then

13  we'll go into a little bit more detail about the different

14  areas that you described.  Can you explain what an AAR write-

15  up employee does?

16  A    They look at the cars when they first come into the

17  facility.  They inspect the cars and let the car men know

18  what repairs need to be done.  Once they get that approval,

19  then they make the work order for the car, then that's handed

20  over to the supervisor.

21  Q    What areas of the shop that you've described already do

22  AAR write-up employees work in?

23  A    They work all aspects of the facility.

24  Q    What do airmen do?

25  A    Airmen are people that work on just the airbrakes on the

1   car.  Each car has their own set of brakes operated by air

2   pressure.  There's valves and brake shoes that are all in this

3   airbrake system.  It's a specific job duty that that's all they

4   work on, is the airbrake system of the car.

5   Q    Do airmen work in all areas of the shop?

6   A    Yes, they do.

7   Q    Does that include the truck shop and the paint shop?

8   A    Not the paint shop, the truck shop is different as well.

9   Those two shops have their own duty to do on the cars.

10  Q    Let's start with the truck shop.  What responsibilities

11  does the truck shop for the cars that come in?

12  A    They recondition components off of the railcars.  They

13  recondition them back to standard that are acceptable for the

14  AAR rules.  Then they're reassembled and put back on the car.

15  Q    What are the positions of the employees that work in that

16  facility?

17  A    They're welders.

18  Q    All of them?

19  A    Yes, they're all welders, and then there's a QA person

20  that oversees the -- in each department.

21  Q    The paint shop was the other shop that you mentioned was

22  different.  What's the responsibility of the employees in the

23  paint shop?

24  A    They sandblast any needed areas of the cars that need

25  painted, and also paint the cars for where it's been repaired,

1   or if they want the whole car painted.  They also apply

2   stencils and decals to the cars.

3   Q    The only employees that work in the paint job are

4   painters, correct?

5   A    Painters and sandblasters.

6   Q    But there's no welders or repairmen or airmen that work in

7   the shop?

8   A    No, there's not.

9   **(Long pause)**

10  Q    I'll have you explain in general terms, what does the

11  Greenbrier Tucson facility do?

12  A    They repair railcars.

13  Q    These are railcars owned by whom?

14  A    There's various companies that own them, a lot of banks

15  own railcars, TGF Corporation owns railcars.  There's

16  individuals that own railcars.  It's not just a set -- even

17  railroads own railcars as well.

18  Q    Is it true that a large percentage of the work that was

19  being performed by the Tucson facility was for a single

20  customer, TGF.  Is that right?

21  A    That's correct.

22  Q    What would you estimate that percentage to be when you

23  left the facility in November 2012?

24  A    It's probably about 70%.

25  Q    Explain how a car comes to the Tucson facility for

1  repair or maintenance.

2  A    It's what we call a bad order with a railroad facility

3  when something's wrong with this car that needs repaired, and

4  they direct it to the nearest facility that can repair that

5  car.  Also, if there's a derailment someplace in the nation,

6  those derailed cars can be sent to that facility as well for

7  repair.

8  Q    Who's responsible for transporting that car to the

9  Tucson facility?

10  A    At the Tucson facility, it's the Union Pacific Railroad.

11  Q    What's the process by which you would learn of a car

12  being repaired or otherwise maintained at the facility?

13  A    There's something called CVT team, it's a car tracker.

14  The car work -- we put it into DECT and we can do the cars

15  that are routed to us.  Also, the railroad has an en route

16  list that shows what cars were routed to us.  So we know what

17  cars will be coming to us.

18  Q    When a car arrives at the facility, where does it go

19  first?

20  A    It goes on the inbound rail, pushed in by the Union

21  Pacific Railroad on what we call inbound track, and that's

22  where they leave it.  We take the cars off the inbound track

23  and put it where we want.

24  Q    You say you take the car off the inbound track, what

25  employees are doing that work?

1    A    It'll go to our switchmen.

2    Q    What shop or area is that?

3    A    They're all over the shop.  They cover all areas of the

4    shop.

5    Q    When a car comes in, how do you determine which area it

6    will go to?

7    A    That would be determined by the car type and the

8    necessary repairs on the car.

9    Q    Earlier, you described multiple shops.  What type of

10    cars are being worked on in the front shop?

11    A    Single-unit cars, the ones that -- they're not multiple

12    unit.

13    Q    The front shop can work on single-unit cars that are for

14    all customers?

15    A    Yes.

16    Q    What employees are working in the front shop?

17    A    We have welders, airmen, QA inspectors look at the cars

18    in the front shop, lead men, supervisors.

19    Q    When you say -- okay, let's start with -- you said the

20    airmen.  I think you've already described what those job

21    duties are.  How many airmen are employed in the front shop?

22         MR. MINER:  Objection, lack of foundation, ambiguous.  Can

23    we have a timeframe of reference?

24         JUDGE LAWS:  What's the timeframe?

25    Q    In November 2012, when you were the plant manager at the

1    Tucson facility.

2    A    There was one.

3    Q    What other -- and you mentioned other positions in the

4    front shop.  What other positions were in the front shop?

5    A    Welders, lead men, supervisors, QA inspectors.

6    Q    Switchmen?

7    A    The front shop has a temporary switchman.  He went back

8    and forth as welder, he did both jobs.  They were considered

9    a welder.

10    Q    What else do the switchmen do besides take the cars off

11    of the tracks?

12    A    That's all they do.

13    Q    Okay.

14    A    The switch crews themselves, that's all they do.

15    Q    But there's no dedicated position in each shop of a

16    switchman?

17    A    Not in each shop, no, they cover the whole area.

18    Q    The switchmen are able to perform job duties of other

19    classifications as well.  You said welders and repairmen?

20    A    With training.  If the switchman is a trained welder, we

21    would use him as a welder.  If we hired them as a switchman,

22    they would not work on the cars.  They would just switch

23    cars.

24    Q    Is your general classification called a repairman?

25    A    Welder repairman.

1  Q    What's the difference between a welder repairman and a

2  welder?

3  A    I don't believe there's a difference.

4  **(Long pause)**

5  Q    Any other positions in the front shop other than you've

6  already described?

7  A    Not that I can think of.

8  Q    What does the lead man in the front shop do?

9  A    They have a specific group of crews that they oversee.

10  They can actually help work on the cars.  They can make sure

11  that the work order is completed correctly and all the work

12  is done on those orders.  They can suggest if an employee is

13  ready to be trained in something else or wants to be moved,

14  or a good employee that we want to keep an eye and maybe

15  advance in the company.  They're working with the crews all

16  day, so they have very good knowledge of who's productive and

17  who's not.

18  Q    When you say they can work on cars, they're able to, if

19  trained, step in to perform the job duties of any of the

20  classifications of the employees in that shop, correct?

21  A    Not any of the classifications.  They might not be able

22  to inspect cars.  If they haven't been trained to switch,

23  they wouldn't be able to switch.  As far as a welder or a

24  repairman, that's generally where they come from, those

25  ranks.

1  Q    How many lead men were in the front shop when you left

2  the facility in November 2012?

3  A    I believe there were two lead men.

4  Q    They were also welders?

5  A    They were at one time.  They were considered a welder

6  and then a lead man.

7  Q    But they're able to perform welding duties?

8       JUDGE LAWS:  I'm sorry, I'm going to have to ask you to

9  speak up.

10      WITNESS:  I'm sorry.

11 Q    They did actually perform welding duties, correct?

12 A    Yes, there were times when they were welding.

13 **(Long pause)**

14      MS. SHIH:  We're concerned about the individual who just

15 walked in, whether or not that's a witness that would

16 potentially be called to testify.

17      MR. MINER:  Just a moment.

18 **(Long pause)**

19      MR. MINER:  I'm sorry, we didn't recognize you.

20      MS. SHIH:  Thank you.

21      JUDGE LAWS:  Go ahead.

22      MS. SHIH:  Actually, if you could give me just a minute?

23      JUDGE LAWS:  Sure.

24      MR. MINER:  Can we take a short five-minute break?

25      JUDGE LAWS:  How much more direct do you think you have?

1      MS. SHIH:  Quite a bit.

2      JUDGE LAWS:  We've only been going for half an hour.  Is

3 there an expedient need for one?

4      MR. MINER:  I just need a short restroom break.

5      JUDGE LAWS:  I will not deny that.  Let's take five.

6 **(Off record)**

7      MS. SHIH:  Your Honor, before I resume my questioning of

8 this witness, because I had intended based on this morning's

9 discussion on the record that counsel is not stipulating to the

10 unit description in 7(a) of the complaint, to go through the

11 appropriateness of the unit, including all of the job

12 classifications that are identified in the unit.  That's going

13 to be incredibly tedious and cumbersome, unless counsel is

14 stipulating to the unit descriptions as alleged in 7(a) of the

15 complaint, with the exception of the issue of the lead men.

16      So there's a little bit of confusion from our stipulation

17 yesterday, and today I just want to make sure that that's

18 clarified on the record.

19      JUDGE LAWS:  Is the lead man the only sticking point, I

20 guess, is the question?

21      MR. MINER:  Thank you, Your Honor.

22 **(Long pause)**

23      MR. MINER:  Yes.  So Greenbrier will enter the same

24 stipulation as we entered in 2011 and May of 2013 regarding the

25 appropriateness of the all of the classifications included in

1  the unit, but necessarily, we would need to include the

2  excluded lead men in that description for it to be an

3  appropriate unit.  Is that sufficiently clear?

4      MS. SHIH:  It's not sufficiently clear for me.  With the

5  exception -- I mean, what I'm asking is, with the exception of

6  the lead men, is the unit as described in 7(a) of the complaint

7  an appropriate bargaining unit?

8      MR. MINER:  With the exception of the --

9      MS. SHIH:  Excluded of the lead men.

10      MR. MINER:  With the exception of the fact that the

11  complaint includes lead men in a group of otherwise appropriate

12  -- a group of employees who otherwise would be an appropriate

13  group for bargaining, yes.  The issue is the supervisory status

14  of the lead men.

15      MS. SHIH:  But the lead men are not expressly included in

16  the unit description.

17      JUDGE LAWS:  We don't need to go into that again.  I guess

18  I'm going to ask it simply, is there any other reason that the

19  unit alleged in Paragraph 7 of the complaint would not be

20  considered appropriate by the Respondent, aside and apart from

21  the fact that it does not specifically exclude lead men as

22  supervisors?

23      MR. MINER:  No.

24      JUDGE LAWS:  Excuse me, I take that back, does not

25  specifically include lead men as supervisors?

1    MR. MINER:  Correct.  Inclusion of the lead men in the

2 unit would result in the unit being inappropriate for

3 bargaining.

4    JUDGE LAWS:  There is no other stumbling block as far as

5 the Respondent is concerned?

6    MR. MINER:  Correct.

7    JUDGE LAWS:  Okay.

8    MS. SHIH:  Thank you.

9  Q   BY MS. SHIH:  Let's go back to the front shop.  Prior to

10 the November 2012 layoff, aside from the two leads and the

11 other job classifications you described, that shop also had a

12 foreman.  Is that right?

13 A    That's correct.

14 Q    All of the employees in the front shop reported directly

15 to that foreman?

16 A    Not directly.  They went through their lead men to their

17 foremen.

18 Q    So the foreman -- there was never a time when there was no

19 lead men in the shop?

20 A    That's the way the structure of the shop is, there should

21 always be lead men on the floor.  The foreman works with other

22 managers.

23 Q    So the foreman's not on the floor generally?

24 A    He is and he's not, he comes and goes.

25 Q    How would you describe the describe of the foreman in the

1  front shop?

2  A    He oversees the entire front shop, lead men included, and

3  reports to the plant manager.

4  Q    The foreman has the ability to hire employees in the front

5  shop?

6  A    No, not without management approval.

7  Q    Or fire an employee in the front shop?

8  A    Not without management approval.

9  Q    When you say management approval, who in management

10 would approve that?

11 A    Me included, we'd involve HR and the general manager.

12 Q    Do foremen actually report to the production manager?

13 Is that right?

14 A    In the chain of command, yes.

15 Q    Does the production manager have the authority to hire

16 or fire employees?

17 A    Not without management approval.

18 Q    Do foremen have the authority to discipline employees?

19 A    They can suggest that an employee might need discipline.

20 They can also suggest merit increases.

21 Q    When you say suggest, are you saying that the foremen

22 don't have the ability to issue a write-up to an employee?

23 A    It goes through the foreman, but they can't just do it

24 on their own without management being involved.

25 Q    The same is true for lead men, correct?

1    A    Correct.

2    Q    When you were the plant manager for the Tucson facility

3    in 2012, employees typically received an annual performance

4    appraisal.  Is that right?

5    A    They typically got six-month evaluations.

6    Q    Who is that evaluation conducted by?

7    A    Supervisors and other managers.

8    Q    When you say supervisor, what specifically --

9    A    That particular individual's direct supervisor.

10    Q    So when you're talking about the welder repairmen in the

11    front shop, who would conduct those performance appraisals?

12    A    A supervisor would conduct it with the production manager.

13    Q    Again, when you say supervisor, I'm not aware of any job

14    classifications that's supervisor.  Are you referring to the

15    foreman?

16    A    Okay, yeah, foreman.

17    Q    The same would be true for the airmen in the front shop,

18    the foreman would conduct those performance appraisals?

19    A    Yes.

20         JUDGE LAWS:  Someone entered the room.  I want to make

21    sure we don't run afoul of our sequestration order.

22    **(Long pause)**

23         MR. BIDDLE:  Different hearing room.

24         JUDGE LAWS:  Go ahead.

25    Q    I'm not sure if I asked this question, I apologize.

1   Airmen, welders repairmen, welders in the front shop, those

2   performance appraisals would all be conducted by the foreman?

3   A    That's correct.

4   Q    I think you mentioned there was a switchman in the front

5   shop, but he also performed other job duties.

6   A    Yes.

7   Q    That person's performance appraisal would also be

8   conducted by the foreman, correct?

9   A    Yes.

10   Q    What about the lead men in the front shop, would their

11   performance appraisals also be conducted by the foreman?

12   A    Yes.

13   Q    There are no other job classifications in the front

14   shop, correct?

15   A    No.

16        JUDGE LAWS:  No, there are not, or no, that's not correct?

17        WITNESS:  No, there are not.

18   Q    When a car is repaired in the front shop, does it then go

19   to another shop, or is all of the repairs completed in the

20   front shop?

21   A    All the repairs are completed in the front shop.

22   Q    So let's use a car that has gone to the front shop for

23   repair as an example.  Once that repair is completed, what then

24   happens to that car?

25   A    The work order ends with the quality assurance inspectors.

1    They do an assessment on it, make sure that the repairs are

2    correct and complete and if it is ready for release.  It's then

3    handed over to the switchman.

4    Q    When you say the switchman, what exactly do you mean?

5    A    Okay, from the front shop, they have to put the car onto a

6    transfer table.  The transfer table hurls the car into a track,

7    and it'll go down to another rail.  Then they drive the car off

8    of that rail.  The actual switch crew picks it up there and

9    they take it out to the outbound track.

10   Q    From there, it goes back to --

11   A    To the railroad.

12   Q    Is work on a car ever performed in multiple areas of the

13   facility, or is it only ever done in one area of the

14   facility?

15   A    We try to do it in one area.  But if the car needs

16   painted, then we have to move it to the paint shop.

17   Q    From what I'm hearing, there would never be a situation

18   where work is performed on a car in the front shop, and then

19   that car is moved to, for example, the center shop for

20   additional repair.  Is that right?

21   A    That's right.

22   Q    If work were to be performed on a car in multiple shops,

23   is the paint shop the only additional shop that would ever be

24   involved?

25   A    The truck shop would be involved if the car doesn't

1  move, only the components.

2  Q    When you talk about the truck shop, can you explain what

3  type of work is performed in the truck shop?

4  A    Under a car, there's a component that we call a

5  transposer.  Over time, those components have areas that

6  wear.  They build it back up on the worn out area to new

7  standards.  Those components are put back on the car and

8  reconditioned.

9  Q    It sounds like if work were to be performed on

10  components from a car in the truck shop, that work would be

11  going on at the same time as the other work that is going on

12  in the rest of the car in whatever shop it came from?

13  A    That's right.

14  Q    For example, work could be performed on a car in the

15  center shop while components of that car are being worked on

16  in the truck shop?

17  A    That is right.

18  Q    Other than welders, are there any other job

19  classifications that work in the truck shop?

20  A    Just the quality inspector, then there's lead men that

21  oversees the truck shop.

22  Q    There's no foreman in the truck shop?  At least in

23  November 2012 prior to the layoff, there was no foreman in

24  the truck shop, correct?

25  A    There was a foreman overseeing the truck shop, but he

1    was considered part of the area.

2    Q    Can you clarify what you mean, there was foreman

3    overseeing the truck shop?

4    A    Yeah, there's -- one of the areas of the facility with

5    the derailed cars there, and that's the same area where the

6    truck shop physically is.  So the foreman that was overseeing

7    the wreck area also had the truck shop as his responsibility.

8    Q    So the foreman of the wreck shop was also the foreman

9    for the truck shop?

10   A    Yes.

11   Q    The truck shop and the wreck shop share the same

12   physical area within the shop, correct?

13   A    Yes, correct.

14   Q    What type of work was being performed in the wreck shop?

15   A    Heavier repairs, the car has derailed and the end of it

16   got tore off or mangled up, and then we would rebuild a car

17   back to the standards.

18   Q    And cars that are repaired in the wreck shop, when work

19   is completed in the wreck shop, does it go to any other shop?

20   A    More than likely, it'd go to paint.

21   Q    But not to the front shop or the center shop?

22   A    No.

23   Q    What are the positions of the employees that work in the

24   wreck shop?

25   A    Welders, they did have an airman there, lead men, lead

1  men over the wrecked cars area, and inspectors.

2  Q    Who was the lead men in the wreck shop prior to the

3  November 2012 layoff?

4  A    Who was?  A name?

5  Q    Yes, if you recall.

6  A    I don't recall.

7  Q    But it wasn't the same lead man in the truck shop,

8  correct?

9  A    That's correct.

10  Q    The lead man in the truck shop, was he also a welder?

11  A    Yes.

12  Q    He performed welding duties as part of his job?

13  A    Yes, he could.  If they were short a man, he would step

14  up.

15  Q    The lead man in the wreck shop was also a welder?

16  A    Yes.

17  Q    And performed welding duties?

18  A    Yes.

19  Q    Other than painters, are there any employees that work

20  in the paint shop?

21  A    No.

22  **(Long pause)**

23  Q    All of the employees in the paint shop are painters?

24  A    That's correct.

25  Q    There's no foreman in the paint shop.  Is that right?

1    A    There's a lead man.

2    Q    Who's also a painter?

3    A    Yes.

4    Q    He performs painting duties?

5    A    Yes.

6    **(Long pause)**

7    Q    You mentioned that the foreman over the wreck shop was

8    also the foreman over the truck shop.  Was there a foreman

9    that oversaw the paint shop?

10    A    Yes, but there was not paint all the time.  It was

11    sporadic.

12    Q    Who was the foreman that oversaw the paint shop when

13    there was paint work going on?  Was it the foreman of the

14    wreck shop?

15    A    It was the foreman of the intermodal shop.

16        JUDGE LAWS:  So why don't we step back here and I'm going

17    to ask you to describe during the time period in and around

18    November 2012 who the foremen were, how many there were and

19    what they oversaw.

20        WITNESS:  Okay.  There was a foreman in the front shop.

21    There was a foreman in the --

22        JUDGE LAWS:  Did the foreman in the front shop only

23    oversee the front shop or did that person oversee anything

24    else?

25        WITNESS:  Only the front shop.

1    JUDGE LAWS:  Okay.

2    WITNESS:  The center had a foreman.  The intermodal shop

3  had a foreman.  The wreck shop had a foreman.

4    JUDGE LAWS:  Going one-by-one on those, did any of those

5  foremen have duties over other areas?

6    WITNESS:  The intermodal shop had the paint shop, and

7  the wreck shop had the truck shop.

8    JUDGE LAWS:  Thank you.

9  **(Long pause)**

10  Q    The front shop, center shop, and intermodal shop, do they

11  all perform the same type of work but on different types of

12  cars?  Is that right?

13  A    Which three shops did you say?

14  Q    The front shop, center shop, and intermodal shop.

15  A    Yes, same type of work on different types of cars.

16  Q    I think earlier you described the types of cars being

17  worked on in the front shop were single unit cars.

18  A    That's correct.

19  Q    The type of work performed in the center shop was?

20  A    They were intermodal cars.

21  Q    In the center shop?

22  A    They could work intermodal cars in the center shop.

23  They had a mix of single unit and intermodal, but we tried to

24  keep intermodal cars in there.

25  Q    When you ay intermodal cars, can you explain what that

1  means?

2  A    Yes, they're the cars that hauls the OSHA containers.

3  They can double stack them in the intermodal cars.  Usually

4  the cars are insulated that can haul five separate

5  containers.

6  Q    Are the intermodal cars the type of cars that are being

7  worked on, I presume, in the intermodal shop?

8  A    Yes.

9  Q    If a single unit car were coming into the Tucson

10  facility, it could be worked on in either the front shop or

11  the center shop.  Is that right?

12  A    Yes.

13  Q    If an intermodal car were coming into the Tucson

14  facility, it could be worked on in either the center shop or

15  the intermodal shop?

16  A    Yes.

17  Q    Can you explain what factors would dictate which shop

18  one of those cars went to?  For example, if an intermodal car

19  came in for repair, what factors would dictate whether it was

20  sent to the center shop or the intermodal shop for repair?

21  A    At this point in time, we were working with a specific

22  customer cars in the intermodal shop.  We were working a

23  program for a customer.  Anytime the customer's cars came to

24  the shop, it went to the intermodal shop.  If we were low on

25  that type of work, then we could work another customer's

1  intermodal cars in the intermodal shop.

2      One of the reasons only the intermodal cars could go

3  there is because there's a track configuration that wouldn't

4  allow a certain type of single unit car to go around the

5  curve to the intermodal shop.

6  Q   So I'm hearing that unless there were insufficient work

7  for that customer in the intermodal shop, otherwise the

8  intermodal shop was exclusively working on cars for a single

9  customer?

10  A   Yes.

11  Q   That customer was CSX, correct?

12  A   No, that program was not CSX.

13  Q   Who was the customer?

14  A   Pacer.

15  Q   What period of time was that intermodal shop working

16  exclusively on cars for that customer?  Was that the entire

17  time you were the plant manager in Tucson?

18  A   Yes, this customer did a yearly program on his cars.  That

19  Tucson shop was the shop that he was working at.

20  Q   Were all of the contracts with customers in the Tucson

21  facility one-year contracts?

22  A   No.

23  Q   At the time that you left in November 2012, was there a

24  one-year contract with CSX?

25  A   No.

1   Q    How long was the contract with CSX?

2   A    I was not aware that there was any specific contract other

3   regular rates.  As far as timeframes on working their cars,

4   there was no set contract.

5   Q    Did you have any responsibility for negotiating contracts

6   with customers for the Tucson facility?

7   A    I was in on the Pacer stack train negotiations, that was

8   all.

9   Q    That was the only contract that you had involvement with

10  over negotiations?

11  A    Yes.

12  Q    Who did have responsibility for negotiating contracts with

13  customers at the Tucson facility?

14  A    I couldn't say who that was.  It was someone in corporate.

15  Q    I'm sorry if I already asked this, the foremen reported

16  directly to the production manager.  Is that correct?

17  A    Yes, through the chain of command.

18  Q    The production manager at the time that you left the

19  Tucson facility in November 2012 was Freddy Valdez.  Is that

20  right?

21  A    That's right.

22  **(Long pause)**

23  Q    You mentioned a separate area with materials.  Is that

24  correct?

25  A    Yes.

1  Q    Can you describe what that area or department does or

2  did in 2012 when you left?

3  A    They received material, any parts that we had ordered in

4  for the cars we were working on.  They received that material

5  and there was a large area that that material was stored in.

6  They distributed that material as needed when a car was in a

7  position to be worked on.

8  Q    The positions of the employees that worked in the

9  materials area, what were those?

10  A    Those were material handlers.

11  Q    Was there a foreman of the material area?

12  A    There was a material manager.

13  Q    He oversaw the materials area or department?

14  A    Yes.

15  Q    There was also a lead men in that area.  Is that right?

16  A    At that time, yes, there was.

17  Q    Did he also perform duties of the material handler?

18  A    Yes.

19  **(Long pause)**

20  Q    When you left in November 2012, who was the lead men in

21  the materials area?

22  A    He was new to the facility, I can't remember his name.

23  Hardenbrook.

24  Q    Do you recall how long he had been there when you left

25  the facility?

1  A    No, I don't recall.

2  Q    Earlier you mentioned switchmen, and it sounds like they

3  were not assigned to a particular shop or particular area.

4  A    That's correct, they were not.

5  Q    That's true for the write-up employees as well, correct?

6  A    That is correct.

7  Q    Are there any other -- were there any other positions in

8  November 2012 that were not assigned to a particular shop?

9  A    The material handlers would haul material to the shop

10 area.

11 Q    But they reported specifically to a material manager.

12 A    Correct.

13 Q    What about positions that reported directly to the

14 production manager?  Laborers?

15 A    I don't recall there being any laborers at that time.

16 Q    Do you recall an employee by the name of Hector

17 Fredrico?

18 A    No, I do not.

19 Q    Ricardo Martinez?

20 A    No.

21 Q    Or Jesús Ruiz?

22 A    No.

23 Q    Were there maintenance employees that weren't assigned

24 to regular shops?

25 A    At that time, there was one maintenance man.

1    Q    That employee reported directly to the production

2    manager?

3    A    Yes.

4    Q    What were the duties of the maintenance employees or

5    employee?

6    A    They were to work on equipment that failed, as it needed

7    repair.  It was all types of equipment for the welders.

8    Q    So the maintenance employees were performing work on

9    equipment owned by Greenbrier?

10    A    Yes.

11    Q    You weren't aware of any employees with the position of

12    laborer or general laborer?

13    A    We would hire a laborer and move him up into a welding

14    position.  So at that time, I can't recall if there were any

15    laborers that were not moved up.

16    Q    Do you recall at anytime during your time as plant

17    manager in Tucson having people in the position of laborer?

18    A    Yes.

19    Q    What did those laborers do?

20    A    They would just clean the shop area, but they -- there's

21    a -- I can't remember when the timing was, but there was a

22    difference between an inter laborer and a laborer, a car

23    laborer.  I don't know if at that time --

24    **(Long pause)**

25    Q    When you were the plant manager for the Tucson in 2012,

1  were you responsible for determining the staffing needs for

2  that facility?

3  A    Yes.

4  Q    You would make the determination whether additional

5  welders were needed?

6  A    Yes.

7  Q    Were production employees typically brought on as

8  temporary employees before they were hired fulltime by

9  Greenbrier?

10 A    I wouldn't say temporary.  We used an agency and we also

11 hired in the company.

12 Q    That agency that you used for temporary employees was

13 Intermountain Staffing.  Is that right?

14 A    That's right.

15 Q    What percentage of production employees when you were the

16 plant manager of the Tucson facility in 2012 would come in

17 through a temporary agency?

18 A    It varied.

19 Q    So you would say that most production employees were hired

20 directly by Greenbrier?

21 A    Yes.

22 Q    Did you use any other temporary agencies during your time

23 as Tucson plant manager?

24 A    I think we attempted one other agency, but it didn't work

25 out.

1  Q    What factors determine when you would use a temporary

2  agency versus hiring direct employees?

3  A    It would depend on the applicants we had and how fast we

4  needed the employee.

5  Q    How did you typically solicit applications for the

6  production employee positions?

7  A    We used Craigslist, I believe we used monster.com as well,

8  and there was a lot of word of mouth that they would come in

9  and apply to the company, just walk in.

10  Q    When you would determine that there were additional

11  production employee positions that needed to be filled, you

12  would communicate that information to the human resources

13  generalist.  Is that correct?

14  A    Yes.

15  Q    At the time you left in November 2012, that was Margaret

16  Madrigal?

17  A    Yes.

18  Q    Would you also communicate to her when positions needed

19  to be filled whether she should fill those through the

20  temporary agency or directly?

21  A    Yes.

22  Q    Do you recall informing Ms. Madrigal in October of 2012

23  that additional welder positions needed to be filled?

24  A    Yes.

25  Q    Do you recall informing her to try to fill those through

1    Intermountain Staffing?

2    A    I don't recall that.  We were always trying to hire

3    people.

4    Q    When you say you were always trying to hire people, what

5    exactly do you mean?  You always had open positions?

6         WITNESS:  Your Honor, can I go to back to when I first

7    started working there and just kind of give you a history of

8    that facility?

9         JUDGE LAWS:  Right now, you're just to answer questions

10   asked by the attorney.  If she wants to ask you that, that's

11   fine.  If counsel wants to ask you that for the Employer when

12   it's their turn, that's fine, but you are limited to answering

13   questions that are asked of you.

14   A    At this time, we were in a position where we were looking

15   for employees.

16   Q    When you say at this time, what timeframe are you

17   referring to?

18   A    October and November.

19   Q    Of 2012?

20   A    Yes.

21   Q    Other than the welder positions, what other positions were

22   you looking to increase the workforce on?

23   A    At that time, just welders.

24   Q    Do you recall how many positions you had instructed Ms.

25   Madrigal to fill in October 2012?

1  A    We had a goal to reach 95 employees, and we were trying to

2  keep two to three employees a month, so I'm not sure what I

3  instructed her at that time to hire.

4  Q    What was the date on which you had a goal of 95 employees?

5  A    It was -- I don't remember what month it was, but it was a

6  goal that got handed down from corporate that that's where they

7  wanted the number of employees to be.  We were slightly behind

8  that goal, but we were always trying to reach it.

9  Q    You were behind that mark in October 2012?

10 A    Yes.

11 Q    So the date you mentioned that was the goal date, it was

12 prior to October 2012?

13 A    It was.

14 Q    So it had already passed?

15 A    Yes.

16 Q    Do you recall whether it was in 2012?

17 A    It was in 2012.

18 Q    But you don't recall what month it was?

19 A    No.

20 Q    Do you recall what quarter it was in?

21 A    Third, that's a guess.

22 Q    At the time you were looking for welder positions in

23 October 2012, how many employees did you have of the 95?

24 A    We were probably between 85-90.

25 Q    How did corporate communicate that information to you, the

1  goal?

2  A    It was through the -- to increase production in the --

3  actually, it was five shops in the company network.  They gave

4  us a goal of employees, a goal of filled hours so our

5  production would increase and the shops would become more

6  stable.

7  Q    When you say they, was there someone specific in corporate

8  that you had a conversation with who communicated this goal to

9  you?

10  A    It was through my general manager.

11  Q    At that time, that was Kevin Stewart?

12  A    That's correct.

13  Q    When did he inform you of that goal?

14  A    It was the first part of 2012.

15  Q    You said based on that goal, you were in a position of

16  trying to fill approximately two to three positions each

17  month?

18  A    That's correct.

19  Q    Were those all welder positions?

20  A    They were all welder positions, but depending on the

21  number of welders that we had employed, it also determined

22  whether we needed more material handlers.

23  Q    When you did use the temporary agency, Intermountain

24  Staffing, were they always the same type of positions?

25  A    Yes.

1   Q     Were those all welder positions?

2   A     Yes.

3   Q     You never hired airmen or switchmen through

4   Intermountain Staffing?

5   A     No.

6   Q     Or painters or general laborers?

7   A     I wouldn't say we never hired a painter through

8   Intermountain Staffing.  That's a possibility, but I don't

9   recall a specific one.

10  Q     Earlier I asked you whether you were responsible for

11  determining the staffing needs of the production employees in

12  the Tucson facility in 2012.  I believe your answer was yes.

13  A     Yes.

14  Q     But it sounds like in this case, corporate was also

15  determining the staffing needs of the Tucson facility in

16  terms trying to get that facility to reach a goal of a

17  certain number of employees.  Is that correct?

18  A     That's correct.

19  Q     What was the involvement that you had with corporate in

20  determining the staffing needs of the facility?

21  A     It was based on workflow to the shop.

22  Q     Would the staffing directive generally come down to you

23  from corporate?  Or were you in a position to make those

24  determinations independently?

25  A     The situation the job was in, it was mainly from

1  corporate, but they wanted it to be on the shop level.

2  Q    Who in corporate was making that determination?

3  A    It was HR at corporate involved in it.

4  Q    Do you know who specifically in corporate HR?

5  A    Al Lave.

6  Q    Anyone else that you know of that was involved in those

7  decisions?

8  A    Gordon Hutchins, the regional manager, was involved in it.

9  Mike Torres.

10 Q    He was the VP of operations?

11 A    Yes.

12 Q    In November 2012?

13 A    Yes.

14 **(Long pause)**

15 Q    You said corporate would make those determinations based

16 on the workflow.  The fact that the Tucson facility was

17 trying to reach a goal number of 95 employees and was behind

18 that, would you say the workflow in 2012, prior to you

19 leaving in November, was high?

20 A    No, workflow was low.

21 Q    If the workflow was low, why were you hiring more

22 employees?

23 A    Because we were always trying to get more work into the

24 shop and we wanted to have employees in place when the work

25 was available.

1  Q    But employees prior to you leaving in November 2012,

2  employees were working mandatory overtime.  Is that right?

3  A    I don't recall it being mandatory overtime.

4  Q    Do you recall employees working overtime prior your

5  departure in November 2012?

6  A    Yes.

7  Q    That was on a weekly basis.  Is that right?

8  A    It was as needed.

9  **(Long pause)**

10  Q    The temporary employees that did come from Intermountain

11  Staffing, would you say most of those temps that came over were

12  eventually hired by Greenbrier to become employees?

13  A    No, not most of them.

14  Q    About what percentage in 2012?

15  A    Maybe 25%.

16  Q    Was the expectation when they were brought on as temps

17  that if they performed well, they would be hired as

18  Greenbrier employees?

19  A    That's right.

20  Q    What was the process by which a temporary employee could

21  be hired on by Greenbrier if they were successful?

22  A    They would fill out a Greenbrier application and go

23  through Greenbrier's HR.

24  Q    But there was a certain period of time that they would

25  have to remain employed by the staffing agency.  Is that

1  right, before they could be hired by Greenbrier?

2  A    Yes, when they first came on, there were a certain

3  number of days.

4  Q    Was that 90 days?

5  A    It was about 90 days.  Intermountain worked with us on

6  various employees.

7  Q    Did you ever hire -- did you ever convert employees to

8  Greenbrier employees prior to 90-day period with the staffing

9  agency?

10  A    I can't say with any certainty that we did, but it would

11  not surprise me.

12  Q    Intermountain Staffing didn't have an employee or

13  supervisor onsite at the Tucson facility to oversee the work

14  of those employees, did they?

15  A    They did not.

16  Q    That was all directed by the Greenbrier foremen, lead

17  men, managers that were working in the Tucson facility?

18  A    Yes.

19  Q    If an individual sent over by Intermountain Staffing was

20  not performing to a foreman's expectations, Greenbrier could

21  inform Intermountain Staffing that that person should not

22  return.  Is that right?

23  A    That is correct.

24  Q    Greenbrier was making the ultimate decision as to

25  whether temporary employees would continue to perform work at

1    Greenbrier or not come back.  Is that right?

2    A    Yes, that's right.

3    Q    The work hours and the type of work that was being

4    assigned to those employees, that was determined by the

5    foremen, managers, supervisors at Greenbrier?

6    A    Yes.

7    Q    When an individual from Intermountain Staffing was not

8    working out, you would communicate to Ms. Madrigal, who

9    informed the staffing agency to let them know that that

10   employee didn't work out.  Is that right?

11   A    That's right.

12   Q    That was based on your discussions with the foremen who

13   were supervising those employees?

14   A    Lead men and foremen.

15   **(Long pause)**

16   Q    The cars that the production employees work on, the time

17   that's being spent by those employee to perform work on those

18   cars, those -- that time has to be tracked to a customer.  Is

19   that right?

20   A    Yes.

21   Q    What's the process by which that time is recorded by

22   employees or tracked by the company?

23   A    It's recorded on the time system, Kronos.

24   Q    Can you explain how that process works or how that time

25   is tracked?

1   A     Each employee has an individual ID card.  They scan it

2   on the time clock, and they can punch what car number that

3   time is going to be applied to, and go to work on the car.

4   Their time is directly applied to that particular car until

5   they either clock off for the day or off into another car.

6   Q     So employees clock in through the Kronos time system at

7   the start of their workday, whether they begin work on a

8   particular car at that time or not?

9   A     That is correct.

10  Q     That's done by the same timekeeping card?

11  A     Yes.

12  Q     When they're not performing work on a particular car,

13  Kronos is still tracking their time for purposes of payroll.

14  A     That's right.

15  Q     It's only when their time worked on a particular car

16  that they have to input a car number in order for that time

17  to be tracked to a particular car and a particular customer,

18  correct?

19  A     That's right.

20  Q     So when an employee performs work on multiple cars

21  during the same day, they are -- they're responsible for

22  swiping their cards and inputting the information.

23  A     Yes.

24  Q     How is the production of individual production employees

25  measured or gauged when you were the plant manager of the

1  Tucson facility in 2012?

2  A    The AAR write-up guy, when he looks at the car, he will

3  estimate a certain number of hours on the car.  Each job

4  performed on that car has a set time that is allowed to be

5  worked in.  Basically, it's how much time the AAR says it

6  will take to do the job.  All the jobs that needed to be done

7  to the car is added up on the work order, and the car might

8  have a total of 50 hours of work that need to be worked on,

9  per the estimate.  Kronos will keep track of the individual's

10  time.  Each car has a set number of hours on it.

11  Q    Is each car only being repaired by a single employee?

12  A    No.

13  Q    For example, if a car were allotted 50 hours for repair

14  and three employees through the Kronos system has tracked

15  hours towards that repair, how do determine how productive

16  each of those employees is when they're all performing work

17  on the same car?

18  A    The lead men are with these guys every day, day in and

19  day out.  They know the work habits of these individuals.  If

20  they have a concern that somebody is not working as hard as

21  he possibly can work, then the lead man would bring it to the

22  attention of a supervisor or a manager.  If it's a consistent

23  problem with an employee and then he'll bring his concern to

24  a manager.

25  Q    Were you running a regular production report based on

1  the Kronos system to gage the performance of production

2  employees?

3  A    Only if there were times of continuous problems would we

4  check an individual against a particular car.  A lot of the

5  times, the car type, if it can be worked in a timely manner,

6  there would have to be a consistent problem with a certain

7  individual.

8  Q    But would you run a regular production report to review

9  the production in general of all of the employees or all of

10  the employees doing ops?

11  A    We would run a regular report of the production of the

12  cars.  If we saw a certain area was consistently a problem,

13  then I'd look into that.

14  Q    Did those monthly production reports contain information

15  that was broken down by the individual employee?

16  A    We could run that report if that wasn't something that

17  was automatically generated.

18  Q    So it was not your practice to run a regular report that

19  would allocate production numbers or records to a particular

20  employee?

21  A    No, it's not practice unless there was a red flag for

22  that to happen.

23  Q    In other words, the monthly production report that it

24  was your practice to run didn't break down information by

25  employee work?

1   A     That's correct.

2   Q     What information was contained on the regular monthly

3   production report?

4   A     The customer, the type of car, the hours on the car, the

5   hours actually worked on the car.

6   Q     So both the hours estimated on a car and the hours

7   actually worked on a car?

8   A     Yes.

9   **(Long pause)**

10  Q     When production employees were hired for the Greenbrier

11  Tucson facility, were they were given any type of employee

12  handbook or a policy manual?

13  A     Yes, every employee has a company handbook.

14  Q     Was that a handbook that was specific for the Tucson

15  facility or was it the same other facilities?

16  A     It was the same for all facilities.

17  Q     Was there any type of new employee training or

18  orientation that was performed?

19  A     Yes, there was.

20  Q     Who was responsible for performing that?  Was it Ms.

21  Madrigal?

22  A     She did a portion of it, and the safety person did a

23  portion of it.

24  Q     By safety, are you referring to the safety manager?

25  A     Yeah.

1  Q    At the time you left the facility in November 2012, that

2  was Julio Arasquez, correct?

3  A    That's correct.

4  **(Long pause)**

5  Q    Other than new employee orientation and safety training,

6  was there any other type of training or orientation that was

7  offered to new production employees that were hired at

8  Greenbrier?

9  A    Yeah, they had to go through a portion of the safety

10 training that was code blue life protection.  It was all

11 about the car movement in the facility and how switch crews

12 could be moving cars at anytime.

13 Q    Was this orientation and training process offered to

14 employees out of Intermountain Staffing?

15 A    Yes.

16 Q    Did that include a copy of the handbook?

17 A    I don't think they got copies of the handbook.

18 **(Long pause)**

19 Q    What was your understanding of the facility's economic

20 situation in 2012?

21 A    I had knowledge that the shop was not meeting the

22 production goals that were set forth.  It was short on

23 workforce.  It was basically struggling to stay profitable.

24 Q    Who set those production goals?

25 A    It was a group of partners, general manager, regional

1    manager and plant manager figuring out the next fiscal year.

2    Q    A fiscal year did not run the calendar year.  Is that

3    right?

4    A    That's correct.

5    Q    What was the fiscal year?

6    A    September.

7    Q    September 1 was the beginning of the fiscal year?

8    A    Yes.

9    Q    What was your understanding of Greenbrier's economic

10   situation, at least in terms of the wheel repair and parts

11   division at the end of the 2012 fiscal year?

12   A    I understood it to be profitable with everything

13   involved.  Even the repair was profitable, but the other four

14   shops were not.

15   Q    What other four shops are you referring to?

16   A    The San Antonio shop was on watch, Cleburne, Texas,

17   Omaha, Nebraska, and I believe Chehalis, Washington.

18   Q    How many repair shops were there for Greenbrier?

19   A    I couldn't say what they were at that time, I'm not

20   sure.

21   Q    The five shops that you mentioned that were on watch --

22   A    Well, they put them on a Big 5 Program to help turn their

23   shops around.

24   Q    Can you explain what that Big 5 Program was?

25   A    It the goal passed down from corporate, it was just an

1   effort to try and turn things around.

2   Q    That took place at the beginning of the 2012 fiscal year,

3   or the beginning of 2012?

4   A    Calendar year 2012.

5   Q    That that's meeting that you referred to among the general

6   manager and --

7   A    No, it wasn't in that meeting.

8   Q    Was that at the beginning of the 2012 calendar year?

9   A    Yes.

10  Q    Who did you have that discussion with?

11  A    That came from corporate HR and the VP, and Gordon

12  Hutchins and Kevin Stewart, all the regional managers.

13  Q    Were you present for those discussions?

14  A    No.

15  Q    Who communicated the substance of the discussions to you?

16  A    It would've been our general manager, Kevin Stewart.

17  Q    The change you described with the company instituting a

18  general manager, whereas previously you reported directly to

19  the region manager.  Was that part of the implementation of the

20  Big 5 Program objective?

21  A    No, it wasn't part of Big 5, that was just to help Tucson.

22  Q    What other initiatives or steps were taken by you or by

23  Greenbrier to help Tucson specifically?

24  A    Well, there was above me, corporate people discussed with

25  customers to try to get more work into the facility.  That was

1   what the ultimate goal was, was to just be able to work on more

2   cars.

3   Q    More generally than the Tucson facility, what were the

4   steps of the Big 5 Program?

5   A    For Tucson or for the whole company?

6   Q    Yes, specifically for Tucson, let's start with that.

7   A    The production for a couple of years, maybe even more --

8   the production in Tucson was low, not hitting expectations.  So

9   that's when they thought maybe a general manager would help us

10  with that at Tucson.  That's when they came out with the Big 5

11  Plan to also help us.  Specifically for Tucson, it was

12  steadily increasing the workflow to the shop.  We wanted to

13  have employees in place for when that would fully arrive.

14  Q    Were there other Big 5 initiatives that were applicable

15  to all of the five shops that were on watch?

16  A    I don't think one of them had anything different than

17  the others.  They were all specific of the program.

18  Q    You said production had been low or that that the

19  facility had not been meeting its expectations for a couple

20  of years prior to this Big 5 Program, correct?

21  A    Yes.

22  Q    When did that start?  How long had it been low?

23  A    I came to Tucson in late 2008 and there were 120 to 130

24  employees.  When the economy was sinking very low and the

25  work was dropping off, so the first I was there, I had to lay

1   off numerous employees.  My lowest number of employees I had

2   at the facility was 63.  From that point on, it was very hard

3   for Tucson to get back up and become a profitable facility.

4        There were situations that came a long way, but there

5   was an immigration issue that came up and we lost a number of

6   people during that situation.  These were key people that

7   turned out to be not particularly able to be in the United

8   States, and we thought they were.  We lost supervisors, we

9   lost lead men, and we just could not get back on our feet at

10  the shop from all these situations.

11  Q    Prior to coming to the Tucson facility, did you work at

12  Greenbrier in another capacity?

13  A    Yes, I did.

14  Q    What capacity was that?

15  A    When I came out to Tucson, I had been in Southern

16  Florida in the Miami area.  It was a repair facility down

17  there with no shop basically.  It was just running on a

18  single track.  I was running it for three and a half years

19  and we were attempting to work the railcars down there.  It

20  never materialized, so I shut down that facility and then

21  came to Tucson.

22  Q    What was your position with the Miami facility?

23  A    Plant manager.  It was directly related to the economy

24  why that facility is not open.

25  Q    Did you see a decline in work in the Tucson facility in

1    2012?

2    A    Overall, I would say there was a decline, but for the

3    year 2012, I couldn't honestly say that it fell off.  It just

4    never picked up to what we needed it to be at.

5        JUDGE LAWS:  I'm going to assume when you say 2012, you're

6    referring to calendar year unless you specifically say --

7        MS. SHIH:  That's correct.  Thank you.

8        WITNESS:  Yes, calendar year.

9    Q    So in the months prior to you leaving the Tucson in

10   November 2012, did you see a decline in work, the volume of

11   work?

12   A    In the volume of work, we did.

13   Q    As late as October 2012, you were still filling new

14   positions, correct?

15   A    We were trying to, yes.

16   **(Long pause)**

17       JUDGE LAWS:  I remember Mr. Miner saying he had a call at

18   noon.  It's about 10:30.  Let me know if it's a good time for a

19   mid-morning break.  Let me know it's a time for you subject

20   matter-wise to break.

21       MS. SHIH:  That would great, thank you.  Actually, if we

22   can take five minutes now for a restroom break?

23       JUDGE LAWS:  Why don't we take a longer midmorning break

24   now?  Let's be back at 20 of 11:00.

25   **(Off record)**

1   Q    Earlier, you testified you were employed by Greenbrier

2   after you left the Tucson in November 2012, and prior to

3   starting work in your current facility in 2013.

4   A    Correct.

5   Q    Were you actually performing work for Greenbrier during

6   that time?

7   A    No.

8   Q    Were you on personal leave?

9   A    Administrative leave.

10  Q    You were not included in the reduction in force,

11  obviously, in November of 2012.

12  A    Well, I wasn't working at Tucson anymore.

13  Q    But you were never terminated by the company, correct?

14       MR. MINER:  Objection, calls for a conclusion, Your Honor.

15       JUDGE LAWS:  I'll allow it, based on this witness'

16  understanding of termination.

17  Q    Were you aware of the reduction in force prior to November

18  12th, 2012?

19  A    No.

20  Q    When did you become aware of the reduction in force?

21  A    November 12th, the morning of.

22  Q    What were you told on the morning of November 12th, 2012?

23  A    Gordon Hutchins, regional manager, and Lisa Maxey with

24  regional HR, they came to my office and told me that they were

25  restructuring Tucson, and that I would be placed on

1  administrative leave until further notice.  That was pretty

2  much all they told me.

3  Q    Was that paid leave?

4  A    Yes.

5  Q    Was this the first reduction in force during your time as

6  plant manager in Tucson that you were not involved with?

7  A    Yes.

8  Q    How many other reductions in force were you involved with

9  during your time as plant manager for Tucson?

10  A    For the first year I was there in 2009, there was a

11  reduction in force that was based on work in the shop and how

12  many employees we needed to work that work.  So for a year, I

13  was laying off people at various times.

14  Q    Was that the only year you were laying off employees in

15  your time as plant manager?

16  A    Yes.  Well, in Tucson.

17  Q    During 2009, whether you were conducting those layoffs,

18  were you making the determination as to which employees would

19  be laid off?

20  A    It was a group effort from lead men, supervisors,

21  managers who we wanted to keep.  It was based on the

22  leadership and management.

23  Q    When you say leadership and management, are you talking

24  about local management in Tucson?

25  A    Yes.

1    Q    Not corporate management?

2    A    That's correct.

3    Q    What factors did you look at in making the determination

4    in Tucson in 2009 at to which employees you laid off?

5    A    It was production, it was the bottom line, that we would

6    keep the most productive people and we would continue to work

7    through the rough times, ones we didn't have issues or

8    concerns with.  It based on production.

9    Q    When you say issues or concerns, are you talking about

10   issues or concerns with their production?

11   A    Production and attendance as well.  If a person had a

12   problem coming to work, we'd choose somebody who was there

13   every day.

14   Q    What about seniority, did that play a factor in this at

15   all?

16   A    No.

17   Q    Were any employees that were laid off in 2009 recalled?

18   A    Yes.

19   Q    Were you involved in the decision after determining

20   which employees would be recalled or offered to be recalled?

21   A    Yes.

22   Q    What factors did you look at that determination?

23   A    There again, the production of how they were when they

24   were working for us, and it was same reasons we brought them

25   back.

1  Q    You made the determination to layoff employees that were

2  not considered to be productive, but you would recall them or

3  rehire them at that point?

4  A    At the time, we were hanging on to good people who were

5  working day in and day out.  It was a hard decision to do a

6  layoff, and so we tried to get these employees back to work.

7  Q    Were the employees you were laying off in 2009 were not

8  necessarily employees that you would say were not good

9  performers or good producers?

10  A    They were probably last in performance of the employees

11  that were still working.

12  Q    At that time in 2009, how did you gage the level of

13  production or the the production of those facilities in order

14  to determine who would be laid off?

15  A    We went through various discussions with lead men who

16  worked with them day in and day out and their supervisors and

17  managers.

18  **(Long pause)**

19  Q    How many employees were laid off in 2009?

20  A    We had between 120 and 130 when I started, and I -- we

21  bottomed out at 63.

22  **(Long pause)**

23  Q    But those were layoffs conducted over the course of a

24  year?

25  A    Yes.

1    Q    What was the largest number of employees that you laid

2    off at any one time in 2009?

3    A    I'd say approximately ten.

4    **(Long pause)**

5    Q    When you left the Tucson facility in November 202, what

6    was the attendance policy at that time, in terms of the point

7    system?  Can you explain?

8    A    When an employee calls and notifies that he's going to

9    be late or off, it's called a timely call.  A timely call is

10    within two hours of his starting time.  If he calls us and

11    notifies us, he gets one point if he's gone for the whole

12    day.  If he calls in less than two hours, then it's a half

13    point.  If he calls and wants to take PTO for that day, then

14    he gets a half point.

15    Q    When you say within two hours of the start time, is that

16    within two hours prior to the employee's start time or can it

17    be after his start time?

18    A    After.

19         JUDGE LAWS:  PTO is paid time off?

20         WITNESS:  Yes.

21    Q    What other types of absences or tardies would get the

22    employees points under the attendance policy?

23    A    If it's a no call/no show and they missed the whole day,

24    that was three points.  When an employee reached two points,

25    they got a verbal warning to let them know they had reached two

1    points on their attendance.  When they reached five points,

2    they got a written warning, and that went in their file.

3    Q    Who issued those written warnings?

4    A    When I was plant manager, either me or the production

5    manager would issue them or it was through their supervisor.

6    Q    And the verbal warnings?

7    A    Same thing, either myself or the production manager and

8    the supervisor.

9    Q    What other kinds of discipline were beyond a written

10   warning?

11   A    Eight points was a three-day suspension, nine points was

12   termination.  That's how the policy is written, but they give

13   the plant manager leeway on certain situations if where points

14   could be revoked if it was a family emergency situation,

15   something like that.  They let us consider those situations

16   that are different.

17   Q    Did employees receive a copy of this written policy in

18   their employee handbook?

19   A    Yes.

20   Q    At what point would an attendance point fall off or go

21   away?  How does an employee lose their --

22   A    If an employee has attendance issues because of a family

23   emergency that no one else could do it, then something like

24   that would knock off those points.

25   Q    It sounds like you're explaining about the discretion that

1  you had whether to issue or not issue points.  What I was

2  actually trying to get you to explain was, how do points come

3  off of an employee's record.

4  A    At the end of a year.  If you get one point, one year

5  later that point falls off.  It's a rolling situation.  So

6  every year, a point would fall off.

7  Q    So if an employee earned a point on January 1st and then

8  a point on February 1st of the same year, and those were the

9  only two points they had for the year, the following January

10  1st, they would be back to just the one point?

11  A    That's correct.

12  Q    Then the following February 1st, it would be back down

13  to zero?

14  A    That's correct.

15  Q    Are you aware of any situations during your tenure as

16  plant manager in Tucson of the company wiping out the

17  attendance points for all of the employees?

18  A    Not in Tucson.

19  Q    But as a plant manager, you had the discretion to

20  determine whether a certain situation would give an employee

21  points or not give an employee points?

22  A    Yes.

23  Q    Who is responsible for tracking attendance points of

24  employees?

25  A    HR.

1   Q    That was, at the time you left Tucson, Ms. Madrigal?

2   A    That's correct.

3   Q    Who would employees have to call in to in order for them

4   to call about an absence?

5   A    Their supervisor, and there's also a system that they

6   can leave a message.  We encourage them to call their

7   supervisor.

8   Q    So in order for Ms. Madrigal to track the points that

9   were being allotted to employees, the information about that

10  call or that absence would then be communicated from the

11  supervisor to her?

12  A    Yes.  Kronos, the time clock, would track those points.

13  They kept track of that system, and we could add comments

14  like no call/no show, family emergency.

15  Q    Who has access to be able to add comments like in

16  Kronos?

17  A    I know HR has access, production manager has access.

18  I'm not sure the supervisors did.  I couldn't answer that for

19  sure.

20  Q    How would an employee know at any given time if they

21  wanted information of how many attendance points they had

22  accrued?

23  A    They could ask.

24  Q    Would that information be given to an employee on a

25  regular basis like on a monthly report or anything like that?

1  A    No.

2  Q    So the only way an employee would be able to track their

3  own points is by keeping some kind of mental track of that?

4  A    I'm not sure that they can scan their card and do that

5  on the clock itself.  I don't know if that information is

6  accessible to -- that they can check their PTO on the clock

7  and the hours they worked, but I'm not sure.

8  Q    Was it your practice to run regular attendance reports

9  on production employees?

10  A    I did not.  I let Kronos take care of it and HR.

11  Q    Was it your practice to regularly review attendance

12  points on employees?

13  A    The only time I would look at their attendance points

14  was if there was an issue.

15  Q    How would you learn about an issue with an individual?

16  A    The Kronos system can notifies management if a person

17  has attendance issues.  If they got five points, you got

18  notice from Ms. Madrigal.

19  Q    Was she responsible for making sure that whatever

20  appropriate discipline in the policy was administered once an

21  employee reached that level?

22  A    She wasn't responsible to see that it happened, but she

23  was responsible to inform a manager, a production manager,

24  that there's a situation.

25  Q    When you received information from her that an employee

1  had reached five points or eight points, what was your

2  practice, what did you do?

3  A    I would look to see what triggered the final point and

4  what was the situation behind that, if they just slept in or

5  if they had a family medical emergency and I addressed it.

6  Q    When you say addressed it, if it warranted discipline,

7  were you involved in actually having the discussion with the

8  employee?

9  A    I could, the production manager could, but the

10 production manager and the supervisor were always the ones to

11 do it.

12 Q    Were you involved in any disciplinary actions for

13 violations of safety policy when you were the plant manager?

14 A    Yes, I would imagine I was.

15 Q    Did the safety manager have the ability to administer

16 discipline for violations of the safety policy on his own?

17 A    No, he would bring that to myself or the production

18 manager.

19 Q    Can you explain what an end of car cushion unit is?

20 A    Yes, it's a giant order that is placed at the end of

21 some cars, not all of them.

22 Q    Employees often have to move those units using a

23 forklift, correct?

24 A    Yes.

25 Q    Are you aware of any employees during your tenure as

1    plant manager that were discharged for failing to strap an

2    end of car cushioned unit?

3    A    Yes.

4    Q    What employees were discharged?

5    A    I couldn't tell you their names right now, but the

6    situation is that these cushioned units have thousands of

7    pounds of gas pressure inside them.  The internal mechanism --

8    internal shaft is just threaded into an internal nut.  The

9    shaft is that big around.

10       JUDGE LAWS:  So that's about six inches?

11       WITNESS:  No, it's probably a two and a half to three-inch

12   diameter.

13   A    With that high pressure on those internal parts, once that

14   cushioned unit is dropped down and out of containment, it could

15   fire that shaft out from the cushioned unit body.  It will --

16   if it were to hit a person, it could kill them.  So we have a

17   policy in place that we strap the straps on that shaft to hold

18   it into the body so that does not happen that it flies out and

19   hurt somebody.

20       It's a policy we adhere to because it's a dangerous

21   situation if it's not followed and that shaft comes out.  If an

22   employee violates that safety policy, then it could be terms

23   for discipline.

24   Q    Which job category of employees are trained on that

25   policy?

1  A    The welder repairman would be trained on it.  They could

2  be the repairman on a car, so they're trained on it.

3  Q    So all production employees don't go through the same

4  safety training?

5  A    That situation, all production employees would have that

6  shop training.  The material handlers needed to have it.  It

7  was a serious situation.

8  Q    During your time as plant manager, all production

9  employees would have received training on that issue?

10  A    Yes.

11  Q    Do you recall specifically any employee, during your

12  tenure as plant manager in Tucson, who was discharged for

13  violating that policy?

14  A    No, I don't recall anyone getting discharged for that.

15  Q    Do you recall any employees who were warned or

16  disciplined or received retraining?

17  A    Yes.

18  Q    Do you recall who specifically which employees?

19  A    There's one with the last name, Madrid.

20  Q    What was his position?

21  A    I believe at the time, he was a lead man.

22  Q    In which shop?

23  A    In the center shop.

24  Q    Any other employees disciplined or otherwise counseled

25  for violating that policy that you recall?

1   A    That's the only incident.

2   Q    What kind of discipline did he receive for violating

3   that policy?

4   A    He got a written warning and retrained.  Everybody went

5   through retraining again.

6   Q    When did that incident take place?

7   A    I don't recall.

8   Q    Do you recall the year?

9   A    If I remember, Kevin was the general manager at that

10  time, so it would've been 2012.

11  **(Long pause)**

12  Q    During your tenure as plant manager in Tucson, there was

13  no safety poker or safety raffle program in place, correct?

14  A    That's correct.

15  Q    Did you ever conduct any employee satisfaction surveys

16  during your tenure as plant manager in Tucson?

17  A    We had what we called communication meetings.  The

18  regional manager or general manager would come on a regular

19  basis, probably twice a year, and do an employee

20  communication meeting.  They would ask all of the shop -- the

21  Tucson managers to not be in the room when they asked

22  questions of -- when employees were asking questions or

23  making comments during the communication meetings.  So the

24  employees, if they had a situation or a complaint about one

25  of the managers, they would feel more free to express

1    themselves about that.

2    Q    These were in person opportunities for employees to ask

3    questions or give feedback?

4    A    That's right.

5    Q    This was to the regional manager and/or the general

6    manager?

7    A    That's right.

8    Q    What about written employee satisfaction surveys that

9    elicited employee feedback about their supervisors or working

10    at the plant in general?

11    A    At one time, we put up suggestion boxes and we got no

12    suggestions, so we quit doing that.

13    Q    Do you recall when that happened, during what timeframe

14    they were up?

15    A    It must've been in 2011.

16    Q    During the time you were the plant manager in Tucson,

17    there were no incidents where employees were given written

18    satisfaction surveys or employee surveys to complete

19    anonymously about their satisfaction?

20    A    Not that I recall.

21    Q    Were CEO bonuses ever given out to employees during your

22    time as plant manager in Tucson?

23    A    Yeah, there was one that came out.  Initially when I

24    first got to Tucson, they were trying to do yearly bonuses.

25    During my stay there, they changed them over to a share

1   quarterly.

2   Q    Anything specifically referred to as a CEO bonus?

3   A    No, I don't recall them being called CEO.

4   Q    You said that during your time in Tucson they were

5   trying to do the quarterly share program.  Did that actually

6   take place?

7   A    Yeah, it did.  It was late in the development.  They

8   were trying to do it early on and there were so many factors

9   that wanted to include in it, safety was one, attendance was

10  a part of it, and production was a part of it.  Trying to get

11  all of that stuff in it was quite a process.

12  Q    When you left the facility in November 2012, were

13  employees receiving quarterly bonuses based on the factors

14  that you described?

15  A    They were receiving quarterly bonuses, but not based on

16  those factors.

17  Q    What were they receiving bonuses based on?

18  A    Greenbrier as a whole with all of its entities included,

19  if it was production, then Greenbrier would give all the

20  employees a bonus per the number of years that they had been

21  employees.

22  Q    If the company determined that it was profitable enough

23  for employees to get a bonus, the bonus that employees would

24  receive in Tucson was not discretionary?

25  A    It was a number of a years' worth.

1  Q    When was the last time that bonus was given to

2  production employees in Tucson prior to you leaving that

3  facility?

4  A    I'm not sure.

5  Q    Were there any given in 2012?

6  A    It does seem like there were some bonuses given in 2012.

7  It was on a quarterly basis, so I'm not clear on that.

8  Q    Based on the company's profitability during that

9  particular quarter?

10  A    Yes.

11  **(Long pause)**

12       JUDGE LAWS:  Go ahead.

13  Q    You were aware that production employees in Tucson were

14  trying to organize a union in 2011, correct?

15  A    That's correct.

16  Q    That was the campaign with the United Transportation

17  Union?

18  A    Yes.

19  Q    You were aware of the production employees who were

20  leading that effort, correct?

21  A    I have certain names of individuals that were interested.

22  Q    What names?

23  A    Armando Lopez was one of them, Anajos Juarez was one.

24  Q    Who had you heard those names from?

25  A    They were quite vocal, so other employees would mention

1   it.

2   Q    You were aware that Jorge Martinez was part of the effort

3   to organize the union, correct?

4   A    I'm not recalling him.

5   Q    You don't recall being involved in issuing a written

6   warning to Jorge Martinez for harassing people about the union

7   campaign?

8   A    There was a situation, but I don't remember who was

9   involved in it.

10  Q    Do you recall being involved in the decision to issue a

11  written warning?

12  A    Yeah, I would've been involved in that decision through

13  corporate HR.

14  Q    You're aware that an election was held?

15  A    Correct.

16  Q    You were aware of the outcome of that election, correct?

17  A    That's correct.

18  Q    You're also aware that following that unsuccessful

19  election that there was a one-year bar prior to any

20  additional attempts to organize a union?

21  A    Yes.

22  Q    You're aware that that one-year bar expired at the end

23  of October 2012, correct?

24  A    Yes.

25  **(Long pause)**

1    MS. SHIH:  Your Honor, may I approach the witness?

2    JUDGE LAWS:  Sure.

3    MS. SHIH:  I apologize, I have not had a chance to make

4    copies of this exhibit, but we certainly will.  Fred, I will go

5    ahead and let you take a look at the document.

6    MR. MINER:  Is this from 2011?  What is the relevance of

7    this?

8    MS. SHIH:  We can have that discussion, but I'm going to

9    question Mr. Morrison about the document for now.

10   MR. MINER:  I'm not going to object if you simply want to

11   identify some of these that this witness has some knowledge,

12   but I'm going to object to introducing this one.

13   MS. SHIH:  Okay.

14   Q    I'm handing you what's been marked as General Counsel

15   Exhibit 8.  Do you recognize that document?

16   **(General Counsel Exhibit 8 marked for identification)**

17   A    Yes, I've seen it.

18   Q    Is that your signature on that document?

19   A    Yes, it is.

20   Q    What is that document?

21   A    It's a disciplinary action.

22   Q    That was issued to Jorge Martinez, correct?

23   A    Yes.

24   Q    In August of 2011?

25   A    Yes.

1  Q    The discipline was issued to Mr. Martinez for soliciting

2  employees about union related matters during production time,

3  correct?

4  A    Yes.

5  Q    The disciplinary action was for violation of the

6  company's solicitation policy?

7  A    Yes.

8  Q    But it was specifically because he was engaging in union

9  activities during work time, correct?

10  A    During company hours, yes.

11  **(Long pause)**

12  Q    The disciplinary action reads that employees stated to

13  the company that he was -- that Jorge Martinez was soliciting

14  them about union related matters during production time.  What

15  was reported to you exactly that Mr. Martinez was doing?

16  A    I couldn't be specific on the situation.  I don't remember

17  Jorge Martinez.

18  Q    Do you recall hearing any employees report that he was

19  trying to get them to sign authorization cards?

20  A    I remember employees complaining about certain individuals

21  constantly bothering them during work about the union and to

22  sign the cards and whatnot.

23  Q    When you say certain employees, other than the two

24  employees that you previously mentioned, are there any other

25  employees that you recall by name?

1  A    Not right off the top of my head, no.

2  Q    Do you recall issuing any discipline to any other employee

3  in 2011 for soliciting employees about union matters during

4  company time?

5  A    I could not recall if there were more than one instance or

6  not.

7  Q    When you say more than one instance, do you mean involving

8  more than this employee?

9  A    Yes.

10  Q    Do you recall any instances during your tenure as plant

11  manager where you issued discipline in any form to employees

12  for violating the solicitation policy?

13  A    Yeah, I recall a specific individual, a lead man.

14  Q    What was that instance?

15  A    He was attending union meetings and also promoting union

16  cards on company property.  He was told that as the lead person

17  that he could not do that.  It was against company rules and

18  the laws that -- that was not acceptable and he continued to do

19  it, so we took disciplinary action on him.

20  Q    Who was that?

21  A    Adopho Florez.

22  Q    Was this during 2011?

23  A    Yes.

24  Q    The United Transportation Union campaign?

25  A    Yes.

1    Q    Any instances that you can recall during your tenure as

2    plant manager in Tucson where an employee was discipline for

3    violating the solicitation policy for engaging in activity that

4    was not related to union?

5    A    I don't recall.

6    **(Long pause)**

7    Q    You were present at a meeting that Al Lave conducted

8    with supervisors and foremen on October 31st, 2012, correct?

9    A    I don't recall the exact meeting.

10    Q    Do you recall a meeting that Al Lave conducted on

11    October 31st, 2012 with other management at the Tucson

12    facility and discussed the union organizing effort?

13    A    Yeah, a year after the UTU, yes.

14    Q    Correct.

15    A    Al came out to brief us that it's been a year, keep your

16    eyes and ears open for any union activity.

17    Q    Who else was present at that meeting?

18    A    It was the managers of Tucson, the production manager,

19    the material manager, all managers, supervisors, and lead

20    men.

21    Q    Margaret Madrigal was present as well, correct?

22    A    Yes, she was.

23    Q    During that meeting, Mr. Lave made a statement about the

24    one-year bar being up on October 31st, correct?

25    A    Yes.

1  Q    During that meeting, he also said that there was already

2  some discussion out there in the shop about trying the UTU or

3  some other union back in, correct?

4  A    I believe it was presented to him that someone had heard

5  some chatter about the union.

6  Q    During that meeting, Mr. Lave asked the supervisors and

7  other managers present, what are you hearing out there,

8  correct?

9  A    I don't remember him saying that specifically, no.

10  Q    You don't recall there being a discussion among the

11  managers present about what had been reported or what they were

12  hearing in the shop about the union organizing effort?

13  A    It was probably discussed if it was talked on company

14  property or if there was an offsite meeting.

15  Q    But it was discussed that by October 31st, the date of

16  this meeting, management was aware that there were

17  discussions going on in the shop among employees of trying to

18  organize again?

19  A    I would not say that management was aware of discussions

20  in the shop.

21  Q    You don't recall Mr. Lave specifically saying that there

22  is already some discussion out there in the shop about trying

23  to bring the UTU or some other union back in?

24  A    What I remember was, there was that information brought

25  to him that there had been talk.  I don't recall if it was in

1    the shop or if it was off the premises.

2    Q    Talk of employees that was reported to Mr. Lave?

3    A    Yes.

4    Q    By whom?

5    A    It was a lead man or a foreman that they had heard that

6    talk.

7    Q    Do you recall any specific comments made by managers and

8    supervisors in that meeting about what they had heard?

9    A    No.

10    JUDGE LAWS:  I need you to be a little more specific

11    there.  You said managers and supervisors, and the testimony

12    that lead men were in this meeting, so you need to clarify

13    whether they're lead men in your questions or not.

14    MS. SHIH:  It's our contention that lead men are not

15    supervisors, so I'm aware that they were present at that

16    meeting.

17    JUDGE LAWS:  When I'm looking through the transcript, it's

18    probably easier to refer to them as foremen if that's going to

19    be who you're referring to as first line supervisors.

20    MS. SHIH:  Well, I'm actually referring to --

21    Q    I guess my question for you is -- first let me back up.

22    Did the company characterize this as a meeting among strictly

23    management?

24    A    Yes.

25    Q    So during this meeting, were there any statements made by

1    any individuals present about the comments they were hearing

2    regarding the union effort?

3    A    Yes, that's where the comments were reported.

4    Q    What comments were reported?

5    A    That there had been talk of -- some more union talk.  I

6    was unclear if it was union talk on company property or if it

7    was something offsite.

8    Q    Do you recall Mr. Lave commenting during this meeting

9    that the company philosophy is that it's a nonunion company?

10   A    Yes.

11   **(Long pause)**

12   Q    Following the October 31st meeting, when did you become

13   aware that production employees were trying to attempt to

14   organize a union again?

15   A    After November 12th.

16   Q    But you were gone by November 12th, correct?

17   A    Yes.

18   Q    So nothing was reported to you between November 1st and

19   November 12th about any rumors of an organizing campaign, any

20   solicitation of cards, any discussions among employees of

21   union organizing?

22   A    No, there was nothing reported to me.

23   **(Long pause)**

24        MS. SHIH:  Your Honor, if it's not too early, I think

25   this might be a good time to take our break, and then I can

1   probably wrap up with this witness after we return.

2       JUDGE LAWS:  Before we do that, I want to talk about -- a

3   big box came in.  Is that documents?

4       MR. BIDDLE:  We're not sure what it is.

5       JUDGE LAWS:  That might factor in to what we do over lunch

6   as well.  Let's go off the record.

7   **(Off record)**

8       JUDGE LAWS:  While we were off the record, the

9   Respondent's counsel and representative looked over the box

10  that was sent.  It's several different documents, apparently in

11  no particular or organized fashion, so they are going to take

12  25 minutes or so to look through those.  We're coming up on

13  lunch as well, so why don't we be here ready to go back on the

14  record at 1:15.  If at that point, any of these documents, once

15  they're presented in an organized fashion, let me know at that

16  point.

17      MS. SHIH:  Thank you, Your Honor.

18      JUDGE LAWS:  Off the record.

19  **(Off record)**

20      JUDGE LAWS:  We are going to continue with the testimony

21  of Mr. Morrison.  Please remember you are still under oath.

22  Before counsel begins questioning you, a couple of things with

23  regard to the documents.  They've been produced for the early

24  to mid part of 2013, and a time period that the Acting

25  General Counsel had requested and that I do this is relevant,

1   most relevant, is the time period in and around the complaint

2   allegation, Paragraph 7, which is the description of the unit

3   and the alleged majority of unit members.

4        MS. SHIH:  Just to confirm with Respondent's counsel, I

5   know our understanding was as of yesterday that they were going

6   to be producing documents as they were able to compile them.

7   So I'm assuming that that is not all of the Respondent's

8   documents.

9        MR. MINER:  No, this is first set of documents.  We asked

10  them to bring them right over as soon as the copies were made.

11       MS. SHIH:  All right.

12       JUDGE LAWS:  Thank you.

13       MS. SHIH:  Thank you.

14       JUDGE LAWS:  Actually, before we go any further with

15  questioning, I do want to briefly talk scheduling for the next

16  week because I just received word of when it would be okay for

17  me to hear it, and I don't want to forget.  And I want to give

18  it as we as we can so schedules don't get tied up.

19       MS. SHIH:  Sure.

20       JUDGE LAWS:  Okay, let's go off.

21  **(Off record)**

22       JUDGE LAWS:  After a brief scheduling discussion, the

23  parties have set aside to meet October 21st and 28th for the

24  resumption of this trial.  The parties have also agreed that

25  we'll be here at 8:00 with the realistic expectation of

1  starting testimony at 8:30, with the caveat that Friday, I have

2  a flight out that's going to require an earlier time.

3      All right, back to business, whenever you're ready.

4  Q    BY MS. SHIH:  Earlier today you testified that on the

5  morning of November 12th you were informed by Gordon Hutchins

6  that there's going to be employees let go from the Tucson

7  facility, correct?

8  A    Correct.

9  Q    Were you -- what were you informed was the nature of

10 that separation?

11 A    It was all for the restructuring of the facility.

12 Q    Were you told specifically that it was a layoff or that

13 it was a reduction in force or that employees would be

14 terminated?

15 A    I don't remember exactly how they worded it, but it was

16 -- I took it that it would be a layoff.

17 Q    So your understanding was that at some point employees

18 may be recalled?

19 A    Yes.

20 Q    What do you recall Gordon Hutchins and Lisa Maxey

21 telling you about the layoff?

22 A    That was at the end of the discussion and I was more

23 concerned about me personally.

24 Q    Where did the conversation take place?

25 A    In my office.

1    Q    Were you told how many employees were being laid off?

2    A    No.

3    Q    Were you told the positions of the employees that were

4    being laid off?

5    A    No.

6    Q    Were you informed about the layoff of any other specific

7    employee by name?

8    A    No.

9    Q    Did you ask how many employees were being laid off?

10   A    No, I did not.

11   Q    What was communicated to you about the reasons for the

12   layoff?

13   A    Pretty much shop performance.

14   Q    That's the performance of that facility while you were

15   you were the plant manager?

16   A    That is correct.

17   **(Long pause)**

18   Q    You also testified earlier that the Tucson facility had

19   not meeting production expectations for a number of years.

20   Is that correct?

21   A    That's correct.

22   Q    Was the Tucson facility meeting production expectations

23   when you became the manager?

24   A    I couldn't answer that.

25   Q    Was there any time during your tenure as plant manager

1    where the production expectations were being met?

2    A    Yes, there were.

3    Q    What were the reasons the production expectations

4    weren't being met at the Tucson facility in 2012?

5         MR. MINER:  Your Honor, could I ask for a clarification of

6    what counsel is asking in terms of production expectations?

7         JUDGE LAWS:  I agree, it would be good for me to have that

8    explanation, what that entailed, what measures.

9         MS. SHIH:  I am actually -- I believe that was actually

10   what the witness explained earlier.

11        JUDGE LAWS:  We just want to know what it means.  What

12   does it mean?

13        WITNESS:  From me?  There are -- the bottom line is

14   certain margins of expense and profitability, and there's

15   margins of -- a gross margin for expenses and then margins

16   after expenses.  Trying to be profitable for expenses that are

17   taken out of the shop is what we were striving to do.

18        JUDGE LAWS:  Did your expenses include materials, labor,

19   overhead, everything?

20        WITNESS:  Everything, yes.

21   Q    So what were the reasons those profit margins weren't

22   being met in 2012?

23   A    There were various reasons, some of the reasons were a

24   lack of repairable cars coming to the facility.  Some of the

25   reasons were inefficiency from the workforce.  Some of the

1    reasons were it was a newer force, meaning that we had new

2    people and new positions that they weren't used to working.

3    That's because of employee reduction during the layoff or

4    during the immigration issues.

5        It was a variety of things that was never -- it wasn't

6    very often that everything was going smooth and everybody was

7    working efficiently and we had enough work to do.  When one

8    piece of that puzzle falls out, it's hard to put it back

9    together.

10   Q    One of the reasons that you mentioned was a lack of

11   repairable cars coming into the facility.  What was your

12   responsibility to either change that or increase the volume of

13   work that was coming into that facility?

14   A    The main thing we could do is let our customers know that

15   if they had a car for repair in the area that we would take

16   that car.  If they had any program work that they wanted done

17   on a group of cars, we would want that program work.  It was me

18   being in contact with the customers, just telling them that we

19   were available for the work to come to the shop.

20       JUDGE LAWS:  I want to clarify something else.  When you

21   talk about the production standards, is that simply that --

22   what's incoming is more than what's outgoing in terms of

23   money?  Or is there a level at which you're expected to be

24   profit-wise?

25       WITNESS:  There is -- I would say that there's probably

1  different levels that are expected to be -- the gross margin is

2  what they look at, they being corporate and stockholders.  Yes,

3  there is a gross margin that is looked at.

4      JUDGE LAWS:  Was that fixed or did it vary?

5      WITNESS:  It varied month to month.

6      JUDGE LAWS:  Okay.

7  **(Long pause)**

8  Q    In terms of negotiating new contracts with either an

9  existing customer or a new customer, that was left up to the

10  corporate level, correct?

11  A    As far as contracts go, yes.

12  Q    Is that also the case for bidding on new work or

13  additional work for existing customers?

14  A    As far as bidding a job, yes, it's up to corporate.  If a

15  customer just has a group of cars that he wants us to work on

16  without any set bid amount on it, then they can just bring them

17  in the shop without any contract.

18  Q    Earlier, you identified one customer for which you were

19  involved in the contract negotiations.  What was different

20  about that customer that you were involved in those contract

21  negotiations, but not in discussions with other customers?

22  A    He was a customer long before I arrived at Tucson.  That

23  Tucson shop was the only shop that he had repairs at.  Every

24  time he had a program, he would bring it to the shop.  The only

25  thing that would change on his process was maybe an increase in

1   the labor rate and that was discussed between him, myself, and

2   Gordon Hutchins or Kevin Stewart.  The repairs were, for the

3   most part, always the same on the cars.  He would just work a

4   different group of cars each year.  We weren't contracting to

5   do any specific repairs, it was mainly just a labor rate.

6   Q    Did you generate or were you provided with income

7   statements on a monthly basis for the Tucson facility while you

8   were the plant manager?

9   A    Yes.

10  Q    Were you responsible for generating those or were you

11  provided those?

12  A    I was provided those.

13  Q    Who provided those to you on a monthly basis?

14  A    Kathy -- she was the plant account manager.  I can't

15  remember her last name.

16  **(Long pause)**

17  Q    Villalobus?

18  A    Yes.

19  Q    You said she was the accountant for that facility?

20  A    Yes.

21  Q    She generated those income statements on a monthly basis?

22  A    Yes.

23  Q    What did you do with that information or that statement

24  when you received it?

25  A    I went over the statements with her and with the general

1    manager, and also the corporate accountant.  We went over to

2    make sure the numbers were accurate and correct.

3    Q    You had monthly meetings with regional management or

4    corporate management over the information contained in those

5    income statements?

6    A    Yes.

7    Q    Was the corporate accounting department involved in

8    those meetings?

9    A    They would be involved in the expectations we were going

10   to do that month.  Once the month was final, then they went

11   over the paperwork and the numbers and they were in on the

12   meetings.

13   Q    Who specifically from corporate accounting was involved

14   in those?

15   A    Dave Torres.

16   Q    Are these meetings that were held face-to-face?

17   A    Usually not, it was conference call.

18   **(Long pause)**

19   Q    At any time either before or after November 2012, did

20   you learn which employees had been laid off from the Tucson

21   facility?

22   A    No.

23   Q    So even sitting here today, you're not aware of what

24   employees were laid off?

25   A    I don't know every one of the employees that were laid

1    off.  I heard a couple names, but --

2    Q    What names had you heard?

3    A    I had heard that Margaret Madrigal and Jack Lopez, Terry

4    Pike, that they were.

5    Q    At anytime in 2012, did anyone ask you or direct you to

6    run any sort of production reports on -- analyzing the

7    production numbers or statistics of the employees in the

8    Tucson facility?

9    A    No.

10    Q    Did anyone ask you to run any sort of Kronos or time

11    reports to reflect the production employees' efficiency or

12    billing?

13    A    No.

14    Q    Did anyone in 2012 ask you or direct you to run any

15    attendance reports of any of the production employees in the

16    Tucson facility?

17    A    No.

18    Q    Did anyone in 2012 ask you or direct you to pull or

19    obtain copies of performance evaluations or appraisals for

20    any of the production employees in the Tucson facility?

21    A    No.

22    Q    Did anyone ask you your assessment of what production

23    employees had high productivity or good attendance --

24    A    No.

25    Q    -- in the Tucson facility in 2012?

1  A    No.

2  Q    So the individual employees that were selected for

3  layoff in November 2012 were selected without any input from

4  you?

5  A    Correct.

6  Q    How would corporate management analyze the efficiency,

7  the productivity, or the attendance of production employees

8  at the Tucson facility without speaking with you?

9      MR. MINER:  Objection, lacks foundation.

10      JUDGE LAWS:  I'll give the instruction to answer only if

11  you know.

12  A    I don't know.  They could do it through some employee

13  system, but I don't know.

14  **(Long pause)**

15      MS. SHIH:  Your Honor, may I approach the witness?

16      JUDGE LAWS:  Sure.

17  Q    I am handing you what's been marked for identification

18  purposes as General Counsel Exhibit 9.  Can you tell me if

19  you've ever seen that chart?

20  **(General Counsel Exhibit 9 marked for identification)**

21  A    No, this chart does not look familiar to me.

22  Q    Okay.  Thank you.

23  **(Long pause)**

24  Q    Do you recall a production employee in Tucson by the name

25  of Jaime Hernandez?

1   A    I remember the name, not specifically the employee.

2   Q    Do you recall recommending for a pay increase in September

3   2012?

4   A    No, I can't say that I do.

5   **(Long pause)**

6   Q    I'm handing you what's been marked General Counsel Exhibit

7   10.  Can you tell me if you recognize that document?

8   **(General Counsel Exhibit 10 marked for identification)**

9   **(Long pause)**

10  A    I don't remember this specifically, but I would say this

11  is accurate.

12  Q    You don't have any reason to think that the email that you

13  -- that the document reflects that you sent to Kevin Stewart on

14  Saturday, September 8, 2012 regarding Jaime Hernandez is not an

15  email that you sent?

16  A    No, I sent this email to Kevin.  Can I expound on that?

17  Q    Actually, I have another question for you.

18  A    Okay.

19  Q    The email to Kevin Stewart from you on September 8, 2012

20  suggests approval of a particular pay increase for Mr.

21  Hernandez, correct?

22  A    Correct.

23  Q    Who would've recommended that pay increase?

24  A    His lead man and supervisor.

25  Q    Based on that recommendation, were you recommending to

1  your general manager that that increase be approved?

2  A    Yes.

3  Q    How many levels of approval were required for an employee

4  to receive a pay increase?

5  A    It'd be the supervisor, the plant manager, and the general

6  manager, and HR as well.

7  Q    Do you recall at this time being informed by Hector

8  Barajas that Mr. Hernandez was one of his strongest men?

9  A    I don't remember that, but it says in here that I was told

10  that.

11  Q    And Hector Barajas was his foreman?

12  A    Yes.

13       MS. SHIH:  Your Honor, I'd like to move for admission of

14  General Counsel Exhibit 10?

15       JUDGE LAWS:  Any objection?

16       MR. MINER:  I'm not understanding the relevance of this

17  email exchange, Your Honor.

18       MS. SHIH:  The relevance is that the company has raised as

19  part of its defense for this reduction in force in November of

20  2012 that the reduction of employee was based on factors

21  which included production and attendance and other factors.

22  Our position is obviously that this particular employee,

23  we'll establish was selected for layoff, was being told in

24  September that he was one of the strongest men.

25       JUDGE LAWS:  I think it's relevant.  For that purpose, I

1    will admit General Counsel 10.

2    **(General Counsel Exhibit 10 received into evidence)**

3        MS. SHIH:  Earlier I had placed in front of the witness an

4    August 2011 disciplinary action issued to Jorge Martinez that

5    we did not have copies.  It's actually now been marked as

6    General Counsel Exhibit 8.

7        JUDGE LAWS:  Okay.

8    **(Long pause)**

9        MS. SHIH:  I'd like to move for admission of General

10    Counsel Exhibit 8 as well.

11        MR. MINER:  We object, Your Honor, both the relevancy and

12    foundational reasons.  First, the discipline is more than two

13    years old and dated more than 15 months before the petition was

14    filed in this case.  Second, I believe that Mr. Morrison

15    testified he did not recall this particular employee or the

16    discipline described in the disciplinary action.  For both of

17    those reasons, we object.

18        MS. SHIH:  Your Honor, in terms of relevance, I think it

19    goes towards animus on the part of the company towards

20    organizing activities and knowledge on the part of the company

21    that this particular individual was engaged in union activity

22    in 2011, one year later, was also organizing on behalf of the

23    union after the one-year bar.

24        MR. MINER:  Well --

25        JUDGE LAWS:  Hold on, let me -- this witness' signature is

1   on this document.  I think on that basis, it has been

2   authenticated.  I will admit it for knowledge of prior union

3   activity, albeit limited to the 2011 period.  For purposes of

4   this document, I will admit it for animus to the extent that

5   there is evidence that other solicitation not related to union

6   matters were permitted during production time and that union

7   matters were somehow treated less favorably.

8   **(General Counsel Exhibit 8 received into evidence)**

9       MS. SHIH:  Thank you, Your Honor.

10  **(Long pause)**

11  Q    Your move to your current position to the facility in

12  Washington -- I'm apologize, could you remind me where that

13  facility is located?

14  A    It's in Kennewick, Washington.

15  Q    Your current position is production manager, that was a

16  demotion from your former plant manager position?

17  A    Yes, it was.

18  **(Long pause)**

19      MS. SHIH:  Your Honor, may I have five minutes?

20      JUDGE LAWS:  Sure.  Is this to see if you have any more

21  areas to cover?

22      MS. SHIH:  Yes.

23      JUDGE LAWS:  Okay.

24  **(Off record)**

25  Q    In 2012, when you were the plant manager in Tucson, what

1    specifically was causing the facility to be unprofitable?

2    A    Like I said earlier, there's a variety of things amiss.    I

3    don't think there's any one particular item, but inefficiency.

4    Q    Can you explain what you mean by inefficiency?

5    A    The hours of the production employees are on the clock

6    were more hours than what we could actually charge the

7    customer.  They were taking too long to do the job.  That comes

8    mainly from inexperience.  There was some job that we were

9    required to get done in a specific time and they weren't able

10    to.

11    Q    When you say the workforce was inexperienced, in 2012, was

12    there a higher percentage than you would normally be expected

13    of inexperienced production employees in that facility?

14    A    When I'm talking inexperienced, I'm also including

15    positions of the lead men and foremen.  They were fairly new in

16    those positions as well and with hiring new people and losing

17    experienced people along the way, it just -- it was harder to

18    keep people working productively.  It was just lack of

19    knowledge of how to do their job efficiently.

20    Q    When you say that production employees working longer

21    than the time that had been set for a particular job, who

22    sets the time for those jobs?

23    A    Based on the original estimate when the car comes in, it

24    gets inspected and there's a specific timeframe that it

25    should be completed by.  For the CSX Company, that time is

1  specified.  For the other customers that we worked for at

2  that time, the AAR, Association American Railroad, we were held

3  to those time standards.

4  Q    Other than efficiency, which was the first factor that you

5  identified, what other factors in 2012 specifically were making

6  the Tucson facility unprofitable?

7  A    There's was -- some of it was the type of work when we'd

8  get those cars.  If those cars had minor repairs that needed to

9  be done, it cost more money to move the car around and all the

10  administrative costs.  If we had a group of cars that we could

11  do the same thing consistently over and over on, the guys did

12  get more efficient on those.  We didn't have many of those type

13  of cars in the shop.  We usually had bad orders coming in.

14      The CSX cars was a big portion of our repair work, and a

15  lot of them were falling off and we weren't doing the type of

16  work that we had in the past.  A combination of all the

17  factors, it's hard to be efficient.

18  Q    Any other factors play into the profit margin of that

19  facility?

20  A    There were months when we had high expenses.  If we had

21  heavy repairs on a crane, for example, it would cost $6,000 or

22  $7,000 for a specific crane.  We had two locomotives on the

23  facility at that time.  One of the locomotives lost the

24  traction and was out for repair.  The forklifts that we had,

25  the repairs on them were increasingly getting higher.  Just

1  operating the shop and the expenses were increasing as well.

2  Q    Any other expenses in particular that were problematic in

3  terms of that facility making money in 2012?

4  A    Nothing I can think of beyond those.

5  **(Long pause)**

6     MS. SHIH:  I have no further questions, Your Honor,

7  although I would like to reserve the right to recall this

8  witness when additional documents are produced that would be

9  relevant to his information.

10     JUDGE LAWS:  Understood.  Do you want a couple of minutes

11  before cross or are you ready?

12     MR. MINER:  Your Honor, our intention is recall this

13  witness in connection with our case.  So we do not have any

14  questions at this time.

15     JUDGE LAWS:  Very good.  I want to thank you for your

16  testimony this afternoon and this morning.  Please don't

17  discuss it, as I mentioned to you before, with any witnesses or

18  anyone who could possibly be connected with these proceedings

19  and is going to be called as a witness.  Thank you.

20  **(Witness excused)**

21     JUDGE LAWS:  Off the record.

22  **(Off record)**

23     JUDGE LAWS:  I am going to swear you in.  If you could

24  raise your right hand?

25  Whereupon,

1                          **ALAN LAVE**

2   was called as a witness, by and on behalf of the General

3   Counsel, and having been duly sworn, was examined and testified

4   as follows:

5        JUDGE LAWS:  If you could please state your name for the

6   court reporter?

7        WITNESS:  My name is Alan A. Lave, A-l-a-n, A, L-a-v-e.

8        JUDGE LAWS:  Thank you.

9                       **DIRECT EXAMINATION**

10  Q    BY MS. SHIH:  What is your current position with

11  Greenbrier?

12  A    Vice president human resources.

13  Q    How long have you been in that position?

14  A    Since June 1st, 2011.

15  Q    Did you hold any former positions with the company prior

16  to that?

17  A    No.

18  Q    Can you describe what your responsibilities and duties

19  are in your position as VP of HR?

20  A    I'm responsible for the new input functions as it

21  applies to our repair shops, our parts manufacturing facility

22  in the United States, Canada, and Mexico.

23  Q    How many facilities is that that you have HR

24  responsibilities for?

25  A    Somewhere in the mid-20s.

1  Q    Approximately how many employees is that that you

2  oversee human resources responsibility?

3  A    Approximately 1,200 to 1,300, I believe.

4  Q    What other human resources staff or personnel do you

5  oversee?

6  A    I currently have a staff of an administrator based in

7  the corporate office with me, and then I have four regional

8  HR managers, two of which are based in San Antonio, one is

9  based out of Omaha, Nebraska, and the fourth is based out of

10 Chicago, Illinois.

11       At my larger repair facilities, we have an HR generalist

12 person who has currently direct relationship to the

13 respective regional manager and a dotted line relationship to

14 the plant manager.

15 Q    What do you mean by dotted line relationship?

16 A    When I came onboard to the company, I understood the

17 structure at the time was the HR generalist reporting to the

18 regional HR manager.

19 Q    The four regional HR managers that you described, they

20 essentially have the same job duties and responsibilities but

21 in different geographic areas?

22 A    The majority of their jobs is the same in terms of

23 providing HR support to their respective shops.  Three of the

24 four also have corporate HR that are involved with me

25 directly.  For example, Michelle Bowden does the e-verifying

1   process for all shops.  Darcy Bishop, for example, is our

2   Kronos HR analyst, database administrator.  So if we had to

3   recode Kronos with a job title, she had that responsibility.

4   The regional HR manager in Chicago has shop support HR

5   functions and does not have any of the corporate HR activities.

6   Q    Who is the regional HR manager in Chicago?

7   A    Her name is Colleen Gold.

8   Q    I believe you identified two of the other four regional HR

9   managers.  Who's the fourth?

10  A    Lisa Maxey.

11       WITNESS:  Your Honor, may I move this microphone?

12       JUDGE LAWS:  Sure.

13       WITNESS:  Thank you.

14  Q    Lisa Maxey was the regional HR manager in 2012 to which

15  the HR generalist at the Tucson facility reported directly.

16  Is that correct?

17  A    Correct.

18  Q    The HR generalist at the Tucson facility in 2012, prior

19  to the November layoff, was Margaret Madrigal?

20  A    Correct.

21  Q    That position was filled after Ms. Madrigal was

22  discharged by Christine Martinez, correct?

23  A    Correct.

24  Q    She's still in that position presently.  Is that right?

25  A    No, she has left the company.

1   Q     Is there currently someone in the position of HR

2   generalist for the Tucson facility?

3   A     No.

4   Q     When was that position eliminated?

5   A     Christine Martinez's last day of employment was -- given

6   the closure was on September 5th, as of September 6th, there

7   was no need to replace that position.

8   Q     Was Ms. Martinez relieved as part of the decision to close

9   the Tucson facility?

10  A     No, she voluntarily resigned to take another job.

11  **(Long pause)**

12  Q     Besides the Tucson facility in 2012, over what other

13  facilities did Lisa Maxey, as a regional HR manager, provide

14  shop support?

15  A     2012?

16  Q     Yes.

17  A     2012, she initially had responsibility for our Alvers

18  Mill and office locations in downtown Portland.  She had

19  responsibility for our Springfield, Oregon facility.  She had

20  responsibility for our Mira Loma, California facility, our

21  San Bernardino, California wheel shop facility, Tucson,

22  Arizona, San Antonio, Texas, SoSan, Texas, Beckmann, Texas.

23  Q     As VP of human resources, who do you report to?

24  A     I currently report to William Lynn, senior vice president

25  and chief QA officer.

1     JUDGE LAWS:  Does the benefits administrator directly

2  report to you?

3     WITNESS:  Yes, Your Honor.

4  Q    Besides the benefits administrator and the four regional

5  HR managers, who else, if anyone, do you have as direct

6  reports?

7  A    Currently, no one else.

8  Q    Are there any other vacant positions that would otherwise

9  report directly to you in your position as VP of HR?

10  A    None.

11  Q    Has there been at anytime during your tenure as a VP of

12  HR for Greenbrier?

13  A    Yes.

14  Q    What other positions formerly reported to you?

15  A    The manager of training and development and the regional

16  safety manager.

17  Q    What happened to those positions?

18  A    The regional safety manager now reports to Mike Torres,

19  vice president of operations.  The manager of training and

20  development also now reports to Mike Torres.

21  Q    When did that change take place?

22  A    September 18th.

23  Q    September 18th?

24  A    Approximately, yes.

25  Q    I think you alluded to this earlier, your office is

1    located in Lake Oswego, Oregon?

2    A    Correct.

3    Q    That's where Greenbrier is headquartered.  Is that

4    right?

5    A    I'm employed by Gunderson Rail Services, LLC.  We do

6    business at Greenbrier Rail Services.  It's a subsidiary of

7    Greenbrier.

8    Q    When you refer to your subsidiary, you were referring to

9    Gunderson Rail Services, LLC?

10    A    Correct, headquartered in Lake Oswego.

11    Q    Thank you.

12    **(Long pause)**

13         MS. SHIH:  Your Honor, may I approach?

14         JUDGE LAWS:  Sure.

15    **(Long pause)**

16    Q    I am handing you what's been marked as General Counsel

17    Exhibit 9.  Do you recognize that document?

18    A    Yes, I do.

19    Q    Did you prepare this document?

20    A    No, I did not.

21    Q    What is this document?

22    A    It is a listing of the employees at the Tucson shop before

23    November 12, 2012 reorganization structuring.  It's a shop

24    organizational chart.

25    Q    Who did prepare this document?

1   A     I'm not sure.

2   **(Long pause)**

3   Q     When have you seen this document prior to today?

4   A     Sometime -- I want to say just before November 12th, the

5   restructuring.

6   Q     Are those -- is that your handwriting at the top of the

7   document?

8   A     Yes, it is.

9   Q     Do you recall when you made those notes at the top of

10  the document?

11  A     I don't know the precise date I wrote that.

12  Q     Who did you receive this from?

13  A     I either received it from Lisa Maxey or Juan Maciel.

14  Q     Is it your understanding that this is an accurate

15  organizational chart of the Tucson facility prior to the

16  November 2012 reduction in force?

17  A     Yes.

18  **(Long pause)**

19        MS. SHIH:  Your Honor, I'd like to move for admission of

20  General Counsel Exhibit 9.

21        JUDGE LAWS:  Any objection?

22        MR. MINER:  No objection, Your Honor.

23        JUDGE LAWS:  Thank you.  It is admitted.

24  **(General Counsel Exhibit 9 received into evidence)**

25  **(Long pause)**

1   Q    You indicated earlier that this chart that's been marked

2   as General Counsel Exhibit 9 was sent to you as an attachment

3   in an email.  Is that correct?

4   A    Yes.

5   Q    That's among emails that were produced to us under the

6   subpoena.  Is that right?

7   A    Yes.

8   Q    Would you be able to identify by reviewing some of those

9   emails to which email this was attached?

10  A    No, I laid them all out and couldn't tell which

11  attachments went to the emails.

12  Q    So by reviewing the actual emails that were part of that

13  production -- and I believe there's only five or six of those

14  emails, you would not be able to identify to which email this

15  chart was attached?

16  A    The documents you have there, I'm not able to identify

17  what was attached.

18  **(Long pause)**

19  Q    I am showing you what's been marked for identification

20  purposes as General Counsel Exhibit 11.  Are you able to

21  confirm whether or not Exhibit 9 was attached to that email?

22  **(General Counsel Exhibit 11 marked for identification)**

23  A    At this point in time, I'll refer to General Counsel's

24  Exhibit 9.

25       MS. SHIH:  Your Honor, may we go off the record just

1   briefly so I can have a discussion with Respondent's counsel

2   about this issue of trying to match up attachments with

3   emails that have been produced to us?

4       JUDGE LAWS:  Okay.

5   **(Off record)**

6       JUDGE LAWS:  Back on the record.  Just a brief discussion

7   about witnesses.  There was a witness that was subpoenaed and

8   she no longer works for the Respondent.  There was a little

9   trouble getting her here and testifying.  She's now here, but

10  the building closes in less than an hour, so I think it

11  doesn't make sense to interrupt this current witness'

12  testimony to get a brief amount of testimony from a witness

13  who would have to come back.  So we are going to proceed with

14  her later this week.

15  Q    When did you first become aware that the company was

16  planning to lay off employees in the Tucson facility in 2012?

17  A    I believe it was November 7th, 2012.

18  Q    What was communicated to you at that time?

19  A    Kevin Stewart was at the annual plant manager meeting in

20  Chicago and informed me that the decision had been made to

21  restructure the Tucson facility.

22  Q    Was this a telephone call from Mr. Stewart?

23  A    No, it was in person.

24  Q    Mr. Stewart's office is also in Lake Oswego?

25  A    His office is in Chehalis, Washington.

1   Q    Where did this conversation take place?

2   A    It was a hotel in Chicago, I don't remember the name of

3   it.

4   Q    So you were present at the annual plant manager meeting

5   in Chicago?

6   A    Yes.

7   Q    What were the dates of that meeting?  November 7th?

8   A    The managers conference was either the Tuesday or

9   Wednesday of that week.

10  Q    Was Lex Morrison present at that conference?

11  A    Yes.

12  Q    What did Mr. Stewart tell you about the company's

13  intention to lay off employees in the Tucson facility?

14  **(Long pause)**

15  A    The shop was continuing to lose money and that the

16  operations management team decided to restructure Tucson by

17  changing the plant manager, restructure the shop and reduce

18  the headcount because there was a lot of inefficiency of

19  people and the lack of inbound railcars, along with some

20  explanation to re-layout the shop in different workflows to

21  try to make the efficiency of railcars coming through.

22  Q    When you he told you that the operations management team

23  had made that decision, who specifically compiles the

24  operations management team?

25  A    Juan Maciel, Kevin Stewart, Mike Torres, and Todd Abel.

1   Q    That was a decision that was made at the plant manager

2   conference in Chicago?

3   A    I don't know that.

4   Q    But it was communicated to you at the plant manager

5   conference in Chicago?

6   A    Correct.

7   Q    Who made the ultimate decision as to which employees

8   would be selected for layoff?

9   A    It was probably a mix of Kevin Stewart, Juan Maciel,

10  myself.

11  Q    Who made the determination as to the number of employees

12  that would be laid off?

13  A    I don't know that.

14  Q    What was communicated to you about the number of employees

15  that would be laid off?

16  A    There wasn't a specific number communicated to us, a

17  communication saying that they were going to do a proportional

18  reduction of direct labor and indirect labor to some degree.

19  28 to 32 people, approximately.

20  Q    Who did you hear that from?

21  A    Kevin Stewart.

22  Q    When did he tell you that?

23  A    The next day or two of the plant manager meeting.

24  Q    So around November 8th or 9th?

25  A    Correct.

1   Q    When you refer to indirect and direct labor, can you

2   explain what that means?

3   A    Direct labor are people who work directly on railcars,

4   rather than an indirect labor person who is more of a support

5   person who doesn't work directly on the railcar.

6   Q    Is it your understanding for the Tucson that a welder

7   would be a direct laborer, whereas the HR generalist would be

8   an example of indirect laborer?

9   A    Yes.

10   Q    Other than the HR generalist, what positions in the

11   Tucson facility, and in regard to Exhibit 9 in front of you,

12   would be considered indirect labor?

13   **(Long pause)**

14   A    Ones I know for sure, the position title is plant

15   accountant, HR, admin, the safety manager.

16   Q    The other positions listed on this Exhibit 9 would be

17   considered direct labor positions?

18   A    No, I cannot say that.  I believe there are other

19   indirect positions on Exhibit 9, I'm just not knowledgeable

20   of the shop operations to know precisely what other jobs are

21   indirect.

22   Q    Are there other positions that you can identify would be

23   direct positions?

24   **(Long pause)**

25   A    No, I'm not knowledgeable of the terminology of the

1    operation.

2    Q    What was communicated to you at the time of the

3    discussion around November 7 through 9 about the layoffs?

4    What was communicated to you with regard to the proportion of

5    direct and indirect employees that needed to be laid off?

6    A    They tried to maintain some type of ratio between direct

7    labor/indirect labor for efficiency purposes.

8    Q    What was your role in determining what employees would

9    be selected for layoff?

10    A    There were only two roles.  One role, my involvement

11    with the restructuring and/or job change was discharge of the

12    plant manager, HR generalist, their production manager type

13    people or long term managers in the shop.  I was involved

14    with those individual decisions.

15        The second role I had was with the shop employee

16    population where my responsibility was to ensure that they

17    prepare their restructuring to lay off people to ensure that

18    there wasn't any disparate treatment or disparate impact

19    possibilities, FMLA, USERRA, EEO.

20        JUDGE LAWS:  Just to have these acronyms clear, FMLA,

21    Family Medical Leave Act?

22        WITNESS:  Correct, Your Honor.

23        JUDGE LAWS:  USERRA, Uniform Service Employees -- and I

24    don't know the rest, but USERRA.

25        MR. MINER:  Reemployment Retraining Act.

1    JUDGE LAWS:  There you go.  I should know that, but --

2    WITNESS:  We call it Military Leave Act.

3    JUDGE LAWS:  EEO, Equal Employment Opportunity, you gave

4    that one too.

5    WITNESS:  Thank you, Your Honor.

6  Q    What was your understanding of what factors were being

7  considered by the decision makers, who you've identified as

8  primarily Kevin Stewart and Juan Maciel?  What factors were

9  they considering in determining which employees would be laid

10  off?

11  A    The factors we used at Greenbrier to layoff were

12  productivity, safety record, attendance record, cross-

13  training, seniority in some situations but not a heavy

14  factor.

15  Q    You stated that those were generally the factors that

16  the company uses in a reduction in force.  Specifically in

17  this reduction of force, were those the factors that were

18  utilized to determine which employees would be selected?

19  A    Yes.

20  Q    Were there any other factors that were utilized to

21  determine which employees would be selected or not selected

22  for layoff?

23  A    None, to my knowledge.

24  Q    Was the expectation that this was a layoff and that

25  employees would be recalled?  Or was this a -- were employees

1   being terminated?

2   A    Employees were terminated.

3   Q    Is that what was communicated to the employees?

4   A    I don't know what was communicated.

5   Q    Does the company make a distinction between a layoff and

6   a reduction in force?

7   A    No.

8   **(Long pause)**

9   Q    What was communicated to you with regard to the

10  timeframe in which this layoff or reduction in force was to

11  be conducted?

12  A    I don't recall the specifics that were communicated to

13  me on that.

14  Q    Was there any deadline or timeframe that was

15  communicated to you?

16  A    On November 8 and 9, it was determined to be November

17  12.

18  Q    What was communicated to you about the reason for the

19  reduction to take place on that date?

20  A    I don't why that date was made.

21  Q    So nothing was communicated to you about the reasons for

22  that date?

23  A    No, other than when -- given the time of the losses of

24  the Tucson facility to that fiscal year, the losses in

25  September and October, the operations seemed to want to make

1    the change very quickly in order to try to turn the shop

2    around.  It was approaching a situation of the viability of

3    the operation.

4    Q    So the reduction in force was strictly an economic

5    decision on the part of the company, correct?

6    A    Correct.

7    Q    What specific losses are you aware of the Tucson

8    facility experiencing that resulted in the decision to

9    conduct the reduction in force?

10   A    I believe there's an exhibit that will share with you in

11   document production that has a summary of that.  I don't have

12   the precise dollar numbers.

13   Q    What's your understanding of the specific losses at the

14   Tucson facility was experiencing that resulted in the

15   decision to reduce employees?

16   A    The loss of money in fiscal year 2012, which ended

17   August 31st.  We lost money in September and in October,

18   which led to the decision to restructure.

19   Q    So these were losses of the Tucson facility experienced

20   throughout fiscal year 2012.

21   A    And probably part of FY '11.  The company had a history

22   for a couple of years of struggle.

23   Q    That was your understanding as well that the facility

24   had been experiencing losses for several years?

25   A    Correct.

1       JUDGE LAWS:  When you get to a subject matter switch at

2  this point, counsel, just let me know because we need to give

3  our court reporter time to pack up and be out by 5:00.  It's

4  not urgent, but within the next ten minutes or so production.

5       MS. SHIH:  Okay, thank you.

6  Q    When you say you were part of the Big 5 recovery, what

7  was your role on that team?  Was it to -- was it limited to

8  the Tucson facility or did it go to all the facilities that

9  were part of that watch list?

10  A    I could probably summarize it as two to three at most.

11  One role was for all five of the shops that were struggling

12  was to try to increase the employees to increase the revenue

13  of those shops.  Each of those five plant managers sent me a

14  forecasting document by month of what they're current

15  headcount was to what their projected headcount was for each

16  month.  I shared that information with a couple of people on

17  the Big 5 team.

18       My other role was -- part of the Big 5 recovery idea was

19  me being new to the company and having come from other work

20  environments, I shared with the senior management team the

21  inherent inefficiencies to the shops.  Our environment at

22  that time had a high degree of meetings and phone calls that

23  plant managers had to attend, which I recommended to the team

24  was keeping the plant managers out of the shop where they

25  needed to be.  It basically had them handcuffed to their

1  desk, to their computer and their phone.  The plant manager

2  needed more time in shop to better oversee and run things.

3  There were a high number of people that were always coming to

4  visit the Tucson shop and again was taking time away from the

5  plant manager and the production management team where they

6  weren't in the shop working with the team on working more

7  efficiently.  It would give them an opportunity to try and

8  turn around a struggling shop.

9       That's a summary of my role and my involvement with the

10  Big 5.

11  Q    Who else was part of the Big 5 Recovery Team?

12  A    Paul Wastmann, vice president of business development;

13  Mike Torres was part of that; possibly Todd Abel, who's our

14  VP of finance.  I'm not for sure whether he was in the

15  initial discussions when we formed the Big 5 task force.

16  Q    When was that formed?

17  A    I think it was December 2011/January 2012.  There were a

18  couple of other managers involved in that, I don't recall

19  precisely who.

20  Q    Were you part of that team from the beginning?

21  A    Yes.

22  Q    Which of the other facilities that were on that list of

23  five experienced reductions in force in 2012?

24  **(Long pause)**

25  A    I believe there were no other facilities that had a

1   restructuring that could be directly involved in all five

2   shops.  It was to ramp up the hiring to get people trained so

3   that we had people available there ready to work on those

4   cars.  Some shops did a better job in setting up their

5   training programs for their welders.  Tucson didn't do well

6   on that training of the influx that they hired people.

7   Q    Did any of those other shops have a union organizing

8   drive going on in 2012 that you're aware of?

9   A    I would have to check my records.

10      MS. SHIH:  This might be a good time to wrap up for the

11  day with this witness.

12      JUDGE LAWS:  Why don't we do that?  I actually have one

13  question before we do that, though.  Do you know if the other

14  four shops at issue were unionized at the time?

15      WITNESS:  No, none of them were unionized.

16      JUDGE LAWS:  All right.  We will resume tomorrow.

17                                              **(4:43 p.m.)**

18      **(Whereupon, the hearing in the above-entitled matter was**

19  **adjourned until Thursday, September 19, 2013.)**

20

21

22

23

24

25

**BEFORE THE**
**NATIONAL LABOR RELATIONS BOARD**
**REGION 19**

```
_____
                                       )
GUNDERSON RAIL SERVICES, LLC,          )
d/b/a GREENBRIER RAIL SERVICES,        )
                                       )
      and                              ) Cases 28-CA-093183
                                       )       28-CA-103909
SHEET METAL WORKERS' INTERNATIONAL     )       28-CA-104184
ASSOCIATION, LOCAL 359, AFL-CIO        )       28-CA-106613
                                       )       28-CA-111186
GUNDERSON RAIL SERVICES, LLC,          )
d/b/a GREENBRIER RAIL SERVICES,        )
                                       )
            Employer                   )       28-RC-092179
                                       )
      and                              )
                                       )
SHEET METAL WORKERS' INTERNATIONAL     )
ASSOCIATION, LOCAL 359, AFL-CIO.       )
                                       )
_____)
```

The above-entitled matter came on for further hearing,
pursuant to adjournment, before **Administrative Law Judge
Eleanor Laws,** at the Federal Courthouse, located at 38 South
Scott Avenue, Tucson, Arizona, on Thursday, September 19, 2013,
at 8:26 a.m.

## A P P E A R A N C E S

```
 1
 2   On Behalf of the Counsel for General Counsel:
 3
 4        EVA SHIH, ESQ.
 5        SOPHIA ALONZO, ESQ.
 6        National Labor Relations Board
 7        2600 North Central Avenue, Suite 1400
 8        Phoenix, Arizona 85004
 9        Phone: (602) 640-2161
10        Fax:   (602) 640-2178
11
12
13   On Behalf of the Employer:
14
15        FREDERICK C. MINER, ESQ.
16        STEVEN G. BIDDLE, ESQ.
17        Littler Mendelson
18        2425 Camelback Road, Suite 900
19        Phoenix, Arizona 85106
20        Phone:    (602) 474-3600
21        Fax:      (602) 957-1801
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
```

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE | CRT EXAM |
|---------|--------|-------|----------|---------|-----------|----------|
| Al Lave | 166 | | | | | 184 |
| | 184 | | | | | |
| Gerald Michael Torra | 283 | | | | | 341 |
| | 343 | | | | | |

```
 1                        EXHIBITS
 2
 3   EXHIBIT                     IDENTIFIED        IN EVIDENCE
 4
 5
 6   General Counsel
 7
 8      15                         166               174
 9
10      11                  Previously marked        184
11
12      12                         174               184
13
14      16                         185               194
15
16      14                         192               194
17
18      17                         194               195
19
20      18                         198               258
21
22      19                         201               206
23
24    20 - 28                      226               230
25
26      13                         259               266
27
28      29                         266               281
29
30      30                         277               281
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
```

**Argie Reporting Service**
5900 Nieman  Road, Suite 200
Shawnee, Kansas  66203
Phone:  (913)  422-5198

PX 000164

1                    **P R O C E E D I N G S**

2        ADMINISTRATIVE LAW JUDGE LAWS:  We are resuming today, and

3    I do want to remind you of the oath you took yesterday.  That

4    is still in effect today.

5        THE WITNESS:  Yes.  Thank you.

6        JUDGE LAWS:  Whenever you're ready.

7        THE WITNESS:  Ms. Shih, when I was working on the

8    documentation last night I reflected on my answers I provided

9    in court yesterday, and I have some clarification, if you'd be

10   interested.

11       MS. SHIH:  Is it an answer that you need to correct from

12   yesterday?

13       THE WITNESS:  I gave you the answer to their unionization

14   and big five shops and I said I couldn't quite recall whether

15   Chehalis had them under union campaign or not.

16       MS. SHIH:  Okay.  And if you want to clarify now if you've

17   been able to confirm.

18       THE WITNESS:  Yes, in mid-September 2012 the International

19   Association of Machinists and Aerospace workers did some

20   campaigning at our Chehalis, Washington facility.

21       MS. SHIH:  You said in mid-September 2012?

22       THE WITNESS:  Correct.

23       MS. SHIH:  Was there another representation petition filed

24   in that facility?

25       THE WITNESS:  No.

1        MS. SHIH:  Thank you.

2    **(General Counsel Exhibit 15 marked for identification)**

3                    <u>DIRECT EXAMINATION (Continued)</u>

4    Q    (BY MS. SHIH)  I'm handing you what's been marked General

5    Counsel Exhibit 15, which I'm okay if you have your original in

6    the front of you.  Take a minute just so you know what we're on

7    the same documents.

8    A    Yes.  Thank you.

9    Q    Do you recognize that document?

10   A    Yes, I do.

11   Q    What is that?

12   A    It is an email from Juan Maciel on November 8, 2012

13   addressed to me and Lisa Maxey adding us in on an employees'

14   list of our work force and initially proposed people for

15   layoff.

16   Q    And the email that's at the front of that exhibit actually

17   has a number of attachments behind it, correct?

18   A    It had one attachment to it.

19        MR. MINER:  Let me make a suggestion.  This is a multiple-

20   page document with, it looks like I has some attachments to it.

21   Perhaps we ought to mark these as General Counsel 15A, B, C, D

22   and so on so we can keep track of the separate exhibits.

23        JUDGE LAWS:  Makes sense, A, B, C, D, 1, 2, 3, 4.  Sure,

24   we should paginate them now that to the extent we cite to them

25   it's clear what page has been cited to.

1     MS. SHIH:  And that will be fine.  I was trying to get the

2  witness to clarify because it appears that there are three

3  attachments, but I believe he just stated there was only one

4  attachment.  So right now I'm a little bit confused.

5  A     Well, it was an excel file, and within each excel there's

6  different tabs or different sheets, I believe the terminology

7  is, and so they didn't have one exact file that was attached.

8  My understanding is there were three sheets contained within

9  that excel.

10  Q    Okay.  The excel file is the one that's denoted on the

11  email that was named Copy of Copy of Employment List 11-07-12?

12  A    Correct.

13  Q    And that attachment consisted of three different sheets,

14  each of which is attached –

15  A    Correct.

16  Q    - or is part of this exhibit.  Okay.

17     So why don't we go ahead then and identify – is that your

18  handwriting on the top of each of the sheets?

19  A    Yes.

20     MS. SHIH:  So the one that's labeled Tucson and pre 11-12-

21  12, we'll call that GC 15A.

22     JUDGE LAWS:  You know what, why don't we just paginate

23  them.  That's easier for me, 1, 2, 3, 4, 5.  GC Exhibit 15,

24  page 4 – or 3.  I think you were referring to page 3 actually.

25     MS. SHIH:  Okay.  Your Honor, I'm going to actually

1    paginate….

2         Just so we all have them in the right order, the order

3    that I have them in is the Tucson Emp and pre 11-12-12, Tucson

4    Emp Post 11-12-12, and then the Tucson Org Post 11-12-12.

5    A    I have that also.  Thank you.

6    Q    Thank you.  And you received this email on November 8th,

7    2012?

8    A    Yes.

9    Q    Were you still in Chicago for the plant manager's meeting

10   at that time?

11   A    I was either at our Chicago Heights wheel facility helping

12   out open enrollment, or I was driving from Chicago Heights

13   wheel facility to our Corliff Tower (phonetic), or I was at the

14   Corliff Tower when this meeting came.  I was not at the plant

15   manager meetings.

16   Q    What were the actual dates of the plant manager meetings?

17   A    Working backwards, Wednesday, November 7th was the half-day

18   wrap-up in the morning.  Tuesday then, November 6th, would have

19   been a full day work session.  And then Monday, November, I

20   guess, 5 would have been the evening kickoff dinner.

21   Q    So the dates of the conference or the meetings are Monday,

22   November 5th through Wednesday, November 7th?

23   A    Correct.

24   Q    And is it still your recollection that the first time you

25   heard about a planned layoff at the Tucson facility was on

1   Wednesday, November 7th?

2   A    Correct.

3   Q    What did you do with the lists that were attached to this

4   email when you received them?

5   A    I spoke to Lisa Maxey and told her I needed the race and

6   age data added to it.

7   Q    Had you received any instructions on what you were to do

8   with these lists?

9   A    No.

10  Q    Did you have any understanding or expectations of what you

11  were expected to do with the lists?

12  A    It was my self-imposed expectations that as the VP of HR

13  I'm responsible for our personnel actions.  So my activity was

14  to analyze their proposed list of layoffs with respect to EEO

15  statistical purposes of race analysis and age analysis and

16  whether anybody was on an FMLE leave, UCERRA leave, or Worker's

17  Compensation leave.

18  Q    What was your involvement in anything, or if anything in

19  creating the lists that are attached to General Counsel's

20  Exhibit 15?

21  A    My involvement was initially instructing Lisa Maxey to

22  create an additional roster list so she and Kevin Stewart and

23  Juan Maciel could then start working through preparing their

24  restructuring.

25  Q    And page 3, the list I identified as Tucson Emp Pre 11-12-

1   12, is that an employee list of Tucson and all the employees in

2   the Tucson facility as of November 8th, 2012?

3   A    No.  It's as of November 7th because that's the date on the

4   excel file and the email.  And it's a list of the entire

5   employee roster at Tucson.  Then down at the bottom there

6   appears to be a set of the temporary contract agency employees

7   at the bottom.

8   Q    When you instructed Lisa Maxey to create the initial

9   roster list, did you instruct her on like categories or what

10  information to include in the list?

11  A    I would have told her to give the standard basic

12  information and anything else that she thought relevant.

13  Q    And what information did you consider the standard basic

14  information?

15  A    Employee number, name, seniority date, original hire date

16  and last hire date, position title, position start date,

17  supervisor.  We use the pay rate for economic studies.  And

18  whether it was exempt or nonexempt.  I got involved more

19  intimately with any kind of personnel actions regarding our

20  exemplar force.

21  Q    And just to clarify, by exempt you're talking for purposes

22  of the Fair Labor Standards Act?

23  A    Yes.  Exempt from minimum wage and overtime.

24  Q    Okay.  Any other specific information that you requested

25  Lisa Maxey to include in that list?

1   A    Not off the initial list, no.

2   Q    When did you give Ms. Maxey the instruction to prepare

3   this initial roster list?

4   A    Sometime on November 7th.

5   Q    How did you communicate that to her?

6   A    Probably by calling her.

7   Q    The last column on page 3 of Exhibit 15, the column that's

8   labeled "Term Y/N," can you identify the meaning of that

9   column?

10  A    My understanding was that was the initial proposed list

11  for the RIF put together by, I believe, Juan and Kevin and

12  possibly Lisa.

13  Q    And term is an abbreviation for terminate?

14  A    Correct.  Term Y, and when it says "Y" they were proposing

15  that that person be terminated.

16  Q    Thank you.  Did you have any input of involvement into the

17  selection of that initial proposed list of employees to be

18  terminated?

19  A    No.

20  Q    Did anyone consult with you prior to making the selection

21  or the initial proposed selection of employees to be

22  terminated?

23  A    Yes.  Kevin Stewart did.

24  Q    In what manner?

25  A    He told me that they decided to remove Lex Morrison as the

1  plant manager, along with removing Maggie Madrigal, our HR

2  analyst, and removing Jack Lopez, who at that time had moved to

3  a QA inspector.

4  Q    And when did Mr. Stewart inform you of his decision?

5  A    November 7th, before he first told me about the

6  restructuring.

7  Q    In terms of the production employees, did anyone consult

8  with you prior to the initial proposed election of those

9  employees to be terminated?

10 A    No.

11 Q    Was this list the first indication you had as to which

12 production employees were being considered for termination?

13 A    Yes.

14 Q    Can you explain what the difference is between pages 3 and

15 4 of General Counsel Exhibit 15?

16 A    Actually they appear to be the same on initial review.

17     JUDGE LAWS:  Now I want to jump in here because I have a

18 question as to the last column "Term" for terminate, yes/no.

19 What does it mean for the very large number of employees who

20 don't have any notation in that column, if you know?

21 A    I don't know, Your Honor.

22     JUDGE LAWS:  Thanks.

23 Q    (BY MS. SHIH)  So despite that, the handwritten notes at

24 the top indicate one that is a pre-termination list and one is

25 a post-termination list.  The page 4 is not actually a roster

1   of employees that the Tucson facility expected to have after

2   November 12th, correct?

3   A    Well, other than deducing from this roster based on the

4   yes and no's, it could be deduced that it was the employees who

5   would remain after restructuring, but it's not a succinct list

6   of the remaining people, correct.

7   Q    Okay.  That succinct list of remaining people, is that

8   what would be reflected in page 5 of General Counsel Exhibit

9   15?

10  A    I believe so, yes.

11  Q    At the time this list was sent to you was any information

12  provided to you as to the number of employees that the Tucson

13  facility was seeking to eliminate?

14  A    I'm sorry, at the time it was sent to me?

15  Q    At the time it was sent to you on November 8th was any

16  information communicated to you about the number of employees

17  the company was seeking to eliminate in Tucson?

18  A    Nothing was communicated to me directly, other than

19  deducing from the yes/no column.

20  Q    You weren't told that you needed to – in terms of

21  analyzing the information to make sure that the company would

22  be in compliance with any EEOC concerns or anything like that.

23  You weren't told that you had to stay within a certain number

24  in terms of we need to eliminate, for example, 28 employees?

25  A    Not on November 8th as I testified yesterday.  When Kevin

1    Stewart first told me about restructuring, I asked him for a

2    ballpark range of employees.  He probably said upper twenties,

3    lower thirties, but they weren't sure yet.

4    Q    Okay.

5        MS. SHIH:  We'd like to move for admission of General

6    Counsel 15.

7        JUDGE LAWS:  Any objection?

8        MS. MINER:  No objection, Your Honor.

9        JUDGE LAWS:  That's admitted.

10   **(General Counsel Exhibit 15 admitted into evidence)**

11   Q    (BY MS. SHIH)  You stated that after you received that

12   list you asked Lisa Maxey to add race and age data to the list;

13   is that correct?

14   A    Correct.

15   Q    When did you – when did you give her that instruction?

16   A    That would have been either on November 8th after I

17   received Exhibit 15 or early on November 9th.

18   Q    And did she, in fact, send an updated list containing that

19   information to you?

20   A    Yes, she did.

21   Q    Did she send that to you by email?

22   A    Yes, she did.

23   **(General Counsel Exhibit 12 marked for identification)**

24   Q    I'm handing you what's been marked as General Counsel

25   Exhibit 12.

1      MS. SHIH:  And I apologize, our numbering is a little bit

2  out of order, but as I think we get caught up with these two

3  out of order we'll get back on track.

4      JUDGE LAWS:  That's fine.  Why don't we go ahead and pen

5  in the page numbers 1 through 4.

6  Q    (BY MS. SHIH)  Is this the email that you just testified

7  about that you received from Lisa Maxey with an updated list,

8  including the race or EEOC and age data?

9  A    Yes.

10  Q    And pages 2, 3 and 4 of this exhibit, are those the excel

11  spread sheets that made up the attachment to this email dated

12  November 9th?

13  A    Yes.  There's three tabs, that specific excel file.  Three

14  sheets, I'm sorry for my terminology

15  Q    If I'm not mistaken, it doesn't appear that there's any

16  EEOC or age data in the pages attached to the email.  Can you

17  clarify whether there was another attachment?

18      MS. SHIH:  Your Honor, could we go off the record for just

19  a minute?

20      JUDGE LAWS:  Is this to clarify –

21      MS. SHIH:  Well, it looks like perhaps some of the copies

22  have pages in different sequences.

23      JUDGE LAWS:  Okay.

24  **(Off the record)**

25      MS. SHIH:  I think I had asked if you could clarify

1  whether there was another attachment, or whether – essentially

2  it doesn't look like these charts reflect –

3      MR. MINER:  I didn't get a copy of what was just

4  exchanged.

5      MS. SHIH:  Sorry.

6  Q    (BY MS. SHIH)  If you can clarify whether there is a

7  missing attachment that did contain the EEOC and age data.

8  A    There's either ran incorrect sheet that I attached to this

9  or I, what do you call it, hid – I'll show you the columns to

10  print this out.  This database expanded when I printed this out

11  back in November.

12  Q    So the hard copy that we have in front of us may be

13  missing columns that were contained in the original file?

14  A    Not – well, maybe this one, but not when we get to the

15  next one.

16  Q    When you say the next one, what are you referring to?

17  A    The large spread sheet I provided you in response that is

18  dated 11-10-2012.

19  Q    And you're referring to the spread sheet that has a lot of

20  handwriting, underlining and notations?

21  A    Yes.

22  Q    Okay.

23  A    Let me tell you, the Court and yourself, I was traveling

24  through three states when these were coming in and out, so the

25  print isn't keeping track of it and it was a little confusing

1    one time.

2        JUDGE LAWS:  Okay.

3    Q    (BY MS. SHIH)  And if you can keep Exhibit 12 in front of

4    you –

5        MS. SHIH:  Your Honor, we're collating and marking copies

6    of, I believe, the document that Mr. Lave just referred to, but

7    I can go ahead and put this in front of you.  It's been marked

8    as General Counsel Exhibit 11.  And I'll – that original needs

9    to go to the court reporter, but I'll let you look at that for

10   a moment.

11   Q    (BY MS. SHIH)  Is that – excuse me.  Is that spread sheet,

12   which obviously has handwriting, but the original spread sheet

13   prior to the handwritten comments, was that attached to the

14   November 9 email from Lisa Maxey that's been marked as Exhibit

15   12?

16   A    Yes.

17   Q    Okay.

18   A    My apologies to the Court for the confusion.

19   Q    And that's a four-page document –

20   A    Correct.

21   Q    – that will paginate.  It appears that the first three

22   pages are – well, actually the first two pages are the spread

23   sheet itself.

24   A    Correct.

25       JUDGE LAWS:  I'm at a loss here because I can't page

1  through this.

2       And this was marked as?

3       MS. SHIH:  Exhibit 11.

4       JUDGE LAWS:  Exhibit 11?

5       MS. SHIH:  Yes.

6  Q    (BY MS. SHIH)  The page 3 are your handwritten notes on

7  the reverse side of the spread sheet, correct?

8  A    Correct.

9  Q    What is page 4?

10  A    I believe page 4 was a document I created from pages 1 and

11  2 to be able to better read the notes column that was provided

12  by Lisa Maxey.

13  Q    Okay.  So page 4 is not actually a spread sheet or a file

14  that was sent to you by Ms. Maxey?

15  A    Correct.

16  Q    But it was one that you created based on the information

17  in the spread sheet that was sent to you by Ms. Maxey?

18  A    That is correct.

19  Q    And it appears that on pages 1 and 2 of Exhibit 11, the

20  spread sheet that was sent to you by Ms. Maxey, two columns

21  have been added, one reflecting the EOOC and one reflecting

22  age.

23  A    Correct.

24       JUDGE LAWS:  And I just want to clarify it's not really

25  EEOC.  It's the Pierce Race National Origin (phonetic).

1    A    Correct.

2         JUDGE LAWS:  And the EEOC is a broader term than that.

3    A    Correct, Your Honor.

4    Q    (BY MS. SHIH)  And the handwriting that's on pages 1, 2

5    and 3 of Exhibit 11 is yours?

6    A    Yes.

7    Q    When you received this spread sheet from Ms. Maxey on

8    November 9th, what did you do with it?

9    A    I printed it out and then started doing an analysis on the

10   race ethnicity category by – I did an analysis of race at this

11   by the tire shop relative to the total of, and then also the

12   race analysis by separate job title.  I also did the same

13   analysis by age for the entire shop relative to the proposed

14   RIF list, and also made an analysis by job title.

15   Q    And when you say analysis, what exactly were you looking

16   for?

17   A    As a quality control check being an HR person I wanted to

18   make sure that from the EEO perspective that we were not

19   unwillingly planning to discharge a certain percentage of our

20   protected category over some other protected category or non-

21   protected category.

22   Q    Were you aware at the time you received the list of

23   proposed employees to be terminated what factors and what

24   documents Mr. Stewart, Ms. Maxey and Mr. Maciel had reviewed in

25   determining who should be on that list?

1    A    Well, I was not aware of what documents they had reviewed

2    to create this list.  I wasn't aware of the factoring.

3    Q    And those are the factors that you testified about

4    yesterday?

5    A    Correct.  I would like to clarify that answer.  The notes

6    column provided by Lisa Maxey, she would have obtained either

7    from the, probably from the Kronos attendance points tracking

8    system within the software.

9    Q    And that's the notes column on page 2 of Exhibit 11?

10   A    Correct.

11   Q    Do you know that she reviewed Kronos reports in inputting

12   that information?

13   A    I don't know for sure if she reviewed Kronos or not.  I

14   assume she did or some other separate file of attendance

15   issues.

16   Q    Did she ever communicate to you at any time that she had

17   reviewed any attendance reports or Kronos reports to determine

18   who had high attendance points?

19        JUDGE LAWS:  And if you're referencing a document, please

20   identify what it is.  I'm talking to the witness.

21        MS. SHIH:  Oh, okay.

22   A    I was referencing back to Ms. Maxey's, the content of her

23   email body to see if that informed me of where — and under her

24   email body it says she — and a few notes on the terms, but it

25   didn't say anything about did she access Kronos or paper files

1   for the notes column or not.  So I don't know for sure what she

2   accessed or not.

3   Q   (BY MS. SHIH)  But she never communicated to you that she

4   had accessed any of that information?

5   A   Correct.

6   Q   Do you know what she considered to be high attendance

7   points?

8   A   No.  I don't know what she considered.  I know what our

9   general theme of, you know, when you start getting near the

10  written warranty level of five points and above, as Lex

11  Morrison testified, you know, written warning at five points

12  and then a suspension somewhere around the seven-and-a-half,

13  eight mark, and then a termination around eight or nine.  That

14  was high attendance because we're getting concerned that the

15  employees attendance at that point, we wanted that individual

16  to help them turn their attendance around so we don't lose an

17  employee.

18  Q   But you don't know whether she considered five points or

19  eight points to be high attendance points?

20  A   Correct, I do not.

21  Q   And you don't know how many attendance points any of these

22  employees selected for termination had at this time?

23  A   Correct.

24  Q   Were the number of attendance points of each of these

25  employees ever communicated to you prior to November 12, 2012?

1    A    The number of points, no.

2    Q    Your handwritten notes at the bottom of page 1 of Exhibit

3    11, starting on the left-hand side where it says "Add" and then

4    there's three individuals listed, can you explain what that

5    reflects, what those notes reflect?

6    A    As I completed my analysis, specifically in the lower

7    repair category, I had concerns that there were too many

8    Hispanics that will be RIF'd and older, older repair people.

9    So I went through that list and to try to rebalance the

10   numbers, I picked those three people off of this list to, I

11   believe, propose to Juan and Kevin that they switch those

12   people and take some other people off of this.

13   Q    And those three people that you chose, Oswaldo Chavira,

14   Brian Perona and Victor – I apologize, I'm going to mangle his

15   last name – Siqueiras, did you identify those individuals based

16   on any factors other than age and race?

17   A    No.  It was purely a statistical analysis.  I don't even

18   know the three people.

19   Q    Did you review any personnel files or documents pertaining

20   to any employees that you proposed to add to the list prior to

21   making that proposal?

22   A    No.

23        MS. SHIH:  Your Honor, we'd like to move for admission of

24   General Counsel's Exhibits 11 and 12.

25        JUDGE LAWS:  Any objection?

1      MR. MINER:  No objection to Exhibit 11.  Exhibit 12 I

2  don't understand there to be a need for pages 2, 3 and 4 of the

3  document.  My understanding is General Counsel 11 is the

4  complete spread sheets that were attached to General Counsel

5  Exhibit 12.  So I simply propose removing pages 2 through 4 of

6  General Counsel 12.

7      MS. SHIH:  Well, Your Honor, the witness identified pages

8  2, 3 and 4 of General Counsel 12 as the document that was

9  attached to the email.  So for purposes of having a complete

10  exhibit, the fact that it may not have been printed

11  incorrectly, which is something we can't determine with

12  certainty without actually reviewing the email attachment, we

13  believe it's appropriate to include that information.

14      JUDGE LAWS:  So this is directed at the witness.

15      Were the pages 2, 3 and 4 of GC 12 attached to the email?

16  I see notations, your writing that it was, but I just want to

17  make sure this is the correct email and there wasn't perhaps

18  another November 9th email that this is referencing because –

19  A    Your Honor, I believe page 2 most likely is from that

20  excel file and that email.  Page 3 I believe is from a sheet in

21  that excel file.  So, yes, I believe page 2 is a sheet tab from

22  that excel file.  I believe page 4 is one, a sheet for the

23  excel file.  Page 3 is either an incorrect attachment or, as I

24  explained to Counsel, I had reduced the columns, hid the

25  columns when I printed this eventually out without the EEOC age

```
 1   information.

 2        JUDGE LAWS:  Okay.  I'll go ahead and admit them both just

 3   with your comments clarifying what the attachments to GC

 4   Exhibit 12 are.  I do have a couple of questions for you on 11,

 5   the big one.

 6   (General Counsel Exhibits 11 and 12 admitted into evidence)

 7                            EXAMINATION

 8   Q    (BY JUDGE LAWS)  When in the notes column it indicates

 9   high attendance points, that's a negative reference, correct?

10   A    Correct.

11   Q    Okay.  And then also performance, that doesn't mean good

12   performance, it means performance is the reason they are being

13   proposed to be RIF'd?

14   A    Correct.

15   Q    Okay.

16        JUDGE LAWS:  Thank you.

17                   DIRECT EXAMINATION (Continued)

18   Q    (BY MS. SHIH)  Did you consult with anyone while you were

19   conducting your age and EEO analysis of the proposed

20   termination list?

21   A    No.

22   Q    Once you completed your analysis what did you do?

23   A    On November 11th I sent an email to various managers

24   reflecting the results of my analysis and some concerns I had

25   regarding their initially proposed list.
```

1   Q      And at the time you were performing your analysis and

2   making changes or proposed changes to the list, you were aware

3   that the company planned to conduct this termination on Monday,

4   November 12th, correct?

5   A      Correct.

6   Q      Who did you send that email to with your concerns and your

7   proposed changes?

8   A      Lorie Hudgens, Juan Maciel, Kevin Stewart, a copy to Tim

9   Stucky, Mike Torra and Lisa Maxey.

10  Q      And when did you send that email?

11  A      November 11, 2012 at 12:35 a.m.

12  **(General Counsel Exhibit 16 marked for identification)**

13  Q      I'm handing you what's been marked as General Counsel

14  Exhibit 16, which is an eight-page exhibit.  Do you recognize

15  that document?

16  A      It's an email.

17  Q      And can you identify the email?

18  A      It is an email from Juan Maciel back to the same manager

19  team, for which he states he's updated the spread sheets, and

20  also listed some changes for the hole in the email body that I

21  had sent him.

22  Q      So the email that you just testified about, the one that

23  you sent to Gordon Hudgens, Juan Maciel and Kevin Stewart with

24  your concerns about the proposed termination list and your

25  proposed changes to that list is part of this email chain with

1    Juan Maciel, correct?

2    A    Correct.

3    Q    And the more recent emails that are part of that chain is

4    Juan's response to your email, correct?

5    A    Correct.

6    Q    The documents that are attached to the email, so pages 3

7    through 8, are those the attachments that you sent on Sunday,

8    November 11th at 12:35 a.m., or are they the attachments that

9    Juan sent on Sunday, November 11th at 12:07 p.m.?

10    A    My assumption is that he took the excel file that I had

11    sent him earlier and then went in and made his changes to it

12    and saved it and sent it back out.

13    Q    So pages 3 through 8 are the attachments to Juan's email

14    to you and others on November 11th at 12:07 p.m.?

15    A    Correct.

16    Q    What was the attachment to the email you sent, if any, on

17    November 11th at 12:35 a.m.?  Was there an attachment to your

18    email?

19    A    No.  He was still working off of what he and Lisa had.  He

20    was working off of the list that he and Lisa created because I

21    did not share with them the EEOC data and the age information.

22    Q    Okay.  So your email to –

23    A    So I apologize for that, this statement.  I did not send

24    them – I didn't change the excel file that Lisa sent me.  I

25    made my handwritten notes on it, then from my handwritten notes

1    I just sent this email out on November 11th sharing my concerns

2    from my study with these people.  Juan then went back to the

3    list that he had prior to when he sent it to Lisa and me when

4    he modified it and then he made changes to that excel file and

5    sent it.

6    Q    So he emailed what you sent on November 11th, the entire

7    email is the text that's contained on pages 1 and 2 of Exhibit

8    16?

9    A    Correct.

10   Q    There was no attachment to that email?

11   A    Correct.

12   Q    And in that email you summarized your EEO and age analysis

13   that you discussed and what your concerns were about balancing

14   the termination list?

15   A    Correct.

16   Q    And that was based strictly on the categories of race and

17   age, correct?

18   A    Correct.

19   Q    So where you proposed swapping out some of the proposed

20   employees for termination with different employees for

21   termination, you didn't consider anything other than the age

22   and the race of those employees and making that suggestion,

23   correct?

24   A    No.  As the content of the email body points out, I was

25   also noting to the audience how long some of these individuals

1    had been in their respective jobs that had furthered my concern

2    about potential disparate treatment.  The example – for

3    example, let's find one.

4    Q    Well, let me ask it this way.  In the category of welders

5    at the bottom of page 1 –

6    A    Yes.

7    Q    – and continuing on to page 2, in making the determination

8    that three individuals who – or, excuse me, two individuals who

9    were originally proposed for termination should be kept, and

10    two different individuals who were originally proposed to be

11    kept should be terminated, you didn't consider anything other

12    than the age and the race of those individuals, correct?

13    A    For the lower category, correct.

14        JUDGE LAWS:  And I want to jump in here to ask a question.

15    Do you know whether or not the company is a federal contractor

16    in sufficient amounts to Department of Labor, Office of Federal

17    Contract compliance programs jurisdiction?

18    A    Yes, I'm aware that we're not under any federal contract,

19    OCCI to require insurance.

20        JUDGE LAWS:  Thank you.  Go ahead.

21    Q    (BY MS. SHIH)  After you sent your concerns to Gordon,

22    Juan and Kevin on November 11, did you have any discussions

23    with any of them about your concerns?

24    A    Yes.

25    Q    What discussions did you have?

1    A    I know there were discussions concerning Jack Lopez

2    because he was what we call a 19-year employee, six years with

3    us, and then 13 years prior with Rail Car America, and we had

4    acquired him, so we're looking at a very long-term person who

5    had worked in the front office.

6    Q    Who did you have discussions with about Jack Lopez?

7    A    That would have been Kevin Stewart and/or Lorie Hudgens.

8    Q    Were those discussions by email or by telephone?

9    A    Telephone.

10   Q    When did you have those discussions?

11   A    Either, either when I was sitting in the Cleveland Airport

12   or when I was sitting in the Denver Airport or –

13   Q    Do you remember what the date was?

14   A    Yes.  On Sunday, November 11, 2012.  I was flying back

15   from Cleveland, Ohio to Portland, Oregon.

16   Q    Other than the concerns about Jack Lopez being a long-term

17   employee, were there any other discussions that you had about

18   the concerns that you raised in your November 11, 2012 email?

19   A    Yes.  I probably had discussions with Kevin Stewart and/or

20   Gordon Hudgens concerning John Anderson, who again was another

21   long-term employee, who worked right in the front office of the

22   shop.

23   Q    Were those discussions part of the same that you discussed

24   Jack Lopez?

25   A    Yes.

1    Q    What other specific employees did you have discussions

2    with, or discussions about?

3    A    None to the best of my recollection at this time.

4    Q    When Juan returned a spread sheet to you on November 11th,

5    2012 at 12:07 p.m., had he inputted the proposed changes that

6    you had suggested in your email?

7    A    Can you clarify what you mean by inputted?

8    Q    Did his updated spread sheet reflect the suggestions that

9    you had proposed as to which employees should be retained and

10   which employees should be terminated?

11   A    It reflected some of my proposed changes, but in the email

12   body response to me he had proposed other changes as

13   alternatives.

14   Q    You're referring to Juan Maciel?

15   A    Correct.

16   Q    He had proposed alternative changes?

17   A    Yes.  Your copy unfortunately is black and white, and my

18   original is printed out in color, so his responses to me were

19   blue ink.  So I can see what he was responding to my email back

20   with the agreement or an alternative person.

21   Q    And you're referring to General Counsel Exhibit 6?

22   A    No. 16.

23   Q    Or, excuse me, 16.

24   A    Correct.

25   Q    So some of the text contained in the body of the email

1    that you sent on November 11 is not your statements, correct?

2    A    Correct.

3    Q    Why don't you, so we have a clear record, reflect what

4    portions of that email are not yours?

5    A    Starting with the paragraph entitled "AAR Write-up

6    Department," the last sentence in that paragraph that reads,

7    "The billing manager's position is open.  I recommend we fill

8    that position with John Anderson."  That was not my email

9    content, that was Juan Maciel's.

10   Q    Okay.

11   A    Continuing in the lead man paragraph, again the last

12   sentence that reads, "We replace Barnes Jesus from the front

13   shop with Marcos Fanseca" was not my email content, that was

14   Juan's content.

15   Q    Okay.

16   A    Continuing on to the QA Inspection paragraph, the last

17   three sentences that begins with, "In my opinion, Jack needs to

18   go. Cesar Navarez is being retained as the front shop foreman.

19   Rudy Pierson is being retained as a repairman in the front

20   shop."  Those three sentences were not my email content.  Those

21   were Juan Maciel's.

22   Q    Okay.

23   A    In the welder's paragraph at the top of page 2 of that

24   email the last sentence that reads, "I agree with keeping Ramon

25   Parra and Julio Perez, but we want to lay off Ryan Scaggs and

1    Oswaldo Chavira." That was not my email content. That was

2    Maciel's content.

3    Q    Anything else that Juan had added to the text of your

4    original email?

5    A    No.

6         MS. SHIH: And, Your Honor, when we have a break we'd just

7    like an opportunity to take the original documents that Mr.

8    Lave has so we can copy those.

9         JUDGE LAWS: Okay.

10   Q    (BY MS. SHIH) Did you have any discussions with Juan

11   about his agreements or disagreements with your post changes?

12   A    I don't recall if I had any discussions directly with

13   Juan. As I testified before, I believe my discussions in the

14   airport were mostly with Gordon Hudgens and/or Kevin Stewart

15   based on just all of our travel schedules.

16   **(General Counsel Exhibit 14 marked for identification)**

17   Q    I'm handing you what's been marked as General Counsel

18   Exhibit 14. Can you identify that?

19   A    Yes. That is an email from Tim Stucky on November 12,

20   2012, at 8:47 a.m. sent to me and copied to Juan Maciel, Lisa

21   Maxey, Gordon Hudgens, Kevin Stewart and Mike Torra.

22   Q    And it's in response to an email that you sent, correct?

23   A    Correct.

24   Q    So this is a continuation of the email chain that's

25   reflected in Exhibit 16, where in response to receiving Juan

1  Maciel's updated spread sheet you provided some additional

2  suggestions?

3  A    Correct.  As it states there I'm in the Denver Airport

4  waiting to board, and I send out an email at 5:25 basically

5  summarizing various conversations I had with Gordon, Lisa and

6  Kevin, along with Juan's notes below to try to succinctly

7  present the group with what some of the additional changes

8  were.  And also making sure that my boss was aware of those

9  changes given that he had certain professional close

10  relationships with a couple of the individual's in the office

11  staff, being Jack Lopez and John Anderson and (inaudible).

12  Q    What discussions, if any, took place in response to Mr.

13  Stucky's email of Monday morning November 12 at 8:47 a.m. where

14  he asks "Why are we laying off Jack Lopez"?

15  A    I'm sorry, I was already thinking through that.  Can you

16  ask me the question so I can focus?

17  Q    What discussions, if any, took place in response to Mr.

18  Stucky's inquiry why are we laying off Jack Lopez?

19  A    There were a number of discussions that may have started

20  that day and continuing on over a number of days after that

21  point in time.

22  Q    When you say "that day," are you referring to Monday,

23  November 12th?

24  A    Yes.  Thank you.

25  Q    That's the day that the layoffs took place, though,

1   correct?

2   A    Correct.

3   Q    Was Mr. Lopez laid off?

4   A    He was.

5   Q    On Monday, November 12th?

6   A    Correct.

7        MS. SHIH:  Your Honor, we move for admission of General

8   Counsel's Exhibits 14 and 16.

9        JUDGE LAWS:  Any objections?

10       MR. MINER:  No objection, Your Honor.

11       JUDGE LAWS:  Those are admitted.

12  **(General Counsel Exhibits 14 and 16 admitted into evidence)**

13  Q    (BY MS. SHIH)  Did you receive at some point a final list

14  of the employees who had actually been terminated from the

15  Tucson facility on November 12th?

16  A    Yes.

17  Q    When did you receive that?

18  A    Probably November 16th, 2012 at 7:24 a.m.

19  Q    From who?

20  A    Lisa Maxey.

21  **(General Counsel Exhibit 17 marked for identification)**

22  Q    I'm handing you what's been marked as General Counsel

23  Exhibit 17.  Do you recognize this document?

24  A    Yes, I do.

25  Q    What is that document?

1    A    This document is a shop, a physical shop layout summary of

2    who was still employed after we had completed the reduction in

3    force and associated job transfers to motions and promotions.

4    Q    Did you prepare this chart?

5    A    No.

6    Q    Do you know who did?

7    A    Yes.

8    Q    Who prepared this chart?

9    A    Lisa Maxey.

10    Q    How did you receive it?

11    A    Either she delivered it in person when she returned from

12    Tucson, or possibly emailed it to me, but I don't recall.

13    Q    And are those your handwritten notes at the top of the

14    page?

15    A    Yes.

16        MS. SHIH:  Your Honor, move for admission of General

17    Counsel Exhibit 17.

18        MR. MINER:  No objection, Your Honor.

19        JUDGE LAWS: That's admitted.

20    **(General Counsel Exhibit 17 admitted into evidence)**

21    Q    (BY MS. SHIH)  You testified yesterday that you were part

22    of the Big 5 program initiative, correct?

23    A    The Big 5 recovery program, correct.

24    Q    And you testified that one initiative that came off as a

25    part of your involvement with that recovery program was that

1  plant managers were attending meetings and needed to spend more

2  time with you, correct?

3  A    Spend more time in the shop, correct?

4  Q    In the shop.  The meetings that plant managers were

5  attending included meetings with supervisors, foremen and lead

6  men in the shop about how to handle Union activity, correct?

7  A    I'm totally confused by your question.

8  Q    The types of meetings that plant managers were attending

9  included meetings with supervisors, foremen and lead men about

10  how to handle Union activity, correct?

11  A    No.  The Big 5 recovery plan –

12  Q    I wasn't –

13  A    – the one component of it –

14  Q    If I can interrupt.  I wasn't asking about the Big 5 plan.

15  I'm asking whether meetings attended by plant managers included

16  meetings with supervisors foremen and lead men about how to

17  handle Union activity.

18  A    Correct.

19  Q    And you conducted meetings with plant managers, foremen,

20  supervisors and lead men about how to handle Union activity,

21  correct?

22  A    Correct.

23  Q    And you conducted some of those meetings at the Tucson

24  facility, correct?

25  A    Yes.

1   Q     In 2011 and in 2012?

2   A     Correct.

3   Q     During those meetings you handed out written information

4   to other supervisors, foreman and lead men about how to handle

5   Union activity?

6   A     Correct.

7   Q     You were aware of the United Transportation Union campaign

8   in the Tucson facility in 2011, weren't you?

9   A     Yes.

10  Q     And you held meetings with employees in 2011 prior to that

11  election, correct?

12  A     Yes.

13  Q     You also held meetings with employees at the Tucson

14  facility prior to the 2013 election with the Sheet Metal

15  Workers, correct?

16  A     Correct.

17  Q     And prior to those meetings you state that the philosophy

18  as a company is that you're a non-Union company, correct?

19  A     Our purpose is to be a non-Union company.

20  Q     But you actually describe it as a philosophy, correct?

21  A     I don't recall if I used the word philosophy or

22  preference.

23  Q     But you state that Greenbrier is a non-Union company?

24  A     Is a non-Union company as in United States and Canada, but

25  not in Mexico.

1   Q    How many Union shops does Greenbrier operate in the United

2   States, any?

3   A    Currently none.

4   **(General Counsel Exhibit 18 marked for identification)**

5   Q    I'm handing you what's been marked as General Counsel

6   Exhibit 18.  Do you recognize that document?

7   A    I do.

8   Q    What is it?

9   A    It's a document entitled "Preparing For and Reacting to a

10  Union Organizing Effort."

11  Q    Is it a document that you prepared?

12  A    It was a document that, yes, I prepared from a series of –

13  a variety of documents.

14  Q    When did you prepare that document?

15  A    This specific one here I prepared approximately two to

16  three weeks ago.

17  Q    For what purpose did you prepare this document?

18  A    Two to three weeks ago we had our annual plant managers

19  meeting for the repair shop and part of the manufacturing shop

20  in Portland, Oregon, and I had a presentation to the plant

21  managers concerning organizing efforts.

22  Q    Have you used this document in any prior meetings or

23  presentations where you discuss Union organizing efforts?

24  A    I've used this document – yes, I've used it in prior

25  meetings, except the cover sheet was probably different.

1   Q    Did you use this document in any meetings that you

2   conducted with any management from the Tucson facility in 2011?

3   A    Can you ask that question again?

4   Q    Did you use this document in any meetings conducted with

5   Tucson management in 2011?

6   A    Not meeting with management.  I used this document with

7   Lex Morrison, plant manager at the time.

8   Q    You don't consider a meeting with Lex Morrison to be a

9   meeting with Tucson management?

10  A    Yes, it is.  I just wanted to clarify that it was a

11  singular meeting.  It wasn't with people where I reviewed this

12  document.

13  Q    And did you provide him with a copy of the document at the

14  time?

15  A    Yes.

16  Q    Did you use this document at any meetings, single or

17  multiple meetings with management from the Tucson facility in

18  2012?

19  A    In 2012?

20  Q    Yes.

21  A    No.

22  Q    You didn't use this document in a meeting with management

23  from the Tucson facility Union organizing on October 31st, 2012?

24  A    I may have had it in a folder with me when I had training,

25  but I don't necessarily share this with any of the supervisors.

1   It's too much information.  I may have had it with me as a

2   reference document.

3   Q    And would you have consulted or did you consult during the

4   meeting on October 31st, 2012?

5   A    No.  I did not need to.

6   Q    Did you use this document in any meetings with Tucson

7   management about Union organizing efforts in 2013?

8   A    No, I did not use this.

9   Q    Did you have any meetings with the plant manager in Tucson

10  in 2013 in which you discussed Union organizing efforts?

11  A    Yes.

12  Q    When did those meetings take place?

13  A    The first meeting would have been a phone call meeting

14  with Eric Valenzuela and Kevin Stewart from a conference room

15  in California with Kevin and I, and Eric in his shop in Tucson

16  four months ago.  I don't recall when I was in Finley.  I don't

17  know precisely, but three, four or five months ago.

18  Q    Prior to the July election for the Sheet Metal Workers,

19  correct?

20  A    Correct.  And there could have been prior discussions on

21  the phone between Eric and I prior to the phone call where I

22  had emailed Eric Valenzuela this document.  I didn't spend time

23  with him on the phone walking through it.

24  Q    Let's start with the telephone conference that you had

25  with Eric and Kevin three or four months ago about Union

1  organizing efforts.  Who else was present?

2  A    Just the three of us.

3  Q    You were on the telephone and Eric and Kevin were in

4  Tucson together?

5  A    No.  Kevin and I were on a speaker phone in Finley, and

6  Eric was in the Tucson shop.

7  Q    Okay.  And what was discussed during that call?

8  A    I believe the discussion centered around possibly because

9  we may have at that point in time received some documentation

10  from the NLRB.  I think it was the announcement of the Notice

11  of Petition for Election had finally been sent to us that they

12  were planning to schedule an election.

13    THE WITNESS:  May I have a break for the restroom, Your

14  Honor?

15    JUDGE LAWS:  Sure.  Is this a good time, or are you

16  wrapping up a section?

17    MS. SHIH:  I'm actually not wrapping up, so this would be

18  fine.

19    JUDGE LAWS:  Okay.  Why don't we break until 10:00.

20  **(Off the record)**

21    JUDGE LAWS:  Back on the record.

22  Q    (BY MS. SHIH)  If I could just back up one moment.

23  **(General Counsel Exhibit 19 marked for identification)**

24    MR. MINER:  I'm sorry, did we ever see Exhibit 13, General

25  Counsel 13?

1      MS. SHIH:  You're about to.

2      MR. MINER:  Oh, okay.  All right.

3      MS. SHIH:  I think that's the one that's still out of

4  order that copies are being made of right now.

5      MR. MINER:  Okay.

6      MS. SHIH:  And then we'll get back into the right list.

7  Q    (BY MS. SHIH)  I'm handing you what's been marked as

8  General Counsel Exhibit 19.  So this is backing up to the

9  subject of the layoff and the termination from earlier.  Do you

10  recognize that document?

11  A    Yes, I do.

12  Q    What is that?

13  A    It was a list of the outside temporary agency employees

14  that worked for us right around the November 12th, 2012

15  restructuring.

16  Q    And how did you come to receive a copy of this list?

17  A    I asked Lisa Maxey to provide it to me.

18  Q    And do you recall when she provided it to you?

19  A    It would have been within a few days to a couple weeks

20  after the November 12th reduction in force so I would have a

21  complete copy for my file of the RIF.

22  Q    Were temporary employees considered in terms of the

23  employees to be terminated on November 12th, 2012?

24  A    Yes.

25  Q    So the earlier –

1      MR. MINER:  I'm sorry, can I have a clarification

2  regarding considered?

3      MS. SHIH:  I'm sorry, that question was unclear.

4  Q   (BY MS. SHIH)  When the company, including yourself, was

5  evaluating the list of employees to be considered for

6  termination on November 12th, were temporary employees from

7  Intermountain Staffing or any other agency part of that

8  employee list?

9      MR. MINER:  Again just to clarify, are you referring to

10  the EEO analysis that Al has been testifying about in terms of

11  consideration?

12      MS. SHIH:  I'm referring to any analysis that was being

13  conducted of the Tucson facility to determine who would be part

14  of the RIF.

15  A    Yes.  The temporary employees from one or two temp

16  services were part of the RIF discussion and analysis between

17  November 8th and November 11, 2012.

18  Q   (BY MS. SHIH)  So this list that's been marked as Exhibit

19  19 was a list that you received after the November 12, 2012

20  termination, correct?

21  A    Correct.

22  Q    And is there a list of temporary employees that were

23  working at the Tucson facility prior to the November 12, 2012

24  termination?

25  A    I believe so, yes, based on my – that's my handwriting

1    that says "L/O" and "Hire."  I deduced from that that this list

2    was a subset of the other list that we talked about within our

3    other exhibits.  Some of these people's names I believe were at

4    the bottom of those large spread sheets.

5    Q    So your – you said that's your handwriting on the left-

6    hand side?

7    A    Correct.

8    Q    What does L/O refer to?

9    A    Layoff.

10   Q    So the individuals that do not have that notation next to

11   their names, they were retained after November 12, 2012?

12   A    I hope so.

13   Q    So despite that the company laid off Greenbrier employees,

14   it retained some temporary employees in those positions that

15   were working for Intermountain Staffing or another agency?

16   A    Correct.

17   Q    What does the "hire" notation refer to?

18   A    For Sylvia Lebel, an admin assistant, she worked up in the

19   front office near the gate as an office support person, and

20   she'd been employed, I believe, with Intermountain Staffing

21   probably for approximately 90 days.  And some of our shops

22   utilize a temp-to-hire program so it may have been at that

23   point in time when she was at that 90-day review, so then we

24   hired her onto GRS payroll, and that's what that "hire" would

25   mean.  She was temping for us at the time in the front office.

1    Q    And when you say at a time, you're referring to at a time

2    of the November 12th termination?

3    A    Not necessarily.  I don't have her records in front of me

4    to know when the actual hire date, what we call the conversion

5    date, occurred.  I don't know exactly when I got this from

6    Lisa, whether it was a couple days afterwards or a couple weeks

7    afterwards.  Or it may have happened that we were getting ready

8    to hire he on, but again I don't know the precise date to give

9    me any reference.  I knew that they were planning to convert

10   from the temp service to our payroll, that's why I wrote that

11   note.

12   Q    And this was something that you had knowledge about after

13   November 12, 2012?

14   A    With Sylvia Lebel, I probably had prior knowledge that

15   they were thinking of converting her to our payroll because we

16   had an open position for quite some time.

17   Q    So it's your understanding that after November 12, 2012,

18   Ms. Lebel was converted to a permanent Greenbrier employee,

19   correct?

20   A    Not to a permanent employee, but to a GRS regular active

21   full-time employee.

22   Q    An employee of Greenbrier?

23   A    Correct.

24   Q    And it's your understanding that prior to November 12,

25   2012, Ms. Lebel was a temporary employee employed by

1    Intermountain Staffing?

2    A    She was a temporary employee.  I don't know for sure what

3    temporary agency she was through.

4    Q    Okay.  But she was not on the payroll of Greenbrier?

5    A    Correct.

6        MS. SHIH:  Your Honor, move for admission of General

7    Counsel Exhibit 19.

8        MR. MINER:  No objection, Your Honor.

9        JUDGE LAWS:  That's admitted.

10   **(General Counsel Exhibit 19 admitted into evidence)**

11   Q    (BY MS. SHIH)  Let's go back to the topic that we were on

12   before we took our break, which was meetings that you conducted

13   or were involved with about Union organizing activity.  And

14   this is specifically for the Tucson facility.

15       Going back to 2011 you held meetings with supervisors and

16   lead men and foremen or other Tucson management about how to

17   respond to Union activity?

18   A    Correct.

19   Q    And then prior to the October 2011 UTU election, correct?

20   A    Correct.

21   Q    How many such meetings did you hold?

22   A    With leads and foremen, supervisors, managers?

23   Q    In the Tucson facility, correct.

24   A    Approximately two to four.

25   Q    And those were all conducted in person in Tucson?

1    A    Well, with the entire Tucson shop manager/supervisor team

2    as a group, yes.

3    Q    Are there other meetings that were conducted that were not

4    with the entire Tucson shop management?

5    A    Yes.  I would periodically have phone meetings with Lex

6    Morrison on the Union, preparing for reacting to Union

7    organizing, yes.  So whether it's called a meeting or not,

8    but….

9    Q    When did those meetings start?

10   A    With the entire supervisory team?

11   Q    Or with Lex Morrison individually.

12   A    And we're referencing 2011?

13   Q    Yes.

14   A    Best recollection late June of 2011, approximately early

15   July 2011, that's when we started.

16   Q    So shortly after you began working for the company?

17   A    Correct.

18   Q    How soon after you started working with the company did

19   you learn that there was a Union organizing effort going on in

20   Tucson?

21   A    Two to four weeks.

22   Q    How were you informed that there was a Union organizing

23   effort going on in Tucson in 2011?

24   A    I was visiting the Tucson shop and investigating some

25   ethics claim complaints that had been filed by one or more

1  employees considering handling of overtime assignments and/or

2  dissatisfaction with one or more members of the supervisory

3  team in Tucson.

4  Q    And were these complaints written complaints that the

5  company had received about employees, or from employees in

6  Tucson?

7  A    Technically not written.  Ethics Support is an outside

8  company that we retain since we are a public company in that

9  employees who have concerns about possible mistreatment or

10 misconduct with a company can either call into a 1-800 number

11 or access a web link and type in a complaint and file it that

12 way, or possibly directly mail in a written out complaint.

13 Q    And when you were visiting the Tucson shop to follow up on

14 those complaints how did you learn that there was a Union

15 organizing effort going on there?

16 A    Best recollection was a discussion with Lex Morrison and I

17 and one or more of the supervisors as I was looking into the

18 concerns about overtime assignments, the supervisors – one of

19 the supervisors mentioned that there were some Union flyers

20 that had been handed out a few weeks before or that – handed

21 out before or were handed out at the gate or something like

22 that.

23 Q    Which supervisor mentioned that to you?

24 A    I don't recall which one.

25 Q    What else did you learn when you visited the Tucson shop

1   in June of 2011 about the Union organizing effort that was

2   going on there?

3   A    That's all I learned at that time.

4   Q    What about after that time, did you hear other information

5   about the Union campaign going on in Tucson in 2011?

6   A    Can you repeat the question, please?

7   Q    You said at that time that was all you learned.  What did

8   you learn after that time in 2011 about the Union campaign that

9   was going on with the ETU?

10  A    In a subsequent trip two or three weeks later I met with

11  the supervisory team and learned that the United Food and

12  Commercial Workers Union had been meeting with employees off

13  site.  And I believe they were starting to be discussions in

14  the shop about the United Food and Commercial Workers Union.

15  Q    How did you learn that on your subsequent visit to Tucson?

16  A    Either from Lex Morrison or other members of his team.

17  Q    And during those discussions was there anything

18  communicated to you as to how Lex Morrison or Tucson management

19  knew that employees were meeting with UFCW off site?

20  A    They learned it from either directly employees coming to

21  them with questions about the Union or employees who had gone

22  to their lead or foreman who had brought that information to

23  Lex or some other management team member.

24  Q    Between June of 2011 and October of 2011 when the UTU

25  election was held, how many times did you visit the Tucson

1  facility?

2  A    Four to eight trips.

3  Q    And you stated that that included about two to four

4  meetings with management in Tucson to discuss how to handle

5  Union activity?

6  A    Correct.

7  Q    As well as several one-on-one phone discussions with Lex

8  Morrison individually about handling Union activity?

9  A    Correct.

10 Q    How many meetings – between those four to eight trips, how

11 many meetings did you hold with employees in the Tucson

12 facility about the Union?

13 A    Between the time period of June up through the election

14 day?

15 Q    Correct.

16 A    Of those four to eight trips I made probably two or three

17 of those days we held meetings with – two to four we held

18 meetings with the employees, and within a specific day of

19 meetings we would hold separate meetings in the shop, either by

20 physical layout of the shop and/or by language.  And so we may

21 have had maybe two to five, three to five separate meetings

22 within that day's visit.

23 Q    So just to clarify and make sure I understand your

24 testimony, between June and October of 2011 you believe that

25 you met with employees in Tucson to discuss Union activity on

1    about two to four occasions?

2    A    Best recollection, yes.

3    Q    And each of those occasions consisted of between three and

4    five breakout meetings with employees?

5    A    The first visit may have been one large meeting or two

6    large meetings.

7    Q    But some of the later visits may have broken the employees

8    into smaller groups?

9    A    Correct.

10   Q    And in all of these meetings the topic of discussion was

11   Union organizing?

12   A    The reason for holding the meeting was Union organizing,

13   yes.

14   Q    Were you present in Tucson when the UTU election was held

15   in 2011?

16   A    Yes.

17   Q    So you're aware that the Union lost that election in 2011?

18   A    Yes, I am.

19   Q    And you're aware of what the vote count was, correct?

20   A    Yes.

21   Q    And that it was close?

22   A    Correct.

23   Q    Were you aware at that time that there was a one-year bar

24   that would have prevented the Union from engaging in additional

25   efforts to organize that facility for a period of one year?

1    A    Well, I was aware that there was a one-year bar on another

2    – holding other elections.

3    Q    When did you first begin having discussions with anyone,

4    either in corporate management or Tucson management, about the

5    expiration of the one-year bar, the election one-year bar?

6    A    When did I start having discussions?

7    Q    Yes.

8    A    The day of the October 20 election I was saying there is

9    now a one-year bar.

10    Q    We're talking about the expiration of that bar, so in 2012

11    did you have any discussions with anyone at corporate

12    management or Tucson management that the one year – the one

13    year was about to be up or had expired?

14    A    Yes.  I had a discussion with Lex Morrison, the plant

15    manager, that the one-year period was going to expire.

16    Q    And when did you have that discussion with him?

17    A    In October 2012.  And I also probably informed my manager

18    at the time, Tim Stucky, that the one-year bar was coming up.

19    You asked about corporate management.  Tim was a corporate

20    manager.

21    Q    The conversation that you had with Lex Morrison, was that

22    by telephone?

23    A    Yes.

24    Q    You actually visited the Tucson facility on October 31st,

25    2012, correct?

1    A    Correct.

2    Q    And had a meeting with managers, foremen, lead men and

3    supervisors about Union organizing, correct?

4    A    Correct.

5    Q    What dates were you actually in Tucson on that trip?

6    A    I believe I flew in October 30th afternoon or evening, and

7    I was in the shop on October 31st for probably all or most of

8    the shift.  I don't recall if I was back in the shop on the

9    following morning, November 1st, or whether I flew home late on

10   the 31st or on the 1st.  I believe the 1st was a fly day for me.

11   That's typically how I structure some of those trips.

12   Q    So you believe that you flew into Tucson on October 30th?

13   A    I believe so.

14   Q    How –

15   A    Yes, because the shift starts early, so if I fly in 12:00

16   or 2:00, you know, it's towards the end of the shift.

17   Q    How soon prior to going to Tucson on October 30th did you

18   plan that trip?

19   A    You mean by plan the trip, schedule it to go?

20   Q    Well, when did you plan to visit – I mean how early were

21   you planning to visit Tucson on October 30th or October 31st?

22   A    Late September, early October.  I plan my travels usually

23   a month in advance if I can.

24   Q    Was the purpose of your visit to Tucson to discuss Union

25   organizing and Union activity with the manager there?

1   A     My purpose was twofold.  It was to meet with the

2   supervisory team to get a – to explain the one-year bar, and

3   that they potentially may see Union organizing activities since

4   the one-year bar had ended.  And because the vote was so close

5   the year before that it wouldn't surprise me if the Union would

6   elect to come back and try to organize again.

7         The second purpose of my trip was to meet with an employee

8   whose brother and coworker – excuse me a moment.

9         The second purpose of the trip was to meet with an

10  employee whose brother and a coworker had died in a motorcycle

11  accident in front of the shop and the life insurance claim was

12  a mess.

13  Q     Just let me know when you're ready to continue.

14  A     My apologies to the Court.

15        JUDGE LAWS:  That's okay.

16  Q     (BY MS. SHIH)  By the time you met with Tucson management

17  on October 31st to discuss the one-year election bar having

18  expired and anticipating Union organizing activity, you were

19  aware that there was already discussion among employees about

20  trying to organize the Union again, correct?

21  A     No, I was not aware prior to the trip.

22  Q     Well, I don't mean prior to your trip.  I mean prior to

23  your actual meeting with management.

24  A     No.  I was not aware of the Union activity prior to

25  meeting with the management.

1  Q    Didn't you tell management in that meeting there's already

2  some discussion out there in the shop about trying to bring the

3  UTU or some other Union back in?

4  A    No.  I did not tell them that.

5  Q    You didn't make that statement?

6  A    No.  When I started the meeting I did not know that

7  information.  I learned that information during the meeting

8  from one or two supervisory people.

9  Q    Okay.  So you learned during the meeting from supervisors

10 that there was discussion in the shop about trying to bring the

11 UTU or some other Union back in?

12 A    Not within the shop.  One or two of the supervisors had

13 mentioned they'd heard an employee or two at a meeting off

14 site.

15 Q    You had multiple meetings with lead men and foremen and

16 supervisors on October 31st, correct?

17 A    Correct.

18 Q    In which meeting did you first hear that there was

19 discussion among employees about trying to bring in a Union?

20 A    I don't recall which meeting but this particular – we

21 would do two or three meetings to have four to six supervisory

22 people in meeting with me so we wouldn't have too many

23 supervisors off the shop floor, and in conjunction sometimes we

24 would do a Hispanic translation.  A supervisor named Sacker

25 (phonetic) from an English-only meeting to be more efficient in

1   those meetings and the fairest to our Spanish-speaking

2   supervisory team.  That's how we had two or three meetings,

3   depending on the production flow that day and the need to

4   better communicate what we want to cover that meeting.

5   Q    But at some point on October 31st you heard from

6   supervisors in Tucson that there was discussion among employees

7   in the shop about trying to bring back a Union?

8   A    No.  As previously testified, I heard from one or two

9   supervisors that they heard one or two employees meeting off

10  site and some sort of Union official.  Nothing about something

11  happening in the shop.

12  Q    Well, I didn't say anything – the only reference to the

13  shop is that – okay, let me back up and ask it this way.

14       The supervisors who stated they had heard about Union

15  activity, what did they report that they had heard?

16  A    One or two supervisors shared that they'd heard from

17  somebody on the shop floor that one or two employees had been

18  meeting off site with some Union person.

19  Q    And you don't recall who those supervisors were that

20  reported that information?

21  A    No.

22  Q    But by October 31st it was your understanding that

23  employees were discussing trying to organize a Union again?

24  A    My understanding there were one or two employees who met

25  off site with a Union person.  I specifically asked had they

1  seen anybody at the gate.  They responded no.  I specifically

2  asked them had they seen any Union flyers in the lunch rooms.

3  They said no.

4  Q    And you instructed them that if they did see any kind of

5  Union cards or Union materials in the shop area to pick them up

6  and deliver them to Lex Morrison, correct?

7  A    Correct.  As consistent with the training back in 2011.

8  Q    You asked in at least one of those meetings with lead men,

9  foremen, managers, supervisors on October 31st, you asked them

10  what they were hearing in the shop about Union activity,

11  correct?

12  A    In response to the one or two supervisors that offered

13  that information about one or two employees meeting with the

14  Union person off site, I didn't ask had they been hearing about

15  anything being discussed on the shop floor in conjunction with

16  asking if they had seen anything at the gate or seen anything

17  in the lunch rooms or break rooms.

18  Q    And you instructed the lead men, supervisors, foremen and

19  managers in those meetings on October 31st to listen in the shop

20  area for any discussions about Union activity, correct?

21  A    Sorry, restate that question.

22  Q    You instructed lead men, supervisors, foremen, managers on

23  October 31st to listen in the shop area for any Union-related

24  discussions?

25  A    I don't know that I instructed them to listen, but I

1    shared with them our preference to be non-Union and as they

2    worked throughout the day to be on the lookout for anyone at

3    the gates or in the lunch room.  And that if they hear any

4    discussions that they should bring that to Lex Morrison's

5    attention.

6    Q    Didn't you actually say we need you out there listening?

7    A    I don't believe that's how it was phrased, but it's kind

8    of a semantics point at this point in time that our supervisors

9    or our frontline people are out of the shop all the time.  They

10   are simply the communication people for our employees.

11   Q    Didn't you tell the foremen and lead men, supervisors and

12   managers on October 31st to look out for Union activity in the

13   shop?

14   A    Yes.

15   Q    And to report anything that they witnessed to Lex

16   Morrison, correct?

17   A    Yes.  If they saw people at the gate, in the lunch room,

18   or if they saw people trying to get authorization cards signed

19   to report that.

20   Q    What involvement, if any, do you have in a facility's

21   decision, and in particular the Tucson's facility decision,

22   whether to hire employees directly as Greenbrier employees or

23   whether to bring them in through a staffing agency?

24   A    I pretty much have little or no involvement in all of

25   that.  We've got two local plant managers that have discretion

```
 1   of how they want to utilize direct hires versus temp to hire.
 2   Q    Were you aware in November of 2012 when you were involved
 3   with the selection of employees for layoff that the Tucson
 4   facility had recently asked Intermountain Staffing to send over
 5   any welders?
 6   A    I was not aware of any of that.
 7   Q    In 2012 what was your understanding of the profitability
 8   of the Tucson facility as compared to the profitability of the
 9   wheels repair and parts division of Greenbrier generally?
10   A    Can you rephrase that question for directly being answered
11   for a specific time in 2012 when I knew about some condition?
12   Q    Well, I don't want to limit it to any specific time frame
13   in 2012, but I'll break the question up into two separate
14   questions actually.
15        In 2012 what was your understanding of the profitability
16   of the wheels repair and parts division of Greenbrier Rail
17   Services?
18   A    Okay.  Let me provide some context first to our
19   organizational structure because it will help my answer for
20   clarity to the Court.
21        As I explained yesterday, I'm employed by Greenbrier Rail
22   Services, LLC, which does business as Greenbrier Rail Services.
23   We are a subsidiary of Greenbrier Companies, Inc., which is
24   also headquartered in Lake Oswego in the same building as we
25   are.  We are one of a number of subsidiaries of the Greenbrier
```

1  Companies, Inc.

2      Within Greenbrier Rail Services staff, we have three

3  business segments: repair shops, parts manufacturing facilities

4  or manufacturing shops, and refurbishment shops.  So those

5  three business segments make up, at the time in 2011 and 2012

6  and for part of 2013, those three business segments made up

7  Greenbrier Rail Services.  So from that contextual explanation

8  can you rephrase the question so I can better respond according

9  to what you ask?

10  Q    Sure.  I'll rephrase the question then in 2012 what was

11  your understanding of the profitability of Greenbrier Rail

12  Services?

13  A    Throughout 2012 as a subsidiary, as a group we were

14  throughout the physical year, calendar year we were below

15  forecast on revenue and below forecast on profit margin.

16  Q    How far below?

17  A    I don't have the detail.

18  Q    Who does have that detail?

19  A    The most precise person would be Todd Abel, our Vice

20  President of Finance.

21  Q    What was your understanding in 2012 of the profitability

22  of the Tucson facility of Greenbrier Rail Services

23  specifically?

24  A    For fiscal year ending 2012, which would have been August

25  31st, 2012, we lost in the Tucson shops significant money for

1   fiscal year ending 2012.  Then as we commenced into FY '13,

2   which also is overlapping with the end of the calendar year

3   '12, we continued to have loss in the Tucson shop in September

4   and significant losses in October.

5   Q    And when you say significant, can you quantify that?

6   A    Yes.  If you'd like to share the one document production

7   of the summary, through your summary, point out to you

8   precisely the significant losses.

9   Q    Is this the document that you're referring to that you

10  would need to review in order to answer our questions?

11  A    What I resorted and put on the top was the main document

12  that I've had access to that gives me a simple overview three-

13  year history of how the Tucson shop was performing.

14  Q    Did you prepare this document?

15  A    No.  That was prepared by our financial analysis in the

16  GRS corporate office.

17  Q    Who is that?

18  A    Chris Safley.

19  Q    Could you spell the last name?

20  A    S-a-f-l-e-y.  And Chris is a male.

21  Q    Are you able to quantify the significant losses that you

22  described without reviewing any documents?

23  A    My recollections of physical year 2012, the Tucson shop we

24  were profitable.  FY '11 I believe we were unprofitable.  FY

25  '12 we had losses exceeding six figures.  September it was a

1  modest loss.  And then October it was significant losses in the

2  six figures.

3  Q    And you're talking about specifically September and

4  October of 2012?

5  A    Correct.

6  Q    And what was your understanding of what those losses were

7  attributed to?

8  A    My understanding is what those losses were attributed to

9  is what Lex Morrison testified to yesterday.  Whether I can

10  recall that specifics in terms of – his shop had, as he said,

11  cranes to fix, aging forklifts.  August, July and August,

12  September of 2011 Tucson lost approximately 13 very seasoned

13  individuals due to an immigration audit, which then led to

14  losses through certain months following that into the early

15  part of 2012 as we were trying to rebuild the work force and

16  had to train a lot of new people both as leads, foremen,

17  supervisors, material and repairman switchmen and specifically

18  welder repair people who are the core of our direct labor

19  force.  We were having to train a lot of new people to make up

20  for that significant loss of those 13 or so people.  The rest

21  of the – the Big 5 recovery plan worked for awhile in 2012 as

22  we focused certain efforts.  They had some profitable months in

23  the middle of '12.  And then the downturn again that was

24  towards the end of the year as I summarized.  And I think that

25  was what Lex was explainin.  The staffing up that we had done,

1  they couldn't train the people fast enough to be efficient and

2  the hope and expectation of the inbound cars.  More orders

3  coming in didn't live up to our forecast, so we had very high

4  payroll expenses going out, and with all of the new people and

5  the training going on there was identified significant

6  inefficiencies within the shop of people waiting around to be

7  trained, waiting around to get tools, waiting around to receive

8  parts.  So we basically were paying people to stand around,

9  they not performing direct labor activities, which were then

10 billed to a customer.

11 Q    And is this your understanding of the reasons for the

12 significant losses in Tucson in 2012, or is this your

13 understanding of those losses today?

14 A    Some of that I understood in – well, I'm going to have to

15 break that down.  The losses that I understood about the 13 or

16 so employees we lost in July, August, September of 2011, I was

17 acutely aware of that because I was involving the Tucson area.

18 The people we rehired –

19 Q    Okay.  So just one question at a time.  The testimony you

20 just gave, the lengthy answer about all of the significant

21 losses and what they were attributed to, is it fair to say that

22 that's your understanding today of the reasons for the

23 significant losses in Tucson in 2012?

24 A    Yes.  It's my summarial understanding of the losses due to

25 those events that happened, and some of them, as I knew at the

1    time, were causing losses as we went.

2    Q    Okay.  I want to know what you understood as of November

3    7th, 2012, when you began your involvement with the selection of

4    employees to be RIF'd of the reasons the Tucson facility had

5    suffered significant losses, as we described before.

6    A    On November 7th the explanation given to me by Kevin

7    Stewart was that portion of my testimony before that we had

8    significant inefficiencies within the shop due to the last five

9    to eight months of hiring of replacement workers in conjunction

10   with inbound cars not supporting that work force and the

11   physical layout of the shop was causing those losses based on

12   the types of rail cars that we were choosing to work on that

13   were low-margin type cars which was higher margin type cars.

14   That was my understanding November 7th.

15   Q    So the name you gave, what's that person's position?

16   A    Kevin Stewart at the time was General Manager.

17   Q    Is it your testimony that the reduction in force that took

18   place in November of 2012 was not the result of a loss of work

19   in the Tucson facility?

20   A    Try not to use the double negatives in there.  Can you try

21   that once more?

22   Q    I can rephrase the question.

23        Isn't it true that loss of work was not a reason for the

24   RIF?  Was not a factor in the RIF?

25   A    I don't know specific loss of work.  I wasn't aware that

1  there was a loss of work at that time.  My understanding the

2  catalyst, the expected increase in inbound rail cars needing

3  repair had not lived up to forecast.  But I don't know if also

4  there was a loss of work or not.

5  Q    Well, let me ask it this way.  Was there any decline in

6  work in the Tucson facility in 2012?

7  A    I don't have an answer for that.  I'm not too involved

8  with the inbound work flow and customer orders in 2012.

9  Q    Was there ever anything communicated to you that the

10  Tucson facility had suffered a decline in work in 2012?

11  A    A decline in work volume?

12  Q    Yes.

13  A    I don't recall if that was ever communicated to me or not,

14  no.

15  Q    Was it ever communicated to you that a decline in work

16  volume, a loss of work coming into the Tucson facility was a

17  reason that 29 employees needed to be terminated in November of

18  2012?

19  A    No.  It was never communicated to me in 2012 that part of

20  the reasons for reduction in force was a reduction in work

21  volume coming into the shop.  I was not aware that that was a

22  factor or not.

23  Q    Has it ever been communicated to you that a loss of work

24  volume in Tucson was a contributing factor to the November of

25  2012 reduction in force?

1  A    I don't recall if it was or wasn't.

2  Q    You're aware that a number of unfair labor practice

3  charges were filed by the Union with the NLRB on behalf of

4  Greenbrier Rail Services, correct?

5  A    Yes.

6  Q    Were you involved in the preparation of any of the

7  position statements that were submitted to the NLRB on behalf

8  of Greenbrier Services by the company's attorneys?

9  A    Yes.

10 Q    Did you review those position statements prior to them

11 being submitted to the NLRB on the company's behalf?

12 A    Yes.

13     MS. SHIH:  Your Honor, if we could take five minutes off

14 record.  We have a number of exhibits to mark.

15     JUDGE LAWS:  Okay.  Why don't we do that.  Let's try to

16 stay in the room though.  I think we're taking too many breaks,

17 and I'd like to minimize them.

18 **(Off the record)**

19 **(General Counsel Exhibits 20 - 28 marked for identification)**

20 Q    (BY MS. SHIH)  I've handed the witness what has been

21 marked as General Counsel's Exhibits 20 through 28.

22     If you can take a moment to look through those documents

23 and tell us whether you've seen and are familiar with each of

24 those.

25 A    Yes, I'm familiar with this.

1    Q    Did you provide information to the company's attorneys in

2    preparing these exhibits – or preparing these documents?

3    A    Yes.

4    Q    And you reviewed each before they were submitted to the

5    NLRB on behalf of Greenbrier?

6    A    Yes.

7    Q    Let me refer you specifically to Exhibit 28.

8    A    Okay.

9    Q    That's the December 20th, 2012 position statement submitted

10   to the NLRB on behalf of Greenbrier during the investigation of

11   an Unfair Labor Practice charge?

12   A    Correct.

13   Q    The bottom of the first page of Exhibit 28, that first

14   paragraph at the bottom of the page beginning "At its Tucson

15   facility," the first two sentences, is Greenbrier's position in

16   December of 2012 a month after employees in Tucson were

17   terminated that the Tucson facility had suffered a decline in

18   business, correct?

19   A    I'm sorry, say the question again now that I found that.

20   Go ahead.

21   Q    It's the company's position that at least in December

22   2012, a month after it terminated a number of employees in the

23   Tucson facility, that that facility has had a decline in

24   business?

25   A    Okay.  And your question to that statement is?

1    Q    My question is had the Tucson facility suffered – is it

2    the company's position that the Tucson facility has suffered a

3    decline in business?

4    A    A decline in business being not reaching their

5    expectations and not reading the merchant profit expectations,

6    yes, there was a decline in business from expectations

7    forecast.

8    Q    So it's your position that the company had not suffered a

9    decline in work falling in the Tucson facility?

10   A    Again, I testified before it had suffered a decline in

11   work volume.

12   Q    So when you reviewed this position statement prior to it

13   being submitted to the NLRB on the company's behalf, what was

14   your understanding of what decline in business meant?

15   A    My understanding would be relative to our forecast for the

16   fiscal years.

17   Q    What specifically do you mean by decline in business?

18   A    I just said as Lex testified, we set up a one-year plan in

19   advance for revenue and margin and were measured each month by

20   our parent company on are we hitting revenue targets and are we

21   hitting margin targets.  And we weren't, so my terminology is

22   that a decline in business compares to our forecast.

23   Q    So what do you mean by decline in business is actually a

24   decline in profit?

25   A    Profit and revenue relative to forecast.  That's what the

1  parent company measures us by and hold us accountable to.

2  Q    So a decline in revenue relative to forecast, are you

3  suggesting that any decline in revenue relative to forecast

4  wasn't attributed to a loss in work, but to perhaps poor

5  expectations or poorly projected expectations about what

6  revenues would be?

7  A    Can you say that again slowly?

8  Q    When you say decline in business refers in part to decline

9  in revenues relative to forecast, are you suggesting that that

10  decline in revenues is not the result of a loss in work volume,

11  but instead that is the result of poorly projected expectations

12  about what work volume would be?

13  A    No, I cannot suggest that it was due to poorly

14  forecasting.  I'm not involved with the forecasting portion.

15  Q    So what else would cause a decline in revenues relative to

16  forecast?

17  A    What else would cause a decline in revenues relative to

18  forecast?  If a customer decided to stop sending us rail cars,

19  if they switch competitors, if based on where the rail cars are

20  physically at in the country, if they don't – it's not

21  geographically practical to route them to a certain shop.  And

22  I'm not intimately involved in the car flow schematic of how it

23  functions with the rail car business, but every – I'll share

24  with you that the customer is very unique, so we're very local

25  like with the pacer program described that's unique to Tucson.

1    And then there's the TTX program that's nationwide.  I'm not

2    that involved and don't understand the complexities of the

3    smaller customers versus the regional players versus the

4    national players.

5    Q    Okay.  But when you say a decline in revenue is relative

6    to forecast could be caused by a customer deciding to send its

7    rail cars to a competitor, that's a loss of work, correct?

8    A    That could be a loss of work, yes.

9    Q    Is there any circumstance in which a customer sending its

10   rail cars to a competitor instead of to Greenbrier would not

11   result in a loss of work?

12   A    Unless coincidentally marketplace with some other inflex

13   of rail cars or if a wreck occurred we can replace that work.

14   So to answer, it could even out if work all of a sudden came in

15   at the same time from a new customer base or from a wreck.

16       MS. SHIH:  Your Honor, General Counsel moves for admission

17   of General Counsel Exhibits 20 through 28.

18       MR. MINER:  No objection, Your Honor.

19       JUDGE LAWS:  Are these all position statements?

20       MS. SHIH:  They are, Your Honor.

21       JUDGE LAWS:  Okay.  Then I will go ahead and admit them.

22   **(General Counsel Exhibits 20 – 28 admitted into evidence)**

23       MR. MINER:  Your Honor, if I could just – could you give

24   us just a second?

25       JUDGE LAWS:  Sure.

1      MR. MINER:  A couple of clarifications, please, Your

2  Honor.  We're proud of our work.  We don't mind having our work

3  offered as exhibits in the hearing, Your Honor.

4      With respect to a couple of items, first attachments that

5  accompany these letters that are referenced in the letters and

6  many cases are not included in the exhibits, so we want to

7  point out that with respect to a number of these exhibits they

8  are simply incomplete.  They contain copies of position

9  statements without supporting materials that were provided with

10  them.

11      And, consequently I would also add that while the

12  statements in the letter reflect the company's position

13  regarding various different matters, obviously these exhibits

14  do not support, they don't go to the truth of the matter

15  asserted in the letters.  And with that clarification and

16  understanding we don't object to the introduction of these

17  exhibits.

18      JUDGE LAWS: Any response?

19      MS. SHIH:  I'm a little bit confused by the second – I

20  mean I understand with regard to the first part, a number of

21  these exhibits do not contain the attachments.  Whether those

22  attachments – I mean if the company wants to offer the complete

23  position statement as an exhibit or wants us to provide that,

24  we'll be happy to do that.  In a number of cases they're really

25  not relevant to the purpose for which the position statements

 1    are being submitted.

 2         As to the second piece, I'm a little confused by what your

 3    position is.  I don't know if you're intending to argue that

 4    it's hearsay to some extent or what it is, but to the extent

 5    that the company's submitting these position statements on

 6    behalf of Greenbrier, they're admissions by the company, and

 7    they're being introduced for the purpose of establishing that

 8    the company's defenses since December 2012 and throughout the

 9    time period of the investigation of these charges has shifted.

10         MR. MINER:  My only point in the second respect, Your

11    Honor, once again to clarify, is that the statements in these

12    position statements are evidence of nothing other than

13    Greenbrier's legal position regarding the subjects under

14    investigation.  And that point is made in most of these

15    correspondence themselves.

16         Obviously, Greenbrier receives a limited time to respond

17    for requests for evidence.  We work very diligently to respond

18    to those requests, and these reflect our best efforts as a

19    result of, you know, our own internal investigation in response

20    on behalf of the company.

21         JUDGE LAWS: That's understood.  And I, you know,

22    definitely take notice that as litigation evolves parties learn

23    more facts and strategies may change, depending on what the

24    attorneys and human resources people garner as knowledge in the

25    process of litigation.  That's common sense, and there's also

1    board law supporting it.

2        So I will admit those with those caveats.  If either of

3    you wants to supplement to make it complete, please feel free

4    to do so.  And I would also add please do so if somehow – and

5    this was a bulk of documents of several pages submitted without

6    a witness being questioned on them.  If there is something

7    that's going to be unclear because of the exhibits not being

8    attached when I go through this, I would need it to be

9    attached.

10       MR. MINER:  Thank you, Your Honor.

11   Q    (BY MS. SHIH)  What was your understanding in 2013 of the

12   reason the Tucson facility began to rehire employees that had

13   been laid off?

14   A    My understanding was in conjunction with the decision to

15   do the restructuring in November of 2012, the terms of the

16   reduction in direct and indirect labor you can move the plant

17   manager and HR analyst the restructuring of the physical layout

18   of the work flow at the shop.  The intent of that was to save

19   the shop, return to profitability and at one point in time it

20   looked like we were going to sustain profitability that we

21   would then start to hire again and make a better effort at

22   managing the growth of the shop to preserve the profitability

23   in mixing the hiring of people and train them in conjunction

24   with the actual work flow coming to the shop.  It's therefore

25   in February we started that process as laid out in November

1   that we were modestly profitable in December, January,

2   February.  And at that point Kevin Stewart and (inaudible)

3   we're now ready to start the managed growth back up of the

4   facility.  That's why we started hiring in February 2013.  So

5   the plans they had laid out was working at that point in time.

6   Q    Was rehiring also possible because of increased volume of

7   work at the Tucson facility?

8   A    I don't know the answer.

9   Q    Are you aware that the company's attorneys communicated to

10  the NLRB during the investigation of the charge that rehires

11  were possible based on increased work out of the Tucson

12  facility?

13  A    I'm not sure if it was increased work or there was just a

14  backlog of rail cars to be fixed sitting there.  And we just

15  said, okay, we've restructured correctly and properly.  We have

16  a backlog, or do we have more business coming in and based on

17  the forecast over what we are hearing from the customers let's

18  start hiring now so we can continue the steady of increased

19  profitability.

20  Q    Let me ask you – ask my question again because you didn't

21  actually answer the question I asked.

22  A    I'm sorry.

23  Q    Are you aware that the company's attorneys communicated to

24  the NLRB during the investigation of the Unfair Labor Practice

25  charges that rehires were possible because of increased work at

1   the Tucson facility?

2   A     Yes.  If it is stated in these position statements, yes.

3   I was aware of that statement.

4   Q     Are you independently aware of that as you sit here on the

5   stand right now?

6   A     No.  They may have communicating in phone calls to the

7   NLRB, or something like that.

8   Q     Okay.  Are you aware of the factors that were considered

9   in determining which employees would be selected for rehire in

10  2013?

11  A     Again, I was aware of the general factors again using my

12  basic knowledge about the rail car business and my experience

13  in production manufacturing environments is that management

14  team would be hiring people as they were needed, additional

15  welders or airmen or switchmen based on their plan to manage

16  the growth.  So they would look at factors such as who might

17  still be out there from the original rail who might be a

18  welder, who might be a welder/airman, who might be a

19  welder/switchman, who might have been a painter before, who is

20  also a welder or vice versa.  So they would look at is there an

21  available local market work force out there that we can tap

22  back into who had those specific skills originally and/or

23  combined to then go and start hiring those people as it would

24  be different positions as we were growing the business.

25  Q     Okay.  I'm not asking though about general factors that

1  you would expect would be reviewed.  I'm asking whether you

2  have specific knowledge about what factors were considered by

3  the individual decision makers who were making the decision to

4  rehire employees, as to what the reason specific employees were

5  selected to be contacted for rehire.

6      MR. MINER:  Your Honor, could I ask for a clarification

7  about specific knowledge?  Are we asking, is Al being asked to

8  testify about what he instructed folks to consider or what

9  folks told him they were going to consider or whether there is

10  some, you know, written policy on this?  What are we asking Al

11  Lave to testify about?

12      MS. SHIH:  I'm asking him to testify about what

13  information he had that – about the factors that were actually

14  considered in 2013 about which employees would be called back

15  and rehired.

16  A    I do not have firsthand knowledge of why an individual

17  person was selected to be hired.

18  Q    (BY MS. SHIH)  Were you involved in any way in the

19  selection of employees for rehire in 2013?

20  A    My involvement was with respect to Juan Maciel's plan to

21  rehire people is that they should be treated like any other

22  applicant since they were rehired to then go through our normal

23  application process, interview process, physical drug screen,

24  interview with Erik Valenzuela and be hired in their time to

25  then make a new employment decision whether we want to rehire

1   that person.

2   Q    Okay.  But as to the selection of which people would be

3   called back for an opportunity to be rehired, you weren't

4   involved in that decision, correct?

5   A    For the people that were hired back, no.  That was left up

6   to Erik and Loren.

7   Q    so you didn't have any input into which employees would be

8   recalled?

9   A    I did not have any input into which employees would be

10  recalled.

11  Q    And you weren't consulted about the decision to recall

12  specific employees with regard to an EEOC or an age analysis,

13  as you were during the layoff, correct?

14  A    Correct.

15  Q    The decision as to which employees would be recalled were

16  made in Tucson by Erik Valenzuela, correct?

17  A    I don't know if that's correct or not.  I don't know who

18  else Erik would have involved in those decisions.

19  Q    But you're aware that Mr. Valenzuela interviewed each

20  applicant for rehire in 2013?

21  A    I'm not aware if he interviewed each person because I

22  believe we may have done some rehiring in February before – I

23  think he started in March, but I don't have the precise dates.

24  I don't have knowledge if he interviewed anybody or not.

25  Q    So you're not aware of the identity of the individual

1  management employees that made the decision as to which

2  employees would be rehired?

3  A    Say that again.

4  Q    Are you aware of the identity of the managers who made the

5  decision as to which employees would be rehired?

6  A    Not specifically each individual rehired, no, I don't.  It

7  could have varied.

8        MS. SHIH:  Your Honor, I'm about to switch to a new topic.

9  I'm happy to continue with the new topic and take a lunch break

10  later, or if it's your preference we can certainly break now.

11  I just wanted to let you know that I'm about to shift gears?

12        JUDGE LAWS:  Why don't we – I mean if everyone is okay

13  with it – make some more headway.  Okay.

14  Q    (BY MS. SHIH)  You were involved in an audit of employees

15  attendance points for the Tucson facility in November of 2012,

16  correct?

17  A    I did not do the audit, but I was a part of the group that

18  was aware of the audit that was performed.

19  Q    So in November 2012 you – didn't you visit the Tucson

20  facility in November of 2012?

21  A    Not for purposes of attending these audits.

22  Q    You weren't present when Lisa Maxey conducted an audit of

23  attendance points in Tucson in November 2012?

24  A    No.  I was in Lake Oswego, Oregon.

25  Q    What was your involvement in the audit of the attendance

1   points for the Tucson employees in November 2012?

2   A    To the best of my recollection I received a call from Juan

3   Maciel and Lisa explaining that after we had discharged Maggie

4   Madrigal as part of Lisa's clean-up activities and temporarily

5   taking over the duties from the HR function there she realized

6   there was a lack of quality or a lack of accuracy within the

7   attendance points tracking that had been going on by the

8   previous HR person.  So she did a full audit and we were

9   concerned about it.

10  Q    When did they contact you with the concern about the

11  attendance point tracking?

12  A    There's some documents they gave me that show that

13  precision or the timing of that November 12, 13, 14 range in

14  there.

15  Q    Following the layoff of the employees in Tucson?

16  A    Correct.

17  Q    When they contacted you with their concerns, what

18  specifically did they tell you?

19  A    Generally they didn't have faith in the quality of the

20  attendance points tracking.  It appeared that some people were

21  not assigned points correctly under the schematic that Lex

22  Morris explained yesterday.  And that there could have also

23  been – there was an apparent lack of documentation on were

24  warnings given or not, and so they had the concern that moving

25  forward in the shop and in fairness to the employees they would

1  be moving forward with an inaccurate database of information,

2  and in fairness to employees that would not be right because of

3  the mistakes and lack of accuracy in the points tracking

4  database.

5  Q    Did they tell you what prompted them to begin looking into

6  the accuracy of the tracking up until that point in the first

7  place?

8  A    I don't recall him telling me this, but as well as an HR

9  person would be filling in a shop you are being involved with

10  the attendance point system.  So I'm assuming Lisa got in some

11  --  one or two file reviews and became concerned that she

12  couldn't figure out what was going on with the point systems.

13  Q    Did she inform you that she was conducting audits of

14  attendance points in any other facilities at Greenbrier?

15  A    Not at that time.  I'm aware that my staff does that when

16  they visit shops.  That's a part of the function we provide to

17  the plant managers is to train the local HR people how to do

18  the point system, to track it properly and so therefore that's

19  part of their function to audit the attendance point system in

20  different parts in time.

21  Q    What facilities have you conducted attendance points

22  audits of since the time you've been in your position for

23  Greenbrier?

24  A    Myself none.

25  Q    What facilities are you aware of that have undergone

1    attendance points audits since the time you've been here at

2    Greenbrier?

3    A    Tucson, Omaha, Atchinson, Clever and Finley, St. Ann,

4    (inaudible).

5    Q    When was there an attendance points audit conducted in

6    Omaha?

7    A    In the last four to ten weeks.

8    Q    And what prompted that audit?

9    A    When we closed down the KC Fastrack location, Kansas City

10   Fastrack was the location that we closed down in April-June

11   range.  And the HR admin person there from KC Fastrack we had

12   identified that we wanted to transfer her to the Atchison,

13   Kansas repair facility, but there was going to be an overlap of

14   duties with another person there for a while, so my regional

15   person Darci (inaudible), and I said, well, let's utilize this

16   person, Dina, to audit the attendance system, audit the

17   personnel files to save Darci the workload because she was

18   involved to have them audit that stuff.  When she completed

19   that audit that identified problems then she still worked at a

20   time of switching her into the Atchinson facility.  In about

21   the same time our regional manager, who had been the acting

22   plant manager in Omaha, resigned from the company, and our

23   number two person, the production manager, was discharged. And

24   the office admin had left us to take another job, so I

25   instructed Darci to brainstorm.  Let's send Dina out to Omaha.

1   Because we are waiting on Atchison to open up.  Let's send her

2   to Omaha to do the same type of thing because we didn't want to

3   lose Dina, so we had her go to Omaha and do the attendance

4   audit, the personnel file audit.

5   Q    Is it the company's practice to regularly audit the

6   attendance point tracking system in each facility?

7   A    Not on a set schedule, no.

8   Q    Are you aware of any prior audits conducted on the

9   attendance points tracking in Tucson?

10  A    I'm aware that both Darci, who was the regional manager

11  over Tucson and regularly worked with Maggie Madrigal on her

12  attendance points tracking skills and Lisa Maxey, who came in

13  as we reassigned territories continued to worked with Maggie on

14  attendance point tracking system.  Now, whether you would call

15  that an audit or not, but that's what they were doing with her

16  because she wasn't doing it well. So it was an ongoing problem

17  that Darci had identified and that Lisa continued to work with

18  her on because she wasn't doing it right.

19  Q    The audit of the Tucson attendance points in November 2012

20  the company zeroed out the attendance points for all employees

21  that were still employed at that facility, correct?

22  A    Correct.

23  Q    And those were the employees that remained after the

24  November 2012 layoff?

25  A    Correct.

1    Q    Are you aware of any other times or occasion when the

2    Tucson facility zeroed out attendance points for all of the

3    employees?

4    A    I'm not aware of any attempts, no.

5    Q    Are you aware of any other occasions in which the company

6    has zeroed out attendance points for all of the employees at

7    any other facility?

8    A    In terms of zeroing out, no.  I'm aware of other rollbacks

9    of certain number of points.

10   Q    You mentioned the Miralona facility as another facility

11   where there's been an audit of attendance points.  When did

12   that take place?

13   A    Probably since Lisa Maxey joined the company, which I

14   believe was April 2012, I believe.  I believe she did Miralona

15   and picked up that facility for her jurisdiction and

16   responsibility for another regional person.

17   Q    Was there any specific reason or incident that triggered

18   that audit?

19   A    In Miralona?

20   Q    Yes.

21   A    I'm not aware of that.

22   Q    What about in San Antonio, Texas, when was there an audit

23   of attendance points conducted there?

24   A    I believe when Lisa was there. I think it's part of her

25   regular proactive HR work that she brought to the company.

1    Q    So this is Maxey's practice to regularly audit the

2    attendance points of the facilities that are under her

3    supervision?

4    A    I can't say whether it's a regular practice or not.  I've

5    learned from her that on her travels to shops that she will

6    periodically do that audit.

7    Q    And that's not being done at your direction?  In other

8    words, did you instruct her to perform attendance points audits

9    of those facilities?

10    A    Not those specific ones.  I've given my staff general

11    instruction as part of the team when they visit shops that they

12    should be doing audits, whether it's attendance points

13    tracking, personnel documents, personnel file reviews, et

14    cetera.

15    Q    You visited the Tucson facility on June 28th, 2013,

16    correct?

17    A    Without my calendar that sounds about right, correct.

18    Q    And one of the reasons for your visit was to meet with

19    employees to discuss the upcoming Sheet Metal Workers election?

20    A    Correct.

21    Q    And you've had multiple meetings with employees at the

22    Tucson facility, correct?

23    A    Yes.

24    Q    Mike Torra, the Vice President of Operations, was present

25    as well?

1    A    Yes.

2    Q    Who else was present during those meetings besides the

3    employees themselves?

4    A    Eric Valenzuela would have been in attendance.  Juan

5    Maciel, General Manager was in attendance.  And besides the

6    employees there would be the appropriate lead person forman

7    manager from those respective departments, the center shop, the

8    front shop, who else had joined that meeting, and an office –

9    well, the office staff.

10    Q    How many meetings did you hold with the employees that

11    day?

12    A    Three or four.

13    Q    And these meetings were mandatory for employees, correct?

14    A    Yes.

15    Q    Was that the first meeting that you held with employees to

16    discuss the upcoming Sheet Metal Workers election in July?

17    A    I believe so, yes.

18    Q    How many meetings, or how many occasions did you meet with

19    employees to discuss the July Sheet Metal Workers election?

20    A    In addition to the June 28th meeting, I believe Juan Maciel

21    and I had held similar, a group of three or four meetings on

22    July 9th, 2013, which was two days before the election.

23    Q    The election was July 11, 2013?

24    A    Correct.

25    Q    And you were present for the election?

1   A    Yes.

2   Q    On June 8th, 2013 – let me back up and ask you.   During

3   these meetings that you held with employees on June 28th, 2013,

4   were you – you were speaking to the group of employees in

5   English, I presume?

6   A    I'm just – I'm not bilingual.

7   Q    And was there someone present who was acting as an

8   interpreter or translating for you?

9   A    Yes.

10  Q    Who –

11  A    In the Spanish-speaking meetings.   Some meetings were

12  English only, and then some meetings were English/Spanish.

13  Q    Okay.   So let me back up then.   On June 28th were the

14  employees divided up into English-speaking groups and Spanish-

15  speaking groups for purposes of holding the meetings?

16  A    Depends on where they came from, the physical shop.   If

17  there's a Spanish employee who is bilingual, then they would

18  come to one of the different meetings.   If an employee was

19  truly only Spanish speaking, they would come to the translating

20  meeting.

21  Q    So you held at least one meeting on June 28th, 2013, where

22  only English was spoken?   In other words, your statements were

23  not translated into Spanish.

24  A    At least one meeting, yes.

25  Q    And the employees that were present at that meeting

1  understood English, correct?

2  A    As far as I know, yeah.

3  Q    And you held at least one meeting on June 28th in which an

4  interpreter or translator translated your statements into

5  Spanish, correct?

6  A    Correct.

7  Q    How many meetings were held only in English?

8  A    I testified there were three or four meetings we had and

9  there was only one Spanish translating meeting, so that would

10  leave two to three English only meetings.

11  Q    About how many employees were present in each meeting?

12  A    I think there were close to three or four – 20 to 35

13  coming from different parts of the shop based on the work flow,

14  center shop versus front shop versus truck shop way in the

15  back.

16  Q    And that's the case for the Spanish meeting as well,

17  approximately 20 to 35 employees?

18  A    Yes.

19  Q    So it's your understanding that two-thirds to three-

20  fourths of the employees at the Tucson facility speak and

21  understand English?

22  A    To some degree, yeah.

23  Q    About how long were each of these meetings?

24  A    The English-speaking meetings were maybe 40 to 60 minutes

25  long.  The Spanish meeting probably was an hour meeting with

1    the time taken to translate, maybe forty five minutes.

2    Q    Were your statements in each meeting generally the same?

3    A    For the most part, yes.

4    Q    The content and the discussion of your statements was

5    generally the same for each meeting?

6    A    It could vary.  Mike Torra and I joined at those meetings,

7    so each meeting could vary.  As he was speaking he may

8    naturally flow into a discussion point that I might have

9    covered in a previous meeting or vice versa.

10   Q    What was – can you describe generally what was the nature

11   of the statements that you made during those meetings on June

12   28th?

13   A    Yeah.  If you have that document we produced there's an

14   actual Talking Points document.

15   Q    You're referring to General Counsel Exhibit 18?

16   A    No.

17   Q    What document are you referring to?

18   A    I think it's – it might be labeled Mike Torra Talking

19   Points, June 28th, 2013.

20   Q    You had in front of you for each of those meetings a list

21   of Talking Points to discuss with employees?

22   A    Mike and I did, yes.

23   Q    From your recollection – and we'll locate that document

24   during lunch.  From your recollection what were the nature of

25   your statements to employees during those meetings?

1   A      Sure.  In terms of generally again, when we're doing a

2   communication meeting concerning a Union election we are – my

3   responsibilities – I share with the employees my responsibility

4   is to, as I tell them, say, we want to take 30 to 40 minutes of

5   your time today and inform you that there's a Union election

6   coming up on July 11th and it's a very important decision for

7   you to make in that I and Mike here want to spend some time

8   with you to educate you on what Unions might be able to do for

9   you and not do for you so you individually can make an informed

10  decision, kind of correlate it to a consumer buying a car.

11  It's my responsibility to employees – and I respect you

12  individually – is to make sure that you can make an informed

13  decision on July 11th, now, do you want a Union to represent you

14  to bargain for wage benefits and working conditions.

15      And so that's kind of the opening of my typical

16  communication with those employees is saying why I'm there.

17  And then we go through again our preference for not having a

18  Union, because again we prefer dealing with our employees face

19  to face, one on one without an outsider from the business, who

20  knows nothing about our business, doesn't know anything about

21  rail car repair.  And then we have an open-door policy within

22  our shops in that our policy may not be perfect, but we strive

23  to continue to improve that policy.  And we share with them

24  that with the advent of (inaudible) we feel that he's been an

25  addition to that open-door policy, and that we feel if the

1   Union was to come in that that ability for us to be able to

2   deal with our employees directly could be hampered because

3   we're having to go through a third-party person.  And my

4   responsibility to my employees is to share with them, say:

5   Hey, many of you may like a third party to help you, and some

6   of you may possibly prefer to come to us directly with your

7   concerns about why you got this warning for attendance, or why

8   you got this pay raise based on your performance evaluation.

9       And so that was more in my content to explain to them that

10  that's our preference.  We want to be able to work with you

11  directly on those workplace concerns so we can better explain

12  why we made the decision or did not make the decision, and we

13  thought that a third-party like the union to be disruptive to

14  and that adds to, in our view, unnecessary layer of efficiency

15  to that.

16      So, again, it's my responsibility to share with employees,

17  that to inform them of those types of things, and then we also

18  inform them that, hey, with or without the Union we're going to

19  continue to make this a better safe place to be.  With or

20  without a Union we're going to stive to, when we can, improve

21  wages.  With or without a Union we're going to strive to

22  improve the benefits when we can in conjunction with parent

23  companies directive to that.

24  Q   On most locations you refer to "we."  Are you referring to

25  yourself and Mike Torra?

1  A    "We" being addition of the manager team, the HR team.

2  Mike Torra, Kevin Steward, Juan Maciel and Eric Valenzuela.

3  Julio Vasquez is the safety person.  The lead people, the HR

4  generalist there.  It's a concept as "we" as a company, "we" as

5  a team.

6  Q    So "we" refers to corporate management or the company?

7  A    Yes.

8  Q    Mike Torra made statements in those meetings as well.  You

9  conducted these meetings with Mike Torra?

10  A    On June 28th, yes.

11  Q    On June 28th do you recall making statements to employees

12  that the Tucson facility was making progress, and that it made

13  money in December 2012, January 2013 and February 2013.

14  A    In the meeting.  And I also want to share that we had made

15  money in March and April and possibly May's financials had been

16  done to – I shared that, yes.

17  Q    All right.  So you –

18  A    In fact, we were – we are stabilizing.  We are starting to

19  make modest money, but we need to improve on –

20  Q    Okay.  Let me interrupt you because you're going past just

21  my question.  If you could just answer my question.

22       You informed employees during the June 28th meeting that

23  the Tucson facility had been making money in the month

24  following the November 2012 layoff?

25  A    Correct.

1   Q    And you informed employees in those meetings that the

2   Tucson facility was making progress?

3   A    Correct.

4   Q    You also informed employees during meetings on June 28th

5   that if the Union came in, it could slow down progress that the

6   facility was making?

7   A    It could be disruptive to the progress.

8   Q    Do you recall using the term "slow down progress"?

9   A    I don't recall whether it was slow down or disruptive.

10  Q    Do you recall informing employees on June 28th that this

11  was a critical time for the Tucson facility that it needed to

12  become more profitable?

13  A    Oh, yes.  Definitely.

14  Q    So that the parent company would allow you to keep the

15  Tucson facility open, correct?

16  A    Correct.  It was on a watch list at the time.

17  Q    And that the Union coming in could impede that progress?

18  A    Potentially, yes.

19  Q    You recall my Torra making statements during the June 28th

20  meetings that non-Union facilities were run better than Union

21  facilities?

22  A    No.  Actually Mike had shared when he worked at G –

23  General Electric rail car that he oversaw shops that were both

24  Union and non-Union– and I think his view was that some were

25  better run as Union and some were better run as non-Union.

1    Q    So you don't recall Mike Torra made the statement that his

2    experience of non-Union facilities were run better than union

3    facilities?

4    A    Not in those words, I don't recall.

5    Q    Do you recall Mike Torre making this statement in any

6    meeting on June 28th that the communication in non-Union

7    facilities was more open than a communication in Union

8    facilities?

9    A    I don't recall if he made that statement or not.

10   Q    Do you recall whether or not Mike Torra made a statement

11   in any meeting on June 28th that non-Union facilities had better

12   compensation and pay structures than Union facilities?

13   A    I believe he was as referencing his experience at General

14   Electric with his shops where he worked at GE.

15   Q    But do you recall him making that statement?

16   A    Some statement to that effect.  That he was recollecting

17   his factuality when he worked at General Electric.

18   Q    Do you recall Mike Torra making the statement to employees

19   on June 28th that the Tucson facilities number one customer TTX

20   is adverse to Unions?

21   A    He did not say TTX was adverse to Unions.

22   Q    What did he say?

23   A    I think he said that TTX preferred dealing with their

24   suppliers as who had non-Union facilities because it avoided

25   their potential, decreased their potential for strikes. Which

1  then put TTX at ease.

2  Q    Do you recall Mike Torra making a statement to employees

3  on June 28th that the reason TTX shops cars with Tucson is

4  because they recognize it as a non-Union facility?

5  A    Not a common statement, no.

6  Q    Do you recall Mike Torra making a statement to employees

7  on June 28th that that was a risk with the number one customer

8  regarding the Unions?

9  A    I don't recall that statement.

10  Q    Do you recall informing employees on June 28th that the

11  Union could file Unfair Labor Practice charges against the

12  company?

13  A    Yes.

14  Q    And that the County was paying an attorney $400 an hour to

15  defend against lawsuits?

16  A    Yes.

17  Q    Do you recall making a statement to employees on June 28th

18  that at that time when the company was trying to make the

19  Tucson camp more profitable?  It was having to spend money on

20  an attorney to defend against a lawsuit.

21  A    Yes.

22  Q    Do you recall informing employees in a meeting on June 28th

23  that the Union had filed Unfair Labor Practice charges against

24  the company because of raises that the company had given?

25  A    Yes.

1    Q    And you recall informing employees that it was frustrating

2    to the company to have to defend those kind of lawsuits when it

3    was trying to make the shop more profitable?

4    A    We explained that, because as our employees know for years

5    we had a regular raise program both for our six-month employees

6    and for our annual increases that we had done forever.  It was

7    frustrating for us to have to defend something that we had done

8    for years at all of our shops.  We were sharing that

9    frustration with the employees as a point of why we prefer to

10   stay non-Union because the Union had not researched that

11   situation, and we thought that was a fruitless claim against

12   us.  That was an example to employees about some of the

13   inefficiency that could come with the Union.

14   Q    So is your answer to my question yes, you did make the

15   statement to employees that it was frustrating to the company

16   when it was trying to make the Tucson shop more profitable to

17   have to defend those kinds of lawsuits?

18   A    Yes.

19   Q    And by lawsuits, you were referring to the Unfair Labor

20   Practice charges filed by the Union, correct?

21   A    Correct.

22        JUDGE LAWS:  Once you wrap up that June 28th meeting let's

23   take a break.

24        MS. SHIH:  At this time I think I've wrapped up that area,

25   so if now is a good time, that's fine.

1    JUDGE LAWS:  Okay.  Why don't we break and be back at five

2    after 1:00.

3    **(Off the record)**

4    JUDGE LAWS:  Did you want to raise the issue?  Have you

5    discussed with counsel?

6    MS. SHIH:  I have not discussed it with him.  I think

7    we'll address it later on.

8    JUDGE LAWS:  Okay.

9    MS. SHIH:  There are just a couple of housekeeping issues.

10   The exhibit that was previously admitted as General Counsel 14

11   – I apologize – 16, which there was testimony about and had

12   some color comments, we actually did make color copies of the

13   original.  And I'd like to see if we can just substitute in the

14   two-page color copy for what has already been provided to the

15   Court?  Can we go ahead and swap that out?

16   The only other thing that we wanted to address at this

17   time is a motion for reconsideration of Your Honor's

18   determination as far as scheduling of the hearing.  It is our

19   position that the hearing, based on the 10-day aspect in that

20   General Counsel had asked the Board for ex parte consideration

21   of that authorization.  We're requesting that the hearing be

22   continued as soon as possible, including as early as next week.

23   Now, I understand there's already been discussion about

24   Respondent's Counsel being unavailable, but we certainly think

25   that's imperative that the hearing reconvene earlier than

1    October 21ˢᵗ, if possible.

2        JUDGE LAWS:  And with Respondent's Counsel being busy next

3    week, which was brought to everybody's attention a long time

4    ago, the next time I can do it is when it's rescheduled for.

5        MS. SHIH:  Okay.

6        JUDGE LAWS:  That is without having it done in piecemeal

7    fashion.  I have trials scheduled.  They may settle.  They may

8    not.  They're probably not going to take all week, but it

9    doesn't make sense to fly down here for a couple days.

10       And I do want to point out on that note about requesting

11   to reschedule it for next week.  When the motion to continue

12   the trial was filed by the Respondent, they represented that

13   the next time they have a two-week block is, in fact, when

14   trial is rescheduled for.  And that request was denied.  So you

15   had the opportunity to have it be heard two consecutive weeks,

16   and it was made clear from the get-go that it wasn't going to

17   be this week and next week.  That was part of the rationale

18   behind Respondent's motion to continue the hearing.

19       So, you know, I think it's a little bit curious that at

20   this point in time now, having insisted that we go forward

21   knowing the Respondent can't go forward next week, you're

22   requesting that it now happen.  I just want to point that out

23   because I think it's been clear all along that can't happen.

24       Mr. Lave, will you come back up?

25       Whenever you're ready, Counsel.

1        THE WITNESS:  Counsel, I'd like to clarify names that I

2    gave you earlier this morning.

3        MS. SHIH:  Okay.  Why don't you give me just one moment.

4        It appears that General Counsel Exhibit 18 is the only

5    exhibit so far that has not been admitted.  I would move now

6    for admission of General Counsel 18.

7        MR. MINER:  No objection, Your Honor.

8        JUDGE LAWS:  Okay.  And that's the –

9        MS. SHIH:  That is the document regarding the Union

10   organizing effort information.

11       JUDGE LAWS:  That's admitted.

12   **(General Counsel Exhibit 18 admitted into evidence)**

13       JUDGE LAWS:  And you stated that you needed to correct an

14   answer that you provided earlier?

15       THE WITNESS:  Add additional information.

16       JUDGE LAWS:  Okay.  Why don't you go ahead and wait for

17   your Counsel to cross-examine you on that issue.  If they need

18   additional information they can ask you for that.

19       THE WITNESS:  Thank you.

20   Q    (BY MS. SHIH)  Earlier you had testified about an email

21   that you received on November 16th that contained the final

22   termination list of the employees for the Tucson facility; is

23   that right?

24   A    Correct.

25   Q    And we were still in the process of making copies at that

1    time.  So at this time I'd like to offer you what's been marked

2    as General Counsel Exhibit 13.

3    **(General Counsel Exhibit 13 marked for identification)**

4         MS. SHIH:  I think we're caught up on the numbers.

5    Q    (BY MS. SHIH)  And that's a five-page document.  Can you

6    identify the document and its attachment?

7    A    The email document is a email from Lisa Maxey to me on

8    November 16, 2012 at 7:24 a.m.

9    Q    And the following pages 2 through 5, are those the various

10   sheets of the attachment to page 1?

11   A    Yes, I believe so.

12   Q    Let's start with page 2, if you can identify what that

13   page is.

14   A    I believe that I testified this morning – I believe this

15   is the – I believe this is the shop physical organizational

16   chart of the employees remaining with us after the November

17   2012 reduction in force.

18   Q    This was part of the attachment to the email that's page

19   1?

20   A    I believe so.

21   Q    Well, you say you believe so.  It's my understanding that

22   you actually looked at your emails between yesterday and today.

23   Are you able to confirm that this document was attached to the

24   email that is page 1?

25   A    No, not at this time.

1  Q    What would be necessary for you to determine what

2  attachments there were to this email of November 16, 2012?

3  A    I'd have to go back to that email and open up the

4  attachment and then start matching up these papers.

5  Q    Isn't that what you did last night?

6  A    Correct.  Yes, correct.  Did we provide these documents to

7  you this morning?

8       MR. MINER:  Correct.

9  Q    (BY MS. SHIH)  So are you able to testify definitively

10 that page 2 of Exhibit 13 was attached to the email that is

11 page 1 of Exhibit 13?

12 A    Yes.

13 Q    And page 2 represents the staffing of the Tucson facility

14 after the November 12, 2012 layoff?

15 A    I believe it does.  However, I've never matched it up to

16 our Kronos system to verify.  This document was not produced by

17 me, but it came in the email from Lisa Maxey entitled "Final

18 List of Terms," so I made the assumption that she had

19 reconfigured the final plant org chart to match up with that.

20 Q    So it was represented to you by Maxey that this was the

21 staffing of the Tucson facility after the layoff?

22 A    Not on this org chart.  Her email only addresses attached

23 was the final list of terms, which is another sheet within the

24 excel file.  But she never emailed and told me that she matched

25 up the final list of terms to this org chart that she created

1    for us.

2    Q    Was there any representation made to you as to what this

3    document was, page 2 of Exhibit 13?

4    A    Well, the representation I deduced because there was

5    earlier, in the earlier attachments on this thread of emails

6    this sheet had been created as part of that attachment where it

7    laid out the physical layout of the shop by front shop, center

8    shop and truck shop and had removed the wreck shop and the

9    other one.

10   Q    Okay.  Do you –

11   A    And I can tell that because it shows me that John Anderson

12   is now listed as the Billing Manager, and that was one of the

13   final decisions that we had made as part of the restructuring

14   was to put John Anderson into that Billing Manager position.

15   Q    Do you have any reason to believe that the document that

16   is page 2 of Exhibit 13 does not accurately represent the

17   Tucson staffing as of Friday, November 16, 2012?

18   A    I couldn't make that statement as of November 16, 2012.

19   There may have been other movement – well, as of the email

20   staffing as of that day, I believe it reflects the staffing as

21   of that day based on how I see John Anderson now is coded as

22   the Billing Manager.

23   Q    My question was actually do you have any reason to believe

24   this doesn't reflect the staffing as of that date?

25   A    The only reason I would have is that I've not personally

1  matched it up to our Kronos database system to verify do these

2  individual names match up to Kronos showing these people were

3  still with us on that date.

4  Q    This document, page 2 of Exhibit 13, does not show a wreck

5  shop or a paint shop.  Were those shops eliminated as part of

6  the November 12, 2012 layoff?

7  A    Ask me that question again, please.

8  Q    Was the truck shop – or, excuse me, the wreck shop and the

9  paint shop – and now that I look again – the intermodal shop,

10  none of which are reflected on this document, were those shops

11  eliminated as part of the November 12, 2012 layoff?

12  A    I don't know if I'm in a position to say whether they were

13  eliminated or not, because we still continued a painting

14  function there.  Now, whether we continued wrecks or not, I

15  don't know.  As I believe it was Lex testified today, the

16  shop's existence, it's different based on what Kevin Stewart

17  and Juan Maciel decided to do to try to get efficiencies back

18  in.  One of them was the physical layout, having people spread

19  all over, including positively changing rail care types, like

20  wreck shops.  I don't know the details of what was actually

21  eliminated per se.  The painting was still continued, but it's

22  our scaled-down version.

23  Q    Okay.  Well, then let me go back and ask you, what

24  discussions did you have with anyone prior to November 12,

25  2012, about the elimination of shops within the Tucson

1  facility?

2  A    Nothing in specific detail.  My understanding from Kevin

3  was they were going to restructure and streamline the shop in

4  one or more ways.

5  Q    You don't - there was no specific mention that the

6  intermodal shop would no longer exist after November 12, 2012?

7  A    No specific discussions directed to me.

8  Q    That's all I was asking about.

9  A    Okay.

10  Q    Any specific discussion that you were a part of in which

11  it was discussed that the paint shop would no longer exist

12  after November 12, 2012?

13  A    No discussions directed towards me.

14  Q    Same question for the wreck shop?

15  A    No discussions directed towards me.

16  Q    Was it your understanding that following November 12,

17  2012, there would be no separate shop identified as the paint

18  shop?

19  A    No.  On the property there is a building that is the paint

20  shop where we continue to paint rail cars.  The physical

21  structure is a paint shop.  I think what they were doing here

22  was organizationally streamlining the operation and eliminating

23  some lead positions and foremen because they didn't have the

24  need for a full-time paint crew per se of three painters and a

25  lead.  But we still maintain the physical function of a paint

 1  shop.

 2  Q    So looking at Exhibit 2 (sic) would you say that it's fair

 3  to say that Eddie Duarte, who is identified as a painter, now

 4  reports to the foreman of the center shop?

 5  A    I would not know that.

 6       JUDGE LAWS:  And I want to correct you, too, because you

 7  said Exhibit 2.

 8       MS. SHIH:  I'm sorry, I apologize.

 9  A    Oh, thank you.  So we're on Exhibit 13, page 2?

10       JUDGE LAWS:  Yes.

11  A    Can you ask me the question again?

12  Q    (BY MS. SHIH)  Is it fair to say based on – looking at

13  page 2 of Exhibit 13 that Eddie Duarte, who is identified as a

14  painter, reports to the foreman of the center shop?

15  A    Based on this chart here, yes, it would appear that he

16  reports to Hector Barajas, Foreman, and/or Martin Torres,

17  Foreman.

18  Q    And those are both the foremen of the center shop?

19  A    On this document, yes.

20  Q    Previously, however, prior to November 12, 2012, the

21  painters reported to a separate foreman, who only oversaw the

22  operations of the paint shop, correct?

23  A    No.  I believe Lex's testimony is they reported to –

24  Q    Well, I'm not asking you to reference someone else's

25  testimony.  I'm asking you –

1    A    I don't know who they reported to prior to November 12th if

2    I can't reference Lex's testimony.  I don't know firsthand.

3    Q    If I can turn your attention to pages 3 and 4 of  Exhibit

4    13, which appear to be a single chart that continues onto two

5    pages.  Can you identify what that chart is?

6    A    This chart appears to be the roster of all employees and

7    temporary contracting employees prior to the November 12th RIF

8    and after I asked Lisa Maxey to go to the race ethnicity page

9    and pay code, but prior to her loading in the notes about high

10   attendance, performance, et cetera.

11   Q    So is this a document that was attached to Ms. Maxey's

12   November 16, 2012 email?

13   A    Yes, it was one of the sheets with it.

14   Q    So pages 3 and 4 reflect a pre-RIF employee list?

15   A    I believe so, yes.

16   Q    And page 5 of Exhibit 13, that's the final list of

17   employees that were let go on November 12, 2012?

18   A    If I can back up to your question about pages 3 and 4.

19   Without matching up line for line under the column where it

20   says "term yes or no," there is a series of people all sorted

21   with a "yes" code, without matching up line for line to the

22   other term listed, it would appear that this contains the –

23   could contain the final list of people who had been – who

24   remain with us and who were discharged on that day.

25   Q    You're referring to pages 3 and 4?

1    A    Correct.

2    Q    So that combined with employees in November 2012 with the

3    ones that were retained and the ones that were let go on

4    November 2012?

5    A    I believe so.  And then page 5 would be a subset of that,

6    which is the newest or as she said the final list of terms to

7    be this page 5.

8    Q    And on pages 3, 4 and 5, any employees that do not have an

9    employee ID number to the left of their names, those are temp

10    employees, correct?

11    A    Yeah, temporary agency employees, correct.

12        MS. SHIH:  Move for admission of General Counsel Exhibit

13    13.

14        MR. MINER:  No objection, Your Honor.

15        JUDGE LAWS:  That's admitted.

16    **(General Counsel Exhibit 13 admitted into evidence)**

17    Q    (BY MS. SHIH)  Prior to the lunch break we were talking

18    about a June 28th, 2013 series of meetings that you had with the

19    Tucson employees, and you made reference to a document

20    containing some talking notes.

21    A    Yes.

22    Q    Do you recall that testimony?

23    A    Yes, I do.

24    **(General Counsel Exhibit 29 marked for identification)**

25    Q    I'm handing you what's been marked as General Counsel

1    Exhibit 29.  Is that the list of Talking Points that you and

2    Mike Torra worked from when you conducted your June 28, 2013

3    meetings in Tucson?

4    A    Yes.

5    Q    Did you prepare this document?

6    A    Yes, I did.

7    Q    When did you prepare it?

8    A    Well, the actual preparation of the document, it was

9    probably prepared one or two days in advance of the meeting up

10   to a week in advance of the meeting.

11   Q    You provided a copy of this document to Mike Torra?

12   A    Correct.

13   Q    Who else did you distribute a copy of the document to?

14   A    Just Mike and I, no one else.

15   Q    Did you and Mr. Torra create this document together?

16   A    Yes.  Specifically, the opening paragraph I use for Mike

17   to kind of get a background since I don't think he'd ever

18   talked to the Tucson employees before.

19   Q    Did Mr. Torra during his statement to employees on June

20   28, 2013, also make his statement to employees in English?

21   A    Did he speak for employees in English?

22   Q    Yes.

23   A    Yes, he did.

24   Q    So in the one Spanish meeting that you testified about

25   earlier that took place on June 28th, were Mr. Torra's comments

1    to employees also translated through an interpreter or a

2    translator?

3    A    Yes.

4    Q    Who served as the interpreter or translator in that

5    meeting?

6    A    It could have been a mix of Julio Vasquez, Eric Valenzuela

7    and/or Juan Maciel.

8    Q    They were all present during that meeting?

9    A    Eric Valenzuela and Juan Maciel for sure.  I don't recall

10   if we had Julio at the meeting or not.  At one point we thought

11   we would be using him as a translator, but I don't remember in

12   the meeting whether we had a need for him, Eric's and Juan's

13   bilingual abilities.

14   Q    But you recall that Eric and Juan were both present at the

15   Spanish meeting on June 28th?

16   A    Yes.

17   Q    And do you recall both of them serving as interpreters or

18   translators for English statements during that meeting?

19   A    Yes.

20   Q    Looking at page 1 of Exhibit 29 under Talking Point No. 7,

21   which is titled "ECONOMY discussion," there are a number of

22   blanks, and it continues onto page 2 that appear to describe or

23   identify losses suffered by the Tucson facility in various

24   months of 2012.

25   A    Correct.

1    Q    When you made, or when you conducted your June 28th

2    meetings to employees was there additional information that had

3    been filled into those blanks?

4    A    Mike verbalized it at the time of the meeting based on

5    some financial record that he or Juan had at the shop.

6    Q    So when Mike Torra was making statements to employees

7    during those June 28 meetings, he was providing information on

8    the economics of the Tucson facility from a document that he

9    had with him?

10   A    I don't recall if it was with him.  I guess we need to

11   clarify that.  Again, we had three or four meetings that day,

12   and in some of the meetings he would cover this discussion

13   point or I would cover it, or we might cover it.

14   Q    Okay.  So let me ask you about when you would cover that

15   discussion point.  Where did you get the information to fill in

16   the blanks as you were speaking to employees about the losses

17   suffered by the Tucson facility in response to 2012?

18   A    I myself would not – I did not quote specific dollar

19   amounts.  I explained general terms.  If I handled a point of

20   physical year 2012, Tucson lost significant monies, you know, a

21   couple hundred thousand dollars.  And I would use like in

22   September we lost a little bit of money.  However, in October

23   the losses increased drastically again to a couple hundred

24   thousand dollars.

25   Q    So when you handled the discussion about bullet point

1    numbers or Talking Point numbers then you didn't provide

2    specific numbers in your statements to employees?

3    A    Not exact to the penny, no.  I was referencing of that

4    other document just for recall numbers of that one page.

5    Q    What I'm asking – I'm asking about the statements that you

6    made on June 28th to employees.  In any meetings where you

7    handled Talking Point No. 7, did you provide employees with

8    numbers of losses at the Tucson facility in any of the amounts

9    listed in Talking Point 7?

10   A    Yes.  In one of these of Talking Point 7, so "A" I may

11   have used the term we lost over a couple hundred thousand

12   dollars.  And also in October 2012 we had lost over a couple

13   hundred thousand dollars.

14   Q    And is that what you recall you actually said, a couple

15   hundred thousand dollars?

16   A    Not exactly recall, no.

17   Q    Did you have any documents in front of you when you were

18   speaking on the economics situation of the Tucson plant?

19   A    No.

20   Q    Did Mr. Torra have any documents in front of him when he

21   was speaking on the situation, the situation at the Tucson

22   plant?

23   A    I don't know.

24   Q    Did you see him with any financial documents during any of

25   these meetings?

1    A    I did not see him hold up financial documents while we

2    were addressing the employees.  Whether he had financial

3    documents in his coat or pocket, I don't know.

4    Q    Do you recall whether Mr. Torra provided numbers of the

5    losses in his statements to employees when he spoke about

6    Talking Point 7?

7    A    Yes.  In one or more of the meetings he may have shared

8    some general type numbers for some of these sub Talking Points.

9    Q    And what's your understanding of where those numbers came

10   from?

11   A    The financial statements that he knew about or had with

12   him there at the Tucson shop.  We did not cover this – he and I

13   did not cover this point in detail prior to the meeting.

14   Q    Were these the only notes that you had with you in the

15   meeting on June 28th from which you spoke to employees?

16   A    Yes, that I had with me, correct.

17   Q    If you'll look at page 2 of Exhibit 29, Talking Point 8,

18   which is listed "Recap of changes since November 2012."  There

19   are two blank spaces below that.  What information did you

20   provide to employees during meetings on June 28th?

21   A    I myself probably didn't provide any additional

22   information there.  That Talking Point 8, actually this

23   document grew out of a Talking Point document created – I

24   created this document back in 2011 when we held employee

25   meetings.  And in the 2011 meetings we shared with them –

1      MS. SHIH:  I'm going to object as nonresponsive, Your

2  Honor.  I asked him specifically what statements he made to

3  employees about the recap of changes since November 2012.

4      JUDGE LAWS: I mean I think you answered you can't recall

5  any.  If the attorney for Respondent wants to follow up as to

6  why, they can do that on their examination.

7      MS. SHIH:  Okay.  I didn't actually hear that his answer

8  was that he did not recall.

9  Q    (BY MS. SHIH)  Do you recall what changes since November

10  2012 you recapped for employees in meetings on June 28th?

11  A    I recapped for them the hiring of Eric Valenzuela as the

12  new Plant Manager, and that we were very pleased with him

13  continuing our policy and making it a more receptive

14  environment.  Obviously in Points 9 and 10 I talk about the

15  hiring of Chris, who had strength for our HR function and

16  hiring Julio as our Safety Manager to strengthen our safety

17  function.  Other changes, I primarily talked about Eric's

18  hiring.

19  Q    Did you recap for them the elimination of attendance

20  points back in November of 2012?

21  A    No, I didn't.  I don't believe I covered that point.

22  Q    You didn't address the issue of attendance points and the

23  elimination of those points at all in your June 28, 2013

24  meetings to employees?

25  A    Mike and/or I may have addressed it in the context of our

1    preference for dealing with our employees one to one with

2    outside third party in that in a non-Union environment we would

3    have the flex – we would the most flexibility to adjust our

4    policies and our procedures in response to situations so

5    meriting, like the attendance policy, a problem that we

6    discovered in November and the comment to them that a Union

7    environment under a negotiated Collective Bargaining Agreement.

8    We as an employer would not have that flexibility –

9          MS. SHIH:  Objection, Your Honor.  Nonresponsive.

10         JUDGE LAWS:  I think he was trying to say he did address

11   it, but –

12         MS. SHIH:  Okay.

13         JUDGE LAWS:  – elsewhere.  So I think we can say that.

14   Q    (BY MS. SHIH)  So you did address the issue of the

15   elimination of attendance points in your meetings with

16   employees on June 28th?

17   A    Mike or I did, yes.

18   Q    You also addressed with employees in your June 28th

19   meetings $30 holiday gift cards that had been provided to

20   employees, correct?

21   A    I did.

22   Q    Other than the hiring of Eric Valenzuela, Chris Martinez

23   and Julio Vasquez, were there any other changes since November

24   2012 that you addressed with employees during your June 28th

25   meeting?

1    A    I don't recall, no.  I don't believe there were any other

2    change I addressed.

3    Q    Did you address the issue of rehired or recalled

4    employees?

5    A    I addressed the rehire of employees in the – yes.  In

6    answer to your question yes.

7    Q    Do you know how many employees of the 28, I believe –

8    actually let me ask you this first.

9         How many employees were discharged as part of – how many

10   nonmanagement employees were discharged as part of the November

11   12, 2012 reduction?

12   A    Let me do the math.

13   Q    Let me actually withdraw that question and restate it this

14   way.

15        How many production employees were discharged as part of

16   the November 12, 2012 reduction?

17   A    Approximately 31 or 32 people were impacted by the

18   restructuring.  Six of those were outside temporary contract

19   employees who would have been what we call production

20   employees.

21   Q    Just to clarify, when you say "impacted," do you mean

22   discharged?

23   A    Discharged and/or changed out.  Lex Morrison was impacted

24   by the rif but he did not lose his job.  He was transferred to

25   Finley.

1  Q    Right.  But I'm referring to production employees.

2  A    Yeah.  I'm trying to deduce to that.  So approximately 31,

3  32 employees less six temp employees leaves us with 25 to 26.

4  Taking out Lex, 24 or 25.  Take out Alex, 23 or 24.  Somewhere

5  in that 23 to 24 range, generic production employees, even

6  though symantic on whether a lead person is a production

7  employee because they do occasionally work on cars.

8  Q    How many of those were recalled after November 12, 2012?

9  A    I believe 14.

10  Q    And the Tucson facility has brought in temporary

11  production employees since November 12, 2012, correct?

12  A    Has the Tucson shop brought in temporary employees since

13  the reduction in force in 2012?

14  Q    Temporary production employees specifically.

15  A    I don't know if they have or haven't.  They have not

16  because I believe we discontinued – momentarily discontinued

17  the temp-to-hire program, and so there were some direct hires

18  specifically in the training crew area as we were trying to

19  ramp the business back up in February, March, April and May.

20  Q    So it's your testimony that the Tucson facility has not

21  used temporary agency services for any employees in the Tucson

22  facility since November 12, 2012?

23  A    Chris Martinez continued on as a temporary because he was

24  employed past that time, at some point in the summer was hired

25  on to GRS payroll.  Other than her, I do not think there –

1   there were a couple of employees after the RIF who continued on

2   with us as temporary employees, who had been there previously.

3   Q    That's not what I'm referring to.  I'm asking whether you

4   know if the Tucson facility engaged any individuals from

5   temporary agencies to work as production workers in the Tucson

6   facility after November 12, 2012.

7   A    I do not know that.

8   Q    You held another meeting with employees at the Tucson

9   facility on July 9, 2013 regarding the Union election, correct?

10  A    Correct.

11  Q    And that Union election was two days later?

12  A    Correct.

13  Q    How many meetings did you conduct with employees on July

14  9th?

15  A    Again it was three or four.

16  Q    How many of those were conducted in English?

17  A    All of them were conducted in English.

18  Q    How many of those were conducted only in English?

19  A    It would be two of the three or three of the four.  We had

20  one Spanish translation meeting.

21  Q    So you had only one meeting on July 9th that was conducted

22  in both English and Spanish?

23  A    Yes.

24  Q    You conducted all four of the meetings or all of the

25  meetings on July 9th?

1    A    Juan Maciel and I conducted the meetings together.

2    Q    In the meeting on July 9th in which both – which was

3    conducted in both English and Spanish, who provided the Spanish

4    translation of your English statement?

5    A    Juan Maciel did.  I apologize for laughing because there

6    was initial confusion when we did it that way, like I couldn't

7    track what he was saying when he spoke in Spanish himself on

8    his Talking Points, so I didn't realize we should have a third

9    translator.  I apologize for the snicker.

10   Q    And those employee meetings on July 9th were mandatory?

11   A    Yes.

12   Q    And the purpose of those meetings was to discuss the

13   upcoming Union election, correct?

14   A    Correct.

15   Q    How many employees at each meeting?

16   A    Similar to the June 28th, 20 to 35.

17   Q    And how long did each of those meetings last?

18   A    Those were probably in the 25- to 40-minute range.

19   Q    You used Talking Points at those meetings as well,

20   correct?

21   A    Correct.

22   **(General Counsel Exhibit 30 marked for identification)**

23   Q    Let me hand you what's been marked as General Counsel

24   Exhibit 30.  Those are your Talking Points for the July 9th,

25   2013 meetings with employees?

1    A    Correct.

2    Q    When did you – did you prepare this document?

3    A    Yes.  I created it in conjunction with Juan Maciel.

4    Q    When did you prepare it?

5    A    Probably either the day before the meeting or a couple

6    days before.

7    Q    The introductory points 1 through 4, were those statements

8    that Juan made to employees?

9    A    Correct.

10   Q    Which Talking Points did you discuss with employees during

11   your meetings on July 9th?

12   A    Again, I don't recall specifically in which meetings what

13   Talking Points I covered or Juan covered.  We fed off – went

14   back and forth off each other covering various Talking Points.

15   Q    So you provided Juan with a copy of this document for

16   those meetings as well?

17   A    Correct.

18   Q    Did you distribute these Talking Points to anyone else?

19   A    No.

20   Q    Do you recall telling employees in any meetings on July 9th

21   that they momentum going in the right direction to turn the

22   shop around?

23   A    Yes.  As I shared with them on June 28th because I was – we

24   had momentum going.

25   Q    Well, when you reference in that meeting I think it makes

1  it a little bit confusing, so if I could ask you to clarify.

2  Do you recall telling employees on July 9th that they had

3  momentum going to turn the shop in the right direction?

4  A    Yes.

5  Q    And you recall telling employees that if the Union got

6  voted in that momentum would get shattered?

7  A    No.  I didn't say that.

8  Q    Do you recall telling employees that if the Union came in

9  it would cause that momentum to go the other way?

10  A    I explained that it may slow down the momentum.

11  Q    Do you recall using the words "slow down"?

12  A    Not precisely, but that's the theme.

13  Q    What do you recall saying specifically about the Union and

14  its impact on momentum?

15  A    That if the Union got in that by law and good faith we

16  would negotiate and attempt to reach a contract on their wages

17  and benefits and working conditions.  But in negotiating a

18  contract that would take management time away from assisting in

19  the turnaround of the Tucson facility, which was concerning to

20  us because we were all working very hard within this building

21  right now here today, people and ourselves, to continue to keep

22  the shop viable and moving forward.

23  Q    What did you say about momentum, and the Union's impact on

24  momentum?

25  A    I think I just explained to them the time it would take.

1   I told the employees that we would negotiate a contract in good

2   faith, but it would take manager time away from our time to

3   dedicate towards the turnaround of the shop in supporting it.

4   Q    Do you recall using the word "momentum" in your meetings

5   on June – July 9th?

6   A    Not necessarily the word momentum, momentum or progress.

7   Q    Talking Point No. 9 states, "Letting a union in here now

8   will only put a wall between us; and hurt the momentum that all

9   of us have been building."

10       Do you recall making that statement?

11  A    Words for it.  Not necessarily, no.

12  Q    Do you recall telling employees on July 9th that there were

13  eight shops that were getting closed down?

14  A    Yes, because some of them asked about the press release

15  that explained that.

16  Q    Do you recall telling the employees in meetings on July 9th

17  that you were getting tired of closing repair shops?

18  A    I don't know if I said that on July 9th or June 28th.

19  Q    But you recall saying that you were getting tired of

20  closing repair shops?

21  A    I said we are getting tired of closing repair shops.  It's

22  not pleasant.  We were trying to grow the business.  I don't

23  like laying off 58 people –

24  Q    There's no pending question.

25       JUDGE LAWS:  Limit your response to the question.

1  Q    (BY MS. SHIH)  Do you recall telling employees on July 9th

2  that you wanted to get back to hiring people instead of laying

3  people off?

4  A    Yes, definitely.

5      MS. SHIH:  Move for admission of General Counsel Exhibits

6  29 and 30.

7      MR. MINER:  No objection, Your Honor.

8      JUDGE LAWS:  Those are admitted.

9  **(General Counsel Exhibits 29 and 30 admitted into evidence)**

10     MS. SHIH:  If I can have about ten minutes to review and

11  see if there's any other questions for this witness?

12     JUDGE LAWS:  All right.  Why don't we all take a 10-minute

13  break.  Let's be back right at 2:15.

14  **(Off the record)**

15     JUDGE LAWS:  Back on the record.

16     Is there anything else for this witness from the Acting

17  General Counsel's side?

18     MS. SHIH:  At this time I have on further questions.

19     JUDGE LAWS:  Okay.  And before I turn things over to see

20  if the Respondent has questions, I just want to note on the

21  record that the Acting General Counsel has requested additional

22  subpoenas, which I will authorize.  And it would be convenient

23  for you to use subpoenas from the Region's files.  I could also

24  get it taken care of when I get back to my office as well.

25     MS. SHIH:  We have subpoenas that we can issue.

1      JUDGE LAWS:  Okay.  Very good.

2      Does the Respondent care to ask any questions of this

3  witness at this time or are you going to wait until the

4  presentation of your case?

5      MR. MINER:  Precisely, Your Honor.  We will be calling Mr.

6  Lave in connection with our case in chief, and so we have no

7  questions at this time.

8      JUDGE LAWS:  Okay.  And I just want to make sure I don't

9  have any questions for you.

10      And I don't.  I want to thank you for your testimony.  And

11  you've been in the room so you know not to discuss anything

12  with anybody –

13      THE WITNESS:  Thank you.

14      JUDGE LAWS:  – who could be involved in this case.

15      MS. SHIH:  Our next witness is Mike Torra.

16      JUDGE LAWS: Okay, let's get him in.

17      MR. MINER:  So these are witness exhibits.  Where would

18  you like those?

19      JUDGE LAWS:  Oh, yeah, I don't want those up on the stand.

20      MS. SHIH:  We'll take them.

21  Whereupon,

22                     **MIKE TORRA**,

23  Having been first duly sworn on oath, was examined and

24  testified as follows:

25      JUDGE LAWS:  If you could please state and spell your name

1   for the court reporter?

2       THE WITNESS: Gerald Michael Torra, G-e-r-a-l-d, Michael,

3   M-i-c-h-a-e-l, T-o-r-r-a.

4       JUDGE LAWS:  Thank you.

5       Whenever you're ready.

6       MS. SHIH:  Thank you, Your Honor.

7                       **DIRECT EXAMINATION**

8   Q    (BY MS. SHIH)  Your current position with Greenbrier Rail

9   Services is the Vice President of Operations, correct?

10  A    Correct.

11  Q    And how long have you held that position?

12  A    Since February of 2012.

13  Q    Prior to February 2012 did you hold any other positions

14  with Greenbrier Rail Services?

15  A    No.

16  Q    Prior to February 2012 did you hold any other positions

17  with Greenbrier Companies, Inc.?

18  A    No.

19  Q    Did you speak with anyone prior to coming here to testify

20  today about your testimony?

21  A    Yes.

22  Q    Who did you speak with?  Without disclosing what was said,

23  who did you speak with?

24  A    The two gentlemen seated at that table.

25  Q    Did you speak with them collectively or individually?

1   A    Collectively.

2   Q    Did you review any documents in preparation for your

3   testimony today?

4   A    No, I did not.

5   Q    Can you describe what your current responsibilities are as

6   a Vice President of Operations?

7   A    I oversee the operations for approximately 22 facilities

8   for Greenbrier Rail Services.

9   Q    Are all those facilities located in the United States?

10  A    There's some in Canada and some in Mexico.

11  Q    How many of those 22 facilities are located in the U.S.?

12  A    Approximately 19.

13  Q    And none of those are Union, correct?

14  A    Correct.  In the U.S.

15  Q    Who do you report to?

16  A    William Glenn.

17  Q    And what's his position?

18  A    He's the Chief Commercial Officer for Greenbrier

19  Companies.

20  Q    Your office is located in Lake Oswego, Oregon?

21  A    That is where our head office is located.  I'm located in

22  Naperville, Illinois.

23  Q    What other positions are out of the office in Naperville,

24  Illinois where you office?

25  A    None.  I work from my house.

1  Q    Can you tell me what positions within Greenbrier Rail

2  Services have a direct report to you?

3  A    A number of positions or a listing?

4  Q    Which positions?

5  A    Material Manager, Process Engineer, General Manager,

6  Assistant Vice President of Production, Director of Quality

7  Assurance.  I believe presently that is all.

8  Q    Now, I'm aware of some staffing charts that we reviewed in

9  this case that there is a Materials Manager in, for example,

10  the Tucson facility.  I assume the position you're referring to

11  has a direct report to you is not a position that's located in

12  any one particular facility?

13  A    Correct.

14  Q    How many Materials Managers report to you?

15  A    One.

16  Q    How many General Managers report to you?

17  A    Three.

18  Q    And who are those individuals?

19  A    Juan Maciel, Kevin Stewart and Steven MacIntire.

20  Q    Are the responsibilities of the General Manager position

21  divided up based on geography?

22  A    No.

23  Q    What was your involvement in the November 2012 layoff of

24  employees at the Tucson facility?

25  A    My involvement?  I was more of a consultant.  I was – I

1    reviewed the action.

2    Q    When you say you reviewed an action, did you have any

3    input into the selection of which employees would be

4    discharged?

5    A    No, I did not.

6    Q    Were you consulted by anyone as to which employees would

7    be discharged or should be discharged?

8    A    No, I was not.

9    Q    Who made the actual decision as to the selection of which

10   employees would be discharged?

11   A    I believe it was a combination of Juan Maciel and Kevin

12   Stewart.

13   Q    So when you say you reviewed the action, can you describe

14   what that means?

15   A    I knew that the action was taking place.  I was consulted

16   on the appropriateness of it.  And I approved it.

17   Q    When did you first learn that there was any suggestion of

18   the need for a layoff in the Tucson facility?

19   A    I mean I'd have to generalize.  I would think it would be

20   sometime in late October or November.

21   Q    How did you learn that?

22   A    Again, I don't know exactly how I found out.  I would

23   imagine it would have been in discussions with Juan or Kevin.

24   Q    Do you remember having discussions with Juan and/or Kevin

25   about the need for a layoff in Tucson?

1    A    Specifically what time and day it was, no, but I remember

2    having discussions with them, yes.

3    Q    Were these face-to-face discussions or by telephone or

4    some other way?

5    A    I think it was a combination.  So the initial discussions

6    would be face to face.

7    Q    Where did those take place?

8    A    I can't recall.

9    Q    Were you present at a Plant Manager's conference or

10   meeting in Chicago in early November 2012?

11   A    Yes, I was.

12   Q    Do you recall having discussions with Juan Maciel and/or

13   Kevin Stewart about a Tucson layoff at that time?

14   A    We may have discussed it at that time during those

15   conferences.

16   Q    Do you recall having any discussions at that time?

17   A    Again, not specifically.

18   Q    Did you – were you aware prior to those meetings in

19   Chicago that there was a proposed layoff in Tucson?

20   A    Again, I can't recall.  It was somewhere around late

21   October or early November that I was aware.  I cannot recall

22   the specific day that I became aware of it.

23   Q    And you don't recall having people there?

24   A    Other than it must have been with either Juan or Kevin

25   through a discussion.

1    Q    So then Juan Maciel and Kevin Stewart were the ones to

2    make the decision that there needed to be a layoff in Tucson?

3    A    Ultimately the decision was mine.  It was made through

4    discussions with those guys.

5    Q    Were Juan and Kevin the ones to propose a layoff in

6    Tucson?

7    A    I cannot recall who proposed it.

8    Q    What do you recall about your discussions with anyone

9    about the need for a layoff in Tucson?

10   A    I recall having a discussion of the need to have a – to

11   reduce the work force in Tucson.

12   Q    That's the only thing that was said?

13   A    The reasons to reduce the work force.

14   Q    Okay. Is this in your initial conversation in which you

15   learned about the need for a reduction in Tucson?

16   A    Yes.

17   Q    So in that initial discussion that you had, who told you

18   that there was a need for a reduction in Tucson?

19   A    Again, I'm not sure who proposed the need for a reduction.

20   There was a discussion of what the issues were, and through

21   those discussions it was decided to reduce the work force.

22   Q    Okay.  When you say through those discussions, are you

23   talking about multiple meetings now, or are you talking about

24   the first meeting in which you learned face to face that

25   someone was suggesting there needed to be a layoff in Tucson?

1    A    Well, you have to understand when I learned it was during

2    a discussion, and it was a decision that was made during a

3    discussion.  So there's multiple people in that meeting.  I'm

4    not sure who proposed the actual action.

5    Q    Who was present at that meeting?

6    A    I believe it was Juan and/or Kevin.  It could have been

7    one or the other, or it could have been both.

8    Q    So you don't recall where this meeting took place, and you

9    don't recall exactly who was present?

10   A    Not exactly.

11   Q    But you recall being told that there was a need for a

12   layoff in Tucson?

13   A    Again, I'm not sure who proposed the need for a layoff.

14   It was the result of a meeting and discussion with one or both

15   of those gentlemen.

16   Q    Okay.  Why don't we go through that conversation and tell

17   me what you recall was actually said about the Tucson facility.

18   A    Sure.  Generally that our actions to date were having not

19   the effects that we wanted to improve the operations at Tucson.

20   And there was a need to consolidate the operations to

21   facilitate an easier improvement of the processes there.  So it

22   was determined to be a process issue.  And to do that we

23   decided to consolidate the operation, reduce the work force to

24   better enhance the possibility of improving the processes.

25   Q    Now, you said generally.  Do you remember any specifics

1   that were discussed?

2   A    Not word for word.

3   Q    Excuse me?

4   A    Not word for word.

5   Q    What do you recall?

6   A    Generally what I've just stated.

7   Q    So there was no specific discussion about the reasons that

8   the work force needed to be reduced other than what you've just

9   said?

10   A    Correct.

11   Q    There as no discussion about the percentage of the number

12   of employees that needed to be reduced?

13   A    Not that I recall.  I think that was in further

14   discussions.

15   Q    Was there any discussion about the profitability or lack

16   of profitability of the Tucson facility?

17   A    I'm sure there was.

18   Q    What do you remember being said about that?

19   A    That it was not good, and it wasn't increasing at a pace

20   that we wanted it to.

21   Q    Was there any discussion about the reasons that

22   profitability wasn't increasing?

23   A    Yes.

24   Q    What do you remember being said about that?

25   A    That the tactics that we had taken so far were not

1    working, and that we discovered it was more of a process issue.

2    And to enhance our ability to fix those processes, it made

3    sense to consolidate the operation and the work force.

4    Q    When you say there was – someone said the tactics were not

5    working, was there a discussion of what those tactics were that

6    had been employed?

7    A    The general strategy was to increase volume to the

8    operation.

9    Q    Okay.  And I'm not asking about what the tactics actually

10   were.  I'm asking whether there was a discussion in that

11   meeting about what tactics had been employed.

12   A    I can't say for certain.  I can only assume there was.  I

13   can't recall exactly.

14   Q    So what tactics had actually been employed to try to

15   increase profitability at the Tucson facility?

16   A    We tried increasing the volume going through the facility.

17   Q    And what efforts did the company take to try to increase

18   the volume?

19   A    We tried to hire more employees.

20   Q    Anything else?

21   A    No.

22   Q    What other tactics did the company take to try to increase

23   profitability for the Tucson facility?

24   A    We enhanced tooling.

25   Q    How?

1   A    We bought new equipment, new tooling.

2   Q    Any other tactics?

3   A    We made management changes.

4   Q    What management changes were made?

5   A    At any specific time period or just in general from now

6   until today?

7   Q    Well, I'm talking about from the time frame when the

8   company identified Tucson as a facility that was not

9   profitable.

10  A    Generally it was management changes in tooling and

11  equipment changes, enhancements.  As far as management changes,

12  we assigned a new General Manager over that shop.  That would

13  be the major change.

14  Q    When did that change take place?

15  A    Hmm.  I'm guessing, I don't recall exactly, May, April of

16  2012.

17  Q    Who was the General Manager that was – who was the new

18  General Manager at the time?

19  A    Kevin Stewart.

20  Q    Who was the former General Manager?

21  A    I believe it reported directly out to a Regional Manager.

22  Q    Who was the Regional Manager that the Plant Manager

23  reported to prior to Kevin Stewart?

24  A    Gordon Hudgens.

25  Q    When did the company first identify Tucson as a facility

1  that was not profitable?

2  A    That would have been before my tenure, before I got there.

3  Q    When did the company start employing the tactic of trying

4  to hire more employees in the Tucson facility?

5  A    That was also before I started with the company.

6  Q    Do you know how long prior?

7  A    I'm not sure.

8  Q    But that was a tactic that was already in place when you

9  started in February 2012?

10 A    Yes.

11 Q    What about with the tactic of enhanced tooling, is that

12 something that was already in place when you started in

13 February?

14 A    No.

15 Q    When did that begin?

16 A    Probably around the same time that Kevin Stewart became

17 the General Manager, April or May of 2012.

18 Q    When Juan and/or Kevin first raised to you the proposed

19 need for a layoff in Tucson, what was your response?

20 A    Again, I'm not sure Kevin and Juan proposed that to me.

21 As I stated before, it was decided in a meeting.  I'm not sure

22 who proposed it to me.

23 Q    But you recall that Juan and/or Kevin were present at that

24 meeting?

25 A    Correct.

1    Q    So it was one or both of them that first proposed to you

2    the need for a layoff in Tucson, correct?

3    A    I'm not saying that they proposed it.  I'm not saying who

4    proposed it.  I may have proposed it.  I don't recall who

5    proposed it.

6    Q    You don't recall if you proposed laying off employees in

7    Tucson as an attempt to increase the profitability of that

8    facility?

9    A    No, I do not.

10   Q    When you started as VP of Operations in February 2012 what

11   was your understanding about the profitability of the Tucson

12   facility?

13   A    That it was suffering.

14   Q    For what reasons?

15   A    The major reason I understood at that point in time was

16   that they had lost a significant part of their work force due

17   to an INS issue.

18   Q    You said that was the major part.  What were the other

19   reasons that you understand that facility was suffering?

20   A    That was the key reason that I understood at that point.

21   Q    Is that the only reason you understood at that time?

22   A    I believe so.

23   Q    Prior to November 12, 2012, were there any other reasons

24   the Tucson facility was not profitable?

25   A    Yes.

1    Q    What were the other reasons?

2    A    There were some management issues.  There was tooling

3    issues.  And there was a skill, labor force issue.

4    Q    What were the management issues?

5    A    In my opinion there was ineffective leadership.

6    Q    You're referring to the Plant Manager Lex Morrison?

7    A    Yes, in part.

8    Q    And what other parts?

9    A    There was other staff or leadership there that was also

10   ineffective.

11   Q    Anyone specific?

12   A    I can't recall the names.

13   Q    Do you recall the positions they held?

14   A    No.

15   Q    When did you first reach the conclusion that the Tucson

16   facility was suffering from ineffective leadership under Lex

17   Morrison?

18   A    Can you repeat that question, please?

19   Q    When did you first reach the conclusion that the Tucson

20   facility was suffering from ineffective leadership under Lex

21   Morrison?

22   A    I think we decided to remove Lex somewhere around July or

23   August of 2012.  And, again, I can't recall exactly when.

24   Q    And when you say we decided, who came to that decision?

25   A    Well, ultimately it was my decision.

1  Q    Who else had input into that decision?

2  A    Kevin Stewart.

3  Q    Anyone else?

4  A    I might have conferred with other people.

5  Q    What other people?

6  A    I may have conferred with Juan Maciel.

7  Q    Do you recall a specific conversation in which you had a

8  discussion with Juan Maciel about getting rid of Lex Morrison

9  as a Plant Manager in Tucson?

10  A    Not a specific conversation.

11  Q    Do you recall having any conversations with Juan in which

12  you and he discussed the need to get rid of Lex Morrison as a

13  Plant Manager in  Tucson?

14  A    Not specifically, no.

15  Q    When did you and Kevin Stewart begin having discussions

16  about getting rid of Lex Morrison as a Plant Manager in Tucson?

17  A    I can't recall specifically.

18  Q    Can you recall approximately?

19  A    Sure.  I would think probably soon after Kevin was given

20  the responsibility of oversight of Tucson that we started

21  discussing if that was a possibility or a reason why the shop

22  was not doing well.

23  Q    Were there any discussions of inadequacies in Mr.

24  Morrison's performance that were leading the shop to not be

25  performing well?  In other words, in what way was Mr. Morrison

```
 1   not a good Plant Manager, in your opinion?

 2   A    Generally lacked leadership skills.

 3   Q    What does that mean?

 4   A    He was an ineffective leader.

 5   Q    Ineffective in what way?

 6   A    You're looking for specific characteristics?

 7   Q    I am.

 8   A    Okay.  He didn't know how to delegate correctly or

 9   effectively.  He didn't know how to prioritize issues.  He

10   didn't know how to strategize correctly.

11   Q    And these are deficiencies that you actually considered in

12   reaching the conclusion that he needed to go?

13   A    Yes, those were considerations made.

14   Q    Were there any other considerations?

15   A    I think those were the main reasons.

16   Q    Were there any other reasons that were not the main

17   reasons?  Were there any other reasons?

18   A    No.

19   Q    These discussions that you had with Kevin Stewart about

20   Lex Morrison and his ineffectiveness as Plant Manager, were

21   these face-to-face conversations you had with Kevin?

22   A    Can you repeat that question again, please?

23   Q    The conversations that you had with Kevin Stewart about

24   Lex Morrison's ineffective leadership as Plant Manager, how did

25   you communicate with Kevin about those?
```

1   A    Both face to face or via teleconferences.

2   Q    Did you exchange any emails with Mr. Stewart on the

3   subject?

4   A    I can't recall if we did.  It's possible.

5   Q    Have you reviewed your emails to determine if there were

6   any communications about the discharge of any of the employees

7   in November 2012 at Tucson?

8   A    No, I have not.

9   Q    Do you recall whether you've had any email discussions

10  with anyone about Lex Morrison's ineffective leadership in

11  Tucson?

12  A    I cannot recall whether any communications I had with –

13  about Lex's performance were via email or not.

14  Q    Do you recall whether any of your communications with

15  anyone else in the company about the proposed layoff in Tucson

16  were via email?

17  A    There was some communication via email.

18  Q    Have you produced or did you provide copies of those

19  emails to the attorneys in this case?

20  A    No, I have not.  Typically I was just carbon copied on

21  other people's emails.

22  Q    So you recall there being discussions about the Tucson

23  layoff in email?  Emails that you received or sent.

24  A    Yes, on how the reduction force was going to be executed.

25  But not discussions about the actual decision to layoff.

1  Q    So there were no discussions about the actual decision to

2  layoff that took place in the email?

3  A    That I don't recall.

4  Q    But you do recall that some of those discussions took

5  place either by telephone or face to face?

6  A    Yes.

7  Q    After the initial discussion that took place sometime in

8  late October or early November about a proposed layoff in

9  Tucson, what other discussions did you have with anyone about a

10  proposed layoff in Tucson?

11  A    I don't think I had very many discussions at all.  It was

12  just a matter of execution at that point, and I think I was

13  just cc'd in on emails of how they were going to do that.

14  Q    Who made the ultimate decision to lay off employees in

15  Tucson?

16  A    Whether to or not to lay off employees in Tucson?

17  Q    Yes.

18  A    Ultimately that was my decision.

19  Q    When did you make that decision?

20  A    To the best of my recollection probably somewhere early in

21  November.

22  Q    What did you base that decision on?

23  A    Our previous discussions on what the issues were at

24  Tucson.

25  Q    Anything else?

1   A     No.

2   Q     Did you review any financial records or any documents

3   prior to making the decision to conduct a layoff in Tucson?

4   A     Well, I think during that time period I was very familiar

5   with what the financial results were for that location.

6   Q     Were there any specific documents that you reviewed in

7   reaching your conclusion to lay off employees in Tucson?

8   A     No.

9   Q     What was the financial condition of Tucson when you made

10  your decision to lay off employees?

11  A     It was losing money.

12  Q     How much money?

13  A     It varied month to month.  The worst month that I recall

14  was over $200,000.

15  Q     What month was that?

16  A     I'm thinking that was October.

17  Q     How long had the Tucson facility been losing money?

18  A     Quite awhile.  I think it had been losing money before I

19  started with the company.

20  Q     Were you familiar with the financial statements pertaining

21  to the Tucson facility for time periods prior to February 2012?

22  A     Probably not intimately.  I may have reviewed them at some

23  point.

24  Q     Did you review them prior to making your decision to lay

25  off employees?

1  A    I don't believe I did.

2  Q    You mentioned earlier when I asked you what you based your

3  decision to lay off employees on, and you stated that it was

4  previous discussions about the condition of the Tucson

5  facility.  What discussions did you have and with whom?

6  A    Numerous discussions with numerous people over the time

7  from when I started with the company until that point about the

8  status of the Tucson operations.

9  Q    So the discussions that you were having with individuals

10  about this task in Tucson began in February 2012?

11  A    Yes.

12  Q    Were these ongoing discussions?

13  A    Yes.

14  Q    On a daily basis?  On a weekly basis?

15  A    I wouldn't say daily.  I've got, you know, over 22

16  facilities to oversee at that point so, you know, it varied.

17  There could have been days when it was on a daily basis.  There

18  could have been times when it wasn't discussed for a week or

19  two.

20  Q    And you said you had numerous discussions with numerous

21  people.  Can you identify the people that you had these

22  discussions with?

23  A    I don't - I can't verify it's all-encompassing, but it

24  would be Lex Morrison, Juan Maciel, Kevin Stewart, my boss at

25  the time Tim Stucky.  I had some employee meetings specifically

1   with the staff there.

2   Q    Anyone else you can recall having discussions with about

3   the financial condition of the Tucson facility?

4   A    Gordon Hudgens.  And other than, you know, brief

5   mentioning or brief discussions with those people, those would

6   be the main people.

7   Q    You said you also had meetings with the staff in Tucson.

8   How many times would you estimate that you visited the Tucson

9   facility between February and November of 2012?

10  A    I would just be guessing.  I would guess four times, three

11  or four times.

12  Q    Do you – are you in possession of any documents, either

13  emails or calendar notes, that would refresh your recollection

14  about when you visited the Tucson facility between February and

15  November 2012?

16  A    I would have expense reports.

17  Q    You talked earlier when I asked you what were the issues

18  in the Tucson facility that were making it not profitable.  You

19  mentioned management issues, and we discussed Lex Morrison.

20  The other issue that you mentioned was tooling issues.

21      When did you first identify tooling issues in Tucson that

22  was making that facility lose money?

23  A    I can't recall exactly when that was first identified that

24  there was tooling issues.

25  Q    Was it identified prior to the time you started with the

1    company or after?

2    A    I can't speak for what was identified prior to my

3    employment, but we did make significant tooling enhancements

4    after I started with the company.

5    Q    When did you make those enhancements?

6    A    I would say most of them would have been after Kevin took

7    over, so since April, May of 2012.

8    Q    So was it around the time that Kevin took over as General

9    Manager that those tooling issues were identified?

10   A    That's when they were brought to my attention.

11   Q    Who brought them to your attention?

12   A    Probably Kevin.

13   Q    So these weren't issues that you were aware of prior to

14   the time that Kevin became General Manager?

15   A    What were the issues?

16   Q    The tooling issues.

17   A    No.  You have to remember I'd only been on board about

18   three months at that time, and I had 22-plus facilities to

19   oversee.  I was trying to get my feet wet at that point.

20   Q    What specifically were the tooling issues in the Tucson

21   facility that were brought to your attention by Kevin Stewart?

22   A    The major issue was a lack of, so not enough tools to go

23   around.

24   Q    Were there any specific tools that were identified?

25   A    I can't recall the specific tools.

1  Q    What did you do in response to that issue being brought to

2  your attention?

3  A    I would have given the approval to spend more money to

4  acquire the necessary tools.

5  Q    How much money was spent in the Tucson facility to acquire

6  new tools in 2012?

7  A    I wouldn't know that.

8  Q    Thousands, hundreds of thousands, millions?

9  A    I'd say it's in the hundreds of thousands.

10 Q    Do you know what type of new equipment was purchased in

11 Tucson?

12 A    Not specifically.

13 Q    What about the either old tools, insufficient quantity of

14 tools was affecting the profitability in Tucson?

15 A    Can you restate that for me, please?

16 Q    What about the tooling issues, which I understand from

17 your testimony was insufficient quantities of tools or that

18 they were out of date or whatever it was that were problems

19 with the equipment in Tucson, what about that was causing the

20 Tucson facility to lose money?

21 A    The main reason was lack of enough tooling so it affected

22 the efficiency of the labor force.

23 Q    So your understanding around not able to perform work that

24 they needed to get done because there were not enough tools to

25 go around?

1   A    Correct.  That was one issue.

2   Q    What other issues were there?

3   A    In regard to the tooling?

4   Q    Yes.

5   A    They may have had inadequate tooling so –

6   Q    You do know or not, because you're saying may have.  So I

7   want to give you a general instruction not to speculate.

8   Answer if you know.  Only speculate if counsel asks you to or I

9   ask you to.

10  A    Okay.  I don't know specifically.  I mean I wasn't

11  overseeing this facility in a direct – I mean I was not in the

12  details of that facility that far.

13  Q    You relied on information provided to you by Kevin Stewart

14  regarding the tooling issue in authorizing that facility to

15  spend money on tools?

16  A    Correct.

17  Q    Are you aware that new tools were actually purchased for

18  the Tucson facility?

19  A    Yes.

20  Q    But you don't know specifically what kind, correct?

21  A    I mean I know there were welders purchased.  There was

22  carts purchased.  Other than that, no.

23  Q    And do you know this because someone communicated it to

24  you, or because you had to approve actual purchase orders?  How

25  do you know of the items that were actually purchased?

1  A      Someone communicated to me that, you know, we need ten

2  welders.   Generally I would have asked what kind of tooling

3  that you needed, and those were some of the answers that I got

4  that I recall.

5  Q      Who would actually be responsible for purchasing the tools

6  for that facility in 2012?

7  A      That would have been the local Material Manager on site.

8  Q      How much did you authorize for the approval of new tools

9  in Tucson in 2012?

10  A      I don't think I gave a specific limit.   I just said get

11  the tools that are necessary.

12  Q      The other category of issues you identified as

13  contributing factor to the financial status of the Tucson

14  facility in 2012 was labor force issues.   Can you explain what

15  that means?

16  A      Lost a significant amount of the labor force before I got

17  there to their immigration or their visa status, I believe.

18  And so we had to replace those with inexperienced employees.

19  And so there's a skill issue involved.

20  Q      How many employees were lost as part of that immigration

21  incident?

22  A      I do not know.

23  Q      How many employees were hired in the Tucson facility in

24  2012?

25  A      I don't know.

1    Q    But it was the company's initiative to increase the work

2    force in Tucson in an attempt to make that facility more

3    profitable?

4    A    Correct.

5    Q    Was the profitability or the lack of profitability of the

6    Tucson facility in 2012 impacted by a decline in work volume?

7    A    Could you define volume?  I mean in my mind that could be

8    output or demand.

9    Q    Well, let's start with demand.  Was there a decline in the

10   demand for work from the Tucson facility in 2012?

11   A    I don't believe so.

12   Q    Was there a decline in the output of work?

13   A    Yes.

14   Q    And that was due to the decline in the labor force there,

15   correct?

16   A    Correct.

17   Q    You said that you were the ultimate decision-maker in

18   deciding that Tucson needed to lay off employees in 2012.  You

19   made the ultimate decision to authorize the layoff, correct?

20   A    Yes, I believe so.

21   Q    Who made the decision as to how many employees needed to

22   be laid off?

23   A    That was between - I believe the decision was made between

24   Kevin and Juan.

25   Q    Was anything communicated to you by either Kevin or Juan

1  as to how many employees needed to be laid off in Tucson?

2  A    Yes.

3  Q    What was communicated to you?

4  A    How many employees needed to be laid off.

5  Q    What specifically was communicated to you?

6  A    How many employees needed to be laid off.

7  Q    What was the number of employees that was communicated to

8  you that needed to be laid off?

9  A    I don't recall.  I think it was somewhere around 25 to 30,

10 I believe.

11 Q    And you said that determination was made by Kevin Stewart

12 and Juan Maciel?

13 A    Yes.

14 Q    Who communicated that to you?

15 A    Again, I can't recall which one communicated it to me.

16 Q    When did they communicate it to you?

17 A    It would have been shortly after we made the decision to

18 take action.  I would say mid-November.  And again, I'm

19 estimating.

20 Q    In conjunction with communicating to you the number of

21 employees that need to be laid off, was anything communicated

22 to you about how that number was reached?

23 A    Other than the basic reasons were skill and ability.  So

24 the decision was made to consolidate the work force so they had

25 that in mind, and they decided how far to consolidate it.

1  Q    And when you say "they," you're referring to Juan and

2  Kevin?

3  A    Juan and Kevin.

4  Q    They made the decision to consolidate the work force, and

5  they determined in conjunction with that how many employees

6  needed to be let go?

7  A    No.  Again, I'm not – I don't recall who exactly proposed

8  to consolidate the work force, but once that decision was made

9  they decided how far to consolidate it.

10 Q    Was anything communicated to you with regard to the

11 selection of which employees would be let go?

12 A    Can you repeat that question, please?

13 Q    Was anything communicated to you about the selection of

14 which employees would be let go in Tucson?

15 A    About specific names?

16 Q    Either specific names or specific conditions.

17 A    I don't recall.  Again, I may have been cc'd on an email

18 to Human Resources with a list of names but, you know, it

19 wouldn't have meant anything to me probably.

20 Q    Well, when either Kevin or Juan communicated to you that

21 approximately 25, or however many employees they communicated

22 to you, needed to be let go, was there any discussion about

23 what positions that would include or which employees that would

24 affect?

25 A    I mean again not at my level.  I wouldn't – it doesn't

1    concern me which employees.  I may have had discussions with

2    them of how to select employees, and that would have been based

3    on skill and ability.

4    Q    So is it fair to say that Juan or Kevin contacted you,

5    told you that they needed to lay off about 25 employees in

6    Tucson, and without reviewing any documents or records or files

7    you said okay?

8    A    Yes.

9    Q    And you relied on information that Juan and Kevin had to

10   form that decision in approving that layoff?

11   A    Yes.  They were empowered to make that determination.

12   Q    Did you approve the layoff in Tucson without knowing the

13   number of employees that would be affected?

14   A    Yes.

15   Q    And you didn't have any involvement in the actual

16   selection of which employees would be let go, correct?

17   A    Correct.

18   Q    When you approved the decision to lay off employees in

19   Tucson, you were aware that there had been a Union campaign at

20   that facility, correct?

21   A    I was aware that approximately a year earlier there was a

22   Union campaign.

23   Q    Were you aware that there was Union organizing activity

24   going on in that facility at the time the decision was made to

25   lay off employees?

1   A     No, I was not.

2   Q     Did you ask?

3   A     No, I did not.

4   Q     When did you learn how many employees would be affected by

5   the layoff?

6   A     Again I think it was – I can't say for certain.  I'm

7   guessing mid-November, right before the layoff.

8   Q     Were you responsible for approving the final list of which

9   employees would be laid off on November 12, 2012?

10  A     No.

11  Q     Who had that ultimate authority?

12  A     Probably Kevin.

13  Q     Do you know that that's the case, or are you guessing?

14  A     Well, I would have given him that authority, so I'm saying

15  that's the case.

16  Q     Were you involved in any discussions with management about

17  EEOC or age concerns with regard to the selection of particular

18  employees for layoff?

19  A     Can you repeat that question, please?

20  A     Were you involved in any discussions with other managers

21  about concerns with regard to EEOC and age as to the selection

22  of specific employees for layoff?

23  A     Not that I can recall.

24  Q     When did you become aware that there was a Union

25  organizing effort in the Tucson facility by the Sheet Metal

1   Workers Union?

2   A     You know, I don't know specifically.  It would be late,

3   late that year.

4   Q     2012?

5   A     Right.

6   Q     Was it after you approved the decision, or after you

7   authorized the layoff?

8   A     I believe so.

9   Q     But you were aware when you authorized the Tucson layoff

10  in 2012 that there had been an election held the prior year for

11  the Union that was unsuccessful?

12  A     Yes.

13  Q     And you were aware that that vote in 2011 was close,

14  correct?

15  A     Yes.

16  Q     And you were also aware that the one-year bar on another

17  election had expired by the time of the layoff, correct?

18  A     I'm not sure at that point whether I knew the time, the

19  exact timing of the other election or not, but I do know that

20  now.

21  Q     You expected that after the one-year election bar expired

22  that the Union would make another – or the employees would make

23  another effort to organize, correct?

24  A     That was not my expectation.

25  Q     It was the expectation of management at the Tucson

1    facility, correct?

2    A    Not that I'm aware of.

3    Q    No one communicated to you that they expected additional

4    organizing efforts after the one-year election bar?

5    A    Not that I can remember.

6    Q    But you assumed that the Union or the employees would make

7    another attempt to organize, didn't you?

8    A    No, I did not.

9    Q    Were you aware that Al Lave visited the Tucson facility in

10    late October to discuss with management the expectation that

11    the Union would make another attempt to organize the employees

12    in Tucson?

13    A    I don't recall that visit.

14    Q    Are you aware that Mr. Lave assumed that the Union would

15    take additional efforts to organize after the one-year election

16    bar?

17    A    I was not aware of that.

18    Q    Did you and Mr. Lave ever have any discussions in 2012

19    about Union activity in Tucson?

20    A    Yes, I did.

21    Q    When did you first have a discussion with Mr. Lave in 2012

22    about Union activity in Tucson?

23    A    I can't say specifically.  I imagine it was shortly after

24    my start.  It was regarding the previous vote in the prior

25    year.

1    Q    What was said in that discussion?

2    A    I can't recall.

3    Q    What did you learn during that discussion?

4    A    I just learned there was a vote.  There was an attempt to

5    organize the labor and their deficit.

6    Q    Mr. Lave communicated that information to you?

7    A    I believe it was Mr. Lave.

8    Q    Did you hear from anyone else in 2012 about the Union

9    effort in Tucson in 2011?

10    A    Not that I can recall specifically.

11    Q    What other discussions did you have with Mr. Lave in 2012

12    about Union activity in Tucson?

13    A    Nothing else, other than there was a previous attempt to

14    organize the labor there.

15    Q    So was it multiple conversations with Mr. Lave in 2012, or

16    was it just the single one that you already testified about?

17    A    I can't recall how many discussions there were.

18    Q    How did you learn that the Union vote in 2011 was close?

19    A    Mr. Lave.

20    Q    Did he give you the actual numbers?  I'm not asking you to

21    tell me right now what you recall.  Do you recall that he

22    provided you with numbers of the vote?

23    A    I don't recall if he did provide with numbers.

24    Q    But you recall him telling you that it was a close vote?

25    A    Yes.

1  Q    And that the Union lost?

2  A    Yes.

3  Q    Did you visit the Tucson facility after the November 12,

4  2012 layoff?

5  A    I've been there since that layoff, yes.

6  Q    How many times?

7  A    I want to estimate it's at least two, could have been

8  more.

9  Q    What was the purpose of your visits?

10  A    One specifically was to go down and present management's

11  view on the recent attempts to organize down there.

12  Q    And is that a meeting that you conducted with Al Lave on

13  June 28th, 2013?

14  A    I believe that's the date, right about then.

15  Q    Was that the next visit you had with Tucson after the

16  layoff?

17  A    I can't recall.

18  Q    Do you have expense reports that would reflect when you

19  visited the Tucson facility?

20  A    Yes.

21  Q    So the purpose of the June 28, 2013 trip was to discuss

22  with employees the Union organizing effort?

23  A    That and all-employee communication meetings.  That was

24  pretty standard.

25  Q    Did you have discussions with Al Lave prior to holding

1   meetings on June 28th with employees?

2   A    I discussed a lot of things with Al.

3   Q    Specifically the meetings that you were going to be

4   conducting jointly on June 28th?

5   A    Well, yeah.  We discussed going down there and

6   coordinating the trip.

7   Q    When did it first come up that you planned to coordinate

8   that trip?

9   A    I think it was within a couple of weeks of the actual

10  trip.

11  Q    After you received notice that a representation election

12  would be held among employees in that facility?

13  A    I do not recall when we received that notice.

14  Q    Were you aware when you scheduled the trip to Tucson that

15  an election would be held among employees at the Tucson

16  facility?

17  A    I can't recall whether I was aware or not.

18  Q    Were you aware by the time you met with employees on June

19  28th that an election was to be held?

20  A    Yes.

21  Q    How did you learn that an election was going to be held?

22  A    I can't specifically say, but I would to the best of my

23  guess Al probably told me.

24  Q    Your communications with Al, were they generally by email

25  or telephone?

1    A    We would communicate both ways, in person, telephone and

2    email.

3    Q    Do you recall if you had any discussions with Al via email

4    about the June 28th, 2013 planned trip to Tucson?

5    A    Not specifically.  I'm not saying there wasn't.

6    Q    Do you recall reviewing written Talking Points for the

7    June 28, 2013 meetings with employees that you held with Al

8    Lave?

9    A    Yes.

10   Q    I'm handing you what's been previously admitted as General

11   Counsel Exhibit 29.  Can you tell me if you recognize that

12   document?

13   A    Yes.

14   Q    When did you first see this document?  Let me back up and

15   ask you, did you prepare this document?

16   A    I did not create the document.  I might have had some

17   input into the content.

18   Q    When did you first see this document?

19   A    I don't know specifically.  It was shortly before the

20   meeting, a couple days, day or two.

21   Q    How did you receive this document?

22   A    I can't recall how I received it, whether it was email or

23   in person.

24   Q    Had you been in the Tucson facility for a couple of days

25   prior to meeting with employees on June 28th?

```
 1   A    No.  I believe, to the best of my recollection, I flew in

 2   the night before.

 3   Q    Do you recall seeing Mr. Lave in person a few days prior

 4   to the meetings in Tucson on June 28th?

 5   A    I don't recall.

 6   Q    But you received this document from Al Lave?

 7   A    Yes.

 8   Q    And it may have been sent to you by email?

 9   A    Correct.

10   Q    Would you be able to determine from a review of your

11   emails if you received this document by email from Mr. Lave

12   prior to June 28, 2013?

13   A    Yes, I would.

14   Q    What do you recall communicating – what statements do you

15   remember making to employees during their meetings on June 28th?

16   A    I don't recall specific statements.  I can just generalize

17   what the communication was.

18   Q    Well, let me back up and get a little bit of context for

19   those meetings.

20        There were multiple meetings held on June 28th with

21   employees, correct?

22   A    Correct.

23   Q    How many meetings?

24   A    I believe there were four.

25   Q    And those meetings were conducted in English and Spanish,
```

1    correct?

2    A    They were all conducted in English, and two of them were

3    translated into Spanish.

4    Q    Do you recall who provided translation for the two Spanish

5    meetings?

6    A    I believe it was a combination of different people.

7    Q    Do you recall which people?

8    A    Juan Maciel, Eric Vanzuela and Julio.  And I can't recall

9    his last name.

10    Q    Julio Vasquez, the Safety Manager?

11    A    I think that's his name, yes.

12    Q    Approximately how many employees were in attendance at

13    each meeting?

14    A    Somewhere around 20 at the meeting.

15    Q    And these meetings were mandatory, correct?

16    A    Yes.

17    Q    And the purpose of the meetings was to discuss with

18    employees the Union campaign and the upcoming Union election,

19    correct?

20    A    In part, yes.

21    Q    What also was the purpose of the meetings?

22    A    Just general state of the business and how we were doing

23    financially.

24    Q    Do you recall telling employees in meetings on June 28th

25    about your personal experience with Unions?

1  A    Yes.

2  Q    Do you recall communicating to employees in meetings on

3  June 28th that your experience was that non-Union facilities

4  were run better than Union facilities?

5  A    I don't recall saying that.

6  Q    Do you recall saying that the communication in non-Union

7  facilities was more open than the communication in Union

8  facilities?

9  A    I don't recall saying that.  I might have said that.

10  Q    Do you recall saying that non-Union facilities had a

11  better pay structure and better compensation that Union

12  facilities?

13  A    No.  I believe what I said was in my past experience I

14  oversaw both at the same time, and that the non-Union

15  facilities had a better compensation package than the Union

16  facilities.

17  Q    What else do you recall saying to employees in meetings on

18  June 28th about your experience with Union facilities?

19  A    Regarding my past experience with Union facilities, I

20  think that was pretty much it.  That based on my past

21  experience I've overseen both, and generally the non-Union

22  facilities have better compensation packages than Union

23  facilities.

24  Q    What did you tell employees was your past experience with

25  Union facilities?

1   A     That I've overseen both Union and non-Union facilities.

2   Q     And other than talking about the difference in the

3   compensation structure, you don't recall saying anything else

4   to employees about your experience with non-Union and Union

5   facilities?

6   A     Not that I recall.

7   Q     Do you recall telling employees in meetings on June 28th

8   that the facilities number one customer TTX is adverse to

9   Unions?

10  A     I don't believe I used the word adverse.

11  Q     What word do you recall using?

12  A     I believe I said they prefer not to have – prefer not to

13  deal with Unions.

14  Q     Do you recall telling employees in meetings on June 28th

15  that the reason TTX shops cars with Greenbrier is because they

16  recognize it has a non-Union facility?

17  A     I don't recall saying that.

18  Q     Do you recall saying that that was a risk that you saw

19  happening with the facility's number one customer?

20  A     I don't recall saying that either.

21  Q     What do you remember saying about TTX other than what

22  you've already testified?

23  A     Nothing.

24  Q     The only thing you recall saying about TTX is that they

25  preferred to work with non-Union facilities?

1    A    I believe I generally said they weren't in favor of Union

2    facilities, so they didn't favor Union facilities.

3    Q    Anything else that you remember saying about TTX?

4    A    Other than they were our number one customer for that

5    facility, no.

6    Q    What's your understanding of the percentage of work that's

7    performed in that facility for TTX?

8    A    Can you repeat that question, please?

9    Q    What's your understanding of the percentage of the total

10   work at the Tucson facility that's performed for TTX?

11   A    Yes, quite large.  It's about 80 percent.

12   Q    What else do you – what else did you communicate to

13   employees in meetings on June 28th about the upcoming Union

14   election?

15   A    The general message was that Greenbrier preferred not to

16   be a Union facility, did not want the Union in their

17   facilities.  And that, you know, we saw it as an unnecessary

18   third party in the employee/company relationship.

19   Q    Do you recall Al Lave telling employees in meetings on

20   June 28th that the company's philosophy is that it's a non-Union

21   company?

22   A    No, I don't recall that.

23   Q    Looking at Exhibit 29 in front of you, did you speak on

24   each of these Talking Points that's identified?

25   A    You know, without reading through this, I think I briefly

1    looked through it before I went into the meetings.  I can't say

2    that I hit on every one of these topics.  I did not have – I

3    did not read from this document.

4    Q    You didn't consult this document as you were speaking to

5    employees on June 28th?

6    A    No, I don't think I did.

7    Q    So it's something that you reviewed prior to meeting with

8    employees on June 28th?

9    A    Yes.

10   Q    Do you recall discussing with employees in meetings on

11   June 28th the economics of the Tucson facility as described in

12   Talking Point 7?

13   A    Yes.

14   Q    What do you recall telling employees about the economics

15   of the Tucson facility in meetings on June 28th?

16   A    I probably characterized our losses or our financial

17   position in each one of those months.  At this point I can't

18   recall what those are, except for that October or September

19   month it was a couple hundred thousand dollars.

20   Q    So when you say you characterized those losses, did you

21   actually provide numbers to employees at these meetings?

22   A    They might have rounded numbers.

23   Q    And were those numbers that you had in notes that you were

24   speaking from, or were those from your memory?

25   A    Bear with me, I've got to think back.  I might have

1  reviewed the numbers before I walked into the meeting.

2      JUDGE LAWS:  And again you're characterizing almost every

3  answer in terms of might have.

4  A    Yeah.  Well, it's so long ago.

5      JUDGE LAWS:  So I'm going to instruct you again for the

6  second time –

7  A    All right.

8      JUDGE LAWS:  Please don't interrupt when I'm talking.

9  Only answer a question if you know it.

10  A    I can't recall.

11  Q    (BY MS. SHIH)  Just so I have a clear answer to the

12  question – to this question, which might be similar to the last

13  one I asked you.  Did you review any financial documents

14  pertaining to the Tucson facility prior to meeting with

15  employees on June 28th?

16  A    I cannot recall doing that.  We may have.

17  Q    Did you review any documents, other than Exhibit 29, prior

18  to meeting with employees on June 28th?

19  A    Other than document or Exhibit 29, no, I don't think so.

20  Q    Have you seen copies of the Unfair Labor Practice charges

21  that were filed by the Union against Greenbrier Rail Services

22  that are the subject of this hearing?

23  A    Yes.

24  Q    When did you receive copies of those charges?

25  A    Probably within the last week.

1  Q    Were you aware prior to a week ago that Unfair Labor

2  Practice charges have been filed against the company by the

3  Union?

4  A    Yes.

5  Q    But you've not seen copies of them prior to about a week

6  ago?

7  A    Correct.

8  Q    When did you become aware that Unfair Labor Practices

9  charges had been filed by the Union against the company?

10  A    I believe - I can't recall.

11  Q    Do you recall whether you learned of Unfair Labor Practice

12  charges in 2013 or in 2012?

13  A    I can't recall.

14  Q    Did you review any position statements prepared by

15  Greenbrier's attorneys in response to the Unfair Labor Practice

16  charges in this case prior to them being submitted to the NLRB?

17  A    No, I don't believe I did.

18      MS. SHIH:  Your Honor, may we have about a 15-minute

19  restroom and break to review to see what additional questions I

20  may have for this witness?

21      JUDGE LAWS:  Are you reviewing just to see if there's

22  anything further you want to ask or - if it's urgent - we've

23  been breaking an awful lot.  I'm trying to minimize that to

24  move things along.  If you think you might be wrapping up, but

25  you just want to double check and/or the restroom break is

1  urgent, then yes.  If there's a lot more to go then, you know,

2  I'd just as soon push forward.

3      MS. SHIH:  It's the former.  I just want to make sure that

4  there aren't any additional areas or questions.  There may be

5  some re-followup in addition to a restroom break.

6      JUDGE LAWS:  Okay.  So why don't we take until about ten

7  of?

8      MS. SHIH:  Thank you.

9      JUDGE LAWS:  Be ready to go back on at 3:15.

10  **(Off the record)**

11      JUDGE LAWS:  Back on the record.

12      MS. SHIH:  I do have some additional questions for you.

13  It won't be lengthy, but I understand that you have a flight

14  back tomorrow, and I believe we can finish with you this

15  afternoon.

16      THE WITNESS:  Okay.

17  Q    (BY MS. SHIH)  In the Talking Points from June 28, 2013

18  that's in front of you, Exhibit 29, you state at the top, or at

19  least the Talking Points state at the top that you oversee 24

20  repair shops in the U.S., Canada and Mexico.  I think earlier

21  you testified about 22 facilities.  Have there been shop

22  closures since the time these Talking Points were prepared?

23  A    Yes, there has.

24  Q    What facilities were closed?

25  A    Our Kansas City facility has been closed.  Our

1    Scarborough, Ontario, Canada facility has been closed.  And we

2    are in the process of closing some more shops.

3    Q    Which shops are you in the process of closing?

4    A    Mexico City repair shop.

5    Q    Any others?

6    A    Tucson.

7    Q    The Kansas City facility, when did that close?

8    A    July of this year.

9    Q    Was it your decision to close that facility?

10    A    I had strong input.

11    Q    Who made the ultimate decision to close that facility?

12    A    I probably made the ultimate decision.  It's a lengthy

13    process and there's a lot of input from a lot of different

14    levels of management, so it's tough to say who actually made

15    the decision.

16    Q    Okay.  But ultimately you have the final authority in

17    determining whether that facility closed or stayed open?

18    A    Correct.  But with the understanding that there's, you

19    know, more senior management than I who can veto my decisions.

20    Q    What type of work was performed at the Kansas City

21    facility?

22    A    Rail car repairs.

23    Q    It was a repair facility?

24    A    Yes.

25    Q    And you said that facility closed July 1st, 2013?

1    A    It closed in July.

2    Q    In July.

3    A    During the month of July.

4    Q    And what about the Canada facility, when did that close?

5    A    I think it was around the same time frame, July 2013.

6    Q    Was that also a repair facility?

7    A    Yes.

8    Q    And I don't mean for you to go into a lot of specifics.

9    What was the reason for the closure of the Kansas City

10   facility?  Reasons.

11   A    There was just too many obstacles to overcome there.  It

12   wasn't a profitable facility.  It was a leased property.

13   Didn't want to make a bunch of infrastructure improvements.  It

14   wasn't profitable.

15   Q    How long had it not been a profitable facility?

16   A    You know, I'm not sure.  That swings, so some days, some

17   months it would make a little bit of profit, and others it

18   would not.  I mean it's not been a consistent profitable

19   facility since the time that I came on board with Greenbrier.

20   Q    You said the facility closed in July 2013.  When was the

21   actual decision made to close the facility?

22   A    April or May of 2013.

23   Q    In Talking Point 8 of Exhibit 29 on page 2 where it says,

24   "Recap of changes since November 2012," was that something that

25   you discussed in meetings with employees on June 28th?

1    A    I believe it was a combination of myself and Al going back

2    and forth recapping some of the changes that had taken place at

3    the facility in 2012.

4    Q    What changes since November 2012 had taken place that were

5    recapped to employees in meetings on June 28th?

6    A    The management changes, the improvements in tooling

7    equipment.

8    Q    Were specific management changes identified in this recap?

9    A    I believe that Al did mention some specific positions.

10   One that I know for sure was the upgrade of the safety

11   coordinator or safety manager on site.  Other than that, I

12   can't specifically remember.  But I do remember him

13   specifically mentioning Julio.

14   Q    What other management changes were you aware of?

15   A    Well, we changed out Lex, the Plant Manager.  And there

16   was other staff changes made there.  I was aware of Julio, the

17   Safety Manager, and then just generally aware that there were

18   other changes made.

19   Q    Do you recall that the HR, the former HR analyst was let

20   go as part of the reduction in force?

21   A    Yes, I was aware of that.

22   Q    When did you become aware that she was part of that

23   reduction in force?

24   A    I can't recall when.

25   Q    Was it prior to or after the actual layoff took place?

1    A    It would have been after.

2    Q    So you were not aware prior to the layoff that that

3    facility intended to let go its HR person?

4    A    I don't believe I was.

5    Q    I believe you testified earlier about some consolidation

6    within the Tucson facility as part of this layoff, correct?

7    A    Correct.

8    Q    Who would be responsible for that consolidation?

9    A    Ultimately Kevin Stewart.

10    Q    And what was your understanding of what the consolidation

11    involved or entailed?

12    A    They were consolidated the work force and consolidating

13    the work area.

14    Q    What do you mean by consolidating the work force?

15    A    We were shrinking the work force.

16    Q    Okay.  So you mean reducing the work force?

17    A    Correct.

18    Q    And when you say consolidating areas, can you explain what

19    you mean?

20    A    Shrinking the work areas also.

21    Q    So the consolidation really just refers to a reduction in

22    work force?

23    A    And work area, correct?

24    Q    Physical work area?

25    A    Yes.

1   Q     Was the facility – was the actual size of the facility

2   reduced as part of this?

3   A     No.

4   Q     So what do you mean by consolidation of the physical work

5   area?

6   A     The use of the existing facility.  So we quit using some

7   parts of the facility.

8   Q     Which parts were – which parts were consolidated and which

9   parts were no longer being used?

10  A     The part that I'm most aware of is – it's generally, and

11  I'm not sure of the name of it, but it's the middle part of the

12  facility, open tracks with infrastructure attached to them.

13  Q     The intermodal shop?

14  A     I'm not sure what it's called.

15  Q     And you say Kevin Stewart was responsible for making the

16  actual consolidation and decisions and implementing them?

17  A     In addition to the Plant Manager and Eric.

18  Q     Are you aware whether Juan Maciel and/or Kevin Stewart in

19  selecting the actual employees for layoff consulted the then

20  Plant Manager Lex Morrison about which employees should be laid

21  off?

22  A     I'm not aware of that.

23  Q     Would it have been your expectation that they would

24  consult the Plant Manager about which employees should be

25  selected for layoff?

1  A    Normally, but given the ineffectiveness of that Plant

2  Manager, we may not – or they may not have relied on his

3  opinion.

4  Q    What would you have expected them to rely on in

5  determining which employees would be selected for layoff?

6  A    Their individual knowledge.

7  Q    Knowledge of what, like what factors?  I think earlier you

8  mentioned skills and qualifications.  Is that an accurate

9  restatement of your testimony?

10  A    Skill and ability?

11  Q    Skill and ability, sorry.

12  A    Yes.

13  Q    Any other factors you would expect them to consider in

14  determining which employees to lay off?

15  A    No.

16  Q    Nothing other than skill and ability?

17  A    Correct.

18  Q    What about seniority?

19  A    No.

20  Q    Did you instruct them on any factors they should consider

21  in particular for this layoff as to which employees to select?

22  A    Can you repeat that question, please?

23  Q    Did you give them any – did you give Kevin and/or Juan any

24  instructions on what factors they should consider in selecting

25  employees for layoff?

1   A    I believe I told them to base it on skill and ability.

2   Q    Were you involved at all in the decision to begin rehiring

3   employees in the Tucson facility in 2013?

4   A    I gave approval to start the hire, yes.

5   Q    Approval to whom?

6   A    I believe it was Kevin.

7   Q    And what was that approval based on?

8   A    I'm not sure I understand the question.  Can you rephrase

9   that for me, please?

10  Q    Why did you approve the Tucson facility hiring new

11  employees months after they had laid off a significant portion

12  of their work force?

13  A    I'm not sure why it was, but I did at the time because

14  they had shown signs of improvement.

15  Q    What signs of improvement had you seen?

16  A    Efficiency improvements in their later work force.

17  Q    And was this - were these improvements communicated to

18  you, or were you actually in a position to review documents

19  that reflected improvements in the Tucson facility?

20  A    They were communicated to me.

21  Q    By whom?

22  A    Again, I'm only surmising.  I'm guessing it would be

23  Kevin.

24  Q    So you relied on Kevin Stewart and/or Juan Maciel to let

25  you know whether the Tucson facility needed to let go of

1  employees and whether they were in a position to begin rehiring

2  employees, correct?

3  A    Well, again on the decision to reduce the work force, I'm

4  not sure who proposed that.  It was a result of discussions

5  amongst us.  And, yes, I did rely on them to make the decision

6  of when it was appropriate to start rehiring.

7  Q    You didn't review any financial documents or statements

8  regarding the Tucson facility prior to approving the decision

9  to rehiring employees?

10  A    I can't recall.

11  Q    Did you give any instructions with regard to the rehire of

12  employees as to what factors that facility should consider in

13  determining which employees would be rehired?

14  A    No, because I believe we tried to rehire all of them.

15  Q    When you say that, you're referring to the production

16  employees that had been laid off?

17  A    Correct.

18  Q    But it's not my understanding that that facility made the

19  termination that all of the employees in mass would be rehired.

20  That's correct, isn't it?

21  A    It's my knowledge or understanding that we attempted to

22  rehire all of the employees.  Whether they were rehired or not,

23  that's different.

24  Q    You didn't give approval for the Tucson facility to in one

25  single day offer to rehire every production employee that they

1    laid off in November, correct?

2    A    Ultimately yes, but you're getting at the point where they

3    brought back in tiers or groups, yes.

4    Q    Right.  And based on that - based on the fact that the

5    employees were rehired over the course of several months, did

6    you get any instructions as to what factors should be

7    considered in determining which employees would be rehired

8    first?

9    A    No, I don't believe I specifically did.  I was assuming

10   they would go with the same instructions that they'd had before

11   on the layoffs, skill and ability.

12   Q    Consider only skill and ability?

13   A    Correct.

14   Q    And it's your understanding that that facility attempted

15   to rehire all employees that had been laid off in November of

16   2012?

17   A    Eventually, yes.

18   Q    And actually offered to recall each of those employees?

19   A    I don't know if offers were made, but I think it was our

20   intention or we attempted to offer or rehire all of those

21   employees, and some of them did not get rehired for various

22   reasons.

23   Q    When did you first observe that there was improvement in

24   the profitability of the Tucson facility after the November

25   layoff?

1  A    Again I'm not sure.  I observed it, but when it was

2  communicated to me, I don't recall.  Shortly before the

3  rehiring.

4  Q    Do you know when employees began to be rehired in the

5  Tucson facility?

6  A    No, I can't say for certain.

7  Q    Do you know whether it was in 2012 or 2013?

8  A    Not sure, no.

9  Q    Did the company consider the November 12, 2012 separation

10  of production employees a layoff or a termination for a

11  reduction in force?

12  A    The reduction in force.

13  Q    Do you consider – do you make any distinction on that?

14  A    I mean it was a termination.

15  Q    It was a termination.  Are you aware of whether anything

16  was communicated to the terminated employees at the time that

17  they might be rehired, or there was an expectation that they

18  would be rehired?

19  A    I'm not aware of that.

20  Q    If I could direct your attention back to Exhibit 29 and

21  Talking Point 7, the economy discussion.  Talking Point F under

22  No. 7 on page 2 states, "December 2012 Tucson made a profit."

23  Is that accurate?

24  A    They're not looking at the financial statements.  I can't

25  say for sure.

1  Q    Do you have any reason to believe that these Talking

2  Points are not accurate?

3  A    No.

4  Q    Is it your recollection that the Tucson facility started

5  making a profit immediately after the November layoff?

6  A    It's my recollection that there was improvements, yes.

7  Q    What level of improvement did you expect to see in Tucson

8  in order to approve employees being rehired?

9  A    Are you looking for a metric?

10  Q    I am.

11  A    I think at the time I was thinking of 15 to 20 percent

12  increase in labor efficiency.  And coupled with a profit.

13  Q    And did you actually review documents that reflected those

14  matrix prior to approving the rehire?

15  A    I've reviewed the financial statements on a monthly basis,

16  so I have done that.  I'm not sure whether I look specifically

17  at a labor productivity document or whether that was

18  communicated.

19  Q    When did Kevin Stewart first request approval to begin

20  rehiring employees in Tucson?

21  A    I can't recall.

22  Q    Would you have approved the rehire of employees at Tucson

23  after only one month profit following that mass layoff?

24  A    Are you asking me that question in retrospect or at the

25  time did I?

1  Q    Well, I'm just trying to get an idea.  I mean I'm just

2  trying to get an idea of when it was – when you were approached

3  about approval to begin rehiring employees?  Would it have been

4  weeks or months prior to the actual rehiring and employees

5  starting.

6  A    Can you rephrase – or can your repeat that question?

7        JUDGE LAWS:  And actually I'm going to give you the same

8  instruction.  You're phrasing things in the speculative.  Why

9  don't we phrase it in the actual?

10       MS. SHIH:  Well, when I phrase it in the actual he says he

11 doesn't recall.  So I'm trying to suggest a question to try to

12 at least narrow down time frame of weeks or months.

13       JUDGE LAWS:  Sure.  Was it weeks or months, not would it

14 have been.

15 Q    (BY MS. SHIH)  I understand that you don't recall

16 specifically when Kevin Stewart asked for approval to rehire

17 employees.  Do you recall whether it was weeks or months prior

18 to the actual rehiring of employees beginning in Tucson?

19 A    I don't recall specifically.  To the best of my

20 recollection it would have been months.

21 Q    Bullet or Talking Point "H" under No. 7 on page 2 states,

22 "February 2013 we made a profit, so we decided to slowly start

23 adding on employees again."

24       Do you have any reason to believe that the rehiring of

25 employees did not begin in February 2013?

```
 1   A    No.

 2   Q    To your knowledge that information is accurate?

 3   A    Yes.

 4   Q    Based on that, do you recall when Mr. Stewart requested

 5   approval to begin rehiring employees?

 6   A    I do not specifically recall.

 7   Q    It was prior to February 2013?

 8   A    Could have been during February of 2013.  It looks like,

 9   according to this, it was after February 2013.

10   Q    It was after February 2013 that the facility began

11   rehiring employees?

12   A    Based on this statement it appears so.

13   Q    How many people did you authorize for rehire?

14   A    I can't recall.

15   Q    Were you asked to authorize a specific number of rehires?

16   Do you recall Kevin Stewart asking for a specific number of

17   rehires to be authorized?

18   A    No, I do not recall that.

19   Q    Who did you expect would make the ultimate decisions as to

20   the number of employees to be rehired in Tucson?

21   A    Kevin Stewart.

22   Q    Were you involved in the decision to keep Lex Morrison

23   with the company?

24   A    Yes.

25   Q    And he was actually transferred to a position in the
```

1   facility in Washington, correct?

2   A    Correct.

3   Q    As a Production Manager?

4   A    Correct.

5   Q    Despite your concerns about his ineffective leadership?

6   A    Correct.

7       MS. SHIH:  I don't have any further questions for this

8   witness at this time.  I would ask, however, that Your Honor

9   order that the witness review the emails pertaining to both the

10  - or the emails pertaining to any discussions that he may have

11  had during the layoffs and a particular - well, essentially

12  review his emails and his documents for any information that

13  would be responsive to the subpoena, including the information

14  about the layoff, as well as his expense reports to identify

15  the dates on the travel to Tucson.

16      JUDGE LAWS:  Does the - well, I guess I want to get a

17  little bit of clarification first as to the processes that the

18  respondent undertook together, response of information.  So

19  let's have that discussion off the record.  I'll summarize it

20  and allow the parties to comment.

21  **(Off the record)**

22      JUDGE LAWS:  Back on the record, please.

23      We were briefly off the record.  I wanted to inquire into

24  attempts to gain documents responsive to this subpoena, but the

25  Respondent, however, indicated no objection to this witness

1    going through his emails.  You are hereby instructed to do so,

2    and pulling out any documents that are responsive to the

3    subpoena request regarding the meetings.  And your attorney

4    can, the company's attorney can help you figure out what types

5    of documents those are, either by showing you the subpoena or

6    instructing you what those are.

7        So I guess I just have a couple general questions for you

8    before we wrap up.

9                        **EXAMINATION**

10   Q    (BY JUDGE LAWS)  Mr. Torra, as VP of Operations can I

11   assume you're part of an executive team?

12   A    Yes.

13   Q    Who else is part of that executive team?

14   A    Mr. Al Lave, Bernie Ferguson, Todd Abel.

15   Q    And what is his position?

16   A    Todd Abel?

17   Q    Yes.

18   A    He's a CFO, Chief Financial Officer.

19   Q    Okay.

20   A    Paul Wasman, Business Development.  I think that is the

21   immediate executive team, along with, of course, my boss Glenn

22   Tutton (phonetic).

23   Q    And is it also safe to assume that you operate like most

24   executive teams in that you have normal meetings?

25   A    Yes.

1    Q    How frequent?

2    A    Usually once a month at least.

3    Q    And I'm not going to go into particulars that are

4    discussed in those meetings, but in those meetings does the

5    executive team share information that is for purposes of all of

6    you collaborating on making decisions for the company?

7    A    Yes.

8    Q    And do you rely on information from your various other

9    specialized counterparts to drive your decision-making?

10    A    Yes.

11        JUDGE LAWS:  Okay.  That's all I have.  I want to offer

12    either party an opportunity to follow up on my questions.

13        And I do want to get at why I asked it just so the parties

14    know.  There were a lot of discussions about conversations with

15    people, and I wanted to include in case I wasn't clear that

16    there were also conversations during these meetings about some

17    of these topics.

18        MS. SHIH:  The only thing that I would have to add in

19    response to that is to the extent that there were any meeting

20    minutes or meeting notes taken in any of those meetings in

21    which this Tucson facility layoff was discussed, Respondent has

22    an obligation to produce those since we have not received any

23    of those.

24        And I apologize, I just lost my train of thought.

25        JUDGE LAWS:  That's okay.

1                    <u>**DIRECT EXAMINATION (Continued)**</u>

2    Q    (BY MS. SHIH)  We – well, actually can I ask whether the

3    Tucson facility layoff was discussed at any of those executive

4    team meetings?

5    A    Yes.

6    Q    Did you take notes in any of those meetings?

7    A    The communication was probably from me to the rest of the

8    staff and to my boss what the actions were, so I wouldn't be

9    taking notes.

10   Q    Are there minutes kept of any of those meetings?

11   A    There could have been financials, executive summary

12   results for the month where they could have been mentioned.

13   Q    Are you aware whether there are – is it the practice to

14   prepare summaries of those meetings in writing?

15   A    Yes.

16   Q    And who are those prepared by?

17   A    Our financial department.

18   Q    So each of those meetings would have written summaries of

19   the content of those meetings and the discussions that took

20   place?

21   A    Yes.  To some degree, yes.

22   Q    And do you recall in what time frame there were

23   discussions of the Tucson layoff in any of these executive team

24   meetings?

25   A    No, other than the financial impacts of the layoffs on

1    that particular month, I don't recall.

2        MS. SHIH:  I would just ask then that any documents from

3    these executive team meetings that discuss the Tucson layoff

4    and reduce of force be produced.  And we'd like to reserve the

5    right to recall this witness in the event that any documents

6    are produced.

7        JUDGE LAWS:  I would think that from the witness testimony

8    some of that's going to be financial statements that will be

9    pulled up anyway, but that shouldn't be a problem, I wouldn't

10   think.

11       MR. MINER:  Not a problem, Your Honor.

12       JUDGE LAWS:  Okay.  All right, thank you.

13       Did you have any questions for this witness at this time?

14       MR. MINER:  No, Your Honor.  We do plan to call Mr. Torra

15   as part of our case in chief.

16       JUDGE LAWS:  All right.  Well, thank you, Mr. Torra.

17   There's something in place at this hearing referred to as a

18   sequestration order.  And what it means is you're not to

19   discuss your testimony here with anyone else you know who is

20   going to be a witness here or anybody who is connected with the

21   case and could be called as a witness.

22       THE WITNESS: Okay.

23       JUDGE LAWS:  Let's go off the record and discuss the next

24   step.

25   **(Off the record)**

1     JUDGE LAWS:  So we are going to reconvene tomorrow at 8:00

2     again, and we briefly discussed what is going to happen after

3     we break tomorrow.

4         The Acting General Counsel projects that realistically

5     we're only going to have time for one witness tomorrow, unless

6     it goes much faster than anticipated.  So we'll proceed that

7     way with the witness on standby in the event that the witness

8     is quicker than expected.

9         And then we discussed times for reconvening.  I have

10    looked to see if there was maybe some time the week of October

11    7th, but that is not workable with schedules.  And we are going

12    to reconvene October 21st, and work the 21st through the 30th.

13    Both Respondent's Counsel and I have a conflict the 31st, and

14    I'm also not available the 1st.  And the Acting General Counsel

15    is going to make arrangements to have trial space reserved for

16    Saturday the 26th with the notion that we will use it if needed.

17    If it looks like things are chugging along and we don't need to

18    work a Saturday, by all means we won't.

19        So with that we will start tomorrow at 8:00 again.

20    MS. SHIH:  One thing before we finish, can we get an

21    update on the status of the production of documents that have

22    been discussed throughout the week?

23    JUDGE LAWS:  Yes.  Why don't we do that.  And there was

24    something else I wanted to address, too, so remind me if I

25    forget.

1        MR. MINER:  We have a large number of documents that are

2   waiting for us at the facility, and we will presumably come

3   with them tomorrow morning.  We don't have a large staff of

4   assistants available to help with the copying process, but the

5   process is coming along.  Those are going to involve, in

6   particular, the October and November 2012 car files that you

7   requested yesterday.

8        We are still working on producing the financial statements

9   that we've been talking about this week.  And we're

10  coordinating with the corporate accounting office and other

11  offices to make sure that we get those documents.  That's still

12  in progress.

13       MS. SHIH:  And are those expected to be produced as well?

14       MR. MINER:  I see no reason why they can't be produced

15  electronically rather than in paper.

16       MS. SHIH:  And is that the same for the financial

17  statements that have already been produced to us are those

18  being produced electronically as well?

19       MR. MINER:  I would think we can produce those

20  electronically, but we'll verify that.

21       MS. SHIH:  Do you have a time frame in which you would

22  expect that those financial records would be produced?

23       MR. MINER:  I don't.  So we do have a conference call

24  scheduled tonight to get updated on our progress, and we'll all

25  learn more about how those are coming along by tomorrow

1    morning.

2        JUDGE LAWS:  What I wanted to broach is the status of the

3    other charges that were recently filed, and what triggered it

4    was the urgent desire to go forward next week.  And then I

5    thought back about the Region first objecting to that because

6    they needed time to determine whether the new charges were

7    going to be turned into a complaint and added to this

8    complaint.  So I just wanted to check in on the status of that

9    because that kind of triggered a thought that maybe that was

10   resolved.

11       MS. SHIH:  I don't have a status since I haven't been

12   directly involved with the actual investigation of that charge.

13   It's my understanding that there had been a request for

14   evidence made, and that Respondent's Counsel was going to be

15   providing a response to that request for evidence by yesterday.

16   And I don't know whether anything was submitted.

17       JUDGE LAWS: Yeah, all I need to know is it's not resolved.

18   The fact that you want to go forward in light of the previous

19   request and not go forward and to wait because the charges

20   might be added.  It just triggered a thought in my mind that

21   maybe that's resolved.

22       MS. SHIH:  I don't believe there's been a determination on

23   the merits made on that charge yet.

24       JUDGE LAWS:  Okay.  Thank you.

25       With that we're off the record until tomorrow.

1    **(Off the record)**

2                                              **(End 4:37 p.m.)**

3    **(Whereupon the hearing was adjourned to reconvene on Friday,**

4    **September 20, 2013.)**

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**BEFORE THE**

**NATIONAL LABOR RELATIONS BOARD**

**REGION 28**

| | |
|---|---|
| In the Matter of: | |
| GUNDERSON RAIL SERVICE, LLC<br>d/b/a GREENBRIER RAIL SERVICES | |
| and | Case No.  28-CA-093183<br>28-CA-103909 |
| SHEET METAL WORKERS' INTERNATIONAL<br>ASSOCIATION, LOCAL 359, AFL-CIO,<br>GUNDERSON RAIL SERVICES, LLC d/b/a<br>GREENBRIER RAIL SERVICES, | 28-CA-104184<br>28-CA-106613<br>28-CA-111186 |
| Employer, | |
| and | 28-RC-092179 |
| SHEET METAL WORKERS' INTERNATIONAL<br>ASSOCIATION, LOCAL 359, AFL-CIO. | |

The above-entitled matter came on for further hearing pursuant to adjournment, before **ELEANOR LAWS, Administrative Law Judge,** at the Federal Courthouse, located at 38 South Scott Avenue, on Friday, September 20, 2013, at 9:00 a.m.

**A P P E A R A N C E S**

```
 1
 2
 3   On Behalf of the General Counsel:
 4
 5        EVA SHIH, Esq.
 6        SOPHIA ALONZO, Esq.
 7        National Labor Relations Board
 8        2600 North Central Avenue
 9        Phoenix, Arizona  85004
10        Phone:  (602) 640-2160
11
12
13   On Behalf of the Employer:
14
15        FREDERICK C. MINER, Esq.
16        STEVE BIDDLE, Esq.
17        Littler Mendelson
18        2425 Camelback Road, Suite 900
19        Phoenix, Arizona  85106
20        Phone:  (602) 474-3600
21        Fax:  (602) 957-1801
22
23
```

```
 1                            I N D E X
 2                                              VOIR   CRT
 3   WITNESS           DIRECT    CROSS    REDIRECT    RECROSS    DIRE   EXAM
 4
 5   Margarita Madrigal 353      424      462                   400    460
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
```

Argie Reporting Service
5900 Nieman Road, Suite 200
Shawnee, KS  66203
(913) 422-5198

PX 000351

<u>**EXHIBITS**</u>

| <u>EXHIBIT</u> | <u>IDENTIFIED</u> | <u>IN EVIDENCE</u> |
|---|---|---|
| **General Counsel** | | |
| 31 | 366 | 367 |
| 32 | 378 | 385 |
| 33 | 399 | 400 |
| 34 | 409 | 411 |
| 35 | 409 | 411 |
| 36 | 409 | 411 |
| 37 | 413 | 463 |

```
 1                    P R O C E E D I N G S

 2                                        (8:01 a.m.)

 3     JUDGE LAWS:  On the record.

 4        Have a seat, make yourself comfortable, let me know when

 5     you're ready.  Okay, ready?

 6     Whereupon,

 7                    MARGARITA MADRIGAL

 8     having been duly sworn, was called as a witness herein and was

 9     examined and testified as follows:

10        JUDGE LAWS:  If you could please state and spell your name

11     for our Court Reporter?

12        THE WITNESS:  My name is Margarita Madrigal.  I go by

13     Maggie.

14        JUDGE LAWS:  And how do you spell Margarita?

15        THE WITNESS:  M-A-R-G-A-R-I-T-A.

16        JUDGE LAWS:  And Madrigal?

17        THE WITNESS:  M-A-D-R-I-G-A-L.

18        JUDGE LAWS:  Very good.  Whenever you're ready, counsel.

19        MS. SHIH:  Thank you.

20                    DIRECT EXAMINATION

21     Q    BY MS. SHIH:  Good morning, Ms. Madrigal.

22     A    Good morning.

23     Q    Can you tell us what your position was when you were

24     employed by Greenbrier Rail Services?

25     A    I was an HR Generalist.
```

1    Q    And that's for the Tucson facility?

2    A    Yes, ma'am.

3    Q    How long did you hold that position?

4    A    Oh my goodness.  I was with the company many years but I

5    was in that position I want to say maybe four years.

6    Q    And your employment with Greenbrier ended November 12,

7    2012, correct?

8    A    That's correct.

9    Q    When did you start working for Greenbrier?

10   A    1/28 of 1998.

11   Q    In what position?

12   A    I started as an Admin Assistant.

13   Q    And what other positions did you hold when you were

14   working for Greenbrier?

15   A    I participated in the safety program, I was like on the

16   safety -- I took part in -- I helped out a lot in the

17   purchasing department, and then the HR Generalist.

18   Q    And were all of those positions for the facility in

19   Tucson?

20   A    Yes, ma'am.

21   Q    Can you describe your responsibilities when you were the

22   HR Generalist in Tucson?

23   A    I would -- I was basically, I would conduct the -- do the

24   new hire orientation -- I had many responsibilities.  Do you

25   want me to list as many as I can remember?

1    Q    Please.  That would be helpful.

2    A    I participated in the orientation, I entered all the

3    information into the system, I --

4    Q    When you say entered information, was this for new hires?

5    A    Yes.  I'm sorry. New hire information.  I also did Kronos,

6    which was their timekeeping.  I participated on some of the

7    payroll.  I did the -- I was in charge of filing the workers'

8    comp.

9    Q    Did you conduct interviews of candidates for new

10   positions, new hire?

11   A    Yes, I did.

12   Q    And was that true for any position within the facility?

13   A    Mainly the welders and the welder repairmen and laborers.

14   It's been a while.  I'm trying to think.  Pretty much all the

15   people that walked in with an application I would go through

16   them.

17   Q    And were you involved in disciplinary actions as well?

18   A    Yes, ma'am.

19   Q    In what way?  What was your role in terms of disciplinary

20   actions?

21   A    My role would be when maybe a foreman or any kind of

22   management would have trouble with an employee, they would you

23   know, say, maybe, "Mr. So-And-So is taking too long."  And what

24   I would do, they would come in and basically a lot of the

25   foremen there had a -- they couldn't write English so they

1   would write out what they wanted and I would just type it out

2   on the disciplinary form that Greenbrier used.

3   Q    Did you participate in disciplinary meetings with

4   employees as well?

5   A    Yes.

6   Q    Termination meetings?

7   A    Yes.

8   Q    Are you bilingual?

9   A    Yes, ma'am.

10  Q    In any of those disciplinary meetings or termination

11  meetings that you would participate in, were you ever present

12  for the purpose of acting as a translator or an interpreter to

13  communicate with an employee?

14  A    Yes, I was.

15  Q    What about for interviews or other types of meetings like

16  that?

17  A    Yes, I participated quite often as the interpreter in many

18  -- whether it was a hiring, whether it was a termination,

19  disciplinary, where I was needed to help out.

20  Q    Were you involved in any way in employee performance

21  reviews or appraisals?

22  A    Yes, I was involved.

23  Q    In what way?

24  A    My position was to hand out the form to the foreman and

25  receive it back, and then we had a spreadsheet that they liked

1   us to use and we put all the information on there and then

2   afterwards, once the manager and the foreman looked it over, I

3   would be involved in -- I would be there when they were

4   explaining to the employee what -- we would go over the

5   performance evaluation.

6   Q    Was it your responsibility to maintains employee's

7   personnel files?

8   A    Yes.

9   Q    And that includes their hiring information?

10  A    Yes, ma'am.

11  Q    Disciplinary records?

12  A    Yes.

13  Q    Attendance points?

14  A    Yes.

15  Q    Does it also include safety records?

16  A    In the beginning safety was a big role of mine, until they

17  got a safety director.

18  Q    So were you responsible for maintaining any records

19  related to employee's safety training or safety violations or

20  anything like that, or are those files kept separate from

21  personnel files that you maintained?

22  A    What I recall, they were kept separate from the personnel.

23  Q    Who was responsible for maintaining the safety records or

24  safety files?

25  A    At the time that left, it was Julio Vasquez.

1    Q    The Safety Manager?

2    A    Yes.

3    Q    Explain to me what was involved in terms of your role in

4    conducting the new hire orientation.

5    A    My role -- basically they would come in, they would get

6    hired on and I would first start them and let Julio, excuse me,

7    the Safety Manager, conduct the safety training and then I

8    would take them, when I would come in -- I would be there as

9    well and I wouldn't leave, and we had a list of you know,

10   orientations.  I'd pretty much go over the handbook with the

11   employees.

12   Q    And were these one-on-one orientation sessions with

13   individual employees as they were hired, or did you meet in

14   groups on a periodic basis after -- for example, each time an

15   employee is hired, do you immediately conduct a new hire

16   orientation with them, or is it something that you would do

17   once a week for anyone who is hired since the prior week?

18   A    I would do it immediately, I would do it the very first

19   day before I even took them, make sure they went on the yard.

20   You know, just -- and I would hire pretty much a big -- well,

21   the plant manager would have a nice group of people to start

22   and it was all conducted the first day, the minute they clocked

23   in we would get them ready for their orientation.

24   Q    And the orientation includes training on Kronos and the

25   timekeeping system?

1    A    Yes.

2    Q    Let's start back prior to the hire process.  Did you have

3    responsibility for recruiting and seeking out applicants or

4    candidates for a position that needed to be filled?

5    A    Yes.  I participated in looking for candidates for work.

6    Q    How would you learn that there was a position open that

7    needed to be filled?

8    A    The plant manager would let me know that we were looking

9    for so many welders or whatever position was open.  The plant

10   manager would communicate with me.

11   Q    And when the plant manager communicated to you, for

12   example that he wanted to hire a welder, whose determination

13   was it whether that person would come from a temporary agency

14   or would be a direct hire?

15   A    It was the plant manager's decision.

16   Q    So would he also communicate to you at the time whether he

17   wanted you to fill that position from a temporary agency or

18   directly?

19   A    Yes.

20   Q    So when the plant manager communicated to you that a

21   welder position needed to be filled and should be filled from

22   the temporary agency, what is your next step?  What did you do?

23   A    We worked with the temp agency and I was -- he would let

24   me know, the plant manager, I would contact the temp agency and

25   I would ask her if she could, I could see a few applications or

 1   resumes for some weld repairmen, and I would set up the

 2   interviews.  She would send me so many and I would set up the

 3   interviews.

 4   Q    Did you only use a single temp agency?

 5   A    We used two but we -- we had two temp agencies that I

 6   would go back and forth, but we stayed with one more regular.

 7   Q    What were the temp agencies that you used?

 8   A    Intermountain Staffing was one.  And I'm trying to

 9   remember -- I want to say -- I know the name, I can remember

10   the name of the man, I just can't -- oh, good grief.  His name

11   was Kelly.  I can't really recall the other name of the temp --

12   I don't want to say something and it not be accurate.  I

13   remember the name of the gentleman I dealt with, I just can't

14   remember the name of the company he was with.

15   Q    Who was the gentleman that you dealt with?

16   A    Kelly.  His name was Kelly.

17   Q    Do you know his last name?

18   A    I don't remember his last name.

19   Q    How long had Greenbrier's Tucson facility had a

20   relationship with Intermountain Staffing?

21   A    We had had a relationship with them -- we'd used them for

22   a couple of years.  Three years.

23   Q    So you were the HR Generalist there when the facility

24   first started using Intermountain Staffing?

25   A    Yes.

1   Q    Was it your decision to initiate a relationship with

2   Intermountain Staffing?

3   A    It was the Plant Manager's decision.

4   Q    Was there a contract with Intermountain Staffing?

5   A    Yes.

6   Q    How often was that -- or what was the term of that

7   contract?

8   A    Terms in --

9   Q    Like the duration, the length of the contract?  Was it a

10  one year contract that was renewed each year?

11  A    Oh, yes.  Yes.  Every -- once a year we called and renewed

12  it.

13  Q    Do you recall the last time that contact was renewed prior

14  to you leaving Greenbrier?

15  A    I don't.

16  Q    Were you involved in the negotiation of the contract with

17  Intermountain Staffing each year, as far as the terms, the

18  rates, things like that?

19  A    No, ma'am.  That was the Plant Manager's -- the only way I

20  was involved, I would -- I'd be kind of the messenger.  They

21  would send it to me and I would hand it to the Plant Manager.

22  It was sent through me via e-mail and I would just present it

23  on the Plant Manager's desk and let him know, you know, it's

24  time for the contract.

25  Q    So the contract would come to you from Intermountain

1    Staffing when it was up for renewal?

2    A    Yes.

3    Q    You said after you contacted the temporary agency to let

4    them know that you were looking to fill a welder -- example, a

5    welder position, they would send over applications to you for

6    review, is that correct?

7    A    Yes.

8    Q    Were those applications Greenbrier applications or were

9    those Intermountain Staffing applications?

10   A    They were Greenbrier applications.

11   Q    How many applications did you typically receive to review

12   for a single position from Intermountain Staffing?

13   A    Between three and five.

14   Q    What did you do with the applications after you received

15   them from Intermountain Staffing?

16   A    I would receive the applications, I would make sure they

17   were filled out accurately, correctly, because most of the time

18   they would hand in maybe a one page and leave the rest blank.

19   After I saw a few and I would set them on the Plant Manager's

20   desk, then he would let me know who he would like to interview

21   -- or -- yes, who he would like for me to -- he would have me,

22   "Okay, I want this guy, this guy, this guy."

23   Q    Did you have any responsibility for filtering out any

24   applications from the initial applications that you received

25   from Intermountain?

1    A    Yes.

2    Q    So were there ever occasions when you would eliminate

3    applications before you even forwarded them on to the Plant

4    Manager?

5    A    Yes, I would.

6    Q    On what basis would you decide to eliminate applications?

7    A    I looked at a lot of their previous history, their job

8    history to see that they had -- due to the fact that the work

9    was pretty hard labor, I wanted to make sure -- but mainly a

10   lot of that I filtered out was a lot of applications that I

11   would receive blank.

12   Q    So incomplete applications?

13   A    Yes.

14   Q    What happened after the Plant Manager received the

15   applications and determined which candidates should be

16   interviewed?

17   A    He would let me know and I would contact the temp agency

18   and we'd set up interviews and welding tests if we were looking

19   for a welder.

20   Q    Who conducted those interviews?

21   A    The Plant Manager.

22   Q    Anyone else present for those interviews?

23   A    I would be present.

24   Q    Anyone else?

25   A    The Production Manager.

1  Q    Anyone from Intermountain Staffing?

2  A    No.  To my knowledge she did the interviewing in her

3  office prior to me.  She would sometimes send me an e-mail

4  saying, "I found a real candidate, might work for Greenbrier,"

5  and send it to me.

6  Q    After the interview process, who made the decision to make

7  an offer to a particular employee or a particular individual?

8  A    It would be the Production Manager and the Plant Manager's

9  decision.  Those two would make the decision on who was going

10 to be brought on to Greenbrier.

11 Q    Were you involved at all in that decision-making process?

12 A    No.

13 Q    And after a decision was made to make an offer to a

14 candidate, what was your role?

15 A    I would -- once they had decided, I would contact the

16 Staffing, they would come in and I would give them the new hire

17 -- they would participate as a new hire orientation and safety

18 training.

19 Q    Who actually contacted the individual to let them know

20 that they were receiving an offer of employment?

21 A    It would be myself.

22 Q    So that contact was not made by anyone by Intermountain

23 Staffing?

24 A    Oh, I'm sorry.  Let me rephrase that.  I would -- the

25 Plant Manager and the Production Manager would tell me, I would

1    get in touch with the Staffing, and their Staffing agency would

2    contact them to let them know they'd been selected.

3    Q    So is the first direct communication between anyone from

4    Greenbrier and the applicant or potential new hire when that

5    individual showed up for their first day of work?

6    A    I'm sorry can you repeat that?  I somehow lost --

7    Q    The first direct communication between anyone from

8    Greenbrier and applicant, or the new employee -- was that when

9    that person showed up for work on the first day?

10   A    Yes.

11   Q    Other than a Greenbrier application for employment, prior

12   to the new hire process, do the applicants from Intermountain

13   Staffing fill out any other Greenbrier paperwork?

14   A    If I recall, we had them -- they filled out our job

15   application and they signed off on the handbook

16   acknowledgement.

17   Q    This is after they --

18   A    Once they're on our property, yeah.

19   Q    Once they are there as a new hire?

20   A    Yes.

21   Q    Okay.  So let's -- before they show up to your property or

22   to Greenbrier's property --

23   A    Oh, before.

24   Q    -- is there any other Greenbrier paperwork than an

25   applicant or a new hire would complete, other than the

1    Greenbrier application for employment?

2    A    No, ma'am.

3    Q    I'm handing you what's been marked as General Counsel

4    exhibit 31, which is a four page document.

5        **(General Counsel Exhibit 31 marked for identification)**

6    Q    BY MS. SHIH:  Can you tell me if you recognize that?

7    A    Yes.

8    Q    What is that?

9    A    The Greenbrier job application.

10   Q    And is this the application for employment that was in use

11   at Greenbrier when you left in November of 2012?

12   A    Yes, it is.

13   Q    Is this the application for employment for any position

14   within the facility?

15   A    Yes, ma'am.

16   Q    Did Intermountain Staffing have a blank application for

17   employment for Greenbrier that they would have temporary agency

18   applicants complete prior to sending them over to you?  Or how

19   did -- how the temporary agency applicants come to complete the

20   Greenbrier application for employment?

21   A    I had sent the temporary agency a copy of Greenbrier's

22   application, so prior -- the temp agency would make sure they

23   had this application filled out.

24   Q    So when you contacted Intermountain Staffing to let them

25   know that you had a welder position open that you needed

1    filled, they already had your application for employment?

2    A    Yes.

3    Q    So you received back completed applications for employment

4    from candidates other Intermountain Staffing?

5    A    Yes, ma'am.

6         MS. SHIH:  Move for admission of General Counsel 31.

7         JUDGE LAWS:  Okay.  Any objection?

8         MR. MINER:  No objection, Your Honor.

9         **(General Counsel Exhibit 31 received into evidence)**

10   Q    BY MS. SHIH:  Was the new hire orientation process that

11   you went through with an Intermountain Staffing employee

12   different than the new hire orientation process for direct hire

13   Greenbrier employees?

14   A    No.  I conducted everything the same.

15   Q    Did the Intermountain Staffing agency employees complete

16   or receive copies of the employee handbook?

17   A    Yes, ma'am.

18   Q    Were they required to sign any kind of acknowledgement

19   forms that they had received a copy of the employee handbook?

20   A    Yes.

21   Q    Were they subject to the same rules that were in the

22   employee handbook that Greenbrier direct hire employees were

23   subject to?

24   A    Yes.

25   Q    Did they go through the same safety training as direct

1   hire Greenbrier employees?

2   A    Yes.

3   Q    And they used the same Kronos timekeeping systems as

4   direct hire Greenbrier employees?

5   A    Yes.

6   Q    Payroll for those employees was handled through

7   Intermountain Staffing, correct?

8   A    That's correct.

9   Q    Was it the expectation that temporary agency employees

10  would become Greenbrier employees through a temp to hire

11  program?

12       MR. MINER:  Objection.  Ambiguous.  Whose expectation?

13       JUDGE LAWS:  Let's clarify.

14  Q    BY MS. SHIH:  Was it the Plant Manager's expectation that

15  temporary employees from Intermountain would be hired on by

16  Greenbrier after a particular period of time?

17       MR. MINER:  Objection.  Lack of foundation.

18       JUDGE LAWS:  If you know.

19       THE WITNESS:  Yes.

20  Q    BY MS. SHIH:  What was the period of time after which

21  temporary employees could be eligible for direct hire by

22  Greenbrier?

23  A    From what I recall particularly, after 90 days.

24  Q    There was no supervisor or other Intermountain staff or

25  Intermountain employee present on site at the Greenbrier

1  facility in Tucson, was there?

2  A    Could you repeat that?

3  Q    Did Intermountain Staffing have an employee or supervisor

4  that worked on site at the Tucson facility of Greenbrier?

5  A    No.

6  Q    So the work that was being performed by the temporary

7  agency employees at the Tucson facility, that work was being

8  directed by Greenbrier supervisors?

9  A    Yes.

10  Q    If an employee that was sent over, a temporary agency

11  employee, was not working out, if a foreman was unhappy with a

12  temporary agency employee, what would happen?  What was your

13  role?

14  A    My role would be to once a Plant Manager -- once it got

15  into my office, I would call the temp agency and she would end

16  their -- the lady from the staffing would end their assignment.

17  She would handle all of that.

18  Q    Was the decision to have a temporary agency employee's

19  assignment ended entirely within Greenbrier management?

20  A    Yes.

21  Q    There was no consultation with Intermountain Staffing

22  prior to ending a temporary agency employee's assignment with

23  you?

24  A    At times there was some consultation with me and -- myself

25  and the Plant Manager and the staffing.  You know, of course,

1  we all wanted to know, you know, what really the problem going

2  out there so there was at times that I would be involved as

3  well as the lady from the staffing company.

4  Q    Can you recall a specific incident, a specific employee

5  whose assignment you consulted with Intermountain Staffing

6  about prior to ending that individual's assignment?

7  A    I can't recall off the top of my head.  I would have to --

8  Q    Did you maintain personnel files for temporary agency

9  employees?

10  A    Yes.

11  Q    And those contained the same types of documents as the

12  personnel files as direct hire Greenbrier employees?

13  A    Actually, now that I recall, the temp -- I just had a

14  folder that I had all the temp employees.  They would not

15  receive like the W2s due to the fact that they were not

16  Greenbrier employees.  I just had one folder that I kept

17  everybody -- I kept track of who the staffing employees were,

18  who the temp employees were.

19  Q    What about disciplinary records.  Were temporary agency

20  employees subject to discipline for violation of employee

21  handbook rules?

22  A    That was handled through the temporary agency.  I don't

23  have -- I don't recall having -- if a situation would arise, I

24  would reach out to the temporary agency and let her know that

25  there was an issue with not following the handbook rules.  And

1    she would handle it.

2    Q    And the staffing agency would handle any disciplinary

3    issues with that individual?

4    A    Yes.

5    Q    So, temporary agency employees could not be written up by

6    a Greenbrier foreman?

7    A    They could be, though we -- they could be written up, but

8    it was mainly handled through the Intermountain Staffing.

9    Q    Can you recall any instance where a temporary agency

10    employee was issued written discipline or verbal discipline by

11    a Greenbrier foreman?

12    A    I can't recall.

13    Q    Did you keep attendance records for temporary agency

14    employees?

15    A    Yes.

16    Q    They were subject to the same attendance point system as

17    Greenbrier employees?

18    A    Yes.

19    Q    Were those attendance records maintained in the personnel

20    files of temporary agency employees?

21    A    I had a binder that I would keep records of the -- well,

22    all the employees; Greenbrier and temp agency.

23    Q    So you did maintain personnel records of the temporary

24    agency employees?

25    A    Just the attendance.  Attendance, as well as the Kronos

1  timekeeping was probably the best that kept track of all the

2  records of their attendance.

3  Q    Any other records that you kept on temporary agency

4  besides attendance and their application for employment?

5  A    No.

6  Q    What about safety records?  Did the facility maintain

7  safety records on temporary agency employees?

8  A    They kept their acknowledgement that they had attended our

9  safety training.

10  Q    What about certifications, copies of training records or

11  certifications?

12  A    That was kept by the Safety Director.  So he would -- any

13  training that he had given them, he would keep track of their

14  records.

15  Q    And when you say -- did you say the Safety Director?

16  A    Yes.

17  Q    And is that the same position as the Safety Manager?

18  A    Oh, I apologize.  Safety Manager, yes.

19  Q    Julio Vasquez?

20  A    Yes.

21  Q    Did he keep those records on temporary agency employees as

22  well?

23  A    I believe so.

24  Q    Other than an employee handbook were there any other

25  written rules or policies that were provided by you to

1   individuals in the new hire orientation?

2   A    No, ma'am.

3   Q    Was there a separate safety manual that's provided to

4   employees?

5   A    No.

6   Q    Did Greenbrier conduct performance reviews or appraisals

7   or evaluations on temporary agency employees?

8   A    No, ma'am.

9   Q    Who made the determination as to whether hire a temporary

10  agency employee after 90 days?

11  A    That decision -- the foreman would go to the Plant Manager

12  and -- I would say the foreman since he worked along the side

13  with him, he would state so-and-so was probably ready to -- he

14  learned everything well and was doing a good job.  So I would

15  say the foreman would take it to the Plant Manager.

16       JUDGE LAWS:  You're sounding a little tentative.  Do you

17  know that or are you speculating?

18       THE WITNESS:  No.  I know that.

19       JUDGE LAWS:  Okay.

20  Q    BY MS. SHIH:  So the foreman would recommend -- the

21  foreman recommended that an employee be hired and the Plant

22  Manager made the decision?

23  A    Yes.

24  Q    And was that decision communicated to you by the Plant

25  Manager?

1   A    Yes.

2   Q    And what did you do with that information after you were

3   told that a temporary agency employee was going to be hired?

4   A    Then I would contact the staffing company and of course,

5   he would be given our -- the Greenbrier -- kind of -- well, the

6   Greenbrier forms, that's the W4s, the I-9s, anything that had

7   to do -- it was a packet that would be given out to anybody

8   that came on board Greenbrier.

9   Q    When a temporary agency employee is hired on direct by

10  Greenbrier, do they complete a new application form?

11  A    Yes.

12  Q    Do they go through the new hire orientation process again?

13  A    Yes.

14  Q    And they sign a new acknowledgement of the employee

15  handbook?

16  A    Yes.

17  Q    And they go through safety training again?

18  A    That's correct.

19  Q    But the training is the same as what they received when

20  they first showed up as a temporary employee?

21  A    Yes.

22  Q    Does their attendance point system, start from zero when

23  they become a Greenbrier employee?

24  A    Yes.

25  Q    Even if they had already accumulated attendance points as

1    a temporary agency employee?

2    A    That's correct.

3    Q    If you were told to fill a position -- switching gears

4    from the temporary agency process -- if you were told to fill a

5    position as a direct hire, from where did you recruit

6    candidates?

7    A    I used -- I would run an ad in the newspaper or Monster.

8    I used a few different methods, you know, newspaper, Monster.

9    I would let most of the -- you know, Greenbrier is looking for

10   welders or whatever position  they were looking for -- word-of-

11   mouth.  Different -- mainly those three forms we used.

12   Q    And when you received applications in response to your ads

13   or through word-of-mouth, was the evaluation and interview

14   process the same as what you've already described it was for

15   temporary agency employees?

16   A    Yes.

17   Q    You did the initial like filtering of applications and

18   then you sent possible candidates to the Plant Manager?

19   A    Yes.

20   Q    And the Plant Manager contacted you when he identified

21   candidates to be interviewed?

22   A    That's correct.

23   Q    And you were present for all of those interviews?

24   A    Yes.

25   Q    Did foremen participate in interviews?

1  A    Yes, we had them participate as well.

2  Q    Was that in every interview was there a foreman present?

3  A    Most of the time.

4  Q    What about lead men?  Did they participate in interviews?

5  A    No, no they didn't.

6  Q    Earlier you described briefly what the process is when you

7  go through the appraisal -- like a performance appraisal with

8  an employee.  You stated that you hand out the appraisal form

9  to the foreman.  How do you know when an employee is due for a

10 regular appraisal?

11 A    I had a spreadsheet that I would keep track.  Basically, I

12 created my own spreadsheet, but I would go off the Kronos, the

13 timekeeping just to see the date of hire and say, "Oh, it's

14 time for so-and-so for a performance."

15 Q    How often did employees receive performance reviews?

16 A    Twice a year.

17 Q    So you had the responsibility for knowing when an employee

18 was due for their regular appraisal?

19 A    Yes.

20 Q    And when that happened, you contacted the foreman with the

21 appraisal form and asked them to complete it?

22 A    Yes.

23 Q    What did you do with the form when it was returned to you?

24 A    I -- when the form was returned back to me, I would put

25 all the information on the spreadsheet that they like us to

 1  use, and that spreadsheet, with the performance eval, were put

 2  on the Plant Manager's desk.

 3  Q    Did employees also perform self-evaluations?

 4  A    Yes, they did.

 5  Q    Was that on a separate form or the same form?

 6  A    Separate form.

 7  Q    Did you provide copies of a self-evaluation form to an

 8  employee when he or she was due for their regular review?

 9  A    I would give the self-assessment as well as the

10  performance to the foreman and he would hand them out to the

11  employee.

12  Q    You said after you input information from the review into

13  your spreadsheet, you gave the spreadsheet form and the

14  evaluation form to the Plant Manager, correct?

15  A    That's correct.

16  Q    What happened with the review after that?

17  A    After that, the Plant Manager and the foreman and the

18  employee would sit down and go over it.

19  Q    And were you present during those meetings?

20  A    Not all the times.  Sometimes I would participate.

21  Q    And when did you participate, just looking back to your

22  experience, can you describe what those meetings consisted of?

23  A    They pretty much went over each -- they went over the form

24  and they all talked, you know, between the employees, the Plant

25  Manager and the foreman, they would go over everything on the

1  form and go over if they could use -- you know, if they were

2  doing a great job, or if they could use some help.  If they

3  could use -- if they could get better, you know, if they needed

4  more help or training.  But they went over that form

5  altogether.  Mainly the Plant Manager being the leader of it,

6  reading every question on that form.

7  Q    Can you recall any occasion where the Plant Manager

8  disagreed with the foreman's review of an employee?

9  A    I can't recall.

10  Q    Were there ever any discussions that you were a part of

11  with the Plant Manager and/or the foreman about an employee's

12  performance review before you all sat down to meet with the

13  employee?

14  A    I don't recall.

15       JUDGE LAWS:  I just want to clarify.  When you say you

16  don't recall are you saying in your experience there weren't

17  any or you don't know or can't remember?

18       THE WITNESS:  I can't remember.

19       JUDGE LAWS:  Okay.

20  Q    BY MS. SHIH:  I'm handing you what's been marked as

21  General Counsel exhibit 32, which is a three page document,

22  titled "Performance Appraisal and Development Plan for Direct

23  Labor Employees."

24       **(General Counsel Exhibit 32 marked for identification)**

25  Q    BY MS. SHIH:  Is this the performance review form that was

1    in use when you left Greenbrier in November of 2012?

2    A    Yes.

3    Q    And this is the form that you would hand to the foreman to

4    complete when an employee was due for a review?

5    A    Yes, ma'am.

6    Q    On page three of the form, under the signatures, there's a

7    space for signature of Human Resources.  Did you sign off on

8    the performance review of all of the employees at Greenbrier?

9    A    At the time, no, the HR Manager would sign off.

10   Q    When you say HR Manager, who are you referring to?

11   A    Lisa -- I can't remember.

12   Q    Lisa Maxey?

13   A    Yes, ma'am.  I couldn't remember the last name.

14   Q    The Regional HR Manager?

15   A    There you go, regional.

16   Q    So you did not sign on behalf of Human Resources on

17   employee evaluation forms?

18   A    I had on some, but then they changed it and she would sign

19   off.

20   Q    When did they make that change?

21   A    Shortly after she came on board, she had it changed.

22   Q    When did she come on board, if you recall?

23   A    Sometime in -- I don't remember when she came.

24   Q    Was it --

25   A    I want to say 2012.

1   Q    Okay, sometime in the year prior to you leaving the

2   company?

3   A    Right.  At the end of 2011, 2012.  She hadn't been there

4   very long when I left the company.

5   Q    Okay.  On this form under rating, there's a column for

6   self, and a column for leader, where the numbers are input on

7   sample pages one and two.  Does the employee input a number

8   under the self column?

9   A    Actually that number would come from their self-assessment

10  that they would receive and the foreman or myself would

11  transfer that self-assessment over to this actual form.

12  Q    Okay.  And the self-assessment is what you described

13  earlier that employees complete a self-evaluation?

14  A    Yes, ma'am.

15  Q    So that information would be transferred onto this form by

16  either you or the foreman?

17  A    Yes.

18  Q    And is that before the foreman completes the rating or

19  after?

20  A    After.

21  Q    So at the time the foreman conducts the appraisal of the

22  employee, the foreman has already received that employee's

23  self-evaluation?

24  A    Yes.

25  Q    On page one of this appraisal at the very bottom under

1    supporting comments, it looks like 5.5 -- is that PTS?

2    A    Yes.

3    Q    Does that refer to attendance points?

4    A    Yes.

5    Q    Is that your handwriting?

6    A    Yes.

7    Q    So was it -- did you always write or include information

8    about attendance points on an employee's appraisal?

9    A    Yes.

10   Q    When did that information make it into the appraisal?

11   A    This information would make it -- this would be put on

12   when I would -- once I had an amount, one, they would come back

13   to me and I would put what they were currently making and their

14   point system on this form.

15   Q    Before it went to the Plant Manager?

16   A    Yes.

17   Q    So the attendance points information is not included on

18   the evaluation at the time the foreman receives it?

19   A    No.

20   Q    At the time you give this to the foreman, how much of this

21   is already completed?

22   A    Usually, usually the top portion is completed.

23   Q    Did you complete the top portion?

24   A    Yes, I would complete it.

25   Q    Did you complete the top portion on this particular form,

1   is that your handwriting?

2   A    Yes.

3   Q    So you completed -- and on this particular form, the box

4   at the top that contains the name, the hire date, the job

5   title, etcetera?

6   A    Yes, that's correct.

7   Q    Did you also complete the checkmark as to whether this was

8   an annual review or a six month review?

9   A    That, yes, I did.

10  Q    Okay.  Anything else on this form that you completed prior

11  to giving it to the foreman?

12  A    I also completed that one bracket -- the right hand where

13  it's got like the little cross, where I have 13, 1378.

14  Q    Okay.  Can you explain what that information is.

15  A    Those are -- the 23 is what the foreman scored -- the

16  leader scored him.  The 13 work he was currently at, and the

17  1378 is what I would get from the spreadsheet that they would

18  have me input and then down below it looks like it was a 6% and

19  it would equal 78 cents.  So due to this performance, it was

20  looking at a 78 cents increase.

21  Q    Okay.  So this -- that little information is something you

22  completed on this form after you received it back from the

23  foreman?

24  A    That's correct.

25  Q    And you said the 23 refers to the sum of all the scores

1    that the foreman gave this individual?

2    A    That is right.

3    Q    And then the 13 is the pay rate that that individual was

4    at prior to receiving the evaluation?

5    A    That's correct.

6    Q    The 1378 is the recommended pay increase based on the

7    score?

8    A    Yes.

9    Q    So you -- and you completed that, you said again after you

10   received it back from the foreman?

11   A    Right.

12   Q    Is there anything else on the form that you completed

13   prior to giving it to the foreman?

14   A    Prior to, just -- I would -- prior to would just be the

15   top.  That's the name, the six months or the annual.

16   Q    Is there anything else on this form that you recognize as

17   your handwriting that we haven't already discussed?

18   A    No, we've discussed everything.

19   Q    And after the meeting with the employee to discuss their

20   performance appraisal, at that time what did you do with the

21   actual appraisal itself?

22   A    I'm sorry, I was reading.  What was it?

23   Q    After the meeting with the employee to discuss the

24   performance appraisal, what happened to the performance

25   appraisal itself?

1    A    It would go in the employee file.

2    Q    And that file that you maintained?

3    A    That's correct.  The Greenbrier, yeah.  The actual

4    employee file.

5    Q    Did employees get to keep -- did they receive copies of

6    their performance appraisals?

7    A    Yes.

8         MS. SHIH:  Move for admission of General Counsel's 32.

9         JUDGE LAWS:  And I want to clear up a seeming discrepancy

10   before I admit this regardless of whether or not there's an

11   objection.  At the top of this document on the first page,

12   there's a leader name and title.  It's Marcos -- you can

13   probably help me with the last name.

14        THE WITNESS:  Fonseca.

15        JUDGE LAWS:  Fonseca, and he's a lead man.  You testified

16   that the foreman filled out the leader portion, but in this

17   case it looks like a lead man did, is that accurate?

18        THE WITNESS:  That's accurate.  This employee was a

19   painter and at the time when I was there, there was no foreman

20   painter.  It was a lead man at the time only.  That was the

21   only department that I remember having no foreman, so Marcos

22   Fonseca would act as a foreman for the performance appraisals.

23        JUDGE LAWS:  And he did that for the painters?

24        THE WITNESS: Just the painters.

25        JUDGE LAWS:  And that was the entire time you were there?

1        THE WITNESS:  Yes.

2        JUDGE LAWS:  Any objection?

3        MR. MINER:  Is this a document we produced?

4        MS. SHIH:  It is.  It is from Mr. Amador's personnel file.

5        MR. MINER:  Thank you.  No objection, Your Honor.

6        JUDGE LAWS:  Okay.  It is admitted.

7        **(General Counsel Exhibit 32 received into evidence)**

8    Q    BY MS. SHIH:  How did you track employees attendance

9    points?

10   A    Through the Kronos timekeeping.

11   Q    Can you explain a little bit more how Kronos works?

12   A    Basically at the time of their first day of work they were

13   given a badge, and I would connect the badge to that employee.

14   I would put it in the system, and the employee himself would

15   clock in with this badge that I had given them.  That badge

16   would connect to this Kronos timekeeping that tracked the jobs

17   they were on, you know, their check in and out times.

18   Q    What about actual tracking of attendance points?  Is that

19   something that Kronos was able to keep track of as well?

20   A    That's correct.  It also had an attendance part to it

21   where just say they for instance, they clocked out early for an

22   appointment, that's where the attendance points were being

23   tracked through that, Kronos timekeeping.

24   Q    Let's start first with an explanation of the points

25   system?  Can you describe what the points system was?

1    A    The points systems was a way that Greenbrier kept track of

2    -- it was a policy that they had and if you were -- goodness,

3    do you want me to kind of explain what I remember.

4    Q    As far as the actual points?

5    A    Right, like they got a point if they --

6    Q    If you can.  But first let me ask you, is that, is the

7    attendance policy and the points system as far as like the

8    count, is that something that is contained in the employee

9    handbook?

10   A    Yes.

11   Q    So, what, if you can recall, what was the actual points

12   charge or accumulation system?

13   A    What I remember, it was oh, boy.  What I remember, they

14   did go -- if you called, we'll use this as an example, if you

15   called in and you did not use a paid, a PTO, you would receive

16   one point for calling in.  If you did use a paid, like a

17   vacation day, they call it the PTO, you would receive a half a

18   point.  That's only if you are calling in.  You know, it's not

19   if you had made prior, given prior notice that would not take

20   effect.

21   Q    After how many points were you subject to disciplinary

22   action?

23   A    What I remember, it was after two points, you were given a

24   verbal warning.  After five you were given a written, eight you

25   were given a suspension, and nine you were terminated if you

1   reached those many points.

2   Q    So the actual number of points an employee has at any

3   given time, that's something the Kronos system was able to tell

4   you?

5   A    Yes.

6   Q    How does the information about the number of points an

7   employee is going to receive for a particular absence or a

8   particular tardiness, how does that information get into

9   Kronos?

10  A    By the badge that they're given that either clocks them in

11  late, or doesn't clock them in at all.  The employee themselves

12  are the ones in charge of that, swiping the badge.

13  Q    Right.  Okay, but for example, if an employee is gone one

14  day and does not clock in at all, they could be on approved PTO

15  in which they would get no points, correct?

16  A    Correct.

17  Q    Or they could have called in that day and used PTO, in

18  which case they would get a half a point?

19  A    If they're calling in?

20  Q    Yes.

21  A    Yes.

22  Q    And they could have not -- and they could have called in

23  and not used PTO, in which case they get one point?

24  A    That's correct.

25  Q    And the other option would be they simply didn't call in

1  at all, in which case they would be a no call/no show and they

2  would get --

3  A    Three points.

4  Q    -- three points?  How does Kronos know how many points to

5  give that employee for that one day absence?

6  A    That is where myself or the Plant Manager -- if I knew

7  there was going to be a paid time off that employee needed that

8  day I would go in prior and schedule it on the calendar so that

9  he was not assessed no points.  But if we can go back to him

10 not calling or showing up, I was given the selection to pick

11 whether it was a no call/no show, whether it was -- I would put

12 it in Kronos, and that's how it would keep track.

13 Q    Okay.  So, you were responsible for manually inputting

14 information to Kronos in order for attendance points to be

15 tracked accurately?

16 A    Yes, ma'am.

17 Q    And did you input information as to the actual points

18 itself, or information about the reason for the absence?

19 A    The reason for the absence.

20 Q    So Kronos knows how many points are assigned to each type

21 of absence?

22 A    That's correct.

23 Q    So at any given time, you can go into the Kronos system

24 and access an employee's -- like you can check how many

25 attendance points a particular employee has?

1    A    Yes.

2    Q    And are you able to run reports of the attendance points

3    of all employees at any given time?

4    A    Yes.

5    Q    Through Kronos?

6    A    Yes.

7    Q    Who had the capability other than you to be able to do

8    that in Kronos?

9    A    The foreman had the capability, and the Plant Manager.

10   Q    What about the Production Manager?

11   A    At the time, the Production Manager had it as well.

12   Q    Lead men?

13   A    No lead men.

14   Q    Prior to you being terminated on November 12, 2012, did

15   anyone ask you to run a Kronos attendance report for all of the

16   employees in the Tucson facility?

17   A    No.

18   Q    Prior to you being terminated on November 12, 2012, did

19   anyone ask you to pull the performance appraisals or the

20   personnel files for all of the employees in the Tucson

21   facility?

22   A    No.

23       JUDGE LAWS:  If there is a point where you're going to

24   switch gears, why don't we stand up and take a break.

25       MS. SHIH:  Sure.  I think after this last question, we can

1  certainly do that.

2      JUDGE LAWS:  No hurry.  I just --

3  Q   BY MS. SHIH:  Prior to you being terminated on November

4  12, 2012, did anyone ask you to pull the disciplinary records

5  or the safety records for all of the employees in the Tucson

6  facility?

7  A   No, ma'am.

8  Q   For any of the employees in the Tucson facility?

9  A   No.

10  Q   What about attendance reports or Kronos reports?  Did

11  anyone ask you prior to November 12, 2012, to pull them for any

12  employees in the Tucson facility?

13  A   No.

14  Q   Personnel files or performance reviews, did anyone ask you

15  to pull those for any of the employees in the Tucson facility

16  prior to being terminated on November 12th?

17  A   No.

18      MS. SHIH:  We can take a break.

19      JUDGE LAWS:  Okay.  Why don't we take a stretch break.

20  It's now 10 after.  Let's be back here at 20 after.

21  **(Off the record.)**

22  **(On the record.)**

23  Q   BY MS. SHIH:  Who did you report to when you were the HR

24  Generalist for the Tucson facility?

25  A   To Lisa Maxey.

1    Q    Before she came on, who did you report to?

2    A    Alan Lave.

3    Q    Al Lave?

4    A    Uh-huh.

5    Q    Any time prior to you leaving in November 12, 2012, did

6    anyone have any discussions with you about problems with the

7    attendance points tracking?

8    A    There were some problems.

9    Q    Can you describe what those problems were?

10   A    The problems were -- the foreman probably should have been

11   keeping more of a track on those, and he wasn't -- they weren't

12   at the time.  They weren't real computer -- they didn't have

13   too much computer experience, so they were just not really

14   keeping track of it, so that's where kind of where I came in

15   and started keeping track.  That's what I remember some of the

16   problems were.

17   Q    When did you start keeping track of the attendance points?

18   A    From the very first day that Kronos -- oh, I don't

19   remember, the very first day that we started using it, which

20   wasn't -- we probably had it for a few years.

21   Q    Before you left?

22   A    Right.

23        JUDGE LAWS:  You may want to clarify here because I'm a

24   little confused.  You said the foremen were in charge of

25   inputting for employees working under them, but you were

1  responsible for doing that from the get-go, so I guess I need a

2  little clarification.

3      THE WITNESS:  The foremen were supposed to be doing this,

4  and they couldn't due to not understanding it, so of course, I

5  became just in charge of it, since --

6      JUDGE LAWS:  And when did that transition occurred?

7      THE WITNESS:  That occurred, from the very first day that

8  we got that new program.

9      JUDGE LAWS:  And when was that?

10     THE WITNESS:  That I can't remember.

11     JUDGE LAWS:  Roughly?

12     THE WITNESS:  From 2009.

13  Q    BY MS. SHIH:  Did you rely on information from the foremen

14  in order to accurately track the points, attendance points of

15  employees in Kronos?

16  A    Yes, I did.

17  Q    So if a foreman did not communicate to you and an

18  individual had called in on a day that they were absent, how

19  would you know how many points Kronos should assign that

20  employee?  Did you have a way of knowing?

21  A    I had no way of knowing.

22  Q    At the time you left in November 2012, were foremen

23  expected to go into Kronos and input information as to the

24  reason for employee's absence?

25  A    Yes.

1    Q    And that was for purposes of accurately tracking

2    attendance points?

3    A    That's correct.

4    Q    If that information were not input by either foremen or by

5    you that an employee was absent for a excused reason or

6    something like that, did Kronos default to giving that employee

7    the no call/no show points?

8    A    Yes, it would default.

9    Q    Did anyone perform an audits of the attendance points

10   tracking system during your time as the HR Generalist?

11   A    Yes, Lisa Maxey did.

12   Q    When did she perform an audit of the attendance points

13   system?

14   A    Shortly after she came on board.

15   Q    And you said that was about a year before you left?

16   A    Yes.

17   Q    Were you involved in that audit?

18   A    No.

19   Q    Were you given any information by Lisa Maxey about the

20   results of the audit, or the outcome of the audit?

21   A    She had many questions regarding it.

22   Q    What questions did she have that you remember?

23   A    She wanted to know why so-and-so had so many points and

24   was not terminated or given a verbal or written warning.  And

25   if I remember, there wasn't -- there was some discrepancies due

1    to the fact that maybe a foreman was not communicating with me,

2    so a point would arise and it would cause lots of confusion.

3    Q    Did Kronos automatically notify you when an employee

4    reached a certain number of points that would trigger a

5    disciplinary action?

6    A    Yes.

7    Q    And that was through running a Kronos report?

8    A    Actually, it would go -- I would be notified -- it would

9    go in my e-mail.

10   Q    After Ms. Maxey performed her audit if the attendance

11   points, did anything about the attendance points tracking

12   change?

13   A    The only thing she wanted was to be very involved in

14   everything.  She wanted to be notified when everything -- what

15   was going on, what was happening.  That's when her -- she made

16   the decision she would be the one signing -- everything was to

17   have her signature on it, from performance evals, to

18   attendance, to point tracking, to verbal, written warnings.

19   Q    Did she implement any changes as to how the attendance

20   points were tracked or information was input into Kronos for

21   attendance point tracking?

22   A    No.

23   Q    So after the audit, the attendance points tracking was

24   handled the same way?

25   A    Yes.

1  Q    Foremen will still expected to input information in it?

2  A    That's correct.

3  Q    But you were still responsible for tracking of the points?

4  A    Yes.

5  Q    And you would continue to be notified if an employee

6  reached a certain number of points?

7  A    Yes.

8  Q    Did Ms. Maxey receive notification of those as well?

9  A    I don't remember if she was linked to it as well where she

10 was notified.  I, I can't remember if it would notify her as

11 well.  It would notify myself and I want to say the Plant

12 Manager.

13 Q    Did Ms. Maxey have the ability to go into Kronos and run a

14 report of employees' attendance reports for the Tucson

15 facility?

16 A    Yes.

17 Q    And is that something she would have to do in the Tucson

18 facility, or was she able to do that remotely?

19 A    Remotely.

20 Q    Her office is where?

21 A    The last I -- Portland, Oregon.

22 Q    Were personnel files for the Tucson employees kept

23 electronically?

24 A    No.

25 Q    So if an employee or if an individual wanted to see the

1    performance reviews of a particular production employee in

2    Tucson, were all of those performance reviews kept in hard copy

3    at the Tucson facility?

4    A    Kept in hard copy at the Tucson facility.

5    Q    At the Tucson facility?  Are copies maintained anywhere

6    else that you're aware of?

7    A    Not that I'm aware of.

8    Q    During your time as the HR Generalist for the Tucson

9    facility, was there ever an occasion that the attendance points

10   for all employees were zeroed out?

11   A    Not while I was there.

12   Q    You mentioned that Lisa Maxey raised some concerns or

13   questions about discrepancies with the attendance point system

14   after she performed her audit.  Which employees did she raise

15   questions or concerns about?

16   A    You would like me to state the names of the employees?

17   Q    If you recall?

18   A    I recall one.  Armando Lopez.

19   Q    Do you recall what the concern or question was that she

20   raised about Mr. Lopez?

21   A    I recall him calling her and not being in agreeance -- not

22   agreeing that his attendance points were right and that's when

23   she got with me we tried to figure this out, as well with him

24   too.  He was present.  That's the one employee that kind of

25   stood out that I can remember.

1  Q     Do you remember what the discrepancy was?

2  A     He was a little -- the discrepancy was he'd reached maybe

3  at eight points and after a year those points are supposed to

4  drop off and he was concerned that his points were not being

5  dropped off.

6      JUDGE LAWS:  And just a follow up question, was that

7  discovery part of the audit or did it prompt the audit, or was

8  it after the audit?

9      THE WITNESS:  It prompted the audit, I want to say.

10 Q     BY MS. SHIH:  Anyone other an Armando Lopez that you can

11 recall having specific questions or concerns raised?

12 A     Not that I can recall.

13 Q     As a result of the audit, did Mr. Lopez's points change?

14 Were there any changes made to how many points the system was

15 indicating he had accumulated?

16 A     Sorry.

17 Q     Do you, as a result of the audit, were there any

18 adjustments made to the points that Mr. Lopez had accumulated?

19 A     There was some adjustments made.

20 Q     Do you recall what those adjustments were?

21 A     I don't recall, but I did keep track of everything and it

22 stayed in his employee file.  When I left it was all there, all

23 the adjustments and the signatures, everything was documented

24 in his file.

25 Q     Was it discovered during the audit that any employees who

1    had a high number of attendance points who should have received

2    discipline had not received discipline?

3    A    No.  I can't remember.

4    Q    At the time you were discharged on November 12, 2012,

5    production employees were working overtime, correct?

6    A    Yes.

7    Q    They were working mandatory overtime regularly weren't

8    they?

9    A    That's correct.

10   Q    Was it weekly that they were working mandatory overtime?

11   A    Yes.

12   Q    Who determines whether employees would be required to work

13   mandatory overtime?

14   A    At the time, the Production Manager.

15   Q    That was Freddy Valdez?

16   A    Yes.

17   Q    Just a few weeks prior that you were discharged from

18   Greenbrier, you contacted Intermountain Staffing and asked for

19   additional welders, correct?

20   A    A few weeks before I was discharged?

21   Q    Yes.  In October 2012, do you recall contacting

22   Intermountain Staffing and letting them know that you needed

23   welders?

24   A    I don't remember.  I called them all the time, but I

25   cannot say yes I did, or no I didn't.  I don't remember that.

1    I communicated a lot with them, so I probably did.

2    Q    Can you tell me if you recognize what's been handed to you

3    as General Counsel exhibit 33?

4        **(General Counsel Exhibit 33 marked for identification)**

5    A    Yes, I do recognize it.

6    Q    What is that?

7    A    It's an e-mail between myself and Marissa, Marissa being

8    the staffing manager.

9    Q    At Intermountain Staffing?

10   A    Yes, ma'am.

11   Q    Requesting welder candidates?

12   A    Yes, she's asking me if I'm still looking and I answered

13   yes, I am.

14   Q    And that was as of October 10, 2012?

15   A    Yes.

16   Q    Do you recall how many welder positions you were looking

17   to fill at that time?

18   A    I don't remember.

19       MS. SHIH:  Move for admission of General Counsel exhibit

20   33.

21       MR. MINER:  Is this a document that we produced?

22       MS. SHIH:  No, it was produced to us by Intermountain

23   Staffing.

24       MR. MINER:  Oh, okay.

25       MS. SHIH:  And we'll have verification of the records on

1   after the break.

2       MR. MINER:  May I voir dire the witness briefly, Your

3   Honor?

4       JUDGE LAWS:  Sure.

5                        **VOIR DIRE**

6   Q   BY MR. MINER:  Ms. Madrigal, do you know who Amanda True

7   is?

8   A   No, I don't.

9       MR. MINER:  Subject to an objection over the foundation

10  for a portion of this document -- the witness has identified

11  the e-mail to her from Ms. Almazan and her response, we have no

12  objection.

13      JUDGE LAWS:  Then it is admitted.

14      **(General Counsel Exhibit 33 received into evidence)**

15  Q   BY MS. SHIH:  I were let go as part of a reduction in

16  force at the Tucson facility on November 12, 2012, correct?

17  A   Yes.

18  Q   Were you aware of that reduction prior to November 12,

19  2012?

20  A   No.

21  Q   Anyone ever communicate to you that they intended to lay

22  off production employees in the Tucson facility?

23  A   No.

24  Q   So you weren't involved then obviously, in the decision to

25  lay off production employees at the Tucson facility?

    1    A    No.

    2    Q    During your time as the HR Generalist for the Tucson

    3    facility had there been any prior reductions in force of that

    4    size?

    5    A    Yes.

    6    Q    When?

    7    A    July, I want to say July of 2010.

    8    Q    How many employees were laid off at that time?

    9    A    I don't remember how many we laid off.

   10    Q    Can you approximate?

   11    A    I can approximate -- 20.

   12    Q    At that time, were you involved in that decision to lay

   13    off employees?

   14    A    Yes.

   15    Q    What type of employees were laid off?  Their positions?

   16    A    The laborers.

   17    Q    So were they all production employees?

   18    A    Yes.

   19         JUDGE LAWS:  And when you say laborers, is that specific

   20    type of production employee, or is that an inclusive term?

   21         THE WITNESS:  I'm trying to think of a word.  The welder

   22    repairs are the welders.  I guess maybe your general labor.

   23         JUDGE LAWS:  Did that include welders?

   24         THE WITNESS:  Yes, it did include welders as well.

   25         JUDGE LAWS:  Thank you.

1   Q    BY MS. SHIH:  Did it include painters?

2   A    It included painters.

3   Q    What about switchmen?

4   A    It included switchmen.

5   Q    Ride up employees?

6   A    No ride up.

7   Q    Any office personnel included in that lay off?

8   A    No.

9   Q    What about foremen or lead men?

10  A    No.

11  Q    What was the reason for the layoff in 2010?

12  A    We -- Greenbrier was not receiving enough work for all the

13  employees.

14  Q    Had the work declined prior to the layoff prior to 2010?

15       MR. MINER:  Objection.  Lack of foundation.

16       JUDGE LAWS:  Again, same instruction.  Answer only if you

17  know.

18       THE WITNESS:  Okay.  Could you repeat that?

19  Q    BY MS. SHIH:  I asked if there had been a decline in work

20  at the Tucson facility prior to the July 2010 layoff?

21  A    Yes.

22  Q    What were the reasons for the decline in work?

23       MR. MINER:  Lack of foundation, Your Honor.

24       JUDGE LAWS:  And again, answer only if you know and had

25  direct knowledge.

1       THE WITNESS:  That I don't.  I don't know why.

2   Q   BY MS. SHIH:  Were there any reasons communicated to you

3   as to why there had been a decline in work?

4   A   They had not been communicated to me.

5   Q   Who made the decision in July 2010 to lay off employees?

6   A   The Plant Manager.

7   Q   And that was Lex Morrison at the time?

8   A   Yes, it was.

9   Q   Were you involved in the decision to lay off employees?

10  A   No, I wasn't.

11      JUDGE LAWS:  And I need to jump in and clarify something.

12  You said the Plant Manager decided to lay off employees.  Do

13  you know if he received instruction from anyone else in

14  connection with making that decision?

15      THE WITNESS:  He received instructions from the Greenbrier

16  corporate office.

17      JUDGE LAWS:  How do you know that?

18      THE WITNESS:  He had mentioned it to me.

19  Q   BY MS. SHIH:  Were you involved at all in determining how

20  many employees needed to be laid off in 2010?

21  A   No.

22  Q   Do you know who made that decision?

23  A   Lex Morrison.

24  Q   Were you involved at all in selecting which employees

25  would be laid off in 2010?

1  A    No, I was not.

2  Q    Who made that decision?

3  A    Lex Morrison.

4    JUDGE LAWS:  And again, I need to get some clarification.

5  Do you know whether or not Mr. Morrison received input from any

6  other source regarding how many employees to lay off?

7    THE WITNESS:  I understood it came from the corporate

8  office as well.  He had mentioned he was told.

9    JUDGE LAWS:  And then with regard to the second question,

10  which specific employees to lay off, do you know whether that

11  was completely within his discretion, or whether he consulted

12  with anybody else?

13    THE WITNESS:  I'm sure he consulted with higher, the

14  corporate office?

15    JUDGE LAWS:  Do you know that or are you speculating?

16    THE WITNESS:  No, he told me.

17  Q    BY MS. SHIH:  Did you provide any information to Mr.

18  Morrison or to other corporate management for the purposes of

19  determining which employees would be laid off in 2010?

20  A    I provided an employee roster with their date of hire.

21  Q    Did you provide any other information?

22  A    No.

23  Q    You weren't asked to pull personnel files of employees?

24  A    No.

25  Q    What about Kronos reports or attendance reports?  Did

1  anyone ask you to run reports of time or attendance for

2  employees prior to July 2010?

3  A    No, just the employee roster, from what I remember.

4  Mainly they were looking at the date of hire.

5  Q    Do you know what factors were used to determine which

6  employees would be selected for layoff in 2010?

7  A    No, I don't.

8  Q    You said approximately 20 employees were laid off in July

9  of 2010.  Were any of those employees later recalled or

10  rehired?

11  A    Yes.

12  Q    Do you know how many?

13  A    16 maybe.

14  Q    When were they rehired?

15  A    If I remember, maybe six months later.

16  Q    Six months later?

17  A    Yes, ma'am.

18  Q    What changed between July 2010 when the employees were

19  laid off and six months later when they were rehired that

20  allowed them to be rehired in Tucson?

21  A    Lex Morrison had stated to me that some additional work

22  was coming back to the Tucson shop.

23  Q    Did he tell you anything about where that work was coming

24  from?

25  A    No.

1   Q    If I can go back to a topic that I was talking to you

2   about earlier, just to wrap up a few loose end questions, on

3   the Intermountain Staffing employees, if an Intermountain

4   Staffing -- at the time that you left in November 2012, when an

5   Intermountain Staffing employee is converted to a Greenbrier

6   employee, who determined the pay rate that that employee would

7   be paid by Greenbrier?

8   A    That would be determined by Lex Morrison.

9   Q    And was that true for direct hires as well?

10  A    Yes.

11  Q    Mr. Morrison set the pay rate?

12  A    Yes.

13  Q    Was the rate the same as what Greenbrier had previously

14  been paying Intermountain Staffing for that employee?  Excuse

15  me.  Not what Greenbrier was paying Intermountain Staffing, but

16  what Intermountain Staffing was paying the employee?

17  A    Was it the same?

18  Q    Yes.  When Greenbrier converted temporary employees to

19  permanent employees, or to Greenbrier employees, did those

20  employees maintain the same pay rate that they received when

21  they were employed by Intermountain Staffing?

22  A    Yes.

23  Q    Who set the pay rates for employees as to how much they

24  would be paid by Intermountain Staffing?

25  A    That would be the Plant Manager.

1    Q    Lex Morrison?

2    A    Yes.

3         JUDGE LAWS:  And again with regard to that, do you

4    remember whether he could set it up by employee, or did he get

5    direction from elsewhere, if you know?

6         THE WITNESS:  He would set what he would -- we went off a

7    pay scale and that's how he would go off.

8         JUDGE LAWS:  And do you know who created the pay scale?

9         THE WITNESS:  It came from the corporate office.

10   Q    BY MS. SHIH:  So Intermountain Staffing did not have any

11   involvement in setting the pay rate for employees assigned to

12   work at Greenbrier?

13   A    No.

14   Q    How many employees of Intermountain Staffing were working

15   at Greenbrier at the time you were discharged on November 12th?

16   A    If I can remember, I want to say six.

17   Q    Were they all production employees?

18   A    Yes.

19   Q    When you were the HR Generalist, did you ever use a

20   staffing agency other than production?

21   A    We hired a purchasing lady, office, through the temp

22   agency as well.  Well, she was through -- at the time that I

23   was there, the purchasing lady was through a temp agency.

24   Q    Was that also Intermountain Staffing?

25   A    Yes.

1  Q    Was Marissa Almazan your primary contact at Intermountain

2  Staffing?

3  A    Yes.

4  Q    Did you ever communicate with anyone else at Intermountain

5  Staffing to recruit candidates?

6  A    I used to -- no, she would mainly be -- I used to talk to

7  her staff, but as in actually recruiting, it was Marissa only.

8  Q    You were aware that there was a union organizing campaign

9  at the Tucson facility in 2011, correct?

10  A    Yes.

11      JUDGE LAWS:  And I do want to jump in here.  I'm getting a

12  lot of the questions to this witness and I don't think she's

13  been established as a 611(c) witness.  I tend to like more

14  open-ended questions.  I think it gets better testimony, less

15  directed testimony.

16      MS. SHIH:  Okay.  Sorry, if you can give me just a minute

17  to regroup and see where I was.

18      JUDGE LAWS:  Sure.

19  Q    BY MS. SHIH:  If I could back up and ask you a couple of

20  additional questions about your contacts with Intermountain

21  Staffing.  Do you still have exhibit 33 in front of you, ma'am?

22  A    Yes.

23  Q    Other than welders, do you recall any other positions you

24  were looking to fill in October of 2012?

25  A    I recall it only being welders.

1  Q    I'm handing you what's been marked as General Counsel's

2  exhibit 34.  Do you recognize that?

3      **(General Counsel Exhibit 34 marked for identification)**

4  A    Yes.

5  Q    What is that?

6  A    This is an e-mail between myself and Marissa.

7  Q    Marissa Almazan at Intermountain Staffing?

8  A    Yes.

9  Q    Do you recall whether you were looking to fill a switcher

10  position in October 2012?

11  A    Yes, now I do.

12  Q    Do you recall when you started looking for someone to fill

13  that position?

14  A    I don't.  I am going to say October 9th that it states in

15  here.

16  Q    How many switcher positions were you trying to fill at

17  that time?

18  A    I want to say one switcher.

19  Q    I've handed you two separate documents, one has been

20  marked as General Counsel exhibit 35 and the other 36.

21      **(General Counsel Exhibit 35 and Counsel Exhibit 36 marked**

22  **for identification)**

23  Q    BY MS. SHIH:  Let's start with 35.  Do you recognize that

24  e-mail?

25  A    Yes.

1   Q    Who is it from?

2   A    Valentin from Intermountain Staffing?

3   Q    Is that a woman or --

4   A    It's a man.

5   Q    A man?  Do know what his position is, or what's his

6   position at Intermountain Staffing at the time you had this

7   communication?

8   A    He was one of their -- he was an office -- an office clerk

9   or staffing assistant or I'm not sure what he went by, but I

10  would speak with him.

11  Q    And exhibit 36, can you identify what that is?

12  A    That is also an e-mail between myself and Valentin from

13  Intermountain.

14  Q    As of Friday, November 2, 2012, the date of the second

15  e-mail in 36, were you still looking for candidates to fill

16  welder positions?

17  A    Yes.

18  Q    Do you recall whether you filled that position before you

19  left on November 12, 2012?

20  A    I don't remember if I filled it.

21  Q    Do remember whether you filled a switcher position or

22  switchman position before you left on November 12, 2012?

23  A    I can't remember if I filled that.

24       MS. SHIH:  Move for admission of General Counsel exhibits

25  34, 35 and 36.

 1      JUDGE LAWS:  Any objection subject us not really knowing

 2  who Amanda True is?

 3      MR. MINER:  No, other than that, Your Honor, no objection.

 4  Thank you.

 5      JUDGE LAWS:  Okay.  They're received.

 6      **(General Counsel Exhibits 34, 35 and 36 are received into**

 7  **evidence)**

 8  Q    BY MS. SHIH:  When you were the HR Generalist, and

 9  specifically in 2011, during the time of the union organizing

10  campaign that went on at the Greenbrier facility.  Did you sign

11  disciplinary notices that were issued to employees?

12  A    Yes, I did.

13  Q    Were you present for any meetings were disciplinary

14  actions were issued to employees?

15  A    Yes.  I was.

16  Q    Do you remember employees receiving discipline in 2011 for

17  soliciting about union matters during work time?

18  A    Yes, I do.

19  Q    Tell me what you remember about that incident?

20  A    What I remember -- what I remember we were -- we got

21  called into Lex Morrison's office with one particular employee

22  by the name of Rogelio Martinez.

23  Q    And when you say we, who is that?

24  A    It's myself, Lex Morrison.  I'm trying to remember who the

25  foreman was of that particular area.  I can't remember the name

1   of the foreman of the truck shop where Rogelio Martinez was

2   working.

3   Q    So Mr. Martinez was present?

4   A    Yes.

5   Q    And his foreman at the time?

6   A    Yes, I just can't remember what the name is.

7   Q    Anyone else present?

8   A    The Production -- Freddy Valdez.

9   Q    And what happened when you went into Mr. Morrison's

10  office?

11  A    They were -- the problem was they were stating that he was

12  continuing to solicitate union information on company time and

13  that's what's the discussion was, that he should not be doing

14  it on company time.

15  Q    And when you say solicit, was there a specific discussion

16  about what he was doing?

17  A    He was -- he was -- I'm trying to find the right word

18  because that's what they said.  Pressuring other employees to

19  sign on this card, some kind of card that they had.

20  Q    Was there any discussion of how they knew that he was

21  pressuring employees or did someone report that he was

22  pressuring them?  What else was said during this meeting?

23  A    Three of the employees in that particular area stated that

24  he was being really pushy about you know, three reported him.

25  Three employees reported him to the management that he was

1  pushing this card on them during work hours.

2  Q    Which employees reported that?

3  A    Gaston Ortiz.

4  Q    Can you repeat that?

5  A    Gaston Ortiz.  Oh, my goodness, what are those two other

6  names?  Rudy Pearson.  There's one more, but I can't -- I don't

7  remember his name.

8  Q    And who did they report to?  Their complaints?

9  A    They reported their complaints to Freddy Valdez.

10  Q    So was Freddy Valdez the one who relayed the information

11  during that meeting?

12  A    Yes.

13  Q    What do you remember Mr. Valdez saying about the incident?

14  A    I remember Mr. Valdez taking that information to Lex

15  Morrison and we all went in the office, myself, Lex, Freddy,

16  and Rogelio, and Lex was the one to take the lead in stating

17  you know, we were here to do our work and you can do that on

18  your own time or whatever, but we were here to work.

19  Q    I'm handing you what's been marked as General Counsel

20  exhibit 37.

21      **(General Counsel Exhibit 37 marked for identification)**

22  Q    BY MS. SHIH:  Can you identify that document?

23  A    Yes.

24  Q    What is it?

25  A    It is a disciplinary action.

1    Q    Issued to Rogelio Martinez?

2    A    Yes.

3    Q    And is that your signature at the bottom next to Human

4    Resources?

5    A    Yes.

6    Q    Was this action issued to Mr. Martinez in that meeting

7    that you described?

8    A    Yes.

9    Q    What else was discussed during this meeting?

10   A    The only thing that was discussed was how he should be

11   working and not pressuring other employees, you know,

12   discussing this issue.  Being in his work area.

13   Q    What, if anything, did Mr. Martinez say in response?

14   A    Mr. Martinez had stated that he was not doing that.  He

15   just said, "I'm not aware that I'm doing that."  He denied it.

16   Q    Are you aware of any other employees receiving

17   disciplinary action for soliciting about union membership

18   during work time?

19   A    I'm aware of a few others that received --

20   Q    Who else received disciplinary action for soliciting about

21   union matters during work time?

22   A    I've got to remember -- Armando Lopez is one of them.  I

23   want to say there was two more, I just can't recall their names

24   right now.

25   Q    Were you present when Mr. Lopez received disciplinary

1   action for soliciting about union matters?

2   A    Yes, I was.

3   Q    Was this also in 2011?

4   A    Yes.

5   Q    What took place during that meeting?

6   A    What took place in that meeting was once again soliciting

7   on company time, should be working and not handing out

8   information or pressuring other employees.

9   Q    Who was present at that meeting?

10  A    Myself, Lex Morrison, Freddy Valdez and Armando Lopez.

11  Q    What was Mr. Lopez's position at that time?

12  A    At that time he was a welder repairman.

13  Q    Was there any foremen or lead men present in that

14  disciplinary meeting?

15  A    Yes, there was, I just -- I can't remember who was the

16  foreman at that time.

17  Q    And what was his response when told that he was being

18  disciplined about soliciting about union matters?

19  A    He actually didn't say -- did not deny anything, just

20  signed and agreed, but he did not have anything to say, no I

21  wasn't or yes, I was.

22  Q    Are you aware of any employees that have been disciplined

23  for soliciting on work time about anything other than union

24  matters?

25  A    No.

1    JUDGE LAWS:  And before counsel asks another question, if

2    you could turn back to exhibit 37.  You mentioned you're

3    bilingual.  Can you read what is written at the bottom of that

4    page, it's handwritten in Spanish.

5    THE WITNESS:  He's saying he is not aware because --

6    JUDGE LAWS:  Read it verbatim, please.

7    THE WITNESS:  I'm sorry?

8    JUDGE LAWS:  Read it verbatim, please?

9    THE WITNESS:  In Spanish?

10   JUDGE LAWS:  Yes.

11   THE WITNESS:  No stoy --

12   JUDGE LAWS:  No, in English.  Translate it word-for-word.

13   THE WITNESS:  Okay.  "I am not aware why they are accusing

14   of something that we have no proof."

15   JUDGE LAWS:  Thank you.

16   MS. SHIH:  And Your Honor, for purposes of the record,

17   we'll ask the interpreter to provide a translation of that for

18   official purposes.

19   JUDGE LAWS:  Okay.  And there's another one too.  Exhibit

20   8.

21   MS. SHIH:  Your Honor, may we have five minutes.  I

22   understand that there is a witness here and there is some

23   confusion of whether he needs to go or should stay?

24   JUDGE LAWS:  Okay.  Why don't we go ahead and take five

25   minutes, stretch.

1    **(Off the record.)**

2    **(On the record.)**

3    Q    BY MS. SHIH:  During 2012, prior to your discharge in

4    November, were you present for any meetings in Tucson where

5    union activity was discussed?

6    A    Yes.

7    Q    How many meetings?

8    A    Oh, I apologize.  You stated 2012, correct?

9    Q    2012.

10   A    I apologize.  No.  '11 yes, 2012, no.

11   Q    How many meetings did you attend in 2011 where union

12   activity was discussed?

13   A    I was in maybe four meetings.  When you ask me that are

14   you meaning like with employees or management?

15   Q    Both.

16   A    Oh, I was in a few meetings.  Four or five meetings that

17   it was discussed -- union talk was, what we were discussing.

18   Q    And that's in 2011?

19   A    Yes.

20   Q    How many of those meetings were just management?

21   A    Two.

22   Q    And who conducted those meetings?

23   A    Al Lave.

24   Q    When did those take place?

25   A    Oh, my goodness.  August, September of 2011.

1  Q    Before the election for the United Transportation Union?

2  A    Yes.

3  Q    What was -- let's start with the first of the two

4  meetings.  That one was in August of 2011?

5  Q    Uh-huh.

6  Q    What was discussed in that meeting?

7  A    We, we were -- what was discussed was just kind of

8  educating us of what was happening, what takes part -- what

9  happens when a union wants to come in.

10  Q    Other than you and Mr. Lave, who else was present at that

11  meeting?

12  A    The lead men, all the lead men and the foremen, Lex

13  Morrison.  Anyone that had a supervisor type --

14  Q    So the Production Manager?

15  A    Production Manager.

16  Q    Safety Manager?

17  A    Safety.

18  Q    Materials Manager?

19  A    Yes.

20  Q    What do you remember Mr. Lave saying?

21  A    Just once again explaining what happens, you know, what

22  happens during -- none of us knew what was really going on and

23  just pretty much just talking about what was taking place.

24  Q    What do you remember him saying about what happens with

25  the process?

1   A     Let me see.  It's been a while, so it takes just a minute

2   to kind of remember.  I can't remember.  I remember once -- I

3   do remember him telling of a story in his past of a furniture

4   shop.  That's what I can somewhat remember of his past

5   experience dealing with the union, that's what I remember.  But

6   not -- oh, I -- what us as managers could and could not do when

7   a union was trying to come in, that's what we --

8   Q    Do you remember any of the items that you were told that

9   you could not do?

10  A     We could not -- we could only hear what -- a lot of

11  employees at Greenbrier wanted to share a lot of things with

12  us, myself, Freddy, Lex, different supervisors, and one of the

13  things, we could just, we could hear them, we couldn't you

14  know, give our personal opinion or anything.  We could just

15  hear what the employee wanted to share with us.

16  Q    Do you remember being told that you should watch for any

17  union activity going on in the workplace?

18  A     I remember -- I should -- I guess if I was -- just say I'm

19  in the lunch room and they want to talk about it -- again, it's

20  their lunch, so they could talk whatever they want at their

21  lunch, but it's working hours and I see somebody stopping and I

22  actually have knowledge of what it is, yes, I remember that I

23  was -- God, that -- now I've confused myself.  I just remember

24  hearing a lot of it but not having much to say back to anybody.

25  Q    Do you remember being told that if you saw any union

1    fliers or union cards in the workplace to pick those up?

2    A    We were to pick them up and just put them on Lex

3    Morrison's desk.

4    Q    Do you remember any discussion about the election that was

5    coming up in 2011?

6    A    I remember they were just mentioning that an election was

7    coming to Greenbrier.

8    Q    You testified earlier that you did not attend any meetings

9    in 2012 where union activity was discussed.  I think that's

10   before I clarified that I was referring to both meetings only

11   among management or meetings with employees.  So with that in

12   mind, do you remember attending any meetings in 2012 just among

13   management where union activity was discussed?

14   A    No, I don't remember.

15   Q    You weren't present at a meeting on October 31st that Al

16   Lave conducted?

17   A    What year?

18   Q    I'm sorry, 2012.

19   A    I can't remember.  It was right.  I don't remember.

20   Q    Do you remember any discussions with Al Lave about the one

21   year election bar having expired?

22   A    Me, myself speaking with Al about that?

23   Q    Or in any meetings where Al Lave discussed that or raised

24   that issue?

25   A    We had discussed that prior.  We had become educated in

1   2011 that it would -- that once this election took place you

2   know, we -- life could go on and there'd be no union talk for a

3   year.  That's what we were aware of.

4   Q    Do you remember any discussions after the one year was up

5   with Al Lave about the fact that the union may begin organizing

6   again?

7   A    Yes, now -- Yes, I do remember there was a little -- there

8   was talk about it again.

9   Q    And was that talk that took place in a meeting?

10  A    I remember -- no, not in a meeting.  I remember it just

11  being brought to my attention by some of the employees.  And in

12  fact I recall that same day that I was let go, I was waiting

13  for Lex Morrison to come back from a meeting to tell him that

14  there was more talk of union, but of course, that day we were

15  all let go.

16  Q    You were trying -- you were going to tell Lex Morrison on

17  November 12th --

18  A    Yes.

19  Q    -- that you had heard talk about the union?

20  A    Correct.

21  Q    What had you heard?

22  A    That they were, that some employees were being persistent

23  about it again.

24  Q    Who did you hear that from?

25  A    I heard that from Keith Tarpley.

1    MR. MINER:  I'm sorry?

2    JUDGE LAWS:  Did you hear the name?

3    THE WITNESS:  Keith Tarpley.

4  Q    BY MS. SHIH:  Who is he?

5  A    He is, he was a material manager.

6  Q    And what did Keith tell you?

7  A    That they were talking about the guys talking about the

8  union coming back.

9  Q    Did he tell you which employees were talking about the

10  union?

11  A    No.  He just stated, you know, how they do, "Oh, word is

12  that the union is coming back."  And I had heard that also from

13  Julio Vasquez.

14  Q    Let me back up to Keith for just a minute.  When did Keith

15  tell you that he had heard the union was back?

16  A    I was let go on the 12th -- the week prior to me being let,

17  me being released.

18  Q    And Julio Vasquez, what did he tell you?

19  A    That a lot of -- that a lot of the employees were saying

20  that the union was trying to come back.

21  Q    Did he say which employees?

22  A    No, he didn't state who.

23  Q    When did Julio tell you this?

24  A    The same week as well, prior to me -- November 12th.

25  Q    Did you hear anything else before you were terminated on

1    November 12th, about the union coming back or employees trying

2    to organize again?

3    A    No, just that -- that's how they -- that they were trying

4    to organize again.  Yeah, that's how I heard.  Monday I was

5    waiting to talk to Lex to see if he felt he needed to -- you

6    know, if he should reach out to Al Lave again.  Of course, I

7    was released, so that didn't happen, more was ever said.

8        JUDGE LAWS:  I want to follow up on that.  You had stated

9    you were about to let Mr. Morrison what you had heard.  Was

10   that by his instruction because you felt, or was that just

11   because you felt it was the right thing to do given your job

12   responsibilities, or was it for some other reason?

13       THE WITNESS:  No.  I felt it was the right thing, because

14   I was hearing about it, and since I was being aware of

15   something -- they had been making me aware of something, I

16   wanted to let the management know, "This is what I've heard,

17   you decide where you want to go with it."

18       JUDGE LAWS:  Thank you.

19   Q    BY MS. SHIH:  Aside from Keith and Julio, you didn't hear

20   from any other manager that they had been hearing about

21   employees trying to organize?

22   A    No.

23   Q    Did you hear anything about union organizing directly from

24   any employee?

25   A    No.

1  Q    Did you see any employees engaged in union activity?

2  A    No.

3       MS. SHIH:  I don't have any further questions at this

4  time.

5       JUDGE LAWS:  Did you want to examine this witness at this

6  point?

7       MR. MINER:  Perhaps, Your Honor.  First, may I ask whether

8  there is an affidavit for this witness?

9       MS. SHIH:  There is not.

10      MR. MINER:  Could we take about a 10 minute break?

11      JUDGE LAWS:   Yes, we seem to be chugging right along.

12 How long do you think it will be for the next witness?  The

13 witness who is waiting outside needs to testify today, so we

14 just need to make sure we can get him in and finish by 1:00 or

15 so.  Do you think --

16      MR. MINER:  That seems doable.

17      JUDGE LAWS:  Okay.

18      MR. MINER:  Thank you.

19 **(Off the record.)**

20 **(On the record.)**

21      JUDGE LAWS:  You may begin your cross when you are ready.

22      MR. MINER:  Thank you, Your Honor.

23                    **CROSS-EXAMINATION**

24 Q    BY MR. MINER:  Good morning, Ms. Madrigal.  My name is

25 Fred Miner.  I'm an attorney for Greenbrier.  I'm going to ask

1    you a few questions, all right?

2    A    Okay.

3    Q    Great.  If you can't hear me, please let me know that.

4        JUDGE LAWS:  And actually before you even get going, did

5    you intend to have this witness testify about a meeting that

6    wasn't covered in cross in your case and chief?

7        MR. MINER:  No, I do not, Your Honor.  All of my questions

8    will be based upon or within the scope of the direct.

9        JUDGE LAWS:  Okay.

10   Q    BY MR. MINER:  All right, so I want to follow up on a few

11   questions that were a little unclear to me --

12   A    Okay.

13   Q    -- during your testimony.  All right?  I want to start

14   with some of your descriptions of your job duties as a Human

15   Resources Generalist.  One of the subjects that you talked

16   about was conducting new hire orientations.  Do you recall

17   that?

18   A    Yes

19   Q    With respect to new hire orientations, typically were your

20   orientation meetings with individual new hires or in groups of

21   new hires?

22   A    They were in groups.

23   Q    Okay.  Did you conduct them on a regularly scheduled basis

24   or as the need arose?

25   A    On a regular basis.

1    Q    Approximately how often?

2    A    They were conducted usually on a Monday, and they were

3    probably -- if we were hiring, about once a month.

4    Q    About once a month?

5    A    Yes.

6    Q    All right.  And during some of these meetings, was there a

7    combination of new direct hires and individuals who had been

8    referred or sent over by Intermountain as well?

9    A    Yes, sir.

10   Q    Okay.  And did you provide any explanation to the

11   employees during the orientation about the difference between

12   the direct hire employees and the Intermountain referrals?

13   A    Yes, I did.

14   Q    For instance?  Can you explain that to us?

15   A    For instance, one of them was I would explain as a

16   Greenbrier employee after six months you got a performance

17   evaluation.  As a staffing employee, you had to become a

18   Greenbrier employee before, so you know, there was a little

19   difference.  That was one that I stated.  Of course, the

20   holiday pay, you know --

21   Q    What's the difference as between direct hires and

22   Intermountain employees in terms of their eligibility for

23   holiday pay?

24   A    Direct hire with Greenbrier you qualify for holiday the

25   first day of employment, and as a temp, or I mean an

1  Intermountain employee, you didn't.  We couldn't pay you

2  holiday pay.  Greenbrier could not pay.

3  Q    How about on the subject of vacations?

4  A    That you did qualify -- being an Intermountain employee,

5  you didn't start accumulating vacation as if you were a

6  Greenbrier employee.

7  Q    How about medical benefits?

8  A    Medical benefits as well.  You had to be with Greenbrier

9  three months and Intermountain -- they might offer it at her --

10  I think she offered it but we didn't offer it as a Greenbrier -

11  - coming on our property to work for an Intermountain employee.

12  Q    How about other kinds of benefits like 401k savings plan?

13  A    The 401k savings plan, as well you had to be a Greenbrier

14  employee.

15  Q    Did you explain that during these orientation meetings?

16  A    Yes, I did.

17  Q    All right.  Did you get any questions about that from

18  Intermountain employees?

19  A    Mainly they wanted -- the Intermountain employees just

20  wanted to know how soon they could get on Greenbrier because of

21  the benefits, you know?

22  Q    So what did you tell them about how soon they could work

23  for --

24  A    I basically said you know, that really goes on your

25  performance and your foreman and be here and do a good job.

1   Q      You covered that during your orientation as well?

2   A      Yes.

3   Q      Do you know whether Intermountain provides medical

4   benefits for its employees?

5   A      I recall her telling me she offered it their employees.

6   Q      Do you know anything about the plan?

7   A      No, sir.

8   Q      How about a 401k Plan?  Do you know whether Intermountain

9   offers that benefit?

10  A      That one, I do not.

11  Q      Do you know whether Intermountain offers paid holidays or

12  accruing any time off such as vacation?

13  A      I don't know if they offer that.

14  Q      Do you know how Intermountain calculates payroll for its

15  employees who were assigned to Greenbrier's Tucson facility?

16  A      No, I do not know how Intermountain calculates.

17  Q      Were you involved in any discussions with the Plant

18  Manager or others about the appropriate wage rate that the

19  Intermountain employees ought to be earning while they are

20  stationed or assigned at the Tucson shop?

21  A      I was in -- I was involved for instance Marissa at the

22  temp agency would say, "So-and-so has so much experience.  Is

23  there any way Lex would be willing to give him $14 instead of

24  $13," and as well, Lex took a lot of that if you had

25  experience, he certainly would give that consideration at maybe

1    starting them at a little higher than the $13 welder wage that

2    Greenbrier brought them in.

3    Q    And this was for Intermountain employees?

4    A    This was for -- No.  I apologize, it was for Greenbrier.

5    Q    For Greenbrier direct hires?

6    A    Right.

7    Q    Do you know how Intermountain set the wage rate for its

8    employees?

9    A    No, I do not know how she --

10        JUDGE LAWS:  I want to clarify.  You're referring to

11   "she".  Is that always going to be Marissa?

12        THE WITNESS:  Marissa.  Yes.

13   Q    BY MR. MINER:  All right.  I think I lost my train of

14   thought.  Do you know whether the hourly rate that

15   Intermountain paid its employees who were assigned at the

16   Tucson shop was more or less than rate that Greenbrier paid its

17   own employees?

18   A    I want to say it's the same.

19   Q    Do you know that?

20   A    I don't.  So I better not say that, no.  I do not know.

21   Q    Do you know how Greenbrier charged -- strike that.  Do you

22   know how Intermountain charged or invoiced Greenbrier for the

23   cost of utilizing its employees at the Tucson shop?

24   A    Yes, I do.

25   Q    How did that occur?  How did they go about charging

1  Greenbrier?

2  A    I'm just trying to remember how much -- how they went

3  about -- we paid -- If I recall right, Greenbrier paid

4  Intermountain maybe like $15 an hour instead of -- you know, we

5  would pay them $13, and Intermountain would charge us more or

6  less like $2 an hour more for welders.

7  Q    I thought you testified you weren't sure how much

8  Intermountain paid its employees?

9  A    Oh, no.  I know what they pay, but I'm talking about the

10  billing of Greenbrier.  I would see when Intermountain would

11  send the bills to Greenbrier.  I might have misunderstood you

12  there.

13  Q    Okay.  What do you see when you're looking at

14  Intermountain's invoice?

15  A    I'm seeing the hourly rate.

16  Q    The hourly rate for the employee?

17  A    For the employee as well as what they charge to

18  Greenbrier.

19  Q    I see.  And what did they charge Greenbrier?

20  A    If I recall, they charged them $15 an hour.  I'm guessing.

21  I saw many bills, many years, but I can't remember exactly.

22  Q    Did they charge the employee's hourly wage rate, but some

23  additional fee for Intermountain service?

24  A    We were paid and additional -- Greenbrier paid an

25  additional fee if the employee worked overtime, and

1    Intermountain employee worked overtime.

2    Q    Okay.  I don't want to get into overtime yet.

3    A    Okay.

4    Q    And I don't want to talk about conversion fees yet either.

5    A    Okay.

6    Q    Okay?  I just want to talk about that first invoice that

7    you get for that brand new referral who comes over and starts

8    working.  You get the invoice, you see some amount that

9    Intermountain is charging Greenbrier for the service of this

10   employee, what is listed on the invoice?  What information?

11   A    The employee's name, the hourly rate and the hourly rate

12   that Intermountain is charging Greenbrier.

13   Q    All right.  Do you know how the hourly rate that

14   Intermountain charges Greenbrier is determined?

15   A    No, I don't.

16   Q    Was it -- do you know whether it was negotiated with the

17   plant management?

18   A    Yes, it was on their contract.

19   Q    So that is something that would be in the agreement

20   between Greenbrier and Intermountain?

21   A    Yes, sir.

22   Q    The hourly amount of the charge for utilizing an employee?

23   A    Yes, sir.

24   Q    Plus the hourly wage rate that Intermountain is paying to

25   the employee?

1    A    That's correct.

2    Q    Okay.  Any other charges, just for the regular straight

3    time rate that the employee is working?

4    A    No, sir.

5    Q    Okay.  So how about for overtime?  How does Intermountain,

6    how did Intermountain invoice Greenbrier for the cost of the

7    overtime premium?

8    A    Greenbrier paid time and a half for a 40 hour and if the

9    employee, an Intermountain employee worked more than 40 hours,

10   had overtime, we paid an additional fee, though I don't

11   remember what they were charged.  It's been almost a year since

12   I've seen one of those bills.

13   Q    Fair enough.  Now with respect to those Intermountain

14   employees who after 90 days are selected to become Greenbrier

15   employees, is there any additional fee charged by Intermountain

16   at that time?

17   A    No, sir.

18   Q    Okay.  Any other fees that you recall in the agreement

19   between Greenbrier and Intermountain?

20   A    No, that I recall.

21   Q    Okay.  So coming back to the orientation meetings, you've

22   testified you spoke with employees about the difference between

23   Greenbrier direct hires and Intermountain employees from the

24   standpoint of things like holiday pay, vacations and medical

25   benefits, and 401ks, and so on.  Correct?

1    A    Yes, sir.

2    Q    Did you talk with them about how the employee handbook

3    would apply to them as Greenbrier versus Intermountain

4    employees?

5    A    Yes.

6    Q    What did you explain to them?

7    A    We basically, we went through the handbook, and I picked

8    out the benefits subject, the holiday's the paid time off, and

9    of course the 401k and I just explained, you know, the

10    difference, how yes, you are a Greenbrier employee, yes, you

11    are an Intermountain employee and once you become a Greenbrier

12    employee.  I just specifically focused on letting them know the

13    difference so that there was no confusion.  No, "Maggie said I

14    qualified for this."

15    Q    All right.  Well, did you explain to the Intermountain

16    employees the sorts of criteria that would be used to evaluate

17    them for becoming Greenbrier employees?

18    A    Oh, yes.  I would explain like how to become a Green-, you

19    know, what we expected of them.  Like is that how you --

20    Q    Yes.

21    A    Yeah.  Yeah, oh yes, I would explain you know, what we

22    expected of them, and how they could become a Greenbrier

23    employee.

24    Q    What did you tell them?

25    A    Once again, I said be here every day, learn as much as you

1    can, safety.  Oh, I spent lots of time on work comp, you know,

2    if you have an accident you report it immediately.  Of course,

3    if you were an Intermountain employee, you took it to your

4    staffing; if you were a Greenbrier, we take care of you.  I

5    basically focused on how to keep, how to become -- how to have

6    the Intermountains become a Greenbrier employee.

7    Q    Okay.  Now, changing gears just a little bit, describe

8    this work environment at the Tucson shop for us if you will?

9    What sort of working environment is this for welder repairmen,

10   for instance?

11   A    It's a hot, dirty, undertrained -- you come out -- you

12   come in at one point and you come out black.  I just explained

13   how it was, you know, it was very hard work for a welder

14   repairman.  But you know, that's how I would explain it to

15   them, it was you know, hot, it was hard, it was -- but you

16   know, they did a good job.

17   Q    Did you talk to the employees about the hazards --

18   A    Oh, definitely.

19   Q    -- that exist in this kind of workplace?

20   A    Most definitely.

21   Q    What did you tell them?

22   A    I just explained how you know, it was very dangerous being

23   under -- you know, I made sure for instance as they're trained

24   up to make sure all the safety precautions are there because we

25   wouldn't want to see nobody not leave there.  I -- that's where

1  I said, but then Julio Vasquez concentrated more on the safety

2  and all that had to do with being safe there.

3  Q    And Mr. Vasquez, how long did his safety presentation

4  last?

5  A    He usually, between him and myself, we did about four

6  hours apiece.

7  Q    Four hours apiece?

8  A    Yes.

9  Q    A full day of orientation?

10  A    A full day of orientation.

11  Q    And with respect to the safety program, all employees,

12  including the Intermountain referrals all participated in the

13  same program?

14  A    Yes.

15  Q    Is that because they're all exposed to the same hazards?

16  A    That's correct.

17  Q    They're all subject to the same safety protocols?

18  A    Yes.

19  Q    They're all expected to comply with the same safety rules?

20  A    Yes.

21  Q    Okay.  After the eight hour orientation program, is there

22  any additional orientation that you provided to the employees

23  or the Intermountain individuals?

24  A    No, sir, just the new hire -- just basically what we've

25  gone over is all I would provide.

1   Q     Okay.  You also testified that it was your responsibility

2   to enter information into the company's computer system for new

3   hires?

4   A     Yes, sir.

5   Q     That means direct new hires, correct?

6   A     Direct new hires.

7   Q     You insert information about their I-9 for instance?

8   A     Yes.

9   Q     And their W4s?

10  A     Yes.

11  Q     Any other information that you recall?

12  A     Their personal history -- you know, their address, their

13  emergency contact, their hourly, their position.

14  Q     Hourly rate?

15  A     Yes.  Hourly rate.  I'm trying to think of the screens

16  that we're going through.  I think that's all I would --

17  Q     Did you enter all that same information for the

18  Intermountain referrals?

19  A     No, I did not enter all that information.

20  Q     You testified about the Kronos system?

21  A     Yes.

22  Q     Is that a computer-based system?

23  A     Yes.

24  Q     It's an electronic application, correct?

25  A     That's correct.

1   Q    And it collects information from time clocks in the plant?

2   A    Yes.

3   Q    And how do you access that information?  How did you

4   access the information?

5   A    I had my user I.D., and I would, that was part of my job

6   duties to get on there -- it was a big part of my work.

7   Q    And so you would access that with your computer, correct?

8   A    Yes, correct.

9   Q    And others could as well, correct?

10  A    A very few.  Yeah, very few of us.

11  Q    For instance, the Plant Manager?

12  A    Yes, Plant Manager had the access.

13  Q    And I think you testified Lisa Maxey could access it?

14  A    Yes.  Lisa Maxey.

15  Q    All the way in Oregon?

16  A    Yes.

17  Q    Now you also testified that there are some records kept in

18  hard copy?

19  A    That's correct.

20  Q    In personnel files?

21  A    Yes.

22  Q    Such as application forms, correct?

23  A    That's right.

24  Q    And you're responsible for putting all those records into

25  the personnel files, correct?

1   A    Right.

2   Q    And where did the files go?

3   A    The files were in the file cabinet in that same HR office.

4   Q    Was it a locked file cabinet?

5   A    Yes.

6   Q    And who had the key?

7   A    Myself and Lex Morrison.

8   Q    After you terminated on November 12, 2012, who had that

9   key?

10  A    I gave the key to Lisa Maxey.

11  Q    Were the personnel file still in that cabinet?

12  A    Yes.

13  Q    They were still in that office, correct?

14  A    Yes, sir.

15  Q    You didn't remove any files before you left?

16  A    No, sir.

17  Q    Thank you.  You also testified you participated in some

18  interviews with candidates for employment, correct?

19  A    That's correct.

20  Q    As well as interviews with candidates referred by

21  Intermountain?

22  A    Yes.

23  Q    Did you ask questions during the interviews?

24  A    I did.

25  Q    Did you have a list of questions to read from?

1   A    Yes, I used this list that I would ask -- you know, like a

2   format that I would ask questions.

3   Q    Who provided the list to you?

4   A    Lisa Maxey.

5   Q    Were there any blanks on the list where you could indicate

6   responses that were provided to you?

7   A    There were blanks I could put them on there.

8   Q    Did you take notes during these interview meetings?

9   A    I took many notes, yes.

10  Q    Who did you provide your notes to?

11  A    They stayed in my -- they just stayed in a notebook that I

12  kept as well as I left there when I left.  Everything stayed

13  there.

14  Q    Did you provide your notes or your notebook to the Plant

15  Manager?

16  A    Always.

17  Q    Always?

18  A    Uh-huh.

19  Q    You want him to know what you're thinking about the

20  candidates.

21  A    I talked a lot with the Plant Manager on the candidates.

22  Q    Did you make recommendations to the Plant Manager about

23  whether he ought to make an offer to particular individuals?

24  A    Yeah, I would make some recommendations.

25  Q    Did he follow your advice?

1  A    At times.  I tried not to let -- I let him pick.  But I

2  would just say, "I found this out about -- you know, and he's

3  worked for this company for numerous years," you kind of like

4  that when they're with a company for a long time.  But Lex was

5  the main person who agreed on who would be hired.

6  Q    All right.  And same questions with respect to these

7  disciplinary meetings with employees.  You testified you

8  participated in some disciplinary meetings, correct?

9  A    Yes.

10  Q    Did you take notes during those meetings?

11  A    Yes.

12  Q    Did you typically ask any questions during the meetings?

13  A    Yes, I would ask questions.

14  Q    Okay.  Did you ask questions from a list or a set of

15  material provided to you beforehand?

16  A    Basically a set of material that was provided beforehand.

17  Q    What kind of material?

18  A    The who, what, why, how.

19  Q    Is there a document that says who, what, why, how on it?

20  A    There was at the time I was there.

21  Q    Is that what you took into the meeting?

22  A    I would take it with me.

23  Q    And other than who, what, why and how, what else did it

24  say?

25  A    I think that's all I would have on the -- if I recall,

1   that's all I'd have.  Where, when.  You know, that one as well,

2   Q    Did you fill in the blanks on the page after who, what,

3   why and how?

4   A    I would fill it on my -- I would keep it on my notes that

5   I kept to myself.

6   Q    What did you do with those notes after the meeting?

7   A    Those notes stayed in the desk when I left.

8   Q    Okay.  Did you share them with the Plant Manager?

9   A    Not -- those ones?  Yes, I did share those.  The only ones

10  I didn't share were performance eval --

11  Q    I'm sorry --

12  A    I mean, I'm sorry, not performance -- what was -- no, you

13  know what, I shared just about everything with Lex, now that I

14  recall.

15  Q    Why did you share your notes with Lex?

16  A    He was the Plant Manager and I just wanted him and me to

17  always be on the -- you know, what I thought.  Just had that

18  working relationship with him.  I talked to him a lot.

19  Q    These disciplinary meetings, were these meetings where the

20  need for discipline was being investigated, or were they

21  meetings where discipline was being communicated to employees,

22  or was it both?

23  A    Communicated to employees.

24  Q    Okay.  So you took notes about what occurred when the

25  employee was informed of the discipline?

1   A     Yes.

2   Q     Did Lex ever ask you for your recommendation about whether

3   discipline should have been issued in the first place?

4   A     He would ask me, as well as the Regional Manager.

5   Q     Uh-huh.  Did he take your advice?

6   A     Yeah, he would, sometimes.

7   Q     How about after a disciplinary meeting?  Did you ever

8   suggest to Lex that he shouldn't, or that discipline shouldn't

9   have been imposed in the first place?

10  A     I did on one occasion.

11  Q     Okay.  Tell us about that.

12  A     A guy had came in late -- oh, no, no, I apologize.  He had

13  hurt himself, and Lex assumed he didn't communicate to anybody

14  and of course, it was a language barrier, so I had to clarify,

15  "Yes, Lex, he did communicate.  I don't think you should do

16  this.  He had told so-and-so, just so-and-so didn't repeat it,

17  you know, didn't get the message to you."  So that was the one

18  situation that he felt that wasn't necessary.

19  Q     So I want to understand what your advice was to Lex.  Was

20  this a case where there was a translation error or

21  misunderstanding?

22  A     And a communication error.

23  Q     Did you explain that to Lex?

24  A     Yes, I did.

25  Q     What happened?

1    A    Lex finally -- you know, oh, you know?  I said, "It's

2    probably good that we just communicate these things before we

3    assume things."  It was just a bad morning, kind of just

4    everybody get to work Monday morning and but it worked out.

5    Lex realized that, "Oh, my, I probably should have asked the

6    foreman did he report it."

7    Q    Okay.  And was there ever a case that you recall where you

8    told Lex after one of these disciplinary meetings, "Lex, that

9    discipline just was unfair, it was wrong.  You shouldn't have

10   done it."

11   A    No.

12   Q    I understand that you acted as an interpreter in a number

13   of meetings, correct?

14   A    That's correct.

15   Q    When you're acting as an interpreter or a translator, what

16   is your practice in a meeting?  Do you repeat word-for-word

17   verbatim what each speaker says or do you simply try to

18   facilitate discussion?  Do you understand my question?

19   A    Yes.  When I personally translate, I like to go, I try and

20   go word-for-word and I have to stop because being Spanish you

21   can blur lots of things out and just really mean one little

22   sentence, but mine I just tried to go word-for-word, and you

23   know, and stop them and, you know, translate -- you know?  But

24   one of my things that I found that I did as well, there was

25   always two interpreters, myself and at the time there was

1    Derrick Miranda and while he would maybe be talking to me,

2    Derrick would be translating to Lex Morrison.

3    Q    Okay.  I understand.

4        JUDGE LAWS:  I want to jump in here.  Are you a

5    interpreter that's certified in any way, or did you just

6    provide translation as --

7        THE WITNESS:  Just providing it as knowing the language.

8    But not at any -- not through the state or certified.

9    Q    BY MR. MINER:  All right.  Thank you.  So I want to turn

10    your attention to personnel performance evaluations.

11    A    Okay.

12    Q    And you were shown an exhibit which was General Counsel

13    exhibit 32.  Would you please put that at the top of your pile?

14    A    Okay.

15    Q    Ms. Madrigal, did you provide any input into any of the

16    ratings in this performance evaluation?

17    A    No, I didn't.

18    Q    Did you have any personal knowledge about whether Mr.

19    Fonseca was a good employee or a bad employee?

20        MS. SHIH:  Actually, he's the lead man.

21        THE WITNESS:  Yeah, mean Mr. Amador?

22    Q    BY MR. MINER:  I'm sorry, this would be Mr. Amador.

23    A    Amador, uh-huh.

24    Q    I'm sorry.

25    A    I -- I had some knowledge of Mr. Amador being a good

1    employee or not too great employee.

2    Q    Okay.  Did you observe his work?

3    A    I had observed him on a few occasions, when I'm out in the

4    yard and I stopped to look at the guys.

5    Q    Did you provide any input in this performance evaluation

6    about your review of Mr. Amador's performance?

7    A    Actually on this one I did not provide no input.

8    Q    Was that typical for most performance evaluations?

9    A    No.

10   Q    I didn't ask that question very well.  Was it typical for

11   you to provide input on the performance of a production worker

12   in the worker's performance evaluation?

13   A    I would provide information or I had observed or I had

14   facts.  But if I didn't know, I would stay quiet.

15        JUDGE LAWS:  I need to clarify something here.  Sorry, to

16   jump in like that, but when you say you had some knowledge as

17   to who was a good employee and who wasn't, are you talking only

18   about Human Resources aspects of that that position or are you

19   talking about their technical performance as -- well, they're a

20   painter, whatever their job may be?

21        THE WITNESS:  Human Resources.

22        JUDGE LAWS:  Thank you.

23   Q    BY MR. MINER:  What sort of Human Resources issues?

24   A    Basically if they were always complaining or coming to,

25   wanting to see me, or always had -- they tend to like and come

1   talk to me quite often.  That was -- it's just how some

2   employees did things.  They always wanted Maggie there.  Come

3   to Maggie.  Maggie go out or Maggie come in.  That's how.  But

4   in this -- like I'd said with him I had been kind of keeping an

5   eye on him, because he was always having an attendance -- and

6   they always wanted to call in to me even though they were told

7   you've got to report to your foreman when you won't be in to

8   work or something.

9   Q    Okay.  And you did provide information on the performance

10  evaluation for Mr. Amador about his attendance, correct?

11  A    That I did.

12  Q    And his attendance wasn't great, was it?

13  A    No, sir.

14  Q    And you indicated that on the review before the review was

15  provided to the Plant Manager, correct?

16  A    That's correct.

17  Q    And again, did you provide any other input onto this form?

18  A    No, just if I knew something for sure.  And of course, the

19  attendance is one thing I definitely had record of.

20  Q    I want to look at this personal tic-tac-board on the upper

21  right-hand corner of the first page of exhibit 32.  Do you see

22  what I'm looking at?

23  A    Yes, sir.

24  Q    It has 23 in the upper left-hand corner?  And you

25  testified that you reviewed or you had a spreadsheet of some

1   kind that enabled you to determine that a 6% rate increase was

2   appropriate based upon the results of this evaluation, correct?

3   A    That's correct.

4   Q    So I want to understand what this spreadsheet looks like.

5   What's on the spreadsheet?

6   A    On the spreadsheet, it is their name, their date of hire,

7   their rate of pay, their position.  Oh, good grief.  It's been

8   a while, but basically on this spreadsheet you've got their

9   score and you inputted it into the spreadsheet, you put in

10  their rate of pay, and the increase came -- you got that 13.78

11  by what you inputted into the spreadsheet.  It was a

12  spreadsheet that was sent to me by Lisa Maxey.

13  Q    Were there any choices for you to make on this

14  spreadsheet, for instance, maybe a 77 cents would be better

15  than 78 cents?  Anywhere on the sheet where you are asked for

16  your own view about what the rate increase ought to be?

17  A    On the spreadsheet?

18  Q    Correct.

19  A    No.  But Lex Morrison had that authority.  If he felt 78

20  cents wasn't good, Lex could -- he had all the authority to,

21  "Nope, I want to give them more."  You know?

22  Q    You can make 79?

23  A    Yes.

24  Q    Okay.  But as for the spreadsheet, the spreadsheet said 78

25  and you wrote 78?

1   A    I wrote 78.  If they changed it, it came back with a "per

2   Lex".

3   Q    Some employers hire temps on a day-to-day basis.  During

4   your employment, did Greenbrier do that?

5   A    On a day-to-day?

6   Q    Yes.  Just as clarification, you've testified about

7   employees being referred from Intermountain and then going

8   through your orientation meetings and so on.  Now I'm asking

9   about whether there was any other use of temporary workers?

10  For instance, did Greenbrier engage any temporary workers to

11  come over for a day or a week or a limited duration of time?

12  A    Yes.  For special projects that would come up, that would

13  happen.  Not very often, but every now and then, they had a

14  special project that needed workers for a week or so.

15  Q    For instance, can you give us a for instance?

16  A    Concrete -- they were going to build a truck shop and they

17  needed employees to help pour concrete and -- A special

18  project.  A break -- we had a couple of break rooms put in and

19  they needed employees as well to come help build the break

20  rooms.  You know, every now and then.  It all depended.  Those

21  are two of the projects I remember.

22  Q    All right.  And before I leave this subject, after 90 days

23  of work at the Tucson shop by an Intermountain referral, those

24  individuals who are selected to become Greenbrier, I understand

25  from your testimony, fill out another Greenbrier application at

1  that time, correct?

2  A    Yes.

3  Q    Are they interviewed again?

4  A    Interviewed?  No, they're not interviewed.

5  Q    Did anybody write up a formal performance review for that

6  individual?

7  A    No, at that time, no performance.

8  Q    Okay.  So how was the individual reviewed -- strike that -

9  - how was the decision made to offer or not offer employment to

10  that individual?

11  A    The decision was -- once a gentleman hits 90 days, the

12  foreman thinks he's a good candidate, the foreman will take it

13  to Lex, Lex lets me know, I let Marissa know, and then we start

14  the -- we start the orientation, we get it ready.  But Lex -- I

15  guess I would be the one to -- I get orders from Lex to offer

16  the rate of pay and go through the whole stuff again, the

17  orientation.

18  Q    All right.  You send them through an eight hour

19  orientation all over again?

20  A    All over again.

21  Q    You had them sign an acknowledgement of the employee

22  handbook?

23  A    Yes.

24  Q    You let them sign up for medical benefits?

25  A    I go, I do a short -- well, they don't become -- they have

1    to -- but I gave them already -- I do another benefit

2    orientation down the line, but give them basic information on

3    the benefits.

4    Q    Give them a W4 to complete?

5    A    Yes, sir.

6    Q    How about I-9?

7    A    I could do an I-9.

8    Q    Who was responsible for reviewing the employment

9    verification documentation in connection with the I-9 process?

10   A    At one time I was in charge, and later on it got handed

11   over to the corporate office.

12   Q    And when did that occur?

13   A    I can't recall.

14   Q    Do you recall if you were reviewing I-9 forms in about

15   2011?

16   A    Oh, my goodness.  I want to say they were going up to

17   corporate at the time in 2011.

18   Q    Okay.  And so when you say they were going up to

19   corporate, how was a representative of the corporate office

20   reviewing the employment verification documents for the

21   employee to complete section 2 of the I-9 form?

22   A    Okay.  Now I remember how we did this.  I haven't done the

23   I-9 -- well, it came in their packet.  I did -- I filled out

24   all -- I would fill it out and I would take their appropriate

25   I.D.s and their I-9 and scan it up to the corporate office.

 1    That's how we handled it.  They would -- the corporate office

 2    would actually do the e-verify part.

 3    Q    Okay.  You didn't conduct any e-verify?

 4    A    I did at one time.  I did for many years, conduct the

 5    e-verify.

 6    Q    Okay.  But ultimately corporate took over that function?

 7    A    Yes.

 8    Q    All right.  Are you familiar, are you aware of an I-9

 9    issue, or an employment verification issue that occurred at the

10    facility in about the summer of 2011?

11    A    Yes.

12    Q    What happened with regard to the employment verification,

13    the employment documentation of some employees that day?

14         MS. SHIH:  Objection.  Relevance.

15         MR. MINER:  This is simply a witness who I believe was

16    involved in the audit that occurred, and we've already heard

17    testimony about.

18         JUDGE LAWS:  We have.  I'll allow it.  Just what do you

19    recall happening?

20         THE WITNESS:  Are we talking about the I-9 audit?

21         JUDGE LAWS:  Yes.

22    Q    BY MR. MINER:  Yes.

23    A    Okay.  What do I recall?

24    Q    Yes.

25    A    Oh, my goodness.  I took a big part in that.  I was -- I

1    understood we might have had some employees with -- somehow, I

2    don't remember, but they got word that maybe Tucson, maybe some

3    employees didn't have proper documents to be employed.

4    Q    What was your involvement in that audit?

5    A    My involvement was to -- I went to training to learn how

6    to make sure I knew how to fill out an I-9 correct and my

7    responsibility was to get an I-9 from every employee.

8    Q    You went through some additional training at that point?

9    A    Yes.

10   Q    Are you aware whether some employees were terminated

11   because they were unable to document their employment

12   eligibility?

13   A    Yes.

14   Q    Do you know how many, if you recall?

15   A    Oh, boy.  Quite a few.  Oh, God.  I can't recall how many,

16   but it was numerous employees.  But I don't have a -- I can't

17   give you a direct number.  I can't remember.

18   Q    All right.  Just one moment.  Do you recall if any of

19   these employees who were terminated at that time were very

20   senior employees?

21   A    Yes.

22   Q    Do you recall if a number of them were?

23   A    A few of them.

24   Q    All right.  You testified about an audient of attendance

25   points that Lisa Maxey conducted with you shortly after she

1  took on her new role with the company, correct?

2  A    Yes.

3  Q    Was it about a year before you left the business?

4  A    Yes.

5  Q    All right.  And you testified that some discrepancies were

6  identified?

7  A    That's correct.

8  Q    How many employees had their attendance points adjusted at

9  that time?

10  A    Maybe five, six.

11  Q    Five or six out of how many?

12  A    At the time we might have had 70 employees, 60.  About 60

13  or 70 employees.

14  Q    Was there any discipline that had been issued by that time

15  that you decided during the audit was inappropriate based upon

16  the attendance points you could verify?

17  A    No, sir, there was not.

18  Q    Okay.  And the flip side of that coin, did you determine

19  that there were any employees who had accrued sufficient

20  attendance points to warrant discipline that had not yet been

21  issued?

22  A    No, we didn't discipline no one.

23  Q    You didn't issue any new discipline after that?

24  A    Not that I recall.

25  Q    Okay.  Do you know what an attendance point roll-back is?

1    A    Do I know what it is?

2    Q    Yes.

3    A    Yes, sir.

4    Q    Did you ever observe that, did you ever experience that at

5    the Tucson facility?

6    A    No, not while I was there.

7    Q    Okay.

8    A    Oh, I apologize.  A roll -- after a year, they roll off.

9    Their points -- is that kind of --

10    Q    They dropped off?

11    A    Yeah.  Yeah.

12    Q    All right.  And I understand from your testimony -- I'm

13    trying to go through in the same order you testified to it -- I

14    understand from your testimony that in November of 2012, some

15    production employees we working mandatory overtime, is that

16    correct?

17    A    Yes.

18    Q    How much?

19    A    How many employees, or how much overtime?

20    Q    Great question.  All right.  How many employees were

21    working mandatory overtime?

22    A    Half of them.  Half of the 60 we'll say -- 30.

23    Q    And how much overtime were they working every week?

24    A    Between 10 to 13 hours of overtime.

25    Q    What dates?

1    A    Monday through Thursday and Saturdays.

2    Q    Do you know what they were doing during those overtime

3    hours?

4    A    They just had a lot of work backed up.

5    Q    Do you know what the work was?

6    A    No, I don't.

7    Q    Did you assign any overtime work to the production

8    employees at that time?

9    A    No, sir.  No.

10   Q    Did you go out to observe them working during their

11   overtime hours to see what they were doing?

12   A    I did not.

13   Q    Do you -- at that time, were you regularly reviewing labor

14   efficiency information within the company?

15   A    No, sir.

16   Q    Did you have access to any financial statements or other

17   internal reports about the work that's being completed at the

18   facility?

19   A    No, sir.

20   Q    You also testified that in October you'd exchanged some

21   communications with Intermountain about the need for welders

22   and switchmen.

23   A    Right.

24   Q    And there were some exhibits, exhibit 33 and exhibit 34.

25   Would you take a look at those?

1    A    Okay.

2    Q    These are e-mails with Marissa Almazan, correct?

3    A    Yes.

4    Q    And she was your primary contact at Intermountain?

5    A    Yes.

6    Q    And my question is did you have a similar e-mail exchange

7    with Marissa like this one, I'm looking at exhibit 33,

8    exchanges like this one also in September of 2012?

9    A    I probably did, because Lex liked to hire once a month,

10   you know, if we needed welders.

11   Q    How about in August?

12   A    We probably as well had.

13   Q    How about in July?

14   A    We're talking 2012, right?

15   Q    Yes.

16   A    That I can't, I don't remember July.

17   Q    Was there ever a time when Marissa sent you an e-mail

18   asking about whether you're looking for any candidates when you

19   responded and said no, we're completely filled up?

20   A    There might have been -- there might have been an e-mail

21   stating that.

22   Q    When's the last time that happened?

23   A    Oh, I can't remember that.  I'm sure she might have asked,

24   "Do you need anybody, Maggie," and of course I asked Lex and he

25   said yes or no.  I would answer her.

1   Q     Did that happen at all in 2012?

2   A     It might have, I just can't remember when.

3   Q     There was a lot of hiring in 2012, correct?

4   A     Uh-huh.

5   Q     Is that a yes?

6   A     Yes.

7   Q     On a regular basis, correct?

8   A     That's correct.

9   Q     Every month, right?

10  A     That's right.

11  Q     And that's why you had to conduct all those monthly

12  orientation meetings, right?

13  A     That's correct.

14  Q     Ms. Madrigal, you testified about a meeting with Al Lave

15  in about August or September of 2011 to talk about what happens

16  during a union organizing campaign, do you recall that

17  testimony?

18  A     Yes, I do.

19  Q     Do you recall Al using an acronym TIPS?

20  A     Yes.

21  Q     Do you recall what TIPS means?  I'm testing.

22  A     Oh, my goodness, you really got me thinking.  I can't

23  remember but you would think it would be -- but yes, I do

24  recall the TIPS.  I can't remember what it --

25  Q     Do you remember how much time Al spent talking about TIPS?

1   A    We spent question a bit of time talking about -- I mean,

2   you know, we had -- when Al was there, that's what we talked

3   about.

4   Q    Did he talk about threatening employees?

5   A    On how we should not do that.

6   Q    Yes.

7   A    Yes.

8   Q    You talked about that?

9   A    Yes, on how we are not allowed to -- nobody should

10  threaten an employee.

11  Q    Did he say anything about interrogating employees?

12  A    Yes.  We were not allowed to interrogate them as well.

13  Q    Or making promises?

14  A    We weren't --

15  Q    To employees?

16  A    We were told not to promise them nothing.

17  Q    Or spying on employees or surveilling their activities?

18  A    We were not allowed to spy or surveillance, yes.

19  Q    Al reviewed all those tips with you?

20  A    Yes.

21  Q    He spent a lot of time talking about that?

22  A    We got pretty educated.

23  Q    Al is very knowledgeable about that, isn't he?

24  A    Very knowledgeable.

25  Q    All right.  And I understand on November the 12th you were

1   waiting to speak with Lex about something you had heard from

2   some co-workers about talk about a union campaign?

3   A    Yes, that's correct.

4   Q    Do you recall when you heard about this talk about a union

5   campaign?

6   A    I heard about that the week before I was released.

7   Q    What date?

8   A    Oh, --

9   Q    Let me stop and ask you a different question?  What day of

10  the week was November the 12th?

11  A    Monday.

12  Q    It was a Monday?

13  A    Yes.

14  Q    Did you work the weekend before?

15  A    Yes.

16  Q    You worked Saturday and Sunday?

17  A    I worked Saturday.  Not Sunday.

18  Q    Okay.  So you were in the shop on Saturday?

19  A    I was in the shop on Saturday.

20  Q    Was it Saturday that you heard this talk?

21  A    It was Wednesday.

22  Q    It was Wednesday?

23  A    And it was Friday.

24  Q    And on Friday?

25  A    Friday, yes.

1   Q    Did you see Lex on Saturday?

2   A    No.

3   Q    Did you see him on Friday?

4   A    No.

5   Q    Did you see him on Thursday?

6   A    Nope.

7   Q    Is that why you were waiting for him on Monday to share

8   this information to him?

9   A    That's correct.

10  Q    Thank you.

11       MR. MINER:  Can we just have a couple minutes, Your Honor?

12       JUDGE LAWS:  Not much, in the interest of time this

13  witness has to leave in less than 25 minutes.

14       MR. MINER:  I understand.  Just a couple minutes.

15       JUDGE LAWS:  We're going to stay on the record.

16       MR. MINER:  Nothing further.

17       THE WITNESS:  Thank you.

18       JUDGE LAWS:  All right, before I turn this over for any

19  follow up, in the interest of time, I want to get -- I have

20  some questions for you that I want to ask.  It will be more

21  efficient.

22                    **COURT EXAMINATION**

23  Q    BY JUDGE LAWS:  In the current system, is it tied to any

24  employee sign in/sign out system or clock in/clock out?

25  A    Just for the -- the Kronos system has a clock in and clock

1    out for the employees.

2    Q    So if an employee doesn't clock in, Kronos knows it?

3    A    That's correct.

4    Q    And I believe you said when an employee was hired as a

5    Greenbrier employee after being a temp, their attendance slate

6    was wiped clean?

7    A    Yes, we started over.

8    Q    Was that always the case?

9    A    Yes.

10   Q    Do you know why Greenbrier started using a temporary

11   agency?  Do you know the reason behind it?

12   A    No, I don't.

13   Q    Do you have any feelings about Greenbrier one way or the

14   other at this point?

15   A    No.

16   Q    Do you have any continuing allegiance?

17   A    I'm sorry.

18   Q    Do you have any continuing reason to need to try to please

19   them?

20   A    No.

21   Q    Are you angry that you were let go?

22   A    No.

23   Q    Did you observe any instances while you were there that

24   you now perceive or then perceived as treating people who

25   supported the union different than people that didn't support

1    the union?

2    A    No.  Well, at the time I was there everybody got treated

3    the same, whether they were for the union or not.

4    Q    In your observation?

5    A    In my observation.

6    Q    Thank you.

7        JUDGE LAWS:  Any follow up?

8        MS. SHIH:  Just briefly, Your Honor.

9                          **REDIRECT EXAMINATION**

10   Q    BY MS. SHIH:  Did you receive a severance package when you

11   were released from Greenbrier?

12   A    Yes.

13   Q    What did you receive in terms of severance?

14       JUDGE LAWS:  The amount isn't important.  Like was a

15   couple months?  A year?

16       THE WITNESS:  It was a couple -- it was six months of pay.

17   Q    BY MS. SHIH:  Anything else that was part of that

18   severance package beyond pay?

19   A    No, that was all.

20       MS. SHIH:  I have no further questions.

21       MR. MINER:  Nothing further, yeah.  Thank you.

22       JUDGE LAWS:  That went quicker than I thought.  So there

23   was no need to hurry before.  I do want to thank you for your

24   testimony.  I appreciate it.  Again, there is a rule in place

25   for this hearing.  It means you are not to discuss your

1   testimony here today with any other witnesses or anybody who in

2   your observation might be called as a witness.

3       THE WITNESS:  Okay.  I got it.

4       JUDGE LAWS:  All right, thank you.

5       THE WITNESS:  Thank you.

6       JUDGE LAWS:  Why don't we go off the record while we get

7   our final witness.

8       MS. SHIH:  Actually, before we went off the record --

9   **(Off the record.)**

10  **(On the record.)**

11      JUDGE LAWS:  Let's  Stay on the record.

12      COURT REPORTER:  Back on.

13      MS. SHIH:  I don't believe General Counsel exhibit 37 has

14  been offered and at this time I would like to offer General

15  Counsel 37 for admission.

16      MR. MINER:  Your Honor, we object to the relevance of

17  General Counsel exhibit 37.

18      JUDGE LAWS:  I do think it is relevant and I'm going to go

19  ahead admit it for the same reason that I stated on the record

20  with regard to exhibit 8.

21      **(General Counsel Exhibit 37 received into evidence)**

22  **(Off the record.)**

23  **(On the record.)**

24      JUDGE LAWS:  So we did have one witness who was prepared

25  to testify.  He indicated however, he is more comfortable

 1    testifying in Spanish than English, even though he is

 2    bilingual.  Because of the need for an interpreter and also the

 3    need for potential additional testimony that the Acting General

 4    Counsel wasn't aware of at the time she did the initial time

 5    projection, we would not be able to get through him with

 6    direct/cross even if we were to secure an interpreter quickly.

 7    So we will get his testimony when we reconvene.  Not necessary

 8    right when we reconvene.  So why don't we for now say that we

 9    will resume the hearing October 21st, I believe is the Monday,

10    but let me pull that up to be sure.  It is October 21st, this

11    location most likely, but I'll ask the Acting General Counsel

12    to send out an Order verifying the time and the location and

13    given that there are concerns getting done even with working a

14    Saturday, nobody seems to mind starting at 8:00, so let's make

15    that our time.  So with that I'll see everyone on the 21st.  I

16    will, in all likelihood schedule at least one telephone

17    conference between now and then just to make sure we're up to

18    speed on documents and we don't have anything we have to deal

19    with beforehand.

20        MS. SHIH:  One other thing before we go off the record.

21    The last witness had testified about personnel documents

22    related to the Intermountain Staffing employees that were

23    working at the Greenbrier facility.  Those were not employees

24    that were included that were included in the production of

25    personnel files and it sounds like she didn't consider them to

1   actually be personnel files, but she did maintain personnel

2   documents, so to the extent that you guys have those on the

3   temporary employees, that were there prior to the RIF, if we

4   could receive those, that would be --

5       JUDGE LAWS:  And if my recollection of her testimony is

6   correct, that's going to be primarily attendance records, that

7   she kept not in a separate personnel file, but just as

8   attendance records.

9       MR. MINER:  We will search for those.

10      MS. SHIH:  Okay.  Thank you.

11      JUDGE LAWS:  All right.  Thank you.  Off the record.

12      MR. MINER:  Thank you.

13  **(Off the record.).**

14                                          *(End 11:55 a.m.)*

15      **(Whereupon, the hearing in the above-entitled matter was**

16  **adjourned until 8:00 a.m., Monday, October 21, 2013.)**

# UNITED STATES OF AMERICA

## BEFORE THE NATIONAL LABOR RELATIONS BOARD

## REGION 28

In the Matter of:

GUNDERSON RAIL SERVICES LLC,          Case No. 28-CA-093183
D/B/A GREENBRIER RAIL                           28-CA-103909
SERVICES,                                                    28-CA-104184
                                                                    28-CA-106613
and                                                              28-CA-111186

SHEET METAL WORKERS'
INTERNATIONAL ASSOCIATION
LOCAL 359, AFL-CIO,

GUNDERSON RAIL SERVICES LLC,          Case No. 28-RC-093179
d/b/a GREENBRIER RAIL
SERVICES,

                              Employer,

and

SHEET METAL WORKERS'
INTERNATIONAL ASSOCIATION
LOCAL 359, AFL-CIO,

                              Petitioner.

The above-entitled matter came on for hearing, pursuant to

notice, before **ELEANOR LAWS,** Administrative Law Judge**,** at the

National Labor Relations Board, Pima County Consolidated

Justice Court, 160 N. Stone Avenue, Third Floor, Courtroom 11,

Tucson, Arizona 85701, on **Tuesday, November 12, 2013, at 9:20**

**a.m.**

<u>A P P E A R A N C E S</u>

**On behalf of the General Counsel:**

    **EVA SHIH, ESQ.**
    **JOHN GIANNOPOULOS, ESQ.**
    NATIONAL LABOR RELATIONS BOARD - REGION 28
    2600 North Central Avenue, Suite 1400
    Phoenix, AZ 85004-3099
    Tel.  602-640-2090
    Fax.  602-640-2178

    **SOPHIA ALONSO, ESQ.**
    NATIONAL LABOR RELATIONS BOARD
    421 Gold Avenue, SW, Suite 310
    P.O. Box 567
    Albuquerque, NM  87103
    Tel.  505-248-5128
    Fax.  505-248-5134

**On behalf of the Respondent:**

    **FREDERICK C. MINER, ESQ.**
    **STEVEN G. BIDDLE, ESQ.**
    LITTLER MENDELSON, P.C.
    Camelback Esplanade
    2425 E. Camelback Road, Suite 900
    Phoenix, AZ 85016
    Tel.  602-474-3653
    Fax.  602-391-2836

## I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| Alan A. Lave | 481 | | | | |

*AV*Tranz

845 North 3rd Avenue, Phoenix, Arizona  85003
www.avtranz.com · (800) 257-0885

## E X H I B I T S

| EXHIBIT | IDENTIFIED | IN EVIDENCE |
|---|---|---|
| **General Counsel:** | | |
| GC-1 | 479 | 479 |
| GC-38 | 479 | 479 |
| GC-39 | 488 | 488 |
| GC-40 | 488 | 488 |
| GC-41 | 488 | 488 |
| GC-42 | 500 | 500 |
| GC-43 | 504 | 504 |
| GC-44 | 517 | 517 |
| GC-45 | 517 | 517 |
| GC-46 | 520 | 520 |
| GC-47 | 520 | 520 |
| GC-48 | 522 | 522 |
| GC-49 | 524 | 524 |
| GC-50 | 527 | 527 |
| GC-51 | 529 | 529 |
| GC-52 | 530 | 530 |
| GC-53 | 533 | 533 |
| GC-54 | 536 | 536 |
| GC-55 | 536 | 536 |
| GC-56 | 540 | 540 |
| GC-57 | 540 | 540 |
| GC-58 | 540 | 540 |

## E X H I B I T S (Continued)

| EXHIBIT | IDENTIFIED | IN EVIDENCE |
|---------|------------|-------------|
| **General Counsel:** | | |
| GC-59 | 542 | 542 |
| GC-60 | 546 | 546 |
| GC-62 | 556 | 556 |
| GC-63 | 558 | 558 |
| GC-64 | 561 | 561 |
| GC-67 | 563 | 563 |
| GC-68 | 565 | 565 |

1                        P R O C E E D I N G S

2        JUDGE LAWS:  All right.  We are starting the resumption of

3    Gunderson Rail Services, LLC doing business as Greenbrier Rail

4    Services and Sheet Metal Workers International Association,

5    Local 359 AFL-CIO.  The various cases numbers were recited at

6    the outset of the hearing.

7        We've been discussing now for -- for quite some time, a

8    couple of motions that were filed.  One was a motion to amend

9    the complaint and another was a motion to consolidate the

10   complaint, and then we were discussing some logistical witness

11   issues.  So, I did want to give the parties an opportunity to

12   state their arguments on the record regarding, why don't we

13   start with the motion to amend?

14   MS. SHIH:  And just to, for clarification, just this

15   morning, we filed an amended motion to amend the second

16   consolidated complaint.

17       Part of those amendments, and actually a significant

18   portion of those amendments, are based on documents that have

19   been produced to us by Respondent since the hearing resumed in

20   September, or, convened in September.  As the General Counsel

21   has been continuing to receive documents, in fact as recently

22   as yesterday, additional allegations have been brought to

23   light; additional witness preparation and many of these

24   allegations have not yet been offered through witness

25   testimony.  So certainly, Respondent is free to cross-examine

1    those witnesses at the time they're called to offer that.

2    They're related to allegations that are already, closely

3    related allegations, that are already contained in the existing

4    complaint based on events that are already alleged in the

5    existing complaint as well, but primarily, the issue is based

6    on newly discovered evidence through documents that Respondent

7    has recently produced to us.

8        JUDGE LAWS:  And your response?

9        MR. MINER:  Your Honor, we object to the motion to amend

10   based on lack of notice.  The proposed paragraph 5N is

11   contained of new allegations that are not familiar to us.

12       The proposed paragraph 6B, contains a new allegation

13   that's not familiar to us.

14       Proposed paragraph 6E has been amended, as has the

15   proposed paragraph 6F.  These are not based upon evidence that

16   was presented during the first four days of the hearing in

17   September.  We object, again, based upon our inability to

18   respond to these meaningfully at this time.

19       JUDGE LAWS:  Any reply?

20       MS. SHIH:  Just very briefly.  With regard to 5N

21   specifically, the documents themselves that contain the -- the

22   alleged threats are documents that Respondent produced to us.

23   So, for Respondent to argue that they are not aware of that

24   information is a little disconcerting.

25       With regard to the other allegations, as I previously

1    mentioned, they're closely related to allegations that are

2    already contained in the complaint that have been investigated,

3    and to the extent that there's been no witness testimony on --

4    on those allegations yet, Respondent's certainly free to

5    examine the witnesses as they're called at their -- at -- at

6    that time.  So, there's no prejudice to Respondent.

7        To amending the allegations now, rather than making a

8    motion after the testimony to conform the allegations of the

9    complaint to the testimony of the witnesses.

10       MR. MINER:  Your Honor, may I?

11       JUDGE LAWS:  Sure.

12       MR. MINER:  In spite of Ms. Shih's sense of disappointment

13   over paragraph 5N, there is no evidence of any prior handout,

14   I think in November, 2012, of which we are aware.  We're not

15   aware of any fliers or handouts being distributed to employees

16   for the period from November, well into 2013.

17       After an election campaign began in about June, we're

18   aware of some fliers and handouts distributed to employees, but

19   there are no documents that have been produced by Greenbrier

20   with respect to November through that period 2013 whatsoever.

21       JUDGE LAWS:  All right.  And one of the disadvantages, I

22   suppose, from my standpoint in not having any sort of pre-

23   hearing mechanism akin to discovery is, I don't know what's

24   been produced.  So, I can't really verify one way or the other.

25       I do think the -- the motion does conform with Board case

1    law on when amendments should be granted.  So, I -- I will go

2    ahead and grant the amendment.  And, this is something we

3    discussed before we went on the record today.  I will permit

4    the Respondent time to answer the amendment, including any

5    affirmative defenses before the Respondent is required to

6    proceed with their case.

7        So, we will resume once the response has had sufficient

8    time to, both respond to these allegations and prepare to

9    present evidence pertaining to them.

10        All right.  Moving to the motion to consolidate, does the

11    General Counsel want to be heard on that on the record?

12    MS. SHIH:  Your Honor, the -- the Board Law on this issue

13    is pretty clearly briefed and our actual motion to consolidate

14    itself.  So, I don't really have anything to add, other than to

15    say that it -- it's been anticipated, obviously, many of the

16    witnesses that have not yet been called that are under subpoena

17    are expected to testify, not only about the allegations in the

18    prior complaint, but also the allegations in the new complaint.

19    So, there's -- there's really not any prejudice to, and in

20    terms of having to duplicate witnesses and recall them.  There

21    have only been a handful of witnesses that have testified in

22    this case so far.

23        So, to the extent that any witnesses would have to be

24    recalled, I think that's minimized in this case because many of

25    the witnesses have not yet been called.

1    We discussed earlier, obviously, giving Respondent an

2    opportunity to prepare the defense, but in this case, there's

3    no prejudice.  And, in fact, to not consolidate the cases would

4    involve more duplication of testimony and evidence then to

5    consolidate them at this time.

6        JUDGE LAWS:  Anything from the Respondent?

7        MR. MINER:  Yes, Your Honor.  Again, we object to the lack

8    of notice and we point out that the -- the situation in which

9    General Counsel now finds herself, is a result of what we

10   anticipated and predicted could happen back in September when

11   we specifically proposed a short postponement of the hearing at

12   that time so that the entire case could be heard together.  And

13   rather than do that, you know, Region 28 proceeded with the

14   hearing; prevented Greenbrier from being able to respond during

15   the hearing, to the new charge that had been filed.  And in

16   spite of the very prompt response to the Region's

17   investigation, apparently no new complaint allegations were

18   issued until the end of last week.

19       And that is not notice that gives us an opportunity to

20   respond.  We object to this surprise.  We appreciate the

21   opportunity to -- to put together a case after we have heard

22   General Counsel's case.  I -- for the logistical reasons we've

23   discussed earlier, I don't think that's feasible.  I don't

24   think it's practical.  And so, I'm concerned about proceeding

25   with a whole new set of allegations when we still have not

1    completed the General Counsel's case on the first set.  It

2    think we ought to complete those first.

3        JUDGE LAWS:  Well, I guess that begs the question of, were

4    we to complete the allegations and then move on to the

5    consolidated allegations, would that involve duplication of

6    witnesses?  Would you be having to then recall the witnesses

7    who you were going to call to testify for the original amended

8    allegations?

9        MS. SHIH:  It's expected that there would be duplication.

10   Obviously, I mean, Respondent's in the better position to know

11   and identify the individuals that were responsible and

12   participate in the shutdown decision, but certainly, I would

13   expect that some of those witnesses are individuals that would

14   be called to testify with regard to the original complaint

15   allegations.

16       JUDGE LAWS:  Well, I do think in the Board's case law,

17   which I don't need to go over.  It's part of the record.

18   It's -- it's cited and argued in the motion, if not mandate,

19   strongly encourages consolidation.  I understand the

20   Respondent's argument and I think we can proceed in a practical

21   manner.

22       We're all here now.  The -- the notice of hearing was set

23   a while ago.  Things got a little messed up because of the

24   shutdown, partial shutdown, whatever you want to call it.  It

25   shut us down.  So, that -- that's what matters as far as time

1    is concerned.  You know, it's nobody's fault that is relevant

2    here, but I think it does throw a wrench into things and I

3    think we -- we all just need to, as best we can, proceed in a

4    practical fashion, mindful of the fact that there are inherent

5    frustrations in this and try to cooperate, moving forward.

6        We're all here and we can at least make some headway.  I

7    think from prehearing discussions, we may have some down time.

8    We all have plenty of other things we can do if there is some

9    down time, but yeah.  I think given that now things have change

10   with the amendments, with the consolidation, the best way to

11   move forward is to use this time we've set aside, which was

12   optimistically going to be used to consider this entire case,

13   use it to have the General Counsel put on their case-in-chief,

14   with the understanding that there may be document issues that

15   come up, but that's -- that's true in every case.  So, I don't

16   think that is something that should hold us back.  We can -- we

17   can deal with those things as they arise.  Hopefully, they

18   won't, but if they do, so be it.

19       So, I -- I am going to grant the motion.  I think the

20   Board's case law is pretty clear in this regard.  I don't want

21   to prejudice the Respondent, however, and therefore, I am going

22   to, as with the amendments, have us proceed in the time we've

23   set aside over the next several days, with the General

24   Counsel's case-in-chief and then we can allow the Respondent

25   the time they need to prepare, make sure all document requests

1    are complied with, and respond to the amendment and

2    consolidation issues that have been presented.

3        And with that, I want to offer you an opportunity, I

4    guess, to make a revised, or changed, opening statement, if

5    you'd like to or we can just proceed with witness testimony.

6        MS. SHIH:  Actually, I do have other little housekeeping

7    matters.  We have a supplement to General Counsel Exhibit 1,

8    which is the formal documents, based on additional papers that

9    have been filed since we were last here in September.

10       JUDGE LAWS:  Yeah.

11       MS. SHIH:  It does not include the amended motion to amend

12   that was just filed this morning.  We can certainly add that to

13   the formals and offer a revised index tomorrow, once we -- or

14   do you want -- or --

15   (Counsel confer)

16       MS. SHIH:  Since Franz already has the copies, an original

17   and a copy of the amended motion, we can simply offer that as

18   the next General Counsel exhibit.  Do you have that number?

19       JUDGE LAWS:  I can pull it up.  Hang on.

20       MS. SHIH:  I believe it would be General Counsel 38.

21       JUDGE LAWS:  38.  All right.  So, let's everybody pen and

22   ink this as GC-38.

23       MS. SHIH:  And General Counsel 1, now goes through 1VV.

24   And we'd move for admission of both General Counsel 1 as

25   revised and General Counsel 38.

1      MR. MINER:  No objection.

2      JUDGE LAWS:  Those are admitted.

3  **(General Counsel Exhibit Number 1 and 38 Received into**

4  **Evidence)**

5      MS. SHIH:  We are still receiving subpoena documents from

6  Respondent.  There have been some recent exchanges of e-mails

7  as to, and letters, as to the documents that we believe are

8  outstanding, not yet been produced and then additional

9  production of documents.

10      MR. GIANNOPOULOS:  Your Honor, I was going to ask if maybe

11  we could take a break to discuss what Mr. Miner and Mr. Biddle,

12  just some of the things that are -- that are, you know,

13  outstanding.  There some things that I found that I want to

14  give you a heads up on.  And there is other things that we

15  think are missing.

16      So, maybe 15 minutes?

17      JUDGE LAWS:  Okay.  Why don't we -- it's -- it's 9:40,

18  basically, why don't we -- why don't we break until 10:00?

19      MR. GIANNOPOULOS:  Okay.

20      JUDGE LAWS:  Come back at 10:00.

21  (Off the record at 9:38 a.m.)

22      JUDGE LAWS:  All right we now -- everybody has their

23  drinks, their water.  Are we ready to proceed?

24      MS. SHIH:  Yes, Your Honor, we are.  For purposes of the

25  record, I -- it was our -- General Counsel's intention to begin

1    today by recalling Mike Torra.

2    JUDGE LAWS:  And it's my understanding from what the

3    Respondent has said that he is not available, but can be

4    available sometime next week.

5    MR. MINER:  Correct, Your Honor.

6    MS. SHIH:  And so just for clarification purposes and for

7    purposes of the record, the individuals that are under subpoena

8    that have yet to testify that the General Counsel intends to

9    call as part of its case in chief are Gordan Hudgens, Mike

10   Torra, Juan Maciel, Eric Valenzuela, Lisa Maxey and Kevin

11   Stewart.

12   JUDGE LAWS:  Okay.  And it's my understanding that the

13   Respondent is setting wheels in motion to see which of those

14   individuals can be available to testify.

15   MR. MINER:  Correct, Your Honor.

16   JUDGE LAWS:  All right, keep -- please keep us apprised.

17   MS. SHIH:  And just as an addition.  A subpoena was also

18   issued to Mark Rittendown, the CFO.  It's our understanding

19   from earlier discussions that Respondent intends to offer a

20   custodian of records for its financial statements, not

21   necessarily Mr. Rittendown.  So that's another individual that

22   has not yet been identified that would be called as part of our

23   case in chief as well.

24   JUDGE LAWS:  And this was pursuant to the discussions we

25   had in September, correct?

1        MS. SHIH:  Correct.

2        JUDGE LAWS:  Okay.

3        MR. MINER:  Correct.

4        MS. SHIH:  So at this time, the General Counsel recalls Al

5    Lave.

6        JUDGE LAWS:  Okay.

7    Whereupon,

8                        **ALAN A. LAVE**

9    having been duly sworn, was called as a witness herein and was

10   examined and testified as follows:

11       MS. SHIH:  Thank you --

12       JUDGE LAWS:  All right --

13       MS. SHIH:  -- Your Honor.

14                      **DIRECT EXAMINATION**

15   Q    BY MS. SHIH:  Mr. Lave, I know you previously testified

16   and there's been quite a bit of time, so please bear with me if

17   we repeat anything that we've already covered.  I'll do my best

18   not to duplicate anything.  Do you recall in November of 2012,

19   after a large number of employees were let go from the Tucson

20   facility, being involved with a decision to roll back

21   attendance points for the remaining employees, correct?

22   A    Yes.

23   Q    I'm doing to show you a series of emails.  I'll start with

24   what's been marked General Counsel Exhibit 39.  Who first

25   raised with you the issue of rolling back attendance points for

1    the remaining Tucson employees?

2    A    Lisa Maxey and Juan Maciel.

3    Q    I'm handing you what's been marked as General Counsel 39.

4    Do you recognize that email?

5    A    Yes, I do.

6    Q    That's an email that you sent to Ms. Maxey on November

7    14th regarding the Tucson point situation?

8    A    Correct.

9    Q    What prompted you to send this email to Ms. Maxey?

10    A    She had either called me or sent me an email earlier.

11    Q    And what was the content of that earlier communication?

12    A    That she had concerns about the quality of the points

13    tracking that had been occurring in the Tucson shop.

14    Q    Could I ask you to raise your voice just a little bit?

15    I'm having a difficult time hearing you.

16    A    Thank you.

17    Q    What concerns specifically did she raise with you?

18    A    That -- I need to think back.  Generally speaking, the

19    concerns were that the HR generalist who was doing the

20    attendance tracking at the time wasn't keeping proper records.

21    Some people -- unfortunately, we have a somewhat complicated

22    points tracking system for attendance and the HR generalist

23    would make mistakes on how many points to assign a person for a

24    certain type of absence or late, whether they had called in or

25    not.  And so sometimes a person may have been -- not been

1  pointed correctly either way, which would then impact decisions

2  on any kind of discipline and stuff like that.

3  Q   Those are the concerns she raised with you in the

4  discussion you had prior to sending this email?

5  A   Either that or in an email.

6  Q   Either that or in what?

7  A   Or in an email she sent me earlier.

8  Q   When was your earlier communication with Ms. Maxey about

9  the Tucson point situation?

10 A   It would have either been on the 12th, the 13th or earlier

11 on the day of the 14th.

12 Q   After employees were discharged from the Tucson facility?

13 A   Correct.  She started doing an audit of the HR function

14 down there.

15 Q   Was that an audit that you instructed her to do?

16 A   No, she did that as part of her regular regional duties,

17 along with -- we had let the HR generalist go that day, so Lisa

18 then assumes the duties for that shop as the shop HR person, so

19 she was trying to get up to speed on where we stood with

20 attendance points.  We had open enrollment benefits going on at

21 that time.  So she had to quickly jump in and get a status on

22 where various HR activities stood.  Our pay raise program, she

23 had to quickly jump into that, because we review people every

24 six months, based on their hire date, so.

25 Q   Was the Tucson facility the only facility that Ms. Maxey

1    conducted a points audit of at that time?

2    A    I wouldn't know that answer.

3    Q    Ms. Maxey reports directly to you?

4    A    Correct.

5    Q    She wouldn't have provided results of any audits to you?

6    A    Depending on the severity of the audit, she may have or

7    may not have.

8    Q    She wouldn't have informed you if she was conducting

9    audits of attendance points for other facilities?

10    A    Sometimes not proactively, no.  It's fairly autonomous how

11    the regionals work.

12    Q    Where there any other facilities that you were aware Ms.

13    Maxey conducted audits of at the time?

14    A    No.

15    Q    So in response to your email to Ms. Maxey on November

16    14th, 2012 at 6:24 p.m., did you have a discussion with her?

17    A    There may have been a discussion later that evening or

18    another email.  I don't recall.

19    Q    So in response to your instruction, "Please call me

20    sometime tonight," did Ms. Maxey in fact call you?

21    A    She may have.  I don't recall.

22    Q    Did you have any subsequent discussions with her about the

23    Tucson points situation?

24    A    I don't know if there were subsequent discussions.  There

25    were subsequent emails.

1   Q    When I say discussions, I'm referring to communications --

2   A    Oh.

3   Q    -- whether verbal, written.  Did you have any

4   communications with Ms. Maxey about the Tucson point situation

5   after this email?

6   A    Yes.  It would have either been later that evening or

7   early the following morning.

8   Q    And what was the substance of those discussions?

9   A    Well, on Thursday morning, the discussion was that they

10   could go ahead and zero out the point system for the entire

11   Tucson shop, based on the lack of quality in the attendance

12   tracking that had been going on.

13   Q    So it was Ms. Maxey's suggestion that the points be zeroed

14   out for all of the remaining employees?

15   A    Here and Juan Maciel's suggestion, because Juan became the

16   acting plant manager when we removed Lex Morrison on November

17   12th.

18   Q    So it was their joint suggestion to you --

19   A    Correct.

20   Q    -- that you approve their recommendation that points be

21   zeroed out for the remaining employees.

22   A    Correct.

23   Q    And this was on Wednesday, November 14th.

24   A    What was on Wednesday?

25   Q    Their suggestion to you that the points be zeroed out for

1   the remaining employees?

2   A     It was either on, again, the 12th, 13th or 14th.  I don't

3   remember when the initial communication started.

4   Q     And your -- and you testified that the reason for the

5   suggestion of zeroing out the points was to correct

6   inaccuracies among tracking that had taken place.  Is that

7   right?

8   A     Correct.  In fairness to our employees, we want to make

9   sure that we track their attendance correctly.  In fairness to

10  them and to the company.  And she had identified a number of

11  quality control issues.  And it just didn't seem fair to the

12  employees to move forward with bad data.

13  Q     And it was also to give them a morale boost, correct?

14  A     Correct.  Because of the layoff that just occurred.  I

15  mean, 30 people had lost their jobs and the remaining people

16  were potentially very -- had poor morale.  And we needed to

17  find some positive way to beef them back up.  So -- you know,

18  to let them know that we're still in business.  We're moving

19  forward, sure.

20  Q     I'm now handing you what's been marked as General Counsel

21  Exhibits 40 and 41.  Let's start with General Counsel Exhibit

22  40.  Do you recognize that email exchange?

23  A     Yes, I do.

24  Q     Working from the bottom up, that appears to be a response

25  from Ms. Maxey the night of November 14th.  Is that after you

1    asked her to call you?

2    A    That would appear so, yes.

3    Q    And she suggests in her email to you, the email that's

4    time stamped 8:17 p.m., recommend -- "I would recommend

5    conducting a point rollback to reset everyone in Tucson to zero

6    points," --

7    A    Correct.

8    Q    -- correct?

9    A    Yes.

10   Q    Is that the first time she suggested that?

11   A    She may have earlier in the day on Wednesday.  She may

12   have called me earlier in the day saying there was some concern

13   about points.  Or she may have left me a voicemail earlier in

14   the day.  And that's why I probably would have sent that email

15   to her, telling her to call me later that evening.

16   Q    So this wasn't the first time that that had been suggested

17   to you by Ms. Maxey.

18   A    About the rollback or not?

19   Q    Yes.

20   A    I don't know if that was the first time or whether she was

21   already mentioning it earlier in the day.  I just knew

22   throughout the say, she had discovered a lot of quality control

23   issues with the points tracking system.

24   Q    And you agreed with her recommendation and asked her to

25   communicate it to the Tucson employees the following day,

1  correct?

2  A    Correct.

3  Q    Do you recognize the document that's been marked General

4  Counsel Exhibit 41?

5  A    Yes.

6  Q    That's an email exchange you had with Mr. Torra regarding

7  the recommendation to zero out the attendance points for

8  Tucson?

9  A    Correct.

10  Q    And he approved that on November 15th, correct?

11  A    Correct.

12  Q    That's the same day that it was communicated to employees?

13  A    Correct.

14    MS. SHIH:  Move for admission of General Counsel exhibits

15  39, 40 and 41.

16    MR. MINER:  No objection, Your Honor.

17    JUDGE LAWS:  Those are admitted.

18  **(General Counsel Exhibit Number 39, 40, 41 Received into**

19  **Evidence)**

20  Q    BY MS. SHIH:  You weren't present on November 12th at the

21  Tucson facility when employees were discharged, correct?

22  A    Correct.

23  Q    But you received, prior to November 12th, talking points

24  that had been prepared for meetings with employees to be held

25  on November 12th, correct?

1   A     Correct.

2   Q     Did you have any discussions with Lisa Maxey about the

3   talking points that she prepared?

4   A     And again, you mean discussions, email in addition to

5   phone calls?

6   Q     Correct.

7   A     I believe so, yes.

8   Q     And what was the substance of those discussions?

9   A     Well, if there's an email thread there, they would be in

10  the email.  I don't recall if there was phone discussions or

11  not.  We had concerns -- like many times, if there is a large

12  layoff, we have concerns about violence.  So we cover the

13  issues of having outside security.  Discussions on the

14  logistics of the day, in terms of the order of people.  You

15  know, who were they going to talk to first, like Lex Morrison,

16  Jack Lopez and Maggie.

17        And then how were they then going to do the large group

18  discussions geared towards the afternoon, I believe, in terms

19  of having the large group of employees who we were letting go

20  in one part of the shop.  And then at the same time, the other

21  remaining employees, having a meeting with them at the same

22  time in the shop.  And so we went through those kind of

23  logistics to make sure she had that lined up in terms of

24  coverage for speakers and security.

25        And then in terms of just, again, going through the

1    talking points for both meetings of what to say and how to

2    explain it and why.  Some of my operations managers aren't --

3    the don't do a lot of public speaking, group speaking, so many

4    times I get involved with talking points to help them out.

5    Q    I'm handing you what's been marked as General Counsel

6    Exhibit 42.  Those are the talking points that you received

7    from Lisa Maxey for the meetings to be held with employees on

8    November 12th?

9    A    Yes, they are.  Correct.

10   Q    In response to receiving the talking points from Ms.

11   Maxey, did you provide her with any feedback on what she had

12   prepared?

13   A    I either provided her some feedback or Juan and Gordan,

14   because I believe they were the two that were conducting the

15   two simultaneous employee meetings.

16   Q    My question is whether you provided any feedback to Ms.

17   Maxey, either written or verbal, in response to the talking

18   points that --

19   A    Yes.

20   Q    -- she had prepared?

21   A    Yes, I did.

22   Q    When did you provide her with feedback?

23   A    Sometime after this Saturday email.

24   Q    And was it by email or was -- by telephone?

25   A    I definitely recall an email.  I don't recall if there was

1    a phone call or not.  I know we definitely talked on the phone

2    about the security issue, because we had a responsibility to

3    make sure there was no violence.  And we have a tough employee

4    population at times.  So that would have been a phone call.

5    Q    And what about the email that you sent back to her?  What

6    feedback did you provide her by email?

7    A    I don't know.  Do you have email with you?

8    Q    No, I don't.  Do you recall sending an email?

9    A    Yeah, because I went probably into a little more detail on

10   this, just to hit some highlights again.

11   Q    Did you actually revise the talking points that Ms. Maxey

12   had prepared and sent to you?

13   A    I did not revise this attachment here, no.

14   Q    Did you send back additional suggestions for her talking

15   points?

16   A    I believe I did, yes.

17   Q    And what were those suggestions?

18   A    Again, I just said, I don't recall without seeing the

19   email.

20   Q    The -- if you look at page one of what's been marked as

21   General Counsel 42, the attachments listed are talking points

22   for retained employees, which is page two of --

23   A    Uh-huh.

24   Q    -- this document.  Talking points for terminating

25   employees, which is page three of this document.  And something

1    identified as Tucson timeline --

2    A    Uh-huh.

3    Q    -- which is not attached to this email.

4    A    Okay.

5    Q    What is the Tucson timeline?

6    A    Best of my recollection, that would have been, as I just

7    mentioned a few minutes ago, the -- she had laid out the day

8    from morning through afternoon of who they were going to talk

9    to first.  And so that timeline document would have probably

10   said, you know, whatever it was, 5:00 a.m. or 6:00 a.m.  I

11   don't recall when the shop started its shift.  I would probably

12   have been -- they would have started with Lex Morrison, since

13   he was the plant manager.

14        And obviously we're relieving him of duty, so they would

15   have started with him.  And then they either then next went to

16   probably some of the office personnel like a Jack Lopez, who

17   had been there quite some time.  And then Maggie Madrigal, the

18   HR generalist.  So they -- the timeline would have been that

19   walk through of Lisa and Gordan and Juan and I being on the

20   same page of them knowing who they were going to talk to first

21   and then whether they needed then to talk to a production

22   manager or not to kind of then layout the rest of the day.

23   Q    Are these emails that you still have electronically on

24   your email system?

25   A    I would -- I believe I would, yes.

1  Q    So you would have a copy of the Tucson timeline attachment

2  to this email?

3  A    If I have the email, yes, then it would still have the

4  attachment.

5  Q    So that's a document that you would be able to provide to

6  us.

7  A    Yes.

8  Q    And you believe you also responded to this email?

9  A    Either by phone or in writing.  I know we've talked about

10  security, because we just can't afford violence in the shops.

11  And we have a tough crowd.  So that would have been a phone

12  call.  I -- with her, because it just --

13  Q    Right, but I recall you also testified that you believe

14  you responded to this email in writing.  Is that correct?

15  A    Could have, yeah.

16  Q    And is that an email that you would still have in your

17  email system?

18  A    Possibly.

19  Q    And is that something you're able to check on from here?

20  A    Not here, no.

21  Q    I'm sorry?

22  A    When you say from here, in the courtroom.

23  Q    From Tucson.  From -- remotely from Tucson.  Or is that

24  something that you would have to be present in your office in

25  Oregon to be able to determine?

1   A      No, I could probably check it remotely in Tucson.

2   Q      The talking points for the terminating employees don't

3   contain any explanation of why those employees had been

4   selected for termination, correct?

5   A      Correct.

6   Q      So the company's intention was not to communicate with

7   employees any reasons that they had been selected for

8   termination, correct?

9   A      I'm sorry.  Can you repeat that question?

10  Q      The company's intention was not to communicate to

11  employees any reasons they had been selected for termination.

12  A      It would have been our intention not to give specific

13  reasons for a specific employee.  We may have given a

14  generality.

15  Q      Well, I'm not asking you to speculate.  I'm asking you to

16  testify as to whether the talking points for terminated

17  employees included reasons for their selection.

18         MR. MINER:  Your Honor, objection.  These speak for

19  themselves.  Mr. Lave has already testified he was not present

20  during the meetings on November 12th.

21         JUDGE LAWS:  Okay.  I do want to clarify, because you

22  asked two different questions.  One, was it the company's

23  intention ever to talk to the employees?  Two, do these talking

24  points address whether the company was going to talk to the

25  employees?  So I guess I need a clarification as to which one

1   you're getting at.  I mean, there's a notation that Lisa's

2   going to talk to each of them individually.  So --

3        MS. SHIH:  What --

4        JUDGE LAWS:  -- it may be some inquiry into what that was,

5   if this witness knows, but --

6        MS. SHIH:  Well, let me back up, then because --

7        JUDGE LAWS:  Okay.

8        MR. MINER:  I know that one, Your Honor.

9        MS. SHIH:  The initial question, which he confirmed is

10  that the talking points for terminating employees does not

11  include any discussion of the reasons they were selected for

12  termination, correct?

13       THE WITNESS:  Right.  Yeah.  And I think your question is

14  what is our practice or philosophy.  We would generally not

15  proactively go into reasons, in fairness to the workforce.  We

16  would not proactively address that.  If it was asked -- a

17  question to us, then we may respond.

18  Q    BY MS. SHIH:  Did you give any instruction to Ms. Maxey or

19  Mr. Maciel as to what response they should give if asked?

20  A    Possibly, yes.

21  Q    But you don't recall?

22  A    The -- with large layoffs, if someone asks us how were

23  those decisions made, the general response by Greenbrier Rail

24  Services, or protocol is we look at a person's performance

25  record, the quality of their work, do they have -- are they

1    cross-trained in other jobs?  What's the quality of their

2    attendance record?

3        What's the quality of their safety record?  So when people

4    ask us in group layoffs, that's our prepared response that I

5    work with the shops on and the layoffs.  And so that's what I

6    would have communicated to them, that if you get these kind of

7    questions, again, this is how we explain things.  Because

8    that's our practice nationwide when we do layoffs.

9    Q    My question for you is did you communicate to Ms. Maxey or

10   Mr. Maciel what their response should be if asked by employees

11   the reasons they were selected for termination?

12   A    I may have, yes.

13   Q    Do you have any specific recollection as to whether you

14   did?

15   A    I recall, again, Your Honor, as I mentioned to counsel

16   before, I recall an email response that I sent.  I could have

17   delineated various things in addition to the security concern

18   with violence about various questions, whether it was why we

19   were having the layoff, what was going on with the business,

20   why these people were picked.  You know, benefits questions,

21   you know.

22       And that's -- with Lisa individually, she had had to meet

23   with people about Cobra health insurance and people -- because

24   it was going to be a traumatic day and people have questions

25   about health insurance and their 401(k) plan.  So yeah, my

1   email could have said, "Hey, remember to hit these points, if

2   people ask.  Here's your -- here's how Cobra will be handled.

3   Here's how your 401(k) will be handled.  If you have a 401(k)

4   loan, here's what's going on."

5       You know, we have people with tuition reimbursement

6   actively going on.  People -- questions about final paychecks.

7   So yeah, in an email, I could have delineated those types of

8   things.

9   Q    But do you know whether you did?  You're testifying you

10  could have, may have.  And what I'm asking is is there as

11  specific recollection?

12  A    Not at this moment.

13  Q    The factors that you testified about that is the company's

14  philosophy to communicate with employees, if asked why they

15  were terminated.  How would Mr. Maciel and Ms. Maxey have come

16  to know that that's what they communicate to employees if

17  asked?  Had you trained them on this issue before?

18  A    No, I hadn't trained them on that.  Well -- you asked me

19  two questions there.  Can you break them into two?

20  Q    Well, you've answered the second one.  So the first

21  question is, how would Mr. Maciel and Ms. Maxey know what

22  response to give to employees, if asked why they had been

23  selected for termination?

24  A    I'd have to assume they know, because in other layoffs

25  that Juan would have done historically, that's what the

1   company's -- those are the factors the company chooses.  And as

2   Lisa came onboard, I would have shared that with her at some

3   point as part of, you know, her on boarding to the company at

4   some point in time.

5   Q    And those factors that the company uses, knowledge of an

6   employee's job, is that a factor that is considered as well?

7   How well an employee knows their job?

8   A    Sure.

9   Q    Performance

10  A    Definitely performance.  That's a key one.  Especially

11  with a shop that's underperforming financially, we need people

12  who are productive.  When are shops are downsized, we need

13  people who not -- who don't necessarily just know welding.  But

14  can they paint?  Can they be a switchman?  Can they fill in on

15  material handling?  If these shops get smaller, the pressure is

16  on us to have people available to go help out.  So we look at

17  performance.

18       We look at are they cross-trained in other jobs I just

19  mentioned.  What is the quality of their work?  You know,

20  what's their attendance record?  What's their safety record so

21  far?  All those type of things.

22  Q    And it's your testimony that all of that information, all

23  of those factors were evaluated for each of the employees that

24  were selected for termination in November, 2012, correct?

25  A    I can't answer that with regards to decisions, because

1   those were made primarily by Kevin Stewart and Juan Maciel.  So

2   my assumption is yeah, they would use those factors, because

3   that's what we do.  That's just how we run our business.

4   Q    It was anticipated that employees that were being

5   terminated would be spoken to individually and collectively,

6   correct?

7   A    Correct.

8   Q    And do you know whether that actually took place?

9   A    Yes, it did.

10  Q    And who conducted the individually meetings?

11  A    As it states there, Lisa did it.

12  Q    Ms. Maxey?

13  A    I'm sorry, yes.  Lisa Maxey did it.  It was right at -- as

14  the group meeting ended, she made herself available for

15  employees to come to her on the side of the meeting room to see

16  if they had questions.

17  Q    So did Ms. -- are you aware that Ms. Maxey spoke with each

18  terminated employee individually?

19  A    I don't believe she talked to each one individually.  She

20  just made herself available.

21  Q    She made herself available --

22  A    Uh-huh.

23  Q    -- in case they had questions and approached her.

24  A    Correct.

25  Q    So there were not individual meetings that were held with

1    the terminated employees?

2    A    I'm not sure.

3        MS. SHIH:  Move for admission of General Counsel 42.

4        JUDGE LAWS:  Any objection?

5        MR. MINER:  No objection.

6        JUDGE LAWS:  It's admitted.

7    **(General Counsel Exhibit Number 42 Received into Evidence)**

8    Q    BY MS. SHIH:  You were involved in a decision to issue

9    year-end hourly bonuses to employees working for Greenbrier

10   Rail Services in 2012, correct?

11   A    For 2012, yes.  As -- I'm responsible for year-end

12   involvement on annual wage increases, any types of bonuses.

13   And there's a variety of them.

14   Q    When did you first have any discussions about granting

15   Greenbrier Rail Services employees a year-end hourly bonus in

16   2012?

17   A    Can you reference specifically the type of bonus?  We have

18   things that we call gain share bonuses.  And then in 2012,

19   internally was something we called the Bill bonus, which we --

20   Q    I'm referring to --

21   A    -- internally named after Bill Furman, the president.

22   Q    I'm referring to what's been identified by you as the Bill

23   Furman year-end hourly bonus.

24   A    Thank you.  Thank you very much.  Okay, so your question

25   again, please.

1  Q    When did you first have discussions about granting

2  employees that bonus?

3  A    That bonus paid out mid-December, 2012.  I may have heard

4  about it in early November from the parent company.

5  Q    You're testifying you may have heard about it.  Did you

6  hear about it?

7  A    Oh yeah.  I just don't know precisely when, whether it was

8  May 2nd or May 4th.  Would have been early in November, because

9  the parent company said, "Hey, Bill Furman wants to give a

10  bonus to all employees at Greenbrier Rail Services and at

11  Gunderson and at the parent company, based on the fiscal year

12  that just ended."

13  Q    And when you say you heard about it from the parent

14  company, who specifically did you hear from?

15  A    Walt Hannan.

16  Q    This is also what's been referred to in position

17  statements that were submitted to the NLRB as the CEO bonus.

18  Is that the same --

19  A    Yeah, the Bill bonus.  The CEO bonus, yes.  Thank you.

20  Q    And this is not a bonus that was given to Greenbrier Rail

21  Services employees every year, is it?

22  A    That specific bonus, no.  Correct.

23  Q    But it was given to all Greenbrier Rail Services employees

24  in 2012?

25  A    It was given to whoever is specified in those subject

1    lines.  I've got employees in Canada, U.S. and Mexico.  I have

2    hourly employees and I have salaried employees.  So every time

3    we do one of these, we have to drill into exactly who's getting

4    one type of gain share bonus or CEO bonus or gift cards and

5    stuff like that, because it varies by country.  So there's a

6    subject line there, I think by Bill or maybe Tim Stuckey that

7    says who got that bonus.

8        But definitely within the United States, it would have

9    been on GRS hourly employees, correct.

10    Q    Including the employees in Tucson who had not been

11    terminated in November of 2012.

12    A    Would have been the employees who had not -- yes.  On the

13    December 14th payout day, who was an a actively and currently

14    employed at that date, those hourly employees nationwide would

15    have gotten that bonus.

16    Q    But I'm talking specifically about the Tucson employees.

17    A    Oh yes.  They were part of the team, yes.

18    Q    And that was a bonus that was paid out in 2012, because

19    the fiscal year had been very successful for Greenbrier Rail

20    Services, correct?

21    A    It had been successful for the Greenbrier Companies, Inc.

22    Q    Which is the parent company of Greenbrier Rail Services.

23    A    Correct.

24    Q    I'm handing you what's been marked as General Counsel

25    Exhibit 43.

```
 1          MR. MINER:  Eva, is this going to be one exhibit --

 2          MS. SHIH:  Yes.

 3          MR. MINER:  -- or separate?

 4          MS. SHIH:  One.

 5          MR. MINER:  Should we mark them (a) through (e)?

 6          JUDGE LAWS:  We can just paginate.

 7          MS. SHIH:  We can just --

 8          JUDGE LAWS:  I think that's what we did --

 9          MS. SHIH:  Yeah.

10          JUDGE LAWS:  -- earlier, so I want to keep it consistent,

11   so --

12          MR. MINER:  Okay.

13          MS. SHIH:  Okay.

14          JUDGE LAWS:  -- just pen and ink page one, two, three,

15   four, five.

16   Q    BY MS. SHIH:  Do you recognize the documents that --

17   A    Yes, I do.

18   Q    -- make up General Counsel Exhibit 43?

19   A    Yes, I do.

20   Q    Those are discussions that you had with Walter Hannan

21   regarding the issuance of the CEO bonus in 2012, correct?

22   A    Yes.

23   Q    And then pages four and five are memoranda that Mr. Furman

24   actually sent to employees -- Mr. Furman and Mr. Stuckey sent

25   to employees who received the CEO bonus, correct?
```

1    A    Correct.

2    Q    Which would include all of the remaining employees in

3    Tucson in December, 2012?

4    A    Correct.

5    Q    Page five, the memorandum from Mr. Stuckey.  That is not a

6    memo that would have been sent to hourly employees in Tucson,

7    correct?

8    A    Well, it was sent to them, to all U.S. and Canada based

9    hourly employees, yeah.  I sent that out, told the plant

10    managers to hand it out to everybody, because it told them they

11    were getting the bonus paid out on December 14th.

12    Q    So the hourly employees in Tucson received both the

13    memorandum from Mr. Furman -- that's page four -- and the

14    memorandum from Mr. Stuckey.  That's page five.

15    A    They should have received it, yes.

16        MS. SHIH:  Move for admission of General Counsel 43.

17        MR. MINER:  No objection.

18        JUDGE LAWS:  That's admitted.

19    **(General Counsel Exhibit Number 43 Received into Evidence)**

20    Q    BY MS. SHIH:  If I can direct your attention to page two

21    of General Counsel Exhibit 43.  Who is Walter Hannan?

22    A    Walter Hannan is the Senior Vice President and Chief Human

23    Resources Officer for the Greenbrier Companies, Inc.

24    Q    In his email to you of November 28th, he states, referring

25    to Mark Rittendown, he had some hesitation that the approach

1  GRS favors is different than Gunderson.

2  A    Yes.

3  Q    GRS refers to Greenbrier Rail Services?

4  A    Correct.

5  Q    And this is specifically with regard to the CEO bonus,

6  correct?

7  A    Correct.

8  Q    What's the -- what was the difference?

9  A    Let me get some context.  The Greenbrier Companies, Inc.,

10  is composed of a number of subsidiaries.  Again, ours is

11  Gunderson Rail Services, LLC, d/b/a Greenbrier Rail Services.

12  We're a stand-alone subsidiary.  Also, another subsidiary is

13  Gunderson, LLC, which is referenced in, I think it's page two

14  as Gunderson.  And then also in Portland, there's another

15  subsidiary called Greenbrier Leasing Company, LLC that does

16  leasing.

17      And then there's a subsidiary in Europe and subsidiaries

18  in Mexico, okay.  So if you take context of those subsidiaries

19  at that point in time, we're fairly autonomous with regards to

20  our compensation practices.  And so when Walt Hannan and Mark

21  Rittendown and Bill Furman came up with this concept of wanting

22  to give bonuses to a lot of employees.  It was Walt's

23  responsibility then to work amongst the different subsidiaries

24  on how they wanted to do it.

25      And our practice at Greenbrier Rail Services was different

1    from Gunderson, LLC, which is the new car manufacturing shop

2    down the river in Portland.  I think Gunderson was interested

3    in this flat $350.  I think that's what they wanted to do.  We

4    didn't want to do it that way, because we had other types of

5    bonuses that we had done, what we called a gain share bonus for

6    the repair and part shops, that we had based it on length of

7    service.

8         Because internally, with ten managers involved as we are,

9    some people like the idea of a flat sum.  Other people said,

10   "Hey Al, you got people who have been onboard three weeks.  Are

11   they going to get $350?"  Which is good for them.  But what

12   about somebody who's been here 20 years?  And so there's all

13   this internal dilemma on how do we balance and maximize the

14   goodwill of this bonus?

15        So we fell back to what we had been doing with our gain

16   share bonus practice, basing it on years of service, that we

17   thought that was in our best interests and how our philosophies

18   were at Greenbrier Rail Services on compensating our employees,

19   both to recognize our very valued long term people, but also

20   still trying to recognize new hires, as you see there, where we

21   came up with -- what'd it end up being, $100?  A hundred

22   dollars.  Because we wanted to incentivize the new hires to say

23   hey, welcome aboard.

24        You know, please state with us.  So that concept disagreed

25   with the Gunderson folk down at the river.  And so my email to

1    Walt was explaining that.  So then, he could go back to Bill

2    Furman and Mark with intelligent information and say hey,

3    here's what Greenbrier Rail Services wants to do with -- on

4    length of service.

5    Q    So the reference in this email to the approach GRS favors

6    is, according to your testimony, an approach whereby employees

7    received a bonus based on their length of service and not a

8    flat amount for every employee, correct?

9    A    It's based on the specific reference to how we

10   administered our gain share bonus up to that point in time, for

11   the repair and parts group.  Not with other bonuses or

12   something like that.  Just my --

13   Q    I'm asking you to explain the phrase.  The approach GRS

14   favors.  What approach did GRS favor --

15   A    Basic --

16   Q    -- that's referenced in this email?

17   A    That's referenced in the email that was based on the years

18   of service.  That we wanted to do $100 for new hires, $200,

19   $275, $500.  That was our approach that we favored, versus

20   Gunderson, the new car shop, seemed comfortable just doing a

21   flat amount across the board.

22   Q    And that was my question to you, but I didn't get --

23        JUDGE LAWS:  Yeah, I think it's been answered.  Let's move

24   on.

25   Q    BY MS. SHIH:  In this -- in the next paragraph, Mr. Hannan

1    states that you are handling things a little differently than

2    GMO, corporate and GLC.

3    A    Exactly.

4    Q    Greenbrier Rail Services was the only entity that took the

5    approach of giving employees a bonus based on length of

6    service?

7    A    I don't know how those other three entities ended up doing

8    their bonus.  But we choose -- because of our autonomy, we

9    wanted to do it based on length of service.  What Walt was

10   obviously asking me there is -- he's pointing out that we're

11   doing things differently.  And I'm saying yes, he was fairly

12   new onboard.  I think he'd been on six or seven months before

13   that.

14        So as part of his learning curve, he's trying to

15   understand all these different subsidiaries with their

16   compensation practices.  So he's pointing out, oh, it looks

17   like this is different.  And he's saying, "Just want to insure

18   we are being consistent."  So that's the constant tension with

19   compensation practices, whether it's within Greenbrier Rail

20   Services on how we try to balance our philosophy.  Plus with

21   the parent company, as you see Walt there trying to balance.

22        Can there be consistency amongst the subsidiaries, GMO,

23   GLC, Gunderson and us.  And if there's not consistency, is

24   there an intelligent business reason for why one of the

25   subsidiaries wants to do it different?  And that's what he was

1    discussing there.  And that's why these memos were there, to

2    find a common ground.

3    Q    And the common ground was to take the approach that GRS

4    had previously taken, correct?

5    A    Correct.  Common ground for what we had done at that time,

6    because that fit within our executive team's philosophy on

7    compensation practices and that our team decided was how we

8    wanted to administer compensation that disagreed with our

9    sister company, Gunderson, LLC, down the river.

10   Q    The CEO bonus that was given to employees of Greenbrier

11   Rail Services in December 2012 was based on the success of

12   Greenbrier Companies in fiscal year 2010, correct?

13   A    Yes.

14   Q    Employees who were laid off or discharged in Tucson in

15   November, 2012 did not receive the CEO bonus, correct?

16   A    Correct.

17   Q    That they worked in fiscal year 2012, correct?

18   A    May of them did.  Now, whether there was somebody who was

19   part of that layoff on November 12th who hired after September

20   1st, just a few months before.  I don't know if there was or

21   not, so --

22   Q    But employees who were discharged in November, 2012, who

23   performed work for Greenbrier Rail Services --

24   A    Uh-huh.

25   Q    -- in fiscal year 2012 did not receive the CEO bonus,

1    correct?

2    A    If they were not employed on December 14th, correct.

3    Q    Some of those employees who were terminated in November,

4    2012 were later rehired by Greenbrier in 2013, correct?

5    A    Yes.

6    Q    Did they receive a bonus at that time?

7    A    Did they receive a bonus or this one?

8    Q    Did they receive a CEO bonus --

9    A    No.

10   Q    -- at that time?

11   A    No.

12   Q    You were involved in the decision to begin rehiring

13   employees in Tucson in 2013, correct?

14   A    Yes.

15   Q    You were also involved in the selection of which employees

16   would be offered rehire in 2013, correct?

17   A    Can you say that question again, please?

18   Q    You were also involved in the selection of employees that

19   would be offered rehire in 2013.

20   A    In a general sense, yes.

21   Q    When did you first have any discussions about rehiring

22   employees in Tucson in 2013?

23   A    The general discussion would have been back at the time

24   when Kevin Stewart and Juan Maciel wanted to downsize and

25   restructure the shop to try to get it to its efficiencies back.

1    And then the plan was to staff it back up.  So we as a group

2    then had discussion then of saying hey, the plant is suffering.

3    It's losing money.  We hired people too fast.  We can't train

4    them.

5        Let's restructure the shop, get it back to profitability

6    and then at some time in the future, let's start hiring new

7    people and rehiring people in a more calm way, in a more

8    structured way, so we can train these people.  So the initial

9    conversation was back at the same time we decided to do it.

10   Now specifically in two --

11       MS. SHIH:  I'm going to object as nonresponsive.

12   Q   BY MS. SHIH:  My question is when did you begin having

13   discussions about recalling or rehiring employees in Tucson in

14   2013?

15       JUDGE LAWS:  And I think the answer was when they made the

16   decisions to do the layoffs that he had already testified

17   about.  So let's move forward from there.

18   Q   BY MS. SHIH:  So the day after you terminated employees,

19   you guys began having discussions about rehiring employees?

20       MR. MINER:  Objection.  That's not what the testimony was.

21       JUDGE LAWS:  That misstates his testimony.  His testimony

22   is when they started discussing the layoffs.  If -- correct me

23   if I'm wrong.  The discussions of the layoffs were part and

24   parcel of the discussions with the recalls.

25       THE WITNESS:  Exactly.

1      JUDGE LAWS:  Okay.

2   Q    BY MS. SHIH:  When was the decision first made to begin

3   recalling in employees in Tucson?

4   A    February-ish of 2013.

5   Q    I'm handing you what's been marked General Counsel Exhibit

6   44.  Do your recognize those emails?

7   A    Is that question to me?

8   Q    Do your recognize --

9   A    I'm sorry.  You --

10  Q    -- those emails?

11  A    -- you were looking at Grant.  I'm sorry.  Yes, I

12  recognize these emails.

13  Q    You were asked by Kevin Stewart on January 23rd whether

14  there was any progress on recalling the four employees to work

15  in Tucson --

16  A    Uh-huh.

17  Q    -- correct?

18  A    Correct.

19  Q    What four employees was Mr. Stewart referring to?

20  A    I don't -- with this email, I don't know.

21  Q    Had he previously communicated to you that four employees

22  had been identified for rehire?

23  A    Yes.

24  Q    And you were asked to provide progress on recalling those

25  four employees?

1    A    Correct.

2    Q    What was your involvement in recalling those four

3    employees?

4    A    My involvement was more general in the sense that when

5    Kevin Stewart and Juan Maciel said hey, we're now ready to

6    start hiring and rehiring, I then worked with Lisa Maxey and

7    Christine Martinez, the HR generalist to say okay, if we're

8    planning to rehire again, we want to treat those people the

9    same as we do any other applicant.  So once Juan and Maciel and

10   Kevin Stewart identified their people, Chris, you're probably

11   going to start calling these people up.

12        We set up a procedure for her follow in terms of call them

13   up, have them come in, complete an application, interview with

14   -- probably it was Juan at that point, because Eric hadn't been

15   onboard yet.  So my involvement was setting up the procedure

16   for that, so -- because Chris was new.  And she didn't know how

17   to do it.  So my involvement was saying hey, once we get the

18   request for Kevin Stewart and Juan Maciel, call the people up,

19   invite them in for applications.

20        They'd interview with whoever the management team is.  And

21   then that group will make that decision.  So from that, then

22   Kevin's saying, okay, where are we at in that process.

23   Q    So it's your testimony that Kevin Stewart and Juan Maciel

24   were responsible for identifying or selecting employees that

25   would be recalled.  Or who would undergo the process for being

1  recalled.

2  A    Yes, correct.

3  Q    And that would be based on the same factors that employee

4  were selected for termination in November?

5  A    It would have been those same factors.  There may have

6  been additional ones, possibly based on -- if we would have had

7  turnover since November and if we had -- if we were needing a

8  switchman.  Maybe one of these people had been used to have

9  prior experience as a switchman, the ones that move the cars

10  around the shop.  So that could have been an additional factor

11  is what turnover had we had.

12      There could have been market condition changes or customer

13  changes.  I don't know at that time, if we were trying to ramp

14  up the paint department or we had more wrecks coming in or if

15  we had more truck shop work going on.  I wouldn't know that

16  detail.  So then identifying the shop's needs would be like any

17  one of our other shops nationwide.  What is going on at that

18  time, based on railcar flow.  And they would know that, based

19  on the people who had been let go back in November.

20  Q    But you weren't --

21  A    So they could have been --

22  Q    -- you weren't involved in the selection of any employees

23  that would undergo the procedure for recall.

24  A    Correct.

25  Q    So you Don't know what factors Mr. Stewart and Mr. Maciel

1  actually considered in identifying which employees would be

2  contacted.

3  A    Correct.

4  Q    Did you give Ms. Martinez training on the procedure for

5  recalling employees?

6  A    Yes.  I just explained.  I visited with her and Lisa

7  saying hey Chris, you're new here, here's how Greenbrier Rail

8  Services handles the hiring process.  Because we hadn't been

9  hiring her whole time here.  And also then how we handle

10 recalls and stuff like that.

11 Q    And when you say you told Ms. Martinez, "Here's how

12 Greenbrier handles the hiring process," what specifically did

13 you tell her?

14 A    That once Kevin Stewart and/or Juan Maciel gave her lists

15 of names for people that they were hoping to possibly rehire,

16 that she was going to call the people up, invite them to come

17 in, complete an employment application and then depending on

18 what direction that Kevin Stewart or Juan had given her, she

19 would then have them move along and interview with somebody.

20 Q    I'm handing you what's been marked as General Counsel

21 Exhibit 45.  Do you recall having a conversation with Mr. Torra

22 about the four names that you were asked to review?

23 A    I don't recall the detail, no I don't.

24 Q    You don't recall being asked to review any names for

25 potential rehires in Tucson?

1  A    Yes.  Yeah.  They sent me those names, but I don't recall

2  specifically.

3  Q    Let me ask it this way.  Did Mr. Torra ask you to review

4  names of employees for potential recall in Tucson?

5  A    Yes.

6  Q    Did you review the employees whose names you were given?

7  A    Apparently, I did.  But I don't know the four names.

8  Q    You don't remember the names of the individuals that you

9  reviewed?

10  A    No, because there was -- well, there was 30 -- 30 or 32

11  people that were part of the reduction of force.  So some were

12  managers in the office and some were temps.  And then some were

13  production employees.  So my involvement with that would be

14  generally in terms of -- let me back up.  Most shops -- when

15  somebody voluntarily leaves Greenbrier, and if they leave on

16  good terms, basically, that local plant has the ability to hire

17  that person back.

18      MS. SHIH:  Objection.  Nonresponsive.

19      JUDGE LAWS:  Okay.  Why don't we re-ask the question.  I

20  think we've gotten a little far afield.  So ask your question

21  and let's just give a pointed response based on the knowledge

22  you have.

23      THE WITNESS:  Okay.

24  Q    BY MS. SHIH:  Did you review four names given to you in

25  January, 2013 as possible rehires in Tucson?

1    A    Yes.

2    Q    And you reviewed them to determine if they would present

3    the company with any further issues?

4    A    Correct.

5    Q    And by that time, January 2013, a number of unfair labor

6    practice charges had been filed against Greenbrier Rail

7    Services, correct?

8    A    By when again?

9    Q    By January, 2013, a number of unfair labor practice

10   charges had been filed against Greenbrier Rail Services in this

11   case.

12   A    There was one or more, I recall, yes.

13   Q    And you were aware of that, correct?

14   A    Yes.

15   Q    And you're aware that a representation petition had been

16   filed by the Union in November, 2012, correct?

17   A    Yes.

18        MS. SHIH:  Move for admission of General Counsel 44 and

19   45.

20        MR. MINER:  No objection.

21        JUDGE LAWS:  Those are admitted.

22   **(General Counsel Exhibit Number 44 and 45 Received into**

23   **Evidence)**

24   Q    BY MS. SHIH:  I'm handing you what's been marked as

25   General Counsel Exhibit 46.

```
 1        JUDGE LAWS:  And I'm going to ask that you take the
 2   documents that aren't currently being used back.  And I
 3   mentioned that I wanted counsel to do that, because we really
 4   don't have anywhere for witnesses to put documents.  And I
 5   don't want them to become disheveled.  But there's limited
 6   space we do have.
 7   Q    BY MS. SHIH:  Do you recognize what's been handed to you
 8   and marked as General Counsel Exhibit 46?
 9   A    Yes, I do.
10   Q    You were informed February 14th of additional rehires in
11   Tucson that the company planned to conduct?
12   A    Yes, Kevin was saying they needed to increase head count
13   another eight people or so.
14   Q    And again, you weren't involved in the decision to -- or
15   in the selection of the actual employees that would be
16   contacted for rehire, correct?
17   A    Correct.
18   Q    But you were asked to review them?
19   A    Correct.
20   Q    And did you in fact review an additional eight names in
21   February, 2013?
22   A    Probably yes.  Some in March, too, I think.
23   Q    Which employees did you review in 2000 -- or in February,
24   2013?
25   A    I don't recall.
```

1    Q    I'm now handing you what's been marked as General Counsel

2    Exhibit 47.  Do you recognize that email exchange?

3    A    Yes.

4    Q    Those are five names that were given to you in February 13

5    to review for rehire?

6    A    Yes.

7    Q    And did you actually review them?

8    A    Yes.  I'm assuming I did, when I got back from the trip.

9    Because it looks like we hired most of those guys back.

10   Q    Did you decide whether any of those individuals would

11   present the company with further issues?

12   A    I don't know specifically.  I just recognize those names

13   who were hired back, so no issues.

14   Q    You didn't pull the personnel files for those individuals,

15   did you?

16   A    I wouldn't have pulled the personnel files.  I might have

17   talked to Lisa Maxey about what their safety record was or what

18   their attendance record was.

19   Q    Did you speak to Ms. Maxey about their safety record?

20   A    I don't specifically on these people or not.

21   Q    You didn't review their personnel files personally.

22   A    No.

23        MS. SHIH:  Move for admission of General Counsel 46 and

24   47.

25        MR. MINER:  No objection.

1          JUDGE LAWS:  Those are admitted.

2     **(General Counsel Exhibit Number 46 and 47 Received into**

3     **Evidence)**

4     Q     BY MS. SHIH:  Do you still have General Counsel 47 in

5     front of you?

6     A     Yes, I do.

7     Q     Why isn't Omar Ramos on that list?

8     A     I have no idea.

9     Q     Did you play any role in the decision to either recall Mr.

10    Ramos or not recall Mr. Ramos?

11    A     I may have had with him, because I know there was a mixed

12    concern on how he handled the application interviewing process.

13    Q     Yes or no?  Did you have any involvement in the decision

14    to either recall Mr. Ramos or not recall Mr. Ramos?

15    A     Yes.

16    Q     What specific involvement did you have?  Did you review

17    his name for recall?

18    A     Yes, with the management team that had interviewed him.

19    Q     Who did you meet with?  When you say the management team,

20    who did you have discussions with?

21    A     I don't know what -- when Omar -- I don't know the timing

22    of when he was asked to come, apply and interview.  I don't

23    know it if it was February or March, because Eric Valenzuela

24    started in there somewhere.  So I don't know if Juan was

25    interviewing him or if Eric was.  I think Eric was at that

1    time, so that would have been March.

2    Q    When you say you had discussions with the management team

3    about Mr. Ramos, who specifically did you have discussions

4    with?

5    A    It may have been Lisa Maxey.  It may have been Juan or

6    Eric.

7    Q    Well, I'm not asking who it may have been.  I'm asking who

8    it was.

9    A    I don't recall specifically.

10   Q    So you don't recall any discussions that you had about Mr.

11   Ramos?

12        MR. MINER:  Objection, that wasn't his testimony, Your

13   Honor.

14        JUDGE LAWS:  Sustained.

15   Q    BY MS. SHIH:  What discussions did you have regarding the

16   recall of Mr. Ramos?

17   A    I don't recall the specifics.

18   Q    I'm handing you what's been marked as General Counsel 48.

19   Do you recognize that email?

20   A    Yes, I do.

21   Q    What two employees did you discuss with Mr. Stewart and

22   Juan Maciel in response to this email?

23   A    I don't recall.

24   Q    Was one of them Mr. Ramos?

25   A    I don't recall.

1       MS. SHIH:  Move for admission of General Counsel 47 and

2   78.

3       MR. MINER:  No objection.

4       JUDGE LAWS:  Those are admitted.

5   **(Respondent Exhibit Number 48 Received into Evidence)**

6   Q    BY MS. SHIH:  I'm handing you what's been marked as

7   General Counsel 49.  Have you seen that document before?

8   A    Yes.

9   Q    Is that your handwriting on the document?

10  A    It is.

11  Q    You were present at the Greenbrier Rail Services strategy

12  and planning meeting in April, 2013?

13  A    Yes.

14  Q    Who else was present at that strategy and planning

15  meeting?

16  A    Bernie Ferguson (phonetic), Mike Torra, Paul Wassman

17  (phonetic), Jerry Ellison, Frank Burstelli (phonetic), Tim

18  Stuckey, Todd Able, possibly Glen Rosebrook.  Maybe others.  I

19  don't recall if this was an executive staff meeting or a senior

20  staff meeting.  There may have been others, depending on if it

21  was a senior staff meeting.

22  Q    One of the items discussed during the strategy and

23  planning meeting was a recovery plan for Tucson?

24  A    Correct.

25  Q    Is that a written document?

```
 1   A    I don't know if -- per se, if there was a written

 2   document.  It was as these list of shops, it was one of many

 3   that would have a page or two discussion on their history and

 4   their current status and what might be moving forward.

 5   Q    So there was a page or two regarding the Tucson facility.

 6   A    Yeah, or a paragraph or something like that.

 7   Q    Has that been produced to us?

 8   A    I don't know if it has been  or not.

 9        MS. SHIH:  Your Honor, at this time, we would ask you to

10   order the production of that document, which has not been

11   produced.  I don't know whether it's in this witness'

12   possession or another's but I don't believe it's been produced

13   to us.

14        MR. MINER:  We're searching for the documents, Your Honor.

15        JUDGE LAWS:  Okay.  So I will order, to the extent it

16   exists, that it be produced as expeditiously as possible.

17   Q    BY MS. SHIH:  One of the other items being discussed in

18   April, 2013 was the closure of the San Antonio facility,

19   correct?

20   A    Yes.

21   Q    Is that facility still open?

22   A    Yes.

23   Q    And in fact, work that was being performed at the Tucson

24   facility is now being performed in San Antonio, correct?

25   A    I'm not aware of that.  I don't know rail car flow that
```

1    well.

2    Q    At this April meeting, during discussions of the San

3    Antonio closure, it was discussed that that closure would take

4    place in September or December, correct?

5    A    Based on my handwritten notes there, yes.

6    Q    And that's September or December, 2013.

7    A    Correct.

8         MS. SHIH:  Move for admission of General Counsel 49.

9         MR. MINER:  No objection.

10        JUDGE LAWS:  That's admitted.

11   **(General Counsel Exhibit Number 49 Received into Evidence)**

12   Q    BY MS. SHIH:  You were aware in early June, 2013, that a

13   Union election was scheduled to be held in Tucson in July of

14   2013, correct?

15   A    Yes.

16   Q    And in preparation for that, you planned visits to the

17   Tucson facility in June and July of 2013, correct?

18   A    Yes.

19   Q    And had discussions the plant manager, Eric Valenzuela as

20   part of those --

21   A    Yes.

22   Q    -- planned meetings?

23   A    Yes.

24   Q    I'm handing you what's been marked as General Counsel 50.

25   Do you recognize that exchange of emails?

1   A   Yes.

2   Q   On June 7, 2013, you told Mr. Valenzuela not to pick on

3   the internal Union organizers, to treat them the same as the

4   employees who you perceive as Pro GRS, correct?

5   A   Yes.

6   Q   Did you perceive the internal Union organizers to be anti-

7   GRS?

8   A   I'm sorry.  Ask the question again, so I can hear it.

9   Q   Did you perceive the Union organizers to be anti-GRS?

10  A   No.

11  Q   What did you mean when you told Mr. Valenzuela to treat

12  them the same as the employees who you perceive as pro GRS?

13  A   Eric Valenzuela was a fairly new plant manager, so it was

14  my responsibility to make sure that he understood our

15  management practices, that we treat everybody the same.

16  Q   So if you were aga -- employees who were against the Union

17  were pro-GRS.

18  A   Is there a question there?

19  Q   Yes.  Is that what you meant when you said employees who

20  you perceive as pro-GRS.  Were those the employees that were

21  opposed to the Union?

22  A   Correct.

23  Q   So if the employees who were opposed to the Union are pro-

24  GRS then the employees who supported the Union were against

25  GRS?

1  A    I'm sorry.  Let's do that one really.

2  Q    Your testimony is that the employees who were opposed to

3  the Union were pro-Greenbrier Rail Services.

4  A    No.  There could be employees who are opposed to the Union

5  that weren't still pro-GRS.  I mean, that's an individual

6  choice.  I mean, some people work for us who don't like us.

7  Q    So who were the employees who you perceive as pro-GRS.

8  A    Who Eric perceived.  I don't know.  I'm reminding him,

9  treat everybody the same.

10 Q    And you're talking about -- when you say treat everyone

11 the same, you're talking about the employees who supported the

12 Union and those who were opposed to the Union.

13 A    Correct.

14 Q    And you viewed that as pro-GRS or not, correct?

15 A    No.  No.  There are individual employee who want Union

16 representative who still are pro-GRS.  And there are employees

17 who do not want Union representation who are anti-GRS.  It's

18 just my informal phraseology to get the point to him that says

19 treat everybody the same.

20 Q    But you specifically said do not pick on the internal

21 Union organizers.

22 A    Yes, correct.

23 Q    And you did not view the internal Union organizers to be

24 pro-GRS, correct?

25 A    No, I already said I don't know.  A lot of those people

1    could be pro-GRS.  A lot of them could not -- may not be.

2    Q    Item number nine on your list to Eric Valenzuela on June

3    7th, you suggested that there were items that he could do that

4    would benefit employees, correct?

5    A    Correct.  The shop had a history of not following through

6    on their to-do lists.  That's why he was hired.

7    Q    Were those things actually ordered or fixed, the

8    suggestions on your list?  I'm sorry.  I didn't hear your

9    response.

10   A    I don't know if they were or not.  I know bathroom or

11   lunchroom got up -- hung up with the City of Tucson, what do

12   you call it, planning board or building code people, but I

13   don't know about the rest of the stuff.

14   Q    You attached a number of handouts to the email that you

15   sent to Mr. Valenzuela on June 7th, 2013, correct?

16   A    Yes.

17   Q    And those have been produced to us?

18   A    I believe so.  They're from the earlier campaign back in

19   2011.  So I believe they've been produced for you.

20   Q    Okay.

21        MS. SHIH:  Move for admission of General Counsel 50.

22        MR. MINER:  No objection.

23        JUDGE LAWS:  50 is admitted.

24   **(General Counsel Exhibit Number 50 Received into Evidence)**

25   Q    BY MS. SHIH:  I'm handing you what has been marked as

1    General Counsel 51.  That's an email that you sent Mr.

2    Valenzuela on June 11th with a proposed itinerary of your trip

3    to Tucson in June?

4    A    Yes.

5    Q    And that's the trip during which you met with employees of

6    Tucson regarding the upcoming Union election, correct?

7         MR. MINER:  Your Honor, I might be a little confused by

8    that question.

9         THE WITNESS:  Yeah.

10        MR. MINER:  Are we talking about a specific meeting with

11   employees or we talking about meetings generally?

12   Q    BY MS. SHIH:  I'm talk -- my question was the June 13th

13   and June 14th visit by Mr. Lave to Tucson was to meet with

14   employees regarding the upcoming Union election.

15   A    I don't recall if I met with the employees on the 13th and

16   14th.  I know I met with the foremen and managers.  But based

17   on this itinerary, I would draw the conclusion that I did not

18   meet with the employees on those days.

19   Q    So the June 13th, June 14th visit to Tucson was only to

20   conduct Union dos and don't trainings -- training sessions with

21   lead, foreman and managers.

22   A    Not only.  It was part of it.  As you see with item two,

23   time permitting, number six, you know, working with Eric.  He's

24   a brand new manager I had never met.  There may have been other

25   issues he wanted to work on.  And worked with HR Chris, meaning

1    Chris Martinez.  Anytime I travel to a shop, I try to make

2    myself available to look into other HR issues and

3    Q    But you didn't meet with employees --

4    A    I don't think --

5    Q    -- during this trip.

6    A    I don't think I did, according to this email.

7    Q    Number five, under Thursday, June 13th references those

8    needing English translation.

9    A    Yeah.  Some of --

10   Q    Is that a --

11   A    -- some of our leads and foremen have limited English

12   speaking and writing skills, so many times I'll ask the plant

13   manager, if it doesn't mess up production.  And they organize

14   the leads and foremen to have one Spanish speaking meeting

15   only, so it's more efficient for everybody.

16   Q    So your Union dos and don'ts training was conducted in

17   English and in Spanish.

18   A    I probably would have had a handout that it was in

19   Spanish, so yes.  And I would have had a translator there.

20   Q    Who actually provided the translation for those meetings?

21   A    I don't recall.

22        MS. SHIH:  Move for admission of General Counsel 51.

23        MR. MINER:  No objection.

24        JUDGE LAWS:  51 is admitted.

25   **(General Counsel Exhibit Number 51 Received into Evidence)**

1    Q    BY MS. SHIH:  I'm handing what's been marked as General

2    Counsel 52.  That's a continuation of your email exchange with

3    Mr. Valenzuela in preparation for your June 13 and 14 trip,

4    correct?

5    A    Yes.

6    Q    The bottom of page one and the top of page 2, those are

7    the lead men, foemen, managers that were invited to intend the

8    meeting with you on June 13th, correct?

9    A    Were planned to be invited.  There was a question about

10   Marcos -- Marcos -- Marcos Forseca  I'm sorry.  Apologize for

11   the informality.

12       MS. SHIH:  Move for admission of General Counsel 52.

13       MR. MINER:  No objection.

14       JUDGE LAWS:  52 is admitted, except it looks like page two

15   is duplicative and by page 2, it's -- I guess it's page 3,

16   because it's double sided, of General Counsel 51.  So why don't

17   we go ahead and remove that?

18   **(General Counsel Exhibit Number 52 Received into Evidence)**

19       MS. SHIH:  Yes, it's the complete email chain.  We wanted

20   to make sure that we had the entire chain included as part of

21   the exhibit, in case there was any concern.

22       JUDGE LAWS:  All right.  Well why don't we then make the

23   whole thing -- just pen and ink this -- the whole thing 51, so

24   we don't have it in there twice.

25       MS. SHIH:  Okay.

1      JUDGE LAWS:  And then we'll know when looking back through

2  the transcript, when he was asked what was initially identified

3  as 52, it will be the first two pages of 51.

4  A    Yes.

5      MS. SHIH:  Your Honor, it's just about noon and my next

6  line of questioning has to do with a series of emails with

7  handouts and attachments.  If this might be a good place to

8  break.

9      JUDGE LAWS:  I was going to ask you to tell me the next

10  good breaking point, so why don't we take this as it and come

11  back at 1:00.

12      MR. MINER:  Thank you, Your Honor.

13  (Off the record at 11:51 a.m.)

14      JUDGE LAWS:  Okay.  We are back after a lunch break, so

15  let's continue with your direct.

16      MS. SHIH:  Thank you.

17  Q    BY MS. SHIH:  In June of 2013, prior to the Union election

18  that was scheduled for July, you began sending handouts to be

19  distributed that to employees in the Tucson facility leading up

20  to the Union election, correct?

21  A    Correct.

22  Q    I'm handing you what's been marked as been marked GC-52,

23  and there may be some exhibits that were marked out of

24  sequence, so we're just still trying to determine which emails

25  went with which handout.  But do you recognize the email that's

1    been handed to you?

2    A    Yes, I do.

3    Q    That was the first of a number of emails that you sent

4    with handouts for employees, correct?

5    A    Yes.

6    Q    And the handouts that were attached to this email were

7    handouts that you prepared?

8    A    Yes.

9    Q    I'm going to do these one at a time.  I'm handing you

10   what's been marked as General Counsel 53.  Do you recognize

11   that document?

12   A    Yes.

13   Q    That's one of the handouts that you sent to be distributed

14   to employees in Tucson?

15   A    Yes.

16   Q    And the emails that you sent with handouts attached, they

17   began with the one that's marked General Counsel 51 that's

18   identified "our first communication handout," correct?  General

19   Counsel -- I'm sorry, 52 was the first of a number of emails

20   that you sent containing handouts to employees?

21   A    Yes.

22   Q    And those emails and handouts continued throughout June,

23   into July, leading up to the July election, correct?

24   A    Correct.

25   Q    Just to confirm, General Counsel 53 is one of those

1    handouts that you sent?

2    A    Correct.

3        MS. SHIH:  Move for admission of General Counsel 52 and

4    53.

5        MR. MINER:  No objection.

6        JUDGE LAWS:  So they are admitted.

7    **(General Counsel Exhibit Number 53 Received into Evidence)**

8    Q    BY MS. SHIH:  I'm handing you what's been marked as

9    General Counsel 54.  Do you recognize 54 as another handout

10   that you sent to be distributed to the employees in Tucson,

11   correct?

12       MR. GIANNOPOULOS:  Your Honor, could we go off the record

13   one second?  Someone has come into the courtroom and I think

14   there's a sequestration order in place.

15       JUDGE LAWS:  Okay, there is a sequestration order in

16   place.

17       MR. GIANNOPOULOS:  Yes.

18       JUDGE LAWS:  Off the record.

19   (Off the record at 1:10 p.m.)

20   Q    BY MS. SHIH:  I believe you had answered my question

21   before we went off, but just to confirm; you recognize General

22   Counsel 54 as one of the handouts that you sent to be

23   distributed to Tucson employees, correct?

24   A    Yes.

25   Q    And was it in fact distributed to employees at Tucson?

1    A    Yes.

2    Q    And the same is true for General Counsel 53?  I'll hand

3    that back to you, if you would like to see it.  That was a

4    handout that was distributed to employees in Tucson prior to

5    the July election?

6    A    Yes.

7    Q    Let me hand you back General Counsel 53.  It appears that

8    page 1 is a handout in English, and the second page is what I

9    presume is a translation of that same page in Spanish; is that

10   correct?

11   A    Correct.

12   Q    Did you prepare the translation?

13   A    No.

14   Q    Who did?

15   A    I think we utilized of translation service in the Phoenix

16   area.

17        MS. SHIH:  Your Honor, we'd like to have the translator

18   review the document -- a number of these documents that we'll

19   be introducing that are in both English and Spanish, and have

20   her confirm that it's an accurate translation.

21        JUDGE LAWS:  That's fine.  I guess we can probably have

22   her do that during witness testimony where her translation

23   services aren't needed or I shouldn't translation --

24   interpreting services.

25        MR. GANNOPOULOS:  Or we could actually -- we give them to

1    her when she's finished and then -- or right now we can give

2    here the documents.  I can hand her a copy, she could just look

3    them over; is that fair?

4        JUDGE LAWS:  Yeah, I think that makes sense, as long as

5    she's here.

6        MR. MINER:  That's fine.

7    Q    BY MS. SHIH:  Mr. Lave, do you have General Counsel 54 in

8    front of you?

9    A    Yes, I do.

10   Q    It's safe to say then that the second page is also a

11   Spanish translation of what's contained on the first page?

12   A    Yes.

13   Q    And again, that was prepared by a translation service that

14   the company hired?

15   A    Correct.

16   Q    I'm handing you what's been marked as General Counsel 55.

17   You recognize General Counsel 55 as one of the handouts that

18   was distributed to Tucson employees prior to the July election,

19   correct?

20   A    Yes.

21   Q    Again, the second page is a Spanish translation of the

22   first?

23   A    As far as I can tell, yes.  I don't speak Spanish.

24   Q    Prepared by a translation service that the company hired?

25   A    Yeah.

1   Q     And was that at your direction?

2   A     Yes.

3         MS. SHIH:  I believe I already moved for admission of

4   General Counsel 52 and 53; is that correct?  Do you recall?

5         MR. MINER:  I don't recall.

6         MS. SHIH:  Okay.

7         MR. MINER:  But I have no objection to them, nor do I

8   object to 54 and 55.

9         MS. SHIH:  So whichever ones have not yet already been

10  admitted, we move for admission.

11        JUDGE LAWS:  They are admitted now.

12  **(General Counsel Exhibit Number 54 and 55 Received into**

13  **Evidence)**

14  Q     BY MS. SHIH:  I'm handing you what's been marked as

15  General Counsel 56.  It's an email that you sent to plant

16  manager, Eric Valenzuela on June 19, letting him know that you

17  were planning to visit the Tucson facility.

18  A     Yes.

19  Q     And discussing a schedule for campaign communications, to

20  include handouts?

21  A     Yes.

22  Q     And those would be of the type of handouts that we've just

23  looked at in English and Spanish, correct?

24  A     Yes.

25  Q     Were those handouts distributed to employees and posted in

1    the workplace as well?

2    A    I don't know firsthand whether they were posted or not.

3    Q    Did you give instructions to Mr. Valenzuela to -- on how

4    to distribute the handouts to employees?

5    A    In the emails that went with each of those exhibits there

6    was an instruction sheet that said hand it out.

7    Q    Or to post it, if it was appropriate to post it?

8    A    Correct.

9    Q    If you take a look at the last sentence of the email

10   that's in front of you, General Counsel 56, referring to

11   Friday, Tim speech, that was the speech or the meeting that  --

12   actually, why don't you explain what that meeting was?

13   A    It didn't happen.  Tim did not go down and make a speech.

14   Q    That's a reference to Tim Stuckey?

15   A    Correct.

16   Q    It was planned though for him to speak to employees at the

17   Tucson facility, correct?

18   A    Correct.

19   Q    About the subject of why the company did not want a union

20   and why the employees should not want a union?

21   A    Correct.

22   Q    Didn't that speech actually take place with Mike Torra?

23   A    Mike and I did a meeting together.  I don't recall whether

24   it was that Friday or not.

25   Q    And the speech that you and Mike Torra did, that was on

1    the same issues related to the Union, correct?

2    A    Right.  When we were here in September there was an

3    exhibit that showed Mike Torra's talking points.

4    Q    And that was one of two meetings that were held with

5    employees prior to the election about why the company did not

6    want a union, correct?

7    A    It was one meeting with Mike and I, and then the second

8    meeting with Juan Maciel.  But Mike and I did one together.

9    Q    You only did one set of meetings with Mr. Torra, but

10   employees attended multiple meetings regarding why the company

11   did not want a union, correct?

12   A    Correct.

13   Q    But none of those were conducted by Mr. Stuckey

14   A    In 2013, correct.

15   Q    One of the issues related to why the company did not want

16   a union was the economic status and future of the Tucson shop,

17   correct?

18   A    Ask me that question again, please.

19   Q    I'll ask it differently.  The status and future of the

20   Tucson shop was to be discussed by Mr. Stuckey as part of his

21   meeting to discuss why the company did not want a union,

22   correct?

23   A    Partly.  The employees had been asking about the status of

24   the Tucson shop, so I wanted Tim to address it.

25   Q    And it was to be addressed as part of this same meeting

1    regarding the Union, correct?

2    A    Sure, the efficiency of flying in the president, yeah.

3    Q    And that subject was actually discussed with employees

4    when employees met with either you and Mr. Torra in June, or

5    with you and Mr. Maciel in July, correct?

6    A    Correct.

7    Q    Employees were told that having a union could threaten the

8    future of the Tucson shop, correct?

9    A    Not threaten the shop, threaten the efficiency of the shop

10   and the ability for us to deal with the employees, because it

11   would be a third party in between us who knew nothing about our

12   business.  Which would then take more time when we're trying,

13   as a team, to partner together to turn the shop around.  We

14   just did not want an outsider impeding our progress that those

15   employees had worked so hard on beginning in December, we

16   didn't want a third party to impeded on that progress that they

17   were making, because we were all trying to save the shop.

18   Q    And was that what you communicated to employees when you

19   met with them?

20   A    Yes.

21   Q    That you did not want a union to impeded the progress that

22   employees and the shop were making.

23   A    I said we had a concern that a union could impede the

24   progress.

25        MS. SHIH:  Move for admission of General Counsel 56.

1        MR. MINER:  No objection.

2        JUDGE LAWS:  It's admitted.

3    **(General Counsel Exhibit Number 56 Received into Evidence)**

4    Q    BY MS. SHIH:  I'm handing you what's been marked as

5    General Counsel 57.  That's another in your series of emails to

6    Eric Valenzuela with handouts to be distributed to Tucson

7    employees prior to the July election?

8    A    Yes.

9    Q    It's actually a number of separate emails referencing

10   handouts for employees leading up to the July election,

11   correct?

12   A    Yes.

13   Q    I'm handing you what's been marked as General Counsel 58,

14   and that's another in the series of emails Mr. Valenzuela with

15   handouts for Tucson employees prior to the July union election,

16   correct?

17   A    Correct.

18        MS. SHIH:  Move for admission of General Counsel's 57 and

19   58.

20        MR. MINER:  No objection.

21        JUDGE LAWS:  Those are admitted.

22   **(General Counsel Exhibit Number 57 and 58 Received into**

23   **Evidence)**

24   Q    BY MS. SHIH:  I'm handing you what's been marked as

25   General Counsel 59.  Actually, I'll leave both of those for you

1    for reference.  That's one of the handouts that was attached to

2    an email that you sent Mr. Valenzuela to be distributed to the

3    Tucson employees, correct?

4    A    Yes.

5    Q    Looking at General Counsel 57, are you able to identify

6    which email this handout was attached to?

7    A    It would appear to match up with the -- my email to Eric

8    of June 24, 2013, that's subject line Tucson union election

9    handout number 3 for Tuesday, June 25th, because the attachment

10   in that email was labeled good faith bargain.

11   Q    Turning your attention back to General Counsel 59, page 2

12   purports to be a Spanish translation of page 1; is that

13   correct?

14   A    Yes.

15   Q    And again, that's a translation that was prepared by a

16   service or an agency that you retained?

17   A    Here in Phoenix, sorry, up in Phoenix, yes.

18   Q    And that document, General Counsel 59, was actually

19   distributed to employees in Tucson prior to the union election,

20   correct?

21   A    Yes.

22   Q    Including posted on bulletin boards in the facility?

23   A    Yes, Eric was instructed to do that.

24        MS. SHIH:  Move for admission of General Counsel 59.

25        MR. MINER:  No objection.

1        JUDGE LAWS:  59 is admitted.

2   **(General Counsel Exhibit Number 59 Received into Evidence)**

3        MS. SHIH:  And 59 is another that we would ask the

4   interpreter to review as well.

5        JUDGE LAWS:  Sure.

6   Q    BY MS. SHIH:  I'm handing you what's been marked as

7   General Counsel 60.  That's one of the handouts you emailed to

8   Mr. Valenzuela to be distributed to employees in Tucson prior

9   to the July election?

10       MR. MINER:  Can you direct the witness to one of the

11  pages?

12       MS. SHIH:  All of them.

13       MR. MINER:   But there's more than one document, right?

14       MS. SHIH:  Well, I don't know whether they were

15  distributed as a single document, but they're all flyers that

16  were produced in response to our subpoena.

17       MR. MINER:  Okay.  I think you asked him to identify a

18  document that's identified General Counsel Exhibit 60, but

19  there are apparently separated or multiple documents here.

20       JUDGE LAWS:  Why don't we just ask the witness about

21  what's been handed to him, whether it's one document or two.

22  He can hopefully sort that out.

23       MR. MINER:  Thank you.

24  Q    BY MS. SHIH:  Do you recognize General Counsel 60?

25  A    Yes.

1  Q    Are these handouts that were given to Mr. Valenzuela to be

2  distributed to Tucson employees prior to the July election?

3  A    I think your question was:  Were these part of the email

4  that I sent to Eric Valenzuela to hand out?  I don't know if --

5  I'd to match them up to the respective email to know for sure

6  which ones were sent with instructions to hand out.

7  Q    Do you recognize these --

8  A    Yes.

9  Q    -- as documents that you provided to Mr. Valenzuela to be

10 distributed to Tucson employees?

11 A    They're documents that I provided to Eric Valenzuela, but

12 without email that's attached I don't know if each one of them

13 was handed out.

14 Q    Did you instruct Mr. Valenzuela to hand each of these out?

15 A    Without the email body, I don't know.  I may have sent him

16 one or two extras and chose later not to have him hand them

17 out.

18    JUDGE LAWS:  Rather than argue about this, I'm going to

19 match them up.  If looks like the last page of General Counsel

20 Exhibit 57 references the top ten ways and six important facts,

21 so the six important facts is covered by that one.  And then it

22 looks like 58 goes toward the Article 17, which is the second

23 part of this.  And then it looks like there's also Greenbrier

24 gives you the facts, which I think I saw referenced in one of

25 the earlier exhibits.  Actually, I'm not sure.  The witness may

1   need to be asked about this.  It looks like on 58 it talks

2   about Article 17 and facts matter as being part of one handout,

3   number 10.

4       Do you know if these were together?  And I'm talking about

5   the --

6       THE WITNESS:  I believe there was one email where I had

7   combined two messages and asked Eric to put them together as

8   one handout.

9       MS. SHIH:  I think part of the problem with us trying to

10   match them up is that the emails were produced separately from

11   the flyers.

12       JUDGE LAWS:  You know, I think they generally match up.

13   We just need to get, I think, to the material questions.

14       Do you have any reason to believe you didn't distribute

15   these two?

16       THE WITNESS:  Article 17 I think was one of those emails

17   that counsel showed me.  I thought I read about Article 17 in

18   my email body that she showed me.

19       JUDGE LAWS:  Yes, Article 17 is GC58.

20       THE WITNESS:  Does it reference another handout in the

21   Article 17 discussion?

22       MR. MINER:  Yes.

23       JUDGE LAWS:  Handout number 10 are Article 17 and facts

24   matter.

25       THE WITNESS:  There we go.  I'm sorry, thank you, Your

1    Honor.

2        MR. MINER:  Facts matter, there are risks in collective

3    bargaining.  That appears to be page 6.  Could that be page 6

4    of GC 60?  I'm just trying to help.

5        JUDGE LAWS:  Appears to be.

6        THE WITNESS:  I think so.

7        JUDGE LAWS:  So these look to be a combination of

8    handouts, couple of which were distributed with GC 58, and then

9    -- let me see.  The six important part facts appears to be a

10    July 3, 2013, email, which is the last page of GC 57.  Looks

11    like we may have some handouts together in an exhibit that

12    weren't necessarily distributed together, but I don't think it

13    really matters.  I think we can all discern it from the subject

14    matter line of the email.

15    Q    BY MS. SHIH:  About how many handouts were distributed to

16    employees in Tucson in June and July of 2013, prior to the

17    election?

18    A    Give or take, around ten.

19        MR. MINER:  Say it again.

20        THE WITNESS:  Give or take around ten.  I'm sorry.

21    Q    BY MS. SHIH:  Aside from the meetings that you conducted

22    that you've already testified about, how many meetings were

23    held among employees in Tucson in June and July 2013, prior to

24    the union election?

25    A    Besides my meetings?

1    Q    Yes.

2    A    I don't know.

3    Q    You're not aware whether Eric Valenzuela held meetings

4    among the Tucson employees regarding the union election?

5    A    I know he held a meeting with handout number one, I

6    believe.

7    Q    Were any other meetings conducted with the distribution

8    of handouts?

9    A    I don't know.

10    Q    Isn't it true that during safety meetings that were held

11    with employees foremen and managers conducting those meetings

12    would discuss the company's views and the union with employees

13    during those meetings?

14    A    I don't know.  I wasn't in those meetings.

15    Q    Safety meetings were held with employees in Tucson on a

16    regular basis, correct?

17    A    I don't know what regular means.  I know they have an

18    ongoing safety program there and they would meet periodically,

19    but I don't know how regularly it met.

20        MS. SHIH:  Move for admission of General Counsel 60.

21        MR. MINER:  No objection.

22        JUDGE LAWS:  60 is admitted.

23    **(General Counsel Exhibit Number 60 Received into Evidence)**

24        MR. GIANNOPOULOS:  Your Honor, we've had a chance to talk

25    to the translator.  I believe she's ready to confirm the

1  General Counsel's -- the Spanish version in General Counsel 53,

2  54, 55 and 59 are accurate translations of the English version.

3  I'll let the translator speak.

4      JUDGE LAWS:  All right.  I'll reserve doing that until I

5  swear her, because that just makes it easier.

6      MR. GIANNOPOULOS:  Okay.

7      JUDGE LAWS:  Because that makes it easier.  Because for

8  her to say that without me giving the oath isn't --

9      MR. GIANNOPOULOS:  I just didn't want to forget the

10  numbers of the exhibits, so I just --

11      JUDGE LAWS:  All right.  Let's not let me forget to do

12  that.

13  Q    BY MS. SHIH:  I'm handing you what's been marked as

14  General Counsel 61.  Operation safety 2013 was the safety

15  program that was implemented in the Tucson facility for the

16  first time in 2013, correct?

17  A    I have no idea.

18  Q    You have never seen this document?

19  A    Correct.

20  Q    You're not aware of any safety program that was

21  implemented in the Tucson facility in 2013?

22  A    I'm aware that there was a general safety program

23  implemented in 2013, correct.

24  Q    Who was in charge of the safety program in the Tucson

25  facility in 2013?

1    A     Primary responsibility would be Julio Vasquez, the EHS

2    manager for Tucson, in conjunction with Eric Valenzuela, the

3    plant manager, in conjunction with all employees, leads,

4    foremen, supervisors, managers, the general manager and Lisa

5    Maxey, regional HR person, who all had responsibility for

6    safety for employees.

7    Q     You're aware that prior to the safety program being

8    implemented in 2013, there was no safety program in Tucson,

9    correct?

10   A     I'm sorry, you were scratching your nose.  I didn't hear

11   the question.

12   Q     You're aware that there was no safety program in the

13   Tucson facility prior to the implementation of operation safety

14   2013.

15         MR. MINER:  Objection.  I think he's already testified he

16   doesn't know what operation safety is.

17         JUDGE LAWS:  Well, I want to give him a chance to answer

18   the question as it was phrased.  If you know.

19         THE WITNESS:  I think you had a double negative in there.

20   Are you asking about 2012 now?

21   Q     BY MS. SHIH:  I'm asking prior to the implementation of

22   operation safety 2013.

23   A     Do you know when this was implemented?

24         JUDGE LAWS:  Do you know of any safety program in place

25   prior to this?

1      THE WITNESS:  Oh, yes, all the shops have them.

2    Q    BY MS. SHIH:  Including Tucson?

3    A    Oh, yes.

4    Q    You're aware specifically that Tucson had a safety program

5    in place prior to 2013?

6    A    Yes.

7    Q    Can you describe the program?

8    A    Sure.  New employee orientation, what we call NEO, for all

9    new hires.  If you come on board as a Greenbrier employee in

10   Tucson, as part of NEO, day one, we're going to walk through

11   with you personal protective equipment, PPE, and what you need

12   to wear.  We're going to walk through other issues of safety

13   with you as a new employee that day to ensure your knowledge so

14   you're safe out there both for your own wellbeing and the

15   wellbeing of your coworkers.  We will put you then through a

16   number of other safety-type training modules to ensure your

17   safety in that facility.  Okay?

18      Your lead person that is responsible for training

19   continues on as they go out to the shop floor, whatever job it

20   is.  Tucson probably at that time had an EHS coordinator as

21   opposed to an EH manager, who is also responsible for the

22   safety of that facility.  Lock out, tag out, hazard

23   communication, crane safety, proper lifting technique,

24   ergonomics.  It goes on and on and on at all 38 GRS facilities

25   nationwide.

1   Q    Other than training program, are you aware of any

2   incentive, raffle, prizes that were given that employees prior

3   to 2013 for safety-related matters?

4   A    Yes.

5   Q    Can you describe that program?

6   A    The wheel shops utilize a monthly gain share program where

7   safety is one component of the gain share payout in regards

8   to -- it's either not have a recordable accident or maybe not

9   having a time-loss accident.

10  Q    So the gain share payout, which would include production

11  employees in Tucson, a component of that gain share payout is

12  safety?

13  A    Tucson was not a wheel shop.  It's a repair shop.

14  Q    Okay.  My question was specifically regarding the Tucson

15  facility.

16  A    The gain share bonus for the repair and part shops, since

17  the time I've been employed, does not have a specific line item

18  for safety for the gain share bonus.

19  Q    But my earlier question was with regard to any safety

20  programs that existed in Tucson prior to 2013 that included

21  incentives, raffles, prizes, safety poker.

22       JUDGE LAWS:  Your earlier was not limited to Tucson.

23       MS. SHIH:  I apologize.

24       THE WITNESS:  Thank you.

25       JUDGE LAWS:  So now we're asking limited to Tucson.

1    Q    BY MS. SHIH:  That's limited to the Tucson facility.

2    A    Prior to this program, I don't know.

3    Q    To your knowledge, was there any safety committee in the

4    Tucson facility that included employee members prior to 2013?

5    A    I do not know.

6    Q    I'm handing you what's been marked as General Counsel 62.

7    That was an email that Christine Martinez sent to you

8    regarding rehires at the Tucson facility in 2013, correct?

9    A    Yes.

10   Q    And it includes the names of specific individuals that

11   were rehired or recalled with the dates on which they were

12   rehired?

13   A    Yes.

14   Q    And you weren't involved in the selection of any of those

15   employees for rehire, correct?

16   A    I was involved in the decision on some of these employees.

17   Q    Which of these employees were you involved in the decision

18   to rehire?

19   A    I'll walk through the list as best I can recall.  I was

20   involved with decision to rehire Martin Valdez, I was involved

21   in the decision to rehire Martin Valdez, maybe William Murguia.

22   That's not his -- that's probably -- that might be his

23   nickname.  Possible Omar Ramos.

24        MR. MINER:  What was that?

25        THE WITNESS:  Omar Ramos, R-A-M-O-S.

1      THE WITNESS:  I might have been involved with Antonio

2  Acuna, who I think I know as Alex, because I think he left in

3  November as a lead and we brought him back in a different role,

4  so I might have been involved with that one.  He came back as a

5  painter or a welder.  That's the best of my recollection.

6  Q    BY MS. SHIH:  So starting with Martin Valdez, how did you

7  identify Mr. Valdez as a candidate for rehire?

8  A    I did not identify him as a candidate for rehire.  Kevin

9  Stewart wanted me -- I was involved with the final selection on

10  whether he was going to be rehired or not.

11  Q    And what factors did you consider in making your

12  recommendation to offer Mr. Valdez rehire?

13  A    His felony conviction.

14  Q    Excuse me?

15  A    His felony conviction.

16  Q    Was that the only issue that you considered with regard to

17  Mr. Valdez's rehire?

18  A    Correct.  Everybody who applies who has a felony

19  conviction is run by me for approval.

20  Q    What documents did you review in determining whether

21  Valdez should be rehired?

22  A    The employment application he filled out when he was

23  inviting to come interview, along with a supplemental

24  application that addresses the details on his convictions.

25  Q    You didn't review anything with regard to his prior

1    performance with the company, his prior job history?

2    A    No, just the felony convictions.

3    Q    Is it safe to say then that you were not the one who

4    identified Antonio Acuna as an individual for possible rehire?

5    A    Correct.  I did not identify him.

6    Q    What factors did you consider in reviewing Mr. Acuna's

7    eligibility for rehire?

8    A    It wasn't an issue of factors; it was probably a

9    discussion about -- with the management team there on them

10   saying we're bringing back an employee who used to be a lead.

11   Because there was probably then a discussion of:  What wage do

12   we set him at?  Because he was going to a lower pay range

13   classification, so many times the shops will call me for advice

14   on how to structure that person's base pay, since they're

15   moving to a lower pay range.  Since he left us as a lead and

16   was coming back in some other capacity, many times they will

17   call me for advice on how to structure that wage.

18   Q    Who did you have those discussions with, with regard to

19   Mr. Acuna?

20   A    I don't recall specifically.  Could have been Lisa or --

21   depending on when he came back, whether it was Juan or Eric,

22   but possibly Lisa because she was my regional person there that

23   handled local wage issues and would bring them to my attention.

24   Q    Did you review any documents, personnel file or anything

25   with regard to Mr. Acuna prior to his rehire?

1    A    No, just what his wage was when he left and how it fit in

2    our pay range of whatever job he came back into.

3    JUDGE LAWS:  I want to jump in here real quick.  You said

4    you probably did.  Do you have a specific recollection of doing

5    it, or are you saying you probably did just based on what you

6    know his position was before and what it was when he came back?

7    THE WITNESS:  Yeah, I'm just kind of speculating that's

8    why I may have had involvement with him.

9    JUDGE LAWS:  Okay.

10    THE WITNESS:  Because I'm involved with all 38 shops with

11    that personnel action when someone moves to a lower pay grade,

12    especially when they move from a lead person to a non-

13    supervisory position I get involved with the wage analysis and

14    discussion at that point in time.

15    JUDGE LAWS:  But this particular instance of it isn't

16    something that you're recalling independently?

17    THE WITNESS:  No.

18    Q    BY MS. SHIH:  Omar Ramos was another employee that you

19    indicated you had an involvement in the decision to rehire or

20    not to rehire him.  Mr. Ramos was not rehired, correct?

21    A    Correct.

22    Q    But he's identified on this email as an individual to be

23    called for rehire, correct?

24    A    Correct.

25    Q    What was your involvement in the decision not to offer

1   rehire to Mr. Ramos?

2   A    His conduct when he came in to apply and/or interact with

3   the office people and/or in the interviewing manager was

4   unacceptable.

5   Q    And that was based on information you received from whom?

6   A    Either Chris or Lisa.  Christine Martinez or Lisa Maxey or

7   Eric Valenzuela, if he was hired at that time or not; I don't

8   recall when Eric started.

9   Q    Did you ever speak to Mr. Ramos?

10  A    No.

11  Q    Did you review any documents, personnel file or anything

12  prior to not offering him rehire?

13  A    No.

14  Q    Was it your suggestion not to offer rehire to Mr. Ramos?

15  A    Yes.

16  Q    Why was William Murguia not considered for rehire?

17  A    I believe it was similar to Mr. Ramos, that his conduct

18  was unacceptable during the application and interview process.

19  Q    And that was communicated to you by whom?

20  A    Again, either Lisa Maxey and/or Chris Martinez and whoever

21  else would have interacted with him during whatever time period

22  it was.

23  Q    You had no direct interactions with him yourself, correct?

24  A    Correct.

25  Q    Why was Oscar Salinas not considered for rehire?

1   A    I don't recall.

2   Q    Do you know why Jose Ortega was not considered for rehire?

3   A    I don't recall.

4   Q    You didn't review the personnel file or other personnel

5   documents regarding any of those three individuals prior to

6   them not being rehired, correct?

7   A    Correct.

8   Q    Was it your recommendation that William Murguia not be

9   rehired?

10  A    Yes, I believe I was part of the group that recommended

11  that he not be rehired.  I think that was the guy found

12  wandering around the shop one day or something.

13       MS. SHIH:  Move for admission of General Counsel 62.

14       MR. MINER:  No objection.

15       JUDGE LAWS:  62 is admitted.

16  **(General Counsel Exhibit Number 62 Received into Evidence)**

17  Q    BY MS. SHIH:  I'm handing you what's been marked as

18  General Counsel 63, which was received in response to our

19  subpoena.  Have you seen this document?

20  A    Yes.  I provided it to our attorneys as a request to

21  respond to a ULP.

22  Q    And that's a list of individuals -- sorry, who were --

23  well, it includes a list of individuals who were rehired in

24  2013, correct?

25  A    Yes.

1    Q    Did you prepare this spreadsheet?

2    A    Yes.

3    Q    For what purpose?

4    A    Our attorney, Steve Biddle, was responding to a ULP filed

5    by the Sheetmetal Workers' Union.  Some of it had allegations

6    about rehiring these people, so I prepared this to assist Steve

7    on structuring his response, Steve Biddle.  I apologize for the

8    informalness.

9    Q    Can you describe what the spreadsheet consists of?

10   A    The first column is the name on the charge, the ULP charge

11   that -- the original charge back in November, and then in

12   conjunction with whatever ULP that Steve was having to respond

13   to.  I then matched, as best I could, the charge, the ULP from

14   November/December, whenever it was filed, to the name in our

15   payroll system.  Because the first column of names, a lot of

16   them were incorrect and redundant and confusing.

17          Then I provided Steve the layoff date and the title at the

18   time of the reduction in force.  And then the rehires, whether

19   they were -- the rehire date was whether they were rehired and

20   what date.  And then the title at the time of rehire, which

21   shows again where we had some additional needs like Federico,

22   we needed a switchman.  And then for who apparently weren't

23   rehired, I made a thing for Steve that said "see notes below."

24   Q    So the individuals listed on this spreadsheet are limited

25   then to the individuals identified in the November 2012 unfair

1    labor practice charge who were alleged to have been unlawfully

2    terminated?

3    A    Correct.

4    Q    When did you prepare this?

5    A    Sometime after May 31, 2013, because on the line item

6    Gabriel Ortiz it says quit 5/31/13, and I don't see any other

7    dates that go past that point in time, so that probably means I

8    prepared that in -- since that date.

9    Q    The notes at the bottom referring to the individuals that

10   were not rehired, you put that information into the

11   spreadsheet?

12   A    Yes.

13   Q    From whom did you obtain information as to reasons those

14   individuals were not rehired?

15   A    It would have been a combination of Christine Martinez,

16   Lisa Maxey, Juan Maciel, Eric Valenzuela.  I believe that was

17   -- it was that group of people where I created this comment

18   section.

19   Q    HRG refers to human resources generalist?

20   A    Correct.

21   Q    And that's a reference to Christine Martinez?

22   A    Correct.

23        MS. SHIH:  Move for admission of General Counsel 63.

24        MR. MINER:  No objection.

25        JUDGE LAWS:  63 is admitted.

1  **(General Counsel Exhibit Number 63 Received into Evidence)**

2  Q    BY MS. SHIH:  I'm handing you what's been marked as

3  General Counsel 64.  These are your handwritten notes, correct?

4  A    Yes.

5  Q    Dated August 13, 2012?

6  A    Correct.

7  Q    What are these notes from?

8  A    They're either from a conference phone call discussing the

9  five large shops, what we call the big five recovery, and/or

10  possibly a meeting somewhere discussing the big five recovery,

11  five large shops.

12  Q    So the five large shops is also a reference to what

13  there's been previous testimony about referring to the big

14  five?

15  A    Correct.

16  Q    And you said this was a conference call?

17  A    It was either a conference call or a meeting.

18  Q    Who was present?

19  A    I don't recall.

20  Q    Among the topics discussed during this call or meeting was

21  the potential for the Tucson facility?

22  A    Yes.

23  Q    And the need to hire more employees in Tucson, correct?

24  A    Correct.

25  Q    The other shops that were part of the big five were San

1    Antonio, Cleburne, Omaha, and -- is that pronounced Chehalis?

2    A    Chehalis.

3    Q    Was Mexico City part of the big five?

4    A    No, it was just a tagalong conversation because the

5    financial performance wasn't going well down there.

6    Q    So that was discussed as part of this caller meeting as

7    well?

8    A    Yeah.  I'm sorry for the spacing.  I was confusing 2013

9    meetings and 2012.  So, yes, August 2012, Mexico City was

10   discussed.   Mexico City -- Mexico City repair; not Mexico City

11   wheel.

12   Q    Do you keep any type of a calendar or anything that would

13   refresh your recollection as to whether this was an in-person

14   meeting or a conference call and who the other attendees were?

15   A    I'm sorry, I was deep in a thought on some of these shop

16   issues.  Could you ask me the question?  I apologize.

17   Q    Do you keep any type of a calendar or other notes that

18   would refresh your recollection as to whether this was an

19   in-person meeting or a conference call or who the other

20   attendees were?

21   A    I do maintain a one-page document that chronicles since I

22   hired, or long before, when we would have a executive staff

23   meeting offsite and when we would have a senior staff meeting

24   offsite and when we would have plant manager meetings.  And so

25   that document might match up this date or not.  Other than

1   that, no, I don't -- no other calendar systems.  Maybe.

2   Q    At the time of this meeting on August 13, 2012, Tucson was

3   identified as a fix-it facility, correct?

4   A    Yes.

5        MS. SHIH:  Move for admission of General Counsel 64.

6        MR. MINER:  No objection.

7        JUDGE LAWS:  64 is admitted.

8   **(General Counsel Exhibit Number 64 Received into Evidence)**

9   Q    BY MS. SHIH:  I'm handing you what has been marked as

10  General Counsel Exhibit 65 and 66, which are position

11  statements submitted to the NLRB with regard to the

12  investigation of charge 28-CA-112806.  You reviewed these

13  position statements prior to them being submitted to the NLRB?

14  A    Yes.

15       MS. SHIH:  Move for admission of General Counsel 65 and

16  66.

17       MR. MINER:  Can I have a moment, please?

18       JUDGE LAWS:  Sure.

19       THE WITNESS:  Your Honor, okay if I take my coat off?

20       JUDGE LAWS:  Sure, absolutely.  It's hot in here.  Please

21  feel free.

22       MR. MINER:  Your Honor, as we did with regard to the prior

23  position statements, we object to the hearsay basis, or the

24  hearsay in the statements.  They do reflect the company's

25  position in response to the charge when it was requested by the

1    Region.  And based upon that, we don't object to the foundation

2    of the documents.  We don't object to the fact that they

3    reflect the company's position at the time they were offered.

4        JUDGE LAWS:  So I will go ahead and admit them with the

5    caveat that the Respondent does object to any hearsay

6    statements, and I will apply the Board's rule on hearsay as I

7    would to any other hearsay evidence, that it isn't per se

8    inadmissible; it can be considered for the truth of the matter

9    asserted, if it is corroborated by other evidence or has other

10   indicia of reliability beyond just the statement itself.

11       MS. SHIH:  Your Honor, at this time we have a number of

12   documents that were produced electronically to us just

13   yesterday.  We have done a preliminary review of them.  There

14   are a number of them that we would be questioning this witness

15   about.  Unfortunately, because we were not expecting to recall

16   him first today and because we received them all electronically

17   while we were in Tucson yesterday, we don't have all of them

18   printed, marked, identified for exhibits, or prepared to

19   question him about it at this time.

20       MR. GIANNOPOULOS:  Can we go off the record for one

21   second, Your Honor?

22       JUDGE LAWS:  Sure, why don't we do that.

23   (Off the record at 2:15 p.m.)

24   Q    BY MS. SHIH:  I'm handing you what's been marked as

25   General Counsel 67.  We have a limited number of copies, so

1    I'll get you another copy.  Have you seen that document before?

2    A    Yes, I have.

3    Q    Can you identify what it is?

4    A    It's a log or a diary maintained by Chris Martinez, who

5    used to be our HR generalist at the Tucson shop.

6    Q    Regarding potential rehires for the Tucson facility in

7    2013, correct?

8    A    Yes, correct.

9        MS. SHIH:  Move for admission of General Counsel 67.

10        MR. MINER:  No objection.

11        JUDGE LAWS:  67 is admitted.

12    **(General Counsel Exhibit Number 67 Received into Evidence)**

13    Q    BY MS. SHIH:  I'm handing you what's been marked as

14    General Counsel 68.  Can you identify that document?

15    A    Yes.

16    Q    What is it?

17    A    It's titled Greenbrier Rental Services, Tucson, November

18    12, 2013, layoffs and subsequent recalls in 2013, and a list of

19    14 employee names and their recall date.

20    Q    Is this a document that you prepared?

21    A    Yes.

22    Q    On what date?

23    A    Sometime after April 15, 2013.  More likely sometime after

24    May 31, 2013, because it was also prepared for Steve Biddle in

25    responding to a ULP filed by the Sheetmetal Workers' Union.

1    Q    Is this a complete list of all employees who were recalled

2    or rehired in Tucson in 2013, from the November 2012

3    terminations?

4    A    I'm not sure, without matching it up to that other exhibit

5    that we talked before the break.

6    Q    You're referring to the spreadsheet that was General

7    Counsel 63?

8    A    Yes.

9    Q    Let me hand you back General Counsel 63.  If you could

10   take a moment and review the two documents and tell me whether

11   68 is a complete list of all employees rehired in Tucson from

12   the November 2012 terminations.

13    2 A    Matching.

14   A    Can I make checks on this to keep track?  Because they're

15   not in the same order.

16   Q    Here's a copy.

17   A    Okay.

18   Q    Sure, that's fine.  Do you have a pen?  Do you need a pen?

19   A    So document 63 was -- so, all right.  Federico was

20   rehired.  Federico was rehired.  Let's do it this way, okay.  I

21   can mark them both?  Pen or pencil?

22        MR. MINER:  Should we go off the record while he reviews

23   this?

24        JUDGE LAWS:  Sure, we can.

25   (Off the record at 2:28 p.m.)

1      THE WITNESS:  Can you ask me that question one more time,

2  please?

3  Q    BY MS. SHIH:  The question was, I believe, whether General

4  Counsel 68 is a complete list of all employees rehired in

5  Tucson in 2013, from the November 2012 termination.

6  A    Yes.

7      MS. SHIH:  Move for admission of General Counsel 68.

8      MR. MINER:  No objection.

9      JUDGE LAWS:  68 is admitted.

10  **(General Counsel Exhibit Number 68 Received into Evidence)**

11      MS. SHIH:  Now, going back -- I believe that's all the

12  questions we have at this time, but we do have additional

13  documents that were produced yesterday that we would like to

14  have the opportunity to copy, mark as exhibits.  So my

15  suggestions would be if we can recess today and try to complete

16  Mr. Lave's testimony in the morning.

17      JUDGE LAWS:  Is there -- I did note a witness did come in.

18  Is that somebody who will be testifying, the person that we had

19  to eject, for lack of a better word?

20      MR. GIANNOPOULOS:  Earlier today?

21      JUDGE LAWS:  Yes.

22      MR. GIANNOPOULOS:  The person that we told to leave?

23      JUDGE LAWS:  Yes.

24      MR. GIANNOPOULOS:  I think he's a potential witness, but

25  was not necessarily one that we were planning call.

1        JUDGE LAWS:  Right away?

2        MR. GIANNOPOULOS:  Yeah.

3        JUDGE LAWS:  Is he a lengthier --

4    (Counsel confer)

5        JUDGE LAWS:  He's left?  Okay.  All right, well, I mean,

6    if you --

7        MR. MINER:  Are you going to call the interpreter?

8        JUDGE LAWS:  Yeah, I'm going to call the interpreter.

9        MR. MINER:  I'm sorry.

10        JUDGE LAWS:  I mean I guess I don't want to take a break

11    to go over documents the rest of today, and then not be ready

12    to go with a couple of witnesses tomorrow, assuming you will

13    get done with Mr. Lave before the end of the day.  So why don't

14    we get the interpretation piece taken care of and then we'll go

15    off the record and discuss how best to proceed.

16    (Interpreter Sworn)

17        JUDGE LAWS:  And you have then asked to review four

18    documents, General Counsel's 53, 54, 55 and 59.  I'm going to

19    show them to you.

20        THE INTERPRETER:  Thank you.  Yes.

21        JUDGE LAWS:  Have you reviewed those four documents?

22        THE INTERPRETER:  I have reviewed four documents.

23        JUDGE LAWS:  And have you compared the English versions to

24    the Spanish versions?

25        THE INTERPRETER:  I have compared the English to the

1    Spanish.

2        JUDGE LAWS:  Okay.  And in your review, did you find the

3    translations to be accurate?

4        THE INTERPRETER:  They're flawless.

5        JUDGE LAWS:  Very good.  Thank you.

6        THE INTERPRETER:  You're welcome.

7        JUDGE LAWS:  Off the record.

8    (Off the record at 2:34 p.m.)

9        JUDGE LAWS:  We had a brief discussion about how to

10   proceed.  The General Counsel has asked for time to review some

11   documents that they believe are going to be relevant to the

12   continued testimony of Mr. Lave, and both parties agree that

13   having some time this afternoon to get things lined up in light

14   of the amendment and consolidation request that I granted would

15   be an efficient use of everybody's time.

16       Mr. Lave is available tomorrow.  There are two other

17   employee witnesses available, at least one of whom will need an

18   interpret, so it is anticipated that is going to take the bulk,

19   if not the entirety, of tomorrow.  And then let's think about

20   who could possibly be ready for Thursday and the parties can

21   communicate about that and hopefully get some witnesses lined

22   up.

23       With that, we'll be here at -- I've gotten a request to

24   have it be 8:30 from the General Counsel because of the issues

25   with security and getting several loads of boxes in.  So I

1    think that does make sense, especially now since -- because of

2    the consolidation and the amendment we're not as time-pressed

3    to get both sides' cases completed this trip.  I think -- I

4    mean I still want to try to make good progress and use our days

5    wisely, but I don't think we're quite as pressured as we were,

6    so let's proceed at 8:30.

7    **(Whereupon, the hearing in the above-entitled matter was**

8    **recessed at 2:38 p.m. until Wednesday, November 13, 2013 at**

9    **8:30 a.m.)**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    <u>C E R T I F I C A T I O N</u>

2    This is to certify that the attached proceedings before the

3    National Labor Relations Board (NLRB), Region 28, Case Numbers

4    28-CA-093183, 28-CA-103909, 28-CA-104184, 28-CA-106613, 28-CA-

5    111186, 28-RC-093179, Gunderson Rail Services LLC, d/b/a

6    Greenbrier Rail Services, and Sheet Metal Workers'

7    International Association, Local 359, AFL-CIO at the Pima

8    County Consolidated Justice Court, 160 N. Stone Avenue, Third

9    Floor, Courtroom 11, Tucson, Arizona 85701, on Tuesday,

10   November 12, 2013, at 9:20 a.m., was held according to the

11   record, and that this the original, complete, and true and

12   accurate transcript that has been compared to the reporting or

13   recording, accomplished at the hearing, that the exhibit files

14   have been checked for completeness and no exhibits received in

15   evidence or in the rejected exhibit files are missing.

16

17

18   _____

19            GRANT C. DAYLEY

20            Official Reporter

21

22

23

24

25

**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

**REGION 28**

---

In the Matter of:

GUNDERSON RAIL SERVICES LLC,    Case No. 28-CA-093183
D/B/A GREENBRIER RAIL                    28-CA-103909
SERVICES,                            28-CA-104184
                                  28-CA-106613
and                              28-CA-111186

SHEETMETAL WORKERS'
INTERNATIONAL ASSOCIATION
LOCAL 359, AFL-CIO,

GUNDERSON RAIL SERVICES LLC,    Case No. 28-RC-093179
d/b/a GREENBRIER RAIL
SERVICES,

                Employer,

and

SHEETMETAL WORKERS'
INTERNATIONAL ASSOCIATION
LOCAL 359, AFL-CIO,

                Petitioner.

---

The above-entitled matter came on for hearing, pursuant to

notice, before **ELEANOR LAWS,** Administrative Law Judge**,** at the

National Labor Relations Board, Pima County Consolidated

Justice Court, 160 N. Stone Avenue, Third Floor, Courtroom 11,

Tucson, Arizona 85701, on **Wednesday, November 13, 2013, at 8:54**

**a.m.**

<u>A P P E A R A N C E S</u>

**On behalf of the General Counsel:**

    **EVA SHIH, ESQ.**
    **JOHN GIANNOPOULOS, ESQ.**
    NATIONAL LABOR RELATIONS BOARD - REGION 28
    2600 North Central Avenue, Suite 1400
    Phoenix, AZ 85004-3099
    Tel.  602-640-2090
    Fax.  602-640-2178

    **SOPHIA ALONSO, ESQ.**
    NATIONAL LABOR RELATIONS BOARD
    421 Gold Avenue, SW, Suite 310
    P.O. Box 567
    Albuquerque, NM  87103
    Tel.  505-248-5128
    Fax.  505-248-5134

**On behalf of the Respondent:**

    **FREDERICK C. MINER, ESQ.**
    **STEVEN G. BIDDLE, ESQ.**
    LITTLER MENDELSON, P.C.
    Camelback Esplanade
    2425 E. Camelback Road, Suite 900
    Phoenix, AZ 85016
    Tel.  602-474-3653
    Fax.  602-391-2836

<u>I</u> <u>N</u> <u>D</u> <u>E</u> <u>X</u>

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| Alan A. Lave | 576 | | | | |
| Hector Frederico | 594 | 609 | 640 | 644 | 596/598 |
| Juan Silva Gutierrez | 646 | | | | |
| Guillermo Murguia | 691 | 742 | | | 699/709<br>712/714<br>724/726<br>728/730<br>734/735 |

**AVTranz**
845 North 3rd Avenue, Phoenix, Arizona 85003
www.avtranz.com · (800) 257-0885

PX 000572

# E X H I B I T S

| EXHIBIT | IDENTIFIED | IN EVIDENCE |
|---|---|---|
| **General Counsel:** | | |
| GC-69 | 577 | 577 |
| GC-70 | 579 | 579 |
| GC-71 | 580 | 580 |
| GC-72 | 582 | 582 |
| GC-73 | 582 | 582 |
| GC-74 | 588 | 588 |
| GC-75 | 589 | 589 |
| GC-76 | 589 | 589 |
| GC-77 | 591 | 591 |
| GC-78 | 595 | 598 |
| GC-79 | 690 | 690 |
| GC-83 | 697 | 697 |
| GC-84 | 703 | 703 |
| GC-85 | 703 | 703 |
| GC-86 | 705 | 705 |
| GC-87 | 705 | 705 |
| GC-88 | 707 | 707 |
| GC-89 | 707 | 707 |
| GC-90 | 708 | 708 |
| GC-91 | 708 | 708 |
| GC-92 | 712 | 712 |
| GC-93 | 712 | 712 |

<u>E X H I B I T S</u> (Continued)

| <u>EXHIBIT</u> | <u>IDENTIFIED</u> | <u>IN EVIDENCE</u> |
|---|---|---|
| **General Counsel:** | | |
| GC-94 | 714 | 714 |
| GC-95 | 714 | 714 |
| GC-96 | 716 | 716 |
| GC-97 | 716 | 716 |
| GC-98 | 717 | 717 |
| GC-99 | 717 | 717 |
| GC-100 | 718 | 718 |
| GC-101 | 718 | 718 |
| GC-102 | 719 | 719 |
| GC-103 | 720 | 720 |
| GC-104 | 721 | 721 |
| GC-105 | 721 | 721 |
| GC-106 | 722 | 722 |
| GC-107 | 723 | 723 |
| GC-108 | 724 | 724 |
| GC-109 | 724 | 724 |
| GC-110 | 727 | 727 |
| GC-111 | 727 | 727 |
| GC-112 | 728 | 728 |
| GC-113 | 729 | 729 |
| GC-114 | 730 | 730 |
| GC-115 | 730 | 730 |

**E X H I B I T S** (Continued)

| EXHIBIT | IDENTIFIED | IN EVIDENCE |
|---------|------------|-------------|
| **General Counsel:** | | |
| GC-116 | 732 | 732 |
| GC-117 | 733 | 733 |
| GC-118 | 734 | 734 |
| GC-119 | 734 | 734 |
| GC-120 | 736 | 736 |
| GC-121 | 736 | 736 |
| GC-122 | 737 | 737 |
| GC-123 | 737 | 737 |

1                    <u>P R O C E E D I N G S</u>

2        JUDGE LAWS:  We are back today and resuming with Mr.

3   Lave's testimony.  I just want to remind you that you are still

4   under the oath that you swore to yesterday.

5        THE WITNESS:  Thank you.

6        JUDGE LAWS:  Whenever you're ready.

7        MS. SHIH:  Thank you.

8   Whereupon,

9                        <u>ALAN LAVE</u>

10   having been previously duly sworn, was called as a witness

11   herein and was examined and testified as follows:

12                    <u>DIRECT EXAMINATION</u>

13   Q    BY MS. SHIH:  I'm handing you back what was admitted

14   yesterday as General Counsel 42 as well as a document that was

15   produced to us this morning, which I understand is the Tucson

16   timeline attachment that's referenced in the email that's

17   marked as General Counsel 42.  Is that correct?

18   A    That's correct.

19   Q    And that was the timeline that Lisa Maxey prepared an

20   email to you as an outline of the plan for the termination of

21   employees on November 12th, correct?

22   A    Correct.

23        MS. SHIH:  Your Honor, since we just received it this

24   morning, I don't have copies.  What I think makes sense is

25   perhaps during the lunch hour, we can make copies and simply

1    add it to General Counsel 42 as an additional page.

2          JUDGE LAWS:  Sure.  Does that work from your standpoint?

3          Okay.

4          THE COURT REPORTER:  Is that one 69?

5          JUDGE LAWS:  It's going to be page 2 of 42 --

6          THE COURT REPORTER:  Okay.

7          JUDGE LAWS:  -- actually.

8          MS. SHIH:  Oh, I think it will actually be --

9          JUDGE LAWS:  Oh.  I'm sorry.  It's going to be page 4.

10         MS. SHIH:  Page 4 of 42.

11         THE COURT REPORTER:  Thank you.

12   **(General Counsel Exhibit Number 69 Marked for Identification)**

13   Q    BY MS. SHIH:  I'm handing you now what's been marked as

14   General Counsel 69, which appears to be a meeting request that

15   you received from Lisa Maxey for a phone call on November 9th,

16   2012.  Do you recognize that?

17   A    Yes, I do.

18   Q    Did you participate in that phone call?

19   A    I can't recall if I participated in that specific phone

20   call, because I believe I was traveling that day through the

21   mid-west and we were having lots of difficulties with times

22   that I was going to be available in different airports, along

23   with just cell phone coverage.  So I don't recall that this

24   group here ever got together in one call.

25   Q    The meeting request indicates that she wanted to touch

1    base on logistics for next week, correct?

2    A    Correct.

3    Q    And that's a reference to the upcoming termination of

4    employees scheduled for November 12th?

5    A    Correct.

6         MS. SHIH:  Move for admission of General Counsel 69.

7         MR. MINER:  No objection.

8         JUDGE LAWS:  69 is admitted.

9    **(General Counsel Exhibit Number 69 Received into Evidence)**

10   Q    BY MS. SHIH:  I'm handing you what's been marked as

11   General Counsel's 70.  Can you identify that document?

12   A    It's an email thread that was initiated by Lisa Maxey on

13   November 7th, 2012, then with a response from Kevin Stewart to

14   others on the same day, November 7, 2012, concerning --

15   Q    And --

16   A    -- concerning Tucson report.

17   Q    Specifically, Mr. Stewart's directive to hold off on any

18   hire hires, which included hiring permanently any temporary

19   employees that were on the Tucson facility's payroll at the

20   tie, correct?

21   A    Correct.

22   Q    And that was due to the upcoming terminations that were

23   scheduled to take place on November 12th?

24   A    Correct.

25        MS. SHIH:  Move for admission of General Counsel's 70.

1    MR. MINER:  No objection.

2    JUDGE LAWS:  Seventy's admitted.

3    **(General Counsel Exhibit Number 70 Received into Evidence)**

4    Q    BY MS. SHIH:  I'm handing you what's been marked as

5    General Counsel's 71.  Yesterday, you testified about your

6    involvement in the rehire of some employees in the Tucson

7    facility in 2013, correct?

8    A    Yes.

9    Q    And Carlos Contreras Ortiz was one of those employees?

10    A    According to this email, yes.

11    Q    What involvement did you have in the decision to bring

12    back Mr. Ortiz in February, 2013?

13    A    Basically little involvement at all, I believe, since this

14    was the first person they were looking at rehiring.  Lisa was

15    probably checking with me to make sure that procedurally, they

16    were following my direction on how to call the people back in.

17    So it looks like she's checking in with me.  So I asked if they

18    had him fill out an application and interview, as discussed

19    last week.  And she said, yes, they had and that Juan seemed

20    very eager to rehire Carlos.  I said, "Very good.  Thanks."

21    Q    Did you have any involvement in reviewing Mr. Ortiz' job

22    history or performance record with Greenbrier prior to his

23    termination?

24    A    I'm sorry.  Prior to the rehire or termination?

25    Q    Did you review Mr. Ortiz job history with Greenbrier prior

1    to his termination, in your involvement in --

2    A    Oh.

3    Q    -- his rehire?

4    A    No.

5    Q    Sorry.  That was a very poorly worded question.

6    A    That's fine.

7    Q    And I couldn't figure out a better way to phrase it.  I

8    apologize.  So your involvement in Mr. Ortiz' rehire in

9    February, 2013 was limited to simply approving the decision

10   that had already been made by Ms. Maxey.

11   A    Correct, because you know, as we infer from this, when she

12   answers that, there was an employment application filled out.

13   She knew that if there was any issues on the employment

14   application, i.e., for example, felony convictions, she would

15   have forwarded that to me.  So by default, since that wasn't

16   addressed, then I said, "Yeah, sounds like a good rehire.  Go

17   ahead."

18        MS. SHIH:  Move for admission of General Counsel's 71.

19        MR. MINER:  No objection.

20        JUDGE LAWS:  71 is admitted.

21   **(General Counsel Exhibit Number 71 Received into Evidence)**

22   Q    BY MS. SHIH:  I'm handing you what's been marked as

23   General Counsel's 72.  Hector Federico was another rehire that

24   you had involvement with, correct?

25   A    Correct.

1    Q     Was your involvement in the decision to rehire Mr.

2    Federico limited to the issue of his pay rate?

3    A     According to this email, yes.  You know -- again, if there

4    was issues with his employment application that he filled out.

5    But again, by default, it wasn't addressed here.  So my

6    involvement basically by default.  That is, if the guys want to

7    rehire him and there's no felony type stuff, he's okay to hire

8    back.  Then as you say, my involvement is specifically

9    addressing his wage issue, because he was moving up in job

10   classification.  And they're just checking with me to make sure

11   that it was okay to move him up to the higher pay rate, because

12   definitely what we want to do, because we want to pay the

13   people fairly.  So he was moving up to switchman, so he moved

14   up, you know, two, three bucks an hour to get him to the

15   switchman rate, so --

16   Q     Did you review job history or performance for any of the

17   individuals that were rehired or not rehired from the November

18   termination in Tucson?

19   A     I'm sorry.  Did I re --

20   Q     Did you review the job history or performance records for

21   any of the employees who were terminated in November, 2012, in

22   determining whether they would be rehired in Tucson in 2013?

23   A     No.  No performance records or evaluations.  We primarily

24   work off of the employment application that they would complete

25   in the rehire process, if there was an issue associated with

1    that.

2    Q    Did the company consider them to be new hires?

3    A    Correct.

4         MS. SHIH:  Move for admission of General Counsel's 72.

5         MR. MINER:  No objection.

6         JUDGE LAWS:  72 is admitted.

7    **(General Counsel Exhibit Number 72 Received into Evidence)**

8    Q    BY MS. SHIH:  I'm handing you what's been marked as

9    General Counsel's 73.  That's an email you received from Eric

10   Valenzuela on May 1st regarding a Union flyer that had been

11   distributed on April 30th, correct?

12   A    Correct, yes.

13   Q    And that's a reference to the day that the Union was hand

14   billing out of Greenbrier's facility in Tucson, correct?

15   A    Possibly.  I don't remember the exact date of the -- what

16   we call the gate incident date.  But I think it was in late

17   April, so that's probably pretty close to it.

18   Q    Did you have discussions with Mr. Valenzuela about the

19   gate incident date?

20   A    Yes.  He had called me about it at the time, with --

21   asking for recommendation on what he should do, because they

22   weren't leaving the property.

23   Q    So Mr. Valenzuela called you at the time the Union agents

24   were still at the Greenbrier facility, correct?

25   A    Well, it was like 4:40 or so in the morning.  I don't

1  recall if he called me for direction right at that time or if

2  somebody did or between him on his own or me advising him, he

3  knew to call the police, because the people were trespassing

4  and wouldn't leave our property.

5  Q    When Mr. Valenzuela called you about the -- I think you

6  referred to it as the gate incident, what did he tell you?

7  A    That he had been informed by one of our supervisors or

8  leads when he was in the back trailer that some people were up

9  near the front gate blocking traffic from our employees coming

10  in off of 36th Avenue.  And that he then had gone out to the

11  gate, either with Freddy Valdez and or Julio Vasquez, the

12  safety manager, to find out why unknown people were blocking

13  our gate.

14  Q    And what did he tell you that he learned when he went out

15  there to speak with them or to see them?

16  A    I believe he said that somebody identified themselves as a

17  Union person.  They were handing out leaflets.  And at that

18  point in time, Eric asked them to pull their car over to, I

19  believe it was the Sam Levitz Warehouse.  It's next door to us,

20  so the car wouldn't block the lane and asked them to move back

21  to the sidewalk area of our property line and inform them that

22  they were creating a safety hazard, because all our employees

23  were coming in from both lanes of 36th Avenue and it was pitch

24  black.

25        And so we had traffic backing up both ways with people

1    trying to turn left into oncoming traffic and employees in the

2    parking lot.

3    Q    Did Mr. Valenzuela tell you how many Union agents there

4    were present?

5    A    No.

6    Q    Did he tell you whether there was any yelling between him

7    and the Union agents?

8    A    No, my understanding, it was a calm conversation.

9    Q    Did he tell you that he called the police?

10   A    Yes.  Yes.

11   Q    What did Mr. Valenzuela tell you about his call to the

12   police?

13   A    That he had called the police, explaining that they had

14   some trespassers on the property who were refusing to leave our

15   property and it was creating a traffic jam on 36th.  And that

16   the police then had to come to the facility and Eric explained

17   to them what was happening.  And I believe at that time, the

18   police instructed whoever it was to move back to the sidewalk

19   of our property.  And then the police asked Eric if they -- to

20   call them, if there was any future incident or something like

21   that.

22   Q    Did Mr. Valenzuela tell you how long the Union agents

23   remained at the gate that date?

24   A    No.

25   Q    Did he tell you how long he remained out there?

1   A     No.

2   Q     Did Mr. Valenzuela inform you that he obtained a copy of

3   the flyer the Union agents were handing to employees that day?

4   A     Yes.  Might have been the one attached to that email.

5   Q     Did he tell you how he obtained it?

6   A     An employee had handed it to him, I believe later in the

7   day or the next day.

8   Q     And that was what he sent to you that's attached to the

9   email that's marked as General Counsel's 73?

10  A     I believe so, but without seeing the attachment, I'm not

11  sure.

12  Q     Did you do anything in response to receiving this email

13  from Mr. Valenzuela on May 1st?

14  A     We had -- he and I had a phone call discussion about that

15  with regards to his interactions with the police on whether he

16  wanted to -- the police asked him if they wanted the company to

17  file charges who these people were.  And I advised Eric at that

18  time that no, we would not file charges, that we just wanted

19  the people off of our property so our employees could get to

20  work.

21  Q     Is that the same discussion that you just described that

22  you had with Mr. Valenzuela or are you referring to multiple

23  conversations you had about that incident?

24  A     It could have been one or two phone calls that morning.

25        MS. SHIH:  Move for admission of General Counsel's 73.

1      MR. MINER:  No objection.

2      JUDGE LAWS:  73 is admitted.

3   **(General Counsel Exhibit Number 73 Received into Evidence)**

4   Q    BY MS. SHIH:  Did you give Mr. Valenzuela an instruction

5   on what he should do, if the Union agents returned to

6   Greenbrier's property in Tucson?

7   A    Yes.

8   Q    What did you tell him?

9   A    I told him if they remained out at the sidewalk line along

10  the street on our property line that they were in their legal

11  right to be there, as long as they weren't backing up traffic.

12  If they were backing up traffic, then it was his discretion to

13  call the police or not.  And also then, if these Union

14  representatives had moved back up into the gate area

15  themselves, and/or their car and were causing a traffic jam of

16  our employees back onto 36th Avenue, that he had discretion to

17  call the police, again.

18  Q    Did you give him any other instruction on what he should

19  do, if the Union agents returned?

20  A    Just be cordial, keep it non-confrontational.

21  Q    Did you ask him to let you know if they returned to the

22  property?

23  A    Yes.

24  Q    How many times did you hear from Mr. Valenzuela that Union

25  agents had returned to the property?

1   A    On that day?

2   Q    At any time after the initial incident.  The initial gate

3   incident.

4   A    Oh, between that and the day of the election?

5   Q    Yes.

6   A    He may have let me know that they were out there six,

7   seven, eight, ten times.  Wouldn't keep track of that at that

8   point.

9   Q    Did he let you know on any other occasion that he

10  contacted the police?

11  A    My understanding, he never needed to call the police

12  again.

13  Q    I'm handing you what's been marked as General Counsel's

14  74.  That's another communication that you received from Mr.

15  Valenzuela, letting you know that the Union agents had been out

16  at the Greenbrier facility in Tucson?

17  A    Correct.

18  Q    What was the notice that he attached to this email?

19  A    I wouldn't know without seeing it attached to this email.

20  Q    Was it a copy of a Union flyer?

21  A    Possibly.  I'm not sure without seeing it.

22  Q    Do you maintain an electronic copy of this email that

23  would have the attached document to it?

24  A    Possibly.

25  Q    Could you check to see, at your convenience --

1    A    Yes.

2    Q    -- if you have that?

3        THE WITNESS:  Steve, would you mind writing down --

4        MR. BIDDLE:  Got it.

5        THE WITNESS:  -- May 29, '13?  Thank you.

6        MS. SHIH:  Move for admission of General Counsel's 74.

7        MR. MINER:  No objection.

8        JUDGE LAWS:  74 is admitted.

9    **(General Counsel Exhibit Number 74 Received into Evidence)**

10   Q    BY MS. SHIH:  You testified yesterday about a meeting you

11   held with lead men, supervisors, managers and foremen at the

12   Tucson facility in June, 2013 regarding the upcoming Union

13   election.

14   A    Correct.

15   Q    I'm handing you what's been marked as General Counsel's

16   75.  I believe you testified yesterday that there was an issue

17   over the attendance at that meeting by an individual by the

18   name of Marcos Fonseca?

19   A    Correct.

20   Q    And that was an issue of whether he was a production

21   employee or a lead man?

22   A    Whether he was a bargaining unit employee or a lead man,

23   correct.

24   Q    Did Mr. Fonseca attend that meeting?

25   A    No, he did not.

1     MS. SHIH:  Move for admission of General Counsel's 75.

2     MR. MINER:  No objection.

3     JUDGE LAWS:  75 is admitted.

4  **(General Counsel Exhibit Number 75 Received into Evidence)**

5  Q    BY MS. SHIH:  I'm handing you what's been marked as

6  General Counsel's 76.  Is that the final list of employees who

7  attended the Union election training that you conducted in

8  Tucson in June of 2013?

9  A    It's the final list as of the date of that email, June 12,

10  2013.

11  Q    And that was for a meeting that was held on June 13th,

12  2013, correct?

13  A    It would appear so, because in the subject line, it talks

14  about my trip to Tucson June 13 and 14.

15  Q    Were there any other individuals in attendance at the

16  meeting that are not on this list?

17  A    Eric Valenzuela was there.  He's technically not

18  enumerated, but he was there.  No, I believe that's the list

19  who attended.

20     MS. SHIH:  Move for admission of General Counsel's 76.

21     MR. MINER:  No objection.

22     MS. SHIH:  76 is admitted.

23  **(General Counsel Exhibit Number 76 Received into Evidence)**

24  Q    BY MS. SHIH:  I'm handing you what's been marked as

25  General Counsel's 77.  This is an email that you sent to Juan

1  Maciel and Eric Valenzuela recommending a particular employee

2  to serve as the observer for the company at the July, 2013

3  election in Tucson?

4  A    Correct.

5  Q    And you recommended him, because he was the company's

6  observer at the October, 2011 one?

7  A    Correct.

8  Q    Correct.  And you stated that he did a very good job for

9  the company as the observer?

10 A    Correct.

11 Q    What did you mean by that?

12 A    He did well in those things of helping check voters in and

13 ID'ing the voters and monitoring the voting area.  He did what

14 the board agent and what we asked him to do, as I recall from

15 October, 2011.

16 Q    There's a reference in the email to the fact Jessie

17 Barajas, who you recommended to serve as the observer was

18 Hector's mother.  Who is Hector?

19 A    Hector Barajas.

20 Q    Was he also an employee of Greenbrier?

21 A    Yes.  He was either a lead person or a foreman at that

22 time in July.

23 Q    At the Tucson facility?

24 A    Yes.  Thank you.

25     MS. SHIH:  Move for admission of General Counsel's 77.

1        MR. MINER:  No objection.

2        MS. SHIH:  77 is admitted.

3    **(General Counsel Exhibit Number 77 Received into Evidence)**

4        MS. SHIH:  Your Honor, may we go off the record for just a

5    few minutes?

6        JUDGE LAWS:  Why?  Is it just to see document issues?

7        MS. SHIH:  Well, we have some audio recordings at this

8    time that we are intending to have the witness listen to.  And

9    logistically, we're trying to determine how best to handle

10   first offering them to Respondent and if we could just have a

11   couple minutes to confer.

12       JUDGE LAWS:  Understood.

13       MS. SHIH:  Thank you.

14       JUDGE LAWS:  Okay.

15       MR. GIANNOPOULOS:  And I think, Your Honor, there's a

16   series of at least three audio recordings where Mr. Lave is at

17   a meeting speaking and we were going to use Mr. Lave to get

18   these in through him identifying his voice, that he was there.

19   And what particularly I was thinking is that we would offer the

20   three audio recordings to Respondent at this time, give him a

21   chance to listen to them and then you know, we could either --

22   we could reach a stipulation.

23       We can get them into the record that way.  If not, we can

24   have Mr. Lave go through the recordings, you know, as they are.

25   We also have, just for ease of reference, a transcript that was

1  compiled by our office.  It may -- I believe, Ms. Shih is --

2  this was the last part of the questioning we had for Mr. Lave?

3      MS. SHIH:  It is.  It's the last part of the questioning.

4      MR. GIANNOPOULOS:  So quite frankly, it might make sense

5  if we offer these recordings from Respondent and we revisit

6  with Mr. Lave tomorrow or later today.  We have some other

7  employee witnesses that are here.  Fred, you know, I'll --

8  because I'm  -- because there -- a few -- I know one is fairly

9  lengthy --

10     MS. SHIH:  They're actually --

11     MR. GIANNOPOULOS:  The other two are fairly -- at least

12  one is fairly short.  So it might take some time for --

13  actually Respondent to listen to them.

14     MS. SHIH:  They're actually all fairly lengthy.

15     JUDGE LAWS:  So do we want -- I mean, Mr. Lave's here,

16  right?  Is it something that's going to -- did you want to have

17  them recorded into the transcript or --

18     MR. GIANNOPOULOS:  We were just going to offer the -- we

19  have them burned on DVDs.

20     MS. SHIH:  They're on --

21     MR. GIANNOPOULOS:  Or on CDs.

22     MS. SHIH:  -- CDs.

23     MR. GIANNOPOULOS:  We were just going to introduce them

24  that way into the -- you know, into the record on the discs

25  themselves.  The actual evidence is the tape.

1        JUDGE LAWS:  Is the discs.  And then you've had them

2   transcribed?

3        MR. GIANNOPOULOS:  Yes.

4        JUDGE LAWS:  All right.  Well, I think probably what makes

5   the most sense to do is have Respondent, at your convenience,

6   go through them, make sure you have no problems with the

7   authenticity or the accuracy of the transcript.  And if there

8   are no problems, just -- I -- for purposes of looking through

9   the record, would prefer to have both the original recording

10   and the transcribed version, assuming everybody can agree

11   there's no problem with the transcription.  All right, so with

12   that then, you're finished for now with --

13        MS. SHIH:  Yes.

14        JUDGE LAWS:  Mister -- okay.  Did you want to ask him any

15   questions now, or --

16        MR. MINER:  No.

17        JUDGE LAWS:  -- are you going to wait?

18        MR. MINER:  Thank you very much.

19        JUDGE LAWS:  Okay.  Well then why don't we -- let's see

20   It's 9:30.  Why don't we take till 9:40, get the next witness

21   ready and then --

22        MR. MINER:  Great, Thank you, Your Honor.

23        MS. SHIH:  Thank you, Your Honor.

24        THE WITNESS:  Thank you.

25   (Off the record at 9:28 a.m.)

1        JUDGE LAWS:  Have a seat right in that chair.  Please

2    raise your right hand.

3    Whereupon,

4                          **HECTOR FEDERICO**

5    having been first duly sworn, was called as a witness herein

6    and was examined and testified as follows:

7        JUDGE LAWS:  Will you please state and spell your name for

8    the Court Reporter?

9        THE WITNESS:  Hector A. Federico.  H-E-C-T-O-R, middle

10   initial A.  F-E-D-E-R-I-C-O.

11       JUDGE LAWS:  Thank you.  Whenever you're ready.

12       MR. GIANNOPOULOS:  Thank you.

13                        **DIRECT EXAMINATION**

14   Q    BY MR. GIANNOPOULOS:  Good morning, Hector.

15   A    Good morning.

16   Q    Were you employed at Greenbrier?

17   A    Yes.

18   Q    And when did you start -- first start working at

19   Greenbrier?

20   A    In the beginning of 2012.

21   Q    And what kind of work did you do at Greenbrier?

22   A    I was the water boy in materials.

23   Q    And then, at some point, did you change to a different

24   job?

25   A    Yes.  I got laid off.

1    Q    Uh-huh.

2    A    And then I was recalled and I was offered the switchman

3    position.

4    Q    Okay.  And let's go back to when you were first hired

5    before the layoff.  Who was your supervisor?  Who'd you report

6    to?

7    A    Freddie Valdez.

8    Q    And at some point, while you were working at Greenbrier,

9    did you sign a card for the Union?

10    A    Yes, I did.

11    Q    I'm going to show you a document that I'm going to mark

12    General Counsel's next in line, which --

13        JUDGE LAWS:  78.

14        MR. GIANNOPOULOS:  78.  Thank you.

15    **(General Counsel Exhibit Number 78 Marked for Identification)**

16        MR. GIANNOPOULOS:  And I'm going to give the original

17    actually for -- just for the Respondent to take a look at,

18    Judge.

19        JUDGE LAWS:  Sure.

20    Q    BY MR. GIANNOPOULOS:  Hector, I'm just showing you what's

21    been marked General Counsel's 78 and ask you to just take a

22    look at that for a second.  Is that your signature on that

23    card?

24    A    Yes, it is.

25    Q    Is that the Union card that you signed?

1    A    Yes.

2    Q    Is that your handwriting on the entire card?

3    A    Yes.

4    Q    And when you signed that card, what did you understand

5    that to mean?

6    A    I understood that the Union was going to come in and

7    represent me.

8    Q    Okay.

9    A    I was giving them permission.

10    MR. GIANNOPOULOS:  I'm going to move for the admission of

11    General Counsel's 78, Your Honor.

12    MR. MINER:  May I voir dire the witness, Your Honor?

13    JUDGE LAWS:  Sure.

14    **VOIR DIRE EXAMINATION**

15    Q    BY MR. MINER:  Mr. Federico, look on the lower left hand

16    corner of Exhibit 78, please.  The -- I'm sorry.  The lower

17    left hand corner of the upper portion.  The handwritten section

18    of the card.

19    MR. GIANNOPOULOS:  And I'm sorry, Fred.  He only has the

20    original.  So I can -- it'd be the first side.

21    MR. MINER:  Oh, fine.

22    MR. GIANNOPOULOS:  I'm sorry.

23    MR. MINER:  Thanks for the clarification.

24    MR. GIANNOPOULOS:  Sorry about that.  So here's the --

25    what he's actually looking at.

1    Q    BY MR. MINER:  So if you look at the English version of

2    the card on the upper portion of the page -- and now I'm going

3    to direct your attention to the lower left hand corner of that

4    card, where it says date.  Do you see that?

5    A    Yes.

6    Q    There's nothing entered there.

7    A    Yes.

8    Q    Why is that?

9    A    I probably forgot to enter the date.

10    Q    Do you know what date it was?

11    A    I don't recall what date it was.

12    Q    Do you recall if it was 2013?

13    A    No, it wasn't.

14    Q    Do you recall if it was --

15    A    2012 --

16    Q    -- 2012?

17    A    -- yes.

18    Q    Do you recall what part of 2012?

19    A    I'll have to say about a month prior to me being laid off.

20         MR. MINER:  No other questions at this time, Your Honor.

21    I have no objection to General Counsel 78.

22         MR. GIANNOPOULOS:  I'll move for the admission then, if I

23    didn't.

24         MR. MINER:  Okay.

25         JUDGE LAWS:  I'm sorry.

1       MR. GIANNOPOULOS:  Move for the admission, if I didn't.

2       JUDGE LAWS:  That is admitted.

3  **(General Counsel Exhibit Number 78 Received into Evidence)**

4       MR. MINER:  Oh, I'm sorry.  May I come back with a

5  question?  Something was just pointed out to me, Your Honor.

6       JUDGE LAWS:  Sure.

7                      <u>**VOIR DIRE EXAMINATION**</u>

8  Q    BY MR. MINER:  On the bottom portion of the card, Mr.

9  Federico there appears to be a date stamp.  And it's a little

10 faint on the copy that I have.  But it says 2012, November

11 14th; do you see that?

12 A    Yes, I do.  It's upside down, but I see it.

13 Q    Was that the date that you signed the card?

14 A    I don't recall.

15 Q    Okay.  Could it have been the date that you signed the

16 card?

17 A    It could have been.

18 Q    Okay.  Do you know did anything in particular happen on

19 November 14th that you recall being significant in your mind?

20 A    No.

21      MR. MINER:  Okay.  I have nothing else then.

22      MR. GIANNOPOULOS:  And with respect to that date, Your

23 Honor, I'm going to hand this -- the original card to you.  And

24 I'd like you to take administrative notice of the fact that the

25 original card is date stamped at the back and it says,

1    "Received PHX NLRB Region 28 2012, November 14th, p.m.," and

2    then there's a clock time and a minute --

3        JUDGE LAWS:  It looks like 1:02.  I can actually make out

4    all of those words from the version that I have, if I turn it

5    upside down.

6        MR. GIANNOPOULOS:  Great.  Thank you.

7                    **DIRECT EXAMINATION** (CONTINUED)

8    Q    BY MR. GIANNOPOULOS:  Now Mr. Federico, you said that you

9    were recalled -- well, first of all, when -- do you remember

10   what month you were laid off from Greenbrier in 2012?

11   A    It was right before the holidays, so I'm thinking it was

12   sometime at the end of November.

13   Q    Okay.  And when you got recalled, when were you recalled;

14   do you remember what year?

15   A    I was recalled in 2013, February.

16   Q    Okay. And then there was a union election in July; did you

17   vote in that?

18   A    Yes, I did.

19   Q    July of 2013?

20   A    Yes.

21   Q    Now, going back to the time of your layoff, the original

22   layoff, what was the workload like?

23   A    It was heavy.

24   Q    Were you working overtime --

25   A    Yes.

1    Q    -- before you were laid off?

2    A    Yes.  We were working ten-hour days and we working six-

3    hour Saturdays, two Saturdays a month.

4    Q    And how did it come about that you were recalled?  Did

5    someone call you, did you call the company?

6    A    Human resources actually called me and said they would

7    like to offer me my job back if I can come in, fill out an

8    application, and speak with Juan Maciel.

9    Q    And did you go in and talk to him?

10   A    Yes, I did.  I was at the front office.  I filled out my

11   application.  And he came in and said that they're going to

12   offer me the switchman position if I am able to work overtime

13   and weekends.  And I told him, yes.  He says, we're going to be

14   working ten-hour days.  And the switchman position usually

15   works more hours.

16   Q    And how long -- and is that in fact when you got recalled

17   the schedule that you were working?

18   A    Yes.

19   Q    Were you working ten-hour days?

20   A    Yes, I was.

21   Q    And were you working weekends, too?

22   A    Yes, two Saturdays a month.

23   Q    And about how long did you work that schedule?

24   A    About six months.

25   Q    Now, the election that you voted in in July of 2013,

1  before that union election were there regular meetings that you

2  had at work, like safety meetings or --

3  A    Yes, every Monday morning.

4  Q    Okay.  And who would attend those meetings?

5  A    Eric Valenzuela, the whole shop, and the plant manager,

6  safety committee manager, and all the other managers inside the

7  office.

8  Q    And where would those meetings take place?

9  A    In the front shop.

10  Q    And would Julio attend those meetings?

11  A    Yes.

12  Q    And who's Julio?

13  A    Julio is the safety committee manager.

14  Q    Okay.  And in the few weeks before the election, let's say

15  maybe two, three weeks before the election, did anyone from the

16  company, either Eric or Julio or anyone ever say anything in

17  those meetings about how the company was doing?

18  A    Yes.  They said that the company is doing better than what

19  it was and we need to stick together and work together hard

20  just like we are in order to come out of the slump that we're

21  in.

22  Q    And who would say that?

23  A    Eric Valenzuela.

24  Q    And did those meetings continue after the Union election?

25  A    Yes.

1    Q     And do you recall after the election --

2    A     Yes.  After the election, we were all, you know, worried

3    about, you know, how we were doing.  And we were told that we

4    were doing really good, that we're really close to coming out

5    of the red and the company coming off of the list of the

6    companies being closed.  They wanted to thank us all for

7    sticking together as a family and doing all the hard work and

8    all the hours that we'd been putting in.

9    Q     Now, at some point did the company start having a raffle?

10   A     Yes.

11   Q     And do you remember if that was before or after the

12   election?

13   A     Before.

14   Q     And could you estimate about how early before the

15   election?

16   A     It was probably a month before the election.

17   Q     Okay.  And did anyone ever tell you what these raffles

18   were about?

19   A     They were just to show the appreciation of the hard work

20   that the employees were putting out.  And they were also for

21   keeping -- excuse me a minute -- the safety --

22   Q     High safety level?

23   A     High safety level.

24   Q     Who told you that?  Who said that that was the reason for

25   that?

1    A    Eric Valenzuela.

2    Q    And do you remember when he said that?

3    A    He said it in the very first meeting a month prior to us

4    starting the raffle.

5    Q    And what would you get for this raffle; what were the

6    prizes?

7    A    The prizes were boot vouchers, coupons, days off of PTO,

8    welding material, helmets, iPods, a lot of different stuff.

9    There was a whole table of stuff that --

10   Q    And how did the raffle work?

11   A    It worked like a poker game.  Every Monday morning at the

12   meetings, after the meeting everybody would pick a card.  And

13   after everybody had five cards, whoever had the best hand would

14   win the raffle.

15   Q    Did you ever win anything?

16   A    No.

17   Q    And how long did that raffle continue?  So after the

18   election -- the election was in July -- how long --

19   A    Probably three months.

20   Q    About three months?

21   A    Yeah.

22   Q    Now, at some point did you find out that the company was

23   going to close the Tucson shop?

24   A    Yes.

25   Q    And when did you find out?

1    A    In a meeting.

2    Q    Do you remember when, the actual date or the month?  So if

3    the election was in July --

4    A    It was the end of September.

5    Q    Okay.  And do you remember where that meeting was?

6    A    Yes.  It was in front of the office.

7    Q    And who was present at that meeting?

8    A    Kevin, Eric Valenzuela, Julio, and the rest of the

9    employees.

10    Q    And you --

11    A    So was the head of HR, the girls from the front office.

12    Q    Okay.  And do you remember what was said about closing in

13    that meeting?

14    A    They just advised us that the company is going to be

15    closing, that they could not afford to stay open, that we

16    didn't have any work, and that TTX -- is one of our main car

17    suppliers -- has pulled their contract from us.

18    Q    And after that meeting, after you heard -- or learned

19    about the closing, did you ever have a conversation with Danny

20    Dicochea about the closing?

21    A    Yes, I did.

22    Q    And who is he?

23    A    Danny Dicochea is the QC manager.

24    Q    Okay.  And where did that conversation take place?

25    A    In the back side of the front office, in front -- right

1   outside the locomotive.

2   Q     And do you remember when it took place?

3   A     It was a week before I got put on administrative leave.

4   Q     And when was that; when did you get put on leave?

5   A     Close to the end of October.

6   Q     Okay.  So you think this conversation took place about a

7   week before that?

8   A     Yeah.

9   Q     And who was present?

10  A     It was myself, Moises Rosales, and Danny Dicochea.

11  Q     And tell me what was said in that conversation; who said

12  what?

13  A     Well, we were just speaking about, you know, the company

14  closing, is it really going to close.  And he said yes,

15  unfortunately it is.

16  Q     Who's he?

17  A     Danny --

18  Q     Okay.

19  A     -- said yes, unfortunately it is.  You know, that was --

20  you know, we thought that we were going to get work.  And he

21  said that he spoke with Brandt personally and they had advised

22  him that they would send 40 to 50 cars within a week or two and

23  all of our maintenance cars.  And he said he also spoke with

24  Pacer and Pacer also advised him that they would send us work

25  to keep us alive until TTX got back on their feet and was able

1   to feed us work.

2   Q    And that's what Danny told you?

3   A    Danny told me that, yes.

4   Q    And who is Brandt; what is Brandt?

5   A    Brandt is a car company.  And we --

6   Q    They have railcars?

7   A    Railcars, yes.

8   Q    And what's -- who's Pacer?

9   A    Pacer is also a railcar company.

10  Q    And when you said they would also send their service

11  vehicles, what are their service vehicles?

12  A    Service vehicles are the cars that come in just for

13  service, you know, just to check the breaks, make sure the cars

14  are running right.  And, you know, I guess they have like

15  yearly inspections.

16  Q    Okay.  Now, after you heard about the shutdown, at some

17  point were you offered a transfer to another Greenbrier

18  facility?

19  A    Yes, I was.

20  Q    And do you remember about when that was?

21  A    It was a week after the meeting of the shop was closing.

22  Q    Uh-huh.

23  A    Juan Maciel offered me a transfer to Mira Loma,

24  California.  There was a switchman position for the night crew.

25  Q    Okay.  And was there -- were they offering any money for

1    you to go?

2    A    Yes.  The offer was they offered me $5,000, 2,500 for the

3    move --

4    Q    Uh-huh.

5    A    -- and a $2.00 raise, and once I've been there for six

6    months I would receive the other portion of the $5,000, which

7    would be another 2,500.

8    Q    Okay.  So if you had moved to California, they were -- you

9    were going to get a $2.00 raise?

10   A    Yes.

11   Q    Now, let me ask you about a different subject.  While you

12   were working at Greenbrier, did you ever talk to your

13   coworkers, just chitchat with them while you were working?

14   A    Yes.

15   Q    And did you ever talk to them during work time?

16   A    Yes.

17   Q    And during those periods of time, would you talk to them

18   -- this is during work time -- would you talk about non-work

19   issues like sports or your family?

20   A    Yes, all the time.

21   Q    Kids, politics?

22   A    Yeah.

23   Q    And did anyone at Greenbrier ever tell you that you can't

24   talk about those things, sports, your kids, politics?

25   A    No.

1    Q    Do you know of anybody who's ever gotten in trouble for

2    talking about sports during work time?

3    A    No.

4    Q    Do you know of anyone who's ever gotten in trouble for

5    talking about their kids or politics during work time?

6    A    No.

7    Q    And how often would you talk about these subjects, non-

8    work subjects, with your coworkers while you were working?

9    A    Every day, every day.

10        MR. GIANNOPOULOS:  And that's all I have, Your Honor.  I

11    don't have any more questions for Mr. Federico.

12        JUDGE LAWS:  And I just have one follow up.  Did you take

13    the offer to move?

14        THE WITNESS:  No, I did not.

15        JUDGE LAWS:  You declined it?

16        THE WITNESS:  Yes, I did.

17        JUDGE LAWS:  Okay.  And any cross?

18        MR. MINER:  Yes, Your Honor.  First, is there an affidavit

19    for this witness?

20        MR. GIANNOPOULOS:  There is not, Judge.

21        JUDGE LAWS:  There is not.

22        MR. MINER:  All right.

23        MR. GIANNOPOULOS:  Okay.

24        MR. MINER:  May I take about a five-minute break, please?

25        JUDGE LAWS:  Five minutes to prepare?  Why don't we do

1   that.

2       MR. MINER:  Thank you, Judge.

3       JUDGE LAWS:  You can stand up and stretch.

4       THE WITNESS:  Oh, okay.

5       JUDGE LAWS:  He's going to take five to prepare to ask you

6   questions.

7   (Off the record at 9:57 a.m.)

8       JUDGE LAWS:  Let Mr. Minor know and he can --

9       MR. MINER:  Thank you.

10                    **CROSS-EXAMINATION**

11  Q    BY MR. MINER:  Mr. Federico, good morning.

12  A    Good morning.

13  Q    My name is Fred Miner.  I'm an attorney for Greenbrier.

14  I'm going to ask you a few questions about the subjects you

15  testified to this morning.  All right?

16  A    Okay.

17  Q    If you don't understand any of my questions, let me know

18  that.  I'll be glad to try again.

19  A    Okay.

20  Q    All right.  Good.  We took a look at an authorization

21  card.  And I've already asked you a couple of questions about

22  the card.  Do you recall where you were when you signed the

23  card?

24  A    Yes.  I was in the material department.

25  Q    Okay.  You were in the facility?

1    A    Yes.

2    Q    In the Tucson shop?

3    A    Yes.

4    Q    Were there any managers or foreman around?

5    A    No.

6    Q    Any lead men around?

7    A    No.

8    Q    Anybody observe you -- strike that.  Any managers or lead

9    men or foreman observe you signing that card, to your

10   knowledge?

11   A    No.

12   Q    Prior to the time that you signed the card, did you wear

13   any hats or buttons or pins to work that indicated you were a

14   supporter of the Sheetmetal Workers Union?

15   A    No.

16   Q    How about after you signed the card?

17   A    No.

18   Q    Did you observe any other employees signing an

19   authorization card at the facility other than yourself?

20   A    Yes.

21   Q    Okay.  When you observed other employees signing

22   authorization cards, did you observe any managers or foremen or

23   lead men in the area who also would have observed this?

24   A    No.

25        MR. GIANNOPOULOS:  Objection; calls for speculation as to

1   whether the other people would have also observed it.  He can

2   certainly ask if he saw any in the area.

3       JUDGE LAWS:  Okay.  And I will take the testimony as to

4   the extent of this witness's knowledge.

5       MR. MINER:  Thank you.

6   Q   BY MR. MINER:  And as the NLRB's lawyer has clarified, let

7   me put that question to you.  When you observed other employees

8   signing cards, did you observe whether there were any managers,

9   foremen, or lead men in the area at the time?

10  A   No.

11  Q   All right.

12      JUDGE LAWS:  You didn't observe or you observed and there

13  weren't any?

14      THE WITNESS:  I did not observe and I did not -- when I

15  did observe, I didn't see anybody around.

16  Q   BY MR. MINER:  Okay.  All right.  Were those cards being

17  signed so as to avoid being observed by management?

18      MR. GIANNOPOULOS:  Objection; calls for speculation, Your

19  Honor.

20      JUDGE LAWS:  Answer only to the extent that you know

21  whether there was any instruction --

22      MR. GIANNOPOULOS:  And objection.  It's --

23      THE WITNESS:  Not of my knowledge, no.

24      MR. GIANNOPOULOS:  Objection, Your Honor.  It's compound.

25  When he said those cards, there -- we're going to present

1    numerous cards.

2        JUDGE LAWS:  Did you ever receive any instruction from

3    management not to -- or from anybody -- excuse me.  Strike all

4    of that.  Were you ever instructed not to sign cards in the

5    presence of leads, managers, supervisors?

6        THE WITNESS:  No.

7    Q    BY MR. MINER:  Did you personally want to avoid being

8    observed by management when you signed a card?

9    A    No.

10   Q    All right.

11   A    You know, when I was approached, you know, to do it, I was

12   -- there was a discussion and I chose myself to do it.

13   Q    Okay.  Was it another employee who approached you to do

14   it?

15   A    Yes.

16       MR. GIANNOPOULOS:  Objection; relevance.

17       JUDGE LAWS:  Overruled.  You can answer.

18       THE WITNESS:  Yes.

19   Q    BY MR. MINER:  Okay.  Was the employee who asked you to

20   sign the card wearing a pin or a hat or a button --

21   A    No.

22   Q    -- indicating his support of the Sheetmetal Workers Union?

23   A    No.

24   Q    Prior to that day, had you ever seen in the facility any

25   of your coworkers wearing any sheetmetal workers paraphernalia?

```
 1   A     No.

 2   Q     How about after the day you signed the card?

 3   A     No.

 4   Q     Did you ever talk with any foremen or leads or managers

 5   prior to the time that you signed the card about your support

 6   of the sheetmetal workers?

 7   A     No.

 8   Q     Or about any other employee's support of the sheetmetal

 9   workers?

10   A     No.

11   Q     How about after you signed the card?

12   A     No.

13   Q     I want to turn your -- or turn your attention, turn our

14   attention, for a minute to the layoffs, which I understand

15   occurred in about November of 2012, correct?

16   A     Yes.

17   Q     And I believe you testified that you thought it was right

18   before the holidays --

19   A     Yes.

20   Q     -- is that correct?

21   A     Yes.

22   Q     And how were you informed about the layoffs occurring?

23   A     In a meeting.

24   Q     Who conducted the meeting?

25   A     I forget the gentleman's name.  He was actually -- I'm not
```

1  sure if he was like a CEO or someone high up for Greenbrier,

2  also with the HR, Lisa.

3  Q    Okay.  Was it Gordan Hudgens --

4  A    Oh, yes.

5  Q    -- does that name ring a bell?

6  A    Gordan, there you go.

7  Q    Gordan Hudgens?

8  A    Yes.

9  Q    Okay.  Did Mr. Hudgens speak or did the lady speak?

10  A    He spoke and the lady spoke also.

11  Q    Did they explain what the reason was for the layoff?

12  A    Yes.

13  Q    What did they say the reason was?

14  A    They said at this time, they feel that the company does

15  not have enough work to employ everybody --

16  Q    Okay.

17  A    -- fulltime or part time.

18  Q    Did they say anything about how employees were selected to

19  be laid off at that time?

20  A    No.

21  Q    They didn't say anything about that?

22  A    No.

23  Q    Did anybody ask?

24  A    Yes.

25  Q    During the meeting?

1    A    Yes, during the meeting.  And it was not answered.

2    Q    Okay.  So --

3    A    They were trying to avoid a big argument and stuff like

4    that.

5    Q    I see.  Okay.  All right.  Do you know personally how

6    employees were selected for the layoffs?

7    A    Just rumors.

8    Q    Did you speak with anyone in management about how they

9    selected employees to be laid off?

10    A    I spoke with management, but was not explained on how the

11    layoff came about.

12    Q    All right.

13    A    He said he was in the dark about it.

14          JUDGE LAWS:  And who is he?

15          THE WITNESS:  Oh, I'm sorry.  Freddie Valdez.

16          JUDGE LAWS:  Thank you.

17    Q    BY MR. MINER:  Okay.  Prior to your layoff, did you ever

18    again -- strike that.  Prior to the time that you were laid

19    off, had you discussed with any managers or leads or foremen

20    your interest in the Sheetmetal Workers Union?

21    A    No.

22    Q    With respect to the recall, I understand that a lady from

23    human resources called you, correct?

24    A    Yes.

25    Q    Did she tell you how it was that she was calling you

1    rather than someone else?

2    A    No.

3    Q    Did you ask?

4    A    No, I didn't.

5    Q    All right.  You went in and you completed an application,

6    correct?

7    A    Yes.

8    Q    Did you fill it out?

9    A    Yes, I did.

10    Q    Fill out everything in the application?

11    A    Yes.

12    Q    Did you discuss it with Juan Maciel?

13    A    Yes, I did.

14    Q    Did Juan Maciel tell you how it was that you were selected

15    to come in and fill out an application rather than someone

16    else?

17    A    He just said that he felt that I was offered the position

18    because, you know, I was a good worker prior to being laid off.

19    Q    What kind of work does a switchman do?

20    A    He operates the locomotive in the facility.

21    Q    Is that something you had done before?

22    A    No.

23    Q    Okay.  So how was it that you were going to perform that

24    work if you hadn't done it before?

25    A    Because prior to the layoff, I was offered the position.

1  Q    All right.  And --

2  A    I was very -- I'm more hands-on than -- on my experience

3  on, you know, heavy equipment, mechanical equipment, and stuff

4  like that from my previous jobs.

5  Q    Had you operated a locomotive before?

6  A    No, I have not.

7  Q    How was it that you were selected for the switchman job

8  before the layoffs?

9  A    I think it was more because they were looking for someone

10  in that position and they thought I would fulfill the job to

11  the fullest of the duties that they expected.

12  Q    Did you tell them that you'd be able to do the job?

13  A    I told them at the time that I was unable to take the job

14  for personal reasons.

15  Q    Okay.  Without the personal reasons being involved, do you

16  think you could have performed the job at that time?

17  A    Oh, yes.

18  Q    Did you tell management you could have done the job if you

19  had --

20  A    Yes.

21  Q    -- if you had been able to do it in spite of those

22  personal reasons?

23  A    Yes, I did.

24  Q    And why is it -- what experience did you have that enabled

25  you to do the switchman job?

1    A    I was willing to learn and I was a hard worker.  I did not

2    have any hands-on experience, but they were willing to train

3    me.

4    Q    Okay.  Did you discuss this with Juan Maciel during your

5    interview when you came back to be rehired?

6    A    No.

7    Q    You didn't?

8    A    No.

9    Q    He told you he thought you could do the job?

10   A    He offered me the job and I took it.

11   Q    Did you tell him you could do the job?

12   A    Yes.

13   Q    Based on what?

14   A    Based on knowing that if they were going to train me, that

15   I would catch on fairly quick and I would be able to do the

16   work that they expected of me.

17   Q    And were you trained?

18   A    Yes, I was.

19   Q    And was it on-the-job training or classroom training?

20   A    It was on-the-job training.  And before that, on safety I

21   was instructed a pamphlet by Julio, the safety committee

22   manager --

23   Q    Uh-huh.

24   A    -- to go over the safety reasons.  And after that, they

25   asked me to stay off connecting cars.  I don't know if you

1    understand, you know --

2    Q    Why don't you explain to us what that means.

3    A    They asked me just to observe for a week --

4    Q    Uh-huh.

5    A    -- not to get off the locomotive and connect any cars --

6    Q    Uh-huh.

7    A    -- until I was properly instructed on how to do it.

8    Q    All right.  And were you instructed how to do it?

9    A    Yes, I was.

10   Q    And Julio Vasquez put you through some safety training

11   when you returned?

12   A    Yes.

13   Q    And was that in the classroom or out in the field?

14   A    It was in his office.

15   Q    In his office?

16   A    Yes.

17   Q    How long did it last?

18   A    Twenty minutes.

19   Q    All right.  And how about on-the-job training; how long

20   did that last?

21   A    That lasted a week.

22   Q    Did you have any classroom training for performing

23   switchman job duties?

24   A    No.

25   Q    Okay.  So it was all out in the field?

1    A    Yes.

2    Q    And it lasted a week?

3    A    Yes.

4    Q    And learned by watching?

5    A    Yes.

6    Q    And then did you do the job after that?

7    A    Yes, I did.

8    Q    How did you do?

9    A    I think I did good.  Well, I actually did really good.

10   Q    So Juan made a good choice?

11   A    Oh yes, he did.

12   Q    Good.  Let's talk about safety for a minute.  You

13   mentioned some safety meetings, weekly safety meetings,

14   correct?

15   A    Yes.

16   Q    What day are those meetings conducted?

17   A    Monday morning.

18   Q    Every Monday morning?

19   A    Every Monday morning.

20   Q    Have those been conducted since you started with

21   Greenbrier in Tucson?

22   A    Yes.

23   Q    And who conducts those meetings?

24   A    Management and safety.

25   Q    You mentioned a safety committee or a head of a safety

1    committee earlier.

2    A    Yeah.  That's Julio --

3    Q    Julio Vasquez?

4    A    Julio Vasquez, yes.

5    Q    Who else is on the safety committee?

6    A    I believe there's one -- I know Jessie Barajas, Kenny Pike

7    (phonetic).  And I don't remember the other guys from the other

8    departments, but.

9    Q    Were those hourly employees or managers?

10   A    Yes, hourly employees.

11   Q    All right.  And had there always been a safety committee

12   since you had been working in Tucson?

13   A    No.

14   Q    Okay.  When did that start?

15   A    That started maybe three months after I was hired the

16   first time.

17   Q    In about 2012?

18   A    Yes.  And then that's when they presented Julio as, you

19   know, he was going to run safety and bring the shop up on

20   safety code and everything.

21   Q    So Julio implemented some new safety committee, what -- he

22   implemented a new safety committee?

23   A    Yes.  And --

24   Q    At the time that he started?

25   A    Yes, he did.

1    Q    And that was about 2012?

2    A    Yes.

3    Q    And other than going to the safety meetings, did Julio

4    implement any other new safety initiatives when he started in

5    2012?

6    A    Yes, lots of them.

7    Q    For instance?  What did he implement?

8    A    That there's a lot of things that need to be brought up to

9    code that he's going to be focusing on.  He's going to focus on

10   our attire, our safety glasses, hard hats, gloves, everything

11   that is needed, you know, to keep the shop safe and to keep the

12   employees safe.  And he started right away.

13   Q    Uh-huh.

14   A    He did.

15   Q    Uh-huh.  And how long did these initiatives continue?

16   A    I guess until I was laid off.

17   Q    Okay.  Coming back to the safety meetings, what kind of

18   subjects are discussed at the weekly safety meetings?

19   A    Just what kind of accidents, what kind of almost accidents

20   did we have, what we have to put more attention to.  And if any

21   of the employees that -- we were always free to talk and asked

22   any questions on what we think needed to be, you know, fixed or

23   anything like that.

24   Q    Do you know what an EOCC unit is?

25   A    Yes.

1    Q    What is an EOCC unit?

2    A    It's actually a gear yoke --

3         MR. GIANNOPOULOS:  Objection; relevance.

4         JUDGE LAWS:  Hold on.

5         THE WITNESS:  Oh.  Sorry.

6         JUDGE LAWS:  There's an objection pending.

7         MR. MINER:  This --

8         JUDGE LAWS:  Is this geared towards something safety

9    related?

10        MR. MINER:  Yes.

11        JUDGE LAWS:  Okay.

12        MR. MINER:  There's a safety violation involving another

13   employee that I'm going --

14        MR. GIANNOPOULOS:  And that goes way beyond the scope of

15   direct, Your Honor.

16        MR. MINER:  Well, I hate to have to recall this witness to

17   ask him about it later, Your Honor.

18        MR. GIANNOPOULOS:  And --

19        MR. MINER:  But I understand the objection.

20        MR. GIANNOPOULOS:  And Your Honor, this gentleman -- I

21   mean, I know the violation that he's getting to.  But we had no

22   direct testimony from this gentleman about that.  It's my

23   understanding he testified he worked as a switchman.  The other

24   individual alleged a complaint worked somewhere else at

25   something else.  It's irrelevant, outside the scope, and I'm

1   going to object.

2      JUDGE LAWS:  All right.  And is this something that you

3   are going to call this witness in your case in chief to testify

4   about?

5      MR. MINER:  I might.  Again, I hate to have to call him

6   back just because we're outside the scope.  It's directly

7   relevant to a safety violation that's disputed in the

8   complaint.

9      MR. GIANNOPOULOS:  Mr. Federico lives in Tucson.  And

10  because the company has shut down, he has no work.  And we'll

11  make him available upon the request from Respondent to call him

12  about those kind of questions.

13     JUDGE LAWS:  All right.  Then why don't we hold off then.

14  Because I do agree it's going a bit beyond the scope.  The

15  direct touched briefly on safety meetings, but didn't get into

16  any specific violations.

17     MR. MINER:  Okay.  Thank you, Your Honor.

18  Q   BY MR. MINER:  You mentioned a new safety issue -- or

19  strike that.  You mentioned a raffle or a poker contest

20  starting up at the facility sometime in 2013.

21  A   Yes.

22  Q   And did I understand correctly this happened about a month

23  before the election?

24  A   Yes.

25  Q   That would have been about May or June, something like

1    that?

2    A    Yes.

3    Q    Do you remember if it was May or if it was June?

4    A    I would have to say it was the end of May.

5    Q    End of May?

6    A    Yeah.

7    Q    And how did you find out about this, the poker program?

8    A    Eric Valenzuela and Julio Vasquez in our regular Monday

9    morning meetings.

10   Q    Was it a regular Monday morning safety meeting?

11   A    Yes.

12   Q    And did they say what the purpose of this poker program

13   was going to be?

14   A    It was to show appreciation to the employees on the hard

15   work that we've been giving and, you know, all the time that we

16   put into the shop, just to put a little bit of spirit into the

17   guys because they work so hard, work so many hours, you know?

18   Q    Uh-huh.

19   A    And they wanted the facility to have some kind of

20   excitement.

21   Q    And there was some safety component to it, too, right?

22   A    Yes.

23   Q    And they talked about a safety reason for the poker

24   contest, right?

25   A    Yes.

1    Q    And what was the safety reason?

2    A    They safety reason was for not anybody getting hurt.

3    Q    There had been some incidents -- some safety incidents in

4    Tucson prior to that, correct?

5    A    Yes, I think so.

6    Q    A lot of recordable OSHA incidents in Tucson prior to May,

7    right?

8    A    Yes.

9    Q    How about after this poker program was implemented, were

10   there more or fewer safety incidents?

11   A    Fewer safety incidents.

12   Q    A lot fewer?

13   A    Yes, a lot fewer.

14   Q    Why is that?

15   A    Well, I believe that the --

16        MR. GIANNOPOULOS:  Calls for speculation.  Objection, Your

17   Honor.

18        JUDGE LAWS:  Only answer --

19        THE WITNESS:  Okay.

20        JUDGE LAWS:  -- only what you have direct knowledge of.

21   Q    BY MR. MINER:  Do you know why that is?

22   A    Can you repeat the question?

23   Q    Yeah.  Do you know why it is that there were so many fewer

24   safety incidents afterwards?

25   A    Well, I feel that everybody was looking forward to

1    continuing their, you know, long-lasting work there.  You know,

2    things were progressing --

3         MR. GIANNOPOULOS:  Same objection, Your Honor.  And what

4    he feels is irrelevant.  Move to strike.  Same objection.

5         JUDGE LAWS:  And I do think there's some relevance.  I

6    will consider the testimony only as to this witness's

7    observations and his observations only.  I did want to

8    interject here because is the incident that you wanted to talk

9    about something that is part of your defense as to why this

10   raffle was implemented?

11        MR. MINER:  No.

12        JUDGE LAWS:  Okay.

13        MR. MINER:  Thank you.

14        JUDGE LAWS:  Uh-huh.

15        MR. MINER:  All right.

16   Q    BY MR. MINER:  Okay.  So you talked about the poker

17   contest involving employees getting a card every week, right?

18   A    Yes.

19   Q    So how was it that an employee would receive a card?  Or

20   strike that.  That's not a good question.  How would you earn a

21   card for the poker contest?

22   A    Just showing up everybody got a card.

23   Q    Did everybody get a card every single week?

24   A    Yes.

25   Q    Did Eric and Julio explain to you whether there would be

1    weeks when employees did not get a card?

2    A    No.

3    Q    Did they tell you employees won't get a card if there's a

4    safety incident?

5    A    No.

6    Q    Okay.  Did you receive a poker card every week?

7    A    Yes, I did.

8    Q    Okay.  And to your knowledge, all the employees received a

9    poker card every week?

10    A    Yes.

11    Q    All right.  Let's talk about the closure.  I think that

12    was the next subject that you talked about this morning.  Did

13    you receive a letter from Greenbrier letting you know that the

14    Tucson facility was going to be closing?

15    A    No.

16    Q    Do you know what the Warn Act is?

17    A    No.

18    Q    You've never heard of that?

19    A    No.

20    Q    Okay.  You didn't receive a September 5th letter from

21    Greenbrier informing you that the facility would be closing in

22    60 days?

23    A    Oh yes, I did.  I'm sorry.

24    Q    You did receive that?

25    A    Yes, I did.  I'm sorry.  That was after they had already

1  told us at the shop.

2  Q    Okay.  And do you remember what the date on the letter

3  was?  Was it about September 5th?

4  A    Yeah, I believe so.

5  Q    Okay.  Did the letter say anything about why the closure

6  was occurring?

7  A    I can't -- I don't recall.  I can't remember what I read

8  on the letter.  I know I have the letter.

9  Q    Okay.  Do you remember the letting telling you that you

10  had 60 days notice of the closure occurring?

11  A    Yes.

12  Q    Were you placed on administrative leave before the 60 days

13  was up?

14  A    Yes.

15  Q    Is that because you worked less than 60 days after the

16  Warn Act notice was given to you?

17  A    No.

18  Q    Okay.  Why was that?

19  A    They informed me that my position as the switchman was not

20  needed as a fulltime job right now.

21  Q    Okay.  Did they --

22  A    They --

23  Q    -- say why the switchman job wasn't needed anymore?

24  A    No.

25  Q    Were there any cars to be moved in the facility by the

1    time you were laid off?

2    A    Yes.

3    Q    How many?

4    A    I would have to say 20 cars still in the facility, plus

5    about maybe 20 wrecks.

6    Q    Okay.  And were there other switchmen working at the

7    facility at the time?

8    A    Not of my knowledge.

9    Q    You were the only one?

10    A    Me and Moises Rosales.

11    Q    And who is Moises Rosales?

12    A    He was my partner, my switch partner.

13    Q    He's another switchman?

14    A    Yes, he was.  He was actually the lead switchman.

15    Q    And he was still at the facility after you were placed on

16    administrative leave?

17    A    No.  They put us both on administrative leave.

18    Q    Same day?

19    A    Same day.

20    Q    Do you know who continued to perform the switchman duties

21    after you left?

22    A    I remember them telling me who did the next day moved a

23    bunch of cars, but I can't --

24    Q    Who told you that?

25    A    One of the guys from the material department.

1   Q    Okay.  Management didn't tell you?

2   A    No.

3   Q    Okay.  Did you ask?

4   A    No, I didn't ask.

5   Q    All right.  So you had a discussion with Danny.  And I

6   apologize.  I was taking notes as quickly as I could, but I

7   didn't catch his last name.

8   A    Oh, Dicochea.

9   Q    Dicochea?  Can you spell that for us?

10  A    I'm sorry.  I can't.  I don't know how to spell it.  I'm

11  sorry.

12  Q    We'll ask somebody else.  Thank you.

13  A    Okay.

14  Q    All right.  And who is Danny?

15  A    He's a QC manager.

16  Q    Do you know whether he negotiates contracts with customers

17  of Greenbrier?

18  A    Yes, I believe so.

19  Q    And which customers does he negotiate contracts with?

20  A    From my understanding, everybody.  From my understanding.

21  Q    Okay.

22  A    But I know more so as of what he told me is Brandt and

23  Pacer.

24  Q    Uh-huh.  How much work did the Tucson shop do for Pacer

25  prior to let's say October of 2013?

1   A    I couldn't tell you.

2        MR. GIANNOPOULOS:  And I would object, Your Honor, with

3   respect to the foundation and to his personal knowledge.

4        JUDGE LAWS:  I will sustain that.  Let's lay some

5   foundation.

6        MR. MINER:  Sure.

7   Q    BY MR. MINER:  Do you know how much work the Tucson shop

8   did for Pacer prior to October 2013?

9   A    No, not to my knowledge.

10  Q    Okay.  Do you know if it was a lot or a little bit?

11       MR. GIANNOPOULOS:  Vague and ambiguous.

12       JUDGE LAWS:  Yeah.  You know, I'll allow it.

13       THE WITNESS:  I would say in the middle, between a lot and

14  a little bit.

15  Q    BY MR. MINER:  All right.

16  A    It was mediocre.  It was more Brandt.

17  Q    It was more Brandt?

18  A    Yes.

19  Q    Okay.  How do you -- let me ask it this way: how do you

20  differentiate the customer of a given car that you're moving on

21  a given day?

22  A    Their name is on it.

23  Q    It's right on the car?

24  A    Yes.

25  Q    So you would see Pacer right on the car?

1  A    Yes.

2  Q    And you would see Brandt right on the car?

3  A    Yes.

4  Q    And what other customers would you see on the car?

5  A    You'd see TTX, you'd see Hopper cars.

6  Q    Uh-huh.

7  A    I really don't -- I'm not too familiar on the names of

8  them, you know, the name of them.  But those few other cars,

9  too.

10  Q    Okay.  And --

11  A    And some Union Pacific cars.

12  Q    Union Pacific?

13  A    Yes.

14  Q    Okay.  Did you see more Brandt than Pacer cars?

15  A    Yes.

16  Q    Did you see more TTX cars than Brandt cars?

17  A    Yes.

18  Q    Did you see more Union Pacific cars than TTX cars?

19  A    No.

20  Q    Okay.  Did you see more Union Pacific cars than Pacer

21  cars?

22  A    Yeah.

23  Q    Okay.  Do you know how much volume of cars Pacer provides

24  to Tucson in a typical month?

25  A    No, I don't.

1   Q      Do you know how much volume of cars Brandt provides to

2   Tucson in a typical month?

3   A      I can't say exact.

4   Q      Do you know who from Pacer -- you know, what Pacer

5   representative is responsible for sending work towards --

6   A      No.

7   Q      -- the Tucson shop?

8   A      No, I don't.

9   Q      Or Brandt, do you know at -- who at Brandt is responsible

10  for sending cars to Tucson?

11  A      No, I don't.

12  Q      Do you know who within Greenbrier negotiates those deals

13  with Pacer and Brandt to bring cars down to the Tucson shop?

14  A      Well, I believe it was Danny Dicochea.

15  Q      Danny, the --

16  A      He is the QC manager.

17  Q      -- the quality control manager?

18  A      Yes.

19  Q      Okay.  Did Danny tell you that he negotiates those deals?

20  A      Danny told me in the previous time he had negotiated a

21  deal with Brandt and Pacer when TTX was having a low volume of

22  cars being brought into the shop.

23  Q      Uh-huh.

24  A      It was a few years back.

25  Q      Okay.

1    A    And Brandt and Pacer actually kept the shop alive for a

2    long time.  They did have a layoff, but it was not as drastic

3    as this and it was -- they didn't need to close the company.

4    Q    How long ago was that?

5    A    I don't know if he said -- it was somewhere between three

6    and five years prior.

7    Q    Did he say it was 2009?

8    A    He didn't say a date.

9    Q    Okay.  Were you at the shop at that time?

10   A    No, sir.

11   Q    Do you know anything about those layoffs that occurred

12   back three or five years ago?

13   A    Just from what I've talked with other people about that

14   were there.

15   Q    Okay.  All right.  How about TTX; who at TTX is

16   responsible for sending cars to the Tucson shop?

17   A    I forgot the gentleman's name.  I know he had been to our

18   shop before.

19   Q    Have you ever spoken with him personally about --

20   A    No, sir.

21   Q    -- TTX's need for work in Tucson?

22   A    No, sir.

23   Q    Okay.  Do you know what basis TTX uses for making

24   decisions about where to send cars for repairs?

25   A    From my understanding, they use the --

1        MR. GIANNOPOULOS:  Objection, Your Honor.  It's whether he

2   knows and lack of foundation how he knows, so.

3        JUDGE LAWS:  Let's lay some foundation.  Sustained.

4   Q    BY MR. MINER:  Well, do you -- tell us how it is that you

5   might know how TTX directs its cars?

6   A    Well, I believe TTX directs --

7        MR. GIANNOPOULOS:  Same objection, Your Honor, how he might

8   know.

9        JUDGE LAWS:  How --

10       THE WITNESS:  Oh, how?

11       JUDGE LAWS:  Well, where did you --

12       MR. GIANNOPOULOS:  Lack of foundation.

13       JUDGE LAWS:  -- gain the knowledge?

14       THE WITNESS:  Oh, where did I gain the knowledge?

15       JUDGE LAWS:  Uh-huh.

16       THE WITNESS:  I gained the knowledge through other

17   employees, managers, Freddy Valdez, Danny, John.

18   Q    BY MR. MINER:  Other people have told you?

19   A    Yes, other people.  Everybody's always curious.

20   Q    You've never spoken with anybody at TTX --

21   A    No.

22   Q    -- about this subject?

23   A    No.

24   Q    You don't know directly, based on your own knowledge, how

25   TTX makes those decisions?

1    A    No.

2    Q    You don't know who at TTX negotiates deals with Greenbrier

3    about how to get its cars repaired?

4    A    No.

5    Q    You don't know who within Greenbrier deals with TTX and

6    signs agreements or doesn't sign agreements with them?

7    A    Well, I believe once an agreement is come upon, the --

8    they will -- that would go to Kevin.

9    Q    Kevin who?

10   A    The -- our main boss for Greenbrier.

11   Q    Kevin --

12   A    He would have to approve --

13   Q    Kevin Stewart maybe?

14   A    -- of the work.  Yes.

15   Q    Kevin would have to approve that?

16   A    Yes.

17   Q    Do you know whether Greenbrier and TTX have any written

18   agreements about sending cars to Tucson?

19        MR. GIANNOPOULOS:  And, Your Honor, I'm going to -- I've

20   been letting this go.  I'm going to object for lack of

21   foundation.  What -- I mean whether he knows -- clearly this

22   man is not a high management official.  I think we've kind of

23   beat this horse to death, but I'm --

24        JUDGE LAWS:  That would be -- I understand.  Yes, do you

25   know.

1      I mean are we -- is there anything more we want to get out

2  of this other than that he didn't have direct knowledge?

3      MR. MINER:  The witness has made various claims about, you

4  know, cars potentially being redirected to Tucson.  I just want

5  to know if there's any basis for him having knowledge --

6      MR. GIANNOPOULOS:  And, Your Honor --

7      MR. MINER:  -- of that.

8      MR. GIANNOPOULOS:  -- this witness made no claims.

9      THE WITNESS:  Yeah.

10     MR. GIANNOPOULOS:  All he's done is relay a conversation

11  that he's had with Mr. Dicochea.

12     JUDGE LAWS:  Aside from the conversation you had with

13  Mr. Dicochea, do you have any knowledge as to how cars were

14  routed to Tucson?

15     THE WITNESS:  Not how they were routed, but I was also

16  informed by Eric Valenzuela in his office that we were going to

17  get another Brandt contract and that that would keep us alive.

18  Q    BY MR. MINER:  When did he tell you that?

19  A    It was after we were informed of us -- before we were laid

20  off, before we were going to get laid off.

21  Q    Laid off in 2013 or 2012?

22  A    2013.

23  Q    2013?

24  A    Yes.  We were running out of work.  Me and Moises Rosales

25  approached Eric Valenzuela in his office, talked to him about

```
 1   it, where everyone was worried, and he said, "Well, as of right
 2   now, we're hoping to get the Brandt contract going again and
 3   that should keep us alive."
 4   Q    Okay.  Eric told you that -- that he was working on a
 5   deal?
 6   A    He said --
 7   Q    Is that what you're saying?
 8   A    Yes.  He said that we were going to get it.
 9   Q    Oh, he said you were -- he -- do you know whether he did
10   get the deal?
11   A    Obviously not.
12   Q    Okay.  All right.  You were offered a transfer to
13   Mira Loma, correct?
14   A    Yes.
15   Q    You declined the transfer?
16   A    Yes, I did.
17   Q    Did you receive any severance when you left the company?
18   A    Yes.  I will be receiving severance.
19   Q    What was the severance offered?
20   A    It was 40 hours per year.
21   Q    Per year of service?
22   A    Yes.
23   Q    For a complete year or a partial year?
24   A    It was partial.
25   Q    I guess my question is are you going to receive one year
```

1    or two years of severance?

2    A    I'm going to -- I'm going to receive actually a little

3    over a year.

4    Q    So it can be a partial year?

5    A    Yes.

6    Q    So a little over a year.  Do you know how much it's going

7    to be?

8    A    Yes.  It's going to be $1,214 before taxes.

9    Q    Uh-huh.  Okay.

10        MR. MINER:  I think that's all my questions.  Thank you,

11    Your Honor.

12        JUDGE LAWS:  Uh-huh.  Any follow up?

13        MR. GIANNOPOULOS:  Just a couple follow-up.

14                    **REDIRECT EXAMINATION**

15    Q    BY MR. GIANNOPOULOS:  Hector, Mr. Miner, the Company's

16    attorney, asked you about being a switchman, what you do --

17    A    Uh-huh.

18    Q    -- operating locomotive.  Just curious, when you're

19    operating this locomotive, is it within the Greenbrier facility

20    or are you driving it out on the roads, on the rails out --

21    A    The only time that we were out on the rail across 36th

22    Street was when we're pulling any big loads.  And we would have

23    to pull all the way down onto 36th Street and make the switch

24    to go into the main shop line.  Yes.

25    Q    So what's the farthest that you would actually drive the

1  locomotive?  A mile, two miles?  Could you estimate?

2  A    I would say probably three -- three to five miles.

3  Q    Okay.  And then Mr. Miner asked you about the safety

4  committee -- the safety meetings, those weekly safety meetings.

5  I believe he asked you what type of matters were discussed in

6  those meetings.  Do you remember him asking you that?

7  A    Yes.

8  Q    Was the Union ever discussed in those safety meetings --

9  A    No.

10  Q    -- those weekly meetings, to your knowledge?

11  A    Before or after --

12  Q    Well, before the --

13  A    -- layoff?

14  Q    -- the election.  Before the election.

15  A    Oh, before the election.

16  Q    Yes.

17  A    Yes.

18  Q    And how often?

19  A    They were -- every Monday morning they were starting to

20  talk about it, you know, advising us not to, you know, volt for

21  the Union, that we need to come together as a family.  "We

22  don't need a third party to represent you guys.  You can come

23  to me."  This was Eric Valenzuela speaking.

24  Q    And in that -- in those safety meetings, were any fliers

25  handed out?

1    A    Yes.

2    Q    Okay.  Those were handed out in the safety meetings?

3    A    Yes.

4    Q    I'm going to show you a couple.  Give me one second.

5         I'm going to show you what's been marked General Counsel's

6    53, 54, 55 and 59.  I'll show you all three (sic) of these and

7    ask that you take a couple of minutes to review them.

8         MR. MINER:  Which ones are we looking at, John?  I'm sorry.

9         MR. GIANNOPOULOS:  53.

10        MR. MINER:  Okay.

11        MR. GIANNOPOULOS:  54.

12        MR. MINER:  Okay.

13        MR. GIANNOPOULOS:  55 and 59.

14        MR. MINER:  Okay.

15    Q    BY MR. GIANNOPOULOS:  Hector, take a couple of minutes and

16    look those over and let me know when you finish looking at

17    them.

18        JUDGE LAWS:  Okay.  I think he's ready.

19    Q    BY MR. GIANNOPOULOS:  Are you ready?

20    A    Yes.

21    Q    Have you seen any of those fliers before?

22    A    Yes --

23    Q    Did you --

24    A    -- all four.

25    Q    All four?

1    A    Yes.

2    Q    Did you get any of those at work?

3    A    Yes.

4    Q    Did you get any of those at the safety meeting?

5    A    Yes, I did.

6    Q    And who -- who was -- who passed out -- who was passing

7    fliers out at the safety meeting?

8    A    HR.

9    Q    And do you remember --

10    A    HR.  Chris and Eric and Julio.

11    Q    Okay.

12         MR. GIANNOPOULOS:  That's all I have, Your Honor.

13         JUDGE LAWS:  All right.  And I just want to follow up on

14    his questions.  You were asked if you received any of those at

15    safety meetings.  Do you know which ones or if it was all of

16    them?

17         THE WITNESS:  I know this, number 53.

18         JUDGE LAWS:  53?

19         THE WITNESS:  Yes.  54 was at the safety meeting.  55 was

20    actually after work.  Chris handed this one out to us at the

21    time clock.  And 59 was at the meeting.

22         JUDGE LAWS:  At the meeting?

23         THE WITNESS:  Yeah.

24         JUDGE LAWS:  Okay.  Thank you.  Okay.  Recross?

25         MR. MINER:  Just a couple, Your Honor.

1                    <u>RECROSS-EXAMINATION</u>

2   Q    BY MR. MINER:  Do you recall what you received -- when you

3   saw or received these documents from --

4   A    They were the --

5   Q    -- Greenbrier?

6   A    -- weeks prior to the vote.

7   Q    The weeks prior to the vote?

8   A    Yes.

9   Q    Do you recall which was the first one you received out of

10  the ones you just looked at?

11  A    No, I don't recall.

12  Q    Okay.  Prior to receiving these four in the weeks leading

13  up to the election, had you ever seen any -- any fliers or

14  pamphlets like these before?

15  A    No.

16  Q    One other question, please.  The poker contest --

17  A    Yeah.

18  Q    -- how long did this poker contest go on?

19  A    About three-and-a-half months maybe.

20  Q    Starting in about May or June?

21  A    Yeah.

22  Q    Continued three-and-a-half months?

23  A    Yes.

24  Q    All right.

25       MR. MINER:  No other questions.  Thank you.

1    JUDGE LAWS:  All right.  Unless there's any --

2    MR. GIANNOPOULOS:  That's -- that's all, Your Honor.  Thank

3  you.

4    JUDGE LAWS:  Okay.  And I don't have any further questions

5  for you.  I want to thank you for coming and testifying at this

6  hearing.  I do need to tell you there's an order in place, and

7  what it means for you is you're not to discuss what you

8  testified about here today with any people you know who are

9  testifying as witnesses or anyone who could be --

10    THE WITNESS:  Okay.

11    JUDGE LAWS:  -- potentially connected to the case and

12  called as a witness.

13    THE WITNESS:  Okay.

14    JUDGE LAWS:  Thank you.

15    THE WITNESS:  Thank you.  Okay.

16    JUDGE LAWS:  Let's go off.

17  (Off the record at 10:42 a.m.)

18    JUDGE LAWS:  Okay.  Let me know when we're ready.

19    Please raise your right hand.

20  Whereupon,

21                    **JUAN SILVA GUTIERREZ**

22  having been duly sworn, was called as a witness herein and was

23  examined and testified as follows:

24    JUDGE LAWS:  And before we get going with this witness,

25  please have a seat.  I want you to know that I have sworn the

1    interpreter.

2        Just a reminder, the oath you took yesterday applies

3    throughout the hearing.

4        THE INTERPRETER:  Yes, Your Honor.

5        JUDGE LAWS:  Can you please state your name for the record?

6        THE WITNESS:  It's Juan, Juan Silva Gutierrez.

7        JUDGE LAWS:  And can you spell that, please?

8        THE WITNESS:  J-U-A-N, Juan; Silva, S-I-L-V-A; G-U-T-I-E-R-

9    R-E-Z -- as to Zulu -- Gutierrez.

10       JUDGE LAWS:  Thank you.  Whenever you're ready.

11       MS. SHIH:  Thank you.

12                        **DIRECT EXAMINATION**

13   Q    BY MS. SHIH:  Mr. Silva, when did you first start working

14   for Greenbrier Rail Services in Tucson?

15   A    The 28th of April, 2010.

16   Q    And what was your position?

17   A    Welder.

18   Q    Who did you report to?

19   A    My immediate supervisor.

20   Q    And what was his name?

21   A    Ismael Lopez.

22   Q    What was his position?

23   A    Leadman.

24   Q    What part of the shop did you work in as a welder?

25   A    When I began, in the back; and when they ran we off, in

1   the front.

2   Q    Did your supervisor ever change during the time that you

3   worked for Greenbrier?

4   A    Yes.

5   Q    And what time?

6   A    When I entered, he was a worker just as -- alongside me.

7   But then after I entered, they made him a supervisor.

8   Q    So when you first started working for Greenbrier, did you

9   have a different supervisor?

10  A    Yes.

11  Q    Do you remember who that was?

12  A    His -- his last name was Ensenus (phonetic).  Edmund

13  Ensenus -- Herman (phonetic).

14  Q    Was Mr. Lopez your supervisor when you were terminated

15  from Greenbrier?

16  A    That is so.

17  Q    When did you first begin hearing discussions among your

18  coworkers at Greenbrier about a union?

19  A    I don't recall the exact date, but it was in 2010, towards

20  the end of 2010.

21  Q    Who first brought up the idea of a union with you?

22  A    His name is Rogelio Martinez.

23  Q    And what did Mr. Martinez tell you about the Union at that

24  time?

25  A    That things could change if the -- if the Union came on

1  board.  That we could have more privileges.  Yeah.  That's it.

2  Q    Did you support the Union?

3  A    Yes.

4  Q    When did you first begin supporting the Union?

5  A    After I spoke with Rogelio Martinez, I began working -- we

6  began talking to other coworkers to see if we could get the

7  Union to come on board.

8  Q    And this was the United Transportation Union?

9  A    Yes.

10 Q    Were you working for Greenbrier in 2011 when there was a

11 union election held?

12 A    Yes.

13 Q    And did you support the Union at that time?

14 A    Yes.  That's so.  Yes.

15 Q    Why did you support the idea of a union?

16 A    There were a lot of injustices at work.

17 Q    Can you describe specifically what the issues were that

18 you thought a union could help with?

19 A    Well, the first thing was lack of safety.  Equipment was

20 in bad conditions, we were supposed to work in the rain and

21 under very extreme weather conditions.  It was very difficult

22 to work there.

23 Q    Were these issues that you had ever brought up to any of

24 your supervisors or managers before?

25 A    In conversations and dialogues.

1    Q    When you brought these things up to supervisors or

2    managers, did you see any improvement?

3    A    No.

4    Q    Did you think the Union could help improve the conditions

5    that you had concerns about?

6    A    Yes, definitely.

7    Q    When did you first learn that employees at Greenbrier were

8    trying to organize with the Sheet Metal Workers Union?

9    A    If I am not mistaken, it was in 2010, toward the end of

10   2010.

11   Q    Just to -- just to clarify for you, there were a couple of

12   different unions that conducted elections at Greenbrier.  Do

13   you remember that?

14   A    I recall two.

15   Q    I'm handing you what's been marked as General Counsel

16   Exhibit 79.  Can you tell me if you recognize that?

17   A    Yes, it was a sheet of paper from the Union that I signed

18   which -- in which I gave them authorization.

19        JUDGE LAWS:  And I want to jump in and ask our interpreter

20   if the writing on the top is a translation of the writing on

21   the bottom?

22        THE INTERPRETER:  And that was for General Exhibit 79?

23        The title in -- in bold is -- it is the true and correct

24   translation.

25        JUDGE LAWS:  What about the words beneath it?

1      THE INTERPRETER:  It's not exact.  And I can point out what

2  it is.

3      JUDGE LAWS:  Please do.

4      THE INTERPRETER:  In -- in the top part, which is in

5  Spanish, it indicates -- oh, wait a minute.  I overlooked that.

6  Never mind.  No, it is -- the paragraph is correct.

7      JUDGE LAWS:  It is correct?

8      THE INTERPRETER:  It is correct, yes.

9      JUDGE LAWS:  Okay.  Thank you.

10     MS. SHIH:  Your Honor, if I may, actually, I'd like to hand

11  the witness the original.

12     JUDGE LAWS:  Sure.

13  Q    BY MS. SHIH:  Can you identify that card?

14  A    Yes.

15  Q    What is it?

16  A    It is the card that the Union gave me in which I gave

17  authorization to be represented by the Union.

18  Q    That's your handwriting on the card?

19  A    Yes.

20  Q    Is that your signature on the card?

21  A    Yes.

22  Q    Who gave you the card?

23  A    Rogelio Martinez.

24  Q    When did he give you that card?

25  A    The 7th of November, 2012.

1   Q    Where were you when Mr. Martinez gave you this card?

2   A    At a store about a distance of a quarter of a mile from

3   where the Greenbrier facilities are.

4   Q    Was this before work?

5   A    After work.

6   Q    Was there anyone there with you besides Mr. Martinez?

7   A    There was a coworker there.  His name was Omar but I don't

8   know his last.  I don't remember his last name.

9   Q    Was Omar a supervisor or a foreman?

10  A    He was a worker.

11  Q    What did Mr. Martinez tell you when he gave you this card?

12  A    That if we all -- that if we all gathered and we all

13  created -- if -- that if we all united, then we would be able

14  to force -- or have a greater force in bringing the Union on

15  board.

16       THE INTERPRETER:  I'm sorry.  The interpreter stands

17  corrected.

18       That if we all united, then we would have greater strength

19  in having -- in bringing the Union on board.

20  Q    BY MS. SHIH:  And were you in support of that idea?

21  A    Yes.

22  Q    What did you understand that it meant when you signed this

23  card?

24  A    That I was giving authorization to the representatives of

25  the Union to represent me within work, within my job.

1  Q    And what did you do with the card after you signed it?

2  A    I handed it over right there to Rogelio.

3  Q    Are those your initials at the top right-hand corner of

4  the card?

5  A    Yes.

6  Q    Those are -- and those are your initials, JSG, at the

7  upper right-hand corner?

8  A    Yes.

9  Q    Did you talk with --

10        THE INTERPRETER:  I'm -- I'm sorry.  Was it JSG?

11        MS. SHIH:  JSG.

12        THE INTERPRETER:  Thank you.

13        Okay.  Just confirming.  It's JSG.  And just for the

14  record, the interpreter had said GSG.  So the translation now

15  is correct.

16  Q    BY MS. SHIH:  Is there any handwriting on that card that

17  is not yours?

18  A    These, RM.

19  Q    Do you know whose handwriting that is?

20  A    I did not see who put those down, but I suppose it would

21  be Rogelio Martinez.

22  Q    That's who you gave the card to after you signed it?

23  A    Yes.

24  Q    Did you talk with any of your coworkers about the Sheet

25  Metal Workers Union?

1    A    Yes.

2    Q    Who did you speak with?

3    A    With everybody at the workshop, with almost everybody at

4    the front, about 99 percent of the people.

5    Q    Those are the employees that worked in the front shop with

6    you?

7    A    Yes.  And also with some that I knew that worked in the

8    workshop in the back.

9    Q    Did you ever speak with any supervisors, foremen or

10   leadmen about your support for the Union?

11   A    Yes.  Yes.  With Ismael Lopez and with Luis Lopez.

12   Q    Ismael Lopez, you said was your immediate supervisor; is

13   that right?

14   A    Yes.

15   Q    Who is Luis Lopez?

16   A    Another supervisor from the bottom part.

17   Q    When did you speak to Ismael Lopez about your support for

18   the Union?

19   A    It was several times, because he would give me a ride in

20   his vehicle.

21   Q    Was it after you signed the card that's in front of you?

22   A    Yes.

23   Q    What did you tell Mr. Lopez about your support for the

24   Union?

25   A    That I hoped that the Union would win when the elections

1    took place because maybe the changes would take place in the

2    company, because things were pretty bad.

3    Q    What did Mr. Lopez say?

4    A    He never made any comment.  He never made a comment.

5    Q    About how many times did you speak with Mr. Lopez with

6    your support for the Union?

7    A    There was plenty of times because I had rides with Luis

8    Lopez and with Mr. Ismael Lopez through the span of a year.

9    Q    The conversation that you had with Ismael Lopez about your

10   support for the Union, was Luis Lopez present for those?

11   A    No.  It was only two of us in the vehicle at any given

12   time.  I would either go with Ismael or I would go with Luis in

13   the vehicle.

14   Q    When did you have conversations with Luis Lopez about your

15   support for the Union?

16   A    It was before the elections took place.  It was before the

17   Union was really being promoted.  Before it was said that the

18   Union was coming on board.

19   Q    Was it after you signed the authorization card?

20   A    Yes.

21   Q    And what, if anything, did Luis Lopez say to you when you

22   brought up the Union with him?

23   A    Well, hopefully then the race will cooperate and unite.

24   Q    That's what Mr. Lopez said to you?

25   A    Yes.

1    Q    Other than sign a card and speak with other employees

2    about the Union, were there anything -- was there anything else

3    that you did to show your support for the Union?

4    A    After the -- they ran me off, I was out handing out

5    fliers.

6    Q    You handed out fliers at Greenbrier's Tucson facility?

7    A    Yes.  Outside.

8    Q    Who did you do that with?

9    A    With the Union people.  With the ones that were with the

10   Union.

11   Q    Do you know who with the Union -- the names of the people

12   with the Union that you handed out fliers with?

13   A    Right now, I don't remember the names.

14   Q    How many times did you go out with the Union agents to

15   hand out fliers?

16   A    Like on three occasions, like twice a week.

17   Q    And during the times that you handed out fliers with the

18   Union agents, did you ever see any supervisors or foremen or

19   managers?

20   A    Yes.  But these always -- you know, they just kind of

21   turned about and left.

22        JUDGE LAWS:  And I want to clarify some of the last

23   testimony, the question before this one, about how often.

24   Three times twice a week?

25        THE INTERPRETER:  Is the question you dressed to the

1  interpreter or to the witness?  Or should --

2     JUDGE LAWS:  I guess I'm going to ask a new question

3  because it wasn't clear to me.

4     You were asked how often you handed out fliers.  How many

5  times total would you guess?

6     THE WITNESS:  Like seven or eight times.

7     JUDGE LAWS:  And then you did it a couple of times a week?

8     THE WITNESS:  Yes, yes.

9     JUDGE LAWS:  For how long a time period?

10     THE WITNESS:  Like a month or two months.

11     JUDGE LAWS:  Okay.  Thank you.

12  Q    BY MS. SHIH:  Were you working on November 12th, 2012?

13  A    Yes.

14  Q    Can you tell me what happened when you arrived to work

15  that morning?

16  A    There was a list.  I don't -- they -- they brought a list.

17  I don't remember if it was the supervisor or who it was that

18  had the list, but it had names on them.  And the names on

19  them -- some of the names were going to be in one area and some

20  of the names that appeared the most were going to be in another

21  area.

22  Q    What area did you go to?

23  A    The two areas were the dressers -- or the dressing --

24  where you put the uniforms on and then the part in front.  And

25  I went to the front.

1    Q    And about how many employees were there with you in the

2    front?

3    A    I suppose half of them went to the dressing area and the

4    other half went to the front.

5    Q    And was there a supervisor or a manager who directed you

6    to go to the front?

7    A    The person that had the list.

8    Q    And when you went to the front, did anyone speak with you

9    and the other employees who were there?

10    A    It's just that I don't recall who -- who were there with

11    me.  It's just been so -- I don't remember who was there and

12    who said what.

13    Q    But was there anyone --

14    A    It was --

15    Q    -- who spoke --

16        THE INTERPRETER:  I'm sorry.  Let me finish.  And it was

17    so --

18        MS. SHIH:  I'm sorry.

19        THE INTERPRETER:  -- because it was so unexpected.  And I

20    apologize for the late translation.

21        MS. SHIH:  That's all right.

22    Q    BY MS. SHIH:  Did anyone speak to you and the other

23    employees who had been told to go to the front?

24    A    Yes.

25    Q    Do you remember who spoke to you?

1    A     If I am not incorrect, it was Juan Maciel that was doing

2    that.

3    Q     Did he speak to you and the other employees in English or

4    in Spanish?

5    A     In both languages.

6    Q     What did -- what did he tell you?

7    A     That the Company wanted to improve, that they wanted to

8    change things, that they were going to let the other people go

9    but we were going to remain in order to improve things.

10   Q     Did he say anything about why you had been chosen to stay?

11   A     The phrase that he used was that only the best had

12   remained.

13   Q     Is there anything else that you remember him saying during

14   that meeting?

15   A     He said since we were starting anew, that they were going

16   to be assigning points for attendance.  And if you missed, if

17   you had seven nonattendance points, you would be let go by the

18   Company.  And that they were going to erase all the points and

19   everybody was going to have to start a clean sheet like so

20   everybody had zero.

21   Q     Did he say why the Company was doing that?

22   A     If he did, I don't recall.

23   Q     During the time that you worked for Greenbrier, had the

24   Company ever erased all your attendance points before?

25   A     Not that I'm aware of.

1  Q    Did Juan Maciel or any other supervisor ever tell you the

2  reason that other employees had been let go on November 12th?

3  A    Officially, I don't know and I have never heard anything

4  officially coming from the office.

5  Q    Did you hear anything from any supervisors or foremen

6  about the reason employees had been let go?

7  A    No, I did not hear anything.  On the -- on the side --

8  outside of the official venues we found out that it had been

9  because of the Union, because they brought somebody aboard that

10 would talk to us and tell us not to support the Union.

11 Because -- and so that was the real reason that they had let

12 them go.  It was because of the Union.  Because they were very

13 good workers and there was a lot of work.

14 Q    Before the employees were let go on November 12th, can you

15 estimate how many hours a week on average you were working?

16 A    Fifty-two, 55, hours.

17 Q    What about after November 12th, 2012?

18 A    We continued working the same.  There was always a lot of

19 overtime.

20 Q    Did the Company continue to hire new employees after

21 November 12th, 2012?

22    MR. MINER:  Objection; lack of foundation, Your Honor.

23    JUDGE LAWS:  Sustained.  Let's establish some foundation.

24 Q    BY MS. SHIH:  Are you aware of any new employees starting

25 at Greenbrier -- new production employees starting at

1    Greenbrier after November 12, 2012?

2    A    Not immediately after.  It wasn't until April that they

3    began to hire people.

4    Q    What about temporary employees, are you aware of any

5    temporary employees that were still working at Greenbrier after

6    November 12, 2012?

7    A    I met two coworkers that were working with the agency,

8    but -- you know, they continued working afterwards, but I don't

9    know if it was through the agency or if it was through

10   Greenbrier.

11   Q    Who were those employees?

12   A    I mean I know them by their nicknames.

13   Q    What are their nicknames?

14   A    The Marco -- oh, the Frog.  Enmarco (phonetic).  And the

15   other one was Acharro (phonetic), Acharito (phonetic).

16   Q    Did you receive a bonus at the end of 2012?

17   A    Yes.

18   Q    What was that bonus for?

19   A    They explained to us that these were profits at the

20   corporate level, at the national corporate offices that

21   hadn't -- they had made money, a profit that year.

22   Unofficially, I knew that the bonuses were every four months

23   and in three years I only received two bonuses.

24   Q    Did you receive a pay raise in 2013?

25   A    Yes.

1    Q    When did you receive that?

2    A    The first week of May.

3    Q    Did anyone tell you the reason for the pay raise?

4    A    Every six months they would give us a raise.

5    Q    Was that in connection with a performance review?

6    A    Yes.

7    Q    And so did you receive a performance review in May of

8    2013?

9    A    The evaluation was conducted in April because I had just

10   completed three years.  And so the following week, they gave me

11   the raise in my check.

12   Q    And who conducted your evaluation in April?

13   A    My supervisor, Ismael Lopez.

14   Q    And what did he tell you at that time?

15   A    The one that spoke to me in order to give me the raise,

16   the one that speak to me was Valenzuela.

17   Q    And what do you remember Mr. Valenzuela telling you?

18   A    That I had done a good job but that they could not give me

19   more than what they were giving me at that time, that I was a

20   good worker and to continue that way.

21        There's something else I wanted to add.  The only thing

22   that I was not in agreement with my evaluation was that they

23   had given me a negative evaluation or a negative point, docked

24   me a point for one day that I arrived late in the entire year.

25   That was the only thing I was not -- I didn't agree with on my

1   evaluation.

2   Q    But you received a pay raise after your evaluation?

3   A    Yes.

4   Q    Did you attend any meetings in 2013 where the Company

5   discussed increasing the maximum pay rate for employees?

6   A    Yes.

7   Q    How many meetings did you attend?

8   A    It was only at one meeting that they said that.

9   Q    And when was that meeting?

10  A    I don't know the date.

11  Q    Do you remember if it was before you received your pay

12  raise in May?

13  A    I then suppose it would be in April then, yes.

14  Q    And what do you remember was said during that meeting?

15  A    That they had increased the pay rate, the pay rate for the

16  wages because they wanted to have -- to increase the efficiency

17  and also production and to keep us happy.

18  Q    Who -- who conducted that meeting for the Company?

19  A    It would have been Valenzuela or Juan Maciel.  Those were

20  the only two that were authorized to give that type of

21  information.

22  Q    And was this a meeting among all employees or was it just

23  the front shop?  Who was present at the meeting?

24  A    It was a rule that every Monday there was a meeting for

25  the entire workshop and it was held in the front, but it was

1   for all -- everybody working at the workshop.

2   Q    And this information about the pay increase was at one of

3   these Monday meetings?

4        THE INTERPRETER:  And the interpreter's going to complete

5   the last portion of his testimony.  That's when they would give

6   us the news of anything that was the -- any novelties.  And may

7   the interpreter have the repetition of the question again?

8        MS. SHIH:  I apologize.

9   Q    BY MS. SHIH:  It was at one of these Monday meetings that

10  you received the -- or you heard the announcement about the pay

11  increase?

12  A    Yes.

13  Q    When did you first hear about a new safety poker program

14  at the Tucson facility?

15  A    At the beginning of the month of April.

16  Q    And how did you hear about this new program?

17  A    At the Monday meetings.

18  Q    Who announced the program?

19  A    Julio Valenzuela.  I think -- is it Julio what?

20  Q    Is it Julio Vasquez?

21  A    Vasquez.  Sorry, sorry.

22  Q    The safety manager?

23  A    Yes.

24  Q    And what did he say about the program?

25  A    That they wanted to implement safety for everybody and

1    because of that, they were going to introduce prizes.  And that

2    every Monday, that we would all get a card that would be picked

3    at random and it was a poker card.  And then when a person had

4    five cards and if he had the high hand, then he would be the

5    winner and he could collect his prize.

6         JUDGE LAWS:  I want to stop here for a second and just ask,

7    is this something we can stipulate to so we don't need to get

8    any more witness testimony on it; that that was the nature of

9    that safety initiative?

10        MR. MINER:  We're going to have plenty of evidence about

11   the initiative and there's some written documentation on it.

12        JUDGE LAWS:  But do we need any more testimony about the

13   mechanics of how it was played?

14        MR. MINER:  Yes, I haven't yet heard the mechanics of it

15   described the way I understand it worked.

16        JUDGE LAWS:  Okay.  So it is still disputed?

17        MR. MINER:  Yes.

18        JUDGE LAWS:  Very good.  Go ahead.

19   Q    BY MS. SHIH:  Did Mr. Vasquez say anything about what kind

20   of prizes would be included?

21   A    They showed us.  It was mainly tools.

22   Q    And do you know whether any employees actually received

23   prizes as part of this safety poker program?

24   A    No, because they ran me off before.

25   Q    Was there any kind of program like this in place before

1    April 2013, during the time you worked for Greenbrier?

2    A    No.

3    Q    During the time you worked for Greenbrier, were you ever

4    asked to complete any surveys regarding your satisfaction

5    working for the Company?

6    A    Two times.

7    Q    When was the first time?

8    A    I don't recall dates.  I'm really bad with dates.

9    However -- I don't know the date.

10   Q    Do you remember the -- the first time, do you remember

11   whether it was early in your employment or late in your

12   employment?

13   A    Let's see, beginning or end.  It was like July or August.

14   Q    Of 2012?

15   A    Yes.

16   Q    Who asked you to fill out a survey?

17   A    It was the one from security.  Julio from safety.  And the

18   one from human resources, Christina.

19   Q    Okay.  Are we talking about the first survey or the second

20   survey?

21   A    The second.

22   Q    When were you asked to fill out the second survey?

23   A    I know it was a supervisor who told this group of ten of

24   us to go to the trailer where the dressing room -- or the

25   dressing area was, that we had to fill out some papers there.

1    But I don't remember -- I don't know the date.  I don't

2    remember the date.

3    Q    Do you remember what month it was?

4    A    Let's see, what month, what month?  Probably March.

5    Q    Of 2013?

6    A    Yes.

7    Q    What were you told?

8    A    Just that we had to go fill out some papers.  That's it.

9    Q    Where did you go to fill out papers?

10   A    To the uniform trailer.

11   Q    And who else was there when you got there?

12   A    Julio Vasquez and Christina.

13   Q    And you said there were ten employees present?

14   A    Approximately there were like some ten, but another group

15   was exiting and I suppose it was another group of ten because

16   of the number of chairs.

17   Q    And what were you told when you got to the uniform

18   trailer?

19   A    That these questionnaires were there and that were being

20   distributed in order to find out that -- were being issued by

21   the Company in order to find out how we felt about working at

22   the Company and what they could do in order to improve

23   production, to improve quality and to make us happier, and that

24   it was optional whether we wanted to sign or name or not.  So

25   we could be anonymous.

1    Q    And was this communicated in English or in Spanish?

2    A    In both.  I do want to add that the questionnaire was

3    because the manager, Eric Valenzuela, was requesting it, but

4    not because the Company had it in its policy or something like

5    that.

6    Q    Did you understand that it was optional whether you filled

7    out the survey?

8    A    The option was anonymous or put your name -- or put your

9    name down, but the -- but you had to fill it out.

10        MS. SHIH:  Your Honor, I don't have copies of this exhibit

11   at this time.  I'm happy to make them over the lunch --

12        JUDGE LAWS:  Okay.  If you could just show -- show

13   everybody --

14        MS. SHIH:  Before I hand it to the --

15        JUDGE LAWS:  -- and then show it to the witness.

16        MS. SHIH:  -- witness I'll --

17        JUDGE LAWS:  Yes.

18        MR. MINER:  Thank you.

19        MS. SHIH:  -- let you take a minute to review it.

20        JUDGE LAWS:  How much longer do you think you have on

21   direct?

22        MS. SHIH:  I would say probably a half hour.

23        JUDGE LAWS:  A half hour?  Well, does it make sense then --

24        MR. MINER:  I'm sorry.  What?  I didn't -- I --

25        JUDGE LAWS:  Is there --

1        MS. SHIH:  I said about a half hour.

2        MR. MINER:  Half hour.

3        JUDGE LAWS:  Let's go off the record and discuss what makes

4    sense to proceed.

5    (Off the record at 11:48 a.m.)

6        MS. SHIH:  I'm going to show the witness what's been marked

7    as General Counsel Exhibit 80.

8    Q    BY MS. SHIH:  If you could take a moment to look it over.

9    A    Okay.

10       JUDGE LAWS:  I just want to look it over quickly before you

11   ask about it.  I will give it back.

12   Q    BY MS. SHIH:  Is that the survey that you completed in

13   about March 2013?

14   A    Yes.

15   Q    And did you sign your name to it?

16   A    Yes.

17       MS. SHIH:  Your Honor, if I may approach?

18       JUDGE LAWS:  Sure.  And does that need to be translated?

19       MS. SHIH:  It will need to be translated.

20       JUDGE LAWS:  Okay.

21       MS. SHIH:  I would actually like the witness to take a look

22   at the comments on the last page and explain what comments he

23   made on the survey.

24       JUDGE LAWS:  Well, first of all, are those your comments?

25       THE WITNESS:  Yes.

1      JUDGE LAWS:  Okay.  Do you -- do we want to just have the

2  interpreter read it into the record?

3      MS. SHIH:  Sure.  If we could have -- actually, if we can

4  have her translate all of the comments on the survey.

5      JUDGE LAWS:  Okay.

6      THE INTERPRETER:  Okey-dokey.

7      JUDGE LAWS:  So hand that -- the entire thing?  Even the

8  multiple choice?

9      MS. SHIH:  Well --

10     MR. GIANNOPOULOS:  I -- I would.

11     MS. SHIH:  What's that?

12     MR. GIANNOPOULOS:  Unless you're going to have an English

13  -- unless we're going to have an English -- could we go off the

14  record a second, Your Honor?

15     JUDGE LAWS:  Sure.

16  (Off the record at 11:51 a.m.)

17     JUDGE LAWS:  On how to deal with the document that's in

18  Spanish.  There is a clean version of the document which is

19  survey in English.  So what we're going to do is have the

20  Spanish version translated to the extent that this witness

21  wrote in individual comments.  At a later point in time, we

22  will have the interpreter ensure that the two documents are a

23  correct translation and fill out a form reflecting this

24  witness' responses to the multiple choice questions but not the

25  comments because we're going to have those read in.

1          THE INTERPRETER:  Your Honor, before we continue, I do have

2     a question.  Could we go off the record?

3          JUDGE LAWS:  Sure.

4     (Off the record at 11:54 a.m.)

5          JUDGE LAWS:  The interpreter had wanted some clarification

6     about whether all the writing on this document is the witness'.

7     And I think for ease, I'm just going to go ahead and ask.

8          Are these numbers your writing?

9          THE WITNESS:  No.

10          JUDGE LAWS:  And that was on page 1.  There's some numbers

11     at the bottom of the page.  On page 2, there are numbers in the

12     upper right-hand side and the bottom left.  Are those your

13     writing?

14          THE WITNESS:  No.

15          JUDGE LAWS:  And then on page 2, there are also initials

16     LM, FM and then some numbers.  Is that your writing?

17          THE WITNESS:  No.

18          JUDGE LAWS:  Page 3, the bottom of the page, are those

19     numbers yours?

20          THE WITNESS:  No.

21          JUDGE LAWS:  Page 4 toward the upper right there are some

22     initials, some numbers and the word "overall" with some

23     equations.  Is that your writing?

24          THE WITNESS:  No.

25          JUDGE LAWS:  The next page, there are again, some numbers,

1   some calculations on the right-hand side down about a third on

2   the page.  Are those your -- is that your handwriting?

3       THE WITNESS:  No.

4       JUDGE LAWS:  Are the rest of the comments and responses on

5   this document yours?  I'm going to strike that.  To the left of

6   the responses, there are some numbers -- and I'm back on

7   page 1 -- there are some numbers and some dash marks.  Are

8   those yours?

9       THE WITNESS:  No.

10      JUDGE LAWS:  And then on each other page to the left of the

11  oval where you're to fill in the response, there are dash

12  marks.  Are -- are any of those -- and I'm showing him all of

13  them -- are any of those yours?

14      THE WITNESS:  No.  No.

15      JUDGE LAWS:  There's an X in a response oval to each

16  question.  Is that your writing?

17      THE WITNESS:  Yes.

18      JUDGE LAWS:  And are the comments that are words in

19  response to some of the questions your handwriting?

20      THE WITNESS:  Yes.  Yes.

21      JUDGE LAWS:  Thank you.

22      THE INTERPRETER:  So page 1, and this is the second

23  question, the question is, "Would you recommend to any friend

24  to apply for a job with our company?"  And the response that is

25  marked off with an X is, "Probably."  "This does not" -- and

1    the response in the comments is, "This does not apply to a lot

2    of people that do not like to work in extreme weathers, given

3    that the heat here is very strong and within" -- "and within

4    the cars even more so."

5        The next question, which would be the third one down on the

6    first page is, "Do you believe that the employees are

7    acknowledged for their efforts and their work as individuals?"

8    And what is marked off with an X is, "Sometimes."  "It" --

9    "they never" -- "It's never said that one does a good job.

10   Only that one is late."

11       The last question on the bottom of the first page is, "How

12   motivated are you in" -- "in" -- "that this company become

13   successful?"  And what is marked off with an X is, "I agree up

14   to a certain point."  And what is commented is that, "There's

15   human deficiencies and technical" -- "human and technical

16   deficiencies."

17       On page 2, second question, "Compared with last year, could

18   you describe your level of satisfaction" -- "your current level

19   of satisfaction in" -- "at work" -- "in the work?"  And what is

20   the marked off with an X is, "Up to a certain point satisfied."

21   And what is commented is that, "One continues to battle with

22   the work equipment."  There are no other comments on the

23   remainder of the second page.  There are no comments on page 3.

24   There are no -- on page 4, and it's the second to the bottom --

25   second to the last question on the bottom, "I feel that the

1    company does offer safety equipment."  "I've" -- so, excuse

2    me -- "I feel that the company" --

3        JUDGE LAWS:  What's the question to the response first?

4        THE INTERPRETER:  The question is --

5        JUDGE LAWS:  Okay.

6        THE INTERPRETER:  It's a question.

7        JUDGE LAWS:  Gotcha.

8        THE INTERPRETER:  And it's under the safety category.  It's

9    the second to the last question on the bottom.  And it says, "I

10   feel that the company offers enough or adequate safety

11   equipment, personal safety equipment."  And what is the marked

12   off is, "Up to a certain point I disagree."  What is indicated

13   in the comments is, "On occasions one does not find gloves on a

14   regular basis in order to be able to weld or plastic ones in

15   order to be able to change oil in the gear."

16       So page 5, the first question on top, "I feel that the

17   security meetings every Monday are informative."

18       JUDGE LAWS:  Is it security or safety?

19       THE INTERPRETER:  Excuse me.  Safety meetings.  It's that

20   they're both translated in the same way in Spanish.

21       JUDGE LAWS:  I understand.

22       THE INTERPRETER:  So I'll restate it.

23       "I feel that the safety meetings every Monday are

24   informative."  And what is marked off with an X is, "Up to a

25   certain point I agree."  What is commented is, "Not everything

1    applies.  The forklifts aren't in good conditions and the

2    terrain is quite uneven."

3         Under the administrative satisfaction section, which would

4    be -- which would be the fifth question down from the first,

5    making it the sixth question, obviously.  The question is, "Are

6    you satisfied with the benefits that the company offers?"  And

7    what is marked off is, "Somewhat dissatisfied."  What is

8    commented is, "I do not agree with the" -- "with the point

9    system, whether you" -- "whether you call that or not.  It's

10   better to communicate with somebody than it is with a machine."

11        The question after that one would be, "Are you satisfied

12   with the way that the evaluation process is carried out?"  What

13   is marked off is, "Somewhat unsatisfied."  "Because they put it

14   on a scale of one to three; and if" -- "and if it's three,

15   nobody can have it?  Or at least I don't know of nobody that

16   does in any given case."

17        The question at the page following that one, which would be

18   the last page, and it's the last three questions that I'm going

19   to be translating, and it allows for comments.  They're in

20   bold --

21        JUDGE LAWS:  Before you do that, let's go back to the last

22   comment.  And do you mind repeating it, because I may have a

23   follow-up question --

24        THE INTERPRETER:  Sure.

25        JUDGE LAWS:  -- for him on that?

1      THE INTERPRETER:  "Are you satisfied with the way the" --

2  "with the way that the evaluation process is carried out?"

3  What is marked off is, is the, "Somewhat unsatisfied."  The

4  comment says, "Because they put them on a scale of one to

5  three" -- and then a semi colon -- "if it's three, nobody can

6  have it" -- question mark -- "Or at least I don't know of

7  anybody that does in any case."

8      JUDGE LAWS:  What do you mean, if you recall, by "nobody

9  can have it?"

10     THE WITNESS:  In three years, I never knew of any of my

11 coworkers who have been given a three.

12     JUDGE LAWS:  Is three the highest, one the lowest?

13     THE WITNESS:  It's the highest, and the one is the lowest.

14     JUDGE LAWS:  Thank you.

15     THE INTERPRETER:  Should I continue?

16     So then back to the last page.  The first question in bold,

17 "What's the best about working for this company?"  "The time

18 that I've been doing this business, I cannot imagine that any

19 other company could possibly have" -- "could compete against

20 it, not here in Tucson.  It's stable, it's solid.  Up until

21 what I know, the recession has not hit it very hard here.  A

22 lot of companies have gone out of business.  All of the

23 holidays are respected or honored.  And there is a possibility

24 of working extra hours.  That's good."

25     The question next, "What is it that bothers me the most

1    about working for this company?"  "They demand a lot without

2    giving you the adequate equipment.  They" -- "they take time as

3    though it was something extreme and it appears that they

4    don't" -- "they are not aware that we don't have the necessary

5    equipment.  I know that it's not a manufacturing shop, but

6    usually we have to manufacture something.  Those who qualify

7    the railcars or the units forgo a lot of details and they don't

8    take that into account from the beginning, as" -- "from the

9    onset."

10       And the last question is, "What do you consider the" --

11    "that the company can do in order to increase your satisfaction

12    as an employee?"  The response is "Motivate one.  Whether you

13    call it employee of the month, offer a bonus, a card or least

14    a" -- "they did it" -- and I quote -- 'they did it really well

15    this time,'" end quote.  And in the bottom there's, "Juan S.

16    Gutierrez."

17       JUDGE LAWS:  Thank you.

18       THE INTERPRETER:  That's it.

19                    **DIRECT EXAMINATION** (CONTINUED)

20    Q    BY MS. SHIH:  After you filled out and signed the survey,

21    what did you do with it?

22    A    I deposited it into a box that they said that you had to

23    deposit it into, that nobody was going to take -- or be --

24    would notice.  And that's what we had to put them in to.

25    Q    Did anyone ever speak with you about the survey after you

1    put it in the box?

2    A    After work, we all meet up at this store that's close by

3    to the -- to work.  And so after work, we all met up over there

4    and we were all making -- we were all commenting as to why they

5    had the questionnaire.

6    Q    Did any supervisor or manager ever speak with you about

7    the survey after you put it in the box?

8    A    No.

9    Q    What day were you terminated from Greenbrier?

10   A    The 30th of May, 2013.

11   Q    Can you describe what happened the morning of May 30th,

12   2013 at work?

13   A    I was lowering a unit, a gear -- that's what they call

14   it -- and I was putting some packaging into the side of the

15   door, and my coworker was lowering the gear and I went because

16   I saw that he needed help.  And so I asked him.  The forklift

17   was alone, off by it side.  It was on.  I saw that there was

18   nobody there, so I got onto the forklift and I brought the unit

19   down by myself and I put it off the side.  And my supervisor

20   saw that I wasn't wearing my strap, but I was operating the

21   forklift.  But then he thought that I had done something unsafe

22   and he accused me of doing something unsafe.

23   Q    And when you refer to the unit or the gear, are you

24   referring to -- is that the same as an EOCC unit?

25   A    Yes.

1  Q    During the time you worked for Greenbrier, did you receive

2  any training on how to unload an EOCC unit?

3  A    Several times.

4  Q    And what were you instructed to do during that -- those

5  training sessions?

6  A    Each session was different.  On one session it was one

7  way, on another session it was another way.  I never knew which

8  was the correct way.

9  Q    On May 30th, 2013, what was your understanding of the

10 correct way to unload an EOCC unit?

11 A    The first thing -- the most practical thing is -- well,

12 first of all, there was a forklift that was there and it was

13 unattended.  And I did -- the first thing that there was

14 there -- that I had to do, that was the most logical thing to

15 do, which was that there was a forklift there that was turned

16 on and it was unattended, and then I never focused or I never

17 took notice whether the strap was attached to the unit or not.

18 Q    What was the practice among employees in the shop with

19 regard to fastening the strap on the unit?

20 A    It was relatively new that -- it was relatively new that

21 they had put that into effect.

22 Q    Were you the one who -- were you the one who had loaded

23 the unit onto the forklift?

24    THE INTERPRETER:  I'm sorry.  May the interpreter have the

25 question -- was it uploaded?

1    Q    BY MS. SHIH:  Were you the -- the one who loaded the unit

2    onto the forklift?

3    A    Yes.

4    Q    Was it common for employees to move units -- EOCC units

5    without fastening the strap?

6        MR. MINER:  Your Honor, I do object to this.  We just got

7    done hearing from another witness about how questions

8    concerning an EU -- an EOCC unit are neither relevant nor

9    within the scope of that particular employee's testimony.  And

10   now we're hearing --

11       JUDGE LAWS:  Well, we don't have to worry about scope of

12   testimony.  This is direct.

13       MR. MINER:  Yeah.  Yeah.  But there also was a relevancy

14   objection at that time.  And now we're -- we're supposed to be

15   hearing from this witness what other employees' practices were

16   with respect to this specific issue that I had sought to ask

17   the earlier witness about.

18       JUDGE LAWS:  Well, I guess I just have one question.  Is --

19   is there a pretext argument that this was something that other

20   people weren't called on?

21       MS. SHIH:  Exactly.

22       JUDGE LAWS:  Okay.  Then I -- then I do find it relevant

23   for that purpose, from this witness.

24       THE INTERPRETER:  And may the interpreter have the question

25   repeated, please?

1    MS. SHIH:  I don't know if I recall the question so I'm

2    just going to regroup here and try to pick up where we left

3    off, if you can give me just a minute.

4    Q   BY MS. SHIH:  Was it common among employees in the shop to

5    move an EOCC unit without fastening the strap?

6    MR. MINER:  Your Honor, objection.  I'd like a more

7    specific question about the time period we're referring to.

8    JUDGE LAWS:  I -- I will sustain that.  And I think get --

9    get some foundation as to his observations and -- and when they

10   occurred.

11   Q   BY MS. SHIH:  Let me back up and ask a different question.

12   At the time of -- at the time you were discharged, what was the

13   practice among employees in the shop with regard to unloading

14   EOCC units?

15   MR. MINER:  Objection; foundation, Your Honor.

16   JUDGE LAWS:  Have you had -- had you -- at the time had you

17   observed any practice?

18   THE WITNESS:  I'm going to go back a bit.  When they put

19   into effect the new rules for unloading the EOCC units, it was

20   a week before because a week before one of the coworkers had

21   unloaded one of the units and it had gone around, spun out, but

22   it didn't hurt anybody.  So they wanted to implement that new

23   practice.

24   Q   BY MS. SHIH:  During -- I'm going to back up and ask some

25   additional questions.

1          MS. SHIH:  And just to let you know, Your Honor, I --

2    this -- this will probably go another 30 minutes.  It's longer

3    than I originally had anticipated.

4          JUDGE LAWS:  All right.  Unless anybody's about to pass

5    out, I -- I just as soon get to the lunch break and have a

6    later lunch.  That will make things quicker too.  Places will

7    be less crowded.  So --

8          MS. SHIH:  That's fine.

9          JUDGE LAWS:  -- let's --

10         MS. SHIH:  I just wanted to give you a heads up.

11         JUDGE LAWS:  Okay.  Are you okay to continue testifying and

12   then break?

13         THE WITNESS:  Thirty minutes is fine.

14         JUDGE LAWS:  Okay.

15   Q    BY MS. SHIH:  During the time you worked for Greenbrier,

16   how often did you have to unload or move an EOCC unit?

17   A    I entered in April 2010 and it was with the crashed units

18   and the -- with the -- the -- I'm sorry -- with the crashed

19   railcars and the units were pressed or squashed.  And we would

20   use the blow torches to cut them out and then we would use

21   the -- the forklifts in order to separate them and to -- to

22   separate the metal and to remove them.  And we never had an

23   accident.  There was never an accident.

24   Q    But how -- how often did you have to move or unload an

25   EOCC unit?

1  A    From 30 railcars that came in, 20 would have the units

2  removed.

3  Q    So is this something that you did at least once a day?

4  A    Three times per week.

5  Q    Can you describe the procedure for moving or unloading an

6  EOCC unit?

7  A    First, check to see if the unit is in good or bad

8  conditions.  Afterwards, to remove or to -- I want to say

9  download -- but no -- to remove the nitrogen, and then put a

10  chain in order to close the unit.  Release the chain and if the

11  piston from the unit does not move, then you can lower it, the

12  unit.  And if it moves, that means that there's still nitrogen

13  in there and you have to go back in and remove the nitrogen and

14  everything out of it.

15  Q    And when you say "lower it," what's the process for

16  lowering the unit?

17  A    A platform sustains the unit, the forklift comes in, the

18  screws are cut out and it begins to be lowered.

19  Q    Is that something that's done by one person or multiple

20  people?

21  A    Two people per railcar work on this and there always has

22  to be two people when you're lowering the unit.  One is always

23  directing and the other person is always on the forklift.

24  Q    And earlier when you testified about the specific incident

25  on May 30th where the unit was lowered without it being

1  strapped, can you describe what you mean by strapping the unit?

2  A    My first thought was that I thought that the forklift

3  could just go out.  And that's when I asked my coworker whether

4  he needed help.  He answered yes, and so then I went to him.

5  Q    Okay.  But my question has to do with the strap.  Can you

6  describe what you mean when you talk about not having strapped

7  the unit?

8       JUDGE LAWS:  First of all, back -- let's back up.  What is

9  the strap?

10      THE WITNESS:  It's a unit that goes from here to here.  So

11 if you're going to lower a unit, it goes from here to here and

12 it ties the unit.

13      JUDGE LAWS:  Okay.  And from here to here was the -- the

14 size of the microphone, which I'm going to say is a little

15 under a foot?

16      THE WITNESS:  Oh, no, no, no, no.  Generally the straps are

17 between 18 to 24 inches.

18      JUDGE LAWS:  Okay.  And what are they used for?

19      THE WITNESS:  If the unit has a piston and if the piston is

20 bad, the piston can -- just can -- it could be projected

21 outwards as a projectile if the unit is not in good condition.

22 So then the strap is then fixed or attached from here to the

23 unit, to the end of the piston, and that ensures that the

24 piston can't move -- can't move at all.

25      JUDGE LAWS:  So it's to secure a loose -- secure a loose

1    piston?

2        THE WITNESS:  Yes.

3        JUDGE LAWS:  Okay.

4    Q    BY MS. SHIH:  What did you do on May 30th, 2013 when you

5    saw an unattended forklift?

6    A    I got on it.

7    Q    And then what did you do?

8    A    I knew that my coworker was working below, so I -- I asked

9    him, I mean I -- I screamed out, "Hey, do you need help?"

10   Q    And what was his response?

11   A    That it was fine.  And he told me, "Lower it," so I

12   lowered it.

13   Q    What was he doing when you got onto the forklift?

14   A    Discharging all the nitrogen, removing it.

15   Q    From the unit that was on the forklift?

16   A    It was -- it was still on the railcar, the unit.  But I --

17   I never got off of the forklift.  I -- I mean I never got off

18   the forklift to see if the strap was placed on it, because I

19   trusted him.

20       JUDGE LAWS:  I'm going to jump in here.  Is -- is it okay

21   for a forklift to be turned out but to have nobody on it?

22       THE WITNESS:  It's not safe.  I mean I know if -- I

23   remember three occasions in which the forklifts were turned on

24   and they just took off by themselves.

25       JUDGE LAWS:  And do you know how this forklift came to be

1    turned on with nobody on it?

2        THE WITNESS:  My coworker, the one that was working below,

3    he took it over there to bring it up.

4        JUDGE LAWS:  And you saw him do that?

5        THE WITNESS:  Yes, I saw him when he was taking it and I

6    was in another area.

7    Q    BY MS. SHIH:  Who was the coworker that you were working

8    with that day?

9    A    His name is Brian.  I don't know his last name.

10   Q    Is it Brian Scaggs, if you know?

11   A    I know he's the only one that worked in the shop whose

12   name was Brian.

13   Q    And did Brian tell you that the unit was ready to be

14   lowered?

15   A    Yes.

16   Q    After you lowered the unit, what happened next?

17   A    When I was lowering the unit on the forklift, my

18   supervisor saw me when I was lowering it and he asked me, "Why

19   didn't you put the strap on the unit?"  And I told him.  I

20   said, "I didn't lower it.  I'm just moving it.  That's all."

21   Q    And who was the supervisor that confronted you?

22   A    Ismael Lopez.

23   Q    And what happened next?

24   A    The incident occurred at 9:00 and, at 12:00, Valenzuela

25   called me into the office, in which he informed me that he did

1    not want me to continue working there.

2    Q    What happened between 9:00 and 12:00?  Did you continue to

3    work?

4    A    Yes.

5    Q    So when you went to meet with Eric Valenzuela at noon that

6    day, who else was present?

7    A    Human resources, Christina, and Fifi (phonetic), the Fifi.

8    What's his name?  Cesar Navarez (phonetic), Cesar Navarez for

9    the transcriber.

10    Q    Who told you to go to the office to meet with Mr.

11    Valenzuela?

12    A    Cesar Navarez.

13    Q    So when you got there, what happened?

14    A    Eric told me that it would be better if I would go to work

15    at a McDonald's because I was not a safe person, that I could

16    have killed somebody.

17    Q    Did he say anything else?

18    A    I told him, "First, fix the equipment.  First, fix the

19    forklifts, which is what you have to do.  I mean, you're the

20    boss.  Do your job."

21    Q    Did Mr. Valenzuela say anything else to you?

22    A    No.

23    Q    Did anybody else who was present say anything to you?

24    A    No.

25    Q    What did Mr. Valenzuela tell you was the reason you were

1    being terminated?

2    A    Because I did not obey the safety rules of the company.

3    Q    And did you say anything during this meeting?

4    A    No.  But two weeks before that occurred, I told Julio

5    Valenzuela, the one from safety -- I told him that they should

6    post, like, on posters around the area of what was the proper

7    procedure in order to lower a unit.  That was two weeks before

8    the incident.

9    Q    Had you ever lowered a unit without fastening the strap?

10   A    Yes.

11   Q    Had your supervisor ever seen you lower a unit without

12   fastening a strap?

13   A    Yes.

14   Q    Had you ever seen any other employees lower a unit without

15   fastening the strap?

16   A    Yes, all of that before they put into effect the new

17   rules.

18   Q    And when did the new rules get put into effect?

19   A    I suppose -- I guess it was the last week of April.

20   Q    Did you receive any type of training on the new rules?

21   A    Yes.  But I told you there were different methods.  On one

22   occasion, they said there had to be a weight limit on the

23   weight unit.  Another occasion, it was known that the unit had

24   to be completely emptied out first.  And on another occasion,

25   it was that, if the unit was fine, you didn't have to, to lower

```
 1   it or -- I never knew which one was the one, the proper method.

 2   Q    And were these all methods that you heard after you

 3   received training on the new rules?

 4        JUDGE LAWS:  I'm going to interject here because that

 5   confuses, I think, the testimony.  He said this was the

 6   training he received on the new rules.  So I just don't want to

 7   confuse the record by you asking if what he just testified was

 8   the training for the rules happened after he was trained on the

 9   rules.

10        MS. SHIH:  Okay.  Then let me clarify because I didn't

11   hear it quite the same way.

12   Q    BY MS. SHIH:  During the training you received on the new

13   rules, did you hear different methods explained for how the new

14   rules worked?

15   A    Honestly, I was confused with the rules.  I did not

16   understand them 100 percent.

17   Q    How many training sessions did you have on the new rules?

18   A    It was approximately some four times in which I attended.

19   They would give it to us in groups, but I believe it was four

20   times.

21   Q    And this was four times beginning in April of 2013?

22   A    I'm not really sure about the position of the dates.  I

23   don't really know dates.  I suppose it was in April of 2013,

24   but I'm not really sure about the dates.

25   Q    But April of 2013 is when the new rules went into effect.
```

1    Is that right?

2    A    Yes.

3    Q    Was the training on the new rules always done by the same

4    person?

5    A    Yes, Julio from safety.

6    Q    In the training sessions that you attended on the new

7    rules, was the procedure described to you the same each time?

8    A    It was the same trainer, but the -- thank you -- training

9    or the dialogue was always different.

10        JUDGE LAWS:  And is that what you described earlier in

11    your testimony?

12        THE WITNESS:  Yes.

13    Q    BY MS. SHIH:  Are you aware of any other employees that

14    have been terminated because they didn't strap an EOCC unit

15    before moving it?

16    A    I was the first one on the list.

17        MS. SHIH:  Your Honor, may I have just a couple of

18    minutes?

19        JUDGE LAWS:  Sure.

20    (Counsel confer)

21        MS. SHIH:  I'm ready, Your Honor.

22        JUDGE LAWS:  Okay.  Okay.

23        THE WITNESS:  Okay.

24        MS. SHIH:  I have no further questions for Mr. Silva at

25    this time.  I do think, though, however that I neglected to

1    move for admission of General Counsel's 79 --

2        JUDGE LAWS:  And that's the --

3        MS. SHIH:  -- which is the authorization card.

4        JUDGE LAWS:  -- authorization card.  Any objection?

5        MR. GIANNOPOULOS:  No objection, Your Honor.

6        JUDGE LAWS:  That is admitted.

7    **(General Counsel Exhibit Number 79 Received into Evidence)**

8        MS. SHIH:  And General Counsel 80, copies of which I have

9    not yet made, and we still have the translation issue, so I

10   think we can probably clear that up later.

11       JUDGE LAWS:  I would say let's hold off on that.  I think

12   this witness's testimony authenticated it.  Is there any issue

13   from the Respondent on that?

14       MR. GIANNOPOULOS:  No.  There isn't.

15       JUDGE LAWS:  So we can hold off on getting that admitted

16   until it's a complete document.  All right.  Well, with that,

17   it is -- you said it's about a four-page affidavit?

18       MS. SHIH:  It is about a four-page affidavit.  It does

19   have some attachments, exhibits that were attached to it.  But

20   the affidavit itself is four and a half pages.

21       JUDGE LAWS:  All right.  It's now 11:45 -- 12:45.  I'm

22   looking at my Pacific time computer here.  Why don't we take --

23   check back in at 2:00?  If you need more time to go over the

24   affidavit and the exhibits, just let me know.

25       MR. GIANNOPOULOS:  Thank you, Your Honor.

1    (Off the record at 12:44 p.m.)

2        JUDGE LAWS:  Come on back.

3    Whereupon,

4                    **GUILLERMO MURGUIA**

5    having been duly sworn, was called as a witness herein and was

6    examined and testified, by and through an interpreter as

7    follows:

8        JUDGE LAWS:  Thank you.  Could you please state and spell

9    your name?

10        THE WITNESS:  G-U-I-L-L-E-R-M-O, half in Spanish and half

11    in English.  Okay.  M-U-R-G-U-I-A.

12        JUDGE LAWS:  G-E-I-A?

13        THE WITNESS:  G-U-R -- I'm sorry.  M-U-R-G-U-I-A.

14        JUDGE LAWS:  Thank you.

15        MR. GIANNOPOULOS:  Thank you.

16                    **DIRECT EXAMINATION**

17    Q    BY MR. GIANNOPOULOS:  Good afternoon, Mr. Murguia.  Did

18    you work at Greenbrier?

19    A    Correct.

20    Q    And when did you start working there?

21    A    Approximately the 20th of April, 2010.

22    Q    And what kind of work did you do at Greenbrier?

23    A    I would do real car repairs and welding.

24    Q    And did you work in a particular shop?

25    A    Yes.

1    Q    What shop did you work at?

2    A    The shop in front.

3    Q    Did that have a name or a particular name?  Or did you

4    just know it as the shop up front?

5    A    The shop up front.

6    Q    Okay.

7    A    Okay.

8    Q    And when did you stop working at Greenbrier?

9    A    November 12th of 2012.

10   Q    And were you laid off?

11   A    That's correct.

12   Q    And at the time of the layoff, before the layoff happened,

13   were you personally busy at work?

14   A    Plenty.

15   Q    And were you working overtime in the months before the

16   layoff?

17   A    A lot of hours.

18   Q    And who was your supervisor?

19   A    Martin Torrez.

20   Q    Now, at some point before you got laid off in 2012, did

21   you become involved in the organizing drive for the Union?

22   A    Uh-huh.  Yes.

23   Q    And let's start with the sheet metalworker's union.  What

24   did you do to assist the organizing with the sheet

25   metalworkers?

1  A    I got involved with another co-worker in order to be able

2  to see how a union could support us.

3  Q    Now, before the sheet metalworkers in 2002, did you

4  visit --

5        JUDGE LAWS:  2002?

6        MR. GIANNOPOULOS:  I'm sorry.

7  Q    BY MR. GIANNOPOULOS:  In 2012, did you visit and assist

8  another union in 2012?

9  A    Uh-huh.  Correct.

10  Q    I'm going to show you a document that's marked General

11  Counsel's 82.

12       MR. GIANNOPOULOS:  Your Honor, unfortunately, I have one

13  copy of this, but I'll show everyone.  And I'll make sufficient

14  copies.

15  Q    BY MR. GIANNOPOULOS:  Guillermo, I'm showing you General

16  Counsel's 82.  That's a card for the United Food and Commercial

17  Workers Union.

18  A    That's correct.  I did sign that card.

19  Q    And this is dated October 24th, 2012?

20  A    That's correct.

21  Q    Did you first go to the United Food and Commercial Workers

22  Union to see about getting a union at Greenbrier?

23  A    Sorry.

24       THE INTERPRETER:  Could we just instruct him to wait?

25       JUDGE LAWS:  Yeah.  Just wait.

1          THE WITNESS:  Correct.

2     Q     BY MR. GIANNOPOULOS:  And for the United Food and

3     Commercial Workers Union, I'm going to use the acronym UFCW.

4     A     That's fine.

5     Q     How did it come about that you went to visit or got

6     involved with the UFCW?

7     A     There was another person that was a lead, who was -- he

8     was recruiting other people to join the Union.

9     Q     And did you pass out cards for the UFCW to any of your co-

10    workers in 2012?

11    A     That's the main union.  Right?

12    Q     No, the first union.  This one that was just on your card.

13    A     No.  They gave me cards.

14    Q     Okay.  And then, at some point -- let me show you what's

15    going to be marked General Counsel's 83.

16         MR. GIANNOPOULOS:  And I'm going to move for the admission

17    of 82, Your Honor.

18         MR. MINER:  Can we wait until we have copies of that?

19         MR. GIANNOPOULOS:  Sure.  We'll do that.

20         MR. MINER:  Thank you.

21         MR. GIANNOPOULOS:  I'll move for the reserve.  You can

22    reserve ruling until the morning.  That's fine.  If someone

23    just reminds me -- I'm sure Grant will.

24         JUDGE LAWS:  He will.

25    (Counsel confer)

1    Q    BY MR. GIANNOPOULOS:  Guillermo, I've handed you a card or

2    a document that's marked General Counsel's 83.  Is that your

3    signature?

4    A    Yes.  It's correct.

5    Q    And it's dated the date there November 5th, 2012.  Is that

6    the date you signed that?

7    A    Yes, sir.  That's correct.

8    Q    So in November of 2012, how did it come about that you got

9    an authorization card for the sheet metalworkers union?

10   A    I got -- we got involved with another person and he was

11   one who gave us the recommendation or referral to sheet metal.

12   And that's how we obtained the sheet metalworkers card.

13   Q    And then who is that other person that told you about the

14   sheet metalworkers union?

15   A    Jorge Martinez.

16   Q    And did you go to any meetings with the sheet metalworkers

17   union, members?

18   A    Correct.

19   Q    And if you signed this on the 5th of November, when was

20   the first meeting that you remember going to with the sheet

21   metalworkers union, in relation to the card?

22   A    This was my first meeting and this was my first signature.

23   Q    And what did you do with this card after you signed it?

24   A    I read it and I verified what was, you know -- to make

25   sure what was correct.

1    Q    Did you hand it to anybody?

2    A    To a member of sheet metal.

3    Q    And where were you when that happened?

4    A    At the local's union.

5    Q    And when you signed this card, what was your understanding

6    about signing the card?  What --

7         THE INTERPRETER:  Yes?

8         MR. GIANNOPOULOS:  Yeah.

9         THE WITNESS:  Upon signing this card, I had understood

10   that we were authorized -- we had to pay a quota for the sheet

11   metalworkers union to represent us.

12   Q    BY MR. GIANNOPOULOS:  Okay.  What did you -- what do you

13   mean by that?  You said "pay a quota".

14   A    And not so much that, but more so, to be able to get them

15   to represent us as -- how do you say that?  As a union.

16   Q    Okay.

17   A    Okay.

18   Q    So did you want the sheet metalworkers to represent you at

19   work?

20   A    Correct.

21   Q    That first meeting you went to at the local union -- were

22   there any of your co-workers there with you?

23   A    Yes.

24   Q    And who was there with you?

25   A    There was another lead, another leader from the Union,

1  Jorge Martinez, and Rogelio Martinez, and two other people

2  whose names I do not recall.

3       MR. GIANNOPOULOS:  Your Honor, I move for the admission of

4  General Counsel's 83.

5       MR. MINER:  No objection.

6       JUDGE LAWS:  83 is admitted.

7  **(General Counsel Exhibit Number 83 Received into Evidence)**

8  Q    BY MR. GIANNOPOULOS:  After you signed the card for the

9  sheet metalworkers union, did you pass out cards for the sheet

10  metalworkers union to any of your co-workers?  And you're going

11  to have to wait until the translator finishes.  Yes.

12  A    Correct.

13  Q    And did you collect signed cards from your co-workers?

14       THE INTERPRETER:  I'm sorry, Your Honor.  This is the

15  interpreter and you have a confused look.  But he had actually

16  answered before and I just -- for the record.

17       JUDGE LAWS:  Okay.

18       THE WITNESS:  Could you please repeat the question again?

19  Q    BY MR. GIANNOPOULOS:  Sure.  So you just testified that

20  you passed out cards to your co-workers.  Did you ever get

21  cards back from them with their signatures on them?

22  A    Yes.

23  Q    And could you tell me, where would you pass out cards to

24  your co-workers?

25  A    Some of them were after work, outside of work, and

1  sometimes some were before work started.

2  Q    And when you would hand out cards to your coworkers, would

3  you say anything to them about the card?

4  A    To read it, to read it carefully, to make sure that they

5  read the card carefully and, if they agreed with it, to sign

6  it, and if not, not to sign it.

7  Q    And the cards that you got back from your co-workers --

8  did they fill them out right there when you gave it to them?

9  Or is there anyone that took the card away, and came back

10  later, and gave it to you?

11  A    They all signed it in front of me and I put my initials on

12  them all.

13  Q    Okay.  I'm going to show you a document that's marked

14  General Counsel's 84.

15      MR. GIANNOPOULOS:  And Your Honor, I might ask to go off

16  the record for about five minutes so I can just mark all of

17  these as opposed to, now that I know I'm at 84.

18      JUDGE LAWS:  Can we just -- then did you have --

19      MR. GIANNOPOULOS:  Yeah.  That's fine.

20      JUDGE LAWS:  -- copies of everything or are they --

21      MR. GIANNOPOULOS:  I have all the copies, yeah.  I can --

22  either way, whatever is smoothest for you.

23      JUDGE LAWS:  Why don't we -- I think it's probably

24  quickest -- just hand them and we can all just pen the number

25  in --

1          MR. GIANNOPOULOS:  Okay.

2          JUDGE LAWS:  -- for our own copies.

3          MR. GIANNOPOULOS:  All right.  That's fair.

4   (Counsel confer)

5   Q    BY MR. GIANNOPOULOS:  Guillermo, I've handed you a

6   document that's marked General Counsel's 84.  And that's a card

7   with the name Jesus Armondo Lopez-Nuno.

8          THE INTERPRETER:  And may I have the second last name

9   again?

10          MR. GIANNOPOULOS:  Nuno.

11          THE WITNESS:  Correct.

12   Q    BY MR. GIANNOPOULOS:  Did you give Jesus Armondo Lopez

13   this card?

14   A    Yes, sir.

15   Q    And what did you tell him when you gave him the card?

16   A    I told him to read the card very carefully and to be

17   aware, very conscientiously, of what he was signing.

18   Q    And did Jesus fill out the card in your presence?

19   A    Yes, sir.

20   Q    And did he sign it in front of you?

21   A    Yes, sir.

22   Q    And did he give it back to you?

23   A    At the very moment.

24   Q    And are those your initials at the top right hand that

25   says G-M under the spot that says initials?

1    A    Yes, sir.

2         MR. GIANNOPOULOS:  I move for the admission of 84, Your

3    Honor.

4         MR. MINER:  Your Honor, may I voir dire the witness,

5    please?

6         JUDGE LAWS:  Yes.

7         THE INTERPRETER:  I'm sorry.  This is the interpreter.  I

8    need to go back and correct the translation --

9         JUDGE LAWS:  Okay.  Go ahead.

10         THE INTERPRETER:  -- because I just put down instead of G-

11    M instead of G-M, instead of J.  In other words, the question

12    was, are the initials G-M and the interpreter stated J-M, so

13    with the Court's permission --

14         JUDGE LAWS:  Just have the record reflect G-M instead of

15    J-M.

16         THE INTERPRETER:  Should I re-ask the question?

17         JUDGE LAWS:  I don't think we need to --

18         THE INTERPRETER:  Okay.

19         JUDGE LAWS:  -- as long as everybody's clear.

20         MR. GIANNOPOULOS:  Yeah.

21         MR. MINER:  I think it's fine.  Just a few questions,

22    please.

23                        **VOIR DIRE EXAMINATION**

24    Q    BY MR. MINER:  Who is Jesus Armondo Lopez-Nuno?

25    A    He was one of the workers that was in front.  He was part

1    of one of the company's workers that wasn't working in the

2    front.

3    Q    Did you work with him in the front shop?

4    A    No.

5    Q    So how is it that you're familiar with him?

6    A    I had knowledge of him because he wanted there to be a

7    change at the company.

8    Q    How long had you been working for Greenbrier with Mr.

9    Lopez-Nuno?

10   A    I met him -- I mean, I didn't -- well, I didn't have too

11   much of a conversation with him because we worked at different

12   areas.

13   Q    Okay.  Have you ever seen -- strike that.  Prior to

14   November 6th, 2012, had you ever seen Jesus Armondo Lopez-Nuno

15   sign his name before?

16   A    Yes, sir.

17   Q    In what circumstance?

18   A    The circumstances in which I mentioned, in which I told

19   him to read the card.

20   Q    Prior to observing him complete the card, had you ever

21   seen him sign his name before?

22   A    No.  He signed it right at that very moment in front of

23   me.

24   Q    Well, it looks like he's crossed out his signature on this

25   card.

```
1        MR. GIANNOPOULOS:  And I'm going to object, Your Honor.
2   This goes a bit past voir dire on the actual document and more
3   into cross.  I let it go for a little bit, but --
4        MR. MINER:  Well --
5        JUDGE LAWS:  I agree we are getting a little bit into
6   cross-examination.
7        MR. MINER:  Really, I'm just going to the authenticity of
8   the signature here.  That's my only goal.
9        MR. GIANNOPOULOS:  And Your Honor, I believe the testimony
10  is clear.  He cited in his presence where it was.
11       MR. MINER:  It looks like he tried to cross it out.
12       MR. GIANNOPOULOS:  And I think that's a subject for cross-
13  .
14       JUDGE LAWS:  I mean, I agree.  If you want to question him
15  on whether he, at the time they were executing this, tried to
16  do anything to indicate he didn't want to sign the card, I do
17  think that is more appropriate for cross-.  I think you
18  established he hadn't seen the signature before.  It is what it
19  is before us.  And, you know, certainly ask away on cross-.
20       MR. MINER:  Okay.
21  Q    BY MR. MINER:  My only question, then, apart from that --
22  and I'll get into that on cross- -- apart from your own
23  initials in the upper right-hand corner of the card are all the
24  marks on the remainder of the card, marks that were made by
25  Jesus Armondo Lopez-Nuno?
```

1     THE INTERPRETER:  And I'm sorry.  The marks that he made?

2     MR. MINER:  Yes.

3   Q   BY MR. MINER:  Were all the marks on the remainder of the

4   card marks that were made by Jesus Armondo Lopez-Nuno?

5     THE INTERPRETER:  Thank you.

6     THE WITNESS:  That is correct.

7     MR. MINER:  No objection to General Counsel 84.

8     JUDGE LAWS:  84 is admitted.

9   **(General Counsel Exhibit Number 84 Received into Evidence)**

10     MR. GIANNOPOULOS:  I'm going to --

11     THE INTERPRETER:  Thank you.

12     MR. GIANNOPOULOS:  The document is marked General

13   Counsel's 85, Your Honor.  And for this document, Your Honor,

14   I'm going to see if I can get a stipulation from Respondent's

15   counsel that this document comes from the personnel file of

16   Jesus Armondo Lopez-Nuno.  And I'll show you the personnel file

17   that was produced and the actual document itself.

18     MR. MINER:  Okay.  We will stipulate to General Counsel

19   85.

20     JUDGE LAWS:  Thanks.

21     MR. GIANNOPOULOS:  And I will move for the admission of

22   General Counsel's 85.

23   **(General Counsel Exhibit Number 85 Received into Evidence)**

24     MR. MINER:  I already stipulated to it.

25     MR. GIANNOPOULOS:  Yeah.  Okay.

1       JUDGE LAWS:  And it will be admitted.

2                    **DIRECT EXAMINATION** (CONTINUED)

3   Q    BY MR. GIANNOPOULOS:  I'm going to show you, Guillermo, a

4   document that's marked General Counsel's 86.

5        MR. MINER:  Thank you.

6   Q    BY MR. GIANNOPOULOS:  And this is a card with the name

7   Alex Amador.  Did you give this card to Alex Amador?

8   A    Yes, sir.

9   Q    And what did you tell him when you gave him this card?

10  A    The same thing that I mentioned before, which is to read

11  the card carefully.  And if they agreed with signing it, then

12  just sign it.

13  Q    And did you tell everyone that, that you gave a card to?

14  A    Correct.

15  Q    And did Alex Amador fill this card out in your presence?

16  A    Yes.

17  Q    And did he sign it in your presence?

18  A    Yes, effectively so.

19  Q    And did he give it back to you?

20       MR. MINER:  May I inquire of the translator or ask you to

21  repeat the last answer?  I think you had said, "Yes,

22  effectively so."

23       THE INTERPRETER:  Correct.

24       MR. MINER:  What does that mean?  What does effectively so

25  mean?

1      THE WITNESS:  Effectively so means that he signed it and

2  being effectively, I mean, happy, just --

3  Q    BY MR. GIANNOPOULOS:  After he signed the card, did he

4  hand it to you?

5  A    Yes.

6  Q    And did you put your initials on this card?

7  A    Definitely, yes.

8  Q    In the top right-hand corner?

9  A    That's correct.

10 Q    And does Alex Amador work at Greenbrier?

11 A    Correct.

12     MR. GIANNOPOULOS:  I'm going to move for the admission of

13 General Counsel's 86, Your Honor.

14     MR. MINER:  No objection, Your Honor.

15     JUDGE LAWS:  86 is admitted.

16 **(General Counsel Exhibit Number 86 Received into Evidence)**

17     MR. GIANNOPOULOS:  And Your Honor, I'm going to seek a

18 similar stipulation with respect to General Counsel's 87.

19 General Counsel's 87 is a document from the personnel file of

20 Alex Amador.

21     JUDGE LAWS:  Thank you.

22     MR. MINER:  We will stipulate to General Counsel 87.

23 **(General Counsel Exhibit Number 87 Received into Evidence)**

24     MR. GIANNOPOULOS:  Thank you.

25     JUDGE LAWS:  All right.  Then that is admitted.  And is

1    this being offered just getting to purpose, to show similarity

2    of handwriting?

3        MR. GIANNOPOULOS:  For this, yes, Your Honor.

4        JUDGE LAWS:  Okay.

5    Q    BY MR. GIANNOPOULOS:  And Guillermo, I'm going to show you

6    a document marked General Counsel's 88.  This is a card with

7    the name Jesus Arellanes (phonetic).

8        THE INTERPRETER:  I'm sorry.  May the interpreter have a

9    repetition of the name?

10        MR. GIANNOPOULOS:  Jesus Arellanes.

11        THE WITNESS:  Uh-huh.  Yes.

12    Q    BY MR. GIANNOPOULOS:  And did you give a card to Jesus?

13    A    Yes, sir.

14    Q    And did he fill that out in your presence?

15    A    Correct.

16    Q    And did he give it back to you?

17    A    Correct.

18    Q    And did he sign it in your presence?

19    A    Yes, sir.

20    Q    And the top right, where there is the initials GM, are

21    those your initials?

22    A    Correct.

23    Q    And did you put your initials on that card?

24    A    Yes, sir.

25        MR. GIANNOPOULOS:  I'll move for the admission of General

1  Counsel's 88, Your Honor.

2       MR. MINER:  No objection.

3       JUDGE LAWS:  And that is admitted.

4  **(General Counsel Exhibit Number 88 Received into Evidence)**

5       MR. GIANNOPOULOS:  And Your Honor, I seek a similar

6  stipulation with General Counsel's 89.

7       MR. MINER:  Thank you.

8       MR. GIANNOPOULOS:  General Counsel's 89 is a document from

9  the personnel file of Jesus Arellanes.

10      MR. MINER:  We will stipulate to General Counsel 89, Your

11  Honor.

12 **(General Counsel Exhibit Number 89 Received into Evidence)**

13      JUDGE LAWS:  It is admitted.

14 Q   BY MR. GIANNOPOULOS:  I'll show you a document, Guillermo,

15 that's marked General Counsel's 90.

16 A    Perfect.

17      JUDGE LAWS:  Help yourself if you need more water here.

18      MR. GIANNOPOULOS:  I poured you some.  This is for you.

19      THE WITNESS:  Thank you.

20      JUDGE LAWS:  And then from that.

21 Q   BY MR. GIANNOPOULOS:  Okay.  Guillermo, I handed you a

22 card with the name Jorge Maldonado on it.  Did you give this

23 card to Jorge Maldonado?

24 A    Yes, sir.

25 Q   And did he fill it out in your presence?

1   A    Yes, sir.

2   Q    Did he sign it in front of you?

3   A    Yes, sir.

4   Q    And did he give it back to you?

5   A    Yes, sir.

6   Q    And did you write your initials on the top right-hand

7   corner of this card?

8   A    Yes, sir.

9        MR. GIANNOPOULOS:  I'll move for the admission of General

10  Counsel's 90, Your Honor.

11       MR. MINER:  No objection.

12       JUDGE LAWS:  90 is admitted.

13  **(General Counsel Exhibit Number 90 Received into Evidence)**

14       MR. GIANNOPOULOS:  And I'll seek the same stipulation,

15  Judge, for General Counsel's 91.

16       JUDGE LAWS:  I'm sensing a pattern here.

17  Q    BY MR. GIANNOPOULOS:  General Counsel's 91 is a document

18  from the personnel file of Jorge Maldonado.

19       MR. MINER:  We'll stipulate to General Counsel 91.

20  **(General Counsel Exhibit Number 91 Received into Evidence)**

21       JUDGE LAWS:  And with regard to these documents that are

22  following the authorization cards, I am going to limit their

23  admissibility to the comparison of signature and handwriting

24  unless instructed to otherwise do so, because I don't want to,

25  however long from now, be looking back and wondering if I

1    should worry about why Jorge Maldonado chose option two on his

2    safety sheet program.

3        MR. GIANNOPOULOS:  And quite honestly, Your Honor, I think

4    that, now, exactly -- quite frankly, I mean, I think we're

5    laying the proper foundation for the cards.  We're just taking

6    extra steps in the event something is raised about the

7    authenticity.

8        JUDGE LAWS:  No, absolutely.  I just am going to note

9    that, unless I'm told otherwise and unless Respondent is told

10   otherwise, we are not going to worry about --

11       MR. GIANNOPOULOS:  Yes.

12       JUDGE LAWS:  -- really what the document itself is.

13       MR. GIANNOPOULOS:  Exactly.

14       JUDGE LAWS:  We're going to worry about signature --

15       MR. GIANNOPOULOS:  Thank you.

16       JUDGE LAWS:  -- and the writing.

17   Q    BY MR. GIANNOPOULOS:  Guillermo, I'm going to hand you a

18   document that's marked General Counsel's 92 -- I'm sorry, 92.

19       THE INTERPRETER:  I'm sorry.  Which number?  I'm sorry.

20       MR. GIANNOPOULOS:  92.  I apologize.

21       THE WITNESS:  Very well.

22       MR. MINER:  Sorry, John.

23       MR. GIANNOPOULOS:  No.  That's okay.

24       MR. MINER:  It looks good.

25       MR. GIANNOPOULOS:  I didn't give you much time, so --

1    Q    BY MR. GIANNOPOULOS:  And this is a card with the name

2    Adolfo Alonso and it also has the name Hernandez on it.  Did

3    you give this card to Adolfo?

4    A    Yes, sir.

5    Q    And did he sign it in front of you?

6    A    Yes, sir.

7    Q    And did he fill it out in front of you?

8    A    Yes, sir.

9    Q    And did he give it back to you?

10   A    Correct.

11   Q    And did you put your initials on the top right-hand corner

12   of that card?

13   A    Yes, sir.

14        MR. GIANNOPOULOS:  I'm going to move for the admission of

15   General Counsel's 92.

16        MR. MINER:  Well, if I can just briefly voir dire the

17   witness --

18        MR. GIANNOPOULOS:  Sure.

19        MR. MINER:  -- may I -- can I have the original shown to

20   the witness, John?

21        MR. GIANNOPOULOS:  Sure, yeah.  He has the original.

22        MR. MINER:  Thank you.

23                    **VOIR DIRE EXAMINATION**

24   Q    BY MR. MINER:  My recollection, from looking at the

25   original, is that there are two different colors of ink used on

1    the card.  Is that correct?

2    A    That is correct.

3    Q    Did Adolfo Alonso Hernandez use both colors of ink?

4    A    He didn't have a pen that was working well, so he switched

5    over to another pen.  That's what happened.

6    Q    But everything on the card other than your initials in the

7    upper right-hand corner is his writing.  Correct?

8    A    Yes, sir.  Yes, sir.  Yes, sir.

9         MR. MINER:  No objection.

10        JUDGE LAWS:  Okay.  And then I just want to ask one

11   question.  There's some scribbles in the upper left-hand

12   corner.  Do you know --

13        THE WITNESS:  No.  No.  No.  Effectively, when he was in

14   front of me, he was trying to write with the pen.  He was

15   trying to write with the pen.

16        JUDGE LAWS:  So was this a scribble trying to get the pen

17   to write?

18        THE WITNESS:  Perfect.

19        MR. GIANNOPOULOS:  Your Honor, if I didn't move for the

20   admission, I move for it now.  I think I did.

21        JUDGE LAWS:  You did.

22        MR. GIANNOPOULOS:  Okay.

23        MR. MINER:  I think you did and then he didn't have --

24        MR. GIANNOPOULOS:  Okay.

25        JUDGE LAWS:  It's admitted.

1    **(General Counsel Exhibit Number 92 Received into Evidence)**

2        MR. GIANNOPOULOS:  And I'm going to ask a similar

3    stipulation for General Counsel's 93, that this is a document

4    from the personnel file of Adolfo Alonso (phonetic).

5        MR. MINER:  We stipulate to General Counsel 93.

6        JUDGE LAWS:  That is admitted as well.

7    **(General Counsel Exhibit Number 93 Received into Evidence)**

8                    <u>DIRECT EXAMINATION</u> (CONTINUED)

9    Q    BY MR. GIANNOPOULOS:  Guillermo, I'm going to hand you a

10   document marked General Counsel's 94.

11       MR. MINER:  Thank you.

12       THE WITNESS:  Correct.

13       JUDGE LAWS:  And I just have a question because it's come

14   up on a few of these documents.  Is (Spanish spoken) welder?

15       THE INTERPRETER:  I'm sorry.  Is --

16       JUDGE LAWS:  (Spanish spoken)?

17       THE INTERPRETER:  (Spanish spoken) is --

18       THE WITNESS:  (Spanish spoken) does mean welder.  Yes.

19   Thank you.

20       JUDGE LAWS:  Thank you.

21   Q    BY MR. GIANNOPOULOS:  Guillermo, I'm handing you a card

22   that says, "Jesus Lopez N."  Did you give this card to Jesus?

23   A    Yes, sir.

24   Q    And did he fill that out in front of you?

25   A    Yes, sir.

1    Q    And did he sign it in front of you?

2    A    Yes, sir.

3    Q    And did he give it back to you?

4    A    Yes, effectively so.

5    Q    And did you put your initials in the top right-hand

6    corner?

7    A    Correct.

8         MR. GIANNOPOULOS:  I'm going to move for the admission of

9    General Counsel's 94, Your Honor.

10        MR. MINER:  I have no objection.

11        JUDGE LAWS:  That's admitted.

12    **(General Counsel Exhibit Number 94 Received into Evidence)**

13        MR. GIANNOPOULOS:  And I will seek a stipulation for

14    General Counsel's 95.

15        MR. MINER:  Actually, can I just go back and ask one voir

16    dire question?

17        MR. GIANNOPOULOS:  Certainly.

18                    <u>**VOIR DIRE EXAMINATION**</u>

19    Q    BY MR. MINER:  Once again, we had an original card with

20    two different colors of ink.  Do you observe that on the card?

21    A    That is so.

22    Q    Are all the marks on the card other than your initials in

23    the upper right-hand corner marks that were made by Jesus

24    Lopez?

25    A    Everything except for the fact that he did not know how to

1    spell out Greenbrier and Rail, and so I filled that in,

2    Greenbrier Rail.  He asked me to.

3    Q    Are you -- you wrote Greenbrier RS?

4    A    Yes, sir.

5    Q    Did you write anything else on the card?

6    A    No, sir.

7         MR. MINER:  Thank you.

8         MR. GIANNOPOULOS:  Your Honor, I move for the admission

9    now for the card.

10        MR. MINER:  No objection, Your Honor.

11        JUDGE LAWS:  That's admitted, 94.

12   **(General Counsel Exhibit Number 94 Received into Evidence)**

13        MR. GIANNOPOULOS:  And I'll seek a stipulation for General

14   Counsel's 95.  This is a document from the personnel file of

15   Jesus Lopez.  I believe his name is perhaps Jesus Lopez

16   Martinez.

17        MR. MINER:  Lopez Martinez.  We will stipulate to General

18   Counsel 95.

19        JUDGE LAWS:  That will be admitted.

20   **(General Counsel Exhibit Number 95 Received into Evidence)**

21                    **DIRECT EXAMINATION** (CONTINUED)

22   Q    BY MR. GIANNOPOULOS:  Guillermo, I'm going to show you a

23   document that will be marked General Counsel's 96.

24   A    Very well.

25        MR. MINER:  I'm sorry.

1        MR. GIANNOPOULOS:  No.  That's okay.

2   Q    BY MR. GIANNOPOULOS:  And this is a card with the name

3   Juan Manuel Enriquez.  Did you give this card to Juan Manuel

4   Enriquez?

5   A    Yes, sir.

6   Q    And did he fill that out in your presence?

7   A    Yes, sir.

8   Q    And did he sign it in front of you?

9   A    Yes, sir.

10  Q    And did he give it back to you?

11  A    Correct.

12  Q    And are those your initials in the top right-hand corner?

13  A    Correct.

14  Q    And did you write those yourself, your initials?

15  A    Perfect.

16       MR. GIANNOPOULOS:  I move for the admission of General

17  Counsel's 96, Your Honor.

18       MR. MINER:  One question on voir dire, please, Your

19  Honor --

20       JUDGE LAWS:  Sure.

21                  **VOIR DIRE EXAMINATION**

22  Q    BY MR. MINER:  Who wrote Greenbrier RS on this card,

23  please?

24  A    He did in English.  He did in Spanish.

25       MR. MINER:  Thank you.  Yeah.  No objection to General

1    Counsel 96.

2        JUDGE LAWS:  That's admitted.

3    **(General Counsel Exhibit Number 96 Received into Evidence)**

4        MR. GIANNOPOULOS:  And then I'll seek the same

5    stipulation, Judge, on General Counsel's 97.

6        JUDGE LAWS:  It's all yours.

7        MR. GIANNOPOULOS:  Yeah.  General Counsel's 97 is a

8    document from the personnel file of Juan Manuel Enriquez.

9        MR. MINER:  We will stipulate to General Counsel 97.

10       JUDGE LAWS:  97 is admitted.

11   **(General Counsel Exhibit Number 97 Received into Evidence)**

12                   **DIRECT EXAMINATION CONTINUED**

13   Q    BY MR. GIANNOPOULOS:  Guillermo, I'm going to show you a

14   document that's marked General Counsel's 98.

15   A    Very well.

16   Q    This is a card for Jesus Peralta.  Did you give this card

17   to Jesus Peralta?

18   A    Yes, sir.

19   Q    And did he sign that in front of you?

20   A    Yes, sir.

21   Q    And did he fill it out in front of you?

22   A    Yes, sir.

23   Q    And did he give it back to you?

24   A    Yes, sir.

25   Q    And did you write your initials in the top right-hand

1    corner of this card?

2    A    Yes, sir.

3        MR. GIANNOPOULOS:  I'm going to move for the admission of

4    General Counsel's 98, then.

5        MR. MINER:  No objection.

6        JUDGE LAWS:  That's admitted.

7    **(General Counsel Exhibit Number 98 Received into Evidence)**

8        MR. GIANNOPOULOS:  Now, with respect to General Counsel's

9    99, I'll seek a stipulation that the document marked General

10   Counsel's 99 is a document from the personnel file of Jesus

11   Peralta.

12       MR. MINER:  We so stipulate, Your Honor.

13       JUDGE LAWS:  99 is admitted.

14   **(General Counsel Exhibit Number 99 Received into Evidence)**

15   Q    BY MR. GIANNOPOULOS:  Guillermo, I'm going to show you a

16   card marked General Counsel's 100.

17   A    Very well.

18   Q    This is a card for Jaime Hernandez.  Did you give this

19   card to Jaime Hernandez?

20   A    Yes, sir.

21   Q    And did he fill that card out in front of you?

22   A    Yes, sir.

23   Q    Did he sign it in front of you?

24   A    Right in front of me.

25   Q    And did he give it back to you?

1    A    Yes, sir.

2    Q    And did you write your initials on the top right corner of

3    this card?

4    A    That's correct.

5        MR. GIANNOPOULOS:  Your Honor, I'll move for the admission

6    of General Counsel's 100.

7        MR. MINER:  No objection, Your Honor.

8        JUDGE LAWS:  100 is admitted.

9    **(General Counsel Exhibit Number 100 Received into Evidence)**

10       MR. GIANNOPOULOS:  And for General Counsel's 101, I'll

11   seek a stipulation that the document is from the personnel file

12   of Jaime Hernandez.

13       MR. MINER:  Thank you.  We so stipulate, Your Honor.

14   **(General Counsel Exhibit Number 101 Received into Evidence)**

15       JUDGE LAWS:  101 is admitted.

16   Q    BY MR. GIANNOPOULOS:  Guillermo, I'm going to show you a

17   document marked General Counsel's 102 and that's a card for

18   Jesus Ruiz.

19   A    Okay.  Very well.

20   Q    Did you give this card to Jesus Ruiz?

21   A    Yes, sir.

22   Q    And did he fill it out in front of you?

23   A    Yes, sir.

24   Q    And did he sign it in front of you?

25   A    Yes, sir.

1  Q     Did he give it back to you?

2  A     Yes, sir.

3  Q     And did you write your initials in the top right-hand

4  corner of this card?

5  A     That's correct.

6        MR. GIANNOPOULOS:  Your Honor, I move for the admission of

7  General Counsel's 102.

8        MR. MINER:  Before I respond to that motion, could we have

9  a translation of the classification on the second to the bottom

10  line to the left-hand side of the card at the top of General

11  Counsel 102, please?

12        JUDGE LAWS:  I'll have to take a look at it.

13        THE INTERPRETER:  Okay.  So this is going to be the second

14  to the bottom on the -- where it says classification?

15        JUDGE LAWS:  Yeah.

16        MR. MINER:  Correct.

17        THE INTERPRETER:  It's maintenance.

18        MR. MINER:  Maintenance?

19        THE INTERPRETER:  Maintenance.

20        MR. MINER:  Thank you.

21        JUDGE LAWS:  Thank you.

22        MR. MINER:  No objection, Your Honor.

23        JUDGE LAWS:  And 102 is admitted.

24  **(General Counsel Exhibit Number 102 Received into Evidence)**

25        MR. GIANNOPOULOS:  And I'll seek a stipulation for General

1    Counsel's 103.  General Counsel's 103 comes from the personnel

2    file of Jesus Ruiz.

3         JUDGE LAWS:  Thank you.

4         MR. MINER:  We so stipulate, Your Honor.

5    **(General Counsel Exhibit Number 103 Received into Evidence)**

6         JUDGE LAWS:  Then 103 will also be admitted.

7    Q    BY MR. GIANNOPOULOS:  Guillermo, I'm going to show you a

8    document marked General Counsel's 104.  And this is a card for,

9    is it, Jesse Fernando Barnes?  Do you know what his first name

10   is?

11   A    It's Jesus.

12   Q    Jesus.  And did you give this card to Jesus Fernando

13   Barnes?

14   A    That is so, yes.

15   Q    And did he fill that out in front of you?

16   A    Yes, sir.

17   Q    And did he sign that in front of you?

18   A    Yes, sir.

19   Q    And did he give it back to you?

20   A    Yes, sir.

21   Q    Okay.  Did you write your initials in the top right-hand

22   corner?

23   A    Correct.

24        MR. GIANNOPOULOS:  I'll move for the admission of General

25   Counsel's 104.

```
 1        MR. MINER:  No objection.

 2        JUDGE LAWS:  104 is admitted.

 3   (General Counsel Exhibit Number 104 Received into Evidence)

 4   Q    BY MR. GIANNOPOULOS:  I'm going to show you a document

 5   that's marked General Counsel's 105.

 6   A    Perfect.

 7        MR. GIANNOPOULOS:  And I seek a similar stipulation that

 8   the document, General Counsel's 105, comes from the personnel

 9   file of Jesus Barnes.

10        MR. MINER:  We so stipulate, Your Honor.

11   (General Counsel Exhibit Number 105 Received into Evidence)

12        JUDGE LAWS:  Then I will admit 105.

13   Q    BY MR. GIANNOPOULOS:  I'll show you a document that's

14   marked General Counsel's 106.

15   A    Yes, sir.

16   Q    And this is a card for Pedro Contreras.

17   A    Yes, sir.

18   Q    Did you give this card to Pedro Contreras?

19   A    Yes, sir.

20   Q    And did he fill it out in your presence?

21   A    Yes, sir.

22   Q    And did he sign it in front of you?

23   A    Yes, sir.

24   Q    And did he give it back to you?

25   A    Yes, sir.
```

1  Q    And are those your initials on the --

2  A    That's correct.

3        MR. GIANNOPOULOS:  I got a bit confused with the

4  translation, Your Honor.

5  Q    BY MR. GIANNOPOULOS:  Are those your initials on the top

6  right-hand corner?  Did you write those?

7  A    They are my initials, but I do have a question.

8  Q    You'll have to hold on for the question.

9  A    Okay.  Perfect.  That's fine.

10 Q    Is there anything on this card other than the initials

11 that you also wrote?

12 A    Greenbrier RS, Rail Services.  He asked me.

13       THE INTERPRETER:  And that's in English.

14 Q    BY MR. GIANNOPOULOS:  Pedro asked you to write Greenbrier?

15 A    Yes, sir.

16       MR. GIANNOPOULOS:  Okay.  I'll move for the admission of

17 General Counsel's 106.

18       MR. MINER:  No objection.

19       JUDGE LAWS:  106 is admitted.

20 **(General Counsel Exhibit Number 106 Received into Evidence)**

21       MR. GIANNOPOULOS:  And for General Counsel's 107, I'll

22 seek a similar stipulation.

23       JUDGE LAWS:  Thank you.

24       MR. GIANNOPOULOS:  Sorry.  Had the wrong Contreras.

25       MR. MINER:  That's all right.  I'm not going anywhere,

1    John.

2        MR. GIANNOPOULOS:  So I'd seek a stipulation to General

3    Counsel's 107.  It's from the personnel file of Pedro

4    Contreras.

5        MR. MINER:  We so stipulate.

6        JUDGE LAWS:  And 107 is admitted.

7    **(General Counsel Exhibit Number 107 Received into Evidence)**

8    Q    BY MR. GIANNOPOULOS:  I'm going to show you, Guillermo, a

9    document marked General Counsel's 108.

10   A    Very well.

11   Q    And this is a card for Javier Madrid.  Did you give this

12   card to Javier Madrid?

13   A    Yes, sir.

14   Q    And did he sign that in front of you?

15   A    That's correct.

16   Q    And did he give it back to you?

17   A    Yes, sir.

18   Q    And did he fill that out in your presence?

19   A    Yes, sir.

20   Q    And did he sign the card in your presence?

21   A    That's correct.

22   Q    And did you write your initials on the top right-hand

23   corner of this card?

24   A    Yes, sir.

25       MR. GIANNOPOULOS:  I'll move for the admission of General

1    Counsel's 108, Your Honor.

2        MR. MINER:  May I ask a voir dire question?

3        JUDGE LAWS:  Sure.

4                    **VOIR DIRE EXAMINATION**

5    Q    BY MR. MINER:  On the reverse side of the card, which is

6    the lower portion of the card on General Counsel 108?  One of

7    the blanks is completed.  It says Greenbrier Gunderson Rail

8    Services.  Who wrote that?

9    A    He did.  He did.

10        THE INTERPRETER:  In English.

11        MR. MINER:  Thank you.  No objection.

12        JUDGE LAWS:  108 is admitted.

13    **(General Counsel Exhibit Number 108 Received into Evidence)**

14        MR. GIANNOPOULOS:  Could I seek a stipulation from General

15    Counsel's 109?  And General Counsel's 109 is a document from

16    the personnel file of Javier Madrid.  Let me see that.  Okay.

17    (Counsel confer)

18        MR. MINER:  We so stipulate.

19    **(General Counsel Exhibit Number 109 Received into Evidence)**

20        JUDGE LAWS:  109 is admitted.  How many more cards are

21    there?  Because depending on how many, that might be a good

22    idea to get through them and then break or, if it's a lot

23    more --

24        MR. GIANNOPOULOS:  You know what?  Can we take maybe a

25    five-, 10-minute break now?  And then, when we come back, I'll

1  just -- we'll finish off the cards and the rest of the

2  testimony.  There isn't a lot of testimony after the cards.

3       JUDGE LAWS:  After the cards.  Okay.  Why don't we do

4  that?  He's been testifying for over an hour, so let's take

5  five minutes.

6       MR. MINER:  Thank you, Your Honor.

7  (Off the record at 3:01 p.m.)

8       JUDGE LAWS:  All right.  Whenever you get the signal that

9  the machine is back on, go ahead.

10  (Counsel confer)

11                 **DIRECT EXAMINATION** (CONTINUED)

12  Q    BY MR. GIANNOPOULOS:  Guillermo, I'm going to hand you a

13  document marked General Counsel's 110.

14  A    Very well, sir.

15  Q    This is a card for Roberto Ruelas.  Did you --

16  A    I know.

17  Q    -- give this card to Roberto Ruelas?

18  A    Yes, sir.

19  Q    Did he fill it out in front of you?

20  A    Yes, sir.

21  Q    And did he sign it in front of you?

22  A    Yes, sir.

23  Q    And did he give it back to you?

24  A    Yes, sir.

25  Q    And did he fill out both the front and the back side?

1  A    Yes.  I hadn't paid attention to this one, but yes.  I

2  think -- but yes.  Yes.  He did.  He did fill it out.

3  Q    And are those your initials on the top right-hand corner?

4  A    Yes, sir.

5  Q    And did you write those initials?

6  A    Yes, sir.

7  Q    And did Roberto give the card back to you?

8  A    Correct.

9  Q    And I just want to clarify.  Did you watch him as he

10  signed it, as he wrote this card?

11  A    I have served him and he asked me to help him write out

12  Greenbrier.

13  Q    And is that your handwriting where it says Greenbrier RS?

14  A    That's correct.

15       MR. GIANNOPOULOS:  I'll move for the admission of General

16  Counsel's 110, Your Honor.

17       MR. MINER:  Just one question on voir dire, please, Your

18  Honor.

19       JUDGE LAWS:  Sure.

20                    **VOIR DIRE EXAMINATION**

21  Q    BY MR. MINER:  Below your initials in the upper right-hand

22  corner of the card, there are additional initials, RR.  Do you

23  see that?

24  A    RR means Roberto Ruelas.

25  Q    Who wrote those letters?

1    A    He did it.

2         MR. MINER:  Thank you.  No objection to the admission of

3    this one, Your Honor.

4         JUDGE LAWS:  110 is admitted.

5    **(General Counsel Exhibit Number 110 Received into Evidence)**

6         MR. GIANNOPOULOS:  And for 111, Your Honor, I'll move

7    actually for a similar stipulation to General Counsel's 111.

8    It's a document from the personnel file of Roberto Ruelas.

9         THE INTERPRETER:  Did you want the interpreter to respond?

10        JUDGE LAWS:  You don't need to.

11        THE INTERPRETER:  Thank you.

12        MR. MINER:  We so stipulate, Your Honor.

13        JUDGE LAWS:  GC 111 is admitted.

14   **(General Counsel Exhibit Number 111 Received into Evidence)**

15                    **DIRECT EXAMINATION** (CONTINUED)

16   Q    BY MR. GIANNOPOULOS:  Guillermo, I'm going to hand you

17   what's marked General Counsel's 112.

18   A    Perfect.

19   Q    And this is a card for Jesus H. Lopez.

20   A    Perfect.

21   Q    Did you give this card to Jesus H. Lopez?

22   A    Yes, sir.

23   Q    And did he fill it out in front of you?

24   A    Yes, sir.

25   Q    And did he sign it in front of you?

1    A    Yes, sir.

2    Q    And did he give it back to you?

3    A    Correct.

4    Q    And did you write your initials on the top right-hand of

5    this card?

6    A    Yes, sir.

7        MR. GIANNOPOULOS:  I'll move for the admission of General

8    Counsel's 112, Your Honor.

9        MR. MINER:  May I voir dire the witness, Your Honor?

10        JUDGE LAWS:  Yes.

11                    **VOIR DIRE EXAMINATION**

12    Q    BY MR. MINER:  Who entered the writing in the blank next

13    to the term "Turno" (phonetic)?

14    A    He did.  He did it.

15    Q    That's the same handwriting as the rest of the card?

16    A    That's what I'm seeing.

17    Q    Well, when you watched him complete the card, did he make

18    all the markings on this side of the card?

19    A    Yes, sir.

20    Q    And the entry directly to the left of that, where it also

21    says Greenbrier RS, who wrote that?

22    A    He wrote that.  He wrote that.  He did.

23        MR. MINER:  No objection, Your Honor.

24        JUDGE LAWS:  112 is admitted.

25    **(General Counsel Exhibit Number 112 Received into Evidence)**

1        MR. GIANNOPOULOS:  Thank you, Your Honor.

2                **DIRECT EXAMINATION** (CONTINUED)

3    Q    BY MR. GIANNOPOULOS:  I'm going to hand you a document

4    that's marked General Counsel's 113.

5        MR. GIANNOPOULOS:  And I'll seek the same stipulation.

6    113 is from the personnel file of Jesus Lopez.

7    Q    BY MR. GIANNOPOULOS:  And while I'm doing that, did Jesus

8    Lopez give the card back to you?

9    A    Yes, sir.

10        MR. MINER:  We stipulate that General Counsel 113 is a

11    document from Jesus Lopez's personnel file.

12        JUDGE LAWS:  And I will admit 113.

13    **(General Counsel Exhibit Number 113 Received into Evidence)**

14    Q    BY MR. GIANNOPOULOS:  Guillermo, I'm handing you a card

15    that's marked General Counsel's 114.  And this is a card for

16    Ramon Parra.

17        THE INTERPRETER:  I'm sorry.  May I get a clarification?

18    Is it with one R or two Rs?

19        MR. GIANNOPOULOS:  Two Rs.

20        THE WITNESS:  Yes.  I understand.

21    Q    BY MR. GIANNOPOULOS:  Did you give this card to Ramon

22    Parra?

23    A    Yes, sir.

24    Q    And did he fill that out, this card out, in front of you?

25    A    Yes, sir.

1    Q    And did he sign it in front of you?

2    A    Yes, sir.

3    Q    And did he give it back to you?

4    A    That's correct.

5    Q    And did you write your initials in the top right-hand

6    corner of this card?

7    A    Correct.

8         MR. GIANNOPOULOS:  I move for the admission of General

9    Counsel's 114, Your Honor.

10        MR. MINER:  May I voir dire the witness, Your Honor?

11        JUDGE LAWS:  Yes.

12                    **VOIR DIRE EXAMINATION**

13   Q    BY MR. MINER:  Did anyone other than Mr. Parra enter or

14   complete any of the blanks on the card?

15   A    No, sir.

16   Q    Mr. Parra signed -- or strike that.  Mr. Parra wrote his

17   name in the top left-hand blank and then also wrote Greenbrier

18   RS three lines down?

19   A    The gentleman does not speak English, so he asked me to

20   fill out the name in English, so I filled out Greenbrier RS and

21   I also filled out welder, but the rest of the information, the

22   name, the date, and everything else, he filled out.

23   Q    Did he sign his name in the lower right-hand blank space

24   in the card?

25   A    That is correct.

1    Q    That's his signature with his own hand?

2    A    That's correct.

3         MR. MINER:  No objection.

4         JUDGE LAWS:  114 is admitted.

5    **(General Counsel Exhibit Number 114 Received into Evidence)**

6         MR. GIANNOPOULOS:  And for General Counsel's 115, Your

7    Honor, we seek the same stipulation.  This document comes from

8    the personnel file of Ramon Parra.

9         MR. MINER:  We so stipulate, Your Honor.

10   **(General Counsel Exhibit Number 115 Received into Evidence)**

11        JUDGE LAWS:  Okay.  General Counsel 115 is admitted.

12        **DIRECT EXAMINATION** (CONTINUED)

13   Q    BY MR. GIANNOPOULOS:  Guillermo, I'm handing you a

14   document marked General Counsel's 116.  And this is a card for

15   Engenio Ruiz.

16   A    I understand that.

17   Q    Did you give this card to Engenio Ruiz?

18   A    Yes, sir.

19   Q    And did he fill that out in your presence?

20   A    Yes, sir.

21   Q    And did he sign it in front of you?

22   A    Yes, sir.

23   Q    And did he date it in front of you?

24   A    Yes, sir.

25   Q    And did he give it back to you?

1    A    Yes, sir.

2    Q    And did you write your initials in the top right-hand

3    corner?

4    A    Yes, sir.

5    Q    And where it says (Spanish spoken), is that -- and then

6    Greenbrier RS, is that your handwriting or his handwriting?

7         THE INTERPRETER:  Okay.

8         JUDGE LAWS:  Go ahead and wait for the translation just so

9    we have it consistently one way.

10        THE INTERPRETER:  I'm sorry.  And I lost the second

11   portion of your question.

12   Q    BY MR. GIANNOPOULOS:  Yeah.  And then it says Greenbrier

13   RS.  Is that your handwriting or Engenio's handwriting?

14   A    It's mine, sir.

15   Q    And I've probably asked you this, but I'll ask you again.

16   Did Engenio give the card back to you?

17   A    Yes, sir.

18        MR. GIANNOPOULOS:  I'll move for the admission of General

19   Counsel's 116, Your Honor.

20        MR. MINER:  No objection.

21        JUDGE LAWS:  116 is admitted.

22   **(General Counsel Exhibit Number 116 Received into Evidence)**

23        MR. GIANNOPOULOS:  One second, Your Honor.  Sorry.

24        JUDGE LAWS:  Sure.

25        MR. GIANNOPOULOS:  So General Counsel's 117, I will seek a

1    similar stipulation to General Counsel's 117, comes from the

2    personnel file of Engenio Ruiz.

3        MR. MINER:  We so stipulate, Your Honor.

4    **(General Counsel Exhibit Number 117 Received into Evidence)**

5        JUDGE LAWS:  117 is admitted, then.

6    Q    BY MR. GIANNOPOULOS:  Guillermo, I'm going to show you a

7    document marked General Counsel's 118.

8    A    Very well.

9    Q    And this is a card for Jose Barcelas.  Did you give --

10   A    Yes.

11   Q    -- this card to Jose Barcelas?

12   A    Yes, sir.

13   Q    And did he fill it out in front of you?

14   A    Correct.

15   Q    And did he sign it in front of you?

16   A    Yes, sir.

17   Q    And did you write your initials in the top right-hand

18   corner?

19   A    Yes, sir.

20   Q    And did Jose give this card back to you?

21   A    Yes, sir.

22       MR. GIANNOPOULOS:  I'll move for the admission of General

23   Counsel's 118, Your Honor.

24       MR. MINER:  Your Honor, may I voir dire the witness?

25       JUDGE LAWS:  Yes.

1                    **VOIR DIRE EXAMINATION**

2    Q    BY MR. MINER:  Alongside -- or strike that.  In the bottom

3    four blanks on the left-hand side of the card, someone's

4    written Arizona and, under that, Greenbrier, under that Walter.

5    Who wrote those entries?

6    A    He wrote that.  It looks like he wrote it differently, but

7    he was the one who wrote it.  He did.

8    Q    You observed him write all that?

9    A    Yes.  I did.

10        MR. MINER:  No objection to General Counsel 118.

11        JUDGE LAWS:  119 is admitted.

12    **(General Counsel Exhibit Number 118 Received into Evidence)**

13        MR. GIANNOPOULOS:  And General Counsel's 119 -- we seek a

14    stipulation to have it -- it's a document from the personnel

15    file of Jose Barcelas.

16        MR. MINER:  We so stipulate.

17    **(General Counsel Exhibit Number 119 Received into Evidence)**

18        JUDGE LAWS:  GC-119 is admitted.

19                    **DIRECT EXAMINATION** (CONTINUED)

20    Q    BY MR. GIANNOPOULOS:  Guillermo, I'm going to hand you a

21    document marked General Counsel's 120.  And that is the card

22    for a Everaldo Andolon.

23        THE INTERPRETER:  May I have the name again?  This is the

24    interpreter.

25    Q    BY MR. GIANNOPOULOS:  I'm sorry.  General Counsel's 120 is

 1   a card for Everaldo Andolon.

 2   A     Perfect.

 3   Q     Did you give this card to Everaldo Andolon?

 4   A     Yes, sir.

 5   Q     And did he fill out the card in your presence?

 6   A     Yes, sir.

 7   Q     And did he sign it and date it in your presence?

 8   A     Yes, sir.

 9   Q     And did he give it back to you?

10   A     Yes, sir.

11   Q     And did you write your initials in the top right-hand

12   corner of this paper, this card?

13   A     Yes, sir.

14   Q     And was this Empleado de Greenbrier -- is that your

15   handwriting or is that Everaldo's handwriting?

16   A     It's mine.  He asked me to help him to write it out.

17         MR. GIANNOPOULOS:  I move for the admission of General

18   Counsel's 120, Your Honor.

19         MR. MINER:  Just one question on voir dire, please, Your

20   Honor.

21         JUDGE LAWS:  Sure.

22                    **VOIR DIRE EXAMINATION**

23   Q     BY MR. MINER:  Who wrote "Primero" in the "Turno" blank?

24   A     I did it because he told me to write down Greenbrier and

25   to write down the shift that corresponded to him.

1   Q    And you did so?

2   A    Yes, sir.

3        MR. MINER:  No objection -- excuse me.  No objection to

4   General Counsel 120.

5        JUDGE LAWS:  120 is admitted.

6   **(General Counsel Exhibit Number 120 Received into Evidence)**

7        MR. GIANNOPOULOS:  General Counsel's 121, a document from

8   the personnel file of Everaldo Andolon, and I'll seek a

9   stipulation from counsel accordingly.

10       MR. MINER:  Yeah.  no objection to General Counsel 121.

11       JUDGE LAWS:  Then it is admitted.

12  **(General Counsel Exhibit Number 121 Received into Evidence)**

13                    **DIRECT EXAMINATION** (CONTINUED)

14  Q    BY MR. GIANNOPOULOS:  I'm going to show you a card that's

15  marked General Counsel's 122.

16  A    Very well.

17  Q    And this is a card for Jeff Raske.

18       THE INTERPRETER:  May I have the name again?

19       MR. GIANNOPOULOS:  Jeff Raske.

20       THE INTERPRETER:  Jeff Raske.

21       MR. GIANNOPOULOS:  R-A-S-K-E.

22       THE INTERPRETER:  Thank you.

23       MR. GIANNOPOULOS:  Are you ready, Grace?  You might --

24       THE INTERPRETER:  Yes.

25       MR. GIANNOPOULOS:  Okay.

1         THE INTERPRETER:  Yes.

2    Q    BY MR. GIANNOPOULOS:  Did you give this card to Jeff

3    Raske?

4    A    Yes, sir.

5    Q    And did he fill out this card in front of you?

6    A    Yes, sir.

7    Q    And did he sign and date it in front of you?

8    A    That's correct.

9    Q    And did you write your initials in the top right-hand

10   corner?

11   A    That's correct.

12   Q    And did he give this card back to you?

13   A    Yes, sir.

14        MR. GIANNOPOULOS:  I'll move for the admission of General

15   Counsel 122.

16        MR. MINER:  No objection.

17        JUDGE LAWS:  122 is admitted.

18   **(General Counsel Exhibit Number 122 Received into Evidence)**

19        MR. GIANNOPOULOS:  And General Counsel's 123, I seek a

20   stipulation from counsel.  This is a document from the employee

21   file of Jeff Raske.

22        MR. MINER:  Yeah.  So stipulated.

23   **(General Counsel Exhibit Number 123 Received into Evidence)**

24        JUDGE LAWS:  And 123 will be admitted.

25   Q    BY MR. GIANNOPOULOS:  Now, Guillermo, all the cards that

1    we just talked about, that you just identified -- after you

2    collected them from the employees, your coworkers, what did you

3    do with those cards?

4    A    I gave it to the Union at a meeting, to their department.

5    Q    And do you remember who at the Union you gave the cards

6    to?  Did you give them to different people at different times?

7    Was there one person?

8    A    No.  There were, like, two or three different people who

9    were there at the meeting, members.

10   Q    And do you remember who from the Union you gave the cards

11   to?

12   A    Of course, Marcos, Jeff, and Greg or Craig.

13        THE INTERPRETER:  Can I get a clarification?

14        MR. MINER:  Craig.

15        THE INTERPRETER:  Thank you.

16        MR. MINER:  Right.

17   Q    BY MR. GIANNOPOULOS:  Now, Guillermo, in November of 2012,

18   were you laid off from Greenbrier?

19   A    Yes, sir.

20   Q    And the day that you were laid off, did you have a

21   discussion with Mike Torrez about the layoff?

22        THE INTERPRETER:  Was it Mike Torrez or --

23        MR. GIANNOPOULOS:  Torrez.

24        THE INTERPRETER:  -- Marco Torrez?

25        THE WITNESS:  It's Martin Torrez.

1    Q     BY MR. GIANNOPOULOS:  I'm sorry.

2          THE INTERPRETER:  Okay.

3    Q     BY MR. GIANNOPOULOS:  Martin, with Martin Torrez.

4    A     Yes, sir.

5    Q     And who is Martin Torrez?

6    A     At that time, he was my foreman.

7    Q     And where did that discussion take place?

8    A     In the area where I was working.

9    Q     And who was present?

10   A     Just he and I.

11   Q     And what time of day was it?

12   A     It was, like, around 8:45 in the morning.

13   Q     And was this conversation in English or Spanish?

14   A     Spanish.

15   Q     And why don't you tell me what was said and by whom during

16   this conversation?

17   A     In the conversation, he said that Mr. Gorry (phonetic),

18   who was coming from Texas, was coming and so something strange

19   was going on.

20   Q     And do you know -- you said Gorry?  What was the name?

21   A     Gorry or Gorry.  I mean, I don't know.  He's --

22   Q     Could it be Gordie (phonetic)?

23   A     He's a person that comes from Texas.  He is a member of,

24   like -- I think he's the president.

25   Q     Okay.  What else?  What else was said in the conversation?

1      THE INTERPRETER:  And I'm sorry.  I missed your first

2  statement.  Is it --

3      MR. GIANNOPOULOS:  I said, could it be Gordie with a D?

4      THE INTERPRETER:  Gordie, thank you.

5      THE WITNESS:  It's difficult to know how he writes his

6  name.  I don't know it.

7  Q    BY MR. GIANNOPOULOS:  Okay.  What else was said in that

8  conversation?

9  A    He mentioned the fact that it looks like they were going

10  to lay people off from work because the situation was looking

11  pretty bad.  Or he thought that it was because of the Union.

12  Q    And did you say anything else in reply to that?

13  A    No.  The only thing I said is, "I don't know anything."

14  Q    And were you laid off that day?

15  A    Yes, sir.

16  Q    And how did you find out about the layoff?

17  A    Concerning what?

18  Q    The layoff, that you were going to be laid off.  How did

19  you find out you were going to get laid off?

20  A    What happened that they sent us down to some trailers.

21  And then what they did is that they sent down a group of

22  people.  And then Mr. Gorry told us that work was very scarce

23  and that those people that were here at that trailer, they were

24  going to let them go, but that in the future, very soon, he was

25  going to send for all of us to come back.

1    Q     And then do you -- was that it?  Did you go home that day?

2    A     Yes, sir.

3    Q     And have you ever gone back to work for Greenbrier since

4    that day?

5    A     No.

6          MR. GIANNOPOULOS:  Give me a couple minutes, Your Honor.

7    I think that's all I have.

8          JUDGE LAWS:  Okay.

9          MR. GIANNOPOULOS:  Can we go off the record for just a

10   quick second?

11         JUDGE LAWS:  Sure.

12   (Off the record at 3:37 p.m.)

13         JUDGE LAWS:  And before I turn things over to cross-, I

14   meant to make a note when we went back on the record last time

15   and I forgot.  With regard to the witness that testified

16   previously, Mr. Silvette (phonetic), he had to go to work at

17   3:00.  And therefore, off the record, we had a discussion.  In

18   order to accommodate his work schedule, which states at 3:00

19   every day, he's going to come back at 9:00 tomorrow for cross-

20   examination and then any follow-up examination.

21         So I told the parties will be here at 8:45, ready to

22   resume with Mr. Silvette scheduled, with his testimony, excuse

23   me, at 9:00.  And with that, the General Counsel has indicated

24   that there are no more questions for this witness on direct.

25   There is not an affidavit and we have taken a break to prepare

1    for cross-, so whenever you're ready, please proceed, Mr.

2    Miner.

3         MR. MINER:  Thank you, Your Honor.  Just one moment,

4    please.

5         JUDGE LAWS:  Sure.

6         MR. MINER:  Bear with me.

7         JUDGE LAWS:  And whenever you're ready, just go.

8         MR. MINER:  Thank you.

9                        **CROSS-EXAMINATION**

10   Q    BY MR. MINER:  Okay.  Mr. Murguia, excuse me.  Mr.

11   Murguia, good afternoon.

12   A    Good afternoon.

13   Q    My name is Fred Miner.  I'm an attorney for Greenbrier and

14   I'm going to ask you a few questions about your testimony.  If

15   you don't understand any of my questions, please let me know

16   that.  I'll be glad to restate it.

17   A    Perfect.

18   Q    Thank you.  So we heard some testimony about an organizing

19   campaign involving first the United Food Commercial Workers

20   and, second, the sheet metalworkers.  Correct?

21   A    That's correct.

22   Q    There are a few items that I didn't understand from your

23   prior testimony, so I'm going to ask a few clarification

24   questions.

25   A    Perfect.

1  Q    Why did you decide to pursue a campaign with the sheet

2  metalworkers rather than the UFCW?

3      MR. GIANNOPOULOS:  Objection, relevance.  It's completely

4  irrelevant which union these employees chose to represent them.

5      MR. MINER:  I thought we started off with testimony on

6  this issue.

7      MR. GIANNOPOULOS:  There is no -- there was some vague

8  testimony, no objections.  The answers are what they are.

9      JUDGE LAWS:  They are.  I agree.  I don't think it's

10  highly relevant, but I will allow just some background, so you

11  can go ahead and answer.

12      THE WITNESS:  The reason that we decided to go with this

13  union instead of the other one is because we found that we had

14  more support from this new union than the prior one.

15  Q    BY MR. MINER:  I see.  During your testimony earlier in

16  the day, I understood you to say that a lead was recruiting

17  other people to join the Union.  Do you recall that testimony?

18  A    Just a moment.  Could you please repeat?

19      THE INTERPRETER:  And the question is being addressed to

20  the interpreter.

21      JUDGE LAWS:  To you?  Okay.  I think it was the witness

22  who actually used the word lead, so maybe just re-ask.

23      THE INTERPRETER:  I will re-ask the very same question.

24      THE WITNESS:  Yes.  I do recall it perfectly.

25  Q    BY MR. MINER:  Okay.  Was a lead recruiting other people

1  to join the Union?

2  A    Jorge Martinez.

3  Q    Jorge Martinez was recruiting other employees to join the

4  Union?

5  A    That's correct, and me, too.

6  Q    Okay.  Did he recruit employees to join the UFCW union or

7  the sheet metalworker union?

8  A    He started with the other one, the U -- what is it called?

9  Q    UFCW.

10  A    Uh-huh.

11  Q    I'm sorry, one moment.

12  (Counsel confer)

13  Q    BY MR. MINER:  Do you know what job Jorge Martinez held in

14  November 2012?

15  A    Yes, sir.

16  Q    Was he a lead man for Greenbrier?

17  A    No, sir.

18  Q    Thank you.  But he was trying to organize employees to

19  join the UFCW.  Correct?

20  A    That's correct.  That's correct.

21  Q    And other employees expressed interest in the sheet

22  metalworkers.  Is that correct?

23  A    That's correct.

24  Q    Okay.  And we saw a copy of your authorization card with

25  the UFCW, dated October 24, 2012.  Correct?

1    A    That is correct.

2    Q    What was the date of the -- what was the date on which you

3    signed the sheet metalworkers authorization card?

4        MR. GIANNOPOULOS:  And I would object, Your Honor, as to,

5    the document speaks for itself.  It's not in front of him, but

6    if he remembers, he can testify.  If not, show him the

7    document.

8        JUDGE LAWS:  Okay.  So there was an objection.  Ask him to

9    respond to the question only if he remembers without reference

10    to his card.

11        THE WITNESS:  I don't recall, but it was towards the end

12    of October.

13        MR. MINER:  Okay.  May I approach, Your Honor?

14        JUDGE LAWS:  Yes.

15    Q    BY MR. MINER:  I'm going to show you General Counsel

16    Exhibit 83.

17    A    Yes.  This is it.

18    Q    Is that a copy of your authorization card?

19    A    Uh-huh.  Sheet metals.

20    Q    I can't read the date on the card.  What is the date?

21    A    11/5/12.

22    Q    November the 5th of 2012?

23    A    That is correct.

24    Q    What happened on November the 5th, 2012?

25    A    What happened?  That day, we signed the cards with

1    sheetmetal workers when we had our first meeting with the

2    Sheetmetal Workers Union.

3    Q    Other than yourself, who signed a card on November 5th?

4         MR. GIANNOPOULOS:  I object, Your Honor.  At least the

5    General Counsel's general policy is, with respect to other

6    union supporters that have not been previously identified at

7    the trial, we do not -- we object as to the relevance and to

8    the identification of "people".

9         JUDGE LAWS:  I guess I want to --

10        MR. GIANNOPOULOS:  They're not being previously

11   identified, so --

12        JUDGE LAWS:  They haven't been previously identified and

13   who the General Counsel is not relying on as submitting --

14   having submitted a card?

15        MR. GIANNOPOULOS:  Correct.

16        JUDGE LAWS:  Okay.  Then I will sustain it with that

17   caveat, that to the extent that this witness has seen the cards

18   that have been relied upon or are going to be relied upon to

19   make the General Counsel's case.  He can answer with regard to

20   those individuals and anybody named in the complaint,

21   obviously.

22        MR. MINER:  Okay.

23   Q    BY MR. MINER:  How many --

24        THE INTERPRETER:  I'm sorry.  So I don't know what

25   instructions to give to the witness.  This is the interpreter.

1      JUDGE LAWS:  So tell him that, with regard to the

2  questions Mr. Miner is going to ask you, you do not need to

3  identify names of individuals whose card you were not shown at

4  this hearing or individuals not identified as having supported

5  the Union in either the complaint or any of the amendments.

6      THE WITNESS:  I would not like to give any information

7  concerning anybody else.

8  Q    BY MR. MINER:  Were any of the individuals who signed

9  cards for you whose cards you have reviewed in evidence this

10  afternoon -- were any of those individuals with you at this

11  meeting on November 5th?

12  A    Some people, yes.

13  Q    Okay.  Which ones?

14  A    I'm not going to identify names.

15      JUDGE LAWS:  Why don't I go through who's been identified

16  one by one?

17      MR. MINER:  Okay.

18      JUDGE LAWS:  And we can do it that way.  And I'm missing a

19  couple exhibits because I gave them to the court reporter, so

20  just jump in, anybody, if I skip somebody.  With this witness,

21  I believe we started at 78.

22      MS. SHIH:  Not with this witness.

23      JUDGE LAWS:  Not with this -- right.  Where did we --

24      MR. MINER:  I think we started with 83.

25      JUDGE LAWS:  83.  Okay.  That's you.  So I presume you

```
 1   were at the meeting with yourself.  Alex Amador?

 2        THE WITNESS:  Uh-huh.

 3        JUDGE LAWS:  He was at the meeting?

 4        THE WITNESS:  Yes, yes.

 5        JUDGE LAWS:  Jesus Arellanes?

 6        THE WITNESS:  No.  He didn't go.

 7        JUDGE LAWS:  Jorge Maldonado?

 8        THE WITNESS:  Uh-huh.

 9        JUDGE LAWS:  He was at the meeting?

10        THE WITNESS:  Yes.

11        JUDGE LAWS:  Adolfo Alonso Hernandez.

12        THE WITNESS:  Also.

13        JUDGE LAWS:  Jesus Lopez?

14        THE WITNESS:  No.

15        JUDGE LAWS:  Juan Manuel Enriquez?

16        THE WITNESS:  Yes.

17        JUDGE LAWS:  Jesus -- is it Peralta?

18        THE WITNESS:  Uh-huh.  No.

19        JUDGE LAWS:  Jaime Hernandez?

20        THE WITNESS:  Yes.

21        JUDGE LAWS:  Jesus Ruiz?

22        THE WITNESS:  Also.

23        JUDGE LAWS:  Jesus Fernando Barnes.

24        THE WITNESS:  Also.

25        JUDGE LAWS:  Pedro Contreras?
```

1          THE WITNESS:  Also.

2          JUDGE LAWS:  Javier Madrid?

3          THE WITNESS:  No.

4          JUDGE LAWS:  Roberto Ruelas?

5          THE WITNESS:  Also.

6          JUDGE LAWS:  Jesus Lopez?

7          THE WITNESS:  Yes.  Yes.

8          MR. MINER:  Yes, meaning he was there?

9          THE WITNESS:  Uh-huh.  He was.

10         JUDGE LAWS:  Ramon Parra?

11         THE WITNESS:  No.

12         JUDGE LAWS:  Engenio Ruiz?

13         THE WITNESS:  Yes.

14         JUDGE LAWS:  Jose Barcelas?

15         THE WITNESS:  Yes.

16         JUDGE LAWS:  Everaldo Andolon?

17         THE WITNESS:  No.

18         JUDGE LAWS:  Jeff Raske?

19         THE WITNESS:  No.

20    Q    BY MR. MINER:  All right.  And so that is 12 employees.

21    Correct?

22    A    Uh-huh.  That's correct.

23    Q    How many additional Greenbrier employees were at the

24    meeting?

25    A    I don't recall the sum, but there were some.

1    Q    More than three?

2    A    Of course, yes, a lot of them.

3    Q    More than 10?

4    A    More than 10, yes.

5    Q    Okay.  When was the -- or strike that.  Where was the

6    meeting held?

7         MR. GIANNOPOULOS:  Objection, relevance, Your Honor.  I

8    don't think there's any relevance in trying to identify where

9    employees were meeting with union representatives?

10        MR. MINER:  Well, I'd be willing to restate the question.

11        JUDGE LAWS:  Okay.

12   Q    BY MR. MINER:  Was the meeting held at the Tucson

13   facility?

14        JUDGE LAWS:  Greenbrier's facility.

15        THE WITNESS:  No.

16        MR. GIANNOPOULOS:  And I would say the same --

17        THE WITNESS:  No.

18        MR. GIANNOPOULOS:  -- relevance, Judge.

19        JUDGE LAWS:  I'll allow that.  It's been answered.  So no,

20   it wasn't at Greenbrier.

21        MR. MINER:  All right.

22   Q    BY MR. MINER:  Were there any managers there?

23   A    No.

24   Q    Any foremen or lead men at this meeting?

25   A    No, sir.

1 Q    Of the employees you have identified, none of them signed

2 an authorization card on November the 5th other than yourself?

3 A    No.  No.  That was, like, a day or two afterwards,

4 something like that.

5 Q    I'm sorry.  I don't understand.

6 A    No.  The date that I signed, nobody else signed except

7 Jorge Martinez, and Rogelio Martinez, and myself.  And then,

8 from then on, everybody else gave me their cards two or three

9 days after.

10 Q    Were there enough cards for everybody to sign a card at

11 the November 5th meeting?

12    MR. GIANNOPOULOS:  Objection, Your Honor, calls for

13 speculation and I'll just put -- calls for speculation right

14 now.  And there's no really foundation as to that.

15    JUDGE LAWS:  Why don't we, if you're going to ask that,

16 get an idea of who had cards, how many there were, et cetera?

17    MR. MINER:  Okay.

18 Q    BY MR. MINER:  Were there representatives for the sheet

19 metalworkers there in addition to the Greenbrier employees?

20    MR. GIANNOPOULOS:  And just so it's not confusing, Your

21 Honor, we're talking about the very first meeting on November

22 5th?

23    JUDGE LAWS:  Yes.

24    THE WITNESS:  That is correct.

25 Q    BY MR. MINER:  Did they have some cards with them?

1    A    Who?

2    Q    Did the Union representatives at the meeting on November

3    5th, held off site out of the Tucson facility, where there were

4    other Greenbrier employees there with you -- did those union

5    representatives have authorization cards with them?

6    A    Yes.

7    Q    Did they have more than one?

8    A    Uh-huh.   Yes.

9    Q    Do you know how many cards they have?

10   A    No.   I don't have it memorized, but they did have more

11   than 20?

12   Q    Did they ask everyone to sign a card at the meeting?

13   A    Yes.

14   Q    Did any employees say they didn't want to sign a card?

15   A    No, because we want a union.

16   Q    Okay.   Did you talk to employees why they didn't sign a

17   card that day?

18        MR. GIANNOPOULOS:   Objection, what's the relevance, Your

19   Honor?

20        JUDGE LAWS:   Yeah.   I will allow some explanation as to

21   why --

22        MR. GIANNOPOULOS:   As to why --

23        JUDGE LAWS:   -- he got the cards when he did.   I, you

24   know --

25        MR. GIANNOPOULOS:   Your Honor, with all due respect, as to

1    why employees did not sign a card at the initial meeting, I see

2    no relevance of that whatsoever.

3        JUDGE LAWS:  And again, I'll allow it.  It's going to be

4    subject to if the employee knows.

5        MR. GIANNOPOULOS:  Objection, hearsay.

6        JUDGE LAWS:  And again, I will allow it if this witness

7    knows.

8        MR. GIANNOPOULOS:  Objection, lack of foundation, then.

9    I'm going to ask for the foundation.  Who was present, exactly

10   where the conversation took place?

11       MR. MINER:  Well, you've already objected to my question

12   about where the conversation took place.

13       JUDGE LAWS:  You did.  And also --

14       MR. GIANNOPOULOS:  Well, then if he can't set the

15   foundation, objection, lack of foundation.

16       JUDGE LAWS:  I think we can get the question in a way that

17   is not objectionable.  You're talking only about the cards that

18   we have in evidence now.

19       MR. MINER:  Correct.

20       JUDGE LAWS:  Correct?  We're not going to go outside of

21   that?

22       MR. MINER:  No.

23       JUDGE LAWS:  Okay.  You know, certainly, if you want to

24   ask him if he talked to any of these witnesses as to why they

25   didn't sign a card, then, I will allow that.  I agree it's

1    hearsay, but I think, as General Counsel well knows, I can,

2    subject to corroborating evidence or other indicia of

3    reliability, admit hearsay.

4        MR. MINER:  Thank you, Your Honor.  I thought that's the

5    question that I asked, but I will restate it.

6    Q    BY MR. MINER:  Did you speak with any of the employees

7    whom you've identified being at the November 5th meeting held

8    off site with some sheet metalworker representatives who asked

9    them to sign cards why they chose not to sign a card that day?

10   A    Because we came to an agreement that we would talk a

11   little bit more about what we were going to plan to do.

12   Q    Very good.  And did you have some additional discussions

13   with those employees?

14   A    Yes, sir.

15   Q    Okay.  After this meeting on November 5th?

16   A    Yes, sir.

17   Q    At the meeting on November 5th, other than asking

18   employees to sign authorization cards, did the sheet

19   metalworkers representatives provide any instructions to

20   employees about encouraging other employees to sign a card?

21       THE INTERPRETER:  I'm sorry.  I lost the second part of

22   your question.  Did the representatives from the sheet

23   metalworkers unions --

24       MR. MINER:  Provide any instructions about soliciting

25   other employees to sign cards?

1          THE INTERPRETER:  Thank you very much.

2          MR. GIANNOPOULOS:  And I'm going to object, Your Honor, as

3    to relevance.  And the board is fairly clear that organizing

4    strategies, unions' organizing strategies are really

5    inadmissible unless it goes -- there's some sort of direct

6    relevance.  And there's no direct relevance here.  This would

7    be the same as, in essence, sending a subpoena to a union for

8    organizing strategies with respect to the organizing drive

9    here.  And that is not relevant, at least nothing so far, so I

10   would object.

11         MR. MINER:  Your Honor, I think that's dead wrong.  The

12   issue of notice to management of the existence of an organizing

13   campaign is directly relevant to every part of this case and

14   so --

15         MR. GIANNOPOULOS:  And he can ask a direct question.

16         MR. MINER:  -- the instructions that are provided by the

17   sheet metalworkers to the employees about conducting this

18   campaign, under the radar or otherwise, is relevant to that.

19         JUDGE LAWS:  And I think we can get at the same question,

20   you know, a different way without getting to organizing

21   strategy --

22         MR. MINER:  And I didn't ask --

23         JUDGE LAWS:  -- with regard to --

24         MR. MINER:  -- about strategy.  I specifically asked about

25   instructions, instructions to employees.

1      MR. GIANNOPOULOS:  And that would be the same.

2      JUDGE LAWS:  I'm going to see if this will get us there.

3  After you left the meeting, did you try to -- did you speak

4  about the Union well at work?

5      THE WITNESS:  Nothing was commented at work.

6      JUDGE LAWS:  Do you know -- did you observe any other

7  employees speaking to other employees at work?

8      THE WITNESS:  No.

9      JUDGE LAWS:  Okay.

10  Q    BY MR. MINER:  No discussions among employees that you're

11  aware of about the Union at work at all?

12  A    No.

13  Q    Any employees wear any union symbols, or pins, or hats at

14  work?

15  A    No, because we wanted it all to be a secret.

16  Q    Who told you to keep the campaign a secret?

17      MR. GIANNOPOULOS:  Objection, assumes facts not in

18  evidence.  Assume someone told him that --

19      JUDGE LAWS:  It does.  Sustained.

20      MR. MINER:  All right.

21  Q    BY MR. MINER:  Did anybody tell you to keep a secret?

22  A    Me, myself.

23  Q    You chose to keep it a secret?

24  A    Uh-huh.

25  Q    Is that a yes?

1    A    What?

2        JUDGE LAWS:  We can't say uh-huh or huh-uh.

3        THE WITNESS:  Okay.  Perfect.  What was it that he said?

4    Q    BY MR. MINER:  No one told you to keep the campaign

5    secret.  Is that your testimony?

6    A    No, because what we wanted to do is that we wanted to

7    organize ourselves and then conduct a campaign completely

8    outside of work.

9    Q    "We" wanted to do that?

10   A    I don't know if you wanted to do that, but I mean, our

11   campaign -- that was the Union's campaign.

12   Q    All right.  So who provided that instruction?

13       MR. GIANNOPOULOS:  Asked and answered, Your Honor.

14       THE WITNESS:  What instructions?

15       MR. GIANNOPOULOS:  And assumes facts not in evidence.

16       JUDGE LAWS:  Sustained.

17   Q    BY MR. MINER:  Well, who made the statement first?

18       MR. GIANNOPOULOS:  Asked and answered.  He said he did.

19       MR. MINER:  Well, he said that he wanted to keep it secret

20   and then he said "We all" wanted to keep it secret.

21       JUDGE LAWS:  Did anybody tell you to keep it secret?

22       THE WITNESS:  No.  The campaign that we were doing for

23   union, we did not -- what I wanted to say is, "We did not want

24   Greenbrier to know about it."  That's what I was trying to say.

25       JUDGE LAWS:  And by "we", who are you referring to?

1      THE WITNESS:  The ones -- we who are the leaders.

2  Q    BY MR. MINER:  All right.  You spoke with Alex Amador

3  about signing a card.  Correct?

4  A    Yes, sir.

5  Q    And I'm sorry.  Before I ask you about this discussion,

6  when did you receive copies of authorization cards to

7  distribute to other employees?

8  A    Copies or the blue forms?

9  Q    The original authorization card forms that you watched the

10 employees sign in your own presence?

11 A    We had more the following day.

12 Q    Yeah.  My question was, when did you receive the cards?

13     JUDGE LAWS:  From the Union.

14     THE WITNESS:  The first day that we were at the Union,

15 they gave us, like, about 20 cards.

16 Q    BY MR. MINER:  Was that at the November 5th meeting?

17 A    That's correct.  That's correct.

18 Q    The Union representatives gave you the 20 cards at the

19 meeting?

20 A    It was, like, around 20 or 25, something like that.

21 Q    All right.  And this was at that particular meeting?  That

22 was my question.

23 A    That's correct.

24 Q    All right.

25 A    That's correct.

1   Q    And one of the coworkers you spoke with was Alex Amador.

2   Correct?

3   A    Uh-huh.  That's correct.

4   Q    And where did you meet with him?

5   A    Outside of work.

6   Q    Where?

7   A    Out on the street, in the store.

8   Q    Okay.  Any managers around at that time?

9   A    No, sir.

10  Q    Any supervisors or lead men present at the time?

11  A    No.

12  Q    Did you plan to meet him at that location or did you just

13  bump into him there?

14       MR. GIANNOPOULOS:  Objection, relevance, Judge.

15       JUDGE LAWS:  Unless there's offer of how it's relevant, I

16  don't see how it's relevant why they met.

17       MR. MINER:  Well, he doesn't want to talk about

18  instructions and plans to meet off site or, otherwise, I'd

19  engage in the campaign.  And so I want to know exactly how he

20  spoke with this specific employee about making arrangements to

21  get this card signed.

22       MR. GIANNOPOULOS:  Yeah.  I don't -- again, same with the

23  relevance, Judge.

24       JUDGE LAWS:  Yeah.  I guess, why is it relevant, how they

25  made the arrangements?

1      MR. MINER:  The arrangements to engage in a surreptitious

2  campaign is relevant to the issue of notice in our case.

3      MR. GIANNOPOULOS:  Your Honor, same objection.  He said

4  where they met.  He said no manager or anyone else was present.

5  I just don't see the relevance.

6      JUDGE LAWS:  You know, I guess arguably, if they made the

7  arrangements at work and someone was in earshot, it could be

8  relevant, so I mean, if that's what you're trying to establish,

9  you know, beyond that, I'm not sure how it's relevant or unless

10  there was, you know -- I'm going to give you some leeway, but

11  I'm going to expect you to tie it into something that is going

12  to be relevant.

13      MR. MINER:  Your Honor, at some point, somebody is going

14  to argue that, based solely on pure inference, it must have

15  been the case that somebody knew there was a campaign going on

16  because there was a campaign going on.  And so I want to know

17  how we might have known this.

18      JUDGE LAWS:  So --

19      MR. GIANNOPOULOS:  And Your Honor, that's not our

20  argument.  By the admission of Mr. Lay (phonetic), they knew

21  there was a campaign going on.

22      MR. MINER:  I don't think that's what it says --

23      MR. GIANNOPOULOS:  And that testimony is already in the

24  record.

25      MR. MINER:  -- who he was.

1          JUDGE LAWS:  You know, without looking at the record, I

2     don't know as to exact timing, you know.  I am going to allow

3     some leeway again.  I expect it to be tied into the issue of

4     notice, employer notice.

5          MR. MINER:  All right.

6     Q     BY MR. MINER:  Did you make arrangements with Alex Amador

7     while you were at work to meet him off site?

8     A     I didn't do anything at work, not me.

9     Q     When you arranged with Mr. Amador to meet with him, did

10    you tell him, "Don't tell anybody about our meeting,"?

11    A     No.

12    Q     All right.  You met with Mr. Amador off site.  Correct?

13    A     Yes.  That is so.  Yes.

14    Q     How long did you meet with him?

15    A     Approximately 10 or 15 minutes.

16    Q     All right.  Did you discuss distributing cards to any

17    other employees at that time?

18    A     No, because it's my responsibility.  That's what I wanted

19    to do.

20    Q     Okay.  How about Jorge Maldonado?  Where did you meet with

21    him when he signed his card?

22         MR. GIANNOPOULOS:  And same objection, Your Honor.  Where

23    these employees are meeting to talk about the Union is -- I'm

24    going to strenuously object.

25         JUDGE LAWS:  I think the question can be limited to at the

1    workplace or not at -- or off site.

2        MR. MINER:  Okay.

3        MR. GIANNOPOULOS:  And when we talk about the workplace,

4    Your Honor, I think that there is distinction to be drawn

5    between the actual, physical plant.  There's differences in the

6    parking lot --

7        JUDGE LAWS:  Uh-huh.

8        MR. GIANNOPOULOS:  -- outside of the workplace.  So when

9    you just say "at the workplace", it's a bit vague and

10   ambiguous.

11       JUDGE LAWS:  The premises of the employer.

12       MR. MINER:  Okay.

13       JUDGE LAWS:  So why don't you give the instruction to the

14   witness, "When workplace is said, it means the premises of the

15   employer."

16       MR. GIANNOPOULOS:  And that would include parking lots,

17   breakrooms.

18       JUDGE LAWS:  All the property.

19       THE WITNESS:  Okay.  That's perfect.  I understand

20   perfectly well.

21   Q    BY MR. MINER:  All right.  Did any of the meetings with

22   any of the employees who signed cards in your presence occur on

23   the company's premises, including parking lots, work areas,

24   breakrooms, trailers, offices, or any other part or parcel of

25   the company's property?

AVTranz

845 North 3rd Avenue, Phoenix, Arizona 85003
www.avtranz.com · (800) 257-0885

1  A    None of the cards were signed on any of the premises of

2  the company, not one.

3  Q    Okay.  And other than yours, none were signed on November

4  5th.  Correct?

5  A    There was one of them that one of the leaders signed and

6  another additional person whom I'm not going to -- but I'm not

7  going to give names.

8  Q    All right.  Three people signed on November 5th?

9  A    Yes.

10  Q    All right.  And separate and apart from the question that

11  I asked you about the premises of the company, during any of

12  the meetings with any of the employees that you were present at

13  the time, for whom you were present at the time they signed

14  cards, were there any managers present at the time as well?

15  A    No.  There was nobody.  It's just the people that were

16  going to sign and me.  And that was it.

17  Q    No other people at all?

18  A    No.  No.

19  Q    No supervisors, no foremen, no lead men?

20  A    No.

21  Q    Are you aware of whether any manager, foremen, or lead men

22  was aware or knew about any of your arrangements to meet with

23  any of these employees to have them sign cards?

24  A    No.

25  Q    And as far as you know, no manager, foreman, or lead men

1    could have known which individual employee had signed a card

2    and which hadn't?

3         MR. GIANNOPOULOS:  Objection, calls for speculation with

4    "could".  The whole question calls for speculation.

5         JUDGE LAWS:  And then ask the question with "if he knows",

6    has direct knowledge.

7         THE WITNESS:  No, absolutely.

8    Q    BY MR. MINER:  Okay.  Did you ever talk with Martin Torrez

9    about your support for the sheet metalworkers?

10   A    No.  No.

11   Q    Did you tell him there was an organizing campaign going

12   on?

13   A    No.  How am I going to tell that to a foreman?

14   Q    Did Mr. Torrez, during your conversation with him on

15   November 12th, tell you why he thought there was a union

16   organizing campaign going on?

17   A    I think that somebody told him something.

18   Q    How do you know that?

19   A    That's what I'm telling you, because you asked me a

20   question. Right.  Why do you think that -- why do you believe

21   that somebody told Mr. Torrez there was a campaign going on?

22   A    Because you asked me that question.

23        JUDGE LAWS:  I think he's not understanding.

24        MS. SHIH:  Objection, Your Honor.  Your Honor, there seems

25   to --

1        MR. GIANNOPOULOS:  Objection, Your Honor.

2        MS. SHIH:  -- be an issue with the translation.  He's

3    referring to him as Gordon --

4        JUDGE LAWS:  I think so.

5        MS. SHIH:  -- not him as Mr. Miner.

6        JUDGE LAWS:  So let's ask.  And I agree.  This has been an

7    issue of translation, so --

8        MR. MINER:  Thank you.  I thought you were referring to

9    me.

10       THE INTERPRETER:  I just said you.  He said you, so I said

11   you.

12       MR. MINER:  Thank you very much.

13       MS. SHIH:  Yeah.  And I --

14       MR. MINER:  All right.

15   Q    BY MR. MINER:  And can you repeat the question that Mr.

16   Torrez asked you, please?

17   A    That day, Mr. Torrez asked me --

18       THE INTERPRETER:  I'm sorry.  I'm sorry.

19       THE WITNESS:  Mr. Torrez asked me that morning.  He

20   mentioned to me that he -- he suspected that they were going to

21   lay people off that morning because Mr. Gorry was there and he

22   believed that the -- there was going to lay people off.  He

23   said, "I don't know what's going on, but maybe it could be due

24   to the Union."

25   Q    BY MR. MINER:  Okay.  You testified that he asked you a

1    question about the Union.  What was the question?

2        MR. GIANNOPOULOS:  Objection, Your Honor, misstates

3    previous testimony.  I don't think he said he could -- Mr.

4    Torrez asked him a question about the Union.

5        JUDGE LAWS:  Let's clarify.  Did Mr. Torrez ever ask you a

6    question about the Union in and around the time frame that we

7    are talking about now?

8        THE WITNESS:  That same day, in which he -- that they had

9    the layoffs, he asked me that it was probably due -- because of

10   the Union.

11   Q    BY MR. MINER:  So what did he ask?

12   A    That's what he asked me.  And I said, "I do not know

13   anything."

14   Q    BY MR. MINER:  Clear as mud.

15   A    Clear as mud, yeah.

16   Q    All right.  And you met with someone whose name you

17   believe was Gorry at a meeting, in which you were informed

18   about the layoffs.  Correct?

19   A    That's correct, Gorry or Gordon.  I don't know.

20   Q    Or Gordon?

21   A    Probably, probably.  He works in Texas.

22   Q    Okay.  A lot of people work in Texas.

23        JUDGE LAWS:  One at a time, please.

24   Q    BY MR. MINER:  All right.  And did Gordon speak any

25   Spanish during the meeting?

 1  A     Huh-uh.  No.

 2  Q     Did anyone translate what Gordon had to say during the

 3  meeting?

 4  A     Effectively so.

 5  Q     Effectively so?  What does that mean?

 6  A     Effectively that somebody was there translating.

 7  Q     Someone was in fact there translating.  Correct?

 8  A     That is so.

 9  Q     And who was that?

10  A     Julio.  I don't know Julio's last name, but he works in

11  safety.

12  Q     Could it be Vasquez?

13  A     It's probably -- yes.  It's probably Vasquez.

14  Q     Okay.  Julio Vasquez is the safety manager at the Tucson

15  facility or was.  Correct?

16  A     Correct.

17         MR. MINER:  Your Honor, I'm going to the end of this

18  portion of my cross-examination.  I just have a couple of more

19  questions, but I would like to come back to the rehire process

20  and it is not going to be a brief subject to question this

21  witness about.  It is somewhat outside the scope of the direct

22  exam, so if there's going to be an objection to that, then

23  maybe we can discuss it now.

24         MR. GIANNOPOULOS:  Well, I mean, you're going to have to -

25  -

```
 1        JUDGE LAWS:  Well, I guess it's a matter of --

 2        MR. GIANNOPOULOS:  We're probably going to have to -- I

 3   mean, he's probably going to have to come back anyway.  I don't

 4   think you're going to finish in two minutes.

 5        MR. MINER:  I'm not.

 6        MR. GIANNOPOULOS:  Yeah.  So we can --

 7        MR. MINER:  And so --

 8        MR. GIANNOPOULOS:  -- discuss it.  We can maybe talk off

 9   the record and see maybe informally what you wanted to ask,

10   what you want to get to, and we can try to not -- informally

11   work it out.  And if we can't, we'll bring it before the Judge.

12   How's that?

13        JUDGE LAWS:  That sounds good.  So why don't we --

14        MR. MINER:  My only question is, can we continue with his

15   cross-examination --

16        MR. GIANNOPOULOS:  Yes.

17        MR. MINER:  -- tomorrow morning and get into the subject

18   of his --

19        MR. GIANNOPOULOS:  Yeah.  Well, I need to check with his

20   schedule because I'm not sure he's available tomorrow morning.

21   I know Mr. Silvette is coming back tomorrow.

22        MR. MINER:  Okay.

23        JUDGE LAWS:  Let's --

24        MR. GIANNOPOULOS:  And I know we want to get Mr. Blade

25   (phonetic) back.  But we can -- we will make sure he, at some
```

1    point, comes back so he can finish cross-.

2        JUDGE LAWS:  Let's go off the record and discuss

3    scheduling of witnesses for tomorrow, possibly the next day.

4    (Off the record at 4:42 p.m.)

5        MR. MINER:  Thank you for your patience.

6        JUDGE LAWS:  Sure.

7    Q    BY MR. MINER:  I want to come back briefly to this

8    November the 5th meeting.  Did anyone mention an election

9    occurring during this meeting?

10   A    Not that I'm aware of.

11   Q    All right.  Had you -- were you -- strike that.  Were you

12   a Tucson facility employee at the time there was an election in

13   2011 involving the United Transportation Workers?

14   A    I did sign a card for that.

15   Q    Well, I don't want to ask about your card in connection

16   with that process, but did you vote in that election?

17   A    That is so.

18   Q    During the November 5th meeting with the sheet

19   metalworkers, was there any discussion of this prior election

20   involving the UTW?

21       MR. GIANNOPOULOS:  And I'd object as to relevance, Judge.

22       MR. MINER:  Well, we've had some questions about

23   subjective understanding of these various cards and what they

24   meant.  And this is one of the purposes of the cards.  I want

25   to understand if he or any of the employees were aware of the

1    use of these cards for requesting an election, as well as other

2    potential uses.

3         JUDGE LAWS:  I mean, I don't really see the relevance.

4    I'll allow it subject to tying it in to something that's before

5    me.  Again, I don't want to anticipate a defense I might not

6    fully appreciate.  So I will give some leeway there.

7         THE WITNESS:  Yes, yes.  There were comments.

8    Q    BY MR. MINER:  Comments about the prior election?

9    A    Yes.

10   Q    Did any employees ask you whether they had an opportunity

11   to vote on the sheet metalworkers?

12   A    How so?  I don't understand.

13   Q    Simply that.  Did any employees ask whether they would

14   have an opportunity to vote in an election about whether the

15   sheet metalworkers should represent them?

16   A    No.  The only thing that was comment was that, if they

17   wanted to vote at elections, that's fine.  If they really

18   wanted to vote for a union, fine.  If they didn't want to vote

19   for a union, that was fine.

20   Q    Who said that?

21   A    I asked them.

22   Q    And who made the statement that you just testified to?  I

23   want to know who made the -- who said those words that you just

24   testified to?

25        THE INTERPRETER:  Your Honor, I think that there's a

1  little bit of a confusion.  The witness is addressing the

2  interpreter and I'm not quite sure that he is understanding

3  that I represent nobody.

4       JUDGE LAWS:  Okay.  So there's some confusion as to --

5       THE INTERPRETER:  Yes.

6       JUDGE LAWS:  Well, I think we are hitting the absolute

7  outside --

8       MR. GIANNOPOULOS:  And it's 10 to 5:00, Judge.

9       JUDGE LAWS:  -- wall of when we need to pack up to get out

10 of here.  So why don't -- seeing as there seems to -- we seem

11 to be losing some translation probably due to being a little

12 bit tired.  Why don't we resume with this witness?  Let's go

13 off the record, briefly discuss, and then I'll go on the

14 record, and talk about how we're going to resume.

15 **(Whereupon, the hearing in the above-entitled matter was**

16 **recessed at 4:38 p.m. until Thursday, November 14, 2013 at 9:00**

17 **a.m.)**

18

19

20

21

22

23

24

25

1                              **C E R T I F I C A T I O N**

2    This is to certify that the attached proceedings before the

3    National Labor Relations Board (NLRB), Region 28, Case Numbers

4    28-CA-093183, 28-CA-103909, 28-CA-104184, 28-CA-106613, 28-CA-

5    111186, 28-RC-093179, Gunderson Rail Services LLC, d/b/a

6    Greenbrier Rail Services, and Sheetmetal Workers' International

7    Association, Local 359, AFL-CIO at the Pima County Consolidated

8    Justice Court, 160 N. Stone Avenue, Third Floor, Courtroom 11,

9    Tucson, Arizona 85701, on Wednesday, November 13, 2013, at 8:54

10   a.m., was held according to the record, and that this the

11   original, complete, and true and accurate transcript that has

12   been compared to the reporting or recording, accomplished at

13   the hearing, that the exhibit files have been checked for

14   completeness and no exhibits received in evidence or in the

15   rejected exhibit files are missing.

16

17

18

19                         GRANT C. DAYLEY

20                         Official Reporter

21

22

23

24

25

# UNITED STATES OF AMERICA

## BEFORE THE NATIONAL LABOR RELATIONS BOARD

### REGION 28

| | |
|---|---|
| In the Matter of: | |
| GUNDERSON RAIL SERVICES LLC, D/B/A GREENBRIER RAIL SERVICES, | Case No. 28-CA-093183<br>28-CA-103909<br>28-CA-104184<br>28-CA-106613<br>28-CA-111186 |
| and | |
| SHEETMETAL WORKERS' INTERNATIONAL ASSOCIATION LOCAL 359, AFL-CIO, | |
| GUNDERSON RAIL SERVICES LLC, d/b/a GREENBRIER RAIL SERVICES, | Case No. 28-RC-093179 |
| Employer, | |
| and | |
| SHEETMETAL WORKERS' INTERNATIONAL ASSOCIATION LOCAL 359, AFL-CIO, | |
| Petitioner. | |

The above-entitled matter came on for hearing, pursuant to notice, before **ELEANOR LAWS,** Administrative Law Judge**,** at the National Labor Relations Board, Pima County Consolidated Justice Court, 160 N. Stone Avenue, Third Floor, Courtroom 11, Tucson, Arizona 85701, on **Thursday, November 14, 2013, at 8:57 a.m.**

<u>A P P E A R A N C E S</u>

**On behalf of the General Counsel:**

 **EVA SHIH, ESQ.**
 **JOHN GIANNOPOULOS, ESQ.**
 NATIONAL LABOR RELATIONS BOARD - REGION 28
 2600 North Central Avenue, Suite 1400
 Phoenix, AZ 85004-3099
 Tel.  602-640-2090
 Fax.  602-640-2178

 **SOPHIA ALONSO, ESQ.**
 NATIONAL LABOR RELATIONS BOARD
 421 Gold Avenue, SW, Suite 310
 P.O. Box 567
 Albuquerque, NM  87103
 Tel.  505-248-5128
 Fax.  505-248-5134

**On behalf of the Respondent:**

 **FREDERICK C. MINER, ESQ.**
 **STEVEN G. BIDDLE, ESQ.**
 LITTLER MENDELSON, P.C.
 Camelback Esplanade
 2425 E. Camelback Road, Suite 900
 Phoenix, AZ 85016
 Tel.  602-474-3653
 Fax.  602-391-2836

## I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| Guillermo Murguia | | 778 | | | |
| Juan Silva Gutierrez | | 817 | 859 | 866 | 849 |
| Guillermo Pico | 873 | 885 | | | 884 |

**AVTranz**
845 North 3rd Avenue, Phoenix, Arizona  85003
www.avtranz.com · (800) 257-0885

PX 000775

**E X H I B I T S**

| EXHIBIT | IDENTIFIED | IN EVIDENCE |
|---|---|---|
| **General Counsel:** | | |
| GC-42 | 777 | 777 |
| GC-82 | 777 | 777 |
| GC-124 | 866 | 866 |
| GC-125 | 867 | 867 |
| GC-126 | 868 | 868 |
| GC-127 | 868 | 868 |
| GC-129 | 871 | 871 |
| GC-132 | 882 | 882 |
| GC-134 | 882 | 882 |
| GC-131 | 885 | 885 |
| GC-132 | 885 | 885 |
| GC-133 | 885 | 885 |
| **Respondent:** | | |
| R-1 | 850 | 850 |
| R-4 | 851 | 851 |
| R-2 | 852 | 852 |
| R-6 | 858 | 858 |

1                    P R O C E E D I N G S

2        JUDGE LAWS:  A couple of housekeeping matters to take care

3    of before we -- I resume with the cross-examination.  The

4    General Counsel has offered into exhibit what we discussed

5    yesterday, which is page 4 of Exhibit 42.  It's the timeline

6    that is referenced already in the exhibit.

7        Any objection to that being admitted?

8        MR. MINER:  No objection, Your Honor.

9    **(General Counsel Exhibit Number 42 Received into Evidence)**

10       JUDGE LAWS:  And then also General Counsel Exhibit 82,

11   which is a United Food and Commercial Workers Union

12   authorization card for Mr. Murguia.  Any objection to 82?

13       MR. MINER:  No objection.

14       JUDGE LAWS:  82 is admitted.

15   **(General Counsel Exhibit Number 82 Received into Evidence)**

16       JUDGE LAWS:  Anything else before we call the witness in?

17       UNIDENTIFIED SPEAKER:  No, thank you.  No, Your Honor.

18       MR. MINER:  Not on our end.  Thank you.

19       JUDGE LAWS:  Okay.  That's good.  Okay.

20       UNIDENTIFIED SPEAKER:  Excuse me.  Thank you.

21       THE INTERPRETER:  Good morning.

22       JUDGE LAWS:  Good morning.

23       MR. MINER:  Good morning.

24       UNIDENTIFIED SPEAKER:  Good morning.  Have a seat.

25       JUDGE LAWS:  Mr. Murguia, just a reminder, you did take an

1    oath yesterday and that applies throughout this trial.  And

2    also one thing about these trials is the way we speak isn't the

3    way we normally speak, and that's because we have a court

4    reporter over there trying to take down every word that is said

5    and that's his job to do that.  So, we just need to take extra

6    care to make sure we wait until the full question is asked,

7    take a pause and then answer so that our poor court reporter

8    isn't trying to transcribe two words said at once.

9         MR. MURGUIA:  I understand.

10        JUDGE LAWS:  It's not how we normally talk but it's what

11   we've got to try to do at least here.

12        MR. MURGUIA:  Perfect.

13        JUDGE LAWS:  All right.  Whenever you're ready.

14        MR. MINER:  Thank you, Your Honor.

15   Whereupon,

16                        **WILLIAM MURGUIA**

17   having been previously sworn, was called as a witness herein

18   and was examined and testified, by and through an interpreter

19   as follows:

20                        **CROSS-EXAMINATION**

21   Q    BY MR. MINER:  Good morning, Mr. Murguia.

22   A    Good morning.

23   Q    When we left off yesterday we were talking about a meeting

24   with the sheetmetal workers and a group of Greenbrier employees

25   offsite, meaning outside the Tucson facility, on November the

1    5th, 2012.

2    A    Correct.

3    Q    And I asked you about whether there was any reference

4    during the meeting to the prior representation election that

5    was held involving the United Transportation workers.

6    A    Yes.

7    Q    And you testified that the sheetmetal workers'

8    representative said to the employees that everybody could vote

9    or not vote for the Union.

10        MR. GIANNOPOULOS:  I would object as I think that

11   mischaracterizes the testimony.  I believe he said that that

12   was the statement he made.

13        JUDGE LAWS:  Why don't we just -- why don't we clarify it

14   without regard to what was said yesterday?  Because I think

15   yesterday all that was clear was that it was confusing.

16        MR. GIANNOPOULOS:  All right.

17        JUDGE LAWS:  So, let's just start anew.

18        MR. MINER:  All right.  Very good.

19   Q    BY MR. MINER:  So, there was a reference to the prior

20   election at the November 5th meeting, correct?

21   A    Correct.

22   Q    And did you or others talk about an election being held

23   involving the sheetmetal workers?

24   A    That's perfect.

25   Q    Okay.  Who discussed an election involving the sheetmetal

1   workers at the November 5th meeting?

2       MR. GIANNOPOULOS:  Objection.  That assumes facts not in

3   evidence.

4       MR. MINER:  I thought he just testified, Your Honor, that

5   there was discussion of that.  I simply want to know who

6   discussed it.

7       JUDGE LAWS:  Okay.

8       MR. GIANNOPOULOS:  And there has been no election with the

9   sheetmetal workers.

10      MR. MINER:  Correct.

11      JUDGE LAWS:  No, they said who -- I think he is asking

12  about who brought up the potential for --

13      MR. MINER:  Correct.

14      JUDGE LAWS:  -- an election.  Okay.  And you may go ahead

15  and answer this question, again, with the caveat that you do

16  not need to identify individuals who we have not already

17  identified as being at the meeting.

18      THE WITNESS:  That's correct.

19  Q   BY MR. MINER:  So, who discussed an election involving the

20  sheetmetal workers?

21  A   A moment.  Like who discussed it?

22  Q   Correct.

23  A   What we had is that we had discussed it previously in

24  order to be able --

25      MR. GIANNOPOULOS:  Objection.  Nonresponsive.  The

1    question was who asked.  That -- that or who -- who discussed

2    it.  That just calls for someone's name.

3        MR. MINER:  Well, I am perfectly happy to listen to the

4    answer --

5        MR. GIANNOPOULOS:  It's nonresponsive.

6        MR. MINER:  -- that Mr. Murguia is ready to give.

7        JUDGE LAWS:  Hold on.  And now I have to tell you both to

8    talk one at a time for our court reporter over here.  The

9    question was who and counsel can follow-up with regard to what

10   was said if he would like.

11       THE WITNESS:  The discussion about the Union in order to

12   involve more people into the Sheetmetal Workers Union --

13       MR. GIANNOPOULOS:  Same objection, Your Honor.

14       JUDGE LAWS:  Well, let her -- let her finish the --

15       MR. GIANNOPOULOS:  Okay.

16       JUDGE LAWS:  -- translation.  I don't know if he

17   identified anybody.

18       THE WITNESS:  -- was only made by the leaders and myself.

19       MR. MINER:  I think that does answer my question.

20       JUDGE LAWS:  It does.

21   Q    BY MR. MINER:  So, first with respect to the leaders other

22   than yourself, what did they say about the holding of an

23   election involving the sheetmetal workers?

24       MR. GIANNOPOULOS:  Objection for relevance, Judge.  I

25   don't see what the relevance is of any discussions of a

1    potential election and I would like to hear at least an

2    explanation from counsel so then I could try to rebut that.

3         JUDGE LAWS:  And I agree.  I don't directly see the

4    relevance.  Again, not knowing what all your defenses are, I do

5    want to provide some leeway --

6         MR. GIANNOPOULOS:  Sure.

7         JUDGE LAWS:  -- if there is relevance.

8         MR. MINER:  So, we heard questioning yesterday of this

9    witness and others about what their subjective intent was when

10   they signed these cards, what they understood the cards to

11   mean.  And there was testimony about what they understood the

12   cards to mean.  They meant that -- my understanding of the

13   testimony so far is that they meant that they wanted the Union

14   to represent them.  And I want to know if it was explained to

15   the employees, as apparently it was, that at least one purpose

16   of signing this card is to seek an election involving this

17   Union.

18        And yesterday I thought one clear thing that came out of

19   Mr. Murguia's testimony was that someone told the employees

20   everyone would be able to vote or not vote for the Union.  So,

21   that's why I'm asking these questions.

22        MR. GIANNOPOULOS:  And if --

23        JUDGE LAWS:  Okay.

24        MR. GIANNOPOULOS:  -- I may, Your Honor?

25        JUDGE LAWS:  Sure.

1          MR. GIANNOPOULOS:  With respect to the employees that came

2    yesterday, Mr. Miner was free to cross-examine each and every

3    one of them at length as to what they testified to.  And if he

4    had any questions about their testimonies at that time with

5    respect to their card signing, he could have asked them that.

6    Now, Mr. Murguia testified about his card and that's certainly

7    relevant.  Other than that, I see no relevance.  And it goes

8    way beyond the scope of direct with this witness.

9          And if I may just quote some case law for you, Judge?

10         NLRB versus Gissel Packing, 89 S.Ct. 1918, the Seminal

11   case; "It stands for determining validity of Union

12   authorization cards.  No approach should be made of the

13   employees' subjective motivations in signing the cards."

14         Ona Corp. versus NLRB, 729 F.2d 713; "For purposes of

15   validating Union authorization cards employees as a rule are

16   not too unsophisticated to be bound by what they sign expressly

17   and that their acts of signing represents ascension to that."

18         So, I mean, this is completely off bore, off scope.  We're

19   going into a totally -- quite frankly I think -- irrelevant

20   issue, particularly with this witness as to what was said at

21   any meetings.  Does he want to ask him about what he thought?

22   I would probably object but I think that's a little more online

23   to what cross-examination is as opposed to creating his -- any

24   kind of defense that he has to the authorization cards.

25         JUDGE LAWS:  Okay.  And I understand and appreciate your

1  objection.  I mean, I certainly think follow-up as to what this

2  witness' understanding was is appropriate for cross-examination

3  because that was brought up on direct.

4      Kind of going off on an aside here, we did discuss whether

5  Mr. Miner was going to call this witness in his case-in-chief

6  and ask him questions not bound by the scope of direct.  And if

7  I recall, that was something you all were going to discuss.  I

8  don't know if that's happened and maybe -- maybe it's worth

9  discussing now and clarifying that before we resume.

10     MR. GIANNOPOULOS:  And I think it was Hector Federico that

11 we talked about that I said he was in town.  And similarly --

12     MR. MINER:  No, I --

13     MR. GIANNOPOULOS:  -- Mr. Murguia is in town.

14     JUDGE LAWS:  I think we talked about both if I remember

15 right.

16     MR. MINER:  I think I only cross-examined one witness

17 yesterday and it was Mr. Federico --

18     UNIDENTIFIED SPEAKER:  Yes.

19     JUDGE LAWS:  Yes.

20     MR. MINER:  -- or I completed one.  And I asked all the

21 questions I had of Mr. Federico.  Mr. Federico I had -- with

22 respect to the scope of the direct.  With respect to the

23 additional questions that were viewed as outside the scope of

24 the direct, the ruling was Mr. Federico would have to come back

25 for that, and we're fine with that.  And now so we're -- now

1    we're viewing another witness with an additional set of issues.

2    I think one goes directly to the scope of direct.  I don't

3    think this is outside the scope at all.

4        I do have additional questions for Mr. Murguia that

5    arguably go outside the scope.  They deal with the rehire

6    process and his efforts, his desire to be rehired.  That's

7    something that he touched on in his direct.  He didn't get into

8    it very deeply.  I, quite frankly, don't view the scope of

9    direct objection as -- as meritorious at all.  I mean, in the

10   Ninth Circuit that's not a valid objection.  I don't

11   think -- if we're really concerned about economy and efficiency

12   and conserving resources and all that good stuff, I don't think

13   we ought to make witnesses come back time and again to testify

14   when they're here.

15       Having said that, if the ruling again is that, you know,

16   the issue of rehire and issues that weren't specifically, you

17   know, dug into during the direct, if that's going to have to be

18   part of some future recall of this witness I'll live with that.

19   Right, I can do that.

20       So, that's my -- that's my response.  I'm not sure I

21   understood the rest of the objections.

22   MR. GIANNOPOULOS:  And with respect to that, Your Honor, I

23   did not discuss with this witness his meetings at any kind of

24   facility with sheetmetal worker officials.  We talked about

25   getting cards signed and that's -- that's simply way beyond,

1    you know, what I asked -- the questions I asked.

2        JUDGE LAWS:  All right.  And I guess, you know, it is

3    within my discretion to allow questions beyond the scope of

4    direct.  However, we want to define that.  There was talk of a

5    meeting, you didn't go in depth into it to develop a full

6    record without recalling witnesses.  And so I am going to allow

7    some leeway for that . I don't want Mr. Murguia to have to come

8    back here who knows when, when it's time for the Respondent to

9    put their case-in-chief on.

10       You know, that said, I understand you haven't heard all

11   the testimony that the General Counsel is going to put on in

12   their case-in-chief but I would like you to make every effort

13   to cover all the ground you need to with this witness so that

14   we don't need to recall him.

15       MR. MINER:  Thank you.

16   Q    BY MR. MINER:  I imagine, Mr. Murguia, that my last

17   question has long since left your memory.

18   A    I think so.

19   Q    Honest answer.  Directing our attention to what the Union

20   leaders said about an election involving the sheetmetal

21   workers, what did they say at the November 5th meeting about

22   that subject?

23   A    We were the leaders --

24   Q    Okay.

25   A    -- and we commented that the best option would be to have

1    the Sheetmetal Workers' Union represent us so that we could

2    have better facilities at work.

3    Q    Great.  And what did the leader, other than yourself --

4    so, we're first focusing on the leaders other than yourself --

5    what did they say about the holding of an election?

6         MR. GIANNOPOULOS:  Again, Your Honor, I am going to object

7    as to foundation and the whole idea of what did they say.  Or

8    who -- who are we talking about?  Are we talking about a

9    specific person?  Are we talking about one or two people?

10   Let's narrow this down to a foundation.  If someone said

11   something specifically, let's -- let's go through the

12   foundational steps to determine who said what when and where.

13        JUDGE LAWS:  Well, I had instructed not to identify people

14   who haven't already been identified.  So, I guess what my

15   instruction to you will be is if it's somebody who we haven't

16   talked about, just say somebody who I choose not to identify.

17   And with that we can build whatever foundation we can.

18   Q    BY MR. MINER:  All right.  I haven't previously asked for

19   the names of the leaders as you have referred to them of the

20   Union.  Of the individuals who are employees of Greenbrier who

21   signed cards in your presence which of those individuals are

22   the leaders as you have described them?

23        THE INTERPRETER:  May I ask counsels both just until for a

24   couple of hours just to keep the answer -- the questions, break

25   them up a little bit?

1        MR. MINER:  Sure.

2        THE INTERPRETER:  I just -- I haven't had my coffee.

3        MR. MINER:  Gotcha.

4        THE INTERPRETER:  So, my retention is a little bit lower

5   than yesterday, okay?

6        MR. MINER:  Okay.

7        THE INTERPRETER:  And I need the second part of your

8   question.

9        MR. MINER:  I don't understand how far you've gotten in my

10   question.

11        JUDGE LAWS:  Let's --

12        MR. MINER:  I'm sorry.  Why don't I start over and I'll --

13        JUDGE LAWS:  Actually before you do that, Mr. Murguia is

14   at a bit of a disadvantage here in answering these questions

15   because he doesn't have the actual cards in front of him.  So,

16   I don't want him to have trepidation answering questions

17   thinking he might be identifying somebody whose card is not in

18   evidence.  So, why don't we take a minute, go off the record,

19   compile a reference list of -- and I'll have the General

20   Counsel do that subject to Respondent verifying it against the

21   exhibits that have already been admitted.  And that way while

22   he is testifying he can have that to reference so that there

23   isn't concern that he is going to be naming somebody whose card

24   is not in evidence.  Make sense?

25        MR. MINER:  Very good.

```
1         THE COURT REPORTER:  Off record?

2         JUDGE LAWS:  Off record.

3  (Off the record at 9:17 a.m.)

4         JUDGE LAWS:  And the witness has been provided a list.

5  And I did just want to note I understand the General Counsel's

6  objection and understand that discussion of elections isn't

7  going to preclude the possibility of showing a majority by

8  cards.  I am assuming that the questions go to something else

9  that's relevant to the Respondent's defense and, therefore, I

10 am allowing some leeway.  But, you know, I understand this is

11 not going to preclude the potential for majority

12 representation.

13        So, with that caveat, please proceed.

14        MR. GIANNOPOULOS:  And I will have a continuing objection

15 on those grounds that you have discussed.

16        JUDGE LAWS:  Okay.

17 Q    BY MR. MINER:  Mr. Murguia, you have been provided a

18 little of employees who signed cards in your presence, correct?

19 A    Correct.

20 Q    Do you recognize all the names on the list?

21 A    Yes, sir.

22 Q    During your testimony you have referred to certain

23 individuals as Union leaders, correct?

24 A    Correct.

25 Q    Does that include any of the individuals on the list you
```

1   were just provided?

2   A    As leaders?

3   Q    Correct.

4   A    No.

5   Q    All right.  Were there any individuals who were not

6   Greenbrier employees whom you referred to as Union leaders?

7   A    Excuse me, the question?  Could you please repeat it?

8   Q    Yes.  Again, during your testimony you have referred to

9   certain individuals as Union leaders, correct?

10  A    Correct.

11  Q    Were any of the individuals you were referred to as Union

12  leaders not employees of Greenbrier?

13  A    Yes, there were employees.

14  Q    Okay.  The individuals who are not employees of Greenbrier

15  whom you have referred to as Union leaders, do they have names?

16       MR. GIANNOPOULOS:  Your Honor, I believe that misstates

17  the testimony.  I think -- I thought he said --

18       JUDGE LAWS:  They -- they --

19       MR. GIANNOPOULOS:  -- that there were employees?

20       JUDGE LAWS:  I thought he said there were -- it was

21  employees as well.  So, let's --

22       MR. MINER:  I --

23       JUDGE LAWS:  -- clarify that.

24       MR. MINER:  -- I misunderstood.

25       JUDGE LAWS:  Okay.

```
 1        MR. GIANNOPOULOS:  And, in fact, yesterday, Your Honor, he

 2   identified one of them --

 3        JUDGE LAWS:  Okay.

 4        MR. GIANNOPOULOS:

 5        MR. GIANNOPOULOS:  -- as Mr. --

 6        UNIDENTIFIED SPEAKER:  Martinez.

 7        MR. GIANNOPOULOS:  -- Jorge Martinez, that's right.

 8        JUDGE LAWS:  Okay.

 9        MR. GIANNOPOULOS:  And I don't believe, you know, that he

10   signed -- Jorge Martinez signed the card.  He's not on that

11   list that he gave.

12        JUDGE LAWS:  Okay.  So, let's -- let's clarify whether he

13   said it was just employees.  That was how I heard his

14   testimony.

15        MR. MINER:  I am sorry, I misunderstood.

16        JUDGE LAWS:  Okay.

17        MR. MINER:  Do you need me to ask another question?

18        THE INTERPRETER:  I need you to clarify.  I mean, I can't

19   initiate your questions, I'm sorry.

20        MR. MINER:  Very good.

21   Q    BY MR. MINER:  Who were the sheetmetal workers' leaders

22   who were not Greenbrier employees?

23        JUDGE LAWS:  And wait, are we referring just to this

24   meeting?

25        MR. MINER:  Correct.
```

 1          JUDGE LAWS:  Okay.  Just at this meeting.

 2          MR. GIANNOPOULOS:  And I would object, Your Honor, as it's

 3    vague and it assumes facts not in evidence.  When you say

 4    Sheetmetal Workers' Union leaders?  I mean, if he wants to know

 5    which Union officials were there, why doesn't he just ask him

 6    in a straightforward fashion?

 7          MR. MINER:  Well, that's what I'm trying to do but I'm

 8    trying to do it within the confines of all the other objections

 9    that have been made and simply trying to lay a foundation about

10    who was at the meeting and who spoke.  So then I can get --

11          JUDGE LAWS:  Hold on.

12          MR. MINER:  -- to the question I really have.

13          JUDGE LAWS:  Okay.  So, all we're doing now is trying to

14    clarify what at least somebody misunderstood in the last

15    testimony.  It shouldn't be that hard, let's get it done.  And

16    I am going to go ahead and do it.

17          You had identified some Union leaders at this meeting?

18          THE WITNESS:  There are leaders but they're not from

19    sheetmetal.

20          JUDGE LAWS:  Are they -- are the leaders you were

21    referring to in your testimony all Greenbrier employees, yes or

22    no?

23          THE WITNESS:  No.

24          JUDGE LAWS:  Okay.

25    Q    BY MR. MINER:  Everybody -- or let me ask you this

1    question.  Was everyone at the November 5th meeting an employee

2    of Greenbrier?

3    A    It was just the leaders.

4    Q    That's not my question.  My question is were all of the

5    individuals who attended the meeting on November 5th employees

6    of Greenbrier?

7    A    Yes, sir.

8    Q    All right.  There were no sheetmetal worker

9    representatives at this particular meeting?

10   A    Yes, there was.

11   Q    All right.  Who were they?

12   A    Marcos Molina, that gentleman over there, and Ray --

13   What's the other person.

14        MR. GIANNOPOULOS:  And, Your Honor --

15        JUDGE LAWS:  You can't ask.

16        THE WITNESS:  Okay.

17        MR. GIANNOPOULOS:  -- let the record reflect he pointed to

18   Mr. Suydan who is the Union's representative at this particular

19   meeting.

20        MR. MINER:  Mr. who, I'm sorry.

21        MR. GIANNOPOULOS:  Greg Suydan.

22        THE WITNESS:  Greg Suydan.

23        THE CLERK:  Spell that last --

24        UNIDENTIFIED SPEAKER:  S-U-Y-D-A-N.

25        MR. MINER:  And that's Greg Suydan?

1        UNIDENTIFIED SPEAKER:  Yes.

2        JUDGE LAWS:  Okay.  The record will reflect that the

3    gentleman he was pointing at was Mr. Suydan.

4    Q    BY MR. MINER:  Marcos Molina, Greg Suydan, anyone else

5    from the sheetmetal workers?

6    A    Uh-huh, yes.  Three or four more persons --

7    Q    Do you know their names?

8    A    It's hard to memorize them.

9    Q    Is it your testimony that you don't recall their names at

10   this time?

11   A    Truth is I don't recall the names.

12   Q    All right.  Mr. Molina was at the meeting on November 5th

13   with employees?

14   A    Correct.

15   Q    Did Mr. Molina refer to an election being held concerning

16   the sheetmetal workers?

17   A    Of elections?  No, I don't understand your question.

18   Q    Okay.  Earlier you testified that there was discussion

19   about an election involving the sheetmetal workers at the

20   meeting?

21   A    Yes, but when we first got together what we were doing is

22   that we were gathering people first before -- in order to be

23   able to get to elections.

24   Q    All right.  So, my question is did Mr. Molina say anything

25   to employees about the holding of an election?

1    A    There were comments but it was in their -- at their

2    own -- at their appropriate time.

3    Q    Okay.  I am just going to ask it again I think.  What did

4    Mr. Molina say about the holding of an election?

5          MR. GIANNOPOULOS:  Objection.  Hearsay.

6          JUDGE LAWS:  And I will allow it.  I will only consider

7    any hearsay testimony for the truth of the matter asserted if

8    it is corroborated by other testimony or otherwise reliable

9    because of other evidence.

10         THE WITNESS:  The only thing that Mr. Molina said was to

11   do -- to be -- to do our best effort in order to become a

12   Union.  That was all he mentioned.

13   Q    BY MR. MINER:  Mr. Molina did not refer to the holding of

14   an election?

15   A    No.

16   Q    Okay.  How about Greg Suydan?

17   A    No.

18   Q    He did not refer to the holding of an election?

19   A    No, I don't understand that to be the case.

20   Q    Okay.  The other individuals from the sheetmetal workers,

21   what did they say about holding an election?

22   A    Nothing at all.

23   Q    Okay.  You did testify earlier that there was discussion

24   about an election at the meeting, correct?

25   A    I testified to that fact earlier because I was trying to

1   explain in the best way that I possibly could that what we were

2   trying to do was to be able to gather as many people as

3   possible in order to be able to create a Union.  Now, those

4   were only the leaders; that was me and another leader that was

5   with me.

6   Q    Okay.  That doesn't answer my question.

7   A    But for me that's a question.

8   Q    Okay.  My question is didn't you testify earlier that

9   there was discussion at the meeting about the holding of an

10  election?

11  A    There was a comment that was made concerning elections but

12  it wasn't until it was time to hold elections.  That's what I

13  meant -- that's what I meant to tell you.

14  Q    I'm confused by the answer.  I don't understand the

15  reference to the time of an election.  And so again -- go

16  ahead.

17       And so my question once again is didn't you testify that

18  at the meeting on November 5th there was discussion about the

19  holding of an election?

20  A    What I said -- what I commented concerning elections was

21  that up until such a time as it was -- a certain time was

22  defined then we would talk to -- then we would talk to

23  everybody about the elections.

24  Q    Is that -- was that the discussion that occurred on

25  November 5th?

1    A    No.

2    Q    And when did that discussion occur?

3    A    I don't recall. Exactly, but we discussed this afterwards.

4    Okay.

5    Q    You testified earlier that you made some comments about

6    the holding of an election on November 5th.  What did you say

7    to employees about holding an election on November 5th?

8    A    What I mentioned to the employees was that we would

9    probably have some elections after we had the majority of the

10   votes and that we had the majority of control -- or the

11   majority of the cards, I'm sorry, and the majority in control.

12   Q    All right.  Did -- strike that.  Were any of the employees

13   on the list you've been provided employees who had not been at

14   Greenbrier at the time of the UTU election?

15        MR. GIANNOPOULOS:  And just I would object, Your Honor,

16   for really lack of foundation or personal knowledge.  I mean,

17   it assumes that he knows the start dates of all of these people

18   that are on there.  Like, I'm not sure how many people are on

19   that list, but at least, I think, 20 plus people on this list.

20   That's kind of a vague question.

21        JUDGE LAWS:  That's sustained.  We do need to lay some

22   foundation as to his knowledge of who was there at each time.

23        MR. MINER:  Sure.  Let me just ask this.

24   Q    BY MR. MINER:  Did any employees respond that they had

25   never been through an election before?

1    A    Some of the people that I have on this list did have --

2    had gone through the experience of the prior elections at the

3    Union.

4    Q    Okay.  Did anybody say they had never been through any

5    election before?  I believe that was my question.

6    A    And my question is -- my response is that, yes, there were

7    some people on this list who had mentioned to me that they had

8    already been through prior elections.

9    Q    When did you provide the cards you collected from your

10    coworkers to the sheetmetal workers?

11    A    It was the first week of the -- it was in the first days

12    of November.

13    Q

14    Q    And do you remember if it was after this meeting on

15    November the 5th?

16    A    Yes, sir.

17    Q    Was it after November the 10th?

18    A    No.  I think it was, like, 7, 8, or 9th -- or, like, the

19    7th, 8th, or the 9th of November, something like that.

20    Q    It had to be after all the cards were signed.  Correct?

21    A    I don't get the question.

22    Q    Who did you provide the cards to?

23    A    The persons to whom I handed over the cards were my

24    coworkers from work and whom -- I gave them the cards.  I

25    explained to them that they had to read it carefully and, if

1    they agreed to it, then they could sign it.  And once they

2    signed it, they would give it back to me signed and dated.

3    Q    After --

4         MS. ALONSO:  Your Honor, there was one portion of the

5    witness's answer that was not translated right at the very end,

6    where he said -- he explained a certain procedure right at the

7    end.

8         THE INTERPRETER:  And that -- I'm sorry, but I can ask the

9    witness -- if I could have the witness --

10        MS. ALONSO:  Well, he said something to the effect of

11   initials.

12        JUDGE LAWS:  Do you -- was there testimony about initials?

13        THE WITNESS:  I had testimony in which I had indicated

14   that I would give them the cards, I would tell them to read the

15   card carefully, and ask if they understood what the card meant.

16   And if they agreed, then they could sign the -- they would sign

17   the card in my presence.  And then afterwards, I would put my

18   initials on it.

19        MR. MINER:  Correct.

20   Q    BY MR. MINER:  After the cards were signed, after you

21   placed your initials on the cards, you had a set of cards.

22   Correct?

23   A    Of course.

24   Q    To whom did you give the cards?

25        MR. GIANNOPOULOS:  And I would just say vague, the signed

1    cards?

2        JUDGE LAWS:  The signed cards.

3        THE WITNESS:  It was at one of the meetings that we had

4    with the sheetmetal workers division.

5    Q    BY MR. MINER:  Who specifically?  What is the name of the

6    person to whom you gave the cards?

7    A    It was two different people that were -- it was handed

8    over to different people who were present at the meeting for

9    the sheetmetal workers division.  It was -- some were given to

10   Marcos, to Greg, and to Jeff.  I can't tell you exactly whom

11   because there were different cards that were given to certain

12   people at the meeting.

13   Q    Did Marcos tell you what he planned to do with the cards

14   that you gave to him?

15       MR. GIANNOPOULOS:  Objection, relevance, Your Honor.

16       JUDGE LAWS:  Overruled.

17       THE WITNESS:  No, no.  He made no mention.  He made no

18   comment.

19   Q    BY MR. MINER:  Did Greg tell you what he planned to do

20   with the cards that you gave to him?

21       MR. GIANNOPOULOS:  A continuing objection.

22       JUDGE LAWS:  Overruled.

23       THE WITNESS:  No.

24   Q    BY MR. MINER:  Did Jeff tell you what he prepared to do

25   with the cards you gave to him?

 1    A    No.

 2    Q    Do you know who prepared the petition for an election that

 3    was filed by the sheetmetal workers?

 4         MR. GIANNOPOULOS:  Objection, relevance, Your Honor, and

 5    lack of foundation, lack of personal knowledge.

 6         MR. MINER:  Lack of foundation?  I asked whether he knew.

 7         MR. GIANNOPOULOS:  I apologize.

 8         JUDGE LAWS:  Okay.  Overruled.

 9         THE WITNESS:  I don't know exactly the name, but they were

10    the ones who were in charge of doing that.

11    Q    BY MR. MINER:  Who is they?

12    A    The division from the sheetmetal workers.

13    Q    Did Marcos ask you, when you gave him the cards, to speak

14    with a manager at Greenbrier about the organizing campaign?

15    A    Absolutely not.

16    Q    Did Greg ask you to do that?

17    A    Absolutely not.

18    Q    Did Jeff ask you to do that?

19    A    No, sir.

20    Q    Do you know whether anyone from the sheetmetal workers

21    demanded recognition from Greenbrier as the representative of

22    employees?

23    A    I didn't understand that question.

24    Q    Do you want me to repeat it?

25    A    Please.

1 Q    Do you know whether anyone from the sheetmetal workers

2 demanded recognition as employees' representative from

3 Greenbrier?

4 A    No.

5 Q    But you didn't do that?

6 A    No.

7 Q    Okay.  Have you ever seen a copy of the petition for an

8 election that was filed by the sheetmetal workers?

9 A    No.

10 Q    Okay.  Who is Eric Valenzuela?

11 A    He's the new plant manager for Greenbrier.

12 Q    When did you first meet Mr. Valenzuela?

13    MR. GIANNOPOULOS:  Objection, Your Honor, assumes facts

14 not in evidence and assumes that he's met him.

15    JUDGE LAWS:  Sustained.

16 Q    BY MR. MINER:  Have you ever met Mr. Valenzuela face to

17 face?

18 A    Yes, sir.

19 Q    When?

20 A    I can't recall the exact date, but it was around, like,

21 May or June, something like that.

22 Q    Did you meet him on March 14th?

23    MR. GIANNOPOULOS:  And I would object, Your Honor, as to

24 relevance.  I object as to relevance and that it goes beyond

25 the scope of direct.

1    JUDGE LAWS:  Overruled.

2    THE WITNESS:  I don't recall if it was March, April, or

3    May, but yes.  I did see them.

4    Q    BY MR. MINER:  All right.  Did you see him at the Tucson

5    shop?

6    A    Yes.  Because I talked to him and he said --

7    THE INTERPRETER:  Wait a minute, wait a minute.  The

8    interpreter wants to clarify a word.

9    JUDGE LAWS:  Okay.

10    THE WITNESS:  Okay.  I had spoken to him directly.  And he

11    asked me to meet with me afterwards.

12    MS. ALONSO:  And Your Honor, just as far as the

13    translations go, I think, you know, just to help with the

14    witness with clarifying, when Grace asked if the word that he

15    used, (Spanish spoken), was spoke directly and he said -- he

16    repeated (Spanish spoken), but I think, if she clarifies with,

17    you know, either by phone or, you know, face to face, that,

18    that may be getting at to what she was --

19    THE INTERPRETER:  And that was the question that I

20    asked -- she asked the witness and see if he could clarify

21    because, in Spanish, (Spanish spoken),  is used to say "I

22    called somebody" or "I spoke to somebody" and I needed

23    clarification to see whether he called him or whether he spoke

24    to him.  And he responded that he spoke.

25    JUDGE LAWS:  Face to face?

1        THE WITNESS:  Yes.

2    Q    BY MR. MINER:  Were you at the Tucson shop when you spoke

3    to him face to face?

4        MR. GIANNOPOULOS:  Your Honor, I would just like to have a

5    continuing objection on this line of questioning as to

6    relevance and I would like to at least know what the relevance

7    is for my purposes of being able to properly object and

8    continue with this cross- or the questioning.

9        JUDGE LAWS:  I was going to allow this.  I made my ruling

10   based on scope and that's continuing.

11       MR. GIANNOPOULOS:  He was not an employee --

12       JUDGE LAWS:  You know, we're -- hold on.

13       MR. GIANNOPOULOS:  Yeah.  Sure.  He did not work at

14   Greenbrier at this time.  He had been laid off --

15       JUDGE LAWS:  Okay.

16       MR. GIANNOPOULOS:  -- in November of 2012.  We're now

17   talking about March 2013.  So I'm not sure what the relevance

18   is and I would just like to know --

19       JUDGE LAWS:  Okay.  Thank you for clarifying because I was

20   assuming we were laying a foundation about meeting the new

21   plant manager.  So where are -- is this going to recall --

22       MR. MINER:  It goes to the rehire process, Your Honor.

23       JUDGE LAWS:  Okay.  And that's what you were referencing

24   earlier that you wanted to testify --

25       MR. MINER:  Correct.

```
1        JUDGE LAWS:  -- him to testify about, excuse me, that

2   wasn't touched on except for very lately on direct.

3        MR. MINER:  I recall him testifying that he, after being

4   laid off, did not come back to work for the company.

5        JUDGE LAWS:  Okay.  Okay.  And I had ruled that I will

6   allow that so as to prevent this witness from having to come

7   back here whenever that occurs, when the Respondent puts on

8   their defense.

9        MR. MINER:  Thank you, Your Honor.

10  Q    BY MR. MINER:  Do you need me to repeat my question?

11       THE INTERPRETER:  No.  I actually remember it this time.

12       THE WITNESS:  Yes, sir.

13  Q    BY MR. MINER:  You met him at the shop on March 14th?

14  A    I don't recall the date, but I did -- yes.  I did see him.

15  Q    Did he ask you to come to the shop or did you go down to

16  the shop unsolicited?

17  A    No.  I looked for the telephone number.  They gave it to

18  me.  And I called him.

19  Q    So before you met him face to face at the shop, you called

20  him first.  Correct?

21  A    That's correct.

22  Q    What did you say to Mr. Valenzuela when you spoke to him

23  on the phone?

24  A    That if there were any possibilities in which I would be

25  able to get my job back.
```

1    Q    Okay.  What did Mr. Valenzuela say?

2    A    Mr. Valenzuela told me to go and speak to him.

3    Q    Did you do so?

4    A    Yes, sir.

5    Q    Did he ask you to complete an application?

6    A    That I remember, no.

7    Q    Did he give you a copy of an application?

8    A    No.

9    Q    Did you complete an application?

10   A    I did not fill out an employment application form because

11   I was aware that people were being rehired back without -- I

12   mean, based on their previous qualifications.

13   Q    Did you tell Mr. Valenzuela that you were not going to

14   fill out an application?

15   A    No, sir.

16   Q    But he asked you to fill one out, didn't he?

17   A    That I recall, no, not at all.

18   Q    Did you tell him that you were entitled to be reinstated

19   because everyone else was being reinstated at that time?

20   A    No.  I mentioned to Mr. Valenzuela -- I asked him what was

21   the reason as to why they hadn't rehired all the people back.

22   Q    Okay.  And what did he tell you?

23   A    Okay.  A week went by.  I called him on the phone.  He

24   said he was waiting on his bosses, to which a coworker from

25   work called me and --

1      THE INTERPRETER:  Okay.  And again, the interpreter has to

2   clarify the word (Spanish spoken), as whether he spoke to him

3   on the phone or whether he spoke to him that directly.

4      THE WITNESS:  A coworker that day spoke to me on the

5   phone.

6   Q    BY MR. MINER:  Well, let me stop you there.  I am asking

7   you about your discussion with Mr. Valenzuela.

8   A    And I want to give a very clear response.

9   Q    Okay.  So I want to know what Mr. Valenzuela said and what

10  you said during this telephone call a week or so after you met

11  him at the plant.

12  A    He told me he was waiting on his bosses in order to verify

13  when I would be eligible for them to call me back in --

14  Q    Okay.

15  A    -- to which he lied to me because, that date that I spoke

16  to him there, his bosses were there at the plant and he told me

17  to wait two weeks, but that day his bosses were there.  And he

18  told me that he was waiting on his bosses --

19  Q    So by that day --

20  A    -- and they came from Portland.

21  Q    By that day, you're referring to March 14th?

22  A    I think that's probably so.  I don't recall, though.

23  Q    Right.  And you spoke with Mr. Valenzuela on the 14th and

24  he told you he would follow up with you at a later time?

25  A    Yes, sir.

1    Q    And it's your testimony he did not do that?

2    A    He did not do it.

3    Q    Okay. Do you know who Christine Martinez is?

4    A    It's a person that is unknown.  No.  I don't know them.  I

5    don't know.  I think that Ms. Martinez is the person from human

6    resources.

7    Q    Didn't you speak with Christine Martinez when you went to

8    the plant on March 14th and also spoke with Mr. Valenzuela?

9    A    Yes.  But Ms. Martinez behaved rather rudely.

10   Q    What happened?

11   A    She told me she mentioned to me that the people had to

12   fill out an application in order to be able to be rehired back,

13   when other coworkers told me -- other employees told me that

14   they did not fill out an application and they were rehired.

15   Q    Okay.  Did Ms. Martinez give you an application?

16   A    No.  No.  No.

17   Q    And why did she refer to an application?

18        MR. GIANNOPOULOS:  Objection, Your Honor, speculation.

19        JUDGE LAWS:  Answer only if you know.

20        THE WITNESS:  No.  Truth, no.

21   Q    BY MR. MINER:  Okay.  She told you you'd have to fill out

22   an application, didn't she?

23   A    That is so, but I did not fill it out because I was aware

24   that the other people who had been rehired did not have to fill

25   out an application.

```
1   Q    Now, you told Ms. Martinez you were not going to fill out
2   an application, didn't you?
3   A    No.  I didn't respond.
4   Q    You didn't say anything to her?
5   A    No.  No.  No.
6   Q    So what happened?
7   A    I left everything in peace.
8   Q    You testified that Ms. Martinez was rude to you.
9   A    Rude and since the -- on her face, there was, like, the
10  aspect of her face -- or the image of her face was that she was
11  mad.
12  Q    Had you ever Christine Martinez before that day?
13  A    No.
14  Q    Did you ever fill out an application and submit it to
15  Greenbrier?
16  A    Obviously, when I started with the company.
17  Q    Okay. How about in March of 2013?
18  A    No.
19  Q    How about in April of 2013?
20  A    No.
21  Q    You said that you spoke with Mr. Valenzuela on the phone
22  after the day when you met him in person.  Correct?
23  A    Yes.
24  Q    And I think you testified that you said you were waiting
25  or you said you were following up on an opportunity at
```

1    Greenbrier.  Is that correct?

2    A    Correct.

3    Q    Did Mr. Valenzuela tell you during that call that you

4    would have to complete an employment application to come back

5    to work?

6    A    No.  He just told me to go talk to him.

7    Q    To come back to the plant again and talk with him again?

8    A    Yes.  But he was always busy.

9    Q    Well, did you ever go back to the plant and speak with him

10   again face to face?

11   A    No, just once when one of the coworkers was with him and

12   that was it.

13   Q    After you met Christine Martinez face to face, did you

14   ever talk with her on the phone again after that date?

15        THE INTERPRETER:  And again, the interpreter is going to

16   clarify the verb (Spanish spoken).

17        THE WITNESS:  I called her on the phone and asked for her

18   to put Eric Valenzuela on the phone and that I wanted to speak

19   to him.

20   Q    BY MR. MINER:  When you spoke with Ms. Martinez on the

21   phone, did you ask her about whether you were going to be

22   recalled to work at the Tucson shop?

23   A    No.  I called again on the phone.

24        THE INTERPRETER:  And again, the interpreter has clarified

25   the verb (Spanish spoken), to speak.

1          THE WITNESS:  And they told me to wait a little bit

2    longer.

3    Q    BY MR. MINER:  Okay.  And who is they?  Was it Mr.

4    Valenzuela or Ms. Martinez?

5    A    It was Mr. Valenzuela.  And I would like to clarify

6    something else with your permission.

7    Q    Well, I'm going to stop you right there because you're

8    three conversations ahead of me.  I still want to come back to

9    this telephone call with Christine Martinez, when you testified

10   you called and you spoke with her and asked to speak with Mr.

11   Valenzuela.

12   A    Correct.

13   Q    And I asked you whether, during that discussion with Ms.

14   Martinez, you asked her whether you would be coming back to

15   work at the Tucson shop.

16   A    I did not comment anything to her.

17   Q    Didn't Ms. Martinez tell you during that telephone call

18   that you'd have to complete an employment application?

19   A    Yes.  She did mention it, but I did not fill it out and it

20   was because I knew that there were other people who had been

21   rehired, who did not have to fill out an employment

22   application.  So what was the purpose of me having to fill out

23   an employment application when others had been rehired without

24   an employment application being filled out?

25   Q    Is that what you told Ms. Martinez?

1    A    I did not comment anything to her.  I didn't comment.

2    Q    Okay.

3         JUDGE LAWS:  And again, just try to wait until the

4    interpretation is done so that you and the interpreter aren't

5    talking over each other.

6         MR. GIANNOPOULOS:  And if I could, Your Honor, we've been

7    on for about an hour and a quarter.  At an opportune time,

8    perhaps, in Mr. Miner's testimony -- or questioning --

9         MR. MINER:  You bet.

10        MR. GIANNOPOULOS:  -- we can maybe take a short break.

11        MR. MINER:  Thanks, John.

12        JUDGE LAWS:  Let us know when you're at the end of a

13   subject.

14        MR. MINER:  Thank you, Your Honor.

15   Q    BY MR. MINER:  After speaking with Ms. Martinez, did she

16   transfer you to Mr. Valenzuela as you requested?

17        THE INTERPRETER:  And again, the interpreter has requested

18   of the witness just to clarify the word (Spanish spoken).

19        THE WITNESS:  I called him on the phone.  I spoke to Mr.

20   Valenzuela on the phone after I spoke to Ms. Martinez.

21   Q    BY MR. MINER:  During that conversation, did you ask Mr.

22   Valenzuela whether you would be coming back to work at the

23   Tucson shop?

24   A    Yes.

25   Q    Didn't he tell you, you would have to fill out an

1 employment application?

2 A    No.  What he asked me was, why was I so special that I

3 wanted to get my job back.

4 Q    Did he say anything else to you during that telephone

5 call?

6 A    No.  What he did was that he made me feel bad.  He

7 humiliated me by using those words.

8 Q    Okay.  Was that the end of the discussion?

9 A    Yes, sir.

10 Q    Is that the last time you spoke with Mr. Valenzuela?

11 A    The last time.  Then I left everything in peace.

12 Q    I don't understand the response.  I'm sorry.

13 A    That was my last conversation with him that I had.  I felt

14 really bad.  He made me feel really bad and then I just left

15 everything as it was.

16 Q    Okay.  And the discussion -- strike that.  The telephone

17 call you had with Christine Martinez at that time -- was that

18 the last time you've spoken with Christine Martinez?

19 A    That was the last time that I spoke.

20    MR. MINER:  This would be a great time for a break, Your

21 Honor.

22    JUDGE LAWS:  Okay.  It's 9:15.  Let's be back, ready to go

23 on the record at 9:25.

24 (Off the record at 10:13 a.m.)

25    JUDGE LAWS:  And whenever you're ready, please resume.

1    Q    BY MR. MINER:  Mr. Murguia, who is Freddy Valdez?

2    A    They had him on as a worker, as a worker.  I mean, I don't

3    know.  He was a worker with Greenbrier, but I don't know.

4    Q    He was the production manager for the Tucson shop.  Right?

5    A    I believe so.

6    Q    Did you see Mr. Valdez at the shop in about January of

7    this year?

8         MR. GIANNOPOULOS:  Objection, Your Honor, assumes facts

9    not in evidence, lack of foundation that this gentleman was at

10   the shop in January of this year, 2013.  He was laid off in

11   2012.

12        MR. MINER:  Right.  It's just a question.  I'm just asking

13   if he saw him at the shop in January 2013.

14        JUDGE LAWS:  Okay.  Again, I'll allow that question to go

15   forward.

16        THE WITNESS:  I don't think it was in January.  I think it

17   was, like, in March or something like that.

18   Q    BY MR. MINER:  All right.  So what -- where were you when

19   you saw Mr. Valdez at the shop?

20   A    I saw him when I went to see Mr. Valenzuela and I greeted

21   him.  And that was it.  It wasn't -- there was no conversation.

22   Q    Didn't you see Mr. Valdez at the shop before the day that

23   you met with Mr. Valenzuela at the shop?

24   A    No.  It was just the day that I met with Mr. Valenzuela.

25   Q    Didn't Mr. Valdez confront you at the shop long after your

1   layoff and tell you, you were trespassing on the company's

2   property being at the shop?

3   A    No.  What he commented was, what was I doing there, and I

4   told him I was going to go speak with Mr. Valenzuela.

5   Q    On the day that you met with Mr. Valenzuela, that's your

6   testimony?

7   A    That is my testimony, yes.

8   Q    And it's your testimony you did not see Mr. Valdez in the

9   shop prior to that date?

10  A    No.

11  Q    And it's your testimony Mr. Valdez did not tell you it was

12  inappropriate for you to be in the shop as you were no longer a

13  Greenbrier employee?

14  A    No.  He commented to me, what was I doing there, and I

15  told him that I was going to come see -- that I had come to see

16  Mr. Valenzuela.

17  Q    And on a prior day, you did not have a confrontation with

18  Mr. Valdez in which he told you it was inappropriate to be at

19  the shop, as you were no longer an employee?

20  A    Yes.  He did comment that to me.

21  Q    Okay.  When did that happen?

22       JUDGE LAWS:  You have to wait.

23       THE WITNESS:  I don't recall what date it was.

24  Q    BY MR. MINER:  How long was it before the day you met with

25  Mr. Valenzuela?

1    A    It was the day that I met with Mr. Valenzuela, because I

2    wanted to talk to him, because he had given me an appointment

3    to meet with him.  And I commented to him that I had to go

4    speak with Mr. Valenzuela.

5    Q    Okay.  Was that the first time you spoke with Mr. Valdez

6    since the date of your layoff?

7    A    Yes, sir.

8        MR. MINER:  Okay.  That's all my questions at this time.

9    Thank you, Your Honor.

10        JUDGE LAWS:  Okay.  Any --

11        MR. GIANNOPOULOS:  Can I just get a couple minutes, Judge?

12        JUDGE LAWS:  Sure.

13    (Counsel confer)

14        JUDGE LAWS:  I'm just going to go off.

15    (Off the record at 10:32 a.m.)

16        JUDGE LAWS:  Okay.  All right.  We are ready to resume

17    with the cross-examination of Mr. Silva.  All right.  Mr.

18    Silva, I want to remind you of the oath you took yesterday.

19    That is in effect throughout your testimony in this trial.

20    Whereupon,

21                              **JUAN SILVA**

22    having been previously sworn, was called as a witness herein

23    and was examined and testified, by and through an interpreter

24    as follows:

25        JUDGE LAWS:  Thank you.  Whenever you're ready.

1      MR. MINER:  Thank you, Your Honor.

2                     **CROSS-EXAMINATION**

3    Q    BY MR. MINER:  Good morning, Mr. Silva.

4    A    Good morning.

5    Q    My name is Fred Miner.  I'm an attorney for Greenbrier.

6    I'm going to ask you a few questions.  All right?

7    A    Okay.

8    Q    If you don't understand my questions, please let me know

9    that.  I'll be glad to reform the question.

10   A    Let's go forward.

11   Q    Thank you.  You testified yesterday about an authorization

12   card that you signed in about November of 2012.

13   A    Yes.

14   Q    This was a card you provided to Rogelio Martinez.

15   A    Yes.

16   Q    You signed the card off site, in other words, not at the

17   Tucson shop.  Correct?

18   A    Correct.

19   Q    Prior to signing the card, did you see any employees at

20   the plant signing cards?

21       MS. SHIH:  Objection, relevance.

22       JUDGE LAWS:  I will allow it as a yes or no, no need to

23   name employees.

24       THE WITNESS:  No.

25   Q    BY MR. MINER:  Prior to signing the card, did you see any

1    employees at the plant wearing any sheetmetal workers pins, or

2    hats, or shirts?

3    A    No.

4    Q    And prior to that time, did you see any sheetmetal workers

5    flyers being distributed at the plant?

6    A    No.

7    Q    How about after you signed your card?  Did you see any

8    other employees signing cards at the plant, after that time?

9         MS. SHIH:  Objection, relevance.

10        JUDGE LAWS:  Overruled.

11        THE WITNESS:  No.

12   Q    BY MR. MINER:  And again, did you see any employees after

13   you signed your card wearing hats, or buttons, or sheetmetal

14   workers pins at the plant?

15   A    No.

16        JUDGE LAWS:  And I'm going to interject here for something

17   I meant to say right when we went back on the record.  Our last

18   witness was excused briefly while we were going to see if the

19   General Counsel was going to do any redirect.  He was not

20   excused from the facility.  It was anticipated he might be

21   doing some redirect, that General Counsel had no redirect for

22   him.

23        Rather than recall him to the stand for me to let him know

24   about the sequestration order, the parties agreed that the

25   General Counsel would let him know about the sequestration

1    order.  So I just want to make sure that has been done.

2        MR. GIANNOPOULOS:  And I did, Your Honor.  I let him know

3    about the sequestration order --

4        JUDGE LAWS:  Okay.

5        MR. GIANNOPOULOS:  -- and Ms. Alonso was with me so to

6    make sure that he understood fully.

7        JUDGE LAWS:  Thank you.

8        MS. SHIH:  And Your Honor, before Mr. Miner restarts, may

9    I take the piece of paper that's in front of the witness?

10       JUDGE LAWS:  Yes.

11       MS. SHIH:  Thank you.

12       JUDGE LAWS:  Please do.  And that is your water if you

13   need it.

14       THE WITNESS:  Okay.  Thank you.

15   Q   BY MR. MINER:  When you gave Rogelio your signed

16   authorization card, did he tell you what he was going to do

17   with it?

18       MS. SHIH:  Objection, Your Honor.  Relevance is the

19   continuing objection.

20       JUDGE LAWS:  Okay.  And I am going to allow it, so that's

21   overruled.

22       THE WITNESS:  Yes.

23   Q   BY MR. MINER:  What did he tell you he was going to do

24   with it?

25       MS. SHIH:  Objection, Your Honor, hearsay.

1      JUDGE LAWS:  And I will consider it for the truth of the

2  matter asserted only if it is corroborated or supported by

3  other evidence that makes it reliable.  Go ahead.

4      THE WITNESS:  It was to give authorization to the

5  representatives from the Union, to give them the power to be

6  able to represent us within the company.

7  Q    BY MR. MINER:  Did he mention anything about an election

8  being held?

9  A    We did not have the date, but yes.  It was mentioned that

10  we were going to have elections.  We just didn't have a date --

11  Q    Okay.  Did you --

12  A    -- for the vote.

13      JUDGE LAWS:  And I want to clarify, was that during this

14  conversation that Mr. Miner asked you about, that you talked

15  about elections?

16      THE WITNESS:  Not at that moment.

17  Q    BY MR. MINER:  When did that conversation occur?

18  A    It would have been within the same week or the next week.

19  Q    Okay.  Did you ever see a copy of the petition for an

20  election that was filed by the sheetmetal workers?

21  A    That if I saw an official document or what are you talking

22  about?

23  Q    Correct, a copy of the actual petition for an election

24  that was filed by the Union.

25  A    Well, what I remember as official was when the elections

1   were going to be held, because they put up some flyers.

2   Q    I understand that.  I simply want to know if you

3   personally saw a copy of the petition that the Union filed.

4   A    I would have to see the document that you're talking about

5   because I don't know what document it would be that you would

6   be talking about.

7   Q    Fair enough.  You testified that you spoke with some

8   coworkers about the sheetmetal workers after you signed your

9   authorization card.

10       THE INTERPRETER:  I'm sorry.  I need to have the

11  question -- may the interpreter request a repetition of the

12  question?

13       JUDGE LAWS:  Sure.

14  Q    BY MR. MINER:  Yes.  Did you testify yesterday that you

15  spoke with some coworkers about the sheetmetal workers after

16  the time that you signed your authorization card?

17  A    Yes.

18  Q    When did you start talking with coworkers about the

19  sheetmetal workers?

20  A    After I signed the card, it was the same week.

21  Q    Same week?

22  A    Yes.

23  Q    Any of those conversations occur at the plant?

24  A    It was always after work.  We would always go to a store

25  where we would purchase things that we would need, so the

1  conversations were always take -- always took place outside of

2  the company.

3  Q    Did you ever observe any managers, or foremen, or lead men

4  in the area when you were having these discussions?

5  A    Like 95 percent of every employee that works at that plant

6  goes through that store.  But they weren't part of our

7  conversation.  I mean, they would come in.  They'd see us.  But

8  they weren't part of our conversation?

9  Q    I just want to make sure that you understood my question

10  that that I understood your answer.  During your discussions

11  with coworkers about the sheetmetal workers off site, did you

12  observe any managers, foreman, or lead men in the same area at

13  that time?

14  A    Yes.

15  Q    Okay.  Who?

16  A    Let's see.  Luis Lopez and, let me see who else it was.

17  We call him Enchino (phonetic), which means the Chinaman, who

18  was a foreman, but I don't know his name.

19  Q    Okay.  Enchino -- is it appropriate for me to refer to him

20  as Enchino?

21  A    Yes.  We all call him like that.

22  Q    Okay.  Did Enchino participate in your discussion about

23  the sheetmetal workers on the occasion you're recalling?

24  A    He never talked to us about the Union never.

25  Q    And how about Luis Lopez?  I do -- strike that.  I recall

1  yesterday you testifying that you spoke with Luis Lopez about

2  the sheetmetal workers.  Correct?

3  A    Yes.

4  Q    When was the first time you spoke with Luis Lopez about

5  the Union?

6  A    Much before or, I mean, a lot --

7        THE INTERPRETER:  The interpreter stands corrected.

8        THE WITNESS:  It was much -- it was before I even signed

9  the card.

10 Q    BY MR. MINER:  Was it at the time of the prior election in

11 2011?

12 A    Yes.

13 Q    Was it prior to that election?

14 A    Yes.

15 Q    All right.  And between the time of the 2011 election and

16 the 2013 election with the sheetmetal workers, how many times

17 did you talk with Mr. Lopez, Luis Lopez, about the Union?

18       MS. SHIH:  Objection, Your Honor, if I could ask Mr. Miner

19 to clarify for the witness, because that time frame that he's

20 giving, there were multiple unions involving in organizing and

21 it's not clear whether he's asking about just sheetmetal

22 workers conversations or conversations with any union.

23       JUDGE LAWS:  Let's clarify that it's -- I assume it's

24 sheet metals you're concerned with.

25       MR. MINER:  No problem, but I was starting with a broader

1    question.

2        JUDGE LAWS:  Okay.

3        MR. MINER:  And I simply am interested in the number of

4    discussions you had with Luis Lopez, as far as you can recall,

5    between the time of the UTU election and the time of the sheet

6    metalworker election in which the subject of a union, one or

7    the other, was discussed?

8        MS. SHIH:  And my objection to that question is relevance.

9        JUDGE LAWS:  Overruled.

10       THE WITNESS:  Many.

11   Q    BY MR. MINER:  Okay.  Were they weekly discussions?

12   A    I mean, we only had the day off at the company on Sundays,

13   so we were always working at the company, so I don't know how

14   many days, how many times.

15   Q    My question is, were these discussions with Luis Lopez?

16   Were they daily?  Were they weekly?  Were they monthly?  Give

17   us an idea of how frequently they occur.

18   A    It was, on average, like, between three to four times a

19   week.

20   Q    Okay.  Virtually daily?

21   A    Yes.

22   Q    All right.

23   A    He knew that I supported the Union.

24   Q    For how long did Luis Lopez know that you supported the

25   Union?

1   A     Ever since forever.

2   Q     You testified yesterday you also spoke with Ismael Lopez

3   about the Union.   Correct?

4   A     Yes.

5   Q     Did you speak with Ismael Lopez as often as you spoke with

6   Luis Lopez about the Union?

7   A     A bit less, but also.

8   Q     Did you speak with Ismael Lopez as long as you did with

9   Luis Lopez?   That was vague.   Strike that.   Did you start

10  discussing the Union with Ismael Lopez at about the same time

11  you started discussing it with Luis Lopez?

12  A     Yes.

13  Q     Did you tell Ismael Lopez what you thought about the

14  Union?

15  A     Yes.

16  Q     Starting when?

17  A     When the movement started, when we started to organize for

18  the Union.   That's when I started to talk to him.

19  Q     Organized which union?

20  A     The one that we're talking about now, the sheetmetal

21  workers.

22  Q     Okay.   Not the United Transportation Workers?

23  A     The first union was for the transportation union.   Yes.

24  Q     Right.   And did you tell Ismael Lopez you were a supporter

25  of the United Transportation Union?

1    MS. SHIH:  Objection, relevance.

2    JUDGE LAWS:  Overruled.

3    THE WITNESS:  Okay.  Just to clarify, ever since I came on

4  board with the company, I started with the company, there was

5  always deficiencies, so when I found out that they were trying

6  to bring the Union on board, I started to support the Union.

7  Now, there were several unions, but I have always supported the

8  Unions.

9  Q    BY MR. MINER:  And have you always told Ismael Lopez that

10  you supported the Union, whichever one it was?

11  A    Yes.

12  Q    You testified about handing out some flyers for the Union

13  in 2013.

14  A    Yes.

15  Q    When did you start handing out flyers for the sheetmetal

16  workers?

17  A    In the first week of June.

18  Q    And you handed out the flyers, I think you testified,

19  about twice a week?

20  A

21  A    Two or three times.

22  Q    Per week?

23  A    Yes.

24  Q    For how many weeks?

25  A    Three, four, was it?  Three or four --

1    Q    Okay.

2    A    -- approximately.

3    Q    Did you hand out any flyers for the sheetmetal workers

4    prior to your termination in May?

5    A    No.

6    Q    You testified about a meeting that you attended on

7    November the 12th, in which layoffs were announced.

8    A    What's the question?

9    Q    Is it correct that you attended a meeting on November the

10   12th with Juan Maciel --

11   A    Yes.  Yes.

12   Q    -- in which the subject of layoffs was discussed?

13   A    Yes.

14   Q    Juan Maciel spoke in English and Spanish during the

15   meeting.  Correct?

16   A    Yes.

17   Q    And he said that some employees were going to be laid off

18   that day.  Correct?

19   A    Yes.

20   Q    Did he say anything about Lex Morrison that day?

21   A    I don't remember him.

22   Q    Do you know who Lex Morrison is?

23   A    Yes.

24   Q    He's the former plant manager at Tucson.  Right?

25   A    Yes.

1    Q    Mr. Morrison left the Tucson plant on November 12th.

2    Correct?

3    A    Yes.

4    Q    And Mr. Maciel became the new plant manager that day.

5    Correct?

6    A    Yes.

7    Q    Did Mr. Maciel announce that at the meeting?

8    A    Yes.

9    Q    What did he say?

10   A    That Lex had been moved to another area.

11   Q    Do you know where?

12   A    No.

13   Q    You testified that there was a reference to attendance

14   points during a meeting with Mr. Maciel.

15   A    Yes.

16   Q    He said that everybody's attendance points were going to

17   be quite clean.  Correct?

18   A    Yes.

19   Q    Was that at the same meeting were announced?

20   A    Yes.

21   Q    And Mr. Maciel made that announcement?

22   A    Yes.

23   Q    And what did he say about why the attendance points were

24   being eliminated at that time?

25   A    They wanted to restore the company and they wanted to

1   start from zero so that they could -- so that everything would

2   be better.

3   Q     You testified yesterday that someone was hired to talk to

4   the employers about not wanting a union.

5   A     Yes.

6   Q     Who was that?

7   A     I don't know the name.  I know he was an American person,

8   but I don't know the name.  I don't know who he would have

9   been.

10  Q     When was he at the plant?

11  A     It's very difficult for me to remember days because every

12  day, I was working and every day was the same, so it's very

13  difficult for me to remember the dates.

14  Q     Was it close to the time that the layoffs were announced?

15  A     Yes.

16  Q     How long before or after?

17  A     Approximately, like, about a month before they were fired.

18  Q     A month before the layoffs occurred?

19  A     I suppose so.

20  Q     And did you attend a meeting with this individual?

21  A     It was mandatory for everybody.

22  Q     So you did attend a meeting with this individual?

23  A     Yes.

24  Q     And what did he say?

25  A     That the Unions were sheer lies, that they were just

1    created just to make some people richer and some people poorer.

2    And it was -- and that, that money was for our families, and

3    that we could instead -- and that we could negotiate directly

4    with the companies that are having to negotiate through third

5    parties.

6    Q    And you're sure that occurred a month before the layoffs

7    were announced?

8    A    I told you I wasn't sure about the date.

9    Q    Well, I'm not asking you for a date.  I'm just asking if

10   you're sure that it occurred about a month before the layoffs

11   were announced.

12        MS. SHIH:  Objection, Your Honor.  The witness has already

13   testified that he's not sure about the dates.

14        JUDGE LAWS:  I think he's asked and answered that.

15        MR. MINER:  Okay.

16        JUDGE LAWS:  Hold on.

17   Q    BY MR. MINER:  No questions.

18   A    Okay.  Sorry.

19        JUDGE LAWS:  It's okay.

20   Q    BY MR. MINER:  What is an EOCC unit?

21   A    It is a shock-absorbing unit that is charged or filled

22   with nitrogen, that is designed to absorb the impact between

23   the rail cars.

24   Q    Are all EOCC units the same?

25   A    The models are different, but the function is the same.

1   Q    Some are screwed onto the unit.  Correct?

2   A    Yes.

3   Q    Some have a phalange with a bolt.  Correct?

4        THE INTERPRETER:  I know the word in Spanish.  It's

5   just -- I'm sorry.  I'm going to have to ask -- the interpreter

6   is going to ask just a moment, off the record --

7        JUDGE LAWS:  Sure.

8        THE INTERPRETER:  -- so I can check my dictionary.

9        MR. GIANNOPOULOS:  And Your Honor, I think he understood

10  the word flange.

11       JUDGE LAWS:  Do you know the word flange?  Okay.  Go

12  ahead.

13       THE WITNESS:  Okay.  Yes.

14  Q    BY MR. MINER:  These units are a little bit different.

15  Correct?

16  A    Yes.

17  Q    But they function the same way?

18  A    Yes.

19  Q    They're hydraulic.  Correct?

20  A    Yes.

21  Q    There's immense pressure inside the unit.  Correct?

22  A    When they're in good operations, yes.

23  Q    And that hydraulic pressure has to be released before

24  these units are moved.  Correct?

25  A    It is the same.  If the unit is in good condition, you do

1  not have to discharge it.  But if the unit is not in good

2  conditions, then you must discharge it.

3  Q    And how do you know if a unit is in good condition or not

4  good condition?

5  A    There's a safety measuring unit that you have to squash or

6  squeeze.  And then that unit, that device, indicates to you

7  whether the unit is good or not.

8  Q    Is this -- what's the right word -- a safety tool that

9  gives you a hydraulic pressure reading inside the unit?

10  A    Well, I've got my doubts.  The manufacturer says yes, but

11  I've got my doubts.

12  Q    All right.  At least the manufacturer claims that's its

13  purpose?

14  A    Yes.  Yes.

15  Q    Before you removed that unit, you have to make sure the

16  hydraulic pressure is completely released from it.  Correct?

17  A    Yes.

18  Q    The manufacturer also provides a strap on the unit.

19  Correct?

20  A    No.

21  Q    Okay.  You testified about a 12- to 18-inch strap that is

22  used on the units?

23  A    Yes.

24  Q    All right.  Who provides the strap?

25  A    We got to go find it and cut it ourselves in the workshop.

1  Q    The manufacturer recommends or requires that the strap be

2  applied to the unit before it is removed from the car.

3  Correct?

4      MS. SHIH:  Objection, foundation.  I don't know if this

5  witness is able to testify about what the manufacturer's

6  recommendations are for this unit.

7      MR. MINER:  He can say if he doesn't know.

8      JUDGE LAWS:  So answer the question only if you know.

9      THE WITNESS:  Then I don't know the question, then.

10  Q    BY MR. MINER:  All right.  You don't know whether the

11  manufacturer requires a strap to be used when the unit is being

12  removed from a car?

13  A    I don't work directly with the manufacturer, but safety is

14  the one who gives us the instructions.

15  Q    And you could --

16  A    They tell us what to do.

17  Q    Thank you.  And you've received a lot of instructions from

18  safety about what to do in this respect?

19  A    Yesterday, I mentioned and commented that it was different

20  versions and it was -- there were various versions.

21  Q    With respect to the strap, that's always been required.

22  Correct?

23  A    It's of May, as of the first of week of May.  That was a

24  requirement that was in something like that.

25  Q    Who told you that was the requirement in the first week of

1    May?

2    A    Julio Vasquez.

3    Q    Who is Julio Vasquez?

4    A    Safety, the director of safety.

5    Q    And he's provided trainings -- he provided -- strike that.

6    He provided training to you in May about the safe-handling of

7    the EOCC unit.  Correct?

8    A    That question is not really posted very well.

9    Q    All right.  I'll ask him again.  Julio Vasquez provided

10   training to you in May of 2013 regarding the safe handling of

11   an EOCC unit.  Correct?

12   A    Yes.

13   Q    And previously, he provided training to you on that same

14   subject as well?

15   A    It's that, if it was a letter and if it was in writing,

16   the letter was always going to be the same.  But when you speak

17   and then you talk about it, there's no way to know that it's

18   the same thing.

19   Q    Okay.  But that doesn't answer my question.  I'm just

20   asking you, prior to May, Julio Vasquez provided plenty of

21   training about the safe handling of EOCC units.  Correct?

22   A    Yes.

23   Q    And all those training programs, he always said, the strap

24   is required before moving that unit.  Correct?

25   A    He didn't say it all the time.  No.

1          MR. MINER:  Okay.  May I approach, Your Honor?

2          JUDGE LAWS:  Sure.

3     Q    BY MR. MINER:  I am handing to you a copy of what I've

4     marked RE-1, Respondent Exhibit 1.  Do you have that?

5     A    Yes.

6     Q    It's a four-page document.  Do you have all the pages?

7     A    Yes.

8     Q    Looking at the first page of Respondent Exhibit 1, do you

9     recognize that?

10    A    Yes.

11    Q    Looking in the second column to the right, four lines

12    down, is that your signature?

13    A    Yes.

14    Q    Did you attend a training program on October 8th, 2012

15    regarding the importance of following established safety

16    procedures?

17    A    I want to clarify that.  When we signed this, there was

18    nothing written on top here.

19    Q    Okay.  Do you recall whether you attended a training

20    program on October 8th, 2012 regarding the importance of

21    complying with established safety procedures?

22    A    Yes.

23    Q    And Julio --

24         JUDGE LAWS:  I want to clarify.  When you said there was

25    no writing up here, are you referring to the writing beneath

1    the word "subjects"?

2        THE WITNESS:  Yes.

3        MR. MINER:  Thank you, Your Honor.

4    Q    BY MR. MINER:  Did Julio Vasquez conduct that training

5    program?

6    A    Yes.

7    Q    And did he tell you that applying the strap to the EOCC

8    unit before moving it was required?

9    A    I'm sure he said it in two meetings.  I'm sure he said it

10   in two meetings.  At the other meetings, he said it was

11   optional.

12   Q    Okay.  Did he say it at this October 8th, 2012 meeting?

13   A    I'll repeat.  Dates confuse me.

14   Q    Okay.  Take a look at page two, please.  Do you recognize

15   that page?

16   A    Yes.

17   Q    Take a look at the list of signatures in the lower left-

18   hand corner, fifth signature in the left-hand column.  Is that

19   your signature?

20   A    Yes.

21   Q    Did you attend a training program with Julio Vasquez on

22   February 4th, 2013?

23       THE INTERPRETER:  And I'm sorry.  It was February 4th?

24       MR. MINER:  It was February 4th.

25       THE INTERPRETER:  Okay.  Thank you.

```
 1        THE WITNESS:  Yes.

 2   Q    BY MR. MINER:  And did he talk about safe operating, safe

 3   handling procedures with EOCC units?

 4   A    Yes.

 5   Q    And didn't he say during that meeting that applying a

 6   strap to the unit before moving it is required?

 7   A    Of the four meetings and two meetings, he did say yes.  On

 8   two meetings, he did say it was optional and I'll repeat, the

 9   dates, I can't -- I don't remember the dates.

10   Q    Would you take a look at page three of Respondent Exhibit

11   1?  The third signature in the lower left-hand corner would be

12   the bottom signature in the left-hand column.  Do you see that?

13   A    Yes.

14   Q    Is that your signature?

15   A    Yes.

16   Q    Did you attend a training program with Julio Vasquez on

17   April 20th?  Strike that.  What is our date here?  On March

18   18th, 2013?

19   A    Yes.

20   Q    And didn't Julio Vasquez tell you during that meeting that

21   the strap is required to be placed on the EOCC unit before it

22   is moved?

23   A    No.

24   Q    Do you recall Mr. Vasquez presenting a PowerPoint program

25   during that meeting?
```

1    A    What's PowerPoint?

2    Q    Did he present on a television or a screen some graphics

3    with some information about EOCC units?

4    A    Yes.

5         MR. MINER:  May I approach, Your Honor?

6         JUDGE LAWS:  Yes.

7    Q    BY MR. MINER:  I'm handing you what I've marked Respondent

8    Exhibit 2.  Do you have that in front of you?

9    A    Yes.

10   Q    It's a 14-page document.  Do you recognize Respondent

11   Exhibit 2?

12   A    Excuse me?  I didn't understand you.

13   Q    Do you recognize this?

14   A    I know what it's talking about, but I've never had this in

15   my hands.

16   Q    Okay.  This is a copy of the PowerPoint program that Julio

17   Vasquez presented during the meeting in March 2013.

18        MS. SHIH:  Objection, Your Honor.  Is that a statement or

19   a question?

20        JUDGE LAWS:  Yeah.  I'm not going to take that as

21   testimony.  So are you asking him?

22        MR. MINER:  Yes.

23        JUDGE LAWS:  Okay.

24        THE WITNESS:  I don't remember any of this.

25   Q    BY MR. MINER:  You don't remember Julio Vasquez saying or

1    referring to a PowerPoint program that says, "Why EOCC Unit

2    Strapping"?

3    A    I don't remember that meeting.  Honestly, I don't

4    remember.

5    Q    Okay.  Turn to page four of Respondent Exhibit 1, please.

6    In the center column five rows down, is that your signature?

7    A    Yes.

8    Q    Did you attend a training program with Julio Vasquez on

9    April 1st, 2013?

10   A    Yes.

11   Q    Did you talk about EOCC units during the meeting?

12   A    Yes.

13   Q    Did Julio Vasquez answer employees' questions about safe

14   handling procedures for EOCC units?

15   A    I had a question and he never responded.

16   Q    What was your question?

17   A    On this page, no.

18       JUDGE LAWS:  Hang on.  I need to describe, so step 10.

19   He's pointing to the page that says step 10.

20   Q    BY MR. MINER:  I'm sorry.  Are we looking at Respondent

21   Exhibit 2?

22       JUDGE LAWS:  Yes.  Yes.

23       MR. GIANNOPOULOS:  And Your Honor, we're going to ask,

24   because we're going to object to Respondent's Exhibit 2 at this

25   time, I'm assuming Mr. Miner at some point will try to lay the

1  proper foundation.  But if we're going to use this as just a

2  demonstrative exhibit --

3      JUDGE LAWS:  Well, let's -- he hasn't offered it yet.

4      MR. GIANNOPOULOS:  Okay.

5      JUDGE LAWS:  So I don't know why you're objecting at this

6  point.  The witness pointed that he had a question about the

7  information on step 10, so let's go from there.

8      MR. GIANNOPOULOS:  I'm objecting because it's not in the

9  record, Your Honor, and if it doesn't get into the record, the

10 transcript, we will have no idea what he's asking about or what

11 question he's talking about.

12     JUDGE LAWS:  Let's have the interpreter read what step 10

13 says.  Well, actually, I can if you can then translate what I

14 say.

15     MS. SHIH:  Actually, Your Honor, if we can have his

16 testimony first --

17     JUDGE LAWS:  Uh-huh.

18     MS. SHIH:  -- I don't know if he's just using this

19 photograph as a demonstration to communicate what the question

20 he was raising at the meeting was.  But I think he was about to

21 testify as to a question that he --

22     JUDGE LAWS:  He asked.

23     MS. SHIH:  -- asked at the meeting.  And perhaps he can do

24 that without reference to this exhibit and, if not, at that

25 time, I think we can address the issues that we have with the

1  use of the exhibit.

2      JUDGE LAWS:  Okay.  Well, let me ask you a question.  When

3  you asked the question during the meeting, did you refer to the

4  document that you have held up in court here, which I will

5  represent is part of Respondent's Proposed Exhibit 2?

6      THE WITNESS:  I asked Julio the question and he never

7  responded, so I never knew what was supposed to be done.

8      JUDGE LAWS:  But when you asked him the question, did you

9  say, "Hey, with regard to this," --

10     THE WITNESS:  Yes.

11     JUDGE LAWS:  So we do need it.  If the question was asked

12 in reference to the specific document, then it does need to be

13 at least identified.

14 Q   BY MR. MINER:  Mr. Silva, earlier, you testified when you

15 were looking at Respondent Exhibit 2 that you didn't recognize

16 it.

17 A    Not the document, but I know what a gear is and here's a

18 gear.

19 Q    Okay.  Do you now recognize page 10 of Respondent Exhibit

20 2?

21 A    I have never seen these sheets before.

22     JUDGE LAWS:  Okay.

23 Q   BY MR. MINER:  Okay.  Do you remember seeing this image on

24 a screen when you were at a training program with Julio

25 Vasquez?

1      MS. SHIH:  Objection, Your Honor.  Is he referring to a

2  specific meeting on a specific date or at any time?

3      JUDGE LAWS:  Well, I think we're --

4      MS. SHIH:  The question is vague.

5      JUDGE LAWS:  Okay.  I would assume it's the meeting that

6  is on the third page of Respondent's 1.

7      MR. MINER:  Your Honor, I'd be happy if he recognized it

8  from anywhere.

9      JUDGE LAWS:  And I do need to make a correction.  You had

10  said page 10 and I want to note it's step 10.  It's actually on

11  the 11th page of proposed Respondent's Exhibit 2.

12      MR. MINER:  Thank you.

13  Q    BY MR. MINER:  Do you recall this image being on a screen

14  at a training program with Julio Vasquez, any of them?

15  A    Yes.

16  Q    Would you please take a few minutes, and look through

17  what's been marked Respondent Exhibit 2, and see if you

18  recognize any of the other images that are in that document?

19  A    All this that is here, I am familiar with because, I mean,

20  this is something that I would do at my work, so I'm familiar

21  with it for my work.  But they never gave us anything that

22  would show us how to do it.  But they never give us anything or

23  showed us anything inviting as to how we had to do things.

24  Q    So you do not recognize these images from a training

25  program with Julio Vasquez?

1    A    The only thing that I remember about what he had taught us

2    was that he put us -- that showed us the 10 different units

3    that there were and the different amounts of charge that each

4    of those units carried or had.

5    Q    So I take it that's a no, you do not recognize the images

6    from what's been marked as Respondent's Exhibit 2, from any of

7    the training meetings that Julio Vasquez presented?

8        MS. SHIH:  Objection, Your Honor, asked and answered.

9        JUDGE LAWS:  Overruled.

10       THE WITNESS:  Precisely separate.

11   Q    BY MR. MINER:  Okay.  So turning our attention back to

12   Respondent Exhibit 1, page four, please, do you recall a

13   training meeting with Julio Vasquez on April the 1st?

14   A    Yes.

15   Q    And didn't Mr. Vasquez tell you during that meeting that

16   the strap is required to be applied to the EOCC unit before it

17   is moved?

18   A    No.

19   Q    You testified about a training program with Mr. Vasquez in

20   May.  Correct?

21   A    Yes.

22   Q    In fact, Ms. Vasquez conducted a safety training program

23   on May 29th, the day before you were terminated.  Correct?

24   A    Yes.

25   Q    The meeting was the result of another employee who failed

1    to apply a strap to an EOCC unit that day.  Correct?

2        JUDGE LAWS:  And answer if you know.

3        THE WITNESS:  I know nothing about that.

4    Q    BY MR. MINER:  Do you recall the training program?

5    A    Yes.

6    Q    Do you recall specifically  discussing with Mr. Vasquez

7    the need to apply a strap to an EOCC unit before moving it on

8    May 29th?

9    A    I argued with him because he didn't answer the question

10   that I asked him.  That's why I argued with him.

11   Q    When did you argue with him?

12   A    The day of the meeting.

13   Q    Which date?

14   A    I don't know.

15   Q    Was it the meeting the day before you were terminated?

16   A    No.

17   Q    Was it a week before you were terminated?

18   A    It was, like, one or two weeks.

19   Q    Okay.  And what were you arguing with Mr. Vasquez about?

20   A    When the unit is already broken, when it arrives, and it's

21   broken, and you apply the strap to the pistons, the pistons

22   either way take off as a projectile.  They just fall out

23   regardless of whether you applied the strap or not.  And he

24   didn't know what to do about that.

25   Q    Mr. Vasquez said that it's required to apply the strap in

1    every case.  Correct?

2    A    Yes.

3        MR. MINER:  May I approach, Your Honor?

4        JUDGE LAWS:  Yes.

5    Q    BY MR. MINER:  I'm handing you what I've marked Respondent

6    Exhibit 3.  Do you have that in front of you?

7    A    Yes.

8    Q    Do you recognize the first page of Respondent Exhibit 3?

9    A    Yes.

10    Q    What is it?

11        JUDGE LAWS:  And I actually want to clarify before he

12    answers.  Does he recognize what's pictured or does he

13    recognize the page as a document that has been presented to

14    him?

15        THE WITNESS:  I recognize the pictures only.  I mean, I

16    know what the pictures are.

17    Q    BY MR. MINER:  Have you ever seen this document before?

18    A    No.

19    Q    Okay.  In May of 2013, who was your immediate supervisor?

20    A    Ismael Lopez.

21    Q    Did you talk with Ismael Lopez about the need to apply a

22    strap to an EOCC unit before moving it?

23        MS. SHIH:  Objection, Your Honor.  The question is vague.

24    I'm not sure what time frame Mr. Miner is referring to.

25        JUDGE LAWS:  Is it ever?

1  Q    BY MR. MINER:  Ever in May of 2013.

2  A    We always asked our supervisors what to do.

3  Q    Okay.  And specifically, did you discuss with Ismael Lopez

4  safe handling procedures for EOCC units?

5  A    I would always ask if we had to apply the strap or not

6  because the supervisor was the one who would go and check it

7  before we would lower it.

8  Q    All right.  And did Ismael Lopez tell you that, "Yes.  The

9  strap has to be applied every time"?

10  A    On some occasions, I mean, I don't know because sometimes

11  the unit was in good operating conditions.

12  Q    Okay.  And yet, to answer my question, did he tell you

13  that it was necessary to apply a strap in every case?

14  A    No.

15  Q    Did he ever tell you that?

16  A    The questions are really confusing.

17      THE INTERPRETER:  Your Honor, this is the interpreter.

18  Could I take a comfort break?

19      JUDGE LAWS:  Sure.

20      THE INTERPRETER:  Thank you.

21      JUDGE LAWS:  All right.  Why don't we -- it's 11:00.  It's

22  a little after 11:50.  Let's reconvene at --

23      MR. GIANNOPOULOS:  12:50.

24      MR. BIDDLE:  12:50.

25      MR. MINER:  12:50.

1      JUDGE LAWS:  -- 12:50.  I'm sorry.  I'm looking at my

2  Pacific time computer.  Yes.  I want to make sure we're

3  mindful, though, of the witness's work schedule.  How much

4  longer do you think you have?

5      MR. MINER:  Thirty minutes.

6      JUDGE LAWS:  Thirty minutes.  Okay.  Why don't we take

7  just five so that we can make sure we get through?

8  (Off the record at 12:50 p.m.)

9      JUDGE LAWS:  We're up and running.  Okay.  Whenever you're

10  ready.

11  Q    BY MR. MINER:  Do you recall when was the last performance

12  appraisal you received before your termination?

13  A    It was the second, first -- no.  It was either the first

14  or the second week of May.

15  Q    Who conducted the review with you?

16  A    Are you referring to who was the person that gave me the

17  results of the evaluation?

18  Q    Who met with you to present the results of the review with

19  you?

20  A    Valenzuela.

21  Q    Eric Valenzuela --

22  A    Yes.

23  Q    -- the plant manager?

24  A    Yes.

25  Q    Did he talk to you about safety during your performance

1   review?

2   A    Yes.

3   Q    Did he tell you that your safety practices needed to

4   improve?

5   A    No.

6        MR. MINER:  May I approach, Your Honor?

7        JUDGE LAWS:  Yes.

8   Q    BY MR. MINER:  I'm going to hand you what I've marked

9   Respondent Exhibit 4.  Do you recognize that document?

10  A    Yes.

11  Q    What is the rating Mr. Valenzuela gave you for safety?

12       MS. SHIH:  Objection, Your Honor.  The document speaks for

13  itself?

14       JUDGE LAWS:  I mean, it does.  We can -- do you want to

15  ask him about the rating?  You can just state what it says.

16       MR. MINER:  Fair enough.

17  Q    BY MR. MINER:  Did you sign on the second page of

18  Respondent Exhibit 4?

19  A    Yes.

20  Q    Did you review all of the entries that are written on the

21  form, Respondent Exhibit 4?

22  A    Yes.

23       MR. MINER:  I'm going to offer Respondent Exhibit 4.  And

24  since I didn't already do it, I'm going to offer Respondent 1

25  as well, Your Honor.

1      JUDGE LAWS:  Any objection to either of those?

2      MS. SHIH:  May I voir dire the witness?

3      JUDGE LAWS:  Sure.

4                    **VOIR DIRE EXAMINATION**

5   Q   BY MS. SHIH:  With regard to Respondent's Exhibit 1, on

6   page one, is there any handwriting contained on page one other

7   than your signature that belongs to you?

8   A   On this first page?

9   Q   Yes.

10  A   No, just my signature.

11  Q   Do you read English?

12  A   Not perfectly.

13  Q   On page two, is there any handwriting on that page other

14  than your signature that belongs to you?

15  A   No.

16  Q   On page three, is there any handwriting contained on that

17  page other than your signature that belongs to you?

18  A   No.

19      JUDGE LAWS:  And I'm going to assume same question, page

20  four?

21      THE WITNESS:  No.

22  Q   BY MS. SHIH:  With regard to Respondent's Exhibit 4, you

23  said that you recognized that document.

24  A   Yes.

25  Q   When that was presented to you, was it presented to you in

1  this format in English?

2  A    This that's written down here was not there when it was

3  presented to me.

4      JUDGE LAWS:  And I'm going to represent that the witness

5  is pointing to the comments following "overall leader" comments

6  at the bottom of page one.

7      THE WITNESS:  And in page number two, none of this was

8  written.

9      JUDGE LAWS:  And can you show me what you mean, please?

10  None of the handwritten remarks?  And I'm going to represent

11  the witness has pointed to the handwritten parts under "leader,

12  complete section below".  What about under "development need"?

13      THE WITNESS:  It was blank when I signed it.

14      JUDGE LAWS:  And how about action plan?

15      THE WITNESS:  It was all blank.  There were no letters.

16      MS. SHIH:  Your Honor, I'm going to object to the

17  admission of Respondent's Exhibit 1 for any purpose other than

18  the signature of the witness, who has already testified not

19  only that handwriting was not present when he signed it, but

20  that he doesn't read English.  And the other information

21  contained on the documents is hearsay.

22      JUDGE LAWS:  I'll admit Respondent's Exhibit 1 to show the

23  signature and I will consider it for the other information that

24  appears on the document, subject to it being authenticated by

25  the person who conducted the trainings.

1  **(Respondent Exhibit Number 1 Received into Evidence)**

2      MS. SHIH:  And same objection to Respondent's Exhibit 4.

3      JUDGE LAWS:  And I will admit Respondent's Exhibit 4.

4  However, for me to consider the comments that appear on page 1

5  after overall leader comments, the handwritten portion of that,

6  and the comments that are handwritten after the "leader,

7  complete section below," in the sections strength, development

8  need, and action plan.  Those will need to be identified and

9  authenticated by somebody familiar with it, presumably the

10  person who wrote it.

11  **(Respondent Exhibit Number 4 Received into Evidence)**

12      MR. MINER:  Thank you, Your Honor.  May I approach?

13      JUDGE LAWS:  Yes.  And just so you know, I filled that

14  water again, so be careful.

15      THE WITNESS:  Thank you.

16      JUDGE LAWS:  Yeah.

17              <u>**CROSS-EXAMINATION**</u> **(CONTINUED)**

18  Q    BY MR. MINER:  Mr. Silva, I've handed you a copy of what

19  I've marked Respondent Exhibit 5.  Do you have that?

20  A    Yes.

21  Q    Do you recognize that document?

22  A    The handwriting is mine, but I don't recall having signed

23  it.

24  Q    You don't recall the day you signed it or you don't recall

25  signing it at all?

1    A    I don't recall that they ever gave me the employee manual.

2    I don't recall that they ever gave me an employee manual.

3    Q    Okay.  But I'm asking you about this document.  Do you

4    recall signing this document?

5    A    No.

6        MS. SHIH:  Objection, Your Honor, asked and answered.

7    He's already testified that that's his signature.

8        MR. MINER:  Did he?  I didn't hear that.

9        JUDGE LAWS:  I'll allow him to answer.

10       THE WITNESS:  The signature is mine.  But I don't recall

11   having seen the document before.

12   Q    BY MR. MINER:  Fair enough.

13       MR. MINER:  Nevertheless, Your Honor, I'll offer

14   Respondent Exhibit 5.

15       MS. SHIH:  No objection, Your Honor.

16       JUDGE LAWS:  Okay.  Respondent Exhibit 5 is admitted.

17   **(Respondent Exhibit Number 5 Received into Evidence)**

18   Q    BY MR. MINER:  You testified about an incident on May the

19   30th in which you saw an unattended forklift near an area where

20   a coworker of yours was working?

21   A    Yes.

22   Q    You testified that you got on the forklift and that you

23   then removed an EOCC unit from a car?

24   A    Yes.

25   Q    What's the procedure for removing the unit?

1  A    You want the entire process, I mean, step by step?

2  Q    Yes.

3  A    You have to check the safety valve.  You have to put --

4  you've got to put a mark on the gear at least at six inches.

5  You have to start to discharge the nitrogen into a tray.  You

6  have to apply a chain and apply pressure so that the piston can

7  go in.  You have to release the chain and check if the gears

8  have moved at all.  And then, if everything is fine, if nothing

9  has moved, then you can lower the unit.

10  Q    Did you follow all those steps when you removed the unit

11  on May 30th?

12  A    No.  Because I got onto the forklift, I did not lower the

13  unit.

14  Q    Okay.  Who lowered the unit?

15  A    Brian.

16  Q    Who removed the unit from the car?

17  A    I have removed the unit from the car, from the rail car

18  off to a side on to the floor.

19  Q    Okay.  Did you follow all the steps that you just

20  described by checking the pressure on the unit, releasing all

21  the --

22      JUDGE LAWS:  Don't go over all the steps, please.

23  Q    BY MR. MINER:  -- and so on?  Did you follow all those

24  steps?

25  A    No.  And yesterday, I did say that two people had to be on

1    the rail car.

2    Q    I don't think that answers my question.

3    A    What's the question?

4    Q    Did you follow all the steps you described for removing a

5    unit from the car?

6    MS. SHIH:  Objection, asked and answered.

7    JUDGE LAWS:  He did ask and answer it, but I think there

8    is some lack of clarity, at least from where I sit, so I'm

9    going to allow him to be asked again for the sake of making

10   sure that the testimony is clear, given some difficulties I am

11   perceiving in translation.  Just tell him he can answer.

12   THE WITNESS:  No.

13   Q    BY MR. MINER:  Did you speak with Ismael Lopez?

14   A    When?

15   Q    After you removed the unit.

16   THE INTERPRETER:  After you -- I'm sorry?

17   Q    BY MR. MINER:  After you removed the unit from the car.

18   A    Yes.

19   Q    What did Mr. Lopez say?

20   A    He asked, "Did you lower the -- did you bring the unit

21   down?  Did you lower the unit?"

22   Q    And what'd you tell him?

23   A    Yes.

24   Q    And what happened next?

25   A    Ismael went to the office and I continued working.

1    Q    Did Ismael ask you why you hadn't followed procedures when

2    you removed the unit?

3    A    No.

4    Q    Didn't he remind you about all the times he had discussed

5    this issue with you before?

6    A    What'd you say?

7    Q    I said, didn't he remind you about all the times he

8    discussed this very issue with you before?

9    A    No.  He just asked.  He went to the office.  And that was

10   it.

11   Q    Didn't he remind you about the safety training you had

12   just had with Julio Vasquez the day before, in which this

13   specific issue was covered?

14   A    No.

15   Q    Did Julio Vasquez come out and speak with you after Ismael

16   Lopez left?

17   A    He just asked me one question and that was it.

18   Q    So he did come out.  And what did he ask you?

19   A    "Didn't you put the strap on?"

20   Q    And what did you say?

21   A    No.

22   Q    And what'd he say?

23   A    Just one question.

24   Q    He didn't say anything else?

25   A    No.

1    Q    He didn't remind you about all the times he had discussed

2    this issue with you?

3          MS. SHIH:  Objection, asked and answered.

4          JUDGE LAWS:  No.

5          MR. MINER:  No.

6          JUDGE LAWS:  It was asked and answered with regard to

7    Ismael, not with regard to Julio.

8          THE WITNESS:  No.

9    Q    BY MR. MINER:  Didn't he remained you about all the

10   training programs where he had told you it was required to put

11   the strap on before moving the unit?

12   A    No.

13   Q    You didn't tell Julio Vasquez that you didn't want to put

14   that strap on?

15   A    I think there's a lot of questions that he is asking and

16   it was only one answer.  It was just simply one question and

17   one answer and that was it.

18   Q    Did you meet with Eric Valenzuela later that day?

19   A    The incident was at 9:00 and, at 12:00, they called me

20   into the office.

21   Q    Did you meet with Eric Valenzuela?

22   A    Yes.

23   Q    And what did he say?

24   A    That I had disobeyed the company rules, that he had to let

25   me go, that I could have killed somebody.

1   Q      Did he show you some paperwork during that meeting?

2   A      Just the resignation letter.  That was it.

3   Q      A resignation letter?

4   A      Well, it was -- let me see.  It was a letter in which they

5   said I could not remain in with the company.

6   Q      Did they ask you to sign something before you left?

7   A      Yes.

8          MR. MINER:  May I approach, Your Honor?

9          JUDGE LAWS:  Yes.

10  Q      BY MR. MINER:  I have just handed you what I've marked

11  Respondent, excuse me, Exhibit 6.  It's a three-page document.

12  A      Yes.

13  Q      Do you recognize Respondent Exhibit 6?

14  A      Yes.

15  Q      Did you review it with Eric Valenzuela before he asked you

16  to sign it?

17  A      No.

18  Q      And did you review it at any time?

19  A      No.  I just -- it wasn't until I left the establishment

20  and I went to the car that I looked at it.  I mean, I didn't

21  really look at it.  They gave me the paper and I went directly

22  from the establishment to my car.  And that's when I saw it.

23  Q      Did they give you a copy to take with you?

24  A      Yes.

25  Q      Is Respondent Exhibit 6 a copy of that same document?

1   A      Yes.

2          MR. MINER:  I offer Respondent 6.

3          JUDGE LAWS:  Any objection?

4          MS. SHIH:  No objection.

5          JUDGE LAWS:  Respondent's 6 is admitted.

6   **(Respondent Exhibit Number 6 Received into Evidence)**

7          MR. MINER:  No other questions, Your Honor.  Thank you.

8          JUDGE LAWS:  Okay.  Any redirect?

9          MS. SHIH:  Yes, Your Honor.

10         MR. GIANNOPOULOS:  Your Honor, we have maybe five minutes.

11  I also am going to -- the guard has graciously allowed me to

12  print a couple documents that I need from this, that we're

13  going to need from the printer.

14         JUDGE LAWS:  Okay.  Go ahead and get them.

15         MR. GIANNOPOULOS:  So if we can just have maybe five

16  minutes --

17         JUDGE LAWS:  Okay.

18         MR. GIANNOPOULOS:  -- to get that done, thank you.

19         JUDGE LAWS:  Are you going to make copies or can we not do

20  that here?

21         MR. GIANNOPOULOS:  Well, I think we can -- we'll make

22  copies tonight and bring them back.

23         JUDGE LAWS:  Later, okay.

24         MR. GIANNOPOULOS:  Yeah.  But they're documents that

25  everyone has seen, but just we don't have it.

1      JUDGE LAWS:  Okay.  Why don't we actually -- why don't you

2  get them and --

3      MR. GIANNOPOULOS:  I think we're going to have to use this

4  printer right here.

5      JUDGE LAWS:  -- we'll use the printer to get them.  We'll

6  go off the record and, while we're off the record, show

7  everyone the documents.

8      MR. GIANNOPOULOS:  Okay.

9      JUDGE LAWS:  And then, when we come back on, we can just

10  get through it.

11  (Off the record at 1:20 p.m.)

12      MS. SHIH:  This is part of what you had marked as R-2 and

13  I just -- this one page is what I'm going to be --

14      MR. MINER:  Okay.

15      MS. SHIH:  -- showing to the witness.

16      MR. MINER:  Uh-huh.

17      MS. SHIH:  I'm handing the witness what's been marked as

18  General Counsel Exhibit 124.

19                          **REDIRECT EXAMINATION**

20  Q    BY MS. SHIH:  Does that photograph show an example of what

21  the safety strap on an EOCC unit looks like?

22  A    Yes.

23  Q    Who is responsible for securing that strap on the unit?

24  A    The person that's working in that rail car.

25  Q    And there's generally, I think you testified yesterday,

1  two people working on each rail car.  Is that right?

2  A    Yes.

3  Q    And on the day in question, the day you were fired, that

4  was you and Brian.  Is that right?

5  A    Yes.

6  Q    Did you think Brian had already secured the strap on the

7  EOCC unit that day, when you got on the forklift?

8  A    Correct.

9  Q    What else did you think that Brian had already done with

10  the EOCC unit that did not now need to be done by you?

11  A    I understood that he had completed the entire process,

12  because one person can complete the entire process, but they

13  can't lower it, bring it down.

14  Q    And by entire process, you're referring to the steps that

15  you described earlier when Mr. Miner questioned you?

16  A    Yes.

17        THE INTERPRETER:  I called you Meyer.  Sorry.

18  Q    BY MS. SHIH:  Was Brian terminated on May 30th?

19  A    No.

20  Q    Do you know whether he was terminated at all for not

21  securing the strap on the EOCC unit on May 30th?

22  A    He continued working.

23  Q    Do you know any other employees who moved an EOCC unit

24  without securing the strap, who were not fired?

25  A    I know of no one.

1  Q    You know of no one who moved a unit without securing the

2  strap and continued to work?

3  A    Could you please repeat the question?  I can't understand

4  it.

5  Q    Let me rephrase the question.  I think all the negatives

6  are confusing.  Do you know of any other employees who moved an

7  EOCC unit without securing the strap?

8  A    Yes.

9  Q    How often did you observe other employees move an EOCC

10  unit without securing the strap?

11  A    In my mind, there are two occasions in which I saw that,

12  two employees.

13  Q    Who were they?

14  A    Carlos Amaraz (phonetic) and Andalon.  That's his last

15  name.

16  Q    When did you observe Carlos move an EOCC strap -- or

17  excuse me, an EOCC unit without securing the strap?

18  A    It was in the month of April.

19  Q    And was Carlos terminated?

20  A    No.

21  Q    The other employee you referred to, I believe, was Mr.

22  Andalon?

23  A    Yes.

24  Q    When did you observe Mr. Andalon move an EOCC unit without

25  securing the strap?

1   A    In the month of April.

2   Q    Was Mr. Andalon fired?

3   A    No.

4   Q    On either of those occasions, are you aware whether the

5   piston discharged from the EOCC unit?

6   A    No.

7        JUDGE LAWS:  No, you're not aware, or, no, the piston did

8   not discharge?

9        THE WITNESS:  No.  The nitrogen has got out.

10  Q    BY MS. SHIH:  On which of those occasions did that happen?

11  A    When Carlos Amaraz discharged it.

12       THE INTERPRETER:  And may the interpreter request a

13  clarification of the word the way he's using discharge?

14       JUDGE LAWS:  Sure.

15       THE WITNESS:  Okay.  Discharge it.

16       JUDGE LAWS:  Okay.

17       THE INTERPRETER:  Okay.

18  Q    BY MS. SHIH:  And you said that happened the month before

19  you were fired?

20  A    Yes.

21  Q    Do you still have in front of you what's been marked as

22  Respondent's Exhibit 1?

23       JUDGE LAWS:  Don't --

24       THE WITNESS:  Yes.

25  Q    BY MS. SHIH:  I believe you testified that, when you

1   signed page one of this document, there was no handwriting

2   above where the signatures are?

3   A    That's correct.

4   Q    Under the heading of subjects on page one, do you

5   understand what's written in that space?

6   A    Not entirely.

7   Q    What portion of that writing do you understand?

8   A    The last line here, where it says --

9        JUDGE LAWS:  Equipment --

10       THE WITNESS:  -- "equipment of daily inspection set".

11  That, I do understand.

12  Q    BY MS. SHIH:  I'm handing you what has been admitted as r

13  Respondent's Exhibit 4.  You testified earlier that you saw

14  that document when you met with Mr. Valenzuela.  Is that right?

15  A    Yes.

16  Q    Did you -- when you received this document, did you

17  receive it in English?

18  A    Just the way it is, yes.

19  Q    Did you ever receive a copy of this document in Spanish?

20  A    I don't recall ever having -- it was always in English.

21  Q    Did anyone translate this document into Spanish with you

22  when you met them?

23  A    No.

24  Q    Do you understand everything on this document, as it's

25  written, in English?

1   A     I have an idea of what the document as such is.

2   Q     The third item listed under key competency is safety.  Do

3   you understand what follows the word safety?

4   A     Yes.

5   Q     Can you read in Spanish what that says?

6   A     Well, it says security.

7   Q     But I'm talking about after the word safety.

8   A     Demonstrate understanding of daily safety practices.

9   Q     Can you finish the rest of that category of safety?

10  A     Dress and maintain personal equipment as required and

11  comply with and maintain all requirements as far as cleaning.

12  Q     Are you able to do the same with this entire document?

13  A     There are words I don't understand.  I want to say

14  something.

15        JUDGE LAWS:  Not without a question pending.  I'm sorry.

16  Q     BY MS. SHIH:  Handing you what's been admitted as

17  Respondent's Exhibit 5, did you ever receive a copy of that

18  document in Spanish?

19  A     No.

20  Q     Did you ever receive a copy of the employee handbook in

21  either English or Spanish?

22  A     No.

23  Q     I'm handing you what's been admitted as Respondent's

24  Exhibit 6.  Did you ever receive a copy of that document in

25  Spanish?

1   A    No.

2   Q    At the time that Mr. Valenzuela met with you to inform you

3  that you were being terminated --

4       THE INTERPRETER:  Go ahead.

5   Q    BY MS. SHIH:  -- did he translate that document for you

6  into Spanish?

7   A    No.

8       MS. SHIH:  Your Honor, may I have a brief moment?

9       JUDGE LAWS:  Sure.

10      MS. SHIH:  Just a couple of very brief additional

11  questions.

12      JUDGE LAWS:  Go ahead.

13   Q   BY MS. SHIH:  Directing you back to this photograph, is

14  the strap required to be welded to the EOCC unit?

15   A   Yes.

16   Q   And who is responsible for welding the strap?

17   A   The person that --

18      THE INTERPRETER:  May I request -- okay.  Thank you.

19      THE WITNESS:  The person who discharges the nitrogen.

20   Q   BY MS. SHIH:  And that's what you thought Brian had done

21  that day on May 30th?

22   A   Yes.

23      MS. SHIH:  Your Honor, move for admission of General

24  Counsel 124.

25      MR. MINER:  I don't think I have a copy of that.

1      MS. SHIH:  It's the -- it came out of Respondent's 2.  And

2   I mean, we can certainly make photocopies of it, but it's that

3   page.

4      MR. MINER:  Yeah.  I'd like a copy of that.  Thank you.

5      JUDGE LAWS:  Any objection, assuming you get a copy?

6      MR. MINER:  Assuming that I get a copy, Your Honor, no

7   objection.

8      JUDGE LAWS:  That will be admitted.

9   **(General Counsel Exhibit Number 124 Received into Evidence)**

10     MS. SHIH:  No further questions.

11     JUDGE LAWS:  Okay.  Any recross?

12     MR. MINER:  Thank you.  Just one question, please.

13     JUDGE LAWS:  Sure.

14                  **<u>RECROSS-EXAMINATION</u>**

15  Q    BY MR. MINER:  You testified about a coworker whose last

16  name is Andalon?

17  A    Yes.

18  Q    Is this employee's first name Everaldo?

19  A    Everaldo.

20  Q    Everaldo?

21  A    Yes.

22     MR. MINER:  Thank you.  Nothing further.

23     JUDGE LAWS:  Okay.  I want to thank you very much for

24  coming here both yesterday and today and providing your

25  testimony.  There's a rule in place for this trial and what it

1  means is that you're not to discuss the testimony you gave with

2  anybody who you know is being called as a witness or anybody

3  who has connection to the incidents in the trial that might be

4  called as a witness.

5       THE WITNESS:  That's fine.

6       JUDGE LAWS:  Okay.  Thank you.

7       MR. MINER:  Your Honor, before we go off the record --

8       JUDGE LAWS:  Sure.  You're excused.

9       MR. MINER:  I'd just like the record to reflect I'm

10  returning Mr. Silva's NLRB affidavit.

11      JUDGE LAWS:  Okay.  It is so reflected.  And it's 1:50.

12  Let's be back at 2:50.

13      MR. GIANNOPOULOS:  And Your Honor, before, could we just

14  get some stipulations in the record with --

15      JUDGE LAWS:  Yes.

16      MR. GIANNOPOULOS:  -- some documents that relate to this

17  witness?  In that way, General Counsel's 125 is a document that

18  is kind of -- it's got a handling date of May 30th, 2013, a

19  personnel action form.  And I'd like a stipulation that this

20  document came from the personnel file of Mr. Silva, who just

21  testified.

22      MR. MINER:  Yes.  So we stipulate to General Counsel 125.

23  And I think we should have plenty of copies of that.  Right?

24  **(General Counsel Exhibit Number 125 Received into Evidence)**

25      JUDGE LAWS:  Sorry.  125 is admitted.

1          MR. GIANNOPOULOS:  General Counsel's 126 is another

2     document that came from the appraisal file of Mr. Silva and it

3     is a -- it looks like it's a Spanish language appraisal that --

4     the date on the back is 10/20 of 2011.  There's a date on the

5     front that says 10/21/2011.

6          MR. MINER:  So John, if you're representing to us that

7     this is a document that we produced to you --

8          MR. GIANNOPOULOS:  Yes.

9          MR. MINER:  -- in response to a subpoena --

10          MR. GIANNOPOULOS:  Yes.

11          MR. MINER:  -- then I'll stipulate to it.

12          MR. GIANNOPOULOS:  yes.

13          MR. MINER:  Okay.

14     **(General Counsel Exhibit Number 126 Received into Evidence)**

15          MR. GIANNOPOULOS:  That is correct.

16          MR. MINER:  All right.

17          MR. GIANNOPOULOS:  And then we'll make sufficient copies

18     of 126.

19          JUDGE LAWS:  That's fine.  All right.  126 is admitted.

20          MR. GIANNOPOULOS:  127 is another document that was

21     produced pursuant to the subpoena.  And this is in the English

22     language, performance appraisal plan.  And there's a signature

23     on the back with a date of 3/30/2012.  And again, this was

24     produced pursuant to subpoena.

25          MR. MINER:  Yeah.  We'll stipulate to 127.

1    **(General Counsel Exhibit Number 127 Received into Evidence)**

2        JUDGE LAWS:  Is 127 the English of 126?

3        MR. GIANNOPOULOS:  I don't think so.

4        JUDGE LAWS:  Okay.

5        MR. GIANNOPOULOS:  I think that's a different date.

6        MR. MINER:  Different date.

7        JUDGE LAWS:  126 is in Spanish, so I did admit it.

8        MR. GIANNOPOULOS:  Yeah.

9        JUDGE LAWS:  But I'm not going to be able to read it.

10       MR. GIANNOPOULOS:  Okay.

11       JUDGE LAWS:  So I'm not sure what it's being offered for,

12   if we were not --

13       MR. GIANNOPOULOS:  And either at the break or beforehand,

14   what I'm offering it for is a -- we can translate the one, two,

15   three, four, just the categories, really, and you can obviously

16   make the rankings out.  Is that fair?

17       JUDGE LAWS:  I think so.  But why don't we have it as a

18   complete document --

19       MR. GIANNOPOULOS:  Okay.

20       JUDGE LAWS:  -- both with the English and Spanish before

21   it's part --

22       MR. GIANNOPOULOS:  Okay.

23       JUDGE LAWS:  -- of the record.

24       MR. GIANNOPOULOS:  127 is English, Your Honor, and I

25   believe Mr. Miner has stipulated to that.

1          MR. MINER:  Yes.

2          JUDGE LAWS:  127 is admitted.

3          MR. GIANNOPOULOS:  And 128 is a performance appraisal for

4    Mr. Silva with a date of October 2012.  And again, this was

5    also produced pursuant to the subpoena.

6          MR. MINER:  Your Honor, we stipulate to the authenticity

7    of the documents that were produced in response to this

8    subpoena.  Having said that, with respect to General Counsel

9    125 through 128, we do not stipulate as to the relevancy of the

10   documents.

11         JUDGE LAWS:  Okay.

12         MR. GIANNOPOULOS:  And then I have one more document, Your

13   Honor.  And this was produced pursuant to the subpoena.  This

14   is from Mr. Scaggs's personnel file.  And this is a

15   disciplinary correction action form, dated May 30th, I believe,

16   2013.  And I would seek a stipulation that this document was

17   produced pursuant to the subpoena and is from Mr. Scaggs's

18   personnel file.

19         MR. MINER:  We can stipulate to it, but we are going to

20   have a witness testifying about this.  And so rather than put

21   it in out of order now, we can put it in through our witness

22   later.

23         MR. GIANNOPOULOS:  I was thinking it would be good to have

24   kind of the Silva documents all together, at least from the

25   General Counsel's perspective.

1         MR. MINER:  I'm not going to prevent -- I'm not going

2   to --

3         MR. GIANNOPOULOS:  Sure.  Yeah.  Okay.

4         MR. MINER:  -- kick and scream over that.

5         JUDGE LAWS:  Okay.

6         MR. MINER:  But there are additional disciplinary actions

7   as well --

8         JUDGE LAWS:  That you'll be --

9         MR. MINER:  -- and our witness is going to cover all of

10  those issues.

11        MR. GIANNOPOULOS:  Okay.

12        MR. MINER:  All right.

13        JUDGE LAWS:  Okay.  And we can put it in now.

14  **(General Counsel Exhibit Number 129 Received into Evidence)**

15        MR. GIANNOPOULOS:  Okay.

16        MR. MINER:  Okay.  And I do have copies of that.

17        MR. GIANNOPOULOS:  Okay.

18        JUDGE LAWS:  Okay.

19        MR. GIANNOPOULOS:  Great.  Excellent.

20        JUDGE LAWS:  Is that everything, then?

21        MR. GIANNOPOULOS:  Yes.

22        JUDGE LAWS:  All right.  Then I'm going to hand these over

23  to you.  Well, actually, you need to make copies.  Right?

24  Before --

25        MR. GIANNOPOULOS:  Yeah.  I will make sufficient copies,

1   so it should be --

2       JUDGE LAWS:  Okay.  I'm going to give you 126 to work on --

3       MS. SHIH:  To work on during lunch.

4       JUDGE LAWS:  -- not during lunch.  No.  For hopefully the

5   next witness.  So let's -- now, it's --

6       MR. MINER:  Sorry.

7       MR. GIANNOPOULOS:  Thank you.

8       MR. MINER:  You're welcome.

9       MR. GIANNOPOULOS:  Thanks for --

10      MR. MINER:  Uh-huh.

11      JUDGE LAWS:  -- 1:55 -- or yeah.  1:55.  Let's be back at

12  -- let's be ready to go on the record at 3:00.

13  (Off the record at 1:53 p.m.)

14      JUDGE LAWS:  Come on up here.  And then it's kind of

15  behind that half-door.  And you're going to be seated on a high

16  stool.  It's a little bit makeshift in here, unfortunately.

17      MR. GONZALEZ:  That's okay.

18      JUDGE LAWS:  Let me know when you're rolling.  I'll have

19  you raise your right hand.

20  Whereupon,

21                  **GUILLERMO GONZALEZ PICO**

22  having been first duly sworn, was called as a witness herein

23  and was examined and testified as follows:

24      JUDGE LAWS:  Can you please state and spell your name for

25  the court reporter?

1        THE WITNESS:  Guillermo Gonzalez Pico.  It's G-U-I-L-L-E-

2    R-M-O.  Last name is G-O-N-Z-A-L-E-Z P-I-C-O.

3        JUDGE LAWS:  Thank you very much.

4                       **DIRECT EXAMINATION**

5    Q    BY MS. ALONSO:  Mr. Gonzalez, are you employed at

6    Greenbrier?

7    A    Yes.  I was.

8    Q    Okay.  And when did you start working at Greenbrier?

9    A    May 2010.

10   Q    Okay.  And what position did you work?

11   A    Materials department, materials handler.

12   Q    And what type of work did you do as a materials handler?

13   A    I did shipping and receiving, receive materials, ship out

14   materials, inspect materials, inventory, help with the order,

15   and help with the paperwork in the office.

16   Q    Now, were you one of the employees laid off in November of

17   2012?

18   A    Yes.  I was.

19   Q    Were you working overtime in the months before the layoff?

20   A    Yes.

21   Q    Okay.  And can you explain what it was like when you did

22   work overtime?

23   A    Regular working conditions.

24   Q    No.  Was it the hours that you would have worked overtime

25   -- was it at the end of the day or was it on the weekend?  How

1    was it?

2    A    It would rotate, since it was three of us on the overtime.

3    Sometimes, they didn't really need all three of us, so we would

4    rotate.  We would rotate on the overtime, so it was on and off.

5    Q    Okay.  And when you say you would rotate, are those with

6    the people in your department?

7    A    Yes.  The people in our department.

8    Q    Okay.  And who worked in the materials department?

9    A    It was Oscar, Alberto, John right before I left, and

10    material -- and myself, and the manager --

11    Q    Okay.

12    A    -- which is Keith Tarpley (phonetic).

13    Q    And who is the materials manager?

14    A    Keith Tarpley.

15    Q    Okay.  And approximately how many hours of overtime were

16    you working in a week before the layoff?

17    A    I'm going to say between four and six.

18    Q    Okay.  And you just mentioned that John started working

19    before you were laid off.  Do you remember approximately when

20    John started working in relation to the time you were laid off?

21    A    A few weeks before.

22    Q    All right.  I'm going to show you a card that's marked as

23    General Counsel's Exhibit 130.  And this is a card for the

24    sheetmetal workers with your name, Guillermo Gonzalez Pico, on

25    it.

1    A    Yes.

2    Q    Is your signature on this card?

3    A    Yes.

4    Q    Okay.  And is your handwriting on this card?

5    A    Yes.

6    Q    Okay.  Now, there's a section on the right-hand corner

7    that says initials.  Which are your initials in that section?

8    A    Yes.  Yes.  They are.  Yes.

9    Q    Okay.  And is that GG?  Those are yours?

10   A    Yeah.

11   Q    Okay.

12   A    GGs are my initials.

13   Q    All right.  Now, there's a date on this card of 11/6/12.

14   Did you sign the card this day?

15   A    Yes.  I did.

16   Q    Okay.  And who gave you this card?

17   A    I received it by -- Guillermo Murguia gave it to me.

18   Q    Okay.  And when you signed this card, what was your

19   understanding of what it meant to sign it?

20   A    It meant that I was going to be represented by a union.

21   Q    Okay.  And did you pass out any cards for the sheetmetal

22   workers?

23   A    Yes.  I did.

24   Q    All right.  Give me just a moment.  I'm going to hand you

25   what's been marked as General Counsel's 131 and 133.

1        MR. MINER:  This is 130.  Correct?

2        MS. ALONSO:  Yes.

3        JUDGE LAWS:  Thank you.

4        MS. ALONSO:  Uh-huh.

5    Q    BY MS. ALONSO:  All right.  Mr. Gonzalez, so I'm going to

6    give you General Counsel's 133, which is a card with the name

7    Alberto Salas, and 131 of General Counsel's exhibits, which is

8    a card with the name Oscar Lopez.

9    A    Uh-huh.

10   Q    Are these -- did you collect these two cards?

11   A    Yes.  I did.

12   Q    Okay.  And where were you when you gave these cards to the

13   employees?

14   A    We were in our department on the containers.  That's where

15   we usually had lunch.

16   Q    Okay.  And were the three of you together?

17   A    Yeah.

18   Q    Okay.  And when did you give them these cards?

19   A    The same day that I received mine, that I filled out mine.

20   Q    Okay.  And tell me what was said and by whom when you gave

21   Oscar and Alberto their cards.

22   A    I basically gave them the basic explanation that they

23   would -- that we were going to be represented by a union.

24   Q    Okay.

25   A    In order for them to come over, we had to sign cards for

1    us to do a voting.

2    Q    Okay.  And when you say for them to come over, do you mean

3    them, the Union, to --

4    A    The Union, yes.

5    Q    Okay.  And to come over, what did you mean by that?

6    A    That's so we can do a voting as far as to whether we

7    wanted the Union or not.

8    Q    Okay.  And did you see Oscar sign his card?

9    A    Yes.  I did.

10    Q    Okay.  And did it appear that he read the card at the time

11    that he signed it?

12    A    Yeah.

13    Q    Now, I want you to look at General Counsel's 133, the card

14    file for Mr. Salas.  Did you see Alberto sign the card?

15    A    Yes.

16    Q    Okay.  And did it appear that he read the card?

17    A    Uh-huh.

18    Q    Okay.

19        JUDGE LAWS:  Is that a yes?  I'm sorry.  We --

20        THE WITNESS:  Yes.  Yes.  I'm sorry.  Yeah.

21        JUDGE LAWS:  He can't take down uh-huh and huh-uh.

22        THE WITNESS:  All right.  That's okay.

23        JUDGE LAWS:  Thanks.

24    Q    BY MS. ALONSO:  Okay.  There are initials on Oscar Lopez's

25    card.  Did you see if Oscar put his initials on this card?

1    A    Yeah.  I thought that we had to do our own initials --

2    Q    Okay.

3    A    -- when it said initials, I thought.  So that's why each

4    of us put their own initials on there.

5    Q    All right.  Now, I want you to take a look at your card,

6    which is 130.  And is this the only union card that you signed

7    in 2012?

8    A    No.

9    Q    Okay.  What other card did you sign?

10    A    I signed another card from the previous union that they

11    were going to represent -- I think it was UFCW.

12    Q    Okay.  And when did you sign the UFCW card relative to

13    when you signed this card in front of you?

14    A    A few weeks before.

15    Q    A couple weeks before.  And do you know why it was that

16    you signed two cards?

17    A    Well, we were under the impression that we were going to

18    get represented by the same union --

19    Q    Uh-huh.

20    A    -- that we had a voting a year prior to that.

21    Q    Okay.

22    A    But they're not -- what's it called?  Jorge Martinez --

23    Q    Uh-huh.

24    A    -- thought -- I guess they came up with another union that

25    represented more towards, like, what we do as far as the job

1    that we were doing.

2    Q    Okay.

3    A    And then they changed it.  They ended up changing the

4    Union.

5    Q    All right.

6        JUDGE LAWS:  And while she's collecting her documents,

7    just let us know if you need any water.

8        THE WITNESS:  That's fine.

9        JUDGE LAWS:  I think what's sitting on my bench is a

10   little old, but you have some.

11       UNIDENTIFIED SPEAKER:  I have a bottle.  Sorry.

12       JUDGE LAWS:  That's all right.

13       THE WITNESS:  Thank you.

14   Q    BY MS. ALONSO:  Now, okay.  Now, after -- so I want to go

15   back to General Counsel's 131, which is the card with Oscar

16   Lopez's name on it, and then 133, which is the card with

17   Alberto Salas.  Now, after they filled them out, what happened

18   next?

19   A    Well, they gave them to me and I put them in my pocket.

20   Q    Okay.  And what did you do with the cards after that?

21   A    I gave them to Jorge Martinez when I had a chance.

22   Q    Okay.  All right.  Mr. Gonzalez, I want to move on to

23   another topic.  While you were working at Greenbrier, did you

24   talk to your coworkers while you were working?

25   A    Yes.  We did.

1    Q    Okay.  Now, did you talk to them -- and what are some of

2    the subjects that you and your coworkers talked about?

3    A    Pretty much --

4    Q    Give me some examples.

5    A    Examples, about family --

6    Q    Okay.

7    A    -- about the work.

8    Q    Okay.  Anything else?

9    A    We also talked about the Union.

10   Q    Okay.  And did anyone at Greenbrier ever tell you that you

11   couldn't talk about your family at work?

12   A    No.

13   Q    Okay.  Do you know if anyone ever got in trouble for

14   talking about their family at work?

15   A    No.

16   Q    While they were working?

17   A    No.

18   Q    Okay.

19        JUDGE LAWS:  No, you don't know, or no, nobody got in

20   trouble?

21        THE WITNESS:  Both.

22   Q    BY MS. ALONSO:  Okay.  Now, did you ever see employees

23   selling, like -- I'll rephrase.  Did you ever see your

24   coworkers passing out fundraisers for schools, or Girl Scout

25   cookies, or those type of things?

1   A      Yeah.  We did it all the time.

2   Q      Okay.  And can you give me some examples?

3   A      Examples like the kids, like, in chorus, they'll get,

4   like, a discount card that you can buy, you know.  They buy

5   them and you go to, like -- if you go, like, to Pizza Hut, you

6   get 10 percent off.  And we will tell the guys, "I got some

7   cards from my daughter."

8   Q      Uh-huh.

9   A      And we're okay.  As soon as I get a chance, we didn't have

10  the money in our pocket, but we actually did talk about it and

11  we did exchange.

12  Q      Okay.  And that was on work time.  Right?

13  A      Sometimes, yes.

14  Q      Okay.  And was that done -- where was that done, on the

15  facility?

16  A      Yeah.

17  Q      Okay.  Do you know if anyone was ever in trouble for

18  selling fundraisers or taking fundraisers to work?

19  A      No, not to my knowledge, no.

20         MS. ALONSO:  All right.  Your Honor, I am going to pass

21  out General Counsel's Exhibit 134 and 132.

22         JUDGE LAWS:  Okay.  Thank you.

23         MS. ALONSO:  Uh-huh.  Now, Your Honor, I'd like to get a

24  stipulation from counsel once I --

25         JUDGE LAWS:  Okay.

1          MS. ALONSO:  -- find the personnel record.  These are

2    documents that were provided to us in the employee personnel

3    file.

4    (Counsel confer)

5          MS. ALONSO:  So Alberto Salas --

6          MR. MINER:  Uh-huh.

7          MS. ALONSO:  -- is Exhibit 134.

8          MR. MINER:  Uh-huh.  We'll stipulate to the authenticity

9    of General Counsel 134.

10          JUDGE LAWS:  Okay.  Thank you.

11    **(General Counsel Exhibit Number 134 Received into Evidence)**

12          MS. ALONSO:  And Exhibit 132, counsel, the document,

13    personnel file.

14    (Counsel confer)

15          MR. MINER:  And we'll stipulate to General Counsel 132 as

16    well.

17    **(General Counsel Exhibit Number 132 Received into Evidence)**

18          JUDGE LAWS:  Thank you.  And as with the documents

19    introduced yesterday, are these being offered solely for

20    signature comparison purposes?

21          MS. ALONSO:  Yes, Your Honor.

22          JUDGE LAWS:  All right.  Then I will admit those for that

23    purpose only.

24          MR. MINER:  All right, Your Honor.  And I move for the

25    admission of General Counsel's Exhibit 130, 131, 132, and 133,

1    and 134.

2        MR. MINER:  We've already stipulated to 134, Your Honor,

3    but --

4        JUDGE LAWS:  Okay.

5        MR. MINER:  -- I would like to take a look, please, at the

6    originals of the cards.

7        MS. ALONSO:  Sure.  And I think the witness has them.

8        THE WITNESS:  They're right here.

9        MR. MINER:  Thank you.

10       JUDGE LAWS:  Just let us know when you're ready.

11       MR. MINER:  Thank you.  Thank you.  And may I briefly voir

12   dire the witness, Your Honor?

13       JUDGE LAWS:  Sure.  And which documents are  you --

14       MR. MINER:  I'd like to take a look at General Counsel

15   Exhibit 130 first --

16       JUDGE LAWS:  Okay.

17       MR. MINER:  -- if I may approach the witness.

18       JUDGE LAWS:  Yes.  And I don't have a copy of that, so I

19   am going to --

20       MS. ALONSO:  130, Your Honor.

21       JUDGE LAWS:  Yes.

22       MS. ALONSO:  I have an extra.

23       JUDGE LAWS:  Thanks.

24       MS. ALONSO:  Or I can hand those back to him.

25       MR. MINER:  Thank you.

1      JUDGE LAWS:  Thank you.  Thanks.  I do have it.  It just

2  wasn't marked.  It had a blank number.  So here.  Let me -- I

3  pen-and-inked it in.

4      MS. ALONSO:  All right.

5      JUDGE LAWS:  There you go.

6      MR. MINER:  Thank you, Your Honor.

7                    **VOIR DIRE EXAMINATION**

8  Q    BY MR. MINER:  Just very briefly taking a look at General

9  Counsel Exhibit 130 --

10 A    Uh-huh.

11 Q    -- next to your initials, in the upper right-hand corner,

12 the GG on the card --

13 A    Uh-huh.

14 Q    Do you see two letters next to those?

15 A    Yes.

16 Q    What are they?

17 A    The initials for Jorge Martinez, the one that -- the guy

18 that I turned in the cards to.

19 Q    It says JM?

20 A    Yeah.

21 Q    Okay.  And did you observe Jorge Martinez make those marks

22 on the card?

23 A    Yes.

24 Q    He wrote that in your presence?

25 A    Uh-huh.

1    Q    Same question about General Counsel 131?

2    A    Yes.

3    Q    Jorge Martinez put his initials on that card?

4    A    Yes.  Yes.  He did.

5    Q    You saw him do it?

6    A    Uh-huh.

7    Q    And the same question regarding General Counsel 133?

8    A    Yes.

9    Q    You saw him put his initials on the card?

10   A    Yes.  I did.

11   Q    Nobody else wrote anything on this card other --

12   A    No.

13   Q    -- than Jorge Maldonado and Alberto Salas?

14   A    Yeah.

15        MR. MINER:  No objection to General Counsel 130, 131, or

16   133.

17        JUDGE LAWS:  Those are admitted.

18   **(General Counsel Exhibit Number 130, 131, and 133 Received into**

19   **Evidence)**

20        MS. ALONSO:  And Your Honor, I have no further questions

21   for the witness.

22        JUDGE LAWS:  Okay.  Any cross-?

23        MR. MINER:  Yes.  Thank you, Your Honor.

24                          **CROSS-EXAMINATION**

25   Q    BY MR. MINER:  All right.  Just a few questions, please --

1     JUDGE LAWS:  Sure.

2  Q    BY MR. MINER:  -- Mr. Gonzalez.  Did you meet with --

3  sorry.  Thank you for your patience.

4  A    It's all right.

5  Q    Did you provide Mr. Lopez and Mr. Salas the cards that

6  they signed at the same time?

7  A    Yeah.

8  Q    The three of you met together?

9  A    Uh-huh.

10  Q    And you spoke together about --

11  A    Yes.

12  Q    -- the cards?

13  A    Yes.  We did.

14  Q    You told them about conducting an election among the

15  sheetmetal workers?

16  A    Yeah.

17  Q    And then you observed them complete and sign the cards?

18  A    Yes.  I did.

19  Q    And you brought them back to Jorge Maldonado?

20  A    Yes.

21     MS. ALONSO:  And it's --

22     THE WITNESS:  I think it's Martinez.

23     MS. ALONSO:  -- Jorge Martinez.

24  Q    BY MR. MINER:  Martinez.

25  A    Martinez.

1  Q    I'm so sorry.  I misspoke.  Jorge Martinez.  Okay.  At the

2  time that you met with Mr. Salas and Mr. Lopez, was anyone else

3  present?

4  A    I can't remember.  I don't think so.  I think it was just

5  us three.

6  Q    And where were you at the time?

7  A    In our area, where we had lunch at the materials

8  department.  It was the containers, where they --

9  Q    What sort of containers?

10  A    They're actually railroad cars sitting on the floor --

11  Q    Uh-huh.

12  A    -- where they keep material out of the sun for smaller

13  items.

14  Q    So you're in a covered area or an area -- an outdoor area

15  with a covering on top of it?

16  A    It's a railroad car with the -- that has the doors on both

17  sides.

18  Q    Uh-huh.

19  A    It's just sitting on the floor, that we have -- they have

20  material in there.

21  Q    Were you inside of a rail car?

22  A    Yeah.  It's actually like a railroad car, yes.

23  Q    And there are walls to the car?

24  A    Huh?

25  Q    There are walls to the car?

1   A    Yeah.  And there's openings on the sides.

2   Q    Are there any windows on the car?

3   A    Windows, no.

4   Q    All right.  And the openings on the sides -- from where

5   you were with Mr. Salas and Mr. Lopez, what could you see out

6   the two openings?

7   A    You can see towards another container on the other side.

8   And then towards the -- it was a uniform trailer.

9   Q    At the time, could you observe any managers, or foremen,

10  or lead men?

11  A    I wasn't looking.

12  Q    Okay.  Did you observe any?

13  A    I didn't see none.

14       MS. ALONSO:  Objection, asked and answered.

15  Q    BY MR. MINER:  Did you discuss completing the card with

16  any lead men, or foremen, or managers?

17  A    No.  I didn't.

18  Q    And did you discuss with any lead men, or foremen, or

19  managers Mr. Salas's or Mr. Lopez's cards?

20  A    No.

21  Q    And did you discuss with any managers, or foremen, or lead

22  men that you had provided cards to Mr. Martinez?

23  A    No.

24  Q    When did you provide the cards to Mr. Martinez?

25  A    I can't recall.  It was -- we came across each other,

1    because I used to be all over their shop, delivering material

2    to other shops.  So when I saw him, I hand him over the cards.

3    Q    Was it the same day that the cards were signed?

4    A    I don't remember.

5    Q    Do you -- and again, do you remember where you were when

6    you handed him the cards?

7    A    Yes.

8    Q    Where were you?

9    A    It was actually in the back shop.  That's where he was.

10   That's where he worked, when I had a chance to go deliver

11   material out there --

12   Q    Okay.

13   A    -- and I saw him.  I just can't remember if it was the

14   same day or maybe the day after, so --

15   Q    Okay.  Where in the back shop?

16   A    The back shop?  It was, I want to say, track 6.

17   Q    Okay.  What is out there at track 6?

18   A    It's right next to the truck shop, where the truck shop

19   with the rec shop is, in the back, all the way in the back, on

20   the very back.

21   Q    At the time you handed the cards to Mr. Martinez, was

22   anyone else present?

23   A    No.

24   Q    Did you observe anyone else nearby?

25   A    There's workers all over.

1  Q    Okay.  Were there any lead men or foremen that you

2  observed?

3  A    I did not see any.  I wasn't looking.

4  Q    Did you discuss giving the cards to any lead men, or

5  foremen --

6  A    No.

7  Q    -- or managers?

8  A    No.

9  Q    Okay.  Have you ever seen a copy of the petition for an

10  election that was filed by the sheetmetal workers?

11  A    I don't remember.  I don't remember.

12  Q    You don't remember seeing a petition filed by the

13  sheetmetal workers?

14  A    I don't remember if I have or not.

15  Q    Okay.  Do you know who filed the petition?

16  A    No, not exactly.  No.  I don't.

17  (Counsel confer)

18       MR. MINER:  One moment, please, Your Honor.

19       JUDGE LAWS:  Sure.

20  (Counsel confer)

21       MR. MINER:  No other questions, Your Honor.

22       JUDGE LAWS:  Any follow-up?

23       MS. ALONSO:  I have none, Your Honor.

24       JUDGE LAWS:  Okay.  And I don't have any questions for

25  you.  I want to thank you for coming in this afternoon.  And

1    there's a rule at this trial that's in place.  And what it

2    means is, you're not to share your testimony, discuss your

3    testimony, with any other witnesses or anybody who could be

4    called as a witness.

5         THE WITNESS:  Okay.  That's fine.

6         JUDGE LAWS:  Okay.  Thank you very much.

7         THE WITNESS:  No, not a problem.  Thank you.

8         JUDGE LAWS:  Thank you.

9         MR. MINER:  Have a good one.

10        THE WITNESS:  You, too.

11        JUDGE LAWS:  All right.

12        MS. SHIH:  Can we have a few minutes?

13        JUDGE LAWS:  Sure.  Do we have another witness lined up?

14        MS. SHIH:  I think that's what we're going to be

15   discussing.

16        JUDGE LAWS:  Okay.  Let's go off the record.

17   (Off the record at 3:30 p.m.)

18        JUDGE LAWS:  We had an off-the-record discussion about how

19   to deal with a couple of different outstanding issues, the

20   first being the audio recordings of, I think, some of the

21   speeches that Mr. Lave gave, or talks.

22        And Mr. Miner indicated they're somewhat lengthy, so

23   because we're wrapping up a little early today, they are going

24   to go listen to them tonight and decide whether they have any

25   issues with the authenticity of the recordings or any other

1    issues and get in touch with the General Counsel if there are

2    problems with the recording and if Mr. Lave is going to need to

3    be recalled in order to be questioned about the recordings.

4    The other thing we discussed is with regard to General

5    Counsel's Exhibit 81, which I did admit, but it is now going to

6    be replaced.  It was what was purported to be the English

7    version of an employee satisfaction survey, which is in

8    Spanish, which appears at Exhibit 80.

9        Our interpreter identified some disconnects in the

10    translation, so she is going to prepare a word-for-word

11    translation from Spanish to English in the order the questions

12    appear on General Counsel Exhibit 80.  And that is going to

13    replace General Counsel Exhibit 81.  Is there anything else I

14    forgot to talk about?

15        MS. SHIH:  I don't believe so.

16        JUDGE LAWS:  Okay.  And with that, we have some witnesses

17    lined up tomorrow.  And we will begin at 8:30.

18    **(Whereupon, the hearing in the above-entitled matter was**

19    **recessed at 3:56 p.m. until Friday, November 15, 2013 at 8:30**

20    **a.m.)**

21

22

23

24

25

1                    <u>C E R T I F I C A T I O N</u>

2    This is to certify that the attached proceedings before the

3    National Labor Relations Board (NLRB), Region 28, Case Numbers

4    28-CA-093183, 28-CA-103909, 28-CA-104184, 28-CA-106613, 28-CA-

5    111186, 28-RC-093179, Gunderson Rail Services LLC, d/b/a

6    Greenbrier Rail Services, and Sheetmetal Workers' International

7    Association, Local 359, AFL-CIO at the Pima County Consolidated

8    Justice Court, 160 N. Stone Avenue, Third Floor, Courtroom 11,

9    Tucson, Arizona 85701, Arizona 85701, on Thursday, November 14,

10   2013, at 8:57 a.m., was held according to the record, and that

11   this the original, complete, and true and accurate transcript

12   that has been compared to the reporting or recording,

13   accomplished at the hearing, that the exhibit files have been

14   checked for completeness and no exhibits received in evidence

15   or in the rejected exhibit files are missing.

16

17

18

19                    GRANT C. DAYLEY

20                    Official Reporter

21

22

23

24

25

## UNITED STATES OF AMERICA

### BEFORE THE NATIONAL LABOR RELATIONS BOARD

### REGION 28

In the Matter of:

GUNDERSON RAIL SERVICES LLC,      Case No. 28-CA-093183
D/B/A GREENBRIER RAIL                       28-CA-103909
SERVICES,                                           28-CA-104184
                                                        28-CA-106613
and                                                 28-CA-111186

SHEETMETAL WORKERS'
INTERNATIONAL ASSOCIATION
LOCAL 359, AFL-CIO,

GUNDERSON RAIL SERVICES LLC,      Case No. 28-RC-093179
d/b/a GREENBRIER RAIL
SERVICES,

                    Employer,

and

SHEETMETAL WORKERS'
INTERNATIONAL ASSOCIATION
LOCAL 359, AFL-CIO,

                    Petitioner.

The above-entitled matter came on for hearing, pursuant to

notice, before **ELEANOR LAWS,** Administrative Law Judge**,** at the

National Labor Relations Board, Pima County Consolidated

Justice Court, 160 N. Stone Avenue, Third Floor, Courtroom 11,

Tucson, Arizona 85701, on **Friday, November 15, 2013, at 8:40**

**a.m.**

<u>A P P E A R A N C E S</u>

**On behalf of the General Counsel:**

    **EVA SHIH, ESQ.**
    **JOHN GIANNOPOULOS, ESQ.**
    NATIONAL LABOR RELATIONS BOARD - REGION 28
    2600 North Central Avenue, Suite 1400
    Phoenix, AZ 85004-3099
    Tel.  602-640-2090
    Fax.  602-640-2178

    **SOPHIA ALONSO, ESQ.**
    NATIONAL LABOR RELATIONS BOARD
    421 Gold Avenue, SW, Suite 310
    P.O. Box 567
    Albuquerque, NM  87103
    Tel.  505-248-5128
    Fax.  505-248-5134

**On behalf of the Respondent:**

    **FREDERICK C. MINER, ESQ.**
    **STEVEN G. BIDDLE, ESQ.**
    LITTLER MENDELSON, P.C.
    Camelback Esplanade
    2425 E. Camelback Road, Suite 900
    Phoenix, AZ 85016
    Tel.  602-474-3653
    Fax.  602-391-2836

## I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---------|--------|-------|----------|---------|-----------|
| Marissa C. Almazan | 898 | | | | |
| Ricardo Martinez | 926 | 933 | | | 932 |
| Alan Lave | 940 | | | | |

## E X H I B I T S

| EXHIBIT | IDENTIFIED | IN EVIDENCE |
|---------|------------|-------------|
| **General Counsel:** | | |
| GC-135 | 905 | 905 |
| GC-137 | 908 | 908 |
| GC-139 | 912 | 912 |
| GC-140 | 912 | 912 |
| GC-141 | 912 | 912 |
| GC-142 | 913 | 913 |
| GC-143 | 917 | 917 |
| GC-144 | 919 | 919 |
| GC-145 | 920 | 920 |
| GC-146 | 921 | 921 |
| GC-147 | 923 | 923 |
| GC-148 | 924 | 924 |
| GC-149 | 929 | 933 |
| GC-150 | 940 | 940 |

1                    <u>P R O C E E D I N G S</u>

2        JUDGE LAWS:  Can you please raise your right hand.

3   Whereupon,

4                    <u>MARISSA C. ALMAZAN</u>

5   having been duly sworn, was called as a witness herein and was

6   examined and testified as follows:

7        JUDGE LAWS:  Can you please state and spell your name.

8        THE WITNESS:  My name is Marissa C. Almazan, and that's M-

9   A-R-I-S-S-A.  Middle initial C. A-L-M-A-Z-A-N.

10       JUDGE LAWS:  Thank you very much.

11       MS. SHIH:  Thank you.

12                    <u>DIRECT EXAMINATION</u>

13   Q    BY MS. SHIH:  Good morning, Ms. Almazan.  I appreciate you

14   being here today.

15   A    Good morning.

16   Q    Where are you currently employed?

17   A    I am currently employed with Intermountain Staffing.

18   Q    And what's your position with Intermountain Staffing?

19   A    Branch manager.

20   Q    And how long have you held that position?

21   A    I've been in the branch manager position four years, one

22   year assistant branch manager.

23   Q    And can you describe a little bit what your

24   responsibilities are as branch manager?

25   A    Well, the entire operations of what we do as a business,

1    we go out, we recruit companies that we could place temporary

2    staff at.   We recruit the staff for said companies depending on

3    what their needs are.

4    Q    And are your staff limited to a particular industry or

5    primarily employed in a particular industry?

6    A    We do light industrial.

7    Q    And what geographic area do you have responsibility for?

8    A    The City of Tucson.

9    Q    And as part of your branch manager's responsibilities were

10   you involved in providing temporary staff employees to

11   Greenbrier Rail Services at its Tucson facility?

12   A    Yes, ma'am, we were.

13   Q    Did you provide temporary employees to Greenbrier Rail

14   Services at any of its other facilities?

15   A    No, ma'am, we did not.

16   Q    When did Intermountain Staffing first begin placing

17   temporary employees with Greenbrier in Tucson?

18   A    I want to say it was approximately April of 2010.

19   Q    And in what positions did those temporary employees serve

20   at Greenbrier?

21   A    Clerical, certified welders, helpers, painters.

22   Q    Any others?

23   A    I believe that's all.

24   Q    Any mechanics?

25   A    Actually, yes, ma'am.

1  Q    Does Intermountain Staffing currently have any temporary

2  employees working at the Greenbrier facility in Tucson?

3  A    No, ma'am.

4  Q    When did Intermountain last have temporary employees

5  working at the Greenbrier facility in Tucson?

6  A    I don't have an accurate date, but I want to say it was

7  either the beginning to the middle of October.

8  Q    Of 2013?

9  A    Of -- yes, ma'am.

10 Q    Do you know who the last employee was that performed any

11 work at Greenbrier through Intermountain Staffing?

12 A    I know a couple of the individuals that we sent in.  Do

13 you want their names?

14 Q    Yes, if you have them.

15 A    Eristro Herrera, Nicolasa Payar, Juliette Berial and

16 Miramar Garcia.

17 Q    And what were their positions?

18 A    They were asked to come in and help to box up said

19 belongings of Greenbrier.

20 Q    Can you describe what the process is for recruiting and

21 placing a temporary employee specifically with Greenbrier Rail

22 Services of Tucson?  And this is during the 2012-2013 time

23 frame.

24 A    Well, the normal process would be that we would be

25 contacted by the HR department.

1    Q    And that's of Greenbrier?

2    A    That's correct.  Requesting welders, painters, whatever

3    position they needed to have filled, they would call us, ask us

4    to recruit those individuals.

5    Q    And who specifically did you receive that call from?

6    A    My main contact at that time was Margarita Madrigal.

7    Q    And after that was it Christina Martinez?

8    A    Actually my communication and interaction with Christina

9    was very limited.  It was more Lisa Maxey --

10   Q    Okay.

11   A    -- that I took direction from.

12   Q    Okay.  And so after Greenbrier contacted you with a

13   specific position or a specific number of positions that they

14   were seeking assistance to fill, what was your next step?

15   A    Then we would actively either post or search for the type

16   of individual that they were looking for.  Either

17   Careerbuilders, Craigslist, Arizona Workforce, word of mouth.

18   We would bring those individuals in.  We would interview them,

19   make sure that we had all the credentialing that was asked and

20   required by Greenbrier.  Then we would send all of that

21   information over to Greenbrier.  They would contact us,

22   schedule an interview.  And if that candidate fit what they

23   were looking for, then they would contact us and let us know to

24   go ahead in regards to the placement process.

25   Q    When you would first meet with the temporary employee to

1  determine whether that person may be someone that you could

2  refer to Greenbrier, did they complete any type of employment

3  application?

4  A    Yes, they did.

5  Q    And was that an Intermountain Staffing application or a

6  Greenbrier application?

7  A    Actually, they have to register with our agency first

8  because they are essentially Intermountain's employees.  And

9  then a part of the hire package that we included was a

10  Greenbrier application.

11  Q    What else was part of the hire package that was specific

12  to Greenbrier?

13  A    Just the application.

14  Q    Just the application.  And is this an application for

15  employment that someone from Greenbrier furnished to

16  Intermountain Staffing to use?

17  A    Can you ask that question again?

18  A    The Greenbrier application for employment is that a

19  document that someone from Greenbrier furnished to you or to

20  other employees at Intermountain Staffing to use with the

21  temporary employees who came in?

22  A    That's correct.

23  Q    Now is that something that you already had at your offices

24  in case an employee came in who was a suitable candidate or is

25  that something you requested from Greenbrier for a specific

1  candidate to complete?

2  A    It was something that we offered to anybody that was

3  applying for a position within that organization.

4  Q    Was there any time when anyone from Greenbrier sent you an

5  updated or revised application for employment to use with

6  candidates?

7  A    Not that I'm aware of.

8  Q    Did anyone from Intermountain Staffing sit in on

9  interviews between the candidates and employees of Greenbrier

10  or representatives of Greenbrier?

11  A    No.

12  Q    Did Intermountain Staffing have any of its own employees

13  present at the Greenbrier facility who supervises work of the

14  Intermountain Staffing employees there?

15  A    Can you state that again?

16  Q    Did Intermountain Staffing have any employees, its own

17  employees, present at the Greenbrier facility to supervise the

18  work of the Intermountain Staffing temps who were assigned to

19  Greenbrier?

20  A    No.

21  Q    Who supervised the work of the Intermountain Staffing

22  employees that were assigned to Greenbrier while they were

23  there?

24  A    Greenbrier's supervisors and leads.

25  Q    I'm handing you what's been marked as General Counsel 135

1  which looks to be an Intermountain Staffing policies and

2  procedures checklist.  Is this required of every individual who

3  registers with Intermountain Staffing?

4  A    That's correct.

5  Q    What other documents are required to be completed by

6  individuals who register with Intermountain Staffing?

7  A    Safety, harassments, authorization for drug tests, typical

8  tax forms.

9  Q    I-9 forms?

10  A    I-9 E-verification.

11  Q    And the only additional item that's required to be

12  completed by an individual who is going to be assigned to

13  Greenbrier is the Greenbrier application for employment?

14  A    That's correct.

15  (Counsel confer)

16     MS. SHIH:  I'm handing the witness what's been previously

17  admitted as General Counsel Exhibit 31.

18  Q    BY MS. SHIH:  Do you recognize that as the Greenbrier

19  application for employment that you provided to Intermountain

20  Staffing employees to complete before they were referred to

21  Greenbrier?

22  A    That's correct, ma'am.

23  Q    Okay.

24     MS. SHIH:  Move for admission of General Counsel 135.

25     JUDGE LAWS:  Any objection?

1      MR. MINER:  No objection, Your Honor.

2      JUDGE LAWS:  135 is admitted.

3   **(General Counsel Exhibit Number 135 Received into Evidence)**

4      MS. SHIH:  Your Honor, I just realized as I'm marking this

5   exhibit that there is a column that includes individual social

6   security numbers so I'm going to go ahead and use these copies

7   so that everyone has a document in front of them, but I will be

8   providing redacted --

9      JUDGE LAWS:  Before we admit.

10      MS. SHIH:  -- versions before we actually admit it.

11      JUDGE LAWS:  Okay.

12  (Counsel confer)

13  Q    BY MS. SHIH:  I'm handing you what's been marked as

14  General Counsel 136.  Can you tell me what this document is?

15  A    This is an internal form that is produced by Intermountain

16  data base system, and this is an assignment register.  These

17  are all of the individuals that were assigned as field

18  employees to Greenbrier Rail Service.

19  Q    And is it specifically during the date range that's listed

20  at the top of January 1, 2010 through September 16, 2013?

21  A    That's correct.

22  Q    So it includes all employees that performed any work at

23  Greenbrier during that time frame?

24  A    That's correct.

25      MS. SHIH:  And we will move for admission of General

1    Counsel 136 with the redacted field of the social security

2    number.

3         JUDGE LAWS:  All right.  And once that is redacted, will

4    there be any objection?

5         MR. GIANNOPOULOS:  And, Your Honor, I think the record

6    should reflect that the witness is represented by counsel today

7    and counsel is present.

8         JUDGE LAWS:  That is accurate so that can be reflected.

9         MR. MINER:  We have no objection to General Counsel 136

10   assuming the redaction of the social security numbers for the

11   individuals listed there.

12        JUDGE LAWS:  Okay.  Then once that has happened, we can

13   just go ahead and admit it at that time.

14        MS. SHIH:  Thank you, Your Honor.

15   Q    BY MS. SHIH:  I'm handing you what's been marked as

16   General Counsel 137.

17        JUDGE LAWS:  And before you ask a question following up on

18   the General Counsel's comment, I do want to note counsel is not

19   questioning the witness, but I should probably have you

20   identify yourself just for the record.

21        MR. NAGY:  Thank you, Judge.  I'm Tibor Nagy, and I'm with

22   the law firm of Ogletree Deakins, and I represent Intermountain

23   Staffing.

24        JUDGE LAWS:  And my guess is you're going to want a

25   spelling.

```
 1          THE COURT REPORTER:  Yes.

 2          MR. NAGY:  T-I-B-O-R.

 3          THE COURT REPORTER:  Can --

 4          MR. NAGY:  T-I-B-O-R.  Nagy, N-A-G-Y.

 5          JUDGE LAWS:  Thank you.

 6    Q     BY MS. SHIH:  Ms. Almazan, can you identify what's been

 7    handed to you as General Counsel Exhibit 137?

 8    A     It looks similar to what you handed me prior without the

 9    social security numbers on it.  It's also an assignment

10    register.

11    Q     And is it the assignment register for the same date range

12    as the document you previously looked at that's been identified

13    as General Counsel 136?

14    A     Well, I don't think I can answer that correctly since I

15    don't see on this one where the date start to the date end.  I

16    mean --

17    Q     Did you generate the document that's marked 137?

18    A     No, I did not.

19    Q     I'm now handing you what's been marked as General Counsel

20    138, which appears to be a statement addressed to Greenbrier

21    Rail Services.  Can you explain what this document or statement

22    is?

23    A     Well, the statement is something that reflects from week

24    to week what we're billing Greenbrier for services provided.

25    Q     And that's for any and all employees of Intermountain that
```

1  were working at Greenbrier during those weeks?

2  A    Yes, ma'am, that's correct.

3  Q    So it includes not only welders and painters, but also

4  clerical individuals as well?

5  A    Yes, ma'am, that's correct.

6        MS. SHIH:  Move for admission of General Counsel 138.

7        MR. MINER:  No objection, Your Honor.

8        JUDGE LAWS:  138 is admitted.

9  **(General Counsel Exhibit Number 138 Received into Evidence)**

10 Q    BY MS. SHIH:  Did you -- did Intermountain Staffing have

11 any employees working at Greenbrier on November 12th, 2012?

12 A    I don't think I can accurately -- what's the date again?

13 Q    November 12th, 2012.

14       JUDGE LAWS:  And answer without looking at any paper

15 unless you're instructed to do so.  So if --

16       THE WITNESS:  Then I don't think --

17       JUDGE LAWS:  -- if we could have exhibits shown when

18 they're going to be asked questions about it and otherwise not

19 have them in front of the witness.

20       MS. SHIH:  Sure.  I'll take that.

21       JUDGE LAWS:  That's been my instruction from the get go.

22       THE WITNESS:  I don't think I can accurately answer that

23 question.

24 Q    BY MS. SHIH:  Do you recall hearing about or did you hear

25 about a large layoff or discharge of employees from Greenbrier

1    Rail Services Tucson facility in November of 2012?

2    A    The only thing I can attest to is that there was a release

3    of our field employees.

4    Q    You had field employees, Intermountain Staffing field

5    employees, who were working at Greenbrier that were released in

6    November 2012?

7    A    I believe so.

8    Q    How many?

9    A    I wouldn't be able to give you an accurate answer on that.

10   Q    At the time -- do you recall if it was more than one?

11   A    I could say more than one.

12   Q    More than five?

13   A    I can't accurately answer that.  I don't know how many

14   employees I had at that time.

15   Q    At the time that you had those employees released, were

16   there any Intermountain Staffing employees assigned to

17   Greenbrier who continued to work at Greenbrier?

18   A    I can't accurately answer that.

19   Q    I'm handing you what's been marked as General Counsel

20   Exhibit 139.  Do you recognize this email exchange?

21   A    Yes, I do.

22   Q    Do you know who I assume it's Mr. Valencia is?

23   A    I know exactly who that is.

24   Q    What type of work did he perform at Greenbrier?

25   A    He was a welder.

1 Q    And he was working at the Greenbrier facility as of the

2 date on this email?

3 A    I believe so.

4 Q    I'm handing you what's been marked as General Counsel 140.

5 Do you recognize that email?

6 A    Yes, I do.

7 Q    Is the question posed in Ms. Martinez's email to you -- or

8 excuse me -- the statement Alcides --

9 A    Uh-huh.

10 Q    -- is that a reference to the same Mr. Valencia that's

11 referenced in General Counsel 139?

12 A    That's correct.

13     MS. SHIH:  I'm going to be handing the witness what's been

14 previously admitted as General Counsel Exhibits 33 and 34.

15     JUDGE LAWS:  Okay.

16 Q    BY MS. SHIH:  Do you recognize those email exchanges?

17 A    Yes, ma'am, I do.

18 Q    And did you, in fact, provide Greenbrier with any of the

19 candidates requested in those emails during the time frame of

20 October and November 2012?

21 A    Yes, we did.

22 Q    I'm handing you what's been marked as General Counsel

23 Exhibit 141.  Do you recognize that as an invoice sent to

24 Greenbrier for employees who performed work there for the week

25 ending March 17, 2013?

1    A    Yes.

2    Q    Was it Intermountain Staffing's practice to invoice

3    Greenbrier on a weekly basis?

4    A    That's correct.

5    Q    Are these the only two employees that performed work at

6    Greenbrier for the week ending March 17, 2013?

7    A    Well, according to the invoice, those are the only two

8    individuals that we were billing for.

9    Q    What position did Michael Downing work in at Greenbrier?

10   A    Mr. Downing was an industrial maintenance technician.

11   Q    And he was hired directly by Greenbrier after the date on

12   this invoice?

13   A    Actually, that was the way that they initially wanted to

14   go with Mr. Downing, but it turned out to be that he was

15   actually placed on assignment rather than a direct hire.

16   Q    Through Intermountain Staffing?

17   A    That's correct.

18   Q    How long did he remain on assignment through Intermountain

19   Staffing with Greenbrier?

20   A    I can't accurately give you that information.  I don't

21   know.

22   Q    That's information that would be contained in the

23   assignment register that you identified earlier?

24   A    That's correct.

25        MS. SHIH:  Just so I don't lose track of anything, I'm

1  going to go ahead and move for admission of General Counsel

2  139, 140 and 141.

3       MR. MINER:  No objection to 139.  No objection to 140.  No

4  objection to 141.

5       JUDGE LAWS:  Those are admitted.

6  **(General Counsel Exhibit Number 139 through 141 Received into**

7  **Evidence)**

8  Q    BY MS. SHIH:  I'm handing you what's been marked as

9  General Counsel 142.  Do you recognize that email?

10 A    Yes, I do.

11 Q    And it lists the hours for Michael Downing and Mr.

12 Valencia provided to you by Greenbrier for the week prior to

13 April 9, 2013?

14 A    That's correct.

15 Q    Was that the practice that Greenbrier would provide

16 Intermountain Staffing with information about the number of

17 hours worked by Intermountain Staffing employees at its

18 facility?

19 A    That's correct.

20 Q    Was Mr. Valencia made a Greenbrier employee effective

21 April 15, 2013?

22 A    Well, according to the email, it is stated that they were

23 going to make it.  I had no communication after the fact.

24 Q    What was the practice if Greenbrier wanted to hire

25 directly one of the Intermountain Staffing employees that was

1    assigned to its facility?

2    A    If they wanted to hire directly?

3    Q    Correct.  Or if they wanted to hire them as their own

4    employee.

5    A    Well, as per the contractual agreement that Intermountain

6    held with Greenbrier, we were -- they would be able to hire

7    those said individuals after they met the contractual agreement

8    of 480 hours.

9    Q    Was there any provision in the contract for hiring an

10    employee without having that -- the 480-hour requirement?

11    MR. MINER:  I'm sorry, Your Honor, I thought she said 180

12    and now you've asked about 480.

13    MS. SHIH:  Oh, I apologize.  I thought she said 480.

14    THE WITNESS:  I did say 480.

15    MR. MINER:  I misunderstood.  My apologies.

16    THE WITNESS:  That's okay.

17    MS. SHIH:  I'll repeat my question.

18    Q    BY MS. SHIH:  Was there any provision in the contract that

19    would allow Greenbrier to hire an Intermountain Staffing

20    employee before that person met the 480-hour requirement?

21    A    No.

22    MS. SHIH:  Move for admission of General Counsel 142.

23    MR. MINER:  No objection.

24    JUDGE LAWS:  142 is admitted.

25    **(General Counsel Exhibit Number 142 Received into Evidence)**

1   Q    BY MS. SHIH:  I'm handing you what's been marked as

2   General Counsel 143.  Do you recognize that email from Ms.

3   Martinez?

4   A    I do.

5   Q    Did you provide Ms. Martinez with any candidates in

6   response to this email requesting a mechanic?

7   A    I don't think I can accurately answer that question.

8   Q    Was it your practice to provide candidates in response to

9   a request from Greenbrier seeking to fill a particular

10  position?

11  A    Yes.

12  Q    Was there any time that you didn't provide candidates in

13  response to a request for -- to fill a specific position?

14  A    Yes.

15  Q    Did you provide any candidates in response to this request

16  to fill a mechanic's position?

17  A    I can't accurately answer that.

18  Q    Do you -- is it because you don't recall or is it

19  because --

20  A    It's because I don't recall.

21  Q    Do you have any reason to believe that you didn't provide

22  any candidates in response to that request?

23       MR. MINER:  Objection, Your Honor, this has been asked and

24  answered.

25       JUDGE LAWS:  She says she doesn't know.

1    Q    BY MS. SHIH:  I'm handing you back what's been previously

2    admitted as General Counsel Exhibit Number 136.  If you could

3    take a look at the entries for Michael Downing.

4        Mr. Downing's been identified on two lines on that

5    document.  The first being a maintenance mechanic and the

6    second being maintenance.  Does that refresh your recollection

7    at all as to whether or not Intermountain Staffing provided any

8    candidates to Greenbrier in response to their request for --

9    request to fill a mechanic position?

10   A    Well, Mr. Downing was hired as an industrial maintenance

11   technician.

12   Q    Okay.  Why does --

13   A    So --

14   Q    -- can you explain why the first line indicates his job

15   title as maintenance mechanic?

16   A    Because, unfortunately, we didn't have a prompt that said

17   industrial maintenance.

18   Q    What -- can you explain why it then changes to maintenance

19   on the second line?

20   A    I don't know how to accurately answer that.  Actually,

21   what took place was that I originally set the order, as you can

22   see, for a $1,200 charge because it was going to go in as a

23   direct hire.  I actually had to cancel that order and replace

24   the order as a active employee on assignment.  So that's just

25   kind of how that job description popped up when I placed that

1    said order.

2    Q    So did Mr. Downing ever perform work for Greenbrier as a

3    mechanic?

4    A    I can't accurately answer that question.

5    Q    You don't know what work Mr. Downing was performing at

6    Greenbrier while he was employed by Intermountain Staffing?

7    A    I know he was hired as an industrial maintenance

8    technician.

9    Q    Has Intermountain Staffing ever had mechanics on

10   assignment with Greenbrier?

11   A    Yes.

12   Q    If you take a look at General Counsel 136, the first name

13   on there, Rene Acevedo, is identified as a maintenance

14   mechanic.  Was he assigned at Greenbrier as a mechanic?

15   A    Yes.

16   Q    Looking at page 3 of the same document, Raul Salazar his

17   job title is listed as maintenance mechanic.  Was he assigned

18   at Greenbrier as a mechanic?

19   A    Yes.

20   Q    And the same question on page 4 for Frank Soto.

21   A    Yes.

22   Q    So is Mr. Downing the only one who's listed as a

23   maintenance mechanic but was not assigned as a mechanic?

24   A    Correct.

25        MS. SHIH:  Move for admission of General Counsel 143.

1       MR. MINER:  It appears that the attachment to the email is

2  out of order, page 2 comes before page 1; but apart from that,

3  I have no objection to General Counsel 143.

4       JUDGE LAWS:  Okay.  Let's go ahead then and get that in

5  the correct order.  The email can be page 1, the first page of

6  the attachment page 2, the second page of the attachment page

7  3.

8       THE COURT REPORTER:  Which one is this?

9       JUDGE LAWS:  143.  And with that change in the order, it's

10  admitted.

11  **(General Counsel Exhibit Number 143 Received into Evidence)**

12  Q    BY MS. SHIH:  Did you ever offer candidates to Greenbrier

13  unsolicited like not in response to a specific request?

14  A    Yes.

15  Q    How often did you do that?

16  A    I don't think I can accurately answer that.  If I happened

17  to find a diamond in the rough and I knew it fit the profile as

18  to what they did as a company, I would put that candidate in

19  front of them.

20  Q    So when you sent candidates to Greenbrier, if you can

21  estimate the percentage of how often it was in response to a

22  request versus how often it was just unsolicited, what would be

23  your estimate?

24  A    I don't think I can accurately answer that.

25  Q    Fifty-fifty?

1   A    I'm -- I did maintenance calls on that facility daily.

2   Q    What do you mean by maintenance calls?

3   A    Maintenance.  How's it going?  You know, are there any

4  needs?  Are there any requests?  If I just happened to get a

5  welder to walk in the door and I knew that they would fit, I

6  would put them in front of the customer and --

7   Q    So you were in communication with Greenbrier about their

8  staffing needs on a daily basis?

9   A    Absolutely.

10  Q    I'm handing you what's been marked as General Counsel 144.

11  Is this an example of an unsolicited offer of a particular

12  candidate to Greenbrier?

13  (Witness reviews document)

14  A    I would say so.

15  Q    Did Mr. Martinez ever get placed with Greenbrier?

16  A    Yes, he did.

17  Q    Do you know when he worked at Greenbrier?

18  A    Can't give you an accurate date.

19  Q    Was it after your email or before?

20  A    Before.

21  Q    Before?

22  A    Correct.

23  Q    Was he placed at Greenbrier after your email?

24  A    No.

25  Q    He was not.  Was he interviewed?

1    A    No.

2    Q    Ms. Martinez's email to you on March 14th requests an

3    interview with Mr. Martinez.  Do you know why he wasn't

4    interviewed?

5    A    Because he took another job.

6         MS. SHIH:  Move for admission of General Counsel 144.

7         MR. MINER:  No objection.

8         JUDGE LAWS:  144 is admitted.

9    **(General Counsel Exhibit Number 144 Received into Evidence)**

10        MS. SHIH:  Handing the witness what's been marked as

11   General Counsel 145.

12        That would have to be marked.  Let me just write the

13   number on it very quickly for you.

14   Q    BY MS. SHIH:  Do you recognize that email exchange?

15   A    Yes.

16   Q    And is this the Michael Downing that performed work at

17   Greenbrier you said as an industrial -- I apologize.  What was

18   the position you referred to?

19   A    Industrial maintenance.

20   Q    Industrial maintenance.  That's the same individual?

21   A    That's correct.

22   Q    And is this another example of an offer of a candidate

23   unsolicited to Greenbrier?

24   A    That was actually a request of Greenbrier.  They were

25   looking to place an industrial maintenance.

1    Q    When did you learn of that request from Greenbrier?

2    A    I can't answer that correctly.

3    Q    Typically, how quickly did you respond to requests from

4    Greenbrier to fill specific positions?

5    A    Immediately.

6    Q    So say you would have -- this would have been an immediate

7    response to a request to fill an industrial maintenance

8    position?

9    A    Correct.

10         MS. SHIH:  Move for admission of General Counsel 145.

11         MR. MINER:  No objection.

12         JUDGE LAWS:  That's admitted.

13    **(General Counsel Exhibit Number 145 Received into Evidence)**

14    Q    BY MS. SHIH:  I'm handing you what's been marked as

15    General Counsel 146.

16    A    Thank you.

17    Q    Do you recognize this email exchange?

18    A    Yes.

19    Q    This was an exchange that you had with Christine Martinez

20    after Greenbrier made the decision to bring Mr. Downing on as a

21    temporary employee?

22    A    That's correct.

23    Q    Can you clarify what you testified about earlier when you

24    said initially the intention was to bring Mr. Downing on as a

25    direct hire?  I believe that was your testimony from earlier.

1    A      That's correct.

2    Q    Is that right?  Can you explain what happened in terms of

3    the hiring of Mr. Downing?

4    A    I don't know what Greenbrier determined -- what the

5    determining factor was that made them decide to bring him in as

6    a temp as opposed to a direct hire.

7    Q    So was it prior to this email exchange of March 22nd that

8    you were first informed that Greenbrier's intention was to

9    bring him on as a direct hire?

10   A    Can you say that again?

11   Q    Was it before this email exchange of March 22nd that you

12   were told Greenbrier intended to bring him on as a direct hire?

13   A    Correct.

14   Q    Okay.  So prior to this email exchange, that intention

15   changed?

16   A    Correct.

17   Q    Was anything communicated to you as to the reasons that

18   intention changed?

19   A    No.

20        MS. SHIH:  Move for admission of General Counsel 146.

21        MR. MINER:  No objection.

22        JUDGE LAWS:  That's admitted.

23   **(General Counsel Exhibit Number 146 Received into Evidence)**

24        JUDGE LAWS:  And just to check in, how much longer do you

25   think you have on direct?

```
 1        MS. SHIH:  Probably just a few more minutes.

 2        JUDGE LAWS:  Okay.  Let's finish it up then and then we

 3   can take a break.

 4        MR. MINER:  Thank you.

 5        MS. SHIH:  I'm sorry.

 6        MR. MINER:  Thank you.

 7   Q    BY MS. SHIH:  I'm handing you what's been marked as

 8   General Counsel 147.

 9        JUDGE LAWS:  Bless you.

10        THE WITNESS:  Can I grab a tissue, ma'am?

11        JUDGE LAWS:  Absolutely.  Here.  Go ahead and open it.

12        THE WITNESS:  Thank you.

13        JUDGE LAWS:  You have water in front of you, too.

14        THE WITNESS:  Thanks.

15        MS. SHIH:  Just signal when you're ready.

16        THE WITNESS:  I'm ready.

17   Q    BY MS. SHIH:  Do you recognize this email from Ms.

18   Martinez?

19   A    Yes.

20   Q    Mr. Valencia was taken off of Intermountain Staffing's

21   payroll as of April 15, 2013?

22   A    According to the email, yes.

23   Q    Did he work for Intermountain Staffing again after April

24   15, 2013?

25   A    No.
```

1     MS. SHIH:  Move for admission of General Counsel 147.

2     MR. MINER:  No objection.

3     JUDGE LAWS:  147 is admitted.

4     **(General Counsel Exhibit Number 147 Received into Evidence)**

5     Q    BY MS. SHIH:  I'm handing you what's been marked as

6     General Counsel 148.  Are you familiar with Juan Morales?

7     A    The name rings familiar.

8     Q    Let me back up and ask you a little bit of -- a background

9     question.  Intermountain Staffing had individuals, employees,

10    who worked at Greenbrier during different times; is that right?

11    So for example, a single employee who was on assignment at

12    Greenbrier left, and then perhaps was assigned to Greenbrier

13    again at a later time.

14    A    That's correct.

15    Q    When that would happen, and this is specifically with

16    Greenbrier, were they required to complete an application for

17    employment with Greenbrier a second time if they had previously

18    been assigned to Greenbrier?

19    A    No.

20    Q    And that's because they already had an application on

21    file?

22    A    That's correct.

23    Q    Did they have to re-register with Intermountain Staffing?

24    A    No.

25    MS. SHIH:  Move for admission of General Counsel 148.

```
 1        MR. MINER:  No objection.

 2        JUDGE LAWS:  148 is admitted.

 3   (General Counsel Exhibit Number 148 Received into Evidence)

 4        MS. SHIH:  And if I could just have a minute?

 5        JUDGE LAWS:  Sure.

 6        MS. SHIH:  I have no further questions.

 7        JUDGE LAWS:  Okay.  Then I -- it's 9:40.  Why don't we

 8   take ten minutes, and we can come back for any questions from

 9   the Respondent.

10        MR. MINER:  Thank you, Your Honor.

11   (Off the record at 9:39 a.m.)

12        MR. MINER:  Thank you, Your Honor.  We have no questions

13   for the witness at this time, but we certainly reserve the

14   right to call her as part of the Company's case.

15        JUDGE LAWS:  Very well.  Then one thing I do need to tell

16   you is there is something called a sequestration order

17   governing this hearing, and what it means is you're not to

18   discuss your testimony with any other witnesses that you know

19   who are testifying or anybody connected to the events in this

20   case that may be called to testify.

21        THE WITNESS:  Yes, ma'am.

22        JUDGE LAWS:  Okay.  Thank you.

23        THE WITNESS:  That it?

24        JUDGE LAWS:  That's it.

25        THE WITNESS:  Thank you.
```

1          MS. SHIH:  Thank you.

2          MR. MINER:  Thank you very much.

3          MR. GIANNOPOULOS:  Thank you very much.

4          THE WITNESS:  Thank you, sir.

5          MR. GIANNOPOULOS:  Pleasure --

6          JUDGE LAWS:  And then let's discuss --

7          MR. MINER:  Tibor, thank you.

8          JUDGE LAWS:  -- the next witness.  I notice there is

9    somebody waiting, correct?

10          MS. SHIH:  There was, and I believe while we were planning

11    for her cross-examination, he may have stepped away briefly.

12          JUDGE LAWS:  Do we want to get him on before Mr. Lave

13    who's probably going to be --

14          MS. SHIH:  Yes.

15          JUDGE LAWS:  -- somewhat lengthy?  Okay.

16          MS. SHIH:  We do.

17          JUDGE LAWS:  Why don't we find him then?

18          MS. SHIH:  So I think it will probably just, hopefully, be

19    a few minutes.

20          JUDGE LAWS:  Sure.  Okay.  Let's -- since he may have

21    stepped outside, let's go off the record and we'll find him and

22    get him on the stand.

23    (Off the record at 9:55 a.m.)

24          JUDGE LAWS:  Can you raise your right hand.

25    Whereupon,

1                          **RICARDO MARTINEZ**

2   having been duly sworn, was called as a witness herein and was

3   examined and testified as follows:

4        JUDGE LAWS:  Please have a seat and if you could state and

5   spell your name for the court reporter, please.

6        THE WITNESS:  Ricardo Martinez.

7        JUDGE LAWS:  Do you need the spelling or can you get that

8   one?

9        THE REPORTER:  I got it.

10       JUDGE LAWS:  All right.  Whenever you're ready.

11       MS. SHIH:  Thank you, Your Honor.

12                      **DIRECT EXAMINATION**

13  Q    BY MS. SHIH:  Mr. Martinez, did you work for Greenbrier

14  Rail Services in Tucson?

15  A    Yes.

16  Q    What were the dates approximately that you worked for

17  Greenbrier?

18  A    The dates?

19  Q    Do you remember when you started working for Greenbrier?

20       JUDGE LAWS:  It doesn't have to be precise.

21       THE WITNESS:  No.

22  Q    BY MS. SHIH:  Was it in 2012?

23  A    Yes.

24  Q    And when you first started working at Greenbrier, were you

25  working for Greenbrier or were you working for a staffing

1    company?

2    A    A staffing company.

3    Q    Was that Intermountain Staffing?

4    A    Intermountain Staffing.

5    Q    So you started at Greenbrier through Intermountain

6    Staffing?

7    A    Yes.

8    Q    How long did you work at Greenbrier for Intermountain

9    Staffing?

10   A    Four months.

11   Q    Four months.  And then were you hired on by Greenbrier?

12   A    Yes.  After four months, Greenbrier hired me.

13   Q    And how long did you work for Greenbrier before you were

14   terminated?

15   A    I worked for them two-and-a-half months.  Two-and-a-half

16   months more besides the four that I worked for Staffing.

17   Q    And you were terminated on November 12 --

18   A    Yes.

19   Q    -- 2012?

20   A    Yes.

21   Q    So you'd worked for Greenbrier or worked at Greenbrier for

22   about six-and-a-half months --

23   A    Yes.

24   Q    -- before you were let go?

25   A    Uh-huh.  Yes.

1    Q    And if you could just -- for the court reporter, if you

2    can let me finish my question before you answer, we'll get a

3    clearer transcript.

4    A    Okay.

5    Q    Thank you.  Did you work for Greenbrier at any other time

6    besides 2012?

7    A    No.

8    Q    You didn't work at Greenbrier in 2013?

9    A    No.

10   Q    What did you do when you were working at Greenbrier?

11   A    I used to take care of a lot of the roads, do the

12   maintenance, painting, run into town and pick up material for

13   them, as a driver.

14   Q    Did you work on any of the railcars?

15   A    No.

16   Q    What was your job title when you worked for Greenbrier?

17   A    Maintenance.

18   Q    Maintenance.  Who was your supervisor at Greenbrier?

19   A    Freddy Valdez.

20   Q    And was he your supervisor when you were working through

21   Intermountain Staffing?

22   A    Yes.

23   Q    Did anything about your job at Greenbrier change when you

24   converted from Intermountain Staffing to being a Greenbrier

25   employee?

1    A    No, not that I recall.  No.

2    Q    Did your pay rate change?

3    A    Just my pay rate changed.

4    Q    Did it go up?

5    A    Yes.

6    Q    You continued to work under Freddy Valdez?

7    A    Yes.

8    Q    When you first were brought on at Greenbrier through

9    Intermountain Staffing, do you remember completing a Greenbrier

10   application for employment?

11   A    A Green (sic) application?  Can't remember.

12   Q    Do you remember ever completing a Greenbrier application?

13   A    Yes.

14   Q    Do you remember when?

15   A    After I -- well, I started for Intermountain Staffing; and

16   after four months, I had to do an application for Greenbrier

17   for when I went on for their company.

18   Q    Okay.

19        MS. SHIH:  Grant, can you give us our next exhibit number?

20   I'm sorry.

21        THE COURT REPORTER:  149.

22        MS. SHIH:  149.  Thank you.

23   **(General Counsel Exhibit Number 149 Marked for Identification)**

24   Q    BY MS. SHIH:  When you worked for Greenbrier, did anyone

25   ever approach you to talk about bringing in a union?

1   A    Yes.

2   Q    When did that happen?

3   A    I can't remember what day it was.

4   Q    I'm handing you what's been marked as General Counsel

5   Exhibit 149.  Can you tell me if you recognize that?

6   A    Yes, this is my writing right here.

7   Q    That's your writing on the card?

8   A    Yes.

9   Q    Is there any writing on that card that does not belong to

10  you?

11  A    The initials on the top.

12  Q    The top right corner?

13  A    On the right side.

14  Q    Do you know whose handwriting that is?

15  A    No, I don't.

16  Q    Is that your signature on the card?

17  A    Yes.

18  Q    Who gave you this card?

19  A    I can't remember the name of the person that gave it to

20  me, but I signed it and I gave it back to him.

21  Q    Where were you when you were given this card?

22  A    I was at Greenbrier at the front shop.

23  Q    You were at work?

24  A    Yes, I was working.

25  Q    The individual who gave you the card, do you know what his

1   job was?

2   A    He was doing maintenance also.

3   Q    What did he tell you when he gave you this card?

4   A    This was for to join the union.

5   Q    I'm sorry.  Could you repeat that?

6   A    To join the union.

7   Q    And is that what you understood it meant when you signed

8   this card?

9   A    Yes.

10  Q    Was that the first time anyone at Greenbrier spoke to you

11  about trying to bring in a union?

12  A    Yes.

13  Q    And were you in support of the idea of bringing in a

14  union?

15  A    Yes.

16  Q    Is that your handwriting under the date -- where the date

17  is, November 7th, 2012?

18  A    Yes.

19  Q    Is that the actual date that you signed the card?

20  A    Yes.

21  Q    And did you sign it as the person who gave it to you was

22  standing there with you?

23  A    Yes.

24  Q    Do you know what he did with the card?

25  A    He took it back to the person that's, I guess, in charge

1    of the -- that was the head leader of the organization of this.

2    Q    Did you see him do that?

3    A    What do you mean did I --

4    Q    Did you see him hand the card to somebody else?

5    A    No, I didn't.

6    Q    How do you know that's what he did with the card?

7    A    Because he told me when he got back that he had taken it

8    to the guy that was in charge of getting all these back.

9    Q    And the printed writing on the card is Spanish.  Do you

10   read Spanish?

11   A    Yeah.  Yes, I do.

12        MS. SHIH:  Move for admission of General Counsel 149.

13        MR. MINER:  Your Honor, may I voir dire the witness?

14        JUDGE LAWS:  Yes.

15                    **VOIR DIRE EXAMINATION**

16   Q    BY MR. MINER:  Is all the writing on General Counsel 149

17   your handwriting?

18   A    On this card right here?

19   Q    Correct.

20   A    Yes.

21   Q    In the upper right-hand corner, it appears there's some

22   initials.  Do you see that?

23   A    Yes, I do.

24   Q    Are those your initials?

25   A    No, sir.

1          MS. SHIH:  Objection, Your Honor, he's already testified

2    that those were -- that's not his handwriting.

3          JUDGE LAWS:  He did on direct.

4          MR. MINER:  I'm sorry.

5    Q    BY MR. MINER:  And you don't know the name of the

6    individual who wrote his initials?

7    A    No.

8          MR. MINER:  Okay.  No objection.

9          JUDGE LAWS:  149 is admitted.

10   **(General Counsel Exhibit Number 149 Received into Evidence)**

11         MS. SHIH:  I have no further questions for this witness.

12         MR. MINER:  Just a couple I think, Your Honor.

13         JUDGE LAWS:  Sure.

14         MR. MINER:  First, is there an affidavit for this witness?

15         MS. SHIH:  There is not.

16         MR. MINER:  Okay.

17                           **CROSS-EXAMINATION**

18   Q    BY MR. MINER:  Mr. Martinez, as of November 7th, 2012,

19   were you an employee of Greenbrier or still employed by

20   Intermountain Staffing?

21   A    Greenbrier.

22   Q    So this was after you completed an application and were

23   hired by Greenbrier?

24   A    Yes.

25   Q    At the time you completed the application, did you

1    complete any other paperwork for Greenbrier?

2    A    The insurance paper that the company, you know, issues

3    you.

4    Q    Okay.  How about an I-9 form?  Do you remember completing

5    an I-9 when you became a Greenbrier employee?

6    A    I can't remember.

7         MS. SHIH:  Objection.  Relevance.

8         MR. MINER:  Well, we've been asked about what changed when

9    he became a Greenbrier employee from being an Intermountain

10   Staffing employee.

11        JUDGE LAWS:  Okay.  You know, I will allow some follow up

12   on that as regards to what steps you needed to take.  Your

13   immigration status is not at issue at this hearing so you don't

14   need to worry about that.

15   Q    BY MR. MINER:  I'm simply asking about whether you

16   completed various forms.  Did you complete an income tax

17   withholding form?

18   A    Yes, I did.

19   Q    Do you recall any other forms that you completed?

20   A    I don't.

21   Q    Did you participate in any meetings?

22   A    Well, every Monday is safety meetings.

23   Q    Okay.  Do you know who Maggie Madrigal is?

24   A    Maggie Madrigal the one that was in human resource?

25   Q    That's correct.  Yes?

1   A      Yes.

2   Q      Did you meet with Maggie Madrigal and go through an

3   orientation program with her?

4   A      Yes.

5   Q      Did you do that after you completed your application for

6   Greenbrier?

7   A      Yes.

8   Q      What did she tell you during the orientation?

9   A      Well, she just put some videos on, and the video just

10  talked about safety.

11  Q      All the videos were about safety?

12  A      Well, yeah.  The orientation that we had it was about

13  safety.

14  Q      Got you.  Did she talk to you about your benefits during

15  that meeting?

16  A      No.

17  Q      Prior to signing the card, General Counsel Number 149, did

18  you speak with any managers or foremen about the sheetmetal

19  workers?

20  A      No.

21  Q      How about after signing the card?

22  A      No, I didn't.

23  Q      Did you wear any bin -- pins or buttons or hats --

24  A      No.

25  Q      -- with sheetmetal workers' logo on it --

1   A     No.

2   Q     -- before or after signing the card?

3   A     No.

4   Q     When you were at work at the Tucson shop, did you see any

5   other employees wearing any sheetmetal worker insignia on pins

6   or hats or shirts?

7   A     No.

8   Q     When you signed the card, General Counsel 149, were there

9   any foremen present at the time?

10  A     No.

11  Q     Any lead men present?

12  A     No.

13  Q     Any managers present that you were --

14  A     No.

15  Q     -- aware of?

16  A     No.

17  Q     Again, did you discuss the card with any managers or

18  supervisors?

19  A     No.

20        MR. MINER:  Just a moment, please, Your Honor.

21  Q     BY MR. MINER:  I think you testified that you signed the

22  card in the front shop, correct?

23  A     Yes.

24  Q     And the individual who gave you the card gave it to you in

25  the front shop?

1    A    Yes.

2    Q    You signed the card and you returned it to him?

3    A    Yes.

4    Q    Do you recall what time of day it was?

5    A    I can't remember what time it was.

6    Q    Was it during a break period?

7    A    It was during working hours.

8         MR. MINER:  No other questions, Your Honor.  Thank you.

9         JUDGE LAWS:  Okay.  Any follow up?

10        MS. SHIH:  No, Your Honor.

11        JUDGE LAWS:  All right.  And I just have one question for

12   you to make sure that something is clear as to timing.  When

13   Ms. Madrigal showed you the safety videos during the

14   orientation, was that after you were hired by Greenbrier or was

15   that when you came on at Greenbrier through Intermountain?

16        THE WITNESS:  It was after and when I turned into

17   Greenbrier employee.

18        JUDGE LAWS:  You went through the same --

19        THE WITNESS:  Yes.

20        JUDGE LAWS:  -- the same thing twice?

21        THE WITNESS:  Uh-huh.  Yes.

22        JUDGE LAWS:  Okay.  All right.  Well, if there's nothing

23   further, then I want to thank you for providing your testimony

24   here today.  There's a rule in place that means you're not to

25   discuss your testimony with any other witnesses or anyone who

1    could be called as a witness in this case.

2        THE WITNESS:  Okay.

3        JUDGE LAWS:  Thank you.

4        MS. SHIH:  Your Honor, if we may have a few minutes with

5    this witness before he leaves.

6        JUDGE LAWS:  To take care of paperwork?

7        MS. SHIH:  Yes.

8        JUDGE LAWS:  Sure.

9        MR. GIANNOPOULOS:  And actually, Your Honor, do you think

10    we could maybe get 15 minutes.  I was kind of -- I thought we'd

11    have a stipulation this morning.  Just for the logistics of

12    getting things ready to play, et cetera.  We might have to set

13    up some computers around --

14        JUDGE LAWS:  Oh, okay.  So Mr. Lave is next?

15        MS. SHIH:  Yes.

16        MR. GIANNOPOULOS:  I think so.  So is that okay?

17        JUDGE LAWS:  That's fine.

18        MR. GIANNOPOULOS:  All right.

19        JUDGE LAWS:  Yep, we'll get things set up.

20        MR. GIANNOPOULOS:  I didn't bring my Bose headphones for

21    everyone.

22    (Off the record at 10:16 a.m.)

23        JUDGE LAWS:  All right.  We're back after early lunch

24    break.  We've discussed the order of witnesses through next

25    Wednesday with the only relative uncertainty being Mr. Torra.

1    And with that we have Mr. Lave back on the stand, and he is

2    going to be testifying about -- listening to some recordings

3    and testifying about them.

4         Mr. Lave, you've been sworn in a few times now.

5         THE WITNESS:  Yes.

6         JUDGE LAWS:  You -- I want to remind you you are still

7    under oath --

8         THE WITNESS:  Yes.

9         JUDGE LAWS:  -- throughout the remainder of this

10   proceeding.

11        THE WITNESS:  Thank you, Your Honor.

12        MS. SHIH:  Actually before we get into the recordings, I'd

13   like to offer what's been marked as General Counsel 150 to Mr.

14   Lave and I don't have copies of this.  It's -- I'll give it to

15   you so I'll let you take a look at that.

16        JUDGE LAWS:  And I want to give you back 136.  That's the

17   document that had social security numbers on it.

18        MS. SHIH:  Oh, thank you.

19        JUDGE LAWS:  I want to make sure nobody walks off with any

20   of those.

21        MS. SHIH:  Okay.

22   Whereupon,

23                          **<u>ALAN LAVE</u>**

24   having been previously duly sworn, was called as a witness

25   herein and was examined and testified as follows:

1                         <u>**DIRECT EXAMINATION**</u>

2    Q    BY MS. SHIH:  I'm handing you what's been marked as

3    General Counsel Exhibit 150.  Do you recognize that document as

4    the employee handbook of Greenbrier Rail Services?

5    A    Yes, I do.

6    Q    That's the employee handbook that was in effect at the

7    Tucson facility in 2012?

8    A    Yes.

9    Q    And 2011 as well?

10   A    Yes.

11   Q    And in 2013?

12   A    Yes.

13   Q    It's the employee handbook that was effective at all of

14   the Greenbrier Rail Services facilities throughout the United

15   States?

16   A    Correct.

17        MS. SHIH:  Move for admission of General Counsel 150.

18        MR. MINER:  No objection.

19        JUDGE LAWS:  150 is admitted.

20   **(General Counsel Exhibit Number 150 Received into Evidence)**

21        MS. SHIH:  And we'll make copies.

22        JUDGE LAWS:  Okay.

23        MS. SHIH:  At this time, I'm giving to Mr. Miner a CD

24   that's been marked as General Counsel Exhibit 151.  It contains

25   two audio recordings.  One of a October 31st, 2012 meeting and

1    one of a June 28th, 2013 meeting.

2        MS. SHIH:  Your Honor, do you need it?

3        JUDGE LAWS:  I don't need one.

4        MS. SHIH:  Okay.

5        JUDGE LAWS:  As long as it's going to be played.

6        MS. SHIH:  I'm also handing to the witness what's been

7    marked as General Counsel 152 which is the transcript we

8    prepared of the October 31, 2012 recording, which is the first

9    one that we'll be listening to.

10       MR. MINER:  Your Honor, I don't know if this is the

11   appropriate time to do it, but I am going to be -- or I'd like

12   to make an objection on the record regarding an audio tape or

13   what we're being told is an audio tape of an October 31st, 2012

14   meeting.  We've not had any testimony by the individual who

15   made the recording.  We haven't had any testimony about the

16   chain of custody of the recording.  There's no reliability,

17   quite frankly, regarding the completeness and accuracy of the

18   audio that we're going to be hearing.

19       I understand that Mr. Lave is going to be asked to

20   identify his voice or possibly other voices on the recording.

21   We object to the presentation of the audio recording to the

22   extent that it hasn't been established to be full, complete and

23   accurate.  We also object to the surreptitious recording of a

24   meeting that was attended solely by and intended solely for the

25   participation of statutory supervisors and non-employees.

1    There certainly was an expectation of privacy and

2   confidentiality around this meeting by Greenbrier and Mr. Lave

3   in particular.  He can testify about that fact.  But for the

4   surreptitious recording by an individual apparently at this

5   meeting to be introduced at this hearing, again, without any

6   foundation, is just improper so we object on that basis as

7   well.

8    JUDGE LAWS:  All right.  And I will allow the General

9   Counsel to respond.  I do want to state, before he does

10  respond, that we did discuss this briefly off the record.  You

11  know, certainly admissibility is going to be dependent on

12  whether the tapes are authenticated, whether chain of custody

13  is established.  All the usually prerequisites.

14    I don't see that there's any harm in having them played

15  and me reserving ruling on their admissibility.  I'm certainly

16  not going to be prejudiced by them.  It would be a different

17  case, perhaps, if I were a jury.  I'm not.  I can sort all of

18  this out without having sort of prejudice concern.  You know,

19  with regard to tape recordings, the Board's case law is clear

20  that they're generally admissible in Board proceedings, even if

21  they're made without knowledge or consent of parties to the

22  conversation and, in fact, even they violate state law.

23    So, you know, if there's some sort of privilege that's

24  being asserted, I would entertain that.  I would need the

25  prerequisites of the privileged law and all of the things that

1  are required of the party asserting the privilege.

2      MR. GIANNOPOULOS:  If I could answer for the government,

3  Your Honor, again, Mr. Lave was at this meeting.  He certainly

4  can authenticate his voice.  He was a participant.  He can

5  testify as to who was there.  The federal case law is clear

6  that with voice authentication you can have tapes played in

7  court, et cetera.  And with respect to some sort of expectation

8  of privacy in these proceedings, first of all, the issue of the

9  leads, whether they're supervisors or not, is something that's

10  in dispute in this proceeding.

11      And second, we are also using this tape, particularly the

12  October 31st tape, to attack the credibility of Mr. Lave,

13  because he testified the first time he was here as to what he

14  said and was said at that meeting.  And we believe the tapes

15  will show something opposite on a few of the questions that he

16  answered.  So with respect to any kind of expectation of

17  privacy that may have occurred at the meeting, Mr. Lave

18  testified under oath as to what was said and what we heard, and

19  we believe these tapes will show the opposite in a couple of

20  instances.  So there's certainly is no privilege in that

21  respect.

22      JUDGE LAWS:  All right.  You know, my ruling -- what I

23  stated before, you responded, will stand.  You know, we can

24  proceed.  The tapes will need to be properly authenticated in

25  order to be admissible.  And any claim of privilege would need

1    to be supported.

2    Q    BY MS. SHIH:  Mr. Lave, I'm going to be playing portions

3    of the audio recording that's been identified as General

4    Counsel Exhibit 151, the October 2012 file of General Counsel

5    151.  Before you is General Counsel 152, which is a written

6    transcript of that recording, and I'd like you to follow along

7    as we listen to portions of the recording and I'll point out

8    the time stamps as well of the portions that I'm playing.  I'm

9    actually going to start at the time stamp of 11:01 from the

10   October 31, 2012 recording.

11        MR. MINER:  Your Honor, I'd ask that we listen to the

12   whole tape, and I think it may be helpful not just for all of

13   us, but for Mr. Lave to hear what there is of the tape to at

14   least understand what context there is to better help him

15   identify his voice and the voices of others, and answer other

16   questions he gets from General Counsel.

17        JUDGE LAWS:  To me that makes sense.  Is there any reason

18   that that shouldn't happen from the General Counsel's

19   standpoint?

20        MS. SHIH:  No, Your Honor, we're happy to play the entire

21   recording.  Obviously we have questions at different portions

22   and I think it makes sense that we can stop it at portions when

23   there are appropriate questions, and then continue it.  I want

24   to let you know in advance this recording is an hour and eight

25   minutes.

1         JUDGE LAWS:  Okay.  I think that's fine.  I think it's the

2    best way to go for a couple of reasons, you know, one, because

3    it's going to help me understand the full context of the

4    meeting.  Secondly, it is hopefully going to negate any

5    potential issues with regard to the correctness of General

6    Counsel 152.  If we have a court reporter transcribing it, I

7    think that would be the official transcript of this meeting,

8    and we wouldn't have issues around that.  And actually I want

9    to correct myself.  It wouldn't be the official transcript of

10   the meeting.  It would be the transcript of the recording of

11   the meeting.

12        MR. MINER:  Thank you, Your Honor.

13        MS. SHIH:  The transcript that we prepared reflects, and

14   the recording reflects, about three minutes of background noise

15   while the recording had been started, but the meeting had not

16   yet begun.  Do you have any objection to us beginning at 3:08

17   or do you want to listen to the entire recording?

18        MR. MINER:  No, we don't have to listen to the background

19   noise.

20        MS. SHIH:  Then I'm going to start it and then move it

21   forward to --

22        JUDGE LAWS:  3:08?

23        MS. SHIH:  3:08.

24   (Audio begins at 12:09 p.m.)

25        MS. SHIH:  And this is the beginning of 3:08.

1       MR. MINER:  Can you turn it down a little bit?

2       JUDGE LAWS:  Yeah, it's a little loud.

3       MR. MINER:  Thanks.

4       MS. SHIH:  I'm stopping it at four minutes.

5   Q   BY MS. SHIH:  Mr. Lave, do you recognize the voice of the

6   individual who introduced you?

7   A   Yes, I do.

8   Q   Who was that?

9   A   Lex Morrison.

10  Q   That was the plant manager in Tucson at the time of this

11  meeting?

12  A   Correct.

13  Q   Which was held on October 31, 2012?

14  A   Correct.

15  (Audio begins at 12:11 p.m.)

16  Q   BY MS. SHIH:  Mr. Lave, do you recognize your voice on

17  that recording?

18  A   Parts of it sounded like my voice.

19  Q   Just before I stopped the recording that was you speaking,

20  correct?

21  A   I heard something like CSX and getting out of my car, fill

22  ramp, that part sounded like me.

23      MS. SHIH:  And just for the record, I stopped it at 6:42.

24  Q   BY MS. SHIH:  That's your voice speaking, just prior to me

25  stopping it at 7:32?

1   A    Correct.  We talked about taking about 30 minutes, yeah,

2   that was me.

3   Q    That's you.  Thank you.

4   (Audio begins at 12:15 p.m.)

5        MS. SHIH:  And just to confirm, I'm stopping the recording

6   at 9:40.

7   Q    BY MS. SHIH:  That's still your voice speaking on the

8   recording, correct?

9   A    Correct.

10  (Audio begins at 12:17 p.m.)

11       MS. SHIH:  I'm stopping the recording at 12:08.

12  Q    BY MS. SHIH:  Mr. Lave, that's still you speaking on the

13  recording?

14  A    Yes.

15  Q    I'm actually going to back it up to 11:01 and ask you a

16  few questions about your statements, so I'll back it up to

17  11:01 and play it up to where I just stopped it.

18  (Audio begins at 12:20 p.m.)

19  Q    BY MS. SHIH:  You stated during this meeting that we have

20  to assume, Lex and I, we have to assume that UTU or other some

21  union may come back here very quickly or may have already come

22  back now, correct?

23  A    Yes.

24  Q    You made that statement.

25       MS. SHIH:  And the recording is now at 12:09 and I'll

1    continue to play it.

2    (Audio begins at 12:22 p.m.)

3        MS. SHIH:  I'm stopping the recording at 14:37, and I'm

4    going to back up just a few seconds.

5    Q    BY MS. SHIH:  Mr. Lave, that's still you speaking on the

6    recording?

7    A    Yes.

8        MS. SHIH:  I'm actually backing it up to 14:15.

9    (Audio begins at 12:25 p.m.)

10   Q    BY MS. SHIH:  You made the statement during this meeting

11   that there's already some discussion out there in the shop

12   about trying to bring the UTU or some other union back in,

13   correct?

14   A    Correct.

15   (Audio begins at 12:25 p.m.)

16   Q    BY MS. SHIH:  That's your voice asking what are you guys

17   as leadsmen and foremen, supervisors, what are you hearing out

18   there at this point in time?

19   A    Yes.

20   Q    Thank you.

21       MS. SHIH:  I'm sorry, I stopped that at 15:05.

22   (Audio begins at 12:26 p.m.)

23       MS. SHIH:  And I just stopped it at 15:21.

24   Q    BY MS. SHIH:  Do you recognize the female voice on the

25   recording?

1   A    No, it's too difficult to interpret.

2   Q    Was Maggie Madrigal present at this meeting?

3   A    Correct.

4   Q    Do you recall any other female employees being present at

5   this meeting?

6   A    The plan accountant may have been at that meeting.

7   Q    What is her name?  Is that Cathy Villalobos?

8   A    Thank you.  Yes.  Catherine.

9   Q    Any other female employees present at this meeting?

10  A    No.

11  (Audio begins at 12:27 p.m.)

12       MS. SHIH:  I'm stopping the recording at 16:12.

13  Q    BY MS. SHIH:  There was obviously a section where there

14  with several different voices, but I want to confirm that the

15  voice on the recording at the time that I just stopped it is

16  yours.

17  A    Yes.

18  Q    Thank you.

19  (Audio begins at 12:28 p.m.)

20  Q    BY MS. SHIH:  I'm stopping it at 16:26.  You stated that

21  our philosophy at this company is we're a non-union company,

22  correct?

23  A    Correct.

24  (Audio begins at 12:28 p.m.)

25       MS. SHIH:  I'm stopping it at 18:34.

1    Q    BY MS. SHIH:  You made a statement that the company

2    promotes what you call an open-door policy of communication,

3    correct?

4    A    Yes.

5    Q    Thank you.

6    (Audio begins at 12:31)

7        MS. SHIH:  I'm stopping it at 23:25.

8    Q    BY MS. SHIH:  That's still your voice on the recording,

9    Mr. Lave?

10   A    Yes.

11   Q    I'm actually going to back it up to 22:50 and ask you a

12   couple of questions about your statement.  I'm replaying the

13   portion beginning at 22:51.

14   (Audio begins at 12:36 p.m.)

15   Q    BY MS. SHIH:  Mr. Lave, you made the statement to the

16   managers, foremen, supervisors and leadsmen who were present

17   that if they saw authorization cards floating around that you

18   needed them to pick them up; is that right?

19   A    Correct.

20   Q    You said we need you to pick those up and bring them to

21   Lex; is that right?

22   A    Correct.

23   (Audio begins at 12:36 p.m.)

24   Q    BY MS. SHIH:  You instructed those employees present that

25   it's kind of a huge responsibility for all of you to monitor

1    your work area to see if there's any union documents or

2    leaflets or union-type materials starting to be laying around;

3    is that right?

4        MR. MINER:  Objection, ambiguous.  He's testified there

5    weren't any employees present at the meeting.

6        MS. SHIH:  By "employees," I'm referring to individuals

7    employed by Greenbrier Rail Services.  I can specify.  I mean

8    managers, supervisors, leadsmen, foremen and any other

9    representatives of Greenbrier that were present at the meeting.

10        JUDGE LAWS:  Thank you.

11        THE WITNESS:  Yes, correct.

12        MS. SHIH:  I'm restarting the recording at 23:24.

13    (Audio begins at 12:38 p.m.)

14        MS. SHIH:  I'm stopping the recording at 49:04, and I'm

15    backing it up just a few seconds to ask Mr. Lave if he

16    recognizes the female voice on the recording beginning at

17    48:59.

18    (Audio begins at 1:04 p.m.)

19        MS. SHIH:  This is at 48:59.

20    (Audio begins at 1:04 p.m.)

21        MS. SHIH:  I'm stopping it again at 49:04.

22    Q    BY MS. SHIH:  Mr. Lave, do you recognize the female

23    voice on the recording?

24    A    I can't make it out.

25    Q    But it was either Ms. Madrigal or Ms. Villalobos?

 1   A     Correct.

 2   Q     And she asked if we hear anything or they start talking we

 3   need to at least bring it to Lex?

 4         MR. MINER:  Could we listen to the tape again?  I didn't

 5   get that.

 6         JUDGE LAWS:  The female voice?

 7         MR. MINER:  Please.  Thank you.

 8         MS. SHIH:  Backed it up just a few seconds further.

 9   (Audio begins at 1:04 p.m.)

10         THE WITNESS:  I'm sorry, could you repeat the question?

11   Q     BY MS. SHIH:  Either Ms. Madrigal or Ms. Villalobos stated

12   in this meeting if we hear anything or they start talking, we

13   need to at least bring it to Lex?

14   A     Sounds like --

15         MR. MINER:  Objection.  I don't think that's what the

16   voice said.

17         JUDGE LAWS:  I couldn't tell whether it said we need to

18   bring it to Lex or explain it to Lex.

19         MS. SHIH:  Let me play it back for the witness.

20         JUDGE LAWS:  Okay.

21   (Audio begins at 1:05 p.m.)

22   Q     BY MS. SHIH:  Mr. Lave, let ask you, what did you hear the

23   female voice on the recording say?

24   A     Something about explain it to Lex.

25   Q     Let me start from the beginning.  If we hear anything or

1    they start talking, we need to at least either bring it to Lex

2    or explain it to Lex?

3    A    Explain it to Lex.

4    Q    Okay.  Your statement is that that female voice who was

5    either Ms. Madrigal or Ms. Villalobos stated if we hear

6    anything or they start talking, we need to at least explain it

7    to Lex?

8    A    Yes.

9        MR. MINER:  Objection, I didn't hear anybody say at least.

10        MS. SHIH:  Okay.  I understand.

11    Q    BY MS. SHIH:  So it's your testimony that the female voice

12    is stating if we hear anything or they start talking, we need

13    to explain it to Lex?

14    A    Okay.

15    Q    Well, that's a question for you.  Is that what you heard?

16        MR. MINER:  Let me just ask for a clarification.  You're

17    asking him what he's heard on the tape or you're asking him

18    what he recalls saying at the meeting?

19        MS. SHIH:  I'm asking him what he's heard on the

20    recording.

21        MR. MINER:  Okay.

22        THE WITNESS:  One more time then, please.

23        JUDGE LAWS:  Do we care what he's hearing now at the

24    hearing?  The tape will speak for itself, I mean --

25        MR. MINER:  True.

1      MS. SHIH:  That's assuming that we are able to admit the

2   recording.  So in the event that we can't, I'd like to get this

3   witness's testimony on what he's heard this voice say.

4   (Audio begins at 1:07 p.m.)

5      THE WITNESS:  So -- so if we hear anything explain it Lex.

6   Q    BY MS. SHIH:  Or they start talking, explain it to Lex?

7   A    I didn't hear the start talking.  It's mumbled.

8      MS. SHIH:  We'll play it one more time.  Earlier you

9   testified that you did, so --

10  (Audio begins at 1:07 p.m.)

11     THE WITNESS:  There was a start talking in there.

12  Q    BY MS. SHIH:  So you heard her state if we hear anything

13  or they start talking?

14  A    Yes.

15  Q    Correct.  We need to explain it to Lex?

16  A    Yes.

17  Q    Ms. Madrigal was the HR generalist at the Tucson facility

18  at this time, correct?

19  A    Correct.

20  Q    And Ms. Villalobos was the plant accountant?

21  A    Yes.

22  (Audio begins at 1:08 p.m.)

23     MS. SHIH:  The transcript ends here.  There is additional

24  noise and background voices.  It was not transcribed because

25  for all intents and purposes, from our perspective, the meeting

1    portion of the recording had completed.  There is another 19

2    minutes of the recording.  If Mr. Miner would like it played,

3    we're happy to do that.  He obviously has the complete

4    recording.  He's had an opportunity to listen to it.  Whether

5    he wants that played is up to him.

6        MR. MINER:  I've heard enough for now.  We can always go

7    back and play more, if the 19 minutes of noise later should

8    seem relevant.

9        MS. SHIH:  That's fine.

10        Your Honor, I hate to do this but is there any way we can

11    take a real short break?

12        JUDGE LAWS:  Yeah, I think we all want a little break, as

13    much as Mr. Miner seems to want to continue to hear this tape

14    we're going to deprive him of that.  Let's come back at 1:20.

15    Off the record.

16    (Off the record at 1:09 p.m.)

17        MS. SHIH:  Based on Mr. Lave's identification of his

18    voice, the primary speaker on the recording that we just

19    listened to, at this time General Counsel is going to move for

20    admission of the audio recording from the October 31, 2012,

21    meeting.

22        MR. MINER:  We object, Your Honor.  There are plenty of

23    voices that haven't been identified, and we still do not know

24    that the recording is accurate and complete, and we don't --

25    it's very simple with current technology to edit and redact and

1    remove snippets or portions or segments of an audiotape, and we

2    don't know if that has been done, because we haven't heard from

3    the individual who made the recording.  We haven't heard from

4    other individuals about the chain of custody of the recording.

5    So we object on those grounds.

6        MS. SHIH:  And if I may respond, Your Honor.  Obviously,

7    the General Counsel is certainly prepared to put on chain of

8    custody evidence, if required.  There's a significant concern

9    with regard to the employee who made the recording, who is

10   still employed by the company.  Based on Rule 901(b)(5), an

11   audio recording can be sufficiently authenticated by

12   identification of a voice.  Rule 901(b)(5) permits a witness

13   with sufficient familiarity with the speaker's voice to

14   identify it through testimony.

15       Mr. Lave has identified his voice as the primary speaker.

16   He's admitted that the statements made on the recording that I

17   played back to him and specific snippets were statements that

18   he made.  U.S. versus Albert, 595 F.2d 283, authenticity is

19   sufficiently established by testimony of a witness identifying

20   the voices on the recording and stating it was a conversation

21   he conducted at the time the recording was made.  Based on

22   that, we do believe that the recording is sufficiently

23   authenticated this time.  And that's why we're moving for

24   admission at this time.  Otherwise, we will need to make

25   arrangements to put on the additional witnesses to establish of

1  custody.

2      JUDGE LAWS:  Well, as to the inaudible portions that under

3  the Board's rulings lying on U.S. v. Parks, 7th Circuit case,

4  has gone to the weight not the admissibility.  I want to

5  reserve ruling on the authentication in terms of there not

6  having been any editing, to look at the law you've cited and to

7  did a little research on my own.  So I will reserve with regard

8  to the authenticity issues or authentication issues, I should

9  say.  You know, as far as having some inaudible parts that, to

10  me, is not going to go to whether it's admissible; it's going

11  to go to the weight the tape is assigned.

12      MS. SHIH:  Thank you, Your Honor.

13      At this time I'm handing the witness what's been marked as

14  General Counsel Exhibit 153, which is what's previously been

15  provided to counsel as the transcript from the June 28, 2013,

16  recording, which is contained on the same CD that we already

17  identified as General Counsel Exhibit 151, I believe.

18      Fred, I presume you're taking the same position with

19  regard to playing the entire recording?

20      MR. MINER:  Yes, please.

21      MS. SHIH:  And just to let everyone know, the recording is

22  an hour and 31 minutes.  And as you can see from the

23  transcript, it's partially conducted in English and Spanish.

24      JUDGE LAWS:  Thanks.

25      MS. SHIH:  Actually, as the transcript reflects, the first

1    eight minutes is background noise.  If there's no objection --

2        MR. MINER:  We can skip ahead.

3        MS. SHIH:  I'll skip ahead and begin the recording right

4    at the eight-minute mark.

5        MR. MINER:  Thanks.

6        JUDGE LAWS:  Sounds good.

7    (Audio begins at 1:31 p.m.)

8    Q    BY MS. SHIH:  Mr. Lave, do you recognize that voice as

9    your own?

10   A    Yes.

11       MS. SHIH:  Restarting the recording at 8:08.

12   (Audio begins at 1:31 p.m.)

13   Q    BY MS. SHIH:  Mr. Lave, do you recognize that voice on the

14   recording?

15   A    No.

16   Q    Do you remember conducting a meeting on June 28, 2013, at

17   the Tucson facility?

18   A    Sounds about right, yes.

19   Q    Who served as the interpreter during that meeting?

20   A    Could have been a variety of people.

21   Q    What people could it have been?

22   A    Juan Maciel, Eric Valenzuela, Julio Vasquez, those three

23   could have been serving.

24   Q    So it's one of those three people?

25   A    At least.

1    Q    And you recognize that voice?

2    A    No.

3    Q    The three people you identified, Mr. Maciel, Mr. Vasquez

4    and Mr. Valenzuela, they're all supervisors or managers of

5    Greenbrier, correct?

6    A    Correct.

7         MS. SHIH:  We'll continue at 8:12.

8    (Audio begins at 1:32 p.m.)

9    Q    BY MS. SHIH:  Mr. Lave, that's your voice?

10   A    Yes.

11   (Audio begins at 1:32 p.m.)

12   Q    BY MS. SHIH:  Do you recognize that voice as Mike Torra?

13   A    Sounds like him.

14   Q    Mr. Torra was present at the meeting with you on June

15   28th?

16   A    Yes.

17        MS. SHIH:  I stopped that recording at 8:42.

18        JUDGE LAWS:  Okay.

19   (Audio begins at 1:33 p.m.)

20   Q    BY MS. SHIH:  That's Mr. Torra speaking, correct?

21   A    Some of it sounded like him.

22   Q    And I'm referring to just the last statement made in

23   English, not to the Spanish, which I understand you've already

24   stated you cannot identify the Spanish speaker.

25        MS. SHIH:  Let me play back just the --

1   (Audio begins at 1:34 p.m.)

2   Q    BY MS. SHIH:  I've stopped the recording at 8:33, and I'm

3   going to ask you about the statement that's about to played in

4   English.

5   (Audio begins at 1:34 p.m.)

6   Q    BY MS. SHIH:  You've already identified that voice as Mr.

7   Torra, correct?

8   A    Yes.

9   (Audio begins at 1:34 p.m.)

10       MS. SHIH:  I'm now stopping the recording at 8:47, and I'm

11  going to ask Mr. Lave about the upcoming statement that's in

12  English.

13  (Audio begins at 1:35 p.m.)

14  Q    BY MS. SHIH:  That's Mr. Torra's voice, correct?

15  A    Yes.

16  (Audio begins at 1:35 p.m.)

17       MS. SHIH:  I'm stopping it again at nine minutes and I'm

18  going to ask Mr. Lave about a statement in English.

19  (Audio begins at 1:35 p.m.)

20  Q    BY MS. SHIH:  That's Mr. Torra speaking, correct?

21  A    Yes.

22  (Audio begins at 1:35 p.m.)

23       MS. SHIH:  I have stopped the recording at 9:23.

24  Q    BY MS. SHIH:  That last statement that was made in

25  English, that's still Mike Torra?

1     A     Yes.

2          MR. MINER:  Can I -- I'll just object to the ambiguity.

3     Are you asking him whether the voice that he hears on the tape

4     is the voice of Mike Torra?

5          MS. SHIH:  That's correct.

6          MR. MINER:  Thank you.

7          THE WITNESS:  Yes.

8          MS. SHIH:  Thank you.

9     (Audio begins at 1:36 p.m.)

10     Q     BY MS. SHIH:  Stopping the recording at 9:45.  That's

11     still Mr. Torra speaking in English, correct?

12          MR. MINER:  Same objection.  Are you asking him whether

13     that's the voice that he heard speaking?

14          MS. SHIH:  Well, I'm asking him first to identify the

15     voice on the recording as Mr. Torra's.

16          MR. MINER:  Okay.

17          THE WITNESS:  The voice sounds like Mike Torra.

18     Q     BY MS. SHIH:  And are those the statements that Mr. Torra

19     made at that meeting on June 28, 2013?

20     A     I don't recall.

21          JUDGE LAWS:  Before you start again, I did want to ask --

22     and I should have done this at the outset, but I didn't think

23     about it -- do we want the interpreter to be following along or

24     are there not going to be issues as to whether the translation

25     is correct or not?

1    MR. GIANNOPOULOS:  If I can answer, I think in case, Your

2    Honor, with respect to this tape there's no issues that the

3    government seeks to raise with respect to the Spanish

4    translations.  With respect to a tape coming up, there will be

5    an issue that we're going to bring up.

6    JUDGE LAWS:  Okay.  And I do want to give Respondent the

7    opportunity to have the interpreter follow along to ensure that

8    there aren't any questions, if they so desire.

9    MR. MIENR:  No, we're not requesting the interpreter to

10   review this, thank you.

11   JUDGE LAWS:  Thank you.

12   MS. SHIH:  I'm actually going to back it up to the last

13   statement.

14   (Audio begins at 1:38 p.m.)

15   MS. SHIH:  I stopped the recording at 9:37.  I'm going to

16   ask Mr. Lave to listen to the upcoming statement that's made in

17   English.

18   (Audio begins at 1:38 p.m.)

19   Q    BY MS. SHIH:  Did Mr. Torra to make that statement during

20   the June 28, 2013, meeting?

21   A    I don't recall.

22   Q    This recording doesn't refresh your recollection about the

23   statements Mr. Torra made during the June 28, 2013, meeting?

24   A    No, it does not.

25   (Audio begins at 1:38 p.m.)

1    Q    BY MS. SHIH:  That's Mr. Torra's voice on the recording?

2    A    Sounds like his voice, yes.

3    Q    Did Mr. Torra make that statement during June 28, 2013,

4    meeting?

5    A    I don't recall.

6    (Audio begins at 1:39 p.m.)

7    Q    BY MS. SHIH:  That English statement, that's still Mr.

8    Torra's voice on the recording, correct?

9    A    Sounds like Mike Torra's voice.

10   (Audio begins at 1:39 p.m.)

11   Q    BY MS. SHIH:  The recording has been stopped at 10:24.

12   That's still Mr. Torra speaking on the recording?

13   A    Sounds like Mike Torra's voice.

14   Q    Did Mr. Torra make those statements at the June 28, 2013,

15   meeting?

16   A    I don't recall.

17   (Audio begins at 1:40 p.m.)

18   Q    BY MS. SHIH:  That's Mr. Torra's voice?

19   A    Sounds like his voice, yes.

20   (Audio begins at 1:40 p.m.)

21   Q    BY MS. SHIH:  I've stopped the recording at 11:07.  That's

22   still Mr. Torra's voice, correct?

23   A    Sounds like his voice.

24   Q    Do you remember Mr. Torra making those statements at the

25   June 28, 2013, meeting?

1   A    I do not recall that.

2   (Audio begins at 1:41 p.m.)

3   Q    BY MS. SHIH:  I've stopped the recording at 11:22.  That

4   last statement in English, that's still Mr. Torra's voice?

5   A    Sounds like his voice.

6   Q    That was Mr. Torra's voice stating it also adds

7   unnecessary costs towards business?

8   A    Sounds like his voice.

9   Q    Did Mr. Torra make that statement during the June 28,

10  2013, meeting?

11  A    I can't recall.

12  (Audio begins at 1:41 p.m.)

13  Q    BY MS. SHIH:  I stopped the recording 11:32.  That's Mr.

14  Torra speaking on the recording?

15  A    Again, it sounds like his voice.

16  Q    That's Mr. Torra's voice stating we're in a very

17  precarious, difficult time right now?

18  A    Sounds like his voice.

19  Q    Did Mr. Torra make that statement during the June 28,

20  2013, meeting?

21  A    I can't recall.

22  Q    What do you recall Mr. Torra saying during the June 28,

23  2013, meeting?

24  A    I can't recall because at points in time during the

25  meeting I was floating in and out of the center of the floor to

1    the back of the office doing some other work.

2    Q    What do you recall Mr. Torra saying during the June 28,

3    2013, meeting?

4    A    I really don't recall.

5    Q    Excuse me?

6    A    I really don't recall.

7    Q    You don't recall anything that Mr. Torra said during the

8    June 28 --

9    A    I remember him introducing himself, that first page or so,

10   because I was there with him, next to him.  But as he went into

11   this spiel with the translator I moved off in the back, out of

12   sightline somewhat, to try to do some other work, so I wasn't

13   really paying attention.

14   (Audio begins at 1:43 p.m.)

15   Q    BY MS. SHIH:  I stopped the recording at 11:56.  That's

16   Mr. Torra's voice on the recording?

17   A    Sounds like his voice.

18   Q    Were you present during the June 28, 2013, meeting when

19   Mr. Torra stated that during the first three months of the

20   fiscal year the company lost $373,000?

21   A    I was present in the meeting, but I don't recall if he

22   said that.

23   (Audio begins at 1:44 p.m.)

24       MS. SHIH:  I stopped the recording at 12:14.

25   Q    BY MS. SHIH:  That's Mr. Torra's voice on the recording

1    stating that we're on the path to recovery?

2    A    Sounds like his voice, yes.

3    (Audio begins at 1:44 p.m.)

4        MS. SHIH:  I'm stopping the recording at 12:48.

5    Q    BY MS. SHIH:  That's still Mr. Torra's voice on the

6    recording?

7    A    Sounds like his voice.

8    (Audio begins at 1:45 p.m.)

9        MS. SHIH:  I stopped the recording at 13:26.

10   Q    BY MS. SHIH:  That's Mr. Torra speaking on the recording

11   about improvements that have been made?

12   A    Again, it sounds like his voice.

13   (Audio begins at 1:46 p.m.)

14       MS. SHIH:  Stopped the recording at 14 minutes.

15   Q    BY MS. SHIH:  That's still Mr. Torra speaking about having

16   a union here, it would be a step backwards?

17   A    Sounds like his voice.

18   Q    Did Mr. Torra make that statement during the June 28,

19   2013, meeting?

20   A    I don't recall.

21   (Audio begins at 1:47)

22       MS. SHIH:  Stopped the recording at 14:22.

23   Q    BY MS. SHIH:  Mr. Lave, that's your voice on the

24   recording?

25   A    That does sound like my voice.

1    Q    Were you present during the meeting on June 28, 2013, when

2    Mike Torra was talking about the company's economic situation?

3    A    I'm sorry, say the question please.

4    Q    Were you present at the June 28, 2013, meeting when Mr.

5    Torra was speaking about our economic situation here?

6    A    I was present in the room back and forth.

7    Q    Did you hear what Mr. Torra said about the economic

8    situation?

9    A    I probably heard parts of it, because I was back and

10   forth.

11   Q    What do you recall Mr. Torra saying about the economic

12   situation?

13   A    I don't recall specifics.

14   (Audio begins at 1:48)

15       MS. SHIH:  I stopped the recording at 14:43.

16   Q    BY MS. SHIH:  Mr. Lave, is that your voice on the

17   recording stating that Mike said that last year fiscal year we

18   lost about $280,000?

19   A    Yes.

20   Q    Did you hear Mr. Torra make that statement during the June

21   28, 2013, meeting?

22   A    I thought he said $280,000, so I don't know what I heard

23   him say.  Again, I'm back and forth from the room.

24   Q    Did you hear Mike Torra speaking during the June 28, 2013,

25   meeting to employees about the amount of money the company lost

1    in the last fiscal year?

2    A    I heard him talking about some amounts of money, but I

3    didn't lock on it.

4    Q    I'm sorry, what was the last --

5    A    I did not lock onto the detail of the conversation.

6    (Audio begins at 1:50 p.m.)

7        MS. SHIH:  Stopped the recording at 14:51.

8    Q    BY MS. SHIH:  Mr. Lave, is that your voice on the

9    recording stating in September we lost money?

10   A    Yes, it is.

11   Q    Did you hear Mike Torra make a statement during the June

12   28, 2013, meeting that the facility lost money in September?

13   A    I don't recall.

14   (Audio begins at 1:50)

15       MS. SHIH:  Stopped the recording at 14:54.

16   Q    BY MS. SHIH:  Mr. Lave, is that your voice on the

17   recording stating in October we lost money?

18   A    Yes.

19   (Audio begins at 1:50)

20       MS. SHIH:  I apologize, I backed it up just a little bit

21   too far, so it's repeating.  We're back at 14:41.  I'll get it

22   caught up.

23   (Audio begins at 1:51 p.m.)

24       MS. SHIH:  Stopped at 14:57.

25   Q    BY MS. SHIH:  Mr. Lave, that's your voice on the recording

1    stating in November we lost money?

2    A    Yes.

3    (Audio begins at 1:51 p.m.)

4        MS. SHIH:  Stopped at 15:09.

5    Q    BY MS. SHIH:  Mr. Lave, that's your voice on the

6    recording?

7    A    Yes.

8    (Audio begins at 1:51 p.m.)

9        MS. SHIH:  Stopped at 15:28.

10   Q    BY MS. SHIH:  Mr. Lave, that's your voice?

11   A    Yes.

12   (Audio begins at 1:52 p.m.)

13       MS. SHIH:  Stopped at 15:48.

14   Q    BY MS. SHIH:  Mr. Lave, that was your voice in English,

15   the English statement, that's your voice?

16   A    Yes.

17   (Audio begins at 1:52 p.m.)

18       MS. SHIH:  Stopped at 15:51.

19   Q    Mr. Lave that's your voice stating we made money in

20   January?

21   A    Yes.

22   (Audio begins at 1:52 p.m.)

23       MS. SHIH:  Stopped at 15:54.

24   Q    BY MS. SHIH:  Mr. Lave, that's your voice stating we made

25   money in February?

1    A    Yes.

2    (Audio begins at 1:53 p.m.)

3        MS. SHIH:  Stopped at 16:04.

4    Q    BY MS. SHIH:  Mr. Lave, that's your voice?

5    A    In English, yes.

6    Q    And just for efficiency purposes, when I ask you if that's

7    your voice I'm referring only to the English portions of the

8    recording.

9    A    Thank you.

10        JUDGE LAWS:  I think maybe another thing we could maybe do

11   for efficiency purposes is while it appears there's a few lines

12   purports to Mr. Lave, play all of them, stop when that part is

13   over, and ask if there's any part of the English portion that

14   wasn't his.

15        MS. SHIH:  That's fine, Your Honor.

16   (Audio begins at 1:53 p.m.)

17        MS. SHIH:  I've stopped the recording at 16:47.

18   Q    BY MS. SHIH:  Was there any portion of the English that

19   you just heard since we last started the recording that was not

20   your voice?

21   A    No.

22   (Audio begins at 1:54)

23        MS. SHIH:  Stopped the recording at 19:29.

24   Q    BY MS. SHIH:  Mr. Lave, is there any of the English

25   statements that you've heard on this recording since I last

1   started it that are not your voice?

2   A    No.

3        JUDGE LAWS:  And before you start up, I want to clarify.

4   I thought I heard about a little more than a third of the way

5   down page, Mexico City wheel shop, not weld shop.

6        THE WITNESS:  Correct, it's a wheel shop.

7   Q    BY MS. SHIH:  The statements that you just heard in

8   English that you confirmed are your voice, did you make those

9   statements during the June 28, 2013, meeting?

10  A    I don't recall.

11  Q    The last statement that you heard before I stopped the

12  recording, did you hear Mr. Torra say during the June 28, 2013,

13  meeting that the company was starting to make a little bit more

14  money or that we're starting to make a little bit more money?

15  A    I'm sorry, ask me the question again, please.

16  Q    Did you hear Mr. Torra say during the June 28, 2013,

17  meeting that since December we're starting to make a little bit

18  more money?

19  A    I don't recall if I heard him say that.

20  Q    When did Greenbrier close the Kansas City fast track in

21  Missouri?

22  A    I believe we announced the closure in April.  It would

23  have wound down through May, maybe a little into June the

24  things trickle on.

25  Q    And are those references to 2013?

1    A    Yes, yes, sorry.

2    Q    The statements that we're listening to that you confirmed

3    are your voice, they were made to employees at a meeting in

4    Tucson in 2013, correct?

5    A    Yes.

6        MS. SHIH:  I am restarting the recording at 19:29.

7    (Audio begins at 2:00 pm.)

8        MS. SHIH:  Stopping the recording at 21:04.

9    Q    BY MS. SHIH:  Those statements that you just heard in

10   English, that's your voice, correct?

11   A    Yes.

12   Q    And you made those statements to employees in Tucson at a

13   meeting on June 28, 2013?

14   A    I don't recall all the preciseness of those statements.

15   Q    But it was at a meeting in Tucson, in 2013, to employees,

16   correct?

17   A    I had a meeting with Tucson employees in June of 2013.

18   Q    And did you make those statements that you just heard to

19   employees at a meeting in Tucson in 2013?

20   A    I don't recall those precise statements.

21   (Audio begins at 2:02 p.m.)

22       MS. SHIH:  Stopped the recording at 21:25.

23   Q    BY MS. SHIH:  Is that your voice stating as Mike said

24   though, if the union comes in that could possibly slow down our

25   progress we're making?

1    A    Yes, that's my voice.

2    Q    Did Mr. Torra make the statement to employees that if the

3    union comes in, that would slow down the progress we are

4    making?

5    A    I don't recall.

6    Q    Do you make the statement to employees at a meeting in

7    Tucson in 2013, that if the union comes in, that could possibly

8    slow down our progress we're making?

9    A    I don't recall if I made that type of statement.

10   (Audio begins at 2:03 p.m.)

11        MS. SHIH:  Stopped the recording at 21:49.

12   Q    BY MS. SHIH:  That's your voice, correct, the English

13   statement?

14   A    Yes.

15   Q    Did you tell employees that this was a critical time?

16   A    Again, I don't precisely recall.

17   Q    Did you think it was a critical time?

18   A    Yes.

19   (Audio begins at 2:04 p.m.)

20        MS. SHIH:  Stopped the recording at 22:22.

21   Q    BY MS. SHIH:  The English statement that you heard, that's

22   your voice, correct?

23   A    Yes.

24   Q    And you asked Mr. Torra to talk to employees about his

25   experience with union contracts, correct?

1   A     I'm sorry, I lost my place.

2   Q     You asked Mr. Torra to talk to employees --

3   A     I'm trying to catch up on the paper.

4   Q     I apologize.

5   A     That's okay.  Okay, all right.  Did I what now?

6   Q     You asked Mr. Torra to speak to employees about a union

7   contract and what that means?

8   A     Yes, it looks that way.

9   (Audio begins at 2:05 p.m.)

10        MS. SHIH:  I stopped the recording at 22:26.

11  Q     BY MS. SHIH:  That's Mr. Torra speaking on the recording,

12  correct?

13  A     Sounds like his voice.

14  (Audio begins at 2:06 p.m.)

15        MS. SHIH:  Stopped the recording at 23:20.

16  Q     BY MS. SHIH:  The English statements that you heard since

17  we last began the recording, those are all Mr. Torra, correct?

18  A     They sound his voice, yes.

19  (Audio begins at 2:07 p.m.)

20        MS. SHIH:  Stopped the recording at 24:46.

21  Q     BY MS. SHIH:  The English statements you've heard since I

22  started the recording, those are all Mr. Torra?

23  A     Sounds like his voice, yes.

24  (Audio begins at 2:08 p.m.)

25        MS. SHIH:  I stopped the recording at 25:07.

1   Q    BY MS. SHIH:  That's Mr. Torra's voice on the recording?

2   A    Sounds like his voice.

3        JUDGE LAWS:  I think the correction to what's been marked

4   as 153 -- bless you.  That wouldn't be the correction -- it

5   would be TTX as opposed to DTX.

6   Q    BY MS. SHIH:  Is that correct, Mr. Lave, the Tucson

7   facility's number one customer was TTX?

8        JUDGE LAWS:  Don't reference what's said there, was

9   Tucson's number one facility or number one customer, excuse me,

10  TTX?

11       THE WITNESS:  In terms of percentage of work, yeah.

12       JUDGE LAWS:  Was there a customer named DTX?

13       THE WITNESS:  I wouldn't know.  I don't know all our

14  customers.

15       JUDGE LAWS:  Do you recall a customer called DTX?

16       THE WITNESS:  Doesn't sound familiar.

17  Q    BY MS. SHIH:  Just for clarity of the record, that's T as

18  in Tom, T as in Tom, X, correct?

19  15 A    Right, yeah.  A lot of our customers have these three-

20  letter acronyms.

21       JUDGE LAWS:  But if your number one customer was DTX --

22       THE WITNESS:  I would know that.

23       JUDGE LAWS:  You would know.

24  Q    BY MS. SHIH:  Did Mr. Torra make the statement to

25  employees at a meeting in Tucson in 2013 that our number

1    customer is TTX?

2    A    I don't recall.

3    Q    Did Mr. Torra make a statement to employees in a meeting

4    in Tucson in 2013 that, whether rightfully or wrongfully, TTX

5    is adverse to unions?

6    A    I don't recall.  Again, I'm starting to move in and out of

7    the flow of the center of the building to the back of it,

8    trying to get up on my notes and other stuff that I'm going to

9    come up and talk about.

10    MS. SHIH:  I'll resume the play of the recording at 25:07.

11    (Audio begins at 2:10 p.m.)

12    MS. SHIH:  Stopped the recording at 25:22.

13    Q    BY MS. SHIH:  That's Mr. Torra's voice?

14    A    Sounds like his voice.

15    Q    Did Mr. Torra make the statement that TTX recognizes us as

16    a non-union facility?

17    A    I don't recall.

18    Q    Did Mr. Torra make a statement to employees that that was

19    a risk he sees happening with the number one customer?

20    A    I don't recall.

21    (Audio begins at 2:11 p.m.)

22    Q    BY MS. SHIH:  That last English statement I've been on

23    board now for like two years as of June 2013, that's your

24    voice, correct?

25    A    Yes.

1    Q    Does that refresh your recollection as to whether this

2    meeting was held in Tucson in June 2013?

3    A    Yes, the meeting was in June 2013.

4    Q    And the statements that you're hearing on this recording

5    were statements made to employees at this meeting in Tucson in

6    June 2013?

7    A    I don't recall specifically that I said those statements.

8    The transcript is saying that I did.

9    (Audio begins at 2:12 p.m.)

10       MS. SHIH:  Stopped the recording at 27:52.

11   Q    BY MS. SHIH:  Mr. Lave, the statements that you heard in

12   English, those are your voice, correct?

13   A    Yes.

14   Q    The reference to Lisa is Lisa Maxey; is that right?

15   A    Yes, I only have one Lisa in HR.

16       JUDGE LAWS:  Before you start the tape again, I just want

17   to make a note.  Second English statement from the top of page

18   11, what I heard was a lot of you guys have see me coming down

19   here, not a lot of you guys have seen me coming now.

20       MS. SHIH:  Resuming 27:52.

21   (Audio begins at 2:15 p.m.)

22       MS. SHIH:  Stopped at 29:17.

23   Q    BY MS. SHIH:  Mr. Lave, the English statements, those are

24   your voice?

25   A    Yes.

1  (Audio begins at 2:17 p.m.)

2      MS. SHIH:  Stopped at 29:38.

3  Q   BY MS. SHIH:  Mr. Lave, that's your voice on the

4  recording?

5  A   Sounds like --

6  Q   Talking about the union filing an unfair labor practice

7  charge?

8  A   Sounds like my voice, yes.

9  Q   Did you tell employees in a meeting in Tucson in June that

10 the union had filed unfair labor charges against the company?

11 A   Yes.

12 (Audio begins at 2:17 p.m.)

13     MS. SHIH:  Stopped at 31:10.

14 Q   BY MS. SHIH:  Mr. Lave, the statements that you heard in

15 English, that's your voice, correct?

16 A   That sounds like my voice, yes.

17 Q   Isn't it true that in a meeting with Tucson employees in

18 2013, before the union election, you told employees that the

19 company was paying an attorney $400 an hour to defend against

20 lawsuits?

21 A   Yes.

22 (Audio begins at 2:19 p.m.)

23     MS. SHIH:  Stopped the recording at 32:50.

24 Q   BY MS. SHIH:  The statements you heard in English, that's

25 your voice, correct?

1    A    Sounds like my voice.

2    (Audio begins at 2:21 p.m.)

3    MS. SHIH:  Stopped the recording at 32:01.

4    Q    BY MS. SHIH:  The statements you heard in English, that's

5    your voice, correct?

6    A    Sounds like my voice.

7    Q    Isn't it true that you told employees in Tucson in 2013

8    that it's frustrating to have to defend those kind of lawsuits

9    when we're trying to make the shop more profitable?

10    A    Yes.

11    (Audio begins at 2:24 p.m.)

12    Q    BY MS. SHIH:  That's your voice on the recording?

13    A    Yes, that's my voice.

14    (Audio begins at 2:24 p.m.)

15    Q    BY MS. SHIH:  That last statement in English, that's

16    actually Mr. Torra speaking, correct?

17    A    Didn't sound like my voice, even though it says Al here.

18    Sounds like Mike's.

19    Q    It's not your voice, though, correct?

20    A    Not my voice, correct.

21    (Audio begins at 2:25 p.m.)

22    Q    BY MS. SHIH:  What you heard in English since I last

23    started the recording, that's your voice, correct?

24    A    That's my voice, yes.

25    (Audio begins at 2:26)

1    Q    BY MS. SHIH:  What you just heard in English, that's Mr.

2    Torra, correct?

3    A    Sounds like Mike Torra's voice.

4    (Audio begins at 2:26 p.m.)

5    Q    BY MS. SHIH:  That's your voice, correct, Mr. Lave?

6    A    Yes, that's my voice.

7    (Audio begins at 2:28 p.m.)

8    Q    BY MS. SHIH:  That's Mr. Torra's voice, correct?

9    A    It sounds like his voice, yes.

10   (Audio begins at 2:29 p.m.)

11        MS. SHIH:  Stopped at 40:19.

12   Q    BY MS. SHIH:  That's your voice that you just heard,

13   correct?

14   A    That's my voice, yes.

15   (Audio begins at 2:30 p.m.)

16        JUDGE LAWS:  And I want you to stop it here.  And I want to

17   get our interpreter here because the translation has an

18   inaudible part.  And to the extent that the Spanish part does

19   not have an inaudible portion, I would like the full

20   translation.  So --

21        THE INTERPRETER:  Okay.  So what is it that you want?

22        JUDGE LAWS:  -- come here.  Come on up here.  You actually

23   can do it without listening.  Come on up near my -- to my mic.

24        Sorry.  She can -- she can lean over.

25        THE COURT REPORTER:  We're off the record, right?

1       JUDGE LAWS:  We're on the record.

2       THE COURT REPORTER:  Oh.

3       JUDGE LAWS:  If you could read that in Spanish and then

4    translate it into English, please.  And I'm pointing to the

5    bottom line of page 17, the bottom three lines.

6       THE INTERPRETER:  "I've been here two months, three" --

7    "three months here and while I don't know much about all of

8    this and how things are happening right now, but -- for

9    example, I see" -- "are there supervisors that are going to

10   vote or no?"

11      JUDGE LAWS:  Okay.  Go ahead.

12      MS. SHIH:  And, actually, that's where -- I had stopped the

13   recording there and wanted Mr. Lave to confirm that the English

14   statements he's heard since I last stopped the recording,

15   those -- those are his voice.

16   Q    BY MS. SHIH:  Correct?

17   A    Yes.

18      MS. SHIH:  We're about 41 minutes into this recording.

19   Would it be possible to take a short bathroom break?

20      JUDGE LAWS:  Sure.  Let's -- let's stay in -- on this floor

21   though, please.  I'm showing 2:35.  Let's be ready to go back

22   on the record at 2:45.

23   (Off the record at 2:34 p.m.)

24      MS. SHIH:  I am restarting the recording at 41:39.

25   (Audio begins at 2:46 p.m.)

1  Q    BY MS. SHIH:  And just to have a clear record, since that

2  last statement was made in English, that's not your voice,

3  correct?

4  A    Correct.

5  Q    Can you identify that voice?

6  A    I'm not sure.

7  Q    Can you identify whether that voice is the same voice that

8  has been providing the Spanish interpretation during this --

9  A    No.

10  Q    -- meeting?

11  A    No.

12  Q    "No," you can't or, "no," it's not?

13  A    No, I can't identify if it's a manager.

14  Q    Thank you.

15  (Audio begins at 2:47 p.m.)

16    MS. SHIH:  Stopped at 42:20.

17  Q    BY MS. SHIH:  That English is your voice, correct?

18  A    Yes.

19  Q    Thank you.

20  (Audio begins at 2:47 p.m.)

21    MS. SHIH:  Stopped at 43:27.

22  Q    BY MS. SHIH:  The English statements that you heard,

23  that's your voice, correct?

24  A    Yes.

25  Q    And in reference to the -- who can vote and who cannot

1  vote, you were referring to the upcoming union election to be

2  held in July 2013, correct?

3  A    Yes.

4  (Audio begins at 2:48 p.m.)

5  Q    BY MS. SHIH:  The English statements that you've heard,

6  that's your voice, correct?

7  A    Yeah.  There -- there was another little English voice

8  there I heard, but most of that was English mine, yes.

9  Q    The English voice that was not yours, that was the

10 interpreter?

11 A    I'm not sure.

12 (Audio begins at 2:50 p.m.)

13 Q    BY MS. SHIH:  That's not your voice, correct?

14 A    I -- I lost track.  I apologize.  It sounded like the

15 supervisor's -- oh, okay.  Right.  That's not my voice.

16 Q    And I'm referring to the English statement that we just

17 heard --

18 A    Yeah.

19 Q    -- on the record, correct?

20 A    Correct.  Yeah, yeah.  That English was not my voice.

21     MS. SHIH:  And I'm restarting at 44:30.

22 (Audio begins at 2:50 p.m.)

23 Q    BY MS. SHIH:  The statement, "By law they're not allowed

24 to vote," that is your voice, correct?

25 A    Yes.

1    (Audio begins at 2:50 p.m.)

2    Q    BY MS. SHIH:  That question that you just heard in

3    English, can you identify the voice?

4    A    No.

5    Q    It's not your voice though, correct?

6    A    It's not my voice.

7    (Audio begins at 2:51 p.m.)

8        MS. SHIH:  Stopped at 47:08.

9    Q    BY MS. SHIH:  The English that you've heard, that's your

10   voice, correct?

11   A    Yes.

12   (Audio begins at 2:53 p.m.)

13   Q    BY MS. SHIH:  Can you identify the voice that you just

14   heard?

15   A    No, not yet.  No.

16   (Audio begins at 2:54 p.m.)

17       JUDGE LAWS:  And I'm going to ask for the tape to stop here

18   and for the translation from Spanish to English of -- the

19   Spanish about midway down the page starting with (Spanish

20   spoken) because the English version has some inaudible parts

21   but the Spanish version does not.

22       So when you are at a good breaking point, if you can come

23   on up.  The three plus lines, starting with (Spanish spoken),

24   if you could translate those from Spanish to English, please.

25       THE INTERPRETER:  "Freddy's question is this:  Let's see,

1    it says -- well, let's suppose that you go into the union, that

2    means then that -- that means then I have to mandatorily belong

3    to the union.  And if I don't want to belong to the union, I'm

4    still eligible -- am I still eligible to come to work at the

5    shop, that is, if they go on strike?"

6        JUDGE LAWS:  Thank you.

7        THE INTERPRETER:  You're welcome.

8    Q    BY MS. SHIH:  Mr. Lave, who is Freddy?

9    A    The Freddy I know at Tucson is Freddy Valdez.  Whether

10   there was another Freddy in the shop, I am not aware of.  But I

11   know Freddy Valdez.

12   Q    Was Freddy Valdez present at this meeting on June 28th,

13   2013?

14   A    He was at one of the meetings.  And it sounds like it's

15   him.

16   Q    Is it your testimony that the voice earlier that you

17   stated you couldn't yet identify sounds like Freddy Valdez'

18   voice?

19   A    I'm sorry.  I'm reading the context and it's recalling

20   that Freddy and I had this discussion about coming to work or

21   not.  I'm sorry.  I don't know if I answered your question.

22   I'm thinking out loud.

23   Q    Let me actually back up the recording just very briefly.

24   And, unfortunately, I don't have a specific time stamp as to

25   when that is, so I'll do my best to get it in the right spot

1  quickly?

2  (Audio begins at 2:57 p.m.)

3     MS. SHIH:  I've stopped the recording at 47:12 and it's the

4  statement in English that's upcoming that -- that I'll be

5  questioning you about.

6  (Audio begins at 2:57 p.m.)

7  Q    BY MS. SHIH:  Is that Freddy Valdez' voice?

8  A    I think it is.  He has a soft voice.

9  Q    And Freddy Valdez was the production manager at the time

10 of June 28, 2013?

11 A    No.  He was -- he was back in write-up.  He was a write-up

12 guy.

13 Q    He was no longer -- is this the same Freddy Valdez that

14 formerly was the production manager in Tucson?

15 A    Yes.

16 Q    He was not a manager at the time of this meeting?

17 A    Correct.

18 (Audio begins at 2:58 p.m.)

19 Q    BY MS. SHIH:  The statements that you've heard in English,

20 those are your voice --

21 A    Yeah --

22 Q    -- on this recording, correct?

23 A    -- that's my voice.

24 (Audio begins at 3:00 p.m.)

25     MS. SHIH:  I stopped the recording at 49:34.

1   Q    BY MS. SHIH:  That voice you just heard in English, that's

2   Mr. Torra?

3   A    That sounded like Mike, yeah.

4   (Audio begins at 3:00 p.m.)

5       MS. SHIH:  Stopped at 49:59.

6   Q    BY MS. SHIH:  That's your voice, correct?

7   A    Yes.

8   Q    Did you hear Mike Torra tell employees at a meeting in

9   Tucson in 2013 that employees will feel pressure from the

10  union?

11  A    Yeah.  Yeah, that's what he said earlier.  Yeah.

12  Q    Did you hear Mr. Torra say that to employees?

13  A    I don't recall if it was that precise statement, but I

14  remember this dialogue that he and I are having when we're in

15  the Q and A session at the meeting.

16  (Audio begins at 3:01 p.m.)

17      MS. SHIH:  Stopped at 51:27.

18  Q    BY MS. SHIH:  The statements you've heard, that's your

19  voice, correct?

20  A    Yes.

21  (Audio begins at 3:03 p.m.)

22      MS. SHIH:  Stopped at 51:33.

23  Q    BY MS. SHIH:  The voice that you just heard on the

24  recording, and we can lock them out, that's Mr. Torra's voice,

25  correct?

1    A    Yes.

2    (Audio begins at 3:03 p.m.)

3        MS. SHIH:  Stopped at 51:42.

4    Q    BY MS. SHIH:  That's your voice, correct?

5    A    Yes, it is.

6    (Audio begins at 3:04 p.m.)

7    Q    BY MS. SHIH:  The question you just heard about whether

8    the union can penalize us for it, is -- was that Mr. Valdez --

9    A    It --

10   Q    -- Freddy Valdez?

11   A    It sounded like Freddy again.  He's really soft.  So it

12   sounded like him.

13   Q    Do you remember Mr. Valdez asking a question at the

14   meeting about whether the union could penalize employees for

15   coming to work during a strike?

16   A    No, I don't recall that -- that precise kind of question.

17   (Audio begins at 3:04 p.m.)

18   Q    BY MS. SHIH:  Those statements in English, they're your

19   voice, correct?

20   A    Yes, they are.

21       MS. SHIH:  And I'm restarting the recording at 52:21.

22   (Audio begins at 3:05 p.m.)

23       MS. SHIH:  Stopped at 54:03.

24   Q    BY MS. SHIH:  The English statements that you've just

25   heard, those are your voice, correct?

1    A    Correct.

2    (Audio begins at 3:07 p.m.)

3    Q    BY MS. SHIH:  The voice you just heard in Spanish, do you

4    recognize that voice?

5    A    I'm sorry.  I don't.

6    Q    And the recording's at 54:35 and there's a -- an upcoming

7    voice in English that I'll ask if you recognize.

8    (Audio begins at 3:08 p.m.)

9    Q    BY MS. SHIH:  Do you recognize that voice?  Is --

10   A    I'm sorry.  No, I didn't.  That wasn't audible.  I

11   apologize.

12   (Audio begins at 3:08 p.m.)

13   Q    BY MS. SHIH:  Is that your voice in English saying --

14   A    Yes.

15   Q    -- answering a question in the negative, correct?

16   A    "Federal laws" --

17   Q    Stating, "Unfortunately" --

18   A    That was my --

19   Q    -- "no?"

20   A    That was my voice, yeah.

21   (Audio begins at 3:08 p.m.)

22        MS. SHIH:  It's on the recording, sorry.

23        THE WITNESS:  Oh, oh, it's the train outside.

24        MR. MINER:  It's the switch -- switch train that's going by

25   the building.  I'm sorry.

1       JUDGE LAWS:  Okay.

2       MS. SHIH:  Let me just back it up very briefly.  And I

3    apologize that we'll have to listen to that again.  I'm

4    starting the recording at 54:31.

5    (Audio begins at 3:09 p.m.)

6       MS. SHIH:  Stopped at 54:52.

7    Q    BY MS. SHIH:  The voice that said, "but that is a common

8    problem," that's Mr. Torra's voice?

9    A    Yes.

10   (Counsel confer)

11      MS. SHIH:  I apologize.  I'm having a slight technical

12   issue.  If we could just go off -- or if you could just give me

13   a moment --

14      JUDGE LAWS:  Sure.

15      MS. SHIH:  -- I -- my recording has disappeared from my

16   play screen.  So I think if I hit play right now I think we'll

17   get music.

18      Okay.  I'm ready.

19      JUDGE LAWS:  You're ready?

20      MS. SHIH:  Sorry.  I'm starting at -- it's at 54:44.

21   (Audio begins at 3:11 p.m.)

22   Q    BY MS. SHIH:  The statement that you just heard in

23   English, do you recognize that voice?

24   A    No, I sure don't.

25   (Audio begins at 3:12 p.m.)

1          MS. SHIH:  Stopped at 54:42.

2     Q    BY MS. SHIH:  Did you recognize that voice?

3     A    No.

4     (Audio begins at 3:12 p.m.)

5     Q    BY MS. SHIH:  That was your voice, correct?

6     A    Yes.

7     (Audio begins at 3:12 p.m.)

8     Q    BY MS. SHIH:  And at this point it sounds like you're

9     having a dialogue in English with another speaker.  Do you

10    recognize the voice of the other speaker?

11    A    No, I don't.

12    (Audio begins at 3:12 p.m.)

13         MS. SHIH:  Stopped at 56:15.

14    Q    BY MS. SHIH:  That was your voice that you just heard,

15    correct?

16    A    Yes.

17    (Audio begins at 3:13 p.m.)

18    Q    BY MS. SHIH:  The English statements that you've just

19    heard, those are your voice, correct?

20    A    Yes, they are.

21         MR. MINER:  Before you start the audio again, near the

22    bottom of page 25 -- sorry to take you back -- there's a

23    reference in the General Counsel 153 to a harsh decision.  I

24    thought the voice said hard decision but I'm not certain about

25    what I heard.

1       JUDGE LAWS:  So the unknown male, third person up from the

2  bottom of 25?

3       MR. MINER:  Yeah.  That's correct.

4       JUDGE LAWS:  Okay.

5       MR. MINER:  I thought he said you know to -- that they

6  would have to make a hard decision.

7       JUDGE LAWS:  But --

8       MS. SHIH:  Do you want me to back up the recording?

9       JUDGE LAWS:  Yes.

10      MR. MINER:  Yeah, just so we can hear that part.

11      MS. SHIH:  And that's -- this is going to be an

12  approximate, because I don't have the exact time stamp.

13      JUDGE LAWS:  That's fine.

14      MR. GIANNOPOULOS:  Try to get it before -- after the train

15  horn.

16      JUDGE LAWS:  Yeah.

17      MS. SHIH:  Yes, it is -- it's definitely after the train

18  horn.

19      MR. GIANNOPOULOS:  Thank you.

20      THE WITNESS:  But that's not a train.

21      MR. MINER:  That wasn't a train horn?

22      MS. SHIH:  Oh, it's not a train.

23      THE WITNESS:  No.  It's usually two -- two sharp sounds

24  right by the car crossing.

25      MS. SHIH:  I'm starting it at 55:27 and I'm hoping that

1   gets us to where we need.

2   (Audio begins at 3:15 p.m.)

3       MS. SHIH:  Stopped at 55:56.  I don't know if there's a

4   question.  I -- I heard the word harsh.  But you do have a CD

5   of the recording --

6       MR. MINER:  Uh-huh.

7       MS. SHIH:  -- as well, so --

8       And then I'll forward it back to where we were, which was

9   around 57:30, and it sounds like what's upcoming -- it's

10  letting me go to 57:18, so I'll start it there.

11  (Audio begins at 3:17 p.m.)

12      MS. SHIH:  Stopped at 58:13.

13  Q   BY MS. SHIH:  What you just heard sounds like a dialogue

14  between you and an individual present at the meeting who was

15  asking questions about the point system and paid time off; is

16  that correct?

17  A   It sounded like there was two or three of us having a

18  dialogue in there.  I couldn't follow all the tones.

19  Q   Do you recognize the other voices besides yours in the

20  dialogue?

21  A   No, I can't identify them.

22  (Audio begins at 3:18 p.m.)

23  Q   BY MS. SHIH:  The voice that you just heard in English,

24  that's your voice?

25  A   That little piece about Eric question PT?  That was me.

1   Q     Correct.

2   A     Yep.

3   (Audio begins at 3:19 p.m.)

4       MS. SHIH:  Stopped the recording at one hour and one

5   second.

6   Q   BY MS. SHIH:  The voice that you just heard, that's Eric

7   Valenzuela, correct?

8   A     It sounds like him, yeah.  Uh-huh.  He has a distinct

9   talking pattern.

10  Q     He was the plant manager at the time of this meeting?

11  A     Yes.

12  (Audio begins at 3:20 p.m.)

13  Q   BY MS. SHIH:  Do you recognize the voice that's having

14  that -- that's making the statement about having to use PTO

15  time?

16  A     No, I do not.

17  (Audio begins at 3:21 p.m.)

18  Q   BY MS. SHIH:  Did you recognize that voice?

19  A     That sounded like Juan.

20  Q     Juan Maciel?

21  A     Can you replay it again?

22  (Audio begins at 3:22 p.m.)

23  Q   BY MS. SHIH:  The voice that stated, "You are still going

24  to lose pay for one of those days," right?

25  A     Yeah, that sounds like Juan's voice because this whole

1    thing was just kind of spinning and all of a sudden Juan and

2    Eric, with all the translators were chatting and I kind of

3    stepped in the back room because I couldn't track them.  It

4    sounded like Juan, Juan Maciel.

5    Q    And you're -- you're referring to Juan Maciel?

6    A    Yes.

7    (Audio begins at 3:22 p.m.)

8        JUDGE LAWS:  So I want you to stop here and start again at,

9    "years ago," but I wanted to have -- there are some inaudible

10   parts.  But what is at the very top of page 28?

11       THE INTERPRETER:  I --

12       JUDGE LAWS:  After she --

13       Sorry.

14       After she translates it, I do want to play it back again

15   just to make sure -- to have our interpreter listen and to try

16   to see if that's what she can hear from the tape as well.

17       THE INTERPRETER:  You know what, I could actually hear it

18   better from back there.

19       JUDGE LAWS:  You could hear it from back there.  Okay.

20       THE INTERPRETER:  So should I just go -- should I just

21   read -- I mean --

22       JUDGE LAWS:  Read, listen to it and then come back up,

23   because you'll need to be near the microphone --

24       THE INTERPRETER:  Okay.

25       JUDGE LAWS:  -- and say what you think was said.

1        THE INTERPRETER:  Okay.  Just translate off of page -- the

2   top of page 28, the italic part, it says, "I believe that's

3   what everybody -- everybody here has been asking for is that

4   they have their PTO and vacations paid.  The PTO was

5   personable" -- it's personally."  And then in brackets it says,

6   "inaudible."  "If you get sick, well, it's -- it's -- I mean

7   it's fine that there's -- that they're going to be deducting

8   it.  But vacations, they should be paid."  And then again,

9   "inaudible."

10       So let me go to the back.

11       JUDGE LAWS:  Go to the back and she'll play it again.  And

12   then play --

13       THE INTERPRETER:  I'm just going to follow it just to --

14       JUDGE LAWS:  Sure.

15       THE INTERPRETER:  -- make sure.

16       MS. SHIH:  Sure.

17       JUDGE LAWS:  Stop after the -- that passage --

18       MS. SHIH:  I'll make sure you have --

19       JUDGE LAWS:  -- and she can come back up and translate from

20   what she heard from the tape, realizing you may start a little

21   before that.

22       MS. SHIH:  Sure.  And I do have an extra copy.  Did she

23   take your copy?

24       JUDGE LAWS:  That's all right.  Thank you.  That's fine.

25       MS. SHIH:  There's -- you can hold onto that copy.

1      I assume that won't be the last question for you.

2      I'm starting it at one hour 41 seconds.

3  (Audio begins at 3:25 p.m.)

4      JUDGE LAWS:  All right.  So up to the part people were

5  talking over each other.

6      THE INTERPRETER:  Right.  Where it says, "Well, PTO,

7  it's" -- "it's a personal thing," and then the only word that I

8  was able to figure out is, "Well -- well, if you get sick."  So

9  where it says "inaudible," it's (Spanish spoken)," but I could

10 not -- pick up the second thing --

11     JUDGE LAWS:  Thank you.

12     THE INTERPRETER:  Okay.

13     JUDGE LAWS:  And, actually, if we have another copy, there

14 is going to be a translation that we're going to need.

15     The bottom of 28 where it says, "(Spanish spoken)," it

16 looks like above that somebody said something in English and

17 that was translated to Spanish.  So when the time comes, why

18 don't we stop the recording after "(Spanish spoken)," and from

19 that "(Spanish spoken)," and she can do her best to translate

20 it from Spanish to English that passage starting --

21     MS. SHIH:  Okay.

22     JUDGE LAWS:  -- above it.

23     MS. SHIH:  You're asking me to stop the recording after the

24 passage that you've asked her to translate that begins

25 "(Spanish spoken) Julio?"

1          JUDGE LAWS:  Yes.

2          MS. SHIH:  Okay.

3          JUDGE LAWS:  I mean you can stop it before that, but -- but

4    at that point I am going to want her to translate what the

5    person said in English --

6          MS. SHIH:  Okay.

7          JUDGE LAWS:  -- that appears to be inaudible above it.

8          MS. SHIH:  Okay.  Thank you.

9          I'm starting it back up at 1:01:17.

10   (Audio begins at 3:27 p.m.)

11         MS. SHIH:  And I've stopped it at 1:03:15.

12   Q    BY MS. SHIH:  The English voice that -- or the English

13   statements that you've heard, that's your voice, correct,

14   Mr. Lave?

15   A    Yes.

16         JUDGE LAWS:  And before you restart, I do also want to

17   instruct the interpreter that in addition to an eye toward

18   translating what's written from Spanish into English, see what

19   you can hear.

20   (Audio begins at 3:29 p.m.)

21         THE INTERPRETER:  I think that's about as good as you're

22   going to get.

23         JUDGE LAWS:  Okay.  So the translation though from Spanish

24   to English of the lines starting with "(Spanish spoken) Julio,"

25   have we heard that --

1      THE INTERPRETER:  "(Spanish spoken) Julio?"

2      JUDGE LAWS:  -- part yet?

3      THE INTERPRETER:  We just did.

4      JUDGE LAWS:  Okay.

5      THE INTERPRETER:  If I could hear it again.

6      JUDGE LAWS:  Sure.

7      MS. SHIH:  Let me see if I can get back to the right spot.

8  (Audio begins at 3:30 p.m.)

9      THE INTERPRETER:  Okay.  The only thing that I put the --

10  the inaudible part, the first part is "(Spanish spoken)" is to

11  give you like -- give you these -- oh, sorry.

12      On the bottom line where it says, "(Spanish spoken) Julio,"

13  okay, the first inaudible part that I was able to discern says,

14  "to give."

15      So let me read it from the -- from Spanish into English

16  where it says, "Unknown male."  It says, "Listen, Julio.  And

17  why is it -- why is it that we can't think about -- let's say

18  you're going to give me, you know -- give me days for -- sick

19  days and then the PTO days will become your vacation.  And

20  that's like to say that your sick days and" -- and then the

21  second part is inaudible.

22      JUDGE LAWS:  Okay.  Thank you.

23      THE INTERPRETER:  Okay.

24  (Audio begins at 3:32 p.m.)

25  Q    BY MS. SHIH:  Did you recognize either the Spanish or the

1    English voice in that part of the recording?

2    A    No, I did not.

3    Q    Neither of those voices were yours, correct?

4    A    Correct, neither one.

5        MS. SHIH:  So I'm starting it now at 1:03:34.

6    (Audio begins at 3:32 p.m.)

7    Q    BY MS. SHIH:  The voice that just said, "So they want

8    basically more time off," that was Mr. Torra, correct?

9    A    That sounded like Mike Torra, yeah.

10   (Audio begins at 3:32 p.m.)

11   Q    BY MS. SHIH:  The voice that you just heard, do you

12   recognize that voice?

13   A    Where it says, "you're going to get pointed?"  No.

14       JUDGE LAWS:  And I want to stop there, because what I heard

15   in the inaudible was -- the second one, starting with, "You

16   don't get a point, but, say, you know, if you're a little sick,

17   you're going to get pointed."  That's what I heard.  Let's play

18   it back.  I want to make sure that is the case.

19   (Audio begins at 3:33 p.m.)

20       JUDGE LAWS:  So, "if you're just sick," not a little sick.

21   That's what I heard.

22   Q    BY MS. SHIH:  And that voice, you stated that you do not

23   recognize?

24   A    I do not know that -- that -- I didn't recognize it.

25   (Audio begins at 3:34 p.m.)

1    Q    BY MS. SHIH:  The voice that you just heard describing the

2    company policy, whose voice is that?

3    A    That's Eric Valenzuela.  He's got that distinct pattern to

4    his -- his diction.

5    Q    Thank you.

6    (Audio begins at 3:35 p.m.)

7    Q    BY MS. SHIH:  That was your voice on the recording talking

8    about the attendance point system?  Your question is kind of

9    how the attendance system -- how you're penalized under the

10   point system?

11   A    Yes.  Yes, that was my voice.

12   (Audio begins at 3:35 p.m.)

13        MS. SHIH:  I stopped the recording at 1:05:06.

14   Q    BY MS. SHIH:  Do you recognize that voice?

15   A    No, I do not.

16   (Audio begins at 3:36 p.m.)

17   Q    BY MS. SHIH:  The voice you just heard in English -- and I

18   stopped it at 1:05:47 -- just prior to stopping it, that's your

19   voice, correct?

20   A    Yes, it was.

21        JUDGE LAWS:  And after the first full sentence that's

22   showing up as audible --

23        THE WITNESS:  Yes, that's right.

24        JUDGE LAWS:  -- regarding -- regarding the passage we

25   just -- we just heard, I did not hear the words "or not" after

1   "to see what they think about those changes."

2       MS. SHIH:  Did you want me to back it up or --

3       JUDGE LAWS:  Why don't we play it again.  And then I'm

4   going to ask you to stop it after the next Spanish passage,

5   because that is either a complete translation of -- of part of

6   what was inaudible above or it is Spanish that isn't translated

7   below.

8       MS. SHIH:  Okay.  I'm starting it at 1:05:37.

9   (Audio begins at 3:37 p.m.)

10      JUDGE LAWS:  And I did hear the "or not" this time.

11      So starting with "(Spanish spoken)."

12      THE INTERPRETER:  He says that he saw -- "the changes have

13  also been recommended and precisely by them and that he's

14  trying to go and -- go around and see -- stop by all the shops

15  across the country right now, seeing how they can make the

16  points system that we've been talking about work with the other

17  managers in different -- in different plans.  He says but -- he

18  says that he doesn't have an answer for you in reference to

19  that at this moment now."

20      JUDGE LAWS:  Okay.  And, to the best of your knowledge, is

21  this individual doing a word-for-word translation or are they

22  translating into Mr. Lave's voice?

23      THE INTERPRETER:  This is a third-party translation.

24      JUDGE LAWS:  Okay.  Thank you.

25      THE INTERPRETER:  So instead of saying it as Mr. Lave would

1    be -- would be speaking, he's saying that "Mr. Lave" or "he is

2    saying," and making a third-party reference.

3        JUDGE LAWS:  Thank you.

4        MS. SHIH:  And I'm starting the recording now at 1:06:02.

5    (Audio begins at 3:39 p.m.)

6        MS. SHIH:  I stopped it at 1:06:17.

7    Q    BY MS. SHIH:  The last voice you heard prior to stopping

8    the recording, that was Mr. Torra, correct?

9    A    Yeah, it sounded like Mike again.

10   (Audio begins at 3:39 p.m.)

11       JUDGE LAWS:  And I just want to ask the interpreter that --

12   it does look like there's more of the interpretation below what

13   Mike Torra is saying, but is it essentially saying -- if

14   anybody wants it word for word, please speak up, I really

15   don't.  Is this translation basically saying the same thing

16   that, we all, even, he, Mr. Torra, presumably lives by the PTO

17   system?  That's what -- it applies to "us?"

18       MR. MINER:  Your Honor, I thought I heard Mike Torra say,

19   "I live by the same rule," and "the same rule" is not indicated

20   on the transcript.  And so maybe it would be helpful to have

21   this Spanish translation translated.

22       JUDGE LAWS:  Why don't we do that since there is some --

23   there is more inaudible space on the English version.

24       THE INTERPRETER:  Okay.  So --

25       JUDGE LAWS:  Starting with "(Spanish spoken)."

```
 1        THE INTERPRETER:  So under Mike Torra, the Spanish

 2   "(Spanish spoken)."  So it would -- and so now -- and it's just

 3   nothing more than a comment.  "He says that everybody's also

 4   living -- that all of us are living under the same rule

 5   system or rules.  That -- and that we don't have any time to"

 6   -- and it's inaudible.  "And we also -- we also have the PTO

 7   system that apply to us."

 8        JUDGE LAWS:  And, again, same question as the last one, is

 9   this a word-for-word translation or is this somebody

10   translating it into the English speaker's voice?

11        THE INTERPRETER:  This is -- this is closer.  They're --

12   they're coming closer, but it's still a third-party

13   translation.

14        JUDGE LAWS:  Thank you.

15        THE INTERPRETER:  Rendition.

16   (Counsel confer)

17        JUDGE LAWS:  Okay.

18   Q    BY MS. SHIH:  I believe there had been an English voice on

19   the recording just prior to me stopping it.  And I was going to

20   ask you if you recognized it.  If you need me to replay it --

21   A    No, I didn't recognize it.

22   Q    Okay.

23        MS. SHIH:  So I'm starting it now at 1:06:37.

24   (Audio begins at 3:42 p.m.)

25   Q    BY MS. SHIH:  Mr. Lave, the English that you heard, that's
```

1    your voice, correct?

2    A    Yeah.  And I want to point out for the record, "I didn't

3    say the "rail company."  I said the "parent company."

4    Q    And later in that -- in that sentence, you also said, "we

5    were able to explain them" -- "to them that that would not be

6    good for us" --

7    A    I recall something like that.

8    Q    -- is that correct?

9    A    Yeah.  Yeah.  I definitely remember something like that.

10   (Audio begins at 3:43 p.m.)

11   Q    BY MS. SHIH:  Let me just ask you again, since we've been

12   hearing a lot of recording, the last Spanish translation, do

13   you recognize that Spanish voice?

14   A    No.

15   (Audio begins at 3:44 p.m.)

16   Q    BY MS. SHIH:  That English voice you heard is Mr. Torra,

17   correct?

18   A    Yes, that was Mike Torra.

19   (Audio begins at 3:44 p.m.)

20       MS. SHIH:  Stopped at 1:08:45.

21   Q    BY MS. SHIH:  That was your voice, correct, Mr. Lave?

22   A    Yes, it was.

23       JUDGE LAWS:  And I'm going to want the interpreter after,

24   "He's got a question.  How long does he have to be with the

25   company before he gets" -- inaudible -- because it appears to

1   be a translation from "(Spanish spoken)," which is not marked

2   as inaudible.  So both listen and -- and be prepared to

3   translate.

4        THE INTERPRETER:  What page are you on?

5        JUDGE LAWS:  I'm on 31, top of 31 "(Spanish spoken)" --

6        THE INTERPRETER:  Okay.

7        JUDGE LAWS:  -- "(Spanish spoken)" --

8        THE INTERPRETER:  Okay.

9        JUDGE LAWS:  -- "(Spanish spoken)."

10        THE INTERPRETER:  Okay.

11        MS. SHIH:  I'm starting it at 1:06:46.

12   (Audio begins at 3:45 p.m.)

13        JUDGE LAWS:  Well, actually, I'm going to revise what I

14   just asked you to do because I felt like I -- I felt like I

15   could hear a lot of what was said before that isn't --

16        THE INTERPRETER:  Okay.

17        JUDGE LAWS:  -- on there after "(Spanish spoken)."  So

18   let's start with that.  And first -- so after other questions

19   about -- on the bottom of page -- oh, I'm sorry, on -- on the

20   bottom of page 30.  I'm sorry.  I was reading the wrong

21   section.  "(Spanish spoken)."

22        MS. SHIH:  So start --

23        JUDGE LAWS:  "(Spanish spoken)."  Start there and -- and

24   see what you can hear, because that also doesn't --

25        THE INTERPRETER:  Okay.

1    JUDGE LAWS:  -- appear to be really translated.

2    MS. SHIH:  Okay.

3    THE INTERPRETER:  So you want me to hear it first?

4    JUDGE LAWS:  Yeah, hear it first and then do your best,

5    based on both the audiotape and what you see.

6    MS. SHIH:  So I'm going to back it up to -- and I believe

7    the time stamp is accurate -- 1:08:46 --

8    JUDGE LAWS:  Thank you.

9    MS. SHIH:  -- and begin playing there and stop it after --

10   JUDGE LAWS:  I guess that's up to you, how much you feel

11   comfortable listening to --

12   THE INTERPRETER:  Just --

13   JUDGE LAWS:  -- at one time.

14   THE INTERPRETER:  Just -- what I need to do is -- just so

15   you know, I'll just -- I'll stop you.

16   MS. SHIH:  For just that -- that paragraph though not into

17   the next voice.

18   JUDGE LAWS:  She's going to tell you when she's --

19   THE INTERPRETER:  Yes.  I -- I would prefer that.

20   MS. SHIH:  Okay.

21   THE INTERPRETER:  Just --

22   MS. SHIH:  It's actually at 1:08:42.  So a few seconds

23   before.

24   (Audio begins at 3:47 p.m.)

25   THE INTERPRETER:  Could you play it again, please?

1   MS. SHIH:  Sure.

2   JUDGE LAWS:  He's a fast talker.

3   MS. SHIH:  I was going to say it sounded pretty fast.  Let

4   me just make sure my volume is all the way up.

5   (Audio begins at 3:48 p.m.)

6   THE INTERPRETER:  Okay.  The first audible word, I did

7   have -- I did have to find in -- on the time stamp 1:08:46 in

8   Spanish and I'm just going to go right down to where I was able

9   to decipher the first audible section, then we'll continue from

10  there.

11  "He says that there's some things in which -- yes, he does

12  have a flexibility at this level in order to be able to -- to

13  fix them."  So the inaudible word is then "(Spanish spoken)."

14  "Some -- some of these things, much of which -- much of these

15  things, when they're just general things, that's the way the

16  parent company manages them."

17  Okay.  Then let me go back and listen to it.

18  MS. SHIH:  And I actually backed it up to the same spot, so

19  we'll rehear what you've already heard.

20  (Audio begins at 3:49 p.m.)

21  THE INTERPRETER:  Play it again.

22  (Audio begins at 3:50 p.m.)

23  MS. SHIH:  I think that was -- that was the end.

24  THE INTERPRETER:  Okay.  So I didn't catch the end.

25  JUDGE LAWS:  Okay.  So everything you can read so far,

1   because we only got to --

2       THE INTERPRETER:  Everything I was able to -- including

3   what I was able to include, but the last part was in --

4       I was able to decipher the first inaudible and go right up

5   until the last inaudible.

6       JUDGE LAWS:  Okay.  So go ahead and --

7       THE INTERPRETER:  So --

8       JUDGE LAWS:  -- and translate that passage ending with

9   "(Spanish spoken)."

10      THE INTERPRETER:  I'm sorry.  What page again?

11      JUDGE LAWS:  The bottom of 30.

12      THE INTERPRETER:  The bottom of 30.  "Many of the things

13  which are general, this is the way the company manages them,

14  and -- and one way or another what they do try to do is to

15  negotiate or to see which is" -- and that's it.

16      JUDGE LAWS:  Thank you.

17      THE INTERPRETER:  And did you need the --

18      JUDGE LAWS:  And then she's going to play the next part.

19      THE INTERPRETER:  All right.

20  (Audio begins at 3:51 p.m.)

21      THE INTERPRETER:  The question of the unknown male --

22  unknown male, the translation is, "I have a question.  How much

23  time do I have to be at the company in order to be able to

24  reach the top of my wage and/or my salary and how much is the

25  top?"

```
 1        JUDGE LAWS:  Thank you.

 2   Q    BY MS. SHIH:  Mr. Lave, did you recognize the voice of the

 3   employee asking that question?

 4   A    No.  No.

 5        MS. SHIH:  And I'm starting it now at --

 6        THE WITNESS:  I was lost through this whole thing, then and

 7   now.  I just -- I couldn't keep up with it.

 8        MS. SHIH:  I'm starting the recording now at 1:09:12.

 9   (Audio begins at 3:52 p.m.)

10   Q    BY MS. SHIH:  That was your voice on the recording just

11   now, correct?

12   A    Yes, that was me.

13   Q    And you were directing Juan to answer the question that

14   had been asked?

15   A    Some question that was asked, yeah.

16   Q    And --

17        JUDGE LAWS:  Okay.  And now --

18        THE WITNESS:  Something to do with our cap, our step --

19   step program and caps.

20        JUDGE LAWS:  Now I'm going to ask our interpreter to listen

21   to the next section that is after, "Interpreter colon;" both

22   look at and listen to the passage.  There was an inaudible

23   part.  If you can fill that in, please do; if not --

24        THE INTERPRETER:  Certainly.

25        JUDGE LAWS:  -- I'll have you translate it without it.
```

```
 1        MS. SHIH:  And I actually had one more for Mr. Lave about

 2   that --

 3        JUDGE LAWS:  Okay.

 4        MS. SHIH:  -- statement that he made.

 5   Q    BY MS. SHIH:  The Juan that you asked to answer the

 6   question about a cap, that's Juan Maciel?

 7   A    Yes.

 8        MS. SHIH:  And I may need to back it up just a few seconds

 9   because I think it started into the Spanish already.

10   (Audio begins at 3:53 p.m.)

11        THE INTERPRETER:  That's off.  And it's off because this is

12   broken up.  That's what it is.

13        JUDGE LAWS:  "(Spanish spoken)" came before "(Spanish

14   spoken) evaluation," right?

15        THE INTERPRETER:  Yes.  Yes.  And he says, "Normally when a

16   welder, and he says an experienced one, begins in a company,

17   begins at a -- at the same level as -- they all begin at a

18   level with the expectation that you should be able to get to

19   the cap of your wage cap within -- within three years."  And

20   then the unknown male voice says, "(Spanish spoken)," which is

21   how much.  And then the interpreter comes back and says, "An

22   evaluation."

23   Q    BY MS. SHIH:  And, Mister --

24        JUDGE LAWS:  And it looks like there's nothing inaudible

25   for the next, one, two, three -- four Spanish passages.  So if
```

1    we could play through those and then after those we'll have you

2    translate them, and please note anything that you perceive as

3    different from what you hear written down.

4    Q    BY MS. SHIH:  And, Mr. Lave, with respect to the Spanish

5    voice that you just heard on the recording with the exception

6    of the voice that asked "(Spanish spoken)," you recognize that

7    voice as Mr. Maciel?

8    A    Yeah, it sounds like Juan.

9        MS. SHIH:  I'm starting now at 1:09:47.

10   (Audio begins at 3:55 p.m.)

11       JUDGE LAWS:  Are you ready?

12       THE INTERPRETER:  Yes.  There's -- I've been listening and

13   translating at the same time and there is nothing in the

14   context that varies.

15       JUDGE LAWS:  So is it your interpretation that these are

16   people just talking and it's not following a question-and-

17   answer format, it's more of a --

18       THE INTERPRETER:  No.  I can --

19       JUDGE LAWS:  -- conversation?

20       THE INTERPRETER:  -- go ahead and translate it.  That's no

21   problem.

22       JUDGE LAWS:  Okay.

23       THE INTERPRETER:  Okay.  He's -- let's see.  Why don't we

24   go back to unknown male.  It says, "How much?"  And the

25   interpreter says, "Three years.  And then every six months

1  there's an evaluation, and it's a self-evaluation, and then an

2  evaluation with your supervisors.  And after -- and it depends

3  upon the points that you obtain on your evaluation, that also

4  will depend upon the raise which is given to you." The unknown

5  male, "And the top or the cap?"  And the interpreter proceeds.

6  "The cap has changed in the last two to three years" -- and

7  then there's something inaudible.  The interpreter comes back

8   -- "for a welder.  It's 20.59. Remember that when you all

9  started, if you have two or three years, it was less and then

10 every year it goes in an increase.  And it's -- every year it

11 increases."

12      JUDGE LAWS:  Okay.  Thank you.

13      MS. SHIH:  Your Honor, the audio recording continues in

14 Spanish for the next several minutes and it was our intention

15 to simply play it through and not question this witness about

16 any of the statements made on those recordings.  If Your Honor

17 would like me to stop it at any point, I'm happy to do that.

18      JUDGE LAWS:  Is it -- is it ever translated, because I'm

19 not sure what good a --

20      MR. GIANNOPOULOS:  No.  But we're not relying on the -- the

21 government's not relying on any of the Spanish, the further

22 Spanish translations for anything.  It provides context to the

23 meeting.

24      JUDGE LAWS:  But what I'm asking is what's the point of

25 having it in the transcript if --

1       MR. GIANNOPOULOS:  Probably none, from our --

2       JUDGE LAWS:  Me, who doesn't speak Spanish is not going to

3    be able to understand a word of it.  Although, I shouldn't say

4    a word of it.  I know some Spanish.  But I'm not going to be

5    able to make sense of it.

6       MS. SHIH:  No.  We had simply requested that a transcript

7    be prepared of what was audible on the recording, whether it

8    was made in English or Spanish, so --

9       JUDGE LAWS:  Are there any parts of the Spanish -- you

10   know, and we can do this another time if you want now.  I think

11   we can perhaps all use a break from this recording.  But if

12   there are any parts of the Spanish that you want the

13   interpreter to translate into the record, you know, that's --

14       MR. MINER:  And --

15       JUDGE LAWS:  -- certainly something that -- that would be

16   reasonable just for sake of completeness, or if there are some

17   parts that you feel are important to add as part of the record.

18       MR. MINER:  Thank you, Your Honor.  And as a Spanish-

19   challenged individual, if there is going to be any Spanish

20   evidence in the record, I'd like to have a translation of it.

21       JUDGE LAWS:  Okay.

22       MS. SHIH:  We -- the General Counsel's not going to be

23   introducing any portion of the Spanish statements from this

24   recording into -- into evidence.  But the recording itself,

25   we'll be offering the entire recording into evidence.

1    MR. GIANNOPOULOS:  So if we want to have Grace translate

2  it, if that's what the Respondent wants, that -- that would be

3  fine.  We could have her --

4    MR. MINER:  I think it makes sense.

5    JUDGE LAWS:  I think that makes sense.  Now, do -- do we

6  want to do it now with all of us listening -- and I'm not

7  saying that with any bias against my doing that -- or do we

8  want to have her -- I mean she has taken an oath to translate

9  verbatim.  Do we want her to do that on her own with the tapes?

10    And I want to get, I suppose, your -- what your reference

11  would be as well.

12    THE INTERPRETER:  I can -- I'm not really understanding

13  your understand.  I mean I'm here to interpret, translate, so

14  whatever you need --

15    JUDGE LAWS:  You'll --

16    THE INTERPRETER:  -- I'm here.

17    JUDGE LAWS:  -- do it whenever?  Okay.

18    I guess what -- do either of you have a preference?  I'm --

19    MR. GIANNOPOULOS:  I would think it would probably be

20  easier if she --

21    MS. SHIH:  Preferable to do it here.

22    MR. GIANNOPOULOS:  -- do it off --

23    MS. SHIH:  Oh.

24    MR. GIANNOPOULOS:  Oh, here?

25    MS. SHIH:  I would think --

1    MR. MINER:  Is -- is the question whether she does it after

2  hours or does it during hearing time?

3    JUDGE LAWS:  Or, you know, whenever -- when there's an

4  English-speaking witness and she can go into another room and

5  perhaps --

6    THE INTERPRETER:  Oh, I see.

7    JUDGE LAWS:  -- put on ear phones and --

8    MR. MINER:  That seems very efficient.

9    JUDGE LAWS:  That seems more efficient.

10    THE INTERPRETER:  So you're asking me for a hard

11  translation?

12    JUDGE LAWS:  Yes.

13    THE INTERPRETER:  I see.  Okay.  I see.  Of -- of what is

14  transcribed here?

15    JUDGE LAWS:  Well --

16    THE INTERPRETER:  Or do you want me --

17    MS. SHIH:  I think what --

18    THE INTERPRETER:  -- to transcribe and translate?

19    JUDGE LAWS:  I think -- I think we need you to do what

20  you've been doing.  Just because -- and, you know, I will say

21  with regard to General Counsel's proposed 153, I made a couple

22  of things -- a couple of corrections, some of which I misheard

23  but some of which I correctly heard.  You know, there -- there

24  were various times when it simply didn't matter to correct.

25  But a word like "but" or so was missing doesn't really matter,

1    but I think in terms of providing a word-for-word translation

2    of what was said, it's a safer practice to have you go from

3    what was said, not what somebody else heard was said.

4         THE INTERPRETER:  Okay.

5         JUDGE LAWS:  So it seems like in the next couple of days

6    we're going to have some -- you're going to be here and we're

7    going to have some witnesses who aren't going to need you.  So

8    what would probably make the most sense is for you to do it --

9         THE INTERPRETER:  Okay.

10        JUDGE LAWS:  -- when they're testifying.

11        THE INTERPRETER:  Okay.

12        JUDGE LAWS:  Does that -- does that work for everybody?

13        MR. MINER:  Yes.  Thank you --

14        MS. SHIH:  Yes, Your Honor.

15        JUDGE LAWS:  All right.  Why don't we -- assuming there are

16    no more questions about what has been played so far, take ten

17    -- well, let's see, it's 4:00 -- five after 4:00.  What -- what

18    else -- can we make some more headway?  We have -- we have one

19    more of these, right?

20        MS. SHIH:  We do have one more of --

21        MR. GIANNOPOULOS:  If -- yeah, and it might make sense --

22        MS. SHIH:  -- these recordings.

23        MR. GIANNOPOULOS:  -- to take a break now, finish the last

24    recording.  And then since we have to pack up everything from

25    today --

1    JUDGE LAWS:  Ah.

2    MR. GIANNOPOULOS:  -- to move to the library tomorrow, at

3  least -- it might take us an extra maybe five minutes just to

4  get the extra boxes out.

5    JUDGE LAWS:  Okay.  Well, let's -- let's take five now, try

6  to get as much -- how -- how long is the next recording?

7    MS. SHIH:  Well, I was going to ask you, it's -- it's a

8  little unclear to me whether we're going to listen to the next

9  five to seven minutes of just Spanish --

10    JUDGE LAWS:  No.

11    MS. SHIH:  -- at this time?  So we're going to skip ahead

12  in the recording?

13    JUDGE LAWS:  We are.

14    MS. SHIH:  And it looks like then we would probably be

15  picking it up at the middle of page 34.

16    JUDGE LAWS:  All right.

17    MR. GIANNOPOULOS:  Oh, I thought we were -- I thought we

18  had finished.  I apologize.

19    MS. SHIH:  Oh, are we --

20    JUDGE LAWS:  I thought we had finished too.  Is -- is there

21  one more recording?  That's what I was --

22    MS. SHIH:  There is another recording.

23    JUDGE LAWS:  How long is that?

24    MS. SHIH:  The last recording is -- I believe it's -- let

25  me pull up the actual recording.

1    MR. GIANNOPOULOS:  I thought we had finished the second

2  recording.

3    JUDGE LAWS:  I had too.

4    MS. SHIH:  Well, there's -- oh, excuse me.

5    JUDGE LAWS:  We were wishful thinking.

6    MS. SHIH:  The last recording is 31 minutes.

7    JUDGE LAWS:  Well, yeah, I think we should try to make some

8  headway with it.  Well, we have a half -- a half an hour if we

9  take five, so -- and even though it's Friday, it really doesn't

10  feel like it, so we may as well just --

11    MR. MINER:  It's Thursday for us.

12    JUDGE LAWS:  -- forge ahead.  Exactly.  It's Thursday for

13  us.

14    So let's take -- let's take five minutes just to stretch

15  and we'll come back at ten after 4:00.

16  (Off the record at 4:04 p.m.)

17    THE COURT REPORTER:  We're on.

18    JUDGE LAWS:  We're on.  Okay.

19    MS. SHIH:  And, Your Honor, there actually are some

20  statements at the end of this June recording that I did want to

21  question this witness about.  So I know it was discussed that

22  it was not our intention now to play the rest of the entire

23  recording into the record.  What I would like to do is jump

24  ahead to -- and it's -- it follows along -- it tracks with

25  what's on page 37 --

```
 1          JUDGE LAWS:  Okay.

 2          MS. SHIH:  -- of the transcript that's noted at the time

 3   stamp of 1:25:31.  And I'm actually going to begin the

 4   recording as close as I can get it, which is 1:25:23.

 5          MR. MINER:  Everything up to this point is going to be

 6   translated, correct?

 7          JUDGE LAWS:  Yes.

 8          MS. SHIH:  That's my understanding.

 9          MR. MINER:  All right.  Yeah.  Thank you.

10   Q    BY MS. SHIH:  And, Mr. Lave, are you at the port -- the

11   spot in the transcript that I was referring to on page 37?

12   A    Oh.  Okay.  I'm on 37.  And --

13   Q    Where it's indicated on the left-hand side 1:25:31 --

14   A    Yes.  Thank you.

15   Q    -- I'm going to be playing the recording just a few

16   seconds prior that.

17   A    Okay.

18   (Audio begins at 4:14 p.m.)

19          MR. MINER:  I think you are around 1:25:50, you had --

20          JUDGE LAWS:  Yeah.  It doesn't seem to be the right place,

21   because the -- the speech right before where you said you were

22   going is Spanish.

23          MS. SHIH:  Right.  And I thought perhaps there was

24   something in English that simply had not been transcribed

25   because I didn't see the statements.  Let me -- let me just --
```

1       MR. MINER:  I think the --

2       MS. SHIH:  I'll see if I can --

3       MR. MINER:  -- 1:25:31 on 30 -- on page 37 must be a typo,

4  and I wonder if it's 1:26 or 27.

5       MS. SHIH:  That does make sense since --

6       JUDGE LAWS:  Yeah.

7       MS. SHIH:  -- on page 26 it's at 1:25:50.  So --

8       MR. MINER:  Yeah.

9       MS. SHIH:  -- let me move it ahead just a little bit and

10  see if I can find this.

11  (Audio begins at 4:15 p.m.)

12      MS. SHIH:  Sorry.

13      MS. SHIH:  My apologies.  That's not it.

14      JUDGE LAWS:  Wow, that was a fun interior meeting.

15      MS. SHIH:  Sorry about that.

16      THE WITNESS:  That was loud.

17      MR. MINER:  A little personal business on that laptop?

18  Q    BY MS. SHIH:  Was there -- was there any Go-Go's music

19  playing during this June meeting, Mr. Lave?

20  A    I mean -- yeah.  I listened to Blondie last night at 2:00

21  in the morning.  So I can't -- Go-Go's, Blondie, it's all the

22  same.

23  (Audio begins at 4:16:27 p.m.)

24      MS. SHIH:  I think to avoid that happening again, I'm going

25  to have to just listen to some of the Spanish and see if --

1    JUDGE LAWS:  Sure.

2    MS. SHIH:  -- I can find the right spot.

3    Okay.  So I think I can jump ahead just a little bit.

4    MS. SHIH:  That appears to be at the bottom of page 36, so

5    let me jump ahead just a little bit.

6    (Audio begins at 4:17 p.m.)

7    MS. SHIH:  The top of 37.

8    (Audio begins at 4:17 p.m.)

9    MS. SHIH:  So it appears that it's actually -- the time

10   stamp should be around 1:28:25 and that's where I'm picking it

11   up right now.

12   (Audio begins at 4:18 p.m.)

13   MS. SHIH:  And I stopped it at 1:28:44.

14   Q    BY MS. SHIH:  The English statements that you've just

15   heard, that's your voice; correct?

16   A    Yes, those are mine -- my statements.

17   (Audio begins at 4:19 p.m.)

18   MS. SHIH:  I stopped it at 1:29:26.

19   Q    BY MS. SHIH:  That's your voice on the recording; correct?

20   A    Yes, it is.

21   (Audio begins at 4:20 p.m.)

22   Q    BY MS. SHIH:  That last statement in English, that was

23   your voice; correct?

24   A    Yes, it was.

25   (Audio begins at 4:20 p.m.)

1     MS. SHIH:  And I stopped the recording at 1:30:29.

2  Q    BY MS. SHIH:  That last statement that you heard in

3  English; that's your voice, correct?

4  A    Yes, it was.

5  (Audio begins at 4:21 p.m.)

6  Q    BY MS. SHIH:  That last -- thank you very much, that was

7  your voice as well; correct?

8  A    Yes, it was.

9  Q    That was the conclusion of your meeting on June 28th, 2013

10  with employees in Tucson?

11  A    As best I recall it was, yes.

12     MS. SHIH:  There's actually another -- the recording

13  itself goes an additional minute.  To my knowledge there is not

14  any dialogue on the recording but, again, Mr. Miner has the CD

15  itself and at this point we would move for admission of General

16  Counsel -- actually we've already moved for admission, I

17  believe, of General Counsel 151, but that was the October

18  recording.  We're moving for admission of General Counsel 151

19  with regard to the June recording under the same grounds and on

20  the same arguments that we previously moved for admission of

21  the October recording.

22     JUDGE LAWS:  And assuming the same objection, I don't want

23  to put words into your mouth but I -- I will make the same

24  ruling and that is basically to reserve ruling on

25  authentication and whether that has been done to a great enough

1  extent with regard to any inaudible portions consistent with --

2  well, that would go to weight, not admissibility.

3      MS. SHIH:  Just to confirm its 4:25 and you did want me to

4  go ahead and begin with the July recording?

5      JUDGE LAWS:  Yeah, I think we should just because we have

6  some time and we might as well use it.

7      MS. SHIH:  And there are some issues with regard to the

8  Spanish portions of the July recording that we will want

9  translated for the record.  And the July recording actually

10  begins in Spanish.  So it makes sense to -- I just realized I

11  haven't given out the July recording.  So what -- marked as

12  General Counsel Exhibit 154 is a CD of the July 9, 2013

13  recording that we'll be playing.

14      And what's been marked as General Counsel 155.

15      I'm handing to Counsel and the witness the transcript of

16  the July recording.  I just wanted to give this to our

17  interpreter and I will get you another copy.

18  (Audio begins at 4:25 p.m.)

19      MS. SHIH:  Up until about time stamp five minutes, 42

20  seconds, there is simply background noise on the recording so I

21  will forward the recording to start it at 5:37 and it does

22  begin in Spanish.  So we'll ask Grace to provide a translation

23  for the record and I'll give you a transcript to follow along

24  with for your convenience.

25  (Audio begins at 4:26 p.m.)

1    MS. SHIH:  May I question the witness about that

2  statement, briefly?

3    JUDGE LAWS:  Would you prefer to translate for us, or does

4  it matter?

5    THE INTERPRETER:  As you all wish.

6  Q    BY MS. SHIH:  Mr. Lave, you recognize the voice that you

7  just heard on the recording in Spanish as Juan Maciel?

8  A    Yes.

9  Q    You're present at a meeting with him that was conducted

10  with Greenbrier employees in Tucson on July 9th, 2013?

11  A    Correct.

12    THE INTERPRETER:  Did you need me to come up to the mic

13  or --

14    JUDGE LAWS:  He probably needs you to come up to the

15  mic --

16    MS. SHIH:  Well, probably this mic would be fine.

17    JUDGE LAWS:  -- anyway,

18    THE INTERPRETER:  Good afternoon, I'm going to introduce

19  myself, for those of you that don't know me, I'm Juan Maciel.

20  I have 20 years of experience in the repair group.  I began --

21  I began in this workshop as a welder in '93 and I've had the

22  opportunity to improve in this company.  In 2012 I worked as a

23  plant manager in San Antonio and I'm like one of the three

24  general managers along with Kevin, who is the other one, one of

25  the other three.  Kevin and I share the responsibility for this

1  shop, make it come out ahead.  I have six other shops under my

2  responsibility.  One near Mira Loma, California, two in San

3  Antonio, one in Philadelphia, one in Mexico in the capital

4  city, and another in Toronto, Canada.

5       But right now what the most important thing is -- is to

6  help here to try to get this work -- get this shop to come out

7  ahead.

8       MS. SHIH:  Restarting the recording at 6:48.

9  (Audio begins at 4:29 p.m.)

10      THE INTERPRETER:  So we'd like to speak with you a little

11 bit because on Thursday there's going to be a vote for the

12 union, to see if you want the union, if it comes in or not.  If

13 you vote yes, union comes on board, if you vote no, it does not

14 come in.

15 Q    BY MS. SHIH:  Mr. Lave, this meeting was held on July 9th,

16 2013; correct?

17 A    Yes.

18 Q    And the union election was held on July 11th, 2013;

19 correct?

20 A    Yes.

21 Q    Thank you.

22      MS. SHIH:  Restarting at 7:06.

23 (Audio begins at 4:30 p.m.)

24      THE INTERPRETER:  So two weeks ago, Al and Mike talked to

25 you guys about what could happen if the union comes in.  Then

1    one of the things that can be lost is the communication between

2    us.  So if you have a complaint or right now, like a special

3    occasion, you can come directly to speak to Eric, speak with

4    him and you guys can fix it between the two -- between you.

5    When union comes in that's lost because everything is managed

6    by the union side, or on behalf of the union.  And the union,

7    depending upon the job that it has or work, does not have to

8    represent your case -- your case before the company.

9        MS. SHIH:  Starting at 7:51.

10   (Audio begins at 4:32 p.m.)

11   Q    BY MS. SHIH:  Mr. Lave, do you recognize that voice on the

12   recording?

13   A    Yeah -- yeah, it was Juan Maciel.

14       MS. SHIH:  Starting at eight minutes.

15   (Audio begins at 4:32 p.m.)

16   Q    BY MS. SHIH:  That's your voice on the recording; correct?

17   A    Yes, it is.

18       MS. SHIH:  Starting at 8:20.

19   (Audio begins at 4:32 p.m.)

20       THE INTERPRETER:  So as they just mentioned, right now, if

21   you guys, if you have a problem or if you have a complaint or

22   if any of you guys individually -- or if any of you guys

23   individually just want to come to talk to any of us, be it

24   Chris, Eric, Kevin, Al or myself for that -- in order to try to

25   fix something or help you with a problem that you have.

1    Q    BY MS. SHIH:  And that was still Mr. Maciel speaking on

2    the recording; correct?

3    A    Yes, correct.

4         THE INTERPRETER:  And the interpreter is going to correct.

5    The -- Grace St. John Carver, the interpreter for the -- as

6    acting as the interpreter for this hearing I'm going to go

7    ahead and correct my own rendition.

8         JUDGE LAWS:  Okay.

9         THE INTERPRETER:  So I'll repeat it again, so as it's just

10   been commented right now, you guys if you have a problem or if

11   you have a complaint, or if any one of you guys individually

12   want to come speak to any of us, with Chris, with Eric, with

13   Kevin, Al or myself in order to try to fix something or help

14   with a problem that you may have.

15        MS. SHIH:  Starting at 8:39.

16   (Audio begins at 4:34 p.m.)

17        THE INTERPRETER:  Did you want me to interpret or --

18        MS. SHIH:  Go ahead.

19        THE INTERPRETER:  That's our practice in this shop and in

20   all of the other shops that we have.  It's something that we

21   would like to continue doing in this shop.

22   Q    BY MS. SHIH:  And again, the English voice on the

23   recording is yours; correct, Mr. Lave?

24   A    Yes.

25   Q    The statements made in English on the recording --

1    A    Yes, yes.

2    Q    -- that's your voice?

3    A    Yes, thank you.

4    Q    And Mr. Maciel at the time of this meeting on July 9th,

5    his position with Greenbrier was general manager?

6    A    Correct.

7    Q    Thank you.

8         MS. SHIH:  Starting at 8:57.

9    (Audio begins at 4:35 p.m.)

10        THE INTERPRETER:  As it was just mentioned, if you have a

11   complaint or a problem that is reported to the union that

12   union, by law, does not have to present the case before the

13   company.

14        MS. SHIH:  Starting at 9:32.

15   (Audio begins at 4:36 p.m.)

16        THE INTERPRETER:  By federal law they can choose which

17   complaints they're going to present and which ones they are not

18   going to present to the company.

19   Q    BY MS. SHIH:  And just to be repetitious, the English

20   statements that you've heard on this recording thus far, that's

21   your voice; correct?

22   A    Yes, correct.

23   (Audio begins at 4:37 p.m.)

24        THE INTERPRETER:  Al does not believe that that is a fair

25   law and that it's not correct.

1      MS. SHIH:  Starting at 9:59.

2    (Audio begins at 4:37 p.m.)

3      THE INTERPRETER:  For those of you who know a little bit

4    more, Al has been with Greenbrier for two years, the last five

5    years before that he was practicing as a labor attorney -- an

6    employment attorney.  He had his own practice.

7      MS. SHIH:  Starting at 10:26.

8    (Audio begins at 4:38 p.m.)

9      THE INTERPRETER:  He would represent individual cases for

10   the people against the companies when this law suit -- I'm

11   drawing a blank with in Spanish -- yes, (Spanish spoken) when

12   he would sue the workers -- when the workers sued the companies

13   when they weren't paid their wages or when their things at work

14   didn't go well, Al -- it was his job to represent this people

15   and to take their cases in to sue companies.

16     MS. SHIH:  Starting at 11:27.

17   (Audio begins at 4:40 p.m.)

18     THE INTERPRETER:  He says that -- Al says that during

19   those seven years he would receive a lot of calls from the

20   workers which wanted -- who wanted him to take their case in

21   order to sue their union because the union was not representing

22   their case before the company.

23     JUDGE LAWS:  It looks like a good place to stop is, go

24   three more passages and then we've got a subject matter change.

25     MS. SHIH:  That was my intention to stop just prior to the

1   12:57 timestamp.

2       JUDGE LAWS:  Sounds good.

3       MS. SHIH:  Starting at 11:59.

4   (Audio begins at 4:41 p.m.)

5       THE INTERPRETER:  Al says that they would ask him if he

6   could do anything to help them and Al says that he couldn't do

7   anything to help them.

8       MS. SHIH:  Starting at 12:13.

9   (Audio begins at 4:41 p.m.)

10      THE INTERPRETER:  They would ask that if you couldn't help

11  them to sue the -- to sue at work then if they can help -- if

12  he could help them to sue the union.

13      MS. SHIH:  Starting at 12:28.

14  (Audio begins at 4:42 p.m.)

15      THE INTERPRETER:  He said that -- that even when he would

16  explain to them that he could not help them, why he couldn't

17  help them, that the way that the federal law was written the

18  union could choose which cases to present and they're going to

19  present -- they're going to present before the company.

20  Q   BY MS. SHIH:  And Mr. Lave, just to confirm, the

21  statements that you've heard thus far in English on this

22  recording, that's your voice; correct?

23  A   Yes, they are.

24  Q   And the statements that our interpreter has been

25  translating at the hearing, those are the voice that you heard

1   in Spanish on the recording, that's Juan Maciel; correct?

2   A    Yes.

3       MS. SHIH:  And I believe this is a good time for us to

4   break.

5       JUDGE LAWS:  I think it is because the building is going

6   to close in 15 minutes.  So tomorrow does everybody know where

7   we are?

8       MR. MINER:  We're going to drive by thereafter -- well, in

9   just a few minutes, Your Honor.

10      JUDGE LAWS:  Okay.  And why don't we be ready to go at

11  8:15.  We can go off the record and figure out how we'll make

12  that logistically.

13  **(Whereupon, the hearing in the above-entitled matter was**

14  **recessed at 4:44 p.m. until Saturday, November 16, 2013 at 8:15**

15  **a.m.)**

16

17

18

19

20

21

22

23

24

25

1    **C E R T I F I C A T I O N**

2    This is to certify that the attached proceedings before the

3    National Labor Relations Board (NLRB), Region 28, Case Numbers

4    28-CA-093183, 28-CA-103909, 28-CA-104184, 28-CA-106613, 28-CA-

5    111186, 28-RC-093179, Gunderson Rail Services LLC, d/b/a

6    Greenbrier Rail Services, and Sheetmetal Workers' International

7    Association, Local 359, AFL-CIO at the Pima County Consolidated

8    Justice Court, 160 N. Stone Avenue, Third Floor, Courtroom 11,

9    Tucson, Arizona 85701, on Friday, November 15, 2013, at 8:40

10   a.m., was held according to the record, and that this the

11   original, complete, and true and accurate transcript that has

12   been compared to the reporting or recording, accomplished at

13   the hearing, that the exhibit files have been checked for

14   completeness and no exhibits received in evidence or in the

15   rejected exhibit files are missing.

16

17

18

19                  GRANT C. DAYLEY

20                  Official Reporter

21

22

23

24

25

UNITED STATES OF AMERICA

BEFORE THE NATIONAL LABOR RELATIONS BOARD

REGION 28

| | |
|---|---|
| In the Matter of: | |
| GUNDERSON RAIL SERVICES LLC, D/B/A GREENBRIER RAIL SERVICES, | Case No. 28-CA-093183 28-CA-103909 28-CA-104184 28-CA-106613 |
| and | 28-CA-111186 |
| SHEET METAL WORKERS' INTERNATIONAL ASSOCIATION LOCAL 359, AFL-CIO, | |
| GUNDERSON RAIL SERVICES LLC, d/b/a GREENBRIER RAIL SERVICES, | Case No. 28-RC-093179 |
| Employer, | |
| and | |
| SHEET METAL WORKERS' INTERNATIONAL ASSOCIATION LOCAL 359, AFL-CIO, | |
| Petitioner. | |

The above-entitled matter came on for hearing, pursuant to

notice, before **ELEANOR LAWS,** Administrative Law Judge**,** at the

National Labor Relations Board, Santa Rosa Branch Public

Library, 1075 S. 10th Avenue, Tucson, Arizona 85701, on

**Saturday, November 16, 2013, at 9:18 a.m.**

<u>A P P E A R A N C E S</u>

**On behalf of the General Counsel:**

    **EVA SHIH, ESQ.**
    **JOHN GIANNOPOULOS, ESQ.**
    NATIONAL LABOR RELATIONS BOARD - REGION 28
    2600 North Central Avenue, Suite 1400
    Phoenix, AZ 85004-3099
    Tel.  602-640-2090
    Fax.  602-640-2178

    **SOPHIA ALONSO, ESQ.**
    NATIONAL LABOR RELATIONS BOARD
    421 Gold Avenue, SW, Suite 310
    P.O. Box 567
    Albuquerque, NM  87103
    Tel.  505-248-5128
    Fax.  505-248-5134

**On behalf of the Respondent:**

    **FREDERICK C. MINER, ESQ.**
    **STEVEN G. BIDDLE, ESQ.**
    LITTLER MENDELSON, P.C.
    Camelback Esplanade
    2425 E. Camelback Road, Suite 900
    Phoenix, AZ 85016
    Tel.  602-474-3653
    Fax.  602-391-2836

## I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---------|--------|-------|----------|---------|-----------|
| Juan Maciel | 1041 | | | | |
| Eric Valenzuela | 1110 | | | | |
| Antonio Acuna | 1148 | 1165 | | | |
| Al Lave | 1207 | | | | |

## E X H I B I T S

| EXHIBIT | IDENTIFIED | IN EVIDENCE |
|---------|------------|-------------|
| **General Counsel:** | | |
| GC-156 | 1038 | 1038 |
| GC-157 | 1059 | 1059 |
| GC-158 | 1189 | 1189 |
| GC-155 | 1217 | 1217 |
| GC-154 | 1217 | 1217 |

1      P R O C E E D I N G S

2      JUDGE LAWS:  Before we get started today -- we're waiting

3  on the interpreter -- I wanted to deal with a couple exhibit

4  matters.  So I understand there are a couple of exhibits you

5  want to admit.

6      MS. SHIH:  Yes, Your Honor.  General Counsel 156 is the

7  complaint and notice of hearing that was issued in case 28-CA-

8  112806, which has been consolidated with this case but was not

9  yet part of the formal papers.  So we're moving for admission

10  of General Counsel 156.

11      MR. MINER:  No objection, Your Honor.

12      JUDGE LAWS:  156 is admitted.

13  **(General Counsel Exhibit Number 156 Received into Evidence)**

14      MS. SHIH:  And for the record, General Counsel 136 has

15  been replaced with a redacted version of what was offered and

16  previously admitted yesterday.

17      JUDGE LAWS:  Very good.  And then was there another

18  exhibit, the survey that was translated?

19      MS. SHIH:  There is the survey that is translated but

20  there is a certificate of translation, and I'm not sure if the

21  interpreter needs to review and execute that before we should

22  offer it.  So perhaps --

23      JUDGE LAWS:  Let's hold off on that.

24      MS. SHIH:  -- we should wait and speak to her.

25      JUDGE LAWS:  All right.  And then I did take a look at

1   some of the law regarding the audiotapes.  And remind me, what

2   were the two that were offered?  What were the numbers?

3        MS. SHIH:  The recordings them -- the CDs themselves are

4   GC Exhibit 151 and 154.  GC-151 is a CD that contains a October

5   31st, 2012 recording and a June 28th, 2013 recording.  GC 154

6   contains the July 9th, 2013 recording.

7        JUDGE LAWS:  Okay.  And in taking a look at board

8   precedent as well as Ninth Circuit precedent and in looking at

9   in re La Marquee Hotel, LLC, 340 NLRB 45, and that is dealing

10  with union cards not tapes, however cites to a decision out of

11  the Ninth Circuit, Alexander Dawson, Incorporated, v. NLRB, 586

12  F.2d 1300.  And that's a 1978 case out of the Ninth Circuit

13  that stands for the premise that under 901(a) of the Federal

14  Rules of Evidence once prima facie evidence of authenticity is

15  adduced it's not necessary to establish chain of custody.  When

16  there is prima facie evidence of authenticity, the burden

17  shifts to the Respondent to rebut the authenticity.  And that's

18  dealing with documents.

19       However, the same rule has been applied with regard to

20  audiotapes, and a couple of cases applying it are U.S. v.

21  Curry, 46 F.3d 1146.  That's a table case, Ninth Circuit out of

22  Washington, 1995 -- and I'll repeat those more slowly once

23  we're off the record -- and U.S. v. Panaro, 266 F.3d 939, Ninth

24  Circuit case out of Nevada, 2001.  And those cases generally

25  stand for the rule that under Federal Rule of Evidence 901

1   what's required is evidence that the -- what's on the tape is

2   what it is claimed to be.

3        I think we are there with regard to Mr. Lave and the

4   meeting that is recorded at 154.  The other witnesses haven't

5   been identified.  I don't think that makes the tape

6   inadmissible; it's just going to go to the weight of it.  I'm

7   not going to be able to find that other people said certain

8   things that are on the tape unless their testimony or their

9   voice, excuse me, is identified and that somebody remembers

10  yes, we had a meeting like this and I recognize this person's

11  voice and yes, this is consistent with what I recall being

12  said.  With regard to 154, I think there is prima facie

13  evidence with regard to Mr. Lave and the voice of Mr. Maciel,

14  which was identified, and then there was one other person,

15  Freddy.

16       So that said, I do think there is prima facie evidence

17  both in form of testimony and other documents in the record

18  that show that these meetings did take place on the dates it

19  occurred and that the individuals who were speaking were there

20  speaking.  The Respondent will be given every opportunity to

21  rebut the authenticity throughout this trial in any way that

22  they see fit to do that.

23       MR. GIANNOPOULOS:  So your plan is to admit 154?

24       JUDGE LAWS:  Yes.

25       MR. GIANNOPOULOS:  Okay.

1    JUDGE LAWS:  151 and 154 but my ruling could be subject

2  to --

3    MR. GIANNOPOULOS:  Sure.

4    JUDGE LAWS:  -- being reconsidered if the Respondent

5  rebuts what I see as prima facie evidence of authenticity.  And

6  again, my comments from yesterday stand that with regard to the

7  inaudible parts, that's going to be a matter for consideration

8  of how to weight the evidence.

9   (Off the record at 9:24 a.m.)

10    JUDGE LAWS:  Raise your right hand please.

11  Whereupon,

12                          **JUAN MACIEL**

13  having been first duly sworn, was called as a witness herein

14  and was examined and testified as follows:

15    JUDGE LAWS:  Can you please state and spell your name for

16  the court reporter?

17    THE WITNESS:  Juan Maciel, J-U-A-N M-A-C-I-E-L.

18    JUDGE LAWS:  Thank you very much.

19    MS. SHIH:  Thank you, Your Honor.

20                      **DIRECT EXAMINATION**

21  Q    BY MS. SHIH:  Mr. Maciel, are you currently employed by

22  Greenbrier Rail Services?

23  A    Yes.

24  Q    In what position?

25  A    General manager.

1    Q    How long have you held that position?

2    A    Three years.

3    Q    Did you hold any positions with Greenbrier prior to

4    becoming the general manager?

5    A    Yes.

6    Q    What position?

7    A    Plant manager.

8    Q    Over what facility?

9    A    San Antonio.

10   Q    And what were the dates that you were the plant manager

11   for San Antonio?

12   A    January 4th of 2000 through I think September of 2010.

13   Q    And is that when you became a general manager?

14   A    Yes.

15   Q    Prior to becoming the plant manager in San Antonio, did

16   you hold any other positions with Greenbrier?

17   A    With Railcar America, which was acquisition.

18   Q    What other positions?

19   A    Welder, supervisor, quality control and lead man.

20   Q    What was the last one?

21   A    Lead man.

22   Q    Were those all in the San Antonio facility?

23   A    No.

24   Q    What other facilities have you worked at?

25   A    Tucson.

1    Q    When did you work at the Tucson facility?

2    A    From 1993 until December of '99.

3    Q    And that was prior to that facility being acquired by

4    Greenbrier Rail Services?

5    A    Yes.

6    Q    Would you please describe your job duties as general

7    manager for Greenbrier Rail Services?

8    A    I oversee seven locations and responsible for their

9    safety, their profitability and just performance.

10   Q    What seven locations are you responsible for?

11   A    Mira Loma, California, San Antonio, So San.

12   Q    Could you repeat that one?

13   A    So San.  It's South San Antonio.  Obeco (phonetic),

14   Toronto, Philadelphia, let me see -- Sunny Point.  Sunny Point

15   is the last one.

16        JUDGE LAWS:  And I'm going to note our interpreter just

17   walked in the door.  We are proceeding with another witness, so

18   if you want to go next door and do the translation you were

19   going to do.

20   (Court and Interpreter confer)

21   Q    BY MS. SHIH:  Were you also responsible for overseeing the

22   Tucson facility in your position as general manager?

23   A    No.

24   Q    In 2012, who was responsible for overseeing the Tucson

25   facility?

1   A      Kevin Stewart.

2   Q      Is that true for 2013 as well?

3   A      Yes.

4   Q      Is his position also general manager?

5   A      Yes.

6   Q      How many other general managers are there for Greenbrier?

7   A      One more.

8   Q      And who is that?

9   A      Steven McIntire.

10  Q      And in your position as general manager, who do you report

11  to?

12  A      Robert Hatfield.

13  Q      What's his position?

14  A      AVP.

15  Q      What does that stand for?

16  A      Assistant vice president.

17  Q      The plant managers of the facilities that you oversee,

18  they report directly to you, correct?

19  A      Yes.

20  Q      You became the interim plant manager for the Tucson

21  facility in November 2012; is that right?

22  A      Yes.

23  Q      How long did you serve in that capacity?

24  A      Three to four months.

25  Q      Did you maintain your responsibility as general manager

1    during that time?

2    A    Yes.

3    Q    Why did you become the interim plant manager over the

4    Tucson facility in November 2012?

5    A    Because they didn't have a plant manager.

6    Q    And what was the reason for that?

7    A    He was moved to another location.

8    Q    What were the reasons that plant manager, Lex Morrison,

9    was moved to another location?

10   A    Restructuring.

11   Q    Who was involved in the decision to restructure and move

12   Mr. Morrison to another location?

13   A    I'd say Steven -- not Steven, I'm sorry, Kevin, Gordan and

14   Mike Torra.

15   Q    You weren't involved in that decision?

16   A    No.

17   Q    But you were informed of that decision?

18   A    Yes.

19   Q    When did you learn of that decision?

20   A    Sometime mid or late November, I'm sorry, late October.

21   Q    Who informed you of the decision?

22   A    Mike.

23   Q    What did Mike tell you?

24   A    I don't recall specifically.

25   Q    What do you recall of what Mike told you about

1   restructuring?

2   A    Restructuring or about the -- and I guess I don't

3   understand your question.  Could you repeat it?

4   Q    Well, you testified that the reason that the plant manager

5   was moved to another location was because of restructuring,

6   correct?

7   A    Correct.

8   Q    Well, first let me ask you, when did you learn that there

9   would be restructuring in the Tucson facility?

10  A    Late October.

11  Q    And whose decision or who was involved in the decision to

12  restructure the Tucson facility?

13  A    I would say Mike, Gordan, Kevin, and then at that time I

14  was brought on board after that decision was made.

15       JUDGE LAWS:  And I'm going to jump in here because you

16  said I would say.  Do you know directly or are you speculating?

17       THE WITNESS:  Directly.

18       JUDGE LAWS:  Thank you.

19  Q    BY MS. SHIH:  So you were not involved in the decision to

20  conduct any restructuring of the Tucson facility?

21  A    I was in late October after they had already decided to

22  restructure.

23  Q    Okay.  When did you learn that they decided to

24  restructure?

25  A    Late October.

1   Q      Do you know the date?

2   A      No.

3   Q      Who informed you of the decision to restructure the Tucson

4   facility?

5   A      Mike Torra.

6   Q      What did Mike tell you at that time?

7   A      That I would be spending some time in Tucson.

8   Q      Anything else?

9   A      No.

10  Q      He didn't tell you what type of restructuring was going to

11  be done in Tucson?

12  A      No.

13  Q      He didn't tell you that any employees would need to be let

14  go as part of the restructuring?

15  A      No.

16  Q      The only thing he told you in late October was you would

17  be spending some time in Tucson?

18  A      Correct.

19  Q      That was the extent of the conversation?

20  A      Correct.

21  Q      Anyone else tell you anything about the restructuring of

22  the Tucson facility?

23  A      He tasked Kevin and I with come -- to come up with a

24  restructuring plan for the facility.

25  Q      And when did he ask you to do that?

1    A    Late October.

2    Q    Did he give you any guidelines or parameters within which

3    to develop a restructuring plan?

4    A    No.

5    Q    Did he give you any information about the economic status

6    of the Tucson facility when he asked you to devise a

7    restructuring plan?

8    A    No.

9    Q    What were you told to do?

10   A    To restructure because of the poor performance of the

11   shop.

12   Q    The communications that you had with Mr. Torra about

13   restructuring the Tucson facility, how were those

14   communications made?

15   A    I don't recall.

16   Q    You don't recall whether he spoke to you over the phone?

17   You don't recall whether it was a face-to-face meeting?

18   A    No.  Most of the restructuring was done with Kevin and

19   myself --

20   Q    But I'm asking --

21   A    -- via e-mail.

22   Q    -- you specifically about the -- I'm asking you

23   specifically about the conversation with Mr. Torra.

24   A    That was face to face.

25   Q    Where were you when he told you that the Tucson facility

1   would be restructured?

2   A     Chicago.

3   Q     Was that at a managers' conference in Chicago?

4   A     Yes.

5   Q     That was actually in early November, wasn't it?

6   A     Late October or early November, I'm not sure.

7   Q     There weren't multiple managers' conferences in --

8   A     No.

9   Q     -- Chicago, correct?

10  A     No.  That was a yearly conference.

11  Q     So that's the first time that you learned of the Tucson

12  restructuring was at the conference --

13  A     Yes.

14  Q     -- in Chicago?  I think you just stated that the

15  discussions you had with Kevin about the actual plan to

16  restructure were primarily conducted by e-mail; is that right?

17  A     Yes.

18  Q     Did you review your e-mails to see if you had any e-mails

19  responsive to the subpoenas that had been issued in this case

20  prior to coming here today?

21  A     Yes.

22  Q     And did you provide copies of e-mail communications to

23  your -- to Greenbrier's attorneys?

24  A     Yes.

25  Q     And this is specifically about the restructuring of the

1    Tucson facility the e-mails that you exchanged with Kevin?

2    A    Yes.

3         MR. GIANNOPOULOS:  And, Your Honor, I don't think we have

4    seen any e-mails in the October time frame about the

5    restructuring of the Tucson facility between Mr. Maciel and

6    Kevin Stewart.

7         MS. SHIH:  Or in the November time frame.

8         MR. MINER:  Yep.  They're all -- they have all been

9    produced.

10        MS. SHIH:  May we take a moment?

11        JUDGE LAWS:  Yeah.  Why don't we do that?

12        MS. SHIH:  Thank you.

13        JUDGE LAWS:  You can get up, stretch, whatever.  Don't

14   feel the need to --

15        THE WITNESS:  Thank you.

16        JUDGE LAWS:  I'm sorry about your ticket.  Oh, my gosh.

17   Hopefully it wasn't because we -- you felt like you needed --

18        THE INTERPRETER:  No.  It's because you can't find your

19   way around here in this town.

20   (Off the record at 9:39 a.m.)

21        JUDGE LAWS:  Okay.  Whenever you're ready.

22        MS. SHIH:  Give me just one moment please.

23        JUDGE LAWS:  Sure.

24        MS. SHIH:  I'm ready.

25        JUDGE LAWS:  Okay.

1    MS. SHIH:  Is -- are we --

2    JUDGE LAWS:  We're on.

3    MS. SHIH:  -- back on?  Okay.  Thank you.

4  Q   BY MS. SHIH:  When did you first begin having discussions

5  with Kevin about the plan to restructure the Tucson facility?

6  A   The day after we were informed by Mike Torra.

7  Q   Were you still in Chicago at the time?

8  A   No.

9  Q   Had -- you had returned to San Antonio?

10 A   Yes.  No, to Tucson.

11 Q   To Tucson.  So you went directly to Tucson from Chicago?

12 A   Yes.

13 Q   And that was after the managers' conference ended?

14 A   Yes.

15 Q   What did you do when you arrived in Tucson?

16 A   Went to work to the shop.

17 Q   In what capacity?

18 A   My general manager's capacity.

19 Q   So at that time did you assume responsibility of the

20 Tucson facility?

21 A   No.

22 Q   So what were you sent to Tucson to do?

23 A   I lived there.  I live here.

24 Q   Did you typically perform your job duties as general

25 manager out of the Tucson facility?

1   A    Yes.

2   Q    So you said you began having discussions with Kevin as

3   soon as you returned to Tucson from Chicago about the

4   restructuring; is that right?

5   A    Yes.

6   Q    What discussions did you have with Kevin?

7   A    How we wanted to restructure the shop.

8   Q    What did you talk about?

9   A    Target headcount, target profitability, how we want to get

10  there.

11  Q    And you said these discussions were primarily via e-mail?

12  A    Yes.

13  Q    Who made the decision that employees in the Tucson

14  facility needed to be let go as a part of the restructuring?

15  A    Kevin and I.

16  Q    When did you make that decision?

17  A    The following week.

18  Q    The week after the managers' conference?

19  A    Well, we started working on it the day after the

20  conference and we made the decision the following week.

21  Q    The managers' conference in Chicago was actually held

22  November 5th, 6th and 7th of 2012; isn't that correct?

23  A    Okay.  Possibly, yes.

24  Q    And the layoff of employees was conducted on November

25  12th, 2012; is that right?

1   A     It sounds right.

2   Q     So sometime between November 7th and November 12th you and

3   Kevin made a decision that employees needed to be let go,

4   correct?

5   A     Correct.

6   Q     And who made the decision that employees needed to be let

7   go on November 12th?

8   A     Kevin and I.

9   Q     Once you made the decision that employees needed to be let

10  go, how did you determine which employees would be let go?

11  A     Feedback from Kevin and then I -- Kevin had been at the

12  facility, so feedback from Kevin and I also got feedback from

13  the production manager.

14  Q     That was Freddy Valdez?

15  A     Correct.

16  Q     You requested from Lisa Maxey an employee list of the

17  employees in the Tucson facility in order to determine what

18  employees would be let go; is that right?

19  A     Correct.

20  Q     And you requested that she provide certain information

21  regarding those employees?

22  A     I don't recall that.

23  Q     You didn't simply ask her for a list of their names,

24  correct?  You asked for additional information regarding their

25  wage rates, their titles, other information about their

1   employment, correct?

2   A     I specifically asked her for the list of names.

3   Q     You only asked for names?

4   A     That I can recall, yes.

5   Q     It wasn't important to you what their jobs were or how

6   long they had worked there?

7   A     All that's on the list.

8   Q     So the list that you requested was more than simply just

9   the name.  Did you --

10  A     Correct.

11  Q     -- provide specific information to Ms. Maxey about what

12  you wanted to know about these employees?

13  A     No.

14  Q     She knew when you asked for an employee list what

15  information it would contain?

16  A     Correct.

17  Q     What did you do with the list after you received it from

18  Ms. Maxey?

19  A     We started identifying people that we wanted to retain.

20  Q     That -- I apologize, I didn't hear, that you wanted to?

21  A     Retain.

22  Q     And when you say we, you're referring to you and Kevin?

23  A     Yes.

24  Q     And how did you determine which employees you wanted to

25  retain?

1    A    Their skills, performance, their safety, their cross-

2   training.

3    Q    Were there any other factors that you looked at in

4   determining which employees you wanted to retain?

5    A    Not that I can recall.

6    Q    What documents did you review in evaluating which

7   employees you wanted to retain?

8    A    I didn't review any documents.

9    Q    You didn't review the personnel files of any of the

10  employees?

11   A    No.

12   Q    You didn't review their attendance records?

13   A    No.

14   Q    You didn't review their performance evaluations?

15   A    No.

16   Q    You made the determination which employees you would

17  retain based solely off the list that was provided to you by

18  Ms. Maxey?

19        MR. MINER:  Objection.  That wasn't his testimony.

20        JUDGE LAWS:  Sustained.  Ask it more open ended.

21        MS. SHIH:  Well, that was the question I had.

22        JUDGE LAWS:  Okay.

23        MS. SHIH:  And if his answer is -- his answer is what it

24  is.

25        JUDGE LAWS:  Did you rely solely on the information

1   provided by Ms. Maxey?

2        THE WITNESS:  No.

3   Q   BY MS. SHIH:  That's the only document that you reviewed

4   though, however, in determining which employees would be

5   retained and which employees would be terminated?

6   A   Correct.

7   Q   I'm handing you what's been marked as General Counsel 157.

8        JUDGE LAWS:  It's a little circle.

9        MS. SHIH:  I'll just walk around the room.

10       JUDGE LAWS:  Well, at least it won't be sedentary, right?

11  Q   BY MS. SHIH:  Do you recognize that e-mail?

12  A   Yes.

13  Q   That's the e-mail that Lisa Maxey sent to you attaching

14  the employee list that had been requested for the Tucson

15  facility, correct?

16  A   Correct.

17  Q   And that's on November 7th, 2012?

18  A   Yes.

19  Q   Did anybody tell you how many employees needed to be laid

20  off from the Tucson facility?

21  A   No.

22  Q   Who made that determination?

23  A   Kevin and I.

24  Q   And how did you determine how many employees would need to

25  be laid off from the Tucson facility?

1    A    Based on our restructuring plan.

2    Q    What was your restructuring plan?

3    A    We had a target headcount.

4    Q    Of what?

5    A    I don't remember exactly, 55, 56, something like that,

6    direct employees.

7    Q    Did someone provide that number to you?

8    A    No.

9    Q    How did you come up with that target headcount?

10   A    Experience from working at the shop in the '90s,

11   restructuring it back to how we used to run it back then.

12   Q    What's -- what other -- strike that.  Let me back up.

13   Other than the target headcount, what else did your

14   restructuring plan consist of?

15   A    Billed hours, profitability, shutting down a couple of the

16   shops in the -- that were currently being ran.  We were just

17   too spread out so shut down half the shop, move -- consolidate

18   everybody to two locations to that target headcount that I just

19   gave you.

20   Q    And when you talk about locations, you're not referring to

21   different facilities; you're referring to locations within the

22   Tucson facility, correct?

23   A    Correct.

24   Q    Regarding the restructuring, what instructions did you get

25   from your superiors?

1  A    I don't recall any other than restructure so we can be

2  profitable.

3  Q    The only thing you were instructed to do by Mr. Torra or

4  anyone else above you was restructure the Tucson facility?

5  A    Correct.

6  Q    They gave you no other direction in terms of how to

7  restructure?

8  A    I don't recall any.

9  Q    Did you need anyone's approval on your restructuring plan

10  once you and Kevin developed it?

11  A    No.

12  Q    Did you communicate your restructuring plan to anyone

13  above you?

14  A    Yes.

15  Q    Who did you communicate it to?

16  A    I believe Kevin sent it on to Mike.

17  Q    When?

18  A    Within a few days after our Chicago meeting.  I don't

19  remember when.

20  Q    But it was after you developed the plan?

21  A    Correct.

22  Q    And prior to conducting the termination?

23  A    Correct.

24  Q    You weren't given any targets by Mike Torra or anyone else

25  above you?

```
 1    A    No.

 2    Q    No target earnings?

 3    A    No.

 4    Q    Target margins?

 5    A    No.

 6    Q    Target return on investment capital?

 7    A    No.

 8    Q    You were simply told restructure the Tucson plant and let

 9    us know what you decide to do?

10    A    Correct.

11    Q    And you and Kevin determined that the target headcount at

12    the facility needed to be approximately 55?

13    A    Correct.

14    Q    And you were aware at the time you made that decision how

15    many employees were employed at the Tucson facility?

16    A    I don't remember.

17    Q    So you don't know when you determined the target headcount

18    how many people it would require be terminated?

19    A    Not off the top of my head.

20         MS. SHIH:  Move for admission of General Counsel 157.

21         MR. MINER:  No objection.

22         JUDGE LAWS:  157 is admitted.

23    (General Counsel Exhibit Number 157 Received into Evidence)

24    Q    BY MS. SHIH:  What did you do with the employee list after

25    you received it from Lisa Maxey?
```

```
 1   A    We started narrowing down the people we needed to retain

 2   to hit our targets.

 3   Q    And when you say we, you're referring to you and Kevin

 4   Stewart?

 5   A    Correct.

 6   Q    And when you say narrowing down, what process was the --

 7   were -- was Kevin Stewart present in Tucson?

 8   A    No.

 9   Q    How did you go about narrowing down that list?

10   A    I believe we had a phone call.

11   Q    And what conversations took place during that phone call?

12   What discussions took place during that phone call?

13   A    Just feedback on employees that he wanted to retain.

14   Q    Did you go down the list starting from the very top and

15   say yes, we want to retain him, no, we don't want to retain

16   him?

17   A    Yes.

18   Q    And you went down that list employee by employee?

19   A    Yes.

20   Q    How long did you discuss each employee before you decided

21   whether it was someone you wanted to retain or not retain?

22   A    A couple minutes, a few minutes, I'm not sure.

23   Q    And did you go through the entire list in one phone call?

24   A    I believe so.  Yes.

25   Q    And when did that take place?
```

1   A    I don't know.

2   Q    Well, the date on the e-mail in front of you when you

3   received the list is Wednesday, November 7 at 1:56 p.m.  Do you

4   recall whether it was the same day?

5   A    It could have probably been a Thursday or Friday.

6   Q    And during that single phone call, you went through each

7   name on the employee list with Mr. Stewart, and by the end of

8   the phone call, had you reached your target headcount?

9   A    I believe so.

10  Q    How long did that phone call last?

11  A    Hour, hour and a half maybe.

12  Q    And did you personally know every person on the employee

13  list?

14  A    No.

15  Q    Had you personally observed the work performance of every

16  employee on the list?

17  A    No.

18  Q    Did Kevin Stewart know every employee on the list?

19  A    I can't answer that.

20  Q    Had Kevin Stewart personally observed the work performance

21  of every employee on the list?

22  A    I can't answer that.

23  Q    How did you evaluate whether you wanted to retain or not

24  retain the employees that you didn't personally know on the

25  list?

```
 1   A    Feedback from Kevin and Freddy.

 2   Q    So you spoke to Freddy Valdez prior to the phone call or

 3   was he on the phone call?

 4   A    I believe I spoke with Freddy prior to the phone call.

 5   Q    And was that in person?

 6   A    Yes.

 7   Q    Did you speak to Freddy Valdez about each employee on the

 8   list?

 9   A    No.

10        JUDGE LAWS:  And I want to clarify something.  You said

11   you believed you spoke to Freddy prior to the call.  Do you

12   know you spoke to him, you just don't know whether it was prior

13   or after --

14        THE WITNESS:  Yes.  I --

15        JUDGE LAWS:  -- or do you not -- are you unsure whether

16   you spoke to him?

17        THE WITNESS:  I know I spoke to him but I'm not for sure

18   if it was before or after.

19        JUDGE LAWS:  Thank you.

20   Q    BY MS. SHIH:  I'm handing you what's been previously

21   admitted as General Counsel 15.  Do you recognize that e-mail

22   exchange?

23   A    Yes.

24   Q    If you turn to page 3 of that exhibit, is that the

25   employee list that Ms. Maxey sent you?
```

1   A    Yes.

2   Q    And that's the list that you reviewed to determine which

3   employees would be retained and which would be terminated?

4   A    Correct.

5   Q    And if I can point you back to the first page of General

6   Counsel 15 at the very bottom that starts with an e-mail to you

7   from Kevin Stewart stating "Fill in the blanks" or the subject

8   line is "Fill in the blanks" and it states, "We just need to

9   finish filling it in, 56 direct, 19 indirect."  That was your

10  target headcount?

11  A    Yes.

12  Q    What do you mean by direct and indirect?

13  A    Direct is employees actually working on cars.

14  Q    So that would include welders, painters, write up

15  employees?

16  A    No.  Just welders, painters.

17  Q    Write up employees are not considered direct employees?

18  A    No.

19  Q    Okay.  Switchmen, are they considered direct?

20  A    No.

21  Q    What other positions are considered direct other than

22  welders or painters?

23  A    Welder, painter, an airman, I think that's all for this

24  facility.

25  Q    When you received that e-mail from Kevin Stewart were you

```
 1   already aware that your target headcount was 56 direct and 19

 2   indirect?

 3   A    Yes.

 4   Q    That was a discussion that you had already had with Kevin?

 5   A    Yes.

 6   Q    Who came up with the numbers 56 and 19?

 7   A    Kevin and I.

 8   Q    How did you come up with those numbers?

 9   A    Past experience working at that shop.

10   Q    What factors from your past experience or what -- what

11   factors from your past experience led you to come up with the

12   numbers 56 and 19?

13   A    When I worked there in the early '90s it was a smaller

14   shop.  It was only the two shops that we restructured to, and

15   this was the headcount we used to run back then.  So we wanted

16   to go back to that because that was a good structure for that

17   shop.

18   Q    And that was in -- what year was the headcount 56 direct

19   and 19 indirect?

20   A    '93 to '99, somewhere around there.

21   Q    Did you review any documents in coming up with the numbers

22   that you did?

23   A    No.

24   Q    At the time of the layoff on November 12, 2012, there was

25   a lot of work in the Tucson facility, correct?
```

1   A    I don't recall.

2   Q    Employees had been working overtime on a regular basis?

3   A    I don't recall.  I wasn't there.

4   Q    There was a backlog of cars actually, wasn't there?

5   A    I'm sure there was a backlog.  Yes.  To what extent, I

6   don't know.

7   Q    And you didn't have any discussions with Kevin Stewart or

8   Lex Morrison about what the workload was at the Tucson facility

9   prior to coming up with the target headcount numbers?

10  A    No.

11  Q    What position did you have at the Tucson facility in 1993?

12  A    Welder and lead man and foreman.

13  Q    That's all in 1993?

14  A    Yes.

15  Q    And you -- I believe you said you left the Tucson facility

16  in 1999?

17  A    Correct.

18  Q    What position did you have when you left the Tucson

19  facility?

20  A    Supervisor.

21  Q    When did you become a supervisor?

22  A    I don't know maybe late '93 or -- yeah, I'm going to say

23  late '93.

24  Q    Is a supervisor above a foreman?

25  A    Yeah.  It's the same, supervisor, foreman.  I think I'm

1    referring to the same thing.

2    Q    Still on the first page of General Counsel 15, if you

3    would go up from the bottom to the next e-mail in the exchange,

4    you responded to Kevin Stewart and Gordan Hudgens in an e-mail

5    that simply says, "Here you go."  What does that mean?

6    A    Probably sending them back a list with names.

7    Q    So when Kevin sent you the list and said fill in the

8    blanks, we just need to finish filling it in, what did you

9    understand you were to do with the list?

10   A    Come up with 56 direct employees.

11   Q    And is that something that you did on your own?

12   A    No.

13   Q    So when you sent it back and said here you go, had you --

14   in between there did you have -- you had a discussion with

15   Kevin about which names would be kept and which ones wouldn't?

16   A    Yes.

17   Q    And that's the phone call that you referred to earlier

18   where you discussed each employee?

19   A    Yes.

20   Q    When you took over as interim plant manager, that was on

21   November 12, 2012?

22   A    I believe the following day.

23   Q    Were you present at the facility on November 12, 2012?

24   A    Yes.

25   Q    So when you took over as interim plant manager on November

1   13th, 2012, production employees were working a lot of overtime

2   at that time, correct?

3   A    I don't recall, could have been.  I'm not sure.

4   Q    Workers continued to work overtime after the termination

5   on November 12, 2012, right?

6   A    I believe so.

7   Q    And that's the month of November and December 2012?

8   A    Possibly, yes.

9   Q    There was still a backlog of cars, correct?

10  A    Yes.

11  Q    Is there a target time frame in which a car is to be

12  completed from the time it comes into the facility?

13  A    Yes.

14  Q    What is that?

15  A    It depends on the car.

16  Q    Well, how many different types of cars are there?

17  A    Maintenance cars have a target throughput of 30 days.

18  Wrecks (phonetic) have a target throughput of 150 days.

19  Q    Why was there a backlog in Tucson in 2012?

20  A    You have to have a backlog to keep your employees busy.

21  Q    How backed up was the Tucson facility?

22  A    I don't recall.

23  Q    At the time that you became the plant manager, you're not

24  aware of how backed up cars were?

25  A    Correct.

1   Q    Do you know what the average time frame was in November

2   2012 when you took over as plant manager as to how long it was

3   taking to turn around maintenance cars?

4   A    Not off the top of my head.  I know it wasn't good.

5   Q    It was over 30 days?

6   A    Yes.

7   Q    Was it twice that?

8   A    I don't recall.

9   Q    What about wreck cars, was it over 150 days?

10  A    Yes.

11  Q    Were you able to meet the target dates when you took over

12  as plant manager in November, December 2012?

13  A    No.

14  Q    So it was still over 30 and 150 days?

15  A    Yes.

16  Q    And that's still the case when you hired Eric Valenzuela

17  as the plant manager in 2013, correct?

18  A    Correct.

19  Q    What happens if Greenbrier doesn't meet the target time

20  frame for turning around the cars?

21  A    You -- I guess your customer might not be very happy.

22  Q    Does the customer receive any kind of discount on that

23  repair?

24  A    No.

25  Q    There is no -- is there -- are there provisions in the

1  contracts between the customers in which Greenbrier is required

2  to complete a car within certain time frames?

3  A    Not for Tucson, not that I'm aware of.

4  Q    What about for other facilities?

5  A    I'm not sure, none of my facilities.

6  Q    What did you do with the employee list after you whittled

7  it down to 56 direct and 19 indirect employees on November 8th,

8  2012?

9  A    Sent it to Kevin.

10  Q    And what did Kevin do with it?

11  A    Let me look at the e-mails here.  I don't remember.  I

12  guess when we were done with the list I sent it to Al, Lisa,

13  Kevin, Mike and Gordan.

14  Q    And why did you send it to Al and Lisa?

15  A    Because they had to -- Al had to final the list before we

16  can move forward.

17  Q    Who did that instruction come from?

18  A    That's just common practice.  When we make any employee

19  headcounts, we will send it off to HR for their blessing.

20  Q    So no one instructed you to send it to Al, that's just

21  something you knew to do?

22  A    Correct.

23  Q    After you sent the list to Al, at some point did you

24  receive comments back from Al?

25  A    Yes.

1  Q    Do you remember what those comments were?

2  A    There was a problem with some of the employees that we had

3  selected to be part of the riff.

4  Q    What kind of problems did Al identify with the employees

5  that you had selected?

6  A    I believe there was some race and some age problems that

7  we could have had in there that he pointed out.

8  Q    What did you do in response to Al's comments about

9  concerns with particular employees that were identified for

10 termination or retention?

11 A    We substituted some employees to accommodate his

12 recommendation.

13 Q    And when you say we, are you referring to you and Kevin?

14 A    Yes.

15 Q    Did you have a discussion with Kevin in evaluating Al's

16 feedback?

17 A    I believe so.

18 Q    What did you discuss with Kevin?

19 A    I believe it was just if we agreed with the people that Al

20 recommended.

21 Q    Do you know who John Anderson is?

22 A    Yes.

23 Q    Who is he?

24 A    Billing manager.

25 Q    And was he recommended for termination as part of the

1  restructuring?

2  A     I believe so.

3  Q     Why did --

4  A     Yeah.

5  Q     Why did you recommend him for termination as part of the

6  restructuring?

7  A     Because for write-up we only needed a certain amount of

8  write-up people, and based on feedback from Kevin we thought we

9  were retaining the top performers.

10 Q     So when you say he's billing -- he's a billing manager,

11 that's not at the time of the layoff, correct?

12 A     Correct.

13 Q     At the time of the layoff he was a write-up employee?

14 A     Correct.

15 Q     What factors specifically with regard to Mr. Anderson made

16 you select him for termination?

17 A     Feedback from Kevin, performance.

18 Q     What feedback did Kevin give you about his performance?

19 A     Probably wasn't getting enough cars inspected.

20 Q     What did Kevin tell you about John Anderson?

21 A     Just what I just told you, not inspecting enough cars.

22 Q     That's what Kevin communicated to you?

23 A     Yes.

24 Q     And this was in that hour-and-a-half phone call where you

25 went through the employees?

1  A    That or a follow-up call.

2  Q    Mr. Anderson was retained after the layoff, correct?

3  A    Correct.

4  Q    And that's based on feedback that you received from Al

5  about his age and his race; is that right?

6  A    Correct.

7  Q    Was there any other factor that led you to retain Mr.

8  Anderson other than his age and his race?

9  A    No.

10  Q    Do you know who Marcos Fonseca is?

11  A    Yes.

12  Q    Who is he?

13  A    I believe he's a painter.

14  Q    At the time of the layoff in November, what position did

15  Mr. Fonseca hold?

16  A    I'm not exactly sure.  He might have been a paint lead or

17  a paint foreman, something like that.

18  Q    And he -- and you recommended he be terminated, correct?

19  A    Correct.

20  Q    Why did you recommend Mr. Fonseca for termination?

21  A    Feedback from Kevin.

22  Q    What did Kevin tell you about Mr. Fonseca?

23  A    He wasn't one -- again, we go back to that target

24  headcount.  We had too many painters so we couldn't keep them

25  all.  So he just was the lower performer of the painters.

1  Q    Was there anything specific about Mr. Fonseca's

2  performance that Kevin communicated to you?

3  A    No.

4  Q    And Mr. Fonseca was retained after the layoff, correct?

5  A    Correct.

6  Q    And that was based solely on Mr. Lave's feedback about his

7  race; is that right?

8  A    Correct.

9  Q    Do you know who Jesus Barnes is?

10 A    I know the name but I don't know him.

11 Q    Was he originally recommended for termination as part of

12 the layoff?

13 A    I don't recall.

14 Q    Was he actually terminated?

15 A    I don't recall if he was.

16      MR. MINER:  Your Honor, is this a good time for a short

17 comfort break?

18      JUDGE LAWS:  I was just going to ask the --

19      MS. SHIH:  I was just going to say --

20      JUDGE LAWS:  -- same question.

21      MS. SHIH:  -- the same thing.

22      JUDGE LAWS:  We're all on the --

23      THE WITNESS:  I was going to ask for water.

24      JUDGE LAWS:  A little water, a comfort break.

25 (Off the record at 10:22 a.m.)

 1      JUDGE LAWS:  We had a brief off-the-record discussion, and

 2   what matters for purposes of putting something on the record is

 3   we talked about the unofficial transcripts of the recordings

 4   that the General Counsel provided as proposed Exhibit 152 and

 5   153.  There is also 155, but we haven't gotten through that

 6   enough to know it's general accuracy.

 7      To sum it up, all parties have agreed that while there are

 8   some problems with the Exhibits 152 and 153, they're not

 9   perfect transcriptions, the evidence that we will rely on will

10   be the tape recordings, and any official transcript of those is

11   going to be the court reporter's interpretation -- that's the

12   wrong word -- transcription of those recordings.  However, they

13   have been useful to follow along with the tapes, and so I am

14   going to admit 152 and 153 with the very express caveat that

15   they will not be relied upon as a perfectly accurate version of

16   what was said in the recordings.

17      Anybody want to add anything --

18      MS. SHIH:  I just wanted --

19      JUDGE LAWS:  -- that I forgot to say?

20      MS. SHIH:  I just wanted to ask, I presume we'll handle

21   155 after we complete the recording --

22      JUDGE LAWS:  Yes.

23      MS. SHIH:  -- of that?  Okay.  Thank you.

24      MR. MINER:  Thank you, Your Honor.

25      JUDGE LAWS:  Do we want him back?

```
 1         Whenever you're ready.

 2         MS. SHIH:  Thank you.

 3    Q    BY MS. SHIH:  Do you know who Oswaldo Chavira is?

 4    A    No.

 5    Q    Do you recognize his name?

 6    A    Yes.

 7    Q    Do you recognize his name as a production employee who was

 8    working at the Tucson facility in November 2012?

 9    A    Yes.

10    Q    He was recommended for retention from the November 2012

11    layoffs; is that right?

12    A    I'm not sure.

13    Q    Did you have a discussion with Kevin Stewart about Mr.

14    Chavira?

15    A    I don't recall.

16    Q    Was Mr. Chavira actually laid off on November 12, 2012?

17    A    I believe so.

18    Q    That was based on feedback from Mr. Lave, correct?

19    A    I don't recall the -- specifically.

20    Q    Do you know Ramon Para?

21    A    Yes.

22    Q    Who is he?

23    A    He's a welder.

24    Q    And he was working as a welder in Tucson at the time of

25    the layoffs?
```

1  A    Yes.

2  Q    He was recommended for layoff, correct?

3  A    I'm not sure.  I don't recall the specifics.

4  Q    Did you know Mr. Para personally?

5  A    I knew him from when I worked there back in the '90s.  I

6  would not say I know him personally.

7  Q    Had you observed his work performance --

8  A    Yes.

9  Q    -- as a welder?  Were you familiar with his work

10 performance as a welder in November 2012?

11 A    No.

12 Q    Did you have a conversation with Mr. Stewart about his

13 performance?

14 A    Yes.

15 Q    What did Mr. Stewart tell you about his performance?

16 A    I don't recall.

17 Q    He was retained after the November 2012 layoff, correct?

18 A    I believe so.

19 Q    And that was based on feedback from Mr. Lave about his age

20 and his race?

21 A    I believe so.

22 Q    Those were the only reasons that he was retained; is that

23 right?

24 A    I believe so.

25 Q    Do you know Eugenio Ruiz?

```
 1   A    No.

 2        COURT REPORTER:  What was that name again?

 3        MS. SHIH:  The first name is spelled -- I might be

 4   mispronouncing it, I probably am -- E-U-G-E-N-I-O and the last

 5   name Ruiz, R-U-I-Z.

 6   Q    BY MS. SHIH:  You knew of him as a welder working at the

 7   Tucson facility in November 2012 though?

 8   A    Yes.

 9   Q    Were you familiar with his work performance as a welder?

10   A    No.

11   Q    Did you have a conversation with Mr. Stewart about him?

12   A    Yes.

13   Q    He was recommended for discharge, correct?

14   A    I believe so.

15   Q    What did Mr. Stewart tell you about the reasons he should

16   be discharged?

17   A    I don't recall.

18   Q    He was retained after the layoff, correct?

19   A    I believe so.

20   Q    And that was based solely on feedback from Mr. Lave about

21   his age and his race?

22   A    I believe so.

23   Q    When did you first learn that the production employees in

24   Tucson were unionizing?

25   A    I want to say it was maybe a week or so, sometime around
```

```
 1   there, after the layoff.

 2   Q    You didn't learn until after the layoff that employees

 3   were trying to organize a union?

 4   A    Correct.

 5   Q    You were the general -- you were a general manager in 2011

 6   for Greenbrier Rail Services, correct?

 7   A    Yes.

 8   Q    You were aware that in 2011 employees at the Tucson

 9   facility had a union election for the United Transportation

10   Union, correct?

11   A    Correct.

12   Q    And you're aware that there was a one-year bar that

13   prevented them from trying to organize again, correct?

14   A    Correct.

15   Q    And you were part of discussions in which company

16   management talked about the fact that it could be assumed that

17   after the one-year bar was up employees would try to organize

18   again, correct?

19   A    I don't recall.

20   Q    Didn't you assume that after the one-year bar was up

21   employees would try to organize again?

22        MR. MINER:  Objection, assumed.

23        JUDGE LAWS:  I'll allow it.

24        MS. SHIH:  I'm asking him if he made that assumption.

25        THE WITNESS:  No.
```

1   Q    BY MS. SHIH:  You were aware of what the union vote was at

2   the Tucson facility, correct?

3        JUDGE LAWS:  In 2011?

4   Q    BY MS. SHIH:  In 2011.

5   A    I don't believe so.

6   Q    You --

7   A    I don't recall.

8   Q    You don't -- no one communicated to you that it was a

9   close vote?

10  A    I could have possibly heard but I don't recall the

11  specifics.

12  Q    Did someone communicate to you that the union lost?

13  A    Yes.

14  Q    Were you present at a meeting held at the Tucson facility

15  on October 31st, 2012, with Mr. Lave and other supervisors,

16  managers and foremen from the Tucson facility?

17  A    I don't recall.

18  Q    What was your involvement in hiring Eric Valenzuela as the

19  plant manager of the Tucson facility in 2013?

20  A    I gave him a site tour and I interviewed him in Tucson for

21  Kevin.

22  Q    When did you interview Mr. Valenzuela?

23  A    I don't recall.

24  Q    Was it in 2013?

25  A    Yes.

1   Q    When did he actually take over as the plant manager in

2   Tucson?

3   A    I don't know the exact date, sometime in March I believe.

4   Q    And how long before he took over that position did you

5   interview him, a few weeks, a few months, a few days?

6   A    I'd say maybe within 30 days.

7   Q    Did you have any input into the decision to hire Mr.

8   Valenzuela?

9   A    Yes.

10  Q    Who else was involved in that decision?

11  A    I'm not sure.  I know Kevin -- I dealt with Kevin on it so

12  I don't know who else was involved.

13  Q    Did you provide training to Mr. Valenzuela when he took

14  over as plant manager?

15  A    Yes.

16  Q    Did you inform Mr. Valenzuela after he began working as

17  plant manager or before that employees at the Tucson facility

18  were in the midst of an organizing campaign?

19  A    No.

20  Q    You didn't give Mr. Valenzuela any information about the

21  union campaign going on in Tucson?

22  A    No.

23  Q    You didn't inform him about unfair labor practice charges

24  with the National Labor Relations Board?

25  A    No.

1   Q    Did you tell him about the petition for representation

2   that had been filed by the union?

3   A    I don't believe so.

4   Q    Do you know if anyone did?

5   A    I believe Kevin might have but I don't know for sure.

6   Q    Whose decision was it to begin rehiring employees in the

7   Tucson facility after the November 2012 layoff?

8   A    Kevin and mine.

9   Q    When did you and Kevin make that decision?

10  A    I think sometime in February.

11  Q    What factors did you evaluate in reaching the decision

12  that the Tucson facility should rehire employees?

13  A    Our efficiencies were where we needed to be.  Our

14  utilization was where we needed to be and we were slightly

15  profitable.  And we knew that at that point we were not going

16  to hit our goals as far as revenue if we did not increase

17  headcount, so that was our decision to start adding people

18  again.

19  Q    When you say your efficiencies and utilization where were

20  they needed to be, who determined where they needed to be?

21  A    Kevin and I.

22  Q    And when you talk about not being able to meet your

23  revenue goals unless you increased headcount, who set those

24  revenue goals?

25  A    We -- corporate.

1   Q     Who in corporate?

2   A     I'm not sure, accountants.

3   Q     Who communicates those revenue goals to you?

4   A     They get distributed out at the beginning of the year.

5   I'm not sure who distributes them.  We get one for each

6   location.

7   Q     And they're the revenue goals for the facility for the

8   entire fiscal year?

9   A     Yes.

10   Q     And are they broken down by month?

11   A     Yes.

12   Q     And these are distributed to the plant manager of each

13   facility?

14   A     Correct.

15   Q     In writing?

16   A     Yes.

17   Q     Who actually sent them to the plant manager?

18   A     I'm not sure.

19   Q     Do you receive them for the plants that you oversee?

20   A     Yes.

21   Q     Who do you receive them from?

22   A     I'm not sure.  I'd have to go back and look.

23   Q     They -- they are sent to you by email?

24   A     Yeah.

25   Q     Isn't it true that Greenbrier was worried that you would

```
 1    be bringing people back to the Tucson facility in 2013 who were

 2    strong Union supporters?

 3    A    No.

 4    Q    You never heard that from anyone at Greenbrier?

 5    A    No.

 6    Q    You had responsibility over the San Antonio facility in

 7    2012, correct?

 8    A    Yes.

 9    Q    Weren't there discussions at Greenbrier in 2012 about

10    closing the San Antonia facility?

11    A    Not discussions about closing, no.

12    Q    What about 2013?

13    A    No.

14    Q    The San Antonio facility wasn't slated for closure at the

15    end of 2012?

16    A    It --

17         MR. MINER:  Let me --

18         MS. SHIH:  -- or --

19         MR. MINER:  -- make an objection to the foundation for

20    this.  Perhaps that would help.

21         JUDGE LAWS:  And -- and I will sustain that.  Let's

22    establish a -- some foundation as to knowledge.

23    Q    BY MS. SHIH:  Has anyone ever communicated to you any

24    discussion among Greenbrier management about the intention to

25    close the San Antonio facility?
```

1    MR. MINER:  Objection.  Can we have a date restriction

2  perhaps?

3    MS. SHIH:  I'm talking about 2012/2013.

4    JUDGE LAWS:  Thank you.

5    THE WITNESS:  No.

6  Q    BY MS. SHIH:  Have you ever heard any rumors among

7  Greenbrier management that the San Antonio facility is slated

8  for closure -- or was -- or has been slated for closure?

9    JUDGE LAWS:  Same timeframe?

10    MS. SHIH:  Yes.

11    THE WITNESS:  No.  Just poor performing.  But as far as

12  having a meeting for closure, no.

13  Q    BY MS. SHIH:  You're in charge of the San Antonio right

14  now, correct?

15  A    Correct.

16  Q    And you were in charge of the San Antonio facility -- have

17  you been in charge of the San Antonio facility throughout 2013?

18  A    Yes.

19  Q    And 2012 as well, correct?

20  A    Yes.

21  Q    So it's your testimony that none of the -- none of your

22  superiors have ever informed you during 2012 or 2013 that the

23  San Antonio facility was slated for closure?

24  A    Correct.

25  Q    You testified earlier I believe that you report directly

1   to Robert Hatfield --

2   A    Correct.

3   Q    -- who's the assistant vice president.

4   A    Correct.

5   Q    In your position as general manager, have you always

6   reported to Mr. Hatfield?

7   A    No.

8   Q    Prior to reporting to Mr. Hatfield, who did you report to?

9   A    Gordan Hudgens.

10  Q    At the time you reported to Mr. Hudgens, his position was

11  regional manager, correct?

12  A    Yes.

13       JUDGE LAWS:  And what was that timeframe when you reported

14  to him?

15       THE WITNESS:  Oh --

16       JUDGE LAWS:  Roughly.  It doesn't have to be exactly.

17       THE WITNESS:  All the way up until a couple of months ago.

18  Q    BY MS. SHIH:  So when you -- when you became a general

19  manager -- you said it was about three years ago, so back in

20  2010.  At that time did you report to Mr. Hudgens?

21  A    Yes.

22  Q    Who does Robert Hatfield report to?

23  A    Mike Torra.

24  Q    When Gordan Hudgens was your immediate supervisor, who did

25  he report to?

1   A     Mike Torra.

2   Q     You said you and Kevin determined in about February 2013

3   that it was necessary to increase the headcount of the Tucson

4   facility, correct?

5   A     Correct.

6   Q     Did you determine at that time what the headcount should

7   be?

8   A     We wanted to start adding about four people a month.

9   Q     And how did you reach that number?  Actually let me back

10  up.  Did you and Kevin reach that -- or did you reach that

11  number?

12  A     The four per month?

13  Q     Yes.

14  A     By recalling some of the people that were on the reef.

15  Q     Sorry.  I may have misstated my question or there might

16  have been a miscommunication.  Who reached the number -- or who

17  made the determination that the Tucson facility should increase

18  his headcount by approximately four people a month?

19  A     Kevin and I.

20  Q     And how did you and Kevin reach that number?

21  A     We didn't want to bring on too many people at once since

22  we were still working on improving our efficiencies even though

23  they were getting closer to where we want it to be.  We didn't

24  want to have a big influx of people because we wanted to

25  maintain and continue to improve our efficiencies.

1  Q    Why four a month, though?  How did you come up with that

2  number?

3  A    We just did.  Just -- good number.

4  Q    And I think in response to a different question you stated

5  that -- or actually let me just ask you clean.  How did you

6  intend to increase the headcount by four a month?

7  A    By recalling people on the reef.

8  Q    And those are people that have previously worked for

9  Greenbrier?

10  A    Correct.

11  Q    Including people who had been let go because of their

12  performance issues?

13  A    Correct.

14  Q    How did you identify -- or did you -- did you identify the

15  four initial employees who would be contacted for rehire in

16  Tucson?

17  A    Yes.

18  Q    How did you identify those four employees?

19  A    Feedback from Freddy.

20  Q    That's Freddy Valdez --

21  A    Yes.

22  Q    -- the production manager?  Who initially proposed names

23  of the four people to first be recalled?

24  A    Freddy and I.

25  Q    And what were the four names that were initially proposed?

```
 1   A    I don't recall.

 2   Q    What did you do after you and Freddy identified the four

 3   initial employees to be contacted for rehire?

 4   A    I believe we passed the names on to HR so they can start

 5   recalling them.

 6   Q    HR was responsible for the recall process?

 7   A    Yes.

 8   Q    And by "HR" you're referring to Al Lave?

 9   A    No.  Chris, Chris Martinez.

10   Q    What was the procedure for recalling an employee?

11   A    We would give her names and she would call them back.

12   Q    Had you ever been -- in your time with Greenbrier, had you

13   ever been involved with any facility where employees have been

14   -- where there had been a layoff?

15   A    Yes.

16   Q    When?

17   A    Oh, I think it was '08.

18   Q    2008.  Which facility?

19   A    San Antonio.

20   Q    And at the time you were the plant manager?

21   A    Correct.

22   Q    How many employees did you lay off in 2008?

23   A    Twenty-five to 30.

24   Q    And what was the reason for the layoff?

25   A    Work.  That time when the economy went bad, we -- we
```

1    nearly -- we just had no work.  Couldn't support it.

2    Q    Were you responsible for selecting which employees would

3    be laid off in 2008 in San Antonio?

4    A    Yes.

5    Q    How did you make that determination?

6    A    Performance, safety, cross training.

7    Q    As the plant manager in San Antonio, you were familiar

8    with all of the employees that worked at that facility,

9    correct?

10   A    Yes.

11   Q    And you had personally observed all of their work

12   performance, correct?

13   A    Yes.

14   Q    Did you confer with anyone else about your selection of

15   which employees would be laid off in San Antonio in 2008?

16   A    Yes.

17   Q    Who did you confer with?

18   A    My supervisors.

19   Q    And who were those people at the time?

20   A    Rubin Holguin.  No.  I'm sorry.  Rubin Salines and Marty

21   Martin.

22   Q    And what were their titles?

23   A    Supervisors.

24        UNIDENTIFIED SPEAKER:  What was the second name?

25        THE WITNESS:  Marty Martin.

1    UNIDENTIFIED SPEAKER:  What was the --

2    THE WITNESS:  Rubin Salinas.

3  Q    BY MS. SHIH:  They supervised the production employees

4  that worked in the San Antonio facility in 2008?

5  A    Yes.

6  Q    Did you confer with anyone above you with regard to your

7  selection of employees for layoff in San Antonio in 2008?

8  A    I'm sure I did, but I don't recall any specifics.

9  Q    Were any of those employees laid off in San Antonio in

10 2008 ever recalled?

11 A    Some were, yes.

12 Q    And were you the plant manager at the time of the recall?

13 A    Yes.

14 Q    What was the process for recalling those employees?

15 A    Same thing.  Give the list of names to HR and try and get

16 ahold of them.

17 Q    And as the plant manager, you were responsible for

18 selecting the employees that HR should contact for rehire.

19 A    Correct.

20 Q    And what factors did you consider in determining which

21 employees would be contacted first?

22 A    Safety, production, attendance.

23 Q    So when you say you give the name to HR and they contact

24 them, what specifically is HR instructed to do in contacting

25 employees for rehire?

1    A    I don't know.  We just give them a list of names and they

2    would call.  I don't know specifically what they have to do.

3    Q    Is there an application process that those individuals

4    have to go through again?

5    A    I believe so.

6    Q    And that was true in 2008 in San Antonio, correct?

7    A    I believe so, yes.

8    Q    And is there an interview process that those individuals

9    have to go through again?

10   A    Yes.

11   Q    And as a plant manager, did you personally interview

12   employees before they were rehired?

13   A    Yes.

14        JUDGE LAWS:  Is that both in San Antonio and Tucson?

15        THE WITNESS:  Yes.

16   Q    BY MS. SHIH:  Did you personally conduct interviews of

17   employees that were recalled at the Tucson facility or rehired

18   at the Tucson facility in 2013?

19   A    Yes.

20   Q    All of them?

21   A    No.

22   Q    At some point Eric Valenzuela began conducting those

23   interviews, correct?

24   A    Correct.

25   Q    Did you and Mr. Valenzuela ever conduct interviews

1  together?

2  A    No.

3  Q    When you and Kevin reviewed the list of employees in

4  Tucson in November 2012 to identify which employees would be

5  retained and which ones would be terminated, did you have any

6  conversations with Lex Morrison?

7  A    No.

8  Q    Did you have any conversations with any of the supervisors

9  in the Tucson facility?

10  A    No.

11  Q    Did you have any conversations with any of the foremen?

12  A    No.

13  Q    I'm showing you what's been previously admitted as General

14  Counsel's 44.  Do you recognize that email exchange?

15  A    I don't recall it, but I -- I see it, yeah.

16  Q    And does the refresh your recollection at all about the --

17  the approximate date on which you and Kevin made the decision

18  to begin increasing the headcount in the Tucson facility?

19  A    Okay.  Possibly, yeah.

20        JUDGE LAWS:  And I'm going to jump in here.

21        Do you know whether the four referred to in this email is

22  the initial four?

23        THE WITNESS:  Yes.

24        JUDGE LAWS:  You do know and it is?

25        THE WITNESS:  I would say that this is for recalling the

1    initial four.

2        JUDGE LAWS:  Thank you.

3    Q    BY MS. SHIH:  So the decision to recall -- to begin

4    rehiring employees in Tucson was made prior to January 23rd.

5    A    Or January 23rd.

6    Q    Or on January 23rd.

7    A    Yeah.

8    Q    Do you know how soon before this email exchange took place

9    that the actual decision was made?  Whether it was a few days,

10   a few weeks, a few --

11   A    I don't recall.

12   Q    Did you have a discussion with Mike Torra about recalling

13   employees in Tucson?

14   A    I don't believe so.

15   Q    When did the first -- when did the first rehire come back

16   to the Tucson facility after the November 2012 layoff?

17   A    I believe it was March.

18   Q    So even though the decision was made in January, no

19   employees actually came back to work until March?

20   A    I believe so.

21   Q    I'm handing you what's been previously admitted as General

22   Counsel 45.  Do you recognize that email?

23   A    I see it.  I don't recall it.

24   Q    Did you have any discussions with Kevin Stewart, Gordan

25   Hudgens or Mike Torra about the four initial employees to be

1   contacted for rehire and whether they would present Greenbrier

2   with further issues?

3   A    I don't think so.

4   Q    Did you have any discussions with Mike Torra or Gordan

5   Hudgens about the four people who had been initially selected

6   for recall?

7   A    I'm sure I talked about it with Kevin.

8   Q    Right.  And I think we already -- you did already testify

9   that you talked about it with Kevin.  Did you talk about it

10  with Mike Torra and Gordan Hudgens?

11  A    I don't believe so.

12  Q    As the interim plant manager of the Tucson facility at the

13  time of January 25th, 2013, did you ask Mike Torra what he

14  meant by further issues?

15  A    No.

16  Q    Why not?

17  A    I didn't believe there was a need to.

18  Q    Because you were personally involved in the selection of

19  those four employees for rehire?

20  A    Possibly, yes.

21  Q    And I think I already asked you this, but just to clarify.

22  How were those four initial employees?

23  A    I don't recall their names.

24  Q    I'm handing you what's been marked as General Counsel's

25  46.  Do you recognize that email exchange?

1   A     Yes.

2   Q     Starting with the email at the bottom from Kevin Stewart

3   to Al Lave on February 14th and copied to you, who made the

4   determination that the Tucson facility needed to increase the

5   direct labor headcount to 65 over the next 45 days?

6   A     I assume Kevin and I.

7   Q     Do you remember that you were involved in that decision

8   with Kevin?

9   A     I vaguely recall something like that.

10  Q     Do you remember a discussion about that specific number?

11  A     Not about this specific number, no.

12  Q     Who -- who determined that the number should be 65?

13  A     I'm sure Kevin and I did.

14  Q     How did you reach that determination?  How did you reach

15  that number?

16  A     Based on work that we were seeing shop and what we thought

17  we needed for direct hours, so -- he probably thought at the

18  time that with 65 direct we can hit -- get closer to our goals.

19  Q     It was busy at the shop at the time?

20  A     I'm sure we had some backlog, yeah.

21  Q     Production employees were working overtime in February

22  2013, correct?

23  A     I believe so.

24  Q     If you move up to the second email from the top where

25  Kevin Stewart says, "57, I believe" -- the direct labor count

1   after the determination was in November was 56.  Is that right?

2   A    I believe so, yes.

3   Q    Had one employee already been rehired as of February 14th?

4   A    No.

5   Q    Do you know why -- do you know how the number became 57 as

6   of that date?

7   A    He probably -- he's guessing.

8   Q    Okay.

9   A    Fifty-seven, I believe.

10  Q    Handing you what's been previously admitted as General

11  Counsel's 47, do you recognize this -- those emails?

12  A    Vaguely, yeah.

13  Q    Were you involved in the selection of these five

14  individuals for possible rehire in Tucson?

15  A    Yes.

16  Q    How did you reach the decision that these five individuals

17  should be contacted for rehire at this time?

18  A    Feedback from Freddy.

19  Q    And when Kevin Stewart said, "This was a lot harder when

20  -- than we thought," do you know what he meant?

21  A    No.

22  Q    Did you ask him what he meant?

23  A    No.

24  Q    When you were involved in the decision to identify these

25  five people, was it difficult to come up with these five names?

```
 1   A    I don't recall.

 2   Q    Why was Omar Ramos not recalled?

 3   A    I have no idea.  I don't know who he is.

 4   Q    You don't know who Omar Ramos is?

 5   A    No.

 6   Q    Or Jesus Omar Ramos?

 7   A    (No verbal response).

 8   Q    Have you heard the name?

 9   A    I don't recall the name.

10   Q    I'm handing you what's been previously admitted as General

11   Counsel 48.  Do you recognize that email?

12   A    I don't recall the email, but I see it, so --

13   Q    Who were the two employees that Tucson was trying to bring

14   back in the month of March?

15   A    I don't know.

16   Q    Did you speak to Kevin about bringing two employees back

17   in March?

18   A    I don't recall.

19   Q    By March 13, 2013, had Mr. Valenzuela been hired?

20   A    I believe so.

21   Q    As a general manager, do you attend Greenbrier strategy

22   and planning meetings?

23        MR. MINER:  Objection.  What sort of strategy and planning

24   meetings?

25        JUDGE LAWS:  Let's -- let's get a little foundation.
```

1  Q    BY MS. SHIH:  I mean, do you attend any meetings that are

2  referred to as Greenbrier Rail Services strategy and planning

3  meetings?

4  A    No.

5  Q    Do you attend any meetings where strategy and planning for

6  Greenbrier Rail Services is discussed?

7       MR. MINER:  Objection.  It's pretty broad, Your Honor.

8  Can we identify --

9       MS. SHIH:  It's -- I mean --

10      MR. MINER:  -- perhaps some other participants in these

11 meetings?

12      MS. SHIH:  I'm not asking any questions about a specific

13 meeting.  I'm asking whether he attends any meetings where

14 Greenbrier strategy and planning is discussed.

15      JUDGE LAWS:  Okay.  I'll allow that.  And then presumably

16 we'll hone in on it if he answers in the affirmative.

17      THE WITNESS:  No.

18 Q    BY MS. SHIH:  When did your duty as interim plant manager

19 for Tucson end?

20 A    When Eric was hired.

21 Q    Was there any overlap where you continued on in that

22 capacity after Eric started working there?

23 A    No.

24 Q    And after you were no longer the interim plant manager in

25 Tucson, did you have any responsibility over the Tucson

1   facility?

2   A    No.

3   Q    But you continued to receive emails in June and July of

4   2013 about the upcoming Union election in Tucson, correct?

5   A    Correct.  I was not directly responsible for the facility,

6   but I was still copied on stuff.

7   Q    What stuff were you copied on regarding the Tucson

8   facility?

9   A    Just financials at the end of the month.  These emails

10  like bringing people back, stuff like that.

11  Q    And emails about the Union campaign and election in the

12  summer of 2013?

13  A    Correct.

14  Q    At the time of June and July 2013, who had responsibility

15  over the Tucson facility?

16  A    Kevin.

17  Q    Why were you concerned about the Union election in July

18  2013?

19        MR. MINER:  Objection.  I don't think he testified he was

20  concerned about an election.

21  Q    BY MS. SHIH:  Were you concerned about the Union

22  election --

23  A    No.

24  Q    -- in July 2013?

25  A    No.

1    Q    Why would you be copied on emails concerning the July 2013

2    email -- or Union election?

3    A    I'm sorry.  Can you repeat the question?

4    Q    Why were you copied on emails concerning the Union

5    election in July 2013?

6    A    It's a good question.  Oh, because I was interim plant

7    manager for three, four months there.

8    Q    Did you -- you attended meetings at the Tucson facility in

9    June and July 2013 with employees about the upcoming Union

10   election, correct?

11   A    Correct.

12   Q    Who asked you to be present at those meetings?

13   A    Al.

14   Q    Did he tell you why he wanted you to be present?

15   A    Because I spoke Spanish.

16   Q    There are other individuals at the Tucson facility that

17   speak Spanish, correct?

18   A    Yes.

19   Q    Julio Vasquez, who's the safety manager there?

20   A    Yes.

21   Q    Eric Valenzuela, the plant manager?

22   A    Yes.

23   Q    Did he give you other -- any other reason why your

24   presence at these meetings was requested?

25   A    No.

1   Q    And you did attend those meetings, correct?

2   A    Yes.

3   Q    You were still living in Tucson at that time?

4   A    Yes.

5   Q    And I think you testified earlier your office is at the

6   Tucson facility?

7   A    Yes.

8   Q    Were you present at the Tucson facility every day?

9   A    No.

10  Q    How often would you be physically present on average at

11  the Tucson facility in -- and I'm talking about after -- well,

12  actually let me back up.  When you were the interim plant

13  manager in Tucson, were you generally present at the Tucson

14  facility every day?

15  A    Yes.

16  Q    When you returned to your general manager responsibilities

17  in March of 2013, about how often on average were you

18  physically present at the Tucson facility?

19  A    Maybe a day or a half day a week.

20       MR. GIANNOPOLOS:  Your Honor, could I have one minute to

21  discuss an issue -- just for a few seconds.

22       MR. MINER:  Is this a good time for a quick restroom

23  break?

24       MS. SHIH:  And actually I would like a quick restroom

25  break.

1    JUDGE LAWS:  It's -- it's been -- it's been an hour.

2    Let's -- let's go until 10:30.

3    MR. MINER:  Thank you.

4    (Off the record at 11:23 a.m.)

5    Q    BY MS. SHIH:  As the interim plant manager in Tucson in

6    late 2012 and 2013, you got to know some of the production

7    employees there, right?

8    A    Yes.

9    Q    You actually got to know all of the production employees

10   that were working there, correct?

11   A    Most of them.

12   Q    You at least knew who they were?

13   A    Yes.

14   Q    You were at the Tucson facility every day?

15   A    Yes.

16   Q    And you had some idea of which employees you though

17   support the Unions and which ones didn't, correct?

18   A    No.

19   Q    You had no idea which employees you thought supported the

20   Union and which ones didn't?

21   A    No.

22   Q    You didn't suspect that there were employees that were

23   Union supporters?

24   A    No.

25   Q    I want to clarify that, when you said you didn't suspect

1   there were employees.  Are you referring to specific employees

2   or are you saying you didn't suspect that any employee was

3   supporting the Union?

4   A    I didn't have any suspicion of any specific employees that

5   was supporting the Union.

6   Q    Thank you.  You knew, though, that a petition for

7   representation had been filed by the Union in November of 2012,

8   correct?

9   A    Yes.

10  Q    And you knew that there was an election that was upcoming.

11  By at least May of 2013 you were aware that there was an

12  election scheduled to be held with the Union in July, correct?

13  A    Correct.  But I wasn't in Tucson any longer.

14  Q    But you were still present at the Tucson facility.

15  A    Not in May.

16  Q    At -- you weren't -- you weren't still present at the

17  Tucson facility a half day one day a week?

18  A    Sure.

19  Q    And you were present at the Tucson facility for meetings

20  in June and July with employees about the Union?

21  A    Correct.

22       MS. SHIH:  At this time, Your Honor, I'm going to -- I

23  would like to ask the witness some questions about the

24  recordings from those meetings in June and July of 2013.

25       JUDGE LAWS:  And are you going to do that referencing the

1   written documents or are we going to use the recordings

2   themselves?

3       MS. SHIH:  Actually both.

4       JUDGE LAWS:  Okay.

5   Q   BY MS. SHIH:  Let me first direct your attention to a

6   meeting held among employees at the Tucson facility on June

7   28th, 2013, with Al Lave and Mike Torra.  Do you recall those

8   meetings?

9   A   Yes.

10  Q   They were actual multiple meetings --

11  A   Yes.

12  Q   -- with employees that day, correct?

13  A   Yes.

14  Q   And you were present for all of the meetings that day?

15  A   I believe so.

16  Q   Did you provide translation during any of the meetings on

17  June 28th, 2013?

18  A   I'm trying to remember because I didn't do all the

19  translating, so I don't know if for that specific meeting I

20  translated or somebody else translated.  I could have.

21  Q   Some of the meetings -- how many meetings were conducted

22  with employees on June 28th?

23  A   I don't recall.

24  Q   Do you remember if it was two?  Four?  Ten?

25  A   Maybe a couple.  Maybe two.

1   Q    Maybe two.  Were they -- were they all conducted in

2   English and Spanish?

3   A    I believe there was an English and a Spanish.

4   Q    And did you -- I think I -- I've already asked you, but I

5   want to double check.  Did you provide translation at the

6   Spanish meeting on June 28th, 2013?

7   A    I could have, but I'm not sure.

8   Q    I'm going to play a portion of the beginning of the

9   recording from the June 28, 2013, meeting, and that's one of

10  the two recordings that's part of the CD that's General Counsel

11  151.  I'm going to begin the recording at eight minute (sic).

12  And I'm going to ask you just to listen to the Spanish voice

13  that you hear.

14       I can't get it quite to eight minutes.  Let's start it at

15  7:55.

16       MR. MINER:  I'm sorry to interrupt you.

17       MS. SHIH:  Excuse me.  I'm sorry.

18       MR. MINER:  Is that the beginning of the tape?

19       JUDGE LAWS:  The beginning of like what --

20       MR. MINER:  Does --

21       JUDGE LAWS:  In dialogue?

22       MS. SHIH:  Yeah.  I'm starting it at 7:55 because --

23       MR. MINER:  Okay.

24       MS. SHIH:  The transcript reflects that the first eight

25  minutes is just noise.

```
 1          MR. MINER:  Thank you.

 2   (Audio begins at 11:38 a.m.)

 3          MS. SHIH:  I'm stopping the recording at 8:47.

 4   Q    BY MS. SHIH:  Is that your voice on the recording?

 5   A    No.

 6   Q    Do you recognize the voice on the recording, the Spanish

 7   voice?

 8   A    Yes.

 9   Q    Who is that?

10   A    It's Julio.

11   Q    Julio Vasquez?

12   A    Yes.

13   Q    The safety manager?

14   A    (No verbal response).

15   Q    But you were present at this meeting?

16   A    Yes.

17   Q    I'm now going to play for you from the July 9, 2013, audio

18   recording that's been admitted as General Counsel I believe

19   154.  The corresponding transcript is GC -- it has been marked

20   as GC-155.  And I'll start the recording -- or start the play

21   at 5.43.

22   (Audio begins at 11:39 a.m.)

23          MS. SHIH:  I'm stopping it at 6.40.

24   Q    BY MS. SHIH:  That's your voice, correct?

25   A    Yes.
```

1   Q    You recall -- or you attended a meeting with Al Lave among

2   employees of the Tucson facility on July 9th, 2013, correct?

3   A    Correct.

4   Q    And that was just two days before the Union election?

5   A    Correct.

6   Q    Do -- you translate it for Mr. Lave at this meeting,

7   correct?

8   A    Yes.

9   Q    You were the only one who was translating for Mr. Lave at

10  this meeting?

11  A    I believe so.

12  Q    There were multiple meetings held among employees at the

13  Tucson facility on July 9th; is that right?

14  A    I don't recall if there was one or two.

15  Q    How many did you attend?

16  A    Don't recall.

17       MS. SHIH:  I'm going to forward it to 23.27.  And I

18  realize -- we'll go back and complete what we began with

19  recording yesterday.  But for purposes of questioning this

20  witness, I do want to just play a portion beginning at 23.27.

21  (Audio begins at 11:42 a.m.)

22  Q    BY MS. SHIH:  Do you recognize that voice as Mr. Lave's?

23  A    Yes.

24  Q    And he told employees at a meeting in Tucson in July 2013,

25  "We encourage you to vote no."

```
 1   A    Yes.

 2   Q    And that's referring to the Union election coming up in

 3   two days, correct?

 4   A    Yes.

 5        MS. SHIH:  Restarting it at 23.43.

 6   (Audio begins at 11:43 a.m.)

 7   Q    BY MS. SHIH:  That's your voice providing the translation

 8   for Mr. Lave?

 9   A    Yes.

10   Q    What were the dates that you oversaw both at the San

11   Antonio facility and the Tucson facility?

12   A    From that November through March timeframe.

13   Q    November 2012 through March 2013.

14   A    Yes.

15   Q    And regarding San Antonio you oversaw the San Antonio

16   facility as general manager from November 2011 through October

17   2012, correct?

18   A    I'm sorry.  Can you repeat that?

19   Q    You -- as the general manager, you oversaw the San Antonio

20   facility of Greenbrier from November 2011 to October 2012,

21   correct?

22   A    Correct.

23   Q    Isn't it true that from November 2011 to October 2012 the

24   San Antonio facility had a poor billing efficiency rate?

25   A    Yes.
```

1   Q     During that timeframe the billing efficient rate at the

2   San Antonio facility averaged 69 percent, correct?

3   A     I believe so.

4   Q     That was the second worst billing efficiency rate

5   throughout Greenbrier Rail Services, correct?

6   A     I don't know that.

7   Q     Mexico City was the only facility that a worse efficiency

8   rate than San Antonio during that time, correct?

9   A     I don't know that.

10  Q     There were no Union drives or Union campaigns in the San

11  Antonio facility between 2011 and 2013; is that right?

12  A     Correct.

13  Q     There were no layoffs in the San Antonio facility during

14  that timeframe as well, correct?

15  A     Correct.

16  Q     The billing efficiency rate is determined by the hours

17  billed divided by the total hours worked; is that right?

18  A     Correct.

19        MS. SHIH:  May we have just a few minutes, Your Honor?

20        JUDGE LAWS:  Are you conferring to see whether you have

21  any more questions?

22        MS. SHIH:  Correct.  Thank you.

23  (Off the record at 11:46 a.m.)

24        MS. SHIH:  Your Honor, we have no further questions at

25  this time.  But we do reserve the right to recall this witness

1   if there are additional documents that are produced that have

2   not previously been produced that are relevant to this witness'

3   testimony.

4        JUDGE LAWS:  Understood.  Then why don't we take a lunch

5   break.  We can discuss timing off the record.

6        THE COURT REPORTER:  Off?

7        JUDGE LAWS:  Off.

8   (Off the record at 11:48 a.m.)

9        THE COURT REPORTER:  We're on.

10       JUDGE LAWS:  I'm going to go ahead and swear you in.  So

11  if you could raise your right hand.

12  Whereupon,

13                      **ERIC VALENZUELA**

14  having been duly sworn, was called as a witness herein and was

15  examined and testified as follows:

16       JUDGE LAWS:  Can you please state and spell your name.

17       THE WITNESS:  Eric, E-R-I-C, Valenzuela, V-A-L-E-N-Z-U-E-

18  L-A.

19       JUDGE LAWS:  Thank you.

20                    **DIRECT EXAMINATION**

21  Q    BY MS. SHIH:  You're currently employed by Greenbrier Rail

22  Services as the plant manager for -- or actually -- let me back

23  that up.  You're currently employed by Greenbrier Rail

24  Services, correct?

25  A    Correct.

1    Q    What's your current position?

2    A    Plant manager.

3    Q    For what facility?

4    A    Finley, Washington.

5    Q    And how long have you held that position?

6    A    Four days.

7    Q    Formerly what was your position with Greenbrier before you

8    took over as the plant manager of Finley?

9    A    I was the plant manager in San Antonio for four days.

10   Q    And before that?

11   A    I was the plant manager for Tucson.

12   Q    And how long were you the plant manager for the Tucson

13   facility?

14   A    Eight months.

15   Q    When did you begin as a plant manager in the Tucson

16   facility?

17   A    March of 2013.

18   Q    Do you remember when in March you started?

19   A    4th of March.

20   Q    March 4th.

21   A    Yes.

22   Q    Did you hold any positions with Greenbrier before you took

23   the position as a plant manager in Tucson?

24   A    No, I did not.

25   Q    How did you come to apply for the position of plant

1    manager in Tucson?

2    A    I was contacted by a headhunter.

3    Q    When?

4    A    Must have been sometime early February.

5    Q    And how were you employed at the time that you were

6    contacted by him?

7    A    I was unemployed.

8    Q    You were not employed?

9    A    Correct.

10   Q    When did you first speak with anyone at Greenbrier about

11   going to work there?

12   A    It was probably early February or mid -- early to mid-

13   February.

14   Q    Who was the first person you had contact with?

15   A    Lisa Maxey.

16   Q    And what did Ms. Maxey tell you?

17   A    They -- she told me they were looking for a plant manager.

18   She described the position, told me it was a repair shop for

19   railcars and -- and -- well, she described a little bit how

20   Greenbrier -- what -- what Greenbrier was and what they did.

21   Q    Were you familiar with Greenbrier Rail Services before Ms.

22   Maxey contacted you?

23   A    No, I was not.

24   Q    What, if anything, did Ms. Maxey tell you in that first

25   communication about the operations of the Tucson facility?

1  A    Well, she just -- I -- I don't remember -- I -- what we

2  talk about.  I remember we talk about what they did and -- and

3  -- I just don't remember details.

4  Q    Did she tell me how -- did she tell you that -- how many

5  employees worked at that facility?

6  A    I think she did because I remember comparing to other of

7  my previous jobs, and -- and it was just about equivalent as

8  far as number of employees.

9  Q    Did she form -- inform you that there had recently been a

10  significant layoff of employees at that facility?

11  A    I don't think she did.

12  Q    When did you first have any -- well, after you spoke with

13  Lisa Maxey about the position, what was the next communication

14  you had with anyone from Greenbrier?

15  A    I was asked to go to the shop to -- to meet with Juan

16  Maciel.

17  Q    Asked by who?  Ms. Maxey?

18  A    By -- yes.

19  Q    And -- and did you, in fact, meet with Mr. Maciel?

20  A    I did.

21  Q    When was that meeting?

22  A    It was probably a few days after initial contact with Lisa

23  Maxey.

24  Q    Did you speak with Mr. Maciel on the phone before you met

25  with him in person?

1   A    I -- I don't -- I don't remember, but I -- I don't think

2   so.  I think first time I talked to Mr. Maciel was in person

3   here in Tucson.

4   Q    And was that an interview for the position?

5   A    Yes.

6        MS. SHIH:  Excuse me.  I apologize.

7   Q    BY MS. SHIH:  How long did your meeting with Mr. Maciel

8   last, your first meeting?

9   A    Probably somewhere between an hour and two hours.

10  Q    Did you meet with anyone else at the same time?

11  A    No.

12  Q    And that meeting was held at the Tucson facility?

13  A    Yes.

14  Q    He gave you a tour of the facility?

15  A    Yes.

16  Q    Did he introduce you to anyone else that was working at

17  the facility?

18  A    No.

19  Q    What did Mr. Maciel tell you in that meeting about the

20  operations of the Tucson facility?

21  A    Well, he just explain of what -- it was very similar to

22  what Lisa Maxey had told me.  I don't think that Mr. Maciel

23  share any -- any new information.  But the -- probably the new

24  -- the only different information was a little more technical

25  about the repair of the cars.  I mean, we actually went and --

1    and see -- and saw the cars and he explained a little bit how

2    it worked and -- and -- but that was about it.

3    Q    You observed employees performing work on the cars during

4    your visit?

5    A    No.  If -- if I'm not mistaken, when -- when I arrived to

6    the facility, they were about to shut down for the day.  And so

7    when we walk around the -- the facility, there was no employees

8    already.

9    Q    How many times did you meet with Mr. Maciel before you

10   were offered the position of plant manager?

11   A    Just once.

12   Q    Did you meet with anyone else other than Mr. Maciel before

13   you were offered the position of plant manager?

14   A    Yes, I did.  I met with Kevin Stewart.

15   Q    When did you meet with Kevin Stewart?

16   A    Must have been a few days after I met with Mr. Maciel.

17   Q    And that was also at the Tucson facility?

18   A    Yes.

19   Q    How long did that meeting last?

20   A    Probably two hours.

21   Q    During that meeting, did you -- were you introduced to

22   anyone else at the facility?

23   A    Yes.  Yes.  I don't remember who, but -- I remember one

24   person that I -- I know I met two or three people.  Probably

25   some of the managers briefly, but I don't remember who.  I

1    remember one for sure.

2    Q    Who was the one person you do remember?

3    A    Keith --

4    Q    Keith Tarpley.

5    A    Keith Tarpley.

6    Q    During your meeting with Kevin Stewart, what did he tell

7    you about the operations of the Tucson facility?

8    A    He did tell me that the -- the shop had been struggling.

9    He explained to me that -- well, actually I ask him why they

10    were looking for another plant manager and he explained that

11    the -- there had been a restructuring of the -- of the plant,

12    and they didn't have a permanent plant manager and they were

13    looking for somewhere.  He explained a little bit about the

14    production manager, Freddy Valdez.

15        And -- and we did talk extensively about some of the key

16    personnel, like Freddy Valdez, production manager, Keith

17    Tarpley, Julio Vasquez, Chris Martinez.  He explained --

18    because there -- there had been many changes at a time, and he

19    explained to me a little bit of what was going on.

20    Q    And you told me that he had talked to you about the fact

21    that there had been a restructuring of that facility recently,

22    correct?

23    A    Yes.

24    Q    As part of that discussion, did Mr. Stewart bring up to

25    you the fact that there had been a significant layoff of

```
 1   employees in November of 2012?

 2   A    Yes.

 3   Q    What did he tell you about that?

 4   A    He said that the company had been losing money and -- and

 5   the -- they had to -- to cut some of the people because they

 6   were losing a significant amount of money every month and that

 7   the plant manager was -- was part of the problem.  So they had

 8   to let him go or -- or transfer him and -- and that's why they

 9   were looking for -- for another plant manager that could

10   probably turn it around.

11   Q    Did Mr. Stewart tell you how long the company had been

12   losing money?

13   A    I don't think he did.  He just told me that had been

14   losing money every month for -- for the past several months,

15   but --

16   Q    After your meeting with Kevin Stewart, did you meet with

17   anyone else from Greenbrier before you were offered the

18   position?

19   A    Only by phone.

20   Q    Who did you speak with by phone?

21   A    Mike Torra.

22   Q    And when did you speak with Mr. Torra?

23   A    It probably again a day or two after I talked to Kevin

24   Stewart.

25   Q    How long was that phone call with Mr. Torra?
```

1   A    Probably 20 or 30 minutes.

2   Q    So these three interviews that you had -- the first with

3   Mr. Maciel, the second with Mr. Stewart and the third by

4   telephone with Mr. Torra -- that was all within the course of

5   approximately a week?

6   A    I will say two weeks.  Two or three weeks.

7   Q    When you spoke to Mr. Torra on the telephone, what did he

8   tell you about the company and the operations of the Tucson

9   facility?

10  A    He only told me that -- he didn't tell me anything

11  specific about the Tucson facility.  He just talked more about

12  Greenbrier as a company, and it was more focused on my

13  experience and -- and what I had to offer to Greenbrier.

14  Q    What did Mr. Torra tell you about Greenbrier as a company

15  during that phone call?

16  A    Well, he told me it was a good company to work for.  He --

17  he was -- at the time he had been with Greenbrier for about a

18  year, so he was telling me that so far he was very happy with

19  the company and -- and he said that he -- he was sure that I

20  would be very happy with the company as well.

21  Q    You mentioned that phone call focused more on your

22  experience and your background.

23  A    Right.

24  Q    What was your work experience prior to accepting the

25  position as plant manager in Tucson?

1  A    Well, I had been a plant manager for about 14 years.

2  Different companies, different industries.  And -- well, that's

3  what I had to offer.

4  Q    What industries had you worked in before as a plant

5  manager?

6  A    It's manufacturing and textiles and construction.

7  Q    Was this in Arizona?

8  A    Arizona, Colorado and California and Texas.

9  Q    And you said you had been a plant manager for about 14

10 years.

11 A    Yes.

12 Q    The facilities that you managed as a plant manager in your

13 prior experience, were those union or non-union facilities or

14 both?

15 A    Non-union.

16 Q    They are all non-union?

17 A    Yes.

18 Q    Have you ever worked in a union facility?

19 A    No.

20 Q    What's your educational background?

21 A    I have a bachelor's degree in business management.  I'm

22 currently working on my master's degree in organizational

23 psychology.

24 Q    After you spoke with Mike Torra about the plant manager

25 position, did you speak with anyone else from Greenbrier before

1   you were offered the position?

2   A    No.  Other than Kevin Stewart.  I don't remember it was

3   more than once, but I talked to Kevin Stewart again and also to

4   Lisa Maxey.

5   Q    And when were you offered the position as plant manager in

6   Tucson?

7   A    I started working on February 4 -- excuse me -- March 4th,

8   so -- I was offered -- two weeks before that I was offered the

9   position.

10  Q    So late February 2013?

11  A    Yes.

12  Q    And who contacted you to offer you the position?

13  A    Lisa Maxey.

14  Q    Before you accepted the position, did anyone from

15  Greenbrier tell you anything about the union or about employees

16  organizing the union at the Tucson facility?

17  A    Yes.

18  Q    When did you -- when were you first told anything about a

19  union campaign or a union drive in Tucson?

20  A    I -- it was said in one of the conversations I had with

21  Kevin Stewart.  I don't recall in which one, but at one point

22  he -- he did mention that the year before there had been a vote

23  to -- for a union.

24  Q    What else did Mr. Stewart say about the union in Tucson?

25  A    That -- that was it.

1   Q    Did he tell you anything about employees trying to

2   organize a union in Tucson at that time?

3   A    No.

4   Q    The only reference he made to a union in Tucson facility

5   was with regard to the prior year?

6   A    Yes.

7   Q    And when you say "prior year," are you referring to 2012?

8   A    Yes.

9   Q    Did he -- what did he tell you about the union effort in

10  2012?

11  A    That some -- some employees tried to organize, and there

12  was -- there had been a vote and -- and that the union had lost

13  the vote, so -- that was it.

14  Q    So he was actually referring to the first election that

15  was held --

16  A    Yes.

17  Q    -- the Tucson facility?

18  A    Yes.

19  Q    And that was actually in 2011 --

20  A    Oh.

21  Q    -- is that right?

22  A    Yes.

23  Q    So Mr. Stewart did not tell you that there had been a

24  representation petition filed by the Union in 2012?

25  A    No.  I don't think he did.  I knew about a vote, and that

1   was all.  That's -- that's all he told me about it.

2   Q    When did you first learn that there was union activity

3   going on in the Tucson facility presently?

4   A    It -- I think that the first time I knew about it was when

5   the -- the Union representatives were giving out flyers outside

6   the facility --

7   Q    And --

8   A    -- in April.

9   Q    In April 2013.

10  A    Yes.

11  Q    When was the first time you learned that the Union had

12  filed a petition for representation for Tucson in November of

13  2012?

14  A    I think that -- I -- I'm -- I don't recall, but I believe

15  that after -- after I found out that the -- after I saw the

16  Union rep -- representatives handing out flyers.  That's when

17  -- when -- when I found out more that there was some of the

18  employees trying to get organized.

19  Q    And when you say you're -- when you refer to the -- the

20  incident where you saw Union representatives trying to pass out

21  flyers, you're referring to the date in April 2013 when you

22  contacted the police?

23  A    Yes.

24  Q    Prior to that date no one from Greenbrier informed you

25  that the Union had filed a petition for representation of the

1   Tucson employees?

2   A   I -- I don't -- I don't think so.  I don't remember.

3       I -- I had never been in a situation or worked with the

4   union, a union facility and -- so I -- I don't -- I didn't

5   understand very well what -- what was the difference or -- I

6   knew there had been a vote and that -- that the employees vote

7   no and -- so I didn't think they were going to come back or --

8   I didn't know much about it.

9   Q   So you were surprised to see Union representatives show up

10   at the Tucson facility in April 2013?

11   A   Yes.

12   Q   And we'll come back to that incident.

13       Prior to the Union officials showing up at the facility in

14   April 2013, were you aware that there had been unfair labor

15   practice charges filed by the Union against Greenbrier with

16   regard to organizing at the Tucson facility?

17   A   I -- I don't recall.

18   Q   At some point you learned that there were unfair labor

19   practice charges that had been filed by the Union against

20   Greenbrier, correct?

21   A   Oh, yeah.  Yes.  No.  I know that the -- I was told that

22   the Union had -- was thinking that we had -- that the -- the

23   reduction in workforce -- the Union was claiming that it was

24   due to the -- to the Union organize (sic).

25   Q   And when did you learn that?

```
 1   A    I -- I think it was the first few weeks of my employment
 2   with Greenbrier.
 3   Q    But it was after you accepted the position?
 4   A    I think so, yes.
 5   Q    And who told you that?
 6   A    Kevin Stewart.
 7   Q    And what did he tell you?
 8   A    He told me that there -- there had been a reduction in
 9   force and -- and that we were going to have to bring him back
10   and -- well, we needed to bring him back because one of the
11   reasons why -- what was explained to me was that one of the
12   reasons they have not rehired the -- those employees was
13   because there was not a plant manager -- a permanent plant
14   manager.  So they didn't want to -- they didn't want to bring
15   back the people and have a bigger workforce when there was a
16   brand new plant manager.  So they waited a little bit until
17   they knew they were going to hire me, and that's when --
18   actually one of the first things I started doing as a plant
19   manager was interviewing people to rehire.
20   Q    What did Mr. Stewart tell you about the unfair labor
21   practice charges that had been filed by the Union?
22   A    That the -- the Union was claiming that the reduction in
23   force was -- was to get rid of Union organizers.
24   Q    Did he say anything else?
25   A    He said it was not true.
```

1  Q     When you started working for Greenbrier in March of 2013,

2  hadn't the Tucson facility already rehired employees?

3  A     They had hired the first group of people -- I think it was

4  about four or five employees -- I think the week before I

5  started working there.

6  Q     There are actually a number of employees that were rehired

7  about a month before you started working there, correct?

8  A     I'm not sure.  I don't know.  Well, there -- there was a

9  group of employees.  I'm not sure if it was a few days before I

10 started or -- or a few weeks.  I knew there was a group of

11 employees that had started just before I did.  That's what --

12 Q     You said one of the first things you did when you became

13 the plant manager of the Tucson facility was rehire employees;

14 is that right?

15 A     Yes.

16 Q     Let me go back to the conversations you had with Mr.

17 Stewart about the layoff of employees in November 2012.  You

18 said you learned about that before you were offered the

19 position at Greenbrier, correct?

20 A     The layoff?  Yes.  Yes.

21 Q     And that's something that Mr. Stewart brought up to you

22 again after you began working as the plant manager, correct?

23 A     Yes.

24 Q     How many conversations did you have with Mr. Stewart about

25 the layoff of employees in November of 2012?

1   A    I -- I don't recall.  I mean, we talk about it -- I don't

2   know -- two, three times.  I -- I don't recall.  I would be

3   just guessing.

4   Q    Mr. Stewart told you that the layoff was because the

5   company was losing money, correct?

6   A    Correct.

7   Q    Didn't he also tell you that employees were thinking about

8   the Union and trying to bring in the Union, talking about the

9   Union and that it made things worse?

10  A    No, he did not.  I don't think he did.

11  Q    Did anyone ever tell you that?

12  A    No.

13  Q    When you became the plant manager of Tucson, did you

14  receive any training?

15  A    Training on what?

16  Q    Training on managing the plant in Tucson?

17  A    No, not formal training.  We -- I mean, I -- I guess I

18  did.  I mean, we -- I had Juan spending a lot of time with me

19  in the plant.  I had Kevin Stewart spending a lot of time with

20  me and -- and some other people like -- Chris Martinez, she was

21  training me on -- on some of the software like Kronos and

22  different -- different employees were training me on -- on

23  different -- different software.

24  Q    Was Kevin Stewart's office located at the Tucson facility?

25  A    No.

1    Q    Where was his office?

2    A    In Chehalis.

3    Q    And I'm referring to the time when you began working at

4    Tucson.

5    A    Yes.

6    Q    His officer is in Washington?

7    A    Yes.

8    Q    When you first became the plant manager in Tucson, you

9    said Kevin Stewart and Juan Maciel were spending a lot of time

10   with you.  How often were they present at the Tucson facility

11   with you when you began working as the plant manager?

12   A    Juan Maciel, I -- I believe he spent at least two or three

13   weeks just about every day in the facility.  And after that, to

14   this day -- I mean, he -- he spends at least a day or two every

15   week in the Tucson shop.

16        JUDGE LAWS:  Sir, I want to backtrack.  I think you may

17   have misspoken.

18        Did you mean two to three days per week at the initial

19   part?

20        THE WITNESS:  No.  Initially every day.

21        JUDGE LAWS:  Okay.

22        THE WITNESS:  Or just about every day for about two or

23   three weeks.

24        JUDGE LAWS:  Okay.

25        THE WITNESS:  And after that it was at least a day or two

```
 1   per week.
 2   Q    BY MS. SHIH:  What about Kevin Stewart, was he there every
 3   day for that two or three weeks when you first started?
 4   A    No, he was not.  I believe we -- he -- he spent at least
 5   the first week with me, my first week, and after that he was
 6   coming back just about every other week.  I mean, we spent a
 7   lot of time together.
 8   Q    And when you say "every other week he was coming back,"
 9   was he only there for a day every other week?
10   A    No.  He was there most of the week.
11   Q    When you first started working at Greenbrier, did you
12   receive any training about unions?
13   A    No.
14   Q    Did you ever receive any training about unions during the
15   time that you worked for Greenbrier?
16   A    Yes.  Once we learned that there was a union -- union
17   activity in -- sometime in April or early May.
18   Q    What kind of training did you receive?
19   A    We had a conference call with Mr. Lave and -- and he just
20   told us what we could do and what we could not do.
21   Q    And when you say, "We had a conference call," who are you
22   referring to?
23   A    All the leadmen, foremen and managers.
24   Q    Is that the only training that you received about unions
25   during the time you've worked for Greenbrier?
```

1    A    Yes.  I think what -- we had the same training a couple of

2    times or I had a training with Mr. Lave and then there was a

3    training with all the supervisors.

4    Q    You had a one-on-one training with Mr. Lave?

5    A    I -- I think so, if I'm not mistaken.

6    Q    When was that?

7    A    Probably a few days after the initial contact with the

8    Union in April.

9    Q    And during that training, what did Mr. Lave tell you?

10   A    We -- I think it's tips, no threats, no questioning of

11   employees and -- and -- I mean, it's -- we had some flyers and

12   emails that -- that shows all the things that we were allowed

13   to do and what we were not allowed to do.

14   Q    During that training did Mr. Lave tell you anything

15   specifically about the Union campaign that had been going on in

16   the Tucson facility?

17   A    Well, at one point I learned everything with more detail

18   what had happened in the previous campaign.  I -- I don't

19   remember if it was Mr. Lave or Mr. Stewart, the one that

20   informed me that -- I'm guessing it was Mr. Lave that -- we

21   went a little more in detail what had happened and -- but I

22   don't remember who -- who or when.

23   Q    Do you remember if it was after the Union representatives

24   showed up to Tucson in April?

25   A    Yes.

1  Q      It was after?

2  A      It was.

3  Q      And when you say you learned more about what had happened

4  during the previous campaign, are you referring to the 2011

5  campaign with the --

6  A      Yes.

7  Q      -- United Transportation Union?

8  A      Yes.

9  Q      What did you learn about that campaign?

10  A      Well, I learned that it was -- it had been a close vote.

11  I think 34 to 37 or something like that.  And then I learned

12  that they had filed the EOP charges and -- and, yeah.

13  Q      When did you learn that the Union had filed a petition for

14  representation -- the sheet metal workers union had filed a

15  petition for representation of the Tucson employees?

16  A      I don't recall, but I'm guessing that in the first few

17  days after the initial contact by the Union in April.

18  Q      And at that time were you informed that that petition was

19  filed two days after employees were laid off from the Tucson

20  facility?

21  A      At one point I learned that.  I -- I -- I don't remember

22  when.

23  Q      What else did you learn about the Union organizing

24  campaign by the sheet metal workers Union?

25  A      Well, that -- that the -- the -- that it was not really

1   the same -- the same union.  It was -- or probably the same --

2   that union had merged with another one and -- it had a

3   different name.  And they were trying to get back in.

4   Q    Did anyone ever communicate to you the employees who were

5   spearheading the effort to organize employees in Tucson?

6   A    No.

7   Q    Did you identify those employees on your own?

8   A    No.  I never knew who they were.

9   Q    Did you have any suspicions as to who were union

10  supporters and who were not in Tucson?

11  A    No.  No.

12       JUDGE LAWS:  And while we're paused, I'll just ask you did

13  anybody ever voluntarily come up to you and just say, "Hey, I

14  don't support the Union"?

15       THE WITNESS:  Yes.  Yes.  Some -- some employees just told

16  me that they were not happy about the situation.  That was it.

17       JUDGE LAWS:  Do you remember who that -- who they were?

18       THE WITNESS:  I'm trying to remember.

19       JUDGE LAWS:  That's okay.  And it doesn't have to be

20  everybody.  If you can't remember everyone, just -- just --

21       THE WITNESS:  Yes.

22       JUDGE LAWS:  If there's anybody that you can.

23       THE WITNESS:  Martin Valdez.  He's one of the ones that

24  told me that -- that he didn't want the Union.  Alex Acuna,

25  Terry Pike.  That's -- I think that's -- that's it.

```
 1        JUDGE LAWS:  All right.  Thank you.

 2        MR. MINER:  Your Honor, could we have a bit of foundation

 3   in terms of when he heard this stuff?

 4        JUDGE LAWS:  Sure.

 5        THE WITNESS:  I -- I heard -- I heard -- I heard this

 6   probably, I don't know, days before the vote.  During the whole

 7   campaign everything was really quiet.

 8        JUDGE LAWS:  So --

 9        THE WITNESS:  Just the last few days where people were

10   really tense and that's when some people started talking and --

11   but -- but it was not much.

12        JUDGE LAWS:  Thank you.

13   Q    BY MS. SHIH:  You said that you heard from these employees

14   that they did not support the Union just days prior to the

15   Union vote in July, right?

16   A    Yes.

17   Q    And that before that things were quiet.

18   A    Yes.

19   Q    You were actually handing out flyers to employees every

20   few days about the Union campaign, correct?

21   A    Correct.

22   Q    And that started in June, correct?

23   A    We started I think about two weeks before the -- the vote.

24   Q    There were more than ten flyers that you handed out to

25   employees about the Union vote and the Union election, correct?
```

1    A    I think it was ten of them or -- or very close to ten.

2    Q    And there were meetings with employees to talk about the

3    Union vote.

4    A    Yes.

5    Q    There were -- they started in June, correct?

6    A    I don't recall when, but -- but probably in June, yes.

7    Q    The conversation that you had with Martin Valdez about him

8    not supporting the Union, how did that conversation come about?

9    A    He asked me if there was something he could do to -- to

10   make sure that the Union didn't -- wasn't voted in.  I told him

11   that the only thing he could do is -- is just vote no.

12   Q    He approached you?

13   A    Yes.

14   Q    Were you in your office and he came up to you?

15   A    No.  I was in the shop.

16   Q    What were you doing in the shop --

17   A    I --

18   Q    -- when he approached you?

19   A    I -- I don't recall, but I -- I usually walk the shop

20   three or four hours a day, yes.  Yes, start looking for

21   potential problems or -- or issues.

22   Q    And that's what you were doing when he brought up to you

23   the upcoming Union vote?

24   A    I -- I think so, yes.

25   Q    And isn't it true that between the time you were hired and

1  the time of the Union election in July you were actually

2  looking out for Union representatives?

3  A    No, it's not true.

4  Q    I'm handing you what's been previously admitted as General

5  Counsel 74.  Do you recognize that email?

6  A    Yes.

7  Q    That's an email that you sent to Al Lave in May of 2013

8  letting him know that Union representatives showed up at the

9  facility, correct?

10  A    Correct.

11  Q    So you weren't looking out for Union representatives.  But

12  if you happen to see them you would notify your superiors?

13  A    Yes.

14  Q    How many times did you happen to notice Union

15  representatives at the facility?

16  A    Probably three or four times.

17  Q    And each time you happen to notice them you informed Mr.

18  Lave and your superiors?

19  A    Yes.

20  Q    Were you instructed to do that by someone?

21  A    Yes.  Well, not -- every time I receive anything -- any

22  flyers or that we -- I picked up flyers from the floor, I will

23  -- I will send Al an email.

24  Q    Who told you to send Al an email each time you observed

25  Union materials or Union representatives?

1  A    Mr. Lave.

2  Q    When did he -- when did he instruct you to do that?

3  A    Probably -- I -- I don't know exactly when, but probably

4  when we had the training.

5  Q    This is the training that you had after the first time the

6  Union representatives --

7  A    Yes.

8  Q    -- were observed at the facility?

9  A    Yes.

10  Q    In April 2013?

11  A    Yes.

12  Q    When was the first time you picked up a Union flyer from

13  the floor in the shop?

14  A    Well, the first time I saw a flyer was that initial

15  contact in April, and someone put it on my desk, one of the

16  employees.

17  Q    Did you see someone put it on your desk?

18  A    No, I didn't see it, but it -- but he told me that he had

19  put it on my desk.

20  Q    Who put that flyer on your desk?

21  A    Kenneth Pike.

22  Q    And that was -- and that was the day that you observed --

23  the first time you saw the Union representative at the

24  facility?

25  A    Yes.

1  Q    Mr. Pike left a copy of a Union flyer on your desk that

2  day?

3  A    Correct.

4  Q    And what did you do with it?

5  A    I scan it and -- and send it to Mr. Lave.

6        JUDGE LAWS:  Was there more than one Pike?

7        THE WITNESS:  Yes.  Yes.  There's two.

8        JUDGE LAWS:  Two Pikes.

9        THE WITNESS:  There's two.

10       JUDGE LAWS:  Are they related?

11       THE WITNESS:  They're brothers.

12  Q    BY MS. SHIH:  And when was the first time you picked up a

13  Union flyer off the floor and --

14  A    I -- I don't know.  But probably the -- the -- in the next

15  few days the Union showed up and -- and -- and there were

16  flyers everywhere.

17  Q    So the Union showed up again a few days after the first

18  time?

19  A    Yes.

20  Q    And you notified Mr. Lave that that had happened?

21  A    Yes.

22  Q    And you saw Union flyers just laying around on the shop

23  floor?

24  A    Yes.

25  Q    And what did you do with them?

1  A    I just -- I mean, I pick up any trash I see on the floor,

2  and -- and I -- I happened to pick up a flyer.

3  Q    Just one flyer?

4  A    The first time -- twice I pick up a flyer off the floor.

5  Q    Okay.  So that happened twice during the Union campaign?

6  A    I -- I think so.

7  Q    And both times you sent copies to Mr. Lave.

8  A    Yes.  I think so.

9  Q    You never sent Mr. Lave copies of any of the other trash

10  that you picked up off of the shop floor --

11  A    No.

12  Q    -- did you?

13  A    No.

14  Q    Just the Union flyers?

15  A    Yes.

16  Q    Okay.  Between May 29th and the election on July 11th how

17  many times did you pick up Union flyers off the shop floor?

18  A    I think only twice.

19  Q    And was that twice after May 29th?

20  A    Oh.  No.  No.  I think it was in the first few weeks after

21  the first flyer, the first -- yes.  Within two or three weeks

22  after the first flyer.

23  Q    And when you say the first flyer, you're talking about the

24  April visit from the Union representative?

25  A    Yes.

1    Q    What did Mr. Pike tell you about that flyer when he left

2    it on your desk?

3    A    He said, "Hey, I left a flyer on your desk that someone

4    was giving out this morning."   And I said, "Oh, thank you."

5    Q    That's all he told you?

6    A    Yes.

7    Q    He didn't tell you how he got it?

8    A    I -- I don't recall if he did, but I suppose that he -- he

9    -- they handed it to him when he was driving in the -- in the

10   property.

11   Q    Did he tell you who handed it to him?

12   A    No.

13   Q    Did he tell you -- why do you suppose that somebody handed

14   it to him as he was driving?

15   A    Because --

16        MR. MINER:  Objection.  Speculation.

17        JUDGE LAWS:  And I will allow it if it's based on

18   knowledge as fact.  If it's based on speculation, as to this

19   witness' speculation only.

20        You can go ahead and answer.

21        THE WITNESS:  I suppose that they -- they gave it to him

22   since they were handing out flyers that morning.

23   Q    BY MS. SHIH:  And that's because you were out there that

24   morning and you saw Union representatives handing out flyers to

25   employees as they were driving in, correct?

 1    A    Yes.

 2    Q    I'm handing you what's been marked as General Counsel

 3    Exhibit 50 -- what's been admitted as General Counsel 50.

 4         Do you recognize that email?

 5    A    Yes.

 6    Q    On June 7th, 2013, Mr. Lave told you not to pick on the

 7    internal Union organizers, correct?

 8    A    Correct.

 9    Q    Who was he referring to?

10    A    I -- I -- I don't know.

11    Q    Did you --

12    A    I mean, guess whoever -- whoever was a Union organizer.

13    Q    Did you know who the Union organizers were?

14    A    No.  No.

15    Q    So how would you know who not to pick on if you didn't

16    know who the Union organizers were?

17    A    I -- I suppose that is just in case I find out.

18    Q    Were you instructed to try to find out?

19    A    No.

20    Q    Were you doing anything to try to determine who those

21    people were?

22    A    No.

23    Q    Did you observe anything that would suggest to you who the

24    internal Union organizers were?

25    A    No.

1   Q    Mr. Lave instructed you to treat the internal Union

2   organizers the same as the employees who you perceive as pro

3   GRS, correct?

4   A    Correct.

5   Q    Were there employees that you perceived as pro GRS?

6   A    Yes.

7   Q    Who were those employees?

8   A    Martin Valdez, Terry Pike, Alex Acuna.

9   Q    And that's because they did not support the Union?

10  A    No.  That's because they -- they told me that they didn't

11  want a union.

12  Q    And so employees who did not want a union are employees

13  that you had perceived to be pro GRS, correct?

14  A    I never made an assumption because I didn't know if they

15  were just trying to get information from me, so I will just

16  assume everybody's the same.  I don't talk about the union.  I

17  don't give information.  I don't ask questions.  You know, I

18  just do my job as -- every day as normal.

19  Q    I understand.  I -- but you testified that the reason --

20  you testified that you perceived Martin Valdez, Terry Pike and

21  Alex Acuna as pro GRS, correct?

22  A    Correct.

23  Q    And that's because they told you they didn't want a union,

24  correct?

25  A    Correct.

1  Q    So employees who did want a union, would you perceive them

2  to be against GRS?

3  A    Well, I didn't know if there were any.

4  Q    I'm not asking you if you knew whether there were any.

5  I'm asking you if you would perceive an employee who did want a

6  union to be against GRS?

7        MR. MINER:  Objection, Your Honor.

8        THE WITNESS:  I --

9        MR. MINER:  Calls for speculation.

10        JUDGE LAWS:  I guess it calls for this --

11        MS. SHIH:  It's a question about his perception.

12        JUDGE LAWS:  -- this -- about this witness' perception

13  which --

14        THE WITNESS:  Well, I never thought about it.

15        MR. MINER:  Hold on.  We're talking --

16        JUDGE LAWS:  One -- one at a time.

17        Go ahead.

18        THE WITNESS:  I never thought about it.  I -- I -- until

19  this moment I -- I don't know if he -- if being pro union is

20  against GRS.  I -- I never thought about it.

21  Q    BY MS. SHIH:  But being anti-union is pro GRS?

22        MR. MINER:  Objection, Your Honor.

23        THE WITNESS:  I don't think so.

24  Q    BY MS. SHIH:  That's a question.  Is being anti-union pro

25  GRS?

1      MR. MINER:  Objection, Your Honor.

2      THE WITNESS:  I -- I don't think so.

3      MR. MINER:  Calls for speculation.

4      JUDGE LAWS:  And, again, I will allow it just as to -- to

5   this witness' perception.

6      THE WITNESS:  I think that if -- if it's -- there's

7   someone anti-GRS, they will not work for GRS.

8   Q     BY MS. SHIH:  That email that's in front of you, General

9   Counsel 50, it's dated June 7th, 2013, correct?

10  A     June 7th?  Yes.

11  Q     And it attached a number of handouts regarding the Union

12  to be distributed to employees in Tucson, correct?

13  A     I -- I think so.

14  Q     Those handouts began being distributed to employees in

15  June of 2013, correct?

16  A     Correct.

17  Q     And those handouts, the approximately ten you described

18  earlier, continued throughout June and July up to the Union

19  election, correct?

20  A     I think probably late June, but I -- I'm not sure.  But,

21  yes.

22  Q     Were you instructed to keep your eyes and ears open for

23  union organizing?

24  A     No.

25  Q     Were you instructed to do anything with regard to union

1   organizing other than contact Mr. Lave about any union activity

2   you happened to see?

3   A    I think that the -- the general instruction was walk away.

4   If you see people talking about it, just walk away.  We were

5   not to contact.  We were not to try to find out information.

6   Q    Other than Martin Valdez, Alex Acuna and Terry Pike, were

7   there any other employees at the Tucson facility that you

8   perceived to be pro GRS?

9   A    No.

10  Q    When did you have a conversation with Alex Acuna about the

11  Union?

12  A    I -- I think it was -- it was about the same time that --

13  probably late June, early July.  It was about the same time

14  where Martin Valdez talked to me.

15  Q    And what did Mr. Acuna tell you about the Union?

16  A    He just made a comment.  I don't remember exactly.  He

17  just made a comment about, "What can the Union do for us," and,

18  "They're just going to take our money," and, "We're just

19  wasting a lot of time," or something along those lines.

20  Q    And how did that conversation come about?  Did he just

21  make those statements at random?

22  A    No.  Because I was talking to Martin.  Martin approached

23  me probably two or three times, and he just -- I think he was

24  making fun of one of the -- one of the flyers that the Union

25  distributed and -- and I don't remember exactly, but he was

1  laughing,  and Alex Acuna was nearby.  And he said something

2  about the Union and -- and -- and then I walked away.  I -- I

3  never made any comments.  If they wanted to tell me something,

4  I will listen and just walk away.  Whether it was pro

5  Greenbrier or pro Union, I -- I never ask any questions.  If

6  they ask me, "What can I do for -- for -- to make sure that the

7  Union doesn't get -- get in here," I say, "Just vote no."

8  Q    So you actually had multiple conversations with Martin

9  Valdez --

10  A    I believe --

11  Q    -- about the Union?

12  A    I believe two -- two or three times.  I'm not -- I'm not

13  sure, but it was -- it was probably not a conversation.  It was

14  just a one way.  He tell me something about the Union or about

15  the flyer and -- and that was it.

16  Q    What about Terry Pike?  What did Mr. Pike tell you about

17  the Union?

18  A    Terry Pike approached me and said that he -- he didn't

19  want the Union because he had worked for -- for a union in the

20  past and -- and it was going to do nothing for him and that he

21  couldn't afford to pay member dues because his wife was

22  terminally ill and -- and that was going to -- he needed every

23  -- every dollar, and he wanted to see if there was something he

24  could do to -- to make sure that the Union didn't get it.

25  Again, I told him I appreciate -- I appreciate that and, you

1  know, "What you can do is just vote no."

2  Q    And how did that conversation come about?  Where were you

3  when you had this conversation with Mr. Pike?

4  A    Again, in the -- in the center shop.  I was walking around

5  probably and -- and -- and he approached me and he started

6  asking questions about the Union.

7  Q    And after you had conversations with Martin Valdez, Alex

8  Acuna and Terry Pike, did you inform anyone at Greenbrier about

9  these conversations?

10  A    I don't remember.

11  Q    Did you --

12  A    I --

13  Q    Did you let Mr. Lave know that you had had these

14  conversations with these employees?

15  A    I -- I don't remember.  I like to think I did, but I --

16  I'm not sure.

17  Q    Do you think an employee can be pro-union and pro GRS?

18  A    Yes.

19  Q    But you specifically perceived Martin Valdez, Alex Acuna

20  and Terry Pike as pro GRS because they did not want a union,

21  correct?

22  A    No.  I -- I believe they didn't want a union.  I believe

23  they were against the union.

24  Q    And that's the reason you perceived them to be pro GRS,

25  correct?

1   A    No.

2   Q    Isn't that what you testified earlier, that that's the

3   reason you perceived them to be pro GRS?

4   A    I -- I probably did, but the more I think about it I don't

5   think I -- I had a -- and I -- I'm sorry that -- if I said it

6   wrong, but -- now that I see the pro GRS, pro-union against GRS

7   or against union -- now I see there's a difference.  And I

8   don't think that -- what I meant to say is that I don't -- I --

9   they told me that they didn't want a union.  They didn't tell

10  me that they were pro GRS.  And -- and even when they told me,

11  I -- I didn't want to suppose they were being honest.  Same if

12  someone told me something pro union, I will just listen and

13  walk away.

14  Q    When you were -- when you were interviewing for your

15  position as plant manager before you were hired or before you

16  were offered the position, did anyone tell you that the Tucson

17  facility was on the fixed sell or closed list?

18  A    I think so, yes.

19  Q    Who told you that?

20  A    I think Kevin Stewart.

21  Q    And when did he tell you that?

22  A    I'm -- I'm not sure.  I knew that I needed to turn the

23  financials around.  I don't remember at what point he told me,

24  but I -- I -- I knew that that was my job.

25  Q    Do you remember -- or was it in the first meeting that you

1    had with Mr. Stewart?

2    A    I don't remember.

3    Q    Did he give you a timeframe in which you had to turn it

4    around?

5    A    No.

6         MR. MINER:  Your Honor, is this a good time for a break?

7         MS. SHIH:  Sure.

8         JUDGE LAWS:  Are we -- are we changing topics?

9         MS. SHIH:  We are changing topics.

10        JUDGE LAWS:  Okay.

11        MS. SHIH:  So this would be a good time.

12        JUDGE LAWS:  And we've had about an hour.  So let's come

13   back at 2.

14   (Off the record at 1:51 p.m.)

15        JUDGE LAWS:  Can you raise your right hand.

16   Whereupon,

17                        **ANTONIO ACUNA**

18   having been duly sworn, was called as a witness herein and was

19   examined and testified as follows:

20        JUDGE LAWS:  Can you please state and spell your name for

21   our court reporter, please.

22        THE WITNESS:  Antonio Acuna, A-N-T-O-N-I-O A-C-U-N-A.

23        JUDGE LAWS:  Thank you very much.

24        MR. MINER:  Last name again.

25        THE WITNESS:  A-C-U-N-A.

```
 1          JUDGE LAWS:  Thanks.

 2                        DIRECT EXAMINATION

 3    Q     BY MS. SHIH:  Mr. Acuna, how are you currently employed?

 4    A     With Greenbrier.

 5    Q     Where do you work?

 6    A     Shop in Mira Loma.

 7    Q     Mira Loma, California?

 8    A     Yeah.

 9    Q     And what's your position?

10    A     Welder, mechanic.  That's what they call them over there,

11    mechanic.

12    Q     How long have you worked for Greenbrier in Mire Loma?

13    A     A week and -- I'm sorry.  A month -- exactly a month and a

14    few days.

15    Q     And before you -- before that were you working for

16    Greenbrier in the Tucson facility?

17    A     Yes.

18    Q     And what was your position in Tucson before you went to

19    Mira Loma?

20    A     Started as a welder.  Then I got the opportunity to move

21    as leadman.

22    Q     And were you a leadman when you moved to Mira Loma?

23    A     They gave me the opportunity to try out the position.

24    Q     Of leadman?

25    A     Of leadman for 30 days.
```

1  Q    In Mira Loma?

2  A    For 30 days.

3  Q    And what happened after 30 days?

4  A    They said I wasn't suitable for the position at that time.

5  Q    So the month you've been out in Mira Loma has been as a

6  leadman?

7  A    No.  Well, yeah.  I was in the transition of becoming a

8  leadman.

9  Q    When did you first start working for Greenbrier?

10 A    I think -- I'm not exact.

11 Q    Approximately.

12 A    I know 2010.  A month -- and I think.

13 Q    Okay.  And you said you started as a welder.

14 A    Yes.

15 Q    When did you become a leadman?

16 A    I think it was a year and a half into the company.

17 Q    So maybe beginning of 2012?

18 A    Yeah.  A few months.  A few months.  It was March.  It was

19 end of March.

20 Q    Do you remember a Union organizing campaign with the

21 United Transportation Union in 2011 in Tucson?

22 A    Do I -- yeah.

23 Q    You remember that there was a Union election in 2011?

24 A    Oh, yeah.  That one, yeah.

25 Q    At that time you weren't a leadman?

1   A    At that time, no, I wasn't.

2   Q    You learned -- did you learn that the sheet metal workers

3   union was trying to organize the Greenbrier employees in Tucson

4   in 2012?

5   A    Yeah.

6   Q    When did you find that out?

7   A    There was -- I can't give you exact date.  Just -- just

8   found out about the flyers and, you know, the rumors that were

9   going around.

10  Q    Do you know what month it was that you learned about it?

11  A    It was a few months before Halloween on -- 2011, right?

12  Q    No.  I'm talking about 2012.

13  A    2012?  Oh, that one.  I had no recollection then.  I had a

14  good position.  Why ruin it?  You know, I -- I wasn't even

15  involved in none of that.  I really don't -- I can't tell you

16  exact date.

17  Q    Do you remember attending a meeting of supervisors,

18  foremen and leadmen with Al Lave on Halloween of 2012?

19  A    Yes.

20  Q    Do you remember what was discussed at that meeting?

21  A    Yes.

22  Q    What was the general discussion at that meeting?

23  A    There was -- they were trying to train us on how to

24  approach the workers.  If we would -- if we would, you know,

25  hear them talking about the Union or was -- if there was like

1   any groups involved with the union to report them to the

2   supervisor, which then was Freddy Valdez and Lex.

3   Q    Lex Morrison?

4   A    Yes.  Good guy. And, yeah, to report any incident that's

5   happening out there in the shop to them, you know, so they

6   could I guess take care of it.

7   Q    At the time of that meeting on Halloween, did you already

8   -- did you know that the sheet metal workers union was trying

9   to organize employee again?

10  A    At 2012?

11  Q    Yes.

12  A    Yes, I was aware, like I said, you know.  But I didn't

13  have nothing -- you know, I was just like -- no.  I didn't want

14  nothing to do with it.  I was at a good position, so I wanted

15  to stay there.

16  Q    The meeting that you attended with Al Lave on October

17  31st, do you remember who else was there?

18  A    Yeah.  It was Armondo Lopez.  It was Maggie Madrigal.  No,

19  Maggie -- yeah, Madrigal, I think.  There was Danny Dicochea.

20  It was -- Lex.  Lex was there.  I was there.  Elisama Rabago

21  was there and Ismael Lopez was there.  All those people were

22  there.

23  Q    Anyone else there?

24  A    Al Lave.

25  Q    Was Kathy Villalobos there?

1    A    Yeah.  The front lady, yeah.  I almost forgot about her.

2    Yeah.  The little old lady, yeah.

3    Q    Was there someone named John there as well?

4    A    Yeah.  New guy.  Came from Chehalis.

5    Q    Do you know what his last name was?

6    A    John Anderson.

7    Q    John Anderson?

8    A    No.  John -- he has a weird last name.  Hardenbrook.

9    Q    Anyone else there?

10    A    I was there.

11    Q    Was Julio Vasquez there?

12    A    Julio Vasquez?  No, he wasn't.

13    Q    Did you make a recording -- an audio recording of that

14    meeting?

15    A    Yes.

16    Q    Why did you record that meeting?

17    A    I -- I started taking recordings after there was -- there

18    was an incident of paperwork trail in the office.  Paperwork

19    got lost, words were said that they -- they were telling me

20    that they weren't said.  So I started taking care of myself,

21    because I thought I had a good position in this company, you

22    know.  I just recorded everything, you know.  I mean, that's --

23    it's good.  You know what I mean?  For me -- at that time it

24    was good for me, so I was doing it.

25    Q    When did you start doing that?

1   A    I had an incident with some PTO that was taken away from

2   me, and I really didn't want it.  It was Maggie.  Maggie had --

3   Maggie put it through.  And I didn't ask for it, and those were

4   -- that's -- my PTO that I work hard enough -- hard, so I could

5   just take a vacation, you know, on -- like in the future.  It

6   was coming up on April.

7   Q    About when did that happen, that incident?

8   A    This happened in -- it was around December.

9   Q    Of --

10  A    Freddy Valdez was there.  There was a third party.  Sorry

11  about that.  There was a third party.  Freddy Valdez was there

12  too.

13  Q    Are you back -- are you -- you mean he was -- he was there

14  at that October 31st meeting or he was --

15  A    No, no, no.

16  Q    -- there during the --

17  A    At this incident.

18  Q    -- incident with Maggie?

19  A    This incident where I started recording, you know,

20  everything after that.

21  Q    Okay.

22       JUDGE LAWS:  And just a reminder, please try to not talk

23  over each other.

24  Q    BY MS. SHIH:  When was that incident with Maggie and

25  Freddy?

1  A    This incident happened --

2        JUDGE LAWS:  It can be a guess if you don't know exact.

3        THE WITNESS:  Yeah.

4        Is there any more rules I need to know before, you know, I

5  get called on like that?  I mean, I didn't get -- I didn't get

6  no rule.

7  Q    BY MS. SHIH:  I think that was as much --

8  A    They just told me sit down, and that's it.

9  Q    I think that was as much for me --

10 A    Oh.

11 Q    -- as for you.  It's sometimes hard to tell when you're

12 done answering --

13 A    Yeah.

14 Q    -- a question and -- or when I'm done asking my question,

15 so --

16 A    All right.  I'm already looking like a dumb ass, you know,

17 so I don't want --

18       JUDGE LAWS:  No, no.

19       THE WITNESS:  -- to look more.

20       JUDGE LAWS:  You're not.  You're not.  It's -- it's not --

21 we don't do this every day.  We -- we do it more than most

22 people, but --

23       THE WITNESS:  Yeah.  I never did.  I don't.

24       JUDGE LAWS:  You don't.  Nor should you.

25       So, yeah, just -- you know, don't overthink rules.  Just

1    answer the questions.

2         THE WITNESS:  All right.

3         JUDGE LAWS:  You know, if you don't know the answer, say,

4    "I don't know."  If you're giving a guess --

5         THE WITNESS:  Late November.

6         JUDGE LAWS:  -- say your best guess --

7         THE WITNESS:  It was late November.

8         JUDGE LAWS:  Okay.

9    Q    BY MS. SHIH:  Let me ask this way.  When you recorded the

10   October meeting with Al Lave, about how long had you been

11   recording meetings and things going on at work?  A few months?

12   A few weeks?

13   A    This couldn't happen then.  I'm sorry, you know.  The --

14   the -- the recording -- I mean, the -- the incident that

15   started recording, it's all paper.  I don't know if they -- I

16   got supposedly a warning for it, you know.  I exactly don't

17   know the date, but, you know, there was an incident like that.

18   Q    Okay.  What did you do with the recording after you made

19   it?  This is -- and I'm referring to the October 31st --

20   A    Yeah.

21   Q    -- meeting with Al Lave.

22   A    Nothing until -- until I was laid off, you know.  And I

23   felt it was unjust -- unjustified the way I was laid off.  So,

24   yeah, I attended an NLRB meeting over here by Reid Park

25   (phonetic) and -- yeah.  That's when I -- I said, "I -- I might

1   have some recordings that, you know, you guys could use."

2   Q    Did you mean you attended a Union meeting?

3   A    Yeah.

4   Q    And who was there at that Union meeting from the Union?

5   A    There was a guy named Jeff.  I don't know.  If you could

6   name some names.  I mean, I really don't, you know --

7   Q    Well, let me ask you.  Who did you give the recording to?

8   A    I gave it to -- I don't want to say -- Jeff.

9   Q    Jeff Holly?

10  A    Uh-huh.

11  Q    How did you -- the recording was made on what kind of a

12  device?

13  A    It was my phone.

14  Q    And so how did you give the recording to Jeff Holly?

15  A    We had to go around, you know, Tucson to Radio Shack and

16  Cricket stores and phone stores to see if they could get it out

17  of the -- out of the phone to transfer it to an email.

18  Q    And who ended up being able to do that?

19  A    Radio Shack.  There was a Radio Shack over here by

20  Irvington.

21  Q    So someone from Radio Shack --

22  A    Uh-huh.

23  Q    -- transferred the recording from your phone to an email?

24  A    Yeah.

25  Q    And they did that in the store?

1   A    Yes.

2   Q    And who was there with you when that happened?

3   A    It was Jeff and this guy -- oh, what's his name?

4   Q    Was it another individual?

5   A    Yeah.  He's from the Union rep.

6   Q    Pat Montroy (phonetic) or Marco Molina?

7   A    Marco Molina.  No.  I'm sorry.  It's not Marco Molina.

8   There were two white guys.  That's all I remember.

9   Q    Okay.  Do you know what they did with the recording after

10  they left Radio Shack?

11  A    Yeah.  They put a -- Jeff called me.  He said he had

12  pushed the paperwork and the recording into federal court in

13  Phoenix.  And, you know, a couple of months later I got a call.

14  Or less than couple of months later I got a call from a guy

15  named Nick and -- yeah.

16  Q    Let me ask you about some of your job duties when you were

17  working as a leadman in Tucson.  Were you involved in any

18  hiring decisions as a leadman?

19  A    No.

20  Q    Were you involved at all -- so did you interview people --

21  A    No.

22  Q    -- who were applying for jobs there?

23  A    No, ma'am.

24  Q    Were you involved in any decisions to transfer employees

25  to other facilities or other jobs?

1  A      No, not facilities or jobs.  No.

2  Q      Did you have any responsibility for disciplining

3  employees, suspending them?

4  A      Yes.

5  Q      Can you describe what that responsibility was?

6  A      They were -- the instructions that were given to me I

7  would have to give them to the workers that were -- I was in

8  charge of, you know, for the day.  And if -- I guess if they

9  didn't comply with them, if they didn't like the orders or, you

10  know, the job they were put in, there was discipline.  You

11  know, I mean, maybe he would -- we would work a different way

12  to get the guy to do his job.  You know, maybe move him to a

13  different part of that same shop, you know; maybe -- something

14  that he knows how to do so production could keep on working.

15  Q      Did you decide whether someone needed to be disciplined or

16  not?

17  A      Yes.  I had the opportunity -- yeah.

18  Q      So you were able to give verbal warnings to employees?

19  A      Yes.

20  Q      Were you able to give written warnings to employees?

21  A      Yes.

22  Q      Did you --

23  A      Which I never did, though.  Sorry.

24  Q      Did you have to check with anyone before you could do

25  that?

1   A    My foreman, Hector Barajas.

2   Q    So you had to check with Hector before you could issue a

3   verbal warning to someone?

4   A    Yea.

5   Q    And was there ever an occasion when Hector told you that

6   you couldn't issue a verbal warning that you wanted to issue?

7   A    No.  We would talk about it, by, you know, it never got to

8   the point, you know, where I had to give a verbal warning or --

9   you know, we resolved the problem before it escalated.

10  Q    Did you have to get -- did you have to get Hector's

11  approval before you could actually the warning to the employee?

12  A    Yes.

13  Q    Were you able to issue a suspicion to an employee?

14  A    No.

15  Q    Were you involved at all in any decision to layoff or

16  recall employees?

17  A    No.

18  Q    Were you able to promote employees?

19  A    I would bring in my evaluations to Hector and my decisions

20  wouldn't get put aside.  They would get evaluated by Hector.

21  Then Hector would give them to the office, which is our

22  production manager.

23  Q    So you were able to give input into the decision to

24  promote an employee?

25  A    Yes.

1   Q     And the input was given to your supervisor?

2   A     Yes.

3   Q     And that's the foreman?

4   A     A foreman.

5   Q     Were you able to promote an employee without getting any

6   approval from Hector?

7   A     No.

8   Q     What about rewarding any employees like by giving them

9   time off or a bonus or anything like that?  Were you able to do

10  that?

11  A     No.

12  Q     Were you able to authorize overtime?

13  A     Yes.

14  Q     And is that something you were able to do without Hector's

15  approval?

16  A     Yes.  If I needed the person, I would ask them to stay if

17  he wanted to stay.

18  Q     And you were able to do that without checking with anyone?

19  A     Yes.

20  Q     How often would you do that?

21  A     Four times a week.  You know, it was a job needed to get

22  done so there --

23  Q     Were you able to authorize raises?

24  A     No.

25  Q     Did you prepare written evaluations of employees, like

1   performance evaluations?

2   A     No.

3   Q     Were you able to fire employees?

4   A     No.

5   Q     Did you assign employees work or direct their work, like

6   give them instructions on what they needed to do each day?

7   A     Yes.

8   Q     Did those instructions come from anyone or did you --

9   A     No.

10  Q     -- create them on your own?

11  A     Sorry.  No.  That's -- after a while I got the privilege,

12  you know, and they -- as a lead -- you know, to be there

13  permanent as a leadman, so he was just -- I would have my own

14  meetings.  You know, get my own people, just send them off.

15  Q     And how did you know what needed to be done each day?

16  A     I was there.  Well, I mean, it's just -- how can I be more

17  specific?  I don't know.  It just -- I was there every day, so

18  I would know what had to be done the next day.

19  Q     And you were able to make that determination on your own?

20  A     Yeah.

21  Q     Were you able to decide who on your team should do certain

22  things?

23  A     Yeah.  Yes.

24  Q     And what kind of factors did you use to decide who should

25  be given certain tasks and who should be given other tasks?

1   A    Can you repeat the question?

2   Q    I'm wondering what kind of -- what factors you used to

3   decide that this task should go to this person versus a

4   different person?

5   A    Ability of the person, you know, to handle -- the way he

6   could handle the job that was given to him.  I mean, not

7   everybody is the sharpest tool in the -- you know, in the shed,

8   you know.  So, you know, just by being there every day you

9   would -- I would just -- like I say, study the -- you know, the

10  workers; you know, get to know them and note their weaknesses

11  and their, you know --

12  Q    Strengths?

13  A    Yeah.  Strengths.  I lost the word.  I was going to say

14  positives, you know.

15  Q    In November before you were laid off from the Tucson

16  facility, how many people were on your team?

17  A    Well, the shop as one is a team, you know.  So in total

18  there was all those people laid off, which was 30ish.

19  Q    What -- I guess what I'm wondering is how many people were

20  you the lead man over?

21  A    Ten.  See, I don't -- I don't recall.

22  Q    Do you --

23  A    You know, I was pissed off that day.  I was fucking

24  pissed.

25  Q    Do you remember approximately if it was like five people?

1   Ten people?

2   A    I could probably say -- probably one, you know, out of

3   there.   No, I can't give you a straight answer on that, you

4   know.

5   Q    Okay.

6   A    I really -- I really can't see the faces right now.

7        JUDGE LAWS:   I'm going to jump in here.   Not necessarily

8   focusing on the day when you weren't quite thinking right, what

9   was the general range or number of employees you were lead

10  over?

11       THE WITNESS:   Fourteen.

12       JUDGE LAWS:   Okay.   Thank you.

13  Q    BY MS. SHIH:   Did you inspect their work?

14  A    Yes.

15  Q    And you attended supervisor meetings, right?

16  A    Yes.

17  Q    Were employees at the Tucson facility in Greenbrier -- did

18  they have uniforms?

19  A    Yes.

20  Q    Was the uniform for a lead man different than for the

21  other employees?

22  A    Yes, it was.

23  Q    What was different about it?

24  A    They get to put lead man or foremen, you know, and then

25  your name.

1   Q     And is --

2   A     Nothing special.  Sorry.  Nothing special.  But I didn't

3   decide to get that, you know.

4   Q     Was that on your shirt?

5   A     Yeah.

6   Q     So your shirt actually said "lead man" on it?

7   A     No.  I just adding -- no, I didn't want none of that.

8   It's just "Alex."  You know, it's nothing in this company, as

9   you could see.  Just a worker, you know.  Just a number/

10  Q     So when you were a lead man, you -- your uniform

11  personally was not different than the other employees?

12  A     No, it was not different.

13  Q     It was not different.

14        JUDGE LAWS:  And I just heard you say "Alex."  Is that

15  what you go by?

16        THE WITNESS:  Yeah.

17  Q     BY MS. SHIH:  Did you sign off on timecards for the 14

18  employees that were under you?

19  A     I -- I would give my -- my report at the end of the day to

20  Hector Barajas, and he would -- I'll give it to him in a piece

21  of paper.  He would go inside the office and move the times

22  around.  Yes.  You know, he would do -- I didn't do it

23  personally, you know, on the computer.  He did it.

24  Q     He was --

25  A     But I would --

1    Q    He was the one who had to sign off on the timecards?

2    A    Yes.

3         MS. SHIH:  I don't believe I have any further questions.

4         JUDGE LAWS:  Any cross?

5         MR. MINER:  Is there an affidavit for this witness, Your

6    Honor?

7         JUDGE LAWS:  Oh, she may have spoken too soon.

8    Q    BY MS. SHIH:  You're here in response to receiving a

9    subpoena from the NLRB, correct?

10   A    Yes.

11   Q    Thank you.

12        MR. MINER:  Is there an --

13        JUDGE LAWS:  Sounded very happy about that.

14        MR. MINER:  Is there an affidavit for this witness, Your

15   Honor?

16        MS. SHIH:  There is not.

17        JUDGE LAWS:  There is not.

18        MR. MINER:  All right.  Can we take about a five-minute

19   break?

20        JUDGE LAWS:  Let's -- yeah.  Let's go ahead and do that.

21   Off the record.

22   (Off the record at 2:34 p.m.)

23                    **CROSS-EXAMINATION**

24   Q    BY MR. MINER:  Good afternoon.  My name is --

25        JUDGE LAWS:  Hold on.  Okay.

1        THE WITNESS:  Okay.

2   Q    BY MR. MINER:  Thank you.  And good afternoon.  My name is

3   Fred Miner.  I'm an attorney for Greenbrier.  I'm just going to

4   ask you a few questions.  All right.  When we left off before

5   we took our break, Ms. Shih asked you about submitting time for

6   employees on your team.  Do you remember that?

7   A    (No verbal response).

8   Q    Do you remember testifying about submitting time on a

9   paper every day --

10  A    Yes.

11  Q    -- for employees on your team?

12  A    Yes.

13  Q    You do that every date?

14  A    Yes.

15  Q    And you provided the paper to Hector Barajas?

16  A    Yes.

17  Q    And Hector submitted the time for your employees?

18  A    Yes.

19  Q    Did he submit the time based on the paper that you

20  provided to him?

21  A    Yes.

22  Q    Did he keep his own track of the time for your employees?

23  A    No.

24  Q    All right.  One other subject I wanted to ask you about.

25  You testified that you went to a Radio Shack and they were able

1  to somehow download an audio recording into an email.  Do you

2  remember that?

3  A    Yes.

4  Q    Do you know how they did that?

5  A    They -- it was a old phone.  It was Cricket.  So what they

6  did -- this guy was a wiz.  I even invited him to a party that

7  night.  He -- he -- he went in there.  He did some codes.  And

8  he -- he somehow like connected the device into another like

9  modem, you know, behind the register.  So it's just like when

10  you get a new phone, which you guys probably do that a lot, you

11  know, you -- you know, you want to trade numbers.  They just do

12  the same thing, you know.  But he put extra codes on the phone,

13  where it just like, you know, transfer all the information to

14  the email he -- to mister -- Jeff's phone.

15  Q    Okay.  So this audiotape that was taken up your phone was

16  transferred onto an email that was sent to Jeff, the Union

17  representative.

18  A    Yes.

19  Q    Did you receive a copy of that email too?

20  A    I gave him the recording.  Why would I receive one?

21  Q    I'm just asking the question.

22  A    Oh.  Oh.  I had one.

23  Q    You had one and so you didn't need another one, right?

24  A    Yeah.

25  Q    And so he didn't send you a copy of that email, did he?

1    A    No, no, he didn't.

2    Q    He just sent it to Jeff, the Union representative.

3    A    Uh-huh.

4    Q    Is that a yes?

5    A    Yes.

6    Q    Okay.  We need it for the transcript.

7    A    Yes.

8    Q    Okay.  When you met with Nick -- you mentioned you met

9    with somebody named Nick a few months later.

10        MS. SHIH:  Objection, Your Honor.  That actually --

11        THE WITNESS:  Yeah.  I didn't meet with him.

12        MS. SHIH:  -- misstates his testimony.

13        MR. MINER:  I'm sorry.

14    Q    BY MR. MINER:  You spoke with somebody named Nick; is that

15    right?

16    A    Yes.

17    Q    Okay.  Did you provide Nick a copy of the audio recording

18    that was on your phone?

19    A    No.

20    Q    Because he already had it, right?

21        MS. SHIH:  Objection, Your Honor.  Calls for speculation.

22        JUDGE LAWS:  Answer if you know.

23        THE WITNESS:  He got it from Jeff.

24    Q    BY MR. MINER:  Is that what he told you?

25    A    Yes.

1   Q    Okay.  Do you still have that audio recording on the

2   phone?

3   A    I have the phone.  It's just completely broken and

4   shattered.  The screen is completely broken and shattered.

5   It's in a drawer.

6   Q    Do you know if the audio recording is still on there?

7   A    Should be on the sim card, as a matter of fact.

8        MR. MINER:  Okay.  No other questions, Your Honor.  Thank

9   you.

10       MS. SHIH:  No redirect, Your Honor.

11       JUDGE LAWS:  Okay.  And I just have one or two questions

12   for you.  Bear with me a minute.

13       Ms. Shih had asked you a little bit about whether you had

14   the authority to promote.  And my question to you is:  When you

15   -- did you ever make recommendations about who you think should

16   be promoted?

17       THE WITNESS:  Yes.

18       JUDGE LAWS:  Were those usually followed or did you

19   usually not have your recommendations followed?

20       THE WITNESS:  Yes.  Hector really put me in the -- he

21   listened to my opinions, and so they were respected by him.

22   Yes, there were -- you know, he did put it in.

23       JUDGE LAWS:  Okay.  Thank you.

24       Anything else?

25       MS. SHIH:  No, Your Honor.

1    MR. MINER:  Nothing further, Your Honor.

2    JUDGE LAWS:  All right.  Thank you very much for coming

3  into California today to provide your testimony.

4    There's a rule in place for this trial, and I just need

5  you not to discuss what you testified about with any other

6  witnesses who you know are testifying or anybody else who has

7  knowledge about this trial who may be called to testify.

8    THE WITNESS:  I just want over with this shit.  You know,

9  this is a waste of my time, you know; obviously everybody's

10  time.  And, you know, it's over.  I just burned myself at

11  Greenbrier, you know.  And it fucking sucks.  So thank you

12  guys, you know.  And obviously, you know, I should watch out

13  myself.  You know, next time I -- it's a learning experience

14  for me, you know.  Next time something happens, you know, just

15  fucking bite my tongue.

16    MR. MINER:  I'll get Eric.

17    MS. SHIH:  If, Your Honor, we can have a few minutes.

18  We're trying to make some transportation arrangements for this

19  witness.

20    JUDGE LAWS:  For him?

21    MS. SHIH:  Yes.

22    JUDGE LAWS:  Okay.  Go ahead and do that.  I don't want

23  him to be any more upset.  Try to make it a little better

24  experience for him.

25  (Off the record at 2:47 p.m.)

1    Whereupon,

2                          **ERIC VALENZUELA**

3    having been previously sworn, was called as a witness herein

4    and was examined and testified as follows:

5                      **DIRECT EXAMINATION** (CONTINUED)

6    Q    BY MS. SHIH:  Mr. Valenzuela, let's talk about the time

7    that you called the police on Union representatives in April

8    2013.  Tell us what happened.

9    A    I -- I was in my office.  It was before -- it was about

10   4:40 in the morning when one of my employees came to -- to my

11   office and told me that he almost run over -- over someone at

12   the entrance of -- of the facility, and I said, "Well, why?

13   Who is it?"  And he said, "Well, there's some people handing

14   out something or they're stopping" -- he didn't say handing

15   out.  He said he -- they're stopping people at the entrance.

16        So I walked towards the entrance, and there was -- so I --

17   it was pitch dark.  It was -- there's no lights, streetlights

18   or anything.  It was really dark.  I could only see the cars.

19   And there was long lines of cars coming, trying to get into the

20   parking lot coming from east and west.  It was a very dangerous

21   situation because we're a -- we're right next to the railroad

22   tracks, and there is no -- the road -- there's -- there's --

23   there's only one lane going east and one lane going west, so

24   cars trying to -- to go south into the parking lot -- there was

25   a long line of cars.  Very dangerous situation.  So I see

1   people stopping the cars and -- and -- and I saw they were

2   handing something out.  And I told them to -- to stop whatever

3   they were doing and get off my property.

4        And they said, "Well, this is not your property."  I said,

5   "It is -- it is my property."  And I said, "Look, there's a

6   sign right there 'Greenbrier,' so this is my property."

7        Said, "Oh, you're the owner of Greenbrier?"  I said, "No,

8   I'm not, but I represent Greenbrier, so please get out of the

9   property."

10       And -- and they say, "Well, we're the -- we're the --

11  we're with the Union and we're handing out flyers, and we're

12  not moving."  And I said -- I said, "I -- I -- I don't care who

13  you are, just -- you know, you're going to cause some

14  accident."  At this time I saw Julio Vasquez.  He got out of

15  his car and he -- he asked me, "What's going on?"  And I said,

16  "Someone is going to get hurt here."

17       And Julio started talking to them and said, "Hey" -- so

18  who are them?  I said, "They're -- they're from a union and

19  they're handing out flyers and some other stuff.  I don't know

20  what it was.  And he offered -- he said, "Hey, guys, look.

21  You're -- you're going to cause an accident here.  Can you

22  please just move out?"  They -- they had their cars parked in

23  our property, so that made it even -- even worse because there

24  was not a lot of room for -- some people were not stopping.

25  They were just going around the traffic, so -- and it was -- it

1   was really dark, so -- the -- Julio offered them to -- some --

2   to safety vests, and they said, "No, no.  We don't want them."

3       I -- I insisted for them to leave the property and -- and

4   they said they weren't going to leave; that I could call the

5   cops if I wanted, which I did.  I called the cops and -- so

6   finally they said that they were going to move; that they were

7   going to leave.  And they did.  They -- they -- they got in

8   their cars, move across the street.  And they continue -- they

9   continue giving out flyers, but they move a little bit more

10  towards the street.  At that point I -- I went back to my

11  office, and -- and that was it.  The cops came, showed up in

12  our facilities about 10:00 in the morning or so.

13  Q   Let me back up and ask you some more questions about this

14  incident.  You said it was approximately 4:40 a.m. when an

15  employee informed you that there were people out at the

16  entrance to the facility.

17  A   Yes.

18  Q   Did he tell you how many people there were?

19  A   No.

20  Q   Who was the employee who told you about the individuals?

21  A   John Hardenbrook.

22  Q   And who is that?

23  A   He's -- he's a -- a materials supervisor.

24  Q   Did he tell you who they were?

25  A   No.

1    Q    Did he tell you what they were doing?

2    A    No.  And I thought it was an emergency, so I didn't -- I

3    didn't ask what was going on.  I -- I just got out of my office

4    and starting walking towards the entrance.

5    Q    And you walked out to the entrance where the, as it turns

6    out, Union representatives were standing?

7    A    Yeah.  I -- I run a little bit until I found Freddy

8    Valdez, and then we -- we walked the rest of the way.

9    Q    But you didn't drive a vehicle over to the entrance?

10   A    Oh, I'm sorry.  No.  I did.  I -- I ran to my vehicle.  I

11   got -- I think I got Freddy Valdez on the way, and then we --

12   we drove to the entrance.  That's right.

13   Q    So you and Freddy Valdez arrived at the entrance in a

14   vehicle together.

15   A    Yes, yes.

16   Q    Was anyone else with you?

17   A    No.  Until Julio Vasquez arrived.

18   Q    And was Julio Vasquez pulling into the facility arriving

19   at work that morning?

20   A    He -- that's what he told me.  I didn't see him.  Next

21   thing I saw -- I saw him getting out his vehicle, but I didn't

22   know if he was coming one way or the other.

23   Q    When you arrived at the -- at the entrance, how many

24   individuals did you observe?

25   A    I think there were two or -- yes, two.

1    Q    Did you introduce yourself?

2    A    No, I did not.

3    Q    Did you tell them what your position was?

4    A    Eventually they -- they did ask me who I was and I told

5    them I'm the plant manager.  I represent Greenbrier.  But not

6    initially.  Initially just asked them to leave the property.

7    Q    Did you ever give them your name?

8    A    I don't -- I don't remember doing it.

9    Q    Were you wearing anything at the time that you first

10   showed up that would indicate that you worked for Greenbrier?

11   A    I always wear a uniform, a shirt.  It has my name and it

12   say "GRS Tucson."

13   Q    So the shirt that you wear -- or that you wore to work

14   each day at the Tucson facility had "Greenbrier" and your name

15   on it?

16   A    Yes.

17   Q    Did it identify you as the plant manager?

18   A    No.

19   Q    Were you wearing that shirt that day?

20   A    I don't remember, but I usually wear it.  I don't remember

21   a date that I didn't wear it.  So I think so.

22   Q    Does every employee at the Tucson wear a Greenbrier shirt

23   to work?

24   A    It's -- it's optional, but most employees do.

25   Q    Did the individuals that were present at the entrance to

1   the facility ever identify themselves to you?

2   A    I -- not by name, but they say that they were from -- from

3   the Union, and I don't remember if they mentioned which union.

4   They just say that they were from a union.

5   Q    When you told them to get off the property, what did they

6   say, if anything?

7   A    That they were doing their job there and that they were

8   not going to move.

9   Q    Do you know who the Union representatives were that were

10  present that day?

11  A    No.  I remember their faces, but -- but I don't know their

12  names or --

13  Q    Did they tell you why they were there?

14  A    No.  That they're doing -- doing their job.

15  Q    Did they have flyers with them?

16  A    Yes.

17  Q    And you observed them handing flyers to employees as they

18  were driving into the facility that morning?

19  A    Yes.

20  Q    And you observed them speaking with employees as they were

21  driving into the facility that morning?

22  A    Yes.

23  Q    You actually remained out there at the entrance observing

24  the Union representatives until they left the property,

25  correct?

1  A    Yes.  However, they didn't leave.  They just parked their

2  vehicles across the street and came back.  And at that point I

3  -- I went back in my -- to my office.

4  Q    The Union representatives were still there handing out

5  flyers when you went back to your office?

6  A    Yes.

7  Q    You actually called the police while you were standing out

8  there near the Union representatives at the entrance to the

9  facility, correct?

10 A    Yes.

11 Q    When you called the police, what did you tell them?

12 A    I told them that there were two individuals in my property

13 and they were trespassing and that they didn't want to leave.

14 They asked me who they were.  I told them they're -- they --

15 they are Union representatives.  They asked me about their

16 characteristics.  I told them.  And they asked me if it was an

17 emergency.  I said no.  I said -- they asked me if my life was

18 threatened.  I said, "No.  However, they're causing a big

19 traffic here and someone may get hurt."  And they said, "Okay.

20 We're going to send someone."

21 Q    Didn't one of the Union representatives tell you that they

22 would be back?

23 A    I -- I think so.  Yes, I -- they say that they were going

24 to come back.

25 Q    And it's your testimony that you went back inside the

1    facility while the Union representatives were still there

2    handing out flyers?

3    A    Yes.

4    Q    How long were you out there while the Union

5    representatives were talking to employees and handing out

6    flyers?

7    A    Probably -- I mean, it was just a few minutes.  Seven,

8    eight minutes.  It was very brief.

9    Q    What's the normal arrival time for employees to work at

10   the Tucson facility during April 2013?

11   A    I think -- there's some employees that start arriving

12   before 4:00 and then -- but the bulk of the employees start

13   arriving -- started arriving about 4:30 and -- and I guess when

14   there's more traffic, it's about 4:50 -- 4:40, 4:50.

15   Q    There were a lot of employees arriving to work at the time

16   the Union representatives were out there --

17   A    Yes.

18   Q    -- handing out flyers?

19   A    Yes.

20   Q    After you went back into the facility, what did you do?

21   A    Nothing for a while.  I just continued working.  And later

22   -- later that day I -- I contacted Kevin Stewart, and I think

23   that's when I wrote a -- that email probably.  I don't

24   remember.  I remember calling Kevin Stewart.

25   Q    And what did you tell Mr. Stewart when you called him?

1    A    I told him that Union representatives were outside and --

2    and what had happened.

3    Q    And --

4    A    He told me to write it down, yes, so I wouldn't forget the

5    details, so I did.

6    Q    Did he tell you to let anyone else know?

7    A    I don't remember.  Probably I called Al at that time or --

8    Lave.  I know at one point I talked to Al Lave, but I don't

9    remember exactly when.

10   Q    Didn't you send an email to Al Lave letting him know that

11   Union representatives were on the property that morning and

12   that you contacted the police?

13   A    I -- I -- yes, I did send an email, but I remember at what

14   moment.  If it was immediately or later that day.

15   Q    But you let him know that you had contacted the police?

16   A    Yes.

17   Q    What happened when the police came to the facility?

18   A    They asked me if -- if I wanted them -- if I wanted the

19   police to contact the Union and let them know that they were

20   not allowed in our property; that if they showed up again that

21   they were going to be trespassing and they could be arrested.

22   And I said, "No, not now."  I just wanted to report this

23   incident, and so -- if -- if -- if it ever happens again, you

24   know, I -- at least I already reported it.

25   Q    How many officers showed up to the facility?

1    A    Just one.

2    Q    And did you complete an incident report?

3    A    Yes.

4    Q    By the time the police arrived had you already spoken to

5    Kevin Stewart?

6    A    I'm pretty sure I did, yes.

7    Q    And did Mr. Stewart give you any instruction on what to do

8    when the police arrived?

9    A    No, he did not.

10    Q    By the time the police arrived had you already spoken to

11    Al Lave?

12    A    Yes.

13    Q    Did Mr. Lave give you any instruction about what to do

14    when the police arrived?

15    A    I believe he told me to just -- just fill the report and

16    -- and just leave it at that.

17    Q    Did Mr. Lave give you any other instruction?

18    A    I don't remember.

19    Q    Did Mr. Lave instruct you to let him know if there were

20    any future visits from the Union representatives?

21    A    I don't remember if he did at that time.  He did

22    eventually, but I don't remember if it was in that specific

23    day.

24    Q    How many more times after that incident did you observe

25    Union representatives at the facility?

1   A     I personally remember two more times.  I know there were

2   more times than that, but I only observe them two more times.

3   Q     Were you driving into the facility when you observed Union

4   representatives there?

5   A     One time I was driving in and another time I was driving

6   out.

7   Q     On the -- on the date in question in April, the first

8   visit from the Union representative, were you able to observe

9   the representatives where they were handing out flyers to

10  employees from your office in the facility?

11  A     No, not from my office.

12  Q     Other than the two other times that you personally

13  observed Union representatives at the facility did anyone

14  inform you about other occasions when Union representatives

15  were present at the facility?

16  A     Yes.

17  Q     On how many other occasions were you informed that Union

18  representatives were present at the facility?

19  A     I -- I don't remember.  I don't know.  I mean, people

20  would just tell me, "Hey, did you see the -- the Union out

21  there?"  Yes or no or whatever.  But, you know, people will

22  always make the comment.

23  Q     Was it more or less than five occasions?

24  A     No.  Probably less than five.

25  Q     Who told you that they observed Union representatives

1  present at the facility?

2  A    I don't remember.  I remember people telling me.  I don't

3  remember who.

4  Q    What about when?  When did employees tell you that they

5  observed Union representatives at the facility?

6  A    I -- you know, during -- during the day when I do my

7  safety walk-throughs or -- when I'm walking in the shop, I --

8  you know, I didn't pay attention to it.  Just, you know, people

9  tell me about it and I say, "Oh, okay."  That's it.

10  Q    I actually month or --

11  A    Oh.

12  Q    -- date, if you know.

13       MR. MINER:  When?

14       THE WITNESS:  I -- I mean, I don't know.  It's -- in May

15  probably I think it was.  I don't remember, but it's -- I don't

16  remember.

17  Q    BY MS. SHIH:  Sometime between the first visit and the

18  Union elections?

19  A    Yes, yes.

20  Q    And that's true for the two other visits you personally

21  observed?

22  A    Yes.

23  Q    Do you know -- do you know the date on which you made

24  those observations?

25  A    No.

1   Q    But you communicated the visits to Mr. Lave at the time,

2   correct?

3   A    Yes.

4   Q    I'm handing you what's been admitted as General Counsel

5   Exhibit 74.  Do you recognize that email?

6   A    Yes.

7   Q    An email you sent Al Lave on May 29th letting him know

8   that the Union representatives had been at the facility the

9   previous day?

10  A    Correct.

11  Q    So on May 28th the Union representatives were at the

12  Tucson facility.  Is -- did you personally observe them there

13  on May 28th?

14  A    I don't remember.

15  Q    You either observed them or someone communicated to you

16  that they were there?

17  A    Yes.  Or I saw the files on the floor.

18  Q    Did you assume that flyers on the shop floor were an

19  indication that the Union representatives had been present at

20  the facility?

21  A    Yes.

22  Q    Were there Union flyers or other materials present at the

23  facility during times when the Union representatives were not

24  present there?

25  A    I don't know.

1    Q    Did you ever see Union flyers or materials posted in the

2    facility like on a bulletin board or in the break room?  Lunch

3    room?

4    A    No.

5    Q    Was Julio Vasquez a safety manager at the Tucson facility

6    when you started working for Greenbrier?

7    A    Yes, he was.

8        MS. SHIH:  I apologize.  I'm trying to locate an exhibit

9    that I had.

10       JUDGE LAWS:  Take your time.  If you can't find it, just

11   let the -- let us know and we can --

12       MS. SHIH:  For this witness.  I need one exhibit.

13       JUDGE LAWS:  No problem.  Is a new one?

14       MS. SHIH:  It's -- it's actually Exhibit 61 that was

15   previously offered but not admitted.

16       And I have the multiple copies ready for this witness.

17   And I think in the shuffle of going --

18       JUDGE LAWS:  That's fine.  Do --

19       MS. SHIH:  -- to another witness --

20       JUDGE LAWS:  Do you have 61?

21       MS. SHIH:  I don't even have -- I had a whole stack of

22   them.  I don't have a copy of this.

23       MR. BIDDLE:  Do you have Number 61?

24       MR. MINER:  Do I have -- I'm sorry.  I think I do.

25       JUDGE LAWS:  We can probably deal with it without you

1   having to find it.  If you two look at one and I'll go sit over

2   by the witness.

3        MR. MINER:  I'm sure I've got it.

4        JUDGE LAWS:  Okay.

5        MS. SHIH:  Thank you.

6        MR. MINER:  65, 63, 62, 61.

7        JUDGE LAWS:  Okay.

8        MR. MINER:  Here -- here we are, Your Honor.

9        JUDGE LAWS:  Okay.  I'm sorry.  I -- I know what it is,

10  so --

11       MR. MINER:  Do you want to look at mine?

12       MS. SHIH:  I actually have a --

13       MR. MINER:  Okay.

14       MS. SHIH:  I do have a copy in my binder, but -- and I'll

15  find the other copies later.

16       MR. MINER:  Okay.

17  Q    BY MS. SHIH:  Sir, you've been handed a document that was

18  previously marked as a General Counsel Exhibit 1.

19       JUDGE LAWS:  Oh, I thought you said 61.

20       MS. SHIH:  Or -- excuse me.  I'm sorry.  61.  Sorry.

21       JUDGE LAWS:  It's all right.  He probably doesn't want to

22  see the formal documents.

23  Q    BY MS. SHIH:  General Counsel Exhibit 61.  Do you

24  recognize that document?

25  A    Yes.

1    Q     What is that?

2    A     I seen it once before.  It's some safety program.

3    Q     And this was a safety program that was implemented in the

4    Tucson facility in 2013, correct?

5    A     I don't know.  I never read it.  I've seen it, but I

6    haven't even read it.  I -- I don't know -- I don't know what

7    it is.

8    Q     When did you see it?

9    A     Last night.

10   Q     For the first time?

11   A     For the first time.

12   Q     Julio Vasquez implemented a new safety program in the

13   Tucson facility in 2013 that consisted of a poker type game,

14   correct?

15   A     Correct.

16   Q     Was that part of operation safety 2013?

17   A     No.

18   Q     Can you describe what the safety poke program was that Mr.

19   Vasquez implemented in 2013 in Tucson?

20   A     Yes.  The poker for safety was part of the Tucson safety

21   -- safety plan that we implemented, and it was just a game of

22   -- a game where we -- where the employees receive a poker card

23   every week.  And in order for them to receive a poker card they

24   have to -- to have been working safe during the week.  And then

25   at the end of five weeks they had five cards and -- and whoever

1187

1   had the best hand will win a prize.

2   Q    When did that program begin?

3   A    In May.  Mid-May.

4   Q    When did it end?

5   A    I don't remember.  Probably about three months -- three

6   months later.

7   Q    After the Union election in July?

8   A    No.  After May.  I think it started about May 15, May 20,

9   and then it -- it -- the game runs for about -- or ran for

10  about six or seven weeks, and then we started another game.

11  Q    But when was the entire program discontinued?

12  A    Well, the program is still going.  It's ongoing.

13  Q    In Tucson?

14  A    In Tucson, yes.

15  Q    So employees that are working in Tucson presently are

16  still receiving a poker card each week?

17  A    No.  We -- we -- we've -- we finish -- we didn't continue

18  the poker, but the program -- the program is still going.

19  Q    Okay.

20  A    The poker was his part of the -- of the program.

21  Q    Okay.  And I'm -- and I apologize for the

22  miscommunication.  I'm asking specifically about when the poker

23  game ended --

24  A    Oh, okay.

25  Q    -- in Tucson.

1  A    Yeah.  It ended about -- about three months after -- after

2  it started in May.

3  Q    Okay.  So to clarify for the record, the poker game

4  portion of the safety program in Tucson began around May 15th

5  and ended about three months later.

6  A    That's correct.

7  Q    And that was after the Union election in July.

8  A    That's correct.

9  Q    What types of prizes were given out as part of the poker

10  game?

11  A    Tools.  Like impact wrenches, set of tools.  Like

12  wrenches, welding hoods, leathers for welding, safety shoes,

13  eye pads.  I think that's -- that's all we had.

14  (Counsel confer)

15      JUDGE LAWS:  Are you done with 61?

16      MS. SHIH:  I am.  And I was going to grab that and hand --

17      JUDGE LAWS:  I'm going to steal this back from you.

18      MS. SHIH:  -- it back to you.  Thank you.

19      JUDGE LAWS:  Thank you.

20      MR. MINER:  Thank you, sir.

21  Q    BY MS. SHIH:  I'm handing you what's been marked at

22  General Counsel Exhibit 158.

23      JUDGE LAWS:  You'll have to go counterclockwise next time.

24      MS. SHIH:  Oh.

25      JUDGE LAWS:  I'm joking.

1    Q    BY MS. SHIH:  Do you recognize that email, Mr. Valenzuela?

2    A    Yes.

3    Q    That's that email that you sent to Mr. Lave letting him

4    know about the first visit from the Union representatives,

5    correct?

6    A    Correct.

7    Q    And you sent that on the day of the actual visit, April

8    23rd?

9    A    Correct.

10        MS. SHIH:  Move for admission of General Counsel 158.

11        MR. MINER:  No objection.

12        JUDGE LAWS:  158 is received.

13   **(General Counsel Exhibit Number 158 Received into Evidence)**

14   Q    BY MS. SHIH:  When did you learn that the Tucson facility

15   would be closed?

16   A    I -- I learned about it about two working days before it

17   was announced to all the employees.

18   Q    What was the date that it was announced to employees?

19   A    I -- I don't remember.  I think it was a Monday.  But I --

20   I -- I'm -- I don't remember for sure.

21   Q    What month was that?

22   A    I don't remember.

23   Q    You don't remember what month you learned that the Tucson

24   facility was going to close?

25   A    I -- I don't.  I think September.  I -- I'm guessing.  I

1    don't know.  I'm not very good with dates.

2    Q    Employees at the Tucson facility were given written

3    notices called warn act notice --

4    A    Correct.

5    Q    -- about the closure, correct?

6    A    Correct.

7    Q    Was it announced to employees before those notices were

8    given to employees?

9    A    Before?

10   Q    Yes.

11   A    No.

12   Q    So the written warn act notices to employees were the

13   announcement?

14   A    Yes.

15   Q    So it was two days before that that you learned about the

16   closure?

17   A    I learned, yes.

18   Q    Okay.  And who did you learn about the closure from?

19   A    Kevin Stewart and Juan Maciel.

20   Q    Was this an in-person meeting or did you speak to them on

21   the phone?

22   A    On the phone, yeah.  Excuse me.  On the phone with Kevin

23   Stewart.  Juan Maciel was -- was there.

24   Q    So you were at the Tucson facility with Juan Maciel and

25   you had a phone call with Kevin Stewart?

1   A    Correct.

2   Q    Who initiated the phone call?

3   A    Kevin Stewart.

4   Q    And what did he say when he called you and why?

5   A    He said that he had bad news and that unfortunately the

6   Tucson facility was going to be shut down.

7   Q    What else did he say?

8   A    I -- I don't remember the details, but something else that

9   he -- I guess I was kind of in shock in, but then he said that

10  the good news is that -- that we're going to be able to offer

11  relocations to just about every employee, including myself.

12  Q    Did he tell you why the Tucson facility was being shut

13  down?

14  A    Yes.  He -- he said that -- that the -- the outcome of the

15  talks with TTX had been that they were -- they didn't have --

16  that the Tucson shop was not in -- in the plants of TTX, that

17  they had offered to send more work to San Antonio and Mira Loma

18  but that Tucson was no longer in their plans.

19  Q    Did he tell you who made the decision to shut down the

20  Tucson facility?

21  A    No, he did not.

22  Q    Did you ever learn who made the decision to shut down the

23  Tucson facility?

24  A    No, I did not.

25  Q    What was the last date that you worked at the Tucson

1   facility?

2   A     I started working in San Antonio November 4th.  So it was

3   one week before that was my -- my last -- it was on a Friday,

4   the -- October 28th, I believe.

5   Q     And you said you worked at the San Antonio facility for

6   only four days?

7   A     Correct.

8   Q     Why did you leave the San Antonio facility?

9   A     Kevin Stewart asked me to help him with -- with the Finley

10  shop.  They're -- they're struggling and -- and they needed --

11  and they don't have a plant manager.  So he asked me to -- to

12  move to Finley.

13  Q     How long after you started in San Antonio were you asked

14  to move to Finley?

15  A     Well, I started in San Antonio that -- November 5th.  It

16  was Tuesday.  And on Thursday Kevin asked me if -- if I will be

17  okay moving to Finley.  I said yes.  And then on Friday he

18  called me and he say, "Okay.  Let's -- let's do it."

19        JUDGE LAWS:  And that's --

20  Q     BY MS. SHIH:  And you started -- I'm sorry.

21        JUDGE LAWS:  That's this year?

22        THE WITNESS:  This year, yes.

23        JUDGE LAWS:  Thank you.

24  Q     BY MS. SHIH:  And you started at Finley on what date?

25  A     On Tuesday of this week, this past week.  Or this week

1  actually.

2  Q    Is there currently a plant manager of the San Antonio

3  facility?

4  A    There is a plant manager.  But he had requested to -- to

5  be moved to production manager.  He didn't want to be a plant

6  manager, so this was the perfect opportunity for -- for both of

7  us.  I wanted to be a plant manager and he wanted to be demoted

8  to -- to production manager.

9  Q    I mean, since you've left San Antonio, is there now a

10  plant manager --

11  A    Oh.

12  Q    -- in San Antonio?

13  A    Oh.  No.  The -- the production manager continued as plant

14  manager.

15  Q    The production manager who had earlier requested not to

16  serve as plant manager.

17  A    Correct.

18  Q    And he is serving as plant manager for San Antonio?

19  A    Correct.

20  Q    And who is that?

21  A    Wendell McMeans.

22  Q    Could you spell that for me.

23  A    Wendell is W-E-N-D-E-L-L.

24  Q    And the last name?

25  A    McMeans, M-C-M-E-A-N-S.

1  Q    M-C capital?

2  A    Yes.

3       MR. MINER:  M-C capital?  Say it again.

4       THE WITNESS:  M-C -- and -- well, I don't know if it's a

5  capital M-E-A-N-S, McMeans.

6  Q    BY MS. SHIH:  Let's go back to after you began as plant

7  manager in Tucson.  Earlier you testified that one of the first

8  things you did was begin to rehire employees in Tucson; is that

9  correct?

10  A    That's correct.

11  Q    How did you choose which people would be contacted first

12  for rehire?

13  A    I -- I got a list from Lisa Maxey and -- I said, "Hey, I

14  need to hire four or five more employees," and she will give me

15  a list and -- or she will give the list to Chris Martinez and

16  then Chris will try to contact them and arrange for an

17  interview.

18  Q    And the list that you got from Lisa Maxey, was that a list

19  of all employees that had been terminated?  What was that a

20  list of?

21  A    It was just a list of -- when I saw the list, it was about

22  seven or eight employees.  We tried to contact some of them and

23  -- and sometimes we didn't find -- we only needed four or five

24  at a time, but we knew we weren't going to be able to contact

25  some of them, so -- so we had extra names just in case we

1   couldn't contact them.

2   Q    So who came up with the list of who would be contacted

3   first?

4   A    I don't know.  We -- I would get it from Lisa Maxey and --

5   Q    It wasn't you.  You didn't determine who would be

6   contacted first for rehire?

7   A    No.  I determined who was rehired, but not who we were

8   going to call first.

9   Q    Once the list was provided to you and those individuals

10  would -- were contacted, asked I presume if they were working

11  elsewhere, if they were interested in coming back to

12  Greenbrier.  What was the next step in the hiring process if

13  they were interested in coming back to Greenbrier.

14  A    They -- they will fill out an application and then we

15  arrange for an interview and I will interview them and then I

16  -- I will make a decision whether I want him or not.

17  Q    Who made the initial contact with the employee to ask if

18  they were interested in coming back?

19  A    Chris Martinez.

20  Q    And was the application process something that employees

21  -- the candidates had to do in person?

22  A    No.  They just had to go to the front office, pick up an

23  application and either leave it -- leave it there in the front

24  office or they could contact Chris Martinez and Chris will ask

25  me if I was available someone if they wanted to be interviewed

1    on the spot.  Sometimes they want, sometimes they -- they

2    didn't, so --

3    Q    The application for employment that the Greenbrier filled

4    out if they were interested in rehire, is that something that

5    was already in place at Tucson when you became a plant manager?

6    A    Yes.

7    Q    How long after you became the plant manager did you

8    conduct your first interview for a rehire?

9    A    I -- I believe it was just a few days after I started

10   working.  Probably the following week.

11   Q    Who was the first individual you interviewed for rehire?

12   A    I don't remember.

13   Q    How many individuals did you interview for rehire?

14   A    I -- I believe I interviewed four or five.

15   Q    Who were those people?

16   A    I don't remember.  I remember probably a couple.  I mean,

17   I -- I -- I remember who I interview.  I don't remember in

18   which order or if they were part of the first group of people

19   that I rehire or the second.

20   Q    How about the names?  What are the names of the people

21   that you interviewed?

22   A    That I interview during the whole process?  Jesus Lopez,

23   Juan Silva, Jorge Martinez, Rogelio Martinez, Brian Scaggs,

24   Alex Acuna, Jesus Barnes, Brian Peprona.  That's -- that's all

25   I can remember now.

1    Q    Any employees that you interviewed that didn't get

2    rehired?

3    A    Yes.  Omar Ramos and Guillermo Murguia.

4    Q    So earlier the list of names that you stated were people

5    that you interviewed, were those only the people that you

6    interviewed that were offered rehire?

7    A    I'm -- can you repeat the question?

8    Q    The list of names that you gave in response to my

9    question, who did you interview -- like -- were those only the

10    people that you interviewed that were offered rehire?

11    A    The -- the list is -- is -- is the people that I interview

12    that we offered a job, and then there's only two that I

13    interviewed that we didn't offer a job.

14    Q    And just for clarification, one of the names that you

15    listed was Juan Silva who was not terminated in November 2012.

16    So I just want to clarify whether this is a different Juan

17    Silva or if there's just a --

18    A    I --

19    Q    -- confusion.

20    A    I -- I was thinking that interview him and I rehire him,

21    but I may be wrong.

22    Q    Okay.  At any time when you were interviewing employees

23    for recall in 2013, did you ever bring up the topic of the

24    union?

25    A    No.

1   Q     During your interviews with employees for rehire was

2   anyone else present during those interviews besides you and the

3   candidate?

4   A     I think that the first -- no, I don't think there was

5   nobody else present.

6   Q     You mentioned Omar Ramos as one of the individuals that

7   you interviewed for rehire, correct?

8   A     Correct.

9   Q     You interviewed him in 2013 for a possible rehire,

10  correct?

11  A     Correct.

12  Q     Where did you interview him?

13  A     In my office.

14  Q     At the Tucson facility?

15  A     Correct.

16  Q     Who else was present?

17  A     Nobody.

18  Q     Just you and Mr. Ramos?

19  A     Yes.

20  Q     When did you interview him?

21  A     I don't remember.

22  Q     About how long after you started as plant manager?  A few

23  days?  Weeks?  Months?

24  A     Probably a month.  I -- I'm just guessing.  It was one of

25  the last rehires that I interviewed.

1    Q    Regarding the 2012 November layoff, you told Mr. Ramos in

2    your interview with him that the company was losing money,

3    correct?

4    A    I don't remember.  But it's possible.

5    Q    You also told Mr. Ramos again regarding the November 2012

6    layoff that probably the union thing may or may not have

7    anything to do with it, correct?

8    A    I don't remember.

9    Q    You also told Mr. Ramos in that interview with him

10   regarding the Union that people talking about it, wasting time,

11   thinking and talking about it made things worse, correct?

12   A    I don't remember.

13   Q    During this conversation with Mr. Ramos in which you were

14   interviewing him for possible rehire, you told him that a lot

15   of people are worried that the company is bringing people back

16   that are strong on the Union thing; isn't that right?

17   A    I don't remember.

18   Q    Was the company worried that they were bringing back who

19   were strong Union supporters?

20   A    I would say no.

21   Q    Were you worried?

22   A    No.

23   Q    Did anyone tell you that they were worried that the people

24   coming back were strong Union supporters?

25   A    No, not that I remember.

1    Q    Did anyone say anything to you about the Union with regard

2    to the recall or rehire of employees?

3    A    Not -- not related to union.  Some people mentioned, "Why

4    are you bringing back these people?"

5    Q    But I'm asking specifically about the process of -- during

6    the process of interviewing people for rehire did anyone tell

7    you -- did anyone at Greenbrier tell you anything about the

8    Union?

9    A    No.

10   Q    Who asked you, "Why are you bringing back these people"?

11   A    I think Cesar Nevarez asked me.

12   Q    He was a foreman, correct?

13   A    He was a foreman.

14   Q    When did -- what -- let me first ask you:  What did he ask

15   you?

16   A    He asked why we were bringing back some of these people.

17   Q    Were those his words, "Some of these people"?

18   A    Yes.

19   Q    When did he ask you that?

20   A    Sometime when we started rehiring some of these people.  I

21   mean, I -- I don't remember.

22   Q    Was -- it was -- was it in March?

23   A    March, April.

24   Q    And what did you understand Mr. Nevarez to mean when he

25   said, "Some of these people"?

1   A    The lazy people, people that didn't have the skills or

2   that -- he thought that had bad attitude or didn't have the

3   right skills.

4   Q    Is that what he told you he meant?

5   A    Yes.

6   Q    He said -- he referred to them as lazy?

7   A    No.  His words in Spanish won't translate to probably --

8        JUDGE LAWS:  Why don't you actually -- if you remember

9   what he said in Spanish -- we have an interpreter here.

10       THE WITNESS:  Okay.

11       MS. SHIH:  And if I could clarify with just a few

12  questions.

13  Q    BY MS. SHIH:  This was a conversation you had with Mr.

14  Nevarez in Spanish?

15  A    Yes.

16  Q    Okay.  And then I'll --

17       MR. MINER:  Grace.

18       JUDGE LAWS:  Come up toward a microphone.  You can sit --

19  sit right a couple down from -- from the witness.

20       As best you can remember, what did he say to you in

21  Spanish.

22       THE WITNESS:  As best as I can remember, he said (Spanish

23  spoken).

24       THE INTERPRETER:  As best as I can remember, he said -- he

25  asked, "Why are we hiring some of these workers that are not

1  good workers"?

2      JUDGE LAWS:  Thank you.

3  Q   BY MS. SHIH:  Did you ask him what he meant by, "Not good

4  workers"?

5  A   Yes.  He said some of them didn't have -- didn't have the

6  skills.

7  Q   What did he -- what did he say to you in Spanish when you

8  asked him what he meant by not good workers?

9  A   He said, as far as I remember, something like (speaking

10  Spanish)

11      THE INTERPRETER:  Some of them are not that good of

12  employees -- or workers.

13      THE WITNESS:  I don't remember if he told me or I just

14  assumed that he meant -- that he meant the skills, welding

15  skills and knowledge about railcars.

16  Q   BY MS. SHIH:  Did he ever say anything to you about those

17  employees being rehired not having -- having bad attitudes?

18  A   Yes.

19  Q   What exactly did he say to you in Spanish about that?

20  A   I'm trying to remember a specific.  I mean, everything --

21  you know, in my mind is just -- is just -- I remember attitudes

22  and -- but not words, so it's difficult for me to -- to try to

23  say what he said when I don't remember.

24  Q   Okay.

25  A   But -- I mean, I -- it's the same I say it in Spanish or

1   in English because I -- I don't remember what he said exactly.

2   But --

3   Q    That's fine.  We can move on.  Anyone else besides Mr.

4   Nevarez say anything -- at Greenbrier say anything to you about

5   the recall of employees or ask you why employees were being

6   rehired?

7   A    Not that I remember.

8   Q    Mr. Ramos was not rehired in 2013, correct?

9   A    Correct.

10       MS. SHIH:  This might be a good time for a break so I can

11  see if I have any --

12       JUDGE LAWS:  Any more --

13       MS. SHIH:  -- further questions and --

14       JUDGE LAWS:  Okay.

15       MS. SHIH:  -- also use the restroom.

16       JUDGE LAWS:  Okay.  Why don't we break for you to go over,

17  see if there's anything more to ask.  And we can reconvene at

18  4.

19       MR. MINER:  Thank you.

20       THE WITNESS:  Thank you.

21  (Off the record at 3:51 p.m.)

22  Q    BY MS. SHIH:  Just a few additional questions for you, Mr.

23  Valenzuela.  During the interview process that you conducted in

24  2013 to determine whether to rehire or recall employees to

25  Greenbrier, did you review any documents pertaining to those

1  employees other than their application for employment?

2  A    I -- I didn't review personally, but I will ask -- I did

3  ask Chris Martinez to inform me about their -- to look at their

4  file and see if they -- they were problem employees; missing

5  work or had any -- any warnings or -- for some reason.

6  Q    You didn't review any of those files yourself?

7  A    No, I did not.

8  Q    Before you came to testify today did you review any

9  documents in preparation for your testimony?

10  A    I saw some -- like that paper, that safety paper.  I

11  didn't read it.  I saw it.  I didn't read it because I didn't

12  want to get confused or anything, so --

13  Q    What other --

14  A    Since --

15  Q    What other documents did you review?

16  A    Some emails, some emails and what -- the -- the employee

17  satisfaction survey and -- I mean, I didn't read them.  I just

18  saw them.

19  Q    When you say "some emails," what emails are you referring

20  to?

21  A    Some -- some of the emails that you have like probably --

22  I mean, I don't know if it's the same.  I just trying to see if

23  there is anything that I -- I know or don't know about it, like

24  that safety document.

25  Q    What was the subject of the emails that you reviewed?

1205

1   A    The -- the Union going to the shop and things like that.

2   Q    Did you discuss our testimony with anyone?

3   A    No.  Excuse me.  In -- in which way?

4   Q    Prior to coming --

5   A    I mean, we did talk about -- I'm going to have it in my --

6   I'm going to give my testimony.

7        MS. SHIH:  Well, just before the witness continues --

8   Q    BY MS. SHIH:  If you're talking about conversations that

9   you had with attorneys for the company, I'm not asking and I

10  don't want you to talk about what you discussed.  But I'm

11  asking you if you discussed your testimony with anyone and if

12  so who, without actually going into what you talked about.

13  A    Well, I didn't know what I was going to testify -- we did

14  talk about me being here.  I didn't know what I was going to

15  testify, so, no, we didn't discuss my testimony.

16  Q    And when you say "we," who are you referring to?

17  A    The gentleman right here.

18  Q    Who was present when you had these conversations?  Can you

19  identify them?

20  A    Al, Fred and -- and -- oh, my God.

21  Q    Steve?

22  A    Steve.  Sorry.  I wanted to -- anyway.

23  Q    Anyone else present during those discussions?

24  A    No.

25  Q    Did you have any discussions with Juan Maciel about your

1  testimony?

2  A    No.

3      MS. SHIH:  No further questions.

4      JUDGE LAWS:  And do you want to question this witness now

5  or are you going to be --

6      MR. MINER:  I do not, Your Honor.  We will reserve

7  questioning Mr. Valenzuela until the company's case.

8      JUDGE LAWS:  All right.  And I don't have any follow-up

9  questions for you.  Thank you for coming and providing your

10  testimony.  It sounds like you've been many places in a short

11  amount of time.

12      THE WITNESS:  Yes.

13      JUDGE LAWS:  Please don't discuss your testimony with any

14  other witnesses in this case or anybody connected to the events

15  of the case that could be called in as witnesses.

16      All right.  It looks like we'll -- off the record.

17  (Off the record at 4:02 p.m.)

18      JUDGE LAWS:  Whenever you're ready.

19      MS. SHIH:  Does there need to be anything on the record

20  that Mr. Lave has been recalled and --

21      JUDGE LAWS:  We've recalled Mr. Lave and he has been sworn

22  in a couple of times.

23      Just another reminder that that oath is still in effect

24  throughout your testimony.

25      THE WITNESS:  Yes.  Thank you, Your Honor.

1    Whereupon,

2                          <u>**AL LAVE**</u>

3    having been previously sworn, was called as a witness herein

4    and was examined and testified as follows:

5                          <u>DIRECT EXAMINATION</u>

6    Q    BY MS. SHIH:  Yesterday we were going through an audio

7    recording from a July 9th, 2013 meeting that you conducted at

8    the Tucson facility, correct?

9    A    Yes.  Correct.

10   Q    And you have in front of you what's been marked as General

11   Counsel Exhibit 155, which is a written transcription of the

12   audio recording that we've been listening to on the record.

13   A    Yes.

14   Q    Yesterday I believe we stopped the recording just after --

15   or just prior to the 12.57 timestamp, so I'm going to resume

16   playing the recording at 12.52, which is the closest I can get

17   it.

18   (Audio begins at 4:09 p.m.)

19        MS. SHIH:  Stopped at 13.20.

20   Q    BY MS. SHIH:  Just to reconfirm for the record, that's

21   your voice, correct?

22   A    Yes, it is.

23   (Audio begins at 4:09 p.m.)

24        THE INTERPRETER:  Al says that two weeks ago when he was

25   here with Mike it's one of the things that -- that -- well,

1    Al's job is -- is to give you all of the information so that

2    when you do take a vote you can do so with good information.

3    And one of the things that if the Union does come into the --

4    into the company, one of the things that is lost is the right

5    to have this communication with us.

6    MS. SHIH:  Restarting at 13.49.

7    (Audio begins at 4:10 p.m.)

8    THE INTERPRETER:  Another thing that the Union that wants

9    to come on board now is the sheet metal union and that union

10   has no knowledge of our area of work which is railcars.  And

11   while to start we don't believe it's going to be good for

12   either part because they don't the job -- they don't know the

13   railcar industry, the work in the railcars.

14   MS. SHIH:  I'm going to back it up just a few seconds so

15   we can pick up the next portion.

16   And I apologize for stopping at mid paragraph, but it

17   seemed like a lengthy paragraph and I wasn't sure whether you

18   wanted me to play through the whole thing.

19   I'm backing it up to 14.10.

20   (Audio begins at 4:12 p.m.)

21   THE INTERPRETER:  Let's see.  Last week there were two

22   announcements that our CEO Bill Furman and me.  One, we're a

23   public company, so we have to report all this.  Then one of the

24   announcements that was made was that eight shops were going to

25   close.  Four of them have already closed as of -- from February

1    up to -- up to today, and then there are four that are still

2    pending which Al has to close from -- as of today up until

3    December -- or through December.

4        MR. MINER:  Was that Bill Sherman?

5        THE INTERPRETER:  Furman.

6        MS. SHIH:  Furman.

7        MR. MINER:  Furman.

8        MS. SHIH:  Starting at 14.45.

9    (Audio begins at 4:13 p.m.)

10        THE INTERPRETER:  Aside from those eight shops, they had

11    -- the created a list of another -- they had -- they created a

12    list with six other shops that were not generating the profits

13    that they should be, and that was what corporate was requiring

14    and then -- so then Tucson is one of those six -- is one of

15    those six shops.

16        MS. SHIH:  Starting at 15.04.

17    (Audio begins at 4:14 p.m.)

18        THE INTERPRETER:  It's very important that we all continue

19    working well.  We've seen the change.  If we -- we -- we see

20    that we're -- we're coming along fine.  As of December up until

21    today's date we have had a little bit of profit.  We haven't

22    lost money.  So then that information Al uses it in order to

23    present it to corporate and to tell them that we're doing well;

24    that we're not where we want to be but that we're on the right

25    road and that would give us -- and to give us a little bit more

1    time.

2        MS. SHIH:  Starting at 15.34.

3    (Audio begins at 4:15 p.m.)

4        THE INTERPRETER:  The other announcement is that since

5    Stuckey (phonetic), our president -- some of you already know

6    him.  He was here for the other election the -- the other year.

7    He as of -- effective of June will not be working with us

8    anymore.  He has already retired.  So then corporate made the

9    decision to separate the group for the repairs for the wheels

10   and repairs because they want to concentrate on the two

11   different areas in order to see how we're coming along and

12   progressing.

13       MS. SHIH:  Starting at 16.10.

14   (Audio begins at 4:17 p.m.)

15       THE INTERPRETER:  Mr. William Glenn, some of you already

16   know him.  He was here for a agenda that we had some four

17   months and all the people from corporate came.  He is the new

18   person who's in charge in the meantime.  So then we've seen a

19   change.  You can see the change the first three months of the

20   year was September to November.  We lost money.  The last seven

21   months, including last month, we've had a little bit of profit.

22   And so I would ask you to continue making your best effort in

23   order to get this shop coming out ahead.

24   Q    BY MS. SHIH:  And, Mr. Lave, the voice that you've heard

25   speaking on the recording in Spanish, that's Mr. Maciel,

1    correct?

2    A      Yes.

3    Q      Thank you.

4          MS. SHIH:  Starting at 16.46.

5    (Audio begins at 4:18 p.m.)

6          THE INTERPRETER:  When he was here two weeks ago, Al

7    explained to you the state of the -- the state of the company,

8    and financially is not very well -- it's not very good.

9          MS. SHIH:  Starting at 17.10.

10   (Audio begins at 4:18 p.m.)

11         THE INTERPRETER:  And I informed you and -- I informed you

12   at that time that Tucson was on that list.

13         MS. SHIH:  17.18.

14   (Audio begins at 4:19 p.m.)

15         THE INTERPRETER:  The list of those six shops, he says,

16   corporate's applying pressure on Kevin, on me, on Eric and Al.

17   And we either have to fix, sell, or close these six shops.

18         MS. SHIH:  17.47.

19   (Audio begins at 4:20 p.m.)

20         THE INTERPRETER:  He's saying the same thing which I just

21   told you, which is as of December up to today's date we've been

22   having a profit every -- every month.  It's important that

23   every month we can show them that we can continue to -- to have

24   a profit -- to make a profit.

25         Interpreter stands corrected.

1      MS. SHIH:  18.18.

2   (Audio begins at 4:21 p.m.)

3      THE INTERPRETER:  Al says that in that information he and

4   Mike Torra, they take it to corporate in order to show them

5   that we're turning -- that we're coming around the bend and

6   that we're coming along fine and that to give us a little bit

7   more time so that they can take us off the list of the six

8   shops.

9      MS. SHIH:  18.51.

10  (Audio begins at 4:21 p.m.)

11     THE INTERPRETER:  As of December up to today's date we've

12  all been working as the good team.  You all and management

13  also.  And we're on the right road.  What worries is that if

14  the Union comes in, that is going to lost.  It's going to get

15  lost because then we're going to have to negotiate contracts

16  and there's other things that are going to get complicated.  So

17  the entry of the Union -- and that is not going to help

18  anybody.

19     MS. SHIH:  Starting at 19.58.

20  (Audio begins at 4:22 p.m.)

21     THE INTERPRETER:  Al says that he's tired of closing down

22  shops.  He's already closed four down and he has four more to

23  close down.

24     MS. SHIH:  20.22.

25  (Audio begins at 4:24 p.m.)

1    THE INTERPRETER:  The six shops that are on that list,

2  everybody's -- everybody's making a huge effort in order to

3  turn these shops around in order to get off the list.  We want

4  to hire more people not close more jobs down.

5    MS. SHIH:  20.52.

6  (Audio begins at 4:25 p.m.)

7    THE INTERPRETER:  We're on the right road and we want to

8  continue on that road in order to be able to turn the shop

9  around.

10    MS. SHIH:  21.06.

11  (Audio begins at 4:25 p.m.)

12    THE INTERPRETER:  You all have seen the improvements that

13  we have been making during these last months.  With or without

14  the Union, we're going to continue improving the work area and

15  we're going to continue evaluating wages and loans, insurance

16  and all of that.  Then that is going to continue being done

17  with or without the Union.

18    MS. SHIH:  21.32.

19  (Audio begins at 4:26 p.m.)

20  Q   BY MS. SHIH:  Mr. Lave, did you recognize that last voice

21  on the recording speaking in English?

22  A   Yeah.  That was Juan Maciel, yeah.

23    MS. SHIH:  21.38.

24  (Audio begins at 4:27 p.m.)

25    THE INTERPRETER:  This Thursday you're all going to have

1  to vote.  You're going to have to vote whether you want the

2  Union to come on board or whether you don't want the Union to

3  come on board.

4      MS. SHIH:  Let me back it up just a few seconds.  22.01.

5  (Audio begins at 4:27 p.m.)

6      THE INTERPRETER:  There's two times in which you're going

7  to be able to vote.

8      MS. SHIH:  22.09.

9  (Audio begins at 4:28 p.m.)

10     THE INTERPRETER:  The vote is going to be right here in

11  this room.  It's going to be between 4:30 in the morning up to

12  6 in the morning.  And then afterwards again at 11:30 in the

13  morning up to 1 in the afternoon.

14     MS. SHIH:  22.32.

15  (Audio begins at 4:28 p.m.)

16     THE INTERPRETER:  At any of those times you guys can come

17  and show up here to vote.  There's going to be a federal

18  government representative here to register your vote.

19     MS. SHIH:  22.55.

20  (Audio begins at 4:29 p.m.)

21     THE INTERPRETER:  This is going to be the card that

22  they're going to give you.  It's similar to this so that you

23  can mark your vote.

24     MS. SHIH:  23.13.

25  (Audio begins at 4:29 p.m.)

1       THE INTERPRETER:  If you want a Union vote yes.  If you

2   don't want a Union vote no.

3       MS. SHIH:  23.26.

4   (Audio begins at 4:29 p.m.)

5       THE INTERPRETER:  Once again, we want you to vote no.

6   It's very important that when you mark -- or when you check

7   your vote that you don't check off more than one box.  Don't

8   put any lines or write any notes here on the vote because if

9   you write it -- if you put any other additional marks, it -- it

10  can be that your vote will not be counted.  They can discard

11  it.

12      MS. SHIH:  24.01.

13  (Audio begins at 4:30 p.m.)

14      THE INTERPRETER:  Some of you before I believe in 2012

15  could have signed a card for the Union.

16      MS. SHIH:  24.22.

17  (Audio begins at 4:31 p.m.)

18      THE INTERPRETER:  Once you signed that card that was a

19  right that you had.  But on Thursday you can still -- you still

20  have the right to vote yes or no.  Just because you signed that

21  card does not mean that you've already voted yes.

22      MS. SHIH:  24.53.

23  (Audio begins at 4:32 p.m.)

24      THE INTERPRETER:  It's important that -- it's important

25  that all of you vote on Thursday because what's going to count

1    is the majority of the votes of the people that voted.

2        MS. SHIH:  25.26.

3    (Audio begins at 4:33 p.m.)

4        THE INTERPRETER:  Right now it's very important that you

5    all have your individual votes, and we hope that you vote no.

6        MS. SHIH:  25.44.

7    (Audio begins at 4:33 p.m.)

8        THE INTERPRETER:  The election is finished at 1, and we

9    hope to have results at the end of the day.

10        MS. SHIH:  26.01.

11    (Audio begins at 4:34 p.m.)

12        THE INTERPRETER:  Thank you for your time.

13        MS. SHIH:  And just for the record, the actual file of the

14    recording continues for another five minutes, but there's no

15    dialogue.

16        At this time we'd move for admission of General Counsel

17    155.

18        MR. MINER:  Subject to the same clarifications as earlier,

19    Your Honor, the actual evidence of the meeting.  To the extent

20    that it's already been admitted, the actual evidence of the

21    meeting is in the audio recording.  We -- we understand that

22    the authoritative interpretation and transcription of what's on

23    the audio recording is the court reporter's transcript,

24    including the translator's translation.  And to the extent that

25    the parties have used General Counsel 155 for reference

1  purposes during the course of the hearing, we don't object to

2  its use on that basis.

3      JUDGE LAWS:  And that's what it will be used for, and that

4  is what it's admitted for.

5  **(General Counsel Exhibit Number 155  Received into Evidence)**

6      MS. SHIH:  And just to clarify for purposes of the record,

7  my understanding is that General Counsel 154, which is the CD,

8  containing that recording has already been admitted.

9      JUDGE LAWS:  It has -- I don't think it has.  I think

10  those are the two that we already ran through.

11      MS. SHIH:  Okay.

12      JUDGE LAWS:  Because we had only run through a third of

13  it.

14      MS. SHIH:  Okay.  I misunderstood.  Then I move for

15  admission of General Counsel 154 as well under the same basis

16  that General Counsel 151 has already been admitted.

17      JUDGE LAWS:  Okay.  And --

18      MR. MINER:  Same objection as we had to General Counsel

19  155.

20      JUDGE LAWS:  I was going to ask.  Is there any different

21  objections assuming they were same.

22      And relying on the case law I cited earlier this morning

23  as well as other cases ruling the same thing, I'm -- I am going

24  to admit it.  I think there has been prime facie evidence to

25  establish its authenticity that is subject to being rebutted.

1    **(General Counsel Exhibit Number 154 Received into Evidence)**

2        MS. SHIH:  We have no further questions for the witness at

3    this time.

4        JUDGE LAWS:  And at this point did you want to ask the

5    witness any questions about the recordings?

6        MR. MINER:  No, thank you, Your Honor.

7        JUDGE LAWS:  Okay.  Well, it looks like we did well for a

8    Saturday.

9        We have nobody else, right?

10        MR. MINER:  No.

11        MS. SHIH:  No, not today.

12        JUDGE LAWS:  Then 8:30 Monday back downtown.

13        MR. MINER:  Thank you, Your Honor.

14        MS. SHIH:  Thank you, Your Honor.

15    **(Whereupon, the hearing in the above-entitled matter was**

16    **recessed at 4:36 p.m. until Monday, November 18, 2013 at 8:30**

17    **a.m.)**

18

19

20

21

22

23

24

25

1    <u>C E R T I F I C A T I O N</u>

2    This is to certify that the attached proceedings before the

3    National Labor Relations Board (NLRB), Region 28, Case Numbers

4    28-CA-093183, 28-CA-103909, 28-CA-104184, 28-CA-106613, 28-CA-

5    111186, 28-RC-093179, Gunderson Rail Services LLC, d/b/a

6    Greenbrier Rail Services, and Sheet Metal Workers'

7    International Association, Local 359, AFL-CIO at the Santa Rosa

8    Branch Public Library, 1075 S. 10th Avenue, Tucson, Arizona

9    85701, on Saturday, November 16, 2013, at 9:18 a.m., was held

10   according to the record, and that this the original, complete,

11   and true and accurate transcript that has been compared to the

12   reporting or recording, accomplished at the hearing, that the

13   exhibit files have been checked for completeness and no

14   exhibits received in evidence or in the rejected exhibit files

15   are missing.

16

17

18

19                    GRANT C. DAYLEY

20                    Official Reporter

21

22

23

24

25

**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

**REGION 28**

---

| | |
|---|---|
| In the Matter of: | |
| GUNDERSON RAIL SERVICES LLC, D/B/A GREENBRIER RAIL SERVICES, | Case No. 28-CA-093183              28-CA-103909              28-CA-104184 |
| and |              28-CA-106613              28-CA-111186 |
| SHEET METAL WORKERS' INTERNATIONAL ASSOCIATION LOCAL 359, AFL-CIO, | |
| GUNDERSON RAIL SERVICES LLC, d/b/a GREENBRIER RAIL SERVICES, | Case No. 28-RC-093179 |
|              Employer, | |
| and | |
| SHEET METAL WORKERS' INTERNATIONAL ASSOCIATION LOCAL 359, AFL-CIO, | |
|              Petitioner. | |

---

The above-entitled matter came on for hearing, pursuant to notice, before **ELEANOR LAWS,** Administrative Law Judge**,** at the National Labor Relations Board, Pima County Consolidated Justice Court, 160 N. Stone Avenue, Third Floor, Courtroom 11, Tucson, Arizona 85701, on **Monday, November 18, 2013, at 8:44 a.m.**

## <u>A P P E A R A N C E S</u>

**On behalf of the General Counsel:**

     **EVA SHIH, ESQ.**
     **JOHN GIANNOPOULOS, ESQ.**
     NATIONAL LABOR RELATIONS BOARD - REGION 28
     2600 North Central Avenue, Suite 1400
     Phoenix, AZ 85004-3099
     Tel.  602-640-2090
     Fax.  602-640-2178

     **SOPHIA ALONSO, ESQ.**
     NATIONAL LABOR RELATIONS BOARD
     421 Gold Avenue, SW, Suite 310
     P.O. Box 567
     Albuquerque, NM  87103
     Tel.  505-248-5128
     Fax.  505-248-5134

**On behalf of the Respondent:**

     **FREDERICK C. MINER, ESQ.**
     **STEVEN G. BIDDLE, ESQ.**
     LITTLER MENDELSON, P.C.
     Camelback Esplanade
     2425 E. Camelback Road, Suite 900
     Phoenix, AZ 85016
     Tel.  602-474-3653
     Fax.  602-391-2836

## I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---------|--------|-------|----------|---------|-----------|
| Kevin Stewart | 1231 | | | | |
| Jorge Martinez | 1281 | | | | 1300/1303 |
| | | | | | 1311/1313 |
| | | | | | 1316/1318 |
| | | | | | 1323/1328 |

<u>E X H I B I T S</u>

| EXHIBIT | IDENTIFIED | IN EVIDENCE |
|---------|------------|-------------|
| **General Counsel:** | | |
| GC-159 | 1225 | 1225 |
| GC-160 | 1225 | 1225 |
| GC-161 | 1226 | 1226 |
| GC-162 | 1226 | 1226 |
| GC-163 | 1229 | 1229 |
| GC-164 | 1229 | 1229 |
| GC-165 | 1229 | 1229 |
| GC-166 | 1229 | 1229 |
| GC-167 | 1229 | 1229 |
| GC-168 | 1243 | 1243 |
| GC-169 | 1301 | 1301 |
| GC-170 | 1304 | 1304 |
| GC-171 | 1308 | 1308 |
| GC-172 | 1309 | 1309 |
| GC-173 | 1310 | 1310 |
| GC-174 | 1312 | 1312 |
| GC-175 | 1312 | 1312 |
| GC-176 | 1314 | 1314 |
| GC-177 | 1314 | 1314 |
| GC-178 | 1316 | 1316 |
| GC-179 | 1316 | 1316 |
| GC-180 | 1318 | 1318 |

## E X H I B I T S (Continued)

| EXHIBIT | IDENTIFIED | IN EVIDENCE |
|---------|------------|-------------|
| **General Counsel:** | | |
| GC-181 | 1318 | 1318 |
| GC-182 | 1320 | 1320 |
| GC-183 | 1320 | 1320 |
| GC-184 | 1321 | 1321 |
| GC-185 | 1321 | 1321 |
| GC-188 | 1326 | 1326 |
| GC-189 | 1326 | 1326 |
| GC-191 | 1327 | 1327 |
| GC-190 | 1328 | 1328 |
| GC-198 | 1330 | 1330 |
| GC-193 | 1330 | 1330 |
| GC-194 | 1334 | 1334 |
| GC-195 | 1334 | 1334 |
| GC-196 | 1335 | 1335 |
| GC-197 | 1335 | 1335 |
| GC-186 | 1337 | 1337 |
| GC-187 | 1337 | 1337 |
| GC-199 | 1376 | 1376 |
| GC-200 | 1376 | 1376 |

1           P R O C E E D I N G S

2       JUDGE LAWS:  All right.  Good morning, everyone.  General

3   Counsel indicated that before calling any witnesses they have

4   some exhibits they want to try to introduce, so go ahead.

5       MS. SHIH:  The first is General Counsel 159, which is a

6   disciplinary and corrective form for an employee, Jorge

7   Maldonado, and that was part of Mr. Maldonado's personnel file

8   that was produced to us by Respondent.  And we would ask

9   Respondent to stipulate to the admission of GC 159.

10      MR. MINER:  So stipulated.

11      JUDGE LAWS:  159 will be admitted then.

12  **(General Counsel Exhibit Number 159 Received into Evidence)**

13      MR. GIANNOPOULOS:  Thank you, Your Honor.

14      General Counsel's 160 is an e-mail chain.  The first in

15  the e-mail at the top of the page is dated December 16th, 2012,

16  and it is a four-page document.  The first e-mail is from Juan

17  Maciel to Gordan Hudgens and Mike Torra.  And we'll move for

18  the admission.  This was also produced from the subpoenaed

19  documents.  We move for the admission of 160.

20      MR. MINER:  No objection.

21      JUDGE LAWS:  That's admitted.

22  **(General Counsel Exhibit Number 160 Received into Evidence)**

23      MR. GIANNOPOULOS:  General Counsel's 161 is an e-mail from

24  a Christopher Safely to a variety of people including Mike

25  Torra, Paul Wasserman, and the subject is network

1    rationalization meeting notes, April 22, 2013.  And it's a two-

2    page document.  And we move for the admission of 161.

3         MR. MINER:  No objection.  The name is Paul Wastman

4    (phonetic).

5         MR. GIANNOPOULOS:  Oh, I'm sorry.

6         MR. MINER:  That's all right.

7         JUDGE LAWS:  That's admitted.

8    **(General Counsel Exhibit Number 161 Received into Evidence)**

9         MR. GIANNOPOULOS:  General Counsel's 162 is a document

10   that was also produced pursuant to the subpoena that is -- let

11   me see -- it looks like 22 pages or 20 pages with one page,

12   actually two attachment, double-sided page attachment.  It's

13   dated April 24th, 2013, GRS network rationalization.  And

14   again, this was produced pursuant to the subpoena and I move

15   for the objection.

16        MR. MINER:  No objection.

17        MR. GIANNOPOULOS:  And --

18        JUDGE LAWS:  Is it paginated?

19        MR. GIANNOPOULOS:  It is paginated up until the last

20   attached page.

21        JUDGE LAWS:  Okay.

22        MR. GIANNOPOULOS:  So I can -- and most of these are like

23   that.

24        JUDGE LAWS:  That's okay.  All right.  That's admitted.

25   **(General Counsel Exhibit Number 162 Received into Evidence)**

 1      MR. GIANNOPOULOS:  And, Your Honor, there is going to be a

 2  series of these network rationalization documents.  They have

 3  been redacted.  The Respondent provided the General Counsel a

 4  redacted version and an unredacted version.  And at this time,

 5  I'm just using the redacted version that was provided to me by

 6  the Respondent and then at a later date if there's information

 7  in the unredacted version that we deem -- that we believe is

 8  relevant and we think that, you know, needs to get into the

 9  record, I'll contact Respondent.  If we can't reach an

10  agreement, we'll bring it before you.

11      JUDGE LAWS:  Sounds good.

12      MR. GIANNOPOULOS:  Okay.  And so that's going to be for

13  General Counsel's 162 through 167 with respect to the

14  redaction.

15      MR. MINER:  No objection to the admission of those various

16  General Counsel exhibits.

17      MR. GIANNOPOULOS:  Okay.  So I'll just go through them one

18  at a time then.  163, just so the record is clear, is a network

19  rationalization plan dated May 30th, 2013.  164 is a Gunderson

20  Rail Service network rationalization plan dated June 20th,

21  2013.  General Counsel's 165 is titled "Confidential Gunderson

22  Rail Services Network Rationalization Plan, July 25th, 2013."

23      With respect to General Counsel's 165, Your Honor, it's

24  only I want to say five pages long double-sided, and the

25  documents produced to the General Counsel for this particular

1  plan were just unredacted, so what I did was went through and

2  redacted the type of information that had been redacted in

3  similar documents.  On the first page, I accidentally crossed

4  out under North Platte under N.  That should read "Fix recovery

5  plan" in the -- under the recommendation.

6      JUDGE LAWS:  And I can see that through the redaction

7  and --

8      MR. GIANNOPOULOS:  Okay.

9      JUDGE LAWS:  -- and you also added it so that's fine.

10     MR. GIANNOPOULOS:  Okay.  And then because it was such a

11  thick document, I only included the San Antonio and Tucson

12  facilities in the July 25th, 2013 document that I have

13  produced.

14     JUDGE LAWS:  All right.  I think just so it can be clear,

15  why don't we go ahead and cross out the organic page numbers --

16     MR. GIANNOPOULOS:  Okay.

17     JUDGE LAWS:  -- there because they're not correct as the

18  document now stands.  And we can just kind of ink in pages 1

19  through 5.

20     THE COURT REPORTER:  Which one is that?

21     JUDGE LAWS:  165.

22     MR. MINER:  Your Honor, just one point of clarification,

23  GRS at the top of these various exhibits refers to

24  Greenbrier --

25     MR. GIANNOPOULOS:  I'm sorry.

1      MR. MINER:  -- Rail Services.

2      MR. GIANNOPOULOS:  I apologize.

3      MR. MINER:  That's all right.

4      JUDGE LAWS:  Okay.

5      MR. MINER:  And to the extent that a complete version or

6  complete redacted version of the July 25th version of the

7  network rationalization plan is necessary or relevant at a

8  later time --

9      MR. GIANNOPOULOS:  Yeah.

10     MR. MINER:  -- we will reserve the right to offer that.

11     MR. GIANNOPOULOS:  Absolutely.  General Counsel's 166 is

12  Greenbrier Rail Services rationalization plan of August 16th,

13  2013.  And then General Counsel's 167 is a GRS network

14  rationalization plan of September 11th, 2013.

15     JUDGE LAWS:  Then with the comments and clarifications

16  made, I will admit 163 through 167.

17  **(General Counsel Exhibit Number 163 through 167 Received into**

18  **Evidence)**

19     MR. GIANNOPOULOS:  Thank you, Your Honor.

20     MS. SHIH:  And there was one other housekeeping matter

21  with regard to exhibits.  General Counsel's 74, which has

22  already been admitted, is an e-mail that references an attached

23  notice by fax, which was not attached to the original e-mail

24  when it was offered and admitted.  We have now received from

25  Respondent the three-page document that was attached to that e-

1  mail, which was the notice of representation hearing issued by

2  the NLRB.  I'll be making copies of it and asking for that to

3  be added to GC-74 so we have a complete exhibit.

4       JUDGE LAWS:  Is that all right from your standpoint?

5       MR. MINER:  That's agreeable.  Yeah.  Thank you, Your

6  Honor.

7       JUDGE LAWS:  We'll go ahead and do that.

8       Anything else?

9       MR. GIANNOPOULOS:  Not at this time.  Thank you, Judge.

10      JUDGE LAWS:  All right. Whenever you're ready with your --

11      MS. SHIH:  I think we're ready to start with our first

12  witness, which is Kevin Stewart.

13      JUDGE LAWS:  And if you need more water, reach over and

14  grab it.

15      THE WITNESS:  Thank you.

16      JUDGE LAWS:  Can you raise your right hand please?

17  Whereupon,

18                        **KEVIN STEWART**

19  having been duly sworn, was called as a witness herein and was

20  examined and testified as follows:

21      JUDGE LAWS:  Okay.  If you could please state and spell

22  your name for the record.

23      THE WITNESS:  Kevin Dean Stewart, K-E-V-I-N D-E-A-N S-T-E-

24  W-A-R-T.

25      JUDGE LAWS:  Thank you very much.

```
 1        MS. SHIH:  Thank you, Your Honor.

 2                    DIRECT EXAMINATION

 3   Q    BY MS. SHIH:  Good morning, Mr. Stewart.  Can you tell us

 4   how you're currently employed?

 5   A    I'm employed with Greenbrier Rail Services as a general

 6   manager.

 7   Q    And how long have you been in that position?

 8   A    Approximately three years.

 9   Q    Did you hold any positions with Greenbrier Rail Services

10   prior to becoming general manager?

11   A    Yes.

12   Q    What was the last position you held prior to becoming

13   general manager?

14   A    Plant manager.

15   Q    For what facility?

16   A    Chehalis, Washington.

17   Q    And how long were you the plant manager in Chehalis,

18   Washington?

19   A    Altogether or for Greenbrier?

20   Q    For Greenbrier.

21   A    For Greenbrier, starting September 11th, 2006.

22   Q    Until you became the general manager three years ago?

23   A    Correct.

24   Q    So up until 2010 sometime?

25   A    Sometime.
```

1   Q    And prior to 2006 were you the plant manager of that same

2   facility in Chehalis, Washington for another company?

3   A    Yes.

4   Q    What was the company that had that facility prior to

5   Greenbrier?

6   A    Railcar America.

7   Q    And what positions did you hold with Railcar America?

8   A    Plant manager, foreman, airbrake man.

9   Q    And were those all in the Chehalis, Washington facility?

10  A    No.

11  Q    What other facilities did you work at?

12  A    San Antonio, Texas.

13  Q    What positions did you hold in the San Antonio facility?

14  A    Plant manager.

15  Q    When were you the plant manager of that facility?

16  A    June of '97 through October of '99.

17  Q    Any of those facilities unionized during the time that you

18  worked there?

19  A    No.

20  Q    What are your duties and responsibilities as the general

21  manager for Greenbrier Rail Services?

22  A    My responsibilities are for the repair shops that are

23  assigned to me, literally everything that happens at those

24  repair shops.  And my duties would be to make sure our company

25  policies, directives, initiatives are followed and

1    profitability, P&L of the facility, safety, just make sure the

2    facility is managed correctly.

3    Q    Which facilities do you have responsibility for?

4    A    Chehalis, Washington; Springfield, Oregon; Tucson,

5    Arizona; and Finley, Washington.

6    Q    Have you had responsibility for the Tucson facility the

7    entire time you've been a general manager with Greenbrier?

8    A    No.

9    Q    During what time period have you had responsibility for

10   the Tucson facility?

11   A    End of March 2012, somewhere in that area.  I don't know

12   the exact date.

13   Q    To the present?

14   A    Correct.

15   Q    Who had responsibility for the Tucson facility prior to

16   March 2012?

17   A    Gordan Hudgens.

18   Q    The plant managers for the facilities that you've

19   identified that you have responsibility for, they report

20   directly to you?

21   A    Correct.

22   Q    Do you have any other direct reports?

23   A    Yes.

24   Q    Who are they?

25   A    Danny Dicochea.

1   Q     What's his position?

2   A     I don't know the exact title because it was a recent

3   promotion.

4   Q     What does he do?

5   A     He works for me.  He'll go to facilities as directed by me

6   and help with improvement projects and --

7   Q     Is he a --

8   A     -- train employees.

9   Q     Excuse me.  I apologize.  Is he a manager?

10  A     Yes.

11  Q     Is he a quality control manager?

12  A     No.

13  Q     Was he formerly a quality control manager?

14  A     Yes.

15  Q     With what facility?

16  A     Tucson, Arizona.

17  Q     And when did he -- until when was he the quality control

18  manager for Tucson?

19  A     I'd need a calendar to give you the date but it was a week

20  ago this last Friday.

21  Q     Other than Mr. Dicochea do you have any other direct

22  reports besides the plant managers?

23  A     No.

24  Q     Who do you report to?

25  A     Mike Torra.  And I'm sorry.  That's incorrect.  Robert

1    Hatfield.

2    Q    What's Mr. Hatfield's position?

3    A    Assistant vice president of production, Greenbrier Rail

4    Services.

5    Q    Assistant vice president of production?

6    A    Uh-huh.

7    Q    Did you formerly report to Mike Torra?

8    A    Not directly.

9    Q    Have you ever reported directly to Mike Torra?

10    JUDGE LAWS:  Let's clarify.  By directly do you mean first

11    line above him or do you mean in any direct straight line --

12    MS. SHIH:  I --

13    JUDGE LAWS:  -- whether it's first line, second line.

14    MS. SHIH:  I'm referring to first line above him.

15    THE WITNESS:  No.

16    JUDGE LAWS:  First line above.

17    Q    BY MS. SHIH:  Were you involved in the decision to

18    restructure the Tucson facility in November 2012?

19    A    Yes.

20    Q    Who else was involved in that decision?

21    A    The planning or the decision?

22    Q    I'm -- right now I'm referring to just the decision that

23    the Tucson facility needed to be restructured, and we'll talk

24    later about how that restructuring would take effect but I'm

25    talking right now about just the decision to restructure the

1    Tucson --

2    A    The final decision wasn't mine.

3    Q    Whose decision was it?

4    A    Mike Torra.

5    Q    Were you involved in the input into that decision?

6    A    Yes.

7    Q    When did you first begin having discussions with Mr. Torra

8    about the need to restructure the Tucson facility?

9    A    On a phone call in late October, end of October.  It was a

10   financial call with general managers and regional managers.

11   Q    Was this a regular call that was held to discuss the

12   financial situations of the various plants?

13   A    Yes.

14   Q    How often was that call held?

15   A    Monthly.

16   Q    Was it held on a particular day of the month?

17   A    No.

18   Q    Who participated in that call?

19   A    Mike Torra, myself, Juan Maciel, Gordan Hudgens, Steven

20   McIntire.  That's all I recall.

21   Q    Were there any agendas that were distributed prior to

22   these monthly calls taking place?

23   A    No.

24   Q    What about after the calls take place, did anyone prepare

25   any kind of minutes or summary of what had been discussed?

1    A    No.

2    Q    What was discussed during that call with regard to the

3    Tucson facility?

4    A    Financial performance, safety, management structure, and

5    that the poor financial results had gone on too long.  That's

6    it.

7    Q    What else was discussed about the Tucson facility's

8    financial performance?

9    A    Just that the performance was unacceptable and what the

10   contributing factors were and that Mike no longer felt he could

11   defend the facility.

12   Q    What were the contributing factors that were discussed in

13   this call?

14   A    SYSPRO implementation, the way our previous CIMA

15   accounting system allocated whip and fixed costs, where

16   everything was calculated different so when we cut over to

17   SYSPRO it -- we took a hit for that because of the way the

18   costs were calculated.

19   Q    Before you go on into additional contributing factors that

20   were discussed, can you explain what SYSPRO is?

21   A    SYSPRO is the inventory an accounting system that

22   Greenbrier uses.

23   Q    And is that something that was new to the Tucson facility?

24   A    Yes.

25   Q    As of what date?

1   A    I don't recall the exact date, probably September-ish.  I

2   think it was in September but I don't recall the exact date of

3   the cutoff.

4   Q    So the first contributing factor that you stated that was

5   discussed with regard to the financial performance was SYSPRO

6   implementation.  What other contributing factors to the

7   financial performance of the Tucson facility were discussed in

8   this call?

9   A    Inventory write off, our inventory was moved from Foxpro

10  system to SYSPRO and we had an inventory adjustment that was

11  non-favorable I believe, efficiencies of the cars that we

12  worked, the mix of work that we were getting from our

13  customers, and labor utilization.  That's all I recall.

14  Q    The physical inventory at the Tucson facility hadn't

15  changed, correct?  This was just an accounting mechanism?

16  A    Yeah.  We're -- correct.

17  Q    With regard to efficiencies, was there any discussion as

18  to why the efficiencies of the Tucson facility were poor?

19  A    Not on that call.

20  Q    As the general manager with responsibility for the Tucson

21  facility, what were the reasons that the efficiencies at that

22  facility at this time were poor?

23  A    The reasons were the mix of the work from the customer;

24  the way the shop was being managed by the plant manager, the

25  production manager and the foreman and leads; the tools and

1    equipment available to the direct labor work force; the working

2    conditions, the facility was divided up into four shops and not

3    all of the shops had the same infrastructure for performing the

4    work, and that was a contributing factor to the inefficiencies.

5    Q    When you talk about the mix of work from the customers

6    being a contributing factor to inefficiency, what do you mean

7    by that?  What was the mix of work and how did it contribute to

8    inefficiency?

9    A    I wasn't quite done with the previous question.

10   Q    Oh, I apologize.

11   A    The -- I don't remember what I was going to say now.  The

12   site -- we didn't follow our processes.  We've got processes in

13   place for managing the cars at the facility from the time they

14   arrive, getting inspected, identifying the material needs, then

15   the car goes into a production, pre-production.  The car gets

16   scheduled into the shop based on what the needs of the car are,

17   and there's an opportunity there for site management to

18   evaluate the work force that's available and pick the right

19   cars to put in the right locations where we can be the most

20   efficient.  And we weren't effectively doing that, and that

21   affected our efficiencies significantly.  We weren't following

22   our processes and procedures.  We also weren't following our

23   processes for identifying the material needs for the car and

24   ensuring that we had adequate stock of material to work the

25   car, so the cars would get into production and we would have to

1  -- we would have work stoppages on the cars frequently,

2  frequent work stoppages.  So the employees would be in the

3  middle of working a car and have to quit and go work on another

4  car and then come back to that car at a later time when we got

5  the material that we needed, and that had an adverse effect on

6  efficiencies and labor utilization.  I'm done.

7  Q    Thank you.  And the examples that you've given of

8  processes not being followed in that facility, would those be

9  examples of what you identified as the way the shop was being

10 managed being a contributing factor to inefficiencies?  In

11 other words, is that something you attribute to the plant

12 manager and how he was operating the facility?

13 A    The plant manager and his management staff.

14 Q    Including the production manager?

15 A    Correct.

16 Q    Going back to the question that I had asked you earlier

17 when I interrupted you, you stated that the mix of work from

18 the customers was one of the factors that contributed to

19 inefficiency.  Can you explain what you mean by that, what the

20 mix of work was and how it contributed to inefficiency?

21 A    In a repair shop, we work on a lot of different types of

22 cars for our customer -- for customers and some of the cars

23 will have 20 hours' worth of direct labor work required to --

24 and some will have 200 hours' worth of work.  And if we get too

25 many light cars that don't have a lot of work on them as

1  opposed to a good mix of light cars and heavy cars, it's hard

2  to utilize the work force effectively.

3  Q    Had the mix of work that was coming in to the Tucson

4  facility as of October 2012, had it recently changed?

5  A    No.  It had been a -- it had been a struggle.  The work

6  mix had been not optimal for probably -- it was that way when I

7  took the shop.  When I went to the shop the first time, that

8  was one of the first things that we started looking at was work

9  mix.  So I don't know how long it had been that way but when

10  they assigned the facility to me as a general manager, it was

11  one of the things that I started looking at was work mix, and

12  it wasn't optimal for the facility.

13        JUDGE LAWS:  And just for my edification, when you refer

14  to light cars and heavy cars, does that refer to the amount of

15  work that needs to be done on a car or the something actual

16  physically describing the car?

17        THE WITNESS:  The amount of work that needs to be done on

18  the car.

19  Q    BY MS. SHIH:  And when you talk about when you went to the

20  Tucson facility the first time that was something that you

21  identified that was not optimal for that facility, are you

22  referring to back when you became general manager and had

23  responsibility of Tucson in around March of 2012?

24  A    Correct.

25  Q    Your office -- is your office currently located out of the

1    Tucson facility?

2    A    Nope.

3    Q    Has it ever been located at the Tucson facility?

4    A    When I'm at the Tucson facility.

5    Q    During the time frame of March 2012 when you were assigned

6    responsibility of the Tucson facility at least up through

7    November 2012, how often were you physically present at the

8    Tucson facility?

9    A    Can you repeat that?  I kind of got -- can you repeat it

10   please?

11   Q    During 2012 when you had responsibility for the Tucson

12   facility as general manager, how often were you physically

13   present at the Tucson facility?

14   A    Quite often, a couple trips a month, you know, on average.

15   I'd have to look at my calendar to give you but often.

16   Q    And when you say a couple trips a month, you'd generally

17   remain at the Tucson facility for at least a couple of days on

18   each trip?

19   A    Correct.

20   Q    And when you were there, you would walk around the

21   facility --

22   A    I would.

23   Q    -- observe operations?

24   A    Yes.

25   Q    You're familiar with the buildings and structures that

1   make up the Tucson facility?

2   A    Yes.

3   Q    And the Tucson facility is a large facility, correct?

4   A    Compared to?

5   Q    Well, I'm just asking you if you would describe it as a

6   large facility.

7   A    It's a moderately sized repair facility in the grand

8   scheme of repair facilities throughout the country.  It's not a

9   large facility.  It's --

10  Q    What about as compared to the other facilities that you

11  have responsibility for?

12  A    It's larger than Springfield and larger than Chehalis.

13  It's about the same size as Finley.

14  Q    I'm handing you what's been marked as General Counsel

15  Exhibit 168, which I'll represent to you is an overhead map

16  from Bing of the Tucson facility, if you could take a look at

17  it and tell me if you can identify the Tucson facility on this

18  map.

19  A    Yes.  I can.

20  Q    And you're aware that the cross streets of the Tucson

21  facility are 36th Street and South Country Club Road in Tucson?

22  A    Yes.

23       MS. SHIH:  Move for admission of General Counsel 168.

24       MR. MINER:  No objection.

25       JUDGE LAWS:  168 is admitted.

1  **(General Counsel Exhibit Number 168 Received into Evidence)**

2  Q    BY MS. SHIH:  During this phone call with Mr. Torra and

3  other managers at the end of October 2012, was there any

4  discussion about a layoff at the Tucson facility?

5  A    No.

6  Q    Was there any discussion about the need to restructure the

7  Tucson facility?

8  A    I guess restructure is a broad term.

9  Q    Well, let me ask it this way.  After all of these

10  discussions regarding the Tucson financial performance, safety

11  issues, management issues at the Tucson facility were

12  discussed, who first initiated any discussion about the need

13  for something to change in Tucson?

14  A    Mike Torra.

15  Q    And what did he say?

16  A    He said that we had to pull -- let's see -- he said we

17  needed to come up with a plan to get the facility profitable

18  quickly and that we would need to pull X from the plant manager

19  slot.

20  Q    And was this -- this was during that October call?

21  A    I don't recall if it was at that call or another phone

22  call shortly thereafter but it was right around that time.

23  Q    During that October call, were there any discussions about

24  possible solutions for fixing the Tucson facility or the

25  problems in the Tucson facility?

1   A    We talked about the problems, and we discussed that we

2   were going to need to make a change with the plant manager and

3   that we needed to come up with a plan to make the facility

4   profitable quickly.

5   Q    Was there any discussion in that call about how that plan

6   would look or what would go into that plan?

7   A    No.

8   Q    When were there first any discussions about the actual

9   plan to fix the Tucson facility and what that would consist of?

10  A    After that call between Juan Maciel and I, and I believe

11  Gordan was briefed somewhat, involved in some of those

12  discussions, but they were over the phone.

13  Q    Who first raised the suggestion or the idea that there

14  needed to be a reduction in the headcount at the Tucson

15  facility?

16  A    I believe it was me.

17  Q    And when did you make that suggestion?

18  A    I don't remember the exact date.  It was after the phone

19  call with Mike Torra, the financial call, in the time leading

20  up to when Juan Maciel and I were to present Mike with a plan

21  to return Tucson to profitability.

22  Q    Did you have a date that you needed to present Mr. Torra

23  with a plan?

24  A    Yeah.  We were going to be in Chicago for a plant

25  managers' meeting, and so we were going to be together and we

1   had to have something ready for him by then.

2   Q    So you had discussions with Mr. Maciel before you went to

3   Chicago about the idea of laying off employees in Tucson?

4   A    Yes.

5   Q    And you said those were discussions you had by telephone?

6   A    Yes.

7   Q    And when you brought that up to Mr. Maciel, what

8   specifically did you say about a layoff in Tucson?

9   A    I said we needed to identify -- you know, Juan and I

10  identified that there was two facilities -- two shops within

11  the facility that were best suited for the work.  They were the

12  original two buildings that were constructed in '93.  They had

13  concrete, power, everything the employees needed to work

14  efficiently.  So we looked at sizing the facility's work force

15  to those two buildings, what those two buildings would support,

16  but we didn't get into any final -- it was preliminary

17  discussions, you know, about right-sizing the work force for

18  those two buildings.  But that's about as far as we got until

19  we got to sit down and talk with Mike.

20  Q    Prior to you meeting with Mr. Torra in Chicago how many

21  discussions did you have with Mr. Maciel in which a layoff of

22  employees at Tucson was discussed?

23  A    We didn't actually discuss layoff; we discussed right-

24  sizing the work force.  We didn't discuss laying the employees

25  off.

1  Q    When you say right-sizing the work force, what do you

2  mean?

3  A    Retain the right amount of direct work force for the car

4  spots available in the two buildings.  So if I can put 10 cars

5  in this shop, I want, you know, roughly 15 employees to work on

6  those 10 cars based on the work mix that we had available.

7  Q    So going back to my earlier question, who first initiated

8  any discussion about reducing the headcount in Tucson?

9  A    It would have been me.

10  Q    And when did that happen?

11  A    I believe it was in Chicago when we told Mike this is what

12  we wanted to do, we wanted to just retain -- you know, keep

13  these two parts of the facility open, mothball the rest, reduce

14  the work force down to a number that we had gotten to looking

15  at -- we looked at San Antonio and Chehalis and how many car

16  spots they had, the work mix, the direct labor, and that we

17  would need to reduce the work force accordingly, that we didn't

18  see a need to -- yeah, we would have to reduce the work force.

19  Q    So you brought up to Mr. Torra in Chicago the need for the

20  work force in Tucson to be reduced?

21  A    That is correct.

22  Q    And was that an in-person meeting with Mr. Torra?

23  A    Yes.

24  Q    Who else was present?

25  A    Juan Maciel.

1    Q    Anyone else?

2    A    You know, I've been trying to -- I tried to remember if

3    Gordan was there or not and I don't recall.

4    Q    What was Mr. Torra's response?

5    A    Do it.

6    Q    Did he give you any instruction on how to do it?

7    A    Clear everything with Al.

8    Q    Al Lave?

9    A    Correct.

10   Q    Did he give you any instruction on what the headcount

11   should be reduced to?

12   A    No.

13   Q    That was up to you and Mr. Maciel?

14   A    Correct.

15   Q    Did he give you a date by which this plan needed to be

16   implemented?

17   A    No.  I don't recall him giving us an exact date, but we

18   needed to move quickly, as I pointed out before.  He wanted

19   something that he could tell his bosses hey, we're doing

20   something in Tucson, you know, to stop the financial losses,

21   this is our plan and we're acting on it.

22   Q    Whose decision was it ultimately that the layoff of

23   employees that did end up being conducted in Tucson would take

24   place on Monday, November 12?

25   A    I don't recall.

1249

1   Q    Is that a decision that you would be able to make on your

2 own?

3   A    No.  As I pointed earlier, Mike said do it, run everything

4 through Al Lave.

5   Q    And I'm not talking about the actual selection of

6 employees for layoff but I'm talking about the date that those

7 employees would be notified that they would be let go, is that

8 something that you would need to clear with Mr. Torra?

9   A    No.

10   Q    Is that something you needed to clear with Al Lave?

11   A    Yes.

12   Q    After Mr. Torra told you to do it, what did you and Mr.

13 Maciel do in terms of carrying out a plan to restructure the

14 Tucson facility?

15   A    Well, I started with selecting the management staff that

16 -- and trying to evaluate what their skill set was and put them

17 in the best positions.  Once we had identified what the two

18 buildings would support, we figured out what the number of

19 direct workers was going to be for those buildings.  And then

20 based on that, I figured out what the number of support

21 positions we would need like material handlers, switching,

22 foremen, lead men, and I went through and identified what I

23 thought were the most qualified candidates for those positions

24 and put them on a spreadsheet.  And I sent it to Juan Maciel

25 and asked him to fill in the blanks for the direct work force

1   because he was more familiar with them than I was.

2   Q    And in the process of you identifying the management

3   needs, identifying what the direct labor headcount needed to be

4   for the structures that you had -- that you intended to

5   utilize, did you have any discussions with anyone?

6   A    I had discussions with Juan Maciel.

7   Q    Anyone else?

8   A    In the initial process, no.

9   Q    You have General Counsel 168 in front of you, the map?

10  A    Yes.

11  Q    Can you identify on the map what two buildings you're

12  referring to when you talk about keeping two shops?

13  A    Can everybody see this, this building up here?

14       JUDGE LAWS:  I am going to describe what that is.  It is

15  the last building running lengthwise to the right edge of the

16  page, the right edge of the page being defined as in

17  juxtaposition to the number 168.  You know, although, arguable

18  the one in the upper corner also does, so let's call it the

19  building next to what looks like a -- well, you all will know

20  what that is better than I will.  What is this?

21       THE WITNESS:  It's a transfer table --

22       MR. MINER:  Your Honor, shall we have --

23       THE WITNESS:  -- Your Honor.

24       MR. MINER:  -- mark the buildings with an A and a B

25  perhaps?

1    JUDGE LAWS:  Good idea.

2    THE WITNESS:  Thank you, Your Honor.

3    MR. GIANNOPOULOS:  How about front and center?

4    MR. MINER:  All right.

5    MR. GIANNOPOULOS:  That's our terminology.

6    MR. MINER:  And then perhaps we could offer as General

7  Counsel 169 a copy of the map with the marks.

8    MR. GIANNOPOULOS:  168.

9    JUDGE LAWS:  Or just replace it.

10    MR. GIANNOPOULOS:  I'll just make sure to offer it.

11    MR. MINER:  Okay.

12    JUDGE LAWS:  You don't need a clean copy for anything,

13  right?

14    THE WITNESS:  So this would be the front shop here and the

15  center shop down here.

16    JUDGE LAWS:  And what did you write on those just so that

17  we know?

18    THE WITNESS:  Front and center --

19    MR. GIANNOPOULOS:  Thank you.

20    THE WITNESS:  -- Your Honor.

21  Q   BY MS. SHIH:  And I'll give you the Sharpie so that you

22  can change that.

23    MR. GIANNOPOULOS:  It's our world.

24    MS. SHIH:  There's always an easier way.

25    MS. SHIH:  Thank you.

```
 1          JUDGE LAWS:  Thanks.

 2    Q    BY MS. SHIH:  And did the rest of the facility -- was it

 3    proposed that the rest of the facility would shut down?

 4    A    Mothballed, shut down, yes.  We wouldn't utilize the rest

 5    of the facility.

 6          JUDGE LAWS:  And before you go on, I just want to make a

 7    note that the witness wrote front one building and center on

 8    another.  The Exhibit 168 is going to be annotated to reflect

 9    those additions by the witness, and that will be the new 168.

10    Q    BY MS. SHIH:  Did you make the determination how many

11    direct and indirect employees would be retained in Tucson?

12    A    With input from Juan Maciel I made the determination.

13    Q    And when I refer to determination, I'm referring to the

14    actual number of employees that would be retained.  Was that

15    your determination as to the exact number of employees that

16    would be retained?

17    A    Well, the exact number that was retained was not the same

18    number that I had proposed to Juan when I sent him the e-mail

19    and asked him to fill in the blanks.  I believe it changed by

20    one or so.

21    Q    The number that you proposed in your e-mail to Juan, is

22    that a number that you came up with?

23    A    With input from Juan Maciel, that's the number I came up

24    with.

25    Q    And what factors did you consider in determining what
```

1    those numbers would be?

2    A    We looked at the number of car spots in the two facilities

3    that we were going to keep open.  We looked at the hours of

4    work available on the mix of cars that we had been working at

5    the facility for the last few months, and we compared that to

6    San Antonio and Chehalis because they were both do a lot of

7    work for TTX, which is the same car owner that was supplying

8    the majority of the work that we were doing in Tucson.  And

9    based on the work force per car spot that was in San Antonio

10   and Chehalis for the same type of mix on TTX cars we came up

11   with the number.

12   Q    And when you say we, you're referring to you and Mr.

13   Maciel?

14   A    Yes.  Juan Maciel.

15   Q    Did you use San Antonio and Chehalis as comparators in

16   this process because the operations there are similar to the

17   operations in Tucson?

18   A    No.

19   Q    Why did you use those two facilities as comparators then?

20   A    Because the mix of work was primarily from TTX in Tucson,

21   and San Antonio and Chehalis also performed a lot of work for

22   TTX.

23   Q    Was the size of the operations in San Antonio and Chehalis

24   similar?

25   A    Similar, yes.

```
 1    Q    What's the number of car spots in Tucson?

 2    A    I don't remember.  I'd have to count them.

 3    Q    Approximately, do you have any estimate?

 4    A    A number of -- total number of car spots, I guess I'll

 5    need clarification if you're talking about working car spots,

 6    storage, the car spots we retained when we right-sized the

 7    facility.

 8    Q    Well, you testified earlier I believe that Chehalis and

 9    San Antonio had a similar number of car spots as the Tucson

10    facility.

11    A    No.  I didn't.

12    Q    When you first began the process of identifying the

13    management needs in Tucson and what the headcount needed to be

14    to support the two buildings that were going to be retained,

15    did you request that Lisa Maxey provide you with an employee

16    list for the Tucson facility?

17    A    Yes.  I believe I did.

18    Q    Other than the list of employees that were working in

19    Tucson, what if anything else did you request Ms. Maxey provide

20    you?

21    A    Initially, that was all.

22    Q    I'm handing you what's been previously admitted as General

23    Counsel Exhibit 15.  Do you recognize that e-mail exchange?

24    A    Yes.

25    Q    Referring to page 3 of that exhibit, is that the initial
```

1    employee list that was furnished to you by Ms. Maxey?

2    A    I can't say if this was the initial list or not.  It's a

3    list of employees.

4    Q    And going back to page 1 looking at the e-mail at the

5    bottom from you to Mr. Maciel and Gordan Hudgens that states we

6    just need to finish filling it in.  Fifty-six direct, 19

7    indirect.  Those are numbers that you came up with, correct?

8    A    These are numbers that I came up with Juan Maciel's

9    assistance.

10   Q    Okay.  And when you sent that email to Mr. Maciel, had you

11   proposed certain employees to be retained and certain employees

12   to be terminated?  Or were you asking Mr. Maciel to complete

13   that?

14   A    I was asking Juan to fill in the employee names for the

15   direct workforce, what his recommendations were.

16   Q    Had you made any recommendations for the direct workforce?

17   A    No, I don't believe so.  No.

18   Q    And would -- by direct workforce, you're referring to

19   employees that work directly on the cars.

20   A    Correct.

21   Q    And that would include welders?

22   A    Yes.

23   Q    Airmen?

24   A    Yes.

25   Q    Does it include painters?

1    A    Yes.

2    Q    What about switchmen?

3    A    No.

4    Q    Does -- what other positions does it include, if any?

5    A    Laborer or welder's helper would be a potential direct.

6    Q    What about mechanics?

7    A    That's an indirect position.

8    Q    And looking to the next email up from the bottom on page

9    one, Mr. Maciel's email to you and Mr. Hudgins on November 8th

10   that states, "Here you go."  Did Mr. Maciel send back to you a

11   list of 56 direct employees that he proposed to be retained?

12   A    He sent me back the list I don't know if had exactly 56 on

13   it.  It was in that area, yes.

14   Q    He sent you back a list of employees that he was

15   recommending that Greenbrier retain.

16   A    Correct.

17   Q    Did you have any discussions with Mr. Maciel as to how he

18   came up with that list?

19   A    Yes.

20   Q    What did you discuss?

21   A    That he talked with -- I believe it was Jerry Dover and

22   Freddy Valdez.

23   Q    What was the first name that you mentioned?

24   A    Jerry Dover.

25   Q    And who was that?

1  A    Previous product manager at the Tucson facility.

2  Q    And Mr. Maciel told you that he spoke with Jerry Dover?

3  A    Correct.

4  Q    And Freddy Valdez in coming up with the proposed retention

5  list of direct employees in Tucson?

6  A    I believe he talked with both of them, yes, but --

7  Q    Did he tell you that he spoke with both of them?

8  A    I believe he did.

9  Q    Did he have any discussions with you about which direct

10 employees should be retained and which ones should not?

11 A    We had discussions, but I did not know the direct

12 workforce by name.  I -- if -- so I -- it -- it was not

13 relevant -- somebody's name is not relevant to me, because I

14 couldn't put the face with the name.  I -- if I was in the

15 facility, I knew which employees were -- had what skills, you

16 know, at some level, because I had worked with the employees.

17 But I did not -- could not remember their names.  I had not

18 spent enough time with them.

19 Q    So you weren't personally familiar with all of the

20 employees at the Tucson facility.

21 A    No, I was not.

22 Q    And you hadn't personally observed the work performance of

23 all of the employees in Tucson.

24 A    I had personally observed the work of the -- of all the

25 employees.  I had observed the work.

1   Q    But you weren't able to put names with faces.

2   A    Correct.

3   Q    What was relevant to you was the type of employee that you

4   were keeping, correct?

5   A    No.

6   Q    But you relied on Mr. Maciel to determine which employees

7   in which job categories should be retained?

8   A    No.  What was relevant was the skill set of the employees

9   that we retained.  And I relied on Juan to identify which

10  employees had the skill sets we needed to do the work, based on

11  the mix of work that we felt were going to have from TTX.

12  Q    What skill sets were relevant?

13  A    M214 truck reconditioning, air brake test, welding,

14  cutting, wreck repair experience, auto wreck experience,

15  experience on the different car types of work that we were

16  retaining.  You know, the mix of work that we were going to

17  have.  Is the question just related to the direct workforce at

18  this point?

19  Q    At this point, yes.

20  A    Okay.  That's it.

21  Q    And again, you relied on Mr. Maciel to determine which

22  employees had the appropriate skill sets to be retained,

23  correct?

24  A    Yes.

25  Q    You didn't personally review the personnel files of the

1    employees to be retained?

2    A    No.

3    Q    What about the employees to be let go?  You didn't

4    personally review their personnel files?

5    A    No.

6    Q    You didn't review the attendance points of the employees

7    to be retained or let go?

8    A    No.

9    Q    You didn't view -- review their production reports or

10   disciplinary history?

11   A    No.

12   Q    Did you review any documents with regard to the employees

13   to be retained or let go --

14   A    No.

15   Q    -- in the Tucson facility?  And that includes their

16   performance evaluations and appraisals?

17   A    That's correct.  I did not review performance evaluation

18   appraisals.

19        JUDGE LAWS:  If you're at a good breaking point, there's

20   an exhibit issue we want to deal with and it might be a good

21   time to let the witness --

22        MS. SHIH:  This will be fine.

23        JUDGE LAWS:  Okay.

24        MS. SHIH:  Thank you.

25        JUDGE LAWS:  All right.  Let's go off the record.

1  (Off the record at 9:47 a.m.)

2  Q      BY MS. SHIH:  Mr. Stewart, at the time of the layoff in

3  November, 2012, the production in the Tucson shop was busy,

4  correct?

5  A      We had plenty of work for the number of employees that we

6  had.  Yes.  We were -- I guess you could say we were busy.

7  Q      Employees were working overtime --

8  A      Yes --

9  Q      -- prior to --

10  A      -- that is correct.

11  Q      And that's prior to the layoff.

12  A      Yes.

13  Q      And even after the layoff, employees continued to work

14  overtime, correct?

15  A      That I don't recall, because I wasn't there after the

16  layoff for quite some time.  So I don't remember specifically

17  if they were working overtime after the layoff.

18  Q      Prior to the November, 2012 layoff, there was a backlog of

19  cars in the Tucson facility?

20  A      We had a backlog of cars, yes.

21  Q      The turnaround time for cars at the Tucson facility was

22  over the expectation or the goal for turnaround.

23  A      Correct.  Yes.

24  Q      When --

25         JUDGE LAWS:  And I want to first clarify before moving on

1   what you mean by over.

2       MS. SHIH:  It exceeded the expectation of what the

3   turnaround for cars should be.

4       THE WITNESS:  Yes, it did.

5       JUDGE LAWS:  Thank you.

6   Q   BY MS. SHIH:  When did you first learn that employees in

7   the Tucson facility were trying to --

8       THE REPORTER:  Hold on for a minute.

9       JUDGE LAWS:  Do you want to verify that you got the

10  testimony about the overtime and the --

11      THE REPORTER:  I did.

12      JUDGE LAWS:  You did.  Okay.

13  Q   BY MS. SHIH:  When did you first find out that employees

14  in Tucson were interested in unionizing?

15  A   I'd have to say when I was -- given the facility as the

16  general manager and briefed, I was told that we had had a --

17  and I knew this, but I was reminded -- that we'd had a Union

18  election previous to that.  And we were successful.  You know,

19  the Union did not win the election.

20  Q   And that's a reference to the Union election that was held

21  in Tucson in 2011?

22  A   Yeah.

23  Q   Who informed you about that?

24  A   I don't recall, but it was common knowledge, you know.  I

25  think Gordan may have told me about it.  Once I got there and

1  was talking with Lex Morrison, you know, he told me about the

2  whole thing in the process, because it wasn't something I was

3  familiar with really.

4  Q    So this is something that you first learned about when you

5  assumed responsibility for the Tucson facility?

6  A    I knew they'd had a vote, but I didn't know any -- and

7  that the company was successful in keeping the Union out.  But

8  I did not know much about it and so I was brief, you know, by

9  Gordan.  And then when I got there, Lex and I talked about it a

10 little bit, so -- so the assumption would have been that -- so

11 based on that, you know, employees were interested then, right?

12 Or they wouldn't have had a vote.

13 Q    So when did you first learn about the 2011 election and

14 organizing efforts?

15 A    I don't remember exactly when I learned about it.  The

16 201?

17 Q    Correct.

18 A    I don't remember.

19 Q    Was it before you assume responsible for Tucson in 2012?

20 A    Yes.  I knew before I went to Tucson in 2012 that there

21 had been a Union vote and that the company -- that the

22 employees had voted in favor of the company over the Union.

23 But I don't remember exactly when I found out about it.

24 Q    Okay.  And you learned about it from Mr. Hudgins, I think

25 you said?

 1   A     Again, I don't remember exactly who told me.

 2   Q     You were aware that the Union vote in 2011 was close,

 3   correct?

 4   A     I wasn't aware that it was close until I got to Tucson and

 5   spent a little bit of time with Lex.  And at some point, we had

 6   a conversation about it.  And that's when I found out it was

 7   close.

 8   Q     Lex Morrison told you that?

 9   A     Yes.

10   Q     What else did he tell you about the 2011 election?

11   A     That there was a lot of meetings and stuff leading up to

12   the election and that it was a drain on the facility and

13   himself.

14   Q     What kind of meetings?

15   A     Meetings with employees.

16   Q     Meetings conducted by management with employees?

17   A     Yes.

18   Q     Were you responsible for hiring Eric Valenzuela as the

19   plant manager at the Tucson facility?

20   A     Yes.

21   Q     And as part of that hiring process, you interviewed Mr.

22   Valenzuela at least once, correct?

23   A     Yes.

24   Q     How many times did you interview Mr. Valenzuela prior to

25   him becoming the plant manager in Tucson?

1    A    Once over the phone and once in person at the Tucson

2    facility.

3    Q    During the interview process with Mr. Valenzuela, what did

4    you tell him about the Union at the Tucson facility?

5    A    I don't recall telling him anything about the Union during

6    the interview process.

7    Q    What about after he was hired?

8    A    After Eric was hired and took over as plant manager, I

9    briefed Eric on the Union 2011 vote, the communication

10   meetings, you know.  What the challenges were at the facility,

11   just like anything else.

12   Q    When did you tell Mr. Valenzuela about the Union activity

13   in Tucson?

14   A    I don't remember the days.  It was after we hired him.

15   Q    Approximately how long after you hired him?

16   A    Few days, few weeks, few months?

17   Q    Few days.  So shortly after he was hired?

18   A    Correct.

19   Q    What did you tell him about the employees in Tucson, their

20   organizing efforts with the Sheet Metal Workers Union?

21   A    I told them that we had gotten a notification, that it

22   wasn't something that I was an expert on by any means,  So he

23   would -- he was briefed in more detail, I believe, by Al Lave.

24   Q    Other than telling him that you had gotten a notification,

25   what else did you tell him about the Sheet Metal Workers Union?

1    A    I don't recall telling him anything else, other than that,

2    that we'd gotten a notification.  What it meant to us, I really

3    didn't fully understand at --

4    Q    And --

5    A    -- that point.

6    Q    And when you refer to notification, are you talking about

7    the petition for representation that the Union filed in

8    November, 2012?

9    A    Yes, I am.

10   Q    So you informed Mr. Valenzuela that there had been a

11   petition for representation filed.

12   A    Yes.

13   Q    Did you tell him that the Union was claiming the layoff

14   was because of the Union drive?

15   A    No.

16   Q    Who made the determination that employees should start to

17   be rehired or recalled at the Tucson facility in 2013?

18   A    Myself and Juan Maciel.

19   Q    And when did you make that decision with Mr. Maciel?

20   A    I don't remember the exact date.

21   Q    About how long before the first employee was rehired did

22   you make that decision?

23   A    I don't know when the first employee was rehired, so I

24   can't answer that question.

25   Q    I'm handing you what's been previously admitted as General

1   Counsel 68.  And I'll represent to you that this was identified

2   as a list of employees from the November 2012 layoff that were

3   rehired in Tucson in 2013.  Looking at that document, with the

4   dates of their rehire, does that refresh your recollection at

5   all as to when you and Mr. Maciel made the determination to

6   begin rehiring employees in Tucson?

7   A    Well, it would have been before February 5th, so --

8   Q    Okay.  A few days before February 5th?  A few weeks?

9   A    No, it took some time.  Juan and I needed more direct

10  employees.  Once Juan had gotten the facility running, we were

11  ready to start calling employees back.

12  Q    And how long did that process of calling employees back

13  take?  I'm trying to get a sense of whether the determination

14  to begin rehiring employees was made a few days before February

15  5th, a few weeks, a few months.

16  A    It was more than a few days.

17  Q    And what factors led you and Mr. Maciel to conclude that

18  it was appropriate to begin rehiring employees in Tucson?

19  A    Can you repeat that, please?

20  Q    What factors led you to conclude that it was appropriate

21  or necessary to begin rehiring employees in Tucson?

22  A    Well, we had our labor utilization in line, was where it

23  needed to be.  Our efficiencies had improved.  And we had a

24  more than adequate backlog of work.  We were making money on --

25  we were achieving contribution margin on the work we were

1    doing, but we weren't doing enough of it to hit the financial

2    goals.  So we needed to do more work.  And the only way to do

3    more was to bring in more people.

4    Q    Did you have a target efficiency rate for the Tucson

5    facility?

6    A    It's a moving target.  So it -- there's variables.

7    Q    Let me back up a little bit and ask you.  At the time that

8    you made the decision to layoff employees in Tucson in

9    November, 2012, were you given any target margins that needed

10   to be reached at the Tucson facility?

11   A    Margins?  No.

12   Q    Were you given any target earnings?

13   A    We have a forecast that is a projection of our earnings

14   and revenue for the year and that is always our goal is to

15   achieve our forecast.  This is what we say we're going to do,

16   you know, in the next fiscal year, so -- so I already had it.

17   Nobody had to give it to me.

18   Q    Were there any specific goals that needed to be achieved

19   before Tucson could begin rehiring employees?

20   A    Labor utilization had to be under control.  And that's the

21   utilization of the direct workforce.  And efficiencies needed

22   to improve to the point where we were contributing margin with

23   our -- with hours.

24   Q    And was it within your discretion to determine that labor

25   utilization and efficiencies were at where they needed to be.

1   Or were you given specific numbers that needed to be met?

2   A     It was at my discretion.

3   Q     What number for labor utilization do you consider under

4   control?

5   A     Again, that's a moving target.  It depends on -- there's

6   too many variables to define a number.

7   Q     Clearly you had hit a number on labor utilization that you

8   felt was under control in 2013, because you started rehiring

9   employees in Tucson, correct?

10  A     That is correct.

11  Q     And do you recall what that number was?

12  A     I do not recall what that number was.

13  Q     How did you determine how many employees needed to be

14  rehired in Tucson?

15  A     We had a head count goal for the facility that was

16  established at the -- when we completed the forecast for fiscal

17  2013.

18  Q     Who set that head count goal?

19  A     I did.

20  Q     And when did you set it?

21  A     In the months prior to August 30th.  You know, when we

22  were preparing our forecast.  Couple months prior.  I don't

23  remember the exact date.

24  Q     Prior to August 30th, 2012.

25  A     Correct.

1   Q    And what was that head count goal for Tucson?

2   A    I don't recall the exact number.  More than 70 direct.

3   Less than 90, probably.  Somewhere in that -- 70 to 90.  I

4   don't recall.

5   Q    And did you make a plan in early 2013 to begin rehiring

6   employees in Tucson at the approximate rate of four employees

7   per month?

8   A    Yes.

9   Q    How did you come up with that number?

10  A    Juan and I discussed that when we brought employees back,

11  that we wanted to make sure that any training that they needed

12  was done properly and that we didn't just -- and then, as you

13  bring employees back, you know, it has an effect on the

14  management of the facility.  You know, it's more demand on the

15  support staff.  So we wanted to just gradually bring the

16  employees back and build on the momentum that we achieved in

17  the -- you know, the past couple months with him running the

18  facility.

19  Q    And after you began bringing employees back, did you start

20  opening up some of the other shops at the Tucson facility that

21  had been closed?

22  A    Eventually, yes, we did.

23  Q    When?

24  A    It was after Eric Valenzuela started.

25  Q    And that was in March, 2013.

1   A     He started in March, 2013.

2   Q     Who made the determination as to which employees would be

3   contacted for rehire first?

4   A     On the initial list of employees that we recalled, Juan

5   Maciel and I discussed the need for, you know, bringing back

6   some employees.  And Juan talked with Freddy Valdez and again,

7   Jerry Dover and came up with what they felt were the employees

8   that had the skill set we needed for the positions that we

9   wanted to fill.

10  Q     Were you involved in those discussions about the specific

11  employees and their skill sets?

12  A     I was, after they identified who they thought were the

13  best candidates.  And they told me what their skill sets were.

14  And I was happy with the list.

15  Q     Did you review any documents pertaining to specific

16  employees in the process of determining which employees would

17  be contacted for rehire?

18  A     No.

19  Q     And you -- I think you testified earlier that Jerry Dover

20  was the former production manager at the Tucson facility?

21  A     That is correct.

22  Q     At the time of these discussions in 2013, what position

23  did he hold with Greenbrier?

24  A     He holds a position with Greenbrier or at that time held a

25  position with Greenbrier where he travels to facilities and

1    works on improvements, as -- you know, training employees.  New

2    employee training, safety.  So it's a traveling position.

3    He'll go to our facilities and --

4    Q    Does he have a title?

5    A    He does.

6    Q    What is it?

7    A    I don't know.

8    Q    Okay.  I'm handing you what's been previously admitted as

9    General Counsel 44.  If you can take a look at that email.

10   JUDGE LAWS:  It's 34, you said?

11   MS. SHIH:  44.

12   JUDGE LAWS:  44.

13   Q    BY MS. SHIH:  Do you recognize that email exchange?

14   A    Yes.

15   Q    When you sent an email to Mr. Lave on January 23rd, asking

16   about the progress on recalling the four employees to work in

17   Tucson, had the four employees to be recalled been identified?

18   A    I don't recall if this was sent before or after we

19   identified the four employees, but I -- I would.

20   Q    Who were -- oh -- I apologize.

21   A    Excuse me.  Just --

22   Q    Let me -- I didn't mean to cut you off.

23   A    Yeah, I actually -- I don't recall the -- if it was before

24   or after.  It --

25   Q    Who identified the first four employees to be recalled?

1   A    Juan Maciel talked with Freddy Valdez and Jerry Dover.

2   And they provided a list of candidates that they felt had the

3   skill sets that we needed.  And we talked about what their

4   skill sets were, you know, once they produced the names and I

5   approved.  And then we forwarded the information to Al Lave.

6   Q    So you were presented with a list of four candidates that

7   had been identified by Juan Maciel, correct?

8   A    Correct.

9   Q    Were you provided the identity of any other candidates

10  that had been considered and not selected to be contacted for

11  rehire?  And I'm referring to just the initial four.

12  A    I believe initially, there was more than four.  And then

13  through discussions with -- that Juan had with Jerry Dover and

14  Freddy Valdez -- and they went back and forth a few times and

15  they finally came to a consensus on which four.

16  Q    But did they communicate to you the names of the other

17  people that they had considered that did not make that list of

18  four?

19  A    I knew that there was more than four initially that they

20  were discussing, so yes.  But I don't remember the names.

21  Q    Who were the first four employees recalled?

22  A    I don't recall their names.

23  Q    And in asking Mr. Lave about the progress on recalling the

24  four employees, what was Mr. Lave's involvement in recalling

25  the four employees?

1   A    Al Lave had to approve all the rehires.

2   Q    And you gave your approval for the four employees that

3   were recommended to you as the four initially to be rehired?

4   A    Correct.

5   Q    I'm handing you now what's been previously admitted as

6   General Counsel 45.  Do you recognize that email?

7   A    Yes, I do.

8   Q    So by January 25th, the initial four employees to be

9   recalled had been identified by name, correct?

10  A    Correct.

11  Q    And those are the four that you approved?

12  A    Correct.

13  Q    You received this email from Mr. Torra dated January 25th.

14  Did you ask him what he meant when he said Al was going to

15  review the four names and determine if they would present us

16  with any further issues?

17  A    No.

18  Q    Now I'm handing you what's been previously admitted as

19  General Counsel 46.  Have you seen that email chain?

20  A    Yes.

21  Q    Starting from the very bottom -- or looking at the last

22  email at the bottom of page -- General Counsel 46, you told Mr.

23  Lave on February 14th, "We need to increase the direct labor

24  head count in Tucson to 65 over the next 45 days."  How did you

25  make that determination?

```
 1    A      Juan and I discussed what we thought -- how quickly we

 2    thought we could onboard employees without losing the momentum

 3    that we had gained in the months that he had been running the

 4    facility.  And we felt that we could increase the head count to

 5    65 over the next 45 days and still keep improving our

 6    efficiencies, labor utilization, quality, all the key metrics.

 7    Q      And was there a rate at which you proposed reaching that

 8    number over 45 days?

 9    A      Well initially, we wanted to bring back four employees.

10    And then our thought was to onboard employees in groups of

11    four.  And then we could put them with experienced employees

12    and make sure that they were trained properly.

13    Q      The top of General Counsel 46, Mr. Lave asked you and Juan

14    on February 14th, do you have a top eight that you are thinking

15    of hiring?  Did you?

16    A      I don't recall at that -- I mean, this was February of

17    2013.  I don't remember.

18    Q      I'm handing you what's been admitted as General Counsel

19    47.  If you could take a look at the email that you sent Al

20    Lave and Juan Maciel on February 21st.  Do you recognize that

21    email?

22    A      Yes, I do.

23    Q      You said, "This was a lot harder than we thought."  And

24    then there's a list of five names.  Those were five names that

25    you proposed for possible rehire in Tucson, correct?
```

1   A    Correct.

2   Q    What did you mean by, "This was a lot harder than we

3   thought?"

4   A    It took longer to come up with the names that everybody

5   agreed on that -- to find the employees that had the skill set

6   that we were looking for and it was harder than I thought.

7   Q    And with regard to those five employees specifically, you

8   didn't review any documents, personnel files, performance

9   evaluations --

10   A    No.

11   Q    -- in determining that they should be contacted for

12   rehire?

13   A    I did not.

14   Q    I'm handing you what's been marked as -- or admitted as

15   General Counsel 48, which is the email that you sent to Al Lave

16   and Juan Maciel on March 13th regarding additional call-backs

17   for Tucson.  You stated, "I prefer to discuss which two with

18   you and Juan at your earliest convenience."  What did you want

19   to discuss about which two employees would be called back that

20   month?

21   A    I wanted to discuss which two employees we wanted to call

22   back.  And I wanted to do it at his earliest convenience.

23   Q    What about the employees did you want to discuss?

24   A    Al had to approve all rehires for Tucson.  And it was hard

25   to get everybody together.  It was a time consuming process.

1   So I wanted to get them on the phone and get it done, so we

2   could bring a couple more people back.

3   Q    Mr. Lave was involved in discussion about employees and

4   their skill sets and whether they were appropriate for rehire?

5   A    Yes.

6   Q    Who were the two employees that you discussed with Mr.

7   Lave and Mr. Maciel?

8   A    I don't remember their names.

9   Q    Were you involved in the decision to shut down the Tucson

10  facility?

11  A    No.

12  Q    When did you learn of the decision to shut down the Tucson

13  facility?

14  A    I don't recall the exact date, but it was sometime before

15  I went to Tucson and make the announcement that we would be

16  closing the facility.  I don't recall the exact date.

17  Q    Well when did you go to Tucson and make the announcement?

18  A    I don't know the exact date.

19  Q    How long before you went to Tucson and made the

20  announcement did you learn of the shutdown?

21  A    It was a very short period of time passed.  I can

22  approximate between three days -- I think it was about a week.

23  Right in there.

24  Q    Who told you of the decision to shut down the Tucson

25  facility?

1   A    Conversation with Mike Torra.

2   Q    By telephone?

3   A    Yes.

4   Q    Anyone other than Mr. Torra on the call?

5   A    I don't recall who was on the call with Mike and I.

6   Q    What did Mr. Torra say about the Tucson facility?

7   A    TTX was longer going to support Tucson.  They were adamant

8   that they would not send another car to the Tucson facility.

9   We talked about the fact that there was really no other

10  potential customer that could fill the Tucson facility with

11  work.  And we didn't have any other option.

12  Q    Did Mr. Torra tell you why TTX would no longer send a car

13  to the Tucson facility?

14  A    No, he did not.

15  Q    Did he tell you who had made the decision to shut down the

16  Tucson facility?

17  A    No, he did not.

18  Q    Did you attend a Greenbrier Rail Services strategy and

19  planning meeting in April, 2013?

20  A    Do you know where the meeting was held?

21  Q    I do not.

22  A    I don't remember.  I don't know.  I'd need more

23  information to answer that question.

24  Q    Were you aware that Greenbrier was talking about closing

25  the San Antonio facility in 2013?

1    A    Yes, I was.

2    Q    When did you learn of that?

3    A    Months prior to the closing of the Tucson facility, we

4    were considering closing the San Antonio facility as a company.

5    It was on a watch list of facilities that were underperforming.

6    Q    And in April, 2013, it was actually slated for closure by

7    the end of 2013, correct?

8         MS. SHIH:  Your Honor, if I may just have a few minutes to

9    see if I have any additional questions for this witness.  Thank

10   you.

11        JUDGE LAWS:  Okay.

12   (Off the record at 10:43 a.m.)

13        MS. SHIH:  Just a few additional questions for this

14   witness.

15   Q    BY MS. SHIH:  Earlier you testified that one of the

16   reasons that you made the determination that it was necessary

17   to begin rehiring in the Tucson facility in 2013 is because the

18   labor utilization rate was under control.  Do you remember

19   that?

20   A    Yes, I do remember that.

21   Q    Do you consider a labor utilization rate of 46 percent as

22   being under control?

23   A    Forty six percent, no.

24   Q    Do you consider a labor utilization rate of 56 percent as

25   being under control?

```
 1    A    No.

 2    Q    What labor utilization rate percentage do you consider

 3    being under control?

 4    A    Between 60 and 80 percent, depending on the type of work

 5    that's being done at the facility and what level of support

 6    personnel are required to support those repairs.

 7    Q    Thank you.

 8    A    It's a moving target.  Sorry.

 9    Q    Sorry.

10        MS. SHIH:  Thank you, Your Honor.  We have no further

11    questions at this time.

12        JUDGE LAWS:  Okay.

13        MR. MINER:  Your Honor, we'll be calling Mr. Stewart as

14    part of the company's case.

15        JUDGE LAWS:  That's what I suspected.  So I want to thank

16    you for providing your testimony.  There's a rule in place for

17    this hearing.  And it means you're not to discuss your

18    testimony with any other witnesses or anybody you think may be

19    connected to the case who might be called as a witness.

20        THE WITNESS:  Thank you, Your Honor.

21        JUDGE LAWS:  Thank you.

22        THE WITNESS:  I understand.

23        JUDGE LAWS:  All right.  Off the record.

24    (Off the record at 10:47 a.m.)

25        JUDGE LAWS:  Just go right here behind that half door.
```

1   Can you raise your right hand?  Oh, we need our interpreter.

2       MS. ALONSO:  Your Honor, yeah.  And you know what, this

3   witness will actually require an interpreter so yeah, sorry

4   about that.

5       THE COURT REPORTER:  Off record?

6       JUDGE LAWS:  That might be helpful to have.

7   (Off the record at 10:59 a.m.)

8       THE INTERPRETER:  Explain what I said?

9       JUDGE LAWS:  Briefly, sure before we go on.

10      THE INTERPRETER:  I basically have indicated to him that

11  I'm his interpreter.  I'm only his voice.  I have no part and

12  no interest in the outcome of this so just ignore me.  I'm

13  going to ignore him.  I just -- I'm going to interpret and when

14  he addresses anybody, he has to address them as talking to him.

15      JUDGE LAWS:  Okay.  And just maybe one other thing,

16  explain the usual just wait until the question is completed by

17  you to get the response.

18      Can you raise your right hand please?

19  Whereupon,

20                  __JORGE MARTINEZ__

21  having been first duly sworn, was called as a witness herein

22  and was examined and testified, by and through an interpreter

23  as follows:

24      JUDGE LAWS:  Can you please state and spell your name?

25      THE WITNESS:  Jorge Martinez, J-O-R-G-E M-A-R-T-I-N-E-Z as

1   in Zulu.

2       JUDGE LAWS:  Thank you.

3                   **DIRECT EXAMINATION**

4   Q    BY MS. ALONSO:  Mr. Martinez, were you employed at

5   Greenbrier?

6   A    Yes.

7   Q    Okay.  When did you start working at Greenbrier?

8   A    The 18th of February of 2010.

9   Q    Okay.  And were you one of the employees laid off in

10  November of 2012?

11  A    Yes.

12      MS. ALONSO:  And, Your Honor, just for interpretation

13  purposes, the word layoff I think -- I don't know which word is

14  being used for layoff but I think that if it's just -- if we

15  don't translate that I think that works with a lot of the

16  witnesses.  I think that's what they're familiar with.  It's

17  colloquial.

18      JUDGE LAWS:  Will you ask him if he knows what the term

19  layoff is?

20      THE WITNESS:  Yes.

21  Q    BY MS. ALONSO:  Okay.  All right.  And what kind of work

22  did you do at Greenbrier before you were laid off?

23  A    Airman.

24  Q    Okay.  And what type of work did you do as an airman?

25  A    Check the brake system for the trains and fix them and

 1    they use hydraulic air.

 2    Q    And who was your supervisor before you were laid off?

 3    A    Cesar Ledezma.

 4    Q    Okay.  And who was your -- do you know what his title was?

 5    A    Lead man.

 6    Q    And did you have a foreman that you also reported to?

 7    A    Yes.

 8    Q    And who was the foreman?

 9    A    Ricky Fonseca.

10    Q    Now, between the time that you were laid off -- between

11    that you -- I'll rephrase my question.  Between the time that

12    you started to work and the layoff, what areas of the shop did

13    you work in?

14    A    In all of the areas.

15    Q    Okay.  Mr. Martinez, I am going to show you a document

16    that's been already admitted in the record.  Okay.  And that's

17    General Counsel's Exhibit 68.  And that's actually 168.  Okay.

18    And, Mr. Martinez, there have been some areas identified in

19    this photo as the front shop and the center shop.  Okay.  Did

20    you have -- while you worked with Greenbrier, did you ever work

21    in the front shop?

22    A    Yes.

23    Q    Okay.  And what type of work was done at the front shop?

24         THE INTERPRETER:  May I have -- may the interpreter

25    request the repetition of his response?

1    MS. ALONSO:  And, Your Honor --

2    THE INTERPRETER:  The interpreter is going to provide a

3  phonetic rendition.  They would repair auto bugs and debugs.

4  It's a type of car, railcar.

5  Q    BY MS. ALONSO:  Okay.  And do you mean auto racks?

6  A    Yes.

7  Q    Okay.

8  A    Yes.

9  Q    All right.  And what is an auto rack?

10  A    It's a unit -- it's a single unit and they're pretty tall

11  so they can't be worked on in any other area of the job.

12  Q    Okay.  And what other types of cars are worked on in the

13  front shop?

14  A    They're railcars that look like boxes.

15  Q    Okay.  And what name was used to refer to those?

16  A    T-box.

17  Q    Okay.  And what is a T-box?

18  A    It's a wagon, like I said, that looks like a box.

19  Q    And were there any other types of cars that were worked on

20  in this area?

21  A    They're low platform railcars.

22  Q    Okay.  Now, I want to refer you to the center shop of the

23  facility.

24    MS. ALONSO:  And, Your Honor, just for purposes of

25  identifying the names of these, I think it's, you know, fine to

1   not interpret the actual names like front shop and center shop

2   but use, you know, the English name.

3       JUDGE LAWS:  Can you verify the witness understands?

4       THE WITNESS:  Yes.

5       JUDGE LAWS:  Okay.

6   Q   BY MS. ALONSO:  So, Mr. Martinez, in the center shop, did

7   you work at the center shop while you were at the Tucson

8   facility?

9   A   Yes.

10  Q   Okay.  And can you tell me which cars were worked on at

11  the center shop?

12  A   Auto racks, three packers and five packers.

13  Q   Okay.  And what is a three pack?

14  A   They're composed of three railcars.

15  Q   Okay.  And is the five packer the same but with five cars?

16  A   Yes.

17  Q   Now, Mr. Martinez, there is an area that is another roof

18  that's shown in the middle of the -- like below the center shop

19  and slightly to the right.

20  A   That's where they paint the cars or where they remove the

21  paint.

22  Q   Okay.  And was that referred to as -- what was the name

23  used to refer to that area?

24  A   Paint shop or glass shop.

25  Q   Okay.  And, Mr. Martinez, I want you to point out where

1  that area is, and I'll go ahead and write that for you so --

2  and I'll go ahead and write paint on that.

3      JUDGE LAWS:  Okay.  And just wait until she's finished

4  interpreting for instance.

5      THE WITNESS:  Okay.

6  Q    BY MS. ALONSO:  Okay.  All right.  Mister --

7      JUDGE LAWS:  And while we're at it, are there any other

8  shops that are going to be identified because I don't want to

9  keep readmitting this exhibit in different forms if we can just

10 get it all done?  That makes more sense.

11      MS. ALONSO:  There are, Judge.

12      JUDGE LAWS:  Why don't we go ahead and do that?

13      MS. ALONSO:  Okay.

14 Q    BY MS. ALONSO:  Okay.  All right.  And, Mr. Martinez, can

15 you identify on the exhibit -- well, let me --

16      JUDGE LAWS:  Do we even need this witness to do it or can

17 we just do it?  I figure there -- I can't imagine it's going to

18 be a controversial thing.

19      MR. MINER:  Can we go off the record for a sec, Judge?

20      JUDGE LAWS:  Yeah.  Why don't we do that?

21 (Off the record at 11:13 a.m.)

22      MS. ALONSO:  All right.  And --

23      JUDGE LAWS:  Hold on.  I'm going to speak first.

24      All right.  We have off the record identified additional

25 areas of this document, which is General Counsel 168, the

1    intermodal shop, sometimes referred to as Coney Island for

2    reasons that are not clear, has been marked.  The truck shop

3    and the wreck shop, I think there's some dispute as to what

4    exactly the wreck shop is, so if the Respondent wants to

5    introduce something to clarify that we can do that.  For now,

6    General Counsel 168 will reflect the annotations that were made

7    with regard to the shops that I mentioned.  And I'm not -- I

8    can't recall if I mentioned paint as well, but if I didn't, I

9    am now.

10   Q    BY MS. ALONSO:  And, Mr. Martinez, in the intermodule

11   (sic) shop, did you --

12        JUDGE LAWS:  Intermodal.

13   Q    BY MS. ALONSO:  Sorry, in the intermodal shop, what type

14   of cars -- did you ever work in the intermodal shop?

15   A    Yes.

16   Q    Okay.  And what type of cars were repaired in that area?

17   A    The long rail cars, which are the three packers and five

18   packers.

19   Q    And are those the cars that are in the image?

20   A    Yes.

21   Q    Now --

22        JUDGE LAWS:  Where in the image?

23        THE WITNESS:  Here.

24        JUDGE LAWS:  Okay.  So he's pointing to the cars above

25   where intermodal is written.

1    Q    BY MS. ALONSO:  Now, the truck shop, Mr. Martinez, did you

2    ever work in that area?

3    A    No.

4    Q    Okay.  And the wreck shop has been identified also?

5    A    Yes.

6    Q    All right.  And did you ever -- or what did you consider

7    to be the wreck shop?

8    A    They work on -- there's pickup trucks --

9         THE INTERPRETER:  I'm sorry, Your Honor, but this -- the

10   interpreter misunderstood this.  There is bolsters and sidecar

11   -- side --

12        MS. ALONSO:  Frames?

13        MR. MINER:  Frames.

14        THE INTERPRETER:  -- side frames that they work on there

15   with the pickup trucks.

16   Q    BY MS. ALONSO:  Okay.  So and let me clarify, Mr.

17   Martinez.  The bolsters and side frames were worked on in which

18   shop?

19   A    Truck shop.

20   Q    Okay.  Now, I want to point you to the area above the

21   truck shop.  Okay.  And that's identified as the wreck shop.

22   A    Yes.

23   Q    Okay.  What type of work was done in the wreck shop?

24   A    Crashed rail cars.

25   Q    And, Mr. Martinez, was there a lunchroom at the facility?

1   A   Yes.

2   Q   Okay.  And where was one of the lunchrooms?

3   A   One was outside of the truck shop.

4   Q   Now, can you identify it on the image by describing what

5   image is the lunchroom?

6   A   There.

7       JUDGE LAWS:  Well, that's to the right.

8   Q   BY MS. ALONSO:  And is that the white roof?

9   A   Yes.  And to a side of the truck shop ending right

10  immediately to the side.  It wasn't a room; it was just chairs.

11  Q   Was that out in the open?

12  A   Yes.

13  Q   Was there a cover over the tables?

14  A   Yes.

15  Q   And were there any other lunch areas?

16  A   Yes.

17  Q   Okay.  Where?

18  A   To one side off of the paint shop.

19  Q   Okay.  And is that in this image?

20  A   Yes.

21  Q   Which one is that?  Okay.

22      JUDGE LAWS:  That's the small little roof on the bottom

23  left-hand corner of the paint shop is where he pointed.

24  Q   BY MS. ALONSO:  And were there any other lunch areas?

25  A   To one side of the center shop.

1  Q    Okay.  And were those tables or was there a roof over

2  them?

3  A    It was a room.

4  Q    Okay.  And can you see that from this image or in the

5  image?

6  A    It's this one, this one.

7       JUDGE LAWS:  And it's the building that's a little

8  detached from the center shop toward the upper right-hand side

9  in the image, not the one caddy-corner but directly above it so

10 that if you drew a line straight up from the right edge of the

11 center shop it would be to the left of it.

12 Q    BY MS. ALONSO:  Was the paint shop -- or was the lunchroom

13 in the paint shop inside or outside?

14 A    Outside, it was another room.

15 Q    Was it open or did it have walls?

16 A    Walls.

17 Q    And was there any other lunch area?

18 A    Under the roof of the floor -- the front shop.

19 Q    And can we see that in this image?

20 A    It's under here.

21 Q    Okay.

22      JUDGE LAWS:  So he pointed just to the main shop

23 underneath the roof somewhere.

24      MS. ALONSO:  And --

25      JUDGE LAWS:  The main front shop I should say.

1    THE WITNESS:  There were just chairs.

2  Q    BY MS. ALONSO:  And was that out in the open?

3  A    Under a roof.

4  Q    Were there any walls around those tables?

5  A    No.  It was between the cars.

6  Q    Okay.  Now, the front shop, did it have walls covering --

7  are there walls underneath that roof?

8  A    No.

9  Q    Okay.  And I also want to ask you about the parking areas.

10  Where did the employees park?

11  A    Here, here and here.

12    JUDGE LAWS:  Okay.  So let's start with the first area.

13    THE WITNESS:  Here.

14    JUDGE LAWS:  So the first area he's identifying is in the

15  upper right-hand part of the property to the left of the

16  largest building in the picture.

17    MR. GIANNOPOULOS:  Your Honor, could we put a P on the

18  pictures maybe?

19    JUDGE LAWS:  Sure.  I thought we were going to take care

20  of all the --

21    MR. GIANNOPOULOS:  Yeah.

22    JUDGE LAWS:  -- markings we were going to do while we were

23  off the record, but we can go ahead and do that.  And any

24  others that you are going to have him identify let's please

25  mark now.

1  Q    BY MS. ALONSO:  So can you write a P in the parking areas?

2       JUDGE LAWS:  Are there any other areas you're going to ask

3  him to identify?  Okay.

4       Can you show those --

5       MR. GIANNOPOULOS:  Can we see one?

6       MR. MINER:  I'll show you these right here.

7       MR. GIANNOPOULOS:  Thank you.

8  (Counsel confer)

9  (Off the record at 11:27 a.m.)

10      JUDGE LAWS:  So additional annotations were made.  The

11 parties have indicated agreement that the markings on the

12 exhibit are generally accurate; is that correct?

13      MR. MINER:  Yes, Your Honor.

14      MS. ALONSO:  That's right, Your Honor.

15      JUDGE LAWS:  Okay.  Let's go ahead.

16 Q    BY MS. ALONSO:  All right.  Mr. Martinez, if you could set

17 that aside.  All right.  I'm going to show you a document

18 marked General Counsel's Exhibit 169.

19      MS. ALONSO:  And, Judge, I will need to make copies of it.

20      JUDGE LAWS:  Okay.  Just show counsel and them me.

21 Q    BY MS. ALONSO:  And, Mr. Martinez, so I'm showing you

22 General Counsel's 169.  Does -- did you sign this card?

23 A    Yes.

24 Q    Okay.  And is the date on the card the date that you

25 signed it?

1   A    Yes.

2   Q    Okay.  And what date is that?

3   A    October 24th, 2012.

4   Q    All right.  Did you contact the UFCW?

5   A    Yes.

6   Q    Okay.  Can you explain how it is that you contacted the

7   UFCW?

8   A    I called them on the phone.

9   Q    Who did you call?

10  A    To Efrain Sanchez.  Efrain Sanchez.

11  Q    Okay.  And what did you tell Efrain when you called him?

12  A    I told him that the employees wanted to organize once

13  again, that the problems had continued in the company, and if

14  he could help us once again.

15  Q    And what was his response?

16  A    He said that yes, he could help us, that he was going to

17  have a meeting to see us and to help us.

18  Q    Okay.  And did you meet with Efrain?

19  A    Yes.

20  Q    Okay.  And where did you meet with Efrain?

21  A    In a restaurant in Tucson.

22  Q    And who was present?

23  A    Guillermo Murguia and Arnaldo Suarez (phonetic).

24  Q    And Efrain was also there?

25  A    Yes.

1    Q    And what happened at this meeting?

2    A    We mentioned to him about the problems that we had at the

3    company, the problems that had occurred with the previous

4    union.  We asked him if he could support us, and he said yes.

5    Q    Okay.  And when you refer to the previous union, is that

6    UTU?

7    A    Yes.

8    Q    And did you pass out cards for UFCW?

9    A    Yes.

10        THE INTERPRETER:  Your Honor, this is the interpreter.

11   May we go briefly off the record?

12        JUDGE LAWS:  Sure.

13        THE INTERPRETER:  Okay.

14   (Off the record at 11:34 a.m.)

15   Q    BY MS. ALONSO:  All right.  Mr. Martinez, before you met

16   with Efrain, were you approached by your coworkers about the

17   union?

18        MR. MINER:  Objection, Your Honor.  Would you --

19        MS. ALONSO:  I can --

20        JUDGE LAWS:  Why don't we clarify?

21        MS. ALONSO:  I can rephrase the question.

22        JUDGE LAWS:  Okay.

23   Q    BY MS. ALONSO:  So in 2012, before you met with Efrain,

24   did you discuss the need to unionize with your coworkers?

25   A    Yes.

1  Q    Okay.  And what was discussed?

2  A    Problems concerning safety and concerning that were

3  continuing were discussed --

4  Q    Okay.  And --

5  A    -- as wages.

6  Q    Okay.  What -- can you give me some examples of what was

7  said about safety?

8        MR. MINER:  Objection, Your Honor.  Can we have a

9  foundation for some of these discussions?

10       JUDGE LAWS:  Sustained.  Let's --

11       MS. ALONSO:  Okay.

12  Q    BY MS. ALONSO:  So when --

13       JUDGE LAWS:  Hang on.  I first want you to know that you

14  don't need to disclose any names of union members involved in

15  these discussions, just identify them as a employee.

16       THE WITNESS:  Okay.

17  Q    BY MS. ALONSO:  Now, when did you begin to have these

18  conversations about the need to organize with your coworkers?

19  A    In September of 2012.

20  Q    And where would you have the conversation?

21  A    During work, outside of work and at the lunchrooms.

22  Q    Okay.  And how often did you have these conversations?

23  Were they daily or weekly?

24  A    Daily.

25  Q    Okay.  And what types of concerns did you discuss?

1   A    Well, like I mentioned, the problems concerning insurance,

2   safety, problems concerning hygiene and, well, that's all.

3   Q    Okay.  And what specifically was -- what were the concerns

4   regarding safety?

5   A    There were problems with the hydraulics systems for

6   forklifts, with the cranes.  There were people that were

7   working on top of the wagons without harnesses.

8   Q    Okay.

9   A    And the work tools for -- the equipment for work were in

10  bad conditions.

11  Q    And did you eventually collect cards for the UFCW?

12  A    Yes.

13  Q    Okay.  And when you say wagon, do you mean a railcar?

14  A    Yes.

15  Q    And when did you begin to collect cards for UFCW in

16  relation to the day that you signed your card for the UFCW?

17  A    A day later.

18  Q    And where did you collect the cards?

19  A    At work --

20  Q    Okay.  And what --

21  A    -- outside of work and during lunchtime.

22  Q    All right.  And which areas of the Tucson facility did you

23  collect the cards?

24  A    In the intermodal shop and in the wreck shop.

25  Q    And for what period of time did you collect the cards for

1   UFCW?

2   A    After the 24th of October.

3   Q    But what was it, for a couple days, a couple weeks?

4   A    It was like those days, less than three days later.

5   Q    Do you know if anyone else helped with passing cards for

6   UFCW?

7   A    Yes.

8   Q    Okay.  And who were they?

9   A    Guillermo Murguia, Omar Ramos, Rogelio Martinez and me.

10  Q    Now, in the days that you were passing out UFCW cards did

11  Martin Torrez say anything to you about a union?

12  A    Yes.

13  Q    And who is Martin Torrez?

14  A    At that time he was in charge of the front shop.

15  Q    And what was his title then?

16  A    At that time, he was a QC but at that time he was a

17  foreman.

18  Q    Okay.  And where were you?

19  A    I had just arrived in the front area.

20  Q    All right.  And how did it come about that you had a

21  conversation -- that you had this conversation with Martin?

22  A    Because he came around -- it came about that I came by to

23  ask for work, and then he asked me hey, is it true that the

24  union was coming around again.  And I said I don't know, why.

25  Q    And did he respond?

1   A    And he responded that there were rumors to be heard --

2   that had been heard.

3   Q    And who else was present?

4   A    No one.

5   Q    Okay.  Mr. Martinez, it's been established in this case

6   that there was an election for the sheet metal workers.  Do you

7   know how it came about that the sheet metal workers became

8   involved with Greenbrier employees?

9   A    Yes.

10   Q    Okay.  Please explain.

11   A    When I spoke with Efrain Sanchez, he told me that he was

12   going to see if he could support us or if not he would put us

13   in contact with another union.  And the relationship was

14   because the sheet metal worker had more of a parallel -- wait,

15   no, they had more in combination with the kind of work that we

16   did.

17   Q    Okay.  Do you mean experience?

18   A    Well, that's what they told me.

19   Q    Okay.  All right.  Go on.

20   A    And then we had a meeting so that Efrain Sanchez

21   introduced us to the organizers for the sheet metal workers.

22   Q    Okay.  Did you tell anyone about the sheet metal workers?

23   A    The coworkers.

24   Q    Okay.  And what did you tell your coworkers?

25        MR. MINER:  Objection, Your Honor.  Could we have a

1   foundation for these discussions first?

2       JUDGE LAWS:  And that's sustained, kind of the same --

3       MS. ALONSO:  Okay.

4       JUDGE LAWS:  -- same ruling as before.

5       MS. ALONSO:  All right.

6   Q   BY MS. ALONSO:  When did you talk to your coworkers about

7   the sheet metal workers?

8   A   The beginning of November.

9   Q   And where did you have these discussions with your

10  coworkers about the sheet metal workers?

11  A   In the same -- in -- at work, outside of work and in the

12  lunch areas.

13  Q   And what did you tell your coworkers?

14  A   That there was another union that could represent us

15  better and we had to sign their cards so that we could go to an

16  election.

17  Q   Now, Mr. Martinez, I want to -- I want you to refer back

18  to General Counsel's Exhibit 169, which is the UFCW card that

19  you signed.  Okay.  And can you read the date aloud?

20  A   October 24th, 2012.

21  Q   Okay.  And with respect to the date that you signed the

22  card, when did you first meet with the sheet metal workers?

23  Was it a few days later or a week later?

24  A   It was like three days later.

25  Q   All right.  And did you attend a meeting with the sheet

1   metal workers?

2   A    Yes.

3        MS. ALONSO:  Your Honor, I -- and I'm just going to take a

4   moment, Your Honor, to mark a couple of exhibits.

5        MR. GIANNOPOULOS:  Could we go off the record, Your Honor,

6   for a second and we could pre-mark this -- at least the first

7   two or three and then I can do the rest?

8        JUDGE LAWS:  Sure.  Are they -- do you have copies of

9   those?

10       MS. ALONSO:  We do.

11       JUDGE LAWS:  Okay.  Were you going to move to admit this

12  one?

13       MS. ALONSO:  Yes, Your Honor.

14       JUDGE LAWS:  All right.  Why don't we take care of that

15  first?

16       MS. ALONSO:  Okay.

17       JUDGE LAWS:  Do you want to see it again?

18       MR. MINER:  Yes.  Please, Your Honor.  Thank you.  Thank

19  you.

20       JUDGE LAWS:  Look it over and just look up when you're

21  ready.  And you can go ahead and mark those while he's looking

22  over that exhibit.

23  (Counsel confer)

24       JUDGE LAWS:  Any objection?

25       MR. MINER:  May I have a few questions on voir dire, Your

1  Honor?

2        JUDGE LAWS:  Sure.

3        MR. MINER:  And may I approach since we only have one

4  copy?

5        JUDGE LAWS:  Yes.  Please do.

6        MR. MINER:  Thank you.

7        JUDGE LAWS:  And I'm going to look on as well.

8        JUDGE LAWS:  Thank you.

9                    **VOIR DIRE EXAMINATION**

10  Q    BY MR. MINER:  Mr. Martinez, where is your signature on

11  that document?

12  A    (No verbal response).

13  Q    Who is Emmanuel?

14  A    Mine, that's my second -- my middle name.

15  Q    That's your signature?

16  A    Yes.

17  Q    Is there anyone else's handwriting on that card?

18  A    No.

19  Q    Who did you provide the card to?

20  A    To Efrain Sanchez.

21  Q    Did he initial it or write anything on the card when he

22  received it?

23  A    No.

24  Q    And what was the date when you provided him the card?

25  A    It was like -- it was the 10th -- the 25th.

1       MR. MINER:  No objection, Your Honor.

2       JUDGE LAWS:  Then 169 from General Counsel is admitted.

3   **(General Counsel Exhibit Number 169 Received into Evidence)**

4       MS. ALONSO:  And, Your Honor, are we off the record?

5   We're just --

6       JUDGE LAWS:  We are not.

7       MS. ALONSO:  Oh, okay.  All right.  Your Honor, I am going

8   to pass out what's been marked as General Counsel's Exhibit

9   170.  Oh, actually, before I get there, I have a couple other

10  questions.

11                  <u>**DIRECT EXAMINATION**</u> **(CONTINUED)**

12  Q    BY MS. ALONSO:  So, Mr. Martinez, did you -- so I just

13  asked you earlier if you attended a meeting with the sheet

14  metal workers.

15  A    Yes.

16  Q    And where was the meeting held?

17  A    At the sheet metal workers office.

18  Q    And who do you -- who was present?

19  A    On behalf of sheet metal workers was Marco Molina, Greg

20  Suydan --

21      MS. ALONSO:  And can the record indicate that Mr. Martinez

22  has pointed to Mr. Suydan, who is the union's representative.

23      JUDGE LAWS:  Yes.

24      THE CLERK:  What was that again?

25      THE WITNESS:  -- Pat Monroe Jeff.

1    MR. MINER:  And, Your Honor, can we have the record

2  reflect it would be Montroe.  He will be a witness letter.

3  Okay.

4    JUDGE LAWS:  And then there was one more I believe after

5  Jeff.

6    MR. GIANNOPOULOS:  Is that Jeff Montroe?

7    MR. MINER:  Pat.

8    MS. ALONSO:  Pat.

9    MR. GIANNOPOULOS:  Pat Montroe.  I'm sorry.  I thought he

10  said Monroe.  Montroe.

11    JUDGE LAWS:  Let's start over with the list because I

12  think we've got a sufficiently muddled record to do that.  So

13  let's name the individuals one more time.  And then after each

14  name, pause and we'll let the interpreter --

15    THE WITNESS:  Marco Molina, Greg, Pat, Jeff, and --

16    MS. ALONSO:  Dion.

17    THE WITNESS:  -- Dion.  And on behalf of the employees,

18  Guillermo Murguia, Rogelio Martinez, me, and there was an

19  employee by the name of Arnaldo Suarez, but he has already been

20  fired.

21  Q    BY MS. ALONSO:  Okay.  And was this the meeting that you

22  testified Efrain from UFCW had arranged?

23  A    Yes.

24  Q    Okay.  And was this your first meeting with the sheet

25  metal workers?

1    A    Yes.

2    Q    And did you sign a card at this meeting?

3    A    Yes.

4        MS. ALONSO:  Your Honor, I'm going to pass out what's been

5    marked as General Counsel's Exhibit 170.

6        JUDGE LAWS:  So now we're going to be using that exhibit

7    anymore?

8        MS. ALONSO:  Just references but not right now.

9        All right.  So the witness has the original.

10    Q    BY MS. ALONSO:  All right.  Mr. Martinez, I have handed

11    you General Counsel's Exhibit 170.  Is this the card that you

12    signed at the union meeting?

13    A    Yes.

14    Q    And this is the card that you just testified about?

15    A    Yes.

16        MS. ALONSO:  Your Honor, I move for the admission of

17    General Counsel's Exhibit 170.

18        JUDGE LAWS:  Any objection?

19        MR. MINER:  May I voir dire the witness please, Your

20    Honor?

21        JUDGE LAWS:  Yes.

22                    **VOIR DIRE EXAMINATION**

23    Q    BY MR. MINER:  Mr. Martinez, do you recognize all of the

24    handwriting on the card that's been marked General Counsel 170?

25    A    Yes.

```
 1   Q     Is all of the handwriting on the card that's marked as

 2   General Counsel 170 yours?

 3   A     Just the initials on the upper right-hand side are Greg's.

 4   Q     I see two sets of initials in the upper right-hand corner.

 5   Do you see those?

 6   A     Yes.

 7   Q     The first one appears to say J.M.  Do you see that?

 8   A     Yes.

 9   Q     Whose initials are those?

10   A     Mine.

11   Q     You wrote that?

12   A     Yes.

13   Q     And just above that it appears G.S. are the initials; is

14   that correct?

15   A     Yes.  Yes.

16   Q     And who wrote those initials?

17   A     Greg.

18   Q     Did he write his initials on the card at the time you

19   presented it to him?

20   A     Yes.

21   Q     You observed him personally write his initials on your

22   card?

23   A     Yes.

24         MS. ALONSO:  No objection to General Counsel 170.

25         JUDGE LAWS:  170 is admitted.
```

1  **(General Counsel Exhibit Number 170 Received into Evidence)**

2      MR. GIANNOPOULOS:  Your Honor, it's noon.

3      JUDGE LAWS:  It is.

4      MR. MINER:  How time flies when you're having fun.

5      MR. GIANNOPOULOS:  Can we break for lunch or do we want to

6  keep going?

7      JUDGE LAWS:  Well, I guess I was having a similar thought

8  and was going to ask if there was any realistic expectation of

9  getting done with direct with this witness prior to a

10  reasonable time for lunch.

11      MR. GIANNOPOULOS:  We have a host of cards.

12      MS. ALONSO:  Yes.

13      JUDGE LAWS:  So that would be a no.

14      MR. GIANNOPOULOS:  No.

15      JUDGE LAWS:  All right.  Why don't we take an hour now for

16  lunch and come back at 1:00?

17      MR. MINER:  Thank you, Your Honor.

18  (Off the record at 11:59 a.m.)

19                    **DIRECT EXAMINATION** (CONTINUED)

20  Q    BY MS. ALONSO:  All right.  Mr. Martinez, when we left off

21  I asked you some questions about a meeting with the union on

22  November 5th.

23  A    Yes.

24  Q    Okay.  And I want you to refer back to the card you signed

25  that's marked General Counsel's 170.  What did you believe or

1   what was your -- I'll rephrase.  What was your understanding of

2   having signed this card?

3   A    It's giving authorization to the union for them to

4   represent us in collective bargaining.

5   Q    And at that meeting on November 5th, did you see anyone

6   else sign a card?

7   A    Yes.

8   Q    Who?

9   A    Rogelio Martinez and Guillermo Murguia.

10  Q    Mr. Martinez, did you pass out cards for the sheet metal

11  workers?

12  A    Yes.

13  Q    Okay.  When did you pass out the cards?

14  A    A day after.

15  Q    And in what areas -- where did you pass out the cards?

16  A    In the intermodal shop, the wreck room and the lunchroom.

17  Q    Okay.

18       JUDGE LAWS:  The wreck shop I think he said.

19       THE WITNESS:  Wreck shop.  I'm sorry.

20  Q    BY MS. ALONSO:  Okay.  And that's at the Tucson

21  Greenbrier, correct?

22  A    Correct.

23  Q    Okay.  And when in the day did you pass out the cards?

24  A    Well, it was during break.  It was during work hours and

25  after work.

1  Q    And when you handed out the union cards, did you have a

2  practice of saying something to your coworkers?

3  A    Yes.

4  Q    What did you say?

5  A    To read it, that if they agreed to sign it, and it was in

6  order to have them have the representative in order to be able

7  to invoke an election.

8  Q    And did you say that to every person who you gave a card

9  to?

10  A    Yes.

11  Q    Okay.  I'm going to hand you a card that's marked General

12  Counsel's Exhibit 171.

13       MR. MINER:  Thank you.

14  Q    BY MS. ALONSO:  This card has the name Miguel Valdez.  Did

15  you give Miguel Valdez this card?

16  A    Yes.

17  Q    Okay.  Where were you?

18  A    In the lunchroom.

19  Q    And who was present when you gave Miguel Valdez this card?

20  A    I don't recall.

21  Q    Okay.  And did Mr. Valdez sign this card in your presence?

22  A    Yes.

23  Q    Now, in the -- there are initials on the top right-hand

24  corner.  There are some initials M.V.  Did you see who wrote

25  the M.V. on this card?

1   A    It was him.

2   Q    Okay.  And the date on the card is 06/11/12.  Did you give

3   the card to -- do you remember the date that you gave Mr.

4   Valdez this card?

5   A    Yes.  It was the 6th of November.

6   Q    Okay.

7   A    What I have to say is in Mexico, it's customary to use the

8   date format in a different format.  First we put down the date,

9   then the month, then the year.

10  Q    Okay.  All right.  And there are initials J.M. on the top

11  right-hand corner?

12  A    Yes.

13  Q    Are those your initials?

14  A    Correct.

15  Q    Okay.

16       MS. ALONSO:  Your Honor, I move for the admission of

17  General Counsel's 171.

18       MR. MINER:  No objection, Your Honor.

19       JUDGE LAWS:  171 is admitted.

20  **(General Counsel Exhibit Number 171 Received into Evidence)**

21  Q    BY MS. ALONSO:  All right.  I'm going to hand you what's

22  been marked as General Counsel's Exhibit 172.

23       MR. MINER:  Thank you.

24  Q    BY MS. ALONSO:  All right.  Mr. Martinez, this is a card

25  with the name Arturo A. Sanchez.  Did you give this card to

1    Arturo Sanchez?

2    A    Yes.

3    Q    Okay.  Where were you when you gave him the card?

4    A    Outside of the lunchroom.

5    Q    And did Mr. Sanchez fill out the card in your presence?

6    A    Yes.

7    Q    Okay.  Now, there are initials J.M. on the top right-hand

8    corner.  Are those your initials?

9        THE INTERPRETER:  Let me try that again.  Excuse me, it's

10   the interpreter.

11       THE WITNESS:  Correct.

12   Q    BY MS. ALONSO:  Okay.  And the date is 11/6/2012.  Is that

13   the date that you gave Mr. Sanchez the card?

14   A    Yes.

15   Q    Okay.

16       MS. ALONSO:  And, Your Honor, I move for the admission of

17   General Counsel's Exhibit 172.

18       MR. MINER:  No objection.

19       JUDGE LAWS:  70 -- 172 is admitted.

20   **(General Counsel Exhibit Number 172 Received into Evidence)**

21       MS. ALONSO:  And, Your Honor, I'm actually going to ask

22   Mr. Miner for a stipulation on a document that his signature

23   rests --

24       JUDGE LAWS:  Okay.

25       MS. ALONSO:  -- in the employee's personnel file, and I

1   just need a moment to find it.

2       JUDGE LAWS:  All right.  Go ahead.

3       MS. ALONSO:  All right, Your Honor.

4       JUDGE LAWS:  You ready?  Okay.  We're back on.

5       MS. ALONSO:  So I have 173 and ask if there's stipulation

6   that it's in the personnel file.

7       MR. MINER:  We so stipulate, Your Honor.

8       JUDGE LAWS:  You stipulate.

9       MS. ALONSO:  And, Your Honor, we move for the admission --

10  oh, one moment.

11      JUDGE LAWS:  And similar to the last go round, are these

12  being offered for the sole purpose of signature --

13      MS. ALONSO:  That' --

14      JUDGE LAWS:  -- identification and handwriting?

15      MS. ALONSO:  That's correct, Your Honor.

16      JUDGE LAWS:  Okay.  Then I will for that purpose admit

17  General Counsel 173 but not for any other purpose.

18  **(General Counsel Exhibit Number 173 Received into Evidence)**

19      MS. ALONSO:  I'm going to show Mr. Miner General Counsel's

20  174.

21  Q   BY MS. ALONSO:  All right.  Mr. Martinez, I am handing you

22  what's marked as General Counsel's Exhibit 174, and this is a

23  card with the name Eliseo Aguilar.

24  A   Yes.

25  Q   Did you give Mr. Aguilar this card?

```
 1   A    Yes.

 2   Q    Where did you give him this card?

 3   A    Outside of the lunchroom.

 4   Q    And there is a date of November 6th, 2012.  Is that the

 5   date that you gave Mr. Aguilar the card?

 6   A    Correct.

 7   Q    Okay.  And did he sign it in your presence?

 8   A    Yes.

 9   Q    Okay.  And there are initials in -- on the top right-hand

10   corner J.M.

11   A    Yes.  They're mine.

12        MS. ALONSO:  All right.  Your Honor, I move for the

13   admission of General Counsel's 174.

14        MR. MINER:  May I voir dire the witness, Your Honor?

15        JUDGE LAWS:  Yes.
```

16                    **<u>VOIR DIRE EXAMINATION</u>**

```
17   Q    BY MR. MINER:  Looking at General Counsel 174, this was

18   the card that Mr. Aguilar signed?

19   A    Yes.

20   Q    Signed it in your presence?

21   A    Yes.

22   Q    Apart from your initials in the upper right-hand corner,

23   did anyone else make any marks or write anything on that card?

24   A    Not initials, no.

25   Q    Other than your initials is all the handwriting on the
```

1   card Mr. Aguilar's?

2   A    Just the salary.  I wasn't in -- at that time.

3   Q    I'm sorry.  Which part?

4        JUDGE LAWS:  Where it says wage rate.

5   Q    BY MR. MINER:  Oh, you wrote down his wage rate?

6   A    Yes.

7   Q    Is any other part of the card in anybody's handwriting

8   other than Mr. Aguilar's?

9   A    No, sir.

10       MR. MINER:  No objection, Your Honor.

11       JUDGE LAWS:  174 is admitted.

12  **(General Counsel Exhibit Number 174 Received into Evidence)**

13       MS. ALONSO:  All right.  And I'm showing Mr. Miner a copy

14  of General Counsel's 175 for stipulation that it's the document

15  that was produced in Mr. Aguilar's personnel file.

16       MR. MINER:  We will so stipulate.

17       JUDGE LAWS:  Then 175 will be admitted for the same reason

18  articulated previously with regard to 173.

19  **(General Counsel Exhibit Number 175 Received into Evidence)**

20  Q    BY MS. ALONSO:  Okay.  Mr. Martinez, I'm going to hand you

21  what's been marked as General Counsel's 176.  All right.  This

22  is a card with the name Angel Amavizca.

23       THE INTERPRETER:  And, ma'am, can the interpreter get the

24  last name again?

25  Q    BY MS. ALONSO:  Amavizca.

1   A      Correct.

2   Q      Okay.  Did you give Mr. Amavizca this card?

3   A      Yes.

4   Q      Okay.  Where?

5   A      In the lunchroom.

6   Q      And there is a date of November 6, 2012.  Is that the date

7   that you gave Mr. Amavizca the card?

8   A      Correct.

9   Q      And did Mr. Amavizca sign the card or fill out the card in

10  your presence?

11  A      Correct.

12  Q      Okay.  Now, there are initials J.M. in the top right-hand

13  corner.

14         THE INTERPRETER:  Is that an M or N?  This is the

15  interpreter.

16         MS. ALONSO:  M, M as in moose.

17         THE INTERPRETER:  Thank you.

18         THE WITNESS:  Yes.  They're mine.

19         MS. ALONSO:  Your Honor, I move for the admission of

20  General Counsel's 176.

21         MR. MINER:  May I voir dire the witness, Your Honor?

22         JUDGE LAWS:  Yes.

23                    **VOIR DIRE EXAMINATION**

24  Q      BY MR. MINER:  Other than the initials in the upper right-

25  hand corner of General Counsel 176, is all the handwriting on

1    that card Mr. Amavizca's?

2    A    Yes, sir.

3    Q    You observed him write -- complete this card and sign his

4    name?

5    A    Yes.  Yes.  Yes.  Yes.

6    Q    Thank you.

7         MR. MINER:  No objection, Your Honor.

8         JUDGE LAWS:  176 is admitted.

9    **(General Counsel Exhibit Number 176 Received into Evidence)**

10        MS. ALONSO:  All right.  And I'm handing Mr. Miner a copy

11   of General Counsel's 177 for stipulation that it's a document

12   produced in Mr. Amavizca's personnel file.

13        MR. MINER:  Can we see the whole file?

14        MS. ALONSO:  Yeah, absolutely.

15        JUDGE LAWS:  Thank you.

16        MR. MINER:  No objection to General Counsel 177.

17        JUDGE LAWS:  Okay.  177 is admitted.

18   **(General Counsel Exhibit Number 177 Received into Evidence)**

19   Q    BY MS. ALONSO:  All right.  Mr. Martinez, I am handing you

20   General Counsel's Exhibit 178.

21   A    Is it 177 or 176?

22        THE INTERPRETER:  No, no.  It says 176 of this --

23        JUDGE LAWS:  Let's take this away.

24        MS. ALONSO:  I'm sorry.  And I correct myself.  I handed

25   the witness General Counsel's 178.

1   Q    BY MS. ALONSO:  All right.  And this is a card with the

2   name Jesus E. Martinez.  Did you give Mr. Martinez this card?

3   A    Yes.

4   Q    All right.  Where?

5   A    In the lunchroom.

6   Q    Okay.  And did you see Mr. Martinez fill it out in your

7   presence?

8   A    Yes.

9   Q    And there are -- I want to refer you to the top card in

10  Spanish.  There are initials J.E.M. in the top right-hand

11  corner.  Whose initials are those?

12  A    Jesus Martinez's.

13  Q    Did you see him fill -- did you see him write his

14  initials?

15  A    Yes.

16  Q    Okay.  And there is a date of November 6, 2012 on this

17  card.  Is this the date that you gave Mr. Martinez the card?

18  A    Correct.

19  Q    Now, on the English side of the card there are initials

20  J.M.

21  A    They're mine.

22  Q    Okay.  And the initials J.E.M., did you see who put those

23  there?

24  A    Jesus Martinez.

25       MS. ALONSO:  Your Honor, I move for the admission of

1    General Counsel's Exhibit 178.

2         MR. MINER:  May I voir dire the witness, Your Honor?

3         JUDGE LAWS:  Yes.

4                    **VOIR DIRE EXAMINATION**

5    Q    BY MR. MINER:  Other than the J.M. initials in the upper

6    right-hand corner on the English side of General Counsel 178,

7    is all the handwriting on both sides of that card Mr.

8    Martinez's handwriting?

9    A    Yes.

10   Q    And you observed him write out both sides of the card?

11   A    Yes.

12   Q    And sign his name on both sides?

13   A    Yes, sir.

14   Q    And the J.M. initials on the English side, those are

15   yours?

16   A    Correct.

17        MR. MINER:  No objection to 178.

18        JUDGE LAWS:  Okay.  178 is admitted.

19   **(General Counsel Exhibit Number 178 Received into Evidence)**

20        MS. ALONSO:  And I'm handing Mr. Miner a copy of General

21   Counsel's Exhibit 179 for stipulation that it's a document

22   produced in Mr. Martinez's personnel file.

23        MR. MINER:  No objection to 179, Your Honor.

24        JUDGE LAWS:  Thank you.  And 179 will be admitted.

25   **(General Counsel Exhibit Number 179 Received into Evidence)**

1    **DIRECT EXAMINATION** (CONTINUED)

2    Q    BY MS. ALONSO:  All right.  Mr. Martinez, I am going to

3    hand you what's been marked as General Counsel's 180.  All

4    right.  This is a card with the name Gabriel J. Ortiz on it.

5    A    Yes.

6    Q    Did you give Gabriel Ortiz this card?

7    A    Correct.

8    Q    Okay.  Where did you give Mr. Ortiz the card?

9    A    Outside of the lunchroom.

10   Q    And there is a date of November 6, 2012.  Is that the date

11   that you gave Mr. Ortiz the card?

12   A    Correct.

13   Q    And did Mr. Ortiz fill out the card in your presence?

14   A    Yes.

15   Q    Now, there are initials J.M. on the top right-hand corner

16   of the English side of the card.

17   A    They're mine.

18   Q    Okay.  Mr. Martinez, did you write anything else on this

19   card?

20   A    Yes.

21   Q    Okay.  Can you explain what that is?

22   A    It's in the part where it says Tucson.  Gabriel Ortiz's

23   pen stopped working so you couldn't see that area very clearly.

24   So I overwrote it with my pen.

25   Q    Okay.

1     MS. ALONSO:  And, Your Honor, I move for the admission of

2  General Counsel's 180.

3     MR. MINER:  May I, Your Honor?

4     JUDGE LAWS:  Yes.

5                  **VOIR DIRE EXAMINATION**

6  Q    BY MR. MINER:  Did you overwrite any other part of the

7  card with your own pen?

8  A    Just the ZIP code.

9  Q    The ZIP code.  How about the shift?

10 A    No, not the shift.  No.

11    MR. MINER:  No objection, Your Honor.

12    JUDGE LAWS:  180 is admitted.

13 **(General Counsel Exhibit Number 180 Received into Evidence)**

14    MS. ALONSO:  I'm handing Mr. Miner General Counsel's 181.

15 Per stipulation, it's a document from Mr. Ortiz's personnel

16 file.

17    MR. MINER:  No objection, Your Honor.

18    JUDGE LAWS:  And 181 will be admitted.  And again, these

19 are just to show similarity of signature handwriting.

20 **(General Counsel Exhibit Number 181 Received into Evidence)**

21    MS. ALONSO:  All right.  I'm passing out General Counsel's

22 182.

23              **DIRECT EXAMINATION** (CONTINUED)

24 Q    BY MS. ALONSO:  And, Mr. Martinez, this is a card with the

25 name Javier Garcia.

```
 1   A     Yes.

 2   Q     Did you give Mr. Garcia this cad?

 3   A     Yes.

 4   Q     Okay.  Where were you when you gave him the cards?

 5   A     In the back of the -- the back shop in the parking area.

 6   Q     Okay.

 7         THE INTERPRETER:  Rather, may the interpreter restate

 8   that?

 9         JUDGE LAWS:  Sure.

10         THE INTERPRETER:  It sounds awkward.  In back of the

11   parking area in the back shop.

12   Q     BY MS. ALONSO:  And this card is dated November 6th, 2012.

13   Is that the date that you gave Mr. Garcia the card?

14   A     Correct.

15   Q     And who was present when you gave Mr. Garcia the card?

16   A     Jorge Martinez.

17   Q     And did Mr. Garcia fill out the card in your presence?

18   A     Correct.

19   Q     Okay.  And there are initials J.M. on the top right-hand

20   corner.  Are those your initials?

21   A     They are mine.

22   Q     Okay.  Did you write anything else on this card?

23   A     No.

24   Q     Okay.

25         MS. ALONSO:  And, Your Honor, I move for the admission of
```

```
 1    General Counsel's 182.

 2         MR. MINER:  No objection.

 3         JUDGE LAWS:  182 is admitted.

 4    (General Counsel Exhibit Number 182 Received into Evidence)

 5         MS. ALONSO:  And, Your Honor, I'm going to take a moment

 6    just to find the personnel file.

 7         JUDGE LAWS:  All right.

 8         MS. ALONSO:  Your Honor, I'm having a hard time finding

 9    this one so I'll come back.  We'll just come back to this one.

10         JUDGE LAWS:  Okay.

11         MS. ALONSO:  So I'm handing Mr. Miner General Counsel's

12    183.

13         MR. MINER:  Thank you.

14    (Counsel confer)

15         MR. MINER:  No objection to General Counsel 183.

16         JUDGE LAWS:  183 is admitted.

17    (General Counsel Exhibit Number 183 Received into Evidence)

18         MS. ALONSO:  Okay.  I'm passing out General Counsel's 184.

19         MR. MINER:  Thank you.

20    Q    BY MS. ALONSO:  Mr. Martinez, this is a card with the name

21    Michael Robles.

22    A    Correct.

23    Q    And did you give Mr. Robles this card?

24    A    Yes.

25    Q    Where were you when you gave him the card?
```

```
 1   A     In the parking lot in the back part of the shop.

 2   Q     And was -- who was present when you gave him the card?

 3   A     I don't recall.

 4   Q     And did Mr. Robles fill out the card in your presence?

 5   A     Yes.

 6   Q     All right.  And the initials J.M., are those yours?

 7   A     Correct.

 8   Q     Did you write anything else on this card?

 9   A     No.

10         MS. ALONSO:  Your Honor, I move for the admission of

11   General Counsel's 184.

12         MR. MINER:  No objection.

13         JUDGE LAWS:  184 is admitted.

14   (General Counsel Exhibit Number 184 Received into Evidence)

15         MS. ALONSO:  And I'm showing to counsel General Counsel's

16   185.  We ask for the same stipulation.

17         MR. MINER:  No objection to General Counsel 185.

18         JUDGE LAWS:  185 is admitted.

19   (General Counsel Exhibit Number 185 Received into Evidence)

20   Q     BY MS. ALONSO:  All right.  Mr. Martinez, did you attend a

21   union meeting on November 8?

22   A     Yes.

23   Q     Okay.  What did you do before you went to the meeting?

24   A     We went to collect some cards which we were missing and

25   then we went to the sheet metal workers meeting.
```

```
 1   Q    I'm showing you what's been marked as General Counsel's

 2   188.

 3        MR. MINER:  188, aren't we up to 186?

 4        MS. ALONSO:  Yeah.  I have a couple pre-marked that I'll

 5   get back to.

 6        MR. MINER:  Okay.

 7   Q    BY MS. ALONSO:  All right.  Mr. Martinez, this is the card

 8   with the name -- with the last name Rabago.

 9   A    Correct.

10   Q    Did you collect this card from Mr. Rabago?

11   A    Yes.

12   Q    Okay.  Where were you when you collected this card?

13   A    Outside of a casino in a parking lot.

14   Q    Okay.  And who was present?

15   A    Guillermo Murguia.

16   Q    And did Mr. Rabago fill out this card in your presence?

17   A    Correct.

18   Q    And there are some initials in the top right-hand corner,

19   which are -- it looks like one is G.  Did you see who put those

20   there?

21   A    It was that person

22   Q    And the initials J.M., are those your initials?

23   A    Correct.

24   Q    What is the date that you collected the card from Mr.

25   Rabago?
```

1    A    8th of November 2012.

2         MS. ALONSO:  And, Your Honor, I move for the admission of

3    188.

4         MR. MINER:  May I voir dire the witness, Your Honor?

5         JUDGE LAWS:  Yes.

6                        **VOIR DIRE EXAMINATION**

7    Q    BY MR. MINER:  Are your initials on the English side of

8    this card?

9    A    Yes.

10   Q    Are Mr. Murguia's initials on the card?

11   A    No.

12   Q    Are Mr. Rabago's initials on the card?

13   A    Yes, sir.

14   Q    Other than your initials, did anyone else make any

15   markings or write anything on the card?

16   A    No.

17   Q    What's the date on the card?

18   A    The 16th of November 2012.

19   Q    I'm sorry.  Say that again.

20   A    November 16th, 2012.

21   Q    Is that the date Mr. Rabago signed the card?

22   A    No.

23   Q    Who wrote the date on the card?

24   A    He did.  I think he made a mistake.

25   Q    Why do you think he made a mistake?

1   A    Because when I picked it up it was on the -- when I

2   collected it, it was on the 8th of November of 2012.

3   Q    Did you observe him sign the card and complete it?

4   A    Yes, sir.

5   Q    You saw him date the card?

6   A    No.  No.  I mean, I saw them fill it out but I don't know.

7   I mean, I was -- I would say that was his mistake.

8   Q    But my question, again, is did you see him, did you

9   observe him write the date on the card?

10  A    Yes, sir.

11  Q    And he wrote it out and signed it in pencil, correct?

12  A    Yes.

13  Q    Any reason he didn't correct the date?

14  A    I don't know.

15       MR. MINER:  Sorry, Your Honor.

16       JUDGE LAWS:  Go ahead.

17       MR. MINER:  No objection to General Counsel 188.

18       JUDGE LAWS:  All right.  I actually want to see the

19  original --

20       MS. ALONSO:  Yeah.

21       JUDGE LAWS:  -- of that if I could.

22       MR. GIANNOPOULOS:  And, Your Honor, we would ask that you

23  take administrative notice of the date stamp, timestamp on the

24  back of the card, which corresponds with all of the other cards

25  that have been introduced in this hearing.

 JUDGE LAWS: I do and that appears on the reproduction as well as the original. The reason I wanted to take a look at the original is, and I'll pass it around for everybody to voice their own observations if desired, it looks to me and it's just as clear on the reproduction as if there used to be something dash number 6 dash and then something ending in a 2. So I just want to note my observation that it looks as if something was perhaps intended to be erased and the 11/16/12 is written over it.

MS. ALONSO: Yes, Your Honor. We would agree.

JUDGE LAWS: I looked it up. That's fine.

MR. GIANNOPOULOS: And, Your Honor, again, it's the General Counsel with the time of the date and timestamp on the back of that card is November 14th, 2012, which is the same as all of the other cards that are in the record.

JUDGE LAWS: And I can't tell that from my reproduction.

MR. GIANNOPOULOS: After looking at the original.

JUDGE LAWS: Can I see that again? Thank you.

MS. ALONSO: And, Your Honor, that does correspond with some of the other -- all of the other cards.

JUDGE LAWS: All right. And I understand that's the General Counsel's contention. I'm not sure it's crystal clear from the reproduction or the original, but the document will say what it says.

MS. ALONSO: And if I have not -- okay.

1   JUDGE LAWS:  Sorry.  I will say it is clear the first

2   number after the month of November is a 1.  What isn't is as

3   apparent because it seems to be running into words that are

4   preprinted on the card, the date stamp is running into words

5   that are preprinted on the card, is the second number.  The

6   first number is clear.

7       MS. ALONSO:  Your Honor, and if I have not done so already

8   I will move for the admission of General Counsel's 188.

9       JUDGE LAWS:  I think you did.

10      MS. ALONSO:  Okay.

11      MR. MINER:  Yeah.  No objection with that limitation.

12      JUDGE LAWS:  188 is admitted.

13  **(General Counsel Exhibit Number 188 Received into Evidence)**

14      MS. ALONSO:  And I'm handing Mr. Miner a copy of General

15  Counsel's 189.  It's a document from Mr. Gamaliel Rabago's

16  personnel file.

17      MR. MINER:  No objection to General Counsel 189.

18      JUDGE LAWS:  That's admitted.

19  **(General Counsel Exhibit Number 189 Received into Evidence)**

20              <u>**DIRECT EXAMINATION**</u> **(CONTINUED)**

21  Q    BY MS. ALONSO:  All right.  And, Mr. Martinez, did Mr.

22  Rabago give you any other cards?

23  A    Yes.

24  Q    Okay.  Whose cards did he give you?  What cards did he

25  give you?

```
 1   A    He gave me two more.  One was from a Martine Martin

 2   Morales and the other one was from Brian Scaggs.

 3   Q    I'm going to hand you what's been marked as General

 4   Counsel's 190.

 5        MS. ALONSO:  And I'm also showing to Mr. Miner General

 6   Counsel's 191.  And we ask for a stipulation from Respondent

 7   that this is a document produced in Mr. Martin Morales'

 8   personnel file.

 9        MR. MINER:  No objection.

10        JUDGE LAWS:  And 191 is admitted.

11   (General Counsel Exhibit Number 191 Received into Evidence)

12   Q    BY MS. ALONSO:  Okay.  Mr. Martinez, is General Counsel's

13   190 the card that Mr. Rabago gave you?

14   A    Yes.

15   Q    And were the initials G.M. on the card when he gave them

16   to you?

17   A    Correct.

18   Q    And the initials J.M., are those yours?

19        THE INTERPRETER:  I'm sorry.  The interpreter

20   misinterpreted.  Just for the record, the first time was G.M.

21   and then the second time I heard J.M.

22        JUDGE LAWS:  J.

23        MS. ALONSO:  J.M. is right.

24        THE INTERPRETER:  Okay.

25        THE WITNESS:  Correct.
```

1  Q    BY MS. ALONSO:  Okay.  Did you write anything else on this

2  card?

3  A    No.

4  Q    Okay.

5       MS. ALONSO:  Your Honor, I'd move for the admission of

6  General Counsel's 190.

7       MR. MINER:  May I voir dire the witness, Your Honor?

8       JUDGE LAWS:  Yes.

9                    **VOIR DIRE EXAMINATION**

10  Q    BY MR. MINER:  Did you observe Mr. Morales sign and

11  complete this card?

12  A    No.

13       MR. MINER:  Objection.  Lack of foundation.

14       MS. ALONSO:  And, Your Honor, it's our position that there

15  are various ways to authenticate a signature on a card, and

16  that is what we have done here.  We have presented a document

17  from Mr. Morales' personnel file along with the card that was

18  purported to be signed by him.

19       JUDGE LAWS:  And I will admit it as having been received

20  by this witness signed by Mr. Morales.  You know, obviously, he

21  hasn't established who wrote the rest of it.

22  **(General Counsel Exhibit Number 190 Received into Evidence)**

23       MR. MINER:  Well, it apparently could have been signed by

24  anyone, Your Honor, using Mr. Morales' name.  That's our

25  concern.

1    JUDGE LAWS:  Okay.

2    MS. ALONSO:  And, Your Honor, we have presented you with a

3  signature comparator from Mr. Morales' personnel file.

4    JUDGE LAWS:  And, you know, I think this is similar to my

5  ruling with regard to the tapes.  I think Respondent is

6  certainly free to call into question the authenticity of this

7  or any document through evidence.  However, it has been

8  established that this witness received this document from its

9  purported author.  Who filled it out and when has not with

10  regard to the pieces other than the signature.

11    THE INTERPRETER:  Your Honor, the witness is asking for a

12  translation of what your -- okay, so --

13    JUDGE LAWS:  Go ahead and tell him.  Do you need me to

14  repeat it?

15    THE INTERPRETER:  Yes.  Would you please?

16    JUDGE LAWS:  Okay.  I am admitting the document as having

17  been received by you with Mr. Morales' signature on it.

18    THE WITNESS:  Okay.

19    MR. GIANNOPOULOS:  Could we have one second, Your Honor?

20  I'm sorry.

21    JUDGE LAWS:  Sure.

22    MS. ALONSO:  All right.  Your Honor, I'm going to pass out

23  what's marked as General Counsel's -- just a moment, Your

24  Honor.  So and, Your Honor, we're asking for a stipulation from

25  counsel as to another document from Mr. Morales' personnel

1   file.  This marked as General Counsel's 198.

2       MR. MINER:  No objection to General Counsel 198.

3       JUDGE LAWS:  198 is admitted.

4   **(General Counsel Exhibit Number 198 Received into Evidence)**

5       MS. ALONSO:  All right.  I'm now going to hand out General

6   Counsel's 192.

7       And I'm also handing Mr. Miner General Counsel's 193, a

8   document that was produced in Mr. Scaggs' personnel file.

9       MR. MINER:  Thank you.

10      No objection to 193.

11      JUDGE LAWS:  193 is admitted.

12  **(General Counsel Exhibit Number 193 Received into Evidence)**

13  Q   BY MS. ALONSO:  Mr. Martinez, I'm handing you General

14  Counsel 192 with the name Brian Scaggs on it.

15  A   Correct.

16  Q   Is this the other card that you received from Mr. Rabago?

17  A   Yes.

18  Q   Okay.  And when you received the card, was all of the

19  writing on it?

20  A   Yes.

21  Q   Okay.  Did you write anything on the card except -- other

22  than your initials?

23  A   No.

24      MS. ALONSO:  Okay.  I move for the admission of General

25  Counsel's 192.

1    MR. MINER:  May I voir dire the witness, Your Honor?

2    JUDGE LAWS:  Yes.

3    MR. MINER:  Are you familiar with Brian Scaggs?

4    THE WITNESS:  Yes.

5    MS. ALONSO:  Objection.  I believe that goes beyond the

6    scope of voir dire.

7    JUDGE LAWS:  Is it getting to something that's actually

8    written?  Okay.  Go ahead.

9    MR. MINER:  Are you familiar with his handwriting?

10    THE WITNESS:  No.

11    MR. MINER:  You don't know what his signature looks like?

12    THE WITNESS:  No, sir.

13    MR. MINER:  Your Honor, there's really no foundation for

14    this card.

15    MS. ALONSO:  And, Your Honor, the General Counsel takes

16    the same position that the foundation has been established, and

17    we have offered not only 193, but also General Counsel's 129

18    which has been admitted already.  And 129, I can show you in

19    how it's -- party to -- respond.

20    JUDGE LAWS:  Thank you.  You did receive this from Mr.

21    Scaggs?

22    THE WITNESS:  Yes.  No, from Mr. Gamaliel.

23    JUDGE LAWS:  Can you establish a little more foundation --

24    MS. ALONSO:  Sure.

25    JUDGE LAWS:  -- about the circumstances under which you

1    received this?

2         MS. ALONSO:  Sure.

3         JUDGE LAWS:  Thank you.

4    Q    BY MS. ALONSO:  So, Mr. Martinez, who gave you the card

5    with Brian Scaggs' name on it?

6    A    Gamaliel Rabago.

7    Q    Okay.  And if this is -- did Mr. -- or did Mr. Gamaliel

8    give you this card at the same time that he also gave you his

9    card?

10   A    Correct.

11   Q    Okay.  And what other card was given to you at the same

12   time?

13   A    Martin Morales'.

14        JUDGE LAWS:  And did you give the card to the union?

15        THE WITNESS:  Yes.

16        JUDGE LAWS:  Okay.  I'm going to rely then on <u>in re La</u>

17   <u>Marquis Hotel LLC</u>, 340 NLRB 485, essentially saying that it's

18   not essential if a General Counsel established a chain of

19   custody of cards that might be necessary in a criminal case

20   absent any evidence of tampering.  The inquiry ends when the

21   union receives the cards.  That case, for that proposition,

22   cites to the Rowland Company Incorporated, 210 NLRB 95, and

23   Altron EX 175 NLRB 644.  So again, you know certainly I will

24   leave the door open for the Respondent to rebut the

25   authenticity of the document.

1   Q     BY MS. ALONSO:  And, Your Honor, I have a lot of documents

2   floating around here.  Did I -- did you -- General Counsel 193?

3         JUDGE LAWS:  Yes.

4         MS. ALONSO:  Yeah.  Okay.  And that's been admitted?

5         JUDGE LAWS:  It has.

6         MS. ALONSO:  Okay.

7   Q     BY MS. ALONSO:  Mr. Martinez, did you collect cards from

8   anybody else on November 8th?

9   A     Yes.

10  Q     Who else?

11  A     The one from Ricardo Castro and Carlos Ortiz.

12  Q     Okay.

13        MS. ALONSO:  I am passing out General Counsel's 194.

14  Q     BY MS. ALONSO:  All right.  Mr. Martinez, this is a card

15  with the name Ricardo Castro.

16  A     Correct.

17  Q     Where did you collect this card from Mr. Castro?

18  A     From Ricardo's house.

19  Q     And who was present?

20  A     Guillermo Murguia.

21  Q     Okay.  And did you -- did Mr. Castro fill out this card in

22  your presence?

23  A     Correct.

24  Q     Okay.  And there's some initials in the right-hand corner.

25  Did you see who wrote those initials?

```
 1   A    Yes.

 2   Q    Okay.  Let's start with GM.  Who wrote those initials?

 3   A    Guillermo Murguia.

 4   Q    Okay.  And the initials JM, are those yours?

 5   A    Correct.

 6        MS. ALONSO:  Okay.  And, Your Honor, I move for the

 7   admission of General Counsel's 194.

 8        MR. MINER:  No objection.

 9        JUDGE LAWS:  194 is admitted.

10        MS. ALONSO:  Okay.

11   (General Counsel Exhibit Number 194 Received into Evidence)

12        MS. ALONSO:  And I'm handing out General Counsel's 195, a

13   document from Mr. Castro's personnel file received pursuant to

14   stipulation.

15        MR. MINER:  No objection to General Counsel 195.

16        JUDGE LAWS:  It's admitted.

17   (General Counsel Exhibit Number 195 Received into Evidence)

18   Q    BY MS. ALONSO:  All right.  And, Mr. Martinez, what other

19   card -- well, just a moment.

20        MS. ALONSO:  I'm handing out what's been marked as General

21   Counsel's 196.

22   Q    BY MS. ALONSO:  I think Mr. Murguia's has the name of

23   Carlos Ortiz on it.

24   A    Correct.

25   Q    Okay.  Did you collect this card from Carlos Ortiz?
```

1    A    Yes.

2    Q    Okay.  And was this the same day that you collected the

3    card from Ricardo Castro?

4    A    Yes.

5    Q    Okay.  And where did you collect this card?

6    A    At Gabriel Ortiz' house.

7    Q    Okay.  And who was present?

8    A    Guillermo Murguia and Gabriel Ortiz.

9    Q    Okay.  And did Mr. Ortiz sign this card in your presence?

10   A    Correct.

11   Q    Okay.  And are your initials on this card -- are your

12   initials, J.M., and on the top right-hand corner of the card?

13   A    Yes.

14        MS. ALONSO:  Your Honor, I move for the admission of

15   General Counsel's 196.

16        MR. MINER:  No objection.

17        JUDGE LAWS:  196 is admitted.

18   **(General Counsel Exhibit Number 196 Received into Evidence)**

19        MS. ALONSO:  And I'm showing to counsel, General Counsel's

20   197, the same stipulation.

21        MR. MINER:  No objection to General Counsel 197.

22        JUDGE LAWS:  197's admitted.

23   **(General Counsel Exhibit Number 197 Received into Evidence)**

24        THE INTERPRETER:  Your Honor, this is the interpreter.

25   Would it be possible to get a break?

1    JUDGE LAWS:  Sure.  Let's come back a little before 2:30.

2    THE INTERPRETER:  Thank you, Your Honor.

3    JUDGE LAWS:  Be ready to go at 2:30.

4  (Off the record at 2:17 p.m.)

5  Q    BY MS. ALONSO:  All right.  Mr. Martinez, I'm going to

6  hand you what's marked as General Counsel's 168.  This is a

7  card with the name Eddie Duarte --

8    MR. MINER:  Is that 168?

9    MR. GIANNOPOULOS:  186.

10    MS. ALONSO:  I'm -- yes, it's 186.

11    MR. MINER:  Ah.

12  Q    BY MS. ALONSO:  And there's a date of November 6, 2012 on

13  the card.  Did you give Mr. Duarte this card on November 6th?

14  A    Yes.

15  Q    Where?

16  A    It was outside of the work -- I mean it's over there,

17  outside of the lunch room.

18  Q    Okay.  And what area of the shop was that?

19  A    In the Intermodal.

20  Q    And your -- there are initials JM on the top, right-hand

21  corner.  Are those initials?

22  A    Correct.

23  Q    Okay.  And did Mr. Duarte fill this card out in your

24  presence?

25  A    Yes.

1   Q   Okay.  Did you write anything else on this card?

2   A   No.

3        MS. ALONSO:  And, Your Honor, I move for the admission of

4   General Counsel's 186.

5        MR. MINER:  No objection.

6        JUDGE LAWS:  186 is admitted.

7   **(General Counsel Exhibit Number 186 Received into Evidence)**

8        MS. ALONSO:  I'm also going to pass out General Counsel's

9   187.  It's a document from Mr. Duarte's personnel file.

10       MR. MINER:  No objection to General Counsel 187.

11       JUDGE LAWS:  That's admitted.

12  **(General Counsel Exhibit Number 187 Received into Evidence)**

13  Q   BY MS. ALONSO:  All right.  Mr. Martinez, what did you do

14  with the cards after you all of them?

15  A   We gathered all of the cards in total and we took it down

16  to sheet metal workers.

17  Q   Okay.  And was that the date that you collected the cards

18  from Mr. Gonoyell (phonetic)?

19  A   Yes.

20  Q   Okay.  And who was present at the union office when you

21  turned in the cards?

22  A   Guillermo Murguia and Rogelio Martinez.

23  Q   Okay.  And who was present from the union?

24  A   Marco Molina, Greg, Pat and Jeff.

25  Q   Okay.  Now, Mr. Martinez, were you one of the employees --

1  I'll rephrase.  Mr. Martinez, earlier you told us you were one

2  of the employees laid off in November 2012.

3  A    Correct.

4  Q    Was there a meeting the day you were laid off?

5  A    Yes.

6  Q    How did you find out there was going to be a meeting?

7  A    Ricky Fonseca told me after work.

8  Q    Okay.  And what did Ricky Fonseca say?

9  A    That after my shift was after to go and show up at the

10  uniform trailer after work --

11  Q    Okay.  And did you --

12  A    -- for a meeting.

13  Q    Did you attend the meeting?

14  A    Yes.

15  Q    And did you record the meeting?

16  A    Yes.

17  Q    What kind of recording machine did you use to record the

18  meeting?

19  A    A pen that tapes audio and video.

20  Q    And were you familiar with the operation of that -- of

21  that device?

22  A    I used it before.  I used it.

23  Q    Okay.  So you did run some type of a test before you used

24  -- before you used it?

25  A    I taped some things at my house, and then I checked to see

1    if it had taped okay and it had taped fine.

2    Q    Okay.  Can you walk us through how you ran that test to

3    play back what you recorded?

4    A    The pen has some indicators.  There's some lights, red and

5    green.  When it's green, it's on.

6    Q    When you mean on, do you mean recording?

7    A    No.  It's just turned on.

8    Q    Okay.

9    A    When it's taping, then it goes to red.

10   Q    Okay.  And how did you much -- when you ran your test, how

11   did you watch the video?

12   A    On my computer.

13   Q    Okay.  And how did you get the recording to your computer?

14   A    I transferred it via a USB cable to the computer.  From

15   the pen to the computer, and then I reproduced it on the

16   computer.

17   Q    Okay.  And on November 12th, did you have this device with

18   you?

19   A    Yes.

20   Q    And where did you have the device?  Was it on your person?

21   A    It was in my pocket in my shirt pocket --

22        THE INTERPRETER:  I'm sorry.  If the Interpreter may

23   double check?

24        THE WITNESS:  It was on my -- it was like on my uniform

25   shirt pocket.

1  Q    BY MS. ALONSO:   Okay.   When did you turn on the device?

2  A    Before I went to the meeting.

3  Q    Okay.  Do you know -- can you estimate about how much time

4  before?

5  A    Approximately like five minutes before.

6  Q    All right.  And did you see a light turn on?

7  A    Correct.

8  Q    Okay.  What color was it when you started the recorder?

9  A    Red.

10  Q    And did you attend the entire meeting?

11  A    Yes.

12  Q    At any point in the meeting, did you  turn off the

13  recording device?

14  A    No.

15  Q    Okay.  And when did you turn off the recording device?

16  A    When I left the meeting.

17  Q    Okay.  And did you ever watch this video?

18  A    Yes.

19  Q    Okay.  When?

20  A    That same day.

21  Q    Okay.  And did you watch the entire video?

22  A    Yes.

23  Q    Okay.  And was the recording true -- was it a true and

24  accurate recording of the meeting that you attended on November

25  12th?

1    A    Yes.

2        MS. ALONSO:  Okay.  And, Your Honor, can we take a moment

3    off the record?  We're going to -- we need to get this set up

4    so that I can play the video.

5        MR. MINER:  Your Honor, we -- we will -- are we off the

6    record?

7        JUDGE LAWS:  We're not yet.

8        MR. MINER:  Okay.

9        JUDGE LAWS:  Do you want to be?

10       MR. MINER:  Yes.

11       JUDGE LAWS:  Okay.  Let's go off the record.

12   (Off the record at 2:39 p.m.)

13   Q    BY MS. ALONSO:  All right.  Mr. Martinez, I'm going to

14   play a CD that's marked General Counsel's 199.  And I'm

15   starting from the very beginning.

16       All right.  Mr. Martinez, as I stopped the video at 37

17   seconds, is this the video of when you turned on the device?

18   A    Yes.

19   Q    Okay.  And where are you in this area?  Where in the shop

20   are you in this image?

21   A    At the entrance of the paint shop.

22   Q    And I'm going to continue playing.  And I've stopped the

23   recording at 1:44, and we just hear a voice.  Did you recognize

24   that voice?

25   A    Yes.

1  Q    Whose voice was that?

2  A    It's me.

3       JUDGE LAWS:  And for efficiency's sake so we don't have to

4  go back and play this from the beginning when it comes time for

5  cross, do you want any of that translated at this point?

6       MR. MINER:  Yes, Your Honor.

7       JUDGE LAWS:  Okay.

8       MS. ALONSO:  Thank you.

9       JUDGE LAWS:  Why don't we go back --

10      MS. ALONSO:  Okay.

11      JUDGE LAWS:  -- and do that.  I just think it makes more

12  sense than playing it twice, as entertaining as it may be. I

13      MS. ALONSO:  I can start it right from the beginning.

14      JUDGE LAWS:  Where his voice starts.

15      MS. ALONSO:  What was it like?

16      JUDGE LAWS:  It was a little ways in.

17      MS. ALONSO:  Okay.  Forty --

18      THE INTERPRETER:  And I'm just -- this is the Interpreter,

19  Your Honor.  I can only interpret as much as comment on the

20  quality?

21      JUDGE LAWS:  Absolutely.

22      THE INTERPRETER:  So I can only do as much as --

23      MR. MINER:  What you understand.

24      ELECTRONIC REPORTER:  And perhaps we could ask the

25  Interpreter to raise her hand for us to stop if she needs, if

1   she -- when she wants us to stop it if --

2        JUDGE LAWS:  That's a great idea.  For when you've heard

3   enough --

4        THE INTERPRETER:  Enough.

5        JUDGE LAWS:  -- say stop --

6        THE COURT REPORTER:  Yeah.

7        JUDGE LAWS:  -- just raise your --

8        THE INTERPRETER:   Okay.

9        JUDGE LAWS:  -- signal Ms. Alonso.

10       MS. ALONSO:  All right.  So we'll go ahead -- I'll go

11  ahead and rewind to about 30 --

12       JUDGE LAWS:  I think at 45 there had been no talk yet.

13  You'd established that this was him, and this was his

14  recording.  He started talking right after that.

15       MS. ALONSO:  All right.  So we'll start at 45.

16       THE WITNESS:  What a coincidence.  There was a meeting up

17  front, and now there's a meeting in the back now.

18       THE INTERPRETER:  You know there's a portion which I can't

19  decipher.  And then it says --

20       THE WITNESS:  You know what?  Guillermo should call me.

21       THE INTERPRETER:  And he says --

22       THE WITNESS:  There's a part over there.

23       THE INTERPRETER:  And then I can't understand what he's

24  saying.

25       THE WITNESS:  And they call me over to the office.

 1      MS. ALONSO:  All right.  And I'm going to continue playing

 2   the video from a minute and five seconds.

 3      THE WITNESS:  As to why he didn't want us -- as to why we

 4   -- he didn't want us to have union in.

 5   Q   BY MS. ALONSO:  And I actually want to ask the question --

 6   the witness some questions here.  So, Mr. Martinez, at one six

 7   -- a minute and thirteen seconds, I want you to explain this

 8   image that we're seeing as to where you are in the shot.  So

 9   let's go ahead and start with the left-hand side.

10   A   On the left-hand size is the plant manager's trailer, the

11   production manager, and the write ups.

12   Q   Okay.  And the trailer next to that in the middle, what's

13   in that trailer?

14   A   Human resources and safety.

15   Q   And the trailer over where there two cars or a truck and a

16   car parked.  There's a car and a truck parked in front.  What

17   is in the trailer?

18   A   The uniform trailer.  And they have a room there that they

19   used to put meetings.

20   Q   Okay.  And when you mentioned write ups, did you mean the

21   AAR write ups?

22      THE INTERPRETER:  For the record, the interpreter has no

23   idea what AAR is.

24      JUDGE LAWS:  That's fine.

25      THE INTERPRETER:  Okay.

1    THE WITNESS:  Yes.

2  Q    BY MS. ALONSO:  And I'm going to continue playing the

3  video at -- beginning at a minute and 13 seconds.

4    THE INTERPRETER:  And just for the record, the

5  interpreter's -- obviously the quality is not going to allow me

6  to.

7  Q    BY MS. ALONSO:  And the video is stopped at a minute and

8  33 seconds.  And I'll restart the video at a minute and 33

9  seconds.

10  A    Well, that's his problem.

11  Q    Okay.  So I've stopped the video at a minute and 52

12  seconds.

13    THE INTERPRETER:  Everything prior to -- the sounds are

14  just too muffled for me to, on the first pass, to even

15  understand what's going on.

16    JUDGE LAWS:  So --

17    THE INTERPRETER:  And this is the interpreter.

18    JUDGE LAWS:  Okay.  And everything -- you did translate

19  one part.  Can you repeat that was because it was be --

20    THE WITNESS:  That's his problem.

21    JUDGE LAWS:  -- it was done -- hold on -- it was done

22  while the tape was still being played.

23    THE WITNESS:  That's his problem.

24    JUDGE LAWS:  Thank you.

25    MS. ALONSO:  And I'm going to restart the video at one

1  minute and 52 seconds.  Okay.  The video has been stopped at

2  two minutes and 47 seconds.

3      THE INTERPRETER:  It said, "We don't work here."

4      And again prior to this, I simply I cannot decipher on a

5  first pass.

6      MS. ALONSO:  Okay.  And I'll restart playing the video at

7  two minutes and 47 seconds.  Okay.  The video's been stopped at

8  three minutes and 17 seconds.

9      THE WITNESS:  I have to leave here at 3:30 because I've

10  got other places to go to.

11      MS. ALONSO:  And I'll restart the video at three minutes

12  and 17 seconds.  Okay.  The video's been stopped at three

13  minutes and 25 seconds.

14      THE WITNESS:  Well, there's something and then inaudible.

15  They're not too -- like then I can't -- it's inaudible and the

16  union, right?

17      MS. ALONSO:  The video's restarting at three minutes and

18  25 seconds.  The video's been stopped at three minutes and 45

19  seconds.

20      THE WITNESS:   Okay.  Yeah.  And no, I've got one too.

21  Ah, look at my little pen.

22      MS. ALONSO:  The video is restarting at three minutes and

23  45 seconds.  I've stopped the video at four minutes and seven

24  seconds.

25      THE WITNESS:  It's outside.  Is it outside?  Well, yeah.

1    THE INTERPRETER:  And then it's inaudible.

2    THE WITNESS:  And we should ask -- and then it's inaudible

3  -- what we should do.

4    MS. ALONSO:  And then I'm restarting the video.

5    THE WITNESS:  And you?

6    MS. ALONSO:  Okay.  I've stopped the video at four minutes

7  and 23 seconds.

8    THE WITNESS:  And you?  Long here?  Just here -- see you

9  this weekend.

10    MS. ALONSO:  Thank you.  I'm restarting the video.  I

11  stopped the video at five minutes and 16 seconds.

12    JUDGE LAWS:  And before the Interpreter starts talking, I

13  just want to describe that what I saw was a group of men,

14  various men talking, hard if impossible to tell who's saying

15  what.

16    THE INTERPRETER:  And that's exactly what I was going to

17  say, so I cannot decipher with precision what is being said

18  because a lot of the voices, the multiple voices, and they're

19  -- the sounds are muffled.  And they're speaking very quickly,

20  multiple, low, and I don't know what voice belongs to whom.

21    MS. ALONSO:  And I'll go ahead and restart the video at

22  the same place, five minutes and 16 seconds.  Okay.  I've

23  stopped the video at five minutes and 55 seconds.

24    THE INTERPRETER:  It's just in English what I was --

25    JUDGE LAWS:  That's okay.  Just -- if it's in English, we

 1  can, you know, understand it presumably.

 2      MS. ALONSO:  And I'll restart the video at the same place.

 3  And I've stopped the video at six minutes and eight seconds.

 4      THE INTERPRETER:  It appears as those are references to

 5  time; it says something 35, but I can't begin to decipher.

 6      MS. ALONSO:  And the -- I'll start the -- restart the

 7  video at the same place.  And I've stopped the video at six

 8  minutes and 42 seconds.

 9      THE INTERPRETER:  Something about between now and

10  tomorrow, and then it's inaudible.  And he goes, "No, I'm not

11  going to sign anything, what?  No.  I'm not going to sign

12  anything.

13      MS. ALONSO:  I'll restart same place.  I've stopped the

14  video at six minutes and 46 seconds.

15      THE WITNESS:  Take this fucking lawsuit because that's

16  what they deserve.

17      MS. ALONSO:  And I will restart the video at the same

18  place.  I've stopped the video at six minutes and 42 [sic]

19  seconds.

20      THE WITNESS:  For having treated me like a dog, that's

21  kind of what they deserve for having taken that off against me.

22      MS. ALONSO:  And I'll restart the video at the same place,

23  six minutes and 52 seconds.  I've stopped the video at seven

24  minutes and 29 seconds.

25      THE WITNESS:  Well, you're the bold ones.  Well, and then

1   it's ineligible (sic).  No, don't worry about it.  You'll see

2   -- they'll see our side of it.

3        JUDGE LAWS:  I'm going to ask a question of the witness.

4   Were you able to tell who was speaking in these last two

5   passages that the Interpreter has interpreted?

6        THE WITNESS:  Yes.

7        JUDGE LAWS:  And who -- why don't we break it down one by

8   one, the part about the lawsuit and being treated like dogs.

9   Who said that?

10       THE WITNESS:  That's Martin Valdez.

11       JUDGE LAWS:  And then the voice in the more recent passage

12   that she transcribed, who was that?

13       THE WITNESS:  That's him, Martin Valdez.

14       JUDGE LAWS:  Thank you.

15       MS. ALONSO:  And I'll restart the video at seven minutes

16   and 29 seconds.  I stopped the video at seven minutes and 43

17   seconds.

18       THE INTERPRETER:  Inaudible.  And then --

19       THE WITNESS:  No, it's way too early.

20       MS. ALONSO:  I'll restart the video at the same place.  I

21   stopped the video at seven minutes and 48 seconds.

22       THE WITNESS:  Well, let's ask him if their intention is to

23   fucking run us off.

24       JUDGE LAWS:  And do you know who that -- who said that?

25       THE WITNESS:  Martin Valdez.

1      MS. ALONSO:  And, Your Honor, I think there may be some

2  colloquialism, in Spanish, you know, colloquially (Spanish

3  spoken) is used to fire.  And so I used a word that was used

4  was (Spanish spoken) in the video.

5      THE INTERPRETER:  And I said to run off which is also

6  colloquially used in English, and the same, shall we say, pitch

7  is to fire.

8      JUDGE LAWS:  Thank you.

9      MS. ALONSO:  All right.  So I'll restart the video at

10  seven minutes and 48 seconds.  I stopped the video at eight

11  minutes and 20 seconds.

12      THE INTERPRETER:  Okay.  I'm really having a lot of

13  difficulty with this because it seems like they're switching

14  before -- between English and Spanish and intermingling it.

15  And I really can't decipher or kind of get an angle for where

16  the conversation's going.

17      JUDGE LAWS:  That's fine.

18      MS. ALONSO:  Now I'll restart the video at eight minutes

19  and 20 seconds.  I stopped the video at nine minutes and three

20  seconds.

21      THE INTERPRETER:  Your Honor, I'm just -- there's just too

22  many voices going on, and honestly I really cannot decipher the

23  words.

24      JUDGE LAWS:  All right.  So from here on out, if you can't

25  decipher, just let it roll.

1     THE INTERPRETER:  Okay.

2     JUDGE LAWS:  And we'll assume that you can't interpret

3  anything unless you tell Ms. Alonso to stop the tape.

4     THE INTERPRETER:  Certainly.

5     JUDGE LAWS:  Thanks.

6     MS. ALONSO:  And I'll restart the --

7     THE WITNESS:  Can I say something?

8     THE INTERPRETER:  That's the witness.

9     JUDGE LAWS:  Let's wait because you're only supposed to

10  respond to questions.

11     MS. ALONSO:  Okay.  So I'll restart the video at nine

12  minutes with -- nine minutes and three seconds.  And I stopped

13  the video at nine minutes and 12 seconds.

14     THE WITNESS:  Okay.  You're late.  Okay.  Look, look,

15  there's another one, another one.

16     MS. ALONSO:  And I'll restart the video at the same place.

17     THE WITNESS:  And I've stopped the video at ten minutes

18  and 45 seconds.

19     THE WITNESS:  The one from security is outside.  And I

20  don't --

21     THE INTERPRETER:  And the interpreter's -- and you must

22  make a cognant (sic) note that security and Spanish spell

23  security and safety.  So with that and without really knowing

24  the context, it sounds as if they are saying, the one from

25  security's outside; oh, shit.

1    JUDGE LAWS:  And do you recognize the voice or voices?

2    THE WITNESS:  No.

3    MS. ALONSO:  And I'll restart the video at ten minutes and

4    45 seconds.

5    MR. MINER:  Sophia, you had a hand up over --

6    MS. ALONSO:  I'm sorry.  I stopped the video at 11 minutes

7    and 33 seconds.

8    THE WITNESS:  Well, maybe they call us here and they're

9    not going to tell us anything or maybe we're not going to --

10   we're not going to collect.

11   THE INTERPRETER:  And then again in Spanish, (Spanish

12   spoken) is either collect or charge, so again I don't know in

13   what context it's being used.

14   JUDGE LAWS:  Thanks.

15   MS. ALONSO:  And I'll restart the video at 11 minutes and

16   33 seconds.  And I've stopped the video at 11 minutes and 49

17   seconds.

18   Q    BY MS. ALONSO:  Mr. Martinez, I handed you a copy of

19   General Counsel's 200.  Do you have that in front of you?

20   A    Yes.

21   Q    And I want you to read along and follow the portions in

22   Spanish.

23   A    Okay.

24   Q    Now the voice that we just heard at 11:49, did you

25   recognize that voice?

 1   A     Yes.

 2   Q     Okay.  Who was that?

 3   A     Gordan.

 4   Q     Okay.  And is that his image in the video?

 5   A     Yes.

 6   Q     And I'll restart the video at 11:49.  Okay.  I'm stopping

 7   the video at 12 minutes and six seconds.  Did you recognize

 8   that voice?

 9   A     Yes.

10   Q     Okay.  And that was a Spanish-speaking voice.

11   A     Yes.

12   Q     Whose voice was that?

13   A     Julio Vasquez.

14   Q     All right.  And I'll go ahead and continue at 12 minutes

15   and six seconds.  Okay.  And I've stopped the video at 13

16   minutes and five seconds.  Did you recognize the Spanish-

17   speaking voice?

18   A     Yes.

19   Q     Whose voice was that?

20   A     Julio Vasquez.

21         MR. GIANNOPOULOS:  Okay, Your Honor, would you like so

22   trans -- have the translation into English of what it said on

23   the video, or not?

24         JUDGE LAWS:  I think maybe not right now.  I was going to

25   ask -- well, off the record, we discussed perhaps the

1    Interpreter pointing out if things were not translated

2    correctly, but she could decipher.  So I think that's probably

3    the best way to go about it.  Because you're the one who's

4    taken the oath and --

5        THE INTERPRETER:  Right.

6        JUDGE LAWS:  -- and you're the one who, you know, is the

7    official interpreter, so --

8        THE INTERPRETER:  At this point in time, what I can say is

9    the first rendition -- the first translation of the

10   introduction where he says, "(Spanish spoken)," where -- in

11   English, it would be, "Fellows, my name is Gordan Hudgens.  And

12   the Interpreter's right under me."  He says, "My name is Gordan

13   Hudgens.  He is the general manager of this company, for the

14   company."  And then it -- underneath, Mr. Hudgens goes for

15   about a paragraph.

16       And the Interpreter states the following, "During the last

17   months, the company has tried -- has had a lot of losses,

18   because they have had a lot of changes, which they have --

19   which the changes that they have," -- and it's implied, like in

20   brackets, implemented.  "They've brought in new people.

21   They've trained," and there's obviously background noise.  And

22   then I coincide with that.  "Trying to find a solution."  And

23   that's where we're at.

24       JUDGE LAWS:  Okay.

25       THE INTERPRETER:  But he's obvious -- the Interpreter's

1    obviously interpreting in third person, not first person.

2         JUDGE LAWS:  Thank you.  And before you go further, I

3    don't want to stop and ask each time if it's still Julio

4    Vasquez.  Let's say if there's any -- if any party or myself

5    has -- or the Interpreter, frankly, notices a change in the

6    voice, they can raise that.

7         MS. ALONSO:  And --

8         JUDGE LAWS:  And they should.

9         MS. ALONSO:  -- I have another question.

10   Q    BY MS. ALONSO:  Mr. Martinez, there is a person standing

11   next to the individual you've identified as Mr. Hudgens.  Do

12   you recognize who that individual is?

13   A    Yes.

14   Q    Who is that?

15   A    Julio Vasquez.

16   Q    Okay.

17        MS. ALONSO:  And I'll restart the video at 13 minutes and

18   five seconds.

19   (Video recording played)

20        THE INTERPRETER:  It's gotten to the point in which we

21   have come upon -- in which an action has -- a definitive action

22   has to be taken -- a drastic action.

23        MS. ALONSO:  Okay.  And the video was stopped at 13

24   minutes and 19 seconds before the translation.

25        THE INTERPRETER:  May I make an and observation as just --

1   the Interpreter's gone through and read ahead and it appears

2   that majority of the tran -- in -- renditions into Spanish are

3   paraphrases.

4        JUDGE LAWS:  Okay.  So --

5        THE INTERPRETER:  So --

6        JUDGE LAWS:  -- perhaps.

7        MR. GIANNOPOULOS:  Perhaps she could translate the words

8   are coming from the -- from the DVD, as opposed --

9        JUDGE LAWS:  Yes.

10       MR. GIANNOPOULOS:  -- to what's on the -- the transcript

11  here is just a guide.  If she could translate the words that

12  are being spoken at the meeting.

13  (Counsel confer)

14       MR. GIANNOPOULOS:  Yeah -- and so -- and yeah, good -- is

15  a paraphrase of what Mr. Hudgens is saying?  Is that what

16  you're saying the Spanish is?

17       THE INTERPRETER:  It appear -- the Spanish appears to be a

18  paraphrase in the third person, a summary of what Mr. Hudgens

19  is saying in some areas.  And in some areas he's -- the

20  Interpreter is --

21       MR. GIANNOPOULOS:  So if we could have the Interpreter

22  interpret the words that the interpreter is using on the DVD.

23       THE INTERPRETER:  Okay.

24       JUDGE LAWS:  Yes.  That makes sense to me, because that's

25  going to be what was actually said.  Well --

1       THE INTERPRETER:  I think --

2       JUDGE LAWS:  Let's go off the record and discuss.

3  (Off the record at 3:29 p.m.)

4       JUDGE LAWS:  Okay, let's go back on.

5       MS. ALONSO:  Okay.  And on --

6       JUDGE LAWS:  Hold on.  So we just had a brief discussion

7  off the record regarding the translation issue.  And we just

8  wanted to clarify that what is being translated are the actual

9  Spanish words that are being said on the video tape.  And so

10  far the Interpreter has indicated that is precisely what she

11  has done so far.  And that is what we are going to continue to

12  do.

13      MS. ALONSO:  And I will restart the video from 13 minutes

14  and 19 seconds.

15  (Video recording played)

16      MS. ALONSO:  Okay.  And the video's been stopped at 13

17  minutes and 37 seconds.

18      THE INTERPRETER:  The moment has arrived in which we have

19  to make the shop a lot smaller and it's going to have to be a

20  leaner shop.

21      MS. ALONSO:  Okay.  And I'll restart at 13 minutes and 37

22  seconds.

23  (Video recording played)

24      THE INTERPRETER:  The purpose of this meeting here is to

25  inform you guys that you guys, the ones that are here are the

1   ones that are going to be cut out.  That as of this moment, you

2   -- as of today, you are no longer going to be part of

3   Greenbrier.

4        MS. ALONSO:  All right.  And I lot my -- I hit the rewind

5   button.  But I'll go ahead and just restart it at 13:01.  And I

6   think it may be replaying what we just heard.

7   (Video recording played)

8        MS. ALONSO:  Okay.  So I stopped the video at 13:19 and

9   that's the portion the Interpreter had translated earlier.

10       JUDGE LAWS:  We've already done this.

11       MS. ALONSO:  Okay --

12       JUDGE LAWS:  Why don't we stop the next time --

13       MS. ALONSO:  -- so --

14       JUDGE LAWS:  -- she hasn't translated yet.

15       MS. ALONSO:  Okay.

16   (Video recording played)

17       MS. ALONSO:  Okay.  And I've stopped the video --

18       JUDGE LAWS:  We've already done this --

19       MS. ALONSO:  Okay.

20       JUDGE LAWS:  -- translation.  Let's keep going, please.

21       MS. ALONSO:  Okay, so we'll restart at 14:10.

22   (Video recording played)

23       MS. ALONSO:  I've stopped the video at 14:41.

24       THE INTERPRETER:  And he says that it's unfortunate that

25   this -- because of this matter, but that he had to come to this

1  conclusion in order to be able to -- in reference to the shop,

2  so that the shop could then have some profit.  And then with

3  God's good grace, further along then maybe they could -- we

4  could grow again.

5      MS. ALONSO:  I'll restart the recording at 14:41.

6  (Video recording played)

7  Q    BY MS. ALONSO:  Okay, and Mr. Martinez, I stopped the

8  video at 15:21.  Did you recognize that voice?

9  A    Yes.

10  Q    Whose voice was that?

11  A    Lisa.

12  Q    Okay.

13      MS. ALONSO:  I'll restart the video at the same place.

14  (Video recording played)

15      JUDGE LAWS:  And I want to stop it now.

16      MS. ALONSO:  Okay.  And I've stopped the video at 15

17  minutes and 42 seconds.

18      JUDGE LAWS:  Did you recognize the voice that started

19  with, "We have a lot of good guys in here?"

20      THE WITNESS:  Yes.

21      JUDGE LAWS:  Who is it?

22      THE WITNESS:  Hector Federico.

23      JUDGE LAWS:  And then with regard to the next comment,

24  "The first people that you hired."  Do you recognize that

25  voice?

1     THE WITNESS:  I think it's him himself.

2     JUDGE LAWS:  Thank you.

3     MS. ALONSO:  And I'll restart the video at 15 minutes, 42

4  seconds.

5  (Video recording played)

6     MS. ALONSO:  Okay, I stopped the video at 16 minutes and

7  four seconds.

8     THE INTERPRETER:  So there you go.  Vote no for the Union.

9  Vote no for the Union.

10    JUDGE LAWS:  And do you recognize that voice?

11    THE WITNESS:  Yes.

12    JUDGE LAWS:  And who is it?

13    THE WITNESS:  Me.

14    JUDGE LAWS:  Thank you.

15    MS. ALONSO:  And I'll restart the video at the same place.

16  (Video recording played)

17    MS. ALONSO:  Okay.  I've stopped the video at 16 minutes

18  and 56 seconds.

19    THE INTERPRETER:  There were a lot of factors that

20  influenced what has happened here and why this decision was

21  taken.  The people that are in this group here, in some cases,

22  it was because they had an attendance record and in other

23  cases, it was because of productivity.  In other cases, it was

24  the manner in which they just handled themselves in general or

25  they performed in general.  And in other cases, it was also

1  that the people that are here are here as a support team.  And

2  unfortunately, when there is no support in the company -- and

3  then it's unintelligible.

4      JUDGE LAWS:  And I'll restart the video at 16 minutes and

5  56 seconds.

6  (Video recording played)

7      THE INTERPRETER:  So what's going to happen with the time

8  that we have, the hours that we have for PTO.

9      JUDGE LAWS:  And don't start playing it.  I want to ask a

10  couple questions.  The voice that started saying, "Is there any

11  way we can fight it?"  Do you recognize that voice?

12      THE WITNESS:  Yes.

13      JUDGE LAWS:  And who is it?

14      THE WITNESS:  Alex Acuna.

15      JUDGE LAWS:  And the voice that said, "We cannot finish

16  the rest of the week.  Nothing.  We're done here.  This is it."

17  Do you know who said that?

18      THE WITNESS:  It's Hector Federico.

19      JUDGE LAWS:  Thank you.

20      MS. ALONSO:  And the video was stopped at 17:25.  And I'll

21  restart it at that same point.

22  (Video recording played)

23      MS. ALONSO:  Okay.  And I've stopped the video at 17:37.

24      THE INTERPRETER:  The last check of this week, which is

25  this Friday, your PTO hours are going to be included, which are

1    -- and it's unintelligible.

2       MS. ALONSO:  I'll restart the video at 17:37.

3    (Video recording played)

4       MS. ALONSO:  Okay.  I've stopped the video at 17:53.

5       THE INTERPRETER:  The hours that you've accumulated plus

6    your PTO, which you -- that you have will be in this Friday's

7    check.

8       MS. ALONSO:  And I'll restart the video the same place.

9    (Video recording played)

10      MS. ALONSO:  Okay.  And I've stopped the video at 18

11   minutes, 12 seconds.

12      THE INTERPRETER:  What you guys have to keep in mind is

13   that what we -- what we had to do was to bring the shop down to

14   a certain size, in order to bring it back up to productivity,

15   in order to bring you back.

16      MS. ALONSO:  Okay.  And I'll restart the video at the same

17   place.

18   (Video recording played)

19      JUDGE LAWS:  Stop.

20      MS. ALONSO:  And I've stopped at 19:09.

21      JUDGE LAWS:  The individual who asked if he could ask a

22   question, the same voice asked about hiring guys from other

23   shops.  Do you recognize that voice?

24      THE WITNESS:  Yes.

25      JUDGE LAWS:  And who is that?

```
 1        THE WITNESS:  It's Alex Acuna.

 2        JUDGE LAWS:  And then the worker who chimed in, "Yeah, did

 3   you guys do that or did you already have people hired?"  Do you

 4   recognize that voice?

 5        THE WITNESS:  Yes.  It's him, himself.

 6        JUDGE LAWS:  Thank you.

 7        MS. ALONSO:  And I'll restart the video at 19 minutes and

 8   nine seconds.

 9   (Video recording played)

10        MS. ALONSO:  I've stopped the video at 19 minutes and 51

11   seconds.

12        THE INTERPRETER:  There's actually two different voices.

13   One says, "I wanted to vote for the Union."  And the other one

14   says, "I wanted to vote for the Union last year."

15        MS. ALONSO:  Okay.  I'm restarting the video at the same

16   place, 19 minutes, 51 seconds.

17   (Video recording played)

18        MS. ALONSO:  I've stopped the video at 20 minutes and 20

19   seconds.

20        THE INTERPRETER:  I have to paraphrase this.  But it's

21   basically nobody wanted this to happen.  Nobody wanted to have

22   to close the shop.

23        MS. ALONSO:  And I'll restart at the same place, 20

24   minutes with 20 seconds.

25   (Video recording played)
```

 1    JUDGE LAWS:  It was intelligible.  Why don't we --

 2    MS. ALONSO:  Okay.  And I've stopped at 21 minutes and 31

 3  seconds.

 4    JUDGE LAWS:  The individual who asked how long have they

 5  known that they were going to lay the guys off, do you know who

 6  what was?

 7    THE WITNESS:  It was Brian Skaggs.

 8    JUDGE LAWS:  And was that still his voice in the next

 9  passage about from the get go, you know, what I'm saying, et

10  cetera?

11    THE WITNESS:  Correct.

12    JUDGE LAWS:  And then the next person taking upset, asking

13  about how he's going to take care of his kids.  Do you know who

14  that was?

15    THE WITNESS:  It's the same one.

16    JUDGE LAWS:  And that was a bomb right there?

17    THE WITNESS:  I don't understand your question.

18    JUDGE LAWS:  Do you know who said, "That was a bomb right

19  there?"

20    THE WITNESS:  No.

21    JUDGE LAWS:  And then the next passage, the individual

22  saying, "This is bullshit.  We give you guys our time.  All you

23  guys do is this?"  Do you know who said that?  And if you need

24  anything played back, let me know.

25    THE WITNESS:  Yes, please.

1    JUDGE LAWS:  Okay,  So start with the passage that he

2  can't identify --

3    MS. ALONSO:  Okay, and -- okay.

4    JUDGE LAWS:  -- which looks to be about 20:51.  That's

5  good.  Start it there.

6    MS. ALONSO:  So I'm restarting the video at 20:45.

7  (Video recording played)

8    MS. ALONSO:  Okay.  And I've stopped the video at 20:54.

9    JUDGE LAWS:  Okay, did -- it sounded to me like there were

10  two voices.  So did you recognize the first voice?

11    THE WITNESS:  Yes.

12    JUDGE LAWS:  And who was that?

13    THE WITNESS:  Brian Skaggs.

14    JUDGE LAWS:  And the second voice.

15    THE WITNESS:  Alex Acuna.

16    JUDGE LAWS:  Okay, thank you.

17    MS. ALONSO:  And I'll continue to replay at 20:54.

18  (Video recording played)

19    MS. ALONSO:  And I've stopped the video at 21:39.

20    JUDGE LAWS:  Did you want to play the full Spanish passage

21  for her to interpret?

22    MS. ALONSO:  Okay, sure.

23  (Video recording played)

24    MS. ALONSO:  And I've stopped the video at 21, 57 seconds.

25    THE INTERPRETER:  There's something, Alex.  They don't

1   give a damn about something.  There's something.  Last year,

2   they brainwashed you guys all, promising you things that --

3   things so that you wouldn't vote for the Union, because they

4   were defending the company in order to supposedly give them a

5   second opportunity.  But you can have this down for sure.  That

6   this Monday, there's going to be a petition for a Union vote.

7         MS. ALONSO:  And I'll replay --

8         MR. MINER:  I'm sorry.  Could we have that voice

9   identified, Your Honor?

10        JUDGE LAWS:  Do you know who said that?

11        THE WITNESS:  Me.

12        JUDGE LAWS:  Thank you.

13        MS. ALONSO:  And I'll replay the video from 21 minutes and

14  57 seconds.

15  (Video recording played)

16        MS. ALONSO:  And I've stopped the video at 22 minutes and

17  three seconds.

18        THE INTERPRETER:  They want to vote.  Yes, they want to

19  vote.  And that's the petition for a vote.

20        MS. ALONSO:  And I'll replay the video the same place.

21  (Video recording played)

22        MS. ALONSO:  Okay, I've stopped the video at 22 minutes,

23  with 23 seconds.

24        THE INTERPRETER:  And I'm going to tell you this.  And I'm

25  telling you this, because I'm one of their leaders.  It's that

1  simple.  So this Monday, we'll have -- they're going to have a

2  petition.  So just, you know, to be prepared.

3       JUDGE LAWS:  And is that still you?

4       THE WITNESS:  Yes.

5       MS. ALONSO:  I'll restart the video at the same place, 22

6  minutes and 23 seconds.

7  (Video recording played)

8       MS. ALONSO:  I've stopped the video at 22 minutes and 30

9  seconds.

10       THE INTERPRETER:  Let's see what they're going to promise

11  the people.  Let's see what they're going to promise the

12  people.  Let's see what they're going to say.

13       JUDGE LAWS:  Do you know who that is?

14       THE WITNESS:  Yes.

15       JUDGE LAWS:  Who is it?

16       THE WITNESS:  Me.  Go ahead.

17       MS. ALONSO:  And I'll start the video at 22 minutes and 31

18  seconds.

19  (Video recording played)

20       MS. ALONSO:  Okay.  And I'm going to -- I've paused the

21  video at 22 minutes and 36 seconds.

22       THE INTERPRETER:  Have a happy new year, right?

23       JUDGE LAWS:  Still you?

24       THE WITNESS:  Yes.

25       MS. ALONSO:  And I'll restart the video at 22 minutes and

1    36 seconds.

2    (Video recording played)

3         JUDGE LAWS:  Let's stop here.

4         MS. ALONSO:  Okay.

5         JUDGE LAWS:  Did your recognize the voice saying, "I feel

6    like I'm being discriminated against?"

7         THE WITNESS:  I recognize two voices there.

8         JUDGE LAWS:  And whose voices did you recognize?

9         THE WITNESS:  I believe it is Hector Federico and Martin

10   Valdez.

11        MS. ALONSO:  Okay.  And I'll continue to play -- or I'll

12   restart the video at 22 minutes and 54 seconds.

13   (Video recording played)

14        JUDGE LAWS:  And stop.  Did you recognize the first voice

15   there?

16        THE WITNESS:  Yes.

17        JUDGE LAWS:  And who is that?

18        THE WITNESS:  It's Guillermo Gonzalez Pico.

19        JUDGE LAWS:  And then who chimed in?

20        THE WITNESS:  Hector Federico.

21        MS. ALONSO:  And the video was stopped at 23 minutes and

22   13 seconds, where I'll restart it now.

23   (Video recording played)

24        MS. ALONSO:  Okay.  And I've stopped the video at 24

25   minutes and one second.

1    THE INTERPRETER:  Okay, I had earlier heard, "Let's go,

2  because it's already been," -- and then several times, they

3  said, "Let's go, let's go."  And now -- which -- it starts

4  where it says to -- where it says Interpreter on the

5  transcript.  "Any of you guys that have any kind of question or

6  any kind of doubt or any kind of -- that you -- anything that

7  you want to -- anything that is disturbing you that you want to

8  talk about in a more personal manner with Lisa.  Lisa's going

9  to be here.  So the forms are here to helped you guys, in order

10  for you guys to pick up your personal belongings."

11    JUDGE LAWS:  And was that Julio again?

12    THE WITNESS:  Yes.

13    MS. ALONSO:  Okay.  And I'll restart the video at 24

14  minutes and one second.

15  (Video recording played)

16    THE INTERPRETER:  "Don't sign anything.  Don't pick up any

17  of your personal belongings." That's what I heard.  But I would

18  -- if we could replay it.

19    MS. ALONSO:  Okay.

20    JUDGE LAWS:  You want it replayed?

21    THE INTERPRETER:  I would, yes.

22    JUDGE LAWS:  Thank you.

23    MS. ALONSO:  Okay.  So I'm restarting the video from 24

24  minutes and two seconds.

25  (Video recording played)

```
 1        THE INTERPRETER:  Can we take our personal -- I mean, our
 2  -- can we take our personal effects, like our tools?
 3        MS. ALONSO:  And I'll -- the video was stopped at 24
 4  minutes and 11 seconds, where I'll restart it.
 5  (Video recording played)
 6        JUDGE LAWS:  And let's stop here, please.
 7        MS. ALONSO:  Okay.  And I'm stopping at 24 minutes and 44
 8  seconds.
 9        JUDGE LAWS:  Do you recognize the male voice that was
10  speaking?
11        THE WITNESS:  Yes.
12        JUDGE LAWS:  And who's that?
13        THE WITNESS:  Omar Ramos.
14        JUDGE LAWS:  And I heard about midway down the paragraph
15  where it says, "You, you are in tears in about the problem with
16  the company."  I heard, "You brought us in here," about
17  problems with the company.  So maybe we should --
18        MR. MINER:  That's what I heard.
19        JUDGE LAWS:  -- replay that.
20        MS. ALONSO:  Replay that?  Okay.
21        JUDGE LAWS:  I think it makes more sense, so I want to
22  replay it --
23        MS. ALONSO:  Sure.
24        JUDGE LAWS:  -- to make sure I didn't just hear it that
25  way, because I think it makes more sense that way.
```

1    MS. ALONSO:  Okay, so I -- replay it from 24 minutes,

2    24:15.  So I'll restart the video from 24 minutes and 15

3    seconds.

4    (Video recording played)

5    MS. ALONSO:  Okay.  And I've stopped the video at 25

6    minutes and 13 seconds.

7    JUDGE LAWS:  "Aren't you going to take anything out?"  Do

8    you know who that is?

9    THE WITNESS:  Me.

10    MS. ALONSO:  And I'll restart the video at 25 minutes and

11    13 seconds.

12    (Video recording played)

13    MS. ALONSO:  Okay, I've stopped the video --

14    THE INTERPRETER:  If I could go back.

15    MS. ALONSO:  Sure.

16    THE INTERPRETER:  To the last statement.  Because there's

17    a lot.

18    MS. ALONSO:  So I'm going to return to 25 minutes.  If you

19    need me to go further, let me know.

20    THE INTERPRETER:  Okay.

21    MS. ALONSO:  But I'm restarting at 25 minutes.

22    (Video recording played)

23    THE INTERPRETER:  I need to hear that again.  There's two

24    voices and they're overlapping.  One of them is saying, "Aren't

25    you going to take anything?"  And another's asking like,

1   "What," one is saying tools, but then they said, "You see,

2   these are the consequences."  But in the background, the

3   Interpreter is also talking at the same time.  So I have to

4   single them out one at a time.

5        MS. ALONSO:  Okay.  So I'll restart at 25:13.

6        THE INTERPRETER:  That's fine.

7   (Video recording played)

8        MS. ALONSO:  And I've --

9        THE INTERPRETER:  There's another voice that's saying,

10  "There's a little bit of a problem here and these are the -- if

11  you guys are going to take this out," -- something to that

12  reference.  And I'm sorry, but I can't decipher it completely,

13  because there's an overlap. And then the other one is saying --

14       JUDGE LAWS:  Do you want to play it again?

15       THE INTERPRETER:  Yes.

16       MS. ALONSO:  Yeah, okay.

17       THE INTERPRETER:  I'm sorry.

18       MS. ALONSO:  Sure.  Same place?

19       THE INTERPRETER:  Yes.

20       MS. ALONSO:  Okay.

21       THE INTERPRETER:  Please.

22       MS. ALONSO:  So I'll restart now at 25 minutes and nine

23  seconds.

24  (Video recording played)

25       THE INTERPRETER:  Okay, there's one voice that's saying,

1  "Okay, we're going to take out tools."  And then in the back

2  is, "The question that I had is not --"

3       MS. ALONSO:  Okay, and --

4       THE INTERPRETER:  And the Interpreter is the one that

5  starts with, "The question that I have is," so it seems like

6  the Interpreter is interpreting for somebody who's asking a

7  question --

8       MS. ALONSO:  And the video was --

9       THE INTERPRETER:  -- in the background.

10      MS. ALONSO:  -- was stopped at 25 minutes and 19 seconds.

11  And I'll restart it there.

12      MS. ALONSO:  And I've stopped the video at 25 minutes and

13  29 seconds.

14      THE INTERPRETER:  These are the consequences of what

15  happened -- and these are the con -- this is the high price

16  that you're paying for what happened last year.  And this is a

17  really high price.  They're throwing it right in your face.

18      JUDGE LAWS:  Do you recognize the voice that said that?

19      THE WITNESS:  Yes.

20      JUDGE LAWS:  And who's that?

21      THE WITNESS:  Me.

22      MS. ALONSO:  And I'll restart the video from 25 minutes

23  and 29 seconds.

24  (Video recording played)

25      THE INTERPRETER:  I would have to go way, way, way back.

1    There's one part, the most recent one, which just says,

2    "Nothing.  Nothing.  I -- he's been taping it."  "Who?"  "No,

3    he's been taping the whole thing.  I've been taping the whole

4    thing."  But prior to that, it appears as though there was a

5    transcription just looking from the document, of statements

6    that were said.  I didn't pick them up, but it seems to be just

7    because there's an overlap of voices.  And in order for me to

8    be able to interpret, I would have to actually listen to it and

9    single out the voices and interpret the -- do you understand

10   what I'm saying?

11        JUDGE LAWS:  I do.

12        THE INTERPRETER:  Okay.

13        JUDGE LAWS:  Is that something that would you be better

14   off doing --

15        THE INTERPRETER:  I can do it on my machine.

16        JUDGE LAWS:  -- on your machine.  Okay.

17        THE INTERPRETER:  Because I'm equipped to do that --

18        JUDGE LAWS:  Why don't we have you do that then?

19        THE INTERPRETER:  -- that section.  Just the last part,

20   because I have obviously two voices that are overlapping.  And

21   one of them appears to be the Interpreter interpreting a

22   question from somebody else who's speaking in Spanish, so I

23   would have to get the question from that person.  From the

24   employee, interpreter.  And then there's a third voice.  So

25   that's what appears to be occurring.

1    JUDGE LAWS:  Then I think the think that makes most sense

2  is to just have you do that, when you're not --

3    THE INTERPRETER:  Doing the other ones.

4    JUDGE LAWS:  -- interpreting.

5    THE INTERPRETER:  Got it.

6    JUDGE LAWS:  And then we can have you read that into the

7  record when you're done.

8    MR. GIANNOPOULOS:  The video has ended, Your Honor.

9    MR. MINER:  Could we take a restroom break please, Your

10  Honor?

11    JUDGE LAWS:  Sure.

12    MR. MINER:  Thank you.

13    JUDGE LAWS:  Good idea.  Let's go off the record.  Five,

14  ten minutes.

15  (Off the record at 4:07 p.m.)

16  Q    BY MS. ALONSO:  Mr. Martinez, after you made the recording

17  of November 12th meeting, when did you -- did you watch it?

18  A    In the evening in my home.

19  Q    Okay.  And can you explain how it was that you watched the

20  video?

21  A    I connected the pen via a cable to the computer and then I

22  transferred the data to the computer.

23  Q    Okay.  And what did you do after you put the data on the

24  computer?

25  A    I put it onto a USB and then I gave it to Marco Molina

1    from Sheetmetal Workers.

2    Q    And is the same recording that we just finished viewing,

3    marked General Counsel's Exhibit 199?

4    A    Yes.

5    Q    Okay.

6        MS. ALONSO:  Your Honor, I move for the admission of

7    General Counsel's 199 and General Counsel's 200.

8        MR. MINER:  Your Honor, no objection to 199.  With respect

9    to General Counsel 200, we'd ask for the same limitation be

10   applied to that as to the other General Counsel prepared

11   transcripts of recordings.

12       JUDGE LAWS:  And it will be.  And also, it isn't yet

13   complete, but I will admitted it subject to the Interpreter

14   completing the translation of the last couple minutes.  And

15   she's going to do that in her own time.

16   **(General Counsel Exhibit Number 199 and 200 Received into**

17   **Evidence)**

18       MS. ALONSO:  All right.

19   Q    BY MS. ALONSO:  Mr. Martinez, why did you record the

20   meeting on November 12?

21   A    Because last year during the first elections, I believe

22   that the company did a lot of things out the -- outside the

23   law.

24   Q    Okay.  And are you referring to things that happened in

25   meetings?

1   A     Correct.  During the meetings, there were occasions in

2   which they threatened to closing the company down, transferring

3   jobs to another state or to fire or layoff people.

4   Q     Okay.  And were those meetings -- which -- I'll rephrase.

5   Were those meetings for around the time of the UTU election?

6   A     That's correct.

7   Q     Okay.

8   A     And that's the reason that I decided to tape this video.

9   If there was anything that was outside the parameters of the

10  law, so that there would be evidence.

11  Q     And before November 12, did anyone tell you about the

12  layoff?

13  A     Yes.

14  Q     Who was that?

15  A     Armondo Lopez.

16  Q     Okay.  And when did you speak with Armondo Lopez?

17  A     A day before the firing.

18  Q     And was that in person or how did you speak with him?

19  A     On the phone.

20  Q     Okay.  And do you know what Armondo Lopez' position was

21  when you spoke with him?

22  A     Lead Man for the truck shop.

23  Q     Okay.  And tell me what Armondo Lopez said to you.

24  A     He told me that a month -- that Javier Garcia had told him

25  that they were going to fire approximately 20 people, Monday

1    the 12th.

2    Q    And do you know Juan Garcia is?  Or sorry.  I mean, Javier

3    Garcia?

4    A    He is Juan Maciel's cousin.

5    Q    And does Javier Garcia work for Greenbrier?

6    A    Yes.

7    Q    And at the time of the layoff, do you know what position

8    he held?

9    A    Welder.

10   Q    Okay.  Now, in the months before the layoff, did you talk

11   to Armondo Lopez about the Union?

12   A    Yes.

13   Q    All right.  Was it one time or more than one time?

14   A    More than one occasion.

15   Q    Okay.  How frequent did you talk to Armondo Lopez about

16   the Union?

17   A    He's my friend, so every time that we would see each

18   other, we would talk about the Union.

19   Q    Okay.  What did you tell Armondo Lopez about the Union in

20   2012?

21   A    I would talk to him about what was going on with the

22   Union, how many cards we had, the entire process.

23   Q    And are you referring to the process of organizing the

24   workers?

25   A    Yes.

1    Q    And was Armondo Lopez involved in the campaign with the

2    Sheetmetal Workers?

3         THE INTERPRETER:  May the Interpreter have the question

4    again?

5    Q    BY MS. ALONSO:  Was Armondo Lopez involved in organizing

6    -- sorry, I'll rephrase altogether.  Was Armondo Lopez involved

7    in the Sheetmetal Workers campaign?

8         THE INTERPRETER:  Thank you.

9         THE WITNESS:  No.

10   Q    BY MS. ALONSO:  Okay.  Was he ever involved in an

11   organizing drive since the time that you started working with

12   Greenbrier?

13   A    During the first campaign in 2011, he was one of the

14   leaders.

15   Q    Okay.  And when you say leader, so you mean a leader of

16   the organizing drive?

17   A    Yes.

18   Q    Okay.  And which Union did he help?  With which Union did

19   he participate with?

20   A    UTU.

21   Q    Okay.  Now, in the months before the layoff, was there

22   overtime available to work?

23   A    Yes.

24   Q    Okay.  And did anyone offer you to work overtime?

25   A    Yes.  Yes, as a matter of fact, that's why they switched

1  me from the areas.  I used to work in the rec shop and Freddy

2  Valdez told me that he wanted me to work more overtime.  And I

3  told him I couldn't.

4  Q    Okay.  And were you transferred to another shop?

5  A    He transferred me to the intermodal shop.  And he told me

6  there it wasn't necessary for me to -- I mean, if I could stay,

7  that was fine.  If not, it wasn't a problem.

8  Q    And when you were offered to work overtime at the rec

9  shop, how often was that?

10  A    Three, four times, approximately per week.

11  Q    Now, Mr. Martinez, I want to ask you about being recalled

12  to work with Greenbrier after you were laid off.

13  A    Yes.

14  Q    Do you remember -- or were you recalled to work with

15  Greenbrier?

16  A    They called me.

17  Q    Okay.  Do you remember when you received a phone call?

18  A    It was the day -- it was like the 24th March.  No like

19  about a week before.

20  Q    And do you mean a week before you actually started

21  working?

22  A    Yes.

23  Q    Okay.  And what day did -- what day were you rehired to

24  work with -- I'll rephrase.  When was your first day back at

25  Greenbrier?

1    A    The 25th of March of 2013.

2    Q    Okay.  So you said that you had received a phone call

3    about a week earlier.  So tell me how it came about that you

4    received this phone call.

5    A    Christina Martinez called me.  She left me a message,

6    because I couldn't answer the phone.

7    Q    Okay.

8    A    And I returned the call.  And she told me that there was a

9    position that was open and if I was interested.

10   Q    Okay.  And what --

11   A    I told her yes.  And she told me to show up on the 25th at

12   the offices.

13   Q    And did you report to the offices on the 25th?

14   A    Yes.

15   Q    Okay.  And where did you report to?

16   A    To Christina Martinez' office in human resources.

17   Q    And this is in Tucson?

18   A    Yes.

19   Q    And who was present in the office?

20   A    Just Christina Martinez.

21   Q    Okay.  And what did Christina say when you got to the

22   office?

23   A    That she was going to pass me over to -- or take me over

24   to Ed (sic) Valenzuela for an interview.

25   Q    Did you have to fill out an application at any time

1   before?

2   A    Yes.

3   Q    Okay.  When did you fill out the application?

4   A    When I went to see Christina Martinez.

5   Q    Who -- did somebody tell you had to fill out the

6   application?

7   A    Christina.

8   Q    And did you meet with Eric Valenzuela?

9   A    Yes.

10  Q    And where did you meet with him?

11  A    In his office, as -- in the plant manager's.

12  Q    Who was present when you met with Eric Valenzuela?

13  A    Eric Valenzuela and I.

14  Q    Okay.  And tell me how this meeting with Eric Valenzuela

15  started.

16  A    We introduced ourselves and the conversation began.  And

17  he asked me why did I think I had been fired.

18  Q    Okay.  Did you respond?

19  A    Yes.

20  Q    Okay.  What was your response?

21  A    Well obviously I couldn't tell him that it was because I

22  thought it was because of the Union, because they wouldn't hire

23  me.  But I told him that I think it was because of the overtime

24  that I couldn't work those hours.

25  Q    Did he respond?

1   A    Yes.

2   Q    What was his response?

3   A    Well he said that in the past they had had problems with

4   the Union, but that had been -- that they were having a change

5   in the administration and now with the new administration, all

6   of those problems were in the past and everything was going to

7   change now.  He told me that he was a psychologist and as a

8   matter of fact, he didn't care about the job.

9   Q    Okay.

10  A    As a matter of fact, he told me he was a psychologist and

11  he didn't really care about the job, but that when he heard

12  about the Union, he didn't work at a place where they would

13  abuse the people.  And then he told me that he doesn't recall

14  with whom, but after he had -- he spoke to somebody.  They told

15  him that they treated people well in this company and they

16  would give them raises, x amount of raises.  And that's the

17  reason that he decided to accept the company -- the job,

18  because it seemed to him to be a good company.

19  Q    Okay.  Did he say anything else?

20  A    I don't recall.

21  Q    Was this interview in English or in Spanish?

22  A    Spanish.

23  Q    Okay.  Was the topic of your sonority discussed?

24  A    Yes, he told me that they were going to respect the salary

25  that I had before the layoffs and that was going to res -- that

1   they were going to respect my seniority.

2   Q    Okay.  And did you discuss the hours that you would be

3   working?

4   A    Yes.  He asked me if it was going to be a problem for me

5   to be working overtime and I told him no, because he told me

6   that the company was operating from Monday to Thursdays ten

7   hours and mandatory eight hours on Saturdays.

8   Q    Okay.  And were you hired to work with Greenbrier to work

9   after this interview?

10  A    Yes.

11  Q    Okay.  And were you assigned to work in a specific area?

12  A    Yes.

13  Q    Which area?

14  A    The front shop.

15  Q    And what type of work were you doing when you were

16  rehired?

17  A    Welder.

18  Q    All right.  After you were rehired, was a raffle announced

19  at some point?

20  A    Yes.

21  Q    Okay.  And do you remember where that was?

22  A    Every Monday morning, we had a safety meeting.  It was in

23  one of those.

24  Q    Okay.  And who conducted that safety meeting?

25  A    Eric Valenzuela and Julio Vasquez.

1  Q    Okay.  And what was said about the raffle?

2  A    That it was an incentive for the employees so that they

3  would put a little bit more attention and effort into safety,

4  because a lot of accident were taking place.

5  Q    Did he explain what was -- how there would be an incentive

6  for safety?  Like if there was a program?

7  A    Yes.  It was going to be like if it was poker.  Every week

8  that a person did not have an incident, then they would be

9  given a card from the deck.

10 Q    Okay.

11 A    At the end of the month, all of the hands were going to be

12 put together.  And the one who had the highest hand would be

13 the winner.

14 Q    All right.  And did he say when?

15 A    It was before the elections.

16 Q    Okay.  And were the prizes discussed?

17 A    Yes.  It was tools for work, drills, welding masks and an

18 iPad.

19 Q    Okay.  And are you aware if this program went into effect?

20 A    It was a couple weeks after I came onboard.

21 Q    Okay.  And did you ever receive a card?

22 A    Yes.

23 Q    Do you know if the cards were actually -- the cards from

24 the stack were actually passed out?

25 A    Yes.

1  Q    Okay.  And for what period of time did the company pass

2  out cards?  Was it just a couple weeks or did it continue for a

3  few months?

4  A    It was during the elections.  Before the elections took

5  place, there were three winners.  It was before the election

6  took place.  There were three winners before the elections took

7  place.

8  Q    Okay.  And so before the election took place -- you're

9  referring to the Union election, correct?

10  A    Yes.

11  Q    All right.  So the month before the election, how many

12  winners were there?

13  A    Three.

14  Q    Okay.  And did anyone explain why there would be three

15  winners?

16  A    They didn't say the reason.

17  Q    Okay.  And where were these winners?  Were you present

18  when these winners were announced?

19  A    Yes.

20  Q    Okay.  And where was that?

21  A    It was during a meeting, like I said, in the morning.

22  Everybody's present.  All the workers are present.

23  Q    Okay.  And who announced the winners?

24  A    Eric Valenzuela.

25  Q    And who won -- who were the winners the month before the

1    election?

2    A    It was Arturo Sanchez, it was Jorge Maldonado and it was

3    Jose Lopez.

4    Q    And the month before this -- the month before there were

5    three winners, was a winner announced at the end of that month?

6    A    No, only one.

7    Q    Okay.  And did the raffle ever come to an end?

8    A    When the elections were over, a month after the elections

9    were over, Eric Valenzuela said that they were no longer going

10   to have the raffles.

11   Q    And where did Eric Valenzuela make that announcement?

12   A    During a meeting.

13   Q    And is that a safety meeting?

14   A    Yes.

15   Q    Okay.  Now since you started to work with Greenbrier, had

16   you ever participated in a similar raffle?

17   A    No.

18       MS. ALONSO:  And Your Honor, I think this might be a good

19   point to stop.  It's --

20       JUDGE LAWS:  How much more do you have to cover?

21       MS. ALONSO:  I have --

22       JUDGE LAWS:  I realize our time constraints.

23       MS. ALONSO:  I have quite a few subjects to cover.  Like a

24   couple of meetings and then his work once we was rehired.

25       JUDGE LAWS:  Okay.  Why don't we -- I mean, we're going

1    slower than I would have hoped today.  Why don't we go until

2    ten of?  It's not going to take us that long to pack-up.  We

3    don't have to take everything with us.  So let's keep going

4    another five minutes.

5         MS. ALONSO:  Okay.

6    Q    BY MS. ALONSO:  Now, Mr. Martinez, were you working at

7    Greenbrier at the time of the Sheet Metal election in 2013?

8    A    Yes.

9    Q    Okay.  And in the months before the election, did you

10   attend Union meetings that were hosted by the company?

11   A    Yes.

12   Q    Okay.  And in the month of June, do you recall attending a

13   meeting?

14   A    Yes.

15   Q    And how did you find out that you had to attend this

16   meeting in the month of June?

17   A    My immediate boss, Ricky Fonseca, told me to go and show

18   up at the uniform trailer.  The trailer for the uniforms.  For

19   a meeting.

20   Q    All right.  And did you to that particular trailer for a

21   meeting?

22   A    Yes.

23   Q    Okay.  Who from Greenbrier do you remember hosting the

24   meeting?

25   A    Al Lave, the gentleman that's present.  Mike Torra and

1    Julio Vasquez and Eric Valenzuela.

2    Q    Okay.  And did you record this meeting?

3    A    Yes.

4    Q    Okay.  What kind of recording device did you use to record

5    the meeting?

6    A    My phone.

7    Q    All right.  And what in your phone did you use to record

8    the meeting?

9    A    I downloaded an application.

10   Q    Okay.  And are you familiar with the function of that

11   application?

12   A    I tried it out several times before.  I downloaded it

13   before I loaded it.

14   Q    Okay.  And the times that you tried it out, what was the

15   result of your test?

16   A    It worked fine.

17   Q    Okay.  And the day of the meeting, where did you have your

18   phone?

19   A    In my pants pocket.

20   Q    When did you turn on the device that day?

21   A    Before I went to the meeting.

22   Q    Okay.  And did you attend the entire meeting?

23   A    Yes.

24   Q    Okay.  At any point in the meeting, did you turn off the

25   recorder?

1   A    No.

2   Q    Okay.  When did you turn off the recording device?

3   A    When I left the meeting.

4   Q    And did you ever listen or watch -- sorry.  Did you ever

5   listen to the recording?

6   A    Yes.

7   Q    Okay.  When did you listen to it?

8   A    That day in the evening.

9   Q    Okay.  And did the meeting -- did the recording truly and

10  accurately reflect the meeting that you attended that day?

11  A    Yes.

12  Q    Okay.  And how did you play back that recording?

13  A    On my phone.

14  Q    Okay.  And is that recording still on your phone?

15  A    Yes.

16  Q    And Mr. Martinez, do you have your phone with you today?

17  A    Yes.

18  Q    Okay.  And can you take it out and go to that particular

19  file?

20      JUDGE LAWS:  Well, and I think now the operative question

21  will be will you have it with you tomorrow?

22      THE WITNESS:  Yes.

23      MS. ALONSO:  Okay.  Is that a good pausing --

24      JUDGE LAWS:  Let's go through --

25      MS. ALONSO:  -- sure.

1    JUDGE LAWS:  Since we're about to get to an audio tape

2    that we're not going to have time for.

3    MS. ALONSO:  Sure.

4    JUDGE LAWS:  Let's break now and come back tomorrow.

5    Let's go off and talk about time.

6    **(Whereupon, the hearing in the above-entitled matter was**

7    **recessed at 4:48 p.m. until Tuesday, November 20, 2013 at 8:30**

8    **a.m.)**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       <u>C E R T I F I C A T I O N</u>

2   This is to certify that the attached proceedings before the

3   National Labor Relations Board (NLRB), Region 28, Case Numbers

4   28-CA-093183, 28-CA-103909, 28-CA-104184, 28-CA-106613, 28-CA-

5   111186, 28-RC-093179, Gunderson Rail Services LLC, d/b/a

6   Greenbrier Rail Services, and Sheet Metal Workers'

7   International Association, Local 359, AFL-CIO at the Pima

8   County Consolidated Justice Court, 160 N. Stone Avenue, Third

9   Floor, Courtroom 11, Tucson, Arizona 85701, on Monday, November

10  18, 2013, at 8:44 a.m., was held according to the record, and

11  that this the original, complete, and true and accurate

12  transcript that has been compared to the reporting or

13  recording, accomplished at the hearing, that the exhibit files

14  have been checked for completeness and no exhibits received in

15  evidence or in the rejected exhibit files are missing.

16

17

18

19              GRANT C. DAYLEY

20              Official Reporter

21

22

23

24

25

# UNITED STATES OF AMERICA

## BEFORE THE NATIONAL LABOR RELATIONS BOARD

### REGION 28

In the Matter of:

GUNDERSON RAIL SERVICES LLC,　　　　　Case No. 28-CA-093183
D/B/A GREENBRIER RAIL　　　　　　　　　　　　28-CA-103909
SERVICES,　　　　　　　　　　　　　　　　　　　28-CA-104184
　　　　　　　　　　　　　　　　　　　　　　　　28-CA-106613
and　　　　　　　　　　　　　　　　　　　　　　28-CA-111186

SHEETMETAL WORKERS'
INTERNATIONAL ASSOCIATION
LOCAL 359, AFL-CIO,

GUNDERSON RAIL SERVICES LLC,　　　　　Case No. 28-RC-093179
d/b/a GREENBRIER RAIL
SERVICES,

　　　　　　　　　　Employer,

and

SHEETMETAL WORKERS'
INTERNATIONAL ASSOCIATION
LOCAL 359, AFL-CIO,

　　　　　　　　　　Petitioner.

The above-entitled matter came on for hearing, pursuant to notice, before **ELEANOR LAWS,** Administrative Law Judge**,** at the National Labor Relations Board, Pima County Consolidated Justice Court, 160 N. Stone Avenue, Third Floor, Courtroom 11, Tucson, Arizona 85701, on **Tuesday, November 19, 2013, at 9:20 a.m.**

<u>A P P E A R A N C E S</u>

**On behalf of the General Counsel:**

      **EVA SHIH, ESQ.**
      **JOHN GIANNOPOULOS, ESQ.**
      NATIONAL LABOR RELATIONS BOARD - REGION 28
      2600 North Central Avenue, Suite 1400
      Phoenix, AZ 85004-3099
      Tel.  602-640-2090
      Fax.  602-640-2178

      **SOPHIA ALONSO, ESQ.**
      NATIONAL LABOR RELATIONS BOARD
      421 Gold Avenue, SW, Suite 310
      P.O. Box 567
      Albuquerque, NM  87103
      Tel.  505-248-5128
      Fax.  505-248-5134

**On behalf of the Respondent:**

      **FREDERICK C. MINER, ESQ.**
      **STEVEN G. BIDDLE, ESQ.**
      LITTLER MENDELSON, P.C.
      Camelback Esplanade
      2425 E. Camelback Road, Suite 900
      Phoenix, AZ 85016
      Tel.  602-474-3653
      Fax.  602-391-2836

## **I N D E X**

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| Jorge Martinez | 1397 | 1411 | 1480 | | |
| Gordon Hudgens | 1485 | | | | |
| Lisa Maxey | 1539 | | | | |

## E X H I B I T S

| EXHIBIT | IDENTIFIED | IN EVIDENCE |
|---------|------------|-------------|
| **General Counsel:** | | |
| GC-201 | 1409 | 1409 |
| GC-202 | 1409 | 1409 |
| GC-203 | 1485 | 1485 |
| GC-204 | 1532 | 1532 |
| GC-206 | 1580 | 1580 |

1       <u>P R O C E E D I N G S</u>

2       JUDGE LAWS:  Before we resume with Mr. Martinez testimony,

3    I did just want to make a note that the General Counsel Exhibit

4    74 has been substituted.  Initially, it was just a one-page

5    e-mail referencing an attachment.  It is now four pages long;

6    it is the e-mail and the referenced attachment.

7       And, Mr. Martinez, I just want to remind you, you took an

8    oath yesterday and that is still in effect today and throughout

9    this trial.

10       THE WITNESS:  Okay.

11       JUDGE LAWS:  Whenever you're ready.

12    Whereupon,

13                          <u>JORGE MARTINEZ</u>

14    having been previously sworn, was called as a witness herein

15    and was examined and testified, by and through an interpreter

16    as follows:

17                       <u>DIRECT EXAMINATION</u>

18    Q    BY MS. ALONSO:  Mr. Martinez, yesterday I left off asking

19    you some questions about reporting a meeting that you attended

20    in June.

21    A    Yes.

22    Q    And you had said that you have -- that you still have the

23    original recording on your phone?

24    A    Correct.

25    Q    Do you have your phone with you?

1   A    Yes.

2   Q    Okay.  Could you take out your phone and go to that file,

3   please?

4        JUDGE LAWS:  And making the assumption that we are going

5   to listen to it, it may make sense if you know how to operate

6   it, for you to do it since there will probably be starts and

7   stops.

8        MS. ALONSO:  Well, not -- not exactly.  So I think the

9   next question may clear that up.

10       JUDGE LAWS:  Okay.

11       MS. ALONSO:  Okay.

12  Q    BY MS. ALONSO:  Okay.  And Mr. Martinez, who is the name

13  of the application that you have this file stored in?

14  A    Easy Boys recording.

15  Q    Okay.  And what is the date of the June 28 -- the June

16  meeting?

17  A    The 28th.

18  Q    Okay.  And does it -- what information is shown on that

19  file?

20  A    The taping of the first meeting.

21  Q    Okay.  And does it show the date and the time?

22  A    The date, the time, and the length.

23  Q    Okay.  So what time did you start the recording on June

24  28th?

25  A    At 10:33 a.m.

1    Q    And how long did you record the meeting?

2    A    One hour, 31 minutes, and 49 seconds.

3    Q    All right.  Now, you testified that you had -- or let me

4    ask you this.  Did you download this file from your phone?

5    A    Yes.

6    Q    Okay.  And how did you do that?

7    A    Through a USB cable through my computer.

8    Q    And did you -- did you share this file with anyone?

9    A    Yes.

10   Q    Okay.  So once you had put it on to your computer, what

11   did you do with the file?

12   A    I saved it on the computer.

13   Q    Okay.  And did you eventually -- how did you eventually

14   share it with someone?

15   A    I transferred it on to a USB and I gave it over to Marco

16   Molina from the sheetmetal workers.

17        MR. GIANNOPOULOS:  And, Your Honor, for the record, we've

18   instructed the witness to keep this file on his phone.  If

19   before the proceedings end there are any issues raised about

20   the authenticity of the recordings that are in the record

21   already, we will make the phone and the file available for you

22   to make a full comparison of what's played on the phone as to

23   what's in the record.  I really don't want to go spend an hour

24   playing the phone.

25        JUDGE LAWS:  I don't either.  I mean, if --

1     MR. GIANNOPOULOS:  But we have instructed the witness not

2  to erase those and they're available if at the end -- we'll

3  certainly complete our chain of custody, but --

4     JUDGE LAWS:  Okay.  If a comparison is needed, we'll keep

5  that in mind.

6  Q    BY MS. ALONSO:  Okay.  And, Mr. Martinez, I now want to

7  direct your attention to July of this year.  Did you attend a

8  meeting hosting by the company on the subject of the Union?

9  A    Yes.

10  Q    Okay.  And how did it come to your attention that there

11  was a Union meeting?

12  A    Through my leadman Ismael Lopez.  He told me to show up at

13  the trailers for the uniforms, that there was a meeting.

14  Q    Okay.  And did you attend the meeting?

15  A    Yes.

16  Q    And who from Greenbrier hosted the meeting?

17  A    Al Lave, Julio, it was -- I don't remember the names.

18  Q    Okay.  But did you record this meeting?

19  A    Yes.

20  Q    And did -- did you use the recording application from your

21  phone that you used to record the June 28 meeting?

22  A    Yes.

23  Q    And where did you have your phone on you when you attended

24  the meeting?

25  A    In my pants pocket.

1    Q    Okay.  And when did you turn on the recording application?

2    A    Before I went to the meeting.

3    Q    Okay.  And when did you turn it off?

4    A    After I left the meeting.

5         JUDGE LAWS:  And I'll jump in.  Is there anything

6    different about what you did with this recording as opposed to

7    the recording for the June 28th meeting.

8         THE WITNESS:  No.

9    Q    BY MS. ALONSO:  Okay.  And did you listen to this file at

10   any time after the meeting?

11   A    Yes.

12   Q    Okay.  When was that?

13   A    In the evening at my house.

14   Q    And was the recording a true and accurate recording of the

15   meeting that you attended?

16   A    Yes.

17   Q    Okay.  And you still have that recording on your phone?

18   A    Yes.

19   Q    Okay.  Could you refer to the phone and give us the date

20   and the time that you turned on the recorder?

21   A    July 9th, 2012 -- 13, at 1:30 in the afternoon.

22   Q    Okay.  And what's the duration on that recording?

23   A    Thirty-one minutes and 16 seconds.  At that meeting Juan

24   Maciel was also present.

25   Q    Okay.  And did you download this file to your computer?

1    JUDGE LAWS:  We already went through that --

2    MS. ALONSO:  Okay.

3    JUDGE LAWS:  -- and he did --

4    MS. ALONSO:  Sure.

5    JUDGE LAWS:  -- the exact same steps.

6    MS. ALONSO:  Okay.  All right.  And do you need me to go

7    to giving it to --

8    JUDGE LAWS:  I asked him if he did anything different than

9    he did last time.

10    MS. ALONSO:  Okay.

11    JUDGE LAWS:  Hang on.

12    MS. ALONSO:  Sure.

13    JUDGE LAWS:  Wait until I'm done, okay.  I asked if he did

14    anything different than he did last time and he said no, so I

15    think that covers it with regard to what he did with the file

16    after wards and how he transmitted it.

17    MR. GIANNOPOULOS:  And we'd make the same representation.

18    We've instructed the witness to keep that -- also that file on

19    his phone and in the --

20    JUDGE LAWS:  Thank you.

21    MR. GIANNOPOULOS:  -- future if there's any issues.

22    THE WITNESS:  Okay.

23  Q    BY MS. ALONSO:  Now, Mr. Martinez, when you were rehired

24    to work, did you work any overtime after your rehire?

25  A    Yes.

1   Q    Okay.  And was that -- was that -- can you tell us

2   approximately how many hours of overtime you were working a

3   week?

4   A    When I entered -- when I started work, it was mandatory.

5   So it was from Monday to Thursday it was ten hours and on

6   Saturdays it was mandatory eight hours.

7   Q    And was that when you started in March of this year?

8   A    Yes.

9   Q    And now are you currently working for Greenbrier?

10  A    Yes.

11  Q    Okay.  And where are you working now?

12  A    Mira Loma, California.

13  Q    When were you transferred to Mira Loma, California?

14  A    The 14th of October 2013.

15  Q    And were you offered money to relocate to Mira Loma?

16  A    Yes.

17  Q    Can you explain that?

18  A    Five thousand dollars to transfer and if I remain within

19  the company another six months, that would be another $2,000.

20  Q    Has there been a change to your wages?

21  A    Yes.

22  Q    Can you explain that?

23  A    Two dollar increase in raise and 50 cents for working the

24  night shift.

25  Q    Mr. Martinez, when you became involved in the organizing

1  drive in 2012 with the sheet -- with the UFCW, did you try to

2  keep the Union a secret?

3  A    No.

4  Q    Okay.  Do you know if it was a secret at work?

5  A    It wasn't possible, there was plenty of people.  Two times

6  we signed our letters of authorization for representation.

7  Q    Okay.  And did you try to keep organizing the workers for

8  the sheetmetal workers a secret?

9  A    No.

10  Q    Now, Mr. Martinez, before you were laid off in 2012, did

11  anyone review your percentage of productivity with you?

12  A    Yes.

13  Q    Okay.  And who was that?

14  A    Ricky Fonseca.

15  Q    And what was his title at the time?

16  A    My direct boss.

17  Q    Okay.  And what -- can you tell me what happened when he

18  reviewed the -- when he reviewed the productivity with you?

19  A    I remember that it was a Monday morning meeting and he

20  said that he was going to start measuring everybody's

21  productivity performance and he handed out a sheet of paper and

22  he wrote and he passed it around for everybody to put their

23  name down.  And I remember it was all above 100 percent.

24  Q    It was all above 100 percent or yours was?

25  A    No.  Mine.  There were people who were below, who were

1   below mine.

2       JUDGE LAWS:  Do you remember roughly when this was?

3       THE WITNESS:  It was, like, about a week before the

4   firing.

5       JUDGE LAWS:  Okay.

6       MS. ALONSO:  Your Honor, if I can take a moment to just

7   review my questions, I may be done with the witness.

8       Okay.  Just a couple more.

9   Q    BY MS. ALONSO:  And Mr. Martinez, I now want to ask you

10  about when you were rehired in March of 2013.  At any time

11  after you were rehired did you receive a bonus?

12  A    Yes.

13  Q    Okay.  And do you remember when you received the bonus in

14  relation to when you were rehired?

15  A    It was during the first six months.

16  Q    And what was -- do you know what the bonus was for?

17  A    Eric Valenzuela mentioned that they were going to try to

18  implement this, that whatever the company made to be able to

19  distribute a portion to the employees.

20  Q    And did you receive -- what was the amount of the bonus

21  that you received?

22  A    Forty-five dollars.

23  Q    And was it explained how or why you received $45?

24  A    It depended upon the seniority of every person.  At that

25  moment they did not honor my seniority, because I had not been

1   working six months prior.

2   Q    Okay.  Now, and I want to take you back to 2011.  Were you

3   involved in the Union organizing drive in 2011?

4   A    Yes.

5   Q    Okay.  And that was with UTU?

6   A    Yes.

7   Q    Okay.  And what was your role in that organizing drive?

8   A    Leader.

9   Q    And when you say leader, what are some of the things that

10  you did in that organizing drive?

11  A    Speak to people, with coworkers, and collect

12  representation cards.

13  Q    And I'm going to show you what's been marked at General

14  Counsel's Exhibit 8.  This is a disciplinary and corrective

15  action form that was issued to you in August of 2011.

16       JUDGE LAWS:  Do you have copies?

17       MS. ALONSO:  It's Exhibit 8 from what's been admitted

18  already, but I don't --

19       JUDGE LAWS:  No.  I can pull it up.  I just need a second.

20       MS. ALONSO:  Okay.

21       JUDGE LAWS:  I am there.  I think everyone has it in front

22  of them now.

23  Q    BY MS. ALONSO:  All right.  And, Mr. Martinez, do you

24  remember having received this written warning?

25  A    Yes.

1    Q    Okay.  Tell me what happened that led up to this write-up?

2    A    They called me to the office.

3    Q    Okay.  And who is they?

4    A    The plant manager Lex Morrison was there.  The lady from

5    human resources, Maggie Madrigal.  And the guy from materials,

6    which was Dirk Miranda.

7    Q    And what was said to you and by whom?

8    A    He said that one of his coworkers had gone over to him and

9    said that I had been threatening him and I had gone to one of

10   the coworkers threatening them for them to sign up for the

11   Union.  And he said that I had been threatening him, that he

12   wanted to be left alone.  I told him that that was not true,

13   that, yes, I would speak about the Union, but at no moment

14   would I ever threaten a coworker.  That if it was true, as they

15   believed, and then I told them to bring the person so he could

16   say it in my face.

17   Q    And did they respond?

18   A    No.  They did not want to.  They said that they had to

19   protect their witness.

20   Q    And would you speak about the Union at work before you

21   were -- before you received this written warning?

22   A    Yes.

23   Q    Okay.

24        MR. GIANNOPOULOS:  Your Honor, could we go off the record

25   one second?  There's something I want to discuss with

1   Ms. Alonso outside.

2       JUDGE LAWS:  Sure.  And while you're doing it, can you put

3   this on the door?

4       MS. ALONSO:  Yeah, sure.

5       JUDGE LAWS:  Thank you.  That's the second time today

6   someone's come in, so I'm concerned we've got a full house and

7   people are going to be wandering in.

8   (Off the record at 8:55 a.m.)

9       THE WITNESS:  I have another thing to say in reference to

10  the warning.

11      MS. ALONSO:  Well, and I think -- I think we're fine with

12  that.

13      THE WITNESS:  Okay.

14  Q    BY MS. ALONSO:  All right.  Mr. Martinez, I'm going to

15  pass out what's been marked at General Counsel's Exhibit 201.

16  Okay.  And, Mr. Martinez, is Rogelio Martinez your father?

17  A    Yes.

18  Q    And were you present when he filled out this card marked

19  as General Counsel's 201?

20  A    Yes.

21  Q    Okay.  And where were you?

22  A    At the sheetmetal workers' office.

23  Q    Okay.  And this card is dated November 5th of 2012.  Is

24  that the date that you were at the sheetmetal workers' office?

25  A    Yes.

1    Q    Okay.  And did you see your father complete this card?

2    A    Yes.

3    Q    And are you familiar with your father's signature?

4    A    Yes.

5    Q    Is this your father's signature on the card?

6    A    Yes.

7         MS. ALONSO:  Your Honor, I move for the admission of

8    General Counsel's 201.

9         MR. MINER:  No objection, Your Honor.

10        JUDGE LAWS:  201 is admitted.

11   **(General Counsel Exhibit Number 201 Received into Evidence)**

12        MS. ALONSO:  And then Your Honor we ask for a stipulation

13   on General Counsel's 202 from Respondent as a document from

14   Mr. Rogelio Martinez's personnel file.

15        MR. MINER:  No objection, Your Honor.

16        JUDGE LAWS:  Then 202 will be admitted.

17   **(General Counsel Exhibit Number 202 Received into Evidence)**

18        MS. ALONSO:  I have nothing further.

19        MR. MINER:  Is there an affidavit for this witness, Your

20   Honor?

21        MS. SHIH:  There is.  And there are three affidavits.

22   They are in Spanish.  Our office did English translations, but

23   we didn't want to have to handle that the way we did it with

24   the earlier ones.

25        MS. ALONSO:  And, Your Honor, I believe the three

1  affidavits, there's two that are fairly lengthy, one that's, I

2  know, a two-page.  So.

3      JUDGE LAWS:  I'll let you take a look and give me your

4  estimate.

5      MR. MINER:  Okay.

6      JUDGE LAWS:  And if you want interpretation, you know,

7  certainly ask.  You know, if you want her to verify that the

8  translation is correct from Spanish to English.

9      MR. MINER:  Thank you.

10     MS. ALONSO:  Your Honor, the first affidavit -- or one of

11  the affidavits is on November 15 -- or dated November 15th of

12  2012 and it's a nine-page affidavit in Spanish.  The second

13  affidavit was provided also on November 15th of 2012 and that's

14  a three-page Spanish affidavit as well.  And a third affidavit

15  was provided on August 28th of 2013, and that is three pages in

16  Spanish.  We do have translations for Mr. Miner.

17     MR. MINER:  Can we take an initial 30 minutes, Your Honor.

18  I'll review these and I'd like the assistance of the translator

19  to review them.  And then, if possible, I'll come back and

20  start cross at that time.

21     JUDGE LAWS:  That sounds good.  That was actually the

22  timeframe I was going to suggest.  So let's check back in at

23  9:35.  And if you haven't been able to get through it and you

24  need more time, let me know.

25         Off the record.

1  (Off the record at 9:03 a.m.)

2      JUDGE LAWS:  We are on.  And I want to make a couple of

3  statements before I turn things over for cross.

4      The reason we're on a bit later than we were originally

5  anticipating is because the two tapes that were on the

6  witness's phone have been transferred via cable to the

7  respondent's computer.  If the Respondent has any issues with

8  regard to the authenticity of what was submitted into evidence

9  by the General Counsel with regard to either the June or July

10  2013, meetings, they now have the original and can compare them

11  and bring any alleged discrepancies to my attention.

12      So with that, whenever you're ready with cross, go ahead.

13      MR. MINER:  Thank you, Your Honor.

14                    **CROSS-EXAMINATION**

15  Q    BY MR. MINER:  Good morning, Mr. Martinez.  My name is

16  Fred Miner.  I'm an attorney for Greenbrier Rail Services.

17      I'm going to ask you some questions about your testimony

18  this morning and about your testimony yesterday.  Please let me

19  know if you don't understand my questions.

20  A    Okay.

21  Q    Thank you.  I want to start by off asking you a few

22  questions about your relocation to Mira Loma, California.  When

23  were you offered relocation?

24  A    It was during the meeting that I have with Kevin, which it

25  was announced to all of the employees that the company was

1   going to close.

2   Q    And who is Kevin?

3   A    He was the person that was here yesterday, but I don't

4   recall his name.

5   Q    Kevin Stewart?

6   A    Yes, sir.

7   Q    Did you meet individually with Mr. Stewart?

8   A    No.

9   Q    So how -- how is it that you were offered relocation?

10  A    There were days after the meetings and I don't remember if

11  it was -- how many of them, but it was Eric Boswell and others

12  who were going around and asking the employees that were

13  interested in relocating.

14  Q    Okay.  So I want to focus on your specific experience.

15  Not what other employees may have heard or been told, but when

16  you were offered relocation to Mira Loma.  Do you understand?

17  A    Yes.  I spoke with Juan Maciel.

18  Q    When did you speak with Mr. Maciel?

19  A    One week before the relocation.

20  Q    And what date was that?

21  A    I don't recall the exact date.

22  Q    What was the date of your relocation?

23  A    The 14th of October of 2013.

24  Q    You met with Mr. Maciel around October 7th?

25  A    I called him on the phone.

1    Q    Spoke with him on the phone?

2    A    Yes.

3    Q    Who told you to call Mr. Maciel?

4    A    His cousin Javier Garcia.

5    Q    Did you speak with Mr. Maciel over the phone on about

6    October 7th?

7    A    Yes.

8    Q    And what did Mr. Maciel tell you about your relocation?

9    A    I asked him if he could transfer me to Mira Loma and he

10   said to count on that.

11   Q    All right.  Did he tell you that there was a vacancy for

12   you to fill in Mira Loma?

13   A    Yes.

14   Q    Did he tell you that he thought you'd be a good fit for

15   the vacancy?

16   A    I didn't understand the question.

17   Q    What did Mr. Maciel tell you about your suitability for

18   the vacancy in Mira Loma?

19   A    He didn't mention anything of this nature.

20   Q    All right.  Did he offer you a relocation package at that

21   time including certain payments?

22   A    No.

23   Q    When did you receive the offer?

24   A    They didn't make me an offer.

25   Q    When were you informed that you would receive a payment in

1   connection with your relocation to Mira Loma?

2   A    Mr. Juan Maciel on the Friday, that was the day before my

3   transfer, he came and he handed me the check in my hands.

4   Q    What did he tell you about the check?

5   A    That it was half the money for the transfer to Mira Loma,

6   but when I was in Mira Loma I would receive the other half.

7   Q    Prior to that time had anyone told you that you would

8   receive relocation payments?

9   A    As I mentioned, it was mentioned during the meeting when

10  the company was going to be closed.

11  Q    Is that the -- is that the meeting with Kevin Stewart?

12  A    Yes.

13  Q    So --

14  A    Yes.  And he explained the process in which he was going

15  to have with the people that he was going to transfer.

16  Q    And what was the date of that meeting?

17  A    I don't recall.

18  Q    Did you receive a letter from Greenbrier informing you

19  that the Tucson shop would be closing and that you would be --

20  your employment there would be terminated at that time?

21  A    I don't recall.

22  Q    Okay.  The meeting with Kevin Stewart, was that the first

23  time that you heard that the Tucson shop would be closing?

24  A    No.

25  Q    What was the first time you heard that this shop would be

1   closed?

2   A     It was like a month before.

3   Q     What was the date?

4   A     I don't know.  It was like a month before Kevin announced

5   it.

6   Q     And you don't recall when the meeting was with

7   Mr. Stewart?

8   A     No.

9   Q     Did Eric Valenzuela inform you that the shop was going to

10  close?

11  A     No.

12  Q     Who told you?

13  A     Armondo Lopez.

14  Q     At the meeting with Kevin Stewart you testified that he

15  announced relocations would be offered to employees, correct?

16  A     Yes.

17  Q     And he described a process for the relocation?

18  A     The process is such he did not explain.

19  Q     I thought you testified that he explained to employees

20  during the meeting that there'd be relocation and that there

21  was a process for the relocation being offered?

22  A     Yes, I told you that.

23  Q     Okay.  And what did he say?

24  A     He said if anybody had a question and Lisa also said that

25  if anybody had a question about it to approach him and then he

1   would address it with them.

2   Q    What sort of question?

3   A    Concerning the process for those who want to transfer and

4   to what workshop and concerning what the probabilities were and

5   to what shops.

6   Q    Okay.  Did he mention any specific shops?

7   A    Yes.

8   Q    Did he say there were vacancies at Mira Loma?

9   A    I don't recall Mira Loma.

10  Q    Did he say there were vacancies at San Antonio?

11  A    Yes.

12  Q    Did he say there were vacancies in Omaha?

13  A    Yes.

14  Q    Did he say -- did he tell employees if they're interested

15  in relocation to let him know?

16  A    Him or Lisa or Julio Vasquez --

17  Q    Did you speak --

18  A    -- or Eric Valenzuela.

19  Q    Did you speak with any of the three of them about

20  relocating to Mira Loma?

21  A    No.  I spoke with Cesar Nevarez because Eric Valenzuela

22  was not there at the time.

23  Q    I thought you said you spoke with Juan Maciel?

24  A    Okay.  When I went to speak to Cesar Nevarez in person, he

25  was the person that was in charge of the company.  And I asked

1   him to please to put me in contact with Juan Maciel to let him

2   know that I wanted to transfer to Mira Loma.

3   Q    Then --

4   A    Days went by without me receiving a response and my

5   coworkers with whom I was transferred, they resolved their

6   issues immediately.  That's why I made the decision to speak to

7   Juan Garcia and ask for Juan Maciel's number and speak directly

8   to him.

9   Q    How long was it after you spoke with Juan Maciel that you

10  were relocated?

11  A    It was a matter of days.

12  Q    Okay.  Going back again to the meeting with Kevin Stewart,

13  did Kevin Stewart describe the relocation package payments that

14  would be offered to employees who accepted a relocation?

15  A    No.  Kevin did not explain that.

16  Q    Okay.

17  Q    Did you receive any written instructions or correspondence

18  like a memo from the company about how the relocation payment

19  would be offered?

20  A    No.

21  Q    Okay.  What was the date of the sheetmetal workers

22  election at the plant?

23  A    I don't remember the exact date.

24  Q    Do you remember what month that occurred in?

25  A    I think it was in August.

1    Q    Okay.  Could it have been July 11th?

2         MS. ALONSO:  Objection.  Relevance.

3         JUDGE LAWS:  Overruled.

4         MS. ALONSO:  The date has been established in the record.

5         JUDGE LAWS:  Overruled.

6         THE WITNESS:  No.  Because I have the tapes from the 8th

7    of July -- no.  Because I have the recordings from the 28th of

8    June and the 29th of July, so it couldn't be before then.

9         Of, okay, just a minute.

10        JUDGE LAWS:  And I want to record to reflect, he's looking

11   at the recording dates on his phone.

12        THE WITNESS:  Yes.  It was that date, the 11th of July,

13   because I recall that on the 7th of July, Al Lave said in a

14   meeting that that was the last date that we could talk about

15   the Union, because he couldn't talk about the Union after this

16   because of the elections.

17   Q    BY MR. MINER:  Did you attend the tally of ballots of July

18   11th?

19   A    For the tally, no.

20   Q    Do you know what the tally was?

21        MS. ALONSO:  Objection.  Lack of foundation.

22        JUDGE LAWS:  He's asking if he knows.

23        MS. ALONSO:  And relevance.

24        THE WITNESS:  I didn't understand.

25   Q    BY MR. MINER:  Do you know what the outcome of the vote

1   was?

2   A    Yes.

3   Q    What was it?

4   A    It was approximately 13 votes in favor.

5   Q    And?

6   A    The rest of them against.

7   Q    How many?

8       MS. ALONSO:  Objection.  Relevance.  The tally of ballots

9   is already in the record as General Counsel's Exhibit 7.

10      JUDGE LAWS:  And I understand that.  I will allow the

11  question.

12      THE WITNESS:  I don't remember the amount.  I know that we

13  are -- we were about 70, 76 employees with the right to vote

14  but I don't remember the amount.

15  Q    BY MR. MINER:  Do you know whether all 76 eligible voters

16  voted in the election?

17      MS. ALONSO:  Objection.  Relevance.

18      JUDGE LAWS:  Again, I'll allow it as to this witness's

19  knowledge.  I know it is established through documentary

20  evidence.

21      THE INTERPRETER:  So may the interpreter have a ruling?

22      JUDGE LAWS:  It's overruled.

23      THE INTERPRETER:  Overruled?  Thank you.

24      And I'm sorry, now I forgot your question, counsel.

25      MR. MINER:  That's all right.  Does he know whether all of

1  the eligible voters actually cast a ballot in the election?

2      THE WITNESS:  I don't know, because I wasn't present when

3  the people were voting.

4  Q   BY MR. MINER:  Okay.  Prior to the election there were

5  Union representatives hand billing at the gate of the facility

6  on various dates, correct?

7      MS. ALONSO:  And I'm going to object to relevance as that

8  is beyond the scope of the direct.  I did not cover any of this

9  subject matter with the witness.

10     JUDGE LAWS:  Would you be calling this witness in your

11 case in chief?

12     MR. MINER:  Yes.

13     JUDGE LAWS:  All right.  Then for purposes of not

14 disrupting this witness again to travel back to Arizona, I will

15 allow some questioning beyond the scope.  The General Counsel

16 will be able to follow up obviously on any of that.

17     THE WITNESS:  Yes.

18 Q   BY MR. MINER:  Did you participate in any hand billing at

19 the gate prior to the election?

20 A   No.

21 Q   Did any Greenbrier employees participate in the hand

22 billing at the gate with the Union representatives prior to the

23 election?

24     MS. ALONSO:  And I'm going to object to lack of

25 foundation.

1    JUDGE LAWS:  And my instruction will be answer only if you

2  have direct knowledge.

3    THE WITNESS:  The ones that I saw were ex-employees.

4  Q    BY MR. MINER:  Any current employees?

5  A    We were offered.  But in my case, for example, there were

6  people that were present from management, Eric Valenzuela for

7  example.  And also Freddy Valdez was present.  So it's not

8  logical that anyone would want to receive any one of the

9  billing -- one of the fliers from any people that were handing

10  them out with these two people present.  They were just

11  intimidated.

12  Q    So the answer to my question is no, there were no

13  Greenbrier employees participating in any hand billing prior to

14  the objection, correct?

15    MS. ALONSO:  Objection.  Asked and answered.

16    JUDGE LAWS:  Overruled.

17    MS. ALONSO:  And objection, lack of foundation.

18    JUDGE LAWS:  And my same instruction.  I think it --

19    MS. ALONSO:  And Your Honor --

20    JUDGE LAWS:  -- inherently implies that answer only if you

21  know directly.

22    THE WITNESS:  Correct.

23  Q    BY MR. MINER:  After the election did you observe any

24  Union representatives hand billing at the gate?

25  A    No.

1    Q    Prior to the election, before the election, did you

2    observe any employees wearing vote yes hats or pins or shirts

3    in the plant?

4    A    No.

5    Q    How about after the election?

6    A    No.

7    Q    Before the election, did you observe any employees wearing

8    any sheetmetal worker logos or insignia on their uniforms or on

9    hats or pins?

10    MS. ALONSO:  Objection, Your Honor.  Can we get some

11    foundation as to when before the election?  That's a very broad

12    timeframe.

13    MR. MINER:  Sure.  I'll narrow it down to the month before

14    the election, Your Honor.

15    JUDGE LAWS:  Thank you.

16    THE WITNESS:  Inside the company?

17    Q    BY MR. MINER:  Correct.

18    A    No.

19    Q    How about after the election?

20    A    No.

21    Q    After you provided the authorization cards to the

22    sheetmetal workers, do you know what happened to those cards?

23    A    No.

24    Q    Did anyone from the Union ask you to speak with management

25    about the authorization cards?

```
1    A    I don't understand the question.

2    Q    Did anyone from the sheetmetal workers' Union and you to

3    speak with management about the authorization cards?

4    A    What management?

5    Q    Any management.

6    A    No.

7    Q    Did you speak with any pregnant about the authorization

8    cards before the election?

9    A    No.

10   Q    Prior to the election, did you provide Eric Valenzuela a

11   list of employees who had signed authorization cards?

12   A    No.

13   Q    How about after the election?

14   A    No.

15   Q    Did you provide a list to Juan Maciel before the election?

16   A    No.

17   Q    How about after?

18   A    No.

19   Q    Do you know what a request for recognition is?

20        MS. ALONSO:  Objection relevance.

21        JUDGE LAWS:  Hang on.  You know, and I don't see it as

22   relevant to my case this witnesses understanding of a request

23   for recollection.  I will grant some leeway assuming you will

24   tie it in.

25        So go ahead.
```

1       THE WITNESS:  No.

2   Q   BY MR. MINER:  The answer is no?

3   A   Could you repeat the question again?

4   Q   Yes.  Do you know what a request for recognition is?

5   A   I think it is a petition that the Union poses before the

6   company asking the company to recognize the Union without

7   having to go to a vote.

8   Q   Okay.  Did you ever request that Greenbrier management

9   recognize the Union --

10      MS. ALONSO:  Objection relevance.

11      MR. MINER:  -- as the representative of employees?

12      MS. ALONSO:  Objection.  Relevance.

13      JUDGE LAWS:  Overruled.

14      THE WITNESS:  No.

15  Q   BY MR. MINER:  Did anyone from the Union ask you to do so?

16      MS. ALONSO:  Same objection.

17      JUDGE LAWS:  Okay.  Overruled.

18      THE WITNESS:  No.

19  Q   BY MR. MINER:  How about after the election; did you

20  request recognition on behalf of the Union among anyone in

21  management?

22  A   No.

23  Q   After the election did you request to meet with anyone in

24  management at Greenbrier on behalf of the Union?

25      MS. ALONSO:  Objection.  Same objection, Your Honor.

1     JUDGE LAWS:  And I will allow it.  Overruled.

2     THE WITNESS:  No, sir.

3  Q   BY MR. MINER:  How about before the election; did you

4  request to meet with anyone in management on behalf of the

5  Union?

6  A   No, sir.

7  Q   Did you request to bargain on behalf of the employees over

8  the issue of the closure of the Tucson shop?

9     MS. ALONSO:  Objection.  Relevance.

10    Your Honor, this employee has not been established as an

11 agent of the Union and I think the this entire line of

12 questioning is entirely irrelevant.

13    MR. MINER:  He said he's a leader, Your Honor.

14    JUDGE LAWS:  I understand the objection.  You know, again,

15 I will allow it, subject to it being tied into something

16 relevant that's before me.

17    THE INTERPRETER:  And may the interpreter have that

18 question again?

19    MR. MINER:  Yes.

20 Q   BY MR. MINER:  Did you request to bargain with Greenbrier

21 on behalf of employees over the issue of the closure of the

22 Tucson shop?

23 A   No.

24 Q   Did you request to bargain with Greenbrier over the

25 implementation of a safety program?

 1  A    No.

 2  Q    Did you request to bargain with Greenbrier over the issue

 3  of a reduction in force and restructuring in November 2012?

 4       MR. GIANNOPOULOS:  We'll stipulate he did not.  We'll

 5  stipulate that this witness did not request to bargain with

 6  Greenbrier over anything.

 7       JUDGE LAWS:  Over anything?  Okay.  Very good.

 8       MR. MINER:  That's satisfactory.  Thank you.

 9  Q    BY MR. MINER:  Do you know whether anyone from the Union

10  requested to bargain with Greenbrier over the subject of the

11  Tucson shop?

12  A    Do I don't.

13  Q    Do you know whether anyone from the Union or on behalf of

14  the Union requested to bargain with Greenbrier over the issue

15  of reductions in force and restructuring in November 2012?

16  A    No, sir.

17  Q    Did you ever identify yourself to Greenbrier as a

18  bargaining representative for employees?

19       MS. ALONSO:  Objection.  Relevance.

20       JUDGE LAWS:  Hold on.  What were you going to say?

21       THE WITNESS:  Could you please repeat the question?

22       JUDGE LAWS:  Go ahead.

23       MR. MINER:  Sure.

24  Q    BY MR. MINER:  Did you ever identify yourself to

25  Greenbrier as a representative, bargaining representative for

1   employees?

2       JUDGE LAWS:  And anticipating the objection that was

3   already lodged, I suppose, so it's not an anticipation.  Would

4   the General Counsel be willing to state that this witness never

5   held himself out as a bargaining agent?

6       MR. GIANNOPOULOS:  Yes, we will, Your Honor.

7       JUDGE LAWS:  Okay.

8       MR. MINER:  Okay.  Great.

9   Q   BY MR. MINER:  Did you ever speak with Eric Valenzuela

10  about your leadership of a Union organizing campaign?

11  A   No.

12  Q   Did you speak with Juan Maciel about that subject?

13  A   If you recall it was on the video when I told Juan Maciel

14  that I was a leader and everybody was present.

15  Q   And when was that?

16  A   That was the day of the firing; the 12th of November of

17  2012.

18  Q   Was Juan Maciel at that meeting?

19  A   Yes, sir.

20  Q   Are you sure about that?

21  A   During the firing, yes.  You can see the video.

22  Q   Juan Maciel?

23  A   Yes, sir.

24  Q   Who is Gordon Hudgens?

25      MS. ALONSO:  Objection.  Relevance.  And it's already been

1   established in the record who Gordon Hudgens is.  We just

2   reviewed that in the video yesterday.

3         JUDGE LAWS:  Well, I'm assuming this is a foundation

4   question.

5         MR. MINER:  It is, Your Honor.

6         JUDGE LAWS:  Okay.  Go ahead.

7         THE WITNESS:  Yes.

8   Q     BY MR. MINER:  Gordon Hudgens was at the meeting on

9   November 12th, correct?

10  A     Yes, sir.

11  Q     Lisa Maxey was at that meeting, correct?

12  A     Yes, sir.

13  Q     Do you understand that Mr. Hudgens and Ms. Maxey are

14  management representatives of Greenbrier?

15  A     Yes, sir.

16  Q     All right.  And at that meeting you informed Mr. Hudgens

17  that you were a leader of an organizing campaign, correct?

18  A     Yes.

19  Q     Prior to that meeting, did you ever speak to Mr. Hudgens

20  about your leadership of an organizing campaign?

21  A     No.

22  Q     How about Ms. Maxey?

23  A     No.

24  Q     How about Juan Maciel?

25  A     No.

1   Q      How about Lex Morrison?

2   A      No.

3   Q      Who was your foreman at the time?

4   A      Direct it would be Ricky Fonseca.

5   Q      Did you tell Ricky Fonseca that you were the leader of an

6   organizing campaign at that time?

7   A      No.

8   Q      Who was your leadman at the time?

9   A      Cesar Ledezma.

10  Q      Did you tell Mr. Ledezma that you were the leader of an

11  organizing campaign prior to November 12th?

12  A      Yes, sir.

13  Q      When did you tell him that?

14  A      It was during some hours -- during some work hours.

15  Q      When?

16  A      Probably about a month before the firings.

17  Q      A month before November 12th?

18  A      Yes, sir.

19  Q      And where were you at the time?

20  A      Center shop.

21  Q      Where in the center shop?

22  A      On to the roof.

23  Q      And who else was there?

24  A      He and I.

25  Q      No one else?

1  A    I don't recall.

2  Q    How is it the subject of an organizing campaign came up

3  during that discussion?

4  A    We were talking about the problems that were in the

5  company, what had occurred with the first vote, and I mentioned

6  to them that I was one of the people that were involved in the

7  Union with them.

8  Q    What did you tell them?

9  A    I don't recall; it's been a long time.

10  Q    You told them you were involved in a campaign?

11  A    Yes.

12  Q    Is that the first time you had discussed your

13  participation in a campaign with Mr. Ledezma?

14      MS. ALONSO:  Objection.  Can I get some foundation here as

15  to when?

16      JUDGE LAWS:  When what?

17      MS. ALONSO:  Which year?

18      MR. MINER:  My question, Your Honor is this the first time

19  that he'd ever spoken with Mr. Ledezma about his participation

20  in an organizing campaign.

21      JUDGE LAWS:  And I think that's clear enough.  Go ahead.

22      THE WITNESS:  No.

23  Q    BY MR. MINER:  All right.  When you spoke with Mr. Ledezma

24  in about October of 2012 about an organizing campaign, what

25  else did you tell him about the campaign?

1    A    Like I said, it's been a long time, so I don't remember a

2    lot of that.  It was simply a conversation amongst friends in

3    which I mentioned to him that I formed a part in that.

4    Q    Did you mention to him the names of other employees who

5    were participating in the campaign?

6    A    No.

7    Q    Did you tell him that you had signed an authorization card

8    for a Union by that time?

9        MS. ALONSO:  Objection.  Misstates the evidence.

10       JUDGE LAWS:  Overruled.

11       THE WITNESS:  No.

12   Q    BY MR. MINER:  Had you signed a card by that time?

13   A    No.

14   Q    How long after that was it that you started circulating

15   authorization cards among your coworkers?

16   A    It was approximately, like, a week after that.

17   Q    And who's cards were you circulating first?

18   A    Local Number 99.

19   Q    Now, you testified that you were involved in the UTU

20   campaign in 2011, correct?

21   A    Yes.

22   Q    You testified you were a leader of that campaign?

23   A    Yes.

24   Q    Did you contact the UTU again in 2012?

25       MS. ALONSO:  Objection relevance.

1    JUDGE LAWS:  Overruled.

2    THE WITNESS:  Yes.

3  Q    BY MR. MINER:  Did you ask the UTU to come in and conduct

4  another organizing campaign?

5    MS. ALONSO:  Same objection, Your Honor.

6    JUDGE LAWS:  Okay.  Overruled.

7    THE WITNESS:  Yes.

8  Q    BY MR. MINER:  And what did they tell you?

9    MS. ALONSO:  Objection.  Hearsay and lack of foundation.

10    JUDGE LAWS:  In --

11    MS. ALONSO:  And I'd like to add relevance.

12    JUDGE LAWS:  Sure.  You know, I think this was asked about

13  on direct.  I mean some of it has been asked and answered.  I'm

14  going to assume you're leading up to something.

15    MS. ALONSO:  And Your Honor --

16    MR. MINER:  I am, Your Honor.

17    MS. ALONSO:   -- questions on the UTU, contacting the UTU,

18  were not reviewed -- or in his direct testimony.

19    MR. MINER:  I'm pretty sure there was testimony about

20  that.

21    JUDGE LAWS:  I think there was.  And anyway, I am going to

22  allow it, because even if there wasn't, if my memory is

23  incorrect, I had ruled previously I will allow some leeway to

24  go beyond to scope so that this witness doesn't have to take

25  another trip and travel away from his job.

1    THE WITNESS:  Could you please repeat it?

2    MR. MINER:  Sure.

3  Q    BY MR. MINER:  Did you contact the UTU about conducting

4  another organizing campaign in 2012?

5  A    Yes.

6  Q    Did they respond to you?

7  A    When I called them, yes.

8  Q    What did they say?

9    MS. ALONSO:  Objection relevance.  I mean relevance and

10  hearsay.

11    JUDGE LAWS:  Okay.  And I will allow it with regard to

12  hearsay.  I think I've stated my interpretation of the Board's

13  position on hearsay and my ruling will be in line with that.

14    THE WITNESS:  He said he was going to call me back and

15  then he never called me back.

16  Q    BY MR. MINER:  And so you never got an answer?

17  A    No.

18  Q    Is that why you called the UFCW?

19    MS. ALONSO:  Objection.  Relevance.

20    JUDGE LAWS:  Overruled.

21    MS. ALONSO:  The subjective motive of why he contact it

22  had UFCW is not relevant.

23    JUDGE LAWS:  And I won't be worried about his subjective

24  motivation.  I think we're just getting some background.  So he

25  may answer.

```
 1          THE WITNESS:  Yes.

 2    Q     BY MR. MINER:  And you spoke with Efrain Sanchez; is that

 3    correct?

 4    A     Yes, sir.

 5    Q     He provided you some UFCW authorization cards, correct?

 6    A     Not at that moment.

 7    Q     Okay.  When you initially met with Efrain Sanchez you

 8    talked with him about a UFCW organizing campaign, correct?

 9    A     Yes.

10    Q     He provided you a card to sign, correct?

11    A     During the phone call he told me to wait, because he was

12    going to find out whether they were going to support us or

13    whether it was going to be another Union that would support us

14    that was more in line with the work that we did.

15    Q     He eventually provided you a card, right?

16    A     Yes.

17    Q     How many days was it after your initial call with him?

18    A     Approximately, two or three days.

19    Q     Okay.  And at that time he gave you additional cards to

20    distribute to other employees, correct?

21          MS. ALONSO:  Objection, relevance.

22          JUDGE LAWS:  I think we went into the UFCW cards on

23    direct.  So presumably the General Counsel deemed the topic

24    relevant.  So I will overrule that.

25          MR. MINER:  Thank you.
```

1    THE WITNESS:  Yes.

2  Q    BY MR. MINER:  How many?

3  A    I don't recall.  I recall that I grabbed 30, 35 cards, but

4  there were more.

5  Q    Did you use all the cards that the UFCW provided you?

6  A    I don't remember.

7  Q    Did you meet with employees at work to show them the UFCW

8  cards?

9  A    I did not meet with the employees at work.

10  Q    Did you meet with them outside of work and show them the

11  UFCW cards?

12  A    I did not meet with them in groups.  I would speak with

13  each one personally.

14  Q    Did you meet with each one personally at the Tucson shop?

15  A    In the workshop and outside of the shop.

16  Q    Okay.  How many employees did you meet with in the shop?

17  A    I don't recall.

18  Q    More than ten?

19  A    Yes.

20  Q    During these meetings, was anyone else present with you?

21    MS. ALONSO:  Objection.  Vague.  If we could, you know,

22  isolate the incidents or refer him to a specific time.

23    JUDGE LAWS:  During any of the meetings.

24    THE WITNESS:  Coworkers have -- had a little bit more

25  confidence or trust.

1  Q    BY MR. MINER:  I don't understand that answer.

2  A    Well, there's coworkers, people, who were on the company's

3  side.

4        JUDGE LAWS:  Why don't we re-ask the question.

5        MR. MINER:  Okay.

6        JUDGE LAWS:  I think we've gotten some misunderstanding.

7        MR. MINER:  Yeah.

8  Q    BY MR. MINER:  My question was when you met with the

9  employees at the facility, did you meet with them one-on-one or

10  were there some meetings where additional people were present?

11  A    On occasions it was just one, that's it.  And then on the

12  other occasions it was two or three.

13  Q    Okay.  When you met with employees in groups of two or

14  three, were there any leadmen present during those meetings?

15  A    No.

16  Q    Were any foremen present?

17  A    No, sir.

18  Q    Or any managers?

19  A    No.

20  Q    After these employees signed cards, did they wear any UFCW

21  insignia or vote yes insignia on their uniforms?

22  A    No.

23  Q    Did you distribute any UFCW campaign literature at the

24  facility?

25  A    On occasions.

1   Q    I'm sorry?  On occasions?

2   A    On occasions.

3   Q    You distributed UFCW literature?

4   A    No.  Not the UFCW, no.

5   Q    No UFCW campaign fliers?

6   A    No.

7   Q    How many cards -- how many signed cards did you provide to

8   the UFCW?

9        MS. ALONSO:  And I will object on the relevance of that,

10  Your Honor.  General Counsel is not relying on UFCW cards to

11  establish a majority.

12       JUDGE LAWS:  What is this going toward, just generally?

13       MR. MINER:  Your Honor, it's being contended that at the

14  time that a certain number of cards were signed for the

15  sheetmetal workers, the Union became in place representative at

16  that time.  We've had lots of questions about the subjective

17  understanding of witnesses about what these cards meant.  I

18  want to know how many cards this witness provided to the UFCW,

19  because I'm interested in whether he thought the UFCW became

20  the employee's representative at that time.

21       MS. ALONSO:  And --

22       JUDGE LAWS:  Okay.  And I understand the gazelle based

23  objection that was lodged when questions were being asked about

24  the employees' subjective understanding of what the sheetmetal

25  workers cards meant.  I will make the same ruling.  I

1  understand the law, this isn't going to a jury; I will allow it

2  assuming that Mr. Miner is going to tie it into something

3  beyond that.

4       MS. ALONSO:  And, Your Honor, if I may respond briefly?

5       JUDGE LAWS:  Sure.

6       MS. ALONSO:  So the General Counsel's position is not that

7  a majority was established with the UFCW cards.  And it's our

8  position that those -- the number of cards he collected for the

9  UFCW prior to collecting the sheetmetal worker cards is utterly

10 irrelevant.

11      JUDGE LAWS:  And I understand.  I'm going to allow it in

12 line with my previous ruling.

13      THE INTERPRETER:  I may need to have that question again.

14      MR. MINER:  Pardon?

15      THE INTERPRETER:  May the interpreter have that question

16 again?

17      MR. MINER:  Yes.

18 Q    BY MR. MINER:  How many signed cards did you submit to the

19 UFCW?

20 A    Approximately, and I believe there were about 30.

21 Q    And do you remember providing an affidavit to the NLRB on

22 about November 15th last year?

23 A    Yes.

24 Q    Didn't you tell the NLRB agent that you submitted 48 cards

25 to the UFCW?

```
 1   A     Like I said, it's been quite a bit of time.  I don't
 2   remember the exact amount or the quantity.
 3   Q     Do you dis --
 4         MS. ALONSO:  And Your Honor, I'm --
 5         MR. MINER:  Do you dispute that number?
 6         MS. ALONSO:  Objection.  Your Honor, and that actually
 7   if -- you know, that actually misrepresents what is in the
 8   affidavit of November 15th.
 9         JUDGE LAWS:  And, you know, certainly that's something you
10   can --
11         MS. ALONSO:  So --
12         JUDGE LAWS:  -- address.
13         MS. ALONSO:  And so if he can show in Mr. Martinez's
14   affidavit where it says that he collected 45 cards that would
15   be different, or that may be a better approach.
16         MR. MINER:  I don't know if that's necessary, but let's
17   see.
18         MS. ALONSO:  Your Honor, page three of the affidavit
19   identifies the number of cards he had collected for the UFCW
20   and it's not 40, it says 20 cards.  Approximately, 20 cards.
21         MR. MINER:  Well, let's take the time to look at this.
22         JUDGE LAWS:  Okay.
23   Q     BY MR. MINER:  Didn't you tell the NLRB agent with respect
24   to the UFCW campaign specifically "In total we turned in around
25   48 authorization cards and I handed them to Sanchez?"
```

1      MS. ALONSO:  And I would object, Your Honor.  This is an

2  improper method of impeachment.  If he's trying to refresh the

3  memories of an employee's recollection, then he should -- he

4  needs to exhaust his recollection, then show him the affidavit

5  and then question him on it.

6      JUDGE LAWS:  Well, I don't think he's trying to refresh

7  his recollection.  I think there's a different purpose here.

8  And that's my yes.  Why don't you at least direct General

9  Counsel as to where you are in what affidavit.

10      MR. GIANNOPOULOS:  Your Honor, if I may speak.

11      JUDGE LAWS:  Sure.

12      MR. GIANNOPOULOS:  If he's trying to impeach the witness

13  with his affidavit, the witness has to be given the opportunity

14  to review the affidavit, to identify it that that's his

15  signature, that that's the page, and then direct him to the

16  page line.  So I'm not sure what's going on here.  If he's

17  trying to refresh his recollection, he needs to have the

18  witness say he cannot remember at all and then refresh his

19  recollection through affidavit.  In he's trying to impeach him,

20  the witness has to have the opportunity to identify that this

21  is his document that he signed and then direct him to various

22  pages.

23      So just blank questions --

24      JUDGE LAWS:  I agree.  I --

25      MR. GIANNOPOULOS:  -- is an improper way to use this

1    affidavit for either refreshing recollection or impeachment.

2        JUDGE LAWS:  I'm assuming he's ultimately going to do

3    that.  I mean there's nothing prohibiting him from asking first

4    and getting authentication after.

5        MS. ALONSO:  Right.  And Your Honor as to what was read to

6    Mr. Martinez, that is actually not what the affidavit says in

7    Spanish.  In Spanish it is a different version.

8        MR. MINER:  This is region 28's translation that I've been

9    working from.  Good grief.

10       MS. ALONSO:  And that may be the case, but, you know, it

11   could be that there is an error in that translation.  The

12   sentence in Spanish, I can read it in Spanish --

13       MR. MINER:  Oh, an error.  An error.

14       JUDGE LAWS:  Well, seeing that it is seven minutes until I

15   start a prehearing conference.  I think it is a good time to go

16   off the record, have our interpreter, General Counsel, and

17   Respondent get together, sort out what exactly this part of the

18   affidavit says.  And let's take ten minutes to do that.  Follow

19   that by lunch and be back here a little bit after 1:00; let's

20   say five after 1:00.

21       If by some chance it takes you longer than about ten

22   minutes -- I would think it wouldn't -- to sort of the

23   interpretation issue, let me know and I'll extend that time.

24   (Off the record at 10:52 a.m.)

25       JUDGE LAWS:  All right.  Well, I want to summarize the

1   discussion off the record about the interpretation occurred and

2   what has been decided is we are going to have the interpreter

3   translate certain portions of the document and I'll have

4   General Counsel describe those for the record since I don't

5   have the document in front of me.

6       MS. ALONSO:  Yes.  So we are going to request that the

7   interpreter translate on -- from the November 15th affidavit

8   that's nine pages in length that she translate page three,

9   lines 20 to 23 and on page four lines one through three, which

10  is a complete paragraph on the subject matter.

11      THE INTERPRETER:  I got approximately -- or, no, I'm

12  sorry.  The interpreter stands corrected.

13      I obtained approximately 20 cards.  We got together,

14  Rogelio Martinez, Guillermo Murguia, and Armondo, with Sanchez

15  approximately at the beginning of October of 2012.  We got

16  together in the offices of the UFCW, which is to be found on

17  Alvernon Avenue in Tucson, Arizona, and 6:00 in the evening.

18      In total we handed over approximately 48 cards -- 48

19  authorization cards and I gave them to Sanchez.  Sanchez told

20  us to wait, because the UFCW was going to put us in contact

21  with another Union, the Sheetmetal Workers Union, which is in

22  charge of the branch of our industry in which we work in.

23      MS. ALONSO:  Thank you.

24      JUDGE LAWS:  Is that going to interfere?  I don't know as

25  long as you can hear testimony I'm not going to worry about it.

1     Okay.  Whenever you're ready.

2     MR. MINER:  Thank you, Your Honor.

3  Q   BY MR. MINER:  Mr. Martinez, did you understand the

4  portion of your affidavit that was just read into the record?

5  A   No.

6     MR. MINER:  Could we have it read in Spanish to the

7  witness, please.

8     THE INTERPRETER:  Certainly.

9     MR. MINER:  Here.  You can take mine.

10    THE INTERPRETER:  And, again, I'm reading exactly the same

11 thing, but in Spanish.  (Spanish spoken)

12 Q   BY MR. MINER:  Do you recall providing that testimony to

13 the NLRB, Mr. Martinez?

14 A   Yes.

15 Q   Did you provide 48 cards to the UFCW?

16 A   Yes.

17 Q   Is it your understanding that the UFCW represented you

18 after that time?

19    MS. ALONSO:  Objection relevance.

20    JUDGE LAWS:  And subject to my ruling before, I will

21 overrule and allow the testimony.

22    THE WITNESS:  Yes.

23 Q   BY MR. MINER:  It was your understanding that the UFCW

24 represented you at that time?

25 A   Yes.

1  Q    Did they noti -- do you know whether the UFCW notified

2  Greenbrier or?

3        MS. ALONSO:  Objection.  Lack of foundation.

4        JUDGE LAWS:  Overruled.

5        THE WITNESS:  I don't know.

6  Q    BY MR. MINER:  Did you note fie Greenbrier that the UFCW

7  represented you?

8  A    No.

9  Q    Did you provide any evidence to Greenbrier regarding the

10 cards that had been submitted to the UFCW?

11 A    No.

12 Q    Did you offer Greenbrier the opportunity to review any

13 authorization cards?

14 A    No.

15 Q    Otherwise, did you identify any of the employees who had

16 signed cards in favor of the UFCW?

17 A    Yes.

18 Q    I'm sorry, you did identify the employees who signed cards

19 to Greenbrier?

20 A    Oh, no.

21 Q    You did not do that?

22 A    No.

23 Q    And the UFCW at the meeting took the cards and told you

24 that they would not represent the employees at Greenbrier,

25 correct?

1    MS. ALONSO:  Objection.  Misstates the testimony.

2    JUDGE LAWS:  Okay.  I don't think it was referring back to

3  testimony.  Can you repeat the question?

4    MR. MINER:  Yes.

5  Q    BY MR. MINER:  The UFCW, at the meeting at which you

6  presented the cards to them, told you that the UFCW would not

7  be representing the employees of Greenbrier?

8  A    They did not say no.  They said that they were in process

9  to see who was going to represent us; to see who would

10  represent us better.

11  Q    Okay.  And what did they inform you at the end of that

12  process?

13    MS. ALONSO:  Objection.  Calls for hearsay.

14    JUDGE LAWS:  Overruled.

15    THE WITNESS:  It was at the next meeting that they

16  introduced us to the sheetmetal workers.

17  Q    BY MR. MINER:  And what was the date of that meeting?

18  A    The 25th of November of 2011.  No.  It was the same day in

19  which I signed my card.  The date that appears on my card.

20  Q    Do you recall what that date was?

21  A    Not exactly.

22  Q    Let's take a look.

23  A    Okay.

24  Q    General Counsel Exhibit 170 is dated November the 5th.

25  You testified earlier that that was the date on which you met

1   with the sheetmetal workers?

2   A    Yes.

3   Q    Is that the correct date?

4   A    Yes.

5   Q    You testified earlier that for the sheetmetal workers

6   Marco Malina, Greg, Pat, Jeff, and Dion were present at the

7   meeting; is that correct?

8   A    It's correct and also Efrin Sanchez was there.

9   Q    For the UFCW?

10  A    Correct.

11  Q    Other than yourself, how many Greenbrier employees were at

12  the meeting?

13  A    Two.

14  Q    So there was three Greenbrier employees at this meeting?

15  A    Yes.

16  Q    And where was the meeting conducted?

17  A    At the sheetmetal workers' office.

18  Q    You testified earlier that the purpose of collecting cards

19  was to -- let me see here -- to pursue an election for the

20  sheetmetal workers, correct?

21  A    Correct.

22  Q    Did anyone at this meeting explain to you how the election

23  process worked?

24  A    Yes.

25  Q    What did they tell you?

1   A    That we had to take the authorization cards given to the

2   coworkers to explain to them what the card says and to explain

3   to them that their signature means that they were giving

4   authorization to the Union for some collective bargaining

5   issues for work.

6   Q    Okay.  But my question was --

7   A    And I'm headed that way.

8   Q    I'm sorry.  Then go ahead.

9   A    And they mentioned to me that we had to collect I don't

10  recall if it was 30 percent of the 76 employees that were

11  eligible to vote and that was in order to be able to petition

12  an election.  And in order to be able to win all we needed was

13  50 percent plus one.

14  Q    In the election?

15  A    Correct.

16  Q    Okay.  And who was the first coworker that you met with

17  about signing a card for the sheetmetal workers?

18  A    I don't recall.

19  Q    You testified earlier that you met with Arturo Sanchez,

20  correct?

21  A    Yes.

22  Q    You testified you met with him outside the lunchroom?

23  A    Yes.

24  Q    Which lunchroom?

25  A    The one that is in the intermodal shop.

1   Q     Are there walls around that lunchroom?

2   A     Yes.

3   Q     Was anyone else present in the room at the time?

4   A     There were workers about.

5   Q     How many?

6   A     No.  I don't recall.

7   Q     Any leadmen around?

8   A     As a matter of fact, that's where they work and that's

9   where they are at all times, leadmen and foremen.

10  Q     Okay.  That wasn't my question.  At the time that you met

11  with Arturo Sanchez, you reviewed the card with him in the

12  lunch -- or outside the lunchroom, excuse me, were there any

13  leadmen present?

14  A     I did not see any.

15  Q     How about a management or a foreman, were any present at

16  the time?

17  A     I didn't see.

18  Q     Okay.  Was Mr. Sanchez wearing any sheetmetal workers'

19  insignia that day?

20  A     No.

21  Q     Or any reference to an election or to an organizing

22  campaign?

23  A     No.

24  Q     How about after that date, did you ever observe him

25  wearing any Union insignia or any references to an organizing

1    campaign on his uniform in the plant?

2    A    No.

3    Q    You testified that -- strike that.

4         You testified that you provided a card to Mr. Sanchez,

5    correct?

6    A    Correct.

7    Q    Did you explain to him the election process that had been

8    explained to you at the meeting on November the 5th?

9    A    I did not explain to him the entire process because we

10   were on work hours.  I explained to him what his signature

11   meant --

12   Q    What did --

13   A    -- once it was on that card.

14   Q    What did you explain to him?

15   A    That upon his signature he was giving authorization to the

16   members of the Union in order for them to elicit an election.

17   Q    Elicit an election in what manner?

18   A    For a -- for a representation of collective bargaining.

19   Q    Did you ever see a copy of the sheetmetal workers'

20   petition for a representation election?

21        THE INTERPRETER:  I'm sorry; may I please have your

22   question again?

23        MR. MINER:  Yes.

24        THE INTERPRETER:  I believe I tangled my own self up on

25   this one.

 1          MR. MINER:  That's all right.

 2    Q    BY MR. MINER:  Did you ever see a copy of the petition for

 3    a representation election that was filed by the sheetmetal

 4    workers?

 5    A    No.

 6    Q    Okay.  Do you know who prepared it?

 7          MS. ALONSO:  Objection.  Lack of foundation.

 8          JUDGE LAWS:  Hang on.  Overruled.  He asked if he knew.

 9          THE WITNESS:  No.  I don't know.

10    Q    BY MR. MINER:  You testified that you met with Eliseo

11    Agular, correct?

12    A    Yes.

13    Q    For the purpose of signing a card, correct?

14    A    Yes, sir.

15    Q    And here you also indicated that this discussion occurred

16    outside the lunchroom?

17    A    Yes.

18    Q    Which one?

19    A    Intermodal shop.

20    Q    Same location where you met with Arturo Sanchez?

21    A    Yes, sir.

22    Q    Any reason why you met in the same location with two

23    different employees?

24          MS. ALONSO:  Objection relevance.

25          JUDGE LAWS:  Overruled.

1    THE WITNESS:  Because at that moment is when we had just

2  gotten out of the lunchroom and that's when we were all there,

3  all of the employees.

4  Q    BY MR. MINER:  Okay.  Were there any leadmen present at

5  the time you discussed the card with Mr. Aguilar?

6  A    I did not see them.

7  Q    How about managers or foremen?

8    MS. ALONSO:  Objection.  Vague as to where he was -- where

9  he saw the foremen or whatever positions Mr. Miner just asked

10  about.

11    JUDGE LAWS:  I think it was outside the lunchroom of the

12  intermodal shop is where we are.  Is that correct?

13    MR. MINER:  That's correct, Your Honor.

14    JUDGE LAWS:  Okay.  I think that's clear.

15    THE INTERPRETER:  So do you want me to re-ask the same

16  question?

17    JUDGE LAWS:  Yes please.

18  Q    BY MR. MINER:  Were there any leadmen, managers, or

19  foremen present at the time of your conversation with

20  Mr. Aguilar outside the lunchroom?

21  A    I did not see any.

22  Q    Okay.  Did you discuss with Mr. Aguilar the purpose of his

23  signing the card?

24  A    Yes.

25  Q    Did you tell him that the purpose is to elicit an election

1   for the sheetmetal workers?

2   A    Yes.

3   Q    Do you know whether Mr. Aguilar ever participated in any

4   handbilling outside the gate at the facility?

5        MS. ALONSO:  Objection.  Relevance.

6        JUDGE LAWS:  Overruled.

7        THE WITNESS:  I don't know.

8   Q    BY MR. MINER:  After signing a card, did you ever observe

9   Mr. Aguilar wearing any Union insignia or any references to an

10  organizing campaign on his uniform at work?

11  A    No.

12  Q    Did you ever identify Mr. Sanchez or Mr. Aguilar to

13  management as individuals who had signed cards and been

14  involved in an organizing campaign?

15       JUDGE LAWS:  And I want to just clarify here, because this

16  is an issue in this trial.  By management do you mean leads,

17  foremen, and managers above them?

18       MR. MINER:  Yes, I do, Your Honor.  Thank you.

19       JUDGE LAWS:  Okay.  So same question, but management

20  includes leads, foremen, and anybody above them in the

21  hierarchy.

22       THE WITNESS:  No.

23  Q    BY MR. MINER:  You testified that you met with Angel

24  Amavizca to review an authorization card, correct?

25  A    Yes.

1  Q    You testified you gave it to him in the lunchroom,

2  correct?

3  A    Yes.

4  Q    Which one?

5  A    In the intermodal shop.

6  Q    The same lunchroom that was close to the area where you

7  had met with Mr. Sanchez and Mr. Aguilar?

8  A    Yes.

9  Q    Were there any leads, managers, or foremen present at the

10 time?

11 A    I did not see them.

12 Q    Did you discuss with Mr. Amavizca that one purpose of the

13 cards is to elicit a sheetmetal workers' election?

14 A    Yes.

15 Q    Did you explain to him he'd have an opportunity to cast a

16 ballot, yes or no, for the sheetmetal workers?

17 A    That I did not tell him.

18 Q    Did you ever identify Mr. Amavizca to a lead, a foreman,

19 or a manager as someone who had signed a card for the

20 sheetmetal workers?

21 A    No.

22 Q    Okay.  You testified you met with Jesus Martinez in the

23 lunchroom?

24 A    Yes.

25 Q    Was that the intermodal shop lunchroom as well?

1   A    Yes.

2   Q    And at the time that you reviewed the card with

3   Mr. Martinez were there any leads, managers, or foremen

4   present?

5   A    I did not see them.

6   Q    Did you explain to Mr. Martinez the election process that

7   had been explained to you by the sheetmetal workers?

8   A    Yes.

9   Q    Did you tell Mr. Martinez that you were seeking to have an

10  election among the sheetmetal workers?

11  A    He already knew.

12  Q    Okay.  Did you ever observe -- strike that.

13       Did you observe Mr. Martinez on that day wearing any

14  sheetmetal workers' insignia or reference to an organizing

15  campaign on any part of his uniform?

16  A    No, I did not see.

17  Q    How about after that day?

18  A    Neither.

19  Q    Did you ever identify Mr. Martinez to a lead or a foreman

20  or a manager as someone who had signed a card for the

21  sheetmetal workers?

22  A    No.

23  Q    You testified that you met with Gabriel Ortiz to review an

24  authorization card, correct?

25  A    Yes.

1    Q    Where did you meet him?

2    A    In the lunchroom.

3    Q    In the intermodal shop lunchroom?

4    A    Yes, sir.

5    Q    Same location where you met Mr. Martinez?

6    A    Yes.

7    Q    Did you meet with him before or after you met with

8    Mr. Martinez?

9    A    I don't remember.

10    Q    Did you explain the election process to Mr. Ortega?

11        MS. ALONSO:  You mean Ortiz?

12    Q    BY MR. MINER:  Sorry.  Ortiz?

13    A    Yes.

14    Q    On that day or any subsequent day, did you see

15    Mr. Ortiz -- did you observe him wearing any Union insignia or

16    any reference to an organizing campaign on his uniform at

17    work?

18        MS. ALONSO:  Objection, compound.

19        JUDGE LAWS:  Overruled.

20        THE INTERPRETER:  May I have the question again?

21        MR. MINER:  Yes.

22    Q    BY MR. MINER:  On that day or any subsequent day did he

23    observe Mr. Ortiz wearing any Union insignia or a reference to

24    an organizing campaign on his uniform at work?

25    A    On his uniform?

1   Q    Correct?

2   A    No.

3   Q    Do you know whether he ever participated in any Union

4   handbilling at the gate of the facility?

5   A    I don't know.

6   Q    Did you ever identify him to a lead or a foreman or a

7   manager as someone who had signed an authorization card?

8   A    No.

9   Q    You testified that you met with Javier Garcia regarding an

10  authorization card, correct?

11  A    Correct.

12  Q    Where did you meet with him?

13  A    In the -- behind the -- in the parking lot behind the back

14  side of the back shop.

15  Q    Was it before or after you met with Mr. Amavizca?

16  A    It was after.

17  Q    Were you working in the back area of the shop in the truck

18  shop area?

19       MS. ALONSO:  Objection.  Vague.  Is he referring to that

20  specific moment or that day or in 2012?

21       MR. MINER:  Okay.

22       JUDGE LAWS:  I think the assumption is that day; is that

23  correct?

24       MR. MINER:  Correct, Your Honor.

25       THE WITNESS:  No.

1   Q    BY MR. MINER:  Was Mr. Garcia?

2        MS. ALONSO:  Objection, calls for speculation.

3        JUDGE LAWS:  Answer if you know.

4        THE WITNESS:  I had understood he was working in the

5   center shop.

6   Q    BY MR. MINER:  Did you go to the truck shop to meet with

7   Mr. Garcia?

8   A    No.  In the back part, there's a parking area.

9   Q    Were you parked there at the time?

10  A    Yes.

11  Q    Was Mr. Garcia?

12  A    Also.

13  Q    At the time that you reviewed the card with him, were

14  there any leads, foremen, or managers present?

15  A    I did not see them.

16  Q    Okay.  When you met with Mr. Garcia, did you describe for

17  him the election workers that the sheetmetal workers explained

18  to you?

19  A    Not the entire process.

20  Q    Did you tell him anything about an election?

21  A    Yes.

22  Q    What did you tell him?

23  A    That, with his signature, he was authorizing the union in

24  order to be able to invoke a petition in order to have an

25  election.

1  Q    Okay.  Did you tell him when the election would occur?

2  A    No.

3  Q    Did you know?

4  A    No.

5  Q    Do you know who was responsible for arranging the

6  election?

7  A    I imagine it was the organizers for sheetmetal workers.

8  Q    On that day or any subsequent day, did you observe Mr.

9  Garcia wearing any union insignia or any reference to an

10  organizing campaign on his uniform at work?

11  A    No.

12  Q    Did you ever identify Mr. Garcia to a lead man, foreman,

13  or manager as someone who had signed an authorization for the

14  sheetmetal workers?

15  A    No.

16  Q    You testified that you met with Michael Robles to review

17  an authorization card.  Correct?

18  A    Correct.

19  Q    You said that the discussion occurred in a parking lot.

20  A    Correct.

21  Q    Same area where you met with Mr. Garcia?

22  A    Yes, sir.

23  Q    Did you meet with Mr. Robles before or after you met with

24  Mr. Garcia?

25  A    I don't recall.

1  Q    Were there any lead men, managers, or foremen present at

2  the time you met with Mr. Robles?

3  A    I did not see any.

4  Q    Did you describe for Mr. Robles what an election was?

5  A    Yes.

6  Q    What did you tell him?

7  A    Concerning the authorization card?

8  Q    Yes, sir.

9  A    That, with the signature on the authorization card, he was

10  granting permission for the union to elicit a petition in order

11  to request or provoke in elections with the sheetmetal workers

12  union.

13  Q    Did you ever identify Mr. Robles to a lead man, foreman,

14  or manager as someone who had signed an authorization card?

15  A    No.

16  Q    Did he ever wear -- did you ever observe him wear any

17  union insignia or any reference to an organizing campaign in

18  the shop?

19  A    No.

20  Q    You testified you reviewed a card with Gamaliel Rabago's.

21  Correct?

22  A    Yes.

23  Q    You testified you met him outside a casino in a parking

24  lot.  Correct?

25  A    Correct.

1    Q    Was Mr. Rabogo working at the facility at the time?

2         MS. ALONSO:  Objection, vague.

3         MR. MINER:  I'll re-ask the question, Your Honor.

4         JUDGE LAWS:  Okay.

5         THE WITNESS:  Okay.

6    Q    BY MR. MINER:  Do you know whether Mr. Rabogo was an

7    active employee at the Tucson shop at the time?

8    A    Yes, yes.

9    Q    He was?

10   A    Yes.

11   Q    Did you arrange to meet with him at the casino parking

12   lot?

13   A    Yes.

14   Q    Did he tell you he didn't want to meet you at the

15   facility?

16   A    No.

17   Q    Did you tell him it wouldn't be a good idea to meet at the

18   facility to review the card?

19   A    No.

20   Q    Did you review the card with him at the casino parking

21   lot?

22   A    Yes.

23   Q    Tell him about what an election is?

24   A    Yes.

25   Q    Did he sign the card there?

1   A    Yes.

2   Q    Were there any lead men, managers, or foremen present at

3   the time?

4   A    No.

5   Q    After that day, did you ever see Mr. Rabogo wearing any

6   union insignia or reference to an organizing campaign on his

7   uniform at work?

8   A    No.

9   Q    Did you ever identify Mr. Rabogo to a lead man, foreman,

10  or manager as someone who had signed an authorization card for

11  the sheetmetal workers?

12  A    No.

13  Q    You testified that you met with Martin Morales to review

14  an authorization card.  Correct?

15  A    No.  No.  I did not say that.

16  Q    You did not testify to that?

17       MS. ALONSO:  Your Honor, that actually misstates the

18  testimony from this witness yesterday.

19       MR. MINER:  I could be confused.  Hang on just a moment.

20  (Counsel confer)

21       MR. MINER:  Okay.  Fair enough.

22  Q    BY MR. MINER:  Did you ever discuss with Mr. Morales the

23  authorization card that he signed?

24  A    No.

25  Q    Brian Scaggs -- did you ever review or discuss with him

1   the card that he signed?

2   A   No.

3   Q   So you don't know whether they understand this election

4   process, do you?

5   A   I would say yes because I had, had on earlier occasions

6   spoken to Martin Morales in earlier election occasions.

7   Q   About an election?

8   A   In the first elections.

9   Q   In 2011?

10  A   Yes, sir.

11  Q   And he understood the election process at that time?

12  A   Yes.

13  Q   How about Mr. Scaggs?

14      MS. ALONSO:  Objection, vague.  What about Mr. Scaggs?

15      JUDGE LAWS:  Well, you're --

16      MR. MINER:  Same question, Your Honor.

17      JUDGE LAWS:  It's assuming her be follow-up --

18      THE WITNESS:  I don't know because he speaks English.

19  Q   BY MR. MINER:  I see.  Did you ever identify Mr. Scaggs or

20  Mr. Morales to management, to a manager, foreman, or lead man

21  as individuals who had signed authorization cards for the

22  sheetmetal workers?

23      MR. MINER:  Do you need me to restate it?

24      THE INTERPRETER:  Yes, please.

25  Q   BY MR. MINER:  Did you ever identify Mr. Scaggs or Mr.

1  Morales as individuals who signed authorization cards for the

2  sheetmetal workers to a lead man, foreman, or manager?

3  A    No.

4  Q    Did you ever observe either of them wearing any sheetmetal

5  workers insignia on their uniform?

6  A    I did not see.

7  Q    Did you ever observe them wearing anything referring to an

8  election or an organizing campaign on their uniform?

9  A    I don't know.  I didn't see.

10  Q    Okay.  Did you testified that you met with Ricardo Castro

11  to review an authorization card?

12  A    Yes.

13  Q    Was Mr. Castro an active employee of Greenbrier at the

14  time?

15  A    Yes, sir.

16  Q    But you reviewed the card with him at his home.  Correct?

17  A    Yes.

18  Q    Did he tell you he didn't want to talk about a card at

19  work?

20  A    No.  What happened was that he was ill at that time.

21  Q    He was home sick?

22  A    Yes.

23  Q    At the time you reviewed the card with him, was anyone

24  else there?

25  A    I think his stepson was there --

1   Q     Okay.

2   A     -- because I saw his car.

3   Q     Is his stepson or was his stepson at the time a Greenbrier

4   employee?

5   A     Yes.

6   Q     Was he a lead man --

7   A     No.

8   Q     -- or a foreman --

9   A     No.

10  Q     -- or a manager?

11  A     No.

12  Q     All right.  Did you ever identify Mr. Castro to a lead

13  man, foreman, or manager as an individual who had signed an

14  authorization card?

15  A     No.

16  Q     Did you ever observe Mr. Castro at work wearing any union

17  insignia on his uniform?

18  A     No.

19  Q     Did you ever observe Mr. Castro wearing any buttons, or

20  pins, or hats referring to an organizing campaign or an

21  election?

22  A     No.

23  Q     Did you observe Mr. Castro participating in any union

24  handbilling at the gate at the facility?

25  A     No.

1  Q    You testified that you met with Carlos Ortiz regarding an

2  authorization that Mr. -- strike that.  In Gabriel Ortiz's home

3  -- correct?

4       THE INTERPRETER:  I'm sorry.  Could you --

5       MR. MINER:  Yes.

6       THE INTERPRETER:  -- restate me your question again?

7       MR. MINER:  Strike that question.

8  Q    BY MR. MINER:  You testified that you reviewed a card with

9  Carlos Ortiz.  Correct?

10  A    Correct.

11  Q    Where?

12  A    At Gabriel Ortiz's house.

13  Q    Did Carlos Ortiz [sic] tell you that he didn't want to

14  discuss a card with you at work?

15  A    No.

16  Q    Did you review -- is there a reason why you didn't review

17  it with him at work?

18       MS. ALONSO:  Objection, relevance.

19       JUDGE LAWS:  Overruled.

20       THE WITNESS:  I don't remember the reason, but I called

21  him on the phone and he said we could see each other there.

22  Gabriel Ortiz is his brother.

23  Q    BY MR. MINER:  I see.  When you met with Carlos Ortiz at

24  his brother's home, was anyone else present?

25  A    Yes.

1   Q    Who?

2   A    Guillermo Murguia and Gabriel Ortiz.

3   Q    Thank you.  Did you ever identify Mr. Ortiz to a lead man,

4   foreman, or manager as someone who had signed an authorization

5   card for you?

6   A    No.

7   Q    Did you ever observe Mr. Ortiz at work wearing any union

8   insignia on his uniform? Did you ever observe him wearing any

9   reference on his uniform, any reference to an election or an

10  organizing campaign?

11  A    No.

12  Q    Did you ever identify Mr. Ortiz to a lead man, foreman, or

13  manager as someone who had signed an authorization card?

14  A    No.

15  Q    You testified you met with Eddie Duarte to review an

16  authorization card.

17  A    Correct.

18  Q    Where did you meet him?

19  A    At the intermodal shop.

20  Q    In the lunchroom?

21  A    I think so, outside.

22  Q    Outside the lunchroom?

23  A    I don't remember if it was outside, but it was there.

24  Q    Were there any lead men, foremen, or managers present at

25  the time?

 1   A    No.  I did not see them.

 2   Q    Did you describe the election process for Mr. Duarte?

 3   A    Yes.

 4   Q    What did you tell them?

 5   A    That, with his signature, he was authorizing the union

 6   organizers to petition for a union vote, for elections.

 7   Q    Okay.  Did you ever identify Mr. Duarte to a lead man,

 8   foreman, or manager as someone who signed an authorization card

 9   for the sheetmetal workers?

10   A    No.

11   Q    Did you ever see Mr. Duarte wearing any union insignia on

12   his uniform at work?

13   A    No.

14   Q    Did you ever wearing any reference to an election or an

15   organizing campaign on his uniform?

16   A    No.

17   Q    Did you observe him participating in any of the union

18   leafleting or handbilling that occurred at the gate of the

19   facility?

20   A    No.

21   Q    You testified that, at the time of the layoffs on November

22   12th, 2012, your immediate supervisor was Ricky Fonseca.

23   Correct?

24   A    Correct.

25   Q    How long had Mr. Fonseca been your immediate supervisor as

1    of that time?

2    A    I don't recall.  It was a very little bit of time.

3    Q    Prior to that time, Hector Encinas was your immediate

4    supervisor.  Correct?

5    A    Correct.

6    Q    And at the time Mr. Fonseca became your immediate

7    supervisor, you moved from a different area of the shop.

8    Correct?

9    A    I was working with Hector Encinas in the rec shop.

10   Q    And where were you working with Mr. Fonseca?

11   A    Intermodal shop.

12   Q    And one of the reasons Mr. Encinas explained to you for

13   transferring you to the intermodal shop was that less overtime

14   was required in that area.  Correct?

15   A    It wasn't Hector Encinas.  It was Freddy Valdez.

16   Q    I see.  Freddy Valdez said that the reason for moving you

17   was because the availability to work overtime was not as

18   important in the intermodal shop.  Correct?

19   A    Correct.

20   Q    How often was overtime called for, required in the rec

21   shop?

22   A    Three to four times per week.

23   Q    Every week?

24   A    Not every week.

25   Q    Okay.  But that was a typical week.  Is that an accurate

1    statement?

2    A    Yes.

3    Q    And there were occasions when you told Hector Encinas that

4    you are not available to work the overtime.  Correct?

5    A    Yes.  But I had my reasons.

6    Q    You had other commitments.  Correct?

7    A    Correct.

8    Q    You were not able to stay late for work on those dates?

9    A    Correct.

10   Q    And Mr. Valdez explained that, in the intermodal shop, it

11   wouldn't be necessary to ask you to stay late so often.

12   Correct?

13   A    Correct.

14   Q    And in fact, you testified that, when you met with Eric

15   Valenzuela in March of 2013, you told him that the reason you

16   had been laid off in November is because you weren't available

17   for overtime?

18        MS. ALONSO:  Objection, misstates the prior testimony.

19   That was not his testimony yesterday as to what he explained to

20   Mr. Valdez (sic).

21        MR. MINER:  Mr. Valenzuela.

22        MS. ALONSO:  Valenzuela.

23        JUDGE LAWS:  Valenzuela.

24        MR. MINER:  I think that is specifically what he testified

25   to yesterday.

1    JUDGE LAWS:  Well, wait.  Let's ask the witness what he

2    recalls.

3    MR. MINER:  Okay.  Shall I restate the question?

4    JUDGE LAWS:  Yes.

5    Q    BY MR. MINER:  Didn't you tell Mr. Valenzuela in March

6    2013 that the reason you had been laid off was because of your

7    unavailability to work overtime?

8    A    No.  The testimony I gave yesterday was that I gave him

9    that reason because, if I would have told him that I thought

10   that I had been laid off because of the union, they would not

11   have hired me.

12   Q    That is the reason you told him.  Correct?

13   A    Correct.

14   Q    That's what Mr. Valdez told you, isn't it?

15   A    Yes.

16   Q    Did you speak with Miguel Valdez about signing an

17   authorization card for the sheetmetal workers?

18   A    Yes.

19   Q    Where did you meet with him?

20   A    In the lunchroom.

21   Q    Which one?

22   A    The one that's in the intermodal shop.

23   Q    Same area where you met with some other employees?

24   A    Correct.

25   Q    Did he sign a card for you at that time?

1   A     Yes.

2   Q     Were there any lead men, foremen, or managers present

3   during that conversation?

4   A     I did not see them.

5   Q     Did you explain to him the process for seeking an

6   election?

7   A     Yes.

8   Q     What did you tell him?

9   A     That, with his signature, he was authorizing the union in

10  order to elicit an election.

11  Q     And did you tell -- strike that.  Did you ever identify

12  Mr. Valdez to a lead man, foreman, or manager as someone who

13  had signed an authorization card for the sheetmetal workers?

14  A     No.

15  Q     Did you ever observe him wearing any union insignia on his

16  uniform at work after that time --

17  A     No.

18  Q     -- or any reference to an election?

19  A     No.

20  Q     Did you observe him participate in any of the union

21  handbilling at the gate?

22  A     No.

23  Q     Did you speak with Hector Federico about an authorization

24  card?

25  A     No.

1    Q    Did you speak with Guillermo Gonzalez Pico --

2    A    Yes.

3    Q    -- about a card?

4    A    Yes.

5         MS. ALONSO:  Objection, vague.  Which card?

6    Q    BY MR. MINER:  Did he sign a card for you?

7         MS. ALONSO:  Objection, vague.  Is this the UFCW or the

8    sheetmetal workers card?

9         MR. MINER:  Thank you.

10   Q    BY MR. MINER:  Did you review a sheetmetal workers card

11   with him?

12   A    With whom?

13   Q    Did you meet with Guillermo Gonzalez Pico and review a

14   sheetmetal workers authorization card with him?

15   A    I gave it -- I handed it to him.

16   Q    Where?

17   A    And I handed him three more.

18   Q    Okay.  Where did you provide Mr. Gonzalez Pico a card?

19   A    In the intermodal shop area.

20   Q    In the work area or in the lunchroom area?

21   A    Work area.

22   Q    Were there any lead men present at the time?

23   A    Yes.  They were present.

24   Q    Who?

25   A    Luis Lopez and Enrique Fonseca.  They were in that area.

1   Q    Okay. Did they talk to you about the cards?

2   A    No.

3   Q    Did they ask you any questions about the cards?

4   A    No.

5   Q    Did they tell you to stop looking at cards and get back to

6   work?

7   A    No.

8   Q    Did they say anything to you at the time?

9   A    No.  Like I said, they were in the area, not that they

10   were observing me.

11   Q    Okay.  And you provided some cards to Mr. Gonzalez Pico at

12   that time?

13   A    Yes.

14   Q    Did he return the card to you?

15   A    Yes.

16   Q    Did you tell him about the election process?

17   A    Yes.

18   Q    Did you identify him to management, meaning a leader, or a

19   foreman, or a manager as someone who had signed a card?

20   A    No.

21   Q    Did he wear any union insignia on his uniform after that

22   time?

23   A    No.

24   Q    Did he wear anything that made reference to an organizing

25   campaign or an election on his uniform?

```
 1   A    No.

 2   Q    Did you discuss with Oscar Lopez an authorization card?

 3   A    Not for the sheetmetal workers, no.

 4   Q    How about Alberto Salas?

 5   A    Neither.

 6        MR. MINER:  Okay.

 7        THE INTERPRETER:  Your Honor, could I take a five-minute

 8   break?

 9        JUDGE LAWS:  I was just going to see where you are.

10        MR. MINER:  This is a good point for a break, Your Honor.

11        JUDGE LAWS:  Do you have more?

12        MR. MINER:  I'm closing in on the end.

13        JUDGE LAWS:  All right.  Well, why don't we do that, then,

14   and come back at 1:25?  And just so you know, Grace, I wasn't

15   going to make you uncomfortable.  I just thought, if he had 30

16   more seconds, we'd wrap it up.

17   (Off the record at 1:13 p.m.)

18        MR. MINER:  Thank you very much, just a few more

19   questions.

20   Q    BY MR. MINER:  I wanted to clarify something you said

21   about your wage rate at the Mira Loma facility.

22   A    Yes.

23   Q    You testified you receive a 50-cent premium for working

24   the night shift at Mira Loma.  Correct?

25   A    Correct.
```

1   Q    Is that 50 cents per hour?

2   A    Yes, sir.

3   Q    Prior to November of 2012, did Lex Morrison provide free

4   lunches for employees as a reward?

5        MS. ALONSO:  Objection, relevance.

6        THE INTERPRETER:  I'm sorry.  May the interpreter request

7   the repetition of that question?

8        JUDGE LAWS:  Sure.

9        MR. MINER:  Yes.

10       JUDGE LAWS:  And I'll address the objection.

11  Q    BY MR. MINER:  Prior to November of 2012, didn't Lex

12  Morrison provide free lunches for employees as a reward?

13       JUDGE LAWS:  Do we want to see what that was about?

14       MS. ALONSO:  Yeah.  I'll go ask him because it looks

15  smoking out there.

16  (Counsel confer)

17       JUDGE LAWS:  And the guard just came in.  For the record,

18  the reason we seem to be going off topic is because the guard

19  just came in and there's a smoky smell, so we want to make sure

20  nothing is going on.

21  (Counsel confer)

22       MS. ALONSO:  So we're fine.  The guard said that he

23  smelled the new piece in, I guess, the air conditioning and

24  that's what's causing the air.  But he said it should clear up

25  in the next couple minutes.

1    (Counsel confer)

2         JUDGE LAWS:  Okay.  Very good.  All right.

3         MS. ALONSO:  Objection, relevance.  There is no allegation

4    in the complaint that free lunches were unlawful.

5         MR. MINER:  It goes to the safety program, Your Honor.

6         JUDGE LAWS:  All right.  I will allow it for that purpose.

7         THE WITNESS:  Yes, yes.  He did.

8    Q    BY MR. MINER:  And that reward was provided during months

9    in which there were no safety incidents.  Correct?

10   A    No.  It was concerning production.

11   Q    For production?

12   A    Yes.

13   Q    All right.

14   (Counsel confer)

15   Q    BY MR. MINER:  So Mr. Martinez, I'm looking at one of the

16   two affidavits you provided to the NLRB on November 15th of

17   2012.  Do you recall telling the NLRB at that time that, in a

18   month in which no safety issue -- or excuse me, no accident

19   occurred at the facility, that Lex Morrison provided a free

20   lunch for all the employees?

21   A    I don't recall that it would have been for no accidents.

22   Q    I'm just going to read an English translation of your

23   Spanish language affidavit --

24        MS. ALONSO:  And Your Honor, objection.

25   Q    BY MR. MINER:  -- and then I'm going to ask if it's right

1    or wrong.

2          MS. ALONSO:  We object, Your Honor.

3          JUDGE LAWS:  And can you identify where you are?

4          MR. MINER:  Sure.  I'm on page four, line 14, of the long

5    November 15th affidavit.

6          MR. GIANNOPOULOS:  And the Government's position is, this

7    witness never signed an English translation.  He has signed a

8    Spanish translation.  We can give it to the translator.  She

9    can translate that portion into the record of the affidavit he

10   signed.

11         JUDGE LAWS:  That probably makes more sense, given what he

12   signed, so let's --

13         MR. GIANNOPOULOS:  After it's been -- I mean, let's take a

14   look at the affidavit and make sure it's the same one that he

15   signed, but that's the process the government prefers.

16         JUDGE LAWS:  And I think that makes more sense because,

17   then, it is a translation from English -- or excuse me, from

18   the Spanish version he actually did sign.  I don't want his --

19   Tess, are you okay?

20         UNIDENTIFIED SPEAKER:  I'm not going to pass out.  I'm

21   just warm.

22         JUDGE LAWS:  Okay.  I was going to see, do we want --

23         UNIDENTIFIED SPEAKER:  That's true.  Am I okay?  Yes, Your

24   Honor.  I am okay.

25         JUDGE LAWS:  Okay.  No.  I was referring to the noxious

1    smell that is invading --

2        MR. MINER:  Yeah.  It's terrible.

3        JUDGE LAWS:  -- the room.

4        UNIDENTIFIED SPEAKER:  No.  It's --

5        JUDGE LAWS:  But how much more cross do you think you

6    have?

7        MR. MINER:  Five minutes.

8        JUDGE LAWS:  Let's get through it.  And then maybe we can

9    take a break, and step outside --

10       MR. GIANNOPOULOS:  Yeah.

11       JUDGE LAWS:  -- and get some fresh air.

12       MR. MINER:  All right.  Grace, would you please read in

13   Spanish and then translate the paragraph beginning on line 12

14   of page four of the witness's affidavit.

15       MS. SHIH:  And which one is that?  We have three.

16       MR. MINER:  As I said, it's the longer November 15th

17   affidavit.

18       MS. SHIH:  Okay.

19       MR. MINER:  Beginning line 12?

20       MR. MINER:  Correct.

21       THE INTERPRETER:  And should I go all the way down to the

22   end of the page or just that paragraph?

23       MR. MINER:  Just that one paragraph.

24       THE INTERPRETER:  Done.

25       MR. MINER:  Thank you.  And now, would you please

```
 1   translate that into English for us?

 2        THE INTERPRETER:  For the record.  Right?  Approximately

 3   in September of 2012, the company held a free lunch during

 4   lunchtime for the employees with chicken, sodas, crackers, and

 5   other food.  Lex Morrison told us that the lunch was to

 6   celebrate a month without accidents and that we came out ahead

 7   in reference to productivity.  We've had this type of meal when

 8   we come out ahead in production or when we have no accidents.

 9   Q    BY MR. MINER:  Is that statement, the statement that you

10   heard in your affidavit, correct or incorrect?

11   A    It's correct.  As it states there, on that occasion, it

12   was for production.

13   Q    Thank you.  You testified that you received a bonus in

14   2013.  Correct?

15   A    Yes.

16   Q    That was after you were rehired in March of 2013?

17   A    Yes.

18   Q    Prior to that time, had you ever received a bonus from

19   Greenbrier before?

20   A    Yes.

21   Q    Do you know what a game-sharing bonus is?

22   A    Yes.

23   Q    How many of these game-sharing bonuses have you received

24   during your employment with Greenbrier?

25   A    I don't recall.  I think it was, like, about three times.
```

1    Q    And the amount of the bonus was dependent on your

2    seniority with the company at the time.  Correct?

3    A    Correct.

4         MR. MINER:  That's all the questions I have at this time.

5    Thank you, Your Honor.

6         JUDGE LAWS:  Okay.

7         MR. MINER:  Thank you.

8         JUDGE LAWS:  Why don't we, so that we don't all pass out,

9    go outside?  It's now 1:34.  Excuse me.  Let's take 10 minutes.

10   (Off the record at 1:32 p.m.)

11        JUDGE LAWS:  Any redirect from the General Counsel?

12        MS. ALONSO:  Yes, Your Honor.

13                    **REDIRECT EXAMINATION**

14   Q    BY MS. ALONSO:   So I am going to, Mr. Martinez -- Mr.

15   Miner asked you some questions about Juan Baciel being present

16   at the meeting on November 12th.

17   A    Yes.

18   Q    I am going to play from my laptop the General Counsel's

19   Exhibit 199, which is the video of the layoff meeting.

20        MS. ALONSO:  I am going to start the video at 25:38.

21        UNIDENTIFIED SPEAKER:  This is 199, video.

22        JUDGE LAWS:  And then let's -- why don't we make it so

23   that we can all see?

24        MS. ALONSO:  Sure.

25        JUDGE LAWS:  Because my computer won't play a CD that has

1   not been blessed with authenticity by the federal government.

2   And --

3        MS. ALONSO:  So should I cut it closer to the witness.

4        JUDGE LAWS:  And then -- sure.  And Mr. Miner, do you want

5   to just stand up and look or --

6        MR. MINER:  Yes, Your Honor.

7        JUDGE LAWS:  Okay.

8        MS. ALONSO:  So I think --

9   (Counsel confer)

10       MR. MINER:  I think your speaker is muted.

11       THE COURT REPORTER:  Speak up when you talk, please.

12  (Video played at 1:50 p.m.)

13       MS. ALONSO:  All right.  I've stopped the video at 25:31.

14  Q    BY MS. ALONSO:   And Mr. Martinez, I'd like you to

15  identify three individuals who are visible on this image.

16  Okay.  Starting with the left-hand side, the person with the

17  white hat and a polo shirt with a mustache, who is that

18  individual?

19  A    Juan Maciel.

20  Q    All right.  And the woman in a white shirt -- who is that

21  on the right-hand side?

22  A    Lisa.

23  Q    And that's Lisa Maxey.  Right?

24  A    Yes.  And he is Martin Torrez.  Yes.

25       JUDGE LAWS:  And that's the only other person in the

1   picture, so we don't need a description.

2       MS. ALONSO:  And if I could just have a moment, Your

3   Honor, I'm going to gather a couple exhibits that I'll be using

4   with the witness.

5       JUDGE LAWS:  Take your time.  Just go whenever you're

6   ready.

7   Q    BY MS. ALONSO:    All right.   Mr. Martinez, I am going to

8   hand you what's been marked as General Counsel's 130, 131, and

9   133.  These are documents that are already -- that have already

10  been submitted.  Okay.  And looking at 130, there are initials,

11  JM, on the top right-hand corner.  Did you put your initials on

12  this card?

13  A    Yes.

14  Q    Okay.  Now, turning to General Counsel's 131, this is a

15  card with the name Oscar Lopez.  There are initials, JM, on the

16  top right-hand corner.  Are those your initials?

17  A    Yes.

18  Q    Okay.  Now, turning to General Counsel's Exhibit 133,

19  there are initials, JM, there on the top right-hand corner.

20  Did you put your initials on that card?

21  A    Yes.

22  Q    Okay.  And how did it come about that you collected these

23  parts, starting with General Counsel's Exhibit 130?

24  A    Guillermo Gonzalez Pico handed them to me.

25  Q    Okay.  And when you say them, are you referring to the

1  card -- to the other two cards?

2  A    Correct.

3  Q    Okay.  So Mr. Gonzalez Pico gave you all three cards?

4  A    Yes.

5      MS. ALONSO:  And I have no further questions, Your Honor.

6      MR. MINER:  No questions, Your Honor.  Thank you.

7      JUDGE LAWS:  Okay.  I want to thank you very much for

8  coming and providing your testimony today.  You are not to

9  discuss your testimony with any other witnesses at this trial

10 or anybody who may be called as a witness at this trial.

11     THE WITNESS:  Okay.  Thank you.

12     JUDGE LAWS:  Thank you.

13     MR. MINER:  Your Honor, before we go off the record, can I

14 let the record reflect that I'm returning the three affidavits

15 to General Counsel?

16     JUDGE LAWS:  It is so reflected.

17     MR. MINER:  Thank you.

18     MS. ALONSO:  And Your Honor, one other issue that I did

19 want to wrap up with this witness was, I wanted to ask that you

20 take administrative notice of the files that are on his phone

21 of the two recordings.

22     JUDGE LAWS:  I never actually saw them.  I'm going to

23 assume, though, that since we connected his phone to the

24 computer and it downloaded, that they were there, so --

25     MR. MINER:  Steve, did we get the files okay?

1    MR. BIDDLE:  I have them in my pocket.

2    MS. ALONSO:  And Your Honor, what we really wanted was the

3  dates that are recorded on his phone of those two files.

4    JUDGE LAWS:  Can I take a look at your phone?  And can you

5  pull out the files?  All right.  One is the 9th of July, Julio.

6  That's July.  Right?

7    THE INTERPRETER:  Correct.

8    JUDGE LAWS:  Even I know that.  And the other is the 28th

9  of June.

10    THE WITNESS:  Correct.

11    MS. ALONSO:  Thank you, Your Honor.

12    JUDGE LAWS:  Okay.  Let's go off the record.  Do you have

13  any paperwork you need to do with the witness?

14    MS. ALONSO:  I do, so I can speak with him.

15    JUDGE LAWS:  Okay.  Is somebody else handling the next

16  witness?

17    MR. GIANNOPOULOS:  Yes.

18    JUDGE LAWS:  All right.

19    MR. GIANNOPOULOS:  And before we move to the next witness,

20  there is a document that I wanted to discuss with Mr. Miner.

21    JUDGE LAWS:  By all means, please do.

22  (Off the record at 1:57 p.m.)

23    JUDGE LAWS:  Will you please raise your right hand?

24  Whereupon,

25                    **GORDON HUDGENS**

1  having been first duly sworn, was called as a witness herein

2  and was examined and testified as follows:

3      JUDGE LAWS:  Can you please state and spell your name for

4  the record?

5      THE WITNESS:  Gordon Hudgens, G-O-R-D-O-N H-U-D-G-E-N-S.

6      JUDGE LAWS:  Thank you.

7      MR. GIANNOPOULOS:  Thank you, Your Honor.  And before we

8  begin with Mr. Hudgens, off the record, we reached an agreement

9  with respect to a document that's marked General Counsel's 203.

10  And that is a three-page document, the monthly repair shop

11  scorecards for Tucson for December 2012, January 2013, and

12  February 2013.  And these documents were produced pursuant to

13  the subpoenas.  General Counsel moves for the admission of

14  General Counsel's 203.

15      MR. MINER:  No objection.

16      JUDGE LAWS:  I will admit them.  Looking at them, I don't

17  really know what they mean, but presumably, that will be

18  explained to me at some point.

19  **(General Counsel Exhibit Number 203 Received into Evidence)**

20      MR. GIANNOPOULOS:  Yes.  Thank you.

21                      <u>**DIRECT EXAMINATION**</u>

22  Q    BY MR. GIANNOPOULOS:   Good afternoon, Mr. Hudgens.

23  A    Hello.

24  Q    Where are you currently employed?

25  A    I'm employed with Strato, Inc.  They are out of New

1    Jersey.

2    Q    And what do you do for Strato, Inc.?

3    A    I'm director of field engineering.

4    Q    And how long have you worked there?

5    A    Since September 30th of this year.

6    Q    And what kind of work does Strato, Inc. do?

7    A    Strato is a rail cart supplier, manufacturer.

8    Q    Are they a competitor of Greenbrier?

9    A    No.

10   Q    Do they supply parts to Greenbrier?

11   A    Yes.

12   Q    Okay.  How long have you been in that industry, the rail

13   car industry?

14   A    Since June 24th, 1974.

15   Q    Okay.  And before this job with Strato, did you previously

16   work at Greenbrier?

17   A    Yes.

18   Q    And give me the time frame.  What years did you work at

19   Greenbrier?

20   A    September 11th of 2006, our company, Rail Car America, was

21   purchased by Greenbrier and I became one of the two general

22   managers.

23   Q    And what parts of the country or what facilities did you

24   oversee as general manager?  And let me draw your -- let me

25   just kind of narrow it down.  Let's start talking about 2011,

1    and 2012, and 2013.

2    A    What shops were my responsibility?

3    Q    Yeah.  What shops were your shops?

4    A    Cleburne, Texas, San Antonio, Texas, two facilities in San

5    Antonio, one a ramp, one a shop, Toronto, Canada, Cleburne.  I

6    mentioned Cleburne.  Tucson, Mira Loma, California, Chehalis,

7    Washington, and Springfield, Oregon --

8    Q    And you oversaw those --

9    A    -- and a ramp in Philadelphia.

10   Q    Okay.  And you oversaw those facilities until September

11   30th, 2013 from, let's say, the start of --

12   A    Until August 16th, 2013.

13   Q    Okay.

14   A    That was my last day with Greenbrier.

15   Q    And you talked about a ramp and a shop and there's been

16   some vague testimony going back about two facilities in San

17   Antonio.  Could you explain to me the difference between what

18   you call a ramp and a shop, let's say, in San Antonio?

19   A    Well, the two ramps are both similar, Philadelphia and San

20   Antonio, so I can explain them together, but the railroads

21   transload containers --

22   Q    Uh-huh.

23   A    -- off of railroad cars onto trucks.  And they bring their

24   110-car trains into these yards that they've built.  And they

25   offload them and transload them.  And subsequently, the

```
 1  railroad cars get inspected and mechanical people, which we

 2  provide, Greenbrier provides, repairs them, inspects and

 3  repairs the railroad cars.

 4  Q    And that's done at the ramp?

 5  A    Yes.

 6  Q    And how about the shop?

 7  A    Well, the shop repair --

 8  Q    Fixes them, repairs them?

 9  A    They repair cars also.  Yeah.

10  Q    And are they next to each other, the ramp and the shop,

11  say, in San Antonio?

12  A    The one in San Antonio --

13  Q    Uh-huh.

14  A    -- is probably, I think, 11 miles away --

15  Q    Okay.

16  A    -- from the shop.

17  Q    From the shop?

18  A    Yeah.

19  Q    At the ramp in San Antonio, do they also repair the cars?

20  A    They do some repairs, yes.

21  Q    More minor repairs?

22  A    Yes.

23  Q    Okay.

24  A    -- than a shop.

25  Q    So there's been some discussions here about the San
```

1    Antonio facility and the Tucson facility.  Is the Tucson shop

2    similar to the San Antonio shop, meaning they do the same types

3    of work?

4    A    Yes.

5    Q    Okay.  And the Tucson and San Antonio facilities -- did

6    you share responsibility of overseeing those facilities with

7    anybody?

8    A    Juan Maciel --

9    Q    He was also --

10   A    -- and Kevin Stewart.

11   Q    Okay.  So there were three general managers?

12   A    There's three general -- there were three general

13   managers.  Right.

14   Q    And I'm talking about these -- whenever I'm asking these

15   questions, just the time that --

16   A    During that time frame, yeah.

17   Q    -- yeah, we talked about.  Okay.  And did you have it

18   broken out by regions, or areas, or all three shared

19   responsibility?

20   A    Each general manager has -- they don't share facilities

21   except in the exception of Tucson there for a short time.  But

22   each general manager had a different facility.  Now, the

23   general managers were shared by the two regionals.  They

24   overlapped.

25   Q    Okay.

1   A    So at times, I had all three generals under me for some of

2   my shops.

3   Q    Okay.  So explain to me just briefly your chain of

4   command, let's say, from you going down to the, you know,

5   actual facilities.  So who from the facilities reported to you?

6   A    Any facility in particular?

7   Q    Let's say Tucson and San Antonio.

8   A    Okay.  The plant manager of the shop worked for the

9   general manager.  And then the general manager reported to the

10  regional manager.

11  Q    And that would be you?

12  A    Right.

13  Q    Okay.  And then how about going up the chain of command?

14  Who did you report to?

15  A    The VP of operations.

16  Q    Okay.  And then do you know who the VP of operations

17  reported to on up?

18  A    The president.

19  Q    And while you were there in that time frame we talked

20  about, who is the VP of operations?

21  A    Mike Torra.

22  Q    Okay.  Did you have any reporting responsibility to Mr.

23  Valle (phonetic)?

24  A    Other than HR issues.

25  Q    Okay.  You were working at Greenbrier during the time of

1   the November 12th, 2012 layoffs.  Correct?

2   A    Yes.

3   Q    When did you first find out that there was going to be a

4   layoff in Tucson?

5   A    2012.

6   Q    2012.  Yes.

7   A    When did I first --

8   A    When did you first hear that there was going to -- you

9   would have to lay people off in Tucson, you know, a layoff

10  would occur?

11  A    I don't really remember.

12  Q    Do you -- in relationship to the actual layoff, can you

13  give me your best guess?  Was it maybe a couple days, a couple

14  weeks, maybe a month?  As you sit here today, what's the best

15  of your memory?

16  A    It may have been a week.  I really can't remember.

17  Q    Okay.  Would you agree that was a fairly significant event

18  for the shop that you oversaw?

19  A    Yes.

20  Q    And how did you first hear that there was going to be a

21  layoff?

22  A    I really can't recall how I heard about it.  I can't say

23  with certainty how I heard about it.

24  Q    For events of this magnitude, was there a common practice

25  on how you would hear about it?  Would it come from Mr. Torra?

1   Would it come from above?

2   A    Well, it could have come from a number of ways, but I just

3   can't remember.  I can't recall how I heard about it.

4   Q    Did you attend a manager's conference in 2012 in Chicago?

5   Do you remember attending that?

6   A    Yes.

7   Q    And when you were at that conference, did you know about

8   the layoff?

9   A    No.  I don't recall.  I don't recall.  I know we talked

10  about the five struggling shops, but not a layoff.

11  Q    Okay.  So you did not talk about the layoff at that

12  manager's conference?

13  A    I don't remember.  I do not remember talking about that.

14  Q    Okay.  And did you get any directives after you were

15  informed about the layoffs?  Did you get any directives from

16  anyone above you on how to implement them or what to do?

17  A    No.  I was not involved in that, really.  It was -- that

18  was being handled by Kevin Stewart, the two generals, and Mike

19  Torra, and of course HR.  I was kind of off to the side.

20  Q    Okay.

21  A    I wasn't involved.

22  Q    So the two generals in the hierarchy of the company report

23  straight to you.  Right?

24  A    Right.

25  Q    And then you reported to --

```
 1  A     On paper.

 2  Q     On paper, sure.  And then on paper, you report to Mike

 3  Torra.  Correct?

 4  A     Right.

 5  Q     But with respect to this layoff, they kind of edged you

 6  out?

 7  A     Right.  Yes.

 8  Q     And so the two generals kind of went around you and were

 9  going right to Torra?

10  A     Yes.  And I know that.

11  Q     Okay.

12  A     I mean, I -- my efforts, my time, was concentrated in

13  another -- at another facility.  I mean, they didn't need me.

14  Q     And what facility was that?

15  A     Mira Loma.

16  Q     Okay.  And do you have a physical -- did you at the time

17  have a physical office at Greenbrier?

18  A     I had a workstation.  I did not have a physical office,

19  no.

20  Q     And where would you spend the majority of your time or

21  would you kind of float around?

22  A     In that time frame?

23  Q     Yeah.

24  A     Mira Loma.  I had a table that I worked off of.

25  Q     I thought perhaps it'd be a rail car.
```

1   A    No.  Boxcar, maybe, but no.

2   Q    I'm going to show you a document that's been marked

3   General Counsel's 15 and ask if you can just take a look at

4   that.  And I'm going to ask you some questions about the e-

5   mails that's on the front.  So tell me when you've had a chance

6   to look at 15.

7   A    Okay.

8   Q    So my question, if you go down to the very bottom e-mail,

9   that looks like an e-mail from Kevin Stewart to Juan Maciel

10  with a copy to you.

11  A    Uh-huh.

12  Q    It says, "Fill in the blanks.  We just need to finish

13  filling it in, 59 direct, 19 indirect."  Do you remember this

14  e-mail?

15  A    No.  No.  I don't.

16  Q    As you sit here today, do you know what they're referring

17  to in this e-mail, what Mr. Stewart was referring to in 59 --

18  56 direct, I'm sorry, 19 indirect?

19  A    No.  I don't remember the e-mail.  No.  I don't know what

20  that could be referring to.

21  Q    Okay.

22  A    I mean, hundreds of e-mails, I --

23  Q    With respect to the employees that were working at the

24  time, did you play any role at all in deciding who was going to

25  stay and who was going to go?  Now, we're talking about the

1   2012 layoff in November.  At some point, there was a decision.

2   Correct, that a certain number of employees had to get laid off

3   and a certain number were going to stay.  Right?

4   A    I did not have any part in that, no.

5   Q    Okay.

6   A    I did not approve any list or anything like that.

7   Q    Okay.  So I'm going to show you General Counsel's 16 and,

8   again, these are a couple e-mails and then some attachments.

9   I'm going to ask you just to take a look at that and let me

10  know when you've had a chance to review that e-mail.

11  A    Yeah.  That's to me, but I don't remember this e-mail.

12  Q    Okay.  So this e-mail that's dated November 11th, 2012

13  from Al Lave to a variety of people -- one of the names is

14  yours.

15  A    Right.

16  Q    And he starts, "Gordon, Kevin, and Juan," and he goes on.

17  Did you play any role in either determining who was going to

18  get laid off and who was going to stay or tweaking that list?

19  A    No.

20  Q    And do you know why they kept you in the loop or why Mr.

21  Lave would have addressed this e-mail starting with you?

22  A    As a courtesy, I guess.

23  Q    Okay.  Just as your role as --

24  A    Yeah.

25  Q    -- regional manager?

1  A    Yeah, as their supervisor.

2  Q    Did you know the workers at the Tucson facility at the

3  time?  Did you know who the employees were?

4  A    I knew a few over the years.  As Kevin took over more of

5  the shop, responsibilities, and they hired more and more

6  people, I knew fewer and fewer people.

7  Q    At the time of the layoff, did you have any knowledge or

8  understanding of the different skills of the individual

9  employees, which one was more skilled than the other?  Let's

10  say who was a better welder than the other.

11  A    No.

12  Q    Did you have any idea about, let's say, the attendance of

13  the employees, which one was having an attendance issue, which

14  one's having -- wasn't --

15  A    No.  I didn't get that granular in the operations.

16  Q    Who would handle those issues for you?

17  A    The plant manager --

18  Q    Okay.

19  A    -- and the general manager.  The plant manager.

20  Q    You did, however, at the time have an idea of the type of

21  the workload, let's say, the workload at your different

22  facilities?

23  A    Yes.

24  Q    And at the time of the layoff, there was a backlog of work

25  in Tucson.  Right?

1    A    Yes.

2    Q    There was a lot of railcars that needed to be fixed?

3    A    They were busy.

4    Q    How about your other facilities?  Were they similarly

5    busy? As

6    A    I can't say for certainty.  I don't remember.

7    Q    But in November 2012, the only layoff that occurred of the

8    facilities that you oversaw was in Tucson.  Right?

9    A    Yes.

10   Q    Okay.  I'll have you look at General Counsel's -- before I

11   do that, let me ask you -- I asked you when you first heard

12   about the layoff and I think you said you couldn't remember.

13   Did anyone discuss with you or did you hear from anyone at

14   Greenbrier, either the people above you or the people that

15   reported to you, why there had to be a layoff?

16   A    Do I remember what?  What was that?

17   Q    Did anyone tell you why the need for a layoff in Tucson?

18   A    I really can't recall any specifics.

19   Q    Just that we needed to cut people?

20   A    Well, the shop was inefficient.

21   Q    So who -- is that what you were told, that was the reason

22   for the layoff, that inefficiency?

23   A    Profitability, yes.

24   Q    Okay.  So at least in my mind, there is a difference in

25   profitability and a difference in inefficiency.  Did someone

1  tell you that, "We have to lay off people in Tucson in November

2  2012 because the shop is inefficient,"?

3  A    I know that was the reason, but I don't remember.  So I'm

4  sure somebody told me.

5  Q    But you don't --

6  A    But I don't remember who --

7  Q    You don't remember who --

8  A    -- or when.

9  Q    -- or when.

10  A    No.

11  Q    Did anybody tell you that there had to be a layoff in

12  November of 2012 because the Tucson shop was unprofitable?

13  A    Did anybody tell me that?

14  Q    Yeah.

15  A    I don't remember who might have told me that.  I know that

16  was the reason, though.

17  Q    You know.  Okay.  So was it both profitability and

18  inefficiency?

19  A    Well, they're tied together.

20  Q    Okay.

21  A    I mean, if you're not efficient, you're not going to be

22  profitable.

23  Q    Okay.  And had there been some profitability issues with

24  the Tucson shop for a while?

25  A    Yes.

1    Q    And why do you think that?

2    A    Because there was a lack of experience.  We grew the shop

3    too fast.

4    Q    Lack of experienced workers?

5    A    Yeah.  We tried to grow experienced workers and

6    experienced trainers, people to train the new people.

7    Q    Managers?

8    A    Lead men, managers --

9    Q    Foremen?

10   A    -- what have you, yes.

11   Q    But over a three-year period, the Tucson shop was

12   profitable.  Right, three years before the layoff?

13   A    I can't say for certainty.  It had been struggling for a

14   long time.  I don't know about three years before that.

15   Q    In some months, the Tucson shop was profitable.  In some

16   months, it wasn't.  Let's say 2011 and 2012.  Isn't that true?

17   A    I'm not sure.  I'd have to look at the financials.

18   Q    Okay.  Now --

19   A    I had several facilities.

20   Q    I understand.

21   A    And they just --

22   Q    Yeah.  I'm just asking if you know.

23   A    Yeah.  I can't say for certain, no.

24   Q    Sure.  Now, when you define -- you say inefficient, give

25   me a definition.  How at Greenbrier, when you were at

1  Greenbrier, would you compare the efficiencies of shops?

2  A    The number of hours worked versus the number of hours you

3  can bill for the work you performed.

4  Q    Is that billing efficiency rate?

5  A    Yeah.  That would be it.  Yes.

6  Q    Okay.  And explain that to me.  There's been some

7  testimony earlier in the proceeding.  How would you bill?  When

8  you say number of hours worked versus number of hours billed, I

9  know how lawyers do it, but I don't know how it works in the

10  rail car industry or in particular at Greenbrier at the time.

11  A    When the railroad -- in the railroad industry, there is a

12  matrix that is industry-wide.  They let you charge X number of

13  -- it's broken down into tents of hours.  And they let you

14  charge a standard amount of hours for each job performed on a

15  car.  So all the work performed on a car is recorded and you

16  bill for that work, no matter how long it took you.

17  Q    And I don't know railcars.  I know regular cars.  So say

18  you need to change the brakes.  I'm assuming railcars have

19  brakes.

20  A    Uh-huh.

21  Q    So say you needed to change the breaks on the railcars.

22  This matrix tells you, you can bill, I don't know, 20 hours,

23  let's say.

24  A    Right.

25  Q    And then that's all you can bill.

1    A    Yes.

2    Q    And if it takes you 30 hours to change the brakes on that

3    railcar for whatever reason, you have to eat that 10 hours?

4    A    Yes.

5    Q    Okay.  And who comes up with that matrix?

6    A    The American Association of Railroads.

7    Q    Okay.  And does the matrix have -- is there, like, an

8    acronym that you refer to that matrix as?

9    A    The Office Manual.

10   Q    The Office Manual.  I've seen some documents that had

11   maybe UPI or I could be mistaken, but does that sound familiar?

12   A    UPI, no.

13   Q    UPI, UPR maybe?

14   A    No.  It doesn't sound familiar.

15   Q    No acronyms.  Okay.  How about the -- well, before I go

16   on, what would you, as you sit here today and going back to the

17   time you worked at Greenbrier, as a regional manager when you

18   were at Greenbrier, was there a demarcation point you would

19   say, "This is efficient and this is not efficient," say a, I

20   don't know, 70 percent billing utilization rate is efficient,

21   if a shop is below 70, it's inefficient?

22   A    It depends on the labor rate that you're billing.  If

23   you're billing, you know, at $150 an hour, you can be less

24   efficient.  If you're billing, you know, $70 an hour, you have

25   to be 100 percent or more efficient --

1   Q    Okay.

2   A    -- because of your overhead rates.

3   Q    And did the different shocks that you oversaw at the time

4   have different billing rates?

5   A    Yeah, because I had different customers.

6   Q    And did the billing rate depend on the customer or did it

7   depend on the location of the shop, the cost of living in the

8   shop, how much you pay people, et cetera?

9   A    The billing rate, no.

10  Q    Okay.

11  A    That has nothing to do with cost of living.

12  Q    Okay.  So say you're fixing a car.

13  A    That's the overhead rate.

14  Q    I'm sorry?

15  A    That's the overhead rate.

16  Q    Okay.  So if you're fixing a car in Tucson for TTX, let's

17  say, if you're changing the brakes on this railcar, and you

18  have the same kind of railcar in Mira Loma that you're changing

19  the brakes on and you're doing the same kind of work, the

20  billing rates for both facilities are exactly the same for

21  Tucson and Mira Loma for the same customer?

22  A    No.  They're not the same in that case.

23  Q    And why would that be?

24  A    I don't know.  Is that a secret, Al?  It's just a

25  different billing structure that they've agreed to with the

1    customer.

2    Q    The customer.

3    A    Yeah.

4    Q    Okay.  So with respect to the customer, there's a

5    different billing structure agreed to at the different

6    facilities for doing their cars?

7    A    No.  Just Mira Loma has a different facility structure or

8    billing structure.

9    Q    Just Mira Loma.  Okay.

10   A    Yeah.

11   Q    Do you know at the time, at least the time that you were

12   there, the billing structures for San Antonio and the billing

13   structures for Tucson -- were they the same?

14   A    You know, I should know that, but I can't remember if they

15   were the same.  I would say -- do you want me to guess?

16   Q    No.  If you're not sure, I'd rather you just say not sure.

17   A    I'm not sure.

18   Q    Okay.

19   A    Yeah.  I'm not sure.

20   Q    Yeah.  That's fine.

21   A    They're not too far off.

22   Q    Sure.

23   A    But yeah.  I'm not sure if they were the same.  I know

24   there was -- one of the shops was a different rate, but they

25   were close.

1  Q    Okay.  And how about the labor utilization rate?  Would

2  you use that as a determiner for efficiency?

3  A    Profitability.

4  Q    For profitability.

5  A    Right.

6  Q    And at least what do you remember as the labor utilization

7  rate being defined as while you were working at Greenbrier?

8  A    I don't remember that.  That's a bad memory.

9  Q    How about total hours versus total direct hours?

10  A    Utilization.

11  Q    That's utilization?

12  A    Yeah.

13  Q    And does that kind of correspond with the billing

14  efficiency?  What does total direct hours mean?

15  A    Direct hours are the actual hours applied to the car,

16  worked on the car --

17  Q    Okay.

18  A    -- actual hours worked, not actual hours billed.

19  Q    And what are total hours?

20  A    Total hours are the total hours that the guy was at work.

21  Q    Okay.  And while you were the regional manager, was there

22  a system in place to determine how many hours an employee

23  worked on a particular car?

24  A    A system in place to determine --

25  Q    Yeah.  Did they write it down?  Did they swipe some kind

1    of card?  Did they carry around, like, a work, you know -- a

2    key card or --

3    A    Yeah, yeah.  The Kronos card.  Yeah.  Kronos timekeeping.

4    Q    And how would that work?  So say I'm a welder and I have

5    to go work on this particular car.  What would I do?

6    A    If they needed change from one card to another --

7    Q    Yeah.

8    A    -- they'd go to the time clock and change the work order

9    number that they're working on.

10   Q    Okay.  And was there, like, a central time clock?  I'm not

11   -- was there once central time clock you'd go to?

12   A    No.  Are you talking about Tucson specifically?

13   Q    Let's say Tucson.  Yeah.

14   A    They had multiple clocks.

15   Q    When was the first time that you learned the actual number

16   of employees that were going to be laid off in Tucson?

17   A    I don't remember.

18   Q    I'm going to show you a document --

19   A    I'm sure there's an e-mail.

20   Q    Okay.  I'm going to show you a document marked General

21   Counsel's 69.  So Mr. Hudgens, I'm going to show you a document

22   that's marked General Counsel's 69.

23   A    Uh-huh.

24   Q    And this looks like a meeting scheduled from an e-mail.  I

25   don't remember what you call it here in Outlook, but an Outlook

1  schedule that's dated Friday, November 9th, 2012, where Lisa

2  Maxey was organizing a meeting with you, Juan Maciel, and Al

3  Lave.  And it says, "Juan had touched base for logistics for

4  next week."  Do you remember attending a meeting with Lisa,

5  Juan Maciel, and Al Lave with respect to logistics for the next

6  week?  The next week would be the layoff, I'm assuming.

7  A    I would assume.  I don't remember specifically, no.

8  Q    How did it come about that you -- I mean, you went to the

9  facility in Tucson.  Right?

10 A    Right.

11 Q    And you told the employees they were going to be laid off,

12 that you guys were getting laid off?

13 A    Yeah.  I volunteered for that.

14 Q    So how did that come about?  How did it come about that

15 you had the honor of coming to Tucson to inform everyone?

16 A    Well, as regional manager, when that shop was a Railcar

17 America shop, I was the VP of operations.  I knew some of those

18 people a long time.  And they knew me.  And I didn't -- I

19 volunteered to do that, that job of informing the employees

20 that they were going to be laid off.

21 Q    And as you --

22 A    I volunteered for it because I didn't want either one of

23 my two generals to have to do it.

24 Q    Okay.  And as you sit here today, do you remember the

25 number of employees that got laid off that day?

1   A     No.  I don't.

2   Q     And again, do you recall the time or date that you got

3   that information, in respect to the 12th?  The 12th, you show

4   up in Tucson and you tell everyone they're laid off.  Right?

5   A     Yes.

6   Q     Okay.  So using that day as a marker, let's go back.

7   Clearly, you would have had to have made -- were your offices

8   in Tucson, your personal office?

9   A     No.  I live in San Antonio.

10  Q     In San Antonio.  So you had to make some sort of

11  arrangements to get to Tucson.  Right?

12  A     Yeah.  That's why I say I probably knew a week ahead of

13  time.

14  Q     Okay.

15  A     But I don't remember specifically when I found out about

16  it.

17  Q     And before the day that you found out -- and you said it

18  might have been a week ahead of time -- were there ever any

19  discussions before then about laying off employees in Tucson?

20  A     I was not involved in that.

21  Q     So you hadn't heard anything about the need for a layoff

22  in Tucson before that day, that you're not really sure about,

23  but estimates about a week before?

24  A     I don't recall.  I just don't remember.

25  Q     Okay.  I'm going to show you a document that's been --

1  that has been heavily redacted, but I ask you a couple of

2  questions with respect to some acronyms.  And this is General

3  Counsel 66.  And unfortunately, it's not paginated, but I will

4  show Respondent the actual document he's looking at.

5       MR. MINER:  This is what I have for 66.

6       MR. GIANNOPOULOS:  Yes.  And it's one of the exhibits.

7       MR. MINER:  An exhibit to 66.

8       MR. GIANNOPOULOS:  Yes.

9       MR. MINER:  Okay.

10      MR. GIANNOPOULOS:  And if I can approach, Your Honor --

11      JUDGE LAWS:  Yes.

12      MR. GIANNOPOULOS:  -- I only have one.  And if you don't

13 mind, I can look at it over here with you.

14 Q    BY MR. GIANNOPOULOS:  Mr. Hudgens, I'm just curious.

15 There's some acronyms on that document I don't understand.  And

16 under time standards, it says IRF.

17      MR. MINER:  I'm sorry.  What page are you on?

18      JUDGE LAWS:  Yeah.  Why don't we go through and read in

19 the pages?

20      MR. GIANNOPOULOS:  Unfortunately, it's not paginated.

21      JUDGE LAWS:  That should always be done for any

22 document --

23      THE WITNESS:  IRF stands for Independent Repair Facility.

24      MR. GIANNOPOULOS:  So are you on the same page?  It's this

25 one.

```
 1          MR. MINER:  No.

 2          MR. GIANNOPOULOS:  Keep going.  There you go.  Yeah.

 3          MR. MINER:  Key driving assumptions?

 4          MR. GIANNOPOULOS:  And on the top of the page, Your Honor,

 5  there's a fax stamp of -- it says 11/16.  That's the best I

 6  could do, I think ,at this time.

 7  Q    BY MR. GIANNOPOULOS:   So again, IRF was Independent

 8  Repair Facility?

 9  A    Yes.

10  Q    And what is UBS?

11  A    UBS is a billing system.

12  Q    And is that the matrix that you talked about?

13  A    That's a TTX billing system.

14  Q    Okay.  That's specifically for that client?

15  A    That's owned by that client.

16  Q    Okay.  And what does -- could you just explain to me what

17  IRF means, what the -- I know you told me the --

18  A    Independent Repair Facility.  That's a --

19  Q    And what is an independent repair --

20          JUDGE LAWS:  Hey, hang on.

21          MR. GIANNOPOULOS:  Sorry.

22          JUDGE LAWS:  You two are talking over each other.

23          MR. GIANNOPOULOS:  I apologize.

24          THE WITNESS:  Okay.  I'm sorry.

25          JUDGE LAWS:  It's happened quite a bit and now you're
```

1  talking over me.  So let's take a second.  We do this in normal

2  conversation.  We can't do it here.  So even if it has to seem

3  artificial, slow down.

4        MR. GIANNOPOULOS:  Sure.

5        JUDGE LAWS:  Wait a second until after the question is

6  asked to answer it.  Don't cut in on his answer unless there's

7  something that you're --

8        MR. GIANNOPOULOS:  Sure.

9        JUDGE LAWS:  -- cutting off for evidentiary reasons.

10       THE WITNESS:  I apologize.

11       MR. GIANNOPOULOS:  Same here.

12       JUDGE LAWS:  All right.  Everybody does it.

13  Q    BY MR. GIANNOPOULOS:   What is an independent repair

14  facility?  What does that mean?

15  A    That is an industry acronym for non-railroad shops,

16  private shops that are not owned by a railroad.

17  Q    I see.

18  A    They used to call them contract shops.

19  Q    And would Greenbrier be considered an independent repair

20  facility?

21  A    Yes.

22  Q    Okay.  In the time frame that we defined earlier with

23  respect to your employment at Greenbrier, when did you first

24  learn that employees in Tucson were interested in unionizing?

25  A    I don't recall.  I don't remember that.

1    Q    You were --

2    A    I'm sorry.

3    Q    No.  That's all right.  Did you have a question?  Go

4    ahead.

5    A    Which time period?

6    Q    We talked about your being in Tucson, overseeing Tucson in

7    2011, 2012, 2013.

8    A    So you're talking about both times or just one time?

9    Q    I'm just curious, when was the first time, if you recall?

10   A    Yeah.  I don't remember.

11   Q    Okay.  But you were the regional manager when there was

12   the first selection in Tucson with the UTU, union number one,

13   in 2011.  Right?

14   A    Yes.

15   Q    Okay.  And did you play any role with respect to that

16   election in discussing with the Greenbrier employees what the

17   company's view was about unions?

18   A    Discussing with employees, no.  I had no role.  I was in

19   one meeting that employees were at, a shop meeting, but that

20   was it.  And that was -- I had very little role.

21   Q    Okay.  And that first election was fairly close.  Do you

22   recall that?

23   A    I do not recall that.  Well, it was fairly close.

24   Q    I think it was three votes?

25   A    Yeah.  I don't know.

1  Q    I think there were five votes?

2  A    I don't know.  The only thing I know, it was voted down.

3  Q    Okay.  And then moving forward, a year later, you were

4  aware that another election petition was filed.  Correct?

5  A    I don't know, other than when it was mentioned in that

6  meeting, when I was laying the guys off.  I don't know of any

7  other time.

8  Q    So at least as you sit here today, is it your testimony

9  that, that was the first time in a meeting you were laying

10  everyone off, the first time you heard that the Tucson

11  employees were, again, interested in unionizing?

12  A    That I can recall.

13  Q    That you can recall.

14  A    Yes.

15  Q    Okay.  I'm going to show you a document that was marked

16  General Counsel's 18.  I'm just asking you to take a look at

17  that.  And this document is titled "Preparing For and Reacting

18  to the Union Organizing Effort".  Did you participate in any

19  type of training where -- or meetings where this document was

20  disseminated?  Do you remember while you were at Greenbrier?

21  A    No.  No.

22  Q    This document doesn't look familiar to you?

23  A    No.

24  Q    Okay.  Is it that you did not participate in any such

25  meetings or you don't remember?

1    A    I don't remember participating, no.

2    Q    Okay.

3    A    No.  This would not have been in my area of expertise.

4    Q    Do you remember being at any meetings where Mr. Lave was

5    involved, where the union -- either the sheetmetal workers

6    union or the UTU, the first union that was trying to organize

7    in Tucson, were mentioned?

8    A    No.  I don't remember.

9    Q    Okay.  Were you involved in any way with respect to --

10   sorry.  Let me take a step back.  You are aware, you remember,

11   that there was a second election for the sheetmetal workers in

12   Tucson in 2013.  Correct?  I say second election.  This was the

13   first election of the sheetmetal workers, but within the maybe

14   year-and-a-half time span.

15   A    I heard about it.  Yeah.

16   Q    Okay.

17   A    That was after my employment in the -- when was the

18   election?

19   Q    When did -- well, the election was July 2013.

20   A    Yeah.  Yeah.  I'm aware of it.  Yeah.

21   Q    Okay.

22   A    Yes.

23   Q    And did you play any role in developing or taking part in

24   strategy, company strategy, on how to defeat the union drive?

25   A    No.

1    Q    I'm going to show you a document that's marked General

2    Counsel's 50.  And let me know when you've had a chance to take

3    a look at that.

4    A    Okay.

5    Q    Did you have any discussions with any of the people listed

6    in that e-mail about the union's organizing drive in Tucson?

7    A    No.

8    Q    Were you just being copied as a courtesy?

9    A    Yes.

10   Q    Okay.  And then I'm going to show you General Counsel's

11   51.  Let me know when you've had a chance to review that.

12   A    Okay.

13   Q    Did you participate in this meeting that's being discussed

14   here in these e-mails with Mr. Lave?

15   A    At the facility?

16   Q    Yeah.

17   A    I can't be sure.  I don't think so.  I don't know.  I

18   don't remember.

19   Q    Between, let's say, November 1st of 2012 and July 30th of

20   2013, can you give me an estimate of how often you would come

21   to the Tucson facility?

22   A    You want me to guess?

23   Q    Well, what was your practice during the time you were

24   regional manager, the entire time you were regional manager at

25   Greenbrier?  Did you have a practice to go into your different

1    facilities?

2    A    No.  Most of my time was spent at the Mira Loma facility.

3    There was no set schedule.  I don't know.  I may have gone

4    there just a couple of times a year.

5    Q    Okay.  Would you get regular updates from your general

6    managers about your different facilities?

7    A    Regular updates, operational issues, yes.

8    Q    Operational issues.

9    A    Yes.  That's mainly what I was concerned with.

10    Q    Okay.  Something like a union drive, you wouldn't be

11    updated about that?

12    A    Yeah.  I would be.

13    Q    Okay.  When was the first time you remember getting

14    updated with respect to the fact that the sheetmetal workers

15    were trying to organize employees in Tucson?

16    A    I don't remember.

17    Q    Okay.  But that would be a subject that you would get

18    updated on?

19    A    Possibly.

20    Q    Possibly?

21    A    Possibly.

22    Q    I mean, isn't it true that a union drive could affect

23    operations?

24    A    Yes.

25    Q    Employees could lose focus on their work.  Right?  Would

1   you agree with that, during a union drive?

2   A    Not necessarily.

3   Q    But it's possible, if employees were busy talking about

4   the union, that could affect efficiency?

5   A    Well, if they spent their time not working.

6   Q    Yeah.

7   A    Well, obviously, yes.

8   Q    Okay.  Were you expected to report information like that

9   to someone else on the hierarchy of the operations that we just

10  discussed earlier?  If one of your general managers had come to

11  you with an issue, for example, employees in Tucson are

12  organizing or trying to unionize, what would you do with that

13  information?  Was it expected you would report that up the

14  chain of command?

15  A    I was usually the last one to hear about it.

16  Q    People carved you out.

17  A    I'm serious.  At this point in time, my focus was growing

18  the Mira Loma shop.

19  Q    Okay.

20  A    I probably heard about it, the last one to hear about

21  anything.

22  Q    How long had you worked at the Mira Loma shop or focused,

23  let's say -- you said you were --

24  A    Well, we started that shop.  We opened that shop, I think

25  it was, 2010, April.  Yeah.  It was -- I'm sorry.

1       JUDGE LAWS:  Don't -- just testify on your memory.

2   Don't --

3       MR. GIANNOPOULOS:  Just -- yeah.

4       THE WITNESS:  Okay.

5       JUDGE LAWS:  -- take any cues.

6       THE WITNESS:  Well, I can't -- okay.

7       MR. GIANNOPOULOS:  Okay.

8       JUDGE LAWS:  If you can't remember, say it.

9   Q   BY MR. GIANNOPOULOS:   I'm just asking you from memory.

10  A   Well, I can't remember for sure.  It was April.  I can't

11  remember if it was 2010 or '11, but I mean --

12  Q   Isn't --

13  A   -- I spent all my time there.  I didn't even spend it with

14  San Antonio.

15  Q   And isn't it true that the Mira Loma shop was purchased

16  from TTX?

17  A   Yes.  It's leased.

18  Q   I'm sorry.  Say that again.

19  A   It's leased.

20  Q   It's leased.  So before Greenbrier took over the Mira Loma

21  shop, that was a TTX shop --

22  A   Yes.

23  Q   -- Mira Loma.  And isn't it true that, at the time the

24  lease went from TTX to Mira Loma, the employees -- I'm sorry,

25  that went from TTX to Greenbrier -- and we're talking about the

1   Mira Loma Shop.  At that time, Greenbrier took it over.  The

2   TTX employees had been organizing for a union.  Right?

3   A    Can you say that again?

4   Q    Sure.  Let's go back.  When Greenbrier took over the Mira

5   Loma facility from TTX --

6   A    Right.  Okay.

7   Q    -- was that -- maybe it was about in 2010.  Do you know if

8   the employees that had been working there were union or non-

9   union?

10  A    That shop had been empty for three years.

11  Q    It had been empty for three years.

12  A    Yes.  It was vacant for three years.

13  Q    At the time it was shut down, did you know anything about

14  whether the fact that TTX plant in Mira Loma, when it shut down

15  -- whether the employees had recently organized?

16  A    They were union.

17  Q    They were union --

18  A    TTX employees were union.

19  Q    Okay.  At the time they shut down?

20  A    Yes.

21  Q    Okay.  I'm going to show you General Counsel's 56.

22        JUDGE LAWS:  And before you do that, I just want to follow

23  up.  You said TTX employees were union.  Do you know whether

24  that was company-wide?

25        THE WITNESS:  It is not company-wide.

1      JUDGE LAWS:  But they were at Mira Loma?

2      THE WITNESS:  Yes.

3      JUDGE LAWS:   Thank you.

4  Q    BY MR. GIANNOPOULOS:    And do you know how long they had

5  been union in Mira Loma before they shut down?

6  A    No.  I don't.

7  Q    Okay.

8  A    I don't know how long.

9  Q    I'm going to show you General Counsel's 56 and 57.  And

10 just let's start with 56 and then, when you're done, go ahead

11 and take a look at 57.

12 A    Okay.

13 Q    With respect to 56, did you attend that meeting in June

14 with Mr. Lave at the Tucson shop?

15 A    I don't remember if this is that meeting or not.

16 Q    Okay.  You attended one meeting, I think you testified to,

17 before the election in 2013 at the Tucson shop?

18      MR. MINER:  Objection.  I think he testified he was

19 involved in one meeting before the 2011 UTU election.

20      THE WITNESS:  Yeah, not the '13.

21 Q    BY MR. GIANNOPOULOS:    Okay.  So in 2013, did you attend

22 any meetings at the Tucson shop with employees where the union

23 was discussed?

24 A    No.

25 Q    Did you attend any meetings within managers, foremen, lead

1  men, supervisors where the union drive at the Tucson shop was

2  discussed in 2012 or 2013?

3  A    No.

4  Q    Okay.  Okay.  And you played no role in the company's

5  strategy on how to defeat the union during that time frame?

6  A    No.

7  Q    Okay.

8  A    I was copied on e-mails, but I had no role.

9  Q    Now, at some point after the layoff in November of 2012,

10 employees were recalled at Tucson.  Correct?

11 A    Yes.

12 Q    And did you play any role in the recall?

13 A    No.

14 Q    Do you know how it was decided that employees would need

15 to be recalled?

16 A    Based on -- I don't know exactly, I should say.  I don't

17 know exactly what criteria was used.  It was my understanding

18 that they can be brought back, depending on how productive they

19 were when they did work there.

20 Q    Okay.  And do you remember where you got that information

21 from?

22 A    I don't remember specifically, no.

23 Q    How about the layoff?  Do you remember what criteria was

24 used to determine which employees would be laid off?

25 A    Productivity.

1   Q    That was the primary --

2   A    Yes.

3   Q    Okay.  How about the decision to recall?  Was there a

4   certain triggering moment that at least you remember spurred

5   the company to start bringing more employees back?

6   A    I don't remember specifically, no.

7   Q    Had things gotten better in Tucson when they started

8   recalling employees?

9   A    Well, we still had a lot of work, so their efficiencies, I

10  believe, did get a little bit better.  We had a little control

11  over things.  So they decided to bring some people back.

12  Q    And when you say control over things, what do you mean by

13  that

14  A    Efficiencies.

15  Q    Okay.

16  A    Productivity.

17  Q    Do you remember -- when you say better, can you define

18  that

19  A    A high efficiency per person.

20  Q    Higher efficiency?  I'm sorry.

21  A    Yeah.

22  Q    I didn't mean to cut you off.

23  A    Yeah,  higher efficiency.

24  Q    Okay.  And that would be both the billing efficiency rate

25  and the labor utilization rate?

1    A    Yes.

2    Q    Okay.  Do you know who made the decision as to which

3    employees were being recalled?

4    A    I think that was between Kevin Stewart, Juan Maciel, and

5    HR.

6    Q    Okay.  Do you know who made the decision as to the number

7    of employees that would be recalled?

8    A    No.  I don't know who made that decision.

9    Q    I'm going to show you a document that has been marked and

10   admitted into evidence as General Counsel's 46.  I'm going to

11   draw your attention to the bottom e-mail on that document.

12   That's dated February 14th, 2012.  That's the e-mail from Kevin

13   Stewart to Al Lave with a copy to you, Mr. Torra, and Juan

14   Maciel.  Did you have a chance to look at it?

15   A    Yes.

16   Q    Do you know why the company needed to increase the direct

17   labor headcount in Tucson to 65 over the next 45 days at that

18   period of time?

19   A    No.  I don't know why that number is -- I don't know why

20   it would be 65.  The only thing I could -- well, I don't know

21   why.

22   Q    Well, did the company have headcount targets?

23   A    Well, you've got certain expenses you've got to cover as a

24   business, fixed expenses, so you need a certain number of

25   billed hours.  And the way to increase that is the headcount.

1    Q    Okay.  Meaning that the more employees you had at the

2    facility, the more you could bill potentially to a client.

3    Right?

4    Q    Potentially, yes.

5    Q    And isn't it true, the larger the facility is, the larger

6    the fixed expenses would be?  Right?

7    A    Yes.

8    Q    And from a capital standpoint, the Tucson facility was a

9    fairly big facility with respect to -- it was owned by

10   Greenbrier.  Right?

11   A    Yes.

12   Q    It's a large piece of property that it was on.  Correct?

13   A    Yes.

14   Q    And based on that, there was a lot of equipment at that

15   facility.  Correct?

16   A    Yes.

17   Q    And that would give you a higher fixed expense.  Correct?

18   A    Yes.

19   Q    Okay.  The San Antonio facility was a leased facility.

20   Right?

21   A    Yes.

22   Q    Okay.  And when I am referring to the San Antonio

23   facility, I'm talking about the shop, not the ramp.

24   A    Okay.

25   Q    Okay.  The shop in San Antonio was leased.  Correct?

1   A      Yes.

2   Q      Mira Loma is a lease.  Right?

3   A      Yes.

4   Q      Okay.  And the other facilities that you testified to

5   earlier when you started, that you oversaw -- were those lease

6   or owned facilities?

7   A      Both, yeah, mixture.

8   Q      So Chehalis?

9   A      Chehalis is owned.

10  Q      Is owned.  I can't remember which ones you said.  I'm

11  sorry.

12  A      Springfield is leased.  Cleburne is leased.

13         JUDGE LAWS:  Toronto?

14         THE WITNESS:  Toronto is a different structure.  It's a

15  RIP track, where we just provide -- Greenbrier provides the

16  labor.

17  Q      BY MR. GIANNOPOULOS:   I'll show you a document that's

18  marked General Counsel's 49.  This is a document that's already

19  been admitted into the record.  Let me know when you've had a

20  chance to look over that document.

21  A      Okay.  Okay.

22  Q      Do you remember participating in a GRS strategy and

23  planning meeting in April 2013, where the topics listed on this

24  document was discussed?

25  A      Is that the plant managers meeting?

1    Q    I'm not sure.  I'm asking if you remember.

2    A    I don't remember.  I don't remember.

3    Q    Okay.  During that time frame in April of 2013, do you

4    remember participating in a meeting where a Tucson recovery

5    plan was discussed?

6    A    Yes.  Yes.

7    Q    And what do you remember being discussed about the Tucson

8    recovery plan?

9    A    I can't remember specifically what was discussed.

10   Q    Okay.  How about, let's say, in 2013 in general?  As the

11   regional manager, if there was going to be a recovery plan in

12   Tucson, I'm assuming you would be aware of it?

13   A    Yes.

14   Q    Okay.  And what in 2013 is being discussed in Greenbrier

15   with respect to a Tucson recovery plan?

16   A    I really can't remember specifics.  I mean, it was all

17   over the board.  It was very fluid, so I don't remember.

18   Q    Okay.  And the same question with respect to San Antonio

19   -- if there was discussion about closing San Antonio, I'm

20   assuming, as regional manager, you would know about that?

21   A    Yes.

22   Q    In 2013, what do you remember being discussed at

23   Greenbrier with respect to closing San Antonio?

24   A    I believe it was just on a watch list.

25   Q    Okay.  Do you recall, as you sit here today, in 2013 from

1    January 1st until the day that you ended -- I thought you said

2    it was August 16th?

3    A    August 16th, yes.

4    Q    Okay.  During that time frame in 2013, was there any

5    discussion about closing Tucson?

6    A    I can't remember any specifics.

7    Q    Okay.  Were you involved in the hiring of Eric Valenzuela?

8    A    I participated in one phone interview of Eric.

9    Q    And at that time or during that interview, did you inform

10   Eric that employees in Tucson had been organizing and trying to

11   unionize?

12   A    Not that I remember.

13   Q    Okay.

14   A    I didn't.

15        JUDGE LAWS:  And while you're getting ready for your next

16   subject, I just want to follow up on something before we get

17   too far away from it.  I've heard the term recovery plan thrown

18   out, taking it to mean what it means in English.  But was that

19   a term that you had heard before at Greenbrier?

20        THE WITNESS:  Before the plan for these five shops?

21        JUDGE LAWS:  And before specifically the Tucson recovery

22   plan.

23        THE WITNESS:  It was in a plan with the other shops.  I'm

24   not sure I understand what -- I heard about a -- did I hear

25   about a recovery plan before?

1    JUDGE LAWS:  I'm not really concerned about when.  What is

2  a recovery plan?

3    THE WITNESS:  I'm sorry.

4    JUDGE LAWS:  What does that mean to you?

5    THE WITNESS:  Well, it all comes down to profitability,

6  the best way to get the shop back to productivity by improving

7  efficiencies and increasing headcount.

8    JUDGE LAWS:  Thanks.

9    THE WITNESS:  That's pretty much it.

10  Q   BY MR. GIANNOPOULOS:   I'm going to hand you a document,

11  Mr. Lave [sic], that's been marked General Counsel's -- I'm

12  sorry, Mr. Hutchens.  I apologize.  I've been dealing with Mr.

13  Lave so much that --

14    JUDGE LAWS:  You'll hand it to him as well.  Right?

15    MR. GIANNOPOULOS:  Yes.

16    JUDGE LAWS:  So --

17  Q   BY MR. GIANNOPOULOS:   It would be marked General

18  Counsel's 204.

19    MR. MINER:  Thank you.

20  Q   BY MR. GIANNOPOULOS:   This is an e-mail that's dated

21  November 8th, 2012.  It looks like it's from you to Kevin

22  Stewart and Juan Maciel regarding "Fill in the blanks".

23  A   Okay.

24  Q   And below that is the e-mail that I talked to you earlier

25  about that said, "56 direct, 19 indirect".  Do you see that?

1    A    Yes.

2    Q    And in the e-mail, you say to Mr. Stewart and Mr. Maciel,

3    "It will be easy to figure out how many billed hours we can do

4    with this headcount.  Is one of you going to estimate what our

5    fixed costs can go down to with this headcount so we can get to

6    at least breakeven margin?  Would you rather we go through that

7    when we conference?"  And that's November 8th, 2012.  What

8    prompted you to send that e-mail?

9    A    I do remember this.

10    Q    Okay.

11    A    I wanted to make sure, you know -- we had to drop the

12    headcount down in order to get a handle on efficiencies, to get

13    control of that.  So I just wanted them to keep in mind that --

14    drop it down to -- if we need to drop the headcount down, drop

15    it down to where we can still cover fixed costs, at least not

16    lose money --

17    Q    Okay.

18    A    -- at the shop.

19    Q    And when you said that you had to drop the headcount down

20    to get a control on efficiencies, does this e-mail refresh your

21    memory at all as to when you were informed or it was decided

22    that, that was the strategy to take, drop the headcount down by

23    laying off employees to increase efficiencies?

24    A    I can't say with any certainty.  I can't remember that

25    closely.

1    Q    Did anyone get back to you with fixed cost estimates?

2    A    Well, I see the financials every month.  I know what the

3    fixed costs are.

4    Q    Here, you ask Mr. Maciel and Mr. Stewart, "Is one of you

5    going to estimate what our fixed costs could go down to with

6    this headcount so we could get to at least breakeven margin?"

7    Do you remember if anyone got back to you with that?

8    A    Well, yeah.  That had to do with the labor costs.  With

9    the adjustment of the headcount going down, the labor costs are

10   going to go down, so I wanted that number.  But what was the

11   other part of that question?

12   Q    Do you remember if anyone actually got back to you with

13   those numbers?

14   A    I don't remember.

15   Q    Was there any kind of goal or target margin rate that you

16   were trying to meet with the layoff?

17   A    Yes.  But I don't remember what it was.

18   Q    And who set that goal?

19   A    I don't remember.

20   Q    Okay.  Again, with respect to the layoff, was there any

21   goal or goal income, net income, that you were trying to meet?

22   A    There is a yearly forecast that we do prior to the fiscal

23   year.  That is the goal.

24   Q    That was the goal?

25   A    Yes.

1    Q    Okay.  How about return on investment capital?  With

2    respect to laying off employees, did anyone give you a goal of

3    return on investment capital that you were trying to meet at

4    that Tucson facility?

5    A    Yes.  There is a goal, but I don't know what it was.

6    Q    And was that just the yearly goal that was set or was that

7    changed in any way with respect to the layoff?

8    A    Now, that is a fixed number that corporate gives us when I

9    was working there as a goal just financially.  Just for every

10   facility, it's the same.

11   Q    And in 2013, isn't it true that the Tucson facility was

12   not the only facility that was not meeting the goal on return

13   on investment capital.  Correct?

14   A    There were others.  Yes.

15   Q    There were others.

16   A    Yes.

17   Q    And the same is true with respect to the goal margin.

18   There were other facilities that were not meeting their margin

19   goals.  Correct?

20   A    Correct.

21   Q    And that's for 2013 again?

22   A    Yes.

23   Q    And the same on income -- there were other facilities that

24   were not meeting their income goals during that time frame.

25   Correct?

1    A    Yes.

2    Q    But during that time frame, only the Tucson facility had a

3    layoff.  Correct?

4    A    Because it was the worst.

5    Q    It was the worst on all three goals?

6    A    Yes.

7    Q    Okay.  And you remember that as you sit here today?

8    A    Yes.  I can remember it being incurable.

9    Q    Okay.

10   A    So yes.  I can't give you what the numbers were, but I

11   know it was bad.

12   Q    It was worse than Mexico City?

13   A    I don't know what Mexico City's numbers were.  I didn't

14   see their financials.

15   Q    So when you say it's the worst, do you mean it was the

16   worst at the facilities that you oversaw or if it was the worst

17   of all the facilities in the Greenbrier system?

18   A    I can't be sure.  I can't be sure of that.  I know it was

19   the worst of mine.

20   Q    Okay.

21   A    Now, on -- yeah.  Let me -- I forgot about Mexico City.

22   On paper, that was under me, too, but I didn't have -- very,

23   very little to do with it.

24   Q    Okay.  So Mexico City was also a repair facility that was

25   under you --

1　A　　Yes.

2　Q　　-- during the same time frame we talked about?

3　A　　Yes.

4　　　　MR. GIANNOPOULOS:  Okay.  I'll move for the admission of

5　General Counsel's 204, Your Honor.

6　　　　MR. MINER:  No objection.

7　　　　JUDGE LAWS:  204 is admitted.

8　**(General Counsel Exhibit Number 204 Received into Evidence)**

9　　　　MR. GIANNOPOULOS:  I have a document that's marked General

10　Counsel's 205.  And unfortunately, Your Honor, I only have one.

11　I could make --

12　　　　JUDGE LAWS:  If you can show it to Mr. Miner, then I can

13　look at it with the witness.

14　　　　MR. GIANNOPOULOS:  203 was the --

15　　　　JUDGE LAWS:  The stipulated document that I --

16　(Counsel confer)

17　　　　MR. MINER:  I didn't realize you were waiting for me,

18　John.  I apologize.

19　　　　MR. GIANNOPOULOS:  I thought you were still looking at it.

20　Q　　BY MR. GIANNOPOULOS:  Mr. Hudgens, I'm going to show you

21　a document marked General Counsel's 205 and let me know when

22　you've had a chance to look at that document.

23　　　　JUDGE LAWS:  I'm going to look over your shoulder.

24　Q　　BY MR. GIANNOPOULOS:  Have you had a chance to look it

25　over?

1    A    Okay.

2    Q    And this is an e-mail that's dated September 14th, 2012

3    from Al Lave and you're one of the recipients.  Correct?

4    A    Correct.  Yes.

5    Q    And it talks about the fiscal year 2012 hiring goal as of

6    year-end August 31st.  And with respect to the Tucson facility,

7    at least, the -- I'm sorry -- August 2012 target headcount is

8    95.  Is that correct?

9    A    Yes.

10   Q    So at least at that time, target headcount for Tucson was

11   supposed to be 95 employees?

12   A    Yes.

13   Q    And is that shop employees, people that actually do the

14   work on the cars?

15   A    Yes.

16   Q    Okay.  And then there's a question here, it looks like,

17   from Mr. Lave to Kevin, "What explanation do you have for

18   missing the Tucson target by 22?"  Do you see that?

19   A    Yes.

20   Q    As regional manager, would missing a headcount target by

21   22 employees be a big miss?

22   A    Yes.  It's a big miss.

23        MR. GIANNOPOULOS:  Okay.  I'm going to move for the

24   admission of General Counsel's 205, Your Honor, and I will make

25   copies tonight and substitute.

1    MR. MINER:  You'll circulate those copies tomorrow?

2    MR. GIANNOPOULOS:  Yeah.  Yes, yes.

3    MR. MINER:  Yeah.  No objection, Your Honor.

4    JUDGE LAWS:  It's admitted.

5  Q    BY MR. GIANNOPOULOS:    I'm going to show you a document,

6  Mr. Hudgens, that's going to be -- that's already in the record

7  as General Counsel's 42.  And this is an e-mail from Lisa Maxey

8  to you and a variety of other people that's dated November

9  10th, 2012 with an attachment that's attached here.  It says

10 "Talking Points" for section two attachments, one for the

11 retained employees and one for the terminated employees.  And

12 then there's a third that says Tucson time.  Do you remember

13 getting this e-mail?

14 A    Yes.

15 Q    And you were the person that you had volunteered, I think

16 you testified earlier, to go to Tucson and talk to the

17 employees.  Correct?

18 A    The terminated employees, yeah, the terminated group, yes.

19 Q    Did you tweak these talking points at all after you got

20 them from Ms. Maxey?

21 A    No.  I don't believe so.  No.

22 Q    Okay.  Thank you.  And when you went to Tucson on the

23 12th, you met with two groups of employees.  Right?  One group

24 was getting laid off and one group was getting retained.

25 A    Not me.  I just met with the terminated.

1  Q    You just met with the terminated employees.  Who met with

2  the employees that were being retained?

3  A    Juan Maciel.  And I don't remember who was with him, if

4  anybody, but --

5  Q    I'm going to show you what's been marked as General

6  Counsel's -- I believe it's 199.  And this is a video.  And I'm

7  just going to step up here and start playing it from the 11:56,

8  11 minutes and 56 seconds.

9       JUDGE LAWS:  You want to do it the same way you did

10  before?

11       MR. GIANNOPOULOS:  Sure.

12       MR. MINER:  May I, Your Honor?

13       JUDGE LAWS:  Yes.  Please do.

14       MR. MINER:  Thank you.

15       MR. GIANNOPOULOS:  If you don't mind, I'll --

16       JUDGE LAWS:  Other way.

17       MR. MINER:  And if you turn it around more --

18       MR. GIANNOPOULOS:  Good.  Okay.  This way, everyone can

19  really see it if I can --

20  (Video played from 3:21 p.m.)

21  Q    BY MR. GIANNOPOULOS:  And I'm going to stop it at 12:43.

22       JUDGE LAWS:  All right.  And then before you go on --

23       MR. GIANNOPOULOS:  Yeah.

24       JUDGE LAWS:  -- the court reporter picked up none of that.

25  Are you okay with just --

1    MR. GIANNOPOULOS:  Yes.

2    JUDGE LAWS:  -- the start and stop times?

3    MR. GIANNOPOULOS:  Yes.  I'm fine with that.

4    JUDGE LAWS:  Okay.

5  Q    BY MR. GIANNOPOULOS:  And that's you on that video, Mr.

6  Hudgens.  Right?

7  A    Yes.

8  Q    And do you remember that being the meeting where the

9  employees were being laid off?

10  A    Yes.

11    MR. GIANNOPOULOS:  Okay.  Sorry.  And Your Honor, if I

12  could take five minutes --

13    JUDGE LAWS:  Why don't we do that?

14    MR. GIANNOPOULOS:  -- and just chat with my co-counsels

15  here for a second, and --

16    JUDGE LAWS:  It's a good time for a break, anyway, so

17  let's take five.  It's 3:25, so 3:30.

18  (Off the record at 3:23 p.m.)

19  Q    BY MR. GIANNOPOULOS:  Okay.  Thank you, Mr. Hudgens, just

20  a few more questions.  I think, earlier, we had talked about

21  the Mira Loma facility under when TTX had it and when you said

22  that it was unionized.  Do you know whether that was the only

23  repair facility that TTX had at the time that was union?

24  A    No.  All their ramps, mobile facilities, are unionized.

25  They have another large shop back east that's non-union.

```
 1   Q     Okay.  And do you know which union represents the

 2   employees at the ramps?

 3   A     No.  I don't.

 4   Q     Is it the locomotive engineers, perhaps?

 5   A     I don't know.

 6   Q     Okay.

 7   A     Yeah.  I wouldn't know.

 8   Q     And what caused your employment at Greenbrier to end?  Did

 9   you resign on your own?  Were you terminated and laid off?

10   A     I was terminated.

11   Q     Okay.  Were you given a reason?

12   A     No.

13   Q     What about the shutdown or the decision to shut down the

14   Tucson facility?  Did you hear about the shutdown at any time

15   in 2013?

16   A     Yes.

17   Q     And who did you hear it from?

18   A     I don't remember.  I don't remember specifically who I

19   heard it from.

20   Q     But the decision to shut down the facility was after you

21   had left?

22   A     Yes.

23   Q     Before you came to testify today, did you review any

24   documents in preparation for your testimony?

25   A     No.
```

1  Q    And before you came to testify today, did you discuss your

2  potential testimony with anybody?

3  A    Just with the attorneys.

4  A    And that's Mr. Miner, and Mr. Biddle, and Mr. Lave?

5  A    Yes.

6  Q    And how often -- was this on the phone or was this in

7  person?

8  A    Dinner last night.

9  Q    Okay.  And at dinner last night, was anyone other than

10  these three present?

11  A    No.

12      MR. GIANNOPOULOS:  Okay.  That's all I have, Your Honor.

13  Thank you.

14      MR. MINER:  Your Honor, we have no questions at this time,

15  but we do reserve the right to call Mr. Hudgens as part of the

16  company's case.

17      JUDGE LAWS:  Okay.  And I don't have any questions for

18  you.  I do want to thank you for coming here today and

19  providing your testimony.  There's a rule in place for this

20  trial.  And what it means is, you're not to talk about your

21  testimony.  I mean, you can talk to the lawyers, obviously, but

22  with any other witnesses or anybody who is connected to the

23  case that could potentially be called as a witness.

24      THE WITNESS:  Okay.

25      JUDGE LAWS:  Thanks.

1    THE WITNESS:  I'll fill my cup up and --

2    JUDGE LAWS:  Yeah.

3    THE WITNESS:  -- go home.

4  (Off the record at 3:35 p.m.)

5    JUDGE LAWS:  Can you raise your right hand?

6  Whereupon,

7                        **LISA MAXEY**

8  having been first duly sworn, was called as a witness herein

9  and was examined and testified as follows:

10    JUDGE LAWS:  If you could, please state and spell your

11  name for the court reporter.

12    THE WITNESS:  My name is Lisa, L-I-S-A, Maxey, M-A-X-E-Y.

13    JUDGE LAWS:  Thank you.  Whenever you're ready.

14    MS. ALONSO:  All right.

15                    **DIRECT EXAMINATION**

16  Q    BY MS. ALONSO:  Ms. Maxey, my name is Sophia Alonso.  I'm

17  an attorney with the government and I'm going to ask you some

18  questions about your position with Greenbrier.

19  A    Okay.

20  Q    What position do you hold with Greenbrier?

21  A    I'm the regional HR manager.

22  Q    Okay.  And when were you hired with the company in that

23  capacity?

24  A    In April 2012.

25  Q    And have you always had that position?

1    A    Yes.

2    Q    Now, you mentioned that you were regional manager.  What

3    is the region that you oversee?

4    A    I oversee several shops.  We don't split up our shops

5    geographically.  We split it up more by employee count from the

6    overall shops.  So I --

7    Q    All right.  And which are the shops that you do oversee?

8    A    Currently, I oversee Tucson, San Antonio, the SoSan

9    ramp --

10   Q    Uh-huh.

11   A    -- Mira Loma --

12   Q    Uh-huh.

13   A    -- and Springfield and then some corporate functions as

14   well.

15   Q    And in November of 2012, what shops did you oversee?

16   A    I oversaw Tucson, San Antonio, the SoSan Ramp, Mira Loma,

17   Springfield, the corporate functions at Albers Mill's office --

18   we had a separate corporate office then -- San Bernardino, and

19   Corsicana, which are both wheel shops.

20   Q    Which are both what?

21   A    Wheel shops.

22   Q    Wheel shops?

23   A    They're in a -- yeah.

24   Q    Okay.

25   A    They're in a different division.

1    Q    Is SoSan South San Antonio?

2    A    Yes.  Sorry.

3    Q    And who do you report to?

4    A    I report to Al Lave.

5    Q    Okay.  And does anyone report to you?

6    A    Yes.

7    Q    Who is that?

8    A    I have an HR generalist in San Antonio and I have an HR

9    generalist in Mira Loma.

10   Q    And in November of 2012, was that any different?

11   A    Yes.  I also had an HR generalist in Tucson who reported

12   to me.

13   Q    Who reported to you in Tucson in November of 2012?

14   A    Margaret Madrigal.

15   Q    Right.  And had she reported to you since you started with

16   the company up to November 2012?

17   A    Yes.

18   Q    And do you have a dotted line to anyone in the company?

19   A    No.

20   Q    Okay.  What are your responsibilities as the HR generalist

21   for the facilities that you oversee?

22        JUDGE LAWS:  HR manager.

23        MS. ALONSO:  Sorry, HR manager.

24        THE WITNESS:  I have oversight in pretty much all aspects

25   of their HR, including performance, training, hiring, firing,

1   disciplinary action, any sort of employee relations issues, and

2   do somewhat -- get involved with payroll and benefits as, you

3   know, a conduit to those specialists.

4   Q    BY MS. ALONSO:    Now, you just mentioned disciplinary

5   action, that you had some role in that.

6   A    Uh-huh.

7   Q    Do you review every single disciplinary action that is

8   taken against an employee?

9   A    It depends on the site.

10   Q    On the what?

11   A    On the location.

12   Q    Okay.  Okay.  In what circumstances would you not review

13   disciplinary action?

14   A    For low-level items for something like attendance, because

15   we have that generated through our HRIS system.  I typically

16   don't review those until they get to a higher level --

17   Q    Okay.

18   A    -- nearing termination.

19   Q    And who would have the discretion to review those when

20   you're not involved?

21   A    The HR generalist on the site and the plant manager.

22        JUDGE LAWS:  And you threw out an acronym, HRIS.  What is

23   that?

24        THE WITNESS:  Human Resources Information System.

25        JUDGE LAWS:  Thanks.

1       THE WITNESS:  It's our computer system.

2   Q   BY MS. ALONSO:   And if someone is being fired, would you

3   review their attendance?

4   A   Yes, if they were being terminated for attendance.

5   Q   And would you review the decision to fire someone based on

6   attendance?

7   A   Yes.  I would.

8   Q   You would?

9   A   Uh-huh.

10  Q   And do you review all terminations at the company?

11  A   For my sites, yes.

12  Q   For your sites.  Are there any other examples where you

13  would not be involved in the discipline of an employee for the

14  sites that you oversee?

15  A   Again, it's site dependent, so some sites have the

16  description to write up employees for things like safety

17  violations, especially verbal warnings.  I'm not always

18  involved in those.

19  Q   So let me direct you to the time that you were hired

20  through November of 2012.  At Tucson, what did you have -- what

21  are the types of disciplinary actions you did not review?

22  A   In Tucson in that time period, I was not reviewing low-

23  level attendance violations.

24  Q   Would you define low-level attendance violations?

25  A   We have a points system for our attendance, so employees

1  are pointed based on absences and tardies.  At two points, they

2  receive a verbal warning, at five points a written warning.  I

3  would not have been reviewing those.  At eight points, they

4  would have received a suspension --

5  Q    Okay.

6  A    -- and at nine points, termination.  I would have reviewed

7  both of those.

8  Q    Only eight-point and nine-point --

9  A    Correct.

10 Q    -- points.  Okay.

11     JUDGE LAWS:  And before counsel asks your next question,

12 you said whether you review disciplinary action depends on

13 location.  Is there any defining factor or any way you can

14 delineate it?  Or is it just location by location?

15     THE WITNESS:  It's a lot location by location.  A lot of

16 it is severity of the issue.  I have a standing rule in my

17 shops that any behavioral problems, I have to disciplinary-

18 action.  I get involved with -- but for some locations where

19 the manager is a long-term manager, we're very comfortable with

20 him issuing disciplinary action.  If it's, "This guy forgot to

21 wear his hard hat," or, you know, decided to, you know, drive

22 fast through a parking lot when he wasn't supposed to, then I

23 don't typically see those.

24 Q    BY MS. ALONSO:   And who is Christine Martinez?

25 A    Christine Martinez was an HR generalist we had in Tucson

1   first as a temporary employee and then as a permanent from

2   about December 2012 --

3   Q    Okay.  And were you involved in hiring Christine Martinez?

4   A    Yes.  I was.

5   Q    Okay.  When did she start?

6   A    Just like I said, December 2012.

7   Q    Okay.  And when did she start reporting to you?

8   A    Immediately.

9   Q    All right.  And for what period of time did she report to

10  you?

11  A    Her entire time.

12  Q    And when did she leave Greenbrier?

13  A    November of -- no, not November.  Excuse me.  September of

14  2013.

15  Q    Is there a temp agency that you hire through?  Or do you

16  know if Christine Martinez used a temp agency for hiring?

17  A    Like her personally is employed through the company?

18  Q    As an employee for Greenbrier, are you familiar with the

19  temp agency that Christine Martinez was using?

20  A    That employed her as a temp?  I'm sorry.  I'm confused by

21  the question.

22  Q    Okay.  So I'll rephrase the question.

23  A    Okay.

24  Q    So when Martinez -- or Christine Martinez worked for

25  Greenbrier --

1  A    Uh-huh.

2  Q    -- was there a temp agency that she used for hiring

3  Greenbrier -- or hiring employees to work at Greenbrier?

4  A    No.  There was -- not that we used consistently, that I'm

5  aware of.

6  Q    Okay.  Are you aware of which companies she did use?

7  A    I am aware of one instance where we had an employee

8  through a temp agency during the time she worked there.

9  Q    And what agency is that?

10  A    Intermountain Staffing.

11  Q    Okay.  And did she review with you the decision to contact

12  Intermountain Staffing?

13  A    Actually, in the one instance that she used Intermountain

14  Staffing, we requested the employee to be run through a temp

15  agency before being brought on board, so we sent that applicant

16  to Intermountain as opposed to Intermountain sending the

17  applicant to us.

18  Q    And what was the reason for that?

19  A    The employee had a criminal record and some spotty job

20  history, so we wanted to try him as a temporary first before

21  putting him on as a full-time employee.

22  Q    Who is the employee?

23  A    Michael Downing, a maintenance mechanic.

24  Q    And what were Christine Martinez's job duties when she

25  worked at Greenbrier?

1   A    Chris was responsible for day-to-day items of HR such as

2   timekeeping, attendance for the employees, communicating items

3   to employees such as benefits and any sort of programs that we

4   were coming out with company-wide.  She would handle new hires

5   onboarding.  She would handle and take complaints or concerns

6   from employees.  And then, also, she would be the person that

7   employees would go to if they wanted to request leave under

8   FMLA or --

9   Q    Okay.

10  A    -- short-term disability.  She was also in charge of

11  handing out performance reviews to supervisors to complete,

12  getting those back in, filing, basic HR generalist stuff.

13  Q    Now, I want to ask you about the HR generalist who was at

14  Greenbrier's Tucson facility at the time that you were hired.

15  A    Okay.

16  Q    And that's Margaret Madrigal.  Correct?

17  A    Correct.

18  Q    And she reported to you.  Correct?

19  A    Correct.

20  Q    And what were her duties, as far as you were aware?

21  A    Same duties all my HR generalists are in charge of,

22  attendance for other sites, data entry into the system for --

23  into our HRIS system for things like rate changes, address

24  changes, new hires, terminations, in charge of employee

25  communications, doing leave paperwork, benefits paperwork,

1   handling any sort of employee concerns, or filtering those to

2   the appropriate people.

3   Q    And are you aware of Margaret Madrigal having contacted a

4   temp agency to hire employees that would then work at

5   Greenbrier?

6   A    Yes.

7   Q    Okay.  And did you instruct her to do that?

8   A    No.

9   Q    Okay.  Does she have the authority to decide when she

10   wanted to hire from a temp agency?

11   A    That would have been the authority of the plant manager.

12   Q    And did she review with you which temp agencies she would

13   use?

14   A    No.

15   Q    Were you in any way involved in her use of the temp

16   agency?

17   A    No.

18   Q    Are you aware of any other temp agency used from the time

19   you were hired through November 12th, other than Intermountain

20   Staffing?

21   A    Yes.  We had another one and I can't recall the name right

22   off the top of my head.

23   Q    Now, with regard to -- did Margaret Madrigal have the

24   authority to hire temp employees without telling you?

25   A    Without telling me, yes.

1  Q     All right.  And did Christine Martinez have the same

2  authority?

3  A     No.

4  Q     Okay.  What was the difference?

5  A     At the time Chris was on board, we weren't using temp, and

6  we restructured our hiring processes, and we were not using

7  temp agencies any longer.  We actually had done that change for

8  some time, even when Margaret was there.  So when I say that

9  she wouldn't have had the authority to do so, we just weren't

10 doing it as a practice anymore, as far as hiring temp

11 employees.

12 Q     And that began when Christine Martinez started to work

13 with the company?

14 A     I believe it began before that.

15 Q     Okay. When do you remember that beginning?

16 A     We were a temp -- we were in the process of going through

17 as far as -- because we can't just cut off from a hiring

18 standpoint that feed of employees all at once, so we had been

19 reducing it for several months.

20 Q     And when did the reduction of using the temp employees --

21 or the temp agencies begin, if you can estimate a month in

22 relation to the layoff?

23 A     In relation to the layoff, if I had to estimate a month, I

24 would estimate probably around August.  We did a restructuring

25 in July or August of 2012 in that shop and I believe we had

1   begun discussing the use of our temp agency then.

2   Q    And that was to reduce the use of a temp agency?

3   A    Yes.

4   Q    Okay.  As far as rehiring is concerned, does Christine

5   Martinez or -- yeah.  Did Christine Martinez have the authority

6   to rehire without consulting with you?

7   A    No.

8   Q    Okay.  So did you review every decision that Christine

9   Martinez made in rehiring former Greenbrier employees?

10  A    Yes.

11  Q    And is there a practice to rehiring former Greenbrier

12  employees?

13  A    Yes.

14  Q    Okay.  And is that applied at all the facilities --

15  A    Yes.

16  Q    -- of Greenbrier?  Okay.  And I want to ask or direct your

17  attention to February of 2013.  There was -- okay.  Okay.  And

18  what is the rehiring practice?

19  A    If an employee is being rehired, I am sent their

20  application as well as their separation information from the

21  last time they were employed, especially if it was from prior

22  to my time with the company.

23  Q    Uh-huh.

24  A    We look at that and we also, you know, re-interview the

25  employee as well.  And I usually talk to the manager who

1  interviewed the employee about the reason they left, why they

2  want to come back.  It has a lot to do with the circumstances.

3  Q    What --

4       JUDGE LAWS:  And I need to clarify something.  You said

5  application and separation information from the last time they

6  hired.  Does "from last time they hired" apply to just the

7  separation information or the application and separation

8  information?

9       THE WITNESS:  It just applies to the separation

10  information.  Anyone who's rehired, we fill out a new

11  application at that time, that they're applying for rehire just

12  like any other person.

13       JUDGE LAWS:  Do you --

14  Q    BY MS. ALONSO:  Now --

15       JUDGE LAWS:  -- look at the old application?

16       THE WITNESS:  No.  Generally, no.

17  Q    BY MS. ALONSO:  Okay.  And was this practice in place in

18  April of 2012 when you started with the company?

19  A    I don't recall.

20  Q    When did you learn about this practice?

21  A    I have a lot of leeway as a regional.  And so I instilled

22  the practice if it wasn't being done already.

23  Q    Okay.  But when in relation to the time that you started

24  to work with the company did you learn about this practice?

25  Was it a couple months, a couple weeks?

1  A    Probably within the first month.

2  Q    Okay.  And did you start this practice?  Was this

3  something you implemented once you began with the company?

4  A    No.  I learned about the practice from Mr. Lave.

5  Q    Now, you mentioned separation information from the last

6  that -- I'll rephrase.  You mentioned that part of the rehiring

7  practice is to review separation information.  Does the company

8  conduct exit surveys?

9  A    When I mean they're separate -- no.  We don't.

10  Q    Okay.

11      JUDGE LAWS:  And I want to backtrack a second here.  You

12  had said you learned about the practice you described about

13  reviewing the new application, the old separation information

14  from Mr. Lave.  Is that the first practice you learned or had

15  you learned something else and this was a changed practice?

16  That wasn't clear to me.

17      THE WITNESS:  When I first came on board, I found out that

18  shops were rehiring people on their own with the discretion of

19  the plant manager.  Mr. Lave asked and suggested that we begin

20  -- that regionals begin reviewing every rehire and that, that

21  should be the practice.  So I said okay.

22      JUDGE LAWS:  And do you know, was there consistency among

23  the individual plants who were doing it on their own?

24      THE WITNESS:  I really don't know.

25      JUDGE LAWS:  Okay.

1    Q    BY MS. ALONSO:    The 4 November 2012 -- before the

2    November 2012 layoff, how many rehires were you involved in for

3    the Tucson facility?

4    A    I really don't know.

5    Q    Okay. Do you remember any -- do you remember being

6    involved in any particular rehires for Tucson before November

7    2012?

8    A    I'm sure I was.  I just don't -- I can't give you names

9    off the top of my head.

10   Q    Is the rehiring practice in writing?

11   A    I don't believe so.

12   Q    Now, you mentioned that -- I mean, when you go through the

13   rehiring practice, who do you review that -- all of the -- I'll

14   rephrase.  Who is involved in the rehiring practice aside from

15   you?

16   A    Usually the HR person at the site, and the plant manager,

17   and then Mr. Lave.

18   Q    Now, were you involved in the rehiring of former

19   Greenbrier employees in 2013?

20   A    Yes.

21   Q    And okay.  So I want to take a, you know -- go back to the

22   subject we just discussed.  Have the individual plant managers

23   been informed of this rehiring practice that Mr. Lave asked you

24   to coordinate?

25   A    Yes.

1  Q    And how are they informed of this rehiring practice?

2  A    I've just --

3  Q    Is it --

4  A    I've told them.

5  Q    Okay.  Did you ever -- is it ever -- has it ever been

6  written?

7  A    Perhaps informally, in an e-mail, I've told them that all

8  rehires need to be approved by myself before being offered

9  employment.

10  Q    And was there any training on the rehiring practice?

11  A    It's not really training necessary.  It's exactly like our

12  new hire practice.

13  Q    Okay.  So there has not been any training on the rehiring

14  of Greenbrier employees?

15  A    I don't know.

16  Q    When did you learn of the decision to rehire employees in

17  Tucson in 2013?

18  A    In January 2013.

19  Q    And who communicated that to you?

20  A    It was communicated to me by Juan Maciel, the interim

21  manager, and Kevin Stewart, the general manager.

22  Q    Okay.  Was that -- how did they communicate that to you?

23  Was that in person or via e-mail?

24  A    I don't remember.

25  Q    Okay.  What do you remember Juan Maciel saying to you?

1   A     I recall that they said that we were extremely busy.  Our

2   work had increased from our customers and we needed to hire

3   more employees to accommodate that need.

4   Q     Did they give you the number of employees that needed to

5   be hired?

6   A     We had a specific hiring plan with goals to hit every

7   month.

8   Q     What did Kevin Stewart say when he communicated to you

9   that there would be rehiring in Tucson?

10  A     Can you clarify.  I'm not sure what you mean by that.

11  Q     Well, so we just discussed -- I just asked you what Juan

12  Maciel said to you.  So what did Kevin Stewart say to you?

13  A     Same thing, that we needed to hire employees in order to

14  meet the demand from our customers.

15  Q     Okay.  And you don't remember if this was face to face, or

16  if it was by e-mail, or a series of e-mails?

17  A     It may.  I really don't recall.

18  Q     Okay.  Let me ask you this.  Where do you work?  Where is

19  your office?

20  A     My office is in Portland, Oregon.

21  Q     Right.  And does Juan Maciel also work from the Portland

22  office?

23  A     No.  He does not.

24  Q     Okay.  Does Kevin Stewart work from the Portland office?

25  A     No.  He does not.

1    Q    Okay.  So when it was communicated to you that this hiring

2    plan, the rehiring plan -- was that in the same discussion that

3    you had with them about rehiring?

4    A    Can you clarify?  I mean, a hiring claim --

5    Q    Sure.

6    A     -- in general?

7    Q    So when you first learned about the rehiring, is that the

8    time that they reviewed the rehiring plan with you?

9    A    Yes.  It was.

10   Q    And who spoke to you about the rehiring plan, which of the

11   two?  Was it Juan Maciel or was it Kevin Stewart?

12   A    I'm sure both of them did at some point.

13   Q    Okay.  But in that conversation --

14   A    Juan Maciel and I discussed at the same time rehiring some

15   employees.

16   Q    Okay.  And this was in January of 2013?

17   A    Yes.

18   Q    Okay.  What did Juan Maciel say about the rehiring plan?

19   A    That we were going to be rehiring some employees because

20   they had a very specific skillset.  They didn't need any

21   training, as opposed to hiring from the outside.  And who we

22   were rehiring would be depending on what positions we needed at

23   the time.

24   Q    Did he identify the positions that you needed to fill?

25   A    Yes.

1  Q    Okay.  What positions did he say needed to be filled?

2  A    At that point, it was welder repairman.

3  Q    How many?

4  A    I don't recall.

5  Q    Was it more than 10?

6  A    On the initial conversation, I don't recall if it was more

7  than 10, on the initial conversation.

8  Q    Did he tell you which area of the shop they would work in?

9  A    No.  He did not.

10  Q    Did he explain why there was a need to hire that specific

11  amount, that particular amount he mentioned to you?

12  A    He just told me that this is the number they needed in

13  order to meet the workload that we were experiencing in that

14  time.

15  Q    And you do remember that he gave you a number?

16  A    Yes.  I just don't recall what that specific number was.

17  Q    Was there another position that he was looking to fill?

18  A    At that time?

19  Q    Right.

20  A    I can't recall specifically.  We were looking for a few

21  other positions in the spring, but I don't know about January

22  in particular.

23  Q    Okay.  And what were the positions that were looking to be

24  filled in the spring?

25  A    We were looking for a maintenance mechanic around that

```
 1   same time, but again, I can't recall if it was January or it

 2   may have been later in the spring.

 3   Q    All right.  You've indicated that Juan Maciel wanted

 4   individuals with a specific skillset.  Did he explain that?

 5   A    Yes.

 6   Q    Okay.  What is the skillset that he described he wanted in

 7   the candidates?

 8   A    He wanted previous railcar repair experience --

 9   Q    Okay.

10   A    -- and welding experience, that had passed a weld test.

11   Q    Okay.  And did Eric -- or did Kevin Stewart say anything

12   about the rehiring plan when you spoke with him in January of

13   2013?

14   A    It would have been the same conversation, that we were

15   going to be rehiring former GRS employees.

16   Q    All right.  And was it discussed that you would rehire or

17   recall the employees that had been laid off from Greenbrier?

18   A    We don't call it a recall, but we would be contacting them

19   to see if they were interested in reapplying with the company.

20   Q    And who made that decision?

21   A    Kevin and Juan.

22   Q    What do you call -- what would you call recalling the

23   individuals who had previously worked for Greenbrier?

24   A    Rehiring them.  Thank you.

25   Q    Did Juan Maciel explain why he wanted individuals who were
```

1    experienced in welding?

2    A    Because that's what our employees do all day.

3    Q    And was it -- it was a priority to increase production for

4    Greenbrier.  Correct?

5    A    Yeah.  That's correct.

6    Q    And you wanted welders who were familiar with Greenbrier's

7    work.  Correct?

8    A    Yes.

9    Q    Okay.  And you would be -- it would have been preferable

10   to have workers who were familiar with the Greenbrier facility.

11   Right?

12   A    That's correct.

13   Q    Okay.  After the discussion in January of 2013, were there

14   any other discussions as to the number of workers that had to

15   be rehired?

16   A    Like I said, we had an ongoing hiring plan, so we had a

17   certain number of direct headcount positions we had to fill in

18   the month.

19   Q    Okay.  When you say "ongoing hiring plan", was this

20   separate from the rehiring plan in January 2013?

21   A    The hiring plan and the rehiring plan are the same thing.

22   I think you're getting caught up in semantics.  We have a goal,

23   a certain number of direct employees that we have to have to

24   staff the facility based on the work we have.  So whether we

25   get those from rehires or outside hires, it doesn't really

1   matter.  All that matters is that we have that X number of

2   people.

3   Q    I see.  But it is your preference to have employees who

4   have knowledge of the facility and who have previously -- and

5   who have experience working at Greenbrier?

6   A    Well, not necessarily experience working at Greenbrier,

7   experience working on railcars, because not everybody that

8   works at Greenbrier works on railcars.

9   Q    Okay.  Were any other factors considered in the rehiring

10  of workers to fill the headcount once you discussed the number

11  of employees -- I'll rephrase.  So since January of 2013, were

12  there any -- aside from the conversation that we just reviewed,

13  did you discuss with anyone else the factors that would be

14  considered in the rehiring of the workers?

15  A    Well, we treat rehires just as we would new hires, so they

16  need to complete our application process.  They need to go

17  through interviews.  And they need to complete a drug screen

18  and clear that before we can rehire them.

19  Q    Any other factors relating to their skillset?

20  A    Not that I can recall.

21  Q    Did you believe that the union impacted productivity of

22  the workers in November of 2013?

23  A    No.

24  Q    You did not?

25  A    Yes.

1  Q    Okay.  Do you believe that a union can impact a worker's

2  productivity?

3  A    No.

4  Q    And in 2012, in October of 2012, did you believe that the

5  union had impacted productivity at Greenbrier in Tucson?

6  A    I wasn't aware of a union, so no.

7  Q    In your capacity, are you involved in labor relations of

8  the company?

9  A    Define what you mean by labor relations.

10 Q    Handling of labor unions, anything with Greenbrier

11 relating to labor unions?

12 A    Yes.  I would be.

13 Q    Okay.  And when you started working with Greenbrier or

14 since you had started working with Greenbrier, when did you

15 first learn that the workers of Greenbrier in Tucson were

16 attempting to organize?

17 A    I didn't learn about that until November of -- when we

18 were served a notice, a petition for an election, November of

19 2012.

20 Q    What was the January 2013 employee headcount goal?

21 A    I don't recall.

22 Q    Okay.  But you were not -- you had not met it at that

23 time.  Correct?

24      MR. MINER:  Objection.  Are we talking about the Tucson

25 employee headcount goal?

```
 1      MS. ALONSO:  Yes, for Tucson.

 2      THE WITNESS:  I don't recall if we had met it or if the

 3  discussion in January '13 was regarding future months, if that

 4  makes sense.  So starting in February, we would have a goal and

 5  then another goal in March, April, et cetera.

 6  Q    BY MS. ALONSO:   How often do you discuss -- or who would

 7  you generally -- who do you discuss headcounts with, headcount

 8  goals with?

 9  A    With the plant manager and general manager.

10  Q    How frequent?

11  A    It depends on the need.  Changing business conditions

12  sometimes alter headcount projections at any given time.

13  Q    Okay.  Did you revisit the headcount goal for Tucson in

14  February of 2013?

15  A    Yes.

16  Q    With who?

17  A    With Kevin Stewart, the general manager, and Juan Maciel,

18  the interim plant manager.

19  Q    And what did they tell you at that time?

20  A    That we had needed to fill some more positions and we

21  would have discussed -- and I can't recall if we lost any

22  people in that month and we would have had to backfill those

23  positions as well.

24  Q    Right.  What positions was Greenbrier looking to fill in

25  Tucson for February 2013?
```

1   A    I can't recall.  It would have been welder repairmen.

2   Q    For March of 2013, what was the goal?  Was the goal

3   headcount communicated to you?

4   A    Yes.

5   Q    Okay.  Was it -- it was also by Kevin Stewart and Juan

6   Maciel?

7   A    Yeah.  No.

8   Q    Okay.  By who?

9   A    It would have been Kevin Stewart and, at that point, Eric

10  Valenzuela, that was the plant manager.

11  Q    Now, how was that communicated to you?  Was that in a

12  teleconference, e-mail?

13  A    We had a series of e-mails, of a chart of what the

14  headcount goal was for every month.

15  Q    What do you remember the headcount goal being for March of

16  2013?

17  A    I don't recall.

18  Q    And you were trying to fill positions -- or you were

19  trying to fill welder positions in March of 2013.  Right?

20  A    There may have been some additional, but yes.

21  Q    For April of 2013, was there still a need to fill

22  positions for the headcount goal?

23  A    I believe so.  Yes.

24       MS. ALONSO:  All right.  Your Honor, I'm going to take a

25  moment to mark some exhibits.

1    JUDGE LAWS:  Okay.

2  (Counsel confer)

3    MS. ALONSO:  Okay.  Your Honor, I'm going to hand out

4  copies of General Counsel's Exhibit 205.

5    JUDGE LAWS:  Thank you.  I think, probably, the witness

6  needs one more than the court reporter at this point.  You can

7  get them to Grant --

8    MS. ALONSO:  All right.

9  Q    BY MS. ALONSO:    I'm handing you General Counsel's Exhibit

10  205.  These are a series of e-mails that were produced in this

11  hearing pursuant to a subpoena.  And I want to review these

12  with you.  All right.  Ms. Maxey, there is an e-mail at the

13  bottom of page -- the first page of 205, that you've written on

14  the subject of the first Tucson rehire.  It's an e-mail to Lave

15  on February 4th.  You say, "Juan called me about bringing back

16  the first guy as of tomorrow.  They're calling him to make a

17  verbal off and send him for drug screen physical this

18  afternoon.  His name is Carlos Contreras Ortiz."  So is this --

19  this is the date that you started to bring back or started to

20  rehire employees in Tucson.  Correct?

21  A    Started the process of interviewing, all that, yes.

22  Q    And Carlos Contreras Ortiz is an employee who had

23  previously been laid off.  Correct?

24  A    Correct.

25  Q    Now, in the second e-mail, you mentioned or you write,

1   "I'll ask you to have the employee fill out an application and

2   interview him as we all discussed last week."  What was

3   discussed last -- the week -- what was discussed the week

4   before about Carlos Contreras Ortiz?

5       MR. MINER:  Your Honor, we have an objection to the

6   multiple form of the question.  Can you restate the question?

7       MS. ALONSO:  Sure.

8   Q   BY MS. ALONSO:   So in the e-mail of February 4th, 2013 at

9   2:19 p.m., Al Lave has responded to your e-mail and he's making

10  a reference about a discussion the week before.  What did you

11  discuss with Al Lave about Carlos Contreras Ortiz the week

12  before?

13  A   We didn't discuss anything about Carlos Contreras Ortiz

14  the week before.  We discussed the process of rehires in

15  general.  Mr. Maciel is a general manager in his normal day-to-

16  day job.  He's not -- and at that point, wasn't the acting

17  interim plant manager.  He wouldn't, as a general manager, have

18  been involved in day-to-days of rehire.  So we just gave him a

19  refresher on, "Here's what we normally do for rehires."

20  Q   Okay.  But this is an e-mail from you to Al Lave.

21  A   Yes.

22  Q   So your testimony is that you and Al Lave did not discuss

23  the hiring or the rehiring of Carlos Contreras Ortiz?

24  A   No.  That's not what I said.

25  Q   Okay.  So did you discuss Carlos Contreras Ortiz the week

1    before you received this e-mail from Al Lave?

2    A    No.  We did not.  We discussed the process --

3    Q    Okay.

4    A    -- in general for anyone we were rehiring.

5    Q    All right.  Okay.  And what did you mean by first -- in

6    your e-mail with the subject line "First Tucson Rehire"?  What

7    did you mean by that?  Was that the first Tucson rehire ever?

8    A    No.  Our first guy that we had -- we had a number of

9    employees that we had contacted to come to see if they were

10   interested in coming back to work for us.  He was just the

11   first one who had responded and we had made an offer to.

12   Q    All right.  Let's go to the second page of the e-mail or

13   the second page of General Counsel's Exhibit 205.  And at the

14   bottom, where there's an e-mail sent from you with the subject

15   of "Returning Employees" -- and you've written that, "Carlos

16   Contreras Ortiz has accepted the offer to return to

17   Greenbrier."  And the last sentence in that paragraph is that

18   you're making -- "He left making $17 an hour and that has been

19   offered to him."

20        JUDGE LAWS:  And I want to clarify.  It doesn't look like

21   she wrote this.  It looks like Christine Martinez wrote this.

22        MS. ALONSO:  Okay.  Yeah.  And that's right.

23   Q    BY MS. ALONSO:   But you did receive this e-mail.

24   A    Yes.

25   Q    Correct?  Okay.

1   A    Yeah.

2   Q    And do you know if Carlos Contreras Ortiz kept his

3   seniority?

4   A    Yes.  He did.

5   Q    And was that the practice of rehiring employees?

6   A    Yes.

7   Q    Was it the practice to bring them back with the same --

8   with their previous salary?

9   A    That's on a case-by-case determination.

10  Q    Okay.  And what is the case-by-case criteria?

11  A    If we're bringing them back into the same position or a

12  different position, it depends on how long they were gone for.

13  It depends on the location, how great the need is.  There's a

14  lot of factors.

15  Q    Okay.  What other factors?

16  A    Well, I just named four of them.

17  Q    Other than the ones you've named, are there more?

18  A    I can't think of any others off the top of my head.

19  Q    If he kept his seniority, why did you require this

20  employee to fill out a new application?

21  A    Standard practice for all rehires.

22  Q    And Carlos was a welder.  Correct?

23  A    That's correct.

24  Q    Okay.  Okay.  And is it a standard practice that you and

25  Al implemented after you were hired?  I'll rephrase.  Is that

1    the standard practice that you and Al Lave implemented?

2    A    What standard practice?

3         JUDGE LAWS:  Requiring a new application.

4         THE WITNESS:  No.  As far as I know, that was the practice

5    at the time I was hired.  All rehires have always filled out an

6    application.

7    Q    BY MS. ALONSO:   And when did you learn of that practice?

8    A    When I was hired.

9    Q    Who told you about that practice?

10   A    Mr. Lave and then it was confirmed by my generalists at

11   the shop.

12   Q    Did the generalist, Margaret Madrigal, ever confirm that

13   with you?

14   A    Yes.

15   Q    Are you familiar with her having rehired a former

16   Greenbrier employee?

17   A    Yes.

18   Q    Okay.  Who?

19   A    I can't recall.  We've rehired several employees over the

20   years.

21   Q    But you've only been there since April of 2012?

22   A    Correct.

23   Q    Go to page three.  All right.  Here, there are two names

24   mentioned in this e-mail that you've written on February 5th of

25   2013.  And one is for Gabriel -- or you mention one employee,

1   Gabriel Ortiz?

2   A    Yes.

3   Q    And he is a welder.  Correct?

4   A    Correct.

5   Q    And you also name Jaime Hernandez and he's also a welder.

6   Correct?

7   A    That's correct.

8   Q    And they were also hired within the first week of

9   February.  Correct?

10  A    That's correct.

11  Q    And they were employees that were laid off in November of

12  2012.  Correct?

13  A    That's correct.

14  Q    Turn to page four.  And the subject -- this is an e-mail.

15  Page four is an e-mail that you've sent on February 6th with a

16  subject of "Hector Anthony Federico".  He was an employee who

17  was laid off in November of 2006.  Correct?

18  A    November of 2006?

19  Q    Sorry.  November of 2012.

20  A    Yes.  He was.

21  Q    And he was rehired after you sent this e-mail.  Correct?

22  A    Yes.  He was.

23  Q    All right.  Let's turn to page five.  And at the bottom,

24  the first e-mail appears to be -- that was actually written

25  from Christine Martinez to you with a subject line of "New Hire

1    Paperwork".

2    A    Yes.

3    Q    And what is the paperwork that you received for Jaime

4    Hernandez and Gabriel Ortiz?

5    A    I would have received their -- what we call an HRIS data

6    form, which is a form the employees complete to give us their

7    address, emergency contacts, phone number, date of birth,

8    statistical information.

9    Q    Uh-huh.  And I'm sorry.  I didn't hear the name of that.

10   What was that?

11   A    It's called an HRIS data form.  I would have received

12   their W-4.  I would have received an EEOC form.  I would have

13   received an Arizona state withholding form.

14   Q    Okay.  And what did --

15   A    I believe that's it.

16   Q    -- you do with the new hire paperwork?

17   A    I use it to rehire them in our HRIS system.

18   Q    Okay.  And did you send that to Al Lave?

19   A    No.

20   Q    Let's turn to page six.  And this is an e-mail that you've

21   received from the HR generalist in Tucson --

22   A    Correct.

23   Q    -- Christine Martinez on February 7th.  And --

24        JUDGE LAWS:  So I'm wondering, can we stipulate as to the

25   authenticity of these documents or do you not want to do that

1    without looking over them more carefully?

2        MR. MINER:  I think we probably can.  It'd just take me a

3    few minutes to read through them.

4        JUDGE LAWS:  Okay.  Why don't we do that?  Because then we

5    don't have to probably identify, and walk through each one, and

6    get this witness's recollection of it.  We can just get to

7    questions that aren't apparent from the basis of the e-mail.

8    (Counsel confer)

9        JUDGE LAWS:  We don't need to.  It's a 32-page document,

10   so it's probably going to take --

11   (Off the record at 4:32 p.m.)

12       JUDGE LAWS:  And we took some time off the record for the

13   Respondent to review the 32 pages of General Counsel Exhibit

14   205.  And the Respondent has indicated their willingness to

15   stipulate to the authenticity of the documents.  And I just

16   want you to verify that that's correct.

17       MR. MINER:  That's correct, Your Honor.  Thank you.

18       JUDGE LAWS:  And, you know, certainly the General Counsel

19   may question this witness on these documents.  We just don't

20   need to walk through them and establish -- they are what they

21   are or what time they were sent, who said what to whom.  But we

22   can certainly get at what some of these documents mean or

23   question things that aren't clear.  Okay?

24       MS. ALONSO:  Okay.

25   Q    BY MS. ALONSO:   Ms. Maxey, in February of 2013, were you

1    advertising for the positions that were available in the Tucson

2    Greenbrier?

3    A    I don't know.

4    Q    Did you instruct anybody to post ads for the positions

5    that needed to be filled in Tucson?

6    A    In February, I don't recall.

7    Q    Okay.  At any time after the decision to rehire?

8    A    I believe, at some point, we were having trouble meeting

9    our numbers, so we did put out a posting.

10   Q    And what is your general practice regarding open

11   positions?

12   A    Generally, we first let it be known in the shop that we're

13   hiring because our best source of referrals comes from our

14   employees.

15   Q    So is that like referrals that you --

16   A    For employees, well, let us know and --

17   Q    Okay.

18   A    -- spread the word that we are hiring.  In this case,

19   since we had a group of people that we thought might be

20   interested in working, we called them up and asked them if they

21   were interested.

22   Q    All right.  And aside from -- is that the only thing

23   that's a part of your general practice?  Or do you post ads?

24   A    We post ads as well if needed.

25   Q    So here, there was -- for Tucson in January of 2013, there

1  was a decision to recall the employees who had been previously

2  working for Greenbrier?

3  A    There was a decision to reach out to them to see if they

4  were interested in returning to work for us.

5  Q    Okay.  All right.  And I want to refer you to General

6  Counsel's Exhibit 205, page six.

7  A    Okay.

8  Q    And I'll just refer -- I'll be referring to this document

9  just by the pages, unless --

10  A    Okay.

11  Q    -- I'm going to show you something else.  Do you know how

12  Ricardo Martinez heard you were hiring?

13  A    I don't know.

14  Q    Now, after February 2013, do you remember posting an ad

15  for the positions?

16  A    After February, we did.  I can't recall what month it was

17  in.

18  Q    Okay.  But an ad was posted --

19  A    Yes.

20  Q    -- for the position or to fill the positions?

21  A    Correct.

22  Q    Okay.  And at that time or later on, did other positions

23  become available aside from the welder positions?

24  A    We may have had -- I believe we had a painter position or

25  two open up sometime in the spring, that we needed some

1    additional work in paint.  We may have had a switchman position

2    open up.  I'm just thinking off the top of my head.  That's all

3    I can recall right now.

4    Q    All right.  Now, I want to direct you to page seven of

5    General Counsel's -- of the document.  And there is an e-mail

6    that you've written to Marissa Almazan.  And Marissa Almazan

7    works for Intermountain Staffing.  Correct?

8    A    That's correct.

9    Q    Okay.  And you told her that you do not have the okay to

10   hire any painters at the time.

11   A    Correct.

12   Q    Okay.  Do you know if Juan Morales was eventually hired?

13   A    Yes.  He was.

14   Q    Okay.  Do you recall the date?

15   A    No.  I do not.

16   Q    And who okayed when painters were available or when there

17   were positions available for painters?

18   A    I take that cue from the plant manager and the general

19   manager.

20   Q    And were you using temp agencies to hire employees since

21   January of 2013?

22   A    No.  We were not.

23   Q    All right.  Let's turn to page eight.  And this is

24   concerning the rehire of Martin Valdez, a chain of e-mails

25   concerning the rehire of Martin Valdez.  And Christine Martinez

1    has informed you that Martin Valdez has a felony.  Correct?

2    A    That's correct.

3    Q    And Martin Valdez is an airman.  Correct?

4    A    I don't recall.

5    Q    And he was rehired despite having a felony.  Correct?

6    A    Yes.

7    Q    All right.  Now, I want you to turn to page 10.  And this

8    is an e-mail on the subject of Tucson rehire that you've

9    written on February 11.

10   A    Okay.

11   Q    And you've indicated that Federico was rehired for switch.

12   What did you mean by switch?  Was that an area of the facility?

13   A    Switch is a group of people who operate the locomotive

14   that move around -- move cars around the facility to be worked

15   on.

16   Q    And at this point, were you looking to fill positions in

17   particular areas of Tucson, of the Tucson facility?

18   A    We were.  I can't speak to that.

19   Q    Which shops in Tucson were you trying to fill?

20   A    Well, at that time, we were only operating in the front

21   shop and the center shop, so that's where they would have been

22   placed.

23   Q    Okay.

24        MR. GIANNOPOULOS:  Your Honor, just to give you a heads

25   up, it's a quarter to 5:00.

1    JUDGE LAWS:  Let's go about five more minutes.  We don't

2    have to pack everything up today.

3    Q    BY MS. ALONSO:    All right.  On page 11, this is another

4    e-mail you've written on March 6th, on the rehires from layoff.

5    Here, in this e-mail, you've instructed Chris on the last

6    sentence, "As with others, please keep very detailed notes in

7    your interactions with them."

8    A    Yeah.

9    Q    And with them, you're referring to the rehires from the

10   layoff.  Correct?

11   A    With the applicants.  Yes.

12   Q    But the subject is the rehires from the layoffs, so that

13   is who you were referring to.  Correct?

14   A    That's correct.

15   Q    What were you looking for in the notes?

16   A    Looking for how people interview, if they filled out

17   applications, if they filled out applications completely, and

18   if they brought up any questions or concerns about them coming

19   back, that we needed to address with them.

20   Q    And these are all people who had worked for Greenbrier

21   just a few months earlier.  Correct?

22   A    That's correct.

23   Q    Okay.  And what did it matter how they filled out their

24   application?

25   A    Because we like to have a complete application on file for

1    any employee.

2    Q    And their ability to fill out an application didn't

3    indicate anything about their skillset as a welder.  Correct?

4    A    It demonstrated their ability to follow instructions.

5    Q    Okay.  And did you already have completed -- I'll

6    rephrase.  You already had completed applications on file for

7    these employees -- or for these former Greenbrier employees.

8    Correct?

9    A    Some of them were several years old and we do update our

10   applications from time to time, so that's why we have a

11   practice of having them always fill out a new one.

12   Q    Do you update your applications for individuals who were

13   not laid off?

14   A    No.  We use the same application for all employees.

15   Q    Okay.  And I meant, do you make it -- do you have a

16   practice of asking your current employees to update their

17   applications?

18   A    Current employees, no.

19   Q    What kind of questions and concerns did you want to

20   address?

21   A    Anything that the employees or applicants had asked of us.

22   Q    And when did you first ask Christine Martinez to begin --

23   or to take detailed notes of her interactions with the rehires

24   from the layoffs?

25   A    When we began hiring.

1  Q    And is it your practice to document these interactions

2  with former employees?

3  A    Yes.  Normally, it's done in each individual person that

4  comes in for an interview, but with so many people being hired

5  at the same time and with Chris being a relatively new

6  employee, we thought it would just be easier to keep one

7  document that she could then send to me.

8  Q    Okay.  I'd like for you to step me through the process for

9  the hiring of a new employee who has not previously worked for

10  Greenbrier.

11  A    Okay.

12       JUDGE LAWS:  And that will be the last answer you'll give

13  today.

14       THE WITNESS:  So okay -- because it's a long one.

15       JUDGE LAWS:  Okay.

16       THE WITNESS:  So for a new hire who has not previously

17  worked for Greenbrier, the first step in the process is an

18  application.  They complete their application.  It's usually

19  reviewed by an HR person depending.  It's for completeness,

20  make sure, you know, job history is filled out, they've checked

21  all the boxes, signed it, dated it, and all those fun things.

22       Usually, the HR person then also does some sort of

23  screening with the applicant such as, "Here's how the interview

24  process works.  Here's where we start our pay at.  Here's what

25  the conditions of employment are.  And here's -- and you're

1 going to have to pass a weld test, and a drug test, and a

2 physical."

3     Then the applicants interview, depending on the shop, with

4 management.  Sometimes, it's the production manager.

5 Sometimes, it's the plant manager.  After the interview,

6 they're usually given a weld test to see if they can pass our

7 weld test, which is a horizontal, vertical, and overhead weld

8 test.

9     Depending on how they do on that, whether we offer them

10 employment, once they're offered employment, they're told, "We

11 want to offer you a position, start you at this wage."  And

12 then, if the employee verbally accepts, then we send them for a

13 drug screen and a physical.  The drug screen is your standard

14 10-panel drug screen.  Your physical is a physical for our work

15 environment as well as a respirator fit test and possibly a

16 hearing -- an audiogram to do a baseline hearing test.

17     JUDGE LAWS:  All right.  And with that --

18     MR. GIANNOPOULOS:  And Your Honor, before we stop the --

19 the exhibit that was marked 205 really should be 206 with all

20 the e-mails.  We have another 205.  I'm sorry.

21     JUDGE LAWS:  All right.  If everyone can, just mark it

22 206.

23     MS. ALONSO:  And Your Honor, with that, I also move for

24 the admission of 206.

25     MR. MINER:  No objection.

1    JUDGE LAWS:  206 is admitted.  And with that, as with

2  today, let's be ready to go, meaning on the record, testifying

3  at 8:30.  Off the record.

4  **(General Counsel Exhibit Number 206 Received into Evidence)**

5  **(Whereupon, the hearing in the above-entitled matter was**

6  **recessed at 4:51 p.m. until Wednesday, November 20, 2013 at**

7  **8:30 a.m.)**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        <u>C E R T I F I C A T I O N</u>

2    This is to certify that the attached proceedings before the

3    National Labor Relations Board (NLRB), Region 28, Case Numbers

4    28-CA-093183, 28-CA-103909, 28-CA-104184, 28-CA-106613, 28-CA-

5    111186, 28-RC-093179, Gunderson Rail Services LLC, d/b/a

6    Greenbrier Rail Services, and Sheetmetal Workers' International

7    Association, Local 359, AFL-CIO at the Pima County Consolidated

8    Justice Court, 160 N. Stone Avenue, Third Floor, Courtroom 11,

9    Tucson, Arizona 85701, on Tuesday, November 19, 2013, at 9:20

10   a.m., was held according to the record, and that this the

11   original, complete, and true and accurate transcript that has

12   been compared to the reporting or recording, accomplished at

13   the hearing, that the exhibit files have been checked for

14   completeness and no exhibits received in evidence or in the

15   rejected exhibit files are missing.

16

17

18

19                    GRANT C. DAYLEY

20                    Official Reporter

21

22

23

24

25

**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

**REGION 28**

---

| | |
|---|---|
| In the Matter of:<br><br>GUNDERSON RAIL SERVICES LLC,<br>D/B/A GREENBRIER RAIL<br>SERVICES,<br><br>and<br><br>SHEET METAL WORKERS'<br>INTERNATIONAL ASSOCIATION<br>LOCAL 359, AFL-CIO,<br><br>GUNDERSON RAIL SERVICES LLC,<br>d/b/a GREENBRIER RAIL<br>SERVICES,<br><br>              Employer,<br><br>and<br><br>SHEET METAL WORKERS'<br>INTERNATIONAL ASSOCIATION<br>LOCAL 359, AFL-CIO,<br><br>              Petitioner. | Case No. 28-CA-093183<br>           28-CA-103909<br>           28-CA-104184<br>           28-CA-106613<br>           28-CA-111186<br><br><br><br><br><br>Case No. 28-RC-093179 |

---

The above-entitled matter came on for hearing, pursuant to notice, before **ELEANOR LAWS,** Administrative Law Judge**,** at the National Labor Relations Board, Pima County Consolidated Justice Court, 160 N. Stone Avenue, Third Floor, Courtroom 11, Tucson, Arizona 85701, on **Wednesday, November 20, 2013, at 8:36 a.m.**

<u>A P P E A R A N C E S</u>

**On behalf of the General Counsel:**

    **EVA SHIH, ESQ.**
    **JOHN GIANNOPOULOS, ESQ.**
    NATIONAL LABOR RELATIONS BOARD - REGION 28
    2600 North Central Avenue, Suite 1400
    Phoenix, AZ 85004-3099
    Tel.  602-640-2090
    Fax.  602-640-2178

    **SOPHIA ALONSO, ESQ.**
    NATIONAL LABOR RELATIONS BOARD
    421 Gold Avenue, SW, Suite 310
    P.O. Box 567
    Albuquerque, NM  87103
    Tel.  505-248-5128
    Fax.  505-248-5134

**On behalf of the Respondent:**

    **FREDERICK C. MINER, ESQ.**
    **STEVEN G. BIDDLE, ESQ.**
    LITTLER MENDELSON, P.C.
    Camelback Esplanade
    2425 E. Camelback Road, Suite 900
    Phoenix, AZ 85016
    Tel.  602-474-3653
    Fax.  602-391-2836

**I N D E X**

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---------|--------|-------|----------|---------|-----------|
| Lisa Maxey | 1587 | | | | |
| Gesus Ramos | 1709 | 1757 | 1775 | 1776 | |
| Freddy Valdez | 1778 | | | | |

**AVTranz**
845 North 3rd Avenue, Phoenix, Arizona  85003
www.avtranz.com · (800) 257-0885

PX 001584

## E X H I B I T S

| EXHIBIT | IDENTIFIED | IN EVIDENCE |
|---------|------------|-------------|
| **General Counsel:** | | |
| GC-207 | 1619 | 1619 |
| GC-208 | 1619 | 1619 |
| GC-209 | 1619 | 1619 |
| GC-210 | 1619 | 1619 |
| GC-211 | 1619 | 1619 |
| GC-212 | 1619 | 1619 |
| GC-213 | 1619 | 1619 |
| GC-214 | 1619 | 1619 |
| GC-215 | 1619 | 1619 |
| GC-216 | 1619 | 1619 |
| GC-217 | 1619 | 1619 |
| GC-218 | 1621 | 1621 |
| GC-219 | 1634 | 1637 |
| GC-220 | 1655 | 1655 |
| GC-221 | 1655 | 1655 |
| GC-222 | 1655 | 1655 |
| GC-223 | 1655 | 1655 |
| GC-224 | 1655 | 1655 |
| GC-225 | 1655 | 1655 |
| GC-227 | 1695 | 1696 |
| GC-228 | 1698 | 1698 |
| GC-230 | 1708 | 1708 |

## E X H I B I T S (Continued)

| EXHIBIT | IDENTIFIED | IN EVIDENCE |
|---------|------------|-------------|
| **General Counsel:** | | |
| GC-232 | 1708 | 1708 |
| GC-233 | 1717 | 1717 |
| GC-235 | 1719 | 1719 |
| GC-234 | 1719 | 1719 |
| GC-236 | 1721 | 1721 |
| GC-237 | 1722 | 1722 |
| GC-238 | 1722 | 1722 |
| GC-239 | 1719 | 1719 |
| GC-240 | 1723 | 1723 |
| GC-241 | 1723 | 1723 |
| GC-242 | 1726 | 1726 |
| GC-243 | 1726 | 1726 |
| GC-244 | 1727 | 1727 |
| GC-245 | 1727 | 1727 |

1        <u>P R O C E E D I N G S</u>

2        JUDGE LAWS:  Good morning, Ms. Maxey.  I just want to

3    remind you I did administer an oath to you yesterday.  That is

4    in effect throughout your testimony.

5        MS. MAXEY:  Good, okay.

6    Whereupon,

7                            <u>LISA MAXEY</u>

8    having been previously sworn, was called as a witness herein

9    and was examined and testified as follows:

10                    <u>DIRECT EXAMINATION</u> (CONTINUED)

11   Q    BY MS. ALONSO:  All right.  Ms. Maxey, yesterday we ended

12   with your testimony on the process for hiring employees.

13   A    Yes.

14   Q    I want you to step me through the process for rehiring

15   former Greenbrier employees?

16   A    We have them fill out an application.  We do an interview

17   with either the production manager or plant manager, depending

18   on what shop it is.  We do a drug screen physical.  Depending

19   on how long they've been gone, we do a weld test.  Weld

20   certificates from GRS are good for six months.  So if they're

21   termed and rehired within six months, we generally don't do a

22   weld test.  Anything beyond that we do.  And so, then they are

23   offered a position, starting rate, and then they do drug

24   screen, physical, that is it.

25   Q    Okay.  And who is involved in -- well, let me ask you

 1    this.  In the rehiring of former employees for any of the

 2    facilities that you have received, who has been involved in

 3    those decisions and rehiring?

 4    A    The decisions -- or the offer is usually determined by the

 5    plant manager.

 6    Q    Okay.

 7    A    Then it's run through myself and Mr. Lave, if needs be.

 8    Q    And that's in the decision to actually rehire the

 9    individual?

10    A    Yeah, that's correct.

11    Q    Yeah.  And in the selection of hiring former Greenbrier

12    employees, who is involved in that -- in those decisions for

13    the facilities that you do oversee?

14    A    I'm sorry.  I think I misunderstood, because you just

15    asked me about that.

16    Q    That was the question.

17         MR. MINER:  What was the question?  I'm sorry, Your Honor.

18         THE WITNESS:  I'm very confused.  I thought -- I think

19    she--

20         JUDGE LAWS:  Let's start over.

21    Q    BY MS. ALONSO:  All right.  Ms. Maxey, you testified that

22    the process was to have all rehires complete applications.  And

23    they cannot an application, correct?

24    A    That's correct.

25    Q    And that's true for all employees laid off that were

1    rehired in 2013, correct?

2    A    That's correct.

3    Q    Okay.  Here's the personnel file of Brian Scaggs that was

4    produced pursuant to the subpoena.  He was rehired in 2013.

5    And I'm going to hand this to you.  Could you please find his

6    2013 application?

7         MS. ALONSO:  And, Your Honor, may the record reflect that

8    this is the personnel file that was produced pursuant to the

9    subpoena.

10        JUDGE LAWS:  Did you want to see it before the witness

11   does or are you --

12        MR. MINER:  Please.  Thank you, Your Honor.  Thank you.

13        MR. GIANNOPOULOS:  And, Your Honor, the Government will

14   make a representation that we reviewed that file and could not

15   find a 2013 application for Mr. Scaggs.

16        MR. MINER:  Well, do you want to ask her about that?

17        MS. ALONSO:  Yeah.

18   Q    BY MS. ALONSO:  Why would there not be an application for

19   2013 for Brian Scaggs?

20   A    I don't know.

21   (Counsel confer)

22   Q    BY MS. ALONSO:  And I have the same question for a

23   personnel file for Hector Federico, who is an individual who

24   was laid off from Greenbrier in 2012 and then rehired in 2013.

25        MR. MINER:  Is this another file that you don't have --

1    MS. ALONSO:  That is correct.

2    MR. MINER:  -- a new application for?

3    MR. GIANNOPOULOS:  Correct.  And we will say, with respect

4    to Mr. Federico's file, there is another employment

5    application.  It's undated.  But based on the work history that

6    he has set forth, it is pretty clear that that application is

7    for 2010, the 2010 timeframe.

8    JUDGE LAWS:  Are you going to submit that or do you just

9    want testimony about with the stipulation that the personnel

10   file is what it is and there's nothing more?

11   MR. MINER:  The personnel file we've produced is what it

12   is, and there's nothing more to -- that we can provide at this

13   time.

14   MR. GIANNOPOULOS:  Okay.  And if there's something --

15   JUDGE LAWS:  Okay.  Probably either submit the undated

16   application or describe it with Mr. Miner also seeing it and

17   attesting that it says what it says.

18   MR. GIANNOPOULOS:  Takes one second.

19   JUDGE LAWS:  Sure

20   MS. ALONSO:  All right.  So the application -- there's

21   Greenbrier Rail Services application for employment filled out

22   by Hector Federico, middle name Antony.  And the work history

23   lists three prior employers, the first being RV Landscaping,

24   where he was employed from 2004 -- from May 2004 to January of

25   2008.  The second employer listed is Solar Temps, and the

1    employed from dates are February 2008 to March of 2009.  Then a

2    third employer listed in work history is Dusty's Drain Sewer.

3    And his employed from dates are April 2009 to March of 2012.

4        MR. GIANNOPOULOS:  And that said, and Mr. Federico was

5    laid off from Greenbrier November 2012.

6        JUDGE LAWS:  Well, I think -- I might want to take a look

7    at it, because if it says prior employers and he -- I think

8    without him saying what that meant, depending on what the

9    application says, there can be some ambiguity.

10       MR. MINER:  Your Honor, I'm not sure where we're going

11   with this.  The fact that a couple of applications appear to be

12   missing from files is not something that was brought to our

13   attention before this morning.  I will say that there were

14   several cases prior to the hearing where Mr. Giannopoulos

15   contacted me, missing personnel files or missing documents from

16   personnel files.  And we were able to provide those documents

17   to him, because they had been misplaced or not copied or lost.

18   And if that is the case with respect to these two applications,

19   we'll be glad to search for them and see if they can be

20   produced at a later time.

21       JUDGE LAWS:  Well, yeah.  And certainly, we're going to be

22   reconvening.  So I don't see that there's a huge problem

23   there --

24       MR. MINER:  Huh-uh.

25       JUDGE LAWS:  -- in terms of opportunity to search for

1  them.  So, certainly, I'll allow that opportunity.  You know,

2  again, kind of without seeing this application, I think it

3  probably is better being made part of the record.

4      MR. GIANNOPOULOS:  Yeah.  We'll make it part of the

5  record.  And at the very least, we'd like to have a stipulation

6  that that is the only application in the file for Mr. Federico

7  that was provided.

8      MR. MINER:  I won't stipulate to that, because in some

9  cases, we produced documents and then you lost them.

10     MR. GIANNOPOULOS:  If --

11     MR. MINER:  And we provided them again.

12     MR. GIANNOPOULOS:  That's -- yeah.  If you look through

13 your files and you find something from Mr. Federico, that's

14 fine.

15     MR. MINER:  Then we'll provide it.

16     MR. GIANNOPOULOS:  Because I know there were also

17 instances where documents just were not provided, like

18 Mr. Sono's personnel file, they were able to find it and get it

19 to us.  So --

20     MR. MINER:  But we had produced Mr. Soto's file and

21 others.

22     MR. GIANNOPOULOS:  Well, in any event --

23     JUDGE LAWS:  Okay.  Why don't we hold off then.  We can --

24     MR. GIANNOPOULOS:  We will hold off with respect to

25 Mr. Federico, but not with respect to Mr. Scaggs.

1    JUDGE LAWS:  Understood.

2    MR. GIANNOPOULOS:  And we will also have the same issue,

3    Your Honor.  There's one more with Oswaldo Chivara Duran (sic),

4    whose application we will make part of the record.  And

5    Mr. Chavira was also laid of November 2012.  And his work

6    history on his -- on the one application that we can find in

7    the file, it's undated.  He has Chris and Sons from August '89

8    through January '92.  He has Bob's Masonry from January 2000

9    through March 2003.  He has AZ from July 2003 through April

10   2006.  He has Precision Machinery from May 2006 through May

11   2009.  And that's my understanding he's been hired by

12   Greenbrier and was laid off in 2012.

13   JUDGE LAWS:  Okay.  And again, I'll treat that the same

14   way as the others.

15   MR. MINER:  Right.

16   Q    BY MS. ALONSO:  All right.  Ms. Maxey, I wanted to return

17   to where it was that you work in Greenbrier.  And I believe

18   yesterday you testified that you work for the Portland office.

19   A    Yes, I have an office in Portland.

20   Q    All right.  And does Al Lave work in the same building as

21   you do?

22   A    Yes, he does.

23   Q    And before November 2012, how often did you visit Tucson?

24   A    Approximately once a month for about a week every month.

25   Q    And the times that you visited the Tucson -- or in the

1    times you visited Tucson, you would meet with the HR

2    generalists and review employee problems?

3    A    That's correct.

4    Q    And Margaret Madrigal reported to you that employees had

5    been complaining about the point system, correct?

6    A    There were some complaints about it.

7    Q    And the employees were not satisfied with the existing

8    point system, correct?

9    A    I don't know if satisfied is the right word.  They've had

10   some concerns that it was -- they didn't like it.

11   Q    Okay.  And they believed it to be unfair, right?

12   A    I can't speak to their opinions on it.

13   Q    All right.  Well, what was reported to you of their

14   concerns about the point system?

15   A    I did have some individuals come to me saying that perhaps

16   their points were incorrect, in which case I would audit their

17   points records --

18   Q    Uh-huh.

19   A    -- and make any corrections as needed.

20   Q    Okay.  And in your visits to Tucson, you also learned that

21   employees had reported complaints about the equipment that they

22   used at work, correct?

23   A    Can you be more specific?

24   Q    Just the equipment that they used in carrying out their

25   duties at Greenbrier.

1    A    I don't recall any specific complaints about that.

2    Q    About safety?

3    A    Safety, but that's a different subject.

4    Q    Okay.  Well, tell me what was reported to you or what you

5    learned about the complaints regarding safety.

6    A    Any safety complaints would not necessarily be handled by

7    me.  We had on onsite EHS manager that handled safety concerns

8    directly.

9    Q    And you --

10    JUDGE LAWS:  Just -- can you spell out what EHS means.

11    THE WITNESS:  Oh, environmental health and safety manager.

12    JUDGE LAWS:  Thank you.

13    THE WITNESS:  Sorry.

14    JUDGE LAWS:  That's all right.

15    Q    BY MS. ALONSO:  And that --

16    MS. ALONSO:  Sorry.

17    Q    BY MS. ALONSO:  And the environmental health and safety

18    manager would review with you what those concerns were of

19    employees, correct?

20    A    If necessary but not all the time.

21    Q    Okay.  But so I want you to explain what you did know,

22    only what was reported to you about safety concerns by the

23    employees.

24    A    The only safety concerns that I possibly would have been

25    involved with is where they crossover into HR related things.

1   So, for example, work comp injuries, because I would handle

2   those, but they usually result from a safety concern.  I'm also

3   copied on accident reports, but those aren't necessarily

4   concerns brought to me.  Those are just a general awareness

5   that I have about safety issues in the shop.

6   Q    And do you have any role in responding to safety

7   violations reported to OSHA?

8   A    No.

9   Q    Do you know who does?

10  A    That would have been the EHS manager at the site, along

11  with our corporate EHS personnel.

12  Q    Now at the time that you were hired -- I'm sorry.  I'll

13  rephrased that.  Did Al Lave ever discuss with you the topics

14  of union pertaining to the Greenbrier facilities assigned to

15  you?

16  A    Yes.

17  Q    Okay.  And is that when you were first hired?

18  A    Yes.

19  Q    Okay.  What did he say?

20  A    He was in -- just giving me a general history of my sites.

21  He did tell me that Tucson had an organizing campaign the prior

22  year, in 2011, and that in October of 2011, there was a vote in

23  the Tucson shop, and the employees voted the Union down.

24  Q    Did he tell you the name of the Union?

25  A    I'm sure he did, but I can't recall right off the top of

1    my head.

2    Q    Did any other facilities assign -- well, I'll rephrase.

3    Did Al Lave ever tell you -- I'll reask the question.  Do any

4    of the facilities you oversee have a union contract?

5    A    No.

6    Q    All right.  And in October of 2012, were you present at a

7    meeting in Tucson where Al Lave met with the lead men and

8    foremen about the potential for union activity at the plant?

9    A    No.

10   Q    Did anyone from Greenbrier ever train you how to prepare

11   and react to a union organizing effort?

12   A    Yes.

13   Q    Are you sure?

14   A    Well, what do you mean?

15   Q    There was some hesitation, so --

16   A    Well, I'm -- by training, can you be more specific?

17   Q    Well, any type of review from Mr. Al Lave or anybody from

18   Greenbrier on the topic of preparing to react to a union

19   organizing effort.

20   A    Yes.

21   Q    Okay.  Who is it that you met with on that topic?

22   A    We didn't meet specifically, but Mr. Lave provided the

23   training -- same training materials that he provides to our

24   supervisors.

25   Q    And did he discuss those training materials with you?

1    A    Yes.

2    Q    Okay.  And what did he say?

3    A    That this is what he was -- used to train the supervisors

4    and that I should familiarize myself with the materials.

5    Q    And that was the extent of your training?

6    A    Yes.

7    Q    Was that a one-on-one session?

8    A    Yes.

9    Q    When did that take -- when did that occur?

10   A    I believe he sent me those documents before providing the

11   training to the supervisors in October 2012.

12   Q    Did anyone from Greenbrier review with you the union

13   activity in Tucson, in 2012?

14   A    Can you clarify the question?

15   Q    Well, what part is confusing to you?

16   A    2012 is a big year.  At what point?

17   Q    Since you began working with Tucson --

18   A    Yes.

19   Q    -- did anyone report to you that there was union activity

20   in Tucson?

21   A    The first time I heard about it was when we got an

22   election petition in November of 2012.

23   Q    And was -- did anyone from Greenbrier ever discuss with

24   you the potential for union activity in Tucson?

25   A    Well, my understanding was that under -- they had voted in

```
 1    October of 2011, so they weren't allowed to organize until one

 2    year after the vote.  So we didn't really -- I didn't know

 3    there was any organizing in Tucson.

 4    Q    And a one-year ban would have been up in October, correct?

 5    A    It would have been up in October 2012.

 6    Q    And Al Lave reviewed that with you?

 7    A    Yes.

 8    Q    Did anyone else?

 9    A    No.

10    Q    Do you know why you got union training before there was a

11    petition filed?

12    A    The -- like I said, the one-year ban was up.  It's just a

13    general reminder about what you can and cannot say to employees

14    in regards to if you hear about any union activity.

15    Q    Were you anticipating another petition once the year ban

16    was up?

17    A    No.

18    Q    Did Mr. Al -- or did Mr. Lave tell you that you should

19    assume that there would be a petition filed?

20    A    No.

21    Q    Or did Mr. Lave tell you that you should assume there

22    would be union activity because the year ban is up?

23    A    No.

24         JUDGE LAWS:  But you knew there could be.

25         THE WITNESS:  We knew there could be, yeah.
```

1  Q    BY MS. ALONSO:  What was discussed on the possibility of

2  there being -- the possibility that there could be union

3  activity?

4  A    Just that there could be union activity once the year had

5  passed.

6  Q    Did you anticipate any particular employees being

7  involved --

8  A    No.

9  Q    -- in the union activity?

10 A    No.

11 Q    So the lead men and foremen were -- the lead men and

12 foremen of Tucson were instructed to report union activity that

13 they saw and heard.  Did you -- were you, in any way, involved

14 in reviewing those reports of union activity.

15    MR. MINER:  We object to the multiple form of the

16 question, Your Honor.  First, there's a question about whether

17 supervisors were given an instruction, and then we have a

18 question about what the responses were to the instruction.

19    JUDGE LAWS:  Let's have a little foundation about her

20 knowledge of what supervisors were told.

21    MS. ALONSO:  Okay.

22 Q    BY MS. ALONSO:  Isn't it true the lead men and foremen

23 were instructed to report union activity that they saw and

24 heard at Tucson?

25 A    I don't know that.

1   Q    Did you hear any reports by lead men and foremen about

2   union activity in Tucson?

3        JUDGE LAWS:  And this hearing directly, indirectly,

4   however --

5        MS. ALONSO:  Indirectly, yeah.

6        JUDGE LAWS:  Indirectly.

7   Q    BY MS. ALONSO:  Indirectly.

8   A    During what timeframe.

9   Q    Since you were hired --

10  A    No.

11  Q    -- through November.

12  A    No.

13  Q    And after November, same question.

14  A    No.  It depends on how far after November, but no.

15  Q    Okay.  Is there any particular report of union activity

16  that you recall hearing about?

17  A    The first union activity on the site that I recall hearing

18  about was in -- I believe it was in April of 2013, when union

19  members showed up at the site to distribute leaflets.  That's

20  the first I heard about it.

21  Q    And after April 2013, did you continue to hear who was --

22  did you hear whether the union activity continued in Tucson?

23  A    Yes.

24  Q    Okay.  What did you hear then?

25  A    Just when union members would hand out leaflets across the

```
 1   street or just in general, when they were on this -- near the

 2   site.

 3   Q    Were the individuals who were passing out handles

 4   identified to you?

 5   A    No.

 6   Q    Were you involved in the layoff of November 2012?

 7   A    Yes.

 8   Q    When were you first notified of the layoff?

 9   A    I believe it was the week prior, probably the last week of

10   October.  I received a phone call from Mr. Lave about our --

11   what we were going to be doing in Tucson.

12   Q    And was anybody else on the phone?

13   A    No.  I believe that one was just him and I.

14   Q    What did Mr. Lave tell you?

15   A    They had just had a senior management meeting in Chicago

16   regarding the financial state of some of the shops, and that

17   due to the financial state in Tucson, we were going to have to

18   reorganize the shop and do a layoff there, cut a number of

19   positions.

20   Q    Did he tell you how many?

21   A    No.  The number had not been determined at that time.

22   Q    Did you ask?

23   A    I did ask.  And I was -- I did ask, yeah.

24   Q    And what was his response?

25   A    That it would be reviewed by the general managers as far
```

1   as what the production need was going to be within a smaller

2   footprint of the shop, and that they would come up with that

3   number and let us know.

4   Q    Did he tell you which general managers would review?

5   A    Kevin Stewart and Juan Maciel.

6   Q    And the senior meeting was the Chicago managers meeting,

7   correct?

8   A    I believe so, yes.

9   Q    And when did you -- and did Mr. Lave instruct you to do

10  anything in that first -- in your initial conversation with him

11  about the layoff?

12  A    He asked me to run some reports, employee lists, outlining

13  people's names, positions, just general employee information.

14  Q    When you say general, did he specify the information he

15  wanted?

16  A    I don't recall.  I believe I ran a typical employee list

17  like I would run for him.

18  Q    What is the typical employee list that you run?

19  A    Employee ID number, name, position, date of hire, date or

20  rehire, if they have any, rate of pay, supervisor.  That's

21  about it.

22  Q    Okay.  And when you say typically, why would you

23  typically, why would you typically run a report like this?

24  A    We run employee head count data information reports from

25  time to time for various benefits, payroll, just to see what

1    the head count is.

2    Q    Any other reasons?

3    A    Not that I can recall.

4    Q    And did you generate the -- did you generate this

5    information for Mr. Lave?

6    A    No, I did not.  I had our IT report writing department

7    pull the report for me.

8    Q    And you provided that to Mr. Lave, correct?

9    A    Yes, I did.

10    Q    When did you -- when was the next time that you learned

11    about the layoff or the status of the layoff?

12    A    It was an ongoing discussion from that point.

13    Q    Okay.  About how often?

14    A    Every day or so I would get an update on when -- timing of

15    when we were going to do it.

16    Q    Okay.  And after this initial conversation, what was

17    discussed in your next conversation about the layoff?

18    A    I believe we determined timing, that it was going to be on

19    Monday -- on a Monday, and we were -- that it was a matter of

20    who was going to be at the shop.

21    Q    And that's Monday following the decision to layoff the

22    employees, correct?

23    A    I don't know if it was the Monday after that initial

24    conversation or the following Monday.  I can't recall without

25    really looking at a calendar.

1  Q    And was that update oral or by email?

2  A    We had several emails and verbal conversations during that

3  week.

4  Q    Who determined the timing of the layoff?

5  A    I believe it was Mr. Lave along with the general managers.

6  Q    Were you involved in those discussions?

7  A    I was involved.  Not in determining, no.

8  Q    Not in determining the timing of the layoff?

9  A    No, not determining the date.  No.

10  Q    Do you know why the date of Monday, November 12th was

11  chosen?

12  A    I don't know.

13  Q    Was it ever explained to you why there would be a layoff

14  on Monday, November -- on that particular date?

15  A    No.  More of a we wanted to do the layoff as soon as

16  possible to mitigate the financial impact that we were

17  experiencing in the shop.

18  Q    What was the financial impact that you were experiencing

19  in the shop?

20  A    From my understanding, we were losing hundreds of

21  thousands of dollars every month.

22  Q    Do you know the amount?

23  A    Around $250,000 the month prior is what I understood.

24  Q    And who said that to you?

25  A    I was told that by the general manager.

1    Q    Which one?

2    A    Kevin Stewart.

3    Q    When did he communicate that to you?

4    A    I believe it was around the first week of November,

5    because that's when we have our financials done for the month

6    prior.

7    Q    When was the number of the employees to be laid off

8    communicated to you?

9    A    I don't recall the exact date.

10    Q    Okay.  When in relation to your initial conversation?

11    A    Within the next week.

12    Q    Who communicated that number to you?

13    A    I believe it was Juan Maciel and Kevin Stewart.

14    Q    What number did they -- well, was that in person or was

15    that on -- how did that come to your attention?

16    A    That was in an email.

17    Q    Okay.  What did they tell you?  What was the amount?

18    A    I don't recall.  We -- on the first pass what the number

19    was.

20    Q    Did the number change?

21    A    Yes, it did.

22    Q    What do you remember the first number being?

23    A    I don't recall.

24    Q    Okay.  And about how many times would you estimate it

25    changed?  Or do you recall it changing?

1    A    Yes, I do.

2    Q    Okay.  And what -- how many times do you recall the number

3    changing?

4    A    We sent the report back and forth two or three times

5    before it was finalized.

6    Q    And when you say report, is that the report of employees

7    who would be laid off?

8    A    Employees who would be laid off and the employees who

9    would be kept at the facility.

10   Q    Did anyone communicate to you the positions that needed to

11   be eliminated?

12   A    Yes.

13   Q    Who was that?

14   A    That was Kevin Stewart and Juan Maciel.

15   Q    Okay.  What did Kevin Stewart tell you about the types of

16   positions that needed to be eliminated?

17   A    That we were going to be eliminating many of what we call

18   are indirect staff, who don't work directly on row cars, as

19   well as direct staff that we did not -- would not have space

20   for anymore, depending on the type of work that we were doing.

21   Q    Right.  And did he tell you the number of indirect -- or

22   did he tell you specific positions of indirect staff that

23   needed to be eliminated?

24   A    Yes.

25   Q    Okay.  What positions were those?

1  A    It wasn't necessarily all of a certain position but, for

2  example, general labor, we were making reductions in our write-

3  up staff, reduction in switch staff, reduction in -- that's

4  about it.  And our -- and QC.  And then we were rearranging a

5  number of people as well.

6  Q    And these are the positions he named to you which needed

7  to be eliminated, correct?

8  A    Like I said, it wasn't all of that position but some

9  people in those positions.

10  Q    Did he indicate to you the number that needed to be

11  eliminated for each particular position?

12  A    That was in the report that we were passing back and

13  forth.

14  Q    Do you recall off the top of your head what that was?

15  A    I don't.

16  Q    Did anyone explain to you why that particular number was

17  decided on?

18  A    It was determined that that was the level needed to staff

19  the shop in a smaller area of the facility.

20  Q    Who said that?

21  A    Juan Maciel and Kevin Stewart.

22  Q    And was that also in a telephone conversation?

23  A    Or an email.

24  Q    Okay.  Now you say smaller shop.  What was discussed about

25  the size of -- of changing the size of the shop?

1    A    Previously, we had four -- or actually, five different

2    work areas.  And we were going down to two main work areas with

3    another smaller what we call truck shop.  So we were

4    eliminating two large work areas.

5    Q    And did you eliminate everyone from those two areas?

6    A    Not necessarily.

7    Q    Okay.  How is -- how did it come about not to eliminate

8    everybody that worked in those areas that were going to be

9    closed?

10    A    We did want to try to retain as many people as possible,

11    so they -- from what I understood, we tried to figure out how

12    many people we could accommodate in the front shop and the

13    center shop.  So some people did -- from the inter modal shop

14    and the rec shop may have started working in the front shop or

15    the center shop.

16    Q    Did you reopen those large work areas in February of 2013,

17    when you started the rehiring?

18    A    Not immediately, no.

19    Q    They were eventually reopened?

20    A    The inter modal shop was later used as a training crew

21    area to train new employees.

22    Q    And where did those employees eventually work in the shop?

23    A    In the front shop and the center shop.

24    Q    So what was the change -- what was -- do you know the

25    number of employees who worked in the front shop pre-layoff?

1   A    I don't know.

2   Q    Do you know the number of employees who worked in the

3   center shop before the layoff?

4   A    I do not.  I'm sorry.

5   Q    Did you know the number of employees who worked in the

6   front shop after the layoff?

7   A    I don't know off the top of my head.

8   Q    For the center shop, the same question.  Do you know the

9   number of employees who worked there after the layoff?

10  A    I don't know off the top of my head.

11  Q    And the two shops that were closed you said were the truck

12  shop and the inter modal shop?

13  A    No, the rec shop and the inter modal shop.

14  Q    The record shop and inter modal shop.

15  A    That's correct.

16  Q    Okay.  At some time -- at some point in 2013, you reached

17  the same head count as you had before the layoff, correct?

18  A    I would have to go back and look at the numbers to see if

19  that's true or not.

20  Q    Okay.  Was that a goal?

21  A    The goal was to increase our head count.  I don't know if

22  it ever reached pre-layoff status.

23  Q    Okay.  And that's the goal for 2013 that you're referring

24  to, correct?

25  A    I'm confused.  I'm sorry.

1  Q     So you just said that that was the goal for 2013, but you

2  don't know if it was ever reached.  Do your --

3  A     We had a head count goal for various months in 2013.  I

4  don't know if it ever reached a level of direct staff that we

5  had before.  The goal was ever the same.  I'm not sure.

6  Q     What shops were the employees going to work in, in 2013?

7  A     The front shop and the center and the truck shop to some

8  extent.

9  Q     Was the truck shop ever closed?

10 A     We did eventually stop working in the truck shop, I

11 believe, in around August of 2013.

12 Q     And immediately after the layoff, was it closed?

13 A     No, it was not.

14 Q     Did you consider the elimination of -- well, did you

15 consider the elimination of employees in November of 2012 a

16 layoff or a termination?

17 A     A layoff is -- a -- we -- in our system and by our

18 vernacular, it was a terminated status with a reason code of

19 layoff.

20 Q     What is the terminated status for your -- for Greenbrier?

21 Can you define?

22 A     That they're no longer an employee of Greenbrier.

23 Q     And if you lay off employees, you have an expectation to

24 recall them --

25 A     No.

1   Q      -- correct?  No, okay.

2          JUDGE LAWS:  And I want to jump in here.  You said

3   terminated stated with a reason being layoff.  Is that to

4   indicate they weren't terminated for doing anything wrong?

5          THE WITNESS:  That's correct.  They were terminated for a

6   lack of work.

7   Q      BY MS. ALONSO:  And was that your understanding, Ms.

8   Maxey, that there was a lack of work?

9   A      Yes, there was a lack --

10  Q      In Tucson.

11  A      There was a restructuring of our site that involved

12  eliminating those positions based on their -- the business we

13  had at the time, yes.

14  Q      Was there lack of Tucson in -- was there a lack of work in

15  Tucson in October of 2012?

16  A      I can't speak to that.  I'm not really involved in the

17  customer side of business.

18  Q      Okay.  What -- any understanding you have on the level of

19  work in Tucson in October of 2012?

20  A      My understanding was that we were not operating

21  efficiently or at a profitable level.  That's my understanding.

22  Q      This production -- or this elimination of positions in

23  November of 2012 is the first reduction in force you

24  participated in with Greenbrier, correct?

25  A      That's correct.

1   Q    Did you play any role in actually deciding who would be on

2   the list for the layoff?

3   A    I did.  I conducted some EEOC analysis for Mr. Lave.

4        JUDGE LAWS:  What about in the front end of initially

5   identifying employees?

6        THE WITNESS:  No, I was not.

7   Q    BY MS. ALONSO:  All right.  Ms. Maxey, I'm going to hand

8   you several documents.

9        MS. ALONSO:  Your Honor, if I may have a moment to mark

10  all of them.

11       JUDGE LAWS:  Okay.  Why don't you -- are you handing them

12  all at once?

13       MS. ALONSO:  I eventually -- no, not all at once but --

14       JUDGE LAWS:  All right.  Why don't we mark the first

15  and --

16       MS. ALONSO:  -- the first couple.  Okay, sure.

17       JUDGE LAWS:  -- you have people next to you who can mark

18  the others.

19       MR. MINER:  Your Honor, I'm sorry.  Can I take just a

20  couple of minutes --

21       THE WITNESS:  That would be great for --

22       MR. MINER:  -- while these exhibits are marked?

23       JUDGE LAWS:  Oh, I'm sure that'll make everyone happy.

24       MR. MINER:  Yeah.  Thank you, Your Honor.

25       THE WITNESS:  Would you mind if I --

```
 1        JUDGE LAWS:  You need a restroom break.  Yeah, that's --

 2        THE WITNESS:  Yeah, that would be great.

 3        JUDGE LAWS:  That can be off the record.

 4        MR. GIANNOPOULOS:  Too much iced tea.

 5        THE WITNESS:  Too much coffee.

 6   (Off the record at 9:19 a.m.)

 7   Q    BY MS. ALONSO:  All right.  Ms. Maxey, prior to testifying

 8   -- or during the break, did you discuss your testimony with

 9   anyone?

10   A    No.

11   Q    Okay.  Did you discuss your potential testimony with

12   Greenbrier's lawyers --

13        JUDGE LAWS:  And that's a yes or no.  You don't have to

14   disclose, if so --

15   Q    BY MS. ALONSO:  -- during the break.

16        JUDGE LAWS:  Hold on.

17        -- any substance.

18        THE WITNESS:  No -- discuss testimony.

19   Q    BY MS. ALONSO:   Did you speak with the Greenbrier's --

20   with Greenbrier's attorneys during this break?

21   A    Yes.

22   Q    Okay.  Was it about the testimony that you just gave

23   today?

24   A    Yes.

25   Q    Who was present?
```

```
 1   A     Mr. Miner and Mr. Biddle and Mr. Lave.

 2   Q     And before you came to testify today, did you discuss your

 3   potential testimony with anyone?

 4   A     Yes.

 5   Q     Okay.  How many times?

 6   A     Once.

 7   Q     Okay.  With who?

 8   A     With Mr. Miner and Mr. Biddle and Mr. Lave.

 9   Q     Was anyone else present?

10   A     No.

11   Q     Did you review any documents before testifying?

12   A     Yes.

13   Q     Okay.  What documents?

14         MR. MINER:  Objection, attorney client privilege, Your

15   Honor.

16         JUDGE LAWS:  And some of the documents may fall within

17   that scope depending on whether they were reviewed with legal

18   advice or whether they are part of attorney work product.

19         MS. ALONSO:  I can qualify.

20   Q     BY MS. ALONSO:  Did you review any documents to refresh

21   your memory for the purpose of testifying?

22   A     Yes.

23         MS. ALONSO:  And, Your Honor, we ask that those documents

24   be produced under Rule -- Federal Rule of Evidence 612.2.

25         MR. MINER:  All the documents have been produced, Your
```

1   Honor.

2   Q    BY MS. ALONSO:  Did you review any potential questions and

3   answered before testifying in this hearing?

4   A    Yes.

5        MS. ALONSO:  Your Honor, we ask that those be produced.

6        MR. MINER:  Objection, attorney client privilege.

7        JUDGE LAWS:  Questions and answers prepared in

8   anticipation of litigation by the attorney would be privileged

9   unless you can cite me some exception.

10  (Counsel confer)

11  Q    BY MS. ALONSO:  Were those questions and answers in paper

12  form that you retained?

13  A    No.

14  Q    Okay.  With respect to the documents that you reviewed to

15  refresh your recollection, can you describe which documents

16  those were?

17       MR. MINER:  Objection, Your Honor, attorney client

18  privilege.  Identifying which documents that she's reviewed in

19  anticipation of the hearing is part of the privilege.  It's

20  within the privilege.

21       MS. ALONSO:  And, Your Honor, it's our position that that

22  falls -- those documents fall within Rule 612.2 and should be

23  produced.  These are documents that refreshed her recollection

24  about the testimony that she has given today or in her

25  potential testimony in this hearing.

1     MR. MINER:  All the documents have been produced, Your

2  Honor.  Identifying which documents are relatively more or less

3  important to Greenbrier is part of the privilege.

4     MR. GIANNOPOULOS:  We can brief this over the break,

5  Judge.  We just want to get this on the record.

6     JUDGE LAWS:  Okay.  I think let's do that, because I don't

7  want to sit here and take the time to --

8     MR. GIANNOPOULOS:  No, that's fine.

9     MS. ALONSO:  Sure.

10     JUDGE LAWS:  -- hash it out.  And Ms. Maxey will be back,

11  right?

12     MR. MINER:  Yes.

13     MS. ALONSO:  All right.  I have several performance

14  appraisals that I'd like to ask for a stipulation on.  These

15  were produced in the employee's personnel files.  If we could

16  do that, that may save some time.  So I'm handing you General

17  Counsel's 207, which is the annual review of Gabriel Ortiz.

18  Omar Ramos' appraisal, and that's General Counsel's 208.  Okay.

19  General Counsel's 209 and 210 are both also performance

20  appraisals, one for Jose Ortega.  That's 2009 -- or 209.  And

21  then 210 is the appraisal for Jorge Martinez.  I also have

22  General Counsel's 211.  This is appraisal for Oswaldo Chavira.

23     MR. MINER:  You gave me two copies of 210.  The same for

24  Carlos Almeraz, General Counsel's 213.  General Counsel's 214

25  for Kenneth Pike.  Both performance appraisals.

1    MR. MINER:  Is there a 212?

2    MS. ALONSO:  There is.  Just -- and I've got to segregate

3  that.  212 is a performance appraisal for Hector Ruiz.  214 is

4  a performance appraisal for Rudy Pierson.  216, performance

5  appraisal for Ricardo Miranda.  And 217 is a performance

6  appraisal for Fernando Ibarra.

7    And those are all the documents that we're seeking a

8  stipulation on.

9    MR. MINER:  Oh, okay.  Are these all documents -- are

10  these all reviews that were produced --

11    MS. ALONSO:  Those were.

12    MR. MINER:  -- to Region 28.

13    MS. ALONSO:  They were all performance appraisals that

14  were included in the personnel files for these particular

15  employees.

16    MR. MINER:  Okay.

17  (Counsel confer)

18    MR. MINER:  Thanks.

19  (Counsel confer)

20    MR. MINER:  Are we ready, Your Honor?

21    JUDGE LAWS:  I believe so.

22    MR. MINER:  The Greenbrier stipulation to authenticity but

23  not necessarily the relevancy of these General Counsel

24  exhibits.  General Counsel 207 is the interim or six month

25  review of Gabriel Ortiz, dated in September 2012.  General

1  Counsel 208 is the interim or six month review of Jesus Omar

2  Ramos, dated in September 2012.  General Counsel 209 was the

3  interim or six month review of Jose Ortega, dated in September

4  of 2012.  General Counsel 210 is the annual review of George

5  Martinez (sic), dated in August of 2012.  General Counsel 211

6  is the review for Oswaldo Chavira, dated in June of 2012.

7  General Counsel 212 is the annual review for Hector Ruiz, dated

8  in August 2012.  General Counsel 213 is the annual review of

9  Carlos Almeraz, dated in June of 2012.  General Counsel 214 is

10  the interim or six month review of Kenneth Pike, dated in March

11  of 2012.  General Counsel 215 is the annual review of Rudy

12  Pierson, dated in October of 2012.  General Counsel 216 is the

13  interim or six month review of Ricardo Miranda, dated in

14  September of 2012.  And General Counsel 217 is the annual

15  review of Fernando Ibarra, also dated in October 2012.

16      JUDGE LAWS:  And I have through 14, so --

17      MS. ALONSO:  Okay.  And I will get those other ones to

18  you, Judge.  And, Your Honor, I move for the admission of

19  General Counsel's 207 through 217.

20      JUDGE LAWS:  All right.  I will admit those, assuming

21  relevancy will be established through questioning or argument.

22  **(General Counsel Exhibit Number 207 through 217 Received into**

23  **Evidence)**

24  (Counsel confer)

25  Q    BY MS. ALONSO:  All right.  Ms. Maxey, thank you for your

1  patience.  I'm going to hand you what's been marked as General

2  Counsel's Exhibit 207 through 217.  And these are performance

3  appraisals for a series of -- or a number of Greenbrier

4  employees.  And these are -- it's our contention that these are

5  the performance appraisals closest to the layoff date, that

6  were taken from the personnel files of the particular

7  employees.

8      Okay.  I'm going to hand you what's been marked as General

9  Counsel's 218.  And 218 is a score of the -- or a tally of the

10  score of the performance appraisals.  And I want you to confirm

11  that these are the scores.  So let's go to Gabriel Ortiz's

12  appraisal, which is 207.  And turning to the second page of the

13  appraisal, the total score for the employee is 28, correct?

14      MR. MINER:  Your Honor, these documents speak for

15  themselves.  It's this General Counsel 218 something that

16  General Counsel can just recite in her brief with appropriate

17  citations to the record?

18      JUDGE LAWS:  You know, I think so.  But do you want to

19  verify that the scores match up?  And we can do that and

20  probably stipulate.

21      MR. MINER:  The scores are what they are.  They're all

22  shown in the reviews in General Counsel 207 through 217.

23      MS. ALONSO:  And, Your Honor, this is a summary that we

24  intend to question the witness from.

25      JUDGE LAWS:  Okay, that's fine.  You know, I don't think

1  we need to have this witness walk through and see if each one

2  matches up.

3      MS. ALONSO:  Okay.

4      JUDGE LAWS:  I can do that.

5      MS. ALONSO:  All right.  And I move for the admission of

6  General Counsel's 218.

7      MR. MINER:  I object to the admission of 218, because the

8  performance reviews themselves show what the reviews of the

9  employees were.

10      MS. ALONSO:  And this is a summary of the evidence -- or

11  of the data included in the personnel file -- or in the -- in

12  performance appraisals for the employees named on General

13  Counsel's 218.

14      JUDGE LAWS:  I will admit it for purposes of ease of

15  reference in the file.

16  **(General Counsel Exhibit Number 218 Received into Evidence)**

17  Q    BY MS. ALONSO:  Ms. Maxey, why was Gabriel Ortiz laid off

18  when he had a score of 28, but Hector Ruiz was retained when he

19  had a score of 23?

20  A    I don't know.

21  Q    Why was Omar Ramos laid off and he had a score of 28, but

22  Fernando Ibarra was retained when he had a score of 21?

23  A    Again, I don't know.

24  Q    Do you know why any of the employees on the laid off list

25  were laid off?

1  A    As I spoke to earlier, we considered several factors in

2  determining to lay off people --

3  Q    And --

4  A    -- not just performance.

5  Q    And for these particular -- for Gabriel Ortiz, what other

6  factors did you consider?

7  A    Well --

8       MR. MINER:  Objection, lack of foundation.  I think she

9  testified that others were responsible for --

10       MS. ALONSO:  And, Your Honor --

11       MR. MINER:  -- initially -- I'm not done.

12       JUDGE LAWS:  Hold on.  Please try not to interrupt.

13       MS. ALONSO:  May we have the witness excused if he's going

14  to review what her --

15       MR. GIANNOPOULOS:  Testimony, yes.

16       MS. ALONSO:  -- could be or --

17       MR. MINER:  I'm describing what her testimony was.

18       MS. ALONSO:  -- how this impacts her testimony?

19       MR. MINER:  Her testimony was that there were others who

20  were responsible for identifying the performance of employees

21  in connection with determining who would be laid off --

22       MS. ALONSO:  And, Your Honor --

23       MR. MINER:  -- and who would be retained.  And I would

24  also ask that one counsel on the other side of the room speak

25  for the General Counsel.

1    JUDGE LAWS:  I agree.  Let's have Ms. Alonso for this

2  witness be the person who does the speaking.  My recollection

3  is, in response to a question I asked, she was not involved in

4  the front end of identifying individuals to be laid off.  You

5  know, certainly, feel free to question her about her knowledge

6  of that, but, you know, that is my recollection in response to

7  a question that I asked.

8    MS. ALONSO:  And, Your Honor, in response to my question

9  as to why these employees were on the laid off list, she

10  testified that we considered other factors.  So I want to

11  explore the witness' knowledge and what those factors were.

12    JUDGE LAWS:  And I will allow that.

13  Q    BY MS. ALONSO:  So, Ms. Maxey, what other factors were

14  considered in selecting Gabriel Ortiz for the layoff?

15  A    Mr. Ortiz, in particular, I can't speak to.

16  Q    Okay.  Omar Ramos, what other factors were considered in

17  selecting him for the layoff aside from his performance

18  appraisal?

19  A    Again, it would be difficult for me to speak to an

20  individual employee.  I wasn't in the debate on individual

21  employees.

22  Q    For Jose Ortega, what other factors were considered aside

23  from his performance appraisal, if any?

24    MR. MINER:  Your Honor, objection.  It assumes facts not

25  in evidence.  We have not had any testimony, as far as I know,

1  so far that performance reviews were a factor in the

2  determination of who to be laid off.

3      JUDGE LAWS:  Let's rephrase and just ask what factors

4  without --

5  Q    BY MS. ALONSO:  What factors did you consider to select

6  Jose Ortega for the layoff?

7      MR. MINER:  Objection.  She's testified that she was not

8  involved in the initial identification of employees to be laid

9  off.

10  Q    BY MS. ALONSO:  To --

11      JUDGE LAWS:  What is your understanding of the factors

12  that were considered by the people in Tucson with regard to the

13  layoff of --

14      Where are we at, Jose Ortega?

15      MS. ALONSO:  Yes.

16      THE WITNESS:  In general, for all employees, we considered

17  what position they were in, if they had other -- served in

18  other positions previously, so that means they were cross-

19  trained in multiple areas.  We considered their attendance.  We

20  considered their -- they may have off-handedly commented on

21  their performance, but I don't believe anyone looked at

22  performance reviews.  And then also other items, such as how

23  many positions of that position we're going to need after the

24  layoff, what equipment they were operating or certified on,

25  their safety record.  That's all I can recall.

1   Q    BY MS. ALONSO:  Okay.  And do you have personal knowledge

2   that the factors you listed were considered for all of the

3   Tucson employees in November of 2012?

4   A    Yes.

5   Q    How?

6   A    That's what I was told in considering --

7   Q    Who?

8   A    Juan Maciel and Kevin Stewart.

9   Q    When did they say to you?

10  A    During phone conversations when we were reviewing the list

11  of employees.

12  Q    And you indicated performance was a factor.  You didn't

13  personally observe these employees work, correct?

14  A    That's correct.

15  Q    And isn't an employee's performance appraisal set -- or

16  isn't an employee's -- isn't an employee's -- I'll rephrase.

17  Isn't an employee's performance set forth in their performance

18  reviews?

19  A    Yes.

20  Q    I'd like you to turn to Rudy Pierson's appraisal.  You

21  said attendance was considered.  How do you --

22       JUDGE LAWS:  Are we backing away from the appraisal you

23  just --

24       MS. ALONSO:  Yes.

25       JUDGE LAWS:  -- directed her to?

1    MS. ALONSO:  Yes.  Yes, for now.

2    THE WITNESS:  Oh.

3  Q    BY MS. ALONSO:  You said attendance was considered.  How

4  did you know the attendance of each particular employee?

5  A    We track attendance in our HRAS system.  And I was able to

6  run a report of their attendance records.

7  Q    Who did you give -- did you give that information to

8  anyone?

9  A    I believe I gave it to Mr. Stewart, Mr. Maciel, and Mr.

10  Lave.

11  Q    For every employee in Tucson?

12  A    Yes, that's correct.

13  Q    All of them?

14  A    Except for salaried personnel.  We don't track their

15  attendance.

16  Q    When did you give that report to them?

17  A    I don't recall.

18  Q    Was it a week before the layoff?

19  A    It would have been in the timeframe where we were

20  reviewing the employees.

21  Q    Okay.  And it was before the layoff?

22  A    Yes, it was.

23  Q    Okay.  I'd like you to turn to Rudy Pierson's performance

24  appraisal, and that's 215.  And I wanted to briefly review

25  these performance forms with you.  So this is an annual review

1    for Rudy Pierson.

2    A    Yes.

3    Q    Okay.  And his job title is QC, correct?

4    A    That's correct.

5    Q    And the rating competencies range from one to three,

6    right?

7    A    That's correct.

8    Q    And one would be the lowest score that an employee can get

9    on a particular category in this key competency group, correct?

10   A    That's correct.

11   Q    All right.  And three would be the highest.

12   A    That's correct.

13   Q    All right.  Let's turn to Rudy Pierson's attendance, which

14   his --

15         JUDGE LAWS:  And first, I want you to identify what QC

16   stands for.

17         THE WITNESS:  Quality control inspector.

18   Q    BY MS. ALONSO:  All right.  And number four of the --

19   under our values, is a category on attendance.  And Rudy

20   Pierson received a two, but he was not selected for the layoff,

21   correct?

22   A    That's correct.

23   Q    Now let's turn to performance appraisal of Terry Pike.

24         JUDGE LAWS:  What number is that?

25         MS. ALONSO:  Sorry.  Kenneth Pike.  That's 214.  That's

1   Kenneth Pike.

2   Q    BY MS. ALONSO:   And Kenneth Pike received a one in his

3   attendance category, correct?

4   A    That's correct.

5   Q    And he was not selected for the layoff, correct?

6   A    That's correct.

7   Q    Now earlier, you testified that performance was a factor

8   considered in the selecting -- in the selection of employees.

9   A    That's what I was told, yes.

10  Q    And what information was relied upon other than the

11  information on the performance appraisals on that particular

12  factor?

13       MR. MINER:   Objection.   It misstates the evidence about

14  reliance on performance reviews.

15       JUDGE LAWS:   And I -- she didn't say performance reviews

16  in the question.   The question was what information was relied

17  upon.

18       And I'm going to instruct you to answer as to your

19  knowledge.

20       THE WITNESS:   My knowledge was that we used just general

21  information about the employee's performance.   Where Mr. Maciel

22  and Mr. Stewart learned that I'm not sure.

23  Q    BY MS. ALONSO:   Okay.   And no one asked you to go back and

24  pull the performance appraisals of all of the employees for

25  Greenbrier?

1   A    No.

2        MS. ALONSO:  And, Your Honor, I'm going to take a moment

3   just to find my next set of exhibits.

4        JUDGE LAWS:  Okay.

5   (Counsel confer)

6   Q    BY MS. ALONSO:  Okay.  Ms. Maxey, I'm going to hand you

7   what's been marked as General Counsel's 40 and 41.  All right.

8   And in the -- if you could turn to 40.

9   A    Yes.

10  Q    Which is an email from Mr. Lave to you, on November 14th,

11  on the topic of points in Tucson.  And here, Mr. Lave has

12  instructed you and Juan to communicate this to Tucson employees

13  tomorrow.  And this would be the rollback of the attendance

14  points, correct?

15  A    That's correct.

16  Q    Okay.  So the attendance points were all rolled back to

17  zero after November 14th, correct?

18  A    That's correct.

19  Q    And did you communicate that -- did you and Juan

20  communicate the rollback of the points?

21  A    Yes, we did.

22  Q    Okay.  And was that in Tucson?

23  A    That was in Tucson.

24  Q    And did you host a meeting?  How was that conducted?

25  A    Yes.  We had a meeting first thing in the morning at the

1    start of the shift.

2    Q     Okay.  Was that the following day, November 15th?

3    A     That was correct.

4    Q     And was this in one of the safety meetings?

5    A     We just gathered the employees for a morning meeting at

6    the start of the shift.

7    Q     And what did you say in this meeting?

8    A     I stated that we had been reviewing -- that I had been

9    reviewing the Kronos attendance records.  I said that we had

10   found some errors with the points, and that to ensure fairness

11   to all employees, that we were going to be rolling the points

12   back to zero and starting everybody from there, but that the

13   points policy and attendance were still in effect, and that it

14   was more important than ever to be there and on time while we

15   were trying to reestablish and improve the efficiencies in the

16   shop.

17   Q     Did Juan -- was that Juan Maciel that you -- you conducted

18   the meeting with Juan Maciel?

19   A     Yes, I did.

20   Q     Okay.  Did he add anything to the meeting?

21   A     He translated into Spanish.

22   Q     All right.  And have you been involved in the rollback of

23   points for any other facilities that you oversee?

24   A     Not that I oversee, no.

25   Q     And on -- I want you to turn to General Counsel's 41.  And

1  this is an email to Mike Torra on the topic of attendance

2  points.  And it's your -- you don't -- you do know that Mike

3  Torra is the vice-president of operations, correct?

4  A    That's correct.

5  Q    Okay.  What would the vice-president of operations have to

6  do with the attendance -- the time and attendance of employees

7  at Greenbrier in Tucson?

8  A    I'm not sure.  I didn't write this email.

9  Q    Okay.  Do you -- have you communicated with Mike Torra on

10 any other -- on any instance on issues of time and attendance?

11 A    In broad general terms, yes.

12 Q    Okay.  What do you mean broad general terms?

13 A    We've discussed the policy before and how it works in the

14 shops.

15 Q    Is that the point system?

16 A    Yes, that is.

17 Q    All right.  Ms. Maxey, you can set those aside.  Ms.

18 Maxey, on the topic of the point rollback, who decided the

19 timing of announcing the -- well, let me -- I'll rephrase.  Who

20 decided to roll back the points, if you know?

21 A    I made a recommendation to Juan Maciel, who is the interim

22 plant manager.  That's what I felt we needed to do.  He agreed,

23 and then we had Mr. Lave review and approve the decision.

24 Q    Okay.  Did anyone discuss with you why it was significant

25 to roll back points at this particular time?

1   A    No.  I was the one who, you know, recommended it.  So I

2   felt it was important to do it as -- immediately.

3   Q    And you made that recommendation after the layoff,

4   correct?

5   A    That's correct.

6   Q    All right.  I'm going to hand you what's been marked as

7   General Counsel's Exhibit 63.

8        JUDGE LAWS:  And while she's gathering that, I want to ask

9   you when employees were hired again who had been laid off, did

10  their previous attendance points follow them back?

11       THE WITNESS:  No.  We would have started them from zero as

12  well, as zeroed out the other employees.

13  Q    BY MS. ALONSO:  And I'm going to hand you what's been

14  marked as General Counsel's 63.  And I'd like --

15  (Counsel confer)

16  Q    BY MS. ALONSO:  Ms. Maxey, before moving on, when did you

17  find out that there were problems with the attendance points?

18  Sorry.  I'll rephrase.  When did you learn -- when did you

19  determine that there were issues with the point system?

20  A    On Monday and Tuesday of that week, I spent a considerable

21  amount of time reviewing the attendance in the course of the

22  day to day operations.

23  Q    And when you say Monday, you're referring to Monday of the

24  layoff?

25  A    That's correct.

1  Q     And you had discovered that there were problems with the

2  point system in your review?

3  A     I had discovered that some employees had come to me at

4  that point and asked me what their points balances were.  And

5  then Tuesday and Wednesday, I began reviewing those more in

6  depth.

7  Q     Did you discover problems with the point system before the

8  layoff?

9  A     Prior to the layoff, employees had brought up individually

10  to me that there may be an error.  So we would review those on

11  a one on -- case by case basis.  And then I would use that as a

12  coaching opportunity with Margaret Madrigal on where we found

13  errors and how she should make sure those errors don't occur in

14  the future.

15  Q     When did you personally decide that there was a problem

16  with the point system?  Was it before the day of the layoff?

17  A     No, it was after the layoff.

18  Q     I'm handing you what's been marked as General Counsel's

19  Exhibit 63.  Have you seen this document before?

20  A     I don't believe I have.

21  Q     Do you know who created this?

22  A     I do not.

23  Q     Do you know if the name -- or if the title name on charge

24  references the charge of the NLRB?

25        MR. MINER:  Objection, lack of foundation.

1    MS. ALONSO:  Do you know.

2    JUDGE LAWS:  I'll allow it.

3    THE WITNESS:  I don't know, because I've never seen this

4  before.

5  Q    BY MS. ALONSO:  Okay.  So you didn't have any involvement

6  in the creation of this exhibit?

7  A    No.

8  Q    All right.  I now am going to show you a document marked

9  as General Counsel's Exhibit 68.   Okay.  And this is a

10  document titled Greenbrier Rail Services, Tucson, November 12,

11  2013 -- 2012 layoff and subsequent recalls in 2013.  Can you

12  look over this list and just look up when you're done.  Okay.

13  These are the names of the individual employees who were laid

14  off and subsequently recalled, correct?

15  A    Yeah, and subsequently rehired, yes.

16  Q    And this indicates the date that the employees were

17  recalled?

18  A    I believe so.

19  Q    And by the end of February, you had only recalled five

20  employees, correct?

21  A    Yes.

22  Q    Okay.  I'm going to show you what's been marked as General

23  Counsel's Exhibit 1.

24    MS. ALONSO:  Sorry.  I've got to mark this one.

25  **(General Counsel Exhibit Number 219 Marked for Identification)**

1    MS. ALONSO:  All right.  I'm handing out what's been

2 marked as General Counsel's 219.

3 Q    BY MS. ALONSO:  Ms. Maxey, this is an email -- this begins

4 with an email on March 1st, at the bottom of General Counsel's

5 219.  That's from Christina Martinez -- or Christine Martinez

6 to you?

7 A    Yes.

8 Q    And at the top of the email -- or at the top of the

9 document, it's an email that you've written to Kevin Stewart

10 and Juan Maciel on March 4th.

11 A    Yes.

12 Q    Okay.  And this is on the subject of employment ads for

13 Greenbrier employees -- or for the rehire of Greenbrier

14 employees, correct?

15 A    That's incorrect.

16 Q    What's that?

17 A    That's incorrect.

18 Q    Okay.  Is it on the -- it's on the subject of employment

19 ads though, correct?

20 A    That's correct, yes.

21 Q    Okay.  And you wrote in your email, on March 4th, that you

22 posted an add on Craigslist, correct?

23 A    That's correct.

24 Q    And what positions were you looking to fill from Craig --

25 from that ad?

1636

1   A    This, in particular, was for a maintenance mechanic

2   position.

3   Q    Maintenance mechanic, okay.

4   A    Yes.

5   Q    And then you also posted an ad on One Start.  What is One

6   Start?

7   A    One Start is the local employment agency for people who

8   are out of work.

9   Q    And in March, Greenbrier was still below the head count

10  goal for the month, correct?

11  A    I'm not sure.

12  Q    And you were also still looking for welders in March,

13  correct?

14  A    Yeah.  This -- yes, we were.

15  Q    And in the email below by Kevin Stewart to you, the last

16  sentence, Kevin Stewart writes:  Juan, is there a different

17  paper in bale?  Water may be better out there.  We may get a

18  better candidate if we target better communities.

19       He's referring to difficulty in finding suitable

20  candidates, correct?

21  A    He's referring to the difficulty in finding a suitable

22  maintenance mechanic.

23  Q    Okay.

24       MS. ALONSO:  And, Your Honor, I move for the admission of

25  General Counsel's 219.

```
 1        MR. MINER:  No objection.

 2        JUDGE LAWS:  That's admitted.

 3   (General Counsel Exhibit Number 219 Received into Evidence)

 4        JUDGE LAWS:  And just not being from this area, I'm just

 5   curious.  What's the significance of water might be better out

 6   there, if you know?

 7        THE WITNESS:  Bale is a different and, from my

 8   understanding, a little bit higher end community.  So we

 9   thought we might find someone with a little bit better

10   employment record, employment track, a little more stable of a

11   candidate.  We were having some struggles finding a maintenance

12   mechanic at the time.

13        JUDGE LAWS:  So water doesn't mean the word water.

14        THE WITNESS:  No, no, no.  It's a euphemism.

15        JUDGE LAWS:  Thank you.

16   Q    BY MS. ALONSO:  Ms. Maxey, do you know what a maintenance

17   mechanic does?

18   A    Yes, I do.

19   Q    Tell me what that is.

20   A    Our maintenance mechanics do maintenance on our equipment,

21   such as forklifts, cranes, welding machines.  They are in

22   charge of doing then preventative maintenance schedule,

23   sometimes dealing with outside vendors, and sometimes doing

24   even light repairs around the shop, like carpentry or light

25   electrical if they're able to do so.
```

1    Q    Okay.

2         JUDGE LAWS:  Did they do any work on the cars?

3         THE WITNESS:  No.  No, no.

4    Q    BY MS. ALONSO:  During 2013, did you post for any other

5    positions on Craigslist?

6    A    Not that I can recall.

7    Q    In Tucson, did you post for any other positions?

8    A    I would have to go back and look at my account.

9    Q    Do you recall posting a position other than the

10   maintenance mechanic?

11   A    Again, I'd have to go back and reference my account.

12   Q    And what position were you seeking -- what position did

13   you post on One Start?

14   A    The maintenance mechanic position.

15   Q    I'd like to direct your attention to General Counsel's 62.

16        JUDGE LAWS:  You can hand her those when --

17        THE WITNESS:   Okay.

18        JUDGE LAWS:  -- she gives you 62.

19        THE WITNESS:  I don't have a 62.

20        JUDGE LAWS:  Yeah.  She'll give it to you.

21   Q    BY MS. ALONSO:  Here's the email identified as General

22   Counsel's 62.

23        JUDGE LAWS:  And can you take those back, please?

24   Q    BY MS. ALONSO:  Okay.  And this is an email written on

25   Friday, May 24th, sent to you by Christine Martinez, on the

```
 1   subject of the Tucson rehires.  And this list identifies four

 2   recall lists.  How did you come up with the -- how were these

 3   lists developed?

 4   A    When we needed people, a list would be given from either

 5   Juan Maciel or Kevin Stewart or Eric Valenzuela, depending on

 6   the timing, and given to Chris to contact the employees.

 7   Q    They are -- are the individuals you just identified the

 8   ones who were selecting the employees to be put on these lists?

 9   A    Yes.

10   Q    Okay.  Did they discuss the selection of those employees

11   to consider for the list?

12   A    Yes.

13   Q    Okay.  What was discussed with you about the first list?

14   A    We discussed how many people we would need and for what

15   positions.

16   Q    Okay.  How many people were needed?

17   A    At the time, it was five people.

18   Q    For which position?

19   A    I would have to go back and look at my notes.

20   Q    Okay.  Were those welder positions?

21   A    In general, yes.

22   Q    Were you always hiring for welders?

23   A    At that time --

24   Q    Yes.

25   A    -- no.
```

1  Q    Oh.  What other positions, if you know, needed to be

2  filled in Greenbrier in 2013, other than a welder position?

3  A    In Tucson?

4  Q    Yes.

5  A    I'm not sure.

6  Q    How was it determined that these particular employees

7  would be selected for recall?

8  A    I'm not sure.

9  Q    Do you know what was considered, whether it was attendance

10  or productivity?

11  A    I believe it was more based on their skill set, what they

12  were used to working on, what kind of cars they were used to

13  working on, things like that.

14  Q    And what type of cars had Carlos Contreras Ortiz -- what

15  type of cars did he have experience working on?

16  A    I don't know.

17  Q    Okay.  Same question for Jaime Hernandez.

18  A    I don't know.

19  Q    Okay.  Same question for Gabriel Ortiz.

20  A    I don't know.

21  Q    Do you know the skill set of any of the employee's names

22  under these particular lists?

23  A    I'm not that involved in production, so I'm sorry, I don't

24  know.

25  Q    Now at the bottom of the email, there is a section that is

1   -- it's the second section from the bottom up.  And it says

2   employees that contacted us once they heard we were hiring but

3   were not considered, and it names Jose Ortega.  What made him

4   unfit for the recall list?

5   A    From my recollection, Mr. Ortega was in an indirect

6   position, either general labor or paint or something.  We

7   didn't have a need for his position.  I'd have to look at the

8   record.

9   Q    Okay.  What made Oscar Salinas unfit for the recall?

10  A    Again, I'd have to go back and look at our detailed log

11  that we were keeping at the time.

12  Q    And was it your priority to hire employees who had

13  experience welding?

14  A    Yes, it was.

15  Q    William Murguia, what made him unfit for the recall?

16  A    We had several instances of Mr. Murguia being obstinate,

17  belligerent with staff, and then also, he would not comply with

18  our rehire process.

19  Q    Okay.  What process -- what is -- what did he do to not

20  comply with the rehire process?

21  A    He failed to fill out an application.

22  Q    He never filled out an application?

23  A    To my knowledge, no, he did not.

24  Q    Is there anything else he did that not comply with the

25  rehire process?

1   A    He frequently showed up at our shop without any sort of

2   invite and was in areas of the shop he shouldn't have been as a

3   non-employee.

4   Q    What areas?

5   A    Back by the foreman's office.  I was told that he, at one

6   point, tried to go into our front shop without authorization.

7   Q    Anything else?  And that made him unfit to be a welder at

8   Greenbrier?

9   A    I don't know if unfit is the right word, but we have, you

10  know -- an employee can't follow the process and follow

11  instructions, then I have a hard time signing off on hiring

12  him.

13  Q    And you used a couple of adjectives.  Were you present

14  when Mr. Murguia had interactions with staff or person or

15  supervisors at Greenbrier?

16  A    No, I was not.

17  Q    Okay.  Who told you that Mr. Murguia was being

18  belligerent?

19  A    Mr. Valenzuela.

20  Q    Okay.  Is that the word he used?

21  A    I don't recall.

22  Q    Okay.  What did he say?

23  A    He said that Mr. Murguia was using a loud voice, being

24  very aggressive, very angry with him.

25  Q    Did he describe what Mr. Murguia did to be aggressive?

1   A    Yelling, telling Mr. Valenzuela that he had to call him

2   back and that he should be returned to work.

3   Q    Okay.  And at this time of the rehire, you knew that Mr.

4   Murguia was involved in the union campaign with sheet metal

5   workers, correct?

6   A    I knew he was named on our charge.

7   Q    And that's a charge with the NLRB?

8   A    That's correct.

9   Q    And Mr. Murguia was upset because he was not recalled,

10  right?

11  A    That was my understanding.

12  Q    Okay.  When did Valenzuela communicate with you about Mr.

13  Murguia?

14  A    I don't recall.  He called me and wrote me an email.

15  Q    All right.  I want to direct your attention to General

16  Counsel's 67.  All right.  Ms. Maxey, you've seen this -- well,

17  I'll back up.  This is a -- General Counsel's 67 is title

18  rehires for Tucson and then begins with February 1st of 2013.

19  And it appears to be a log with names of supervisors and

20  individuals who are being considered for rehire.  Have you seen

21  this document before?

22  A    Yes.

23  Q    Okay.  Is this a log that was created by Christine

24  Martinez?

25  A    Yes.

1   Q    And you instructed her to create this log?

2   A    Myself and Mr. Lave instructed her to create this log.

3   Q    Were you present when -- were you present with

4   Ms. Martinez when you gave her those instructions?

5   A    Yes, I was.

6   Q    Okay.  What did you tell her?

7   A    To keep a log of who she called, what their response was,

8   and if there is unusual about her interactions with them.

9   Q    Did you define what would be unusual?

10   A    Any sort of questions they asked, any sort of -- if they

11   were -- anything about their demeanor or behavior that would

12   have been concerning to her.

13   Q    What type of demeanor did you mean?

14   A    So if someone was -- as with any applicant, if someone is

15   argumentative, if someone is rude, if someone is obstinate to

16   the process or won't comply with the process.

17   Q    All right.  I want you to turn to March 27th.

18        JUDGE LAWS:  And I want everybody to number this exhibit,

19   and any exhibit, really, offered that's more than a couple

20   pages should be numbered.  So let's go through and just pen and

21   ink that, please.

22   Q    BY MS. ALONSO:  Much easier.  All right.  I want you to

23   look at page 7 of General Counsel's 67 and refer to March 27.

24   And here, it has been reported that Lisa Maxey had a conference

25   call with Eric Valenzuela and Chris Martinez, and informed them

1  that the decision was made not to bring back Omar.  That's Omar

2  Ramos, correct?

3  A    That's correct.

4  Q    Okay.  And you had a conference call with Eric Valenzuela

5  and Ms. Martinez on Mach 27th, correct?

6  A    That's correct.

7  Q    Okay.  What did you -- well, the conference call was after

8  Ramos had been -- Mr. Ramos had been interviewed by Mr.

9  Valenzuela, correct?

10  A    That is correct.

11  Q    Okay.  And corporate had identified Mr. Ramos as a

12  disruptive employee, right?

13  A    That's correct.

14  Q    And corporate considered Mr. Ramos to be a troublemaker,

15  right?

16  A    I don't believe that's the word we used, no.

17  Q    Just disruptive but not a troublemaker?

18  A    He was disruptive during his rehire process.

19  Q    At the time of the phone call, Greenbrier knew that

20  Mr. Ramos was involved in the -- with the sheet metal workers

21  union, correct?

22  A    I knew he was named on our -- an NLRB charge.

23  Q    And Mr. Valenzuela discussed the Union with Mr. Ramos,

24  right?

25  A    I don't know.

1  Q    Okay.  You discussed Mr. Ramos' history in the conference

2  call, correct?

3  A    We discussed his work history with the company, yes.

4  Q    Okay.  What was discussed about his history?

5  A    We discussed instances of his -- we discussed the most

6  recent instance that he had -- his interaction with Chris

7  Martinez during the rehire process.  We had discussed some

8  items from -- that I was aware of from prior -- his prior

9  employment with him also being -- having similar interactions

10 with our previous HR generalist, Margaret Madrigal.

11 Q    Can you describe -- and first, let me ask you this.  How

12 did you learn of those prior incidents?

13 A    From Ms. Madrigal.

14 Q    All right.  Did you ask her document them?

15 A    We spoke about them informally.  I'd have to go back and

16 look at his employment file to see if there was any formal

17 documentation.

18 Q    Is that where you would have kept them?

19 A    Yes.

20 Q    And what did Ms. Madrigal report to you had occurred with

21 Mr. Ramos?

22 A    She reported that he was sometimes very rude to her, would

23 get very angry easily with her if she was giving him

24 information.  Sometimes that he would be very argumentative and

25 get upset very easily with her.

1    Q    And that was in regard to his attendance points, wasn't

2    it?

3    A    It may -- I would have to go back and look at my notes.

4    Q    Did you ask her?

5    A    Oh, yes, at the time, when we discussed it.

6    Q    And what do you remember her telling you?

7    MR. MINER:  Your Honor, could I ask counsel not to

8    interrupt the witness, please.

9    MS. ALONSO:  Oh, sure.

10    JUDGE LAWS:  Let's let her finish the question.  Thanks.

11    THE WITNESS:  At the time, we discussed it in general

12    terms of -- I was working with Maggie on a lot of coaching.

13    She would come to me with issues with employees, and it was

14    frequent that Mr. Ramos would get argumentative, rude with her.

15    And she would ask me advice on how to handle those situations.

16    Q    BY MS. ALONSO:  And did you ask Ms. Madrigal to explain to

17    you exactly what the topics of those discussions were?

18    A    Yes.

19    Q    That prompted this behavior?

20    A    Yes.

21    Q    Okay.  What did you ask her?

22    A    I asked her what are some of his concerns and complaints.

23    Q    And what were they?

24    A    From my recollection, one was his points, his attendance

25    record.

1    Q    He didn't agree with the attendance points that were

2    assigned to him, did he?

3    A    I believe so.  I believe that's correct.

4    Q    Any performance issues discussed about Mr. Ramos' prior

5    employment?

6    A    I would have to, again, look at his file and go back

7    through emails or notes to look at that.

8    Q    What about in this conference call that you just -- that

9    you had regarding Mr. Ramos?  Was the topic of his performance

10   while he was previously employed with Greenbrier discussed?

11   A    I don't believe so.  I think it was more focused on his

12   behavior that he had demonstrated most recently.

13   Q    Was his -- were his skills as a welder discussed?

14   A    I don't recall.

15   Q    Mr. Ramos did, in fact, fill out an employment

16   application, correct, at the time that he was requested to fill

17   it out?

18   A    Per the entry, previous, on March 25th, he did, but it

19   take some cajoling -- some interactions with him where he was

20   resistant to doing so.

21   Q    And in March 25th, there's a summary about when Omar did

22   return in the afternoon to take the -- or to return his

23   employment application.  And it states that:  Eric stated that

24   his meeting with him went without incident.  Omar was very calm

25   and informative.

```
 1          That was accurate, right?

 2    A     That was Eric's perception.

 3    Q     I want you to turn to page 4 of General Counsel 67.  And

 4    I'm also going to hand you General Counsel's 68 if you don't

 5    have that up there anymore.  I think you do.

 6    A     I don't believe so.

 7    Q     All right.  And I'll also hand you 68.

 8    A     Thank you.

 9    Q     So Alex Acuna is the same person as Antonio Acuna,

10    identified on General Counsel's 68, correct?

11    A     That's correct.

12    Q     Okay.  And he was rehired on March 18th of 2013, correct?

13    A     That's correct.

14    Q     And according to -- returning to General Counsel's 67 on

15    page 4, on March 11th, under the March 11th entry, there's a

16    summary on Antonio Acuna.  And it indicates that on Saturday,

17    March 9th, he had talked to the foreman, Hector Barajas.  And

18    then further down on the paragraph underneath, Chris Martinez

19    wrote that she spoke to you because there may be scheduling

20    conflicts with Antonio Acuna, because he was working on the

21    mines.  But you gave Chris Martinez permission to see when Mr.

22    Acuna could come in, and you would try to accommodate him as

23    much as possible.

24    A     That's correct.

25    Q     Okay.  So as of March 9th, Greenbrier was still looking to
```

1  fill several positions, correct?

2  A    That's correct.

3  Q    And you gave Martinez -- Ms. Martinez permission to try to

4  accommodate him as much as possible, although he wasn't

5  available to start immediately, correct?

6  A    When I said to accommodate him, to -- as far as a time to

7  come fill out an application and do an interview, I would have

8  approved her overtime to work --

9  Q    I see.

10  A    -- additional hours.

11  Q    I see.  But he was also -- he also -- he did not start

12  work until nine days later, correct?

13  A    That's correct.

14  Q    And Acuna used profanity at the layoff meeting that you

15  attended, correct?

16  A    I don't recall.

17  Q    Okay.  And Acuna was a belligerent employee, wasn't he?

18  A    I -- there -- no.

19  Q    Well, Acuna was an argumentative employee, right?

20  A    In what context?

21  Q    Did you ever hear him argue -- have an argument with

22  anyone?

23  A    With an argument with anyone?  No.

24  Q    Okay.  You were present at the November 12th layoff

25  announcement.  Correct?

1   A    That's correct.

2   Q    And Mr. Hudgens was also there?

3   A    Yes.  Yes.  He was.

4   Q    And there was an employee who began to curse in reaction

5   to the layoff.  Correct?

6   A    There were several employees who began to curse.

7   Q    And there was one in particular who was using profanity.

8   Do you remember that?

9   A    No one in particular.  There were a few employees who were

10  using profanity.

11  Q    And do you -- did you observe Mr. Acuna being belligerent

12  at the layoff meeting?

13  A    He was upset about being laid off.

14  Q    Okay.  But you didn't consider that belligerent?

15  A    No.  I considered it being upset over losing his job.

16  Q    Okay.  And Mr. Murguia was upset about not being recalled.

17  Correct?

18  A    That is correct.

19  Q    And Mr. Murguia was never recalled to work.  Correct?

20  A    That is correct.

21  Q    Omar Ramos was also never recall.  Correct?

22  A    That's correct.

23       MS. ALONSO:  Your Honor, may I have a moment to mark

24  several exhibits?

25       JUDGE LAWS:  Sure.

```
 1        MR. MINER:  Your Honor, is it a good time for another

 2   break?

 3        JUDGE LAWS:  How close are we to being done?  I mean, I

 4   don't want to take time off the record every time --

 5        MS. ALONSO:  Yeah.

 6        JUDGE LAWS:  -- exhibits need to be marked,   but --

 7        MS. ALONSO:  And I don't think we need to, Your Honor.

 8        JUDGE LAWS:  Okay.

 9        MS. ALONSO:  I am -- I think I have just another -- just

10   this line of questioning and then another.  And we should be

11   able to wrap up quickly.

12        JUDGE LAWS:  Okay.

13        MS. ALONSO:  So --

14        JUDGE LAWS:  Why don't we -- unless somebody really

15   needs --

16        MS. ALONSO:  At least --

17        JUDGE LAWS:  -- a break, let's continue.

18        MS. ALONSO:  Right, at least --

19        MR. MINER:  You all right?

20        MS. ALONSO:  -- during your examination.

21        MR. MINER:  We're okay, Your Honor.

22        JUDGE LAWS:  Okay.

23        MR. GIANNOPOULOS:  I haven't -- I anticipate there will

24   be -- this isn't going to be a half-hour of questioning.

25        JUDGE LAWS:  This will be?
```

1     MR. GIANNOPOULOS:  This will not be --

2     JUDGE LAWS:  Okay.

3     MR. GIANNOPOULOS:  -- more than a half-hour, 45 --

4     JUDGE LAWS:  Okay.

5     MR. GIANNOPOULOS:  -- minutes of questioning.

6     JUDGE LAWS:  Okay.

7     MR. MINER:  Your Honor, I guess, if it is going to be

8  another half-hour, then I'd ask for a quick break.

9     THE WITNESS:  Yeah.  I would, too.

10     JUDGE LAWS:  You need one.  Okay.  Why don't  we --

11     THE WITNESS:  If it's going to be that long --

12     JUDGE LAWS:  Why don't we take a --

13     MR. GIANNOPOULOS:  Your Honor, before we go off the

14  record --

15     JUDGE LAWS:  Very quick.

16     MR. GIANNOPOULOS:  -- the government would ask that you

17  extend your sequestration order as allowed by the Supreme Court

18  in Perry v. Leek (phonetic), to prevent the witness from

19  discussing any testimony or her potential testimony during the

20  break with counsel.

21     And the Supreme Court in Perry v. Leek said a judge has

22  the power to maintain the status quo during a brief recess if

23  there is a virtual certainty that any conversation between the

24  witness and the lawyer would relate to the ongoing testimony.

25  In that case, the Petitioner claimed that he had a --

1    JUDGE LAWS:  Well, hang on.  Do you need to discuss

2  anything with her?

3    MR. MINER:  No.  I don't, Your Honor.

4    JUDGE LAWS:  Okay.  Then that's fine.  I will invoke that,

5  so --

6    THE WITNESS:  Okay.

7    JUDGE LAWS:  -- we're just going to take a quick break.

8  Don't discuss testimony with anybody.

9    THE WITNESS:  Okay.

10  (Off the record at 10:46 a.m.)

11  Q    BY MS. ALONSO:  All right.  Ms. Maxey, I'm going to hand

12  you a series of performance appraisals for Greenbrier

13  employees.  First is one for Jesus Nuno Lopez, marked General

14  Counsel's 221.

15    MS. ALONSO:  And Your Honor, for these, I'll ask for a

16  similar stipulation with counsel as I get them all passed out.

17    JUDGE LAWS:  Okay.

18  (Counsel confer)

19    JUDGE LAWS:  That's fine.  The next unrelated exhibit can

20  be 220.

21    MR. MINER:  Are we done with 67 and 68 for now?

22    MS. ALONSO:  Yes, now.  Okay.  General Counsel's 222 is a

23  performance appraisal of Rogelio Martinez.

24  (Counsel confer)

25    MS. ALONSO:  Okay.  General Counsel's 223 is a performance

1    appraisal of Carlos Contreras.

2    (Counsel confer)

3        MS. ALONSO:  Okay.  And then General Counsel's 220, I did

4    find.  It's a performance appraisal for Jesus Barnes.

5        MR. MINER:  Sorry.

6        MS. ALONSO:  And 224 is a performance appraisal for Brian

7    Perona.  225 is a performance appraisal of Brian Scaggs.  Your

8    Honor, I'd ask for a stipulation from counsel that appraisals

9    marked 220 through 225 are performance appraisals that were

10   produced in particular employees' personnel files.

11       MR. MINER:  Well, is General Counsel representing that

12   these are documents that were produced by Greenbrier in

13   response to subpoenas?

14       MS. ALONSO:  That's correct.

15       MR. MINER:  With that representation, then we will

16   stipulate to the authenticity of the documents, but not their

17   relevancy.

18       JUDGE LAWS:  Okay.  Then I will admit those documents

19   under the assumption that the relevancy will be established

20   through testimony and/or argument.

21   **(General Counsel Exhibit Number 220 through 225 Received into**

22   **Evidence)**

23       MS. ALONSO:  All right.  So I'm handing the witness what's

24   been marked as General Counsel's 222 through 225.

25   Q    BY MS. ALONSO:  And Ms. Maxey, I want to review these

1   performance appraisals with you.

2        JUDGE LAWS:  What about 220 and 221?

3        MS. ALONSO:  Yes.  It's 220 through 225.

4   Q    BY MS. ALONSO:  And Ms. Maxey, do you still have General

5   Counsel's 68 up --

6   A    I do not.  I'm sorry.

7        JUDGE LAWS:  No.  I've instructed that --

8        MS. ALONSO:  Okay.  All right.

9        JUDGE LAWS:  -- exhibits be taken away once you're

10  finished with them because we don't have anywhere to put paper

11  up here.

12       MS. ALONSO:  Okay.  I just need to locate that one for the

13  witness.  All right.

14  Q    BY MS. ALONSO:  So Ms. Maxey, I'm also going to give you a

15  copy of Gesus Omar Ramos's performance appraisal, marked as

16  General Counsel's 20 and then also General Counsel's 68, which

17  is the recall list.

18  A    Okay.

19  Q    Okay.  Referring to -- or beginning with 2084, which is

20  Omar Ramos's performance appraisal, I'd like you to turn to the

21  last page and note that the date -- and note that, on the human

22  resources line, your signature appears on the performance

23  appraisal.  Correct?

24  A    That's correct.

25  Q    And you signed this on September 25th of 2012.  Correct?

1   A    That's correct.

2   Q    Now, you -- so you had approved his performance appraisal

3   at the time.  Right?

4   A    That's correct.

5   Q    And under employee development, the strengths of Mr. Ramos

6   were that he puts out quality work and never says no to

7   anything asked of him.  Correct?

8   A    That's correct.

9   Q    And he did not have any issues with -- under -- I'll

10  rephrase.  Under the category of mutual respect on the first

11  page, Mr. Ramos received a three.  Correct?

12  A    That's correct.

13  Q    And that is the highest ranking that an employee can

14  receive in that category.  Correct?

15  A    That's correct.

16  Q    And some of the comments were that, "He gets along well

17  and respects everyone."  Correct?

18  A    That's correct.

19  Q    And everyone meant everyone at Greenbrier in Tucson.

20  Correct?

21  A    I don't know.  I didn't complete the review.

22  Q    But you did approve it.  Correct?

23  A    That's correct.

24  Q    Now, on the second page, in the category -- in category

25  eight, quality of work, Mr. Ramos is given a six, a total of

1    six points.  And that is the highest amount of points that an

2    employee could earn in his category.  Correct?

3    A    That's correct.

4    Q    And it was noted in the comments that, "He puts out good

5    quality work," exclamation point.  Right?

6    A    That's correct.

7    Q    And under -- in the category below, productivity, Mr.

8    Ramos also received a four.  Correct?

9    A    That's correct.

10   Q    And his total score, the total score on his performance

11   appraisal -- approximately two months before the layoff was the

12   28th.  Correct?

13   A    That's correct.

14   Q    Now, I want to refer you to General Counsel's 220.  Okay.

15   And alongside that, will you keep General Counsel's 68 in front

16   of you?  So 220 is Jesus Barnes.  Do you have that?

17   A    Yes.  I do.

18   Q    Okay.  Now, Jesus Barnes was rehired on March 12th.

19   Correct?

20   A    Yes.

21   Q    Okay.  And Jesus Barnes had received a 20 on his

22   performance appraisal.  Correct?

23   A    That's correct.

24   Q    As a total score?  And in opportunities for development,

25   it had been noticed that -- or noted that, "He has a lot more

1    procedures to learn, needs to learn, work orders."  Correct?

2    A    That is correct.

3    Q    And in additional -- in the category -- or in the space

4    right below that, there's a title, Additional Opportunities for

5    Development, "Learn MIs and work orders."  Do you know what MIs

6    are?

7    A    They're maintenance instructions.

8    Q    Okay.  And that is what MI is referring to.  Correct?

9    A    That's correct.

10   Q    Great.  You can set that aside.  Now, I want you to -- I'd

11   like for you to refer to General Counsel's 221.  And this is

12   the performance appraisal of Jesus Nuno Lopez on October --

13   signed by his leader on October 26th of 2012.  And his senior

14   leader -- well, let me ask you this.  Do you recognize who

15   signed -- or whose signature that is on his leader?

16   A    Yes.  I do.

17   Q    Is that Hector Rojas?

18   A    That is.

19   Q    And the senior leader was Freddy Valdez.  Correct?

20   A    That's correct.

21   Q    And in days before the layoff, Mr. Nuno Lopez was given a

22   score of 24 points on his performance appraisal.  Correct?

23   A    That's correct.

24   Q    And under competency to develop, under the competency to

25   develop title, there's a comment that, "Jesus needs to learn

1  how to weld so he can become a welder."  Correct?

2  A    Yes.

3  Q    Okay.  But Mr. Jesus Nuno Lopez was rehired on March 13th

4  of 2013.  Correct?

5  A    That's correct.

6       JUDGE LAWS:  And I just have a question about his

7  performance appraisal.

8       THE WITNESS:  Sure.

9       JUDGE LAWS:  What is the job title there.

10      THE WITNESS:  He says he was a switchman at the time.

11      JUDGE LAWS:  Thank you.  I just couldn't make out the

12  writing.

13  Q    BY MS. ALONSO:  Was he rehired as a welder or a switchman?

14  A    I'm not sure.  I'd have to go back and look at my system.

15  Q    Do you remember having to recall switchmen?

16  A    I do believe that we did, at one point, recall a switchman

17  or two.

18  Q    And Hector Federico became the switchman on the recall,

19  didn't he?

20  A    Again, I'd have to go back and look in our system what

21  they were rehired as.

22  Q    All right.  I would like you to refer to General Counsel's

23  222.

24  A    Okay.

25  Q    And this is a performance appraisal of Rogelio Martinez.

1  He was -- or Rogelio Martinez was recalled to work on April

2  15th.  Correct?

3  A    That is correct.

4  Q    And he received a lower score than Mr. Ramos.  Correct, on

5  his performance appraisal?

6  A    In July of 2012, yes.

7  Q    Okay.  In July of 2012, you approved the performance

8  appraisal where he received 24 points.  Correct?

9  A    That is correct.

10  Q    I'd like to refer you to General Counsel's 223.  This is a

11  performance appraisal of Carlos Contreras.  And he was a welder

12  at the time of his appraisal.  Correct?

13  A    That is correct.

14  Q    And in his performance appraisal, he received a score of

15  27 points.  Correct?

16  A    That's correct.

17  Q    And he received this performance appraisal in July of

18  2012.  Correct?

19  A    That's correct.

20  Q    And Mr. Contreras was the first employee recalled to

21  Greenbrier.  Correct?

22  A    Yes.

23  Q    All right.  I'd like you to refer to General Counsel's

24  224.  And Brian Perona was an employee recalled on April 1st.

25  Correct?

1   A    Yes.

2   Q    Okay.  And his score was also lower than Omar Ramos.

3   Correct?

4   A    Yeah, 27.

5   Q    Yes.  And Mr. Brian Perona received 27 points in his

6   appraisal that you signed off on in June of 2012.  Correct?

7   A    That's correct.

8   Q    And Mr. Perona was rehired as a welder.  Correct?

9   A    Yes.

10  Q    All right.  I'd like to refer you to General Counsel's

11  225.  This is a performance appraisal for Brian Scaggs that was

12  filled out, that was signed by the employee in October of 2012,

13  but it's signed by Freddy Valdez.  Is that -- well, let me ask

14  you, in the senior leader block, is that Freddy Valdez's

15  signature?

16  A    That is.

17  Q    Okay.  And he signed it in August of 2012.  Do you know

18  why there was a difference in dates?

19  A    Not sure.  I'd have to go back and look at my records.

20  Q    Right.  In the comments of Mr. -- in the comments on the

21  third page of Mr. Scaggs's performance appraisal, it indicates

22  that, "Brian's job performance will be reevaluated in 90 days.

23  Brian will need to show a significant size of improvement or he

24  will be moved to a different job."  Correct?

25  A    That's correct.

1    Q    And the total points that Mr. Scaggs received was 18 on

2    this particular performance appraisal.  Correct?

3    A    I believe it's 22.  I believe that's what -- or I'd have

4    to go through and add them up, but that may be just --

5    Q    Okay.  We can do that now.  The 18 is circled.

6    A    Okay.  Let me --

7         JUDGE LAWS:  It looks like there's a self-one and the

8    leader one.

9         THE WITNESS:  Yeah.  Okay.  Okay.  So this is --

10   Q    BY MS. ALONSO:  And there were issues with Mr. Scaggs in

11   dealing with Greenbrier's customers.  Correct?

12   A    At the time, he was in write-up, which is a very customer-

13   focused position.  He's an estimator, so he would deal

14   frequently with customers.

15   Q    Okay.  And he upset Union Pacific.  Correct?

16   A    I don't know.

17   Q    His performance appraisal, under category eight, customer

18   focus, the third line indicates, "Union Pacific upset due to

19   inaccurate estimates and excessive revisions."  Correct?

20   A    Yes.

21   Q    And isn't it true that, in July of 2012, Mr. Scaggs was

22   also a welder?

23   A    I would have to go back and look at his record.

24        JUDGE LAWS:  Do you know what positions he held, if any,

25   other than the write up?

1    THE WITNESS:  He was a welder for some time and then we

2  gave him an opportunity to do write-up.  And I don't think he

3  did very well on that.  Then we moved him back.

4  Q    BY MS. ALONSO:  In November of 2012, he was a writer.

5  Correct?  Sorry.  I'll rephrase.  In November of 2012, Mr.

6  Scaggs was a welder.  Correct?

7  A    I believe he was, yes.

8    MS. ALONSO:  Okay.  Okay.  And Your Honor, we are seeking

9  a stipulation from counsel as to the disciplinary correction

10  action forms from Mr. Brian Scaggs's personnel file that were

11  produced pursuant to subpoena.  And it's a three-page document

12  numbered 2C226.  And the job title of these three documents

13  indicate that Mr. Scaggs is a welder.

14    MR. MINER:  So these are documents that we produced to you

15  in response to the General Counsel's subpoena?

16    MS. ALONSO:  That's right.  They were in his personnel

17  file.

18    MR. MINER:  Okay.  So we will stipulate to the

19  authenticity of the documents, but not their relevance, Your

20  Honor.

21    JUDGE LAWS:  Okay.

22    MS. ALONSO:  And Your Honor, if you want to take a look at

23  them, but we will make copies during -- well, we'd have to make

24  copies.

25    JUDGE LAWS:  Are you going to question this witness on the

1   document?

2       MS. ALONSO:  No, Your Honor.

3       JUDGE LAWS:  Okay.  We can hold off, then.

4       MS. ALONSO:  Okay.

5   Q   BY MS. ALONSO:  And Ms. Maxey, I'll go ahead and take

6   those exhibits from you.

7       THE MONITOR:  You have one of my documents there, so --

8       MS. ALONSO:  And just a moment, Your Honor.  I'm searching

9   for the witness's exhibit so I can continue it.

10  Q   BY MS. ALONSO:  All right.  Ms. Maxey, handing you General

11  Counsel's 206, we started reviewing these e-mails yesterday.

12  A   Okay.

13  Q   There's a binder clip on the top, so if you need to, just

14  -- all right.  Ms. Maxey, can you turn to page 12 of the e-

15  mail, of the document, of General Counsel's 206?  Just look up

16  when you're done.

17  A   Okay.

18  Q   And I want to refer you to an e-mail that you sent on

19  March 7, at 5:45 a.m. on the subject of "Rehires from the

20  Layoff".

21  A   Okay.

22  Q   Now, you're responding to an e-mail from Christine

23  Martinez below.  And Christine Martinez has asked you how to

24  proceed with these gentlemen.  And by these gentlemen, she's

25  referring to the employees from the layoff.  Correct?

1   A    To our next round of rehires, is what she's referring to.

2   Q    Okay.  And she asked if she needed to set up interviews

3   with them.  Right?

4   A    That's correct.

5   Q    Okay.  And so you instruct her to sit with them first?

6   A    Yes.

7   Q    Okay.  What was the purpose of Ms. Martinez sitting with

8   these particular employees?

9   A    We had done that in the previous round in February as

10  well.  She sat with them while they completed the applications,

11  answered any questions they might have about coming back to the

12  company.

13  Q    Why did you feel it was important for Ms. Martinez to sit

14  with these employees?

15  A    She didn't sit with all of them.  Some employees chose to

16  take the application home, and complete it at home, and then

17  bring it back.  But then she did -- and most of my HR

18  generalists do this -- sit with any applicant to answer

19  questions, tell them about what the expectation is, what kind

20  of -- where they'd be working, and things like that.

21  Q    But these individuals had worked for Greenbrier just a

22  couple months before.  Correct?

23  A    That's correct.

24  Q    What kind of questions did you think these employees would

25  have without Greenbrier?

1   A    A lot of the employees had questions regarding their

2   seniority, how benefits would be reinstated, about attendance

3   points when they came back, about -- I'm trying to think --

4   even things about where they would be working if it was the

5   same area, because we had eliminated shops where they would be

6   working, front shop, center shop.

7   Q    What was the policy regarding attendance points for the

8   employees who were rehired?

9   A    They start back at zero.

10  Q    Okay.  Let's turn to the next page.  And this is an e-mail

11  from Christine Martinez to you on the subject of five

12  returnees.

13  A    Uh-huh.

14  Q    And here, Ms. Martinez is explaining to you that she's

15  going to document her discussions with Cesar and Freddy in her

16  log.  Correct?

17  A    That's correct.

18  Q    And this is the log that we reviewed earlier.  Correct?

19  A    That's correct.

20  Q    Was there any other log that was created?

21  A    No.

22  Q    How often were you reviewing that log?

23  A    She would send it to me about once a week or whenever I

24  asked to see an update.

25  Q    Okay.  Did you make any edits to the log?

1    A    Sometimes, I asked her to clarify items that weren't

2    clear.

3    Q    Subsequent to them occurring.  Correct?

4    A    That's correct.

5    Q    What are some of the revisions you asked her to make in

6    the log?

7    A    If there was anything that was unclear or grammatically

8    incorrect, I asked her to please correct it.

9    Q    What did you find to be unclear in her log?

10   A    Sometimes, if she was missing a date or time of when she

11   spoke to an employee, sometimes, if it was sometimes just the

12   chronology of how she had done things, I would go back and say,

13   "Well, did this occur on the 25th or the 27th?"  And we would

14   discuss that and make sure that it was accurate.

15   Q    Did you ask her to elaborate on any subjects that she had

16   included in her log?

17   A    If it needed elaboration.

18   Q    Like employee behavior, demeanor?

19   A    Exactly, so -- yes.

20   Q    And what did you -- aside from the e-mail we're looking

21   at, did you give her any other direction in keeping this log?

22   A    I would give her feedback on the log when she gave it to

23   me.

24   Q    And by the time you instructed Ms. Martinez to create the

25   log, you knew that the sheet metalworkers had filed a union

1    representation petition.   Correct?

2    A    Yes.   They did so in November.

3    Q    And did you inform Ms. Martinez that a representation

4    petition had been filed?

5    A    She was aware.

6    Q    Okay.   You informed her?

7    A    Yes.

8    Q    Okay.   What did you tell her?

9    A    I actually told her about it during her interview process

10   because she was hired in December.

11   Q    Tell me -- is that -- are you done?

12   A    Uh-huh.

13   Q    Okay.   Tell me, the best that you can remember, what you

14   said to her at the time that you brought up the petition in her

15   interview.

16   A    All I told her was that we had, had a petition filed, that

17   we hadn't had any union activity beyond that petition because,

18   at the time, we had not, and that we were seeing some

19   improvements in the shop, and as far as production and

20   profitability.   And that's why she was being brought on board

21   at that time.

22   Q    And did you believe there were problems that had existed

23   with productivity because of the union?

24   A    No.

25   Q    Okay.   How is it that -- or why did it matter that she be

1    informed of the representation petition at the time of her

2    interview?

3    A    So she was aware of the situation in the shop as a whole.

4    Q    What was the situation in the shop?

5    A    That we had, had a layoff recently, that we had

6    restructured the shop.   That was part of the conversation.

7    Q    Now, between February 1st of 2013 and the end of May 2013,

8    Greenbrier also hired new employees in Tucson along with the

9    rehires.   Right?

10   A    That's correct.

11   Q    And how many new employees were hired?

12   A    I would have to go back and look at the record.

13   Q    And General Counsel's 67 and only -- I'll actually show

14   you General Counsel's 67 once again.   General Counsel's 67 only

15   contains rehire -- or information related to the rehire

16   employees.   Correct?

17   A    That's correct.

18   Q    Was Christine Martinez creating a separate log for new

19   employees?

20   A    Not to my knowledge.

21   Q    Did you train Ms. Martinez on how to deal or address

22   unions?

23   A    Not me, no.

24   Q    Do you know if anyone did?

25   A    I believe she was trained with Mr. Lave, Siemens

1   (phonetic), our other supervisors.

2   Q    But you weren't present when --

3   A    No.

4   Q    -- she was trained?

5   A    I was not.

6   Q    Did you have any other discussions with Ms. Martinez on

7   the topic of unions?

8   A    In a general broad context?  Is that what you're --

9   A    No.

10   Q    Or in any context?

11   A    When there was instances of the union handing out

12   information at the shop, we would discuss that.

13   Q    Okay.  Would she report that activity to you?

14   A    Yes.  She would.

15   Q    Did you instruct her to report that activity to you?

16   A    Yes.  I did.

17   Q    Okay.  Did you -- what were your instructions to her that

18   you remember?

19   A    If she saw people, if she was entering or exiting, you

20   know, the property when she was there and just --

21   Q    So she was instructed to report union activity.  Correct?

22   A    Just when union members were there handing out information

23   to all the employees.

24   Q    And some of those union members handing out information at

25   the gate of Tucson were former Greenbrier employees.  Correct?

1   A    I'm not sure.  She didn't provide specific names.

2   Q    Okay.  What did you -- and she did in fact report that

3   there were union members at the gate.  Correct?

4   A    That's correct.

5   Q    And that was on the phone?

6   A    Yeah.

7   Q    Okay.  Were there any e-mails?

8   A    I can't recall.

9   Q    Okay.  And what did you ask her when she reported these

10  instances to you?

11  A    I didn't ask her anything.

12  Q    You just listened?

13  A    "Thanks for letting me know."

14  Q    Okay.  And what did you do with that information?

15  A    It's general information to be aware of what was going on

16  in the shop.

17  Q    Okay.  Did you share that with Al Lave?

18  A    Yes.

19  Q    Okay.  What would you -- what did you tell Mr. Lave the

20  first time that Christine Martinez reported union members at

21  the Greenbrier facility?

22  A    That there were union members at the Greenbrier facility.

23  Q    What did he ask you?

24  A    He didn't ask me any questions.

25  Q    He didn't ask any questions about what you had reported to

1   him?

2   A    I don't recall, but --

3   Q    Did you look into the number of members who were at

4   Greenbrier?

5   A    No.

6   Q    Okay.  All right.  Let's turn to General Counsel's Exhibit

7   206, page 14.  Okay.  This is another e-mail from Christine

8   Martinez to you on the subject of an update with attachments of

9   "Tucson Rehires".  And is this an e-mail where Ms. Martinez is

10  sending you the log attached -- the log, which is marked as

11  General Counsel's 67?

12  A    That's correct.

13  Q    And she's asking if it was specific enough.  How specific

14  did you want the log?

15  A    Very specific.

16  Q    Okay.  Was there -- were there any particular areas you

17  wanted more specificity in?

18  A    I wanted to make sure that we were specific with names,

19  dates, times, where, and phone numbers, the facts.

20  Q    Why were names, dates, and times important to you?

21  A    For accuracy in her recordkeeping.

22  Q    Was the log specific enough for you?

23  A    I don't know.

24  Q    Did anybody else review that log?

25  A    It was sent to Al Lave on occasion.

1    Q    And would you transmit that by e-mail?

2    A    Yes.

3    Q    And did he ever instruct you to ask Christine Martinez for

4    revisions?

5    A    If he had a question, if something was unclear in the log.

6    Q    And he did in fact did that.  Correct?

7    A    Yes.  He did.

8    Q    Do you remember on what particular instances he instructed

9    you to have Christine Martinez revise the log?

10   A    I don't remember.

11   Q    Did you ever discuss the log with Al Lave?

12   A    Yes.  I did.

13   Q    When?

14   A    I don't recall.

15   Q    Okay.  When was it in relation to the time that the log --

16   you started to keep the log?

17   A    We discussed it on occasion while the log was being

18   updated.

19   Q    And these were ongoing conversations?

20   A    Yes.

21   Q    What do you remember discussing with Mr. Lave about the

22   log?

23   A    We discussed who had been recalled, dates and times of

24   various employees starting.  We would discuss if there was

25   anything that was unclear or confusing or that he was confused

1    about.

2    Q    Okay.  What instances did he indicate that he was confused

3    about?

4    A    I don't recall.

5    Q    Did you discuss the individual employees on the log?

6    A    If he had questions about them, yes.

7    Q    Do you remember who he had questions about?

8    A    I don't recall.

9    Q    Okay.  Did he have questions about Omar Ramos?

10   A    He may have.  I don't remember.

11   Q    Did you discuss any of these instances set forth in the

12   log?

13   A    Yes.  We did.

14   Q    Okay.  Which ones?

15   A    May I look at it?

16   Q    Sure.

17   A    I believe we discussed Mr. Chavira's instance, Mr.

18   Murguia's instance.  That's what I can recall.

19   Q    All right.  Now, without looking at this --

20   A    Uh-huh.

21   Q    -- I want you to tell me what conversation you had with

22   Mr. Lave about Mr. Chavira's instance.

23   A    We just reviewed the instance of him going to the shop and

24   Al asked me some questions to make sure that he had a good

25   understanding of it.  And then that was it.

1   Q    What questions did Mr. Lave ask you?

2   A    He just asked me, "So he showed up without announcement?"

3   Yes.

4   Q    Without what?

5   A    Without being invited to the shop, yes.  You know, we just

6   reviewed the instance.

7   Q    And there were other employees who showed up without

8   invitation to ask for an application.  Correct?

9   A    That's correct.

10  Q    What made Mr. Chavira's incident different?

11       JUDGE LAWS:  And again, do it without looking, please --

12       THE WITNESS:  Sorry.

13       JUDGE LAWS:  -- first.  If she wants you to -- why don't

14  we put the document aside?

15       THE WITNESS:  Okay.

16       JUDGE LAWS:  If she wants to refer to it, she --

17       THE WITNESS:  Because Mr. Chavira had been, if I recall

18  correctly, offered a position and not accepted it.  And so that

19  was unusual because most of the employees were accepting the

20  positions that we were offering back, so we just discussed that

21  situation.

22  Q    BY MS. ALONSO:  What about Mr. Murguia?  What discussion

23  did you have with Al Lave about Mr. Murguia?

24  A    We discussed that Mr. Murguia was not following the rehire

25  process.

1    Q    Okay.  What exactly do you remember being said in that

2    conversation?

3    A    I told Mr. Lave that Mr. Murguia had not filled out an

4    employment application and that Mr. Lave stressed that he would

5    need to fill out an employment application in order to be

6    considered for rehire.

7    Q    Was anything else discussed about Mr. Murguia?

8    A    We did discuss his behavior that he had exhibited toward

9    Eric Valenzuela and towards Chris Martinez.

10   Q    What did you tell Mr. Lave in that conversation about Mr.

11   Murguia's behavior?

12   A    That what was being told to me was that he was angry and

13   aggressive when dealing with Mr. Valenzuela and Ms. Martinez.

14   Q    And did you and Mr. Lave conference call either Eric or

15   Chris Martinez to ask them what had happened?

16   A    I don't know if he did.

17   Q    When you were present, though?

18   A    No.

19   Q    Okay.  And did you?

20   A    I had already discussed the instance with Mr. Valenzuela

21   and with Ms. Martinez.

22   Q    And did you ask them to create personal statements as to

23   their interaction with Mr. Murguia?

24   A    Yes.  I did.

25   Q    Okay.  And did you review those?

1   A    Yes.  They e-mailed me, so I was able to have a record of

2   that.

3   Q    Who e-mailed you?

4   A    Mr. Valenzuela and Ms. Martinez.

5   Q    But aside from an e-mail, you didn't ask them to write a

6   statement describing their interaction with him?

7   A    No.

8   Q    Okay.  And did Mr. Lave ask you anything about Mr. Murguia

9   when you reported that to him?

10  A    I don't recall.

11  Q    Okay.  Did he ask you to follow up --

12  A    In what regard?

13  Q    -- with Mr. Murguia?

14  A    No.  He did not.

15  Q    Okay.  All right.  I'd like to refer you to General

16  Counsel's 206, page 15.  All right.  And beginning at the lower

17  e-mail from Christine Martinez to you, dated March 8th on the

18  subject of rehires, I want to ask you some questions about this

19  e-mail.

20  A    Sure.

21  Q    Jesus -- Christine Martinez is writing to you about Jesus

22  Barnes and Jose Sepulveda, who have accepted -- or who had at

23  the time accepted to return to Greenbrier.  Correct?

24  A    That's correct.

25  Q    And you responded that there were no issues with either of

1  them.  Or you responded by asking if there were no issues with

2  either of them in the interview process.  Correct?

3  A    That's correct.

4  Q    What issues were you referring to?

5  A    I don't recall.

6  Q    What would you consider an issue in the interview process?

7  A    If they had failed to complete the application, if their

8  interviews went poorly with Eric.

9  Q    What would you consider an interview going poorly to be?

10 A    If Eric chose not to offer a position to someone, I would

11 assume that his interview went poorly.

12 Q    But what conduct or what in the interview would you have

13 considered to be poor?

14 A    You'd have to ask Mr. Valenzuela.  I didn't actually

15 interview anyone.

16 Q    And you responded in the e-mail at the very top to --

17 sorry.  And this is -- I'm sorry.  I'll rephrase.  So Ms.

18 Martinez responds to you that, at all times, they are both very

19 appreciative and respectful.  Correct?

20 A    That's correct.

21 Q    And isn't it true that you were using the interview

22 process for your laid-off employees to screen out the

23 troublemakers?

24 A    No.

25 Q    Okay.  Then why was she reporting to you that they were

1  appreciative and respectful?

2  A    That they were appreciative and respectful.

3  Q    And individuals who are appreciative and respectful are

4  not troublemakers.  Correct?

5  A    No.

6  Q    Was Eric instructed to bring up the topic of the union

7  during his interviews, during his interview of the rehires?

8  A    I don't believe I gave Eric any instructions on what to

9  ask in interviews.

10  Q    Do you know if he ever did so?

11  A    I don't know.

12  Q    What instructions did you give Eric instructions to follow

13  in his interview of the rehires?

14  A    I let the managers decide what they're going to ask in the

15  interviews.

16  Q    All right.  I'd like you to turn to page 17 of General

17  Counsel's 206.  And at the bottom of the e-mail chain, Chris

18  Martinez writes to you on March 6th -- excuse me, March 11th,

19  and one of her -- her second to last sentence is that, "He

20  already knows that he's going to tell him we are only hiring

21  welders."  So at the time, in March of 2013, you were only

22  hiring welders.  Correct?

23  A    I believe so.

24  Q    Okay.  Let's turn to the next page, page 18 of General

25  Counsel's 206.  And here, Chris Martinez has sent you an e-mail

1   on the subject of another former employee, dated March 15th of

2   2013.  Is this the incident with Guillermo Murguia that you

3   asked her to document?

4   A    I don't recall.

5   Q    And this e-mail relates to Guillermo Murguia.  Correct?

6   A    I believe so.  Yes.

7   Q    All right.  Now, I want you to turn to General Counsel's

8   -- page 19 of the same exhibit.  And in the March 18th e-mail,

9   Freddy Valdez writes to you about an encounter he has had with

10  Mr. Murguia.  Correct?

11  A    That's correct.

12  Q    And Mr. Murguia tried to talk to his colleagues while he

13  was laid off.  Correct?

14  A    That is, while he was not an employee.  That's correct.

15  Q    Right.  And you didn't want the laid-off workers talking

16  to your current employees, did you?

17  A    No.

18  Q    Why?

19  A    That's not correct.

20  Q    Well, what incident occurred?

21  A    The incident that had occurred was, Mr. Murguia came onto

22  the property and was walking from the parking lot into the

23  front shop during work hours.

24  Q    And how do you define the property?

25  A    The Tucson property.

1    Q      Is that everything?

2    A      I'm not sure on the specifics of our property lines.  I'm

3    so sorry.

4    Q      Well, does your definition include the parking lot?

5    A      Yes.  Yes.

6    Q      All right.  Let's turn to General Counsel's -- page 20 of

7    the same exhibit.  And this is another e-mail on the topic of -

8    - or on Mr. Murguia.  Correct?

9    A      That's correct.

10   Q      And again, Mr. Murguia really wanted to get back to work.

11   Correct?

12   A      He did come to the shop several times asking for work, but

13   he never filled out an application.

14   Q      Okay.  Let's turn to General Counsel's 22 and skip over

15   the --

16          JUDGE LAWS:  We're still on the same exhibit.

17          MS. ALONSO:  Sorry.  Page 22.

18   Q      BY MS. ALONSO:  Okay.  And beginning with the e-mail on

19   March 21st, Christine Martinez writes to you about rehiring a

20   couple of these workers.  And she has notified you that Brian

21   accepted his position.  And at this time, you were still at --

22   by March 21st, you needed to fill two positions.  Correct?

23   A      I'm not sure of the exact number.

24   Q      And she asked you in the e-mail, "Do you want me to call

25   one of the other guys from the list for our discussion to be

1   able to count for two in March.

2   A    Based on this, I would have -- she would have been able,

3   saying for two more in March, so yes.

4   Q    Okay.  And you asked how his attitude and demeanor --

5   about his attitude and demeanor.  Correct?

6   A    That's correct.

7   Q    Why was that important, attitude and demeanor, if he had

8   previously worked for you?

9   A    The reason I asked that was because Mr. Perona, in our

10  lay-off meeting, had become extremely upset, was one of the

11  individuals who'd become extremely upset during the layoff

12  meeting.  So I just inquired to see, you know -- to make -- to

13  see if he was still upset.

14  Q    You wanted to know about the attitude and demeanor of

15  every single employee who was being rehired, correct?

16  A    Not in specific.  I asked about certain employees --

17  Q    Okay.

18  A    -- to Ms. Martinez.

19  Q    Which employees?

20  A    Well, Mr. Perona.

21  Q    Who else?

22  A    I don't recall.

23  Q    Okay.  And she -- well, actually, Eric Valenzuela

24  responded that he was very calm and nice.  That's what you

25  wanted, people who -- right, people who were calm and nice?

1    A    It wasn't what I wanted.  Eric makes the hiring decisions.

2    Q    Okay.  And you approved that?

3    A    Yes.

4    Q    You didn't want people with negative attitudes, right?

5    A    I don't think that's the right -- I'm confused on your

6    phrasing.  I'm sorry.

7    Q    Okay.  Well, did you want employees with negative

8    attitudes to work at Greenbrier?

9    A    Define what you mean by negative attitudes.

10   Q    Can you define what you think is a negative attitude?

11   A    I can.

12   Q    Okay.  Please do.

13        JUDGE LAWS:  Describe what it means to you.

14        THE WITNESS:  Okay.  So for -- you know, a negative

15   attitude would be someone who is aggressive, who can't follow

16   instructions during the rehire process, who seem to have some

17   sort of chip on their shoulder about -- and aren't, you know,

18   willing to accept the terms and conditions of their employment

19   as we were offering them upon the rehire.

20   Q    BY MS. ALONSO:  What do you mean by chip?  I want you to

21   define what you believe to be a chip on someone's shoulder.

22   A    I think some employees felt -- or some laid off employees

23   had questions about their seniority, their benefits being

24   reinstated, and other items.  Some people -- and also, Eric --

25   from my understanding, Eric would lay out things like his

1  expectations for performance and attendance in the interview

2  process.  If he felt that the person wasn't wanting to comply

3  with that, then he wouldn't offer them a position.

4  Q    And you did not want employees who were questioning the

5  terms and conditions that you were offering at Greenbrier,

6  right?

7  A    Again, Eric was the one that made the offers.  I wasn't in

8  the --

9  Q    Yeah.  But what was your preference?

10  A    My personal preference --

11  Q    Yeah.

12  A    -- was that -- you know, that we have the best workforce

13  possible.

14  Q    Okay.  And you personally did not want employees who were

15  questioning the terms and conditions that were offered by

16  Greenbrier, correct?

17  A    In all my shops, any employee who doesn't want to accept

18  the terms and conditions that we're offering as a company as

19  part of their employment we simply just don't offer positions

20  to.

21  Q    And that's because they could be problematic, correct?

22  A    We have a standard set of rules, regulations, policies.

23  If they're not willing to comply with those from the get-go,

24  then there's no point in hiring them.

25  Q    And you would consider those types of employees to be

1  disruptive, correct?

2  A    We don't consider them to be employees, because we don't

3  offer them positions.

4  Q    Well, employees who do work for Greenbrier and --

5  A    Uh-huh.

6  Q    -- question their terms and conditions of employment, you

7  consider them disruptive, right?

8  A    Not necessarily.

9  Q    Would you consider them troublemakers?

10  A    No.

11  Q    Okay.  What would consider those employees?

12  A    If an employee has a question on a policy or procedure, we

13  do our best to educate them as to why that policy or procedure

14  exists.  Sometimes we do review the policy and procedure and

15  just provide a little more education to those employees.  It's

16  not always a negative experience.

17  Q    Okay.  And if they still don't agree with it, they would

18  have a negative attitude, right?

19  A    Not necessarily.

20  Q    Okay.  Some employees thought they were laid off because

21  of the Union, right?

22  A    Yes.

23  Q    In the rehiring process, were you trying to figure out

24  which of the employees believed they had been laid off because

25  of the Union?

1   A     No.

2   Q     So you were just keeping details notes for other reasons?

3   A     Yes.

4   Q     And you were keeping notes about their demeanor and

5   attitude.  Correct?

6   A     Yes.

7   Q     Now, let's go ahead and turn to page 25 of General

8   Counsel's 206.  And these are -- page 25 consists of e-mails --

9   an e-mail from Christine Martinez on March 25th to you on the

10  subject of Omar Ramos.

11        And towards the middle of the paragraph, there is a

12  sentence that begins with, "When I," -- so when I -- and she

13  writes to you that, "When I informed him that he needed to

14  complete it before he could be interviewed, he got upset and

15  stated, 'As far as I am concerned, you cannot hire anyone until

16  you bring us back that were let go.'  I responded, 'There is a

17  process for possible opportunity to return.'"  What was the

18  process?  And do you know what process she explained to Mr.

19  Ramos?

20  A     She explained to him our rehire process.

21  Q     And the statement that Chris Martinez quotes to you -- is

22  that what you consider to be questioning terms and conditions

23  of employment offered by Greenbrier?

24  A     I consider it not following a process that he was asked to

25  follow.

1  Q    Is that someone with an attitude?

2  A    In Ms. Martinez's opinion.

3  Q    Okay.  And in your opinion, is it?

4  A    My opinion was that it didn't seem like he wanted to

5  follow instructions.

6  Q    Okay.  And in your opinion, did he have a poor demeanor?

7  A    In my opinion, he had the demeanor -- not the demeanor of

8  someone I would like to see in an applicant.

9  Q    All right.  Now, in the e-mail at the very top, this is

10  from Al Lave to you and Eric Valenzuela is included, sent on

11  March 25th.  And Mr. Lave has written, "Please double-check

12  with Freddy on his interaction with Omar."  Did you in fact

13  follow up with Freddy?

14  A    I did.

15  Q    Okay.  And when did you follow up with Freddy?

16  A    I'm not sure.

17  Q    Okay.  What did you tell Freddy when you followed up with

18  him?

19  A    I didn't tell him anything.

20  Q    Well, let me ask you this.  How did you communicate with

21  Freddy?  Was it in person or was it on the phone?

22  A    It was on the phone.

23  Q    Okay.  And tell me how you began the conversation.

24  A    I explained to him that Mr. Ramos had stated to Chris that

25  him, Freddy, had offered him a job.  I asked Freddy if that was

1    true.

2    Q    Okay. And what was his response?

3    A    Freddy told me that, no, he had not offered Omar a job.

4    Q    Okay.  What else did you ask?

5    A    I had asked him if he had talked to Omar at all.

6    Q    Did he?

7    A    Yes.  He had.

8    Q    What was said next?

9    A    Mr. Valdez told me that, yes, he had talked to Omar and

10   that he had instructed Omar to go fill out an application if he

11   wanted to be considered for rehire.

12   Q    And what was said next?

13   A    That's all I recall discussing with him.

14   Q    What did you report back to Mr. Lave?

15   A    That is what I reported back to Mr. Lave, our

16   conversation.

17   Q    Okay.  And did you expect all the applicants for rehire to

18   be grateful that the company was giving them a chance to apply

19   for their old jobs?

20   A    No.

21   Q    On page 26 of General Counsel's 206, Rogelio Martinez was

22   offered a job and that's what the e-mails on this page

23   reference.  Correct?

24   A    That's correct.

25   Q    And Omar wasn't hired, but Rogelio was hired as a welder.

1   Correct?

2   A    That is correct.

3   Q    Okay.  And Omar was also seeking a position as a welder.

4   Correct?

5   A    Yes.

6   Q    Okay.  Turn to page 27.  And on page 27, Chris Martinez

7   sends an e-mail to you on March 26th, asking if you've met your

8   hiring goal for March.  What was the hiring goal for March?

9   A    I don't recall the number.

10   Q    And is it the end of March and she's still unsure if it's

11   been met.  Correct?

12   A    I don't believe she is asking a question there.  She's

13   stating that we will meet our hiring goal.

14   Q    All right.  Let's turn to page 29.  And here, Ms. Martinez

15   has written another e-mail to you dated March 28th on the

16   subject of Juan Morales.

17   A    That's correct.

18   Q    And she ends the e-mail, writing to you that or

19   indicating, writing, "So we are minus one for March."  You were

20   minus one, but Omar and Murguia are still available for rehire.

21   Correct?

22   A    This is in regard to Juan Morales.  Juan Morales was a

23   painter, not a welder.

24   Q    Okay.  So you were minus one hire for March.  Correct?

25   A    As an overall number.  Correct.

1    Q    Okay.  And what was the overall number?

2    A    I don't recall.

3    Q    Okay.  And you still had a welder position available in

4    March.  Correct?

5    A    I believe the one hire was for Juan Morales's painter

6    position, according to this e-mail.

7    Q    Were there any openings for welders in April?

8    A    I believe so.

9    Q    Okay.  Let's turn to page 30.  Okay.  Brian Scaggs was

10   brought back as a welder.  Correct?

11   A    That's correct.

12   Q    Juan Morales -- was he also brought back as a welder?

13   A    He's a painter.

14   Q    And what about Brian Perona?

15   A    He is a welder.

16   Q    Turn to page 31.  And here, Christine Martinez sent you an

17   e-mail on March 26th on the subject of Juan Morales.  Ms.

18   Martinez informed you that Juan Morales was convicted of a DUI

19   about 10 years ago.  Juan Morales was hired even though he had

20   a DUI.  Correct?

21   A    That's correct.

22   Q    Let's turn to page 32.  I want to refer you to an e-mail

23   you wrote on April 3rd.  And the subject is "HC Goal to

24   Forecast".  And HC -- what does that indicate?  Is that

25   headcount?

 1    A    That's headcount.

 2    Q    Okay.  And you've written that the goal was to be at 63.

 3   Correct?

 4    A    That's correct.

 5    Q    63 direct employees?

 6    A    That's correct.

 7    Q    Okay.  And you further write, "However, with Ricky coming

 8   off end of term, we're two short."  You meant that you were two

 9   short welders.  Correct?

10    A    Not necessarily.  Direct is several positions.

11    Q    Okay.  So you were -- you still had two openings for

12   direct positions.  Correct?

13    A    That's correct.

14    Q    And Omar, Guillermo -- sorry.  Omar Ramos was not hired.

15   Correct?

16    A    That's correct.

17    Q    And Guillermo Murguia was also not hired.  Is that

18   correct?

19    A    That's correct.

20    Q    And adding indirect and direct, your headcount was 76.

21   Correct?

22    A    Yes.

23    Q    Okay.  And then you end -- coming close to the end of your

24   e-mail, you indicate, "We'll need to hire four people in May

25   instead of the previously forecasted two in order to be back on

 1    track."  Correct?

 2    A     That's correct.

 3    Q     So there was still four positions that needed to be filled

 4    the following month.  Correct?

 5    A     The following month of May?

 6    Q     Or for May.  In May?

 7    A     Yes.

 8    Q     Okay.  What was your role in developing the headcount for

 9    Greenbrier in Tucson?

10    A     I did not have a role in that.

11    Q     Okay.  Do you know who did?

12    A     It was Kevin Stewart and Eric Valenzuela.

13    Q     Who communicated the headcount necessary to you?

14    A     I believe it was Kevin Stewart.

15    Q     Who's that?

16    A     Kevin Stewart.

17    Q     All right.  And the times that you visited Greenbrier, did

18    you have the opportunity to walk around the facility while

19    employees were working?

20    A     In Tucson?

21    Q     Yes.

22    A     Yes.

23    Q     And you heard employees over -- you must have overheard

24    employees speaking.  Correct?

25    A     Yes.

1    Q    Okay.  And what are the subjects -- and you heard the

2    employees speaking to each other during working time.  Right?

3    A    During work time, yes.

4    Q    Okay.  And while employees were working, you heard them

5    talking about non-work issues like sports and family.  Right?

6    A    On occasion, yeah.

7    Q    Do you know if anyone has been disciplined for talking

8    about non-work issues while they're working?

9    A    I don't know.

10   Q    Have you ever approved a disciplinary action to an

11   employee for discussing non-work issues while working?

12   A    I would have to go through every disciplinary action I'd

13   ever, you know, approved to --

14   Q    Do you remember being involved in --

15   A    I don't recall.

16        JUDGE LAWS:  Is that grounds for discipline?

17        THE WITNESS:  In general, no.  That's up to the individual

18   foreman to see if it's being disruptive to the work process.

19        MS. ALONSO:  All right, Your Honor.  And I just need a

20   moment to mark a couple more exhibits.

21        JUDGE LAWS:  Okay.  Why don't we mark the next one in

22   order, question the witness on it, and --

23        MS. ALONSO:  Sure.

24        JUDGE LAWS:  -- your co-counsel can help mark the ones

25   that are going to be offered after that.

1   (Counsel confer)

2   Q   BY MS. ALONSO:  All right.  Ms. Maxey, I'm handing you

3   what's marked as General Counsel 's 227.  And this is an e-mail

4   that you've written on November 7th, a series of e-mails that

5   you've written on November 7th.

6        JUDGE LAWS:  Is there going to be a 226?

7        MS. ALONSO:  No.

8        JUDGE LAWS:  Why don't we mark this as 226?

9        MS. ALONSO:  And Judge, I think -- you know what?  I think

10  I may have -- I think the numbers are all confused on this.

11       MR. GIANNOPOULOS:  With Brian Scaggs's corrective actions,

12  I'm going to make copies at the break, Your Honor.

13       JUDGE LAWS:  Okay.  That's why I don't have it.  Thank

14  you.  227.

15       MS. ALONSO:  227.  Yes.

16       JUDGE LAWS:  Yes.  That's the next in order.

17  **(General Counsel Exhibit Number 227 Marked for Identification)**

18  Q   BY MS. ALONSO:  All right.  So Ms. Maxey, here's a copy of

19  General Counsel's 227.  Okay.  Ms. Maxey, are these e-mails

20  that you wrote on November 27th in generating a report prior --

21       JUDGE LAWS:  I'm going to correct to November 7th, not

22  27th.

23       MS. ALONSO:  Thank you, Your Honor.  And I can rephrase.

24  Q   BY MS. ALONSO:  So Ms. Maxey, are these e-mails regarding

25  a report that you generated prior to the layoff in 2012?

1   A    Yes.

2   Q    And the report that you generated on November 7th, you did

3   not include any type of production numbers for these particular

4   employees.  Correct?

5   A    By production numbers, what do you mean?

6   Q    Just any type of rating on their level of productivity.

7   A    No.  That's not stored in this system.  This is coming out

8   of our HRIS system and we don't have this information like that

9   there.

10   Q    And the only information that you included was your ID

11   number.  Correct?

12       JUDGE LAWS:  Well, it's on there.  If there's anything --

13   Q    BY MS. ALONSO:  So everything that you've listed is the

14   extent of what you included on the list.  Correct?

15   A    That's correct.

16   Q    And this is the only list that you were asked to generate

17   before the layoff.  Correct?

18   A    Yes.

19   Q    Okay.

20   A    That I recall.

21       MS. ALONSO:  And I move for the admission of General

22   Counsel's 227.

23       MR. MINER:  No objection.

24       JUDGE LAWS:  227 is admitted.

25   **(General Counsel Exhibit Number 227 Received into Evidence)**

1    Q    BY MS. ALONSO:  All right.  Ms. Maxey, I'm handing you

2    what's been marked as General Counsel's 228.  Okay.  Ms. Maxey,

3    this is an e-mail that you've written on November 12th -- or

4    begin at the top of the e-mail.  It's one that you've written

5    on November 12th to Annette Holman.

6    A    Yes.

7    Q    All right.  And I want to direct your attention to page

8    two of the document, of 228, to an e-mail that you've written

9    on November 12th at 10:18 a.m.  And the subject is Tucson

10   terms.  And you have sent Ms. Holman -- first of all, who is

11   Annette Holman?

12   A    She is the payroll manager for the Greenbrier companies.

13   Q    Okay.  And you're sending her a list of the employees that

14   were going to be laid off that day.  Correct?

15   A    That's correct.

16   Q    And you mentioned that Rogelio Martinez and Juan Morales

17   were not present on November 12th.  Correct?

18   A    That's correct.

19   Q    And were you involved in terminating Rogelio Martinez?

20   A    Yes.

21   Q    Okay.  And were you involved in terminating Juan Morales?

22   A    Yes.

23   Q    And did you meet with Mr. Martinez the following day, on

24   November 13th?

25   A    Yes.  We did.

1    Q    And who was present?

2    A    It was myself and Juan Maciel.

3    Q    Okay.  And who spoke?

4    A    In that case, Mr. Maciel did.

5    Q    Okay.  Did he speak in English or in Spanish?

6    A    In Spanish.

7    Q    Okay.  Before meeting with Mr. Martinez, had you

8    instructed Mr. Maciel what he was to communicate to Mr.

9    Martinez?

10   A    I don't believe so.

11   Q    Okay.  Did you discuss it with him, what would be

12   explained to Mr. Martinez in the meeting?

13   A    Yes.

14   Q    And what did you tell him?

15   A    It was going to be explained to Mr. Martinez that we were

16   restructuring the shop, that there was a layoff, and that his

17   position had been eliminated.

18        MS. ALONSO:  Okay.  I move for the admission of General

19   Counsel's 228.

20        MR. MINER:  No objection.

21        JUDGE LAWS:  228 is admitted.

22   **(General Counsel Exhibit Number 228 Received into Evidence)**

23   Q    BY MS. ALONSO:  And you also had a similar meeting with

24   Juan Morales?

25   A    That's correct.

1   Q   Okay.  And you met with him as the only employee in the

2   room?

3   A   Yes.

4   Q   Okay.  The same information was communicated to him?

5   A   Yes, in English.

6   Q   All right.  I am going to hand you an e-mail, a chain of

7   e-mails, marked as General Counsel's Exhibit 229.

8   Q   BY MS. ALONSO:  All right.  And Ms. Maxey, this is an e-

9   mail.  Let's turn to page two of the document.  And these are

10   e-mails regarding the Tucson terminations.  Correct?

11   A   That's correct.

12   Q   Okay.  And at the time of the layoff, Ms. Maxey, did

13   anyone communicate to you that the employees who were laid off

14   would be rehired in the near future?

15   A   No.

16   Q   When is the first time you learned of the decision to

17   rehire the laid-off employees?

18   A   In January 2013.

19   Q   BY MS. ALONSO:  All right.  And I want to direct your

20   attention to an e-mail you've sent to Annette Holman at 11:53

21   a.m.

22   A   Uh-huh.

23   Q   And you have had -- you wrote that you did not anticipate

24   more changes.  Was that list ever changed?  Was the list you

25   sent to her changed subsequently?

```
 1   A     I don't believe so.

 2   Q     And then, finally, on page one of the document, you just

 3   confirmed that Juan Morales and Rogelio Martinez were in fact

 4   terminated before their shift?

 5   A     That's correct.

 6         MS. ALONSO:  Your Honor, I'd move for the admission of

 7   General Counsel's 229.

 8         MR. MINER:  No objection.

 9         JUDGE LAWS:  And I'm wondering if we can't just rename

10   General Counsel 229 228 because the only difference appears to

11   be, there is one more e-mail on the top.

12         MS. ALONSO:  Yeah.  That's fine, Judge.

13         JUDGE LAWS:  Okay.  This will be 228.  The previous 228

14   will be withdrawn as duplicative.

15         UNIDENTIFIED SPEAKER:  So you're withdrawing 228?

16         JUDGE LAWS:  The first one offered, 228.  229 is the exact

17   same as 228, except there is one additional part of the e-mail

18   chain on the top.  I don't see the need to have duplicative

19   information in the record, so I'd like that to just be 228.

20   Q     BY MS. ALONSO:  All right.  All right.  Ms. Maxey, I want

21   to ask you about the shutdown of Tucson.

22   A     Okay.

23   Q     When were you first informed that Tucson would be shut

24   down?

25   A     I was informed, I believe it was, the last week of August
```

1   of 2013.

2   Q    And who informed you of that?

3   A    It was Mr. Lave.

4   Q    Who else was present?

5   A    It was only he and I.

6   Q    Were you in his office?

7   A    I don't recall.

8   Q    What did Mr. Lave say to you about the shutdown?

9   A    That we had had the series of meetings with our primary

10  customer in Tucson, TTX, and that TTX was no longer willing to

11  send work to the site.  Therefore, we were going to have to

12  shut down Tucson.

13  Q    Okay.  Did he explain why TTX was no longer willing to

14  ship -- to make shipments to Tucson?

15  A    From my understanding in the meetings, we have three

16  locations in the southwest that are primary TTX customers, Mira

17  Loma, San Antonio, and Tucson.  From my understanding, they

18  didn't have enough work to support all three locations.

19  Q    Is that what Mr. Lave told you?

20  A    Yes.

21  Q    Did you have any other involvement in the decision to shut

22  down Greenbrier in Tucson?

23  A    No.

24  Q    Other than your discussion that we just reviewed with Mr.

25  Lave, did you discuss the shutdown of Tucson with anyone else?

1    A    Yes.

2    Q    With who?

3    A    Mr. Maciel and Mr. Stewart.

4    Q    Was that at the same time or you just spoke with him

5    individually?

6    A    I believe I spoke with them individually.

7    Q    Okay.  I want to talk about your conversations with Juan

8    Maciel.  With when was -- when is -- when was this

9    conversation?

10    A    Around the same time.

11    Q    Okay.  The last week of August?

12    A    Yes.

13    Q    And how did the topic of shutting down Tucson come up?

14    A    We were discussing it in relation to -- he was already

15    aware of it and we were discussing it in relation to what

16    employees we may use to fill open positions elsewhere.

17    Q    And is that something that Mr. Maciel raised?

18    A    Yes.

19    Q    And did you identify the employees that you would use to

20    fill other positions?

21    A    Not at that time.

22    Q    Okay.  Was that something that was discussed later?

23    A    Yes.

24    Q    Okay.  The particular employees that you would make offers

25    of relocation?

1    A    For specific manager positions, yes.

2    Q    What about relocation positions -- what about the

3    relocation for positions other than lead men or foremen?

4    A    Are you referring to welders, laborers?

5    Q    Yes.

6    A    We determined that later, their relocation package for

7    them.

8    Q    Okay.  What was the relocation package that was determined

9    for welders?

10    A    For all direct or non-management positions, we had a

11    relocation package depending on what location they were moving

12    to.  So it was $5,000 total relocation for California, $6,000

13    total relocation for our shops in Texas, San Antonio, Cleburne,

14    and then 7,000 for Omaha, Chehalis, or anywhere else.

15        JUDGE LAWS:  And I want to backtrack a little bit, because

16    you had said all direct-line employees.  What about indirect

17    employees?

18        THE WITNESS:  I'm trying to think if we had any indirect

19    people relocate.  We did and it was the same package.

20        JUDGE LAWS:  Okay.

21        THE WITNESS:  Okay.

22    Q    BY MS. ALONSO:  Okay.  And is there a union contract at

23    any of the facilities that you just identified?

24    A    No.

25    Q    Did Mr. Lave tell you when he found out about the

1   shutdown?

2   A    He did not.

3   Q    Did he tell you who told him?

4   A    He did not.

5   Q    Okay.  Were you involved in issuing the WARN Act notices

6   regarding the Tucson shutdown?

7   A    Yes.  I was.

8   Q    Okay.  When did those go out?

9   A    Those went out on September 5th, 2013.

10  Q    Did you prepare them?

11  A    No.  Mr. Lave prepared them.

12  Q    Did you in any way assist in the preparation of them?

13  A    I assembled them and copied them.

14       MR. GIANNOPOULOS:  Just a second, Judge.

15       JUDGE LAWS:  Uh-huh.

16       MR. GIANNOPOULOS:  We're --

17       MS. ALONSO:  Yeah.

18       MR. GIANNOPOULOS:  -- close to wrapping up.

19  (Counsel confer)

20       MS. ALONSO:  Okay.  Yeah.

21  Q    BY MS. ALONSO:  Okay.  Ms. Maxey, I'm going to refer you

22  to a document that's been admitted in evidence.  It's General

23  Counsel's Exhibit 25.  And this is a position statement that

24  Greenbrier provided to the government in response to unfair

25  labor practices.  Okay.  Now, I turn you to Exhibit 4.  And

1   this is a list of employees labeled "Employee List Free Rift

2   (phonetic)", November 7th of 2012.  And between November 7th

3   and 2000 -- and I'll rephrase.  Between November 7th and the

4   date of the layoff, Greenbrier did not hire any employees.

5   Correct?

6   A    I don't --

7        MR. MINER:  I'm sorry.  Can you reiterate those dates?  We

8   didn't catch those.

9        MS. ALONSO:  Sure.

10       THE WITNESS:  Yeah.

11  Q    BY MS. ALONSO:  Between November 7th and the date of the

12  layoff, Greenbrier did not hire new employees to work in

13  Tucson.  Correct?

14  A    I don't believe so.

15       MS. ALONSO:  Okay.  And Your Honor, I'm just going to take

16  a brief moment and I think we're done with the witness.

17       MR. GIANNOPOULOS:  I think we're done with this, if we

18  could have just two minutes, Judge.

19       JUDGE LAWS:  Okay.  Let's stay in the area, though,

20  because we are under --

21       MR. GIANNOPOULOS:  Just the hallway.

22       JUDGE LAWS:  Okay.

23  (Off the record at 12:21 p.m.)

24       JUDGE LAWS:  I think we're good.  All right.  Just signal

25  when you're ready.

1    MS. ALONSO:  And Your Honor, I have no further questions

2    for the witness.

3    MR. MINER:  And Your Honor, I have no questions at this

4    time.  We intend to recall Ms. Maxey as part of the company's

5    case.

6    JUDGE LAWS:  Okay.  Very good.  Then why don't we take a

7    lunch break?  We'll go off the record and determine how much

8    time we're going to take.  It's going to kind of depend on how

9    much more ground we have to cover.

10   (Off the record at 12:23 p.m.)

11   MR. GIANNOPOULOS:  Thank you, Your Honor.  During the

12   lunch break, we made copies of documents we had discussed

13   earlier today.  I'd like to seek a stipulation on the

14   documents, at least as to their authenticity and have them

15   introduced into the record.

16   JUDGE LAWS:  Okay.

17   MR. GIANNOPOULOS:  The first is General Counsel's 229.

18   And that is an employment application from Brian Scaggs.  I

19   showed this to Mr. Miner the copy that he had in the personnel

20   file.  And this is the only copy of an application for

21   employment at Greenbrier for Mr. Scaggs that we can locate in

22   our copy of the personnel file.  It's pages one and three.

23   And the best that I could guess, in looking at other

24   applications, is that perhaps it was a two-sided document and

25   only the one side's got a copy.  But in any event, the General

1    Counsel's position is, this is for employment in 2010 based

2    upon where it says career interests.  It says, "When are you

3    available to work?"  It says July 9th, 2010.

4        JUDGE LAWS:  Okay.

5        MR. GIANNOPOULOS:  And so we would move for the admission

6    of 229 and there's a full application if we can substitute it.

7        MR. MINER:  Sounds good.  We'll stipulate to the

8    authenticity of the document.

9        JUDGE LAWS:  Okay.  And so I will admit 229.  Let's make

10   efforts to see if we can get a full copy.  And then, with any

11   of these that the General Counsel has indicated they could only

12   find the one application in the file, to the extent you find

13   one, turn it on over before the next hearing --

14       MR. MINER:  You bet we will.

15       JUDGE LAWS:  -- before I receive it.

16       MR. MINER:  Yes.

17       JUDGE LAWS:  Okay.  Thank you.

18       MR. MINER:  Thank you, Your Honor.

19       MR. GIANNOPOULOS:  And the second is application for

20   Hector Federico, General Counsel's 231.  This is a four-page

21   document and it's dated May 17th, 2012.  And again, this is the

22   only copy of an application for employment for Hector Federico

23   that we could find in our copy of the personnel file.  SO I

24   move for the admission of General Counsel's 231.

25       MR. MINER:  And the same stipulation, Your Honor.

1    JUDGE LAWS:  Okay.  I will admit it.

2    MR. GIANNOPOULOS:  Then General Counsel's 230 -- I'm sorry

3  I went out of order --

4    JUDGE LAWS:  That's all right.

5    MR. GIANNOPOULOS:  -- is an employment application for

6  Oswaldo Chavira.  It's a four-page document.  And again, this

7  is the only application we could find in Mr. Chavira's

8  employment file that was provided to us.  And our contention is

9  that this is for, again, an application for employment in

10  either 2009 or 2010.  And we base that on the work history

11  that's provided.

12    MR. MINER:  We'll stipulate to the authenticity of the

13  application.

14    JUDGE LAWS:  Okay.  I will go ahead and admit GC-230.

15  **(General Counsel Exhibit Number 230 Received into Evidence)**

16    MR. GIANNOPOULOS:  And then General Counsel's 232 is the

17  Excelsior list for the election that occurred in July of 2012.

18    MS. ALONSO:  '13.

19    MR. GIANNOPOULOS:  '13.  I'm sorry.  Thank you.

20    MR. MINER:  We stipulate to General Counsel 232.

21    JUDGE LAWS:  That's admitted.

22  **(General Counsel Exhibit Number 232 Received into Evidence)**

23    JUDGE LAWS:  Okay.  If there's nothing else as far as

24  documents or any other housekeeping matters are concerned, get

25  your next witness whenever you're ready.

1     MS. ALONSO:  Sure.

2     JUDGE LAWS:  You come on up here behind that half door.

3  Have a seat.  Good afternoon.

4     MR. RAMOS:  Good afternoon.

5     JUDGE LAWS:  Okay.  Will you please raise your right hand?

6  Whereupon,

7                    **GESUS OMAR RAMOS**

8  having been first duly sworn, was called as a witness herein

9  and was examined and testified as follows:

10    JUDGE LAWS:  And if you could, please state and spell your

11 name for the court reporter.

12    THE WITNESS:  Gesus Omar Ramos, G-E-S-U-S O-M-A-R R-A-M-O-

13 S.

14    JUDGE LAWS:  Thank you very much.

15                  **DIRECT EXAMINATION**

16 Q    BY MS. ALONSO:  Mr. Ramos, did you work at Greenbrier?

17 A    Yes.  I did.

18 Q    Okay.  And were you one of the employees laid off in

19 November of 2012?

20 A    Yes.

21 Q    How long had you worked for Greenbrier before you were

22 laid off in November of 2012?

23 A    About a year.

24 Q    What kind of work did you do at Greenbrier?

25 A    I was a welder.

1    Q    And what shop did you work in?

2    A    The truck shop.

3    Q    What type of work was done in the truck shop?

4    A    We used to rebuild bolsters, what is called a bolster.

5    Q    Who did you report to?

6    A    Rudy, Rudy Valdez.  I mean, Rudy Pierson and, for another

7    time, BonBon (phonetic).

8    Q    For another time, who?

9    A    BonBon, for, like, probably the --

10   Q    Who is BonBon?

11   A    BonBon -- he was my foreman.

12   Q    And is that a nickname?

13   A    The lead man, I mean.  He was a lead man.  Yeah.  That's

14   the lead man.

15   Q    Okay.  So Rudy Pierson was the foreman?

16   A    The foreman, that's right.

17   Q    And the lead man was underneath him?

18   A    Yeah.

19   Q    Okay.

20   A    But he was only my lead man for, like, the four months

21   before.

22   Q    Four months before the layoff?

23   A    Probably about four months, yeah.

24   Q    And just a moment --

25        MS. ALONSO:  Grant, are you catching his voice?

1       THE MONITOR:  He needs to speak up.

2       THE WITNESS:  Okay.

3   Q   BY MS. ALONSO:  And the lead man -- is that who is BonBon?

4   A   Yes.

5   Q   Okay.  Do you know his actual name?

6   A   No.  I don't.

7   Q   It's all right.

8       MR. GIANNOPOULOS:  You have to speak up, please.

9       THE WITNESS:  No.  I don't.

10  Q   BY MS. ALONSO:  Okay.  Now, I want to direct your

11  attention to the year 2012.  Did you collect union cards in

12  2012?

13  A   Yes.  I did.

14  Q   Okay.  Did you collect cards for the UFCW?

15  A   Yes.  I did.

16  Q   Okay.  And explain to me how you became involved in

17  collecting cards for the UFCW?

18  A   Rogelio came up to me and -- Rogelio Martinez -- he asked

19  me if I wanted to help the union by passing out cards and

20  everything because, during the first campaign, he was the one

21  doing that.  And they were trying to get rid of him.  The

22  company was trying to get rid of him for doing that, so he

23  asked me if I could help him out by passing out the cards and

24  collecting them.  That way, he doesn't get fired, you know, for

25  doing it.

1    Q    Okay.  And where was your conversation with Rogelio?

2    A    It was at Greenbrier --

3    Q    At the shop?

4    A    -- by the truck shop.  Yeah.

5    Q    Okay.  Okay.  When in relation to the time you were laid

6    off did you have this conversation with Rogelio?  Do you

7    remember if it was --

8    A    Probably about a month.

9    Q    Okay.

10    JUDGE LAWS:  A month before?

11    THE WITNESS:  About a month before.

12    Q    BY MS. ALONSO:  Now, in this time frame, about a month

13    before the layoff, did you talk with other coworkers about the

14    need to unionize?

15    A    Yes.  I did.

16    Q    And where were these conversations, in the shop?

17    A    Around the shop, you know, around the truck shop area.

18    Q    Okay.  And how frequent were your conversations?

19    A    During lunchtimes, breaks.

20    Q    Okay.  Was it daily or just a couple times a week.  Can

21    you estimate?

22    A    Just, like, pretty much on a daily basis, we would, like,

23    cheer each other up, like, you know, let's move on and stuff,

24    but, like, serious, serious talks, you know, it --

25    Q    Okay.

1   A    -- was, like, probably, like, two or three times a day,

2   you know -- I mean, a week.

3   Q    Okay.  And when you mean serious talks, those are -- what

4   are you referring to?

5   A    That's, like, long talks --

6   Q    Okay.  I see.

7   A    -- during lunchtime.

8   Q    Like more lengthier conversations?

9   A    Excuse me?

10   Q    Longer conversations?

11   A    Yeah, longer conversations.

12   Q    And what did you discuss about the need to unionize?

13   A    Pretty much the unfair things that were going on in the

14   company and also, like, the benefits that it would bring us,

15   you know, by bringing a union to us.  Prior to that, the main

16   part, you know, is that pretty much everybody felt jeopardized.

17   And also, you know, the favoritism that was there, you know --

18   it was pretty clear, you know.

19   Q    Now, when you say jeopardize, do you mean that the

20   employees felt their jobs were jeopardized?

21   A    Yeah.  We felt that it was jeopardized over, you know,

22   pretty much, like, unfair things, you know --

23   Q    Okay.

24   A    -- what it was to us.

25   Q    Okay.  Now, I want to ask you about passing out cards for

1   the UFCW.  Where did you pass out the cards for the UFCW?

2   A    It was around the truck shop area, the truck shop.

3   Q    Okay.  Any area in particular of the truck shop?

4   A    Mainly the lunch room, you know, the lunch and by the time

5   clock area.

6   Q    All right.  And where is the time clock?

7   A    It's right next to the truck shop.

8   Q    Okay.  And for what period of time did you pass out the

9   cards for the UFCW?

10  A    About a week or two.

11  Q    Okay.  And it's been established in this case that there

12  was an election by the sheet metalworkers.  Were you involved

13  in collecting cards for the sheet metalworkers?

14  A    Yes.  I was.

15  Q    Okay.  Do you know how it came about that the employees

16  received cards from the sheet metalworkers?

17  A    Excuse me?

18  Q    How did it come about that you passed out cards for the

19  sheet metalworkers?

20  A    Because a week or two before, we had done the -- for the

21  -- we had done it for what was known as a Carniceros Union

22  (phonetic).

23  Q    Okay.

24  A    And it's actually the UFCW union.  And we did those cards.

25  We passed them out, collected them.  And the representative for

1   the UFCW told Jorge, one of our guys, that they weren't the

2   right union for us.  And so they referred us to the sheet

3   metalworkers union.

4   Q    Okay.  And did you share that information with any of your

5   coworkers?

6   A    Yes.

7   Q    And when was that in relation to the time that you were

8   laid off?

9   A    About a week, week and a half.

10  Q    And what is it you told your coworkers about the sheet

11  metalworkers?

12  A    What is it?

13  Q    Yeah.  What did you tell them about --

14  A    I told them that they -- that we were, you know -- since

15  we were referred by that union to them -- and we told them that

16  -- well, we told them that we had a good reference from the

17  other union --

18  Q    Uh-huh.

19  A    -- and that we knew that they were pretty strong, and that

20  they knew what we were doing, our field, you know, which was

21  welding, and working with metals, and all that.

22  Q    And did you state anything about passing out sheet

23  metalworker cards?

24  A    Yes.

25  Q    And what did you say?  What did you explain about that?

1   A    That, by signing the cards, they acknowledged to be --

2   that they were going to be represented by the union and that

3   they were also going to pay dues for the union, that pretty

4   much they were going to be also protected, just in case, you

5   know, something happened.

6   Q    Okay.  And did you eventually pass out cards for the sheet

7   metalworkers?

8   A    Yes.  I did.

9   Q    And when you handed out the cards for the sheet

10  metalworkers, did you -- was there anything in particular you

11  would tell the employees?

12  A    Yes. I told them that it was a serious, you know, thing --

13  Q    Uh-huh.

14  A    -- to read it.  And I acknowledged to them, you know, what

15  the consequences was of signing it, which was, you know, being

16  represented by the union and also that we had a better chance,

17  a better chance of job security.

18  Q    Okay.  All right.  Mr. Ramos, I'm going to show you a

19  document that's been marked as General Counsel's Exhibit 233.

20  And Mr. Ramos, this is a card with -- a sheet metalworkers card

21  with the name Gesus Omar Ramos.  Did you sign this card?

22  A    Yes.  I did.

23  Q    Okay.  And who gave you this card?

24  A    Rogelio Martinez.

25  Q    Where were you when Mr. Martinez gave you this card?

```
 1    A    By the truck shop.

 2    Q    And is there any writing on this card that is not yours?

 3    A    Yes.

 4    Q    Okay.  And this card is dated November 6th of 2012.

 5    A    Yes.

 6    Q    Is that the date that you signed the card?

 7    A    Yes.

 8    Q    And there are initials on the top right-hand corner, RM.

 9    A    Uh-huh.

10    Q    Are those your initials?

11    A    No.

12    Q    Did you see who wrote those?

13    A    Yes.

14    Q    Who?

15    A    Rogelio Martinez.

16         MS. ALONSO:  All right.  And Your Honor, I move for the

17    admission of General Counsel's 233.

18         MR. MINER:  No objection.

19         JUDGE LAWS:  233 is admitted.

20    (General Counsel Exhibit Number 233 Received into Evidence)

21    Q    BY MS. ALONSO:  And Mr. Ramos, what was your understanding

22    about your -- what did you understand you were agreeing to when

23    you signed this card?

24    A    That I was going to be represented by the union.

25    Q    Okay.  And I'm going to show you what's been marked as
```

 1   General Counsel's Exhibit 234.  Okay.  And Mr. Ramos, this is a

 2   card with the name Oswaldo Chavira Duran on it.

 3   A    Uh-huh.

 4   Q    Do you recognize that card?

 5   A    Yes.  I do.

 6   Q    Okay.  Did you give this card to Oswaldo Chavira Duran?

 7   A    Yes.

 8   Q    Okay.  And where were you when you gave him this card?

 9   A    By the lunch area.

10   Q    Which lunch area were you at?

11   A    The truck shops.

12   Q    Okay.  And did you -- did Mr. Durand sign this -- or did

13   Mr. Chavira Duran sign this card in your presence?

14   A    Yes.

15   Q    And did he return the -- the initials RM on the top right-

16   hand corner -- did he write those initials there?

17   A    No.  He didn't.

18   MS. ALONSO:  And Your Honor, I'm also going to pass out General

19   Counsel's 235.

20   Q    BY MS. ALONSO:  And before doing that, though, do you know

21   -- or Mr. Ramos, do you know who wrote the initials RM on the

22   card in front of you

23   A    Yes.  I do.

24   Q    234?

25   A    Yes.

1  Q    Who is that?

2  A    Rogelio Martinez.

3       MS. ALONSO:  Okay.  I'm passing out General Counsel's 235.

4       JUDGE LAWS:  And do you know that because you saw him or

5  because you recognize his writing?

6       THE WITNESS:  Because I recognized it from the writing.

7       JUDGE LAWS:  Thank you.

8       MS. ALONSO:  All right.  And Your Honor, for 235, I'll

9  seek a stipulation from counsel that this is the document

10  produced in Oswaldo Chavira Duran's personnel file.

11       MR. MINER:  We will so stipulate.

12       JUDGE LAWS:  Okay.  I will admit 235.  Did you want to

13  move for admission of 234?

14  **(General Counsel Exhibit Number 235 Received into Evidence)**

15       MS. ALONSO:  Yes.  I move for the admission of General

16  Counsel's 234 and 235.

17       JUDGE LAWS:  235 has been admitted.

18       MS. ALONSO:  Okay.  Sorry.

19       JUDGE LAWS:  Any objection to 234?

20       MR. MINER:  No, Your Honor.

21       JUDGE LAWS:  Okay.  I will go ahead and admit 234.

22  **(General Counsel Exhibit Number 234 Received into Evidence)**

23       MS. ALONSO:  And I'm going to pass out a card, General

24  Counsel's 236.

25  Q    BY MS. ALONSO:  Mr. Ramos, I'm handing you General

```
 1   Counsel's 236.  This is a card with the name Angel Ortega on

 2   it.  Do you recognize this card, Mr. Ramos?

 3   A    Yes.  I do.

 4   Q    And did you give this card to Angel Ortega?

 5   A    Yes.  I did.

 6   Q    Where were you when you gave it to him?

 7   A    I was by the truck shop area, too.

 8   Q    Okay.  And describe to me how it is or how it came about

 9   that you gave him this card.

10   A    Coming from the parking lot and -- actually, that was the

11   first one.  That was the first time I handed it to him.  It was

12   during the first break, during the first lunch break, the

13   morning one --

14   Q    Okay.

15   A    -- that I handed it to him, the second one.

16   Q    Approximately what time is your first lunch break?

17   A    About 8:15.

18   Q    So your first break is --

19   A    Uh-huh.

20   Q    -- around 8:15.  Okay.

21   A    8:15 in the morning.

22   Q    And you gave it to him at that time?

23   A    Yeah.

24   Q    Okay.

25   A    Around that time.
```

1   Q    And did he sign the card in your presence at that time?

2   A    Yes.  He did.

3   Q    Okay.  And did you see Mr. Ortega sign the card?

4   A    Yes.

5   Q    And did you see there initials, RM, on the top right-hand

6   corner?  Were those -- I mean, Mr. Ortega did not write those.

7   Correct?

8   A    No.  He didn't.

9   Q    Okay.  Okay.  And did you -- what did you do with this

10  card after you received it?

11  A    I handed it to Rogelio Martinez.

12  Q    All right.  Do you know whose initials are on the top

13  right-hand corner?

14  A    Yes.  I do.

15  Q    Whose are they?

16  A    Rogelio Martinez.

17       MS. ALONSO:  Your Honor, I move for the admission of

18  General Counsel's 236.

19       MR. MINER:  No objection.

20       JUDGE LAWS:  236 is admitted.

21  **(General Counsel Exhibit Number 236 Received into Evidence)**

22       MS. ALONSO:  And Your Honor, I have General Counsel's 237

23  to seek a similar stipulation, and 238.

24       MR. MINER:  Your Honor, we stipulate to the authenticity

25  of General Counsel 237 and 238.

1    JUDGE LAWS:  Okay.  It will be admitted.  I haven't seen

2    them, but I am assuming that they are for purposes only of

3    establishing handwriting and signature.

4    **(General Counsel Exhibit Numbers 237 and 238 Received into**

5    **Evidence)**

6    MS. ALONSO:  That's correct, Your Honor.

7    JUDGE LAWS:  Okay.  Thank you.

8    Q    BY MS. ALONSO:  All right.  Mr. Ramos, I'm going to hand

9    you what's been marked as General Counsel's 239.  And this is a

10   card with the name Victor Sigueinos.  Do you recognize that

11   card?

12   A    Yes.  I do.

13   Q    Okay.  Did you give this card to Mr. Sigueinos?

14   A    Yes.  I did.

15   Q    Where were you when you gave it to him?

16   A    At the truck shop.

17   Q    Did Mr. Sigueinos fill out this card in your presence?

18   A    Yes.  He did.

19   Q    And did he return the card to you at that moment?

20   A    Yes.

21   Q    And there are initials, RM, on the top right-hand corner

22   of the card.  Did Mr. Sigueinos write those?

23   A    No.

24   Q    Okay.  Do you -- what did you do with the card after it

25   was returned to you?

1   A      I handed it to Rogelio Martinez.

2   Q      Okay.  Do you recognize the initials, RM, on this card?

3   A      Yes.  I do.

4   Q      Okay.  Do you know whose they are?

5   A      Rogelio Martinez.

6          MS. ALONSO:  Your Honor, I move for the admission of

7   General Counsel's 239.

8          MR. MINER:  No objection.

9          JUDGE LAWS:  239 is admitted.

10  **(General Counsel Exhibit Number 239 Received into Evidence)**

11         MS. ALONSO:  And for GC-240, we seek a similar

12  stipulation, Your Honor.

13         MR. MINER:  Thank you.

14  (Counsel confer)

15         MR. MINER:  Your Honor, we'll stipulate to the

16  authenticity of General Counsel 240.

17         JUDGE LAWS:  And 240 is admitted.

18  **(General Counsel Exhibit Number 240 Received into Evidence)**

19         MS. ALONSO:  I am passing out General Counsel's 241.

20  Q      BY MS. ALONSO:  And Mr. Ramos, this is General Counsel's

21  241.  It's the card with name Alcides Valencia.  Did you give

22  Mr. Valencia this card?

23  A      Yes.  I did.

24  Q      Okay.  And where were you when you gave it to him?

25  A      At the truck shop.

1   Q    Okay.  And did Mr. Valencia fill out the card in your

2   presence?

3   A    Yes.

4   Q    Okay.  Did you see him sign the card?

5   A    Yes.

6   Q    Okay.  And this card has a date of November 6th, 2012.  Is

7   that the date that you gave Mr. Valencia the card?

8   A    Yes.

9   Q    What did Mr. Valencia do with the card after he signed it?

10  A    He handed it to Rogelio Martinez.

11  Q    Okay.  And where was Rogelio Martinez?  Was he present at

12  the time?

13  A    Yes.

14  Q    And there are initials, RM, on the top right-hand corner.

15  Did you see who wrote those on this card?

16  A    No.  But it's Rogelio's.  I mean, yeah.

17  Q    Okay.  And you recognize those as Rogelio Martinez's --

18  A    Yes.

19  Q    -- initials.  Okay.

20       MS. ALONSO:  Your Honor, I move for the admission of

21  General Counsel's 241.

22       MR. MINER:  No objection.

23       JUDGE LAWS:  241 is admitted.

24  **(General Counsel Exhibit Number 241 Received into Evidence)**

25  Q    BY MS. ALONSO:  All right.  Mr. Ramos, I'm handing you a

1    card with the name Cilboto Milton.  Do you recognize this card?

2    A    Yes.  I do.

3    Q    Okay.  And did you give this card to Cilboto Milton?

4    A    Yes.  I did.

5    Q    Where were you when you gave him the card?

6    A    At the truck shop.

7    Q    And did Mr. Milton sign this card in your presence?

8    A    Yes.  He did.

9    Q    Okay.  There's a date of November 6th of 2012.  Is that

10   the date that you gave Mr. Milton the card?

11   A    Yes.

12   Q    And their initials are -- who else was present at the time

13   when you gave Mr. Milton the card?

14   A    Just me and him.

15   Q    Okay.  And after he filled out the card, what did he do

16   with it?

17   A    I handed it to Rogelio Martinez.

18   Q    Okay.  So he gave it to you and you gave it to Rogelio?

19   A    Rogelio Martinez, right.

20   Q    Okay.  And do you recognize the initials, RM, on the top

21   right-hand corner of the card?

22   A    Yes.  I do.

23   Q    Okay.  Are those Rogelio Martinez's initials?

24   A    Yes.

25        MS. ALONSO:  And Your Honor, I move for the admission of

1    General Counsel's 242.

2        MR. MINER:  No objection.

3        JUDGE LAWS:  242 is admitted.

4    **(General Counsel Exhibit Number 242 Received into Evidence)**

5        MS. ALONSO:  And I'm handing out General Counsel's 243 for

6    a similar stipulation from counsel.

7        MR. MINER:  Your Honor, we'll stipulate to the

8    authenticity of General Counsel's 243.

9        JUDGE LAWS:  It is admitted.

10    **(General Counsel Exhibit Number 243 Received into Evidence)**

11        MR. MINER:  Thank you.

12    Q    BY MS. ALONSO:  Mr. Ramos, I'm handing you General

13    Counsel's 244, which is a sheet metalworker card with the name

14    Jose F. Soto.  Do you recognize that card?

15    A    Yes.  I do.

16    Q    And did you give that card to Mr. Soto?

17    A    Yes.  I did.

18    Q    Where were you when you gave him the card?

19    A    At the truck shop.

20    Q    And did Mr. Soto sign the card in your presence?

21    A    Yes.  He did.

22    Q    Okay.  There's a date of November 6th of 2012.  Is that

23    the date that you gave Mr. Soto the card?

24    A    Yes.  It is.

25    Q    Okay.  And on the top right-hand corner, there's some

1  initials on there, JOR.  Do you know who wrote those initials

2  on the card?

3  A    Yes.

4  Q    Who is that?

5  A    Me.

6  Q    So those are yours?

7  A    Yes.

8  Q    And what did you do with the card after you received it?

9  A    I handed it to Rogelio.

10    MS. ALONSO:  Okay.  And Your Honor, I move for the

11  admission of General Counsel's 244.

12    MR. MINER:  No objection.

13    JUDGE LAWS:  244 is admitted.

14  **(General Counsel Exhibit Number 244 Received into Evidence)**

15    MS. ALONSO:  Okay.  And I'm seeking a similar stipulation

16  to General Counsel's 245.

17    MR. MINER:  We will stipulate to the authenticity of

18  General Counsel 245.

19    JUDGE LAWS:  245 is admitted.

20  **(General Counsel Exhibit Number 245 Received into Evidence)**

21  Q    BY MS. ALONSO:  All right.  Mr. Ramos, I want to refer you

22  to General Counsel's 233, 234, and 236.

23    MS. ALONSO:  Your Honor, I'm going to look on because I

24  don't know where my copies are.

25  Q    BY MS. ALONSO:  Looking at 233 -- all right.  After you

1    filled out this card, what did you do with it?

2    A    I gave it to Rogelio Martinez.

3    Q    Now, General Counsel's 234 -- after this card had been

4    filled out, what did you do with the card?

5    A    I gave it to Rogelio Martinez.

6    Q    Okay.  And that's the card filled out by Oswaldo Chavira

7    Duran?

8    A    Yes.

9    Q    And looking at General Counsel's 236, a card with the name

10   Angel Ortega, what did you do with the card after it was filled

11   out?

12   A    I gave it to Rogelio Martinez.

13   Q    Okay.  Thank you.  Okay.  Mr. Ramos, I want to direct your

14   attention to 2011, the year of 2011.

15   A    Uh-huh.

16   Q    In the year 2011, is this when you started working for

17   Greenbrier before you were laid off?

18   A    Yes.

19   Q    Okay.  Do you remember if it was summer or if it was

20   closer to the winter?

21   A    It was closer to the winter.

22   Q    Okay.  And were you working for Greenbrier when there was

23   an election for UTU?

24   A    Yes.

25   Q    Okay.  And were you involved in the campaign for UTU?

1    A    Yes.

2    Q    Okay.  Can you describe, briefly describe, to me what your

3    role was?

4    A    Pretty much just talked to coworkers, you know, encourage,

5    and, you know, just --

6    Q    And when you say encourage, do you mean encourage them to

7    vote either way for the union, one way or another?

8    A    Yeah.

9    Q    Okay.  And which way did you encourage them to vote?

10    A    Into making -- thinking about, you know, the decision that

11    they were making.

12    Q    Okay.  You encouraged them to vote yes?

13    A    Yes.

14    Q    Okay.  And during the first campaign, who was your foreman

15    at the time?

16    A    It was Rudy.

17    Q    And when I say first campaign, I'm referring to the UTU

18    campaign.

19    A    The UTU, yes.

20    Q    And did Rudy ever talk to you about the union?

21    A    Yes.  He did.

22    Q    Okay.  When was that in relation to the date of the vote?

23    A    It was probably, like, a month, month and a half.

24    Q    A month and a half.  Okay.  And where were you?

25    A    I was at the truck shop.

1    Q    Okay.  And tell me how it came about that you had this

2    conversation with Rudy Pierson.

3    A    Me, Rogelio, and Victor Sigueinos were, you know, talking

4    and Rudy Pierson passed by.  And he pulled me aside.

5    Q    Okay.  And what did he tell you?

6    A    He told me that Victor Sigueinos and Rogelio Martinez --

7    that they were about to be -- that the company wanted to get

8    rid of them.  So he told me pretty much to stay away from them,

9    and to stay away from their games, you know, because they were

10   trying to bring the union, and that, that could cause the

11   company to shut down, and that they were on thin ice, you know,

12   so to be careful with those two.

13   Q    Okay.  Did you respond?

14   A    No.  I didn't.

15   Q    Okay.  Now, Mr. Ramos, you testified earlier that you were

16   one of the employees laid off in 2012.

17   A    Yes.  Correct.

18   Q    How did it come to your attention that you were going to

19   be laid off from the company?

20   A    When they called everybody to a meeting and certain people

21   had to go to one area and the other to another area.

22   Q    Okay.  And did you attend that meeting?

23   A    Yes.  I did.

24   Q    Okay.  And do you know who else was called from your

25   department to attend the meeting that you were attending?

1    A    Yes.

2    Q    Who was that?

3    A    Brian Perona.

4    Q    Okay.  And did you and Brian walk there together?

5    A    Yes.

6    Q    Okay.  And did you two talk about what was going to

7    happen?

8    A    Yes.

9    Q    Okay.  What was said?

10   A    Right from the get-go, Brian Perona already knew what was

11   going to happen because, during the -- when he worked for

12   another facility of Greenbrier back in California, he said --

13   he told me that the same thing happened to him, the same thing,

14   that people were trying to unionize and that one amount of

15   people were called to one area and the other to another area.

16   And, like, one of them got let go, you know, were told that

17   they were being laid off.  And the reason was because they were

18   trying to unionize.

19   Q    Now, Mr. Ramos, after you were laid off in November of

20   2012, did you reapply for your position as a welder?

21   A    Yes.  I did.

22   Q    And how did you come about that you applied for this

23   position?

24   A    Because Rogelio Martinez told me that they were hiring

25   back people that were being laid off.  And he encouraged me to

1    go fill out an application and find out --

2    Q    Okay.  And did you go and fill out an application?

3    A    Yes.  I did.

4    Q    Okay.  Where did you go?

5    A    I went to a human resource office.

6    Q    Okay.  And that's in Greenbrier?

7    A    In Greenbrier, exactly.

8    Q    And who did you talk to from the HR office?

9    A    The new HR --

10   Q    Okay.

11   A    -- person that was there.

12   Q    Was it a woman or a man?

13   A    A woman.

14   Q    Do you remember if her name was Christine Martinez?

15   A    Yes.  It is.

16   Q    Okay.  And who was present when you spoke with her?

17   A    Just me and her.

18   Q    Okay.  And tell me how your conversation with Ms. Martinez

19   started.

20   A    I knock on the door and she told me to come in.  And I

21   asked her, you know, if it was true that the company was hiring

22   back people.  Well, first, I introduced myself.  And she said

23   that, yeah, that some people were getting hired again.  And she

24   -- and I asked, you know, if I could -- if I was -- how do I

25   know if I'm going to get my job back.

1   Q    Uh-huh.

2   A    And she told me to fill out an application and it --

3   Q    And did she --

4   A    -- was up to them.

5   Q    Did she give you an application?

6   A    Yes.  She did.

7   Q    Okay.  And what did you do when she gave you an

8   application?

9   A    Filled it out.

10   Q    Okay.  Did you ask her any questions about the

11   application?

12   A    Yes.  I did.

13   Q    What did you say?

14   A    I asked her even if I was laid off, if it was necessary,

15   and --

16   Q    Uh-huh.

17   A    -- she said yes.

18   Q    Did you raise your voice at her?

19   A    No, no.

20   Q    Did you argue with her?

21   A    No.

22   Q    Did she raise her voice at you?

23   A    No.

24   Q    And did you in fact fill out the application?

25   A    Yes.

1   Q    Okay.  And did you -- what did you do with the application

2   after you filled it out?

3   A    I handed it to her.

4   Q    What happened next?

5   A    She went to Eric's office, the plant manager at that

6   time --

7   Q    Uh-huh.

8   A    -- to ask him, you know, if I was going to be interviewed

9   or what.

10  Q    Okay.  And did you have an interview with Eric?

11  A    Yes.  I did.

12  Q    Was it that same day or was it on another day?

13  A    The same day.

14  Q    And where did you have the interview with Eric?

15  A    At his office.

16  Q    Who was present in the office when you interviewed with

17  Eric?

18  A    Just Eric.

19  Q    Did you record your interview with Eric?

20  A    Yes.  I did.

21  Q    And what machine did you use to record the interview?

22  A    My cell phone.

23  Q    And have you used your cell phone before to record -- I'll

24  rephrase.  Have you used your phone for recording at any other

25  time?

1   A    Yes.

2   Q    Okay.  And did that recorder work properly?

3   A    Yes.  It did.

4   Q    Where did you have your phone in the -- or during the

5   interview?

6   A    My hands, on my lap.

7   Q    When did you turn on the recorder in your phone?

8   A    About a minute or two after I walked in.

9   Q    And when did you stop the recorder?

10  A    When I felt I heard enough.

11  Q    When -- I'm sorry.  I didn't hear you.

12  A    When I felt I heard enough.

13  Q    Okay.

14       JUDGE LAWS:  And I need to ask some follow-up questions.

15  You said you turned it on about a minute or two after you

16  walked in.  After you walked into the facility or after you

17  walked into Mr. Valenzuela's office?

18       THE WITNESS:  After I walked into his office.

19       JUDGE LAWS:  Thank you.

20  Q    BY MS. ALONSO:  After the interview, did you listen to the

21  recording?

22  A    Yes.  I did.

23  Q    Did you listen to the entire recording?

24  A    Yes.

25  Q    Okay.  And what did -- how did you play back the

```
 1   recording?  Did you need to download it?  Or what did you do?

 2   A    Just go in the program on my phone, and see it, and play

 3   it.

 4   Q    You can play it from your phone?

 5   A    Yeah, play it from my phone.

 6   Q    And did the recording accurately reflect the conversation

 7   you had with Mr. Valenzuela?

 8   A    Yes.  It did.

 9   Q    Did you keep the original recording on your phone?

10   A    Yes.

11   Q    Okay.  Did you ever edit the file in any way?

12   A    No.  I didn't.

13   Q    Okay.  And did you send that file to anyone?

14   A    Yes.  I did.

15   Q    To who?

16   A    To you guys.

17   Q    To the government attorneys?

18   A    To the -- yeah, to the government attorneys.

19   Q    Okay.  And how did you transmit it to us?

20   A    Via Gmail.

21   Q    Okay.  And Mr. Ramos, do you have your phone with you

22   today?

23   A    Yes.  I do.

24   Q    Can you please take it out and go to that file, please?

25   A    Yeah.
```

1  Q    Okay.  You can just set that by -- right on the top by the

2  microphone.

3       MS. ALONSO:  And Your Honor --

4       THE WITNESS:  You want me to play it?

5  Q    BY MS. ALONSO:  You can just set it down.

6       MS. ALONSO:  Your Honor, I'm going to hand out a copy of

7  General Counsel's 247 and 246.  And 246 is the file that Mr.

8  Ramos sent to us, which was put onto a CD by the General

9  Counsel.

10      JUDGE LAWS:  Okay.

11      MS. ALONSO:  And Your Honor, 247 is the relevant portion

12 of the recording that General Counsel is relying on in Mr.

13 Ramos's refusal to rehire allegation.  Okay.  And Judge, we

14 actually wanted to play the file from his phone.

15      JUDGE LAWS:  Okay.  Go ahead and do it.  I'm going to have

16 counsel do it.

17      THE WITNESS:  Okay.

18      JUDGE LAWS:  Thank you.

19      MS. ALONSO:  I'm just going to ask him to.  Okay.  And

20 Your Honor, could you take notice of the date and time of the

21 phone -- sure.  Sorry.

22      MR. MINER:  Thank you.  That's a nasty crack.  So where am

23 I looking?  Sorry.

24      MS. ALONSO:  Right here, the dates.

25      MR. MINER:  3/25/13.

1     MS. ALONSO:  Yeah, and then the time is 13.

2     MR. MINER:  All right.

3     JUDGE LAWS:  At least it still works.  Right?

4     THE WITNESS:  Yeah.

5     JUDGE LAWS:  So it's 3/25/2013, 14:55.

6  (Audio played at 2:30 p.m.)

7     MR. RAMOS:  Yeah.  I don't want to go down to them.  I am

8  less making -- the first time -- I'm going to be honest with

9  you.  The first time that I --

10  (Audio ended at 2:30 p.m.)

11  Q    BY MS. ALONSO:  So Mr. Ramos, did you get a copy of 247?

12  A    No.

13  Q    Here's General Counsel's 247.  And Mr. Ramos, I want you

14  to follow -- this transcript indicates names and times, so I

15  would like for you to follow along.  And I'll go ahead and

16  announce when we get to these particular times.  All right.  So

17  I'm going to start the recording now.

18  (Audio played at 2:31 p.m.)

19     MR. VALENZUELA:  (Indiscernible).

20     MR. RAMOS:  Yeah.  And I don't want to go down to that

21  level.  I am less -- let me -- the first time -- I'm going to

22  be honest with you. The first time that I start working here --

23  (Audio ended at 2:31 p.m.)

24  Q    BY MS. ALONSO:  I've stopped the recording.  That voice

25  that was just playing in the first couple seconds -- do you

1    recognize that voice?

2    A    Yes.  I do.

3    Q    Whose was that?

4    A    Eric Valenzuela.

5    (Audio played at 2:46 p.m.)

6        MR. VALENZUELA:  (Indiscernible).

7        MR. RAMOS:  Yeah.  I know.

8        MR. VALENZUELA:  (Indiscernible).

9        MR. RAMOS:  I don't want to go down for that.  I am like

10   -- look at -- the first time -- I'm going to be honest with

11   you.  The first time that I stopped working here, I got fired,

12   you know, pretty -- in a pretty shitty way, man.  And even

13   Freddy knows it.  (Indiscernible).

14       MR. VALENZUELA:  (Indiscernible) people.

15       MR. RAMOS:  Yeah, man.

16       MR. VALENZUELA:  And he have --

17       MR. RAMOS:  He used to be --

18       MR. VALENZUELA:  -- a meeting, have a meeting, and then in

19   front of everybody, "Get the fuck out of here," things like

20   that.  Is that true?

21       MR. RAMOS:  Yeah, man.  He used to -- I mean, they used to

22   talk nasty -- things and the first time was -- the first time

23   that I got fired was here.  And, well, Jerry -- well, I got

24   sick and my wife was pregnant.  And I don't like to miss days

25   or anything, but at that time, my wife was very sick and she

1  was pregnant, you know.  She was almost due.  And I remember I

2  had to -- we only had one car and I had to leave work to take

3  her to a hospital.  And then the next day, when I would come

4  back, I would always show my proof.  And back then, Dick was

5  the plant manager.

6      And he would tell her like, "If you got to leave, leave.

7  If you got to, you know, if you don't have -- if you can't come

8  to -- if you can't show up it's okay.  Just bring proof and we

9  won't give you any points."  So every time I would miss a day

10  or anything, I would always bring my doctor's notices.  And all

11  of a sudden, you know, I got sick.  Me and my wife got, like, a

12  -- what's it called -- food poisoning.  We got food poisoning.

13      And I was in the hospital like since 12:00 a.m. to, like,

14  12:00 on the next day.  And the doctor told me, like, not to

15  come to work the next day, for the following day.  When I came

16  to work the next day, I told Manny, "Hey, Manny, you know, I

17  had to -- I couldn't come yesterday and I couldn't call you

18  because I was on an IV, and I didn't have nothing, and I didn't

19  have my phone or anything, but you know, I'm here.  They told

20  me not to come.  Here's my doctor's notice.  They told me not

21  to come, but I still came."

22      And she was like, "Well, you're going to have to leave,"

23  she said.  And I was like, "No, no.  I'm good."  I was like,

24  "I'm good, Maggie," you know, "I'm ready to go to work."  And

25  she was like, "No.  You're just fired."  I was like, "What?"

1    "Yeah, dude.  You're fired.  You got, like, so much points."

2        I was like, "No, Maggie.  Like, all this time that I've

3    failed -- all the time that I had to leave work, or it turns

4    out I couldn't come, or anything, I would always bring my proof

5    and I showed it to Jerry."  And they brought Jerry.  Jerry --

6    they told him , hey so what's going to happen?  "Yeah, dude.

7    You're fired."  I was like, "Jerry, I used to always bring you

8    my proof, dude.  I used to always bring you doctor's notices."

9    "Do I have them on me?  I don't have them on me," he said.  A

10   week after that, dude, my wife -- I'm sorry to call you dude.

11       A week after that, my wife gave birth.  And it was a tough

12   cookie in or -- because not even the insurance wanted to take

13   care of me.  So I was like, "I didn't do nothing, man."  I

14   didn't do -- I didn't tell Jerry anything.  I didn't tell

15   Maggie anything.  I was like, "What goes around, comes around,"

16   and I just left.  So that's the kind of person that I am.  You

17   know what I mean?

18       MR. VALENZUELA:  So how come you started working again?

19       MR. RAMOS:  Because I like this job, man.  I like this --

20       MR. VALENZUELA:  So you got fired and then some --

21       MR. RAMOS:  I came back again because I heard that Jerry

22   had gotten fired and, like, friends from here that work here

23   were like, "Yeah, Omar.  Come back, man, you know.  Guess who

24   got fired?"  I was like, "For real?"  "Yeah."  And I came to

25   apply and that's when Freddy hired me and he sent me to a truck

1  shop, which I had never done the truck shop because it was new,

2  and then this last time.

3       MR. VALENZUELA:  Your friends with Freddie?

4       MR. RAMOS:  Well, I wouldn't say "friends" friends, but

5  yeah.  I --

6       MR. VALENZUELA:  (Indiscernible).

7       MR. RAMOS:  Yeah.

8       MR. VALENZUELA:  All right.  Do you have any questions for

9  me?

10      MR. RAMOS:  Yeah.  If I get hired, am I going to start at

11  what I was --

12      MR. VALENZUELA:  What you were making?

13      MR. RAMOS:  Yeah.  And also, I'm going to keep my

14  seniority.

15      MR. VALENZUELA:  Yes.

16      MR. RAMOS:  Yes.  And benefits, everything, uniforms,

17  awesome.

18      MR. VALENZUELA:  (Indiscernible).

19      MR. RAMOS:  Uh-huh.

20      MR. VALENZUELA:  The reason why there was a lay-off -- I

21  know that is -- it seems to me like people can tell you

22  (indiscernible).

23      MR. RAMOS:  Uh-huh.

24      MR. VALENZUELA:  (Indiscernible).  The reason for the lay-

25  off was that the company was losing money and probably the

1  union thing may or may not have anything to do, but you know,

2  people talking about it, wasting time, you know, thinking and

3  talking about it made things worse --

4      MR. RAMOS:  Uh-huh.

5      MR. VALENZUELA:  -- you know, because you do that on your

6  own time, then you're okay, but if you do it during work -- and

7  the company was losing money.  We have been losing money for

8  months and months.  So they were going to shut down this plant

9  (indiscernible).  They have been losing money for almost two

10 years.  So finally, they said, "Okay, we're shutting down."

11     And then so my boss and other people say to the directors

12 -- they told them, "Hold on.  We can fix it.  Don't shut us

13 down.  We can fix it.  (Indiscernible)."  We're going to

14 replace the plant manager.  We're going to replace this and

15 that.  And we're going to have a lay-off so the new plant

16 manager can (indiscernible).  And starting with the smaller

17 crew, it's going to be easier to manage (indiscernible).

18     MR. RAMOS:  Uh-huh.

19     MR. VALENZUELA:  And then so they say, "Okay.  Go ahead."

20 So that's what they did.  So now that they hire me, now we have

21 to live up to what it was before.  And that's why we're

22 bringing people back.

23     MR. RAMOS:  Yeah.

24     MR. VALENZUELA:  So a lot of people are worried.  We're

25 bringing back people that were very strong with the union

1    thing.  And like, I don't care, you know.

2        MR. RAMOS:  Well, it's like -- this is what I think about

3    the union.  I mean, it's all up to you guys.  You know what I

4    mean?  That is up to you, because, before, on the first -- the

5    first time we tried to unionize, it was because of that, you

6    know, because everybody knew that there was favoritism.  Like,

7    only certain people would, like, move up and, like, you know,

8    like foremans (sic) and lead mans (sic), you know -- they had

9    their little -- their favorite ones.

10       So we were like, what's the rest of us, you know, the ones

11   that don't get noticed, you know, or the ones that don't get

12   along with the boss.  We got to move up.  We got to be under

13   that.  You know what I mean?  And you know -- and the other

14   thing was that, that everybody felt that their job was

15   jeopardized all the time.

16       MR. VALENZUELA:  All right.  So if you weren't, friends

17   with the boss, then job security --

18       MR. RAMOS:  Yeah.  It wasn't -- yeah, yeah.

19       MR. VALENZUELA:  -- you weren't going to have it even if

20   you were a good worker, you know.  So well, one of the reasons

21   they hired me -- well, just to tell me, when -- I'm in school.

22   I am currently going to school to be a psychologist.  It's

23   industrial psychology.  So when they called me here, I decided

24   not to work for a little while because I wanted to get ahead in

25   school.  So when they call me from his job, you know, I came to

1 the interview just because I was living in Phoenix and they

2 were going to pay for me to come here, pay the gas and

3 everything.

4      But I told my wife, "Hey, want to go to Tucson?"  "Okay."

5 I said, "They are paying for everything."  She said, "Yeah,

6 just go."  So that's why we came, I mean, honest to God.  I

7 mean, I had no intention of getting a job in Tucson, because my

8 house is a tiny thing.  And before being in Phoenix, I was in

9 Colorado.  Before that, I was in San Diego.

10      So we went from Phoenix to San Diego to Colorado to

11 Phoenix again.  And when we moved to Phoenix, I told my wife,

12 "I promise I'm not going to make you move again."  So she

13 didn't want to move here.  And I say, "I promise I -- even if I

14 have to work at McDonalds, I'm not going to make you move no

15 more."  So when -- so, you know, I wasn't in school.  And so we

16 came to the interview.  And when I talked to Juan, he told me

17 how people start making $13 an hour, and within three years,

18 and got to be at the top pay.

19      So I said -- so the plant manager's job must be pretty

20 easy because everybody is so happy, you know.  I mean, they

21 make a lot of money, you know, and I mean, just to make $17 or

22 $18 without having a college degree or something like that and

23 in a smaller place like Tucson, it must not be easy.  Right?

24 So I thought, "You know, everybody real happy.  So my job will

25 be really easy."  So I told Juan, you know -- I said look I --

1  I want you to know something before you even offer me the job,

2  you know.

3      I don't know if you are going to offer it, but before you

4  even think about it, I said, "For the last 15 years, I've been

5  working in other places where management just wants to take

6  advantage of the employees, you know, pay them minimum wage and

7  not giving good benefits, I mean, really bad, and then

8  management, upper management, is pushing me to get more

9  production out, and more quality, and all these.  And I go to

10  the employees and I ask them, "Hey, I need more work or I need

11  more quality."  And then they say, "Come on, man.  They're

12  paying me eight bucks an hour."

13      MR. RAMOS:  Uh-huh.

14      MR. VALENZUELA:  "I mean, what do you expect for that?"

15  "Yeah.  I guess you're right."  So I go to upper management.

16  "You know that we're paying $8 an hour?  You know, some of

17  these guys have been here for 10 years and they are making

18  9.75, you know."  And then I know the -- the pay raise is once

19  a year.

20      They get 15 or 20 cents, you know, once a year.  So after

21  20 years, they're still making $10, $11 an hour.  I sorted out

22  every job I've had and see it like that, you know, where my

23  supervisors that have all the experience and have been there

24  for forever are making $13 an hour.

25      I mean, I'm not kidding.  I'm talking Phoenix, San Diego,

1  then Colorado, same, and then came back to Phoenix because of

2  the job, same thing, everybody making minimum wage or a little

3  bit above minimum wage.  It's really hard, you know, so I feel

4  like I'm taking advantage of people, you know, when I know that

5  upper management are making a lot of money, you know, like --

6  so I told Juan that, "I'm not willing to take a job where I

7  feel that I'm taking advantage of the employees."

8       I said, "That's it.  The last job I took like that was six

9  months ago and I quit.  So I'm not doing that.  So if you're

10 thinking that I'm going to do something like that, I'm not your

11 man, you know.  I'm a person that cares.  I care for the

12 company.  I care for my employees.  I care for my job.  And I

13 care for my boss.  And I care, you know, but I don't care

14 (indiscernible) or my boss.  I care for my employees, you know,

15 because -- and when I was hired the first day, I had meetings

16 with the people.

17      I'm not (indiscernible), you know.  I (indiscernible).

18 But I'm a person that, yeah, I may have that, the big office

19 and whatever, but the way I see it, you know, I work for you,

20 because, you know, I'm the one that's bringing you the tools --

21 or not bringing physically, but, you know, I'm the one making

22 sure you have the tools, that you have your pay raises on time,

23 that you have your benefits, that, you know, customers pays us

24 on time so we can pay you.

25      So in reality, who's working for who?  You know what I

1  mean?  How do you be the boss?  Like, in reality, my job here

2  is to make sure that you're all right.  So if you aren't all

3  right, you know, I wouldn't have a job.  So thanks to you, I

4  have a job, you know.  So it's weird.  It's kind of weird.

5  It's kind of (indiscernible).  I'm a person that -- I really

6  care.  I do care and that's why I'm the -- we're talking

7  directly to --

8  (Audio ended at 2:46 p.m.)

9      MS. ALONSO:  That was the end of the recording.  All

10  right.  I'm going to play -- just go back to 4:20 or four

11  minutes and 52 seconds so that you can identify that voice.

12  (Audio played at 2:47 p.m.)

13      MR. VALENZUELA:  I never been told anything by, you know,

14  (indiscernible) fuck you or whatever --

15      MR. RAMOS:  Yeah.  I know.  Is that -- if I get hired, am

16  I going to start at what I was --

17      MR. VALENZUELA:  What you were making (indiscernible)

18  yours, you know, because --

19      MR. RAMOS:  Uh-huh.

20      MR. VALENZUELA:  -- if you do that on your own time, then

21  you're okay, but --

22      MR. RAMOS:  Things -- but --

23  (Audio ended at 2:47 p.m.)

24  Q    BY MS. ALONSO:  All right.  And I have to use my finger to

25  find the time button.  So I'm going to start the recording at

1    four minutes and 14 seconds.

2    (Counsel confer)

3        MS. ALONSO:  Okay.  So I'm going to start it at that time.

4    Q    BY MS. ALONSO:  And Omar, I want you to listen to this

5    voice and tell me whose it is.

6    (Audio played at 2:47 p.m.)

7        MR. RAMOS:  Yeah.  I got --

8        MR. VALENZUELA:  (Indiscernible).  All right.  Do you have

9    any questions for me?

10       MR. RAMOS:  Yeah.

11   (Audio ended at 2:47 p.m.)

12   Q    BY MS. ALONSO:  Okay.  The voice who said, "Do you have

13   any questions for me," -- do you recognize that voice?

14   A    Yes.  I do.

15   Q    Whose is that voice?

16   A    Eric's.

17   Q    And I'll restart it at four minutes and 26 seconds.

18   (Audio played at 2:48 p.m.)

19       MR. RAMOS:  If I get hired, am I going to start at what

20   I --

21       MR. VALENZUELA:  What you were making.

22   (Audio ended at 2:48 p.m.)

23   Q    BY MS. ALONSO:  Okay.  The voice asking, "If I get

24   hired," -- is that your voice?

25   A    Yes.  It is.

1   Q     And during the entire conversation we just played, whose

2   voices were those?

3   A     Mine's and Eric's.

4   Q     And that's Eric Valenzuela?

5   A     Eric Valenzuela.

6       MS. ALONSO:  Okay.  And Your Honor, I move for the

7   admission of General Counsel's 246 and 247.

8   (Counsel confer)

9       MR. MINER:  246, I understand to be a partial recording of

10  a portion of an interview with Mr. Valenzuela.  We don't object

11  to 246, again, which has been authenticated as part of that

12  discussion.  247 seems to me to not be necessary or not

13  necessarily to be accurate.  I understand that it's being used

14  to identify a certain portion of the recording that the General

15  Counsel is interested in, but it would be our position that the

16  evidence -- the discussion is in -- the portion of the

17  discussion is in General Counsel 246.

18      JUDGE LAWS:  And I tend to agree.  I think our court

19  reporter is going to be able to transcribe that verbatim.  It

20  was clear all the way through.  So I don't --

21      MS. ALONSO:  And Your Honor, 240 -- if I may respond, 247

22  we are not offering for the substance of it.  We're not

23  asserting that this is the truth, that this is actually what

24  was said.  It's an aid to the Court, an aid for you to reflect

25  the discussions and the portions that the General Counsel is

1   relying on in support of some of the allegations in this

2   complaint.

3      JUDGE LAWS:  Sure.  But that's something, I think, that's

4   better pointed out on brief.  I'd rather not have two pieces of

5   duplicative testimony in the record, one on the transcript, one

6   in a document.  You know, in briefs, certainly just point out

7   the parts that you want to highlight.

8      MS. ALONSO:  And Your Honor, we do request that this, that

9   General Counsel's 247 be put in the rejected exhibit file.

10     JUDGE LAWS:  Sure.  I mean, is there anything about it

11  that isn't cumulative?

12     MS. ALONSO:  Well, we won't know until we get the

13  transcript, so I think, at this point, it could be helpful to

14  have this in the rejected exhibit file.

15     JUDGE LAWS:  Okay.  Well, from what I heard and following

16  along, I think it is going to be cumulative.  If there's

17  anything that proves me wrong, I will reconsider it as an

18  exhibit, but for now, I am going to reject it because I think

19  it's already reflected in the record.  And I don't need it

20  there twice.

21     If I'm wrong somehow, I'll reconsider.  The Respondent has

22  not objected to GC-246.  I will accept GC-246 that has been

23  played and transcribed into the record as representing part of

24  a meeting between the witness and Mr. Valenzuela.

25     MS. ALONSO:  Okay.  And I'm going to return the phone to

1   the witness.

2   Q    BY MS. ALONSO:   Mr. Ramos, how soon after the recording

3   ended did you leave the office of Mr. Valenzuela?

4   A    How soon?

5   Q    How much time passed until you left the office?

6   A    About 15, 10 more minutes.

7   Q    And was the topic of the union brought up again in those

8   15 minutes?

9   A    No, not in that 15, really.

10  Q    And did you receive an offer to return to work with

11  Greenbrier?

12  A    I was told I was going to go back.

13  Q    What did Mr. Valenzuela say?

14  A    Before I record -- before I started recording, that's when

15  he told me that I was going to go back, that there was a big

16  chance of me going back.

17  Q    Okay.

18  A    And I decided, you know, to ask again when I started

19  recording.   That way, it could be clarified further.

20  Q    Okay.   And after your meeting with Mr. Valenzuela, did

21  Eric or anyone from Greenbrier recall you to work?

22  A    No.

23  Q    Did you get in touch with Greenbrier after your interview

24  with Mr. Valenzuela?

25  A    No.

1  Q    Okay.  Now, Mr. Ramos, at the beginning of the recording

2  that we listened to from your phone, you had mentioned that you

3  were fired from Greenbrier sometime before.

4  A    Yes.

5  Q    Okay.  And that's not -- you weren't referring to the

6  layoff.  You were referring to a time before the layoff.

7  Correct?

8  A    Yes.

9  Q    And before you were fired that previous time, when had you

10 first started to work for Greenbrier?  Do you remember the

11 year?

12 A    2007 --

13 Q    Okay.

14 A    -- around 2007, 2008.

15 Q    And for what period of time did you work for Greenbrier

16 then?

17 A    For what period?

18 Q    Was it about a year?  Was it about a year and a half?

19 A    It was about a year and a half.

20 Q    Okay.

21 A    About a year and a half.

22 Q    So you were hired in, was it, 2007 or 2008?

23 A    It was, I think, 2008 because that's the day I got

24 married.

25 Q    Okay.

1   A    And I got married before that, you know, months before

2   that, so I believe it was --

3   Q    Months before --

4   A    Yeah, 2008.

5   Q    And that was months before you started -- you got married

6   months before you started working?

7   A    Yes.

8   Q    Okay.  And --

9        JUDGE LAWS:  When did you get married?  You probably know

10  that date.

11       THE WITNESS:  December 2008.  Yeah, December.

12       JUDGE LAWS:  Okay.

13       JUDGE LAWS:  I won't ask you for the specific date.

14       THE WITNESS:  December '08.

15  Q    BY MS. ALONSO:  And in the period of time that -- or

16  during your first span with Greenbrier, what positions did you

17  work?  Let's start with your first one.  What was the first

18  position you had?

19  A    Painter.

20  Q    Okay.

21  A    And then I moved on to welder.

22  Q    Well, let's pause right there.  So about how long were you

23  a painter?  Was it a couple months or a couple weeks?

24  A    No.  It was actually more than a couple months.  It was

25  about, you know, six to eight months --

1    Q    All right.

2    A    -- I believe.

3    Q    And what position did you move on to?

4    A    To a welder.

5    Q    All right.  And which areas of the shop did you weld -- or

6    were you performing welding work?

7    A    Front shop.

8    Q    In the front shop.

9    A    Uh-huh.

10   Q    And did you hold any other position in that period of time

11   that you were in that first time frame?

12   A    Yes, materials, material handler.

13   Q    Materials handling?

14   A    Uh-huh.

15   Q    What does that mean?  What type of work did you do as a

16   materials handler?

17   A    We pretty much -- it's, like, kind of like a warehouse.

18   We get the train parts and everything.  We stock them, put the

19   part number on them, and we hand them to the guys that need

20   them, to the workers that need the parts.

21        JUDGE LAWS:  Just for the sake of time management, how

22   much more do you think you have?  And is there an affidavit?

23        MS. ALONSO:  Your Honor, I think I'm just about done --

24        JUDGE LAWS:  Okay.

25        MS. ALONSO:  -- with my questions.  So if I could just

1   have one moment -- and to answer your question, two affidavits

2   for this particular witness.

3       JUDGE LAWS:  Okay.  All right.  Then continue on.

4       MS. ALONSO:  Okay.  And Your Honor, if I could just take a

5   second, I think we're done.

6       JUDGE LAWS:  All right.  Didn't mean to suggest anything.

7   (Off the record at 2:57 p.m.)

8       MS. ALONSO:  And Your Honor, I have no further questions

9   for the witness.

10      MR. MINER:  Your Honor, is there an affidavit for this

11  witness?

12      MS. ALONSO:  We have two.  And if you give us a moment, we

13  will get those for you.

14      JUDGE LAWS:  Great.

15      MS. ALONSO:  Okay.  So there are two English affidavits

16  for this witness.  The first one is dated November 15th of 2012

17  and is 11 pages.

18      Second affidavit is dated October 31st of 2013, consisting

19  of six pages, and Exhibit A through Exhibit H.

20      JUDGE LAWS:  Okay.  Just take a look and give me an

21  initial estimate.

22      MR. MINER:  How about 20 minutes from now?

23      JUDGE LAWS:  All right.  Let's come back at 3:20.

24      MR. MINER:  Thank you.

25  (Off the record at 2:59 p.m.)

1            **CROSS-EXAMINATION**

2    Q    BY MR. MINER:  Mr. Ramos, my name is Fred Miner.  I'm an

3    attorney for Greenbrier and I'm going to ask you a few

4    questions about your testimony.  All right?

5    A    All right.

6    Q    If you don't understand my questions, please let me know

7    that.

8    A    Okay.

9    Q    You testified this afternoon about a discussion with Rudy

10   Pierson --

11   A    Uh-huh.

12   Q    -- regarding some coworkers who Rudy was cautioning about

13   their involvement in union activity.  Correct?

14   A    Correct.

15   Q    When did that conversation occur?

16   A    I'm not clear, you know, to the specific date.

17   Q    Uh-huh.

18   A    But it happened months before, you know, the election.

19   Q    Which election?

20   A    The first election that we had, back in 2011.

21   Q    It happened months before the first election in 2011?

22   A    Yeah.

23   Q    Is that the only --

24   A    It was right around the time that I got hired, you know,

25   right about that time, you know, the first one.

1  Q    And when were you hired?

2  A    In October.

3  Q    October 2011?

4  A    October 2011, yeah, around that time.

5  Q    What was Rudy Pierson's job at the time?

6  A    He was the lead man of the truck shop.

7  Q    He was a lead man.

8  A    Yeah.

9  Q    What kind of work did he do?

10 A    It was just, you know, making sure the quality of the

11 work, and you know, taking care of paperwork, and all that at

12 the truck shop.

13 Q    He assigned work to --

14 A    Yeah.

15 Q    -- hourly employees?

16 A    Excuse me?

17 Q    He assigned work --

18 A    Yeah.  He assigned work to --

19      JUDGE LAWS:  Hang on.  The two of you are talking over

20 each other.

21      THE WITNESS:  Uh-huh.

22      JUDGE LAWS:  So I know it's not the way we talk in normal

23 life, but because our court reporter here needs to get down

24 every word, just make sure Mr. Miner is done asking you a

25 question before you start to answer.  And he'll make sure

 1   you're done answering before he asks another one.

 2        THE WITNESS:  Okay.

 3   Q    BY MR. MINER:  Mr. Pierson assigned work to hourly

 4   employees.  Correct?

 5   A    Yes.

 6   Q    Did you ever know Mr. Pierson to issue discipline to

 7   employees?

 8        MS. ALONSO:  Objection, lack of foundation.

 9        JUDGE LAWS:  Overruled.  He asked if he knew.

10        THE WITNESS:  He had the authority.

11   Q    BY MR. MINER:  He did?  You know that?

12   A    Yeah.

13   Q    After that discussion, there was an election involving the

14   UTU.  Correct?

15   A    Yes.

16   Q    It was about November of 2011.  Correct?

17   A    Yeah.  I believe so.

18   Q    That's a yes?

19   A    I'm not entirely clear to the date, you know, but again --

20   Q    Are you sure it was 2011?

21        MS. ALONSO:  Objection, asked and answered.

22        THE WITNESS:  What do I do?

23        JUDGE LAWS:  I'll just ask you.  Do you -- when roughly do

24   you believe the 2011 was?

25        THE WITNESS:  It was around Christmas, you know, right

1   about around that time.

2   Q    BY MR. MINER:  And you were involved in the effort to

3   obtain an election in support of the UTU.  Correct?

4   A    Yes.

5   Q    You circulated cards to your coworkers.  Correct?

6   A    Not in the first election, I didn't.

7   Q    You did not do that?

8   A    No.  In the 2011 election, I didn't.

9   Q    Okay.  When did you first get involved with authorization

10  cards?

11  A    It was during the 2012 campaign.

12  Q    And who was it who asked you to distribute cards?

13  A    Rogelio Martinez.

14  Q    Did you attend any meetings with representatives of the

15  sheet metalworkers union?

16  A    No.  I didn't.

17  Q    So Rogelio spoke to you?

18  A    Yes.

19  Q    Where did he speak to you?

20  A    It was at the truck shop during --

21  Q    Were there any --

22  A    -- lunchtime.  Yeah.

23  Q    Sorry.  I didn't mean to interrupt.

24  A    It was during lunchtime by the truck shop.

25  Q    Were there any lead men, or managers, or foremen present

1   at the time of the discussion?

2   A    No.

3   Q    Was anybody else present?

4   A    No.

5   Q    Did Rogelio tell you about the process for obtaining an

6   election?

7   A    Yes.

8   Q    What did he tell you?

9   A    He explained to me.  I actually asked him, "How does it

10  work?"  And he explained to me that, by passing out the cards,

11  we acknowledged, you know, that we wanted to be represented by

12  a union.  And if we gave more than 50 percent of the workers to

13  -- if we get them to sign the cards, that we had a shot for an

14  election again.

15  Q    And then what happens in the election?

16  A    Then we vote if we want the union in or not.

17  Q    And then what?

18  A    And then, if it gets voted in, you know, the company is

19  supposed to sit and bargain with them.

20  Q    Okay.  And then after you spoke with Rogelio, you took

21  some cards from him.  Right?

22  A    Yes.

23  Q    And you distributed the cards to some of your coworkers.

24  Right?

25  A    Yes.

1    Q    Such as Oswaldo Chavira --

2    A    Yes.

3    Q    -- and Angel Ortega?

4    A    Yes.

5    Q    When you met with those coworkers to provide them cards,

6    did you tell them about this election process?

7    A    Yes.

8    Q    What did you tell them?

9    A    I told them that, you know, by signing the card, they

10   acknowledge that they were going to be represented by the

11   union.  And we previously talked over this with the union, so I

12   knew that we were pro-union.  And I pretty much let them know,

13   you know, that they were going to be represented in the case

14   the union was going to be voted in.

15   Q    And what did you tell them about an election process?

16   A    Pretty much I didn't tell them about the election process

17   because they knew.  They already knew from the beginning how

18   that worked.

19   Q    They knew that from 2011?

20   A    Yes.

21   Q    Were all those coworkers that you handed cards to

22   employees who had voted in the 2011 election as well?

23        MS. ALONSO:  Objection, lacks foundation, calls for

24   speculation.

25        JUDGE LAWS:  If you know.  Do you know whether they voted?

1    THE WITNESS:  I know they voted, some of them.

2  Q    BY MR. MINER:  In the 2011 election?

3  A    Yes.

4  Q    Were they all eligible?  To your knowledge, were they all

5  eligible to vote in the 2000 [sic] election.

6  A    Yes.

7    MS. ALONSO:  Objection, calls for a legal conclusion as to

8  whether those employees were eligible or not to vote in an

9  election in 2011.

10    JUDGE LAWS:  And I will accept the witness's testimony as

11  to his understanding.  I'm not going to tie any legal

12  definition to that.

13  Q    BY MR. MINER:  Do you know whether Rudy Pierson voted in

14  the 2011 election?

15  A    Yes.  He didn't.

16  Q    He did not?

17  A    Yes.

18  Q    Do you know why not?

19  A    Because he was a lead man.

20  Q    You spoke with Oswaldo, Angel, Victor Sigueinos, Alcides

21  Valencia, Cilboto Milton, Jose Soto.  Correct?

22  A    Correct.

23  Q    You provided all of them cards.  Correct?

24  A    Correct.

25  Q    You provided them cards in the truck shop area.  Correct?

1    A    Correct.

2    Q    At the time you provided the cards to those coworkers,

3    were there any lead men present at that time?

4    A    No.

5    Q    Any managers or foremen present at that time?

6    A    No.

7    Q    After you provided cards to these coworkers, did you ever

8    observe them wearing any insignia on their uniforms to work?

9    A    I don't understand the question.

10    Q    Any insignia references to the sheet metalworkers or to

11    being represented by a union?

12    A    Like if they knew that they were going to be represented

13    by the sheet metalworkers?  Is that what you're --

14        JUDGE LAWS:  Did anyone wear, like, a shirt that says

15    sheet metalworkers or a hat that --

16        THE WITNESS:  No, none of us.  Yeah, no.

17    Q    BY MR. MINER:  Nobody did anything like that?

18    A    Nobody, no.

19    Q    Did you ever talk with a lead man or a foreman about the

20    fact that you signed a card?

21    A    No.

22    Q    Did you ever tell a lead man or a foreman that Oswaldo, or

23    Angel, or others had signed cards for you?

24    A    No.

25    Q    Why not?

1    MS. ALONSO:  Objection, relevance.

2    THE WITNESS:  They didn't ask me.

3    JUDGE LAWS:  Overruled.

4  Q    BY MR. MINER:  They didn't ask.  All right.  And you

5  didn't tell them?

6  A    And I didn't tell them.

7  Q    All right.  Prior to November 12th, the day that the

8  layoffs were announced, did you speak with any lead men or

9  foremen about an organizing campaign going on among the sheet

10  metalworkers?

11  A    No.

12  Q    You testified about a discussion you had with Brian Perona

13  about another Greenbrier facility he previously worked at.

14  Correct?

15  A    Correct.

16  Q    When did that discussion occur?

17  A    It was -- the first time I heard about him and knowing

18  about the union was when I offered him a card to see if he

19  wanted to sign it.

20  Q    Okay.  Let me just stop you for a second.

21  A    Uh-huh.

22  Q    When was that?  When did that --

23  A    It was during the time that I started handing cards,

24  around October.

25  Q    Around the same day that you provided cards to other

1   coworkers?

2   A    Yes.

3   Q    Okay.  So you spoke with Brian Perona at that time?

4   A    Yes.  I did.  And I asked him if he wanted to be

5   represented by a union, if he wanted to be part of the union

6   movement.  And he said no, because that's what had happened

7   before, you know, that he was working at California and that

8   the guys over there tried to unionize.  And they ended up --

9   some of them ended up getting fired.

10  Q    What kind of job did Brian Perona have at the Tucson shop?

11  A    The ribuldana (phonetic), what is called a site frame

12  (phonetic).

13  Q    Okay.  So he wasn't a welder?

14  A    Yeah.  He was a welder.

15  Q    He was a welder?

16  A    Yes.

17  Q    And what area did he work in?

18  A    At the truck shop also.

19  Q    He was one of your coworkers in the truck shop?

20  A    Yes.  Uh-huh.

21  Q    Yes?

22  A    Yes.

23  Q    And which facility in California did he previously work at

24  where this occurred?

25  A    He was working for a Greenbrier facility at the truck shop

1   also, doing --

2   Q    But did he say which shop?  Did he say it was Mira Loma or

3   did he say it was some other California-based shop?

4   A    I'm not sure which.  He didn't say the name or anything.

5   Q    Okay.  You testified about coming in to the facility in

6   2013 and expressing your interest in rehire with the company.

7   Correct?

8   A    Correct.

9   Q    Have you ever met Christine Martinez before that time?

10  A    No.

11  Q    That was the first time you met her?

12  A    That was the first time I met her.

13  Q    And was this the first time you had met Eric Valenzuela as

14  well?

15  A    Yes.  Yeah.  It was the first time.

16  Q    The day that he interviewed you was the --

17  A    Yes.

18  Q    -- first time you met --

19  A    This is the first time I seen him.

20  Q    All right.  Did you speak with Chris Martinez first or did

21  you speak with Eric Valenzuela first?

22  A    Chris Martinez first.

23  Q    She's the first one you spoke to?

24  A    The human resources lady, yeah.

25  Q    And she told you that you needed to fill out an

1    application to be considered for rehire.  Correct?

2    A    Correct.

3    Q    Did you take that application?

4    A    Yes.

5    Q    Did you fill it out right there in the office?

6    A    Yes.

7    Q    You didn't leave with the application and fill it out

8    somewhere else?

9    A    Not that I remember, no.

10   Q    You didn't bring that application back later in a second

11   trip to the facility?

12   A    No.  I handed it to her and then she went to Eric's

13   office, I remember.

14   Q    Didn't you have some initial discussion with Chris

15   Martinez where you asked her, you know, why you had to fill out

16   an application and told her you didn't want to complete an

17   application at that time?

18   A    No.  I didn't tell her that.  I just asked her, you know,

19   if it was necessary.  I was like, "Is it necessary for me to

20   fill it out, even though I was laid off," you know, because my

21   thought was, you know, that they had my records and everything,

22   you know.

23   Q    Okay.  But she told you that it was necessary to fill it

24   out.  Right?

25   A    Yeah.  Yes.

1  Q    You don't recall taking that application and leaving the

2  facility at that time?

3  A    No.  I think --

4  Q    You didn't come back with a completed application later

5  that day?

6  A    I don't remember that, no.

7  Q    You don't remember that?

8  A    No.

9  Q    In any event, later, after speaking with Chris Martinez,

10 you spoke with Eric Valenzuela.  Correct?

11 A    Correct.

12 Q    You played an audio recording of part of that discussion.

13 Correct?

14 A    Correct.

15 Q    How long was the discussion overall, the interview?

16 A    We stopped -- I stopped the recording at 15 minutes,

17 probably, like, 10 more minutes.

18 Q    How long had you been talking when you started the

19 recording?

20 A    About a minute or two, like I said --

21 Q    Did you -- sorry.  Go ahead.

22 A    No.  Just --

23 Q    Just a minute or two?

24 A    Yeah, about a minute.

25 Q    And during that time, what did you discuss with Mr.

1   Valenzuela?

2   A    I first started, you know -- when I just walked in, I

3   asked him that, you know, if I was there to, you know, get

4   rehired.

5   Q    What did he tell you?

6   A    He told me that, yeah, you know, that I was -- since I

7   had, you know, what's it called, experience, since I had

8   experience in everything, that he needed people with

9   experience, you know, better than newbies.

10  Q    Did he make you an offer to come back?

11  A    No.

12  Q    Did he tell you to show up for work on some particular

13  day?

14  A    No.

15  Q    He didn't say, "Can you start tomorrow?"

16  A    He asked me when I was available --

17  Q    Okay.

18  A    -- and I told him as soon as possible.

19  Q    Did he tell you to come in and start working the next --

20  A    No.

21  Q    -- day or another day?

22  A    No.

23  Q    So you spoke with him for, what, a couple minutes before

24  you started the recording?

25  A    Yes.

1   Q    And it was just the two of you in his office.   Correct?

2   A    Yes.

3   Q    Did you tell him you were recording the discussion?

4   A    No.

5   Q    Why not?

6   A    Because I didn't trust him.

7   Q    Why not?

8   A    I didn't know him.  I didn't trust him.  From the get-go,

9   he told me that he was an industrial psychologist.  That

10  brought to my head, you know, a point that he might try to, you

11  know, talk to me or manipulate the conversation, so I didn't

12  trust him before.  I thought that I wish I could have had my

13  recording on previous meetings or, you know, interactions with

14  my leaders at the company to have recorders, so I saw my chance

15  and I took it.

16  Q    Didn't he say on the recording that he was an industrial

17  psychologist?

18  A    He said it.  He said it.

19  Q    So he said it again?

20  A    Yes.

21  Q    This is something he started out discussing with you and

22  then he brought it up again during the course of this

23  recording?

24  A    Yeah, when he said that he was going to school to do that,

25  you know, to major in that or something like that, you know.

1   Q    So you were sitting with Mr. Valenzuela, talking with him

2   about coming back to work, and while you were talking with him,

3   you activated the recording device on your phone?

4   A    Yes.

5   Q    How do you go about doing that?  Strike that.  What is it

6   -- what do you do -- what do you have to press on your phone to

7   get it to start recording a conversation?

8   A    First, you got to unlock the phone, go to the application

9   section.  I chose the voice recorder, pressed it, and started

10  recording.

11  Q    Did you have the phone set up to record when you went into

12  the meeting?

13  A    No.  I didn't.

14  Q    So while you were talking with Mr. Valenzuela, you

15  unlocked it.  You accessed the application, and you started

16  recording the discussion all in Mr. Valenzuela's presence and

17  during your discussion with him?

18  A    Yes.

19  Q    Okay.  And Mr. -- strike that.  After the recording

20  stopped, you spoke with him for another 10 minutes? a

21  A    About 10 minutes.

22  Q    Okay.  Earlier, counsel asked you whether the subject of

23  the union came up again during that 10 minutes and you said, I

24  believe, "Not necessarily."  Do you recall that?

25  A    Well, he just, you know, explained to me that, like, once

1   again, you know, I'm here to work for you, you know.  He said

2   that, "I'm here to work for you and, you know, whether the

3   union comes in or not, you know, I'm just willing to sit and

4   make the best, you know, out of the situation."

5   Q    Is that what he told you after the recording ended?

6   A    Yeah, because he didn't want --

7   Q    Hang on.  Hang on.

8   A    Okay.

9   Q    Thank you.  All right.  And I want to make sure I

10  understand your employment history with Greenbrier.  You

11  testified that you started the first go-around at about 2008.

12  Correct?

13  A    Yeah.

14  Q    And you worked for six to eight months as a painter.

15  Correct?

16  A    Yes.

17  Q    And you testified that, for the remainder of the initial

18  year and a half or so that you worked for Greenbrier, you also

19  worked as a welder and a material handler.

20  A    Yes.

21  Q    How long did you work as a material handler at the Tucson

22  shop?

23  A    I have no specific set dates, but it was a few months.

24  Q    A few months.  And how long were you welding at the shop?

25  A    I was welding for about, I'd say, like six to nine months

1    also, you know, around.

2    Q    Okay.  When you came back in about October of 2011, what

3    job did you come back into?

4    A    The truck shop.

5    Q    And what were you doing in the truck shop?

6    A    I was rebuilding bolsters.

7    Q    Were you welding?

8    A    Yes.

9    Q    Is that all you did between October 2011 and November

10   2012?

11   A    No.  I also went to the tracks and do some work over

12   there.

13   Q    Were you welding over there, too?

14   A    Yes.

15   Q    In the front or the center shop?

16   A    It was on the center shop.

17        MR. MINER:  That's all the questions I have.  Thank you,

18   Your Honor.

19        JUDGE LAWS:  Thanks.  Any follow-up?

20        MS. ALONSO:  No, Your Honor.

21        JUDGE LAWS:  Okay.  I have a couple questions for you.

22   When you recorded the conversation with Eric Valenzuela, was

23   your phone in plain sight?

24        THE WITNESS:  Well, I had it right here, you know, so --

25        JUDGE LAWS:  So he's indicating right in front of him.

1    THE WITNESS:  Yeah.  And he was, like, sitting, like,

2  across the desk, you know, so --

3    JUDGE LAWS:  So across a typical-sized office desk?

4    THE WITNESS:  Yeah, like that one.

5    JUDGE LAWS:  Okay.  Like the desk at counsel's table,

6  which is a typical-sized office desk, I could represent.

7    THE WITNESS:  Yeah.

8    JUDGE LAWS:  Had you been fiddling with your phone at all

9  beforehand?

10    THE WITNESS:  What do you mean?

11    JUDGE LAWS:  Let me ask something different.  Had your

12  phone been out before you turned on the recording, or had it

13  been in a pocket, or somewhere else?

14    THE WITNESS:  Yeah.  It was in my pocket.

15    JUDGE LAWS:  So you took it out --

16    THE WITNESS:  Uh-huh.

17    JUDGE LAWS:  -- turned it on.  Did Mr. Valenzuela watch

18  you do that?

19    THE WITNESS:  I think he did.

20    JUDGE LAWS:  Did he say anything?

21    THE WITNESS:  No.

22    JUDGE LAWS:  Any follow-up on my questions?

23                    **REDIRECT EXAMINATION**

24  Q    BY MS. ALONSO:  Which pocket did you have your phone in?

25  A    This one.  I always keep it on my left one.

1    JUDGE LAWS:  Left pants pocket, he's pointing to.

2    THE WITNESS:  Uh-huh.

3    JUDGE LAWS:  I'm probably the only one who can see that.

4  Q    BY MS. ALONSO:  And Mr. Valenzuela was sitting behind the

5  desk?

6  A    Yes.

7  Q    Okay.  And you were sitting on the other side of the desk?

8  A    Yes.

9  Q    Okay.  And did you know what Mr. Valenzuela could see,

10 like what he could actually see on the other side where you

11 were sitting?

12 A    But I didn't really care, you know, so --

13 Q    Where did you have the phone where you were -- where did

14 you have the phone set when you were recording?

15 A    Right here on my lap, you know, right here.

16     JUDGE LAWS:  On his left --

17     THE WITNESS:  Uh-huh.

18     JUDGE LAWS:  -- upper thigh.

19     THE WITNESS:  And my hand.

20 Q    BY MS. ALONSO:  And were you sitting down?

21 A    Yeah.  I was sitting down.

22     MR. MINER:  Maybe just one, Your Honor?

23     JUDGE LAWS:  Sure.

24                    **RECROSS-EXAMINATION**

25 Q    BY MR. MINER:  Was the phone above the surface of the desk

1    or below the surface of the desk?

2    A    I would say below the surface of the desk.

3        MR. MINER:  Thank you.  Nothing further.

4        JUDGE LAWS:  And it was not a clear desk.  Correct?  It

5    was a solid desk?

6        THE WITNESS:  No, yeah.

7        JUDGE LAWS:  Not some newfangled --

8        THE WITNESS:  Uh-huh.

9        JUDGE LAWS:  -- translucent desk.

10       MR. MINER:  That was the last bit.

11   (Counsel confer)

12       JUDGE LAWS:  Greenbrier doesn't have those, huh?

13       MR. MINER:  No.

14       JUDGE LAWS:  All right.  I want to thank you for providing

15   your testimony here today.

16       THE WITNESS:  You're welcome.

17       JUDGE LAWS:  You are not to discuss your testimony with

18   anybody else who you know has been called as a witness in this

19   case or anybody connected to what happened who might be called

20   as a witness.  Okay.  Thank you.

21       MR. MINER:  Your Honor, may I have the record reflect that

22   I'm returning the two affidavits to the General Counsel?

23       JUDGE LAWS:  Yes.

24       MS. ALONSO:  Thank you.

25       JUDGE LAWS:  All right.  Let's go off the record.

```
 1   (Off the record at 3:46 p.m.)

 2        JUDGE LAWS:  All right.  Can I please have you raise your

 3   right hand?

 4   Whereupon,

 5                            FREDDY VALDEZ

 6   having been first duly sworn, was called as a witness herein

 7   and was examined and testified as follows:

 8        JUDGE LAWS:  Can you please state and spell your name for

 9   the record?

10        THE WITNESS:  I'm Freddy Valdez.

11        JUDGE LAWS:  You probably have that spelling already.

12   Thank you.

13                          DIRECT EXAMINATION

14   Q    BY MR. GIANNOPOULOS:  Good afternoon, Mr. Valdez.  My name

15   is John Giannopoulos.  I'm an attorney for the government in

16   this case.  Where are you currently employed?

17   A    Currently?

18   Q    Yeah.

19   A    In Mira Loma.

20   Q    For who?  Who do you work for?

21   A    Greenbrier.

22   Q    And what's your position in Mira Loma?  What do you do?

23   A    Night supervisor.

24   Q    And why don't you just describe a little bit what a land

25   supervisor is?
```

1    MR. MINER:  He said night supervisor.

2    MR. GIANNOPOULOS:  I'm sorry.

3    MR. MINER:  It's all right.

4    THE WITNESS:  Excuse me?

5  Q  BY MR. GIANNOPOULOS:  A night supervisor -- what does a

6  night supervisor do?

7  A  Manages a crew of 20 guys a night.

8  Q  And when did you move to Mira Loma?

9  A  I live here.  I just go back and forth.

10  Q  Okay.  When I said move, I meant with the company.

11  A  I didn't --

12  Q  Did you transfer to Mira Loma?

13  A  Was it October 4th, somewhere in there?

14  Q  Of 2013?

15  A  Yeah.

16    MR. GIANNOPOULOS:  And Your Honor, with your permission,

17  I'd like to continue under Rule 611(c) with this witness.

18  Q  BY MR. GIANNOPOULOS:  You previously worked in Tucson.

19  Correct, for Greenbrier?

20  A  Correct.

21  Q  Okay.  Let me ask you, before you came to testify today,

22  did you discuss the subject matter of this case with anybody?

23    JUDGE LAWS:  And he's indicating the people at

24  Respondent's counsel table.

25  Q  BY MR. GIANNOPOULOS:  Mr. Miner?

1   A    Yeah, Fred, Al, and Steve.

2   Q    Mr. Lave.  Okay.  And how many times did you meet with

3   them?

4   A    Once and then yesterday, when I seen them here.

5   Q    Okay.  And they met with you in person or over the phone?

6   A    Yeah, in person.

7   Q    Was there anyone else present?

8   A    No.

9   Q    You didn't talk about your testimony or this case with

10  anyone else?

11  A    No.

12  Q    With Juan Maciel?

13  A    No.

14  Q    Eric Valenzuela?

15  A    No.

16  Q    Kevin Stewart?

17  A    No.

18  Q    Okay.  And did you review any documents at all in

19  preparation for your testimony today?

20  A    No.

21  Q    Okay.  Now, when you were working in Tucson, when did you

22  start working for Greenbrier in Tucson?

23  A    Can you say that question again?

24  Q    Sure.  We've established that you work for Greenbrier

25  currently in Mira Loma.  Correct?

1   A    Correct.

2   Q    And before you went to Mira Loma, you used to work for

3   Greenbrier in Tucson.  Correct?

4   A    Yes.

5   Q    And when did you start working for Greenbrier in Tucson?

6   A    2006.

7   Q    Okay.  And what did you do when you started working for

8   Greenbrier in 2006 in Tucson?

9   A    I was in the write-up department.

10  Q    Okay.  And so when cars would come in, you would write up

11  what was wrong with them?

12  A    Yes.

13  Q    And then did you move to a different position?

14  A    Production manager.

15  Q    So you went right from a write-up to production manager?

16  A    Correct.

17  Q    Okay.  And when did you become production manager?

18  A    I was there for two and a half years roughly, plus or

19  minus a few months.  I don't know exactly what day because --

20  Q    Okay.  And --

21        JUDGE LAWS:  So hang on.

22        MR. GIANNOPOULOS:  Sorry.

23        JUDGE LAWS:  Was it sometime in 2008, do you think, that

24  you became production manager?

25        THE WITNESS:  Somewhere in there.  That sounds right.

1   Q    BY MR. GIANNOPOULOS:  And were you the production manager

2   in Tucson until the time you were transferred to Mira Loma?

3   A    No.

4   Q    Did you have another position in between?

5   A    Yes.  Okay.  Let me make sure I -- can you ask that

6   question?

7   Q    Sure.

8   A    Like, was I doing something else?

9        JUDGE LAWS:  I think maybe an easier way to go about this

10  is, you were hired in 2006 as doing write-ups.

11       THE WITNESS:  Uh-huh.

12       JUDGE LAWS:  Walk through your chronology of everything

13  you did in order in Tucson, please.

14       THE WITNESS:  Just with Greenbrier.  Right?

15       JUDGE LAWS:  Yes.

16       THE WITNESS:  Yeah.  Well, I think, right when I became

17  production -- and then, like, after that I went back to write-

18  up.

19  Q    BY MR. GIANNOPOULOS:  Okay.

20  A    And then that's when I transferred to Mira Loma.

21  Q    Okay.  And so when did you go from being production

22  manager back to the write-up department?

23  A    I don't have the exact date, but it could be three to four

24  months, maybe three to five months back.

25  Q    Okay.  Well, just --

1    JUDGE LAWS:  From now?

2    THE WITNESS:  Yeah.

3    Q    BY MR. GIANNOPOULOS:  Okay.  Let's -- how about -- let's

4    pinpoint around the time of the union election.  You're aware

5    that there was a union election in July 2013 at Greenbrier.

6    Correct?

7    A    I heard something like that, yeah.

8    Q    Were you working at Greenbrier --

9    A    Yeah.

10   Q    -- in Tucson in July 2013?

11   A    Yeah.

12   Q    Okay.  And were you a production manager there or were you

13   back in the write-up department?

14   A    When?

15   Q    The election occurred.

16   A    Write-up.

17   Q    Did you vote in the election?

18   A    Yes.

19   Q    Okay.  And with respect to the election, how far in

20   advance of that election did you go back to the write-up

21   department?

22   A    Roughly six to seven weeks, somewhere in there.

23   Q    Six to seven weeks before the election?

24   A    When the votes came in or --

25   Q    Yeah.

1   A    It could be close to two months.

2   Q    Two months.  Okay.

3   A    Yes.

4   Q    And what prompted you moving back into the write-up

5   department from being production manager?

6   A    Just the pressure --

7   Q    Okay.

8   A    -- you know.

9   Q    Would you consider that a demotion?

10  A    No.  I mean, because for me, it was just more like, you

11  know -- it was business, so I just, like -- it was too much

12  pressure for me at the time.  So that's when I just decided to

13  step down.

14  Q    And that was your -- you did that voluntarily yourself?

15  A    Yeah.

16  Q    Nobody, no one told you they were going to demote you or

17  fire you if you don't step down?

18  A    Not to that, not to those words, no.

19  Q    Well, whether words --

20  A    I mean, no.  I mean, no.

21  Q    When you were production manager, did anyone from

22  Greenbrier tell you that there was an issue with your

23  performance as production manager?

24  A    Say that again.

25  Q    Sure.  While you were production manager at Greenbrier,

1    did anybody above you at the company ever come and tell you

2    they're having issues with your work performance?

3    A    No, not like verbally.  I mean, if anything, things we

4    cannot improve on.

5    Q    The Tucson shop, at least -- how was the Tucson shop doing

6    under your management?  How would you describe it?  Was it

7    doing well?  Was it doing poorly?

8    A    Poorly.

9    Q    Poorly.  And was it doing poorly before you took over?

10    A    No.  It was still in poor condition.

11    Q    So before you took over the Tucson shop as production

12    manager, it was doing poorly?

13    A    Yes.

14    Q    Did you have a chance to look at the financials of how

15    well the Tucson shop was doing before you took over?

16    A    I don't believe, no.

17    Q    So when you say it was doing poorly, it's just an estimate

18    on your part?

19    A    Yeah.

20    Q    Okay.  And is it your testimony that nobody at Greenbrier

21    had any concerns with your performance as production manager?

22    A    That anybody had any concerns about me the way I was being

23    production manager?

24    Q    Yeah.

25    A    I don't understand, you know.

1   Q    Did any -- did the boss ever call you in a meeting and

2   say, "Freddy, we've got some issues with the Tucson shop that

3   you're managing.  It's not going well."

4   A    No, no.  As far as -- when we had meetings, there was

5   things about what we could improve, what areas, stuff like

6   that, but you know, things that I can work on also.

7   Q    They told you, "Hey, you need to work on this.  You need

8   to work on that."

9   A    Yeah.

10  Q    "Your shop's not doing well."

11  A    Correct.  Yeah.

12  Q    And what were the issues that were brought to your

13  attention with respect to the Tucson shop?

14  A    Like what we can do better.

15  Q    Yeah.

16  A    You know, like, well, let me see.  There's a lot of areas

17  in that, like, X material, make sure that's done right, covered

18  right.  That's one example.  Make sure that the right material

19  is being ordered so the cars are not on a stand, you know,

20  wave, just little stuff like that.

21  Q    Sure.  Let's talk about materials.  There was a real issue

22  with respect to inventory and materials while you were the

23  production manager of the Tucson shop.  Right?

24  A    It was getting better.

25  Q    But there was a problem.  There was a real issue.  Right?

1   There was a lack of material, a lack of inventory in the Tucson

2   shop while you were production manager, wasn't there?

3   A    I would say not a whole lot, but you know, like, we wanted

4   to make sure everything works better.  You know what I mean?

5   Just, you know, not -- it wasn't really affecting us as much.

6   Q    Let me kind of focus your attention now.  You were aware

7   there was a layoff in November of 2012.  Correct?

8   A    A layoff?

9   Q    A layoff in November of 2012.  You're aware of that,

10  aren't you?

11  A    Yeah.

12  Q    Okay.  And let's say that, six to eight months before the

13  layoff in 2012 -- isn't it true that there was a real inventory

14  problem at the Tucson shop?  There was a lack of materials,

15  wasn't there?

16  A    Either that -- no, no -- there was some, again, some, but

17  there was also issues with maybe parts coming in wrong maybe

18  because a vendor might have sent them.

19  Q    Okay.

20  A    You know, it's just part of the business, you know.  Just

21  stuff happens.

22  Q    And the issue with parts coming in wrong is something that

23  you're supposed to oversee, isn't it, as production manager?

24  A    Work with the material manager.

25  Q    And the issue of not having enough inventory in the shop

1    is something that you're supposed to oversee.  Right?

2    A    Yes.

3    Q    And isn't it true that the issue of not having enough

4    inventory in the shop was causing a huge backlog of cars that

5    needed to be worked on in the Tucson shop?

6    A    Again, there was enough material to keep cars flowing, you

7    know, so I guess, you know, what you're asking me, to me, it

8    was not a setback because the cars kept coming in at a certain

9    time.  And then they were being brought to the shop, being

10   worked.  I mean, again, there was not a big setback for cars

11   that were on a standstill.

12   Q    Isn't it true the lack of materials caused employees to

13   wait around at times, waiting for certain materials to come in

14   so they can fix these cars?

15   A    Maybe around that time, we were -- they brought in the

16   Cispro system and we were all trying to get familiar with it

17   because, you know, you just can't go get a part unless it's

18   properly documented and moved.  So it was a transition for

19   everybody there at the time.

20   Q    Okay.  So let's talk about the Cispro system.  When about

21   was that implemented in relation to the layoff?  The layoff was

22   November 12th, 2012.  When do you remember the Cispro system

23   coming in?

24   A    Well, when the layoff came -- I'm going to say -- let me

25   see, you know, a year, probably a year.

1   Q     And wasn't the Tucson shop one of the first shops in the

2   Greenbrier system to implement the Cispro system.

3   A     I believe second or third.

4   Q     And who was first and second, if you remember?

5   A     What I want to say was Chehalis and maybe San Antonio

6   somewhere.  I don't know what order.  I just --

7   Q     Okay.

8   A     -- you know --

9   Q     And the Cispro system -- the Cispro system in Tucson was

10  causing some real problems in the production area.  Right?

11  A     Just trying to get -- everybody was trying to get familiar

12  with it.

13  Q     And that trying to get familiar with the Cispro system was

14  causing inefficiencies, wasn't it?

15  A     Some, not a whole lot, but some of it --

16  Q     Some of it.

17  A     -- you know.

18  Q     And it was causing, you know, parts to be ordered wrong.

19  Right?

20  A     The Cispro doesn't order the system.  It's ordered by a

21  material manager.

22  Q     Okay. But that whole familiarity was causing, you know,

23  materials to come in late, parts to come in wrong, wasn't it?

24  A     The Cispro was more like to track what we have on hand,

25  and where cars are going to, and stuff like that.  I'm not

1   really sure I understand your question.

2   Q   Well, because of that system, trying to get familiar with

3   the system, weren't there mix-ups and materials going to the

4   wrong cars?

5   A   It could happen.

6   Q   And parts going to the wrong cars.  Right?

7   A   Yeah.  You know, stuff like that could happen.

8   Q   And that would cause workers to work extra hours that you

9   can't bill to clients.  Right?

10  A   No.  For the meantime, they corrected that pretty quick, I

11  mean, because if the material is right there, that's the raw

12  one.  They just go ahead and make the material manager and the

13  foreman get together.  They talk about it and make the change

14  right away.  They fix it.

15  Q   You're not a welder, are you?

16  A   Am I a welder?

17  Q   Uh-huh.

18  A   I started off as a welder.

19  Q   You didn't weld at Greenbrier, did you?

20  A   No.  I didn't weld at Greenbrier, but I started it in '93

21  with Arizona Freight Car.  I was a welder then.

22  Q   Okay.  When you started at Greenbrier, did you have a

23  welding certificate?

24  A   You know what?  When I started with the company freight

25  car -- and when Greenbrier came in, my certificate should

1   probably still be there.

2   Q    At the time you started working for Greenbrier, you said

3   you started working as a write-up.  Correct?

4   A    Yeah.

5   Q    Okay.  Did you have a valid welding certificate to your

6   knowledge?

7   A    From Greenbrier?

8   Q    Yeah.

9   A    No.  I never really asked because I figured my old one got

10  transferred, so I didn't --

11  Q    You never did any welding for Greenbrier.  Correct?

12  A    Like, well, a whole day's worth, no.

13  A    On production.

14  A    No.

15  Q    Okay.  And you're not a journeyman welder, are you?

16  A    Journeyman?  What do you mean?

17  Q    Do you know what that means, a journeyman welder?

18  A    Like a long-time welder?

19  Q    Yeah.

20  A    Day-per-day basis, no.

21  Q    Okay.  And when you moved back from production manager to

22  write-up, who did you have that discussion with?  How?  Did you

23  go to your boss?  Did your boss come to you?  What happened?

24  A    When I went from production to write-up --

25  Q    Uh-huh.

1    A    -- yeah, right at that time, I stepped in, and talked to

2    Eric, and told him I wanted to, you know, go back into the

3    write-up department.

4    Q    Okay.  What were your job duties as a production manager?

5    A    Make sure that the -- I help any area like the material

6    department, the foreman.  I work more with the material

7    manager, foreman, keep track of flow of cars coming in, make

8    sure that the appropriate cars are assigned to the right

9    tracks, work closely with the plant manager, make sure that we

10   got enough cars coming into our facility, and stuff like that.

11   Q    Who did you report directly to in 2012 when you were

12   production manager?

13   A    Was it Lex?  I think he was our plant manager.

14   Q    Plant manager.

15   A    Lex.

16   Q    Would you have foremen under you that reported directly to

17   you?

18   A    When I was a production manager, yes.

19   Q    Yeah.  And in 2012, who were those foremen?

20   A    I know Hector Barajas was one of them.

21   Q    And what did Hector Barajas oversee?  Was there a certain

22   area of the plant he oversaw?

23   A    Yes, a section of the shop.  I mean, you want -- there's

24   four sections of the shop, but --

25        JUDGE LAWS:  And we've gotten some familiarity, so it

1    makes sense.

2         THE WITNESS:  Okay.  So yeah.

3    Q    BY MR. GIANNOPOULOS:  So Hector oversaw what sections?

4    A    So we got the front, the center, intermodal, and then the

5    back shop, so he was center.

6    Q    And did Hector have any leads that reported to him?

7    A    In 2012?

8    Q    Yeah.

9    A    I'm trying to remember who they were.

10   Q    If you can.  If you can't, that's fine.

11   A    I'm not really sure who.

12   Q    Okay.  Can you estimate the number of leads that would

13   have reported to Hector?

14   A    I'm going to say between an average of one and two.

15   Q    And then how about any other foremen?  So we have Hector.

16   Who else?

17   A    And then you have Cesar.  He was the front shop foremen.

18   Q    And did he have leads that reported to him?

19   A    Two.

20   Q    Two.  Do you remember the names of those leads?

21   A    One of them is Elizama Radago.  And the other one is -- I

22   believe his last name is Lopez, first name Ismael.

23   Q    Okay.  So any other foremen?  We've now identified two of

24   them.  Were there any other foreman in 2012 that reported to

25   you?

```
 1   A     Ricky Fonseca.

 2   Q     Mr. Fonseca?  And what part of the shop did he oversee?

 3   A     The intermodal shop.

 4   Q     And how many leads did Mr. Fonseca have reported to him?

 5   A     One.  There was one.  Yeah.

 6   Q     Do you remember the name of that lead?

 7   A     I believe it was Greg Nuraria (phonetic).

 8   Q     Okay.  So we've got three foremen reporting to you.  Any

 9   others?

10   A     Around that time -- I don't know what time -- I think

11   Edgar was a foreman in the back shop.  I want to say somewhere

12   around that time, maybe, it could be.

13   Q     And his name was Edgar?

14   A     Yeah.

15   Q     Okay.  And do you remember his last name?

16   A     Jimenez.

17   Q     And did he have any leads that reported to him?

18   A     It was a smaller track.  I think it was just him.

19   Q     Okay.  And you were also production manager in 2011.

20   Correct?

21   A     I believe so, yeah.

22   Q     Okay.  And that was -- at the time, there was a union vote

23   in 2011 also.  You're aware of that, aren't you?

24   A     Correct.

25   Q     Okay.  And in 2011, wasn't Rudy Pierson a lead?
```

```
 1   A     Wait.  In 2011?

 2   Q     2011.

 3   A     Well, there was also the truck shop.  We didn't talk about

 4   that.

 5   Q     Okay.

 6   A     I'm trying to remember if he was -- maybe he was a lead in

 7   the truck shop.

 8   Q     Was he ever a foreman?

 9   A     No.

10   Q     Okay.  In 2012, let's move back again.  I thought we had

11   finished all the foremen.  Who was the foreman of the truck

12   shop?

13   A     In 2012?

14   Q     Uh-huh.

15         JUDGE LAWS:  Well, you asked 2011 and then he responded in

16   2012, so which one do you want?

17         MR. GIANNOPOULOS:  No, no.  I just -- I apologize.  I

18   wanted to move back to 2012, my error.

19         JUDGE LAWS:  Okay.

20   Q     BY MR. GIANNOPOULOS:  The truck shop foreman -- was there

21   a truck shop foreman in 2012?

22   A     Let me think here.

23         JUDGE LAWS:  I may have misheard you.

24         THE WITNESS:  It must have been Armondo.

25   Q     BY MR. GIANNOPOULOS:  Armondo?
```

1    A    Lopez.

2    Q    Lopez.  And were there any leads in the truck shop?

3    A    No.  I don't think so.

4    Q    And are those all the foremen that reported to you then in

5    2012, the ones you just named?

6    A    The thing about Armondo -- I don't know what time he

7    actually came in.

8    Q    Uh-huh.

9    A    But at one point, he did.

10   Q    Okay.  And when you were the production manager, did you

11   have an office at the Tucson facility?

12   A    Yes.

13   Q    And where would that office be?  Was it in a building?

14   Was it near one of the shops?

15   A    It was -- well, it was just, like, a double-wide, I don't

16   know, trailer or whatever you want to call it sort of, like, in

17   the middle, I guess, where it was located.

18   Q    Near the intermodal shop?

19   A    It was more towards near the front shop.

20   Q    Okay.  Did you walk around the facility during your normal

21   workday or were you more in the office?

22   A    A little bit of both.

23   Q    50/50?

24   A    Yeah.  It just depends where I was needed or what I needed

25   to do.

1    Q    Okay.  And is the same true for 2011?

2    A    That's when I started.  I was trying to get -- yeah.  I

3    think I was just getting up and running, seeing what the

4    production manager decision was all about.

5    Q    Okay.  Now, the 2011 election at the Tucson facility --

6    you're aware that the union lost that election by three votes.

7    Correct?

8    A    I knew it was close.

9    Q    Okay.  And --

10   A    I heard.  I'm sorry.  I heard.

11   Q    Okay.  And you also had heard from company officials that

12   employees in Tucson could not petition for another election for

13   at least a year.  Correct?

14   A    Can you ask me that question again?

15   Q    Sure.  After the 2011 election, when the union lost, you

16   said you heard it was close.  Right?

17   A    Uh-huh.

18   Q    You also heard from Greenbrier officials, managers, people

19   above you that the union or employees could not petition for

20   another union election for at least a year.  Right?

21   A    Uh-huh.

22   Q    You had heard that.  Correct?

23   A    Yeah.

24   Q    And when the year ban was coming up in 2012, management

25   officials weren't anticipating that employees would start

1    organizing, start trying to unionize again.  Correct?

2    A    Well, was who worried or what?  Can you say that again?

3    Q    Sure.  Let's move forward now from 2012.  So the union

4    lost the 2011 election.

5    A    Yeah.

6    Q    The year ban was coming up.  As the ban was approaching in

7    2012, isn't it true that Greenbrier officials were concerned

8    that employees might try to petition for a union again?

9    A    When you say Greenbrier officials, who would that be?

10   Q    Everybody at your level and above.

11   A    Okay.  They could have been talking about that.

12   Q    Yeah.  You heard them --

13   A    Yeah.

14   Q    -- talk about that.  Right?

15   A    Yeah.

16   Q    Who did you hear talk about that?

17   A    Just word of mouth.  People are talking about it.

18   Q    Yeah.

19   A    You know, I mean, you know, since it was a close vote to

20   2011, you know, we kind of --

21   Q    Sure.

22   A    -- anticipated.

23   Q    And in fact, they had been talking about that throughout

24   that year.  Right?

25   A    I really didn't get involved and talk a lot about that

1    material you're talking about.

2    Q    Okay.  When you said you heard people talking about that,

3    who do you remember hearing that from?

4    A    I don't know who exactly, but, you know, there was just

5    people randomly talking.

6    Q    Mike Torra?

7    A    No.

8    Q    Al Lave?

9    A    No.  I don't know if pretty much -- I don't really know

10   who said something.  But really, like I said, I didn't get

11   involved with if there was going to be a vote coming in or not.

12   I was too busy trying to focus on production.

13   Q    Okay.  And when was the first time in 2012 that you found

14   out that there was talk around the shop of trying to get the

15   union back in?

16   A    I don't remember.

17   Q    So let's try to us some target dates.  The layoff was

18   November 12th, 2012.  Right?

19   A    The layoff was November 2012.  Yeah.

20   Q    Then we have a Fourth of July holiday.  Okay?  Did you

21   estimate that you heard before the Fourth of July holiday or

22   after the Fourth of July holiday?

23   A    I didn't know there was going to be a vote.

24   Q    I'm not talking about a vote.  I want to know when was the

25   first time that you became aware or you heard that employees in

1    the Tucson shop were talking about unionizing again.

2    A    I don't remember.  I don't even remember -- again, when I

3    heard something was when I was coming into work one time,

4    because I get there early and I leave early.  So I didn't

5    really hear anything about that, you know.  I stay late, leave

6    early.  So all I know is, there was people talking about it

7    because, one time, we were coming into the shop and there was

8    some gentleman out there trying to pass out some flyers.

9    Q    And that was the only -- that was the first time you heard

10    about it?

11    A    That I seen physically something, yeah.

12    Q    I'm not asking about when you seen physically something.

13    I want to know when the first time you heard anything about

14    employees in Tucson in 2012 being interested in unionizing

15    again.

16    A    No.  I didn't.

17    Q    Not until you saw that person outside the shop?

18    A    Yeah.

19    Q    Isn't it true that you were at a meeting on Halloween in

20    2012 where Al Lave was present with the other foremen, lead

21    men, supervisors of Tucson?  Do you remember that meeting?

22    A    Okay.  I think I got my dates wrong.

23    Q    Uh-huh.

24    A    Okay.  So you're asking me, when did I hear about it?

25    Q    I'm asking you, in 2012, when was the first time that you

1 ever heard anybody say anything that employees were interested

2 in unionizing again --

3 A    Okay.

4 Q    -- whether it's a Greenbrier official or one of the

5 employees that worked under you?

6 A    I don't remember that, that conversation.  But I do

7 remember Al coming and talking to us.

8 Q    Okay.  And is it your testimony that that's the first time

9 you heard anything about employees in 2012 being interested in

10 unionizing?

11 A    That I can remember, yeah.  I mean, it's been a while.

12 Q    And what do you remember from that conversation?  What do

13 you remember Al saying?

14        JUDGE LAWS:  Are you talking about the meeting?

15        MR. GIANNOPOULOS:  The 2012, October 31st meeting with Al

16 Lave.

17        JUDGE LAWS:  Okay.

18        THE WITNESS:  There was just conversations of, you know --

19 being a supervisor, you know, you can't say, like, vote yes,

20 vote no, so you just kind of hear them out, stuff like that.

21 Q    BY MR. GIANNOPOULOS:  I don't understand when you're

22 saying just kind of, like, hear of mouth --

23 A    Like what -- you're asking me what that meeting was about?

24 Q    I was asking you what was said about the union in that

25 meeting, about unionizing in that meeting.

1   A    There was nothing like they were trying to get something

2   in, but they were just talking about more like, if something

3   was to come up, you know, and then employees were concerned

4   whether there were -- whatever the case was there, they could

5   come talk to us, you know, like, be prepared, and what we

6   needed to tell them.

7   Q    Isn't it true during that meeting, that Mr. Lave said that

8   there was talk already in the shop of employees wanting to

9   bring the union back in?

10  A    I don't remember.

11  Q    You don't remember that?

12  A    No.

13  Q    Did you ever talk to any employee at Greenbrier about

14  unions or unionization in 2011 or 2012?

15  A    Me?

16  Q    Yeah, personally.

17  A    No.  They just -- no.  Just some employees said, "Hey,

18  what's going to happen if we go union or we don't?"  I go, "I

19  don't know.  I've never been through this."  So I didn't really

20  talk to anybody about anything specific, I mean, that I can

21  remember.

22  Q    When did you first learn that there would be a layoff in

23  November 2012?

24  A    The same day.

25  Q    The day of the layoff?

```
 1   A     Yeah.

 2   Q     And how did you find out about it?

 3   A     They called us in a group and they separated two groups.

 4   Q     And --

 5   A     And then that's the very first day I found out, because

 6   they brought us in two groups.  And was it -- Juan brought -- I

 7   was in the group where the employees were being retained.  And

 8   that's what I heard that, "Hey, we're being retained," so I'm,

 9   like, wondering what's going on."  And then they let go of so

10   many people.

11   Q     Okay.  And so isn't it true that, before the day of the

12   layoff, November 12th, 2012, you had no idea there was going to

13   be a layoff that day.  Right?

14   A     Not to my knowledge.

15   Q     You had no idea that Greenbrier was even planning a

16   layoff.  Right?

17   A     Not to my knowledge.

18   Q     Okay.  So that's true.  That's correct.

19   A     The very first day I heard about that layoff was the same

20   day.

21   Q     Okay.  No one had ever called you up and said, "Hey, we're

22   going to lay off employees."  Right?

23         MR. MINER:  Objection, asked and answered, Your Honor.

24         JUDGE LAWS:  He's answered this.

25         MR. GIANNOPOULOS:  Okay.
```

```
 1       JUDGE LAWS:  I think we've covered it.
 2   Q   BY MR. GIANNOPOULOS:  And nobody ever asked you to
 3   identify which employees we should keep or which employees we
 4   should lay off.  Correct?
 5   A   No.
 6   Q   That's not correct?
 7   A   Well, you're asking me who should we --
 8   Q   I'm sorry.  Did anyone ever call you and ask you who we
 9   should retain or who we should fire?
10   A   No.
11   Q   Okay.
12       JUDGE LAWS:  When you ask in negative and ask if it's
13   correct --
14       MR. GIANNOPOULOS:  I apologize, Your Honor, for my poor --
15       JUDGE LAWS:  -- it can be confusing.
16       MR. GIANNOPOULOS:  -- poor question.
17   Q   BY MR. GIANNOPOULOS:  Now, at the time of the layoff,
18   isn't it true that there was a backlog?  Right?  There was a
19   backlog of work on November 12th, 2012.  Correct?
20   A   Backlog of work?
21   Q   Yeah.  There were cars.  You had a bunch of cars waiting
22   to get worked on.  Correct?
23   A   I believe so.  I think that's when -- yeah.
24   Q   Did anyone ever tell you why there needed to be a layoff
25   in November 2012?
```

1   A    Wait.  Say that again.

2   Q    Sure.  Did anybody ever tell you why the company needed to

3   lay off employees in November 2012?

4   A    No.

5   Q    Okay.  Did you ever talk to any of your leads in October

6   or November of 2012 about employees being interested in the

7   union?

8   A    Did I?

9   Q    Yeah.

10  A    No.  I didn't approach nobody.

11  Q    No.  But did any leads ever come to you and say, "Hey, So-

12  and-So is passing out union cards," or, "So-and-So is talking

13  about the union," or, "This and that is going on about the

14  union,"?

15  A    No.  I mean, just maybe when -- I don't know if there was

16  guys out there and they got a flyer.  They said, "Hey, did you

17  get the flyer?"  I go, "No," and I went about my business.

18  Q    Okay.  Did you ask anyone why the company had to lay

19  people off in November 2012?

20  A    That day of the layoff, you know, I was wondering what was

21  going on and they pretty much did a reduction because the

22  company wasn't doing good.

23  Q    And who did you ask?

24  A    Juan.

25  Q    And that's all Juan told you?

```
 1   A    Yeah.

 2   Q    How about -- were you the production manager when

 3   employees were being recalled in about February 2013?

 4   A    When they were being called back?

 5   Q    Yes.

 6   A    Yeah.  I was production manager.  That sounds right.

 7   Q    Okay.  And did anybody ever talk to you about the rehires?

 8   A    No.  They just -- I was told that they're going to bring

 9   some guys back.  And I said great.

10   Q    And that's the total extent of the role that you played in

11   the rehires.  Correct?

12   A    Yeah.  I mean, I was just happy to see some guys back so

13   we can get our --

14   Q    Okay.

15   A    -- work back up, you know, so --

16   Q    Did anyone tell you why employees were being recalled?

17   A    Why?

18   Q    Uh-huh.

19   A    No.

20   Q    Did anyone ever tell you how they decided which employees

21   to recall?

22   A    No.

23   Q    And you played no role in deciding which employees should

24   be recalled.  Correct?

25   A    To bring back?
```

1  Q    Yeah.

2  A    No.

3  Q    You played no role in that?

4  A    No.  I just remember saying, "Hey, you got two guys

5  coming, four guys here coming," and so --

6  Q    And you were happy to get guys.

7  A    Yeah.  I mean, I was, yeah.

8  Q    And when again did you move from production manager back

9  to write-up in 2013?  I think you said it was maybe seven weeks

10  before the election.  Or I don't want to misstate the exact

11  words you used.

12  A    Well, I don't know exactly what date it was.

13  Q    Okay.

14  A    It was - it could have been -- I think I said two months.

15  Q    Between --

16  A    It could have been somewhere in there.

17  Q    Sure.  Between, let's say, January 1st -- in that two

18  months when you went back to production, did you participate in

19  any meetings with --

20  A    You mean write-up or --

21  Q    Yeah, write-up.  If I said production, I meant write-up.

22  You went back to write-up.

23  A    Okay.

24  Q    Did you participate in any meetings with Greenbrier

25  management where they were talking about the union drive?

1    A    Okay.  Can you ask me that question again?

2    Q    Sure.  Between the start of 2013, January 1st, and the

3    time that you went back to write-up, were you in any meetings

4    with management where they were talking about the union

5    organizing drive?

6    A    It could have been when I was in write-up, not production,

7    like you said, and I think -- was it Mr. Torra?  Mike Torra

8    came in, and just did his regular routine stop, and had

9    meetings with us, and might have mentioned something to that.

10   Q    Okay.  But that's when you were in write-up.  Right?

11   A    I believe so.  I believe that was the date.

12        JUDGE LAWS:  Do you remember, at any time during the

13   campaign leading up to the 2013 election, being told as a

14   manager what you can and cannot do in response to a union

15   campaign?

16        THE WITNESS:  Well, I know -- as supervisor, I already

17   know that, you know, you're not allowed to --

18        JUDGE LAWS:  I understand that.

19        THE WITNESS:  Yeah.

20        JUDGE LAWS:  And then I'm talking about where -- did you

21   go to any meetings in the 2013 time period as a manager, being

22   told, with regard to that current campaign that was going on

23   then, what you could and couldn't do?

24        THE WITNESS:  I don't remember.

25        JUDGE LAWS:  Okay.

1    MR. GIANNOPOULOS:  Your Honor, can I just have a couple

2    minutes?

3    JUDGE LAWS:  Sure.

4    MR. GIANNOPOULOS:  I think that I'm getting close to the

5    end.

6    (Off the record at 4:27 p.m.)

7    Q    BY MR. GIANNOPOULOS:  Mr. Valdez, sometime in 2013, you

8    became aware of the fact that Greenbrier was going to close

9    down the Tucson shop.  Correct?

10   A    I found out when the shop was going to close down, when

11   they told everybody.

12   Q    Okay.  And do you remember when that was?

13   A    The day?  I don't know.  It could have been September,

14   somewhere in there.

15   Q    And how did it come about that you transferred to -- are

16   you at Mira Loma?  Is that where you're at now?

17   A    Yes, sir.

18   Q    Yeah.  How did it come about that you transferred to Mira

19   Loma?

20   A    Because, when -- that day that they told us they were

21   going to close the shop, when they told everybody, they pretty

22   much said that, if we wanted to transfer, you know, there's

23   going to be that option, not just to me, to all employees.

24   Q    And did you transfer to Mira Loma as a write-up?

25   A    No.  When I transferred, there was a position and I went

1   that -- for a supervisor, foreman.

2   Q    And they gave it to you?

3   A    Correct.

4   Q    Okay.  And did you get some sort of money to transfer,

5   expense money, or a bonus?

6   A    Just a moving allowance.

7   Q    Uh-huh.

8   A    Yeah.

9   Q    Was it five grand?

10  A    No.  It was more like 10.

11  Q    Okay.  And who took over for you as production manager in

12  Tucson when you moved back down to the write-up?

13  A    Officially, there was no production manager after that.

14       MR. GIANNOPOULOS:  Okay.  Those are all the questions I

15  have, Your Honor.

16       MR. MINER:  Your Honor, I have no questions for Mr. Valdez

17  at this time, but we do reserve the right to call him during

18  the company's case.

19       JUDGE LAWS:  Okay.  And I just have a question for you.

20  It may lead to additional questions.  I'm showing him the map

21  of the facility.  It's 168.  And --

22       THE WITNESS:  Are all 55 acres there?

23       JUDGE LAWS:  Yeah.  We got all 55 acres, if that's what it

24  is.  You had referred to Mr. Jimenez, Edgar Jimenez, being a

25  foreman of what you said was a back, back shop.  Did you just

1   repeat the word back?

2       THE WITNESS:  I think I did.  Yeah.

3       JUDGE LAWS:  Okay.  And what is the back shop?

4       THE WITNESS:  Okay.  Okay.

5       JUDGE LAWS:  Can you point to me?

6       THE WITNESS:  Let me see.  This is -- let me see.  Can I

7   look at this real quick first?

8       JUDGE LAWS:  Sure.  Orient yourself and then --

9       THE WITNESS:  Yeah.  I know.  I was like -- you see this

10  right here?  This is the front shop.

11      JUDGE LAWS:  Yeah.

12      THE WITNESS:  That's the center shop --

13      JUDGE LAWS:  Yeah.

14      THE WITNESS:  -- the paint shop, the intermodal shop.

15  Right there is another piece of that.

16      JUDGE LAWS:  Another piece of what?

17      THE WITNESS:  The back shop.

18      JUDGE LAWS:  In the back shop.  So what is identified as

19  rec shop -- what's the difference between the rec shop and the

20  back shop?  Or are they called the same thing?

21      THE WITNESS:  The rec, you work more of the cars that have

22  been involved in a derailment --

23      JUDGE LAWS:  Uh-huh.

24      THE WITNESS:  -- versus the center is more running

25  repairs.

 1      JUDGE LAWS:  So physically, was the back shop -- are you

 2  indicating it's over to the right of the rec shop?

 3      THE WITNESS:  Yeah.  Right here is the center shop --

 4      JUDGE LAWS:  Yeah.

 5      THE WITNESS:  -- so it would be right here, just the strip

 6  right here, those two lines.

 7      JUDGE LAWS:  Here and here?

 8      THE WITNESS:  Uh-huh.  Wait.  You know what?  I take that

 9  back.

10      JUDGE LAWS:  Okay.

11      THE WITNESS:  It's actually here on the floor, where we're

12  working those cars, on that flat area.  And then, from there,

13  we use these tracks just to button things up at the end.

14      JUDGE LAWS:  And that's what you called the back shop?

15      THE WITNESS:  Yeah.  And then this would be the truck

16  shop.

17      JUDGE LAWS:  But the back shop is open air, basically?

18      THE WITNESS:  Yeah.

19      JUDGE LAWS:  All right.  And I'm going to show everybody

20  what was just I identified.  It was -- the witness said it was

21  this brown area here and then this one, the lower line of

22  tracks.

23      MR. GIANNOPOULOS:  Okay.

24      JUDGE LAWS:  And that's going to make no sense to Grant.

25  So why don't we, when we go off the record, go ahead, and

1   annotate this document even further, and resubmit it in its

2   newest and best from?

3        MR. GIANNOPOULOS:  Okay.

4        THE WITNESS:  All right.  On those, can I say something?

5        JUDGE LAWS:  Sure.

6        THE WITNESS:  And then on these tracks, I believe that's

7   where Edgar was there.  Again, I don't know exactly the dates,

8   but that's where he was there for a few months or whatever the

9   case was.

10        JUDGE LAWS:  Okay.  Understood.

11        MR. MINER:  Your Honor, what's the number of that exhibit?

12        JUDGE LAWS:  168.

13        MR. MINER:  Thank you.

14        MR. GIANNOPOULOS:  And the government has no further

15   questions based on that.

16        JUDGE LAWS:  You don't want further  description --

17        MR. GIANNOPOULOS:  No.

18        JUDGE LAWS:  -- of this map?

19        MR. GIANNOPOULOS:  No.

20        JUDGE LAWS:  Right.  I assume the Respondent doesn't,

21   either?

22        MR. MINER:  No, Your Honor.  Thank you.

23        JUDGE LAWS:  All right.  Well, thank you very much.

24        THE WITNESS:  Is that it?

25        JUDGE LAWS:  That's it.  Thank you for providing your

1   testimony.  One thing I do need to tell you before you go is,

2   there is a rule in place that means you are not to discuss your

3   testimony with anybody else who you know has testified at this

4   hearing and also anybody who you know that might have

5   information that would lead them to be called as a witness.

6        THE WITNESS:  Not a problem.

7        JUDGE LAWS:  Okay.  Thank you.

8        THE WITNESS:  Thank you.  You enjoy the rest of your day.

9        JUDGE LAWS:  Thank you.  You, too.  It's going to be spent

10  on a plane, so I don't think it'll be very enjoyable, but --

11       THE WITNESS:  Well, at least you'll be going home.

12       JUDGE LAWS:  Exactly.  Off the record.

13  (Off the record at 4:34 p.m.)

14       MS. SHIH:  Grace sent back an e-mail stating that she was

15  working on cleaning up the translation, although she referenced

16  Exhibit 80, pages 31 through 38, which is not correct.

17       JUDGE LAWS:  Okay.

18       MS. SHIH:  It actually should be Exhibit 153, which is the

19  written transcript of the June 28th recording.  Pages 31

20  through 38 are the end portion of that, so it's my

21  understanding that's what she's working on.

22       JUDGE LAWS:  Okay.

23       MS. SHIH:  I do have a matter with regard to Exhibit 81.

24  That was the English version of the employee satisfaction

25  survey that Mr. Silva had completed in Spanish.  We originally

1   had admitted into the record 81 as the English version that we

2   had received, although what we'd like to do now, if

3   Respondent's counsel will agree, is replace 81 with a certified

4   translated version that Grace prepared.

5           MR. MINER:  Okay.

6           MS. SHIH:  And now, that would reflect that 81 is the

7   actual certified translation of Exhibit 80, which was the

8   Spanish version that Mr. Silva completed.

9           JUDGE LAWS:  Okay.  And all you're wanting to do with that

10  exhibit is show what the Spanish version said, not what any

11  potential difference between the Spanish version and the

12  English version might have been?

13          MS. SHIH:  That's correct, because the version that Mr.

14  Silva completed was in Spanish, so we wanted --

15          JUDGE LAWS:  Very good.

16          MS. SHIH:  -- simply an accurate English translation of

17  that survey.

18          MR. MINER:  We have no objection to replacing what was

19  General Counsel 81 with the official translation of the Spanish

20  version of the survey.

21          JUDGE LAWS:  All right.  Then let's do that.

22          MS. SHIH:  And then the only other matter is, the

23  certified English translation of Exhibit 126, which was a

24  performance evaluation of Mr. Silva that was in Spanish, has

25  been prepared.

1    JUDGE LAWS:  Okay.

2    MS. SHIH:  And I've marked it as the continuation of GC

3  126, so that would be kept together.  We'd like to offer that

4  as an addendum to what's already been admitted as GC 126.

5    JUDGE LAWS:  And I would like to see them together, too,

6  so do we need to paginate it?  Because I don't want there to be

7  multiple page ones, page twos, et cetera.  I think we need to

8  have one, uniform, paginated version.  So if we need to --

9    MR. MINER:  Your Honor --

10    JUDGE LAWS:  -- mark that, let's do it.

11    MS. SHIH:  We can do that.

12    MR. MINER:  I wonder if we should have Grace provide some

13  explanation to us when we reconvene, because this is not using

14  the company's form and it's not obvious what exactly is being

15  translated, at least not to me.

16    JUDGE LAWS:  I have to -- do you mind?

17    MS. SHIH:  And if it would help, I have the Spanish of

18  what she translated.  Unfortunately, as she explained to me,

19  the English translation, she was not able to keep the same

20  pagination, which is why the actual Exhibit 126 in Spanish is a

21  two-page document, but the version that she created translated

22  is a three-page document.

23    JUDGE LAWS:  I mean, she's obviously not going to be able

24  to have the company's form unless it's provided to her.  And

25  this certified -- you know, if the company wants to introduce

1  something that resembles more its form, you're free to do so,

2  but I think, as far as authenticity, even though it doesn't

3  look the same, as long as the words are translated, I can sort

4  that out.

5      MR. MINER:  Your Honor, as long as we can have an

6  opportunity to show us how she's translated, and what portions

7  are translated, and what portions of the original are

8  translated, and what portions of the certified translation,

9  then we'll be satisfied.

10     JUDGE LAWS:  Absolutely.

11     MR. MINER:  And I need another copy of that.

12     JUDGE LAWS:  I'll give you this.

13     MR. MINER:  All right.  All right.

14     JUDGE LAWS:  I'm just going to go through -- let's go

15  through and mark it, page one, two, three, page one through

16  six.  There we go.

17     MR. MINER:  Thank you.  Thank you.

18     JUDGE LAWS:  Uh-huh.

19     MS. SHIH:  This Spanish is actually my side.

20     JUDGE LAWS:  Okay.

21     MS. SHIH:  You're welcome to take that.

22     MR. MINER:  All right.

23     JUDGE LAWS:  Did you need a copy of the Spanish or do you

24  have it?

25     MR. MINER:  I have the Spanish.

1    JUDGE LAWS:  Okay.

2    MR. MINER:  Thank you.

3    JUDGE LAWS:  Now, I do need a copy of the English.  I said

4    that wrong.  Then, if there aren't any further exhibit issues,

5    we talked about dates.  Everybody is available to reconvene

6    beginning Monday, February 3rd, running at least through the

7    7th.  And I think, at this point, that's all we're satisfied

8    everybody has blocked off for now.  So we are certainly going

9    to be having at least a call or two in between.  Everybody

10   except Mr. Biddle is free the week of January 6th.  If his

11   matter settles, then I would ask that, if possible, the parties

12   keep that week open as a potential week of hearing.

13   MR. BIDDLE:  Thank you.

14   JUDGE LAWS:  And just let us know.

15   MR. BIDDLE:  I will.

16   JUDGE LAWS:  Anything else?

17   MR. GIANNOPOULOS:  No.  Thank you, Your Honor.  Thank you

18   for your patience for the last 10 days or however many days

19   we've been here.

20   MR. MINER:  Yeah.  Thank you.

21   JUDGE LAWS:  And I will have the San Francisco office set

22   up a call to discuss subpoena issues at some point after I have

23   an opportunity to look at the petition to revoke.  Do you want

24   to file a written response?

25   MR. GIANNOPOULOS:  We will file a written response then,

1   yeah.

2        JUDGE LAWS:  Once that's in, then we'll deal with that in

3   due course.

4        MR. MINER:  Very good.

5        JUDGE LAWS:  All right.  Until next time.

6   **(Whereupon, the hearing in the above-entitled matter was closed**

7   **at 4:46 p.m.)**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   <u>C E R T I F I C A T I O N</u>

2   This is to certify that the attached proceedings before the

3   National Labor Relations Board (NLRB), Region 28, Case Numbers

4   28-CA-093183, 28-CA-103909, 28-CA-104184, 28-CA-106613, 28-CA-

5   111186, 28-RC-093179, Gunderson Rail Services LLC, d/b/a

6   Greenbrier Rail Services, and Sheet Metal Workers'

7   International Association, Local 359, AFL-CIO at the Pima

8   County Consolidated Justice Court, 160 N. Stone Avenue, Third

9   Floor, Courtroom 11, Tucson, Arizona 85701, on Wednesday,

10  November 20, 2013, at 8:36 a.m., was held according to the

11  record, and that this the original, complete, and true and

12  accurate transcript that has been compared to the reporting or

13  recording, accomplished at the hearing, that the exhibit files

14  have been checked for completeness and no exhibits received in

15  evidence or in the rejected exhibit files are missing.

16

17

18

19          GRANT C. DAYLEY

20          Official Reporter

21

22

23

24

25